**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Ciara Foster (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al.*, | Case No. 23-19865 (JKS) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF DAVID TOLLEY,**
**CHIEF EXECUTIVE OFFICER OF WEWORK INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, David Tolley, hereby declare under penalty of perjury:

1.     For decades, entrepreneurs, freelancers, and small business owners without access

to dedicated office space made do with coffee shops and kitchen tables.  Then came WeWork.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases is attached hereto as **Exhibit A-1**, and may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017, and the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

2.      In 2010, co-founders Adam Neumann and Miguel McKelvey opened WeWork's[2] first location in SoHo, far from the traditional corporate neighborhoods of midtown and downtown Manhattan.   As a flexible workspace provider, WeWork offered affordable and community-centered office space to small businesses and individuals who previously struggled to find dedicated workspaces.  The premise was straightforward:  people in need of flexible office space would find it with WeWork.

3.      But WeWork's ambitions went far beyond the office space it provided.  For the founders, WeWork promised to change how people worked by creating inspiring environments where people and companies, spanning countless industries and a wide range of interests, could come together to create community and pursue their professional passions and aspirations.

4.      With that mission in mind, and following great success at its initial locations, WeWork pursued global expansion.  Within four years, WeWork had grown to twenty-three locations across eight cities and opened its first international locations in the United Kingdom and Israel.  In the years that followed, WeWork continued its trajectory of dramatic growth, opening its first locations in Australia, Canada, China, Mexico, and South Korea in 2016.

5.      To facilitate its continued growth and global expansion, in 2017, WeWork raised $4.4 billion from SoftBank at a valuation of approximately $20 billion.  That same year, WeWork opened its first locations in Brazil, France, India, Japan, the Philippines, and Singapore.  Just two years later, WeWork raised an additional $2 billion from SoftBank at a valuation of approximately $47 billion.  By the time it reached its peak valuation at the beginning of 2019, WeWork had

---

[2]      "WeWork" or the "Company" refers to WeWork Inc. together with its debtor and non-debtor affiliates.  "Debtors" refers to WeWork Inc. together with its debtor affiliates.  A list of non-Debtor affiliates of WeWork Inc. is attached hereto as **Exhibit A-2**.  Capitalized terms used but not defined in this section shall have the meaning ascribed to them in later parts of this declaration.

invested billions of dollars to improve its existing leased properties and expand into more than 700 locations across thirty-four countries on six continents.

6.       But WeWork's corporate valuation came into doubt after the Company filed its Initial Registration Statement related to a proposed initial public offering ("IPO") on August 14, 2019.  With heavy attention on WeWork's negative earnings and questions raised about its governance, investors balked at the $47 billion private valuation and, less than two months after it was filed, the Initial Registration Statement was withdrawn.

7.       The unsuccessful IPO had a number of repercussions.  First, Neumann resigned as the chief executive officer and relinquished majority voting control.  Second, the Company was left with a dire need for capital, and SoftBank stepped in, this time providing approximately $5 billion in new financing.  Third, the Company formulated and began to execute on a strategic plan to transform its business.  After almost a decade of building out one of the most expansive private commercial real estate portfolios in the world, including becoming the largest private office tenant in certain cities including New York and London, the Company recognized the need to pivot away from further high-growth initiatives to focus instead on operational efficiency and optimization and establishing a path to profitability.  This meant cutting previously uncontrolled expenses, exiting businesses that were not part of the Company's core offering, and optimizing a real estate portfolio that had come to contain many unprofitable locations due primarily to above-market rents.

8.       Unfortunately, just as the Company's lease rationalization process was progressing, the COVID-19 pandemic struck and wreaked havoc on the commercial real estate landscape, particularly in major cities where WeWork has a large footprint.  As a company focused on providing office spaces intended for people to work together, the widespread work-from-home

mandates necessitated by COVID-19 were extraordinarily disruptive to and inflicted significant damage on WeWork's business and financial condition.  Among other things, WeWork experienced a sharp reduction in new sales volumes at its locations and considerable customer churn largely due to the massive and, in many instances, permanent, shift of companies large and small to working from home.

9.    Despite the COVID-19 headwinds, WeWork adapted as best it could to the challenges by, among other actions, (i) accelerating efforts to digitize its services, including expanding the WeWork Access product to provide further flexible access; (ii) offering discounts and deferrals to customers; and (iii) engaging with landlords to secure rent abatements, deferrals, or outright exits in connection with its ongoing lease rationalization process.  Motivated in part by the initial success of these initiatives, WeWork embarked on its second attempt to become a publicly traded company approximately eighteen months after the COVID-19 pandemic began.  This time, WeWork successfully went public on the New York Stock Exchange through a de-SPAC transaction.

10.    Since the successful de-SPAC transaction, WeWork has continued to grow its business and execute on its strategic plan, benefiting from a cyclical recovery from the depths of the pandemic but also burdened by the need to adapt to permanent changes among companies and employees in work and work-from-home behaviors.  Acknowledging the need to right-size its portfolio and cut lease costs in the face of these issues confronting the entire commercial real estate industry, the Company has successfully amended over 590 leases and implemented a series of measures to enhance operational efficiency, reducing future rent obligations by over $12 billion and selling, general, and administrative expenses by approximately $1.8 billion.

11.    In early 2023, having still not achieved its goal of realizing corporate profitability, the Company negotiated the Notes Exchange Transactions with a majority of its public noteholders and SoftBank.  As a result of this transaction, WeWork (i) secured over $1 billion of total funding and capital commitments; (ii) canceled or equitized approximately $1.5 billion of total debt; and (iii) extended the maturity of approximately $1.9 billion of debt from 2025 to 2027.

12.    Unfortunately, these many steps and the extraordinary efforts of the Company's management and employees could not overcome the legacy real estate costs and industry headwinds WeWork faced.  Recognizing that the situation now required a more holistic solution, the Company engaged professionals from Kirkland & Ellis LLP ("Kirkland"), PJT Partners LP ("PJT"), Hilco Real Estate, LLC ("Hilco"), and Alvarez & Marsal North America LLC ("A&M") to chart a path of value preservation and maximization.  The Company and its advisors, led initially by Hilco, then began a comprehensive review of the Company's real estate lease portfolio and engaged substantially all of the Company's landlords in negotiations to reduce the Company's rent burden and identify leases most likely to continue driving indefinite losses for the Company.  In parallel, Kirkland, PJT, and A&M engaged with SoftBank and the other major holders of the Company's funded debt to negotiate the terms of a comprehensive restructuring transaction.

13.    Following good faith, arm's length negotiations, the Company, SoftBank, the Ad Hoc Group (representing approximately 87 percent of the Company's Series I 1L Notes and 2L Notes), and Cupar entered into a Restructuring Support Agreement ("RSA") that contemplates a path forward for these chapter 11 cases with the support of SoftBank and other holders of approximately 92 percent of the Company's Secured Notes.  The RSA is centered on the full equitization of the Company's 1L Notes, 2L Notes, and the LC Facility and will reduce the Company's funded debt by approximately $3 billion.  The Debtors have also filed motions seeking

authority to reject approximately over sixty unprofitable leases and the approval of procedures designed to streamline the process of additional lease rejections.

14.    After effectuating the restructuring transactions, the Company will emerge from these chapter 11 cases with a vastly improved real estate and lease portfolio, a deleveraged balance sheet, and renewed prospects for long-term, sustainable growth.  As the effects of COVID-19 recede and its impact on how people work continues to evolve, flexible workspace is projected to take up as much as 30 percent of total office supply in the United States in the long term[3] (compared to just 2 percent today).[4]  As WeWork emerges from these chapter 11 cases, it will be particularly well-positioned to capitalize on this revenue growth opportunity with a global portfolio of profitable leases, well-established market connections, and most importantly, a community united by passion and entrepreneurship.  These chapter 11 cases are the next step in that journey.

*      *      *      *      *

15.    On November 6, 2023, each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.  In addition, the Debtors have filed motions and pleadings seeking various types of "first day" relief that will enable the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

16.    To further familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the motions filed along

---

[3]    *See* JONES LANG LASALLE, IP, INC., *The Impact of Covid-19 on Flexible Space* 2 (July 2020), https://www.us.jll.com/content/dam/jll-com/documents/pdf/articles/covid-19-and-flexible-space-report.pdf?utm _medium=email&utm_source=Eloqua&utm_campaign=REEN TRY-SEND-10-EXTERNAL-AMER-National-GEN-07142020-179237&elqTrackId=df0bca d0eae148b7b2b5ec3b76b43e94&elq=cf06214d88084d9ba7ef522 1d8a4e40d&elqaid=93566&elqat=1&elqCampaignId=179237.

[4]    *See* CBRE, *Awakening an Era of Flexibility: Flexible Office Space 2022* (Jan. 28, 2022), https://www.cbre.com/insights/books/awakening-an-era-of-flexibility-flexible-office-space- 2022.

with the petitions (collectively, the "<u>First Day Motions</u>"), I have organized this declaration into six parts:

- **<u>Part I</u>** provides a general overview of the Debtors' corporate history;

- **<u>Part II</u>** describes the Debtors' business services and operations;

- **<u>Part III</u>** describes the Debtors' organizational structure and prepetition capital structure;

- **<u>Part IV</u>** describes the circumstances leading to the commencement of these chapter 11 cases, an overview of the Debtors' prepetition restructuring efforts, and a proposed path forward.

- **<u>Part V</u>** sets forth my background and qualifications as the Declarant; and

- **<u>Part VI</u>** sets forth the evidentiary basis for the relief requested in the First Day Motions.

## I.   <u>WeWork's Corporate History.</u>

### A.   <u>Early Years:  Founding to Fast Growth.</u>

17.    For Adam Neumann and Miguel McKelvey, their ambitious vision for WeWork was dramatically innovative:  they sought to create a business that offered inspiring flexible workspaces with a focus on building community while forever changing how people worked. Hoping to turn their ideas into a profitable business, in 2010 Neumann and McKelvey opened the first WeWork location in SoHo, Manhattan.  That location was designed to provide entrepreneurs and small businesses with flexible, affordable, and community-centered office space.

18.    From there, WeWork focused on growth.  Within four years of its founding, WeWork grew to twenty-three locations across eight cities.  But WeWork was not content with domestic expansion alone; the Company expanded globally, opening locations in the United Kingdom and Israel.  As of December 31, 2018, WeWork reached over 400,000 memberships across 425 locations in 100 cities and twenty-seven countries.

19.     To finance this capital-intensive growth, WeWork attracted many sophisticated investors.  Among them, SoftBank Group Corp. ("SoftBank") was—and remains to this day—the most significant.  WeWork's relationship with SoftBank began in 2017.  At that time, WeWork raised $4.4 billion from SoftBank.  WeWork then used that capital for general corporate purposes and to further accelerate its expansion efforts, opening its first locations in China, Japan, Brazil, Singapore, and the Philippines.

20.     In succeeding years, WeWork continued to rely on SoftBank for financing, capital, and general financial support.  Two years after SoftBank provided WeWork with its initial $4.4 billion investment, WeWork raised an additional $2 billion from SoftBank.[5]

**B.     Unsuccessful Initial Public Offering and the Rescue Financing.**

21.     WeWork then prepared to go public.  As one of its first steps, in August 2019, WeWork filed a registration statement (the "Initial Registration Statement") in connection with an IPO transaction.  Unfortunately, investors generally reacted negatively to the Initial Registration Statement and pushed back on the Company's private market valuation.[6]  With an IPO in doubt, Adam Neumann announced his resignation in September 2019.  On September 30, 2019, six days after Neumann announced his resignation, the Company filed a formal request to withdraw the Initial Registration Statement.

---

[5]     David Gelles, *SoftBank Bets Big on WeWork. Again.* N.Y. TIMES (Jan. 7, 2019), https://www.nytimes.com/2019/01/07/business/softbank-wework.html.  Over the years, WeWork also explored other ventures, such as WeGrow, which included a primary school; Rise by We, a fitness center; and WeLive, a residential unit envisioned to provide shared living space; and acquired or invested in a multitude of alternative business such as the Flatiron School, a coding academy; SpaceIQ, a workplace management software platform; Meetup, a web-based platform; Managed by Q a workplace management platform; and Teem, a software-as-a-service workplace management solution.  These ventures and alternative business have all been sold or discontinued.

[6]     Peter Eavis & Michael J. de la Merced, *WeWork I.P.O Is Withdrawn as Investors Grow Wary*, N.Y. TIMES (updated Oct. 21, 2021), https://www.nytimes.com/2019/09/30/business/wework-ipo.html.

22.     The unsuccessful IPO left the Company under significant financial pressure. SoftBank stepped in to provide the Company with much-needed financial support, this time in the form of rescue financing (the "2019 Rescue Package").  Specifically, the 2019 Rescue Package included (i) approximately $5 billion in new financing, comprising $1.1 billion in senior secured notes, $2.2 billion in unsecured notes, and a $1.75 billion letter of credit facility; (ii) a tender offer (the "2019 Tender Offer") to purchase $3 billion of the Company's equity securities from eligible equity holders at a price of $19.19 per share; (iii) the acceleration of SoftBank's April 2020 $1.5 billion payment obligation at $11.60 per share, subject to shareholder approval; and (iv) SoftBank Vision Fund's ("SVF") swapping of all of its interests in regional joint ventures outside of Japan for shares in WeWork at $11.60 per share.  Had it been fully implemented, the 2019 Rescue Package would have brought SoftBank's fully diluted economic ownership of WeWork to approximately 80 percent.

23.     After certain changes to the management team, WeWork initiated a strategic pivot from short-term rapid expansion to a focus on long-term profitability.  This plan included (i) a five-year strategic plan focused on growth-led transformation; (ii) a five-year financial plan to position WeWork to achieve profitability on an adjusted EBITDA basis by 2021 and positive free cash flow by 2022; (iii) robust management of expenses; (iv) a strategic exit from non-core businesses; and (v) optimization of its real estate portfolio.

**C.     Subsequent Litigation and Settlement with SoftBank Following the 2019 Tender Offer.**

24.     As noted above, one of the components of the 2019 Rescue Package included SoftBank's launch of a tender offer to purchase $3 billion of the Company's equity securities from eligible equity holders at a price of $19.19 per share, which was contingent on WeWork satisfying certain conditions by April 1, 2020.  But prior to April 1, 2020, SoftBank informed WeWork that

it believed the conditions necessary to launch the 2019 Tender Offer had not been met. These unmet conditions included WeWork's alleged failure to (i) secure antitrust approvals, (ii) complete the roll-up of certain joint ventures with SoftBank in Asia, and (iii) resolve ongoing government investigations. As a result, on April 1, 2020, SoftBank purported to terminate its 2019 Tender Offer. In addition, SoftBank's purported termination of the tender offer meant that it was no longer obligated to provide WeWork with $1.1 billion in additional secured debt financing.

25.    In response, WeWork sued SoftBank in the Delaware Court of Chancery[7] for breach of contract and breach of fiduciary duty. On February 25, 2021, WeWork, SoftBank, and SVF entered into a settlement agreement, resulting in SoftBank's purchase or promise to purchase half of the shares it initially agreed to purchase in the 2019 Tender Offer and capping the voting power of SoftBank and SVF at 49.9 percent pursuant to a proxy agreement.

### D.    Impact of COVID-19 on the Business.

26.    On February 2, 2020, WeWork announced that Sandeep Mathrani would join the Company as Chief Executive Officer and a member of the board of directors of WeWork (the "Board"), effective February 18, 2020.

27.    On March 11, 2020, shortly after Mathrani's appointment, the World Health Organization declared COVID-19 a pandemic.[8] In the months that followed, COVID-19 prompted governments to impose numerous restrictions, including travel bans, quarantines, stay-at-home orders, social distancing requirements, and mandatory closures of "nonessential" businesses.[9]

---

[7]    The case is *In re WeWork Litigation*, C.A. No. 2020-0258-AGB (Del. Ch. Apr. 7, 2020).

[8]    *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, WORLD HEALTH ORG. (March 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[9]    *See, e.g.*, George J. Borjas, PhD, *Business Closures, Stay-at-Home Restrictions, and COVID-19 Testing Outcomes in New York City*, CTRS. FOR DISEASE CONTROL AND PREVENTION (Sept. 17, 2020),

COVID-19 restrictions on in-person work initiated a remote work trend that has since changed the way businesses operate and their need for physical office space.  COVID-19 greatly impacted WeWork's business model and financial results.

28.    COVID-19 negatively impacted WeWork's primary offering—space-as-a-service—by fueling a shift to remote work, which in turn led to customer attrition, delayed or withheld customer payments, and increased customer requests for payment concessions, deferrals, or cancellations.  Memberships declined from the start of the pandemic until the beginning of 2021.  While they have since rebounded from the deepest COVID-driven lows of 2020, memberships are still below pre-pandemic levels in many countries, including the United States.

29.    To adapt to remote work and macroeconomic developments, WeWork accelerated efforts to digitize its services by launching the WeWork Access products, which offer more flexibility than traditional memberships in terms of price and location.  WeWork Access, however, has not fully made up for the loss of traditional memberships.

**E.    Public Listing.**

30.    On October 20, 2021, WeWork successfully closed a de-SPAC transaction and began trading the following day.  Specifically, BowX Acquisition Corp. ("Legacy BowX"), a Delaware special purpose acquisition company ("SPAC"), consummated a business combination by and among Legacy BowX, BowX Merger Subsidiary Corp., a Delaware corporation ("Merger

---

https://www.cdc.gov/pcd/issues/2020/20_0264.htm#:~:text=Effective%20on%20March%2022%2C%202020,outdoor%20recreational%20activities%20(6).; Phil Willon et al., *L.A. Orders All Nonessential Businesses Closed, Bans Public Gatherings of Any Size*, L.A. TIMES (March 19, 2020), https://www.latimes.com/california/story/2020-03-19/as-coronavirus-spreads-california-puts-national-guard-on-alert-asks-u-s-navy-for-help; Noah Higgins-Dunn, *Prime Minister Boris Johnson Imposes Stay-at-Home Order in England as Coronavirus Cases Surge*, CNBC (Oct. 31, 2020), https://www.cnbc.com/2020/10/31/prime-minister-boris-johnson-imposes-stay-at-home-order-in-england-as-coronavirus-cases-surge.html.

Sub") and a direct, wholly owned subsidiary of Legacy BowX, and New WeWork Inc., a Delaware corporation formerly known as WeWork Inc. ("Legacy WeWork").  First, Merger Sub merged with and into Legacy WeWork, with Legacy WeWork surviving as a wholly owned subsidiary of Legacy BowX (the "First Merger").  Next, Legacy WeWork merged with and into BowX Merger Subsidiary II, LLC, a Delaware limited liability company ("Merger Sub II"), with Merger Sub II surviving as a direct, wholly owned subsidiary of Legacy BowX (the "Second Merger" and together with the First Merger, the "Mergers").

31.     In connection with the Mergers, Legacy BowX changed its name to WeWork Inc. and completed a de-SPAC transaction to become publicly listed on the New York Stock Exchange, issuing up to approximately 61.3 million units and reselling up to approximately 628.3 million units of class A common stock with a proposed maximum offering price per share of $9.72.  At that time, WeWork had an equity valuation of approximately $9.5 billion.[10]

## II.     WeWork's Business Services and Operations.

32.     WeWork's customer base includes over 600,000 individuals and companies across six continents, from Fortune 500 companies to small startups.  Customers can choose from a suite of WeWork services depending on their unique commercial needs.

### A.     WeWork's Services and Products.

33.     *WeWork Private Workspace*.  The vast majority of WeWork's revenue still comes from its core, traditional "space-as-a-service" products, which offer members access to flexible workspace and related business amenities and services ("WeWork Private Workspace").  Flexibility is provided by offering Member Companies access to dedicated workspaces on a

---

[10]     Peter Eavis, *WeWork Stock Starts Trading, Two Years After an Aborted I.P.O.*, N.Y. TIMES (Oct. 21, 2021), https://www.nytimes.com/2021/10/21/business/wework-trading-debut.html.

month-to-month or fixed-term basis.  Whether looking for a dedicated desk, a private office, or a fully customized floor, Member Companies can tailor their WeWork workspace to fit their evolving business needs.  Member Companies have the option to choose the type of membership that best fits their needs, with a range of flexible offerings that provide access on an hourly, daily, or monthly-subscription basis or through a multi-year membership agreement.

34.     Memberships include much more than access to physical space.  Member Companies can access a suite of amenities and services, such as dedicated community staff, private phone booths, internet access, high-speed business printers and copiers, mail and package handling, front desk services, coffee and other beverages, off-peak building access, unique common areas, WeWork-sponsored events and networking, and daily enhanced cleaning.  Then there is the host of business and technical service solutions, including remote workforce solutions, connections to human resources benefits and professional services benefits, dedicated bandwidth, and IT equipment co-location.  WeWork offers these ancillary services and amenities to retain a diverse network of Member Companies by catering to their unique demands all while delivering additional revenue and margin to the Company.



35.   ***WeWork Access***.  WeWork has taken steps to make its real estate portfolio digitally accessible to a global customer base in the post-pandemic world.  In 2020, WeWork launched WeWork All Access and WeWork On Demand (together, "WeWork Access," and customers of WeWork Private Workspace and WeWork Access, the "Member Companies").

36.   WeWork All Access is a monthly subscription-based model that provides Member Companies with access to more than 500 participating WeWork locations.  Through WeWork All Access, Member Companies looking for flexible workspace solutions in major urban centers can book workspaces, conference rooms, and private offices from the convenience of their phones, giving users maximum flexibility to choose when, where, and how they work.

37.   WeWork On Demand is a pay-as-you-go membership, allowing Member Companies to book individual workspace by the hour or conference rooms by the day on the WeWork mobile app.  Since the successful pilot program launch in New York City in 2020, the WeWork On Demand offering has expanded across the United States, Canada, and select markets in the European and Pacific regions.

**B.   WeWork Workplace.**

38.   In addition to WeWork's core "space-as-a-service" offerings, WeWork also offers WeWork Workplace, a proprietary office management software and data analytics platform jointly developed with Yardi Systems, a leader in leasing, financial, and asset management software, that allows subscribers to manage and optimize their workspaces, whether at a WeWork location or in a customer's own offices, in exchange for a monthly licensing fee.

39.   As businesses return to the office post-pandemic, many are looking for hybrid options that provide the flexibility to streamline their real estate footprints while also maintaining employee productivity and collaboration.  To capture the growing demand of businesses to most

efficiently utilize their real estate footprints, WeWork leveraged its lease portfolio, technology platform, and more than ten years of experience in building and managing a global network of flexible workspaces to develop WeWork Workplace, which enables landlords and operators to most efficiently utilize their flexible spaces.

40.     Since its official launch in July 2022, WeWork Workplace has attracted over 220 companies, with over 42,000 licenses sold as of December 2022.

**C.     WeWork's Broad Global Presence.**

41.     With a global presence on six continents and in thirty-seven countries, WeWork is one of the largest flexible space providers in the world, operating approximately 43.9 million rentable square feet globally, including 18.3 million rentable square feet in the United States and Canada as of December 2022.



15

42.    WeWork's international growth strategy has involved a combination of leasing and managing wholly-owned locations and also entering into joint ventures or franchise agreements. In particular, WeWork has focused on building a framework to further support joint venture, franchise, and/or licensing arrangements under which WeWork may transfer a controlling equity interest in its operations in certain markets to a local partner.  In exchange, WeWork (i) earns a percentage of revenue from, and in some cases retains minority ownership in, such operations, and/or (ii) licenses the use of the WeWork brand, technology, and services for a fee.  Today, such arrangements support WeWork-branded operations in Japan, China, Israel, Brazil, Mexico, Columbia, Chile, Argentina, Costa Rica, India, and South Africa.

III.    **WeWork's Organizational Structure and Prepetition Capital Structure.**

A.    **WeWork's Organizational Structure.**

43.    An overview of the current organizational structure of the Debtors is reflected below.  Other than the two Netherlands entities, WW Worldwide C.V. and WeWork Companies (International) B.V., the United Kingdom entity The We Company Worldwide Limited, and the Canadian entity 9670416 CANADA Inc., international entities are neither guarantors nor equity pledgors with respect to the LC Facilities, the Secured Notes, or the Unsecured Notes (each as defined below).[11]

---

[11]    WeWork Capital Advisors LLC ("WeCap Manager"), a majority-owned subsidiary of the Company and its controlled affiliates, is a global alternative asset management firm that invests in real estate and other private equity assets.  In connection with its space-as-a-service offering, the Company, WeCap Manager, and WeCap Manager's other 20 percent owner formed the WeCap Investment Group to acquire, develop, and manage properties that could benefit from the Company's occupancy or involvement.  WeCap Manager and its immediate parent, ARK Investment Group Holdings LLC are not debtors in these chapter 11 cases and will continue to operate in the ordinary course.



### B.       WeWork's Prepetition Capital Structure.

44.       As of the date hereof (the "Petition Date"), the Debtors have approximately $4.2 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below.

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Make-Whole, and Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **Senior LC Facility** | May 14, 2025 | $988.3 million[12] | $88.9 million | $1,077.2 million |
| **Junior LC Facility** | Mar. 7, 2025 | $470.0 million | $82.0 million | $552.0 million |
| **1L Notes (Series I)** | Aug. 15, 2027 | $525.0 million | $89.2 million | $614.2 million |
| **1L Notes (Series II)** | Aug. 15, 2027 | $306.3 million | $39.0 million | $345.2 million |
| **1L Notes (Series III)** | Aug. 15, 2027 | $181.3 million | $22.9 million | $204.1 million |
| **2L Notes** | Aug. 15, 2027 | $687.2 million | $45.8 million | $733.0 million |
| **2L Exchangeable Notes** | Aug. 15, 2027 | $187.5 million | $12.5 million | $200.0 million |
| **3L Notes** | Aug. 15, 2027 | $22.7 million | $1.6 million | $24.3 million |
| **3L Exchangeable Notes** | Aug. 15, 2027 | $269.6 million | $19.5 million | $289.1 million |
| *Total Secured Debt* | | *$3,637.8 million* | *$401.5 million* | *$4039.3 million[13]* |
| **7.875% Senior Notes** | May 1, 2025 | $163.5 million | $6.6 million | $170.1 million |
| **5.000% Senior Notes** | Jul. 10, 2025 | $9.3 million | $0.1 million | $9.5 million |
| *Total Funded Debt Obligations:* | | *$3,810.7 million* | *$408.2 million* | *$4,218.9 million* |

---

[12]   Amount is based on drawn amount funded by and undrawn amount cash collateralized by SoftBank pursuant to the Satisfaction Letter (as defined below).

[13]   Includes approximately $31.5 million in fees incurred in connection with certain prepetition transactions with respect to the LC Facility.

## 1. LC Facility.

45.    As of the Petition Date, Goldman Sachs International Bank ("Goldman"), OneIM Fund I LP ("OneIM"), and certain other financial institutions (collectively, the "Issuing Banks") have issued several letters of credit in two tranches on behalf of the Debtors pursuant to that certain Credit Agreement, dated as of December 27, 2019 (as amended, supplemented, or otherwise modified from time to time, the "LC Facility Credit Agreement," and the facility issued thereunder, the "LC Facility"), by and among the Issuing Banks, WeWork Companies U.S. LLC (the "WeWork LC Facility Obligor"), SoftBank Vision Fund II-2 L.P. (the "SVF Obligor," and jointly and severally liable on the LC Facility with the WeWork LC Facility Obligor, the "Obligors"), Goldman as the administrative and collateral agent for the senior tranche, Kroll Agency Services Limited ("Kroll") as the administrative agent for the junior tranche, and the other parties from time to time thereto.  The SVF Obligor is subrogated to the Issuing Banks' and other secured parties' rights against the WeWork LC Facility Obligor to the extent the SVF Obligor pays, reimburses, or cash collateralizes obligations under the LC Facility, and such payments, reimbursements, and cash collateral are not reimbursed by the WeWork LC Facility Obligor pursuant to that certain Amended and Restated Reimbursement Agreement, dated as of December 20, 2022 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Reimbursement Agreement") by and among the Obligors.

46.    The obligations under the LC Facility and certain cash management and swap/derivative obligations provided by parties to the LC Facility (or their affiliates) are secured by the assets and equity interests of certain Debtor entities.  The SVF Obligor has also secured such obligations by collaterally assigning its right to call up to approximately $2.5 billion in capital from SoftBank.

47.     As of the Petition Date, and in connection with the Satisfaction Letter executed by the WeWork LC Facility Obligor, the SVF Obligor, Goldman, Kroll, and certain of the Issuing Banks including Goldman and OneIM, the SVF Obligor reimbursed approximately $179.5 million for the senior tranche of the LC Facility and approximately $542.6 million for the junior tranche of the LC Facility, posted approximately $808.8 million of cash collateral for the undrawn senior tranche of the LC Facility, and paid approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement.  As of the Petition Date and pursuant to the Prepetition Reimbursement Agreement, the WeWork LC Facility Obligor's total indebtedness to the SVF Obligor in its capacity as subrogee under the LC Facility with respect to such reimbursement, cash collateral, and other payments is not less than approximately $1.6 billion.

**2.  1L Notes.**

48.     Pursuant to that certain First Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "1L Notes Indenture"), by and among WeWork Companies U.S. LLC and WW Co-Obligor Inc. as the co-issuers (the "Notes Issuers"), the guarantors party thereto (the "Notes Guarantors"), and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Company issued $1,012,500,000 in aggregate principal amount of 1L Notes.  The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Note Issuers with respect to the 1L Notes.

49.     Pursuant to the 1L Notes Indenture, the 1L Notes were originally issued with a face value of $1,012,500,000, comprising:  (i) $525,000,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series I (the "Series I 1L Notes"), (ii) $306,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series II (the "Series II 1L Notes"), and (iii) $181,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series III (the "Series III 1L Notes," and, together with

the Series II 1L Notes, the "1L Delayed Draw Notes" and, collectively with the Series I 1L Notes

and the Series II 1L Notes, the "1L Notes").

50.     In connection with the Notes Exchange Transactions, the Series I 1L Notes were

issued and sold to the New Money Participants as a requirement to be able to exchange their

Unsecured Notes into 2L Notes.  The Series I 1L Notes were backstopped by an ad hoc group of

noteholders (the "Ad Hoc Group") that represented approximately 62 percent of the Unsecured

Notes outstanding at the time.  The Series II 1L Notes were issued to SVF II, initially in the form

of an undrawn delayed draw commitment, following the redemption of the $300 million in

aggregate principal amount of Secured Notes due 2025 held by an affiliate of SoftBank

(the "SoftBank Secured Notes") that were outstanding at the time in connection with the Notes

Exchange Transactions.  The Company drew on the $300 million delayed draw commitment of

Series II 1L Notes on July 17, 2023, and August 25, 2023, and issued an additional $6.25 million

of Series II 1L Notes as a commitment fee on account of the delayed draw commitment.  The

Series III 1L Notes were issued to Cupar Grimmond, LLC ("Cupar"), in connection with its

$175 million delayed draw commitment.  The Company similarly exercised its delay-draw option

and drew on the commitment on July 17, 2023, and August 25, 2023 and issued $6.25 million of

Series III 1L Notes as a commitment fee on account of the delayed draw commitment.  As of the

Petition Date, the Debtors are liable for approximately $1,012,500,000 in outstanding aggregate

principal amount of the 1L Notes, plus approximately $151.1 million on account of accrued and

unpaid interest plus all other fees and expenses (including make-whole premiums) on account of

the 1L Notes.

### 3.  2L Notes.

51.     Pursuant to that certain Second Lien Senior Secured PIK Notes Indenture, dated as

of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L

Notes Indenture"), by and among the Note Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Company issued $687,212,250 in aggregate principal amount of 11.00% Second Lien Senior Secured PIK Notes due 2027 (the "2L Notes") to the New Money Participants in connection with the Notes Exchange Transactions.  The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Note Issuers with respect to the 2L Notes.

52.     In connection with the Notes Exchange Transactions, New Money Participants were entitled to receive in exchange for $1,000 in principal amount of Unsecured Notes being exchanged (i) $750 in principal amount of new 2L Notes, and (ii) a number of WeWork's Common Shares equal to $150, calculated at $0.9236 per share (the "Equity Exchange Price").[14]  As of the Petition Date, the Debtors are liable for approximately $687,212,250 in outstanding aggregate principal amount of the 2L Notes, plus approximately $45.8 million on account of accrued and unpaid interest plus all other fees and expenses (including make-whole premiums) on account of the 2L Notes.

### 4.  2L Exchangeable Notes.

53.     Pursuant to that certain Second Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L Exchangeable Notes Indenture"), by and among the Note Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Company issued $187,500,000 in aggregate principal amount of 11.00% Second Lien Senior

---

[14]    The Equity Exchange Price was determined, prior to the Reverse Stock Split, based on the twenty-day volume weighted average price of WeWork's Common Shares during the period starting ten trading days prior to the commencement of the Exchange Offers and ending ten trading days after the commencement of the Exchange Offers.

Secured PIK Exchangeable Notes due 2027 (the "2L Exchangeable Notes") to an affiliate of SoftBank in connection with the Notes Exchange Transactions. The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Note Issuers with respect to the 2L Exchangeable Notes.

54.     Pursuant to the 2L Exchangeable Notes Indenture, the 2L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily by the holder at any time or (ii) mandatorily by the Company after November 5, 2024, if certain conditions are met.

55.     In connection with the Notes Exchange Transactions, an affiliate of SoftBank was entitled to exchange $250,000,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $187,500,000 in aggregate principal amount of 2L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price. As of the Petition Date, the Debtors are liable for approximately $187,500,000 in outstanding aggregate principal amount, plus approximately $12.5 million on account of accrued and unpaid interest plus all other fees and expenses (including make-whole premiums) on account of the 2L Exchangeable Notes.

### 5.  3L Notes.

56.     Pursuant to that certain Third Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Notes Indenture"), by and among the Note Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Company issued $22,653,750 in aggregate principal amount of 12.00% Third Lien Senior Secured PIK Notes due 2027 (the "3L Notes") in connection with the Notes Exchange Transactions. The Notes Guarantors

unconditionally and irrevocably guaranteed the obligations of the Note Issuers with respect to the 3L Notes.

57.     In connection with the Notes Exchange Transactions, Non-New Money Participants were entitled to receive in exchange for every $1,000 in principal amount of Unsecured Notes being exchanged, (i) (a) $750 in principal amount of 3L Notes, and (b) a number of WeWork's Common Shares equal to $150, calculated at the Equity Exchange Price, or (ii) a number of WeWork's Common Shares equal to $900, calculated at the Equity Exchange Price. As of the Petition Date, the Debtors are liable for approximately $22,653,750 in outstanding aggregate principal amount, plus approximately $1.6 million on account of accrued and unpaid interest plus all other fees and expenses (including make-whole premium) on account of the 3L Notes.

### 6.  3L Exchangeable Notes.

58.     Pursuant to that certain Third Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Exchangeable Notes Indenture"), by and among the Note Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Company issued $269,625,000 in aggregate principal amount of 12.00% Third Lien Senior Secured PIK Exchangeable Notes due 2027 (the "3L Exchangeable Notes," and together with the 1L Notes, the 2L Notes, the 2L Exchangeable Notes, and the 3L Notes, the "Secured Notes") to an affiliate of SoftBank in connection with the Notes Exchange Transactions.

59.     The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Note Issuers with respect to the 3L Exchangeable Notes.  Pursuant to the 3L Exchangeable Notes Indenture, the 3L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily

by the holder at any time or (ii) mandatorily by the Company after November 5, 2024 if certain conditions are met.

60.     In connection with the Notes Exchange Transactions, an affiliate of SoftBank was entitled to exchange $359,500,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $269,625,000 in aggregate principal amount of 3L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price.  As of the Petition Date, the Debtors are liable for approximately $269,625,000 in outstanding aggregate principal amount, plus approximately $19.5 million on account of accrued and unpaid interest plus all other fees and expenses (including make-whole premiums) on account of the 3L Exchangeable Notes.

### 7.  Unsecured Notes.

61.     Holders of the 7.875% Senior Notes due 2025 (the "7.875% Senior Notes") and the 5.000% Senior Notes due 2025, Series II (the "5.000% Senior Notes" and together with the 7.875% Senior Notes, the "Unsecured Notes") who did not participate in the Notes Exchange Transactions continue to hold Unsecured Notes.  As of the Petition Date, the Debtors are liable for approximately $164 million in outstanding aggregate principal amount, plus approximately $6.6 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 7.875% Senior Notes, and approximately $9.3 million in outstanding aggregate principal amount, plus approximately $123,000 on account of accrued and unpaid interest, plus all other fees and expenses on account of the 5.000% Senior Notes.

### 8.  Equity.

62.     WeWork Inc.'s certificate of incorporation authorizes the Board to issue 4,874,958,334 shares of Class A common stock, par value $0.0001 per share (the "Common Shares"), 25,041,666 shares of Class C common stock, par value $0.0001 per share, and

100 million shares of preferred stock ("Preferred Shares").  Approximately 52.83 million Common

Shares and approximately 497,000 shares of Class C common stock are outstanding as of the

Petition Date.[15]  The Common Shares trade on the New York Stock Exchange under the ticker

symbol "WE."  To date, WeWork has not issued any Preferred Shares.

IV.    **Events Leading to these Chapter 11 Cases and Next steps.**

    A.    **Economic and Operational Headwinds.**

    63.    As the world emerged from the pandemic, WeWork was on a reasonable track

toward profitability.  In 2022, total revenue increased by $675 million, or 26 percent relative to

2021, primarily driven by an increase in total membership and service revenue, which in turn was

primarily driven by a 17 percent increase in memberships to approximately 547,000 as of

December 2022.  Moreover, lease costs contractually paid or payable decreased by $60 million, or

2 percent, pre-opening location expenses decreased by $38 million, or 24 percent, location

operating expenses decreased by $171 million, or 6 percent, and selling, general, and

administrative expenses decreased by $276 million, or 27 percent.

    64.    Ultimately, WeWork's progress toward profitability was interrupted by a series of

compounding factors.

    **1.    Changing Commercial Real Estate Landscape.**

    65.    Since late 2021, to curb inflation, central banks around the world have continuously

raised interest rates.  Policymakers in advanced economies have raised rates by about 400 basis

---

[15]    This outstanding number of shares reflects a 1-for-40 reverse stock split (the "Reverse Stock Split") of WeWork's
outstanding shares of Class A common stock and Class C common stock, effective on September 1, 2023, that
was approved by the Board and within the ratio range authorized by WeWork's shareholders at the June 2023
annual meeting.  No other references to the number of shares in this declaration reflect the Reverse Stock Split.

points on average.[16]  In the U.S., the Federal Reserve raised its benchmark short-term rate **11 times** since March 2022, reaching 5.5 percent in July 2023, its highest level since 2001.[17]

66.     The historically rapid rise in interest rates, in combination with slower than expected post-COVID return to office (further discussed below), has pressured liquidity and driven increasing economic distress in the commercial real estate sector.  As a direct result of this distress, landlords are more willing than in the past to reduce rent and offer flexible leasing terms.[18] Moreover, many office tenants are adjusting to the global shift to hybrid work by consolidating their footprints and attempting to sublease their excess space, often at a rent significantly discounted to their original cost.[19]  As a result, commercial office space, especially in the large cities where WeWork operates, has become available and accessible at unprecedented prices and in significant volume.[20]  This amounts to much greater competition in WeWork's target market.

---

[16]   *See* Tobias Adrian, *Higher-for-Longer Interest Rate Environment is Squeezing More Borrowers*, INT'L MONETARY FUND (Oct. 10, 2023), https://www.imf.org/en/Blogs/Articles/2023/10/10/higher-for-longer-interest-rate-environment-is-squeezing-more-borrowers#:~:text=Policymakers%20have%20raised%20rates%20by,points%20in%20emerging%20market%20economies.

[17]   *See* Christopher Rugaber, *Federal Reserve Raises Rates for 11th Time to Fight Inflation but Gives No Clear Sign of Next Move*, A.P. NEWS (July 26, 2023), https://apnews.com/article/federal-reserve-inflation-interest-rates-economy-jobs-47a78ceb285ac50217ef39e2441112ee; Ben Eisen & Gina Heeb, *Mortgage Rates Hit 7.23%, Highest Since 2001*, W.S.J. (Aug. 24, 2023), https://www.wsj.com/economy/housing/mortgage-rates-hit-7-23-percent-72688ccd.

[18]   *See* Ashley Fahey, *Office Lease Negotiations are Changing as Landlords Pull Out the Stops to Retain Tenants*, BUS. J. (Jun. 28, 2023), https://www.bizjournals.com/washington/news/2023/06/28/office-lease-negotiations-change.html.

[19]   *See* Konrad Putzier, *Office Building Owners Drown in Tide of Sublease Space*, W.S.J. (May 9, 2022), https://www.wsj.com/articles/office-building-owners-drown-in-tide-of-sublease-space-11652097600.

[20]   *See* Carol Ryan, *Manhattan's Top Office Landlord Looks at Plan B*, W.S.J. (April 20, 2023), https://www.wsj.com/articles/manhattans-top-office-landlord-looks-at-plan-b-20aa3198.



67.    WeWork lacks the necessary financial flexibility to adjust to the rapidly shifting commercial real estate market.  Many of the Company's leases were entered into in a much stronger real estate market and are characterized by above-market rents and fixed annual rent escalation without rent resets or lessee-friendly termination rights.  Saddled with many of these unsustainable leases, WeWork's existing business model has become increasingly difficult to maintain and must be repriced to align with the current real estate market.

### 2.    Slower-than-Expected Return to Office.

68.    While the supply of office space has surged, demand has receded as businesses continue to follow hybrid work policies first adopted in the pandemic.  Many businesses and individuals have emerged from the pandemic eschewing the traditional office environment in favor of remote or hybrid work arrangements.[21]  As late as February 2023, office occupancy rates in the

---

[21]    *See* Bryan Robinson, Ph.D., *Remote Work Is Here to Stay and Will Increase Into 2023*, FORBES (Feb. 1, 2022), https://www.forbes.com/sites/bryanrobinson/2022/02/01/remote-work-is-here-to-stay-and-will-increase-into-2023-experts-say/?sh=1f2f45ed20a6.

United States remained at 40 to 60 percent of their pre-pandemic levels. [22]   The slower-than-expected return to office among customers has led to a corresponding reduction in sales, revenue, and membership demand for WeWork.[23]

69.     WeWork's membership numbers have not grown at a rate sufficient to support its capital structure.  WeWork saw its membership decline from approximately 650,000 in the first quarter of 2020 to approximately 470,000 in the first quarter of 2021 before rebounding to the post-pandemic peak of approximately 682,000 in the fourth quarter of 2022.  Since that time and due to the factors described above, memberships have declined modestly to approximately 635,000 in the third quarter of 2023.  Further, in an attempt to retain memberships, the Company has often offered additional discounts and deferrals, negatively impacting the Company's top and bottom line.

70.     In light of these operational and economic challenges, in early 2023, the Company began consulting with Kirkland and PJT to evaluate potential refinancing and restructuring options.

**B.     March 2023 Notes Exchange Transaction.**

71.     In March 2023, WeWork, with the assistance of Kirkland and PJT, negotiated a recapitalization transaction (the "Notes Exchange Transactions") with the Ad Hoc Group, SoftBank, and Cupar.  As a result of the Notes Exchange Transactions, WeWork secured over $1 billion of total funding and capital commitments, cancelled or equitized approximately $1.5 billion

---

[22]   *See* Konrad Putzier, *As Americans Work From Home, Europeans and Asians Head Back to the Office*, W.S.J. (Feb. 28, 2023), https://www.wsj.com/articles/as-americans-work-from-home-europeans-and-asians-head-back-to-the-office-db6981e1?mod=e2li.

[23]   *See* Mark Sweney & Julia Kollewe, *WeWork's Losses Quadruple to $2.1Bn as Work From Home Policies Halve Revenue*, THE GUARDIAN (May 21, 2021), https://www.theguardian.com/business/2021/may/21/weworks-losses-quadruple-to-21bn-in-first-quarter-of-2021.

of total debts through the equitization and discounted exchanges of over $1 billion of unsecured notes held by SoftBank and the participating public noteholders (including the Ad Hoc Group), and extended the maturity of approximately $1.9 billion of *pro forma* debts from 2025 to 2027.

72.     Specifically, WeWork (i) offered to all holders of the Unsecured Notes the opportunity to purchase $500 million in aggregate principal amount of Series I 1L Notes (the "Exchange Offers"), which was backstopped by the Ad Hoc Group; (ii) rolled $300 million in aggregate principal amount of the SoftBank Secured Notes into a delayed draw commitment for Series II 1L Notes; and (iii) obtained a commitment to purchase $175 million of Series III 1L Notes from Cupar, who also agreed to purchase 35 million Common Shares at $1.15 per Common Share.

73.     If a holder of Unsecured Notes participated in the Notes Exchange Transactions to exchange all of its Unsecured Notes and fully purchased its *pro rata* share of $500 million of 1L Notes (such holder, a "New Money Participant"), it was entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 2L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price.  If a holder of Unsecured Notes participated in the Notes Exchange Transactions but did not purchase its *pro rata* share of Series I 1L Notes (such holder, a "Non-New Money Participant"), it was only entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 3L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price.

74.     Of the approximately $1.65 billion in aggregate principal amount of 5.000% Senior Notes due 2025, Series I (the "SoftBank Unsecured Notes") held by an affiliate of SoftBank, (i) for $250 million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was

exchanged at face value into $750 of 2L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; (ii) for approximately $360 million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $750 of 3L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; and (iii) for the remaining approximately $1.04 billion in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $900 of Common Shares at the Equity Exchange Price.

### C.    Enhanced Corporate Governance.

75.    On August 8, 2023, four experienced and disinterested directors—Paul Aronzon, Paul Keglevic, Elizabeth LaPuma, and Henry Miller (collectively, the "Independent Directors")—were appointed as independent directors to the Board.  On August 17, 2023, in connection with its contingency planning efforts and in consultation with its advisors, the Board reviewed the Company's existing corporate governance infrastructure and determined that it was advisable and in the best interests of the Company and its stakeholders to establish a special committee of the Board comprising the Independent Directors (the "Special Committee").

76.    The Board delegated to the Special Committee certain rights, authority, and powers in connection with any matters in which a conflict of interests exists or is reasonably likely to exist between the Company, on the one hand, and any of its related parties, including current and former directors, managers, officers, equity holders, employees, and advisors, on the other hand.  On October 3, 2023, the Special Committee retained Munger, Tolles & Olson LLP as independent counsel and Province, Inc. as independent financial advisor.

### D.    Prepetition Negotiations and the Restructuring Support Agreement

77.    In August 2023, the Company engaged Hilco to assist with an accelerated and comprehensive lease rationalization on a global scale.  Beginning in September of 2023, the

Company and Hilco began engaging with hundreds of landlords to secure amendments or exits to substantially all of the Company's real estate leases. Ultimately, however, the deliberate pace of that process together with the Company's finite liquidity did not provide the Company with sufficient runway to complete an out-of-court rationalization of its lease portfolio, and the Company began to take steps to extend its liquidity while it negotiated a comprehensive restructuring transaction with parties in interest.

78.    At the beginning of October 2023, the Company withheld (i) approximately $95.2 million of interest payments on its 1L Notes, 2L Notes, 2L Exchangeable Notes, 3L Notes, and 3L Exchangeable Notes, approximately $37.3 million of which was payable in cash and the remaining $57.9 million were payable in kind; and (ii) approximately $78 million of rent payments at certain locations across its lease portfolio, including approximately $37 million in the United States and approximately $41 million in international locations ((i) and (ii) collectively, the "Payment Withholding"). Under the Notes Indentures, the Company had a thirty-day grace period to make the missed interest payments before the non-payment crystalized into an event of default. Contemporaneously with its decision regarding the Payment Withholding, the Company began negotiations with key stakeholders across its capital structure, including SoftBank, the Ad Hoc Group, and Cupar.

79.    In the following weeks, the Company, with the assistance of their advisors, worked tirelessly to engage with their key stakeholders to chart a value-maximizing path forward in these chapter 11 cases. On October 30, 2023, the Company, SoftBank, the Ad Hoc Group, and Cupar entered into an agreement (the "Forbearance Agreement") pursuant to which SoftBank, the Ad Hoc Group, and Cupar agreed to forbear from exercising remedies following the Payment Withholding until November 6, 2023. That same day, WeWork, SoftBank, Goldman, Kroll, and

certain other Issuing Banks under the LC Facility executed that certain Satisfaction Letter and Forbearance Agreement (the "Satisfaction Letter") pursuant to which (i) SoftBank agreed to repay approximately $179.5 million for the senior tranche of the LC Facility and approximately $542.6 million for the junior tranche of the LC Facility and posted $808.8 million of cash collateral for the undrawn amounts under the LC Facility; and (ii) Goldman, Kroll, and certain other Issuing Banks, constituting the requisite majority of Issuing Banks of the LC Facility, agreed to forbear the exercise of any rights or remedies against the Company with respect to the Company's cross default on the LC Facility while SoftBank's payment and cash collateralization was pending.  On October 31, 2023, SoftBank paid the entire $1,466,955,937.39 in accordance with the Satisfaction Letter and became subrogated to the Issuing Banks' and other secured parties' rights under the LC Facility Credit Agreement.  Seven days later, the Debtors, SoftBank, the Ad Hoc Group, and Cupar reached an agreement on the terms of a comprehensive restructuring transaction, embodied in the RSA attached hereto as **Exhibit B** (the transactions contemplated in the RSA, the "Restructuring Transactions").

80.    Pursuant to the RSA, the Restructuring Transactions contemplates:[24]

i.    the equitization of the Drawn DIP TLC Claims (other than up to $100 million of such Claims which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests;

ii.    the cancellation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth herein (other than any equity Interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by the Parties, a SoftBank Party contributes its Claims in exchange for the retention of its equity interests;

---

[24]    Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the RSA.

iii. issuance of a New 1L Exit Term Loan Facility for the lesser of (a) the total amount of all Drawn DIP TLC Claims and (b) $100 million, plus, in each case, the DIP TLC Fee Claims;

iv. a DIP TLC Facility that, among other things:  (a) deems all outstanding, undrawn, letters of credit under the Prepetition LC Facility (other than undrawn letters of credit issued in connection with certain leases/locations

v. to be identified and agreed upon by the Company Parties and the Consenting

vi. Stakeholders no later than the Petition Date) whether rolled, replaced, renewed, reissued, or amended (the "DIP LCs") to be obligations under the DIP TLC Facility and all associated cash collateral posted for each letter of credit to continue as credit support under the DIP TLC Facility, in each case on a dollar-for-dollar basis; and (b) provides for the roll, replacement, renewal, reissuance, and/or amendment of the DIP LCs, which facility shall rank *pari passu* in lien and claim priority with the Prepetition LC Facility Claims and 1L Notes Claims (other than with respect to (1) amounts funded by the SoftBank Parties or their Affiliates to the Company Parties in the form of "Term Loan C" and (2) certain fees thereunder); and

vii. a binding commitment by certain SoftBank Parties to, subject to the following sentence, provide credit support in the form of providing cash to be used as collateral for a New LC Facility.

81.    The RSA further establishes certain case milestones to ensure that these chapter 11 cases proceed at an appropriate and efficient pace, thereby avoiding an unnecessarily prolonged stay in chapter 11.  The key RSA milestones are as follows:

| Date | Proposed RSA Milestone |
|---|---|
| November 6, 2023 | Commencement of chapter 11 cases |
| November 9, 2023 | Entry of the interim cash collateral order |
| December 11, 2023 | Entry of the final cash collateral order and the Final DIP TLC Order |
| February 4, 2024 | Filing of a chapter 11 plan, the disclosure statement, and the disclosure statement motion |
| February 24, 2024 | Entry of the order approving the adequacy of the disclosure statement |
| March 5, 2024 | Entry of the order confirming the chapter 11 plan, and the occurrence of the effective date of the chapter 11 plan. |

**E.     Lease Portfolio Rationalization.**

82.     To optimize their operations, the Debtors intend to utilize the tools provided to them under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") to continue to right-size their lease portfolio by identifying currently unattractive locations for potential lease renegotiation, rejection, and closure in both the United States and Canada.  As rent payments are the single most significant cash outflow of the Debtors, right-sizing the lease portfolio is essential to the Debtors' profitability and long-term business plan.  The Company's lease rationalization process has accelerated in the months prior to these chapter 11 cases in connection with the Company's broader restructuring efforts.

83.     Contemporaneously herewith, the Debtors filed the *Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date; and (II) Granting Related Relief* (the "Rejection Motion") [Docket No. 14] and the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* (the "Assumption/Rejection Procedures Motion") [Docket No. 12].  The Rejection Motion seeks relief to, among other things, reject over sixty leases for locations that the Debtors have determined to

be unnecessary and burdensome to their estates. Rejection of these leases will reduce high fixed operational costs at vacated or underperforming locations and better position the Debtors to conduct competitive operations at profit-driving locations going forward. The Assumption/Rejection Procedures Motion seeks relief to, among other things, establish streamlined procedures for assuming and rejecting executory contracts and unexpired leases to reduce the costs and administrative burden of having to file a motion for each and every assumption or rejection. Over the course of these chapter 11 cases, the Debtors anticipate the leases rejected pursuant to the Assumption and Rejection Procedures Motion, once approved, will result in significant annual margin improvement. The Company has taken—and will continue to take—great care to minimize the impact of out-of-court exits and in-court rejection of leases on Member Companies.

84.     In parallel, the Debtors, with the assistance of their advisors, remain in active negotiations with their landlords with respect to the potential restructuring of existing lease terms. As of the Petition Date, Hilco is in active negotiations with over 400 landlords to consummate lease amendment agreements. Although ongoing, the Debtors are hopeful that these negotiations will lead to further lease concessions and modifications that will allow the Debtors to reduce fixed costs, focus on other, more profitable locations, and secure the foundation of long-term profitability.

## V.     **Qualifications as Declarant.**

85.     I have served as WeWork's permanent Chief Executive Officer since October 2023, as interim Chief Executive Officer from May 2023 to October 2023, and as a director since February 2023. I have over twenty-five years of experience creating and executing strategies that increase corporate valuation, cash flow, and revenue. Most recently, I served as Chief Financial Officer at Intelsat S.A. from 2019 to 2022. Over the course of my career, I have also served as

Chief Financial Officer of OneWeb, was a private equity partner at Blackstone from 2000 to 2011, where I focused on investments in the communications and media industries, and was Vice President in the Investment Banking Division of Morgan Stanley. I currently serve on the Boards of Directors of DigitalBridge and KVH Industries. I hold a Master of Business Administration from Columbia Business School and a Bachelor of Arts in Economics and History from the University of Michigan.

86.    I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except where specifically noted, the statements in this Declaration are based on (i) my personal knowledge; (ii) information obtained from other members of the Debtors' management team, employees, or advisors; (iii) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; or (iv) my opinions based upon my experience and knowledge. On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Court"). I submit this Declaration to assist the Court and interested parties in understanding why the Debtors filed these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in First Day Motions filed along with the petitions. The facts set forth in each First Day Motion are incorporated herein by reference.

87.    I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to smoothly transition into chapter 11 and to continue ordinary course operations postpetition.

88.    The statements set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors,

my review of relevant documents and information concerning the Debtors' operations, financial

affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify,

I could and would testify competently to the facts set forth herein.

**VI.**     **Evidentiary Basis for Relief Requested in the First Day Motions.**

89.     Contemporaneously with the filing of this Declaration, the Debtors have filed a

number of First Day Motions seeking relief to minimize the adverse effects of the commencement

of these chapter 11 cases on their business and to ensure that their reorganization strategy can be

implemented with limited disruptions to operations.  Approval of the relief requested in the First

Day Motions is critical to the Debtors' ability to continue operating their business with minimal

disruption and thereby preserving value for the Debtors' estates and various stakeholders.  I have

reviewed each of the First Day Motions, and I believe that the relief sought therein is necessary to

permit an effective transition into chapter 11.  I believe that the Debtors' estates would suffer

immediate and irreparable harm absent the ability to make certain essential payments and

otherwise continue their business operations as sought in the First Day Motions.  The evidentiary

support for the First Day Motions is set forth on **Exhibit C** attached hereto.  Accordingly, for the

reasons set forth herein and in the First Day Motions, the Court should grant the relief requested

in each of the First Day Motions.

*  *  *  *  *  *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 7, 2023

*By: /s/ David Tolley*
Name: David Tolley
Title:  Chief Executive Office

## <u>Exhibit A-1</u>

### The Debtors

- WeWork Inc.
- 1 Beacon Street Tenant LLC
- 1 Belvedere Drive Tenant LLC
- 1 Glenwood Ave Tenant LLC
- 1 Lincoln Street Tenant LLC
- 1 Milk Street Tenant LLC
- 1 Post Street Tenant LLC
- 1 South Dearborn Street Tenant LLC
- 1 Union Square West HQ LLC
- 10 East 38th Street Tenant LLC
- 10 East 40th Street HQ LLC
- 100 Bayview Circle Tenant LLC
- 100 Broadway Tenant LLC
- 100 S State Street Tenant LLC
- 100 Summer Street Tenant LLC
- 10000 Washington Boulevard Tenant LLC
- 1001 Woodward Ave Tenant LLC
- 1003 East 4th Place Tenant LLC
- 101 East Washington Street Tenant LLC
- 101 Marietta Street NorthWest Tenant LLC
- 101 North 1st Avenue Tenant LLC
- 10250 Constellation Tenant LLC
- 1031 South Broadway Tenant LLC
- 10585 Santa Monica Boulevard Tenant LLC
- 10845 Griffith Peak Drive Tenant LLC
- 10885 NE 4th Street Tenant LLC
- 109 S 5th Street Tenant LLC
- 1090 West Pender Street Tenant LP
- 10900 Stonelake Boulevard Tenant LLC
- 1099 Stewart Street Tenant LLC
- 11 Park Pl Tenant LLC
- 110 110th Avenue Northeast Tenant LLC
- 110 Corcoran Street Tenant LLC
- 110 Wall Manager LLC
- 1100 15th Street NW Tenant LLC
- 1601 Elm Street Tenant LLC
- 1601 Market Street Tenant LLC
- 1601 Vine Street Tenant LLC
- 161 Avenue of the Americas Tenant LLC
- 1615 Platte Street Tenant LLC
- 1619 Broadway Tenant LLC
- 166 Geary Street HQ LLC
- 1660 Lincoln Street Tenant LLC
- 167 N Green Street Tenant LLC
- 1700 Lincoln Street Tenant LLC

- 1100 Ludlow Street Tenant LLC
- 1100 Main Street Tenant LLC
- 1111 Broadway Tenant LLC
- 1111 West 6th Street Tenant LLC
- 1114 W Fulton Market Q LLC
- 1115 Broadway Q LLC
- 1115 Howell Mill Road Tenant LLC
- 1115 W Fulton Market Q LLC
- 115 Broadway Tenant LLC
- 115 East 23rd Street Tenant LLC
- 1150 South Olive Street Tenant LLC
- 1155 Perimeter Center West Tenant LLC
- 1155 West Fulton Street Tenant LLC
- 1156 6th Avenue Tenant LLC
- 117 NE 1st Ave Tenant LLC
- 1175 Peachtree Tenant LLC
- 11801 Domain Blvd Tenant LLC
- 12 East 49th Street Tenant LLC
- 12 South 1st Street Tenant LLC
- 120 West Trinity Place Tenant LLC
- 1200 17th Street Tenant LLC
- 1200 Franklin Avenue Tenant LLC
- 1201 3rd Avenue Tenant LLC
- 1201 Wills Street Tenant LLC
- 1201 Wilson Blvd Tenant LLC
- 12130 Millennium Drive Tenant LLC
- 1240 Rosecrans Tenant LLC
- 125 S Clark Street Tenant LLC
- 125 West 25th Street Tenant LLC
- 12655 Jefferson Blvd Tenant LLC
- 128 South Tryon Street Tenant LLC
- 130 5th Avenue Tenant LLC
- 130 Madison Avenue Tenant LLC
- 130 W 42nd Street Tenant LLC
- 1305 2nd Street Q LLC
- 21 Penn Plaza Tenant LLC
- 210 N Green Partners LLC
- 210 N Green Promoter LLC
- 2120 Berkeley Way Tenant LLC
- 21255 Burbank Boulevard Tenant LLC
- 214 West 29th Street Tenant LLC
- 22 Cortlandt Street HQ LLC
- 2201 Broadway Tenant LLC
- 221 6th Street Tenant LLC
- 2211 Michelson Drive Tenant LLC

- 1330 Lagoon Avenue Tenant LLC
- 1333 New Hampshire Avenue Northwest Tenant LLC
- 135 E 57th Street Tenant LLC
- 135 Madison Ave Tenant LLC
- 1372 Peachtree Street NE Tenant LLC
- 1389 Peachtree Street Northwest Tenant LLC
- 1400 Lavaca Street Tenant LLC
- 1410 Broadway Tenant LLC
- 1411 4th Avenue Tenant LLC
- 142 W 57th Street Tenant LLC
- 1430 Walnut Street Tenant LLC
- 1440 Broadway Tenant LLC
- 1448 NW Market Street Tenant LLC
- 1449 Woodward Avenue Tenant LLC
- 145 W 45th Street Tenant LLC
- 1450 Broadway Tenant LLC
- 1453 3rd Promenade Q LLC
- 1455 Market Street Tenant LLC
- 1460 Broadway Tenant LLC
- 148 Lafayette Street Tenant LLC
- 149 5th Avenue Tenant LLC
- 149 Madison Avenue Tenant LLC
- 15 West 27th Street Tenant LLC
- 150 4th Ave N Tenant LLC
- 152 3rd Street Tenant LLC
- 1525 11th Ave Tenant LLC
- 1535 Broadway Tenant LLC
- 154 W 14th Street Tenant LLC
- 1547 9th Street HQ LLC
- 1557 West Innovation Way Tenant LLC
- 1560 Broadway Tenant LLC
- 16 East 34th Street Tenant LLC
- 160 Varick Street Tenant LLC
- 160 W Santa Clara St Tenant LLC
- 1600 7th Avenue Tenant LLC
- 3101 Park Boulevard Tenant LLC
- 311 W 43rd Street Tenant LLC
- 3120 139th Avenue Southeast Tenant LLC
- 315 East Houston Tenant LLC
- 315 W 36th Street Tenant LLC
- 316 West 12th Street Tenant LLC
- 3200 Park Center Drive Tenant LLC
- 3219 Knox Street Tenant LLC
- 3280 Peachtree Road NE Tenant LLC
- 33 Arch Street Tenant LLC

- 1701 Rhode Island Avenue Northwest Tenant LLC
- 1725 Hughes Landing Boulevard Tenant LLC
- 1730 Minor Avenue Tenant LLC
- 17300 Laguna Canyon Road Tenant LLC
- 177 E Colorado Blvd Tenant LLC
- 1775 Tysons Boulevard Tenant LLC
- 18 West 18th Street Tenant LLC
- 180 Geary Street HQ LLC
- 180 Sansome Street Tenant LLC
- 1814 Franklin St Q LLC
- 18191 Von Karman Avenue Tenant LLC
- 1825 South Grant Street Tenant LLC
- 1828 Walnut St Tenant LLC
- 183 Madison Avenue Q LLC
- 1840 Gateway Dr Tenant LLC
- 185 Madison Avenue Tenant LLC
- 18691 Jamboree Road Tenant LLC
- 1875 K Street NW Tenant LLC
- 1881 Broadway HQ LLC
- 1900 Market Street Tenant LLC
- 1900 Powell Street Tenant LLC
- 1910 North Ola Avenue Tenant LLC
- 1920 McKinney Ave Tenant LLC
- 195 Montague Street Tenant LLC
- 199 Water Street Tenant LLC
- 2 Belvedere Drive Tenant LLC
- 2 Embarcadero Center Tenant LLC
- 2 North LaSalle Street Tenant LLC
- 20 W Kinzie Tenant LLC
- 200 Berkeley Street Tenant LLC
- 200 Massachusetts Ave NW Tenant LLC
- 200 Portland Tenant LLC
- 200 South Biscayne Blvd Tenant LLC
- 200 South Orange Avenue Tenant LLC
- 200 Spectrum Center Drive Tenant LLC
- 201 Spear St Tenant LLC
- 2031 3rd Ave Tenant LLC
- 205 Hudson Street Tenant LLC
- 205 North Detroit Street Tenant LLC
- 429 Lenox Ave Tenant LLC
- 430 Park Avenue Tenant LLC
- 4311 11th Avenue Northeast Tenant LLC
- 433 Hamilton Avenue Tenant LLC
- 437 5th Avenue Q LLC
- 437 Madison Avenue Tenant LLC
- 44 East 30th Street HQ LLC
- 44 Montgomery Street Tenant LLC
- 44 Wall Street HQ LLC
- 448 North LaSalle Street Tenant LLC
- 45 West 18th Street Tenant LLC

- 222 Kearny Street Tenant LLC
- 222 North Sepulveda Tenant LLC
- 222 S Riverside Plaza Tenant LLC
- 2221 Park Place Tenant LLC
- 2222 Ponce De Leon Blvd Tenant LLC
- 225 South 6th St Tenant LLC
- 225 W 39th Street Tenant LLC
- 229 West 36th Street Tenant LLC
- 231 11th Ave Tenant LLC
- 2323 Delgany Street Tenant LLC
- 24 Farnsworth Street Q LLC
- 2-4 Herald Square Tenant LLC
- 2401 Elliott Avenue Tenant LLC
- 2420 17th Street Tenant LLC
- 2425 East Camelback Road Tenant LLC
- 245 Livingston St Q LLC
- 25 West 45th Street HQ LLC
- 250 E 200 S Tenant LLC
- 250 Park Avenue Tenant LLC
- 255 Giralda Avenue Tenant LLC
- 255 Greenwich Street Tenant LLC
- 255 S King St Tenant LLC
- 2600 Executive Parkway Tenant LLC
- 2700 Post Oak Blvd. Tenant LLC
- 27-01 Queens Plaza North Tenant LLC
- 2755 Canyon Blvd WW Tenant LLC
- 28 2nd Street Tenant LLC
- 28 West 44th Street HQ LLC
- 29 West 30th Street Tenant LLC
- 30 Hudson Street Tenant LLC
- 30 Wall Street Tenant LLC
- 300 Morris Street Tenant LLC
- 300 Park Avenue Tenant LLC
- 3000 Olym Boulevard Tenant LLC
- 3000 S Robertson Blvd Q LLC
- 3001 Bishop Drive Tenant LLC
- 3003 Woodbridge Ave Tenant LLC
- 3090 Olive Street Tenant LLC
- 31 St James Ave Tenant LLC
- 6 East 32nd Street WW Q LLC
- 600 B Street Tenant LLC
- 600 California Street Tenant LLC
- 600 H Apollo Tenant LLC
- 6001 Cass Avenue Tenant LLC
- 601 South Figueroa Street Tenant LLC
- 606 Broadway Tenant LLC
- 609 5th Avenue Tenant LLC
- 609 Greenwich Street Tenant LLC
- 609 Main Street Tenant LLC
- 611 North Brand Boulevard Tenant LLC

- 33 East 33rd Street Tenant LLC
- 33 Irving Tenant LLC
- 330 North Wabash Tenant LLC
- 3300 N. Interstate 35 Tenant LLC
- 332 S Michigan Tenant LLC
- 333 West San Carlos Tenant LLC
- 3365 Piedmont Road Tenant LLC
- 340 Bryant Street HQ LLC
- 345 4th Street Tenant LLC
- 345 West 100 South Tenant LLC
- 35 East 21st Street HQ LLC
- 353 Sacramento Street Tenant LLC
- 35-37 36th Street Tenant LLC
- 360 NW 27th Street Tenant LLC
- 3600 Brighton Boulevard Tenant LLC
- 38 West 21st Street Tenant LLC
- 385 5th Avenue Q LLC
- 3900 W Alameda Ave Tenant LLC
- 391 San Antonio Road Tenant LLC
- 40 Water Street Tenant LLC
- 400 California Street Tenant LLC
- 400 Capitol Mall Tenant LLC
- 400 Concar Drive Tenant LLC
- 400 Lincoln Square Tenant LLC
- 400 Spectrum Center Drive Tenant LLC
- 4005 Miranda Ave Tenant LLC
- 401 San Antonio Road Tenant LLC
- 404 Fifth Avenue Tenant LLC
- 4041 Macarthur Boulevard Tenant LLC
- 405 Mateo Street Tenant LLC
- 408 Broadway Tenant LLC
- 410 North Scottsdale Road Tenant LLC
- 414 West 14th Street HQ LLC
- 415 Mission Street Tenant LLC
- 419 Park Avenue South Tenant LLC
- 420 5th Avenue Q LLC
- 420 Commerce Street Tenant LLC
- 424-438 Fifth Avenue Tenant LLC
- 428 Broadway Tenant LLC
- 77 Sands WW Corporate Tenant LLC
- 77 Sleeper Street Tenant LLC
- 7761 Greenhouse Rd Tenant LLC
- 777 6th Street NW Tenant LLC
- 78 SW 7th Street Tenant LLC
- 8 W 40th Street Tenant LLC
- 80 M Street SE Tenant LLC
- 800 Bellevue Way Tenant LLC
- 800 Market Street Tenant LLC
- 800 North High Street Tenant LLC
- 801 B. Springs Road Tenant LLC

- 450 Lexington Tenant LLC
- 460 Park Ave South Tenant LLC
- 460 West 50 North Tenant LLC
- 4635 Lougheed Highway Tenant LP
- 475 Sansome St Tenant LLC
- 483 Broadway Tenant LLC
- 49 West 27th Street HQ LLC
- 490 Broadway Tenant LLC
- 50 W 28th Street Tenant LLC
- 500 11th Ave North Tenant LLC
- 500 7th Avenue Tenant LLC
- 501 Boylston Street Tenant LLC
- 501 East Kennedy Boulevard Tenant LLC
- 501 East Las Olas Blvd Tenant LLC
- 501 Eastlake Tenant LLC
- 5049 Edwards Ranch Tenant LLC
- 505 Main Street Tenant LLC
- 505 Park Avenue Q LLC
- 50-60 Francisco Street Tenant LLC
- 511 W 25th Street Tenant LLC
- 515 Folsom Street Tenant LLC
- 515 N State Street Tenant LLC
- 5161 Lankershim Boulevard Tenant LLC
- 5215 North O'Connor Boulevard Tenant LLC
- 524 Broadway Tenant LLC
- 525 Broadway Tenant LLC
- 53 Beach Street Tenant LLC
- 540 Broadway Q LLC
- 545 Boylston Street Q LLC
- 546 5th Avenue Tenant LLC
- 550 7th Avenue HQ LLC
- 550 Kearny Street HQ LLC
- 57 E 11th Street Tenant LLC
- 575 5th Avenue Tenant LLC
- 575 Lexington Avenue Tenant LLC
- 5750 Wilshire Boulevard Tenant LLC
- 5960 Berkshire Lane Tenant LLC
- 599 Broadway Tenant LLC
- Common Desk West 7th, LLC
- Creator Fund Managing Member LLC
- Euclid LLC
- Euclid WW Holdings Inc.
- FieldLens LLC
- Five Hundred Fifth Avenue HQ LLC
- Insurance Services by WeWork LLC
- Legacy Tenant LLC
- Mailroom Bar at 110 Wall LLC
- MissionU PBC
- One Gotham Center Tenant LLC
- 615 S. Tenant LLC
- 625 Massachusetts Tenant LLC
- 625 West Adams Street Tenant LLC
- 63 Madison Avenue Tenant LLC
- 65 East State Street Tenant LLC
- 650 California Street Tenant LLC
- 6543 South Las Vegas Boulevard Tenant LLC
- 655 15th Street NW Tenant LLC
- 655 Montgomery St Tenant LLC
- 655 New York Avenue Northwest Tenant LLC
- 660 J Street Tenant LLC
- 660 North Capitol St NW Tenant LLC
- 6655 Town Square Tenant LLC
- 67 Irving Place Tenant LLC
- 6900 North Dallas Parkway Tenant LLC
- 695 Town Center Drive Tenant LLC
- 7 West 18th Street Tenant LLC
- 700 2 Street Southwest Tenant LP
- 700 K Street NW Tenant LLC
- 700 North Miami Tenant LLC
- 700 SW 5th Tenant LLC
- 708 Main St Tenant LLC
- 71 5th Avenue Tenant LLC
- 71 Stevenson Street Q LLC
- 711 Atlantic Avenue Tenant LLC
- 725 Ponce De Leon Ave NE Tenant LLC
- 7272 Wisconsin Avenue Tenant LLC
- 729 Washington Ave Tenant LLC
- 7300 Dallas Parkway Tenant LLC
- 731 Sansome Street Tenant LLC
- 75 Arlington Street Tenant LLC
- 75 E Santa Clara Street Tenant LLC
- 75 Rock Plz Tenant LLC
- 750 Lexington Avenue Tenant LLC
- 750 White Plains Road Tenant LLC
- 755 Sansome Street Tenant LLC
- 756 W Peachtree Tenant LLC
- 77 Sands Tenant LLC
- WeWork Canada LP ULC
- WeWork Commons LLC
- WeWork Companies U.S. LLC
- WeWork Companies Partner LLC
- WeWork Construction LLC
- WeWork Holdings LLC
- WeWork Interco LLC
- WeWork LA LLC
- WeWork Labs Entity LLC
- WeWork Little West 12th LLC
- WeWork Magazine LLC
- 808 Wilshire Boulevard Tenant LLC
- 820 18th Ave South Tenant LLC
- 821 17th Street Tenant LLC
- 83 Maiden Lane Q LLC
- 830 Brickell Plaza Tenant LLC
- 830 NE Holladay Street Tenant LLC
- 8305 Sunset Boulevard HQ LLC
- 8687 Melrose Avenue Tenant LLC
- 8687 Melrose Green Tenant LLC
- 88 U Place Tenant LLC
- 880 3rd Ave Tenant LLC
- 881 Peachtree Street Northeast Tenant LLC
- 8910 University Center Lane Tenant LLC
- 90 South 400 West Tenant LLC
- 901 North Glebe Road Tenant LLC
- 901 Woodland St Tenant LLC
- 902 Broadway Tenant LLC
- 920 5th Ave Tenant LLC
- 920 SW 6th Avenue Tenant LLC
- 9200 Timpanogos Highway Tenant LLC
- 925 4th Avenue Tenant LLC
- 925 N La Brea Ave Tenant LLC
- 9670416 CANADA Inc.
- 9777 Wilshire Boulevard Q LLC
- 980 6th Avenue Tenant LLC
- 9830 Wilshire Boulevard Tenant LLC
- 99 Chauncy Street Q LLC
- 99 High Street Tenant LLC
- Bird Investco LLC
- CD Locations, LLC
- Cities by We LLC
- Clubhouse TS LLC
- Common Coffee LLC
- Common Desk Daymaker LLC
- Common Desk DE, LLC
- Common Desk Holdings LLC
- Common Desk OC, LLC
- Common Desk Operations LLC
- WW 401 Park Avenue South LLC
- WW 5 W 125th Street LLC
- WW 500 Yale LLC
- WW 51 Melcher LLC
- WW 520 Broadway LLC
- WW 535 Mission LLC
- WW 555 West 5th Street LLC
- WW 5782 Jefferson LLC
- WW 600 Congress LLC
- WW 641 S Street LLC
- WW 718 7th Street LLC

- One Metropolitan Square Tenant LLC
- Parkmerced Partner LLC
- Play by WeWork LLC
- Powered By We LLC
- Project Caesar LLC
- Project Standby I LLC
- Prolific Interactive LLC
- PxWe Facility & Asset Management Services LLC
- South Tryon Street Tenant LLC
- Spacious Technologies, LLC
- The Hub Tenant LLC
- The We Company Management Holdings L.P.
- The We Company Management LLC
- The We Company MC LLC
- The We Company PI L.P.
- WALTZ MERGER SUB LLC
- We Rise Shell LLC
- We Work 154 Grand LLC
- We Work 349 5th Ave LLC
- We Work Management LLC
- We Work Retail LLC
- WeInsure Holdco LLC
- Welkio LLC
- WeWork 156 2nd LLC
- WeWork 175 Varick LLC
- WeWork 25 Taylor LLC
- WeWork 261 Madison LLC
- WeWork 54 West 40th LLC
- WeWork Asset Management LLC
- WeWork Bryant Park LLC
- WeWork Canada GP ULC

- WeWork Real Estate LLC
- WeWork Services LLC
- WeWork Space Services Inc.
- WeWork Space Services LLC
- WeWork Wellness LLC
- WeWork Workplace LLC
- Wildgoose I LLC
- WW 1010 Hancock LLC
- WW 107 Spring Street LLC
- WW 11 John LLC
- WW 110 Wall LLC
- WW 111 West Illinois LLC
- WW 115 W 18th Street LLC
- WW 1161 Mission LLC
- WW 120 E 23rd Street LLC
- WW 1328 Florida Avenue LLC
- WW 1550 Wewatta Street LLC
- WW 1601 Fifth Avenue LLC
- WW 1875 Connecticut LLC
- WW 2015 Shattuck LLC
- WW 205 E 42nd Street LLC
- WW 210 N Green LLC
- WW 220 NW Eighth Avenue LLC
- WW 222 Broadway LLC
- WW 2221 South Clark LLC
- WW 240 Bedford LLC
- WW 25 Broadway LLC
- WW 26 JS Member LLC
- WW 312 Arizona LLC
- WW 350 Lincoln LLC
- WW 379 W Broadway LLC

- WW 745 Atlantic LLC
- WW 79 Madison LLC
- WW 81 Prospect LLC
- WW 811 West 7th Street LLC
- WW 85 Broad LLC
- WW 995 Market LLC
- WW Brooklyn Navy Yard LLC
- WW BuildCo LLC
- WW Co-Obligor Inc.
- WW Enlightened Hospitality Investor LLC
- WW HoldCo LLC
- WW Journal Square Holdings LLC
- WW Journal Square Member LLC
- WW Onsite Services AAG LLC
- WW Onsite Services EXP LLC
- WW Onsite Services LLC
- WW Onsite Services SFI LLC
- WW Onsite Services SUM LLC
- WW Project Swift Development LLC
- WW Project Swift Member LLC
- WW VendorCo LLC
- WW Worldwide C.V.
- WWCO Architecture Holdings LLC

## __Exhibit A-2__

## **Non-Debtors**

- 1 America Square Q Tenant Limited
- 1 Ariel Way Tenant Limited
- 1 George's Quay Tenant Limited
- 1 Lloyd's Avenue Tenant Limited
- 1 Locatellikade Q B.V.
- 1 Mark Square Tenant Limited
- 1 Poultry Tenant Limited
- 1 St Katharine's Way Tenant Limited
- 1 St Peter's Square Tenant Limited
- 1 Sussex Street Pty Ltd
- 1 Waterhouse Square Tenant Limited
- 10 East Road Tenant Limited
- 10 Fenchurch Avenue Tenant Limited
- 10 Hazerem Street Tenant Ltd
- 100 Harris Tenant Pty Ltd
- 101 Karl-Marx-Straße Tenant GmbH
- 10-12 Russell Square Q Limited
- 11 Neue Bahnhofstraße Q GmbH
- 11 Spittelmarkt Tenant GmbH
- 114 East 4th Avenue Tenant LP
- 119 Marylebone Road Tenant Limited
- 11 Hammersmith Grove Tenant Limited
- 12 Moorgate Tenant Limited
- 120 Moorgate Tenant Limited
- 120 Old Broad St Q Limited
- 120 Spencer Street Pty Ltd
- 123 Buckingham Palace Road Tenant Limited
- 123 Eagle Street Tenant Pty Ltd
- 123 Schönhauser Allee Tenant GmbH
- 125 Kingsway Tenant Limited
- 125 Shaftesbury Tenant Limited
- 130 Wood Street Tenant Limited
- 131 Finsbury Pavement Tenant Limited
- 133 Houndsditch Limited
- 14-16 Great Chapel Tenant Limited
- 53 Belliardstraat Tenant
- 55 Colmore Row Tenant Limited

- 56 Schildergasse Tenant GmbH
- 6 Totzeret Haaretz Tenant Ltd.
- 64 York Street Pty Ltd
- 66 King Street Tenant Pty Ltd

- 7 Menachem Begin Tenant Ltd.
- 70 Wilson Street Tenant Limited

- 71-91 Aldwych House Tenant Limited

- 142 Old Street Q Tenant Limited
- 142 Wardour Street Tenant Limited
- 144 Menachem Begin Tenant Ltd.
- 146 Derech Menachem Begin Tenant Ltd.
- 15 Bishopsgate Tenant Limited
- 15 Herzogstraße Tenant GmbH
- 150 9 Avenue Southwest Tenant LP
- 152 Saint Georges Terrace Pty Ltd
- 155 Townsend St Q Tenant Limited
- 16 Efal Tenant Ltd.
- 16 Helkikey Ha'Or Tenant Ltd
- 160 Shelbourne Road Q Limited
- 161 Castlereagh Street Pty Ltd
- 165 Fleet Street Tenant Limited
- 17 St Helen's Place Tenant Limited
- 184 Shepherds Bush Road Tenant Limited
- 19 Schillerstraße Tenant GmbH
- 192 Ann Street Tenant Pty Ltd
- 2 Eastbourne Tenant Limited
- 2 Minster Court Tenant Limited
- 2 Southbank Tenant Limited
- 20 Heinrich-Heine-Allee Tenant GmbH
- 20 Rotherstrasse Tenant GmbH
- 207 Old Street Tenant Limited
- 21 Soho Square Tenant Limited
- 22 Long Acre Tenant Limited
- 222 Exhibition St Pty Ltd
- 23 Schocken Street Tenant Ltd
- 242 Prenzlauer Allee Tenant GmbH
- 25 K Street Pty Ltd
- 25 Turmstraße Tenant GmbH
- 26 Hatton Garden Tenant Limited
- 260 Queen Street Pty Ltd
- 28-42 Banner Street Q Limited
- 3 Aluf Kalman Magen Tenant Ltd.
- Kurfürstendamm 11 Tenant GmbH
- LATAM CO B.V.

- LT Build Limited
- Midtown Music Club Ltd.
- Naked Hub Vietnam Holdings Limited
- Neue Schönhauser Straße 3-5 Tenant GmbH
- Neuturmstraße 5 Tenant GmbH
- NHNP VN Limited

- No. 1 Spinningfields Tenant Limited

- 3 Cuvrstr.aße Tenant GmbH
- 3 Waterhouse Square Tenant Limited
- 30 Churchill Place Tenant Limited
- 30 Ibn Gabirol Tenant Ltd.
- 31 Handelsstraat Tenant
- 32 King George Tenant Ltd.
- 320 Pitt Street Pty Ltd
- 33 Bloor Street East Tenant LP
- 33 Q Street Tenant Limited
- 33 Rue La Fayette Tenant SAS
- 333 George Street Pty Ltd
- 345 Bourke Street Tenant Pty Ltd
- 35 Kalvebod Brygge Tenant ApS
- 37 Shaul HaMelech Boulevard Tenant Ltd
- 38 Chancery Lane Tenant Limited
- 383 George Street Tenant Pty Ltd
- 4 Maale HaShichrur Tenant Ltd
- 4 Sint-Lazaruslaan Tenant
- 40 Tuval Tenant Ltd.
- 401 Collins Street Pty Ltd
- 41 Blackfriars Road Tenant Limited
- 42 Charlemont Street Tenant Limited
- 424 Fifth Avenue Holdings LLC
- 424 Fifth Avenue Junior Holdings LLC
- 424 Fifth Avenue LLC
- 424 Fifth Avenue Senior Holdings LLC
- 45 HaAtzmaut Tenant Ltd.
- 5 Harcourt Road Tenant Limited
- 5 Martin Place Tenant Pty Ltd
- 5 Merchant Square Tenant Limited
- 50 Miller Street Pty Ltd
- 500 Bloor Street West Tenant LP
- 50-60 Station Road Tenant Limited
- 51 Eastcheap Tenant Limited
- 52 Bedford Row Tenant Limited
- WeWork Companies LLC
- WeWork Companies Partner (International) B.V.
- WeWork Denmark ApS
- WeWork France SAS
- WeWork Germany GmbH
- WeWork Greater China Holding Company B.V.
- Wework Gulf I FZ-LLC
- WeWork Holding (Thailand) Company Limited
- WeWork India Management Private Limited

- 72 Knesebeckstraße Tenant GmbH
- 76-78 Clerkenwell Road Tenant Limited
- 77 Farringdon Road Tenant Limited
- 77 Leadenhall Street Tenant Limited
- 80 George Street Tenant Limited
- 8-14 Meard Street Tenant Limited
- 89-115 Mare Street Tenant Limited
- 90 York Way Tenant Limited
- 91 Baker Street Tenant Limited
- 97 Hackney Road Tenant Limited
- 99 Q Victoria Street Tenant Limited
- Alexanderplatz 1 Tenant GmbH
- ARK Investment Group Holdings LLC
- Arnulfstraße 60 Tenant GmbH
- Axel-Springer-Platz 3 Tenant GmbH
- Ballindamm 40 Tenant GmbH
- Bow Bells House Tenant Limited
- Central Plaza Tenant Limited
- Chausseestraße 29 Tenant GmbH
- Dalton Place Tenant Limited
- Dublin Landings Tenant Limited
- Eichhornstraße 3 Tenant GmbH
- Emprendimientos y Proyectos del Peru S.A.C.
- Friedrichstraße 76 Tenant GmbH
- Friesenplatz Tenant GmbH
- Gänsemarkt 43 Tenant GmbH
- Gerhofstraße 1-3 Tenant GmbH
- Gravity Coworking Pty Ltd
- Hagfish Mumbai Private Limited
- Hammerjaw Bengaluru Private Limited
- Herengracht 206 Tenant B.V.
- Houndshark Delhi Private Limited
- Icefish APAC Holdco B.V.
- Icefish Investment Holdco B.V.
- Iveagh Court Tenant Limited
- Junghofstrasse 13 Tenant GmbH
- Junghofstraße 22 Tenant GmbH
- Karl-Liebknecht Street Tenant GmbH
- Keizersgracht 271 Tenant B.V.
- Keizersgracht 572 Tenant B.V.
- Kemperplatz 1 Tenant GmbH

- Oskar-von-Miller-Ring 20 Tenant GmbH
- Oskar-von-Miller-Ring 33 Q GmbH
- Powered By We Germany GmbH
- Powered By We UK Limited
- Provost and East Tenant Limited
- PT PoweredByWe Services Indonesia
- PT WeWork Services International
- PxWe India Private Limited
- Rosenthaler Straße 43-45 Tenant GmbH
- Rudolfplatz 7 Tenant GmbH
- Sarphatistraat 8 Tenant GmbH
- Shoreditch the Bard Tenant Limited
- Skelbækgade 2-4 Tenant ApS
- Spacemob Pte. Ltd.
- Stadhouderskade 5-6 Q B.V.
- Stamford Street Tenant Limited
- Standby I Tenant GmbH
- Stralauer Allee 6 Tenant GmbH
- Strawinskylaan 4117 Tenant B.V.
- Stresemannstraße 123 Tenant GmbH
- Taunusanlage 8 Tenant GmbH
- The Hewitt Shoreditch Tenant Limited
- The We Company ROU S.R.L.
- The We Company Worldwide Limited
- Unomy Ltd.
- Warschauer Platz Tenant GmbH
- WeTech LLC
- WeWork (Czech Republic) s.r.o.
- WeWork (Thailand) Limited
- WeWork APAC Partner Holdings B.V.
- WeWork Asia Holding Company B.V.
- WeWork Australia Pty Ltd
- WeWork Belgium SRL
- WeWork Busan 1-Ho Yuhan Hoesa
- WeWork Canada GP B.V.
- WeWork Canada LP B.V.
- WeWork Capital Advisors LLC
- WeWork Community Workspace Ireland Limited
- WeWork Community Workspace UK Limited
- WeWork Community Workspace, S. L.
- WeWork Companies (International) B.V.

- WeWork International Limited
- WeWork Israel Ltd.
- WeWork Italy S.R.L.
- WeWork Japan GK
- WeWork Korea Yuhan Hoesa
- WeWork Malaysia Sdn. Bhd.
- WeWork Middle East DWTC FZE
- WeWork Middle East Gazelle Limited
- WeWork Middle East Holdings B.V.
- WeWork Netherlands B.V.
- WeWork New Zealand
- WeWork New Zealand Holdco B.V.
- WeWork Norway AS
- WeWork Paris IV Tenant SAS
- WeWork Peru Management S.R.L.
- WeWork Peru S.R.L.
- WeWork Poland sp. z o.o.
- WeWork Rus LLC
- WeWork Saudi Arabia Limited
- WeWork Seoul 1-Ho Yuhan Hoesa
- WeWork Seoul 2-Ho Yuhan Hoesa
- WeWork Seoul 3-Ho Yuhan Hoesa
- WeWork Seoul 4-Ho Yuhan Hoesa
- WeWork Seoul 5-Ho Yuhan Hoesa
- WeWork Singapore Pte. Ltd.
- WeWork Technology Israel Ltd.
- WeWork Uruguay S.R.L.
- WeWork Vietnam Limited
- Wilmersdorferstrasse 59 Tenant GmbH
- WW Bishopsgate Limited
- WW Community Workspaces Philippines, Inc.
- WW Devonshire Limited
- WW Hanover House Operations Limited
- WW Medius Limited
- WW Metropool Limited
- WW Moor Place Limited
- WW Sea Containers Limited
- WW Sweden AB
- WW Weteringschans B.V.
-
-

## Exhibit B

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT, DOES NOT CONSTITUTE, AND SHALL NOT BE CONSTRUED TO CONSTITUTE, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of November 6, 2023, (the "**Execution Date**") by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**" and each a "**Party**"):[1]

    i.    WeWork Inc., a company incorporated under the Laws of Delaware ("**WeWork**,") and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this sub-clause (i), collectively, the "**Company Parties**");

    ii.    SoftBank Vision Fund II-2 L.P., a limited partnership established in Jersey ("**SVF II**"), acting by its manager SB Global Advisers Limited, a limited company incorporated under the Laws of England and Wales, SVF II Aggregator (Jersey) L.P., a limited partnership established in Jersey ("**SVF II Aggregator**"), acting by its general partner, SVF II GP (Jersey) Limited, a Jersey private company, SVF II WW (DE) LLC, a Delaware limited liability company ("**SVF II WW**"), and SVF II WW Holdings (Cayman) Limited, a Cayman Islands exempted company ("**SVF II WW Holdings**"), each in its capacity as (a) a holder of 1L Series 2 Notes, 2L Exchangeable Notes, 3L Exchangeable Notes, and/or Interests in WeWork, as the case may be, or (b) "SVF Obligor," as defined in the Prepetition LC Credit Agreement (as defined herein), as applicable (together with SVF II, SVF II Aggregator, SVF II WW, and SVF II WW Holdings, "**SoftBank Parties**");

    iii.    Cupar Grimmond, LLC, a Delaware limited liability company ("**Cupar**");

    iv.    the holders (or beneficial owners) of, or investment advisors, sub-advisors, or managers of funds or accounts in their capacities as holders (or beneficial owners) of, (a) the 1L Series 1 Notes and (b) the 2L Secured Notes, in each case that have

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

executed and delivered counterpart signature pages to this Agreement, a Joinder Agreement, or a Transfer Agreement to counsel to Company Parties (such undersigned parties, the "**Consenting AHG Noteholders**"[2]); and

v.    any other Entity that becomes a party to this Agreement by executing a Joinder Agreement or Transfer Agreement in accordance with the terms of this Agreement (such Entity, and together with the other Entities in sub-clauses (ii) through (iv), the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' business and capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (including all exhibits, annexes, and schedules attached thereto, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement and consummate the Restructuring Transactions pursuant to the terms and conditions set forth in this Agreement, including through the commencement by the Company Parties of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"), commencing proceedings under the Laws of any other relevant jurisdiction, as determined by the Company Parties with the consent of the Required Consenting Stakeholders (not to be unreasonably withheld), to implement the Restructuring Transactions contemplated herein (including, without limitation, by commencing an Insolvency Proceeding);

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

---

[2]    For the avoidance of doubt, any affiliates or related parties of any Consenting AHG Noteholder shall not be deemed to be Consenting AHG Noteholders themselves, unless such affiliate or related party has itself signed this Agreement. The Parties acknowledge and agree that all representations, warranties, covenants, and other agreements made by any Consenting AHG Noteholder that is a separately managed account of or advised by an investment manager are being made only with respect to the Notes Claims held by such separately managed or advised account (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Notes Claims that may be beneficially owned by other accounts that are managed or advised by such investment manager. The Parties further acknowledge and agree that all representations, warranties, covenants, and other agreements made by any Consenting AHG Noteholder that is an investment advisor, sub-advisor, or manager of managed accounts are being made solely in such Consenting AHG Noteholder's capacity as an investment advisor, sub-advisor, or manager to the beneficial owners of the Notes Claims specified on the applicable signature pages hereto (in the amount identified on such signature pages), and shall not apply to (or be deemed to be made in relation to) such investment advisor, sub-advisor, or manager in any other capacity, including in its capacity as an investment advisor, sub-advisor, or manager of other managed accounts. Notwithstanding the foregoing, and in accordance with Section 13.19 hereof, each Consenting AHG Noteholder (in the capacity in which it signs in accordance with this footnote) shall be bound to this Agreement on account of all Company Claims/Interests set forth on its signature page hereto.

**WHEREAS**, the Parties have reached an agreement with respect to the Company Parties' consensual use of cash collateral, pursuant to the terms and conditions to be set forth in the Cash Collateral Orders; and

**WHEREAS**, the DIP lender and the DIP LC Issuers (as defined herein) shall seek, severally and not jointly, to provide a senior secured, debtor-in-possession term loan "C" and cash collateralized letter of credit facility (the "**DIP TLC Facility**") pursuant to terms and conditions to be agreed as set forth in a commitment letter (the "**DIP TLC Commitment Letter**") and consistent with the terms set forth in the term sheet attached hereto as **Exhibit E** (the "**DIP Term Sheet**").

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation*.

1.01.          Definitions.  The following terms shall have the following definitions:

"**1L Notes**" means the 1L Series 1 Notes, 1L Series 2 Notes, and 1L Series 3 Notes.

"**1L Notes Claims**" means any Claim on account of the 1L Notes.

"**1L Series 1 Notes**" means the 15.000% First Lien Senior Secured PIK Notes due 2027, Series I, issued by the Issuers under the First Lien Indenture.

"**1L Series 1 Notes Claims**" means any Claim on account of the 1L Series 1 Notes.

"**1L Series 2 Notes**" means the 15.000% First Lien Senior Secured PIK Notes due 2027, Series II, issued by the Issuers under the First Lien Indenture.

"**1L Series 2 Notes Claims**" means any Claim on account of the 1L Series 2 Notes.

"**1L Series 3 Notes**" means the 15.000% First Lien Senior Secured PIK Notes due 2027, Series III, issued by the Issuers under the First Lien Indenture.

"**1L Series 3 Notes Claims**" means any Claim on account of the 1L Series 3 Notes.

"**2L Exchangeable Notes**" means the 11.000% Second Lien Exchangeable Senior Secured PIK Notes due 2027 issued by the Issuers under the Second Lien Exchangeable Indenture.

"**2L Exchangeable Notes Claims**" means any Claim on account of the 2L Exchangeable Notes.

"**2L Notes**" means the 2L Secured Notes and the 2L Exchangeable Notes.

"**2L Notes Claims**" means any Claim on account of the 2L Notes.

3

"**2L Secured Notes**" means the 11.000% Second Lien Senior Secured PIK Notes due 2027 issued by the Issuers under the Second Lien Indenture.

"**2L Secured Notes Claims**" means any Claim on account of the 2L Secured Notes.

"**3L Exchangeable Notes**" means the 12.000% Third Lien Exchangeable Senior Secured PIK Notes due 2027 issued by the Issuers under the Third Lien Exchangeable Indenture.

"**3L Exchangeable Notes Claims**" means any Claim on account of the 3L Exchangeable Notes.

"**3L Notes**" means the 3L Exchangeable Notes and the 3L Secured Notes.

"**3L Notes Claims**" means any Claims on account of the 3L Notes.

"**3L Secured Notes**" means the 12.000% Third Lien Senior Secured PIK Notes due 2027 issued by the Issuers under the Third Lien Indenture.

"**3L Secured Notes Claims**" means any Claim on account of the 3L Secured Notes.

"**Ad Hoc Group Advisors**" means Davis Polk & Wardwell LLP, Ducera Partners LLC, Greenberg Traurig, LLP, Freshfields Bruckhaus Deringer LLP, and any other special or local counsel or advisors providing advice to the Ad Hoc Noteholder Group in connection with the Restructuring Transactions.

"**Ad Hoc Noteholder Group**" means the ad hoc group of holders (or beneficial owners) of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that hold (or beneficially own), Notes Claims, and that is represented by the Ad Hoc Group Advisors.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Prepetition LC Credit Agreement and Indentures, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble hereof and includes all the exhibits, annexes, and schedules attached hereto.

"**Agreement Effective Date**" means the date upon which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement; *provided*, that the Agreement Effective Date with respect to any Consenting Stakeholder that becomes party to this Agreement through execution of a Joinder Agreement or a Transfer Agreement shall be the date that such Consenting Stakeholder executes such Joinder Agreement or Transfer Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, consent, solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to and/or materially inconsistent with one or more of the Restructuring Transactions.  For the avoidance of doubt, none of the actions described in this paragraph that solely implicates the SoftBank Parties and/or their non-Company Party subsidiaries or affiliates shall constitute an "Alternative Restructuring Proposal" under this Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under title 28 of the United States Code, 28 U.S.C. § 2075, and the general, local, and chambers rules of the Bankruptcy Court, as may be amended from time to time.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York or country of Japan.

"**Cash Collateral Documents**" means the Cash Collateral Orders, the Cash Collateral Motion, any collateral, security or other documentation related thereto, and any budgets (including initial and subsequent budgets) related thereto.

"**Cash Collateral Motion**" means the motion filed by the Debtors seeking entry of the Cash Collateral Orders, together with all exhibits thereto and other documents the Debtors file in connection with such motion.

"**Cash Collateral Orders**" means, collectively, the Interim Cash Collateral Order, the Final Cash Collateral Order, and any other orders entered in the Chapter 11 Cases authorizing the Debtors' use of cash collateral.

"**Causes of Action**" means any claims, cross-claims, third-party claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of

duties imposed by Law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the preamble hereof.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including, without limitation, Notes Claims and Prepetition LC Facility Claims.

"**Company Parties**" has the meaning set forth in the preamble hereof.

"**Company Parties Advisors**" means Kirkland & Ellis LLP, PJT Partners LP, Alvarez & Marsal North America, LLC, Hilco Real Estate, LLC, Munger, Tolles & Olson LLP, Cole Schotz P.C., Province, Inc., and any other special or local advisors providing advice to the Company Parties in connection with the Restructuring Transactions.

"**Company Parties Transaction Expenses**" means all out-of-pocket fees and expenses of the Company Parties (including the fees and expenses of the Company Parties Advisors accrued since the inception of their respective engagements in accordance with the terms of their applicable engagement letters and/or fee letters, or as otherwise may be agreed, with the Company Parties, and not previously paid by, or on behalf of, the Company Parties) incurred in connection with this Agreement and the Restructuring Transactions.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting AHG Noteholders**" has the meaning set forth in the preamble hereof.

"**Consenting Stakeholders**" has the meaning set forth in the preamble hereof.

"**Consenting Stakeholder Transaction Expenses**" means all reasonable and documented fees and out-of-pocket expenses of the Cupar Advisors, the Ad Hoc Group Advisors and the SoftBank Advisors (including such fees and expenses accrued since the inception of their respective engagements in accordance with the terms of the applicable engagement letters and/or fee letters, or as otherwise may be agreed, with the Company Parties, and not previously paid by, or on behalf of, the Company Parties) incurred in connection with this Agreement and the Restructuring Transactions.

"**Cupar**" has the meaning set forth in the preamble hereof.

6

"**Cupar Advisors**" means Cooley LLP, as counsel to Cupar, and Piper Sandler & Co., as financial advisor to Cupar, and any other advisors providing advice to Cupar in connection with the Restructuring Transactions and pursuant to an engagement letter approved by the Company Parties in their discretion in consultation with the Required Consenting Stakeholders.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.

"**DIP Term Sheet**" has the meaning set forth in the recitals hereof.

"**DIP TLC Commitment Letter**" has the meaning set forth in the recitals hereof.

"**DIP TLC Credit Agreement**" means the credit agreement with respect to the DIP TLC Facility.

"**DIP TLC Documents**" means, collectively, the DIP TLC Commitment Letter, the DIP Term Sheet, the DIP TLC Motion, the DIP TLC Orders, and the DIP TLC Credit Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, budgets, and other security documents, as amended, supplemented, or otherwise modified from time to time.

"**DIP TLC Facility**" has the meaning set forth in the recitals hereof.

"**DIP TLC Motion**" means the motion seeking approval of the DIP TLC Orders.

"**DIP TLC Orders**" means, collectively, any order(s) approving the DIP TLC Credit Agreement, which may include the Cash Collateral Orders.

"**Disclosure Statement**" means a disclosure statement, including any exhibits, appendices, related documents, ballots, notices, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"**Disclosure Statement Order**" means the order(s) of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials.

"**Enforcement Action**" means any action of any kind to:

(a) declare prematurely due and payable or otherwise seek to accelerate payment of all or any part of any Company Claims/Interests;

(b) recover, or demand cash cover in respect of, all or any part of any Company Claims/Interests (including by exercising any set-off, save as required by Law);

(c) petition for (or take or support any other step which may lead to) any corporate action, legal process (including legal proceedings, execution, distress, and diligence), or other procedure or step being taken in relation to any Company Party entering into Insolvency Proceedings; or

(d) sue, claim, institute, or continue any legal process (including legal proceedings, execution, distress, and diligence and exercise of any enforcement or forfeiture rights under leases) against any Company Party.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Execution Date**" has the meaning set forth in the preamble hereof.

"**Fiduciary Out**" means the board of directors, board of managers, or such similar governing body of any Company Party (or its direct or indirect subsidiaries) determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal.

"**Final Cash Collateral Order**" means the order entered in the Chapter 11 Cases authorizing, among other things, the Debtors' use of cash collateral on a final basis.

"**Final DIP TLC Order**" means the order(s) entered in the Chapter 11 Cases authorizing, among other things, the Debtors' incurrence of the DIP TLC Facility on a final basis, which may include the Cash Collateral Orders.

"**First Day Orders**" means the orders of the Bankruptcy Court granting the relief requested in the First Day Pleadings.

"**First Day Pleadings**" means all of the motions, proposed court orders, and other material documents that the Debtors file upon or around the commencement of the Chapter 11 Cases.

"**First Lien Indenture**" means that certain First Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended by the First Supplemental Indenture, dated as of July 17, 2023, and the Second Supplemental Indenture, dated as of August 25, 2023, and as may be further amended, amended and restated, or otherwise supplemented from time to time), by and among the Issuers, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as trustee and as collateral agent.

"**Foreign Plan**" means any voluntary plan, scheme, arrangement, or similar restructuring plan that is administered or implemented through a Foreign Proceeding.

"**Foreign Proceeding**" means a "foreign main proceeding" or "foreign nonmain proceeding," as those terms are defined in section 1502 of the Bankruptcy Code, including any Insolvency Proceeding, to the extent applicable.

8

"**Indentures**" means, collectively, the First Lien Indenture, the Second Lien Indenture, the Second Lien Exchangeable Indenture, the Third Lien Indenture and the Third Lien Exchangeable Indenture.

"**Initial Consenting AHG Noteholders**" means those Consenting AHG Noteholders who execute this Agreement on the Agreement Effective Date.

"**Insolvency Proceeding**" means any corporate action, legal proceeding, or other procedure or step (including commencing any Foreign Proceeding) taken in any jurisdiction in relation to:

(a)      the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition, or reorganization (by way of voluntary arrangement, scheme, or otherwise) of any Company Party (or any of its subsidiaries), including under the Bankruptcy Code or any Foreign Proceeding;

(b)      a composition, conciliation, compromise, or arrangement with the creditors generally of any Company Party (or any of its subsidiaries) or an assignment by any Company Party (or any of its subsidiaries) of its assets for the benefit of its creditors generally or any Company Party (or any of its subsidiaries) becoming subject to a distribution of its assets;

(c)      the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, or other similar officer in respect of any Company Party (or any of its subsidiaries) or any of its assets;

(d)      the enforcement of any security over any assets of any Company Party (or any of its subsidiaries);

(e)      any request for recognition of a Foreign Proceeding such as under chapter 15 of the Bankruptcy Code; or

(f)      any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (e) above.

"**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, general or limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, general or limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and including any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) in a Company Party).

"**Interim Cash Collateral Order**" means the order entered in the Chapter 11 Cases authorizing, among other things, the Debtors' use of cash collateral on an interim basis, in a form agreed to by the Required Consenting Stakeholders.

"**Interim DIP TLC Order**" means any order of the Bankruptcy Court authorizing the incurrence of the DIP TLC Facility on an interim basis.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Issuers**" means WeWork Companies LLC and WW Co-Obligor Inc.

"**Joinder Agreement**" means a joinder agreement in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Material Adverse Effect**" means one or more Events or a series of Events that taken alone or together has a material adverse effect on (i) the Company Parties (taken as a whole), that prevents them from implementing the Restructuring Transactions in a material way, or (ii) the financial condition of the Company Parties, taken as a whole, other than the following:

(a)     a breach of any contractual financing arrangement (i) which has been waived or with respect to which the applicable counterparties have agreed to forbear from exercising remedies, in each case with the consent of the Required Consenting Stakeholders, or (ii) which arises as a result of the Restructuring Transactions;

(b)     either the failure to meet any projections or estimated revenues or profits or (ii) the occurrence of any costs or expenses in excess of estimated amounts;

(c)     any Enforcement Action which has been stayed, suspended, or dismissed;

(d)     any litigation or similar action against any Company Party commenced on or after the Agreement Effective Date which arises from or relates to the Restructuring Transactions with respect to the Company Parties' capital structure and is being defended by a Company Party in good faith and in consultation with the Required Consenting Stakeholders;

(e)     the commencement or pendency of any Chapter 11 Case in accordance with this Agreement;

(f)     the commencement or pendency of any Insolvency Proceeding, or any Foreign Proceeding, if any, in accordance with this Agreement in connection with any of the Company Parties or their direct or indirect subsidiaries that has been pursued with the consent of the Required Consenting Stakeholders;

(g)     the execution, announcement or performance of this Agreement, or other Definitive Documents or the transactions contemplated hereby or thereby (including any act or omission of WeWork or any other Debtor expressly required or prohibited, as applicable, by this Agreement);

10

(h)    the commencement of any Enforcement Action against any of the Company Parties, or their direct or indirect subsidiaries, by any creditors (including landlords) who are not Consenting Stakeholders;

(i)    any matters known or expressly disclosed to any Consenting Stakeholder prior to the date of this Agreement; or

(j)    any material changes after the date of this Agreement in applicable Law or GAAP or enforcement thereof.

"**Milestones**" shall have the meaning set forth in the Restructuring Term Sheet.

"**New Corporate Governance Documents**" means the documents providing for corporate governance of the Reorganized Company, which may include any form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, shareholders' agreement, and such other applicable formation, organizational and governance documents (if any) of the Reorganized Company, each of which shall be included in the Plan Supplement, if applicable.

"**New LC Facility**" means the letter of credit facility to be entered into on the Plan Effective Date.

"**New LC Facility Documents**" means the agreements and related documents governing the New LC Facility, including new, amended, or amended and restated guarantees and security documents and agreements, other ancillary documents, as applicable, and all opinions, certificates, filings and other deliverables required to satisfy the conditions precedent to the effectiveness of the foregoing documents and agreements.

"**New LC Facility Term Sheet**" means the term sheet attached hereto as **Exhibit F** setting forth the material terms of the New LC Facility.

"**New LC Lenders**" means any lender under the New LC Facility.

"**Notes**" means the 1L Notes, 2L Notes, and 3L Notes.

"**Notes Claims**" mean any Claim against a Company Party arising under, derived from, based on, or related to the Notes or Notes Documents, including (but in no way limited to) Claims for all principal amounts outstanding, interest, fees, expenses, costs, guarantees, and other charges arising thereunder or related thereto.

"**Notes Documents**" means, collectively, the Indentures and all instruments, security agreements, collateral agreements, guaranty agreements, intercreditor agreements, pledges, and other documents with respect to the Notes.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization, including any exhibits and schedules thereto, filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement).

"**Plan Effective Date**" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are waived in accordance with the terms of this Agreement and the Plan, and on which the Restructuring Transactions become effective or are consummated.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court in accordance with the schedule set forth in the Disclosure Statement and prior to the hearing on confirmation of the Plan, which shall include the Schedule of Retained Causes of Action, the Schedule of Rejected Executory Contracts and Unexpired Leases, the Schedule of Assumed Executory Contracts and Unexpired Leases, New LC Facility Documents, the New Corporate Governance Documents, any Ruling Request, the Restructuring Transactions Exhibit, and any other documents that the Debtors determine to include.

"**Prepetition LC Credit Agreement**" means, as it may be amended, supplemented, or otherwise modified from time to time, that certain Prepetition LC Credit Agreement, dated as of December 27, 2019, by and among WeWork Companies U.S. LLC, SVF II, SVF II GP (Jersey Limited), and SB Global Advisors Limited, as obligors, the several issuing creditors and letter of credit participants from time to time party thereto, Goldman Sachs International Bank, as senior tranche administrative agent and shared collateral agent, Kroll Agency Services Limited, as junior tranche administrative agent, and the other parties thereto from time to time.

"**Prepetition LC Facility Claims**" means any Claim against a Company Party arising under, derived from, based on, or related to the Prepetition LC Credit Agreement (including any Prepetition LC Subrogation Claims and Prepetition LC Reimbursement Claims).

"**Prepetition LC Facility Documents**" means the Prepetition LC Credit Agreement and related documents, including, without limitation, the Prepetition LC Reimbursement Agreement.

"**Prepetition LC Reimbursement Agreement**" means that certain Reimbursement Agreement, dated as of February 10, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among SVF II, SoftBank Group Corp., and WeWork Companies U.S. LLC.

"**Prepetition LC Reimbursement Claims**" means all claims arising under the Prepetition LC Reimbursement Agreement.

"**Prepetition LC Subrogation Claims**" means claims for any and all Applicable Obligations (as defined in the Prepetition LC Credit Agreement) paid by the SVF Obligor (as defined in the Prepetition LC Credit Agreement), including, without limitation, the total amount

required pursuant to the terms of the Prepetition LC Credit Agreement for the SVF Obligor to reimburse all drawn amounts under the Senior LC Facility and the Junior LC Facility (as both terms are defined in the Prepetition LC Credit Agreement) and to pay or cash collateralize all outstanding amounts under the Prepetition LC Credit Agreement (including, without limitation, any fees, interest, expenses, and other amounts thereunder).

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable public or private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers some or all Company Claims/Interests (or enter with customers into long and short positions in some or all Company Claims/Interests), in its capacity as a dealer or market maker in some or all Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against or Interests in issuers or borrowers (including debt securities or other debt).

"**Reorganized Company**" means (a) reorganized WeWork, (b) a new corporation, limited liability company, partnership, or other Entity that may be formed to, or a Company Party that may, among other things, issue the New Interests, or (c) another reorganized Debtor Entity in all cases as on the Plan Effective Date, in accordance with the Plan and Restructuring Term Sheet.

"**Reorganized Debtor**" means any of the Company Parties (including Reorganized WeWork and any special purpose entities) being reorganized with the consent of the Required Consenting Stakeholders, on and after the Plan Effective Date, in accordance with the Plan and Restructuring Term Sheet.

"**Required Consenting AHG Noteholders**" means, as of the relevant date, (a) at least two (2) unaffiliated Initial Consenting AHG Noteholders holding at least 50% of the aggregate outstanding principal amount of Notes Claims that are held by the Initial Consenting AHG Noteholders; (b) if there are not at least two (2) unaffiliated Initial Consenting AHG Noteholders holding at least 50% of the aggregate outstanding principal amount of Notes Claims that are held by the Initial Consenting AHG Noteholders, then Initial Consenting AHG Noteholders holding at least 50% of the aggregate outstanding principal amount of Notes Claims that are held by Initial Consenting AHG Noteholders; or (c) if there are no Initial Consenting AHG Noteholders party to this Agreement, Consenting AHG Noteholders holding at least 50% of the aggregate outstanding principal amount of Notes Claims that are held by Consenting AHG Noteholders.

"**Required Consenting Stakeholders**" means, collectively, the SoftBank Parties and the Required Consenting AHG Noteholders; *provided* that to the extent any action, event, amendment, or waiver requiring consent or approval of the Required Consenting Stakeholders would materially, adversely and disproportionately affect Cupar, the SoftBank Parties, the Required Consenting AHG Noteholders, and Cupar.

"**Restructuring Effective Date**" means the occurrence of the Plan Effective Date according to its terms.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals hereof.

"**Restructuring Transactions**" has the meaning set forth in the recitals hereof.

13

"**Restructuring Transactions Exhibit**" means the exhibit to the Plan Supplement that will set forth the material components of the transactions that are required to effectuate the Restructuring Transactions contemplated by this Agreement and the Plan, including any "restructuring steps memo," "tax steps memo" or other document describing steps to be taken and the related tax considerations in connection with the Restructuring Transactions.

"**Rules**" means Rule 501(a)(1), (2), (3), (7) and (8) of Regulation D under the Securities Act.

"**Ruling Request**" means a request for one or more private letter rulings from the IRS pertaining to certain U.S. federal income tax matters relating to the Restructuring Transactions or any Alternative Restructuring Proposal, including any supplemental filings made or supplemental rulings requested in connection therewith.

"**Sale Order**" means an order entered by the Bankruptcy Court approving the sale of some or all of the assets of the Debtors to a purchaser.

"**Second Lien Exchangeable Indenture**" means that certain Second Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as may be amended, amended and restated, or otherwise supplemented from time to time), by and among the Issuers, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as trustee and as collateral agent.

"**Second Lien Indenture**" means that certain Second Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as may be amended, amended and restated, or otherwise supplemented from time to time), by and among the Issuers, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as trustee and as collateral agent.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**SoftBank Advisors**" means Weil Gotshal & Manges LLP, Houlihan Lokey Capital, Inc., Wollmuth Maher & Deutsch LLP, and any other special or local counsel or advisors providing advice to the SoftBank Parties in connection with the Restructuring Transactions.

"**SoftBank Parties**" has the meaning set forth in the preamble hereof.

"**Solicitation Materials**" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, any motion requesting approval of the Disclosure Statement, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

"**SVF II**" has the meaning set forth in the preamble hereof.

"**SVF II Aggregator**" has the meaning set forth in the preamble hereof.

"**SVF II Holdings**" has the meaning set forth in the preamble hereof.

"**SVF II WW**" has the meaning set forth in the preamble hereof.

"**Tax Ruling**" means a favorable private letter ruling from the IRS regarding any of the matters set forth in the applicable Ruling Request.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01 through 11.06.

"**Third Lien Exchangeable Indentures**" means that certain Third Lien Exchangeable Senior Secured PIK Notes Indenture, dated May 5, 2023 (as may be amended, amended and restated, or otherwise supplemented from time to time), by and among the Issuers, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as trustee and as collateral agent.

"**Third Lien Indenture**" means that certain Third Lien Senior Secured PIK Notes Indenture, dated May 5, 2023 (as may be amended, amended and restated, or otherwise supplemented from time to time), by and among the Issuers, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as trustee and as collateral agent.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); *provided*, *however*, that any pledge in favor of (a) a bank or broker dealer at which a Consenting Stakeholder maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally or (b) any lender, agent or trustee to secure obligations generally under debt issued by the applicable fund or account, in each case shall not be deemed a "Transfer" for any purposes hereunder so long as such pledge does not result in the inability of the applicable Consenting Stakeholder granting such pledge to vote its Company Claims/Interests to accept the Plan.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Indentures, including any successors thereto.

"**United States Trustee**" means the Office of the United States Trustee for the district of the Bankruptcy Court.

"**Unsecured Notes**" means the 7.875% senior notes due 2025 and the 5.00% senior notes due 2025, Series 2, each, issued by the Issuers.

"**WeWork**" has the meaning set forth in the preamble hereof.

1.02.        Interpretation.  For purposes of this Agreement:

(a)        in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "stockholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company, corporation, or partnership Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.** *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at the time and date upon which the following conditions are satisfied or waived in accordance with this agreement as follows:  (1) with respect to the Company Parties upon satisfaction of Section 2(a), (2) with respect to the Required Consenting AHG Noteholders, upon satisfaction of Section 2(b)(i), (3) with respect to the SoftBank Parties upon the satisfaction of Section 2(b)(ii), and (4) with respect to Cupar, upon the satisfaction of Section 2(b)(iii), or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)      the following Parties shall have executed and delivered (to counsel to the Company Parties) counterpart signature pages of this Agreement:

(i)       holders or beneficial owners of at least: (x) 95% of the aggregate outstanding principal amount of 1L Series 1 Notes and (y) 93% of the aggregate outstanding principal amount of 2L Secured Notes;

(ii)       the SoftBank Parties, in their capacity as the holder of (A) 100% of the aggregate outstanding principal amount of the 1L Series 2 Notes, 2L Exchangeable Notes, and 3L Exchangeable Notes, and (B) 46,597,499 shares of Interests in WeWork; and

(iii)       Cupar, in its capacity as the holder or beneficial owner of 100% of the aggregate outstanding principal amount of the 1L Series 3 Notes;

(c)       all Consenting Stakeholder Transaction Expenses for which an invoice was delivered to any Company Party or counsel thereto at least one (1) day prior to the Agreement Effective Date shall have been paid; and

(d)       counsel to the Company Parties shall have given notice to counsel for each of the SoftBank Parties, Consenting AHG Noteholders, and Cupar in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**  ***Definitive Documents***.

3.01.       The Definitive Documents governing the Restructuring Transactions shall include this Agreement and all other agreements, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including each of the following:

(a)       the New LC Facility Documents;

(b)       the  New Corporate Governance Documents;

(c)       any documents in connection with any First Day Pleadings or "second day" pleadings and all orders sought pursuant thereto (including the First Day Pleadings) and First Day Orders;

(d)       the Plan;

(e)       the Confirmation Order and any pleadings filed by the Debtors in support of entry thereof;

(f)       the Disclosure Statement and Solicitation Materials (including any motion seeking either approval of the Disclosure Statement or combined or conditional approval of the Disclosure Statement and/or Plan);

(g)       the Disclosure Statement Order;

(h)       the Cash Collateral Documents;

(i)      the DIP TLC Documents;

(j)      any "key employee" retention or incentive plan and any motion or order related thereto;

(k)      the Restructuring Transactions Exhibit and Ruling Request, if any;

(l)      the Plan Supplement;

(m)      any material agreements, settlements, motions, pleadings, briefs, applications, orders and other filings with the Bankruptcy Court with respect to the rejection, assumption and/or assumption and assignment of executory contracts and/or unexpired leases;

(n)      if applicable, any Sale Order and any other motions, proposed orders, and definitive documentation, including any purchase agreement or procedures, related to the sale of all or substantially all of the assets of the Company Parties taken as a whole;

(k)      any other material (with materiality determined in the reasonable discretion of the Company Parties with the consent of counsel to the Consenting Stakeholders, such consent not to be unreasonably withheld) agreements, settlements, applications, motions, pleadings, briefs, orders, and other filings with the Bankruptcy Court (including any documentation related to any equity or debt investment or offering with respect to any Company Party) that may be reasonably necessary or advisable to implement the Restructuring Transactions;

(l)      any pleadings that impose or seek authority to impose sell-down orders or restrictions on the ability of the Consenting Stakeholders or other parties to trade any of the Company Parties' securities;

(o)      if any Insolvency Proceeding other than the Chapter 11 Cases is commenced:

(i)      a certified copy of the decision commencing such Insolvency Proceeding, or any analogous procedure under applicable law;

(ii)      where applicable, an order of the relevant court in which each Insolvency Proceeding has been filed, giving orders for directions with respect to, among other things (if applicable), the convening of creditor and/or member meetings to vote on the relevant Foreign Plan;

(iii)      any Foreign Plan;

(iv)      where applicable, an order of the relevant court in which each Insolvency Proceeding has been filed sanctioning the relevant Foreign Plan;

(v)      any other material document, deed, agreement, filing, notification, letter, or instrument necessary or desirable entered into by a Company Party or Consenting Stakeholder in connection with the relevant Foreign Plan or Insolvency Proceeding and referred to in the explanatory statement described in paragraph (r)(i) above (including, for the avoidance of doubt, documents described in the explanatory statement relevant to any Insolvency Proceeding);

*provided* that notwithstanding the foregoing, any monthly or quarterly operating reports, retention applications, fee applications, fee statements, and declarations in support thereof or related thereto shall not constitute Definitive Documents.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, settlement, filing, notification, letter or instrument related to the Restructuring Transactions, including any modifications, amendments, or supplements thereto, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and be subject to the applicable consent rights of the SoftBank Parties and the Required Consenting AHG Noteholders, individually or together, set forth herein, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall be at all times in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided*, that the Cash Collateral Documents, DIP TLC Documents, Plan, the Plan Supplement (including the New Corporate Governance Documents), the Restructuring Transaction Exhibit, the Ruling Request (if any), the Confirmation Order, and the New LC Facility Documents shall at all times be acceptable in all respects to the Required Consenting Stakeholders.

## Section 4. *Commitments of the Consenting Stakeholders*.

4.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)    During the Agreement Effective Period, but subject to the terms and conditions of this Agreement, each Consenting Stakeholder agrees severally, and not jointly, in respect of all of its Company Claims/Interests, to:

(i)    support and consent to the Restructuring Transactions and vote and exercise any powers or rights available to it (*provided*, that such powers or rights are necessary to achieve the support and consent of such Consenting Stakeholders), subject to terms hereof (including in any board, shareholders', stockholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent reasonably necessary to implement the Restructuring Transactions, in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement and the Definitive Documents, as applicable;

(ii)    use commercially reasonable efforts to cooperate with and assist the Company Parties, or their direct or indirect subsidiaries, in obtaining additional support for the Restructuring Transactions from the Company Parties' (or their direct or indirect subsidiaries) other stakeholders;

(iii)    use commercially reasonable efforts to give any reasonable notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; and

(iv)    negotiate in good faith and use commercially reasonable efforts to execute (where applicable) and implement the Definitive Documents—and any other agreements required

to effectuate and consummate the Restructuring Transactions—that are consistent with this Agreement.

(b)      During the Agreement Effective Period, each Consenting Stakeholder agrees severally, and not jointly, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly (including directing or encouraging any person or entity to):

(i)      object to, delay, impede, or take any other action that would reasonably be expected to materially interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding that is materially inconsistent with this Agreement or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties (it being understood, for the avoidance of doubt, that any litigation or proceeding to enforce this Agreement or any Definitive Document or that is otherwise permitted under this Agreement shall not be construed to be inconsistent with this Agreement or the Restructuring Transactions);

(v)      (A) take (directly or indirectly) any Enforcement Actions, including (x) sue, claim, institute or continue any legal process in the exercise of rights and remedies on account of, (y) seek recovery or demand cash cover in respect of (including by exercising any set-off save as required by law), or (z) petition for or support any corporate action, legal process or other proceeding in connection with any Insolvency Proceeding of any Company Party in connection with, all or any part of any Company Claims/Interests; (B) direct or encourage any person to take any action described in the preceding clause (A); or (C) vote or direct any proxy appointed by it to vote in favor of any such action described in the preceding clause (A), in each case except as contemplated by this Agreement or the Definitive Documents or as otherwise agreed in writing to be necessary or desirable for the implementation of the Restructuring Transactions by the Company Parties and the Required Consenting Stakeholders; and

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, other than as permitted by this Agreement.

4.02.      <u>Commitments with Respect to Insolvency Proceedings Other Than the Chapter 11 Cases</u>.  During the Agreement Effective Period, each Consenting Stakeholder agrees severally, and not jointly, in respect of each of its Company Claims/Interests pursuant to this Agreement:

(a)      to use commercially reasonable efforts to (i) take all necessary steps, and (ii) execute all necessary documents, to the extent practicable and subject to terms hereof, to

provide any requisite consents, or authorize or direct a vote on such Consenting Stakeholder's behalf in favor of any plan of reorganization, scheme of arrangement, insolvency plan, or similar plan, proposed by a Company Party and contemplated by this Agreement, in respect of each of such Consenting Stakeholder's Company Claims/Interests against the Company Party that is subject to that Insolvency Proceeding pursuant to this Agreement;

(b)     to use commercially reasonable efforts to oppose any party or person from objecting to, delaying, impeding, or taking any other action to interfere with any motion or other pleading or document filed by a Company Party in any legal forum (including the Bankruptcy Court) that is consistent with this Agreement;

(c)     without limiting the binding nature of any plan, scheme, arrangement or the like under any Insolvency Proceeding, to comply in all material respects with the terms of each Insolvency Proceeding and related Foreign Plans that it is subject to and to take all commercially reasonable actions and steps (including executing any document) to give effect to the terms of each Foreign Plan and any Insolvency Proceedings that it is subject to;

(d)     to the extent a class of Company Claims/Interests is permitted to vote to accept or reject the Foreign Plans, to attend (in person or by proxy) any relevant meeting (as appropriate and upon reasonable notice) and vote (or cause the relevant person to vote, to the extent it is legally entitled to cause that person to vote) each of its Company Claims/Interests, in favor of any matter necessary to facilitate, implement and/or consummate the relevant Foreign Plan on terms consistent with the Restructuring Term Sheet, including promptly instructing any relevant Agent/Trustee to take any step to facilitate, implement, and/or consummate the relevant Foreign Plan and to vote with respect to any amendment or modification to the relevant Foreign Plan or adjournment to a meeting in each case to the extent as contemplated by or which is required in accordance with the Restructuring Term Sheet;

(e)     to not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote referred to in clause (c) above; *provided*, that each Consenting Stakeholder may change or withdraw its vote if the Termination Date occurs as to such Consenting Stakeholder (other than as a result of the occurrence of the Plan Effective Date); and

(f)     to otherwise consent to, support, and take all commercially reasonable actions necessary or reasonably requested by WeWork or the relevant Company Party to give effect to the Foreign Plan and/or any Insolvency Proceedings, in each case to the extent not inconsistent with this Agreement or any Definitive Document.

4.03.     Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, but subject to the terms and conditions of this Agreement, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees severally, and not jointly, that it shall, subject to such Consenting Stakeholder's receipt of the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)     vote on a timely basis each of its Company Claims/Interests set forth on its signature page to this Agreement, any Transfer Agreement, or any Joinder Agreement to accept

the Plan by delivering its duly executed and completed ballot accepting the Plan following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot and prior to the deadline for such delivery;

(ii)    to the extent it is permitted to elect whether to opt out of (or opt in to) the releases set forth in the Plan, elect not to opt out of (or elect to opt in to) the releases set forth in the Plan by delivering its duly executed and completed ballot(s) indicating such election prior to the deadline for such delivery, *provided*, that such Plan releases are materially consistent with those set forth in the Restructuring Term Sheet; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided*, that each Consenting Stakeholder may change or withdraw its vote if the Termination Date occurs as to such Consenting Stakeholder.

4.04.        Commitments with Respect to Ruling Requests.  The Company Parties, with the prior written consent of the Required Consenting Stakeholders, shall have the right to seek one or more Tax Rulings and to submit a Ruling Request related thereto.  In connection with each Ruling Request submitted in accordance with this Section 4.04, each Consenting Stakeholder shall (and shall cause each of its Affiliates to) reasonably cooperate with the Company Parties, as applicable, in connection therewith.

**Section 5.** *Additional Provisions Regarding the Consenting Stakeholders' Commitments*. Notwithstanding anything contained in this Agreement, nothing in this Agreement and neither a vote to accept the Plan by a Consenting Stakeholder nor the acceptance of the Plan by any Consenting Stakeholder shall:

(a)    be construed to prohibit or limit any Consenting Stakeholder from taking or directing any action relating to maintenance, protection, or preservation of any collateral provided that such action is not materially inconsistent with this Agreement and does not hinder, delay, or prevent consummation of the Plan and the Restructuring Transactions;

(b)    affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any Insolvency Proceeding;

(c)    impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement or the Definitive Documents in connection with the Restructuring Transactions;

(d)    be construed to prohibit or limit any Consenting Stakeholder from appearing as a party in interest in any matter to be adjudicated concerning any matter arising in the Chapter 11 Cases or any Insolvency Proceeding, so long as, during the Agreement Effective Period, the exercise of such right is not inconsistent with this Agreement or any Definitive Document, or such Consenting Stakeholder's obligations hereunder;

(e)     be construed to prohibit any Consenting Stakeholder from enforcing this Agreement or any Definitive Document, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising its rights or remedies reserved herein or in the Definitive Documents;

(f)     prevent any Consenting Stakeholder from taking any action which is required by applicable Law;

(g)     require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege or work-product doctrine;

(h)     require any Consenting Stakeholder to incur any material financial or other material liability other than as expressly described in this Agreement or any Definitive Document;

(i)     obligate a Consenting Stakeholder to deliver a vote to support the Plan or prohibit a Consenting Stakeholder from withdrawing such vote, in each case from and after the Termination Date (other than as a result of (i) the occurrence of the Plan Effective Date or (ii) such Consenting Stakeholder's material breach of this Agreement); *provided*, that upon the withdrawal of any such vote on or after the Termination Date (other than as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void ab initio and such Consenting Stakeholder shall have the opportunity to change its vote;

(j)     require any Consenting Stakeholder, or the board of directors, board of managers, or similar governing body of such Consenting Stakeholder, after consulting with counsel, to take any action or to refrain from taking any action to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section (j) shall not be deemed to constitute a breach of this Agreement;

(k)     prevent any Consenting Stakeholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(l)     prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims/Interests (including, without limitation, the filing of a proof of claim against any Company Party);

(m)     be construed to prohibit any Consenting Stakeholder from taking any action that is not materially inconsistent with this Agreement;

(n)     be construed to limit consent and approval rights provided in this Agreement (including the Restructuring Term Sheet) and the Definitive Documents;

(o)     limit the ability of any Consenting Stakeholder to assert any rights, claims, and/or defenses arising under the Notes, the Prepetition LC Facility Documents, or any related documents

or agreements so long as the positions advocated in connection therewith are not inconsistent with this Agreement or any other Definitive Document;

(p)      limit the ability of any Consenting Stakeholder to defend against or assert any rights, claims, and/or defenses with respect to any Cause of Action threatened or commenced against any Consenting Stakeholder by any third party; or

(q)      except as expressly provided in this Agreement, the Restructuring Transactions, any nondisclosure agreement, and the Definitive Documents, limit the ability of any Consenting Stakeholder to purchase, sell, exchange, or enter into any other transactions regarding the Company Claims/Interests.

**Section 6.  *Commitments of the Company Parties*.**

6.01.  <u>Affirmative Commitments</u>.  Except as set forth in **Section** 7, during the Agreement Effective Period, during the Agreement Effective Period, subject to the terms and conditions of this Agreement, the Company Parties agree to:

(a)      support the Restructuring Transactions, act in good faith, take all actions, to the extent practicable and subject to the terms hereof, reasonably necessary to implement and consummate the Restructuring Transactions (including facilitating solicitation of the Plan) in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement and the Definitive Documents, as applicable;

(b)      comply with each Milestone;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment, including to negotiate in good faith appropriate additional or alternative provisions to address any such impediment including to negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in each case, in a manner reasonably acceptable to the Required Consenting Stakeholders, and/or timely filing a formal objection to any motion, application or proceeding (i) seeking relief that is inconsistent with this Agreement in any material respect, or would (or would reasonably be expected to) frustrate the purposes of this Agreement, (ii) seeking the entry of an order modifying or terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization, (iii) challenging the amount, validity, allowance, character, enforceability or priority of any Company Claims/Interests of any of the Consenting Stakeholders, (iv) challenging the validity, enforceability or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting Stakeholders, (v) seeking standing to pursue claims or Causes of Action of the Company Parties against any Consenting Stakeholder, (vi) objecting to or seeking to interfere with the Cash Collateral Motion or Cash Collateral Orders, or (vii) objecting to or seeking to interfere with the DIP TLC Motion or DIP TLC Orders;

(d)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and consult

with the Consenting Stakeholders regarding the status and the material terms of any negotiations with any such stakeholders;

(e)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(f)      negotiate in good faith and use commercially reasonable efforts to execute and deliver and perform its obligations under the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)      operate the business of each of the Debtors in the ordinary course (other than changes in the operations resulting from or relating to the Restructuring Transactions or the filing of the Chapter 11 Cases or any other Insolvency Proceedings) and in accordance with their business judgment and in a manner that is materially consistent with this Agreement and the business plan of the Debtors;

(h)      provide the following reporting to each of (1) the advisors to the Consenting Stakeholders and (2) the Consenting Stakeholders (subject, in the case of (2), to acceptable non-disclosure agreements where applicable and consistent with past practice among the Parties) with the following reporting:

(i)      weekly update calls with respect to:

a.      the business plan;

b.      lease negotiation status and strategy, including any leases to be added to pleadings to assume or reject leases, which shall include an overview of leases to be assumed or rejected and a reasonable opportunity for Required Consenting Stakeholders to provide input on such strategy, assumptions, negotiations and rejections, both in the U.S. and in all other jurisdictions in which the Company Parties and their direct and indirect subsidiaries operate;

c.      weekly updates on the status and progress of the negotiations of the Definitive Documents;

d.      the status of obtaining any necessary or desirable authorizations (including any consents) with respect to the Restructuring Transactions from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(ii)      budgets related to the Cash Collateral Orders in accordance with the reporting requirements set forth therein;

(iii)      provide timely and reasonable responses (written responses to the extent reasonably requested) to all reasonable diligence requests;

(i)      provide reporting, including, without limitation, with advisors to the Consenting Stakeholders and the Consenting Stakeholders, quarterly update calls regarding the Company Parties' operations, performance, and financial conditions;

(j)      inform the applicable counsel to the Consenting Stakeholders as soon as reasonably practicable, but no later than two (2) Business Days, after obtaining actual knowledge thereof: (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination of, this Agreement; (ii) any matter or circumstance which they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of the Company Parties (and their direct and indirect subsidiaries) unless such notice is disclosed on the docket maintained in the Chapter 11 Cases within two (2) Business Days after obtaining actual knowledge thereof; (iv) a breach of this Agreement (including a breach by the Company Parties); (v) any representation or statement made or deemed to be made by the Company Parties under this Agreement which is or provides to have been materially incorrect or misleading in any respect when deemed to have been made; (vi) the initiation, institution or commencement of any material lawsuit, action or other proceeding by any person or entity (A) involving the Company Parties or any of their respective current or former officers, employees, managers, directors, members or equity holders (in their capacities as such) unless such notice is disclosed on the docket maintained in the Chapter 11 Cases within two (2) Business Days after obtaining actual knowledge thereof or (B) challenging the validity of the Restructuring Transactions or seeking to enjoin, restrain or prohibit this Agreement or the consummation of the Restructuring Transactions unless such notice is disclosed on the docket maintained in the Chapter 11 Cases within two (2) Business Days after obtaining actual knowledge thereof, (vii) the happening or existence of any fact, event or circumstance that shall have made any of the conditions precedent to any Company Party's obligations set forth in (or to be set forth in) any of the Definitive Documents incapable of being satisfied, and (viii) the receipt of notice from any person or entity alleging that the consent of such person or entity is or may be required under any contract, agreement, permit, Law or otherwise in connection with the consummation of any part of the Restructuring Transactions, unless such notice is disclosed on the docket maintained in the Chapter 11 Cases within two (2) Business Days after obtaining actual knowledge thereof; *provided,* that in respect of their obligations to provide reporting and information pursuant to Sections 6.01(h)(i), 6.01(h)(iii), and 6.01(i), the Company Parties will procure that, where the relevant leases are held by, or the diligence requests are in respect of information relating to, any of their direct and indirect subsidiaries (wherever located and whether wholly or jointly owned) which are not Company Parties, such subsidiaries will assist in providing such information to the Company Parties or, if requested by the Consenting Stakeholders, directly to the Consenting Stakeholders and their advisors;

(k)      maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(l)      provide to counsel to the Consenting Stakeholders drafts of all Definitive Documents and declarations related thereto (other than declarations in support of, or related to, retention applications, fee applications, or fee statements) that the Company Parties intend to file with the Bankruptcy Court, and drafts of all material court filings and documents relating to any

26

insolvency proceedings (including, for the avoidance of doubt, any Insolvency Proceedings relating to the direct and indirect subsidiaries (wherever located and whether wholly or jointly owned) of the Company Parties) no less than two (2) Business Days prior to such filing, or if exigencies make such delivery impossible, as soon as reasonably practicable prior to such filing;

(m)     timely file a formal written reply to any objection filed with the Bankruptcy Court by any person with respect to any of the Definitive Documents;

(n)     timely file a formal objection to any motion filed with the Bankruptcy Court by any person seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that is inconsistent with this Agreement in any material respect or would reasonably be expected to frustrate the purposes of this Agreement, including by preventing consummation of the Restructuring Transactions;

(o)     timely file a formal objection to any motion filed with the Bankruptcy Court by any person seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(p)     take all actions reasonably necessary and proper to prosecute and defend any appeals of the Confirmation Order;

(q)     negotiate in good faith upon reasonable request of any other Party any modifications to the Restructuring Transactions that would improve the tax efficiency of the Restructuring Transactions or are otherwise necessary to address any legal, financial, or structural impediment that may prevent the consummation of the Restructuring Transactions, in each case to the extent such modifications can be implemented without adverse effect on such Company Party;

(r)     promptly pay the Consenting Stakeholder Transaction Expenses as and when due in full in cash; provided, that on and after the Plan Effective Date, so long as this Agreement has not been terminated prior to the Plan Effective Date as to all Parties, the Company Parties shall pay the Consenting Stakeholder Transaction Expenses as and when due without any requirement for Bankruptcy Court review or further Bankruptcy Court order;

(s)     use best efforts to (i) prevent counterparties of non-residential real property leases from applying, setting off, recouping, or otherwise drawing on the relevant letters of credit and (ii) oppose any and all requests and/or motions made by such counterparties to, apply, set off, recoup, or otherwise draw on such letters of credit; and

(t)     make such senior management and other representatives of Company Parties and their direct and indirect subsidiaries (wherever located and whether wholly or jointly owned) as the Consenting AHG Noteholders, the SoftBank Parties or Cupar may reasonably request, available to assist in all matters in relation to implementation or consummation of the Restructuring Transaction at such times as the Consenting AHG Noteholders or the SoftBank Parties may reasonably request; provided, that such requesting parties will use commercially reasonable efforts to coordinate such requests to avoid duplication.

6.02.          <u>Negative Commitments</u>.    Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action that would reasonably be expected to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement;

(c)      seek to amend or modify the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement;

(d)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(e)      (i) consummate or enter into a definitive agreement evidencing, or file one or more motion or application seeking authority to consummate or enter into, any merger, consolidation, disposition of material assets, acquisition or sale of material assets, or similar transaction, (ii) make any material investments, (iii) pay any dividend, or (iv) incur any indebtedness for borrowed money, in each case (x) outside the ordinary course of business, (y) in excess of $2,000,000 in the aggregate, or (z) other than as contemplated by this Agreement and the Restructuring Transactions, unless the Required Consenting Stakeholders have provided prior written consent;

(f)      amend, terminate or modify any agreement, document, instrument, indenture or other writing evidencing any indebtedness or prepay, repay, redeem, defease, purchase, acquire, terminate, or discharge any such indebtedness without the consent of the Required Consenting Stakeholders;

(g)      seek the application of the equitable doctrine of marshaling, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code with respect to any of the Prepetition LC Facility Claims or the 1L Notes or 2L Notes;

(h)      make, modify, or amend (other than in the ordinary course of business, as required by law or as permitted, required or contemplated as part of the Restructuring Transactions or in the Definitive Documents) a material tax election, including a tax classification election (or any deemed tax classification election through an amendment of a Company Party's organizational documents or the conversion of a Company Party to a different entity classification for U.S. federal income tax purposes), without the written consent of the Required Consenting Stakeholders, not to be unreasonably withheld, conditioned or delayed;

(i)      (i) seek discovery in connection with, or prepare or commence an avoidance action or other legal proceeding that challenges, (A) the amount, validity, allowance, character, enforceability or priority of any Company Claims/Interests of any of the Consenting Stakeholders or (B) the validity, enforceability or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting Stakeholders or (ii) support any third party in connection with any of the acts described in clause (i) of this paragraph;

(j)    commence, support, or join any litigation or adversary proceedings against any Consenting Stakeholder;

(k)    incur any liens or security interest, or encumbrance other than: (i) those existing immediately prior to the date hereof, (ii) those permitted pursuant to the DIP TLC Facility, or (iii) those granted under or permitted by the DIP TLC Orders and Cash Collateral Orders;

(l)    make any payment in satisfaction of any existing funded indebtedness other than as contemplated by the Restructuring Transactions and outside the ordinary course of business;

(m)    cause any Company Party that is a Debtor to pay any tax on behalf of any Company Party that is not a Debtor (or to transfer any amount to such non-Debtor Company party to pay such tax) in excess of $1,000,000 without the prior written consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned or delayed); or

(n)    except as contemplated by this Agreement, the Plan, or pursuant to the Restructuring Transactions, issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its Interests, including capital stock or limited liability company interests.

**Section 7.    *Additional Provisions Regarding Company Parties' Commitments*.**

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement; *provided*, it is agreed that any such action that results in a termination of this Agreement in accordance with the terms hereof shall be subject to the provisions set forth in Section 11.06 hereof.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (a) consider, respond to, and facilitate any unsolicited Alternative Restructuring Proposals received by the Company Party; (b) provide access to non-public information concerning any Company Party to any Entity and enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions. If any company Party receives an Alternative Restructuring Proposal, then such Company Party shall, within three (3) Business Days of receiving such proposal, (i) provide to the Consenting Stakeholders and their counsel with all

29

documentation received in connection with such Alternative Restructuring Proposal (or, if such proposal was not made in writing, a reasonably detailed summary of such Alternative Restructuring Proposal), including the identity of the person or group of persons involved and reasonable updates as to the status and progress of such Alternative Restructuring Proposal, and (ii) respond promptly to reasonable information requests and questions from counsel to the Consenting Stakeholders relating to such Alternative Restructuring Proposal.

7.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**   *Transfer of Company Claims/Interests and Securities*.

8.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated Entity, including any Entity in which it may hold a direct or indirect beneficial interest, unless:

(a)   in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder;

(b)   either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Consenting Stakeholders, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties and counsel to the Consenting Stakeholders as soon as reasonably practicable, but in no case later than by close of business three (3) Business Days following such Transfer; and

(c)   such Transfer does not violate the terms of any order entered by the Bankruptcy Court with respect to preservation of tax attributes.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 8.01 shall be void ab initio.

8.03.   Except as set forth in Section 8, this Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders), (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest

acquired) to counsel to the Company Parties and counsel to the Consenting Stakeholders within five (5) Business Days of such acquisition, (c) any such acquisition shall be subject to the provisions of Section 8.07 and (d) any such acquisition shall not violate the terms of any order entered by the Bankruptcy Court with respect to preservation of tax attributes.

8.04.        This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.        Notwithstanding Section 8.01, any Consenting Stakeholder may Transfer any Company Claim/Interest to a Qualified Marketmaker and a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests, in each case, solely to the extent that (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.        Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.        From the Agreement Effective Date until the Termination Date, and except as described in the Restructuring Term Sheet and the Definitive Documents: (a) neither the SoftBank Parties nor Cupar shall (i) claim any worthless stock deduction for U.S. federal income tax purposes with respect to the Interests of WeWork for any tax period ending prior to the Plan Effective Date, (ii) acquire or pledge, encumber, assign, sell, or otherwise Transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise Transfer, in whole or in part, directly or indirectly (including, for the avoidance of doubt, constructively owned Interests based on the application of Section 382(l)(3) of the Internal Revenue Code), any portion of its right, title, or interests in any of its Interests, or any other interest treated as equity for U.S. federal income tax purposes, to the extent such acquisition or Transfer (including any such pledge, encumbrance, assignment, sale, or other transaction or event) could result in an "ownership change" of any Company Party for purposes of Section 382 of the Internal Revenue Code, or (iii) acquire any

outstanding indebtedness of any Company Party to the extent such acquisition would reasonably be expected to result in the application of Section 108(e)(4) of the Internal Revenue Code; (b) for purposes of the Plan, the Consenting AHG Noteholders shall not be treated as a single "entity" as defined under Treasury Regulations Section 1.382-3(a)(1) solely as a result of its members' formulation of or participation in the Restructuring Transactions or the Transactions (as defined in the Transaction Support Agreement dated as of March 17, 2023, as modified, if applicable, to reflect the transactions that were actually implemented on or prior to May 5, 2023), and (c) except as provided in clause (a) of this Section 8.07, no Consenting Stakeholder (other than a Consenting AHG Noteholder) shall acquire (including pursuant to an exchange (or deemed exchange) of We Company Partnership units (together with the corresponding number of shares of WeWork Inc. Class C common stock)) any Interest that could cause such Consenting Stakeholder to become a "5% shareholder" (as such term is defined in Section 382(k)(7) of the Internal Revenue Code) of WeWork, taking into account any Interest to be received in the Restructuring Transactions; provided, however, that, (1) with respect to clause (a)(ii) and clause (c) of this Section 8.07, the Company Parties shall evaluate in good faith any proposed acquisition or Transfer that would otherwise violate the provisions of this Section 8.07 and, if the Company Parties determine (in their sole discretion) that such proposed acquisition or Transfer would not result in an "ownership change" of any Company Party under Section 382 of the Internal Revenue Code when viewed in the aggregate with any other proposed acquisitions or Transfers such acquisition or Transfer shall be permitted upon written notice by the Company Parties, and (2) with respect to clause (a)(iii) of this Section 8.07, the Company Parties shall evaluate in good faith any proposed acquisition of outstanding indebtedness that would otherwise violate the provisions of this Section 8.07 and, if the Company Parties determine (in their sole discretion) that such acquisition would not result in the application of Section 108(e)(4) of the Internal Revenue Code, such acquisition or Transfer shall be permitted upon written notice by the Company Parties; provided, further, that prior to any Company Party giving consent to any acquisition or Transfer pursuant to the foregoing proviso, such acquisition or Transfer shall be subject to the written consent, not to be unreasonably withheld, conditioned or delayed, of the Required Consenting Stakeholders.

8.08.         After the date hereof, the Parties agree to use good faith efforts and to reasonably cooperate in order to determine (i) the potential availability of Section 382(l)(5) of the Internal Revenue Code taking into account the commercial provisions of the Restructuring Transactions and the legal and tax structure of the Debtors, and (ii) whether to further pursue an arrangement that would permit the application of Section 382(l)(5) of the Internal Revenue Code to the Restructuring Transactions, as quickly as reasonably practicable; provided that, for the avoidance of doubt, each Party shall be entitled to determine, in its sole discretion, whether to support pursuing such arrangement.  The Required Consenting Stakeholders shall, in any event, make any such determination no later than 30 days after the date hereof or such later date as may be agreed by the Required Consenting Stakeholders (in each Required Consenting sole discretion) (the "Determination Date") and shall notify the Debtors of such decision in writing.  Prior to the Determination Date, the SoftBank Parties and Cupar shall use commercially reasonable efforts to avoid taking any action that could reasonably be expected to limit the applicability of Section 382(l)(5) of the Internal Revenue Code to the Restructuring Transactions.

**Section 9.**       ***Representations and Warranties of Consenting Stakeholders***.   Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Restructuring Effective Date:

(a)       it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, a Joinder Agreement, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8); *provided*, that the foregoing does not apply to a determination of ownership for tax purposes;

(b)       it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)       such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)       it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement, a Joinder Agreement, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8) as contemplated by this Agreement subject to applicable Law; and

(e)       solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**       ***Mutual Representations, Warranties, and Covenants***.   Each of the Parties severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement and as of the Restructuring Effective Date:

(a)       it is validly existing and in good standing under the Laws of the state of its organization (to the extent such concept exists in such jurisdiction), and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)       except as (i) expressly provided in this Agreement, the Restructuring Term Sheet, the Plan, and the Bankruptcy Code, or any approval required in connection with any Insolvency Proceeding, or (ii) as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws, no material registration or filing with, consent or approval, or notice to, or other action, with or by, any federal, state or governmental authority or

regulatory body is required in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions (including the Restructuring Transactions) contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)      such Party has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or entity, would prevent it from taking any action required of it under this Agreement; and

(f)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**    *Termination Events*.

11.01.  <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated, in each case, with respect to (i) the Consenting AHG Noteholders, by the Required Consenting AHG Noteholders, (ii) the SoftBank Parties, by the SoftBank Parties, and (iii) Cupar, by Cupar, (a) solely to the extent that such event materially, adversely and disproportionately affects Cupar, and (b) who may only terminate this Agreement as to itself, by the delivery to the Company Parties of a written notice to all other Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events, unless waived, in writing, by the terminating Consenting Stakeholders on a prospective or retroactive basis:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, undertakings, commitments, or covenants of the Company Parties set forth in this Agreement that remains uncured for five (5) Business Days after such terminating Consenting Stakeholder transmits a written notice to the Company Parties in accordance with Section 13.10 hereof detailing any such breach;

(b)      solely as to the Consenting AHG Noteholders, the breach in any material respect by any of the SoftBank Parties, and solely as to the SoftBank Parties, the breach in any material respect by the Consenting AHG Noteholders, in each case of any of the representations, warranties, undertakings, commitments, or covenants of the SoftBank Parties or, the Consenting AHG Noteholders, as applicable, set forth in this Agreement that remains uncured for ten (10) Business Days after such terminating Consenting Stakeholder transmits a written notice in accordance with Section 13.10 hereof detailing any such breach; *provided*, neither a Consenting AHG Noteholder nor a SoftBank Party shall have the right to terminate this Agreement: (i) if such terminating Consenting Stakeholder is also in material breach of any of the representations, warranties, or covenants of such terminating Consenting Stakeholder set forth in this Agreement; or (ii) upon the

breach in any material respect by one or more of the Consenting AHG Noteholders of any of the representations, warranties, undertakings, commitments, or covenants, the non-breaching Consenting Noteholders still hold more than two-thirds 66.7% of the aggregate outstanding principal amount of 1L Series 1 Notes;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholder transmits a written notice to the Company Parties in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)    any Company Party exercises a Fiduciary Out;

(e)    (i) the Bankruptcy Court enters the Confirmation Order in a form not acceptable to the Required Consenting Stakeholders, (ii) the Bankruptcy Court enters an order denying confirmation of the Plan, or (iii) the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the Required Consenting Stakeholders within five (5) Business Days of such reversal or vacation;

(f)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a responsible officer, in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing the Chapter 11 Cases, or (iv) rejecting this Agreement;

(g)    the failure by a Company Party to comply with any of the Milestones unless such Milestone is extended by written consent of the Company Parties and the Required Consenting Stakeholders in accordance with this Agreement;

(h)    the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents, or the Restructuring Transactions, and such inconsistent relief is not dismissed, vacated, or modified to be consistent with this Agreement and the Restructuring Transactions within five (5) Business Days following written notice thereof to the Company Parties by such terminating Consenting Stakeholder;

(i)    (1) the occurrence of a "Termination Event" under the Cash Collateral Orders that has not been waived or timely cured in accordance therewith; (2) any Cash Collateral Order is entered in form and substance not acceptable to the Required Consenting Stakeholders, and (3) any Cash Collateral Order is reversed, stayed, dismissed, vacated, reconsidered, or modified or amended in a manner that is not approved by Required Consenting Stakeholders;

(j)    (i) the occurrence of a "Termination Event" under the DIP TLC Orders that has not been waived or timely cured in accordance therewith; (ii) any DIP TLC Order is entered in a form not acceptable to the Required Consenting Stakeholders, or (iii) any DIP TLC Order is reversed,

stayed, dismissed, vacated, reconsidered, modified or amended in a manner that is not approved by Required Consenting Stakeholders;

(k)    the Bankruptcy Court enters an order (or the Company Parties seek an order) invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of the Consenting Stakeholders, the liens securing the company Claims/Interests of the Consenting Stakeholders, or the adequate protection liens granted in any Cash Collateral Order or DIP LC Orders, or any official committee or other person obtains standing to pursue any Challenge (as defined in the Cash Collateral Orders);

(l)    any of the Company Parties consummates or enters into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pays any dividends, or incurs any indebtedness for borrowed money, in each case outside the ordinary course of business, in each case other than: (i) the Restructuring Transactions or (ii) with the prior consent of the Required Consenting Stakeholders

(m)    any of the Company Parties enters into a material executory contract, lease, any key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business, in each case other than with the prior consent of the Required Consenting Stakeholders;

(n)    the filing by any Company Party of any Definitive Document, motion, or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, and such filing is not withdrawn (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Company Parties are provided with such notice, such order is not stayed, reversed, or vacated) within five (5) Business Days following written notice thereof to the Company Parties by the Required Consenting Stakeholders;

(o)    the Bankruptcy Court grants relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure or other remedy against any asset with a value in excess of $10,000,000 or to permit other actions that would have a material adverse effect on the company Parties without the written consent of the Required Consenting Stakeholders;

(p)    the Company Parties lose the exclusive right to file and solicit acceptances of a chapter 11 plan;

(q)    the failure of the Company Parties to promptly pay Consenting Stakeholder Transaction Expenses as and when due;

(r)    any Company Party withdraws or revokes the Plan or files, proposes or otherwise supports any (i) Alternative Restructuring Proposal, including making any statements indicating intent to pursue any Alternative Restructuring Proposal, or (ii) amendment or modification to the Definitive Documents containing any terms that are materially inconsistent with the implementation of, and the terms of this Agreement without the prior written consent of the Required Consenting Stakeholders which remains uncured (to the extent curable) for five (5)

Business Days after such terminating Consenting Stakeholder transmits a written notice in accordance with Section 13.10 detailing any such breach;

(s)     any Company Party enters into a definitive agreement with respect to an Alternative Restructuring Proposal;

(t)     any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Notes Claims, any Prepetition LC Facility Claims, or any lien or interest held by any Consenting Stakeholders arising under or relating to the Indentures, the Notes, the Prepetition LC Credit Agreement, or the Prepetition LC Facility Claims or (ii) supports any application, adversary proceeding, or Cause of Action filed by a third party against a Consenting Stakeholder, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action against a Consenting Stakeholder, including, without limitation, any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i);

(u)     other than the Chapter 11 Cases and any Insolvency Proceedings that are consented to by the Required Consenting Stakeholders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, or foreign bankruptcy, insolvency, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the forgoing;

(v)     any Definitive Document or any other document or agreement necessary to consummate the Restructuring Transactions is filed or solicited in form or substance not acceptable to the Required Consenting Stakeholders or inconsistent with this Agreement;

(w)     any Company Party (i) amending, or modifying, or filing a pleading seeking authority to amend or modify, the Definitive Documents in a manner that is inconsistent with this Agreement, (ii) suspending or revoking the Restructuring Transactions or (iii) publicly announcing its intention to take any such action listed in the foregoing clauses (i) and (ii) of this subsection;

(x)     any Company Party incurs any liens or security interest, or encumbrance other than: (i) those existing immediately prior to the date hereof, (ii) those permitted pursuant to the DIP LC Facility, or (iii) those granted under or permitted by the DIP TLC Orders and Cash Collateral Orders;

(y)     the amendment, termination, or modification of any agreement, document, instrument, indenture or other writing evidencing any indebtedness or prepayment, repayment, redemption, defeasance, purchase, acquisition, termination, or discharge of any such indebtedness without the consent of the Required Consenting Stakeholders;

(z)     any Company Party (i) consummating or entering into a definitive agreement evidencing, or filing one or more motion or application seeking authority to consummate or enter into, any merger, consolidation, disposition of material assets, acquisition or sale of material assets, or similar transaction, (ii) making any material investments, (iii) paying any dividend, or (iv) incurring any indebtedness for borrowed money, in each case (x) outside the ordinary course of

business, (y) in excess of $2,000,000 in the aggregate, or (z) other than as contemplated by this Agreement and the Restructuring Transactions, unless the SoftBank Parties and the Required Consenting AHG Noteholders have provided prior written consent;

(aa)    any payment in satisfaction of any existing funded indebtedness other than as contemplated by the Restructuring Transactions or as authorized by the Bankruptcy Court;

(bb)    the entry of any order authorizing the use of cash collateral that is not in the form of the Cash Collateral Orders, or otherwise acceptable to the Required Consenting Stakeholders;

(cc)    the Cash Collateral Orders cease to be in full force and effect for any reason or an order shall be entered (or the Company Parties seek an order) reversing, amending, supplementing, staying, vacating, or otherwise modifying the Cash Collateral Orders without the written consent of the Required Consenting AHG Noteholders, or the SoftBank Parties, as applicable; or

(dd)    the entry of any order authorizing the use of DIP financing that is not in the form of the DIP TLC Orders, or otherwise acceptable to the Required Consenting Stakeholders.

11.02.    <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting AHG Noteholders that would result in non-breaching Consenting Noteholders holding less than (x) two-thirds 66.67% of the aggregate outstanding principal amount of 1L Series 1 Notes and (y) two-thirds 66.67% of the aggregate outstanding principal amount of 2L Notes, of any of the representations, warranties, undertakings, commitments, or covenants of the Consenting AHG Noteholders that remains uncured for a period of five (5) Business Days after receipt by the Consenting AHG Noteholders of notice of such breach; *provided*, that the Company Parties shall only have the right to terminate this Agreement as to such breaching Consenting AHG Noteholder pursuant to this paragraph, and shall not have the right to terminate this Agreement as to all Parties pursuant to this paragraph; *provided*, *further*, that a Company Party shall not have the right to terminate this Agreement if such terminating Company Party is also in material breach of any of the representations, warranties or covenants of such terminating Company Party set forth in this Agreement;

(b)    the breach in any material respect by the SoftBank Parties of any of the representations, warranties, undertakings, commitments, or covenants of the SoftBank Parties that remains uncured for a period of five (5) Business Days after receipt by the SoftBank Parties of notice of such breach; *provided*, that the Company Parties shall only have the right to terminate this Agreement as to the SoftBank Parties pursuant to this paragraph, and shall not have the right to terminate this Agreement as to all Parties pursuant to this paragraph; *provided*, *further*, that a Company Party shall not have the right to terminate this Agreement if such terminating Company Party is also in material breach of any of the representations, warranties, or covenants of such terminating Company Party set forth in this Agreement;

(c)    the breach in any material respect by Cupar of any of the representations, warranties, undertakings, commitments, or covenants of Cupar that remains uncured for a period

of five (5) Business Days after receipt by Cupar of notice of such breach; *provided*, that the Company Parties shall only have the right to terminate this Agreement as to Cupar pursuant to this paragraph, and shall not have the right to terminate this Agreement as to all Parties pursuant to this paragraph; *provided*, *further*, that a Company Party shall not have the right to terminate this Agreement if such terminating Company Party is also in material breach of any of the representations, warranties, or covenants of such terminating Company Party set forth in this Agreement;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party to the extent that any Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(e)      the Company Parties make a Fiduciary Out determination; or

(f)      the Bankruptcy Court enters an order denying confirmation of the Plan and the Company Parties, after exercising good faith efforts to negotiate a revised Plan and Confirmation Order consistent with the consent rights in this Agreement and obtain confirmation of such Plan, is unable to obtain such confirmation within twenty (20) business days thereof.

11.03.  MAE Termination.  The obligations under Section 4.01 of this Agreement may be terminated by each of the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of a Material Adverse Effect.

11.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) each of the SoftBank Parties; (b) the Required Consenting AHG Noteholders; and (c)  the Company Parties.

11.05.  Automatic Termination.  This Agreement shall terminate automatically, without any further required action or notice, upon the earlier of:

(a)      the Company Parties (i) notify the Consenting Stakeholders pursuant to Section 7.02 and/or make a public announcement that they intend to pursue an Alternative Restructuring Proposal or (ii) enter into a definitive agreement with respect to an Alternative Restructuring Proposal; or

(b)      the Restructuring Effective Date.

11.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, shall have all the rights and remedies that it would have had, had it not entered into this

Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; *provided*, that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder before the Termination Date and (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 13.20 hereunder.  Upon the occurrence of a Termination Date, prior to the Plan Effective Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(e) or Section 11.02(f).  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(e).

## Section 12.    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.01.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Stakeholders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; *provided*, further, that any amendment to the definition of "Required Consenting AHG Noteholders," "Required Consenting Stakeholders," "Consenting AHG Noteholders," Consenting Stakeholders," Section 11.05(b), and this Section 12, shall require consent of each Party.  Any consent required to be provided pursuant to this Section 12 may be delivered by email from counsel.  Any proposed modification, amendment, waiver or supplement that does not comply with this 12.01 shall be ineffective and void *ab initio*.

(c)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 11.01 shall be ineffective and void *ab initio*.

(d)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 13.    *Miscellaneous*

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  For the avoidance of doubt, the Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement and the terms and conditions of the Restructuring Transactions are set forth in this Agreement, the Restructuring Term Sheet, and the Definitive Documents.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern; *provided*, that in the event the terms and conditions set forth in the Restructuring Term Sheet and in this Agreement are inconsistent, the Restructuring Term Sheet shall control.

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to use their commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties with respect to the subject matter of this Agreement other than as set forth in this Agreement.

13.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity except as set forth in Section 8.

13.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

c/o WeWork Companies LLC
12 East 49th Street,
3rd Floor,

42

New York, NY 10017
Attention: Pamela Swidler, Chief Legal Officer
E-mail address:    pamela.swidler@wework.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Steven N. Serajeddini and Ciara Foster
E-mail address:    steven.serajeddini@kirkland.com
                           ciara.foster@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Connor K. Casas
E-mail address:    connor.casas@kirkland.com

(b)    if to the SoftBank Parties, to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Gabriel A. Morgan, Kevin Bostel, and Eric L. Einhorn
E-mail address:    gabriel.morgan@weil.com
                           kevin.bostel@weil.com
                           eric.einhorn@weil.com

(c)    if to Cupar, to:

Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, AA 90401
Attention:  Tom  Hopkins,  Cullen  D.  Speckhart,  Logan  Tiari,
Michael A. Klein
E-mail address:    thopkins@cooley.com
                           cspeckhart@cooley.com
                           ltiari@cooley.com
                           mklein@cooley.com

(d)    if to a Consenting AHG Noteholder, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue

43

New York, NY 10017
Attention:  Eli J. Vonnegut; Natasha Tsiouris; Jonah A. Peppiatt
E-mail address:    eli.vonnegut@davispolk.com
                            natasha.tsiouris@davispolk.com
                            jonah.peppiatt@davispolk.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the fullest extent permitted by Law waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, (a) the duties and obligations of the Parties under this Agreement shall be several, not joint; (b) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (c) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (d) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; and (e) none of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company or any of the Company's other creditors or stakeholders, except as a result of this Agreement or the Restructuring Transactions.

13.16. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.17. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.18. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.19. <u>Capacities of Consenting Stakeholders</u>.  Subject to the limitations set forth in footnote 2, each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.20. <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 11.06, and Section 13 (and any defined terms used in any such Sections) shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; *provided* that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

13.21. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.22. <u>Disclosure; Publicity</u>.  The Company Parties shall submit drafts to counsel to the Consenting Stakeholders of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.  Except as required by Law, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents or (b) disclose to any Entity (including, for the avoidance of doubt, any other Consenting Stakeholder), other than advisors to the Company Parties, (i) the principal amount or

percentage of any Company Claims/Interests held by any Consenting AHG Noteholder without such Consenting AHG Noteholder's prior written consent (it being understood and agreed that each Consenting AHG Noteholder's signature page to this Agreement shall be redacted to remove the name of such Consenting AHG Noteholder and the amount and/or percentage of Company Claims/Interests held by such Consenting AHG Noteholder to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases or otherwise made publicly available); *provided*, however, that (x) if such disclosure is required by Law, and to the extent reasonably practicable and not otherwise prohibited by Law, the disclosing Party shall afford the relevant Consenting AHG Noteholder a reasonable opportunity to review and comment in advance of such disclosure and such Party shall take all reasonable measures to limit such disclosure and (y) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by the Consenting AHG Noteholders of the same class, collectively.  Notwithstanding the provisions in this Section 13.22, (1) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof and (2) any Party may disclose, to the extent expressly consented to in writing in advance by a Consenting AHG Noteholder, such Consenting AHG Noteholder's identity and individual holdings.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

46

## **EXHIBIT A**

**Company Parties**

## **EXHIBIT B**

**Restructuring Term Sheet**

*Execution Version*

**THIS RESTRUCTURING TERM SHEET (THIS "<u>TERM SHEET</u>")[1] DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS.**

### *RESTRUCTURING TERM SHEET*

### INTRODUCTION

The Term Sheet sets forth the principal terms of the Restructuring Transactions and certain related transactions concerning the Company Parties agreed to by the Consenting Stakeholders and the Company Parties.

The Restructuring will be accomplished through the commencement of cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code to implement the chapter 11 Plan described herein.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring Transactions, which documents remain subject to negotiation and completion in accordance with the Restructuring Support Agreement (the "**RSA**") and applicable bankruptcy law. The Restructuring Transactions and Definitive Documents shall be consistent in all respects with this Term Sheet and the RSA, and shall be subject to the consent and approval rights set forth herein and therein. This Term Sheet incorporates the rules of construction as set forth in the RSA.

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS |
| --- |

| Restructuring Summary | The Restructuring Transactions will be consummated pursuant to the Definitive Documents through confirmation of the Plan (and any equivalent Foreign Plan, to the extent applicable). The |

---

[1] Capitalized terms used but not defined in this Term Sheet have the meanings given to such terms in the Restructuring Support Agreement to which this Term Sheet is attached as <u>Exhibit B</u>.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** |
|---|

Restructuring Transactions will be implemented pursuant to the RSA.  In general, this Term Sheet contemplates:

(a) the equitization of the Drawn DIP TLC Claims (other than up to $100 million of such Claims which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests, as further set forth, and subject to the conditions set forth, herein;

(b) the cancellation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth herein (other than any equity Interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by the Parties, a SoftBank Party contributes its Claims in exchange for the retention of its equity Interests, as further provided herein);

(c) issuance of a New 1L Exit Term Loan Facility for the lesser of (a) the total amount of all Drawn DIP TLC Claims and (b) $100 million, plus, in each case, the DIP TLC Fee Claims;

(d) a DIP TLC Facility that, among other things:

    (i). deems all outstanding, undrawn, letters of credit under the Prepetition LC Facility (other than undrawn letters of credit issued in connection with certain leases/locations to be identified and agreed upon by the Company Parties and the Consenting Stakeholders no later than the Petition Date) whether rolled, replaced, renewed, reissued, or amended (the "**DIP LCs**") to be obligations under the DIP TLC Facility and all associated cash collateral posted for each letter of credit to continue as credit support under the DIP TLC Facility, in each case on a dollar-for-dollar basis; and

    (ii). provides for the roll, replacement, renewal, reissuance, and/or amendment of the DIP LCs, which facility shall rank *pari passu* in lien and claim priority with the Prepetition LC Facility Claims and 1L Notes Claims (other than with respect to (1) amounts funded by the SoftBank Parties or their Affiliates to the Company Parties in the form of "Term Loan C" (on which (x) the creditors under the DIP TLC Facility shall have a first lien and claim priority, and (y) the Prepetition LC Facility Claims and 1L Notes Claims shall not have any lien) and (2) certain fees thereunder, as further set forth in the DIP TLC Term Sheet attached to the RSA as Exhibit E) on the terms and subject to the conditions set forth in the DIP TLC Term Sheet, any subsequent DIP TLC term sheet agreed by the Company Parties and Consenting Stakeholders, the DIP TLC Orders, and the Cash Collateral Orders, as applicable; and

(e) a binding commitment by certain SoftBank Parties to, subject to the following sentence, provide credit support in the form of providing cash to be used as collateral for a New LC Facility on the terms and subject to the conditions set forth in the New LC Facility Term Sheet attached to the RSA as Exhibit F.  For the avoidance of doubt, credit support provided under the New LC Facility, if any, shall not exceed the amount of undrawn and outstanding letters of credit under the DIP TLC Facility (and shall be reduced on a dollar-for-dollar basis based on drawn letters of credit that occur prior to the Plan Effective Date).

As described in greater detail herein and subject to the terms of the RSA, each Consenting Stakeholder has agreed to support the Restructuring Transactions, which shall be consistent with the RSA in all respects, and at all times shall be subject to the Required Consenting Stakeholders' consent and/or consultation rights, as applicable.

| | |
|---|---|
| **New Interests** | On the Plan Effective Date, Reorganized Debtors will distribute the New Interests to holders of Drawn DIP TLC Claims, Prepetition LC Facility Claims, 1L Notes Claims, and 2L Notes Claims (or their designees) as set forth herein. |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
| --- | --- |
| **Definitive Documents** | All Definitive Documents and any other documents that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the RSA.  Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |
| **Use of Cash Collateral** | The Required Consenting Stakeholders and the Company Parties have agreed, pursuant to the RSA and subject to the Cash Collateral Orders, to the Company Parties' consensual use of cash collateral, pursuant to the terms and conditions set forth in the Cash Collateral Orders, which shall be consistent with the RSA and the rights set forth therein. |
| **Debtor-in-Possession Financing** | The Required Consenting Stakeholders have agreed to consent to the incurrence of debtor-in-possession financing by the Debtors consistent with the terms and conditions set forth in the DIP TLC Term Sheet and subject to entry by the Bankruptcy Court of interim and final orders approving such financing that are consistent with the RSA and the Cash Collateral Orders and otherwise acceptable to the Debtors and the Required Consenting Stakeholders. |
| **New LC Facility** | Softbank Parties have agreed to commit to provide credit support for the New LC Facility, which shall be entered into on the Plan Effective Date, pursuant to the terms set forth in the RSA and the New LC Facility Term Sheet. |

\* \* \*

3

**TREATMENT OF PREPETITION CLAIMS AND INTERESTS**

Each Holder of a Claim or Interest, as applicable, shall receive, on the Plan Effective Date or as soon as is reasonably practicable thereafter, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Claim or Interest, **except to the extent different treatment is agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of such Claim or Interest, as applicable, with the consent of the Required Consenting Stakeholders**.

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **Administrative Claims** | Each Holder of an Administrative Claim shall receive payment, in full, in cash. | N/A |
| N/A | **Priority Tax Claims** | Each Holder of a Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| | | **Classified Claims and Interests** | |
| Class 1 | **Other Secured Claims** | Each Holder of an Other Secured Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 2 | **Other Priority Claims** | Each Holder of an Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 3A | **Drawn DIP TLC Claims** | Each Holder of a Drawn DIP TLC Claim shall receive: (a) first, its *pro rata* share of the loans under the New 1L Exit Term Loan Facility on a dollar-for-dollar basis; and (b) second, if the Drawn DIP TLC Claims exceed $100 million in the aggregate, its *pro rata* share of the DIP TLC Equity Distribution. | Impaired / Entitled to Vote |
| Class 3B | **Undrawn DIP TLC Claims** | Each Undrawn DIP TLC Claim shall be exchanged on a dollar-for-dollar basis into obligations under the New LC Facility. | Impaired / Entitled to Vote |
| Class 3C | **DIP TLC Fee Claims** | Each Holder of a DIP TLC Fee Claim shall receive, for every dollar of DIP TLC Fee Claim it holds, one dollar of principal face amount of the New 1L Exit Term Loan Facility. | Impaired / Entitled to Vote |

4

| Class 4 | **Prepetition LC Facility Claims and 1L Notes Claims** | Each Holder of Prepetition LC Facility Claims and 1L Notes Claims shall receive its *pro rata* share of the 1L Equity Distribution. | Impaired / Entitled to Vote |
|---|---|---|---|
| Class 5 | **2L Notes Claims** | Each Holder of a 2L Notes Claim shall receive its *pro rata* share of the 2L Equity Distribution. | Impaired / Entitled to Vote |
| Class 6 | **3L Notes Claims** | Each Holder of a 3L Notes Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code for the secured portion of the Claim. If any Holder of a 3L Notes Claim has collateral securing such Claim, such Claim shall only be secured to the extent the value of the collateral exceeds the value of such Claim.<br><br>To the extent the value of the 3L Notes Claim exceeds the value of the collateral, the Holder of such Claim shall receive, on account of and in full and final satisfaction of the remainder of such Claim that is more than the value of the collateral, its *pro rata* share (together with each Holder of the Unsecured Notes Claims and the General Unsecured Claims at each applicable Debtor) of no less than the liquidation value of the unencumbered assets held by the Company Party against which their Claim is Allowed. | Impaired / Deemed to Reject |
| Class 7 | **Unsecured Notes Claims** | Each Holder of an Unsecured Notes Claim shall receive its *pro rata* share (together with each Holder of the 3L Notes Claims, as applicable, and General Unsecured Claims at each applicable Debtor) of no less than the liquidation value of the unencumbered assets held by the Company Party against which their Claim is Allowed. | Impaired / Deemed to Reject |
| Class 8 | **General Unsecured Claims** | Each Holder of a General Unsecured Claim shall receive its *pro rata* share (together with each Holder of the 3L Notes Claims, as applicable, and Unsecured Notes Claims at the applicable debtor) of no less than the liquidation value of the unencumbered assets held by the applicable Debtor against which their Claim is Allowed. If any Holder of a Claim has collateral securing such Claim, such Claim shall only be secured to the extent the value of the collateral exceeds the value of such Claim, and any remainder of the Claim that is more than the value of the collateral shall be treated as a General Unsecured Claim; and such Holder shall receive, on account of and in full and final satisfaction of such Claim, (a) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code for the secured portion of the Claim; and (b) the remainder shall be treated as a General Unsecured Claim. | Deemed to Reject |
| Class 9 | **Parent Interests** | Each Holder of Interests in the Reorganized Company, shall have such Interest cancelled, released, discharged, and extinguished and such Interests will be of no further force or effect, and Holders of such Interests shall not receive any distribution on account of such Interests (for the avoidance of doubt, other than any equity Interests held by | Impaired / Deemed to Reject |

| | | the SoftBank Parties with respect to which a SoftBank Party contributes its Claims in exchange for the retention of its equity Interests), pursuant to the Plan and as agreed by the Parties; *provided*, further, that no such contribution or retention shall occur if it would increase the amount of cancellation of indebtedness income realized by the Debtors, or otherwise have an adverse tax effect on any of the Debtors, without the prior consent of the Required Consenting Stakeholders (other than the SoftBank Parties). | |
| --- | --- | --- | --- |
| Class 10 | **Section 510(b) Claim** | All Allowed Section 510(b) Claims against any applicable Debtor shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims. | Impaired / Deemed to Reject |
| Class 11 | **Intercompany Claims / Intercompany Interests** | Each Intercompany Claim and Intercompany Interest shall be (a) cancelled, released, discharged, (b) reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors in each case with the consent of the Required Consenting Stakeholders in accordance with the Restructuring Transactions Exhibit. | Unimpaired / Deemed to Accept, or Impaired / Deemed to Reject, as Applicable |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall settle and compromise the respective contractual, legal, and equitable subordination rights of the Holders of such Claims and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall authorize and ratify, among other things, all actions as may be necessary or appropriate, consistent with the RSA, to effect any Restructuring Transactions or settlement described in, approved by, contemplated by, or necessary to effectuate the Plan. On the applicable Plan Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, corporate governance documents, and other documents required to be issued to implement the Plan and the Restructuring Transactions.  For the avoidance of doubt, neither the SoftBank Parties nor the Consenting AHG Noteholders agree or consent to any rights offering. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Term Sheet, RSA, the Plan, or other Definitive Documents, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, note purchase agreements, and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | Subject to the special committee investigation, the Plan will provide for reasonable and customary mutual releases; provided, that, the Company Parties and Consenting AHG Noteholders hereby acknowledge and agree that the releases set forth in **Annex B** are reasonable, customary, and acceptable with respect to the SoftBank Parties and may not be amended without the consent of the SoftBank Parties. |

\* \* \*

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the satisfaction of conditions precedent acceptable to the Required Consenting Stakeholders, including the following:<br><br>(a) The RSA shall have been executed, shall not have been terminated, and remains in full force and effect and no event or occurrence has occurred that, with the passage of time or the giving of notice, would give rise to the right of any of the Required Consenting Stakeholders to terminate the RSA.<br><br>(b) The Bankruptcy Court shall have entered the Final Cash Collateral Order, consistent with the RSA, and the Final Cash Collateral Order shall not have been vacated, stayed, or modified without the prior written consent of the Required Consenting Stakeholders.<br><br>(c) The Bankruptcy Court shall have entered the Final DIP TLC Order, consistent with the RSA, and the Final DIP TLC Order shall not have been vacated, stayed, or modified without the prior written consent of the SoftBank Parties and the Consenting AHG Noteholders.<br><br>(d) All financing necessary for the Plan shall have been obtained, including the New LC Facility, and any documents related thereto (including the New LC Facility Documents) shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred, having been satisfied or waived), and shall be in form and substance acceptable to the Consenting AHG Noteholders.<br><br>(e) The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein) and the Plan.<br><br>(f) All Consenting Stakeholder Transaction Expenses shall have been paid in full in cash in accordance with the terms and conditions set forth in the RSA and the Cash Collateral Orders.<br><br>(g) All requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transactions, to the extent required.<br><br>(h) All documents contemplated by the RSA to be executed and delivered on or before the Plan Effective Date shall have been executed and delivered.<br><br>(i) The Confirmation Order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless waived by the Required Consenting Stakeholders. |
| **MIP** | On or after the Plan Effective Date, the New Board shall determine the terms and conditions of and implement the MIP, including any and all awards granted thereunder and any determinations with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation. |
| **Exemption from SEC Registration** | The issuance of all securities under the Definitive Documents will be (a) exempt from registration under the Securities Act and applicable Law to the fullest extent applicable and (b) permitted by Law in reliance on the Section 1145 Exemption or section 4(a)(2) of the Securities Act (or another |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | applicable exemption under the Securities Act), subject to any other applicable local or state securities Laws. |
| | For the avoidance of doubt, the New Interests are expected to be issued in reliance upon the Section 1145 Exemption, to the extent permissible and available. If the Section 1145 Exemption is not available, such New Interests are expected to be issued in reliance upon the exemptions provided by section 4(a)(2) of the Securities Act (or another applicable exemption under the Securities Act). |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable Law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, restructuring advisors, and other professionals and/or agents or representatives of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Restructuring Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, than the indemnification provisions in place prior to the Restructuring Effective Date. |
| | After the Restructuring Effective Date, the Reorganized Company will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased prior to the Restructuring Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Restructuring Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Restructuring Effective Date. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than those that the Debtors release pursuant to the release and exculpation provisions outlined in this Term Sheet and as set forth in the Plan, with the consent of the Required Consenting Stakeholders. |
| **Restructuring Transactions Tax Structuring** | The parties will negotiate in good faith to structure and implement the Restructuring Transactions (a) in a tax-efficient manner (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) to the Company Parties and the Reorganized Debtors, (b) in a manner that minimizes any current cash taxes payable by the Reorganized Debtors, and (c) to the extent not inconsistent with the preceding clauses (a) and (b), and to the extent reasonably practicable in a manner intended to be tax-efficient for Holders of Claims and Interests; *provided*, that no guarantee of tax efficiency will be made to any particular Holder, which may include reorganizing the ownership structure of WeWork, its subsidiaries and assets, and/or the exchange of interests of one or more existing or newly-formed subsidiaries of WeWork that own the assets currently owned by WeWork, rather than equity of WeWork, making one or more "elections" for U.S. federal income tax purposes, applying for one or more private letter rulings with the IRS, and/or transferring or assigning debt from an applicable Company Party or subsidiary to one or more Company Parties or subsidiaries, and in each case, in a manner acceptable to the Debtors and the Required Consenting Stakeholders, with such structuring to be set forth in the Restructuring Transactions Exhibit. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **New Corporate Governance Documents** | The New Corporate Governance Documents will be acceptable to the Debtors and the Required Consenting Stakeholders and will become effective as of the Plan Effective Date.<br><br>The New Board will be composed of seven (7) directors, including (a) three (3) members appointed by the SoftBank Parties; (b) two (2) members to be appointed by the Required Consenting AHG Noteholders; (c) one (1) independent to be mutually agreed upon, and (iv) the Chief Executive Officer. |
| **Executory Contracts and Unexpired Leases** | Executory Contracts and Unexpired Leases (other than Unexpired Leases of non-residential real property) that are not rejected as of the Restructuring Effective Date will be deemed assumed pursuant to section 365 of the Bankruptcy Code.  Unexpired Leases of non-residential real property that are not expressly assumed as of the Restructuring Effective Date will be deemed rejected pursuant to section 365 of the Bankruptcy Code.<br><br>Claims arising from the rejection of any of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims. |
| **Milestones** | The Debtors shall implement the Restructuring Transactions in accordance with the following Milestones, unless any such Milestone is extended or waived in writing, which may be by email between applicable counsel, by (a) the Debtors, and (b) the Required Consenting Stakeholders, subject to the Bankruptcy Court's availability (the"**Milestones**"):<br><br>    (a)  no later than November 6, 2023, the Petition Date shall have occurred;<br><br>    (b)  no later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Cash Collateral Order;<br><br>    (c)  no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final Cash Collateral Order;<br><br>    (d)  no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP TLC Order;<br><br>    (e)  no later than ninety (90) days after the Petition Date, the Debtors shall have filed (i) the Disclosure Statement and Plan and (ii) a motion seeking entry of the Disclosure Statement Order;<br><br>    (f)  no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;<br><br>    (g)  no later than one hundred and twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>    (h)  no later than one hundred and twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred. |
| **Professional Fees and Expenses** | All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall be paid in full or amounts sufficient to pay such fees and expenses in full after the Plan Effective Date shall be placed in the professional fee escrow account as set forth in, and in accordance with, the Plan. |
| **Employment and** | Treatment of the Debtors' employment obligations for officers, directors, and/or employees is to be determined with the consent of the Required Consenting Stakeholders. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Indemnification Obligations** | |
| **Modification to Treatment of Claims and Interests** | Any modifications to the proposed (or actual) treatment of Claims or Interests shall require the consent of the Required Consenting Stakeholders.  For the avoidance of doubt, such consent shall be required in connection the treatment of any Class of Claims or Interests indicated herein to be determined at a future date or time. |

**ANNEX A**

| CERTAIN DEFINITIONS | |
|---|---|
| **1L Equity Distribution** | The percentage of New Interests equal to (x)(i) Prepetition LC Facility Claims *plus* 1L Notes Claims *divided by* (ii) Total 1L Claims *plus* Adjusted 2L Notes Claims *multiplied by* (y)(i) 100% of the New Interests *minus* (ii) the Drawn DIP TLC Equity Distribution, such percentage subject to dilution by the MIP and the New LC Equity Allocation. |
| **1L Notes Claim** | All claims arising under the 1L Notes, including for postpetition interest, fees or other obligations arising postpetition in connection therewith. |
| **2L Equity Distribution** | The percentage of New Interests equal to (x)(i) Adjusted 2L Notes Claims *divided by* (ii) Total 1L Claims *plus* Adjusted 2L Notes Claims *multiplied by* (y)(i) 100% of the New Interests *minus* (ii) the Drawn DIP TLC Equity Distribution, such percentage subject to dilution by the MIP and the New LC Equity Allocation. |
| **5.00% Unsecured Notes Indenture** | As it may be amended, supplemented, or otherwise modified from time to time, that certain Amended and Restated Senior Notes Indenture, dated as of December 16, 2021, by and among WeWork Companies LLC, as issuer, WW Co-Obligor Inc., as co-issuer, the guarantors from time to time party thereto, and U.S. Bank Trust Company, National Association (as successor to U.S. Bank National Association), as trustee. |
| **5.00% Unsecured Notes, Series I** | WeWork Companies LLC's 5.00% Senior Notes due 2025, Series I, issued pursuant to the 5.00% Unsecured Notes Indenture. |
| **5.00% Unsecured Notes, Series II** | WeWork Companies LLC's 5.00% Senior Notes due 2025, Series II, issued pursuant to the 5.00% Unsecured Notes Indenture. |
| **7.875% Unsecured Notes** | WeWork Companies Inc.'s 7.875% Senior Notes due 2025 issued pursuant to the 7.875% Unsecured Notes Indenture. |
| **7.875% Unsecured Notes Indenture** | As it may be amended, supplemented, or otherwise modified from time to time, that certain Senior Notes Indenture, dated of April 30, 2018, by and among WeWork Companies LLC, as successor to WeWork Companies Inc., as issuer, WW Co-Obligor Inc., as co-issuer, the guarantors from time to time party thereto, and U.S. Bank Trust Company, National Association (as successor to U.S. Bank National Association, as successor to Wells Fargo Bank, National Association), as trustee. |
| **Adjusted 2L Notes Claims** | Total 2L Notes Claims multiplied by 70.0%. |
| **Adjusted Drawn DIP TLC Claims** | The amount of Drawn DIP TLC Claims equal to the total amount of Drawn DIP TLC Claims minus the lesser of (a) the total amount of all Drawn DIP TLC Claims and (b) $100 million. |
| **Administrative Claim** | A Claim against any of the Debtors arising pursuant to section 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code. |

12

| | |
|---|---|
| **Affiliate** | As set forth in section 101(2) of the Bankruptcy Code. |
| **Allowed** | With reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Plan Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Plan Effective Date, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Company, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Company, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; *provided*, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Company shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan. |
| **Class** | A class of Claims or Interests as set forth in the Plan pursuant to section 1122(a) and 1123(a)(1) of the Bankruptcy Code. |
| **Confirmation Date** | The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021. |
| **Deemed to Accept** | An Unimpaired Claim, the Holder of which is conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. |
| **Deemed to Reject** | An Impaired Claim, the Holder of which is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. |
| **DIP TLC Facility** | A senior secured, debtor-in-possession "Term Loan C" and cash collateralized letter of credit facility in an aggregate amount not to exceed $750,000,000, under the DIP TLC Credit Agreement. |
| **DIP TLC Fee Claims** | Claims on account of the Structuring Fee and Fixed (Running) Cost (each as used or described in the DIP TLC Term Sheet) under the DIP TLC Facility, which Claims shall be Allowed super-priority administrative expenses pursuant to the DIP TLC Orders. |
| **Drawn DIP TLC Claims** | Claims on account of the principal face amount of obligations due or payable as of the Plan Effective Date under the DIP TLC Documents attributable to letters of credit drawn under the DIP TLC Facility. |
| **Drawn DIP TLC Equity Distribution** | A percentage of New Interests equal to: (i) the amount of Adjusted Drawn DIP TLC Claims divided by the sum of Total 1L/DIP Claims plus Adjusted 2L Notes Claims (ii) multiplied by 2.00, such percentage subject to dilution by the MIP and the New LC Equity Allocation; *provided*, that the percentage of the Drawn DIP TLC Equity Distribution shall never result in a lower recovery for all holders of both 1L Series 1 Notes Claims and 2L Secured Notes Claims taken as a whole than if (x) all Adjusted Drawn DIP TLC Claims were treated as |

| | |
|---|---|
| | 1L Notes Claims and (y) such holders had received no recovery on account of their 2L Notes Claims. |
| **Executory Contracts** | A contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof. |
| **General Unsecured Claim** | Any unsecured Claim against any of the Debtors that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court, (b) an Administrative Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (e) an Other Secured Claim, (e) an Other Priority Claim, (f) an Intercompany Claim, or (g) any other Claim that is subordinated or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. |
| **Governmental Unit** | As set forth in section 101(27) of the Bankruptcy Code. |
| **Holder** | An Entity holding a Claim or Interest, as applicable |
| **Impaired** | Any Claim or Class of Claims, which is impaired under the terms of the Plan pursuant to section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | Any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor. |
| **Intercompany Interests** | Any interest in one Debtor held by another Debtor. |
| **Junior LC Facility** | The Junior L/C Tranche as defined in the Prepetition LC Credit Agreement. |
| **Liens** | As set forth in section 101(37) of the Bankruptcy Code. |
| **Milestone** | The deadlines by which the Debtors shall implement the Restructuring Transactions, as set forth in the Term Sheet. |
| **MIP** | Means the management incentive plan as determined by the New Board of the Reorganized Debtors. |
| **New 1L Exit Term Loan Facility** | The term loan facility of up to $100 million on account of the first $100 million of Drawn DIP TLC Claims (plus the dollar amount of the DIP TLC Fee Claims), to be entered into on the Plan Effective Date on the following terms and conditions: <br><br> (a)  8.5% fixed rate cash interest, paid quarterly; <br><br> (b)  4-year tenor; <br><br> (c)  no call protection; <br><br> (d)  free transferability but must be sold in its entirety; <br><br> (e)  customary covenants; <br><br> (f)  first lien claim on all assets, ranking *pari passu* with the New LC Facility (including *pari passu* at each guarantor entity); and |

| | (g)  such other terms and conditions as are agreed by the Required Consenting Stakeholders. |
|---|---|
| **New Board** | The board of directors of the Reorganized Debtors following the Plan Effective Date. |
| **New Interests** | The single class of equity issued by the Reorganized Debtors on the Plan Effective Date. |
| **New LC Equity Allocation** | New Interests equal to 1.25% of the total New Interests. |
| **New LC Facility** | The letter of credit facility to be entered into on the Plan Effective Date. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim other than: (a) the Prepetition LC Facility Claims; (b) the Secured Notes Claims; or (c) the Prepetition LC Subrogation Claims. |
| **Prepetition LC Facility** | Collectively, the Junior LC Facility and the Senior LC Facility. |
| **Prepetition LC Facility Claims** | All claims arising under the Prepetition LC Facility Documents, including the Prepetition LC Subrogation Claim or the Prepetition LC Reimbursement Claim, and all unpaid accrued and deferred fees, including, without limitation, any upfront fees, running fees, administrative, and fronting fees (without double counting).  For the avoidance of doubt, (a) any cash collateral posted but subsequently returned to the SoftBank Parties shall not give rise to a Prepetition LC Facility Claim and (b) any Holder of a Prepetition LC Facility Claim shall be entitled to recover on account of either its Prepetition LC Subrogation Claim or Prepetition Reimbursement Claim, but not both. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | Any Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **Rejecting** | The status of a Class of Claims that is Deemed to Reject. |
| **Section 1145 Exemption** | The exemption from the requirement to register issued securities under the Securities Act established pursuant to section 1145 of the Bankruptcy Code, and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security. |

| Section 510(b) Claim | Any Claim against any of the Debtors subject to subordination under section 510(b) of the Bankruptcy Code. |
|---|---|
| Secured Claim | A Claim that is: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Definitive Documents, or separate order of the Bankruptcy Court, as a secured claim. |
| Security | Any security, as defined in section 2(a)(1) of the Securities Act. |
| Senior LC Facility | The Senior L/C Tranche as defined in the Prepetition LC Credit Agreement. |
| Total 1L/DIP Claims | The total aggregate amount of (a) Adjusted Drawn DIP TLC Claims, (b) Prepetition LC Facility Claims, and (c) 1L Notes Claims, including, for the Prepetition LC Facility Claims and 1L Notes Claims, all postpetition interest and fees. |
| Total 1L Claims | The total aggregate amount of (a) Prepetition LC Facility Claims and (b) 1L Notes Claims, in each case, including, all postpetition interest and fees. |
| Total 2L Notes Claims | The total aggregate amount of 2L Notes Claims, excluding, for the avoidance of doubt, any postpetition interest or fees. |
| Undrawn DIP TLC Claims | Claims on account of undrawn letters of credit under the DIP TLC Facility. |
| Unexpired Lease | An unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof. |
| Unimpaired | Any Claim or Class of Claims, which is not Impaired within the meaning of section 1124 of the Bankruptcy Code. |
| Unsecured Notes | Collectively, the 5.00% Unsecured Notes, Series I, the 5.00% Unsecured Notes, Series II, and the 7.875% Unsecured Notes. |
| Unsecured Notes Claims | Any Claim against a Company Party arising under, derived from, based on, or related to the Unsecured Notes or the Unsecured Notes Indentures. |
| Unsecured Notes Indentures | Collectively, the 5.00% Unsecured Notes Indenture and the 7.875% Unsecured Notes Indenture. |

16

**Annex B**

**CUSTOMARY RELEASES[2]**

*Definitions.*

The following definitions shall be applicable to the foregoing release and exculpation provisions:

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such, (a) each of the Debtors, (b) each independent director of any Debtor, and (c) any statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as well as each of its member.

"**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, investment committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, investment or fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees.

"**Released Parties**" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Companies; (c) each Consenting Stakeholder; (d) each DIP TLC Issuing Bank; (e) each DIP TLC Agent; (f) each Agent; (g) current and former Affiliates of each Entity in clause (a) through clause (g); and (h) each Related Party of each Entity in clause (a) through clause (g); *provided, that* in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the releases contained in the Plan, either by means of (i) a formal objection filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

"**Releasing Parties**" means, collectively, and in each case in its capacity as such:  (a) each Debtor, (b) each Reorganized Company; (c) each Consenting Stakeholder; (d) each DIP TLC Issuing Bank; (e) each DIP TLC Agent; (f) each Agent; (g) all holders of Claims that vote to accept the Plan; (h) all holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (i) all holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (j) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) each current and former Affiliate of each Entity in clause (a) through (k); and (l) each Related Party of each Entity in clause (a) through (k) for which such Entity is legally

---

[2]    For the avoidance of doubt, all releases remain subject to the ongoing investigation of the special committee of independent directors of the board.

entitled to bind such Related Party to the releases contained in the Plan under applicable law.

A.      *Releases by the Debtors.*

Except as expressly set forth in the Plan or the Confirmation Order, effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, finally, and forever released, waived, and discharged, to the fullest extent permissible under applicable Law, by each and all of the Debtors, and each of their respective current and former Affiliates, the Reorganized Debtors, and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or any other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the Notes, the Indentures, the Prepetition LC Credit Agreement, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (b) any retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable,

and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; essential to the Confirmation of the Plan; and (g) an exercise of the Debtors' business judgment.

B.      *Releases by the Releasing Parties.*

Effective as of the Plan Effective Date, except as expressly set forth in the Plan or the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the fullest extent permissible under applicable Law, each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the Notes, the Indentures, the Prepetition LC Credit Agreement, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section B, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases set forth in this Section B is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released

pursuant to this Section B; (e) in the best interests of the Debtors and their estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to this Section B.

C.      Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Cause of Action or Claim whether direct or derivative, for any claim related to any act or omission from the Petition Date to the Plan Effective Date, in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Disclosure Statement, the Plan (including the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Disclosure Statement and the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other or omission, transaction, agreements, event, or other occurrence taking place on or before the Plan Effective Date related to or relating to any of the foregoing (including, for the avoidance of doubt, providing any legal opinion effective as of the Plan Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Plan Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.      Injunction.

Upon entry of the Confirmation Order, except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been extinguished, released, discharged, or are subject to exculpation, whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interests, along with their respective present or former employees, agents, officers, directors, principals, Affiliates, and Related Parties are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (a) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such

20

Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Plan Effective Date, and notwithstanding an indication of a Claim, Interest, Cause of Action, liability or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Action released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

With respect to Claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Plan Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases (including the filing and administration thereof), the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany transactions, the Restructuring, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or filing of the RSA and the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Disclosure Statement, the Plan, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the Notes and the Indentures, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action. To the extent the Bankruptcy Court may have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.

## <u>EXHIBIT C</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among WeWork Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof (x) to the extent the Transferor was thereby bound and (y) with respect to any and all Company Claims/Interests the Transferee may hold prior to the consummation of the Transfer contemplated hereby, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Claims (principal amount):* | |
|---|---|
| Senior Letter of Credit Tranche | US$ |
| Junior Letter of Credit Tranche | US$ |
| 1L Series 1 Notes | US$ |
| 1L Series 2 Notes | US$ |
| 1L Series 3 Notes | US$ |
| 2L Secured Notes | US$ |
| 2L Exchangeable Notes | US$ |
| 3L Secured Notes | US$ |
| 3L Exchangeable Notes | US$ |
| Interests in WeWork | (number of shares) |
| Warrants | (number of warrants and underlying Interests) |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit D**

**Form of Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2023 (the "**Agreement**"),[1] by and among WeWork Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests, and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Claims (principal amount):* | |
|---|---|
| Senior Letter of Credit Tranche | US$ |
| Junior Letter of Credit Tranche | US$ |
| 1L Series 1 Notes | US$ |
| 1L Series 2 Notes | US$ |
| 1L Series 3 Notes | US$ |
| 2L Secured Notes | US$ |
| 2L Exchangeable Notes | US$ |
| 3L Secured Notes | US$ |
| 3L Exchangeable Notes | US$ |
| Interests in WeWork | (number of shares) |
| Warrants | (number of warrants and underlying Interests) |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## **Exhibit C**

**Evidentiary Support for First Day Motions**[1]

---

[1]    Capitalized terms used but not defined herein have the meaning ascribed to them in the applicable First Day Motion.

I.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors
to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition
Obligations Related Thereto, and (C) Maintain Existing Debtor Bank Accounts,
Business Forms, and Books and Records; (II) Authorizing the Debtors to Continue to
Perform Intercompany Transactions; (III) Waiving Certain U.S. Trustee
Requirements; and (IV) Granting Related Relief (the "Cash Management Motion").**

1.      In the ordinary course of business, the Debtors and their non-Debtor affiliates
(the "Non-Debtor Affiliates") maintain and operate a complex global cash management system
(the "Cash Management System"), a schematic of which is attached as Exhibit 1 to the Interim
Order.  As of the Petition Date, the Cash Management System comprises 1,004 bank accounts
(such accounts, together with any other bank accounts WeWork may open in the ordinary course
of business, the "Bank Accounts") that are owned by Debtors and certain Non-Debtor Affiliates
and are held at thirty-seven banks across forty countries in thirty-one different currencies (such
banks, collectively, the "Cash Management Banks").  As of the Petition Date, the Debtors hold
approximately $164 million in cash across Debtor-owned Bank Accounts.

2.      The Cash Management System is critical to WeWork's business.  It streamlines
WeWork's ability to collect, transfer, and disburse funds generated from its operations and
facilitates cash monitoring, forecasting, and reporting.  WeWork's Treasury department maintains
daily oversight of the Cash Management System and implements cash management controls for
accepting, processing, and releasing funds, including in connection with any Intercompany
Transactions.  WeWork's Accounting department regularly reconciles WeWork's books and
records to ensure that all transfers are accounted for properly.

2

3.      The Cash Management System generally comprises four[2] separate components: (i) the cash management system for U.S. operations (the "U.S. Cash Management System"); (ii) the cash management system for the Asia-Pacific region ("APAC," and such cash management system, the "APAC Cash Management System"); (iii) the cash management system for UAE, Russia, Norway, Hungary, Poland, and the Czech Republic ("Non-Pool EMEA," and such cash management system, the "Non-Pool EMEA Cash Management System"); and (iv) the Notional Cash Pool, which manages cash for operations in jurisdictions outside of the U.S., APAC, and Non-Pool EMEA, including Australia, Singapore, and certain jurisdictions in Europe (the jurisdictions in the Notional Cash Pool, "Pool Jurisdictions").

4.      Each day, in the ordinary course of business, the Blocked Account Control Agreement Account (the "BACA Account" or "BACA") transfers $25 million into the Master Operating Account, which in turn transfers funds on an as-needed basis around the rest of the Cash Management System.

5.      WeWork's cash receipts from operations across the Company's business enterprise are deposited into Operating Accounts held directly by special purpose operating entities incorporated to hold one or more lease agreements.  Cash deposited into the Operating Accounts is automatically swept up either directly or through a series of Intermediate Concentration Accounts and Master Concentration Accounts into the Master Operating Account and then ultimately into the BACA Account.  The Operating Accounts also make ordinary course disbursements to fund operations at the Company's leased properties.  Because the vast majority of Operating Accounts in the Cash Management System are "zero balance" accounts that are swept

---

[2]      Cash management for the Company's joint venture operations in Japan, Argentina, Brazil, Chile, Colombia, Mexico, Netherlands, China, India, and U.S, is managed by an unrelated system comprising bank accounts controlled entirely by Non-Debtor Affiliates.

daily, almost all disbursements from the Operating Accounts result in a temporary overdraft (each, an "Operating Overdraft").  Master Concentration Accounts in each country where the Company operates generally settle Operating Overdrafts overnight by cash transfers.

6.      WeWork's cash system in Pool Jurisdictions was historically governed by a notional cash pooling arrangement with Cash Management Bank J.P. Morgan Bank Luxembourg S.A. ("JPM Lux," the notional cash pool maintained thereby, the "Notional Cash Pool," and the Bank Accounts comprising the Notional Cash Pool, the "Cash Pool Accounts").  The Notional Cash Pool, including the Pool Overdraft Limit provided thereby, historically allowed WeWork to minimize tax and other operational complexities associated with intercompany transfers among multiple jurisdictions within the Notional Cash Pool, organize and monitor cash flows for its operations in the Pool Jurisdictions, ensure that available cash was efficiently used to meet financial obligations, and reduce the risk of cash shortage or idle funds.

7.      The Cash Management System is similar to those commonly employed by businesses of comparable size and scale to WeWork to help control funds, ensure cash availability for each entity, and reduce administrative expenses.  WeWork estimates that its cash receipt collections averaged approximately $250 million per month in the twelve months prior to the Petition Date.  In addition, WeWork estimates that total disbursements to third parties averaged approximately $290 million per month in the twelve months prior to the Petition Date.

8.      Because of the nature and operational scale of the Debtors' business, any disruption to the Cash Management System would have an immediate and material adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders.

9.      ***The Bank Accounts.***  As of the Petition Date, the Cash Management System comprises a total of 1,004 Bank Accounts.  Of the Bank Accounts, 560 are owned and controlled

by the Debtors (the "Debtor Bank Accounts"), which are identified on Exhibit 2 to the Interim Order, while the remaining 444 are owned by Non-Debtor Affiliates.  The Debtors' primary Cash Management Bank outside of the APAC Cash Management System is J.P. Morgan Chase Bank, N.A. ("JPM"), and its primary Cash Management Banks in the APAC Cash Management System are HSBC Bank ("HSBC") and JPM.  Cash Management Banks in the Non-Pool EMEA Cash Management System include JPM, Citibank Europe plc, Unicredit Bank, PKO Bank, AO Raiffeisenbank, and Skandinaviska Enskilda Banken.

10.    ***Ordinary Course Cash Flows.***    Substantially all of WeWork's cash on hand comprises proceeds from WeWork's ordinary course operations and historical funded-debt borrowings.  The Operating Accounts receive cash generated from the Debtors' operations, including receivables on account of, among others, WeWork's space-as-a-service business, WeWork Access, and WeWork Workplace.  Excess funds from the Operating Accounts are generally swept upstream on a daily basis.  In the U.S., Operating Accounts are "zero balanced" directly into the Master Operating Account, and in Pool Jurisdictions, Operating Accounts are "zero balanced" into Pool-Related Concentration Accounts, either directly or through one or more Intermediate Concentration Accounts.  The Pool-Related Concentration Accounts and the Intermediate and Master Concentration Accounts in APAC and Non-Pool EMEA are permitted to hold cash to fund operations in their respective jurisdictions on an as-needed basis.

11.    In the ordinary course of business, WeWork's Operating Accounts make disbursements to third parties to meet WeWork's payment obligations.  Disbursements from the Operating Accounts primarily consist of (i) payments on account of payroll obligations, in the case of APAC (other than South Korea) and Non-Pool EMEA, (ii) payments to vendors and suppliers, (iii) rent payments, (iv) non-enterprise level marketing expenses, and (v) other ordinary course

operating expenses.  Disbursements on account of payroll obligations are made from either the

Payroll Accounts or the Operating Accounts, as applicable.  Disbursements on account of

enterprise-level taxes, interest, and other debt service payments, enterprise level marketing

expenses, insurance payments, and other corporate expenses are made out of the Master

Disbursement Account.  Finally, disbursements on account of utility obligations are made out of

Master Disbursement Account and into an account maintained by the Debtors' utility agent, who

then makes payment to each utility provider.  The collection and disbursement of cash on behalf

of each Debtor and Non-Debtor Affiliate is tracked and recorded and results in Intercompany

Claims between each Debtor and Non-Debtor Affiliate.

12.     Because a majority of the Operating Accounts are "zero balance" accounts, nearly

all disbursements from Operating Accounts result in Operating Overdrafts.  Operating Overdrafts

are then settled each night through a series of transfers from the Master Operating Account, Master

Concentration Accounts, and Intermediate Concentration Accounts, as applicable.  Historically,

pursuant to the definitive documentation that governs WeWork's relationship with JPM, the

maximum amount of Operating Overdrafts permitted across all JPM Bank Accounts in any given

day is capped at $62 million (the "Original Intraday Limit").  On November 2, 2023, JPM informed

the Company that it has reduced the Original Intraday Limit to $0.  Following good faith,

arm's-length negotiation, prior to the Petition Date, JPM and the Company agreed to the following

changes to the Company's Cash Management System, as reflected in that certain agreement

between JPM and the Company (the "JPM Agreement"):  (i) an adjusted overdraw limit across all

Debtor Bank Accounts of up to $35 million in the aggregate (the "Adjusted Intraday Limit");

(ii) with respect to the Bank Accounts in UK, Canada, and Australia, and any other jurisdictions

as mutually agreed between the Company and JPM, an overdraw sublimit of up to $15 million in

the aggregate (the "Intraday Sublimit"); and (iii) the Cash Management System for Non-Debtor Affiliates in Germany, Ireland, France, Italy, and Netherlands, shall have access to JPM's "just-in-time" product (the "Just In Time," together with the Adjusted Intraday Limit and the Intraday Sublimit, the "JPM Cash Management Structure") shall apply.  Access to the Adjusted Intraday Limit is subject to the Company's maintaining a minimum cash balance across Debtor Bank Accounts of $55 million plus projected processional fees incurred by the Debtors' professionals subject to the applicable Approved Budget (as defined in the Cash Collateral Order).

13.     WeWork also maintains a letter of credit facility (the "L/C Facility" and participating banks the "L/C Banks") as part of the Cash Management System.  Pursuant to the L/C Facility, the L/C Banks issue letters of credit to support certain of WeWork's real estate leases and surety bonds.  As of the Petition Date, there are approximately $1.563 billion in aggregate outstanding principal and accrued interest for obligations outstanding under the L/C Facility. Historically, cash held in the L/C Collateral Account was used to cash collateralize WeWork's obligations under the L/C Facility; however, following the Company's entry into a reimbursement agreement with SoftBank on February 10, 2020, the L/C Collateral Account was drawn down and now contains *de minimis* funds.  While the L/C Collateral Account is no longer integral to the Cash Management System., out of an abundance of caution the Debtors seek authority, but not direction, to maintain the L/C Collateral Accounts as described herein.

14.     **The Bank Fees.**  In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintenance of the Cash Management System (collectively, the "Bank Fees").  Each month, the Debtors incur *de minimis* Bank Fees in connection with maintaining Debtor and Non-Debtor Affiliate Bank Accounts.  Generally, the Bank Fees are netted against the interest payment that the Cash Management Banks owe to the

Debtors and do not involve additional cash outlay by the Debtors.  As of the Petition Date, the Debtors estimate that they owe a *de minimis* amount in prepetition Bank Fees, all of which will be netted against the interest payment owed by the Cash Management Banks.

15.     ***Critical Payment Processing Providers***.  In the ordinary course of business, the Debtors accept, among other payment methods, American Express, Visa, Mastercard, Diners, Discover, and JCB from customers.  To process the non-cash payment transactions, the Debtors are party to certain agreements with payment processors (the "Payment Processors"), who in turn charge the Debtors a processing fee (collectively, the "Processing Fees").  The Debtors incur approximately $900,000 in Processing Fees per month.  The Debtors estimate that they owe approximately $1.2 million in prepetition Processing Fees as of the Petition Date.

16.     ***Credit Card Program***.  As part of the Cash Management System, the Debtors provide certain employees with access to travel and travel-related expense credit cards and purchase credit cards issued by American Express and Barclays Bank PLC (collectively, the "Corporate Credit Cards") as part of its credit card program (the "Credit Card Program").  The Corporate Credit Cards are used to cover certain authorized business or travel expenses, including miscellaneous operational expenses, hotel stays and meals, and other necessary and approved company expenditures.  The Debtors pay the balances accrued on the Corporate Credit Cards directly for approved charges made by their respective employees through the Master Disbursement Account.  Employees receive monthly billing statements that reflect the payments these entities made on their behalf.  For any expenses not approved by these entities, the employees are responsible for paying the accrued balances on the Corporate Credit Cards directly.

17.     The Debtors incur approximately $700,000 each month under the Cash Management System to maintain the Credit Card Program.  As of the Petition Date, the Debtors

8

do not estimate that they owe any amount in prepetition obligations related to the Credit Card Program.

18.    ***Compliance with the Bankruptcy Code and Guidelines***.  The majority of the Debtors' Cash Management Banks are held at JPM, an authorized depository under the U.S. Trustee Guidelines (the "Authorized Depositories"), while the remaining Cash Management Banks—at which the Debtors maintain forty-four of their Bank Accounts—are not.  Likewise, most of the Debtor Bank Accounts are insured by the Federal Deposit Insurance Corporation (the "FDIC").  JPMorgan Chase Bank, Toronto, JPMorgan Chase Bank, Amsterdam, JPM Lux, and JPMorgan Chase Bank, London, where certain Debtors maintain accounts outside the United States (the "Foreign Bank Accounts"), are well-capitalized, financially stable, and reputable institutions.  These financial institutions are well-positioned to continue performing depository and cash management functions during these chapter 11 cases.  Furthermore, given the global scope of the Debtors' operations and cash management requirements, it is not feasible to post a bond or relocate the Foreign Bank Accounts to U.S.-only accounts, which could have potentially significant tax or regulatory impacts.  Cause exists to allow the Debtors to continue utilizing the existing Bank Accounts consistent with historical practices.

19.    ***Business Forms and Books and Records.***  As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  To avoid a material disruption to their business operations and to minimize administrative expense to their estates, the Debtors request

9

authorization to continue using all of the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

20.     ***Intercompany Transactions***.  Characteristic of a global enterprise, in the ordinary course of business, WeWork entities maintain and engage in routine business transactions with one another, including issuing and receiving Intercompany Loans (such transactions, the "Intercompany Transactions"), that may result in intercompany claims (the "Intercompany Claims").  Generally, Intercompany Claims arise in the ordinary course of business as Debtors and Non-Debtor Affiliates periodically transfer cash to one another, either via the Notional Cash Pool, the APAC Cash Management System, or the Non-Pool EMEA Cash Management System, for certain purposes as described above.  The Debtors can ascertain, trace, and account for all Intercompany Transactions through bank cash balance reports, which are reflective of actual cash movements, and will continue to monitor Intercompany Transactions on a postpetition basis in the ordinary course of business.  Intercompany Claims are generally reflected as journal entry receivables and payables, as applicable, in the Company's accounting systems and, in some circumstances, documented through intercompany agreements.

21.     The Intercompany Transactions are essential components of the Debtors' global operations and relate to, among other things:  (i) allocations of costs, revenue, or receipts in respect of assets or contracts with third parties across the applicable WeWork entities; (ii) concentration of cash in the Master Concentration Accounts and Intermediate Concentration Accounts for cash management purposes; (iii) satisfaction of Intercompany Loans or other debt-related payments; (iv) transfer of funds to Operating Accounts for the purpose of settling Operating Overdrafts and

making ordinary course expenditures, as needed; and (v) remittance of profits to parent entities in the form of dividends or partnership distributions (as applicable).

22.    ***Intercompany Loans***.  The Debtors fund their international operations through a system of interest bearing intercompany loans (the "Intercompany Loans").  In the ordinary course of business, Debtor WeWork Interco LLC issues Intercompany Loans to certain Non-Debtor Affiliates in Pool Jurisdictions and Non-Pool EMEA (the "Non-APAC Loans").  Interest on the Non-APAC Loans ranges from 0% to 15% and is payable semi-annually.  To fund operations in APAC, WeWork Interco LLC issues an Intercompany Loan to Non-Debtor Affiliate WeWork Asia Holding Company B.V., which in turn issues Intercompany Loans to Non-Debtor Affiliates within APAC (the "APAC Loans").  Interest on the APAC Loans ranges from 3% to 8% and is payable semi-annually.

23.    Within each jurisdiction, when funds are transferred from a Master Concentration Account or Intermediate Concentration Account sitting at one WeWork entity to an Operating Account sitting at another WeWork entity to settle the Operating Overdraft incurred by the Operating Account, such transfer is recorded as an Intercompany Loan issued by the entity maintaining the applicable Master Concentration Account or Intermediate Concentration Account in favor of the entity holding the applicable Operating Account.  In the U.S., such Intercompany Loans do not bear any interest.  In all other jurisdictions, such Intercompany Loans accrue interest at a rate between 5% and 8%.

24.    ***Non-Debtor Affiliate Intercompany Transactions***.  The Debtors engage in Intercompany Transactions with certain of their Non-Debtor Affiliates in the ordinary course of business—either through the Notional Cash Pool, the APAC Cash Management System, or the Non-Pool EMEA Cash Management System.  When cash is needed to fund a foreign-based

Non-Debtor Affiliate in APAC or Non-Pool EMEA, the U.S.-based Debtors will make an ordinary

course transfer from the Master Operating Account to the Interco Account.  Funds in the Interco

Account are then transferred to the APAC Master Concentration Account and subsequently into

the Payroll Accounts, Master Concentration Accounts, Intermediate Concentration Accounts, and

Operating Accounts held by Non-Debtor Affiliates.  Funds in the Interco Account are transferred

directly into the Payroll Accounts, Master Concentration Accounts, Intermediate Concentration

Accounts, and Operating Accounts held by Non-Debtor Affiliates in Non-Pool EMEA.  This series

of disbursements allows WeWork to cover business operations and costs such as employee payroll,

payments to vendors, and benefits and expenses incurred by the international offices, including

rent, insurance, and similar operational costs through overnight settlement of Operating

Overdrafts.  Because all Non-Debtor Affiliates in Pool Jurisdictions, APAC, and Non-Pool EMEA

are either direct or indirect wholly-owned subsidiaries of Debtor entities, these Intercompany

Transactions ultimately inure to the benefit of the Debtors.  In addition, excess cash generated

from the business operations of the foreign-based Debtors and Non-Debtor Affiliates is

occasionally repatriated back to the Interco Account and ultimately up to the BACA Account to

help fund domestic business operations.   The Debtors anticipate that the Intercompany

Transactions will continue postpetition in the ordinary course of business.

**II.      Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief (the "Epiq 156(c) Retention Application").**

25.      Although the Debtors have not yet filed their schedules of assets and liabilities and

statements of financial affairs, they anticipate that there will be thousands of creditors and parties

in interest to be noticed, many of which may file proofs of claim.  In view of the number of

anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims,

12

noticing, and solicitation agent will provide the most effective and efficient means of noticing,

administering claims, and soliciting and tabulating votes.

III.    **Debtors' Motion For Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Motion</u>").**

        26.     The Case Management Procedures, among other things:  (a) establish requirements

for filing and serving notices, motions, applications, declarations, affidavits, objections, replies,

responses, memoranda, briefs, supporting documents, and other papers filed in these chapter 11

cases, including with regard to any contested matters and any related adversary proceedings

(collectively, the "<u>Court Filings</u>"), and any orders entered in these chapter 11 cases, including with

regard to any contested matters and any related adversary proceedings (together with the Court

Filings, the "<u>Court Filings and Orders</u>"); (b) delineate standards for notices of hearings and

agendas; (c) fix periodic omnibus hearing dates and provide mandatory guidelines for scheduling

hearings and setting objection and reply deadlines; and (d) minimize potential burdens on the

Court by limiting matters that are required to be heard by the Court.

        27.     The Debtors believe that the Case Management Procedures will facilitate service

of Court Filings and Orders in a manner that will maximize the efficiency and orderly

administration of these chapter 11 cases, while at the same time ensuring that appropriate notice is

provided, particularly to parties who express an interest in these chapter 11 cases and those directly

affected by a request for relief.

        28.     To ensure that parties in interest in these chapter 11 cases are made aware of the

Case Management Procedures, the Debtors propose to:  (a) serve the Case Management Procedures

via electronic mail (where available) or regular mail on each of the parties on the Master Service

List (as defined in the Case Management Procedures) as soon as practicable after entry of the

Order; (b) publish the Case Management Procedures on the Debtors' restructuring website at

13

https://dm.epiq11.com/WeWork  (the "Case Website"); and (c) make the Case Management Procedures readily available upon request to the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring LLC (the "Claims Agent"). If the Case Management Procedures are modified during these chapter 11 cases, the Debtors will (a) make updated versions of the Case Management Procedures available on the Case Website, (b) file a notice of the updated procedures (along with a copy of the updated procedures) electronically on the docket, and (c) serve such updated procedures in accordance with the revised Case Management Procedures.

**IV.    Debtors' Motion for Entry of Interim and Final Orders(I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief (the "NOL Motion").**

29.    The Debtors currently estimate that, as of December 31, 2022, they had approximately $7.7 billion of U.S. federal NOLs, a capital loss carryover of approximately $126 million, approximately $716 million of 163(j) Carryforwards, "net unrealized built-in losses" and certain other Tax Attributes. The Debtors may generate additional Tax Attributes in the 2023 and 2024 tax years, including during the pendency of these chapter 11 cases. The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years. In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.

30.    Implementation of the Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefit of the Debtors' estates. The Tax Attributes may provide the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter 11 cases. Conversely, the elimination or limitation of the Tax Attributes could, therefore, be materially detrimental to all parties in interest, including by

14

potentially limiting the Debtors' ability to utilize certain structures to consummate a chapter 11 plan.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

31.    To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, I understand that the Debtors seek limited relief that will enable them to closely monitor certain transfers of, exchanges for, and issuances of or with respect to Beneficial Ownership of Common Stock and certain worthless stock deductions for U.S. federal income tax purposes with respect to Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions for U.S. federal income tax purposes, if necessary, with the purpose of preserving the Tax Attributes.  I believe that by establishing and implementing such Procedures, the Debtors will be in a position to object to "owner shifts" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

32.    I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the NOL Motion should be approved.

## V.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").

33.    In the ordinary course of business, income taxes, franchise taxes, sales and use taxes, personal property taxes, commercial rent taxes, foreign taxes, and other governmental and regulatory taxes, penalties, interests, assessments and fees (collectively, the "Taxes and Fees"). The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly,

15

semi-annually, or annually, as applicable) depending on the nature and incurrence of the particular Taxes and Fees and as required by applicable laws and regulations. The Debtors generally, but not exclusively, pay and remit Taxes and Fees via checks, through third party service providers, or an Authority's online portals. In some cases, the Debtors' customers or contract counterparties withhold taxes from the Debtors' invoice payments and remit the taxes directly to the Authorities. From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees. The Debtors generally use these credits in the ordinary course of business to offset against future Taxes and Fees or cause the amount of such credits to be refunded to the Debtors.

34. The Debtors indirectly pay certain sales and use taxes, property taxes, and regulatory and other Taxes and Fees in the ordinary course of business through their third-party tax administrator, Anybill Financial Services, Inc. (together with certain of its affiliates, "Anybill"). [3] To do so, certain of the Debtors' employees provide Anybill with information related to amounts owed to the applicable Authorities and the required timing for payment. The Debtors remit funds to Anybill via ACH, wire transfer, or through an automatic debit, pulling funds directly into Anybill's bank account. In turn, Anybill remits such tax payments to the applicable Authorities once the funds are received from the Debtors.

35. Additionally, the Debtors are and may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases. Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors. Additionally, the Debtors request authority, not direction, to make distributions of cash, directly or indirectly, to certain Debtor equity holders of Debtor The We

---

[3]   Funds are transferred from the Company to an affiliate of Anybill (Paypool), which then generates the payments.

Company Management Holdings L.P., a Cayman Islands exempted limited partnership (the "We Company Partnership") to satisfy any Taxes and Fees owed by such Debtor equity holders that are due and owing as of the Petition Date or may become due and owing in the ordinary course of business during these chapter 11 cases in respect of such Debtor equity holders' ownership of equity interests in the We Company Partnership under applicable law, in each case without regard to any restrictions, conditions or limitations on such distributions that may otherwise exist under that certain Third Amended and Restated Agreement of Exempted Limited Partnership of The We Company Management Holdings L.P., dated as of October 21, 2021.  The Debtors estimate that approximately $11.6 million in Taxes and Fees is outstanding as of the Petition Date, in addition to other amounts that will become due and owing to the Authorities after the Petition Date in the ordinary course.

36.     Any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including that:  (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring.  Taxes and Fees not timely paid as required by law may result in fines and penalties, the accrual of interest, or both.  In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

17

37.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Taxes Motion should be approved.

**VI.    Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief (the "<u>Assumption and Rejection Procedures Motion</u>").**

38.     The Debtors are party to thousands of Contracts, which include, among other agreements, real property leases, contracts with vendors for the supply of goods and services, and other contracts related to the operation of the Debtors' business.  During the pendency of these chapter 11 cases, the Debtors may, on a consensual or non-consensual basis, assume, assume and assign, or reject the Contracts.

39.     The Debtors are in the process of evaluating all of their Contracts, including as part of the Debtors' ongoing initiative to rationalize their expansive lease portfolio, to determine whether such Contracts should be (a) rejected, as they are unfavorable to the Debtors or no longer beneficial for the Debtors' business operations, or (b) assumed (including as amended) or assumed (including as amended) and assigned, as they are favorable or otherwise valuable to the Debtors' estates (including those Contracts that the Debtors may assume as amended following consensual negotiations with the applicable contract counterparties).  As set forth in more detail in the First Day Declaration, this analysis is well underway.

40.     Absent the relief requested in this Motion, the Debtors would be required to file separate motions to reject or assume Contracts, resulting in substantial costs to, and administrative burdens on, the Debtors' estates—not to mention the attendant burden on the Court's docket.  Accordingly, the Debtors hereby request approval of these Contract Procedures to streamline their ability to (a) reject burdensome Contracts that no longer provide a benefit to the Debtors' estates

18

and (b) assume (included as amended) fruitful Contracts that the Debtors believe will benefit the estates, while also providing parties in interest with adequate notice of the rejection or assumption of a Contract and an opportunity to object to such relief within a reasonable time period.

**VII. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations Thereto and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

41.      ***The Insurance Policies and Related Payment Obligations.***  In the ordinary course of business, the Debtors maintain approximately forty-one insurance policies (collectively, the "<u>Insurance Policies</u>") administered by various third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  Generally, the Insurance Policies fall into the following categories:  auto, crime, flood, workers' compensation, property, terrorism, business travel accident, crime, cyber/errors and omissions, director and officer liability (including tail coverage), pollution, general and excess liability, and umbrella liability.  As of the Petition Date, the Debtors owe approximately $15.4 million with respect to the Premiums (as defined herein) and related fees paid in connection with the Insurance Policies.

42.      As of the Petition Date, the Debtors owe approximately $15.4 million with respect to the Premiums and related fees, including Premiums paid pursuant to the Financing Agreements and Brokerage Fees (as defined herein).  As of the Petition Date, the Debtors estimate that there are approximately $2.35 million in accrued but unpaid amounts pursuant to the Deductibles and SIRs (not including the Deductibles and SIRs under the Sompo Insurance Policies).

43.      Additionally, the Debtors obtain their Insurance Policies through their insurance brokers, Marsh USA Inc. and Rampart Insurance Services, and their various affiliates (the "<u>Insurance Brokers</u>").  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage and evaluating benefit plan offerings and advise the Debtors with respect to

accounting and actuarial methodology.  They also advise the Debtors on the negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.

44.     The Insurance Brokers collect fees and/or commission payments for services rendered (the "Brokerage Fees") assisting the Debtors in obtaining the Insurance Policies.  The Brokerage Fees are included in the Premiums that the Debtors pay in the ordinary course of business.  As of the Petition Date, the Debtors estimate they do not owe any amount on account of prepetition obligations associated with the Insurance Policies outside of the Premiums.

45.     ***The Debtors Surety Bond Program.***  In the ordinary course of business, the Debtors are required to provide surety bonds (the "Surety Bonds") to certain third parties to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program").  The Debtors currently maintain twenty-five Surety Bonds, in the aggregate amount of approximately $66.4 million, consisting of three mechanic lien bonds and twenty-two lease security bonds (the "Lease Security Bonds") in the United States and Canada.

46.     When a party that transacts with the Debtors requests a bond and the Debtors determine that they have better operational uses for cash and do not wish to provide the cash and cash equivalents necessary to satisfy such request, they may obtain a surety bond from a surety (the "Surety").  In such situations, sureties provide, upfront, the full amount of the requested cash and cash equivalents to the requesting party on behalf of the Debtors, in exchange for a fee from the Debtors and an amount of collateral to secure the bond issuance on the Debtors' behalf.  The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from an obligee (such as a landlord) to a surety.

47.    The premiums for the Surety Bonds (the "Surety Premiums") are generally determined on an annual basis and are paid by the Debtors when the bonds are issued and upon renewal.  The aggregate annual premium for the Surety Bonds currently maintained by the Debtors is approximately $410,000.  As of the Petition Date, the Debtors owe approximately $205,000 with respect to the Surety Premiums and related fees.

48.    The Debtors obtain their Surety Bonds through Marsh USA Inc. (the "Surety Bond Broker," together with the Insurance Brokers, the "Brokers").  The Surety Bond Broker is paid a commission for their services (the "Surety Brokerage Fees") related to surety bond coverage in connection with the Debtors' Surety Bond Program, which is payable as part of the premiums paid on the Surety Bond Program.  As of the Petition Date, the Debtors estimate they do not owe any amount on account of prepetition obligations associated with the Surety Bond Program outside of the Surety Premiums.

49.    To continue their business operations during these Chapter 11 Cases, the Debtors must be able to provide financial assurance to landlords, contract counterparties, and other third parties.  As explained above, the Debtors do not currently plan to provide any additional Lease Security Bonds.

**VIII.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief (the "Critical Vendors Motion").**

50.    *Critical Vendor Claims.*  As described in further detail in the First Day Declaration, what sets WeWork apart from other providers in the industry is not only the true flexibility, the prime locations, and the unique design of its workspace, but also the member-first hospitality and exceptional community experience that it endeavors to provide to its members.  Accordingly, the Debtors' ability to continue generating revenue and operating their businesses, and thus the success

of these chapter 11 cases, fundamentally depends on the Debtors' ability to continue to provide the WeWork experience to which members are accustomed.  At each of the nearly 600 locations that the Debtors directly operate in the United States and around the world, in the ordinary course of business, the Debtors obtain certain products and services from suppliers who are indispensable to the commercial viability of the Debtors' business enterprise (the "Critical Vendors").  These Critical Vendors include certain (a) providers of certain health and safety services such as building repair and maintenance and daily enhanced cleaning; (b) providers of certain IT services and equipment, such as high-speed printing, network hardware and software, and business development and member service request management; and (c) providers of other goods and services essential to the WeWork member experience, including office stationery and consumables such as snacks, coffee, dairy products, condiments, and other consumable goods.

51.      Many Critical Vendors supply goods or provide services on an order-by-order basis pursuant to certain master service or supplier agreements.  If the Debtors are unable to pay prepetition claims held by the Critical Vendors and continue to pay amounts owed to the Critical Vendors as they come due in the ordinary course postpetition (collectively, the "Critical Vendor Claims"), the Critical Vendors may refuse to provide the goods and services the Debtors need to maintain ordinary course operations.  In addition, many Critical Vendors are logistically integrated with the Debtors' business enterprise.  Should the Debtors' business relationship with such Critical Vendors be disrupted, finding their replacement at each individual location would require significant effort, time, and expenses that the Debtors cannot afford and would distract from the Debtors' smooth transition into these chapter 11 cases.  Accordingly, paying the Critical Vendor Claims is essential for maintaining the going concern value of the Debtors' business and

minimizing operational degradation as they work to effect a comprehensive reorganization of their business enterprise.

52.    As of the Petition Date, the Debtors estimate that they owe an aggregate of approximately $21 million on account of prepetition goods provided and/or services rendered by all three categories of Critical Vendors.

53.    ***Foreign Vendor Claims.***  The continual operation of the Debtors' business entails transacting with certain foreign vendors, including foreign utility providers (collectively, the "Foreign Vendors").  The Foreign Vendors provide, among other things, critical goods and services including building-level utilities, cleaning services, and maintenance and repairs at the Debtors' foreign Facilities.  As of the Petition Date, the Debtors estimate that there is approximately $2 million in aggregate amounts outstanding on account of prepetition goods provided and/or services rendered by the Debtors' Foreign Vendors (the "Foreign Vendor Claims").

54.    Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a significant and material risk that a Foreign Vendor may stop providing services, including utilities, to the Debtors on a timely basis and/or completely sever its business relationship with the Debtors.  Foreign suppliers and vendors are often unfamiliar with the chapter 11 process and react skeptically to various debtor protections.  Upon nonpayment of certain Foreign Vendor Claims, Foreign Vendors may take other harmful actions short of severing their relations with the Debtors, including refusing to supply goods or services or cutting off utility services to the detriment of members and the Debtors' ongoing business operation at foreign locations.  Providing uninterrupted services for the Debtors' foreign-based members is critical to the Debtors' businesses and cash flows, and the Debtors cannot afford any delays or interruptions of this kind.

23

55.      ***503(b)(9) Claims.***  Pursuant to section 503(b)(9) of the Bankruptcy Code, claims arising from the value of any goods received by the Debtors within the twenty days before the Petition Date in the ordinary course of business (the "503(b)(9) Claims") are entitled to administrative expense priority.  11 U.S.C. § 503(b)(9).  In the twenty days prior to the Petition Date, the Debtors received large volumes of coffee, dairy products, condiments, and other consumables from certain vendors (collectively, the "503(b)(9) Claimants") on a rolling basis to satisfy their customers' demands.

56.      The vast majority of the 503(b)(9) Claimants are also Critical Vendors or Lien Claimants (as defined herein).  The Debtors' relationships with these vendors, and with many other 503(b)(9) Claimants, are not governed by long-term contracts.  Rather, the Debtors obtain goods from such claimants on an order-by-order basis pursuant to the terms of those certain master agreements.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims.  Such refusal would negatively affect the Debtors' estates, as the Debtors' business is dependent on the steady flow of goods and supplies essential to the WeWork member experience.

57.      The Debtors also believe that certain 503(b)(9) Claimants could demand payment in cash on delivery—further exacerbating the Debtors' liquidity.  The Debtors believe that, as of the Petition Date, they owe approximately $4 million on account of goods delivered within the twenty days immediately preceding the Petition Date, approximately $3 million of which may become due within the first twenty-one days of these chapter 11 cases and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  *See* 11 U.S.C. § 503(b)(9).

58.     *Lien Claims.*  The Debtors routinely transact business with a number of third parties who may assert various statutory liens (the "Lien Claimants"), including mechanics' liens, against the Debtors and their property if the Debtors fail to pay for the services rendered.  The Lien Claimants primarily consist of companies providing construction and build-out services on the Debtors' locations across the United States and Canada.

59.     In the ordinary course of business, the Debtors incur obligations (the "Lien Claims") to the Lien Claimants for design and construction services and the delivery and installation of furniture, fixtures, and equipment.  Also, to maintain efficient operations, the Debtors employ a network of providers that warehouse and transport goods to their various locations.  Under the laws of most states, these servicers or carriers will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses the Debtors incurred in connection with the transportation of goods or the supply of labor.[4]  As of the Petition Date, the Debtors estimate that there is approximately $3 million in aggregate amounts outstanding on account of the Lien Claims.

60.     If amounts owed to the Lien Claimants are not paid, certain of the Lien Claimants may be able to assert and perfect mechanics' or other liens against certain of the Debtors' goods or property, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code. To the extent any Lien Claimant has already perfected a lien on any of the Debtors' or their customers' property or, in the Debtors' estimation, could assert and perfect a lien on any such property, it is imperative that the Debtors be authorized to pay such Lien Claimants, regardless of

---

[4]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. § 7-307(a) (2005).

whether their claims arose prior to or after the Petition Date. Such payment will secure the release of any such liens and ensure the Debtors' continued, uninterrupted access to the goods and services provided by the Lien Claimants.

61. Moreover, the value of the assets in the possession of the Lien Claimants generally exceeds the value of their respective prepetition claims. The Lien Claimants' refusal to deliver or return the Debtors' goods due to nonpayment would severely disrupt the Debtors' operations and could potentially cost the Debtors a substantial amount of revenue and future business. The Debtors' ability to maintain access to materials, goods, equipment, and installation services is critical to the continued viability of the Debtors' business operations.

62. ***Outstanding Orders.*** Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders"). In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.

## IX. Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").

63. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.

Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

**X.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Fee Payments to the Utility Agent, and (V) Granting Related Relief (the "Utilities Motion").**

64.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "Utility Services") from a number of utility providers or brokers (each, a "Utility Provider" and collectively, the "Utility Providers"). Further, to manage the Debtors' payments owed to many of their Utility Providers, the Debtors partner with Engie Insight Services Inc. (the "Utility Agent"). Specifically, three times a week the Utility Agent pays certain Utility Providers directly for Utility Services on behalf of the Debtors. The Debtors pay the Utility Agent a monthly fee of approximately $20,000 in the ordinary course of business, and occasionally apply certain offset credits against the Utility Agent Fees for past services. In addition, to ensure continued Utility Services, the Debtors maintain an advance reserve deposit in favor of the Utility Agent in the amount of $75,000, subject to occasional increases at the Debtors discretion to mitigate risks associated with an imminent disconnection. As of the Petition Date, the Debtors owe approximately $120,000 in Utility Agent Fees.

65.    On average, the Debtors pay approximately $1.95 million each month for Utility Services, calculated as the historical average payment for the twelve-month period ending October, 2023, including amounts paid through the Utility Agent but excluding Utility Services billed directly to the Debtors' landlords.

66.     To provide additional assurance of payment, the Debtors propose to deposit $1 million into a newly created, segregated, interest-bearing bank account (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Providers.

67.     Additionally, the Debtors seek approval of their proposed adequate assurance procedures, which set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

68.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the efficient administration of these chapter 11 cases.  As of the Petition Date, the Debtors operate approximately 294 shared workspaces, as well as four corporate offices. These locations require electricity, telecommunications, internet, water, waste management, and the other Utility Services to operate.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to orderly effectuate the chapter 11 process.

**XI.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief (the "Wages Motion").**

69.     The Debtors seek authority to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits:

| RELIEF SOUGHT | AMOUNT REQUESTED |
|---|---|
| Wage Obligations | $1,300,000 |
| Withholding Obligations | $200,000 |
| Reimbursable Expenses | $100,000 |
| Health and Welfare Coverage Benefits | $500,000 |
| Workers' Compensation | $0 |
| Retirement Plans | $20,000 |
| Paid Leave Benefits | $2,800,000 |
| Non-Insider Severance Program | $800,000 |
| Non-Insider Retention Bonus Program | $0 |
| Non-Employee Director Compensation | $0 |
| Additional Benefits Programs | $100,000 |
| Payroll Vendors | $100,000 |
| **TOTAL** | $5,900,000 |

70.    As of the Petition Date, WeWork maintains a global workforce of approximately 2,700 employees spread across twenty-six countries and thirty legal entities, including 2,650 full-time employees and fifty part-time employees.  Debtor entities employ approximately 1,500 individuals, including approximately 1,440 employees working in the United States (the "U.S. Employees") and approximately sixty Employees working outside the United States (the "Non-U.S. Employees," and together with the U.S. Employees, the "Employees").  None of the Employees are represented by a union or employed pursuant to a collective bargaining agreement.

71.    ***Wage Obligations***.  In the ordinary course of business, the Debtors incur obligations in account of Employee Compensation, the Staffing Agencies, Independent Contractors, and the Bonus Programs (each as defined below and collectively, the "Wage Obligations").  As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million on account of accrued but unpaid Wage Obligations.

72.    Any loss of Wage Obligations would inflict substantial financial hardship on the Employees and Independent Contractors and could lead to significant headcount attrition. Considering the indispensable value the Employees and Independent Contractors provide to the

29

Debtors' estates and the cost attendant to filling sudden vacancies, it is critical that the Debtors maintain their workforce during the pendency of these chapter 11 cases.

73.    ***Employee Compensation***.  In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, and similar obligations (the "Employee Compensation").  The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts and other electronic means or checks on a bi-weekly basis for U.S. Employees and Non-U.S. Employees.  All Employee Compensation accrues on either a salaried or hourly basis with respect to base compensation and either a performance or achievement basis with respect to the Bonus Programs (as defined below) and is generally paid in arrears.  As of the Petition Date, the Debtors believe there are no prepetition amounts outstanding on account of accrued but unpaid Employee Compensation.

74.    ***Staffing Agencies and Independent Contractors***.  In the ordinary course of business, the Debtors incur payment obligations to their Staffing Agencies that assist the Debtors in retention of certain Employees (the "Staffing Agencies" and the Debtors' obligations thereto. The "Staffing Agency Obligations"), and Independent Contractors for services rendered to the Debtors (the "Independent Contractor Obligations").  The Staffing Agency Obligations and Independent Contractors are paid through the Debtors' accounts payable system following submission of a documented and supported invoice.  Amount and frequency of payment to the Staffing Agencies and Independent Contractors depends on the type of services they provide, but on average, the Debtors spend approximately $10,000 per month on account of Independent Contractor Obligations and approximately $63,000 per month on account of Staffing Agency Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 and $174,000 in accrued but unpaid Independent Contractor Obligations and Staffing Agency

Obligations, respectively.  The Debtors believe that continuing to pay their Staffing Agencies and

Independent Contractors is critical to maintaining and administering their estates.  The Staffing

Agencies and Independent Contractors perform critical administrative services that support the

Debtors' Employees and operations.

75.     ***The Bonus Programs***.  In the ordinary course of business, the Debtors offer their

Employees several bonus programs to ensure Employees feel valued and are performing at their

maximum potential:  (i) the Annual Cash Bonus Program, (ii) the Sales Incentive Program, (iii) the

Additional Bonus Programs, and (iv) the Legacy Equity Incentive Program (each as defined

herein, and collectively, the "Bonus Programs").  As of the Petition Date, the Debtors estimate that

they owe approximately $1.1 million on account of the Bonus Programs.  The Bonus Programs

are critical not only to maintaining employee morale and loyalty, but also minimizing attrition and

operational disruption as the Debtors transition into chapter 11.

76.     ***The Annual Cash Bonus Program.***  In the ordinary course of business, the Debtors

offer a cash bonus plan to certain eligible non-insider Employees with an annual target bonus based

on job level that is, for the current fiscal year, paid out in quarterly installments, with the amount

of each quarterly installment based on such Employees' and the Company's performance

(the "Annual Cash Bonus Program").  Payments under the Annual Cash Bonus Program are

conditioned on the applicable Employee's being both employed (without having received notice

of termination) and in good standing on the applicable payment date.  An Employee who gives or

receives notice of termination prior to the applicable payment date forfeits all rights to future

payment under the Annual Cash Bonus Program.  Furthermore, the Annual Cash Bonus Plan's

quarterly installments are guaranteed (subject to the aforementioned conditions), meaning that

eligible Employees will receive 100 percent of their applicable bonus amount determined by the

Company in any given quarter.  Bonus payments made to Employees under the Annual Cash Bonus

Program are typically lower in relation to their base compensation than bonus payments made to

sales department employees under the separate Sales Incentive Program because bonus payments

under the Sales Incentive Program are more directly based on individual and team achievement of

sales metrics and sales department Employees typically expect their bonus payments to comprise

a larger percentage of their overall bonus.  As of the Petition Date, the Debtors do not believe that

there are any prepetition amounts due and owing on account of the Annual Cash Bonus Program.

77.    ***The Sales Incentive Program.***  Many Employees in WeWork's sales department

are also eligible for bonus payments to incentivize individual and/or team achievement of sales

targets (the "Sales Incentive Program").  Sales teams participating in the Sales Incentive Program

include the Company's Leasing, Accounts, WeWork All Access, Inside Sales, Business

Development, WeWork Workplace, and Brand and Event Partnerships divisions

(each a "Participating Sales Team").

78.    In general, the bonus amounts paid to the eligible Employee are based on

achievement of sales metrics established each year by WeWork's senior sales leadership team.

Each Participating Sales Team has different sales metrics that are set in accordance with

WeWork's company-wide financial targets and business goals and are often based on the annual

contract value of any given sale, so amounts paid out vary across Participating Sales Teams.

Eighty percent of eligible Employees' annualized target bonus payments under the Sales Incentive

Plan is based on individual and/or team achievement of sales metrics with the remaining twenty

percent based on company-wide performance.  Employees on a Participating Sales Team must be

employed (without having received notice of termination) and in good standing on the applicable

payment date in order to receive payment under the Sales Incentive Program, with such payment

pro-rated to the extent that the Employee began employment or participation in the Sales Incentive Plan after the beginning of the corresponding quarter.

79.    Typically, bonus payments under the Sales Incentive Program are earned at the end of a target period (generally monthly or quarterly).  Within six-to-eight weeks following the completion of the applicable target period, the Debtors reconcile the performance data of every Participating Sales Team, determine the amount of bonus payments, and disburse the applicable amounts to the Employees.  As of the Petition Date, the Debtors believe there are approximately $1.1 million in prepetition amounts outstanding on account of the Sales Incentive Program.

80.    *The Additional Bonus Programs.*  In the ordinary course of business, the Debtors maintain and administer the WeCap Bonus Program for nine Employees who perform daily functions for non-Debtor WeWork Capital Advisors LLC.  While such Employees render services to a non-Debtor subsidiary of Debtor WeWork Companies U.S. LLC, they are employed and paid by Debtor WeWork Management LLC.  Under the WeCap Bonus Program, in the beginning of each year, the Debtors determine the annual target bonus payment for each eligible Employee. Employees who meet or exceed their overall performance expectation become eligible for a cash bonus according to a pre-set formula.

81.    Several other categories of the Debtors' Employees responsible for building operations at locations acquired in connection with the Company's purchase of Common Desk in January 2022 are eligible for discretionary annual or quarterly bonuses that vary from three percent to fifteen percent of such Employee's then-current quarterly base pay rate (the "Common Desk Bonus Program" and to together with the WeCap Bonus Program, the "Additional Bonus Programs").  Similar to the other Bonus Programs, Employees eligible for the Additional Bonus Programs must be employed (without having given or received notice of termination), and in good

33

standing on the applicable payment date in order to receive payment under the Additional Bonus Programs.  Employees who participate in the Additional Bonus Programs are not eligible to participate in the Annual Cash Bonus and Sales Incentive Bonus Programs.  As of the Petition Date, the Debtors do not believe there are any prepetition amounts outstanding on account of the Additional Bonus Programs.

82.    ***The Legacy Equity Incentive Program.***  Historically, the Debtors maintained the Legacy Equity Incentive Program for certain Employees.  Under the Legacy Equity Incentive Program, certain Employees were eligible for certain stock-based awards, including stock options and restricted stock units (collectively, the "RSUs").  The terms of the program outlined that the number of awarded RSUs and the vesting schedule were determined at the Debtors' discretion on a case-by-case basis for each individual eligible Employee according to a preset formula.  In 2023, the Annual Cash Bonus Program replaced the Legacy Equity Incentive Program.

83.    As of the Petition Date, approximately 158,245 outstanding RSUs and 505 stock options that may vest postpetition.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Legacy Equity Incentive Program.

84.    ***Withholding Obligations***.  In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Employer Payroll Taxes (each as defined below and collectively, the "Withholding Obligations").  In the United States, the Debtors accumulate a monthly average of approximately $7.2 million in Withholding Obligations on account of federal, state, and local income taxes, employee benefits elections and garnishments, and employer taxes. The Debtors have similar obligations to foreign taxing authorities for Non-U.S. Employees under the laws of Canada.  For example, the Debtors are obliged to withhold and remit federal, province, and city tax to appropriate federal, state, or local taxing authorities.  On average, the Debtors

withhold and subsequently remit approximately $300,000 per month on account of Withholding Obligations in Canada.  As of the Petition Date, the Debtors believe there are approximately $200,000 in prepetition amounts withheld but not yet remitted on account of the Withholding Obligations.

85.     ***Deduction Obligations***.  During each applicable payroll period, the Debtors routinely deduct certain amounts from U.S.-based Employees' paychecks, including garnishments and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein.  Such deductions include (i) an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, miscellaneous deductions; and (ii) amounts the Debtors are required by applicable statutory authority to pay on account of U.S. Social Security and income taxes for remittance to the appropriate federal, state, and local taxing authorities (the "U.S. Deductions").  In Canada, the Debtors routinely deduct certain amounts from Non-U.S.-based Employees' paychecks, including garnishments and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain Employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, retirement contributions and miscellaneous deductions (the "Foreign Deductions", and together with the U.S. Deductions, the "Payroll Deductions").

86.     On average, the Debtors withhold and remit approximately $5.2 million per month on account of U.S. Deductions and approximately $200,000 per month on account of Foreign Deductions and forward the withheld amounts to various third-party recipients.  The Debtors retain only those Payroll Deductions related to the Employees' share of health care benefits and insurance premiums.  As of the Petition Date, the Debtors believe there are approximately $100,000 in

prepetition amounts withheld but not yet remitted on account of U.S. Deduction Obligations and no prepetition amounts outstanding on account of Foreign Deductions.

87.     ***Employer Payroll Taxes***.  The Debtors pay employee payroll taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance, Social Security and Medicare taxes, and other foreign social insurance contributions (the "Employer Payroll Taxes").   The Employer Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with remittance intervals and deadlines established by such taxing authorities.  As of the Petition Date, the Debtors believe there are approximately $100,000 in prepetition amounts outstanding on account of U.S. Employer Payroll Taxes and no prepetition amounts outstanding on account of foreign Employer Payroll Taxes.

88.     ***Reimbursable Expenses***.  Prior to the Petition Date and in the ordinary course of business, the Debtors reimburse certain Employees for certain expenses incurred on behalf of the Debtors within the scope of their employment (the "Reimbursable Expenses").   Reimbursable Expenses include, among other expenses, certain necessary business expenses incurred as a direct consequence of Employees' job duties, such as work travel, lodging, and meals.  Employees who pay for their own Reimbursable Expenses up front are responsible for maintaining and submitting verifying documentation for reimbursement to the Debtors through the WorkDay platform.  Once the Debtors have determined that the charges are for valid reimbursable business expenses, the Debtors reimburse the submitting Employees.   The Debtors incur a monthly average of approximately $48,000 in Reimbursable Expenses and estimate that, as of the Petition Date, approximately $66,000 is due and owing on account of Reimbursable Expenses.

89.     The Debtors' inability to reimburse Employees for the Reimbursable Expenses may be in conflict with certain applicable employment laws, and also would also impose an undue hardship on Employees who incurred the Reimbursable Expenses as business expenses on the Debtors' behalf or otherwise, and with the understanding that such expenses would be reimbursed.

90.     ***Health and Welfare Coverage and Benefits***.  The Debtors offer their Employees the ability to participate in a number of health, insurance, and benefits programs, including, among others, U.S. Medical and Prescription Coverage, Foreign Sponsored Health Plans, FSAs, HSAs, Life Insurance Coverage, Dental Insurance Coverage, Vision Insurance Coverage, and the Employee Disability Program (each as defined herein, and along with the COBRA Benefits (as defined below), the "<u>Health and Welfare Coverage Benefits</u>").  The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including, without limitation, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA Benefits</u>").

91.     The Debtors' Health and Welfare Coverage and Benefits include:

- <u>U.S. Medical and Prescription Coverage</u>:  The Debtors provide eligible U.S. Employees with medical and prescription coverage programs ("<u>U.S. Medical and Prescription Coverage</u>") through self-funded plans administered by Aetna.  Under the Aetna plan, U.S. Employees may choose from one of two options with a fixed premium: (i) the "Point of Service" plan, which gives participating Employees flexibility by allowing them to visit any doctor in- or out-of-network in exchange for a low deductible and out-of-pocket maximum; and (ii) the "High Deductible Health Plan," which has lower Employee contribution requirements but results in a higher deductible and out-of-pocket maximum.  Only the Employees participating in the High Deductible Health Plan are eligible for HSAs, as described below. Temporary Employees who have worked at least ninety days consecutively and part-time Employees who have worked an average of thirty hours per week in a twelve-month measurement period are eligible to participate only in Aetna's Point of Service plan.  For both plans, the Debtors cover an average of approximately seventy-four percent of the cost of premiums while the Employees cover the remaining twenty-six percent.  Legal spouses, domestic partners, and dependent children are eligible dependents and can be additionally covered.  Approximately ninety-four percent of U.S. Employees enroll in U.S. Medical and Prescription

Coverage.  Under the agreement with Aetna, the Debtors are self-insured up to $350,000 dollars per insured individual (the "Stop Loss Limit").  The Debtors cover their Employees' medical expenses up to the Stop Loss Limit, and Aetna covers the excess.  The monthly cost of the U.S. Medical and Prescription Coverage for administration fees and premiums to the Debtors is approximately $170,000.  As of the Petition Date, the Debtors estimate they owe approximately $170,000 on account of accrued but unpaid obligations in connection with U.S. Medical and Prescription Coverage.

As self-insured medical plan providers under the Aetna Plan, the Debtors pay medical claims under the plans as they become due on a weekly basis.  Employee contributions are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund a portion of the payment of U.S. Medical and Prescription claims.  The Debtors pay approximately $1.6 million per month on account of U.S. Medical and Prescription Coverage claims.

- Foreign Sponsored Health Plans:  The Non-U.S. Employees are generally offered similar medical and prescription coverage under either Debtor-sponsored programs (the "Foreign Sponsored Health Plans") or government-sponsored programs. Approximately sixty Non-U.S. Employees are enrolled in Foreign Sponsored Health Plans, which are administered by various third-party providers, including Equitable Life of Canada ("Equitable Life").  The Foreign Sponsored Health Plans include coverage for, among other things, hospital visits, general health care, prescription drugs, and dental.  The monthly cost of the Foreign Sponsored Health Plans to the Debtors is approximately $16,300 for Equitable Life.  As of the Petition Date, the Debtors estimate that they do not owe any prepetition amounts on account of obligations under the Foreign Sponsored Health Plans.

- Flexible Spending Accounts and Health Savings Accounts:  The Debtors provide U.S. Employees with the opportunity to contribute to a dependent care flexible spending account (the "FSA") administrated by Health Equity and a health savings account (the "HSA"), administered by Fidelity.  The FSAs and the HSAs allow U.S. Employees voluntarily to set aside pre-tax funds to pay for eligible health and welfare expenses.  For the 2023 calendar year, each eligible U.S. Employee can contribute up to $5,000 to an FSA depending on such U.S. Employee's marital status and up to $7,750 to an HSA depending on such U.S. Employee's age and familial status, and immediately draw on contributions to pay for eligible child and dependent care and health care expenses.  The Debtors do not contribute directly to the FSAs but do contribute to U.S. Employee HSAs based on the type of Medical and Prescription Coverage the U.S. Employee is enrolled in and whether the coverage includes spouses and/or dependents.    The Debtors contribute approximately $18,000 each month to U.S. Employee HSAs.  Additionally, the Debtors pay a quarterly administration fee of approximately $1,800 to Fidelity on account of the HSAs.    The Debtors pay a monthly administration fee of approximately $3,000 to Health Equity on account of both the FSAs and Commuter Transit Accounts (i.e., a pre-tax account to help pay for public transit and/or parking).  As of the Petition Date, the Debtors do not believe they owe any amounts

on account of unpaid HSA contributions, while they believe that approximately $2,100 remains outstanding on account of unpaid HSA fees.  In addition, as of the Petition Date, the Debtors estimate they owe approximately $3,000 on account of unpaid FSA fees.

- Life Insurance Coverage:  The Debtors provide (i) basic life and accidental death and dismemberment insurance (at an amount calculated based on a percentage of the Employee's annual earnings, up to a fixed maximum amount); (ii) long- and short-term disability insurance to all active Employees who are working thirty or more hours per week; and (iii) supplemental, spousal, and child life products offered on a voluntary, Employee-paid basis ("U.S. Life Insurance Coverage"), administered by First Unum Life Insurance Company (the "Unum").  Certain Non-U.S. Employees are provided different Life and Insurance Coverage depending on the jurisdiction in which they sit.  Life plans for Non-U.S. Employees are administered by Equitable Life of Canada (the "Foreign Life Insurance Coverage," and, together with the U.S. Life Insurance Coverage, the "Life Insurance Coverage").  As of the Petition Date, retiring Employees of the Debtors are generally not provided Foreign Life Insurance Coverage.

  The average monthly cost of the Life Insurance Coverage to the Debtors is approximately $97,000, excluding voluntary products.  As of the Petition Date, the Debtors estimate they owe approximately $97,000 on account of unpaid Life Insurance Coverage.

- U.S. Dental Insurance Coverage:  The Debtors offer eligible U.S. Employees basic and enhanced dental plans administered by Aetna ("Dental Insurance Coverage").  The dental plans provide for both in- and out-of-network coverage.  Approximately thirty-six percent of the dental premiums are employer-paid.  The average monthly cost of the Dental Insurance Coverage to the Debtors is approximately $4,200.  As of the Petition Date, the Debtors estimate they owe approximately $4,200 on account of unpaid Dental Insurance Coverage.

  The dental plan is self-insured, and as such, the Debtors pay dental claims of Employees covered by the dental plan as they become due weekly.  Employee contributions to the dental plans are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund a portion of the payment of dental claims.  The Debtors pay approximately $103,000 per month on account of dental claims in the United States.

- U.S. Vision Insurance Coverage:  The Debtors offer vision insurance plans provided by Aetna ("Vision Insurance Coverage").  The vision plans provide for both in- and out-of-network coverage.  The Debtors provide 100 percent of Vision Insurance Coverage.  The average monthly cost of the Vision Insurance Coverage to the Debtors is approximately $900.  As of the Petition Date, the Debtors estimate that they owe approximately $900 on account of unpaid Vision Insurance Coverage.

The vision plan is self-insured, and as such, the Debtors pay vision claims of Employees covered by the vision plan as they become due weekly. Employee contributions to the vision plans are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund a portion of the payment of vision claims. The Debtors pay approximately $12,000 per month on account of vision claims in the United States.

- **Employee Long-Term/Short-Term Disability Program**: The Debtors also provide long-term and short-term disability benefits (the "U.S. Employee Disability Program") to U.S. Employees through Unum. The U.S. Employee Disability Program is designed to offer resources such as short-term disability payment during parental leave, hospitalization, illness, and/or injury. Upon an Employee's application for short-term disability payment, Unum makes certain determinations regarding eligibility and the amount of benefits. The type of disability benefits available to Non-U.S. Employees varies by geographic region (the "Foreign Employee Disability Program" and, together with the U.S. Disability Benefits, the "Employee Disability Program"). For example, in Canada, the Debtors also provide long-term and short-term disability benefits to Non-U.S. Employees through Equitable Life.

  The average monthly cost of the Employee Disability Program to the Debtors is approximately $167,000. As of the Petition Date, the Debtors estimate that approximately $167,000 is due and owing on account of the Employee Disability Program.

- **COBRA**: The Debtors are required to offer certain of their former U.S. Employees COBRA Benefits following termination of employment. The Cobra Benefits allow former Employees of the Debtors to continue using the U.S. Medical and Prescription Coverage, Dental Insurance Coverage, Vision Insurance Coverage for up to eighteen, and occasionally thirty-six, months following termination of employment. The Debtors' COBRA Eligible Employees are typically responsible for paying all costs associated with COBRA Benefits except with respect to those former Employees whose COBRA Benefits are consideration under a severance agreement. In such instances where COBRA Benefits are included in a severance agreement, the Debtors pay for up to eighteen months of COBRA Benefits. The Debtors contribute payments to the COBRA Benefits as part of their bi-weekly payments under the Non-Insider Severance Program (as defined herein). As of the Petition Date, the Debtors believe there are $10,100 in prepetition amounts outstanding on account of COBRA Benefits. Nevertheless, out of an abundance of caution, the Debtors request authority, but not direction, to pay any prepetition amounts outstanding on account of the COBRA Benefits and continue to honor their obligations in connection with the COBRA Benefits postpetition in the ordinary course of business consistent with past practices.

- COBRA is self-insured, and as such, the Debtors pay COBRA claims of Employees covered by COBRA as they become due weekly. The Debtors pay approximately $123,000 per month on account of COBRA claims in the United States. Employee

contributions to COBRA are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund the payment of COBRA claims.

92.    The Debtors incur a monthly average of approximately $500,000 on account of the Health and Welfare Coverage and Benefits. As of the Petition Date, the Debtors estimate they owe approximately $500,000 on account of unpaid Health and Welfare Coverage and Benefits. As discussed above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce.

93.    Workers' Compensation. In the ordinary course of business, the Debtors maintain three workers' compensation insurance policies in accordance with applicable requirements in the United States and equivalent coverages in foreign jurisdictions in which the Debtors operate as required by local laws. Employees in the United States and Canada are entitled to participate in the Workers' Compensation Programs (as defined below).

94.    The Debtors maintain workers' compensation insurance for their U.S. Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "U.S. Workers' Compensation Program"). The U.S. Workers' Compensation Program does not entail additional discretionary workers' compensation insurance. On average, the Debtors pay approximately $494,000 in annual plan premium payments for the U.S. Workers' Compensation Program. As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with American International Group, Inc. ("AIG," and such policy, the "U.S. Workers' Compensation Insurance Policy").

95.    The Debtors also maintain Workers' Compensation Programs for Non U.S. Employees located in Canada (the "Foreign Workers' Compensation Programs" and, together with the U.S. Workers' Compensation Program, the "Workers' Compensation Programs"). The Foreign Workers' Compensation Programs are administered by Insurance Company of the State

41

of Pennsylvania.   On average, the Debtors pay approximately $15,000 in annual premium payments for the Foreign Workers' Compensation Programs.

96.     Applicable state and foreign law require the Debtors to maintain the Workers' Compensation Programs.  If the Debtors fail to maintain the Workers' Compensation Programs, state and foreign laws may prohibit the Debtors from operating in the U.S. and applicable foreign jurisdictions.  Payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

97.     The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  Currently there is one active open claim under the Workers' Compensation Program.

98.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process.  As of the Petition Date, the Debtors do not believe that there are any prepetition amounts outstanding on account of accrued but unpaid Workers' Compensation Program obligations (subject to a potential premium adjustment that may become due and owing on account of the AIG Worker's Compensation Audit).

99.     The 401(k) Plan.  As of the Petition Date, the Debtors maintain a retirement savings plan for the benefit of their U.S. Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").   The 401(k) Plan is administered by Fidelity Investments ("Fidelity") and allows for automatic pre tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  The Debtors do not provide

a 401(k) match program but the U.S. Employees are permitted to contribute to their old 401(k) accounts and open new 401(k) accounts with Fidelity. Fidelity administers and maintains the Debtors' Employees 401(k) accounts for a quarterly administrative fee in the amount of $15,000. The Debtors estimate that, as of the Petition Date, approximately $15,000 is due and owing on account of such fees.

100.    Foreign Retirement Plans.  As of the Petition Date, the Debtors maintain certain retirement plans for their Non U.S. Employees (the "Foreign Retirement Plans," and together with the 401(k) Plan, the "Retirement Plans").  Non-U.S. Employees located in Canada are able to participate in a registered retirement savings plan (the "RRSP") with Desjardins.  Under the RRSP, which is administered by Desjardins, the Debtors match 100 percent of a participating Non U.S. Employee's contribution up to a maximum of $3,500 of such Non-U.S. Employee's contribution to the RRSP.  Desjardins administers and maintains the Debtors' Employees RRSP accounts for a quarterly administrative fee in the amount of $5,000.  As of the Petition Date, the Debtors estimate they have accrued approximately $5,000 on account of the Foreign Retirement Plans.

101.    Paid Leave Benefits.   The Debtors provide paid time off to certain eligible Employees (the "Paid Leave Benefits").  The Debtors' Paid Leave Benefits program consists of paid time off ("PTO"), paid sick time ("PST"), and paid parental leave.  In addition, the Debtors provide paid bereavement leave and voting leave.  Family and Medical Leave Act leave, military leave, safety leave, and jury duty leave (except as required by applicable state law) are not included in the Paid Leave Benefits program.  When an Employee elects to use Paid Leave Benefits, that Employee is paid his or her regular hourly or salaried rate.  Paid Leave Benefits accrue differently depending on the type of benefit considered.  For example, PTO accrues for twenty days per year during the Employee's first three calendar years of employment, and twenty-three days per year

thereafter, irrespective of the class of worker (e.g., hourly or salaried). Upon an Employee's termination, the Debtor pays out accrued and unused PTO consistent with applicable law and Company policy. PST is accrued at the rate of 80 hours per year, irrespective of the class of worker (e.g., hourly or salaried) and is not paid out upon termination of employment. Paid parental leave is provided for sixteen weeks for eligible employees of Debtors, is not paid out upon termination of employment if unused, and, in jurisdictions where an Employee is simultaneously eligible to receive government-provided pay, reduced such that the two sources of remuneration (i.e., from the Debtors and from the government) amount to only 100 percent of the Employee's base compensation rate.

102.     The Debtors believe that the continuation of the Paid Leave Benefits program in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Furthermore, many, if not all, Employees have come to depend on the Paid Leave Benefits. As of the Petition Date, the Debtors estimate that they owe approximately $2.8 million on account of accrued but unpaid Paid Leave Benefits.

103.     ***Non-Insider Severance Program***.  In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain non-insider Employees (the "Non-Insider Severance Program"). Under the Non-Insider Severance Program, certain Employees may be eligible for payment of severance if their employment is terminated due to not-for-cause, employer-initiated termination and they first sign a fulsome release of claims agreement in favor of the Company. Most severance payments (the "Non-Insider Severance Benefits") vary based on the length of the Employee's affiliation with the Debtors based on length of service, subject to a maximum accrual period of twenty-six weeks of base pay for eligible Employees who have been employed by WeWork for nine or more years. Non-Insider Severance Benefits are paid in

installments in accordance with the regular payroll practices of the Company (but no less frequently than monthly) and will commence within sixty days following the Employee's employment termination date.  Additionally, a number of higher-level, non-insider Employees negotiate individualized severance terms as part of their employment contract, and as a result, the Debtors' severance obligations may vary for such Employees when compared to the generalized terms of the Non-Insider Severance Program for other Employees.

104.    The Debtors' maintenance of the Non-Insider Severance Program and payment of Non-Insider Severance Benefits are critical to maintaining Employee morale and loyalty.  Failure to maintain the Non-Insider Severance Program would result in increased instability in the Debtors' workforce, which would undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.

105.    As of the Petition Date, the Debtors believe that thirty-three Employees are entitled to Non-Insider Severance Benefits totaling approximately $800,000, including amounts owed to individual holders of claims with respect to such Non-Insider Severance Benefits in excess of the Priority Cap.

106.    ***Non-Insider Retention Bonus Program (Final Order Only)***.  Prior to the Petition Date, the Debtors implemented a retention bonus program to retain approximately forty-four non-insider Employees (the "Non-Insider Retention Bonus Program").  The Non-Insider Retention Bonus Program is crucial to retaining the Debtors' valuable Employees.  Under the Non-Insider Retention Bonus Program, bonuses are paid out each quarter (each, a "Retention Period") with postpetition payments coming due in February, 2024, May 2024, and August 2024.  Under the Non-Insider Retention Bonus Program, each participant must remain employed through the applicable Retention Period.  If an eligible non-Insider Employee is terminated for any reason

other than death or disability or for cause, such Employee is entitled to receive a *pro rata* portion of the bonus for the Retention Period that the termination occurred. An Employee who resigns voluntarily or is terminated by the Debtors for cause prior to any vesting will not be eligible to receive any retention payments for such Retention Period.

107.   As of the Petition Date, the Debtors do not believe that there are any prepetition amounts due and owing on account of the Non-Insider Retention Bonus Program. The Debtors estimate that the total amount that will come due under the Non-Insider Retention Bonus Program after the Petition Date and during the pendency of these chapter 11 cases is approximately $3.5 million.

108.   ***Non-Employee Director Compensation (Final Order Only)***.   As of the Petition Date, the Debtors WeWork Inc.'s board of directors (the "Board") includes six non-Employee individuals who serve as directors (the "Directors") for WeWork Inc. Each of the non-Employee Directors receive $285,000 per year as a base plus any of the following amounts, as applicable: (i) $70,000 per year for serving as Independent Chair, (ii) $30,000 per year for serving as Audit Committee Chair, (iii) $15,000 per year for serving as an Audit Committee Member, (iv) $25,000 per year for serving as Compensation Committee Chair, (v) $12,500 per year for serving as a Compensation Committee Member, (vi) $15,000 per year for serving as Nominating & Corporate Governance Committee Chair, *and* (vii) $7,500 per year for serving as a Nominating & Corporate Governance Committee Member. All of the foregoing amounts (the "Director Payments") are paid monthly in advance in cash and prorated for partial service.

109.   Additionally, the Disinterested Directors receive an average monthly retainer of approximately $16,667, which is paid monthly in advance and prorated for partial service (the "Disinterested Director Retainer Fees"). Non-Employee Directors are also entitled to expense

reimbursement for certain reimbursable expenses (the "Director Reimbursable Expenses," and together with the Disinterested Directors Retainer Fees and the Director Payments, the "Director Compensation").

110.    As of the Petition Date, the Debtors do not believe they owe any amounts on account of Director Compensation and believe that they are authorized to pay any postpetition Director Compensation in the ordinary course.

111.    ***Additional Benefit Programs***.   In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of ancillary benefits (the "Additional Benefit Programs").  The Additional Benefit Programs includes (a) planned and unplanned hospital stay coverage; (b) serious illness or condition coverage; (c) identity theft protection; (d) family, wills, and estates attorney services; (e) mental health counselling; (f) child and elderly care; (g) pet insurance; (h) milk delivery services for breastfeeding mothers; (i) student loans assistance; (j) business travel insurance; (k) transgender benefits, including prescription and surgeries coverage; (*l*) employee referral program; (m) barista cash and credit card tips; (n) corporate relocation; and (o) an employee referral program.  The aggregate cost of the Additional Benefit Programs is approximately $110,000 on a monthly basis.

112.    As of the Petition Date, the Debtors believe there are approximately $80,000 in prepetition amounts outstanding on account of the Additional Benefit Programs.

113.    ***Payroll Vendor Obligations***.   In the ordinary course of business, the Debtors contract with several third-party professional employee organizations that handle human resources-related administrative functions, including payroll processing, withholding, remittance, reporting of payroll taxes, and payment to partner staffing companies.  For example, the Debtors utilize Alight Solutions ("Alight"), CloudPay, ADP International Services BV ("ADP"), and

47

Workday, Inc. ("Workday," and together with Alight, CloudPay, and ADP, the "Payroll Vendors," and the obligations the Debtors owe thereto, the "Payroll Vendor Obligations") to administer payroll and several other employee related benefits programs.  Among other things, the Payroll Vendors calculate gross-to-net wages and tax obligations and also provide payroll tax filing and human capital management services for the Debtors and, in the case of Workday, provide certain services related to administering the Compensation and Benefits, including, among other things, benefits pay and module services.  The Debtors incur a monthly average of approximately $105,000 on account of payroll processing and application hosting services provided by the Payroll Vendor.  As of the Petition Date, the Debtors estimate they owe approximately $58,000 on account of Payroll Vendor Obligations.

114.    The Debtors' relationships with the Payroll Vendors allow the Debtors to realize substantial cost savings with respect to the administration of the Compensation and Benefits by not having to employ additional human resources professionals.  In addition to saving costs, third party intermediaries like the Payroll Vendors enable the Debtors to administer payroll and benefit programs internationally, assist with labor and tax regulatory compliances, and otherwise effectively and efficiently administer the Compensation and Benefits.

**XII.    Debtors' Motion Seeking Entry of an Order (I) Extending to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief (the "SOFAs and Schedules Motion").**

115.    The ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the Schedules and Statements, the Debtors must compile information from those books and records, and from documents relating to the claims of their thousands of creditors, and the Debtors' many assets and contracts.  This information is extensive and located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires an enormous expenditure of time and

effort on the part of the Debtors, their employees, and their professional advisors in the near term—when these resources would be best used to stabilize the Debtors' business operations.

116.    The Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, but resources are strained.   Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

## XIII.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs, (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").

117.    The Debtors serve more than 100,000 customers across six continents.  The vast majority of the Debtors' revenue comes from the Debtors' core "space-as-a-service" products, which offer members access to flexible workspace and related business amenities and services. WeWork Private Workspace offers individuals and teams access to, among other services, dedicated private workspaces—either dedicated desks, private offices, or full-floor offices—on a month-to-month or fixed-term basis ("<u>WeWork Private Workspace</u>").   The Debtors offer two additional "space-as-a-service" products, which WeWork's customers can use on a standalone basis or to complement their other WeWork subscriptions (collectively, "<u>WeWork Access</u>," and together with WeWork Private Workspace, the "<u>WeWork Membership Programs</u>," and the customers of the WeWork Membership Programs, collectively, the "<u>Member Companies</u>" and each, a "<u>Member Company</u>"):  (a) WeWork All Access, which is a monthly subscription service

49

that allows customers to book workspaces, conference rooms, and private offices online or from their mobile devices on an *ad hoc* basis at select locations around the world ("WeWork All Access"); and (b) WeWork on Demand, a "pay-as-you-go" service that is similar to WeWork All Access but does not require a monthly subscription.

118.     Through the WeWork Membership Programs, Member Companies and their employees are given access to WeWork locations in addition to certain amenities and ancillary services, such as conference rooms, private phone booths, internet, printers, copiers, mail and package handling, front desk services, off-peak building access, shared amenities and common areas, complimentary coffee and other beverages, and daily cleaning.

119.     In addition to WeWork's core "space-as-a-service" offerings, the Debtors offer a number of other products to customers including, among others, WeWork Workplace, a proprietary office management software and data analytics platform that allows subscribers to manage and optimize their workspaces, whether at a WeWork location or in a customer's own offices, in exchange for a monthly licensing fee (the customers of WeWork Workplace and WeWork's other products and services together with the Member Companies, collectively, the "Customers" and each, a "Customer").

120.     The Debtors maintain their position as the world's leading flexible workspace provider by offering their Customers best-in-class service across all business lines.  In order to meet competitive market pressures, the Debtors have historically provided certain programs to incentivize and improve Customer retention, increase Customer satisfaction and loyalty, and attract new Customers.  Specifically, among other things, the Debtors have offered:  (i) Credits; (ii) Refunds;  (iii) Rebates;  (iv) Sales Promotions;  (v) Service Retainer Refunds;  (vi) Referral Programs; and (vi) Non-Cash Payments (each as defined herein, and together with certain other

customer programs described below, the "Customer Programs").  As of the Petition Date, the Debtors estimate that there are approximately $14 million of prepetition obligations outstanding related to the Customer Programs.

121.    The Debtors believe that their ability to continue the Customer Programs and honor any obligations thereunder in the ordinary course of business is necessary to maintain their reputation for reliability, remain competitive in the flexible and coworking office space market, ensure Customer satisfaction and retention, and preserve goodwill and WeWork's brand equity. Maintaining the Customer Programs is therefore critical to the Debtors' ongoing operations during the pendency of these chapter 11 cases and is necessary to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

122.    ***Credits.***  In the ordinary course of business, the Debtors offer certain credits to Member Companies either in connection with a Member Company's agreement with WeWork (the agreements entered into with Member Companies, the "Membership Agreements," and the Membership Agreements specific to the WeWork Private Workspace service, the "WeWork Private Workspace Agreements") or on an ad hoc basis, including as customer service accommodations.  As set forth in greater detail below, the Debtors provide three principal forms of credit:  (i) Membership Credits; (ii) Satisfaction Credits; and (iii) Service Disruption Abatement Credits (each as defined herein, and collectively, the "Credits").  The Debtors' ability to honor the Credits and to continue issuing Credits in the ordinary course of business is critically important to the Debtors' reputation and their ability to maintain their Customers' goodwill.

123. **_Membership Credits._**   In the ordinary course of business, pursuant to the Membership Agreements, WeWork issues a preset number of Credits that can be used to pay for certain ancillary services offered at WeWork locations (the "Membership Credits").  Such ancillary services include, among other things, access to conference rooms, private workspaces, access to other WeWork locations, and printing.  Typically, Member Companies receive a specified number of Membership Credits per month as specified in their Membership Agreements, which expire at the end of the month in which they are issued and cannot be rolled over from month to month.  In the event that a Member Company uses all of its Membership Credits, the Member Company is invoiced for any additional use for the covered services at scheduled rates. The Membership Credits are issued under the Membership Agreements for all WeWork Membership Programs.

124. **_Satisfaction Credits._**   In the ordinary course of business, the Debtors provide certain Credits to Member Companies on an ad hoc basis to boost Member Companies' satisfaction and loyalty (the "Satisfaction Credits").  Like the Membership Credits, the Satisfaction Credits can be used by Member Companies to pay for certain ancillary services at WeWork locations. Generally, WeWork employees at specific WeWork locations will issue the Satisfaction Credits as one-time accommodations or to address Member Company complaints.  The Satisfaction Credits are offered in connection with the WeWork Membership Programs and are not redeemable for cash.

125. **_Service Disruption Abatement Credits._**   In the ordinary course of business, the Debtors issue certain Credits to compensate Member Companies for service disruptions that may occur from time-to-time while utilizing a WeWork location (the "Service Disruption Abatement Credits").  The Service Disruption Abatement Credits are generally issued on an ad hoc basis in

52

the form of a credit that is automatically applied to a Member Company's next monthly invoice. After negotiations, WeWork may occasionally decide to provide cash payments in lieu of the Service Disruption Abatement Credits. The Service Disruption Abatement Credits are offered in connection with the WeWork Membership Programs.

126.    The Credits, which can generally only be applied to Member Companies' invoices, are typically not redeemable for cash and, thus, do not require a material cash outlay by the Debtors. Virtually all Credits are redeemed in the year they are issued. In order to maintain brand equity, attract new Member Companies, and maintain relationships with existing Member Companies, the Debtors seek authority, but not direction, to continue to honor the Credits, including any prepetition obligations related thereto, and to continue issuing new Credits in the ordinary course of business on a postpetition basis consistent with past practice.

127.    *Refunds.*  In the ordinary course of business, the Debtors issue certain refunds to Member Companies (the "Refunds") to promote goodwill, attract new Member Companies, and improve Member Company loyalty. Under the WeWork All Access Membership Agreements, WeWork All Access subscriptions automatically renew if they are not canceled at least five days prior to their renewal date (i.e., the end of the month). To accommodate Member Companies who try to cancel shortly after the cancelation deadline, WeWork occasionally offers discretionary Refunds, as is common practice for auto-renewing subscription services. The Debtors' ability to provide these Refunds is necessary to attract new Member Companies who might otherwise be reluctant or unwilling to subscribe to WeWork's offerings.

128.    WeWork provides certain other Refunds to Member Companies on a case-by-case basis. For example, WeWork sometimes offers partial Refunds to Member Companies that wish to terminate their WeWork Private Workspace or WeWork All Access subscriptions early due to

significant service disruptions. The Debtors may also offer Refunds to Member Companies for service reservations that are canceled prior to applicable cancelation deadlines (*e.g.*, waiving a cancelation fee for a conference room reservation). Refunds are generally issued to Member Companies in their original form of payment (*e.g.*, refunded to a Member Company's credit card) in accordance with the terms of the parties' arrangement.

129.    Offering Refunds maintains Customer goodwill, facilitates trust with new and existing Customers, and is consistent with industry practice. Moreover, discontinuing or failing to honor the Refunds could harm WeWork's reputation for reliability and best-in-class customer service. In addition, in certain jurisdictions where WeWork operates, WeWork is required by applicable law to provide consumers full Refunds within a certain time period after purchase. Failure to provide Refunds when required by applicable law could subject WeWork to civil and monetary penalties. The Debtors estimate that they issue approximately $7.2 million in Credits and Refunds annually. As of the Petition Date, the Debtors estimate that approximately $670,000 on account of Credits and Refunds.

130.    ***Rebates.*** In the ordinary course of business, WeWork will negotiate and agree to certain global terms with WeWork's enterprise clients that govern the parties' relationships across locations and WeWork Membership Programs (the "Enterprise Master Agreements"). The Enterprise Master Agreements occasionally include rebates at a negotiated, preset rate for enterprise Member Companies who meet certain regional spend thresholds (the "Rebates"). Because the Rebates are only provided to WeWork's large, enterprise Member Companies, disruption in the Debtors' ability to offer and honor the Rebates may have an outsized effect on the Debtors' operations. The Debtors provide approximately $70,000 of Rebates annually, but since they are typically applied against the Member Companies' accounts payable and are not

redeemable for cash, the Rebates do not require material cash outlays. Nevertheless, and out of an abundance of caution, the Debtors seek authority, but not direction, to continue to honor the Rebates, including any prepetition obligations related thereto, and to continue providing Rebates in the ordinary course of business on a postpetition basis.

131.    ***Sales Promotions.***  In the ordinary course of business, the Debtors offer sales and other promotions on an ad hoc basis, both online and at physical WeWork locations, for select WeWork locations (collectively, the "Sales Promotions"). The Sales Promotions are intended to attract new Member Companies and incentivize existing Member Companies in the form of membership renewal discounts. For example, WeWork occasionally sends online discount codes to new WeWork Access Member Companies that can be used to redeem a discount on their monthly membership fee for a fixed period of time. In addition, WeWork sometimes offers prospective WeWork Private Workspace Member Companies the first month free when making a commitment of at least twelve months and occasionally runs seasonal Sales Promotions to promote certain WeWork locations. The Sales Promotions are not redeemable for cash and thus do not require material cash outlays (*i.e.*, Sales Promotions are provided in the form of discounted future monthly service fees). Nevertheless, the Sales Promotions have historically been a critical channel through which the Debtors bring in valuable new Member Companies.

132.    ***Service Retainers.***  The Debtors operate the WeWork Private Workspace service in accordance with the terms of the individual WeWork Private Workspace Agreements entered into between WeWork and Member Companies. Pursuant to the WeWork Private Workspace Agreements, each Member Company is required to pay a "Service Retainer" fee (the "Service Retainers") in addition to a monthly membership fee and an initial set-up fee, prior to the commencement of the Member Company's WeWork Private Workspace subscription term. Upon

paying their Service Retainers, Member Companies, including their authorized employees, gain access to the benefits provided in their WeWork Private Workspace subscription.  In general, Service Retainers are equal to approximately two months of the WeWork Private Workspace Agreement's monthly service fee.  So long as a Member Company makes all other payments and completes all other obligations under its WeWork Private Workspace Agreements prior to its conclusion, WeWork will refund the Member Company's Service Retainer (a "Service Retainer Refund"), subject to WeWork's contractual right to make certain deductions and offsets (including for damages or unpaid fees), if applicable.  The amount owed as the Service Retainer Refund is not known until the WeWork Private Workspace Agreement is concluded.  As of the Petition Date, the Debtors estimate that they owe approximately $8.8 million of accrued and unpaid Service Retainer Refunds.

133.    The Service Retainers are an integral part of the WeWork Private Workspace Agreements.  Any failure or disruption to the Debtors' timely issuance of Service Retainer Refunds could lead to irreparable reputational harm, alienate Member Companies (which may be driven to the Debtors' competitors or seek alternative workspace), and create unnecessary confusion at the outset of these chapter 11 cases.  Accordingly, the Debtors believe that continuing to meet their obligations under the WeWork Private Workspace Agreements, including in connection with Service Retainer Refunds, is critical to the Debtors' successful reorganization.

134.    ***Credit Cards and Other Payment Processors.***  In addition to cash, the Debtors accept certain non-cash methods of payment from Customers, including, through American Express, Visa, Mastercard, Diners, Discover, and JCB, among others (the "Non-Cash Payments").  To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment

56

Processing Agreements") with payment processors (each, a "Payment Processing Company"), such as Adyen N.V., CyberSource, and Stripe, Inc.

135.    Pursuant to the Payment Processing Agreements, the Debtors generally receive net Customer sales less any chargebacks, returns, and processing fees.  The processing fees charged by each Payment Processing Company vary depending on the location of the transaction and the type of transaction but average approximately 3.1 percent for credit card transactions and 1.5 for debit card transaction (the "Processing Fees").  Some of the Payment Processors also hold cash deposits and/or letters of credit to minimize their exposure to chargebacks.  As of the Petition Date, the Debtors have an outstanding balance of approximately $1.2 million in Processing Fees.

136.    The Debtors' continued acceptance of Non-Cash Payments and performance under the Payment Processing Agreements is critical to the operation of the Debtors' business because the majority of the Debtors' sales are made using Non-Cash Payments.  Declining to accept Non Cash Payments or ceasing to perform under the Payment Processing Agreements would have a severe negative effect on the Debtors' business.  To avoid disrupting these vital payment processing services, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Processing Fees and under the Payment Processing Agreements, and to continue paying the Processing Fees and performing under the Payment Processing Agreements in the ordinary course of business on a postpetition basis.

137.    *Other Customer Programs.*    The Debtors offer certain other miscellaneous Customer Programs (the "Other Customer Programs"), including market-specific Customer Programs operated at the regional level.  For example, certain WeWork locations have historically offered WeWork gift cards on an *ad hoc* basis at the discretion of the location's employees.  Certain WeWork locations may on occasion bring local vendors in to provide Member Companies with

complimentary benefits, such as free breakfast for the Member Companies' employees, with WeWork receiving a discount from the vendor in exchange for joint marketing.  The Debtors rely on the Other Customer Programs to increase Customer satisfaction and loyalty, improve retention, and respond to market-specific expectations.  Typically, the Other Customer Programs are not redeemable for cash and thus do not require a cash outlay by the Debtors.  The Debtors do not believe any material obligations related to the Other Customer Programs remain outstanding as of the Petition Date.  Out of an abundance of caution, the Debtors seek authority, but not direction, to pay all prepetition amounts outstanding on account of the Other Customer Programs and to continue meeting their obligations in connection with the Other Customer Programs in the ordinary course of business on a postpetition basis.

**XIV.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact or Withhold Certain Confidential Information of Customers, and (D) Redact Certain Personally Identifiable Information; (II) Waiving the Requirement to File a List of Equity Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief (the "Creditor Matrix Motion").**

138.    ***Consolidated List of the 30 Largest Unsecured Creditors.***  Because the top creditor lists for each individual Debtor overlap, the Debtors submit that filing separate lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate top creditor lists for each individual Debtor could consume an excessive amount of the Debtors', and their advisors', limited time and resources.  The Debtors believe that the Top 30 List will better aid the U.S. Trustee in the efforts to communicate with these creditors.

139.    ***Consolidated Creditor Matrix.***  Allowing the Debtors to prepare and maintain a consolidated list of their creditors (the "Consolidated Creditor Matrix"), in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of these chapter 11 cases

where there are thousands of creditors and parties in interest. Converting the Debtors'
computerized information to a format compatible with the matrix requirements, as well as the
preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and
administratively burdensome and would increase the risk of error with respect to information
already on computer systems maintained by the Debtors or their agents.

140. ***Redaction of Certain Confidential Information of Customers.*** Cause exists
pursuant to section 107(b)(1) of the Bankruptcy Code to authorize the Debtors to redact from any
paper filed or to be filed with the Court or otherwise made public in these chapter 11 cases,
including the Consolidated Creditor Matrix, the Top 30 List, and the schedules of assets and
liabilities and the statements of financial affairs (collectively, the "Schedules and Statements"),
the names and all associated identifying information of the Debtors' customers. The Debtors'
customer list, and related customer data, is an important and valuable asset of the Debtors, and it
is vital that the Debtors maintain their customer list in strict confidence. Accordingly, cause exists
to authorize the Debtors to redact from any paper filed or to be filed the names, home addresses,
and email addresses of the Debtors' customers.

141. Cause exists pursuant to section 107(c) of the Bankruptcy Code to redact from any
paper filed or to be filed with the Court in these chapter 11 cases, including but not limited to the
Consolidated Creditor Matrix and the Schedules and Statements, (a) the home and email addresses
of natural persons—including the Debtors' employees and individual equity holders—who are
citizens of the United States located in the United States and (b) the names, home and email
addresses, and other Personal Data of any natural person to the extent they are processed subject
to the UK GDPR or EU GDPR because, respectively, (x) such personally identifiable information
can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic

59

violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (y) disclosure risks violating the CCPA, UK GDPR, and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties.

142.    ***Waiving the Requirements to File a List of Equity Holders.***  The requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to Debtor WeWork Inc. ("<u>WeWork Inc.</u>").  WeWork Inc.'s common stock is publicly traded on the New York Stock Exchange, with approximately 52.83 million outstanding shares of common stock as of the Petition Date and cannot be readily traced to specific individual holders.  WeWork Inc. does not maintains a list of its registered equity security holders (an "<u>Equity List</u>") and therefore must obtain the names and addresses of its beneficial shareholders from a securities agent.  Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties will create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest.

**XV.    Debtors' Motion for Entry of Order (I) Authorizing WeWork Inc. to Act as Foreign Representative and (II) Granting Related Relief (the "<u>Foreign Representative Motion</u>").**

143.    Pursuant to the Foreign Re rixpresentative Motion, the Debtors seek entry of an order:  (i) authorizing Debtor WeWork Inc. to act as the Foreign Representative (as defined below) on behalf of the Debtors' estates in the Canadian Proceeding and (ii) granting related relief.

144.    The Debtors' operations in Canada are primarily run through a number of Canadian entities:  (i) WeWork Canada GP ULC and WeWork Canada LP ULC are Canadian unlimited liability corporations; (ii) 700 2 Street Southwest Tenant LP, 4635 Lougheed Highway Tenant LP, and 1090 West Pender Street Tenant LP are Canadian limited partnerships; and (iii) 9760416 CANADA Inc. is a Canadian corporation (the entities listed in (i)–(iii), collectively, the "<u>Canada</u>

Debtors"). WeWork Inc. is the ultimate parent and holds substantially all of the economic interests in the Canada Debtors.

145.    I understand that WeWork Inc., as the proposed Foreign Representative, will shortly seek ancillary relief in Canada on behalf of its estate in a court of proper jurisdiction in Toronto, Canada (the "Canadian Court") pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA"). I have been advised by counsel that the purpose of the ancillary proceeding (the "Canadian Proceeding") is to request that the Canadian Court (i) recognize these chapter 11 cases as a "foreign main proceeding" under the applicable provisions of the CCAA to, among other things, protect the Debtors' assets and operations in Canada, (ii) lend assistance to the Court, and (iii) grant any other appropriate relief that the Foreign Representative deems as just and appropriate. To commence the Canadian Proceedings, the Debtors require authority for a Debtor entity to act as the "foreign representative" on behalf of the Debtors' estates (the "Foreign Representative").

146.    For WeWork Inc. to seek recognition as the Foreign Representative in the Canadian Proceeding, and thereby apply to have the Debtors' chapter 11 cases recognized by the Canadian Court, this Court must enter an order authorizing WeWork Inc. to act as the Foreign Representative in the Canadian Proceeding. If the order is granted, WeWork Inc. will be able to file the order with the Canadian Court as the instrument authorizing WeWork Inc. to act as the Foreign Representative pursuant to section 46 of the CCAA.

147.    I believe that authorizing WeWork Inc. to act as the Foreign Representative on behalf of the Debtors' estates in the Canadian Proceeding will allow for coordination between these chapter 11 cases and the Canadian Proceeding, and provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates.

**XVI.** **Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, *Ipso Facto* Protections, and Anti Discrimination Provisions of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief (the "<u>Automatic Stay Motion</u>").**

148.    The Debtors' operations span two continents and serve thousands of members and customers.  The broader WeWork enterprise operates across six continents and includes joint venture operations in Japan, China, India, Brazil, and many other countries.  The global reach of the WeWork enterprise requires the Debtors to rely on, and incur obligations to, suppliers of goods and services and other creditors that are based outside the United States.  These goods and services are highly specialized and vital to preserving the value of the Debtors' business.  Without continued support from their non-U.S. vendors, the Debtors would face severe interruptions to their operations, which would result in a significant loss of operational efficiency, decrease the competitiveness of their businesses, and impair stakeholder value at the outset of these chapter 11 cases.

149.    Many of the Debtors' foreign suppliers, however, lack meaningful, if any, relationships with the United States.  Non-U.S. creditors and contract counterparties may be unfamiliar with the chapter 11 process, the scope of a debtor in possession's authority to operate its business, and/or the importance and implications of the automatic stay.  Indeed, certain of the Debtors' non-U.S. creditors—and others—may attempt to seize assets located outside of the United States or take other actions violating the automatic stay to the detriment of the Debtors, their estates, and creditors.  Moreover, upon the commencement of these chapter 11 cases, counterparties to the Debtors' agreements could attempt to terminate unexpired leases or executory contracts pursuant to *ipso facto* or other provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or

other similar grants held by a Debtor that are required for the Debtors' ongoing business operations

in violation of sections 362 and 525 of the Bankruptcy Code.