UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Peter J. D'Auria, Esq.
Fran B. Steele, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: Peter.J.D'Auria@usdoj.gov
        Fran.B.Steele@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WeWork Inc., *et al.,*[1] | : | Case No. 23-19865(JKS) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Hearing Date: December 6, 2023 at 11:00 a.m. |
| | : | |

**UNITED STATES TRUSTEE'S OBJECTION TO
THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO (A) FILE A CONSOLIDATED LIST OF THE
DEBTORS' THIRTY LARGEST UNSECURED CREDITORS, (B) FILE A
CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE
MAILING MATRIX FOR EACH DEBTOR, (C) REDACT OR WITHHOLD CERTAIN
CONFIDENTIAL INFORMATION OF CUSTOMERS, AND (D) REDACT CERTAIN
PERSONNALLY IDENTIFIABLE INFORMATION; (II) WAIVING THE
REQUIREMENT TO FILE A LIST OF EQUITY HOLDERS AND PROVIDE NOTICES
DIRECTLY TO EQUITY SECURITY HOLDERS AND PROVIDE NOTICES
DIRECTLY TO EQUITY SECUIRYT HOLDERS; AND
(III) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S.

Trustee"), through his undersigned counsel, files this objection (the "Objection") to the *Debtors'*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website
of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/WeWork.

Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact or Withhold Certain Confidential Information of Customers, and (D) Redact Certain Personally Identifiable Information; (II) Waiving the Requirement to File a List of Equity Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief (the "Motion") (Dkt. 17), and respectfully states:

## I.    PRELIMINARY STATEMENT

1.    The bankruptcy process operates, like the rest of the court system, on the bedrock principle of American jurisprudence that the public has a right of access to judicial records. Only under limited circumstances may a federal court restrict or deny that access. Here, the Debtors seek authority for a wholesale redaction from "any paper filed or to be filed with the Court or otherwise made public in these chapter 11 cases, including the Consolidated Creditor Matrix[2], the Top-30 List, and the schedules of assets and liabilities and the statements of financial affairs . . . the names and all associated identifying information of the Debtors' customers." *Motion* at ¶ 14. Additionally, the Debtors seek to redact "the names, home and email addresses, and other Personal Data of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state." *Proposed Final Order* at ¶ 6. The documents that would be subject to such redactions are the Debtors' Consolidated Creditor Matrix, Top 50 Creditor List, Schedules and Statements, and any other document filed with the Court in these cases.

---

[2]    Any capitalized terms not defined herein shall have the definition set forth in the Motion and the Privacy Policy, as applicable.

2.      The U.S. Trustee does not object to filing under seal the addresses or e-mail addresses of customers or other creditors who are individuals.  The U.S. Trustee does, however, object to the sealing of the *names* of such customers and creditors, and the sealing of the names, addresses and other contact information for customers or creditors who are not individuals.

3.      Disclosure is a basic premise of bankruptcy law.  Indeed, it is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised.  The Bankruptcy Code contains very limited and specific exceptions to the general rule that bankruptcy proceedings should be open and transparent.  The movant must demonstrate extraordinary circumstances and a compelling need to obtain protection to justify any such request.  This is especially true as to information required to be filed by the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, such as the Creditor Matrix, Schedules and Statements.  Here, the Debtors seek extremely broad authority to conduct a significant portion of the bankruptcy cases under seal. If the Motion is granted, the ability of interested parties to evaluate the Debtors and their bankruptcy process and to communicate and find each other will be significantly curtailed.

4.      In addition to creating unfavorable precedent in this and other commercial real estate industry chapter 11 cases, and in any other bankruptcy case in which a debtor has creditors who are customers, allowing the Debtors to file incomplete creditor lists and Schedules and Statements is a slippery slope.  Do the Debtors intend to conduct all of their claim objections under seal?  Will certain creditors' treatment in a plan be redacted?  Will objections to the disclosure statement and confirmation also be sealed?  Will the hearings before the Court in these cases have to be repeatedly closed?  It is well settled that, as a matter of promoting the integrity of the judicial

system, bankruptcy proceedings must be open and transparent.  Accordingly, the Debtors' request should be denied.

5.      As to the names of those customers and other creditors who are individual citizens of the United Kingdom or of member countries of the European Union, the Debtors assert only cursorily that the GDPR constrains them from disclosing information regarding such creditors, at the risk of incurring penalties.  The Motion fails to establish that a foreign statute supplants the disclosure requirements of the Bankruptcy Code and fails to establish any entitlement to relief. Also not addressed in the Motion is that the GDPR contains a "safe harbor" permitting the Debtors to disclose such information in the Debtors' exercise of their rights and duties in these bankruptcy cases.

6.      In a recent cryptocurrency matter, the United States Bankruptcy Court for the Southern District of New York recently ruled that the debtors could not redact the names of customers and creditors who were individuals, regardless of the country of their citizenship, but could redact their addresses and email addresses under section 107(c) of the Code.  *See In re Celsius Network, LLC*, 644 B.R. 276 (Bankr. S.D.N.Y 2022).  As to customers and creditors who were not individuals, the court did not authorize the redaction of any information.  The U.S. Trustee requests that this Court similarly limit any relief granted to that authorized in *Celsius*.

7.      Finally, it is unclear whether the Debtors are seeking to avoid having to file unredacted versions under seal of any documents the Court permits to be redacted in the publicly viewable version.  The Proposed Final Order requires the unredacted versions to be provided to the Court, the U.S. Trustee and the Committee without requiring a request to be made.  Proposed Final Order ¶ 6.  In addition, the Proposed Final Order allows any party-in-interest to request a copy of an unredacted version of any document filed with the Court upon request.  *Id.*  To the

extent the Debtors are permitted to file redacted documents, the Debtors should be required to file unredacted versions under seal pursuant to section 107, provide the unredacted copies to the Court, the U.S. Trustee, the Committee, and provide the unredacted copies to any other party-in-interest upon request.

8.    For these reasons, set forth in more detail below, the Debtors' Motion should be denied, except to allow the redaction from public filings of the addresses and e-mail addresses of individuals.

## II.    JURISDICTION, VENUE AND STANDING

9.    This Court has jurisdiction to hear and determine this Objection.

10.    Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

11.    Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Objection. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## III.    FACTUAL BACKGROUND

### General Case Background

12.    On November 6, 2023 ("Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

13.     On November 7, 2023, the Debtors filed the *Declaration of David Tolley, Chief Executing Officer of WeWork, Inc., in Support of Chapter 11 Petitions and First Day Motions.* (the "Tolley Declaration") (Dkt. 21).

14.     On November 8, 2023, the Court entered an Order directing that these cases be jointly administered.  *See* Dkt. 87.

15.     The Debtors continue to operate their business(es) as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

16.     No trustee or examiner has been appointed in these chapter 11 cases.

17.     On November 16, 2023, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  *See* Dkt. 150.

18.     "The Debtors, together with their non-Debtor affiliates (collectively, "WeWork" or the "Company"), are the global leader in flexible workspace, integrating community, member services, and technology."  *Motion* at ¶ 5.  The Debtors' "customer base includes over 600,000 individuals and companies across six continents, from Fortune 500 companies to small startups." *Tolley Declaration* at ¶ 32.  At the center of the Debtors' operations is the rental of business office space.  "The vast majority of WeWork's revenue still comes from its core, traditional "space as service" products, which offer members access to flexible workspace and related business amenities and services ("WeWork Private Workspace").  *Id*. at ¶ 33.  The Debtors serve as landlord, renting commercial office space to their business customers.  "Whether looking for a dedicated desk, a private office, or a fully customized floor, Member Companies can tailor their WeWork workspace to fit their evolving business needs."  *Id*.

**The Motion**

19.     On November 7, 2023 the Debtors filed the Motion, seeking both interim and final relief.

20.     The Motion seeks, in part, a court order allowing the Debtors to redact the names and all associated identifying information of all the Debtors' customers from the Schedules and Statements, as well as any other document filed in these cases. *Motion* at ¶ 14.  The Debtors assert that their "customer list," and related customer data, is an important and valuable asset of the Debtors, and that it is vital for the Debtors to maintain such list in strict confidence. *Id*.

21.     The Debtors further seek to redact the names (together with home and email addresses, and other Personal Data) of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state." *Proposed Final Order* at ¶ 6.  The Motion provides the rationale for such relief is that (i) disclosure risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties, and (ii) that individuals could fall victim to phishing scams. *See*, Motion at ¶¶ 19-22, 24.

22.     The Motion repeatedly speaks to "confidentiality" as a basis for the relief sought therein, but does not establish the presence of any confidentiality agreement between any Debtor and any party.

23.     Further, the Motion does not clearly indicate the extent of the relief sought.  The Motion does not detail how many parties are included on the suggested "customer list," how many of such parties would otherwise be included on the Debtors' Schedules and Statements, or the number of individuals who are customers or creditors of the Debtors and who are citizens of EU member countries or the UK.

24.     A hearing on the interim relief sought in the Motion took place at the "first day" hearing on November 8, 2023 (the "First Day Hearing").  On November 8, 2023, the Court entered an order granting interim relief on the Motion (the "Interim Order") and set the hearing to consider approval of final relief for December 6, 2023 at 11:00 a.m.  *See* Dkt. 90.

25.     The Interim Order required the Debtors to provide an unredacted creditor matrix to the Court.  *See* Dkt. 90 at ¶ 6.  As of the filing of this Objection, the lead case docket does not reflect the filing of any Consolidated Creditor Matrix, whether under seal or in a redacted format, even though a creditor matrix is required by Fed. R. Bankr. Pro. 1007-1(a) to be filed by the Debtors with the petition.

**The Debtors' Policies for Sharing Customer Information**

26.     The Debtors' Privacy Policy ("Privacy Policy"), a copy of which is attached as **Exhibit A** hereto, includes the following regarding the disclosure of customer information to third parties:

6. HOW WE SHARE YOUR PERSONAL DATA

We consider the protection of your Personal Data to be a vital part of our relationship with you; therefore, we do not sell your Personal Data to third parties. There are, however, certain circumstances in which we may disclose, transfer or share your Personal Data with certain third parties ("**Third Parties**") as set forth in this Policy.  These Third Parties can be categorized as follows:

**WeWork Group Companies.** We may share your Personal Data with our parent companies, subsidiaries and/or affiliates ("**WeWork Group Companies**") for purposes consistent with this Policy. WeWork Group Companies shall process your Personal Data in accordance with this Policy.

**Licensees**. Certain WeWork locations may be owned and/or operated by Licensees under a license or similar agreement with WeWork. Accordingly, we may share your Personal Data with such Licensees for purposes consistent with this Policy. WeWork acts as an independent controller in relation to our Licensees and we are not responsible for the privacy or data security practices of our Licensees, which may differ from those explained in this Policy.

**Our Service Providers.** We use third-party companies, vendors, agents and contractors ("**Service Providers**") to perform services or business-related functions on our behalf or to assist us with the provision of our products and services. We may share your Personal Data with such Service Providers as necessary for them to perform or provide services on our behalf. For example, we engage Service Providers to provide data hosting, payment processing, marketing, online advertising, communications, infrastructure and IT services, research and analytics, customer service, surveys, data enhancement, fraud prevention(including anti-money laundering (AML) checks), website analytics, CRM services, network and information security and technical support. Service Providers are contractually bound to implement appropriate security measures to protect the Personal Data in their possession and to process the Personal Data consistent with this Policy. Service Providers are not authorized to use or disclose your Personal Data for their own purposes and are contractually bound to process Personal Data only as necessary to perform or provide services on our behalf and in accordance with our documented instructions.

**Advertising Partners.** As is common practice among companies that operate online, we may share limited Personal Data with certain third parties, including non-affiliated business partners, advertising networks, analytics providers and other advertising providers ("**Advertising Partners**") for purposes of targeting advertisements on non-WeWork websites, applications and services. In addition, we may allow certain Advertising Partners to collect limited information from our websites and services using cookies, web beacons, mobile advertising identifiers and other technologies. These Advertising Partners may use this information to display online advertisements tailored to your interests and preferences across your browsers and devices and to conduct ad campaign measurement and website analytics. We do not control the types of information collected and stored by these third-party cookies, web beacons, mobile advertising identifiers and other technologies. You should refer to the third-party's website for more information on how they use cookies.

**Our Professional Advisors.** We may share your Personal Data with our professional advisors, including our lawyers, bankers, auditors and insurers who provide consultancy, legal, banking, auditing, insurance and accounting services to us. Our professional advisors are subject to appropriate obligations of confidentiality(whether contractual or statutory) with respect to Personal Data.

**The Member Company or Account Holder with Whom You are Associated.** We may share your Personal Data with your employer, educational institution or another organization (to the extent your account or use of our products or services is associated with such party's contract for our products and services) ("**MemberCompany**" or "**Account Holder**," as applicable) for purposes consistent with this Policy. For example, membership activity and usage data may be shared to enforce our terms and policies (including payment obligations) and to allow for Member Company or Account Holder to assess the effectiveness of our

9

models and plans and to perform administrative functions such as utilization, forecasting, capacity planning and real estate strategy.

**Add-On and Integration Partners.** Through our software and technology platform and applications or in connection with our products and services, we may provide you with opportunities to integrate with and/or access additional features, functionality, applications, products and/or services (collectively, "**Add-Ons**")provided by non-affiliated third parties ("**Add-On Partners**"). Some Add-On Partners may need to access or collect your Personal Data in order to provide the Add-Ons. In circumstances where you integrate with or choose to access or use Add-Ons, we may share your Personal Data with the associated Add-0n Partner so that you can access or use the Add-On. For example, we may share your Personal Data with a third-party office space provider to facilitate your third-party office space booking made through our software and technology platform and applications. We do not control the Add-On Partners' use of your Personal Data and their use of your Personal Data will be subject to their own terms and policies. We are not responsible for the privacy or data security practices of the Add-0nPartners, which may differ from those explained in this Policy. You should refer to the applicable Add-0n Partner's privacy policy and direct any privacy or data security questions directly to them. If you do not want your Personal Data to be shared with an Add-On Partner, you should not use an Add-On.

**Organizers, Hosts and Sponsors.** We may share your Personal Data with organizers, hosts and sponsors ("**Sponsors**") when you register for, attend or take part in events, webinars, programs, promotions or contests associated with such Sponsors. For example, if you input your name and email address into a web form for an event, webinar, program, promotion or contest, the associated Sponsor will receive that information. Sponsors that receive your information may send you communications, which may be subject to their own privacy policy. We are not responsible for the privacy or data security practices of such Sponsors, which may differ from those explained in this Policy. You should refer to the Sponsor's privacy policy and direct any privacy or data security questions directly to them.

**Our Landlords and Building Owners and Managers.** We may share your Personal Data with our landlords and building owners and managers as necessary to comply with our lease and/or management agreements that require us to collect and provide such data to facilitate access and security at the base building controls where our workspaces are located. For example, we may be required to share your Personal Data in order to enable your WeWork keycard or mobile key to function at base building access controls. Our landlords and building owners and managers are subject to standard confidentiality arrangements.

**Membership and Loyalty Program Partners.** We may partner with third-party program partners ("**Program Partners**") such as airline and hotel companies to provide you with opportunities to earn loyalty program points in connection with certain WeWork purchases. If you participate in these opportunities, we may share

your Personal Data with those Program Partners in order to properly attribute points to your associated rewards program. Personal Data shared in these circumstances will be subject to the Program Partner's own terms of service and privacy policy. We are not responsible for the privacy or data security practices of such Program Partners, which may differ from those explained in this Policy. You should refer to the Program Partner's privacy policy and direct any privacy or data security questions directly to them.

**Our Partners (in Connection with your Membership).** Where permitted by law, we may share your Personal Data with select partners that offer products and services related to your membership. For example, we may share your basic Contact Information with specific insurance providers who may contact you to provide products and services to meet your contractual insurance requirements. Where required by applicable law, we will only share your Personal Data with your consent. Our partners are bound by a contractual obligation to process Personal Data only as necessary to offer products and services related to your membership.

**Third Parties Involved In Business Transactions.** If we engage in a merger, acquisition, bankruptcy, dissolution, reorganization, sale of some or all of our assets or stock, financing, public offering of securities, acquisition of all or a portion of our business, a similar transaction or proceeding, or steps in contemplation of such activities, your Personal Data may be shared or transferred, subject to standard confidentiality arrangements.

**Other Third-Party Disclosures.** We may share your Personal Data: (i) at your direction or with your consent, (ii) if required to do so by law in order to, for example, respond to a subpoena or request from law enforcement, a court or a government agency (including in response to public authorities to meet national security or law enforcement requirements) or (iii) in the good faith belief that such action is necessary to: (a) comply with a legal obligation, (b) protect or defend our rights, interests or property or that of our employees, agents, members, customers and other third parties, (c) prevent or investigate possible wrongdoing in connection with our products and services, (d) enforce our terms and conditions, policies and agreements, (e) act in urgent circumstances to protect the personal safety of you, other individuals or the public or (f) protect against legal liability.

7. INTERNATIONAL TRANSFERS OF PERSONAL DATA

WeWork's products and services are available around the world. To make that possible, your Personal Data may be transferred to, accessed by and stored by us and Third Parties in the United States and other countries, which may include jurisdictions outside your own. These jurisdictions may have data protection laws that differ from the laws where you reside, and in some cases, may not be as comprehensive or protective. Although the data protection laws of certain jurisdictions may differ from those where you reside, we take appropriate steps, such as implementing standard contractual clauses, relying on adequacy decisions

and other international transfer agreements or frameworks approved by regulators
and governments, to ensure your Personal Data is handled as described in this
Policy and in accordance with applicable data protection law.

*See* Privacy Policy at pages 23 to 28.

## IV.    LEGAL FRAMEWORK

### A.  Debtors in Bankruptcy Are Required to File
### Certain Information Regarding Their Creditors

27.     The Bankruptcy Code states that the debtor "*shall* . . . file, unless the court orders

otherwise - a schedule of assets and liabilities," and "statement of the debtor's financial affairs,"

among other information.  11 U.S.C. § 521(a)(1)(B)(i)(emphasis added).  Rule 1007-1(b) of the

Federal Rules of Bankruptcy Procedure provides that a debtor, other than one under chapter 9,

shall file schedules of assets and liabilities, of current income and expenditures, of executory

contracts and unexpired leases, and a statement of financial affairs, among other documents.

28.     Bankruptcy Rule 1007(a)(1) requires that a debtor in a voluntary case "file with the

petition a list containing the name and address of each entity included or to be included on

Schedules D, E/F, G and H as prescribed by the Official Forms."

29.     Debtors in chapter 11 and chapter 9 cases are also required to file Official Form

201, setting forth a list of creditors with the largest unsecured claims that are not insiders. That

form requires the provision of the following information for such creditors:  name, complete

mailing address, the name, telephone number and email address of a creditor contact, and the

nature and amount of claim.

### B.  The Right of Public Access to Judicial Records

30.     In American jurisprudence, there is a long-standing, common law right of public

access to court records.  *See Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 597 (1978) ("[i]t is

clear that the courts of this country recognize a general right to inspect and copy public records

12

and documents, including judicial records and documents.")  The public's right of access envisions "a pervasive common law right to inspect and copy public records and documents, including judicial records and documents." *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001) (citations omitted).

31.    The "access to civil proceedings and records promotes public respect for the judicial process." *Id.* (citations omitted).  Such access is "rooted in the public's First Amendment right to know about the administration of justice." *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 561 B.R. 36, 41 (Bankr S.D.N.Y. 2016).  This right is "firmly entrenched and well supported by policy and practical considerations." *Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 26 (2d Cir. 1994).

32.    The right of public access has given rise to "a strong presumption and public policy in favor of public access to court records."  *In re Borders Grp., Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011).  This presumption "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice . . . [P]ublic monitoring is an essential feature of democratic control."  *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  The Second Circuit has issued this pointed guidance:

> There must be a strong presumption against sealing any document that is filed with the court.  Our courts do not operate in secrecy.  Except on rare occasions and for compelling reasons, everything that courts do is subject to public scrutiny.  To hide from the public entire proceedings, or even particular documents or testimony forming a basis for judicial action that may directly and significantly affect public interests, would be contrary to the premises underling a free, democratic society.

*City of Hartford v. Chase*, 942 F.2d 130, 137 (2d Cir. 1991).

**C.  The Right to Public Access Is Codified in the Bankruptcy Code**

33.     In our bankruptcy system, it is widely acknowledged that the governmental interest

is safeguarding public access to judicial records is "of special importance . . . as unrestricted access

to judicial records fosters confidence among creditors regarding fairness in the bankruptcy

system." *Motors Liquidation*, 561 B.R. at 41, *quoting Gitto v. Worcester Telegram & Gazette*

*Corp. (In re Gitto Global Corp.)*, 422 F.3d. 1, 7 (1st Cir. 2005) (*quoting In re Crawford*, 194 F.3d.

954, 960 (9th Cir. 1999).  Described as "fundamental to the operation of the bankruptcy system

and . . . the best means of avoiding any suggestion of impropriety that might or could be raised,"

the policy of open inspection, as applied in this Court, cannot be underestimated.  *Motors*

*Liquidation*, 561 B.R. at 41-42, *quoting In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D.

Ohio 1984).

34.     The common law right of public access to judicial records has been codified in

section 107(a) of the Bankruptcy Code.  *Togut v. Deutsche Bank AG (In re Anthracite Capital*

*Inc.)*, 492 B.R. 162, 170, 173 (Bankr S.D.N.Y. 2013); *see also Gitto Global*, 422 F.3d at 7-8

(section 107 supplants the common law of public access).  Pursuant to section 107(a), papers filed

in bankruptcy cases and the Court's dockets are "public records, open to examination by an entity

at reasonable times without charge."  11 U.S.C. § 107(a); *Anthracite*, 492 B.R. at 170.

**D.  The Limited Exception of Bankruptcy Code § 107(c)**

35.     Despite its deep underpinnings, the right to public access to court records is "not

absolute."  *Nixon*, 435 U.S. at 598; *Motors Liquidation*, 561 B.R. at 42.  "Every court has

supervisory power over its own records and files, and access has been denied where court files

might have become a vehicle for improper purposes."  *Nixon*, 435 U.S. at 598; *Orion Pictures*, 21

F.3d at 27 (noting that court may limit access where user's purpose is improper).

36.     Section 107(b)(1) of the Code provides that, "[o]n request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development or commercial information."  11 U.S.C. § 107(b)(1).  Section 107(b) of the Code provides a "narrow statutory exception" to public access in bankruptcy cases."  *In re Muma Services, Inc.*, 279 B.R. 478, 484 (Bankr. D. Del. 2002).

37.     Section 107(c)(1), added to the Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, "broadened the situations in which the court could protect individuals from disclosure of sensitive information in light of the emerging problem of identity theft." 2 *Collier on Bankruptcy* ¶ 107.LH[2] (16th ed.).  The statute provides:

> (c)(1) The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property:
>
> (A) Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.
>
> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c).

38.     Section 1028(d)(7) of title 18 ("Fraud and related activity in connection with identification documents, authentication features, and information") defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including any –

> (A)  name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
>
> (B)  unique biometric data (such as finger print, voice print retina or iris image, or other unique physical representation);
>
> (C)  unique electronic identification number, address, or routing code; or

(D)   telecommunication identifying information or access device (as defined in section 1029(e)).

18 U.S.C. § 1028(d)(7).

39.    The specific "purpose of § 107(c) is to set forth a limited exception to the general rule that all records are public." *In re French*, 401 B.R. 295, 305 (Bankr. E.D. Tenn. 2009). Accordingly, under the precise structure and deliberate terms of section 107(c), the Court, in the exercise of its discretion, *may* limit public access of certain identification information only if it determines that (1) *cause exists, and* (2) *to the extent* dissemination of the information would constitute an *undue risk* of identity theft.   *Id*. (emphasis added).   The Supreme Court has "emphasized that the word 'may' clearly connotes discretion." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 136 S. Ct. 1923, 1931 (2016).  "Undue," which appears as a modifier in section 107(c), is not defined in the Bankruptcy Code, and generally means "excessive or unwarranted." *Black's Law Dictionary* (3rd pocket ed. 2006). With regard to the statutory interpretation of modifiers, such as "undue," the Court has the "duty to 'give effect, if possible, to every clause and word of [the] statute.'" *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997) (interpreting "liquidated" and "noncontingent" as modifiers of "debts" in § 109(e)), *quoting United States v. Menasche*, 348 U.S. 528, 538-39 (1955).

40.    Given the express limitations in the statute permitting a bankruptcy court to "protect an individual" solely "to the extent" that "undue" risk is present, section 107(c)(1), like Section 107 in general, "does not mandate sealing – only protection." *Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 753 (D. Del. 2018), *quoting Anthracite*, 492 B.R. at 180.  It follows from this principle that the Court's consideration of a request for relief under section 107(c)(1) necessarily entails a consideration of competing interests. *Id.*, 585 B.R. at 755-57.

**E.  <u>The Debtors Have the Burden of Proof Under § 107(b)(1) and (c)(1)</u>**

41.    In seeking to apply any exception to the general right of public access to judicial

records, codified by section 107(a) of the Bankruptcy Code, "[t]he burden is on the party who

seeks to overcome the presumption of access to show that the interest in secrecy outweighs the

presumption." *Cendant Corp.*, 260 F.3d at 194.   In *Cendant*, the Third Circuit Court of Appeals

further explained:

> [T]he party seeking the closure of a hearing or the sealing of part of the
> judicial record "bears the burden of showing that the material is the kind of
> information that courts will protect" and that "disclosure will work a *clearly
> defined and serious injury to the party seeking closure*." In delineating the
> injury to be prevented, *specificity is essential*. Broad allegations of harm,
> bereft of specific examples or articulated reasoning, are insufficient.

*Id.* (internal citations omitted, emphasis added).

42.    The moving party bears the burden of showing that a request to place documents

under seal falls within the parameters of Bankruptcy Code section 107(b) and Bankruptcy Rule

9018 by demonstrating ". . . that the interest in secrecy outweighs the presumption in favor of

access." *United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 150 B.R.

334, 340 (D. Del. 1993); *accord Food Mgmt. Group, LLC,* 359 B.R. 543, 561 (Bankr. S.D.N.Y.

2007); *In re Fibermark, Inc.*, 330 B.R. 480 (Bankr. D. Vt. 2005).

43.    The burden of proof to seal or redact filed bankruptcy papers "is not an easy burden

nor should it be . . . The party seeking impoundment must submit 'evidence that filing under seal

outweighs the presumption of public access to court records.'" *In re Creighton*, 490 B.R. 240, 244

(Bankr. N.D. Ohio 2013), *quoting Gitto/Global*, 321 B.R. at 373, *quoting In re Muma Servs. Inc.*,

279 B.R. 478, 485 (Bankr. D. Del. 2002).   "[S]ealing official documents," as the Debtors would

like, "should not be done without a compelling reason." *City of Hartford*, 942 F.2d at 135.

**F.** **The General Data Protection Regulation**

44.      The EU's privacy law, known as the GDPR, became effective as of May 25, 2018, and establishes standards for entities that collect or process data on citizens and residents of EU member countries.[3]   At the unified EU level, the GDPR is administered by the European Commission, which is responsible for proposing EU-wide legislation, implementing decisions of EU member states, upholding EU treaties, and managing the EU's daily affairs.   Also, the European Data Protection Board, which includes representatives from data protection authorities of each EU member state, has promulgated guidelines for compliance with the GDPR.   *See* www.edpb.europa.eu.

45.      With respect to individuals who are citizens of the UK, all data processing and collection of data prior to December 31, 2020, falls under EU's GDPR, because the UK was a member of the EU through that date.   Data collected after that date falls under the UK's GDPR, which can be accessed at https://uk-gdpr.org/.[4]  The UK's GDPR is substantially similar to that of the EU GDPR. Unless otherwise indicated, the Article numbers of the GDPR cited herein are the same Article numbers for both the EU and UK GDPR.

46.      An entity's obligations under the GDPR are determined by reference to whether the entity is a "controller" of information -- or merely a "processor" -- under the GDPR.   Generally, a data processor is an entity that merely processes (*e.g.*, collects, stores or uses) personal data on behalf or at the direction of a data controller.   GDPR Art. 4(8).   A data controller is an entity that determines the purposes for which the personal data is processed, and how the data is processed.

---

[3]      A copy of the GDPR can be accessed at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32016R0679R(02) or https://gdpr.eu/tag/gdpr/.
[4]      *See* https://www.gdpreu.org/differences-between-the-uk-and-eu-gdpr-regulations/.

GDPR Art. 4(7) (an entity that "determines the purposes and means of processing personal data").

The Debtors in these U.S. bankruptcy cases qualify as "data controllers" under the GDPR.

47.    The GDPR protects the disclosure of "personal data," which includes "any

information relating to an identified or identifiable natural person ('data subject')."  GDPR Art.

4(1).  An "identifiable natural person" under the GDPR "is one who can be identified, directly or

indirectly, in particular by reference to an identifier such as a name, an identification number,

location data" and other attributes.  *Id.*

48.    Transactions involving the personal data of EU or UK citizens and residents who

are located within the EU or UK, or who are doing business with entities also based in the EU or

UK, are covered by the GDPR.  GDPR Art. 3.  The GDPR also has extra-territorial reach.  In

addition to EU and UK based entities, the GDPR also applies to the processing by non-EU and

non-UK entities "of personal data of [individual] "data subjects who are in the [European] Union,"

or the UK, regardless of citizenship, where the entity's processing generally concerns its business

or its monitoring of the data subjects' EU or UK based behavior.  GDPR Art. 3(1, 2).  U.S. entities,

for example, may be subject to the GDPR if they control or process data concerning EU or UK

citizens and residents.  *Id.*

49.    In the event that data controllers (e.g., the Debtors) collect personal data from an

individual "data subject" (e.g., a creditor of the Debtors), they must provide certain processing

information to the individual data subject, including contact information for the controller, the

purpose of the data collection, any intended recipients of the data, and whether the personal data

will be transferred outside the EU or UK.  GDPR Art. 13(1).  Processing personal data under the

GDPR is lawful if the data subject consents, if processing is necessary for contractual performance,

or if processing is "necessary for compliance with a legal obligation to which the controller is subject," among others.  GDPR Art. 6(1).

50.     Within the particular territory of a given EU member, an independent public authority, known under the EU GDPR as a "Supervisory Authority," and a "Commissioner" under the UK GDPR, is responsible for monitoring compliance with the GDPR, enforcing the GDPR's edicts, and conducting investigations.  The GDPR imposes a tiered structure of corrective actions and administrative fines for violations of the GDPR, which are imposed by the applicable Supervisory Authority or UK Commissioner.  A Supervisory Authority or UK Commissioner may, for example, issue warnings for likely processing infringements of the GDPR, issue reprimands for actual infringements, or suspend data flows to recipients in third countries.  GDPR Art. 58(2).

51.     Also, "depending on the circumstances of each individual case" a Supervisory Authority or UK Commissioner may impose administrative (*i.e.*, monetary) fines for infringements of the GDPR.  GDPR Art. 83(1).  As an exercise of discretion, "[w]hen deciding whether to impose an administrative fine and deciding on the amount of the administrative fine in each individual case, due regard" must be given by the Supervisory Authority or UK Commissioner to "the nature, gravity and duration of the infringement[,] taking into account the nature[,] scope or purpose of the processing concerned," among other aggravating or mitigating factors.  GDPR Art. 83(2).  A Supervisory Authority may impose an administrative fine of up to €10.0 million, and the UK Commissioner up to 8.7 million pounds, or two percent of an offending entity's global annual revenue for lesser processing infringements, and a fine of up to €20.0 million, and the UK Commissioner up to 17.5 million pounds, or four percent of global annual revenue for other GDPR infringements, including the unauthorized transfer of personal data to third countries (*i.e.*, countries outside the EU or the UK).  GDPR Art. 83(4, 5).

52.     Pursuant to the GDPR, transfers of "personal data which are undergoing processing or are intended for processing after transfer to a third country" may "take place only if, subject to the other provisions of [the] Regulation," (*i.e.*, whether a GDPR-recognized legal basis applies to the processing of the data as a threshold matter), the data controller complies with certain "conditions" set forth in Chapter V of the GDPR.  GDPR Art. 44.  The Debtors' filings in these U.S. bankruptcy cases of documents containing Personal Information qualify under the GDPR as transfers of personal data to a third country.

53.     Generally, under GDPR Chapter 5, data processors such as the Debtors may transfer personal data to third countries such as the U.S. if they have met one of three conditions: (1) the EU Commission or a UK Commissioner has made a prior "adequacy decision" vis-à-vis the recipient third country; (2) the data processor has put in place one of several "appropriate safeguards;" or (3) if a specific "derogation" (*i.e.*, an exception) set forth in the GDPR applies. GDPR Arts. 45, 46, 49.  In these bankruptcy cases, it appears that solely the third condition – *i.e.*, the derogations in the GDPR – apply to the data transfers proposed by the Debtors in the Motion to Redact.[5]

---

[5]     The GDPR contains two antecedent conditions not applicable here.  First, under the GDPR, transfers of personal data to third countries also may first take place if covered by a prior "adequacy decision" of the EU Commission.  GDPR, Art. 45(1, 3).  Such a decision constitutes a finding by the EU Commission that the legal framework in place for the recipient third country provides an "adequate level of protection" for the personal data rights of EU individuals.  *Id.*  Because the EU Commission has made only a partial finding of adequacy with respect to the U.S., EU entities may transfer personal data to U.S. entities under GDPR Art. 45(1) only if covered by the Commission-approved EU-US Privacy Shield framework.  *See* www.privacyshield.gov.  To the extent that the Federal government and the Court are recipients of personal data of EU residents, they are neither eligible for nor signatories to the Privacy Shield.

Second, in the absence of an adequacy decision pursuant to GDPR Art. 45(3), a data controller also may transfer personal data to a third country only if the controller has provided one of certain enumerated "appropriate safeguards."  GDPR Art. 46 (1, 2).  Such safeguards generally consist, among others, of: instruments between public authorities involved in the transfers; binding inter-corporate rules approved by a Supervisory Authority; contracts with a third country recipient containing Supervisory Authority-

54.     If a European or UK entity's transfer of personal data to a third country such as the U.S. is not covered by either a prior adequacy decision or an appropriate safeguard recognized under the GDPR, the data transfer may still be made under the GDPR if it is covered by one of the exceptions provided in GDPR Article 49 ("Derogations for specific situations").  Known in the GDPR as "derogations," the exceptions include:  the explicit consent of the individual data subject (*e.g.*, an employee) (GDPR Art. 49(1)(a)); the transfer is necessary for the performance of a contract between the individual and the data controller (GDPR Art. 49(1)(b)); or "*the transfer is necessary for the establishment, exercise or defence of legal claims*" ("Legal Claim Exception," GDPR Art. 49(1)(e) (emphasis added)).

## IV.    <u>OBJECTION</u>

55.     The Debtors have not overcome the long-standing presumption of the public's right to access court records.  It is well settled that transparency and full disclosure are paramount in bankruptcy.  The duty of disclosure is important in the chapter 11 context, where the debtor in possession serves as a trustee for the bankruptcy estate.  *In re Scott*, 172 F.3d 959, 967 n.6 (7th Cir. 1999).  In these cases, the Debtors have not overcome that presumption.

### A.  **The Debtors Have Not Established Grounds to Redact Customer Names Under Section 107(b) of the Bankruptcy Code**

56.     The Debtors seek to redact the names, addresses and other contact information for all of their customer-creditors, whether they be individuals, corporations or other legal entities, from "any paper filed or to be filed with the Court or otherwise made public in these chapter 11 cases," which includes, but is not limited to, the Debtors' "Consolidated Creditor Matrix, the Top

---

or Commission-approved data protection clauses; a recipient's participation in a Supervisory Authority-approved code of conduct; or a recipient's certification by a Supervisory Authority.  GDPR Art. 46.

30 List, and the schedules of assets and liabilities and the statements of financial affairs.  *Motion*,

¶ 14.  The Debtors argue that the customer list "is an important and valuable asset of the Debtors"

which is entitled to protection as confidential commercial information under section 107(b) of the

Code because "it is vital that the Debtors maintain their customer list in strict confidence."  *Id.*

57.     Under section 107(b), "commercial information" has been defined as information

which would cause an "unfair advantage to competitors by providing them information as to the

commercial operations" of the requesting party. *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d

Cir. 1994) (internal quotations omitted); *accord In re Borders Group, Inc.,* 462 B.R. 42, 47 (Bankr.

S.D.N.Y., 2011).

58.     "The 'commercial information' exception is not intended to offer a safe harbor for

those who crave privacy or secrecy for its own sake." *Motors Liquidation Co.,* 561 B.R. at 43

(*quoting In re Dreier LLP*, 485 B.R. 821, 822-23 (Bankr. S.D.N.Y. 2013)).  "Evidence–not just

argument–is required to support the extraordinary remedy of sealing." *Id.* at 43; *accord Dreier*,

485 B.R. at 823 (finding that "conclusory statements in [a declaration] are not probative").

59.     To meet its burden to show that a request to place documents under seal falls within

the parameters of section 107(b), a movant "must demonstrate *extraordinary circumstances and

compelling need* to obtain protection." *Food Mgmt.*, 359 B.R. at 561 (emphasis added)(*citing In

re Orion Pictures Corp*., 21 F.3d 24, 27 (2d Cir. 1994)).  In addition, "[t]he moving party bears

the burden of demonstrating that the information it is seeking to protect from public viewing is

both commercial and confidential." *In re Williams*, No. 15-71767, 2017 WL 6278764, at *3

(Bankr. W.D. Va. Dec. 8, 2017) (*citing In re Oldco M Corp.*, 466 B.R. 234, 237 (Bankr. S.D.N.Y.

2012) and *In re Northwest Airlines Corp.*, 363 B.R. 704, 706 (Bankr. S.D.N.Y. 2007)).

60.     Here, the Debtors have not demonstrated extraordinary circumstances or compelling need to seal the names of those customers and other creditors who are individuals, or the names and addresses of those customer-creditors who are not individuals. Nor do the Debtors cite any authority holding that the type of information they seek to seal is both confidential and commercial information under the Bankruptcy Code.  *See, e.g., In re Motors Liquidation Company,* 561 B.R. 36, 44 (Bankr. S.D.N.Y., 2016) (holding that the identities of the owners of 10% or more of the equity interests of a party in an adversary proceeding are not confidential commercial information and denying motion to seal). The Debtors provide only conclusory statements regarding the information's commercial importance, and "statements made by lawyers in briefs are not evidence."  *Id.*  "To put it clearly, just because information may be 'confidential' does not mean it is 'commercial information' entitled to the extraordinary procedure of sealing." *Id*.

61.     The information the Debtors seek to conceal falls directly into the category of information that is required to be disclosed when a party avails itself of the protections of the Bankruptcy Code.  *See* 11 U.S.C. § 521; Fed. R. Bankr. P. 1007.  The Debtors, who have voluntarily sought relief in this Court, have no basis for sealing the Consolidated Creditor Matrix, Top 30 List, the Schedules and Statements, or other documents.  Congress was clear that bankruptcy proceedings must be transparent, and transparency requires pleadings to be filed on the public docket unless narrow and enumerated exceptions apply.  Such exceptions do not apply here.

62.     The purpose of requiring a debtor to disclose all assets, liabilities and business dealings is to ensure that creditors have reliable and accurate information which they can rely on to determine the status of the debtor's financial affairs and to trace a debtor's financial history.  *In*

*re Haynes*, 549 B.R. 677, 687 (Bankr. D. S.C. 2016). The bankruptcy schedules and statements of affairs are designed to elicit certain information necessary to the proper administration and adjudication of the case. *Id.*

63.    As stated by the court in *Celsius*, the schedule of liabilities "constitute prima facie evidence of the validity and amount of the claims of creditors unless they are scheduled as disputed, contingent, or unliquidated," under Fed. R. Bankr. P. 3003. *Celsius,* 644 B.R. at 297. This transparency is "'important because creditors can look at the schedule and see whether their claim has been listed, and whether it is an undisputed claim, in which case, they don't have to file a proof of claim.'" *Id.* (quoting the court's statements at the hearing). The court further noted that "[e]nabling parties in interest and the public to see the identity of creditors and the amount of their claims, and then tracking the disposition and treatment of claims during the bankruptcy case, is important to the fairness and public perception of the bankruptcy process. Only in the rarest of cases should these ordinary expectations be upset." *Id.* [6]

64.    The disclosure of the identity of the Debtors' customers is also important because the amounts owed to the Debtors or the amounts the Debtors owed are likely probative to the Debtors' ability to successfully restructure. The Debtors have made no showing that disclosure of the identities of some of its creditors are "reasonably [] expected to cause the entity commercial injury." *In re Alterra Healthcare Corp.,* 353 B.R. 66, 75 (Bankr. D. Del. 2006). The Debtors simply cannot seek bankruptcy protection and then do business behind a shield of secrecy.

---

[6]    The Court in *Celsius* rejected the debtors' "anonymization" process, whereby the debtors would send individual e-mails to every account user that informed them of the amount at which their claim had been scheduled, and a number that would allow them to go to the claims agent's website to confirm the same. *Id.* at 287. The Court was not persuaded by this proposed solution, in part "because the public schedules do not merely serve the interests of individual creditors, but, rather, also serve the interests of creditors and the public in general—all parties and the public share an interest in complete transparency, with only the rarest of exceptions." *Id.* at 297.

65.     At the outset, the Privacy Policy states that there are circumstances where the Debtors "may disclose, transfer or share your Personal Data with certain third parties." *Privacy Policy*, pg. 23.  The Privacy Policy proceeds to outline a number of groups of such "Third Parties" who the Debtors may share a customer's Personal Data with, and in many instances the Debtors disclaim responsibility for such Third Parties' use of the information.  The Debtors reserve rights to share a customer's Personal Data with their fellow WeWork Group Companies, outside Service Providers, Professional Advisors, any Member Company or Account Holder a customer is associated with, Landlords, and Membership and Loyalty Program Partners.  *Id.* at pgs. 24-27. The Debtors further reserve the right to provide information to a number of such Third Parties while disclaiming any responsibility for a customer's Personal Data.  The Debtors reserve the right to provide Personal Data to certain Licensees, stating that they are "not responsible for the privacy or data security practices of our Licensees." *Id.* at pg. 24.  A customer's Personal Data can be provided to online Advertising Partners, with the reservation that the Debtors "do not control the types of information collected and stored by these third-party cookies, web beacons, mobile advertising identifies and other technologies." *Id.* at pgs. 24-25.  Add-On and Integration Partners can receive a customer's Personal Data, with the Debtors warning that they "do not control the Add-On Partners' use of your Personal Data" and that the Debtors "are not responsible for the privacy of data security practices of the Add-On Partners." *Id.* at pgs. 25-26.

66.     Very critical to the considerations here, the Privacy Policy notifies customers that in the event the Debtors engage in a bankruptcy, Personal Data may be shared.  *Id.* at pg. 27. Moreover, the Privacy Policy states that the Debtors may share a customer's Personal Data in order to "comply with a legal obligation." *Id.*

67.     Additionally, the Privacy Policy further states that a customer's Personal Data may be transferred internationally, including in the United States, and to jurisdictions that may have data protection laws that differ from the laws where a given customer may reside. *Id*. at pgs. 27-28.

68.     As the Privacy Policy allows customers' names and contact information to be shared with numerous third parties, it is not secret or confidential. Moreover, the Privacy Policy allows the Debtors to share privacy information if legally required to do so, as they are here, under the statutory requirements of the Bankruptcy Code.  The Debtors have neither tried to meet their burden of showing more than speculative harm, nor have they established that such relief is actually necessary to protect a party from harm.

69.     At the First Day Hearing, counsel to the Debtors argued there is concern that the Debtors could lose customers to competitors if they complete their Schedules and Statements.  The debtors in the *Celsius* cases sought authority to redact the names and addresses of all of their customers, whether individuals or entities, arguing as the Debtors do here, that such information was confidential commercial information and could lead to competitors "targeting the debtors customers and undermine[ing] the Debtors' ability to reorganize." *Celsius*, 644 B.R. at 291.  The court in *Celsius* rejected this argument.  In the context of the Celsius debtors' businesses, the Court did acknowledge the significant investment required to build their customer base, making it a valuable asset.  *See* Id. at 282.  The court indicated, however, that such circumstances did not amount to "sufficient evidence to support sealing of the *names* of all creditors." *Id.* at 292.  As to individual creditors, the court rejected the idea that names alone, without e-mail and physical addresses linked to such names, met the standard for confidential commercial information under section 107(b)(1), because "[n]ames alone are simply not enough to facilitate a competitor's theft."

*Id.* at 293.  The court pointed out that by sealing individual customers' home and email addresses to protect those customers under section 107(c), the debtors would also "gain protection of whatever commercial value may flow from that information." *Id.* at 292.  The court emphasized, however, that it was granting that protection with respect to addresses of *individual* customers, not for corporate, LLP or LLC customers.  *Id.* [7]

70.     Regarding non-individual creditors, the Debtors' disclosures made thus far calls into question the Debtors' requested relief in the Motion.  The Motion includes a request to redact the Top 30 List.  *See*, Motion at ¶ 14.  However, the Top 30 List is already filed, with full creditor information provided, without any redactions.  *See* Dkt. 1.  The U.S. Trustee respectfully asserts that, with regard to creditors that are business entities, the Motion should be denied in its entirety, as was the result in the *Celsius* matter, and more recently in *In re BlockFi Inc., et al*., No. 22-19361(MBK) (Bankr. D.N.J. Oct. 19, 2023) (final order entered on Debtors' underlying redaction motion denying the motion in its entirety with regard to all corporations or other business entities, thereby requiring full disclosure of such parties).

71.     "The strong public policy of transparency and public disclosure in bankruptcy cases requires *very narrow exceptions and only on strong evidentiary showings*." *Id.* at 292 (emphasis added).  In these cases, as in *Celsius*, the Debtors' evidentiary showing is insufficient to justify the wholesale sealing of creditors' identities. *Id.*

### B.  The Debtors Have Not Established Grounds to Redact the Names of Customers and Creditors Who Are Individuals Under Section 107(c) of the Bankruptcy Code

72.     The Debtors have made no attempt to fulfill their burden of proof under Bankruptcy Code § 107(c).  As that statute is applied in these cases, for the Court to exercise its discretion to protect the names of the Debtors' customers and other creditors who are individuals, the Debtors

---

[7]     In so doing, the *Celsius* Court recognized rulings in other cases that reached different results.

must furnish evidence and make a concrete showing that filing *only the names*, with no other information, of such individuals, "*would* create" an "*undue* risk" of identity theft or other unlawful injury to those customers and employees or their property.  11 U.S.C. § 107(c) (emphasis added).

73.     This issue also was addressed in *Celsius*. There, the court determined that "[i]dentifying the individual account holders by name, without physical and email addresses, is insufficient information to expose customers to risks of identity theft or personal danger."  644 B.R. at 293.  The court recognized that sealing such information from public disclosure "risks transforming the open and transparent bankruptcy process into something very different, which the Court is loath to do without a strong showing of real and not speculative risks." *Id.*

74.     The Debtors in these cases have not set forth any facts demonstrating that disclosure of only the names of the Debtors' customers and creditors who are individuals, without any other contact information, would create any risk, let along any undue risk, of identity theft or other unlawful injury.   The Debtors provide, as an example, one incident that took place in another bankruptcy case in this Region in 2017, but in that instance an address was provided along with the name. *See* Motion at ¶ 24 (discussing *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS)).  Similarly, the ruling in *In re Forever 21, Inc.*, cited by the Debtors, referenced persons who "seek to have their *addresses* withheld" to guard against identity theft. *Id*. at ¶ 27 (emphasis added).  The same holds true for certain other cases cited by the Debtors: *In re Nat'l Realty Investment Advisors, LLC* (order did not permit redaction of individuals' names); *In re Christopher & Banks Corp.* (order did not permit redaction of individuals' names, except for any individual protected by the GDPR, with a reservation of rights for the U.S. Trustee to object at any time); *In re Cred Inc.* (permitting redaction, but with a reservation of rights that upon a showing of good cause, the Court could release some or all of the personally identifiable information).

75.    Moreover, the Privacy Policy, quoted above, supports the argument that the information sought to be redacted does not meet any exception to section 107(a).  The Privacy Policy specifically states that the Debtors may share Personal Data with many groups of Third Parties, such as the WeWork Group Companies, outside Service Providers, Professional Advisors, any Member Company or Account Holder a customer is associated with, Landlords, and Membership and Loyalty Program Partners.  *Privacy Policy* at pgs. 24-27.  Additionally, as more fully outlined above, the Privacy Policy allows the Debtors to provide a customer's Personal Data to certain Licensees, online Advertising Partners, and Add-On Integration Partners, while the Debtors assert that they are not responsible and/or do not control what these Third Parties do with the Personal Data.  *Id*. at pgs. 24-26.  Although the privacy policy permits a customer to "opt out" from providing their Personal Data to the Debtors, customers are warned that by doing so the Debtors "may not be able to provide you with our products or services or respond to your requests for which the provision of such Personal Data is necessary."  *Id*. at pg. 5.

76.    Consistent with the depth of the public right to access judicial documents, Bankruptcy Code § 107(c) by its express terms requires both proof of undue risk – *i.e.*, not merely a slightly possible, theoretical risk – as well as a certainty of such undue risk.  11 U.S.C. § 107(c).  The modifier "undue" must be proven by a movant under section 107(c)(1), and not read out of the statute.  *In re Mazzeo,* 131 F.3d 295, 302 (2d Cir., 1997).  In the Motion, the Debtors merely hypothesize, without the evidence required, that there is a possibility of just ordinary risk.  That simply does not suffice to fulfill the Debtors' heavy burden of proof under section 107(c).  *Cendant*, 260 F.3d at 194 ("Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient"); *see also Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 144-45 (2d Cir. 2016) ("'Broad and general findings' and 'conclusory assertion[s]'

are insufficient to justify deprivation of public access to the record, . . . 'specific, on-the-record findings' are required.") (*quoting United States v. Erie Cty.*, 763 F.3d 235, 243 (2d Cir. 2014) (internal quotations omitted).

77.     Without any additional proof establishing an "undue" risk of identity theft or other unlawful injury to the Debtors' customers and creditors who are individuals by the mere disclosure of their names, the Motion must be denied under section 107(c)(1).

### C.   Names of Individuals Covered by the GDPR Should Not Be Redacted

78.     The Debtors request the redaction of names, home and email addresses, and other Personal Data of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state.   That aspect of the Motion should be denied because: (i) the scope of the Debtors' request is excessive; (ii) the GDPR does not supersede U.S. bankruptcy law for purposes of the Motion; and (iii) the GDPR makes an exception for the filing of such information in these bankruptcy cases.

### 1.        The Bankruptcy Code, Not the GDPR, Controls Here

79.     The Debtors, having consented to the jurisdiction of this Court by filing voluntary petitions for bankruptcy relief, failed to set forth any authority for their implied proposition that the GDPR supersedes U.S. interests, as implemented through the disclosure provisions of the Bankruptcy Code, the Bankruptcy Rules, and related law.   To the contrary, in these chapter 11 cases, the Court simply may not be bound by the GDPR.

80.     In this regard, in the analogous discovery context, the Supreme Court has weighed in very clearly.   With respect to a French "blocking statute" that authorized criminal penalties for the production of economic, commercial and financial documents in foreign judicial proceedings,

including U.S. proceedings, the Court unequivocally ruled: "It is well settled that such [foreign

blocking] statutes do not deprive an American court of the power to order a party subject to its

jurisdiction to produce evidence even though the act of production may violate that statute."

*Societe Nationale Industrielle Aerospatiale v. U.S. Dt. Ct. for the Southern Dt. of Iowa*, 482 U.S.

522, 544 n.29 (1987); *see also Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d. 409, 422-25

(S.D.N.Y. 2016) (denying European banks' objections to discovery based on 1995 EU Directive

95/46/EC (part of the UK Data Protection Act), because as a matter of comity, the United States'

national interests outweigh those of the UK); *Royal Park Investments SA/NV v. HSBC Bank USA,*

*N.A.*, Case No. 14-CV-8175 (LGS), 2018 WL 745994 (S.D.N.Y. Feb. 6, 2018) (holding that

plaintiff improperly withheld custodial information and substantially redacted individual names

and email addresses in deference to Belgian Data Privacy Act, which restricts transfer of personal

data to countries outside the EU).

81.     The *Celsius* court addressed this issue as well.  There, as here, the debtors sought

authorization to redact the names, email addresses, and home addresses of any citizens of the UK

or European Economic Area member countries, arguing that the disclosure of those names and

addresses would risk violating the UK GDPR and the EU GDPR, which would expose a debtor to

potential civil liability and significant financial penalties. *Celsius*, 644 B.R. at 295.  The court

noted that there, as here, the debtors provided "no legal authority explicitly dictating why the UK

GDPR and the EU GDPR should apply to the bankruptcy cases of the Debtors filed in the United

States, or specifically, why the foreign laws would take precedence in a situation where United

States law requires the disclosure of the information." *Id*.  The court examined whether disclosure

of the names and addresses of such individuals could be protected under section 107(c), but

indicated that it remained "unconvinced, beyond speculation, that the disclosure of names alone

(without email or physical addresses) presents an imminent risk of harm." *Id.* The court also indicated that it would "not treat the UK and EU citizens differently than the United States citizens implicated in this case filed in New York." *Id.* The court ruled that the debtors could redact home addresses and email addresses of any individual, including those located in the UK or the EU member countries, but denied the proposed redaction of the names of the individuals. *Id.* The U.S. Trustee asserts the same result is warranted here.

82.     The Debtors should not be allowed to eviscerate long-standing disclosure requirements grafted into the Bankruptcy Rules and the Local Rules of this Court and the long-standing policies underlying those authorities. While the UK and the EU have a legitimate interest in enforcing their own laws, this Court's interest in enforcing the Bankruptcy Code in these bankruptcy cases is superior. The Debtors have put forth no proof whatsoever, let alone the plausible evidence required, that their applicable Supervisory Authority or UK Commissioner, would unduly pursue enforcement action and issue penalties against them for obeying both U.S. law and a specific disclosure order of this Court.

### 2.     Personal Information May Be Filed Under the GDPR Legal Claim Exception

83.     In addition, the Debtors have failed to discuss the GDPR's Legal Claim Exception, which facially appears to permit the disclosure of the names (as well as residential addresses) of EU and UK creditors in these bankruptcy cases. Pursuant to the Legal Claim Exception, the Debtors' transfer of the names of EU or UK creditors to a third country such as the U.S., by filing the same in these bankruptcy cases, is allowed to the extent that "the transfer is necessary for the establishment, exercise or defence of legal claims." GDPR, Art. 49(1)(e). Recital 111 to the GDPR, which interprets the Legal Claim Exception, expressly provides that under the exception, a transfer of data, such as the names of EU or UK creditors at issue here, may take place where it

is "occasional and necessary in relation to a contract or a legal claim, regardless of whether in a judicial procedure or whether in an administrative or any out-of-court procedure, including procedures before regulatory bodies."  GDPR Art. 49(1)(e), Recital 111.[8]

84.     According to official guidelines promulgated by the European Data Protection Board, the Legal Claim Exception broadly "covers a range of activities."  *Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679* (May 25, 2018).[9]  The EDPB Guidelines expressly provide that the Legal Claim Exception includes "actions by the data exporter to institute procedures in a third country[,] for example commencing litigation or seeking approval of a merger."  EDPB Guidelines § 2.5.  According to the European Data Protection Board, such third-country procedures, *e.g.* – legal proceedings in a third country – "must have a basis in law, including a formal, legal defined process," and "a close link is necessary between a data transfer and a specific procedure regarding the situation in question."  *Id*.

85.     Here, it cannot be disputed that the requirements imposed by the U.S. Bankruptcy Rules constitute and furnish a well-recognized, "formal, legal defined process" within the meaning of EDPB Guidelines § 2.5.  It follows that because full disclosure of the names of all creditors is required under Bankruptcy Rule 1007(a)(1), the Debtors' transfers of personal data to a third country under the GDPR, *i.e.* – their filing of the names of EU or UK creditors in these U.S. bankruptcy cases – is unquestionably "necessary for the establishment [and] exercise" of the

---

[8]     A copy of Recital 111 may be found at https://gdpr.eu/Recital-111-Exceptions-for-certain-cases-of-international-transfers.  The Recitals of the EU GDPR also apply to the UK GDPR.  *See* https://ukgdpr.fieldfisher.com/recitals/.

[9]     A copy of the EDPB Guidelines may be found at https://edpb.europa.eu/our-work-tools/our-documents/publication-type/guidelines_en.  The EDPB has not applied to UK since January 1, 2021. https://edpb.europa.eu/sites/default/files/files/file1/edpb_statement_20201215_brexit_updated202101 13_en.pdf.  Nevertheless, the EDPB Guidelines may still be instructive in interpreting the UK GDPR with respect to the provisions discussed in this Objection, as such provisions in the UK GDPR are nearly identical to those of the EU GDPR.

Debtors' "legal claims" in these U.S. bankruptcy cases.  GDPR Art. 49(1)(e).  By virtue of having

voluntarily requested relief under chapter 11 of the Bankruptcy Code, the Debtors subjected

themselves to the non-discretionary disclosure requirements of Bankruptcy Rule 1007(a)(1).  Thus,

the Debtors' filing of unredacted names of EU and UK creditors, *i.e.* – their transfers of personal

data to a third country under the GDPR – fulfills the requisite "necessary" standard of the Legal

Claim Exception of GDPR, Art. 49(1)(e).  For these same reasons, the filing of the names of EU

and UK creditors by the Debtors is "necessary" within the meaning of Recital 111 to GDPR, Art.

49(1)(e), and such filing fulfills the "close link" requirement of EDPB Guidelines § 2.5.

86.    In addition, the Debtors' disclosure of the names of EU and UK creditors in these

cases also squarely satisfies the requirement of the applicable GDPR Recital.  GDPR Art. 49(1)(e),

Recital 111 (data transfers must be "occasional").  The Debtors are required to include the names

of EU and UK creditors in the Consolidated Creditor Matrix, the Top 30 List and also in the

Schedules and Statements.  11 U.S.C. § 521(a)(1)(B); Bankruptcy Rules 1007(a)(1) and 1007-

1(b); and Official Form 201.  Therefore, in terms of GDPR Recital 111, at the underlying "data

transfers" of names of EU and UK creditors by the Debtors will occur with only "occasional"

frequency within the meaning of the Recital.  GDPR Art. 49(1)(e), Recital 111.

87.    Though the Debtors bear the burden of proof here, the Motion fails to bear any

indication that they have pursued any threshold assessments of their risk of penalization under the

GDPR.  There is, for example, no proof that the Debtors simply sought the consent of the EU and

UK creditors to include their names in the Consolidated Creditor Matrix, the Top 30 List, and the

Schedules and Statements, rather than asking for extraordinary judicial relief.  GDPR Art.

49(1)(A).  The Motion also fails to demonstrate that the Debtors made an inquiry with their

applicable EU GDPR Supervisory Authority or UK Commissioner about the lawfulness of

transferring the names of the EU and UK creditors to the United States by filing that information

in these bankruptcy cases pursuant to the requirements of the Bankruptcy Rules or seeking a permit

from their Supervisory Authority or UK Commissioner to do so.   Particularly in light of the tenets

of the Legal Claim Exception, of the discretion expressly given by the GDPR to the Debtors'

Supervisory Authority or UK Commissioner, and of the strength of the American laws militating

in favor of full disclosure in these bankruptcy cases, these types of diligence by the Debtors are

crucial at this relatively early stage of the implementation of the GDPR, and critical to the Debtors'

faithful fulfillment of their fiduciary duties here.

88.     For the reasons set forth above, the relief requested by the Motion as it regards EU

and UK citizens who are individual customers-creditors of the Debtors should be denied as to the

proposed redaction of their names.

### D.  The Debtors Must File Under Seal Unredacted Versions of All Documents They File in a Redacted Format

89.     In the event the Court grants any portion of the Debtors' Motion seeking to redact

customer and creditor information, the Debtors should be required to file under seal an unredacted

version of each redacted document filed.   In addition, any unredacted documents should be

provided to the Court, the U.S. Trustee and the Committee without any such party having to make

a separate request.   Further, any other party-in-interest should be allowed to receive unredacted

copies of documents filed with the Court upon request.

90.     To the extent this Court grants any portion of the Motion as it concerns redaction,

the final order should be modified to require that any party who files a document with information

that has been authorized by the Court to be redacted must also file an unredacted version of the

same with the Court under seal. Likewise, the final order should include language that requires

unredacted versions of redacted documents filed with the Court to be provided to the Court, the

U.S. Trustee and the Committee without a separate request being required.  In addition, any such unredacted version should be provided to any party-in-interest upon request.

91.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the final relief requested by the Motion, as it concerns redaction of information, except to allow the redaction from public filings of the addresses and email addresses – but not names – of individuals who are customers or other creditors of the Debtors and grant any such other and further relief that the Court deems just and proper.

Respectfully Submitted,

**ANDREW R. VARA,**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

By:     */s/ Peter J. D'Auria*
        Peter J. D'Auria
        Trial Attorney

By:     */s/ Fran B. Steele*
        Fran B. Steele
        Trial Attorney

Dated:  November 29, 2023