| |
|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** |
| Caption in Compliance with D.N.J. LBR 9004-2(c) <br> **MORRIS JAMES LLP** <br> Brya M. Keilson [NJ Bar No. 022502004] <br> 500 Delaware Avenue, Suite 1500 <br> Wilmington, DE 19801 <br> Telephone: (302) 888-6800 <br> Facsimile: (302) 571-1750 <br> E-mail: bkeilson@morrisjames.com <br><br> -and- <br><br> **SHULMAN BASTIAN FRIEDMAN & BUI LLP** <br> Leonard M. Shulman (*pro hac vice* pending) <br> Melissa Davis Lowe (*pro hac vice* pending) <br> 100 Spectrum Center Drive, Suite 600 <br> Irvine, CA 92618 <br> Telephone: (949) 340-3400 <br> Facsimile: (949) 340-3000 <br> E-mail: lshulman@shulmanbastian.com <br> E-mail: mlowe@shulmanbastian.com <br><br> Counsel for Cushman & Wakefield U.S., Inc. |

| | |
|---|---|
| In re: <br><br> WEWORK INC., *et al*., <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 23-19865 (JKS) <br> (Jointly Administered) |

**DECLARATION OF ERIN LEAHY IN SUPPORT OF MOTION OF CUSHMAN & WAKEFIELD U.S., INC. FOR ORDER COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT OR IN THE ALTERNATIVE, FOR <u>RELIEF FROM THE AUTOMATIC STAY</u>**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

Erin Leahy, being duly sworn, deposes and says:

1. I am the Account Director on the Debtors' account for Global Occupier Services for Cushman & Wakefield U.S., Inc. ("Movant"), located in New York, NY.

2. On November 6, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (the "Debtors") commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). Movant is listed on the Debtors' Schedule of the Thirty Largest Unsecured Creditors with a general unsecured claim in the incorrect and lower amount of $2,535,989.66 [Docket No. 1].[2]

3. I make this Declaration in support of the Motion for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, For Relief From the Automatic Stay [Docket No. 348] ("Motion"). Capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

4. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of Movant's management; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Movant's operations and agreements with Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. Movant has authorized me to submit this Declaration.

5. I am also personally familiar with, and am custodian of, the records of Movant as they pertain to any of Movant's records submitted in support of the Motion. The records of Movant are made by employees or agents of Movant who report to me and who have a business duty to enter the records of Movant accurately and at or near the time of the event which they record.

---

[2] Movant disputes this amount and asserts the pre-petition balance owed to Movant is much higher.

6. On or about May 18, 2022, Movant and Debtors entered into a Master Services Agreement and Canada Participation Agreement (collectively, and with all addenda, schedules, exhibits, and attachments thereto, the "MSA"). A true and correct copy of the MSA is attached hereto as Exhibit 1[3]. Not included in Exhibit 1 are changes made to the scope of certain controls which are not relevant to the Motion.

7. Pursuant to the terms of the MSA, Movant provides various facilities management services in support of substantially all of the Debtors' locations in the United States and Canada, on which Movant has oversight, management, and complete responsibility for and on behalf of the Debtors for the services provided under the MSA. Such services include oversight and management of the building mechanical systems (such as repair, maintenance and replacement of HVAC systems), building electrical systems, plumbing services, major items of repair and maintenance of the buildings, fire and life safety systems (such as sprinkler systems, smoke/heat detectors, emergency lights, exit signs, etc. to ensure continuous and appropriate operations during emergency situations), pest control, and asset lifecycle management. In exchange, the Debtors pay Movant a fee, provide funds to Movant for Movant to pay its subcontractors, and reimburse Movant for payroll and other employee related expenses.

8. Movant provides the services necessary for the operations, business continuity and co-compliance required for occupancy at nearly all of the Debtors' locations in the United States and Canada.

9. In addition, Movant provides services necessary to maintain the WeWork member experience. Specifically, Movant provides services to ensure the Debtors' members receive the

---

[3] A copy of the MSA is not currently attached to the Motion because it contains confidential and proprietary information. Movant is seeking an order of the Court to file the MSA under seal pursuant to a separate motion filed concurrently herewith.

3

amenities and perks which they expect as members of WeWork. Such services are necessary to ensure member satisfaction, keep members and attract new members.

10. In support of its services under the MSA, Movant may, in its discretion, hire certain vendors and subcontractors (the "Vendor(s)").

11. In order for a Vendor to receive payment from Movant under the MSA, Movant must first receive payment from the Debtors under the MSA. Specifically, the Vendor Agreement between Movant and the Vendor provides as follows:

> Section 22.(d) Contractor acknowledges and agrees that (i) C&W is the sole point of contact regarding the Services, including with respect to payment; and (ii) Contractor shall not be paid until and unless C&W receives funds from Client [WeWork] specifically designated for payment of the obligations due or to become due to Contractor.
>
> Section 23    LIMITATION ON C&W'S OBLIGATIONS. Notwithstanding anything to the contrary contained herein, Contractor acknowledges and agrees that C&W's obligation to make payment to Contractor of any compensation hereunder shall be conditional upon Client providing C&W with funds sufficient to pay such compensation to Contractor. In the event Client shall fail or refuse for any reason whatsoever to provide C&W with funds sufficient to pay the compensation due to Contractor hereunder, then C&W will not be able to make any payment of such compensation to Contractor.

12. A true and correct copy of the form Vendor Agreement is attached hereto as Exhibit 2.

13. Likewise, the purchase order provided by Movant to the Vendor provides the following language:

> Submit your invoice with this Purchase Order number indicated thereon. AVOID PARTIAL INVOICES. In a manner and form reasonably acceptable to Purchaser, Vendor/Contractor shall provide correct and complete invoices to Purchaser within fourteen (14) business days of completion of work or as otherwise agreed up in writing by the parties. Payment shall be due within ninety (90) days of the date of receipt of such invoice. Purchaser shall not be

4

> liable for payment of any invoice amount for services or expenses not billed in a timely manner, and in no event for fees for services more than ninety (90) days after such is performed or incurred as the case may be. <u>Vendor/Contractor agrees that it will not be paid for the services until and unless Owner furnishes funds to Purchaser specifically designated for payment of the obligations due or to become due to Vendor/Contractor hereunder; in the event Owner shall fail or refuse for any reason whatsoever to provide Purchaser with funds sufficient to pay the compensation due to Vendor/Contractor hereunder, then Purchaser will not be able to make any payment of such compensation to Vendor/Contractor, and Vendor/Contractor shall have no claim for payment against Purchaser</u>. In the event that Owner becomes subject to a bankruptcy or insolvency proceeding and any fees and costs paid by Owner to Purchaser (which formed the basis of Purchaser paying Vendor/Contractor) are avoided and recovered pursuant to 11 U.S.C. Section 547, or similar state insolvency law, Vendor/Contractor shall be required to refund the fees and costs Vendor/Contractor received from Purchaser on account of such avoided transfer within 30 days after Purchaser provides Vendor/Contractor with proof of such payment by Purchaser to Owner's bankruptcy estate. If an amount less than the full amount of the alleged preferential payment is avoided, such as by way of settlement or partial defense, Vendor/Contractor's refund obligations to Purchaser shall be limited to Vendor/Contractor's pro rata share of any such avoided transfer(s).

14. A true and correct copy of a form purchase order used by Movant is attached to the hereto as Exhibit 3.

15. Thus, Vendors providing services under the MSA will not receive payment unless and until Movant receives payment from the Debtors.

16. The Debtors agreed to such payment terms and conditions with the Vendors as part of the MSA. Specifically, the FM Schedule to the MSA provides as follows at Section 5:

> Unless as otherwise set forth in this Schedule as to the payment of specific Approved Expenses, the Approved Expenses shall be invoiced by C&W on a bi weekly basis to Client, and Client shall pay C&W the Approved Expenses within sixty (60) days of invoice. Time is of the essence in the payment of the Approved Expenses by Client. <u>C&W will pay Subcontractors only after C&W is paid by Client. Client acknowledges and agrees that Services may be delayed or not be delivered if C&W does not receive timely</u>

5

<u>payments. Subject to the limitations of liability included in the Master Agreement, Client shall indemnify, defend and hold harmless C&W from any and all loss or claims including, but not limited to, late penalties, damages, liens, causes of action, or otherwise, resulting from the failure of Client to timely pay C&W the Approved Expenses</u>, except to the extent caused by the negligence, willful misconduct and fraud of C&W, including C&W's failure to include in the contracts with Subcontractors payment terms that are consistent with Client's payment terms herein and that allow C&W to make timely payments.

17. The FM Schedule is included with the MSA attached hereto as Exhibit 1.

18. Movant is under no obligation to pay the Vendors unless and until payment is received by the Debtors. The Debtors acknowledged and agreed to such terms as part of the MSA. The Debtors further acknowledged that if Movant does not receive timely payment from the Debtors such that Movant can pay the Vendors, then services may be delayed or not delivered.

19. Also, as part of the MSA, approximately 200 of the Debtors' employees are dedicated and work solely on projects related to the Debtors, and their wages must be reimbursed by Debtors to Movant. Specifically, Section 2 of the FM Schedule attached to the MSA provides in pertinent part as follows:

> 2. Premises Employees.
>
> Subject to the limitations provided in this Schedule, C&W agrees to use best efforts to perform the Services so as to operate, manage and/or maintain the Premises in accordance with commercial facility management industry standards and the provisions of this Schedule and the Master Agreement. C&W will use reasonable care in the hiring of its employees assigned to provide Services hereunder with respect to the Premises and to comply with the applicable provisions of the Master Agreement. .
>
> . . .
>
> C&W will, commencing on the effective date of such employee's employment by C&W: (a) pay all wages (including overtime for non-exempt employees), salaries, annual and one-time bonus payments and other compensation due to or on behalf of such employees including all Benefits Costs as defined herein. "Benefits

6

> Costs" include all payable in respect to the payroll such as, but not limited to, the following: (i) benefits administration fees, incentive compensation, FICA, Medicare, FUTA, SUI, 401k (employer contribution), pension contribution, severance*, employee-based workers' compensation insurance, short term disability insurance, long term disability insurance, medical, dental and vision insurance and life insurance, or included in any collective bargaining agreements which C&W may enter into on behalf of Client for reimbursable employees in the United States; and (ii) similar taxes, insurance and benefits (including health, welfare and pension plans) customarily paid for by employers for reimbursable employees in countries other than the United States (all hereinafter referred to as "C&W Employee Costs").
>
> . . .
>
> C&W shall invoice Client for C&W's Employee Costs on a bi-weekly basis and such C&W Employee Costs shall be reimbursed to C&W by Client within five (5) days from date of invoice, provided that all invoicing requirements are satisfied. Time is of the essence in the payment of the Employee Costs by Client.

20. Movant employs around 200 prior employees of the Debtors and/or Debtors' previous supplier who are dedicated and work solely on the Debtors' projects. As of the date of this Motion, the Debtors owe to Movant the sums of USD$ 2,548,583.92 and CAD$ 176,972.09 in pre-petition payroll that has come due and not been paid by Debtors to Movant for these employees.

21. If Debtors terminate the MSA, the MSA provides for various compensation to be paid by the Debtors to Movant, including any severance that Movant may pay to its employees. It is my understanding that the severance obligations could be $3.4 million or more, the reimbursement of transition costs could be up to $1.4 million, and the remaining unamortized share of the settlement amount is approximately $1.735 million. Specifically, the MSA provides as follows:

4.22 De-Scoping of Services. Upon not less than thirty (30) days' prior written notice to C&W, C&W shall De-Scope any Service upon Client's request, provided that any material change in the volume or scope of the Services shall be addressed by the Parties in accordance with Exhibit 5 (Governance/Change Control) to the Schedule for Facilities Management Services. To the extent Client performs such De-scoped Service itself or retains any third-party service provider (other than an Integrated Facilities Management Competitor of C&W) to do so, C&W shall reasonably cooperate with Client and such designated third party service provider during the applicable period to De-Scope in connection with the performance of such De-scoped Services. For avoidance of doubt adding or removing Premises does not constitute a De-Scoping of Services. Further, to the extent that such De-Scoping results in a material change to the scope of services included in the Schedule for Facilities Management Services as of the Effective Date, the parties agree that Client shall reimburse C&W for the relevant portion of the remaining unamortized transition costs at that time (for example, if the fiscal year approved Budget is reduced by 25%, then only 25% of the transition costs should be amortized over the Term), which under no circumstances would exceed $1,400,000, and for all severance costs incurred by C&W as a result of such De-Scoping of Services. Material change shall be defined as a twenty-five percent (25%) decrease in the overall then current fiscal year approved Budget, provided that any amount of budget reduced due to savings or efficiencies should not count towards this threshold. Notwithstanding the foregoing, if a Client De-Scoping of Services resulting in the material change to the scope of services described in this Section 4.22 occurs prior to December 31, 2022, Client shall reimburse C&W for a proportionate, remaining unamortized share of the Settlement Amount. The Parties further agree that should a material change (up or down) to the scope of Services included in the Schedule for Facilities Management Services as of the Effective Date, occur after the Effective Date, the Parties shall discuss in good faith whether an equitable adjustment to the Facilities Management Fee would be appropriate given the material change to the scope of services.

17.5 Termination of Agreement for Convenience. Notwithstanding anything to the contrary contained in this Section 17, either party may terminate this Master Agreement (and/or any Participation Agreement hereunder), in whole or in part, without cause upon ninety (90) days prior written notice.

(a) In the event Client terminates the Master Agreement for convenience or C&W terminates for cause, then Client shall reimburse to C&W, within thirty (30) days of termination, (i) the

relevant portion of the remaining unamortized Settlement Amount remaining at that time, and (ii) any remaining unamortized portion of the transition costs (which under no circumstances shall exceed $1,400,000). In either event, Client shall further reimburse C&W for (a) the actual severance costs paid to C&W's employees as a result of such termination who: (a) were solely dedicated to the Client account; (b) were not hired or offered to be hired by the Client or the incoming service provider; and (c) were unable, after reasonable efforts by C&W, to be redistributed within C&W's organization or to provide services to its other clients.

22. The Debtors have failed to pay to Movant a substantial sum of money for services performed pre-petition. Specifically, the Vendors are owed over USD $5.5 million and over CAD $500,000 for services performed pre-petition, left unpaid because the Debtors have not paid Movant. In addition, the Debtors owe Movant over USD $2.5 million and over CAD $176,000 for the reimbursement of pre-petition payroll as outlined above. Finally, the Debtors have not paid Movant any of the fees or other compensation owed directly to Movant under the MSA which totals over USD$ 500,000.00 and over CAD$ 34,000.00.

23. The monies owed to third-party pass through entities (the Vendors) must be paid immediately. The Vendors do not have to continue working if they remain unpaid. If the Vendors remain unpaid, the Vendors may not preform post-petition and the Debtors will not receive the benefit of their bargain under the MSA post-petition.

24. Moreover, if post-petition services are not performed due to non-payment, the Debtors are at risk sanctions by regulatory agencies, disruption to the Debtors' day to day business operation, potential breaches of the Debtors' leases, liens recorded by the Vendors and loss of business due to unsatisfied members.

25. In fact, many of the Vendors have threatened to walk off jobs, either because they have not been paid in full for their pre-petition services or because they are concerned they will not be paid in full due to the Debtors' bankruptcy filing.

26. To wit, at least twenty-four (24) Vendors have either put Movant on hold or are refusing to provide further services until their pre-petition amounts are paid. The employees that report to me speak directly to the Vendors and report to me regularly as to whether any of the Vendors have ceased providing services. Moreover, at least one Vendor has filed multiple notices of claims in order to preserve its lien rights on various projects. Attached hereto as Exhibit 4 is an example of one of the notices of claims the Debtors received. I expect many more notices of claims to be filed in short order as pre-petition invoices continue to become overdue.

27. Further, without the Debtors' assumption of the MSA, Movant is unable to provide its current employees (and hiring for open positions) with any assurance of continued employment, making it more likely that employees will leave and open positions will not be filled.

28. Movant and Debtors have been in discussions regarding the MSA, and amounts owed to Movant and to the Vendors for pre-petition services under the MSA, since before the Petition Date. In fact, the very morning of the Petition Date, I had a conversation with representatives of the Debtors and Alvarez and Marsal ("A&M"). At that time, they told me that Movant is one of their most important vendors and that Movant may fit nicely into one (1) of the three (3) buckets of what they consider to be critical vendors. I was also present for another call

later that same day on November 6, 2023 with other representatives of Movant and A&M regarding the MSA and critical vendor status wherein A&M reiterated the same sentiment from the earlier call.  Following those calls on November 6, 2023, I was under the impression that the Debtors considered Movant one of its most important vendors and that Movant would very likely fit into one of the critical vendor buckets.

29. Since then, Movant and the Debtors have continued their discussions and also involved counsel.  We have been in nearly constant communication with the Debtors for the last thirty (30) days trying to reach a resolution, with and without counsel.  Movant exhausted all efforts, and took all steps possible, to try to reach an amicable resolution with the Debtors before filing this Motion.  Unfortunately, the parties could not reach an agreement and so Movant felt it had no choice but to file the Motion.

30. For all of the reasons set forth herein and in the Motion, Movant respectfully requests the Court grant the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  December 5, 2023
New York, NY

*Erin Leahy*
_____
Erin Leahy