UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**BALLARD SPAHR LLP**
Leslie C. Heilman
Laurel D. Roglen
Margaret A. Vesper
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
         roglenl@ballardspahr.com
         vesperm@ballardspahr.com

Dustin P. Branch
Nahal Zarnighian
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: (424) 204-4354
Facsimile: (424) 204-4350
E-mail:  branchd@ballardspahr.com
         zarnighiann@ballardspahr.com

*Counsel to Criterion Santa Monica, LLC; AMCO 120 West Trinity LLC; Cousins 725 Ponce LLC; Railyard LLC; Terminus Venture T100 LLC; RAR2-222 Broadway Owner SPE, LLC; and RAR2 – 222 South Riverside, LLC*

In re:

WEWORK INC., *et al.*,[1]

                    Debtors.

Case No.:  23-19865 (JKS)

Chapter 11

Judge John K. Sherwood

(Jointly Administered)

**Related to Docket Nos. 43, 103, and 186**

**LIMITED OBJECTION OF CRITERION SANTA MONICA, LLC; AMCO 120 WEST TRINITY LLC; COUSINS 725 PONCE LLC; RAILYARD LLC; TERMINUS VENTURE T100 LLC; RAR2-222 BROADWAY OWNER SPE, LLC; AND RAR2 – 222 SOUTH RIVERSIDE, LLC TO (A) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SCURED PARTIES, (III) SCHEDULING A FINAL HEARING; (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF; AND (B) DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

**OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III)
MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Criterion Santa Monica, LLC; AMCO 120 West Trinity LLC; Cousins 725 Ponce LLC; Railyard LLC; Terminus Venture T100 LLC; RAR2-222 Broadway Owner SPE, LLC; and RAR2 – 222 South Riverside, LLC (the "Objecting Landlords" or "Landlords"), by and through their undersigned counsel, hereby file this limited objection (the "Objection") to (a) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 43] (the "Cash Collateral Motion"), and (b) *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 186] (the "DIP Motion"),[2] and respectfully represent as follows:

I.    **BACKGROUND**

1.    Objecting Landlords are the owners or the agents for the owners of certain real property in which Debtors operate coworking locations pursuant to written leases (the "Leases", and each a "Lease"), as more fully set forth below.

| LOCATION | CITY/STATE | LANDLORD |
|---|---|---|
| 312 Arizona Avenue | Santa Monica, CA | Criterion Santa Monica, LLC |
| 120 West Trinity Place | Decatur, GA | AMCO 120 West Trinity LLC |
| 725 Ponce | Atlanta, GA | Cousins 725 Ponce LLC |
| The RailYard South End | Charlotte, NC | Railyard LLC |
| Terminus 100 | Atlanta, GA | Terminus Venture T100 LLC |

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Cash Collateral Motion or the DIP Motion, as applicable.

Case 23-19865-JKS    Doc 364    Filed 12/07/23    Entered 12/07/23 15:01:55    Desc Main
Document        Page 3 of 24

| LOCATION | CITY/STATE | LANDLORD |
|---|---|---|
| 222 Broadway | New York, NY | RAR2-222 Broadway Owner SPE, LLC |
| 222 South Riverside Plaza | Chicago, IL | RAR2-222 South Riverside, LLC |

2.      Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on November 6, 2023 (the "Petition Date") in the United States Bankruptcy Court for the District of New Jersey (the "Court"). Since the Petition Date, Debtors have been operating and managing their businesses as debtors-in-possession. The Official Committee of Unsecured Creditors (the "Committee") was appointed on November 16, 2023. [D.I. 150]

3.      The Debtors filed the Cash Collateral Motion on the Petition Date seeking authority to utilize cash collateral subject to the liens of the Prepetition Secured Parties. On November 19, 2023, the Debtors filed the DIP Motion, seeking, *inter alia*, authority to obtain a "first-out" letter of credit facility and a senior secured, first priority "last-out" term loan C facility (together, the "DIP Facilities"). Both the Cash Collateral Motion and DIP Motion sought to grant other protections to the Prepetition Secured Parties and DIP Lenders, including a waiver of any of the Debtors' rights or benefits of section 506(c) of the Bankruptcy Code upon entry of a final order (a "506(c) Waiver").

4.      On November 9, 2023, the Court entered an order approving the Cash Collateral Motion on an interim basis [Docket No. 103] (the "Interim Cash Collateral Order"). The Interim Cash Collateral Order excludes the Leases from the Adequate Protection Collateral, permitting DIP Liens only on the proceeds of the disposition of the Leases where Leases do not permit a lien to attach to the Lease itself. *See* Interim Order, ¶3(a) n.4. Additionally, the Interim Cash Collateral Order limits the Required Consenting AHG Noteholders' and the Softbank

Parties' rights to access the Premises following a Termination Event.  *See* Interim Order, ¶ 12. (collectively with any other modifications to the Interim Cash Collateral Order made at the request of Landlords, the "Landlord Protections").

     5.     Despite the Debtors' ongoing use and occupancy of the Premises to conduct their business, including remaining open to their members at each of the Landlords' locations, the Debtors have failed to pay post-petition rent for the period of November 6, 2023 through November 30, 2023 (the "Stub Rent") to any of the Objecting Landlords for the use and occupancy of the Premises, nor to Objecting Landlords' knowledge, has any provision been made in the Budget approved in connection with the Cash Collateral Motion for the payment of such Stub Rent.  Based on discussions with counsel, Landlords believe Stub Rent is not included in the Budget, and instead, would only be paid upon confirmation of a plan and emergence from bankruptcy at some unknown future date beyond the term of the Budget, and it is not clear where the funds to pay the Stub Rent would come from.

     6.     It is also unclear whether the Budget provides for the payment of all other additional post-petition rental obligations that may become due under the Leases pursuant to Section 365(d)(3) of the Bankruptcy Code through the assumption or rejection of such Leases (together with the Stub Rent, the "Post-Petition Rent"), including, but not limited to, go-forward rent beginning in December 2023 at all remaining locations, and for any bi-annual real estate taxes to be paid by the tenant, and other like charges that may arise outside of the monthly recurring rental obligations that have been budgeted.

     7.     A proposed final order approving the Cash Collateral Motion (the "Proposed Final Cash Collateral Order") has not been filed, but a version has been provided to counsel for the Landlords which maintains the Landlord Protections negotiated in connection

with the Interim Order.  To the extent any Proposed Final Cash Collateral Order includes the previously-negotiated Landlord Protections, Objecting Landlords will withdraw those portions of this Limited Objection.

8.      Landlords further object to the approval of any 506(c) waiver for the Debtors' lenders, whether in connection with the Cash Collateral Motion or DIP Motion, prior to the payment, budgeting, or otherwise providing for the Debtors' ability to pay the administrative Stub Rent and Post-Petition Rent incurred in these cases.  It has long been the standard that Debtors and their lenders must pay the freight of a bankruptcy in order to enjoy its benefits, sometimes known as "pay to play," and this case is no different.  There is no reason to force Landlords to unduly shoulder the risk of administrative insolvency of these estates, particularly where it is questionable whether the Debtors even need the financing sought by the DIP Motion. The Debtors' lenders should not obtain the benefit of a 506(c) waiver unless and until Post-Petition Rent is paid or Landlords are provided with adequate protection of the Debtors' ability to pay.

9.      Finally, the Landlords are also beneficiaries under certain standby letters of credit issued in connection with the Leases.  Nothing in the Proposed Final Cash Collateral Order or Proposed DIP Order can or should interfere, modify, alter, or disturb any of the Landlords' rights with respect to letters of credit that have been issued.  The overbroad language of the Proposed DIP Order, combined with the Debtors' conflation of the parties to a letter of credit relationship are troubling, and any order entered by this Court should make clear that nothing therein disturbs those rights or obligations.

II.    **ARGUMENT**

    A.    **Any Final Cash Collateral Order or DIP Order Must Retain the Landlord Protections.**

        10.    The Landlord Protections included in the Interim Cash Collateral Order are critical to protecting Landlords' interests in their Premises as fee owners and in order to respect the contractual provisions of the Leases—provisions for which the bankruptcy code provides no authority to override.

      i.    **The Bankruptcy Code does not invalidate lease provisions that prohibit or restrict liens on leases in connection with a debtor's post-petition financing.**

        11.    Landlords do not object to the Lenders having liens that attach to the proceeds of any disposition of the Leases, consistent with the Interim Cash Collateral Order. However, the Bankruptcy Code does not create an independent right to grant a lien against the Leases themselves, and it does not authorize rendering lease provisions unenforceable in connection with the Debtors' request for post-petition financing.  Any Proposed Final Cash Collateral Order or Proposed DIP Order should clearly provide that the lenders are not seeking any direct lien attaching to the Leases.

        12.    In addition to the strict prohibition in the Leases themselves against the granting of liens on, or hypothecation of, the leasehold interests, the Premises may be encumbered by their own mortgages which, upon information and belief, specifically prohibit the applicable Landlord from allowing any encumbrances to be granted upon the Leases.  Those Leases, as the mortgagee's collateral, are themselves subject to the prior mortgage liens of the Landlords' lenders.

        13.    Neither the Debtors nor the Lenders have provided any authority which would allow this Court to override the express prohibitions in the Leases against granting liens. The simple reason is that no such authority exists.  Neither the Bankruptcy Code generally, nor

11 U.S.C. § 364 specifically, authorize Debtors to violate the Leases in connection with their post-petition financing.  The United States Supreme Court is clear in its rulings that bankruptcy courts are to uphold nonbankruptcy rights unless a specific bankruptcy provision or policy requires differently.  Butner v. United States, 440 U.S. 48, 55 (1979).  "'Property rights are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'" Stern v. Marshall, 131 S. Ct. 2594, 2616 (2011), quoting Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 451 (2007), quoting Butner, 440 U.S. at 55.  The burden to demonstrate that bankruptcy law overrides applicable state law falls on the party making that assertion.  See Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 25 (2000); Butner, 440 U.S. at 55.  A lease provision that is enforceable under applicable state law is enforceable in a bankruptcy proceeding, absent a specific bankruptcy provision or policy that requires differently.  There is no applicable bankruptcy law that overrides state law or the terms of the Leases with respect to the Debtors' request for use of cash collateral or postpetition financing, and the lenders do not need a direct lien on the Leases in any event.

14.    Section 364 authorizes Debtors to obtain financing.  It does not authorize Debtors to alter lease provisions, and it does not preempt Section 365 or the rights granted to Landlords therein.  More specifically, Section 364 does not authorize Debtors, for the benefit of a non-debtor party, to render any provision of a lease unenforceable.  If Congress intended to provide such authority in connection with a request for financing, Congress would have included a provision in Section 364 that is similar to those set forth below.  Congress did not provide such language in connection with obtaining financing pursuant to Section 364.

15.     There are two statutory instances where the Bankruptcy Code potentially renders a lease provision unenforceable for bankruptcy purposes.  The first is where a provision is what is termed an "ipso facto" clause.  This is a provision that would cause a default or termination of a lease based upon the: (i) insolvency or financing condition of the debtor; (ii) commencement of a bankruptcy case; or (iii) appointment of a trustee or custodian in a bankruptcy case.  See 11 U.S.C. § 365(e)(1).  This section, found in a different portion of the Bankruptcy Code under which the Debtors have **not** sought relief, has no application to a request for post-petition financing.

16.     The second instance is where a lease provision prohibits assignment of a lease.  Section 365(f)(1) authorizes a debtor to assign an executory contact or unexpired lease (subject to compliance with Sections 365(b) and (c)), notwithstanding that such contact or lease prohibits assignment. Section 365(f)(1) applies only in the context of a motion to assume and assign a lease, and only upon compliance with the requirements of Sections 365(b) and (c).  See 11 U.S.C. § 365(f)(1).  Again, Section 364 contains no such authorization with respect to lease provisions in connection with financing or use of cash collateral.

17.     Provisions that restrict the ability to encumber leases are critical to Landlords' ability to (a) control their properties, (b) preserve clear title to their Leases, (c) comply with their own financing and investment requirements, and (d) effectively market their properties.  Even where a Lease may permit liens, such rights may be subordinate to Landlords' own financing.  There is no authority under the Bankruptcy Code for the Lenders to gain rights that are not otherwise available to them under state law or the Leases.  Landlords object to any pledge, encumbrance, lien, or hypothecation of the Leases, and the Court should

not approve any form of order that seeks to attach liens to the Leases or otherwise render

provisions of the Leases unenforceable.

> **ii.    Section 365 requires the Debtors to comply with the terms of the Leases, including provisions that prohibit or restrict liens.**

18.    Section 365 mandates that Debtors "timely perform all of the obligations"

under the Leases until such time that the Debtors assume or reject the Leases, and provides:

> The trustee shall timely perform *all of the obligations of the debtor*, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

See 11 U.S.C. § 365(d)(3) (emphasis supplied).   Accordingly, the Debtors must perform their

obligations under the Leases and comply with the terms of the Leases, including provisions

concerning encumbrances, hypothecations, mortgages, or other liens against Leases.  Moreover,

the Leases may have provisions that subordinate any liens by a tenant to liens the Landlords have

granted or may grant to their own lenders.

19.    Given the potential sweeping remedies granted under the Cash Collateral

Motion, DIP Motion, and DIP Documents in the event Debtors' default, a grant of a security

interest in the Leases, and any attendant exercise of remedies following a default, creates a de

facto assignment of the Leases.  There is no authority to permit such an assignment (under the

guise of pledging the Leases as collateral), independent of the safeguards of Sections 365(b)(3)

and (f)(2).  Therefore, the Debtors cannot grant any lien that would give the lenders the ability to

potentially circumvent Section 365.

20.    Any final order should limit any liens on the Leases to the proceeds of a

disposition of the Leases and should not authorize any violation of the terms of the Leases

consistent with the Interim Order.  Finally, nothing in the grant of any lien should compromise

Landlords' rights under Section 365, and Landlords request that any final order specifically include language to that effect.

### iii.   <u>The Lenders do not need a security interest in the Leases.</u>

21.     Granting a direct lien on the Leases is not necessary to protect the Lenders, as any disposition of the collateral is already controlled by the Bankruptcy Court. Where leases are assumed and assigned, the lenders will retain a lien on the proceeds generated by such assignment, and in the event of liquidation sales, the Lenders' liens again attach to the proceeds of those sales.  During either process, the Bankruptcy Court and state law remedies preserve the lenders' rights to realize upon the Debtors' assets.

22.     Landlords, not Debtors, own the Premises.  There is no need to force Landlords to accept a cloud on their title to the Leases.  The value in the Leases to Debtors and the lenders is the value that will be realized in a sale or other assignment process.  Granting a security interest in the Leases serves no economic purpose, and it is wholly unnecessary.

### iv.   <u>There is no statutory basis to permit Lenders to access Landlords' Premises following an event of default in violation of the terms of the Leases.</u>

23.     The Landlord Protection limiting the Lenders' rights to access Landlords' owned real property in violation of the Leases must also be preserved in any Proposed Final Cash Collateral Order or Proposed DIP Order.  Otherwise, the relief sought in the Motion and DIP Documents, upon the occurrence of an event of default, provides the Lenders with unfettered access and occupancy rights with respect to the Premises.  Such provisions are contrary to the Leases, and any attempt by the Lenders to enforce their rights under the loan agreements must comply with all of the provisions of Section 365 of the Bankruptcy Code and the Leases themselves.

24.     Accordingly, any final order should limit any applicable Lenders' access to the Premises to that provided by applicable non-bankruptcy law, by the terms of the Lease or separate agreement of Landlord and Lenders, or as otherwise ordered by this Court after the filing of a motion and appropriate opportunity for Landlord to object and be heard.

25.     Without these limitations, the granting of such rights though a financing order is excessive and inappropriate, as the Debtors are otherwise bound by the terms of the Leases.  See 11 U.S.C. §§ 365(b)(3) and (d)(3).  There is no basis to exempt Lenders from the restrictions in the Leases, or the explicit requirements of the Bankruptcy Code.

26.     Any request for authority to enter onto the Premises without proper protections in place, is also unduly prejudicial and exposes the Landlord and the Premises to unnecessary risk of loss.  The Lenders are not a party to the Lease and have no contractual or possessory right to occupy and use Landlord's property.  Landlords provide Debtors with a right to occupy the Premises, as set forth by the terms of each of the Leases.  Debtors possess no right to use the Premises beyond those rights granted within the Leases, and the Bankruptcy Code does not expand those rights.

27.     Finally, if the Lenders seek to enter onto the Premises, Lenders must bear full financial responsibility, not only for all charges arising under the Leases going forward, but also for prior unpaid rent or other charges that arise.  To the extent the Lenders seek authority to essentially step into the shoes of the Debtors following a default, there is no reason to allow them to exercise rights which the Leases otherwise prohibit and "assume" the Leases for an indeterminate period of time, without being required to cure outstanding post-petition defaults.

28.   Thus, the Court should not approve any form of Final Cash Collateral Order or DIP Order that fails to include the Landlord Protection limiting acces rights following an event of default.

**B.   Landlords are entitled to adequate protection for the Post-Petition Rent for the post-petition use and occupancy of the Premises as part of any Proposed Final Cash Collateral Order or DIP Order.**

29.   While there may be some doubt as to whether the Debtors' require the financing proposed by the DIP Motion given the high costs to the estates, if the DIP Motion or the Cash Collateral Motion are approved on a final basis, Landlords must receive adequate protection that they will receive payment of the Post-Petition Rent accrued (and that continues to accrue and come due) under all Leases, regardless of whether the Leases are ultimately assumed or rejected.   Since the bankruptcy filing, Landlords have provided and continue to provide critical benefits to the Debtors and their Lenders in terms of their continued use of the Premises in order to operate the Debtors' business for the Debtors' members to maximize the value of the Lenders' collateral, secured storage of the Lenders' collateral, and payment of out of pocket expenses such as taxes, common area maintenance, utilities, and insurance.

30.   The Debtors recognize that their business is <u>uniquely reliant</u> upon the ongoing use of their leased locations, and that Landlords are correspondingly critical to their potential success.   That fact notwithstanding, the current Budget unfairly fails to budget for certain Post-Petition Rent, placing Landlords in a position unlike any other administrative creditor by relegating Landlords to the position of an involuntary, unsecured, post-petition, interest-free lender to the Debtors in the amount of the unbudgeted Post-Petition Rent.   This is the very result that Section 365(d)(3) was intended to counteract.   <u>See</u> <u>In re Warehouse Club, Inc.</u>, 184 B.R. 316, 318 (Bankr. N.D. Ill. 1994).   The Budget provides for the payment of other post-petition administrative expenses of these estates, including professional fees, and although it

provides certain budgeted amounts for payment of post-petition Rent, Landlords understanding is that the Budget fails to provide for the payment of the Stub Rent at any time during these bankruptcy cases, and it is unclear whether the Budget is sufficient to pay certain other post-petition Lease obligations, such as for bi-annual real estate taxes.  The Proposed DIP Order provides that the Debtors can only use the proceeds of the DIP Loans and Cash Collateral as provided by the Budget, and the use of Cash Collateral in any manner that is not consistent with the Budget is a Termination Event set forth in the Interim Cash Collateral Order.  (See Interim Order, ¶11(p)).  As a result, if an expense is not included in the Budget the Debtors cannot and will not pay it.  (See Interim Order, ¶¶10(a) & (d)).

31.     As a result, the ultimate payment of the Post-Petition Rent is at a risk that is not shared by other administrative creditors.  While Landlords may not ever recover on account of the pre-petition rent that the Debtors have failed to pay, this Court should not also permit the Debtors to avoid paying for their post-petition use and occupancy of the Premises, while availing themselves of the benefits of the Bankruptcy Code (and simultaneously avoiding its obligations).  There is ample support for Landlords' entitlement to adequate protection under the Bankruptcy Code.

32.     Adequate protection for the Post-Petition Rent is warranted as a condition of a sale or plan that involves the use of the Premises under Section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, *the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest*. . . .

11 U.S.C. § 363(e) (emphasis added).

13

33.     Section 363(e) provides a basis to grant adequate protection to real property lessors in the form of budgeting for the payment of or reserving for the Post-Petition Rent.  See, e.g., Matter of Cont'l Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (finding that adequate protection is available under § 363(e) for a decrease in value due to the use, sale, *or lease* of an entity's interest in property) (emphasis added); In re P.J. Clarke's Rest. Corp., 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (providing that a "landlord's right to adequate protection seems to follow clearly from the language of Section 363(e)"); In re Ernst Home Center, Inc., 209 B.R. 955, 966-67 (Bankr. W.D. Wash. 1997) (finding that adequate protection is available to real property lessors under Section 363(e)); In re RB Furniture, Inc., 141 B.R. 706, 713-14 (Bankr. C.D. Cal. 1992) (adequate protection under Section 363(e) may even be broader than the rights encompassed under Section 365(d)(3), given it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property").

34.     While all parties hope these cases will be administratively solvent, it is too early to tell if this will be true in these proceedings.  The Debtors' path forward remains uncertain, and although the Debtors have negotiated a Restructuring Support Agreement of which the DIP Facilities are a component, the proceeds of the DIP Facility clearly cannot be used for the payment of the Post-Petition Rent.  Further, the Restructuring Support Agreement has not been approved by this Court (nor has such approval been sought), which makes any purported exit financing commitment nebulous, at best, and likely subject to the same restrictions on use as the DIP Facilities.  Simply allowing an administrative expense claim for the Post-Petition Rent will not adequately protect Landlords. See 11 U.S.C. § 361(3).  In fact, Section 361(3) makes clear that adequate protection may not take the form of a deferred administrative claim.

35.     The Debtors are open to their members and operating their businesses in all of Landlords' Premises.  Unlike other creditors, Landlords have no choice but to allow the Debtors to continue to use and occupy their Premises.  Many Landlords wish to maintain a relationship with the Debtors, but not at their sole expense.  This Court has seen many cases where the Debtors and their professionals have stated (and believed) that there would be money to pay administrative claims at the end of a case, only later to concede that the estates are administratively insolvent.  In this case, the Debtors have many milestones and obstacles to overcome.  Everyone, including Landlords, is hopeful that the Debtors can achieve their goals, but the outcome remains uncertain at this time and Landlords should not be the only administrative creditors to shoulder this risk.  The Court should require the Debtors to provide adequate protection for the continued use of the Premises through the date of the payment of the Post-Petition Rent.

36.     Thus, any order approving the Cash Collateral Motion on a final basis or the DIP Motion must provide adequate protection to the Landlords.

**C.     <u>Adequate protection can be provided to the Landlords in various ways</u>.**

37.     Because the Landlords are entitled to adequate protection of the Post-Petition Rent, the Court may consider the various forms of adequate protection that can be provided.

*i.     Payment is a form of adequate protection.*

38.     The best form of adequate protection the Debtors could provide is the payment of all of the Post-Petition Rent obligations that will accrue through the assumption, assumption and assignment, or rejection of the Leases.  <u>See</u>, <u>e.g.</u>, <u>In re ZB Company, Inc.</u>, 302 B.R. 316, 320 (Bankr. D. Del. 2003) (holding that rent should be paid to landlords on a per diem

basis during the pre-rejection period in order to avoid the potential that the landlord could be left with an allowed administrative claim against an administratively insolvent estate).

39.    No provision of the Bankruptcy Code permits the Debtors to receive the benefits and protections of chapter 11 while simultaneously shirking their attendant obligations. In circumstances where there is a risk of administrative insolvency, it is appropriate for adequate protection to take the form of budgeting and immediate cash payments for post-petition use of the Premises.  See 11 U.S.C. § 361; In re Kellstrom Indus., Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2002).

40.    Moreover, the Court may also allow the unpaid Post-Petition Rent, including Stub Rent, as an administrative expense of the Debtors under Section 503(b)(1), and order its payment.   Section 503(b)(1) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate. See 11 U.S.C. § 503(b)(1).  Section 365(d)(3) does not preclude the Court from ruling that Stub Rent is an administrative expense under Section 503(b)(1).  See In re Goody's Family Clothing Inc., 610 F.3d 812, 816-19 (3d Cir. 2010) ("When a Debtor occupies post-petition non-residential space it leases, that § 365(d)(3) provides when the rent obligation arises does not erase when lessors may make § 503(b)(1) claims for the value conferred post-petition by that occupancy."); In re Einstein Moomjy, Inc., Case No. 11-34723 (NLW), 2012 Bankr. LEXIS 3238 at *20-22 (Bankr. D.N.J. July 13, 2012) (following Goody's to reject a debtor's assertion that Section 365(d)(3) is the only means by which a landlord can recover for post-petition occupancy);  In re Garden Ridge Corp., 323 B.R. 136, 142-43 (Bankr. D. Del. 2005) (citing ZB Co. Inc., 302 B.R. at 319 (landlords entitled to prorated rent from the Petition Date—despite the fact that the billing date occurred the day before the petition date).  A landlord's administrative claim under Section 503(b)(1) is equal to

the lease contract rate.  See ZB Co. Inc., 302 B.R. at 319 (contract rate is presumed to be the fair

rental value).

   41. Courts have discretion to determine the timing of administrative payments.

See, e.g., Garden Ridge Corp., 323 B.R. at 143 (citing In re HQ Global Holdings, Inc., 282 B.R.

169, 173 (Bankr. D. Del. 2002) (entering interim orders directing the full contract rent for

February 2004 to each landlord); ZB Co., Inc., 302 B.R. at 320.  "In determining the time of

payment, courts consider prejudice to the debtor, hardship to the claimant, and potential

detriment to other creditors."  See Garden Ridge Corp., 323 B.R. at 143; see also HQ Global,

282 B.R. at 173.  The hardship to Landlords outweighs any prejudice to the Debtors or other

creditors.  Without immediate payment of Post-Petition Rent, including the Stub Rent, or at least

providing adequate protection that Landlords will receive such payment in one of the manners

set forth herein, Landlords bear the risk of administrative insolvency, while the Debtors and

Lenders continue to benefit from the use of their Premises.  Other creditors do not provide post-

petition services to the Debtors without payment.  Forcing Landlords to act as involuntary post-

petition lenders is contrary to the Bankruptcy Code, and directing payment (or adequate

protection for payment) of the unpaid Post-Petition Rent, including Stub Rent, is appropriate

under the circumstances.  See In re Travel 2000, Inc., 264 B.R. 444 (Bankr. W.D. Mich. 2001)

(finding that Congress and courts have determined that a landlord should receive the benefit of

its bargain to compensate a landlord for being compelled by the Bankruptcy Code to continue

providing a debtor with a critical service).  Therefore, this Court may allow and require the

immediate payment of the Stub Rent under Section 503(b)(1).

### ii.    *Post-Petition Rent can be escrowed as a form of adequate protection.*

42.    Short of immediate payment of the Post-Petition Rent owed to Landlords,
the Debtors could escrow sufficient funds to provide adequate protection for the Post-Petition
Rent, including Stub Rent.  The Court was faced with a similar situation in *CEC Entertainment,
Inc.*, where the debtors' financing budget failed to provide sufficient funds for the payment of
stub rent and other outstanding post-petition lease obligations, and the debtors similarly sought a
506(c) waiver before those amounts would be paid to landlords.  There, the Court fashioned a
remedy of an escrow for the outstanding stub rent to provide adequate protection to landlords
until the catchup payment could be made by the Debtors.  [CEC Entertainment, Inc., Case No.
20-33163, Tr. Hr'g 10/8/20 pp. 74:4-75:3, relevant portions attached hereto as Exhibit 1], see
also In re The Sports Authority, Inc., et al., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3,
2016) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [D.I. 1699, at § 40]
(requiring reserve of stub rent for closing locations).[3]

### iii.    *A carve out or condition to any surcharge waiver under Section 506(c) can provide Landlords adequate protection.*

43.    As set forth in the Cash Collateral Motion and DIP Motion, the Debtors
are seeking a waiver of their surcharge rights under Section 506(c) in connection with a Final
Cash Collateral Order and the Proposed DIP Order.  Section 506(c) provides that a trustee or
debtor in possession may recover from property securing an allowed secured claim the
"reasonable, necessary costs and expenses of preserving or disposing of, such property to the
extent of any benefit to the holder of such claim . . . ." 11 U.S.C. § 506(c); See Precision Steel
Shearing, Inc. v. Fremont Financial Corp. (In re Visual Ind., Inc.), 57 F.3d 321, 325 (3d Cir.
1995).  The premise underlying Section 506(c) is that the unsecured creditors should not be

---

[3] A copy of the Sports Authority final DIP Order is attached to this Limited Objection as Exhibit 2.

required to bear the costs of preserving a secured creditor's collateral.  See In re Evanston Beauty Supply Inc., 136 B.R. 171, 175 (Bankr. N.D. Ill. 1992).  "Ample case authority exists which permits lessors to recover under Section 506(c) provided that the standards for recovery are met."  In re World Wines, Ltd., 77 B.R. 653, 658 (Bankr. N.D. Ill. 1987).  Standards for recovery are that the services were necessary and beneficial to the lender.  Visual Indus., Inc., 57 F.3d at 325.  The Debtors and Lenders continue to benefit from the post-petition use and occupancy of the Premises, which is vital to operation of the Debtors' business, and there is no legitimate reason that they should not pay for that benefit.

44.     Courts may surcharge lenders for post-petition rents and storage charges owed to them for storing a lender's collateral, as necessary and directly beneficial to the lender. In re Scopetta-Senra Partnership III, 129 B.R. 700 (Bankr. S.D. Fla. 1991) (determining that a landlord that provided post-petition lease space provided benefit to the secured creditor by storing its collateral, and ensuring the debtor's continued operations); In re Gain Electronics Corp., 138 B.R. 464, 465 (Bankr. D.N.J. 1992); In re World Wines, Ltd., 77 B.R. at 658 (finding that landlord was entitled to be paid by the bank for the use and occupancy of its premises for storage of wine pursuant to Section 506(c)); In re Proto-Specialties, Inc., 43 B.R. 81 (Bankr. D. Ariz. 1984).

45.     The Debtors and Lenders are requesting a waiver of the Debtors' (and any other party's) ability to surcharge the Lenders under Section 506(c).  This places the risk of future administrative insolvency on the Landlords in the amount of the unpaid Post-Petition Rent, as well as any other post-petition obligations that are not provided for in the Budget. Shifting this risk to unsecured creditors—and involuntary unsecured creditors, at that—is contrary to the purpose of Section 506(c) and results in an unwarranted windfall to the Lenders.

As a result, courts have increasingly required that lenders pay for such benefits, which requirement is sometimes referred to as the "pay to play" concept.  See, e.g., In re The Sports Authority, Inc., et al., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [D.I. 1699] (preserving Section 506(c) rights for the Debtors or any party with standing absent providing for payment of Stub Rent and Section 503(b)(9) claims).

46.    Indeed, courts in a number of jurisdictions have adopted this "pay to play" concept.  In the Eighth Circuit, for instance, the case law provides that "if a secured creditor consents to the debtor's continued operation, it also impliedly consents to the debtor surcharging the necessary operating expenses of continuing its business against the creditor's secured claim."  See In re Machinery, Inc., 287 B.R. 755, 768 (Bankr. E.D. Mo. 2002); citing Underwriters Ins. v. Magna Bank (In re Hen House Interstate, Inc.), 150 F.3d 868, 871-72 (8th Cir. 1998) rev'd on other grounds 150 F.3d 868 (8th Cir.1998) (en banc) aff'd. 530 U.S. 1 (2000); United States v. Boatmen's First Nat'l. Bank, 5 F.3d 1157, 1159-60 (8th Cir.1993).  "[B]oth Boatmen's and Hen House . . . require a finding that the secured creditor does in fact impliedly consent [to surcharging of its collateral] when it agrees to the debtor's continued operation of its business."  Machinery, Inc., 287 B.R. at 768.  This is just another way of stating the "pay to play" concept to make sure that Landlords and other unsecured creditors do not solely bear the risk of administrative insolvency.

47.    If the Debtors and their Lenders are unable or unwilling to pay or escrow the Post-Petition Rent, then any waiver of the Debtors' surcharge rights under Section 506(c) should carve out Post-Petition Rent to make such waiver applicable to Post-Petition Rent only after such amounts are escrowed or paid to the Landlords.  This conditional 506(c) waiver is

another means of providing Landlords' with the adequate protection to which they are entitled

under the Bankruptcy Code.  See In re The Sports Authority, Inc., et al., Case No. 16-10527

(MFW) (Bankr. D. Del. May 3, 2016) (Final Order Authorizing Debtors to Obtain Postpetition

Financing) [D.I. 1699, at § 43(a)].  It is improper for the Debtors to seek to waive the statutory

provisions specifically intended to protect Landlords' Post-Petition Rent claims while providing

absolutely no means for such claims to be paid.

### D.  **Bankruptcy Code Requires Equal Treatment of Administrative Expense Creditors.**

48.     Moreover, the Bankruptcy Code does not allow the Debtors to treat

similarly situated administrative claimants differently.  In re Lazar, 83 F.3d 306, 308-09 (9th Cir.

1996) ("Under the Bankruptcy Code, administrative expense creditors must be treated equally

and the court should not set up its own order of priorities.").  Through their DIP Budget, the

Debtors appear to be establishing different classes of administrative claimants to receive

payment to the exclusion of others (namely, the Landlords), in violation of the Bankruptcy Code.

As there is a risk of administrative insolvency, this alone should justify the payment of the Post-

Petition Rent or, at a minimum, the non-payment of other similarly situated administrative

claims until such time as the Post-Petition Rent is paid.

### E.  **Any DIP Order or Final Cash Collateral Order must preserve and cannot modify rights or obligations under issued letters of credit..**

49.     In the DIP Motion and the Proposed DIP Order, the Debtors conflate the

identity of the parties to a letter of credit relationship, as well as those parties' attendant rights

and obligations, in a way that may have the effect of impermissibly modifying those rights and

obligations in violation of applicable non-bankruptcy law.  To obtain a letter of credit, an

applicant makes a request of a bank to issue a standby letter of credit in favor of a beneficiary.

In this case, the Debtors are the applicant, the bank is the issuer, and the Landlords are the

beneficiaries.  Under the independence principle, a "letter of credit is completely separate from the underlying contract between the customer and the beneficiary," which in this case, is the Lease.  PNC Bank v. Spring Ford Indus. (In re Spring Ford Indus.), 338 B.R. 255, 261 (Bankr. E.D. Pa. 2006) (citing Tudor Dev. Grp. V. U.S. Fidelity & Gaur. Co., 968 F.2d 357 360 (3d Cir. 1992).

50.     Courts have overwhelmingly held that a letter of credit and its proceeds are not property of an applicant-debtor's bankruptcy estate, primarily because the issuer distributes its own funds to the beneficiary and not assets of the applicant-debtor.  In re Spring Ford Indus., 338 B.R. at 261; In re Metro Commc'ns, Inc., 115 B.R. 849, 854 (Bankr. W.D. Pa. 1990); see also Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.), 831 F.2d 586, 589 (5th Cir. 1987); Hechinger Inv. Co. of Del. v. Allfirst Bank (In re Hechinger Inv. Co. of Del., Inc.), 282 B.R. 149, 161 (Bankr. D. Del. 2002).

51.     Yet the DIP Motion states that "[p]rior to the Petition Date, **the Debtors and its non-Debtor affiliates** regularly renewed and **issued** LCs . . . ," which is not an accurate statement of the Debtors' role in the letters of credit.  DIP Motion, ¶ 3 (emphasis supplied). Moreover, the proposed DIP Order further provides that "[t]he Borrower is hereby authorized to borrow money, cause letters of credit . . . to be issued, rolled, replaced, reissued, amended, extended, renewed, or otherwise continued by the DIP LC Issuers . . . subject in each case to any limitations on borrowing under the DIP Documents."  Proposed DIP Order, ¶ 2(a).  This expansive grant of authority with no reference to or limitation to applicable non-bankruptcy law governing the letters of credit is echoed again in the Proposed DIP Order, stating "[t]o the extent permitted by the DIP Documents, the Borrower is authorized to roll, replace, reissue, amend, extend, renew, or otherwise continue letters of credit issued or deemed issued under the DIP

Documents, on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis" limited solely by certain consent rights of the DIP Lenders and the DIP Documents.  Proposed DIP Order, ¶ 8.

52.    To be clear, although the Debtors may use the proceeds of the DIP Facilities to obtain letters of credit in accordance with the DIP Documents, there is no basis under the bankruptcy code for this Court to "amend" or "replace" or in any way modify or disturb current letters of credit, as those are independent contractual rights and obligations existing between the issuer (a non-debtor and not a party to the DIP Documents) and the beneficiary (also a non-debtor and not a party to the DIP Documents).  See U.C.C. § 5-103(d) ("Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

53.    Any order granting the DIP Motion must include language that makes clear that the relief granted therein does not in any way alter or disturb existing letters of credit and that it does not authorize the Debtors or any other party to take any actions that do so.

## RESERVATION OF RIGHTS

54.    Objecting Landlords reserve the right to make such other and further objections as may be appropriate, and do not waive and hereby preserve all of their rights, remedies, and arguments with respect to the Leases.

## JOINER IN OTHER OBJECTIONS

55.    Objecting Landlords hereby join in the objections filed by Debtors' other landlords or the Committee to the extent that such objections are not inconsistent with the provisions hereof.

WHEREFORE, Objecting Landlords respectfully request that the Bankruptcy Court grant relief consistent with the foregoing objections; and for such other and further relief as may be just and required under all of the circumstances.

Dated:  December 7, 2023
Wilmington, Delaware

Respectfully submitted,

*/s/ Leslie C. Heilman*
Leslie C. Heilman, Esquire
Laurel D. Roglen, Esquire
Margaret A. Vesper, Esquire
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
         roglenl@ballardspahr.com
         vesperm@ballardspahr.com

         and

Dustin P. Branch, Esquire
Nahal Zarnighian, Esquire
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: (424) 204-4354
Facsimile: (424) 204-4350
E-mail:  branchd@ballardspahr.com
         zarnighiann@ballardspahr.com

*Counsel to Criterion Santa Monica, LLC; AMCO 120 West Trinity LLC; Cousins 725 Ponce LLC; Railyard LLC; Terminus Venture T100 LLC; RAR2-222 Broadway Owner SPE, LLC; and RAR2 – 222 South Riverside, LLC*