| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>**Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| **ALLEN MATKINS LECK GAMBLE**<br>**MALLORY & NATSIS LLP**<br>Ivan M. Gold, Esq. (*pro hac vice* pending)<br>Michael S. Greger, Esq. (*pro hac vice* pending)<br>Three Embarcadero Center, 12th Floor<br>San Francisco, CA 94111<br>Tel: (415) 837-1515<br>Fax: (415) 837-1516<br>Email: igold@allenmatkins.com<br>    mgreger@allenmatkins.com<br><br>-AND-<br><br>**KELLEY DRYE & WARREN LLP**<br>Robert L. LeHane, Esq.<br>Maeghan J. McLoughlin, Esq. (*pro hac vice* pending)<br>Connie Y. Choe, Esq.<br>3 World Trade Center<br>175 Greenwich Street<br>New York, NY 10007<br>Tel: (212) 808-7800<br>Fax: (212) 808-7897<br>Email: rlehane@kelleydrye.com<br>    mmcloughlin@kelleydrye.com<br>    cchoe@kelleydrye.com<br><br>-and-<br><br>One Jefferson Road, 2nd Floor<br>Parsippany, NJ 07054<br>Tel: (973) 503-5900<br><br>*Counsel for Objecting Landlords identified in Exhibit A hereto* | |
| In re:<br><br>WEWORK INC., *et. al*,<br><br>                Debtors[1]. | Chapter 11<br><br>Case Number: 23-19865 (JKS)<br><br>(Jointly Administered) |

---

[1]    The last four digits of the Debtor WeWork Inc's taxpayer identification number are 4904. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017, and the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005.

**LIMITED OBJECTION OF MULTIPLE LANDLORDS TO (A) DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES, ETC. AND
(B) DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
THE DEBTOR TO OBTAIN POSTPETITION FINANCING, ETC.**

Multiple landlords, identified in Exhibit A hereto (collectively, the "Objecting Landlords"), by and through their undersigned counsel, hereby submit their combined limited objection (the "Objection") to *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 186] (the "Financing Motion") and *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 43] (the "Cash Collateral Motion" and, collectively, the "Motions") and respectfully state as follows:

**PRELIMINARY STATEMENT**

The Objecting Landlords do not generally dispute Debtors' need to use cash collateral in order to continue to operate post-petition and to facilitate efforts at a Chapter 11 reorganization. Nevertheless, Debtors' landlords, including the Objecting Landlords, are involuntary creditors in this Chapter 11 case and bear the risk of potential administrative insolvency. At that same time, the Prepetition Secured Parties[2] and proposed DIP LC Lender and DIP Term Lender (collectively, the "Lenders") seek to improve their positions, expanding their collateral base to the detriment of other stakeholders, while not contributing any "new money" to promote

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Cash Collateral Motion and Financing Motion.

Debtors' reorganization efforts. Indeed, there are substantial questions as to whether the relief sought by the Financing Motion, effectively a re-finance of Debtors' existing letter of credit facility with a "roll up," is even necessary.

While many of these concerns will be advanced, on behalf of all unsecured creditors, by the Official Committee of Unsecured Creditors (the "Committee"), there are a number of discrete issues relating to Debtors' nonresidential real property leases that are implicated by the Motions. While Lenders are not committing "new money" to Debtors' estates, Debtors are nevertheless waiving their rights to potentially surcharge Lenders for the expense of operating their business and administering these Chapter 11 cases while failing to pay, or even budget for, landlords' administrative expense claims for November "stub rent." The Financing Motion goes even further, apparently impairing landlords' rights and remedies under previously-issued letters of credit that support Debtors' lease obligations, in defiance of the established "independence principle" governing letter of credit transactions. Lenders also seek to preserve their purported rights, for which no authority has been offered, to encumber Debtors' leasehold interests as part of their enlarged collateral base, notwithstanding prohibitions or restrictions in the underlying leases.

While Objecting Landlords, along with the Committee and other landlord groups, have attempted to negotiate a consensual resolution of the issues presented by the Motions, to date, such efforts have not resulted in an agreement, necessitating this Objection.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      On November 6, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") with this Court.  Since the Petition Date, the Debtors have continued to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. On November 16, 2023, the Office of U.S. Trustee appointed the Committee [Docket No. 150].

2. As part of their "first day" motions, Debtors filed their Cash Collateral Motion, seeking authority to use cash collateral subject to the liens of the Prepetition Secured Parties. On November 9, 2023, this Court entered its order approving the Cash Collateral Motion on an interim basis [Docket No. 103] (the "Interim Cash Collateral Order"). The Interim Cash Collateral Order approved, on an interim basis, the Debtors' post-petition 13-week budget (the "Budget"). The Budget and the Motions do not indicate whether there will be funds left to pay administrative claims in these cases or, much less, make a distribution to general unsecured creditors.

3. On November 19, 2023, the Debtors filed the Financing Motion. The Financing Motion seeks approval of a letter of credit facility (the "LC Facility") and a term loan facility (the "Term Facility" and, together with the LC Facility, the "DIP Facilities") to fund the LC Facility. Debtors are seeking entry of a final order (together with the Final Cash Collateral Order, the "Final Orders") approving the DIP Facilities on an *emergency* basis [Docket No. 187]. The Debtors submit that the relief is critical to the Debtors' ability to renew and issue letters of credit ("LCs") in the ordinary course to support their lease obligations because a significant portion of the leases in their portfolio require the Debtors, as tenants, to provide LCs as security for the leases. The DIP Credit Agreement has not yet been filed with the Court.

4. Objecting Landlords, identified in Exhibit A hereto, are lessors of office properties located throughout the United States, leased by Debtors as part of their flexible co-working "space as a service" business model. In many cases, Objecting Landlords are beneficiaries of irrevocable standby letters of credit issued by third party banks to support Debtors' leasehold obligations. The vast majority of Objecting Landlords did not receive payment of November 2023 rent and charges prior to the Petition Date.

**ARGUMENT**

**I.    ANY CASH COLLATERAL OR FINANCING ORDER SHOULD NOT WAIVE THE BANKRUPTCY ESTATE'S RIGHTS UNDER BANKRUPTCY CODE SECTIONS 506(c) AND 552(b)**

<u>The Budget Fails To Include Debtors' Liability For "Stub Rent":</u>

5.    Here, the Initial Budget accompanying the Cash Collateral Motion (Exhibit 1) fails to account for, or reserve for payment of, "stub rent," i.e., the pro-rated, post-petition portion of November 2023 rent and expense charges under Debtors' nonresidential lease. *See*, *e.g.*, *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 360 (Bankr. S.D.N.Y. 2008) (defining "stub rent"). While payment of November stub rent is not presently due, pursuant to the Third Circuit's adoption of the so-called "billing date" approach to post-petition rent (*In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir. 2001)), there should be no serious question that Debtors' landlords have administrative expense claims for unpaid stub rent under Bankruptcy Code section 503(b)(1)(A) (*see*, *e.g.*, *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 818-820 (3rd Cir. 2010); *In re Epstein Moomjy, Inc.*, 2012 WL 2884943 at *7-8 (Bankr. D. N.J. 2012) ("When a Debtor occupies post-petition non-residential space it leases, that § 365(d)(3) provides when the rent obligation arises does not erase when lessors may make § 503(b)(1) claims for the value conferred post-petition by that occupancy."), particularly in light of the fact that Debtors received payment from WeWork members and enterprise clients for the use and occupancy of the premises for the month of November. Additionally, when the Debtors ultimately assume leases under Bankruptcy Code section 365(b), Debtors will be required to "cure" existing defaults as a condition of assumption. 11 U.S.C. § 365(b)(1)(A). While it is apparently Debtors' position that such administrative expenses can be paid "at the end of the case," Debtors' landlords, including Objecting Landlords, bear the risk of ultimate non-payment of stub rent, while being required to allow the Debtors to continue in possession and use of leased premises.

4856-6711-0293v.2

6. Under these circumstances, this Court should not approve any advance waiver of the estates' rights under Bankruptcy Code sections 506(c) and 552(b) at this time, particularly where neither the relief sought by both the Cash Collateral Motion and the Financing Motion <u>do not provide any "new money"</u> to the Debtors and the Budget fails to address known and quantifiable administrative expense claims. Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself. 11 U.S.C. § 506(c). This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries. *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (stating that "the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").[3] Similarly, the "equities of the case" exception in Bankruptcy Code section 552(b) allows a debtor, creditors' committee or other party-in-interest to exclude post-petition proceeds from pre-petition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure or other disposition of assets. 11 U.S.C. § 552(b).

7. Here, Lenders benefit from the continued operation of Debtors' business through the opportunity to improve their position during the pendency of these bankruptcy cases, enhancing or preserving Debtors' going concern value, or, if restructuring efforts fail, the opportunity to liquidate their assets. As a result, the Lenders must accept the costs and risks

---

[3] It is well-settled, however, that administrative claimants do not have an independent right to seek payment of otherwise unsatisfied claims under Section 506(c) from property encumbered by a secured creditor's lien since the statute reserves that right to a trustee (or debtor-in-possession in a Chapter 11 case). *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947 (2000).

associated with those benefits, including payment of necessary administrative expenses incurred by Debtor in continuing to operate its businesses. *See, e.g., In re Gain Electronics Corporation,* 138 B.R. 464, 466 (Bankr. D. N.J. 1992) (lender surcharged for rent and maintenance expenses arising from storage of its collateral); *In re Scopetta-Senra Partnership III,* 129 B.R. 700, 701 (Bankr. S.D. Fla. 1991) (landlord that leased auto dealership premises to debtor, without payment of administrative rent, provided benefit to secured creditors through the continued use of the premises to sell the vehicles to enable repayment to the secured creditors); *In re So Good South Potato Chip Co.*, 116 B.R. 144, 146 (Bankr. E.D. Mo. 1990) (where the trustee declined to pursue a Section 506(c) surcharge claim, the failure of secured creditor to pay for storage of collateral at premises leased by debtor would otherwise "result in a windfall benefit to the secured creditor to the detriment of a third party."). Indeed, in denying a Section 506(c) waiver in *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del.), Judge Walrath observed that where, as here, a Chapter 11 case is being run for the "benefit of the lenders," then "the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent." April 26, 2016 hearing transcript [Docket No. 1463] at 194:10 to 195:16.[4]

8.    Foisting the economic burden and risk of these cases onto unsecured creditors, particularly Debtors' landlords, in the event Debtors' restructuring effort stalls or fails, contravenes the essential purpose of Section 506(c). It has been observed that bankruptcy courts "should not ignore the basic injustice of an agreement in which a debtor, acting out of desperation, has compromised the rights of unsecured creditors." *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D. N.C. 1985); *accord, In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) (recognizing that debtors-in-possession "generally enjoy little negotiating

---

[4]    *See also In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del.) Jun. 5, 2014 hearing transcript at 212:8-22 [Docket No. 3927] (disapproving 506(c) waiver "based primarily . . . on the fact that it's not fully consensual").

power" with secured lenders, "particularly where the lender has a prepetition lien on cash collateral.").

Landlords Are Entitled To Adequate Protection:

Bankruptcy Code section 363(e) provides, in pertinent part, that:

> … [A]t any time, on request of an entity that has an interest in property used, sold or leased, or proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

9. Real property lessors are entitled to seek adequate protection. *See*, *e.g*., *In re P.J. Clarke's Restaurant Corp*., 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (noting that a "landlord's right to adequate protection seems to follow clearly from the language of §363(e)…"); *In re Ernst Home Center, Inc*., 209 B.R. 955, 965-966 (Bankr. W.D. Wash. 1997); *In re MS Freight Distribution, Inc*., 172 B.R. 976, 980 fn. 4 (Bankr. W.D. Wash. 1994) ("Section 363(e) by its express terms authorizes an entity whose property is to be leased by the debtor to seek adequate protection."); *In re RB Furniture, Inc*., 141 B.R. 706, 713 (Bankr. C.D. Cal. 1992). Moreover, Section 363(p) places the burden of proving adequate protection on the Debtors.

10. To the extent that landlords did not receive current payment on account of the post-petition use and occupancy of leased premises, Bankruptcy Code section 363(e) requires that the Debtors provide their lessors with some form of adequate protection. *See In re Attorneys Office Management, Inc*., 29 B.R. 96, 98 (Bankr. C.D. Cal. 1983).

> Section 361(1) provides that adequate protection may be provided by the trustee [or debtor-in-possession] making period[ic] cash payments to the extent of the use of the premises. Payment of net rentals by [the tenant] may be one means of providing these lessors with adequate protection. However, where the debtor has an inadequate cash flow to make sufficient periodic payments, other means of protection must be utilized.

*In re Attorneys Office Management, Inc*., *supra*, 29 B.R. at 99.

11. The mere allowance of an administrative priority claim for November stub rent, as apparently contemplated by Debtors, is not adequate protection. *Id.* at 99 ("In §361(3) it is

made clear that an administrative claim under §503(b)(1) in itself will not constitute adequate protection.").

12.  Here, in order to provide adequate protection to Objecting Landlords, with respect to November "stub rent," Debtors should be required to either: (1) make payment on account of post-petition portion of November rent and charges from the proceeds of post-petition membership revenue, or (2) provide clear reserves in the Budget for November 2023 "stub rent" to provide assurance of payment. *See In re RB Furniture, Inc.*, *supra*, 141 B.R. at 714. If funds are not available for payment or establishment of a reserve, then a denial of waivers of Section 506(c) and 552(b) is a form of adequate protection. *See*, *e.g.*, *In re Sports Authority Holdings, Inc.*, *supra*, Final Order Authorizing Debtors to Obtain Postpetition Financing, entered May 3, 2016 [Docket No. 1699].

13.  Accordingly, until there is greater clarity with respect to the adequacy of the Budget and the nature of Debtors' post-petition operations, waivers of Sections 506(c) and 552(b) as part of the final approval of the Cash Collateral Motion and the Financing Motion are inappropriate and should not be approved at this time.

**II.  ANY ORDER ON THE FINANCING MOTION MUST PRESERVE NON-DEBTOR PARTIES RIGHTS UNDER EXISTING LETTERS OF CREDIT**

14.  The Financing Motion and proposed Order conflate the separate relationships in letter of credit transactions and disrupt the independence principle which is fundamental to letter of credit law. It is well-established that an issuer's obligation to a beneficiary under a letter of credit is entirely independent from any contracts and obligations between the beneficiary and the debtor/applicant or those between the debtor/applicant and the issuer. Indeed, issuers of letters of credit use their own assets, not that of Debtors, to pay the proceeds of letters of credit. *See*, *e.g.*, *Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.)*, 399 F.3d 558, 566 (3d Cir. 2005); *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 317 (3d Cir. 1989); *Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 885 (3d Cir. 1977); *PNC Bank v. Spring Ford Indus., Inc. (In re Spring Ford Indus., Inc.* (E.D. Pa. 2006). Notwithstanding the legal separation

4856-6711-0293v.2

of each party in a letter of credit transaction, the Financing Motion states that the <u>Debtors</u> "regularly renewed and issued LCs in the ordinary course." Financing Motion at ¶ 3. This is clearly not accurate. While the Debtors may have requested that the banks issue letters of credit, the Debtors were never the issuers. In the simplest terms "applicable commercial law provides that the letter-of-credit obligation is that of the issuer alone, and that obligation is independent of either the underlying contract or any reimbursement agreement." *Colonial Courts Apartment Co. v. Proc Associates, Inc.*, 57 F.3d 119, 124 (1st Cir. 1995). The banks issued the letter of credits directly to the beneficiaries (Debtors' landlords) and such letter of credit agreements are completely separate and distinct from any underlying reimbursement relationship between the Debtors (as applicant of the letters of credits) and the issuing banks.[5]

15. The lack of critical separation in the Financing Motion and proposed Order as to the different legal relationships in a letter of credit transactions creates significant problems. For example, Paragraph 2(a) of the proposed Order purports to grant the Debtors authority to issue, roll, replace, amend, extend, renew, or continue letters of credit. Given that the Debtors themselves are not the issuers of the letters of credit, the Debtors cannot perform any of these functions and the Court cannot confer such rights on the Debtors. Paragraph 4 of the proposed Order is even more problematic, purporting to deem $650 million in existing letters of credit to, among other things, "<u>constitute obligations of the Debtors under the DIP LC Facility</u>." These are plainly <u>not the Debtors' obligations</u> under the independence principle underlying letter of credit transactions; they are the separate obligations of the issuing banks. By deeming the existing letter of credit to be the obligations of Debtors, the independence principle would be destroyed. The letters of credit are not obligations of the Debtors and the issuer's payment under

---

[5] Debtors' characterization of letter of credit relationships is fundamentally inconsistent with both the Uniform Commercial Code (UCC) and The International Standby Practices, International Chamber of Commerce Publication No. 590 ("IPS98"). Under both the UCC and ISP98, WeWork was the applicant, not the issuer, of the underlying letters of credit issued to landlords: the "person at whose request or for whose account a letter of credit is issued." UCC Section 5-102(a)(2); <u>see also</u> ISP98 Rule 1.09(a). As the applicant, Debtors' obligations to the issuing banks are separate and independent from the obligations of the issuing banks under the letters of credit issued to the beneficiary landlords. <u>See</u> ISP98 Rule 1.06(c)("Because a standby is independent, the enforceability of an issuer's obligations under a standby does not depend on: (i) the issuer's right or ability to obtain reimbursement from the applicant . . .").

any letters of credit is not a payment of estate funds. Debtors offer no authority for a contrary outcome.

16. While the Committee and landlords, including Objecting Landlords, have proposed language to Debtors to fully separate these relationships and resolve these issues – seeking to make it clear that nothing in any order granting the Financing Motion alters, amends, modifies, impairs, releases, or otherwise changes, in any way, the issuing banks' existing obligations or future obligations under any letter of credits issued to beneficiaries -- the Debtors' landlords – to date, no agreement has been reached.[6]

### III. THE ATTEMPTED IMPOSITION OF LIENS ON DEBTORS' LEASEHOLD INTERESTS MUST BE LIMITED

17. As part of the DIP LC Loan Collateral, Debtors seek to grant a first priority senior security interest in and lien on all Unencumbered Property (see Proposed Order at ¶ 7(a)(ii)), including a lien on Debtors' leasehold interests. *See* Financing Motion at ¶ 35. With respect to the relief sought by the Cash Collateral Motion, the Interim Cash Collateral Order permits the imposition of a lien on leaseholds in the absence of a prohibition in the lease to the attachment of such lien "unless (i) applicable law permits such attachment notwithstanding any prohibition or limitation in such lease; and (ii) the permissibility of such attachment has been determined by the Court following notice and a hearing, and the DIP Secured Parties' and applicable landlords' rights are expressly hereby reserved with respect to arguments that may be made at such hearing." Neither Debtors nor its Lenders have identified the "applicable law" that would permit such relief. Similarly, the "notice and a hearing" proviso would appear to conflict with Rule 7001(a)(2) of the Federal Rules of Bankruptcy Procedure, providing "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" is an adversary proceeding, not a contested matter. No authority is provided that would relieve the Lenders from the

---

[6] In this regard, it is important to recognize that Debtors agreed, in the recently entered *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 289], to provide (at ¶ 2(h)) that "[f]or the avoidance of doubt, nothing in this Order shall affect, modify, limit, or expand upon the rights of any party with respect to letters of credit or surety bonds securing an obligation under a lease."

requirement that they file an adversary proceeding should they wish to adjudicate whether a lien may be imposed on one or more of Debtors' leasehold interests.

18. Debtors and the Lenders ignore the fact that the vast majority of its leases contain prohibitions or restrictions on collateral assignment, pledge, hypothecation or mortgage of the underlying lease (and, indeed, the imposition of any such lien is, in many cases, a default under the landlord's own financing arrangements). For example, Debtors' lease with BSREP II SJ Towers, LLC, for premises in San Jose, California, provides (at Section 10(a)) that the "Tenant shall not, without the prior written consent of Landlord (1) assign, transfer or encumber this Lease or any estate or interest herein, whether directly or by operation of law …" Similarly, Debtors' lease with Riverpark Tower 1 Owner, LLC for premises in San Carlos, California provides (at Section 14.1) that the tenant shall not, without the prior written consent of the landlord, "assign, *mortgage, hypothecate, encumber*, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law." (Emphasis added.)

19. Nevertheless, Debtors assert that a debtors' leasehold interests are "routinely" encumbered in connection with post-petition financing. Financing Motion at ¶ 35. Debtors' assertion is a generalized overstatement, ignoring the actual language of relevant orders in other cases. For example, the *Final Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, etc.*, entered June 13, 2023 in *In re Bed Bath & Beyond, Inc.*, Case No. 23-13359-VFP [Docket No. 716], in defining "DIP Collateral" (at ¶ 5), expressly excluded "the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease." (Emphasis added.) Similarly, the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral* recently entered in *In re Rite Aid Corporation*, Case No. 23-18993-MBK [Docket No. 120], excludes from the scope of "DIP Term Loan Exclusive Collateral" (at ¶ 7(d)(3)) "the Debtors' real property leases solely

to the extent that the grant of a DIP Lien or an Adequate Protection Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease (but shall include all proceeds of such leases)." In both of those recent District of New Jersey Chapter 11 cases, as well as many others, the question of whether a lien attached to Debtors' leasehold interests could be resolved by reference to the leases themselves, not subject to the lingering threat of future litigation by a debtor's pre- or post-petition lenders. But the language in the Interim Cash Collateral Order (at ¶ 3(a)) does just that, providing for potential imposition of a lien on Debtors' leaseholds "if the permissibility of such attachment has been determined by the Court following notice and a hearing." This broad reservation of rights, also sought by the Lenders with respect to the Financing Motion, provides no certainty, purports to reserve rights Debtors' Lenders do not have, and should not be included in any Final Orders.

20. While Objecting Landlords are confident that the restrictions on transfers of Debtors' leasehold interests contained in the various leases are enforceable as a matter of state law (*see*, *e.g*., Cal. Civil Code §§1995.210(a), 1995.230), the reservation of rights sought by Lenders gives Objecting Landlords no comfort, creating a continuing "cloud" on their interests and potentially subjecting them to the cost, uncertainty and distraction of future litigation in either this Court or state courts over the enforcement of lease transfer restrictions following a default under any Debtors' credit facilities and the exercise of the lender's foreclosure remedy, as well as lingering uncertainty in the context of a future sale or refinance of the real property. Additional burdens could be imposed on landlords, such as notice and cure requirements in favor of the leasehold mortgagee, together with the burden and uncertainty imposed on the landlord's ability to deal with major events such as damage, destruction or condemnation. There is not even any assurance that the rejection of any of the leases would extinguish the lenders' security interests (*see*, *e.g*., *Matter of Austin Development Company*, 19 F.3d 1077, 1083-1084 (5th Cir. 1994) (security interest granted in lease not extinguished by rejection, noting conflict in case law).

21. Neither Debtors or their lenders have offered any authority permitting an assignment of Debtors' interest in its real property leaseholds, in the form of a pledge of the leases as collateral for pre- and post-petition indebtedness, contrary to express lease restrictions and Bankruptcy Code section 365(d)(3). Debtors and their Lenders may not rely on Section 365(f)(1) to circumvent the express provisions of the leases because Section 365(f) <u>requires assumption</u> of Debtors' leases as a condition to their assignment, which is not contemplated under the proposed financing. Indeed, the purported grant of liens on Debtors' leases, in contravention of existing lease restrictions, is potentially a post-petition breach of literally hundreds of Debtors' nonresidential real property leases.

22. Nor is there anything in Section 364 that authorizes the modification or impairment of Debtors' nonresidential real property leases in connection with post-petition financing. The proposed encumbrance of the Objecting Landlords' leasehold interests, notwithstanding lease and state law restrictions is also contrary to Third Circuit precedent. As explained by the Third Circuit in *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.,* 124 F.3d 487, 493 (3rd Cir. 1997), unless federal bankruptcy law explicitly preempts a valid state law restriction imposed on property of the estate, a trustee's rights in property of the estate are limited to those rights that the that the debtor possessed prepetition. *Id.* As the Third Circuit further explained, a strong presumption exists in bankruptcy against inferring Congressional preemption of state law rights and for preemption to exist it must be explicit. *Id.* In particular, the Third Circuit held that general enabling provisions of the Code, such as section 363(b) of the Code which authorize a trustee to sell property outside the ordinary course of business with court approval, do not give rise to explicit preemption and do not expand or change a debtor's interests in property of the estate simply because the debtor files bankruptcy. Similar to section 363(b) analyzed by the Third Circuit in *Integrated Telecom*, section 364 of the Code does not grant the Debtors or their Lenders any explicit rights to override state law, valid contractual restrictions in real property leases as part of a financing request.

23. This Court should adopt the approach utilized in both the *Bed Bath & Beyond* and *Rite Aid* cases. Absent lease language expressly permitting the grant of a lien on Debtors' leasehold interest, a lien on the potential proceeds of the disposition of Debtors' leases more than adequately protects the Lenders' interests, while remaining consistent with the terms of the underlying leases. The "bonus value" of the leases has been long been recognized as property of the bankruptcy estate (*see*, *e.g.*, *In re Ernst Home Center, Inc.*, 209 B.R. 974, 985-986 (Bankr. W.D. Wash. 1997) and a security interest in that bonus value, in the form of a lien on the proceeds of the disposition of leases, strikes a balance between the Lenders' economic interests, Debtors' need for financing, and the landlords' rights under the leases and the Bankruptcy Code.

## IV. THE COURT'S ORDERS ON THE FINANCING MOTION AND CASH COLLATERAL MOTION SHOULD CONTAIN LANGUAGE LIMITING THE REMEDIES OF THE LENDERS IN THE EVENT OF DEFAULT

24. Any order granting the Financing Motion should make it clear that the DIP Secured Parties do not have unrestricted rights of access to use and occupy Debtors' leased premises to dispose of collateral or otherwise exercise remedies following a default under the DIP Documents. Notwithstanding any remedies sought to be authorized in connection with the Financing Motion, there is no basis for a bankruptcy court to authorize a non-debtor party rights to use and occupy real property leased by a debtor outside the parameters of Section 365. *See, e.g., In re Antwerp Diamond, Inc.*, 138 B.R. 865, 866-869 (Bankr. N.D. Ohio 1992).

25. The resolution of this issue is straightforward. The Interim Cash Collateral Order previously entered in these Chapter 11 cases, contains (at ¶ 12) language containing the customary limitations on access rights with respect to leased premises following an event of default. Such provisions should be included in any Finals Orders.

## V. JOINDER

To the extent not inconsistent with the foregoing, Objecting Landlords join in the objections to Debtors' Cash Collateral Motion and Financing Motion, and the entry of final orders thereon, filed by Debtors' other landlords and any objection filed by the Committee.

## VI. RESERVATION OF RIGHTS

Objecting Landlords reserve the right to make such other and further objections to the Cash Collateral Motion and the Financing Motion, or either of them, as may be appropriate based upon any new information provided by Debtors or upon any different relief requested by Debtors, or as may be developed through formal or informal discovery.

## VII. CONCLUSION

For the foregoing reasons, Objecting Landlords request that this Court deny (1) the Financing Motion and (2) the Cash Collateral Motion on a final basis, unless the Final Orders and accompanying Budget are modified as requested.

Dated: December 7, 2023

        **KELLEY DRYE & WARREN LLP**

        By: */s/ Robert L. LeHane*
            Robert L. LeHane, Esq.
            Maeghan J. McLoughlin, Esq. (*pro hac vice* pending)
            Connie Y. Choe, Esq.
            3 World Trade Center
            175 Greenwich Street
            New York, NY 10007
            Tel:  (212) 808-7800
            Fax: (212) 808-7897
            Email: rlehane@kelleydrye.com
                     mmcloughlin@kelleydrye.com
                     cchoe@kelleydrye.com

        -and-

4856-6711-0293v.2

One Jefferson Road
Parsippany, NJ 07054
Tel: (973) 503-5900

-AND-

Ivan M. Gold, Esq. (*pro hac vice* pending)
Michael S. Greger, Esq. (*pro hac vice* pending)
**ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP**
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
Tel:  (415) 837-1515
Fax:  (415) 837-1516
Email: igold@allenmatkins.com
          mgreger@allenmatkins.com

*Counsel for Objecting Landlords identified in <u>Exhibit A</u>*

4856-6711-0293v.2