# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-l(b)**

**GREENBERG TRAURIG, LLP**

Paul H. Schafhauser, Esq.
500 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 443-3233
Email:  paul.schafhauser@gtlaw.com

*Counsel to Lincoln Street Property Owner, LLC*

In re:

    WEWORK INC., *et al.*,

              Debtors.[1]

Chapter 11

Case Number: 23-19865 (JKS)

(Jointly Administered)

**Requested Hearing Date: February 20, 2024, at 2:00 p.m. (ET)**

**Requested Objection Deadline: February 13, 2024, at 4:00 p.m. (ET)**

### DECLARATION OF TERRENCE STOREY IN SUPPORT OF LINCOLN STREET PROPERTY OWNER, LLC'S MOTION FOR ENTRY OF AN ORDER COMPELLING THE DEBTORS' PAYMENT OF CERTAIN POST-PETITION RENT AND OTHER OBLIGATIONS AND REQUIRING ADEQUATE PROTECTION OF LANDLORD INTERESTS

Pursuant to 28 U.S.C. § 1746, I, Terrence Storey, declare as follows:

-----------------------

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiqll.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

I do know, based upon my own personal knowledge, that the following facts are true and correct, and if called as a witness in this proceeding, would and could testify as follows:

1. I am a Chief Investment Officer ("CIO") of Lincoln Street Property Owner, LLC ("Landlord"). In my role as CIO, among other things, I have primary responsibility for overseeing Landlord's business dealings with 1 Lincoln Street Tenant LLC, one of the chapter 11 debtors in the above-captioned chapter 11 cases ("Tenant" or "Debtor").

2. The business records of Landlord are kept in the normal course of business, and it is its regular business practice to record business activities, including records and data compilations, at or near the time the information is prepared or received by the company. Records pertaining to Landlord's business dealings with Tenant are maintained in this fashion. I oversee the employees of Landlord who are responsible for maintaining these records. The exhibits attached hereto are part of these business records.

3. Landlord and Tenant are parties to an Office Lease Agreement dated as of December 31, 2018 (as amended, the "Lease") for the lease of certain premises (the "Premises") located in the building commonly known as 1 Lincoln Street, Boston, MA (the "Building"). A true and correct copy of the Lease, including amendments, is attached hereto as **Exhibit A.**

4. Under the terms of sections 1.14 and 4.1 of the Lease, Tenant is required to timely pay rent, with Base Rent (as defined in the Lease) due on the fifth of each month.

5. The Lease further provides at section 19.2 that if there is an Event of Default (as defined in the Lease) by Debtor, Tenant shall pay Landlord its reasonable attorneys' fees and expenses.

6. Since the Petition Date, the Tenant has continually occupied and used the Premises in the operation of its business. The Tenant failed to pay a portion of rent for the month of December 2023 in the amount of $14,711.37, which consist of operating charges that are due and payable under section 5.2 of the Lease. These were due on December 18, 2023.

7. The rent for the month of January 2024 in the amount of $1,577,216.82 was due and payable under the Lease on January 5, 2024, but Tenant remitted only $354,553.89, a partial

payment on January 9, 2024. Additional rents for electricity and HVAC charges were billed on

January 15, 2024, for $13,270.97 and on January 31, 2024, for $13,759.02, which have not been

paid. The Debtor has, therefore, intentionally withheld $1,264,404.29 that was due after the petition

date.

8.       Landlord has been negotiating a potential restructuring of the Lease with Tenant

which would involve reducing the number of floors that are being leased.  The partial payment of

January rent tendered by Tenant appears to be intended to impose leverage on Landlord in

connection with such negotiations even though the entire premises are being leased and no

agreement has been reached on reducing the floor space that is subject to the Lease. Landlord has not

agreed to accept reduced rent while the negotiations are ongoing. A copy of a letter advising the

Tenant that the partial payment was unacceptable and a violation of the Lease is attached hereto as

**Exhibit B**. Tenant was advised that the partial payment that was tendered was not acceptable and a

default under the Lease.  Tenant has refused to tender the additional rent owing.

9.       On February 5, 2024, the Tenant will owe an additional $1,577,216.82 for rent for the

month of February 2024, exclusive of electricity and HVAC charges which will be billed subsequent

to that date.

10.       As of the date of this Motion, the rent for December 2023 due and payable by the

Tenant under the Lease totals $14,711.37 (the "December 2023 Rent").

11.       As of the date of this Motion, the rent for January 2024 due and payable by the

Tenant under the Lease totals $1,264,404.29 (the "January 2024 Rent").  A copy of the rent ledger

for the Lease is attached hereto as **Exhibit C**.

12.       In addition, as noted above, under the Lease Landlord is entitled to recover all of its

costs and expenses (including reasonable attorneys' fees) in seeking to protect its rights and enforce

the provisions of the Lease on account of the Tenant's failure to pay its rent obligations.

I declare under penalty of perjury under the laws of the United States that the forgoing is true

and correct.

Executed on this 5th day of February, 2024, at New York City, New York.

_____
Terrence Storey

# EXHIBIT A

*EXECUTION VERSION*

**OFFICE LEASE AGREEMENT**

**BY AND BETWEEN**

**LINCOLN STREET PROPERTY OWNER, LLC**

**AND**

**1 LINCOLN STREET TENANT LLC**

**1 LINCOLN STREET**
**BOSTON, MA  02111**

## TABLE OF CONTENTS

Page

1  ARTICLE I        DEFINITIONS................................................................................................1
2  ARTICLE II       PREMISES ...................................................................................................5
3  ARTICLE III      TERM ...........................................................................................................7
4  ARTICLE IV       BASE RENT.................................................................................................12
5  ARTICLE V        OPERATING CHARGES AND REAL ESTATE TAXES ............................13
6  ARTICLE VI       USE OF PREMISES.....................................................................................21
7  ARTICLE VIII     MAINTENANCE AND REPAIRS ................................................................39
8  ARTICLE IX       ALTERATIONS............................................................................................41
9  ARTICLE X        SIGNS...........................................................................................................45
10 ARTICLE XI       SECURITY DEPOSIT...................................................................................46
11 ARTICLE XII      INSPECTION ...............................................................................................51
12 ARTICLE XIII     INSURANCE.................................................................................................52
13 ARTICLE XIV      SERVICES AND UTILITIES .......................................................................56
14 ARTICLE XV       LIABILITY OF LANDLORD.......................................................................64
15 ARTICLE XVI      RULES..........................................................................................................66
16 ARTICLE XVII     DAMAGE OR DESTRUCTION...................................................................67
17 ARTICLE XVIII    CONDEMNATION .......................................................................................68
18 ARTICLE XIX      DEFAULT .....................................................................................................69
19 ARTICLE XX       BANKRUPTCY ............................................................................................73
20 ARTICLE XXI      SUBORDINATION.......................................................................................73
21 ARTICLE XXII     HOLDING OVER .........................................................................................74
22 ARTICLE XXIII    COVENANTS OF LANDLORD ...................................................................75
23 ARTICLE XXIV     PARKING......................................................................................................77
24 ARTICLE XXV      GENERAL PROVISIONS ............................................................................78
25 ARTICLE XXVI     RIGHT OF FIRST OFFER............................................................................87
26 ARTICLE XXVII    ARBITRATION ............................................................................................90
27 ARTICLE XXVIII   PERMITTED ACCESS AND USE FOR EQUIPMENT;
28                  TELECOMMUNICATIONS SERVICES.......................................................92
29 ARTICLE XXIX     PERMITTED DOGS .....................................................................................94
30

EAST\162676362.12

31    EXHIBIT A —           Description of the Premises
32    EXHIBIT B-1 —         Base Building Conditions
33    EXHIBIT B-2 —         Work Agreement
34    EXHIBIT C —           Rules and Regulations
35    EXHIBIT D-1 —         Certificate Affirming Lease Commencement Date
36    EXHIBIT D-2 —         Certificate Affirming the Rent Commencement Date
37    EXHIBIT E —           Tenant's Signage
38    EXHIBIT F —           Insurance Requirements for Contractors
39    EXHIBIT G —           Form of Letter of Credit
40    EXHIBIT H —           Form of Surety Guaranty
41    EXHIBIT I —           Form of Subordination, Non-Disturbance and Attornment Agreement
42    EXHIBIT J —           Lease Guaranty
43    EXHIBIT K —           Good Guy Guaranty
44    EXHIBIT L —           Certain Specific Operational Requirements
45    EXHIBIT M —           Restrictions on Competitor Language to be inserted in Future Leases
46    EXHIBIT N —           Depiction of Location of Tenant's Visitor's Center
47

EAST\162676362.12

48                                    OFFICE LEASE AGREEMENT

49         THIS OFFICE LEASE AGREEMENT (this "Lease") is dated as of the 31st day of
50    December, 2018 (the "Execution Date"), by and between **LINCOLN STREET PROPERTY**
51    **OWNER, LLC**, a Delaware limited liability company ("Landlord"), and 1 Lincoln Street Tenant
52    LLC, a New York limited liability company ("Tenant").

53                                           ARTICLE I
54                                          DEFINITIONS

55         1.1     Building:  A thirty-six (36) story (above grade) building containing approximately
56    One Million One Hundred Fourteen Thousand Two Hundred Eighty-Two (1,114,282) square
57    feet of total building rentable area and located at 1 Lincoln Street, Boston, MA.  The rentable
58    area of the Building has been determined in accordance with the modified BOMA Standard (as
59    described in Section 25.18).

60         1.2     Premises: Prior to the Subsequent Lease Commencement Date, approximately
61    one hundred seventy-one thousand, two hundred seventy (171,270) square feet of rentable area
62    in the aggregate, consisting of the entire rentable area of the twenty-fourth (24th) floor of the
63    Building, the twenty-sixth (26th) floor of the Building, and the twenty-ninth (29th) through the
64    thirty-fourth (34th) floors of the Building (collectively, the "Majority of the Premises"), as more
65    particularly described on Exhibit A and subject to remeasurement pursuant to Section 2.2 below.
66    From and after the Subsequent Lease Commencement Date, approximately two hundred forty
67    thousand, nine hundred forty (240,940) square feet of rentable area in the aggregate, consisting
68    of the Majority of the Premises together with the entire rentable area of the twenty-fifth (25th),
69    twenty-seventh (27th) and twenty-eighth (28th) floors of the Building (collectively, the
70    "Remainder of the Premises"), as more particularly described on Exhibit A and subject to
71    remeasurement pursuant to Section 2.2 below.

72         1.3     Lease Term:  Beginning on the Initial Lease Commencement Date and ending on
73    the date that is the last day of the one hundred eightieth-fifth (185th) full calendar month
74    following the Initial Rent Commencement Date, subject to Sections 3.1 and 3.5.

75         1.4     Lease Commencement Date:  As the context requires, the Initial Lease
76    Commencement Date or the Subsequent Lease Commencement Date, as applicable.

77         1.5     Initial Lease Commencement Date:  The date on which the Majority of the
78    Premises is delivered to Tenant in Ready for Buildout Condition (as hereinafter defined);
79    provided, however, in no event shall the Initial Lease Commencement Date occur unless
80    Landlord has given Tenant at least sixty (60) days advance written notice of the Initial Lease
81    Commencement Date ("Landlord's Initial Lease Commencement Date Notice").

82         1.6     Subsequent Lease Commencement Date: The date on which the Remainder of the
83    Premises is delivered to Tenant in Ready for Buildout Condition; provided however, in no event
84    shall the Subsequent Lease Commencement Date occur unless Landlord has given Tenant at
85    least sixty (60) advance written notice of the Subsequent Lease Commencement Date
86    ("Landlord's Subsequent Lease Commencement Date Notice").

87       1.7     Ready for Buildout Condition: With respect to the Majority of the Premises or the
88  Remainder of the Premises, as applicable, when (i) all of the conditions or criteria described on
89  Exhibit B-1 with respect to such portions of the Premises, as applicable, and the Building have
90  been met (the "Base Building Conditions"), (ii) such portions of the Premises are free of
91  Hazardous Materials, debris and personal property and broom-clean, (iii) such portions of the
92  Premises comply with all applicable Laws, including the Americans with Disabilities Act and the
93  regulations promulgated thereunder, as the same may be amended from time to time (the
94  "ADA"), and (iv) all Building Systems (as hereinafter defined) serving such portions of the
95  Premises are in good and operating condition.

96       1.8     Rent Commencement Date:   The Initial Rent Commencement Date or the
97  Subsequent Rent Commencement Date, as applicable.

98       1.9     Initial Rent Commencement Date:  The date that is one hundred fifty (150) days
99  following the Initial Lease Commencement Date.

100      1.10    Subsequent Rent Commencement Date:  The date that is one hundred fifty (150)
101 days following the Subsequent Lease Commencement Date.

102      1.11    Expiration Date:  11:59 p.m. (local time at the Building) on the last day of the
103 Lease Term.

104      1.12    Anticipated Delivery Date for the Majority of the Premises:  April 1, 2019.

105      1.13    Anticipated Delivery Date for the Remainder of the Premises: January 1, 2020.

106      1.14    Base Rent:  Annual amounts payable as follows:

| Lease Year | Annual Rate per Rentable Square Foot of Premises | Before Subsequent Rent Commencement Date | | From and after Subsequent Rent Commencement Date | |
|---|---|---|---|---|---|
| | | *Monthly Installment* | *Annual Installment** | *Monthly Installment* | *Annual Installment** |
| 1 | $58.00 | $827,805.00 | $9,933,660.00 | $1,164,543.33 | $13,974,520.00 |
| 2 | $59.16 | $844,361.10 | $10,132,333.20 | $1,187,834.20 | $14,254,010.40 |
| 3 | $60.34 | $861,202.65 | $10,334,431.80 | $1,211,526.63 | $14,538,319.60 |
| 4 | $61.55 | $878,472.38 | $10,541,668.50 | $1,235,821.42 | $14,829,857.00 |
| 5 | $62.78 | $896,027.55 | $10,752,330.60 | $1,260,517.77 | $15,126,213.20 |
| 6 | $64.04 | $914,010.90 | $10,968,130.80 | $1,285,816.47 | $15,429,797.60 |
| 7 | $65.30 | $931,994.25 | $11,183,931.00 | $1,311,115.17 | $15,733,382.00 |
| 8 | $66.56 | $949,977.60 | $11,399,731.20 | $1,336,413.87 | $16,036,966.40 |
| 9 | $67.82 | $967,960.95 | $11,615,531.40 | $1,361,712.57 | $16,340,550.80 |
| 10 | $69.08 | $985,944.30 | $11,831,331.60 | $1,387,011.27 | $16,644,135.20 |
| 11 | $70.34 | $1,003,927.65 | $12,047,131.80 | $1,412,309.97 | $16,947,719.60 |
| 12 | $71.60 | $1,021,911.00 | $12,262,932.00 | $1,437,608.67 | $17,251,304.00 |
| 13 | $72.86 | $1,039,894.35 | $12,478,732.20 | $1,462,907.37 | $17,554,888.40 |
| 14 | $74.12 | $1,057,877.70 | $12,694,532.40 | $1,488,206.07 | $17,858,472.80 |
| 15 | $75.38 | $1,075,861.05 | $12,910,332.60 | $1,513,504.77 | $18,162,057.20 |
| 107 | *Based on twelve (12) calendar months | | | | |

2

108    The parties acknowledge that the Annual Installment amounts due pursuant to the foregoing
109    chart do not account for the fact that, as described in <u>Section 3.1</u> below, Tenant will not be
110    required to pay Base Rent or Tenant's Proportionate Share of Operating Charges or Real Estate
111    Taxes (i) with respect to the Majority of the Premises during the first one hundred fifty (150)
112    days immediately following the first day of the month following the first anniversary of the
113    Initial Rent Commencement Date or (ii) with respect to the Remainder of the Premises during
114    the first one hundred fifty (150) days immediately following the first day of the month following
115    the first anniversary of the Subsequent Rent Commencement Date.    The parties further
116    acknowledge and agree that the second (2nd) Lease Year shall be the seventeen (17) months
117    following the first (1st) Lease Year, and that each other Lease Year shall be twelve (12) months
118    in duration.

119        1.15    Security Deposit: Letter of Credit in the amount of Thirty-Five Million Dollars
120    ($35,000,000) and Surety Bond in the amount of Twenty Million Dollars ($20,000,000.00),
121    subject to reductions in accordance with and as further described in <u>Article 11</u> below.

122        1.16    Broker(s): Newmark Knight Frank, who is acting as Landlord's broker
123    ("<u>Landlord's Broker</u>") and Winick Realty Group, LLC and Cushman and Wakefield, Inc., who
124    are acting together as Tenant's broker ("<u>Tenant's Broker</u>").

125        1.17    Tenant Notice Address: 115 West 18th Street, 2nd Floor, New York, New York
126    10011, Attention: Lease Administration; with copies to 115 West 18th Street, 2nd Floor, New
127    York, New York 10011, Attention: Legal Department.

128        1.18    Landlord Notice Address: c/o Fortis Property Group, LLC, 45 Main Street, Suite
129    800, Brooklyn, New York  11201, Attn: Jonathan Landau.

130        1.19    Landlord Payment Address:

131                Account #: 329681296870
132                Account Title: Lincoln Street Owner LLC-Operating
133                Address:  45 Main Street, Suite 800, Brooklyn, NY 11201
134                Bank name:  KeyBank NA
135                Bank address: Norwalk, CT
136                Bank routing transit # or ABA #: 021300077
137

138        1.20    Building Hours or Business Hours: 7:00 a.m. to 7:00 p.m. Monday through
139    Friday (excluding Holidays) and 7:00 a.m. to 1:00 p.m. on Saturday (excluding Holidays), and
140    such other additional hours, if any, as Landlord may determine from time to time upon written
141    notice to Tenant.

142        1.21    Tenant's Proportionate Share: The percentage, from time to time, which is equal
143    to a fraction, the numerator of which is the number of square feet of rentable area in the Premises
144    that have been delivered to, and accepted by, Tenant at the time in question, divided by the
145    rentable square feet of rentable area in the Building. For purposes hereof, and subject to any
146    increase as a result of the addition of space to the Premises any decrease as a result of the
147    deletion of space from the Premises and remeasurement pursuant to <u>Section 2.2</u> below, (i) from

148 and after the occurrence of the Initial Lease Commencement Date but prior to the occurrence of
149 the Subsequent Lease Commencement Date, Tenant's Proportionate Share shall be 15.37% (i.e.,
150 the number of square feet of rentable area in the Majority of the Premises only, 171,270), divided
151 by the rentable square feet of rentable area in the Building (1,114,282), and (ii) from and after
152 the occurrence of the Subsequent Lease Commencement Date, Tenant's Proportionate Share
153 shall be 21.62% (i.e., the rentable square feet of rentable area in the entire Premises (i.e., the
154 Majority of the Premises and the Remainder of the Premises, 240,940), divided by the rentable
155 square feet of rentable area in the Building (1,114,282).    Notwithstanding anything to the
156 contrary contained in this Lease, in no event shall the rentable square footage of the Premises be
157 increased nor shall Tenant's Proportionate Share be increased due to any reason other than an
158 expansion of the Premises or a remeasurement of the Premises pursuant to <u>Section 2.2</u> below.

159    1.22    Parking Allotment:  See <u>Section 24.1</u>.

160    1.23    Parking Facility:  The five (5) story underground parking garage serving the
161 Building that is located on or under the Land.

162    1.24    Holidays:  New Year's Day, Inauguration Day (as applicable), Martin Luther
163 King, Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day,
164 Thanksgiving Day, and Christmas Day.

165    1.25    Construction Allowance:  $100.00 per square foot of rentable area in the Premises
166 (i.e., Twenty-Four Million Ninety-Four Thousand Dollars ($24,094,000.00) for the entire
167 Premises, to the extent Tenant leases the entire Premises).

168    1.26    Guarantor:  WeWork Companies Inc., a Delaware corporation.

169    1.27    Members:  Companies, entities, individuals and other persons that enter into
170 membership, license, sublease or other occupancy agreements with Tenant or one of its Affiliates
171 to occupy space in facilities operated by Tenant (including the Premises) or one of its Affiliates
172 for the Permitted Use.

173    1.28    Affiliate(s) or affiliate(s): Any person, corporation, partnership, limited liability
174 company or other entity which directly or indirectly controls, is controlled by or is under
175 common control with the party in question.  The term "control" as used in this Lease shall mean
176 (i) the possession, directly or indirectly, of the power to direct or cause the direction of the
177 management and policies of the entity or the distribution of its profits, whether by the ownership
178 of voting securities, partnership shares, by contract or otherwise, or (ii) (1) in the case of a
179 corporation, ownership directly or indirectly of more than fifty percent (50%) of the outstanding
180 capital stock of that corporation, (2) in the case of a general or limited liability partnership,
181 ownership directly or indirectly of more than fifty percent (50%) of the general partnership or
182 membership interests of the partnership, (3) in the case of a limited partnership, ownership
183 directly or indirectly of more than fifty percent (50%) of the general partnership interests of such
184 limited partnership, and (4) in the case of a limited liability company, ownership directly or
185 indirectly of more than fifty percent (50%) of the membership interests of such limited liability
186 company.

4

187       1.29    Permitted Tenant Parties: Permitted occupants, licensees and invitees of Tenant
188 and Tenant's Members at the Premises in connection with its respective businesses and
189 operations at the Premises including, without limitation, (a) any Affiliates, (b) Members, (c)
190 strategic partners of Tenant or any Tenant Affiliates, (d) on-site vendors and service or
191 concessions providers (e.g., food or beverage vendors) providing goods, services or concessions
192 to Tenant's Members and other Permitted Tenant Parties, and (e) independent contractors of
193 Tenant.

194       1.30    Agents: With respect to each of Landlord and Tenant, such party's agents,
195 employees, and contractors.

196       1.31    Business Days: All days, excluding Saturdays, Sundays and Holidays.

197 <center>ARTICLE II</center>
198 <center>PREMISES</center>

199       2.1    Tenant leases the Premises for the Lease Term and upon the conditions and
200 covenants set forth in this Lease.  Tenant will have the non-exclusive right to use the common
201 and public areas of the Building (the "Common Areas").  When Tenant is leasing the entire
202 rentable area on a particular floor, the term "Premises" shall be deemed to include the elevator
203 lobbies and common area corridors on such floor, and the same shall not be part of the Building
204 Common Areas.  Except as may otherwise be expressly provided in this Lease, the lease of the
205 Premises does not include the right to use the balconies, terraces or roofs adjacent to the
206 Premises, roof, mechanical rooms, fan rooms, electrical closets, shafts, stacks, pipes, conduits,
207 wires, ducts and appurtenant fixtures, janitorial closets, telephone rooms, parking areas or
208 non-common or non-public areas of any portion of the Building, all of which are expressly
209 excluded from the Premises and reserved to Landlord, it being understood that Tenant shall have
210 the non-exclusive right to use, in common with other tenants, occupants and users of the
211 Building, the plenums, risers, electrical closets, janitorial closets, telephone rooms, ducts or
212 pipes, or mechanical rooms, located on the floors on which the Premises is located or designated
213 to serve the Premises (provided Tenant shall have such utilization in no greater proportion than
214 Tenant's Proportionate Share of Operating Charges), but only (a) with, at Landlord's option, the
215 accompaniment of Landlord's representative (unless such rooms and closets contain no system,
216 wiring or other item related to either the Building Structure and Building Systems (each as
217 hereinafter defined) or any other tenant of the Building, in which case no such accompaniment
218 shall be required), (b) by properly licensed and trained technicians, and (c) in accordance with
219 Landlord's reasonable rules, regulations and requirements in connection therewith (subject to
220 Section 16.1)).

221       2.2    Upon written request from Tenant received by Landlord within thirty (30) days
222 after the Initial Lease Commencement Date or the Subsequent Lease Commencement Date, as
223 applicable, Landlord shall provide Tenant with a copy of Landlord's calculations of the
224 measurement of the Majority of the Premises or the Remainder of the Premises, as applicable, in
225 accordance with the measurement standard set forth in Section 25.18 below ("Landlord's
226 Calculation").  Tenant shall have the right, at Tenant's sole cost and expense, to have Landlord's
227 Calculation confirmed (by a licensed architect selected by Tenant, including Tenant's or its
228 parent company's own employees who are licensed architects) in accordance with the

<center>5</center>

229    measurement standard set forth in said <u>Section 25.18</u>.  In the event that the measurement
230    determined by Tenant's architect ("<u>Tenant's Calculation</u>") differs by no more than three percent
231    (3%) (higher or lower) from Landlord's Calculation, then Landlord's Calculation shall control.
232    In the event that Tenant's Calculation differs from Landlord's Calculation by more than three
233    percent (3%) (higher or lower), then Tenant shall give Landlord written notice thereof (together
234    with a copy of Tenant's Calculation documentation) not later than thirty (30) days following
235    Tenant's receipt of Landlord's Calculation, and Landlord and Tenant, in coordination with their
236    respective architects shall endeavor in good faith to resolve the discrepancy.  If Landlord and
237    Tenant are not able to resolve such discrepancy, then Landlord and Tenant (in coordination with
238    their respective architects) shall jointly appoint an independent architect within ten (10) days
239    following a written notice requesting same from either Landlord or Tenant to the other, to
240    resolve such discrepancy. The determination of such independent architect shall be binding on
241    both Landlord and Tenant.  If such independent architect determines that the rentable area differs
242    by no more than three percent (3%) (higher or lower) from Landlord's Calculation, then the fees
243    of such independent architect shall be borne solely by Tenant; otherwise the fees of such
244    independent architect shall be borne by Landlord.  Upon confirmation of the measurement
245    pursuant to this <u>Section 2.2</u>, by the parties or by the independent architect as applicable,
246    Landlord and Tenant shall promptly enter into an amendment to this Lease modifying such
247    rentable area of the Premises, the Base Rent set forth in <u>Section 1.14</u> above, and all other terms
248    of this Lease that vary by measurement.  Landlord shall have the right throughout the Lease
249    Term (and any extensions thereof) to re-measure the square footage of the Premises, provided,
250    however, that notwithstanding such remeasurement, the rentable square footage of the Premises
251    as set forth in <u>Section 1.2</u> (or as determined in accordance with the foregoing provisions of this
252    <u>Section 2.2</u>) shall not be modified for any purpose under this Lease (including without limitation
253    the calculation of Base Rent or Tenant's Proportionate Share) and Tenant's Proportionate Share
254    shall not be increased.

255          2.3    Landlord acknowledges and agrees that SSB Realty LLC (the "<u>Existing Tenant</u>")
256    is currently in possession of the entire rentable area of the Building (including, without
257    limitation, the Premises) under that certain lease date as of May 9, 2001 between Kingston
258    Bedford Joint Venture, LLC, as landlord ("<u>Original Landlord</u>"), and Existing Tenant, as tenant,
259    as amended by that certain First Amendment to Lease dated as of August 15, 2003, as further
260    amended by that certain Second Amendment to Lease dated as of February 13, 2004, and as
261    further amended by that certain Third Amendment to Lease dated as of December 22, 2004 (as
262    so amended and as assigned by Original Landlord to Landlord, the "<u>Existing Lease</u>").
263    Concurrently with Tenant's execution of this Lease, (a) Landlord and the Existing Tenant are
264    entering into an amendment of the Existing Lease that provides for (i) the termination of the
265    Existing Lease with respect to the Premises, (ii) the termination of the Existing Tenant's control,
266    management, operation, maintenance and repair of the Building prior to the Initial Lease
267    Commencement Date, including, without limitation, the Building Systems and Common Areas
268    and (iii) the Existing Tenant to vacate the Premises and all other portions of the Building with
269    respect to which the Existing Lease is terminated (the "<u>Existing Lease Amendment</u>"), as more
270    particularly set forth in the Existing Lease Amendment, and (b) shall deliver a true and accurate
271    copy of the fully-executed Existing Lease Amendment, redacted to protect certain financial and
272    other confidential terms. The foregoing representations and warranties of Landlord shall survive
273    Tenant's acceptance of the Premises.

<div align="center">6</div>

<div align="center">ARTICLE III

TERM</div>

3.1    All of the provisions of this Lease shall be in full force and effect from and after the Execution Date; provided, however, that Tenant shall not be obligated to pay Base Rent, Tenant's Proportionate Share of Operating Charges, or Tenant's Proportionate Share of Real Estate Taxes (a) for portions of the Premises until the applicable Rent Commencement Date for such portions, subject, however, to abatement as otherwise provided herein, (b) with respect to the Majority of the Premises during the first one hundred fifty (150) days immediately following the first anniversary of the Initial Rent Commencement Date, or (c) with respect to the Remainder of the Premises during the one hundred fifty (150) days immediately following the first anniversary of the Subsequent Rent Commencement Date.    The Lease Term shall commence on the Initial Lease Commencement Date, continue through the Initial Rent Commencement Date and Subsequent Rent Commencement Date, and then continue after each such Rent Commencement Date for the period specified in Section 1.3.    If the Initial Commencement Date is not the first day of a month, then the Lease Term shall include the partial month in which the Initial Commencement Date occurs.    The Lease Term shall also include any properly exercised renewal or extension term.    Notwithstanding the foregoing, the parties acknowledge and agree that the Tenant shall have no rights or obligations hereunder with respect to the Remainder of the Premises after the Initial Lease Commencement Date until such time as the Subsequent Lease Commencement Date occurs.

3.2    Promptly after each applicable Lease Commencement Date is ascertained, Landlord and Tenant shall execute a certificate in the form attached to this Lease as Exhibit D-1 (a "Certificate Affirming Lease Commencement Date") to confirm such Lease Commencement Date.    Promptly after each applicable Rent Commencement Date is ascertained, Landlord and Tenant shall execute the certificate confirming such Rent Commencement Date attached to this Lease as Exhibit D-2.    Failure to execute said certificate shall not be a default hereunder and shall not affect the commencement or expiration of the Lease Term or the commencement of Tenant's obligation to pay rent.    If this Lease is terminated before the Lease Term expires, then, upon Landlord's request the parties shall execute, deliver and record an instrument acknowledging such fact and the date of termination.

3.3    (a)    It is presently anticipated that the Majority of the Premises will be delivered to Tenant in Ready for Buildout Condition and the Initial Lease Commencement Date will occur on or prior to the Anticipated Delivery Date for the Majority of the Premises (and Landlord agrees to provide Tenant with at least sixty (60) days advance written notice of the date on which the Initial Lease Commencement Date shall occur); provided, however, that in no event shall the Initial Lease Commencement Date occur prior to the Anticipated Delivery Date for the Majority of the Premises unless Tenant elects to accept possession of the Majority of the Premises or any portion thereof prior to such date in Tenant's sole and absolute discretion.    If the Initial Lease Commencement Date does not occur by the Anticipated Delivery Date for the Majority of the Premises, then Landlord shall not have any liability whatsoever, except as provided herein, and this Lease shall not be rendered void or voidable as a result thereof, except as provided herein.    Landlord shall use commercially reasonable efforts to cause the Initial Lease Commencement Date to occur by the Anticipated Delivery Date for the Majority of the Premises. Notwithstanding the foregoing: (i) if the Initial Lease Commencement Date shall not

<div align="center">7</div>

occur on or prior to June 1, 2019 (subject to extension for Tenant Delay and any delay caused by any of the factors set forth in <u>Section 25.21</u> of the Lease, a "<u>Force Majeure Delay</u>"), provided that the extension for any Force Majeure Delay shall be capped at ninety (90) days in the aggregate for all Force Majeure Delays, then, Tenant shall be entitled to a rent abatement for the Majority of the Premises following the Initial Rent Commencement Date in an amount equal to (x) one hundred percent of the per diem Base Rent for the Majority of the Premises payable during the period immediately following the Initial Rent Commencement Date for every day in the period commencing on June 1, 2019 and ending on the first to occur of the date on which the Initial Lease Commencement Date occurs or August 31, 2019, and (y) two hundred percent (200%) of the per diem Base Rent for the Majority of the Premises payable during the period immediately following the Initial Rent Commencement Date for each day during the period commencing on September 1, 2019 and ending on the date on which the Initial Lease Commencement Date occurs, and (ii) if the Initial Lease Commencement Date shall not occur on or prior to April 1, 2020 (subject to extension for Tenant Delay and Force Majeure Delay, provided that the extension for any Force Majeure Delay shall be capped at ninety (90) days in the aggregate for all Force Majeure Delays), then Tenant shall have the right to terminate this Lease by delivering written notice of the exercise of such right to Landlord.  Such right of termination may be exercised by Tenant only during the period commencing on April 2, 2020 (subject to extension for Tenant Delay and Force Majeure Delay, provided that the extension for any Force Majeure Delay shall be capped at ninety (90) days in the aggregate for all Force Majeure Delays) and continuing until the Initial Lease Commencement Date shall occur, and if such termination option is not exercised prior to the occurrence of the Initial Lease Commencement Date, such right shall thereafter lapse and be of no further force or effect.  Notwithstanding the foregoing, Tenant shall not have the right to terminate this Lease pursuant to this Section if Landlord certifies in writing and in good faith to Tenant within five (5) days after Landlord's receipt of Tenant's termination notice that the Initial Lease Commencement Date will occur within thirty (30) days following Landlord's receipt of Tenant's termination notice (and Landlord does, in fact, cause the Initial Lease Commencement Date to occur within such thirty (30) day period).  In the event Tenant has exercised its right to terminate this Lease pursuant to this <u>Section 3.3</u>, Landlord shall reimburse Tenant for all of Tenant's reasonable out of pocket costs and expenses incurred in connection with this Lease (up to a maximum amount, in the aggregate, of $500,000) within thirty (30) days following the date on which Tenant has provided Landlord with a reasonably detailed list of such costs and expenses and such other supporting documentation as is reasonably requested by Landlord, which obligation shall survive the termination of the Lease.  Subject to the terms of the Existing Lease, if the failure to cause the Initial Lease Commencement Date to occur is due to a prior occupant holding over, Landlord shall promptly take all commercially reasonable actions, including the institution of summary proceedings to obtain possession and remove any holdover tenant, and any holdover by the Existing Tenant shall not constitute a Force Majeure Delay for the purposes of this <u>Section 3.3(a)</u>.

        (b)    It is presently anticipated that the Remainder of the Premises will be delivered to Tenant in Ready for Buildout Condition and the Subsequent Lease Commencement Date will occur (and the Remainder of the Premises will thus become part of the Premises) on or prior to the Anticipated Delivery Date for the Remainder of the Premises (and Landlord agrees to provide Tenant with at least sixty (60) days advance written notice of the date on

8

363  which the Subsequent Lease Commencement Date shall occur); provided, however, that in no
364  event shall the Subsequent Lease Commencement Date occur prior to the Anticipated Delivery
365  Date for the Remainder of the Premises unless Tenant elects to accept possession of the
366  Remainder of the Premises or any portion thereof prior to such date in Tenant's sole and
367  absolute discretion.  If the Subsequent Lease Commencement Date shall not occur by the
368  Anticipated Delivery Date for the Remainder of the Premises, then Landlord shall not have any
369  liability whatsoever, and this Lease shall not be rendered void or voidable as a result thereof,
370  except as provided herein.  Landlord shall use commercially reasonable efforts to cause the
371  Subsequent Lease Commencement Date to occur by the Anticipated Delivery Date for the
372  Remainder of the Premises.  Notwithstanding the foregoing: (i) if the Subsequent Lease
373  Commencement Date shall not occur on or prior to January 1, 2020 (subject to extension for
374  Tenant Delay and any Force Majeure Delays, provided that the extension for any Force Majeure
375  Delay shall be capped at ninety (90) days in the aggregate for all Force Majeure Delays), then,
376  Tenant shall be entitled to a rent abatement for the Remainder of the Premises following the
377  Subsequent Lease Commencement Date in an amount equal to (x) one hundred percent of the
378  per diem Base Rent payable for the Remainder of the Premises during the period immediately
379  following the Subsequent Rent Commencement Date for every day in the period commencing
380  on April 1, 2020 and ending on the first to occur of the date on which the Subsequent Lease
381  Commencement Date occurs or July 31, 2020, and (y) two hundred percent (200%) of the per
382  diem Base Rent payable for the Remainder of the Premises during the period immediately
383  following the Subsequent Rent Commencement Date for each day during the period
384  commencing on August 1, 2020 and ending on the date on which the Subsequent Lease
385  Commencement Date occurs, and (ii) if the Subsequent Lease Commencement Date shall not
386  occur on or prior to January 1, 2021 (subject to extension for Tenant Delay and Force Majeure
387  Delay, provided that the extension for any Force Majeure Delay shall be capped at ninety (90)
388  days in the aggregate for all Force Majeure Delays), then Tenant shall have the right to
389  terminate this Lease with respect to only the Remainder of the Premises by delivering written
390  notice of the exercise of such right to Landlord.  Such right of termination with respect to the
391  Remainder of the Premises may be exercised by Tenant only during the period commencing on
392  January 2, 2021 (subject to extension for Tenant Delay and Force Majeure Delay, provided that
393  the extension for any Force Majeure Delay shall be capped at ninety (90) days in the aggregate
394  for all Force Majeure Delays) and continuing until the Subsequent Lease Commencement Date
395  shall occur, and if such termination option is not exercised prior to the occurrence of the
396  Subsequent Lease Commencement Date, such right shall thereafter lapse and be of no further
397  force or effect. Notwithstanding the foregoing, Tenant shall not have the right to terminate this
398  Lease with respect to the Remainder of the Premises pursuant to this Section if Landlord
399  certifies in writing and in good faith to Tenant within five (5) days after Landlord's receipt of
400  Tenant's termination notice that the Subsequent Lease Commencement Date will occur within
401  thirty (30) days following Landlord's receipt of Tenant's termination notice (and Landlord does,
402  in fact, cause the Subsequent Lease Commencement Date to occur within such thirty (30) day
403  period).  Subject to the terms of the Existing Lease, if the failure to cause the Subsequent Lease
404  Commencement Date to occur is due to a prior occupant holding over, Landlord shall promptly
405  take all commercially reasonable actions, including the institution of summary proceedings to
406  obtain possession and remove any holdover tenant, and any holdover by the Existing Tenant
407  shall not constitute a Force Majeure Delay for the purposes of this Section 3.3(b).

408          (c)     Provided no Event of Default is then continuing under this Lease and
409 Tenant has provided Landlord written evidence demonstrating that Tenant is then carrying all
410 insurance required by this Lease to be carried by Tenant and the Premises or portions thereof
411 are vacant, Tenant shall have the right to enter upon and access the vacant portion(s) of the
412 Premises at any time and from time to time during the period that is sixty (60) days prior to the
413 applicable Lease Commencement Date for such vacant portion(s) of the Premises (the "Early
414 Access Period") for the purposes of: (i) conducting architectural and engineering activities that
415 are generally performed in preparation for the construction of office space in Comparable
416 Buildings (e.g., taking or preparation of measurements, surveys, elevations, sketches and
417 layouts); and (ii) conducting any work that Tenant desires to perform in or about the Premises
418 that, under applicable Law and governmental regulations, does not require the issuance of a
419 building permit. Notwithstanding the foregoing, neither Tenant nor any of Tenant's Agents
420 shall enter the Premises during the applicable Early Access Period to the extent that Landlord
421 reasonably determines that such entry will unreasonably interfere with activities of Landlord or
422 Landlord's Agents or the tenant under the Existing Lease in the Premises. In such event,
423 Landlord shall notify Tenant of specific times during which Tenant may make such entry. Any
424 and all activity by Tenant or any Agent of Tenant prior to the applicable Lease Commencement
425 Date shall be coordinated with Landlord to ensure that such activity does not unreasonably
426 interfere with any other work. If Landlord reasonably determines that any such unreasonable
427 interference is occurring, then Landlord shall have the right to require the removal of the
428 offending party from the Premises (with Tenant having no right to assert that the applicable
429 Lease Commencement Date or Tenant's other obligations are affected thereby).
430 Notwithstanding anything in this Lease to the contrary: (y) Landlord shall have no
431 responsibility with respect to any items placed in the Premises by Tenant or any Agent of
432 Tenant prior to the applicable Lease Commencement Date; and (z) all of the provisions of this
433 Lease (including, without limitation, all insurance, indemnity and utility provisions) shall apply
434 during each Early Access Period, except that during such period Tenant shall not be obligated to
435 pay Base Rent, Tenant's Proportionate Share of Operating Charges or Tenant's Proportionate
436 Share of Real Estate Taxes or any other amount that is payable by Tenant with respect to the
437 portion of the Premises that is the subject of such Early Access Period.

438         3.4     "Lease Year", as the context requires, shall mean a period of twelve (12)
439 consecutive months commencing on the Initial Rent Commencement Date, and each successive
440 twelve (12) month period thereafter; provided, however, that (i) if the Initial Rent
441 Commencement Date is not the first day of a month, then the first Lease Year shall end on the
442 last day of the month in which occurs the first anniversary of the Initial Rent Commencement
443 Date and (ii) the second Lease Year shall be the seventeen (17) months immediately following
444 the end of the first Lease Year.

445         3.5     Landlord hereby grants to Tenant the right, exercisable at Tenant's option, to
446 extend the term of this Lease with respect to all of the then-current Premises for one term of five
447 (5) years (the "Renewal Term"). If exercised, and if the conditions applicable thereto have been
448 satisfied, the Renewal Term shall commence immediately following the end of the initial Lease
449 Term provided in Sections 1.3 and 3.1. The right of renewal herein granted to Tenant shall be
450 subject to, and shall be exercised in accordance with, the following terms and conditions:

(a)     Tenant shall exercise its right of renewal with respect to the Renewal Term by giving Landlord written notice (the "Renewal Option Notice") not later than eighteen (18) months prior to the Expiration Date.  Within ten (10) Business Days after receipt of such notice, Landlord shall provide Tenant with Landlord's determination of the annual base rent, escalation factor and additional rent for the Renewal Term and the parties shall then have thirty (30) days after Tenant's receipt of such notice (the "Negotiation Period") in which to agree on the annual base rent, escalation factor and additional rent which shall be payable during the Renewal Term.  The parties shall attempt in good faith to agree upon an annual base rent payable for the first year of the Renewal Term which would equal one hundred percent (100%) of the applicable fair market rent that will be effective on the date that is six (6) months prior to the commencement date of the Renewal Term taking into account all relevant factors, including, the Market Items (as defined below), provided, however, that concessions included within the term Market Items shall only be considered in determining the fair market rent to the extent such concessions are actually granted or not granted to Tenant in connection with the renewal transaction.  The term "Market Items" shall mean, if then applicable, rent abatements, brokerage commissions and construction allowances for standard and above-standard construction.  The "fair market rent" shall be rent that a willing tenant and willing landlord would pay in an arms-length lease transaction for comparable space in office buildings of comparable, size, age and quality in downtown Boston ("Comparable Buildings"), the rental rates then being quoted by Landlord in comparable renewal transactions to comparable tenants for comparable space in the Building and Comparable Buildings, and the rents being charged in comparable renewal transactions to comparable tenants for comparable space in Comparable Buildings, taking into account all relevant factors and Market Items.  If during the Negotiation Period the parties agree on such annual base rent, escalation factor and additional rent, then they shall promptly execute an amendment to this Lease stating the terms so agreed upon; provided however, the failure of Landlord or Tenant to so execute such amendment shall not affect the commencement of the Renewal Term or constitute or give rise to a default or Event of Default hereunder.  If during the Negotiation Period the parties are unable, for any reason whatsoever, to agree on such annual base rent, escalation factor and additional rent payable, then at any time during the five (5) day period commencing on the first day after the Negotiation Period and ending on the fifth day after the Negotiation Period (the "Revocation Period"), Tenant shall have the right to revoke its election to exercise its right with respect to the Renewal Term by providing Landlord with written notice of such revocation (the "Revocation Letter").  In the event Tenant timely provides the Revocation Letter to Landlord pursuant to the immediately preceding sentence, then Tenant's right of renewal shall lapse and be of no further force or effect.  In the event Tenant does not timely provide the Revocation Letter to Landlord, then Tenant's Renewal Term election shall continue to be effective and the parties shall each appoint a real estate broker who shall be licensed in Massachusetts and who specializes in the field of commercial office space leasing in the downtown Boston market, has at least ten (10) years of experience and is recognized within the field as being reputable and ethical.  To qualify as a broker under this provision, a broker may not have been engaged in connection with this Lease, be an affiliate of Landlord or Tenant, an employee of Landlord or Tenant, or an employee of any affiliate of Landlord or Tenant, or have represented either Landlord or Tenant in the prior five (5) years.  Such two individuals shall each determine, within ten (10) days after their appointment, such annual base rent, escalation factor and additional rent (to be not less than the minimums specified in this Section).  If such individuals do not agree on such items, then the two

11

individuals shall, within five (5) days, render separate written reports of their determinations and together appoint a third similarly qualified individual.  The third individual shall, within ten (10) days after his or her appointment, select either Landlord's broker's determination or Tenant's broker's determination (this being the third broker's sole function) as being closest to the applicable fair market annual base rent, escalation factor and additional rent and shall notify the parties of such selection.  If either party fails to timely deliver its determination to such third individual, then the other party's determination of the annual base rent, escalation factor and additional rent shall be final and conclusive.  The third broker's decision shall be final and conclusive, and binding on Landlord and Tenant.  Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker.  Upon determination of the annual base rent, escalation factor and concessions payable pursuant to this Section, the parties shall promptly execute an amendment to this Lease stating the rent and additional terms so determined.  Notwithstanding anything herein to the contrary, the parties acknowledge and agree that annual base rent during any Lease Year during the Renewal Term shall not be less than the annual base rent due and payable for the then-current Premises immediately prior to the Expiration Date.

(b)    If any Renewal Option Notice is not given timely, then Landlord shall deliver a reminder notice to Tenant reminding Tenant that it failed to provide such Renewal Notice (the "Reminder Notice").  If Tenant does not elect to exercise the renewal option within thirty (30) days after receipt of such Reminder Notice, Tenant acknowledges and agrees that Tenant's right of renewal with respect to the Renewal Term shall lapse and be of no further force or effect.

(c)    If a monetary or material non-monetary Event of Default exists on the date Tenant sends the Renewal Option Notice or on the date the Renewal Term is to commence, then, at Landlord's election, the Renewal Term shall not commence and the Lease Term shall expire on the then Expiration Date; provided however, if Tenant cures such Event of Default prior to the date that Landlord exercises its right to terminate this Lease or dispossess Tenant from the Premises, Tenant shall again have the rights granted pursuant to this Section 3.5.

(d)    If on the date Tenant sends the Renewal Option Notice or on the date the Renewal Term is to commence, twenty-five percent (25%) or more of the square feet of rentable area of the Premises is being subleased or has been assigned other than to a Permitted Transferee or to a Permitted Tenant Party as permitted pursuant to Article 7, then Tenant's rights pursuant to this Section shall lapse and be of no further force or effect.

(e)    Tenant's right of renewal under this Section may be exercised only by Tenant and may not be exercised by or for the benefit of any other transferee, sublessee or assignee of Tenant other than a Permitted Transferee.

## ARTICLE IV
## BASE RENT

4.1    From and after the applicable Rent Commencement Date, subject to the 5-month free rent periods described in Sections 3.1(b) and 3.1(c) for certain portions of the Premises, Tenant shall pay the Base Rent with respect to the applicable portion of the Premises in equal

12

monthly installments in advance on the fifth day of each month during the applicable Lease Year, and Base Rent for the Remainder of the Premises from the Subsequent Rent Commencement Date through the Expiration Date at the then escalated Base Rent rate for the Majority of the Premises as indicated in the Schedule of Base Rent set forth in <u>Section 1.14</u> above.

4.2    If the applicable Rent Commencement Date is not the first day of a month, then the Base Rent due with respect to such partial first month shall be prorated on a per diem basis at the rate of one-thirtieth (1/30th) of the monthly installment of the Base Rent payable for the applicable Lease Year, and Tenant shall pay such prorated amount on the applicable Rent Commencement Date.

4.3    All sums payable by Tenant under this Lease shall be paid to Landlord or, if Landlord shall so direct in writing, to Landlord's agent or nominee, in legal tender of the United States, without setoff, deduction or demand, at the address Landlord shall designate in writing, or to such other party or such other address as Landlord may designate in writing in the future, or by wire transfer pursuant to wire instructions described in <u>Section 1.19</u> above.  Landlord's acceptance of rent after it shall have become due and payable shall not excuse a delay upon any subsequent occasion or constitute a waiver of any of Landlord's rights hereunder.  If any sum payable by Tenant under this Lease is paid by check which is returned due to insufficient funds, stop payment order, or otherwise, then:  (a) such event shall be treated as a failure to pay such sum when due; and (b) in addition to all other rights and remedies of Landlord hereunder, Landlord shall be entitled to impose a returned check charge of Fifty Dollars ($50.00) to cover Landlord's administrative expenses and overhead for processing.  All sums payable to Landlord pursuant to this Lease other than Base Rent (including but not limited to Tenant's Proportionate Share of Operating Charges and Real Estate Taxes, parking charges and charges for above standard or after hours services) may be referred to hereinafter as "<u>additional rent</u>".

<div align="center">ARTICLE V
OPERATING CHARGES AND REAL ESTATE TAXES</div>

5.1    For the purposes of this <u>Article V</u>, the term "Building" shall be deemed to include the site upon which the Building is constructed (which site is sometimes referred to herein as the "<u>Land</u>"), the roof of the Building and any physical extensions therefrom, any driveways, sidewalks, landscaping and parking facilities in the Building or on the Land, and all other areas, facilities, improvements and appurtenances relating to any of the foregoing.  If the Building is operated as part of a complex of buildings or in conjunction with other buildings or parcels of land, Landlord may prorate the common expenses and costs with respect to each such building or parcel of land in a fair and equitable manner between the various users of the complex or other buildings.

5.2    (a)    From and after the Initial Rent Commencement Date, subject to the 5-month free rent periods described in <u>Sections 3.1(b)</u> and <u>3.1(c)</u> for certain portions of the Premises, Tenant shall pay as additional rent the applicable Tenant's Proportionate Share of Operating Charges (as hereinafter defined) with respect to the Premises, for each calendar year falling entirely or partly within the Lease Term, as applicable.

<div align="center">13</div>

579          (b)   "Operating Charges" with respect to the Building shall mean, without
580 duplication, all commercially reasonable expenses, charges and fees incurred by or on behalf of
581 Landlord in connection with the management, operation, maintenance, servicing, insuring and
582 repairing of the Building, including, without limitation, the following:  (1) charges for
583 electricity, gas, water, HVAC, sewer and other utility costs, charges and fees (including,
584 without limitation, any tap fees and connection and switching fees) of every type and nature;
585 (2) premiums, deductibles (to the extent commercially reasonable and customary) and other
586 charges for insurance, including fire, casualty, liability, rent loss and such other insurance as
587 may from time to time be carried by Landlord with respect to the Building (which insurance
588 shall be comparable to the insurance carried by landlords of Comparable Buildings) and fees of
589 Landlord's insurance consultants or brokers in connection therewith; (3) management fees (in
590 an amount equal to the current market rates for management fees charged by landlords of
591 comparable first-class office buildings in the same geographical area of the Building, but in no
592 event more than three percent (3%) of the gross receipts of the Building (excluding any
593 percentage rent or profit sharing received from other occupants of the Building), and personnel
594 costs of the Building (including all fringe benefits, workers' compensation insurance premiums
595 and payroll taxes); (4) costs of service, access control and maintenance contracts relating to the
596 Building as a whole; (5) maintenance, repair and replacement expenses and supplies; (6) annual
597 amortization for capital expenditures made by Landlord that are reasonably anticipated to
598 reduce operating expenses based on the recommendation of Landlord's consultant and
599 implemented in accordance with the recommendations of such consultant) or to comply with
600 legal requirements that are first created, imposed or applicable after the Initial Lease
601 Commencement Date (provided that each such capital expenditure shall be amortized over the
602 useful life of the applicable capital improvement (in accordance with GAAP) and only that
603 portion attributable to a particular calendar year shall be included in Operating Charges for that
604 year); (7) charges for janitorial and cleaning services and supplies for the Common Areas;
605 (8) any business, professional or occupational license tax payable by Landlord with respect to
606 the Building and any association fees; (9) [intentionally deleted]; (10) sales, use and personal
607 property taxes payable in connection with tangible personal property and services purchased for
608 and used in connection with the Building; (11) reasonable third party accounting and audit fees
609 relating to the determination of Operating Charges (and tenants' proportionate shares thereof)
610 and the preparation of statements required by tenant leases; (12) expenses incurred in
611 connection with concierge services provided to the Building (if any); (13) the fair market rental
612 value of any management office located in the Building (of reasonable and customary size not
613 to exceed 5,000 square feet of rentable area used solely for the management of the Building);
614 (14) during any period in which Landlord operates the Amenity Spaces, all costs of operating,
615 maintaining, and repairing any fitness center, tenant lounge, building conference center (and, if
616 approved by Tenant, any cafeteria) that is offered for use to all tenants of the Building free of
617 separate or additional fee or charge (collectively, "Amenity Spaces") and replacing equipment
618 located therein; provided, in each case, (i) no such cost shall be capital in nature except as
619 permitted under subsection (6) hereinabove, (ii) the costs described in this subsection (14) shall
620 be offset by any revenues derived from the same, and (iii) Tenant's annual cost with respect to
621 Amenity Spaces shall not exceed Two Hundred Fifty Thousand and no/100 ($250,000) in the
622 aggregate (the "Amenity Space Cap"), which shall be prorated for any partial calendar year
623 (provided that Landlord and Tenant acknowledge and agree that Tenant shall not have the right
624 to use any amenities other than the Amenity Spaces that Landlord offers for use to all tenants of

625 the Building free of separate or additional charge at any time during the Lease Term (unless
626 Landlord and Tenant agree to increase the Amenity Space Cap or otherwise agree upon an
627 alternative structure or approach with respect to Tenant's use of such other amenities);
628 (15) special assessments, fees, penalties and other charges and costs for transit, transit
629 encouragement traffic reduction programs, or any similar purpose; (16) during any period in
630 which Landlord operates the Parking Facility, the costs of ventilation, water, electricity,
631 security, and life safety and alarm and elevator services to the Parking Facility by means of
632 common Building systems servicing both the Building and the Parking Facility and the costs of
633 snow and ice removal from the ramps providing ingress and egress to the Parking Facility,
634 except to the extent such costs are expressly excluded as provided in <u>Section 5.2(c)</u> below; and
635 (17) any other expense incurred by Landlord in arm's-length transactions in maintaining,
636 repairing or operating the Building, provided, in each case, no such expense shall be capital in
637 nature except as permitted under <u>sub-section (6)</u> hereinabove.

638           (c)     Notwithstanding any provision contained in this Lease to the contrary,
639 Operating Charges shall not include: (a) Real Estate Taxes; (b) principal or interest payments
640 on any Mortgages (as defined in <u>Section 21.1</u>); (c) ground lease payments; (d) advertising and
641 promotional expenses relating to sales or leasing; (e) costs for which Landlord is entitled to be
642 reimbursed by Tenant, by other tenants, by insurance proceeds, warranties, service contracts or
643 from any other third party (other than tenants' regular contributions to Operating Charges);
644 (f) legal fees incurred for collecting rents; (g) costs of repairs, replacements or other work
645 occasioned by fire, windstorm, other casualty, and acts of terrorism, or the exercise by
646 governmental authorities of the right of eminent domain (except a commercially reasonable
647 deductible); (h) costs arising from the presence of Hazardous Materials in, about or below the
648 Land or the Building (including any Hazardous Materials brought to, deposited on or disposed
649 of at the Building by Landlord or Landlord's Agents or any other tenant or occupant of the
650 Building other than Tenant or Tenant's subtenants, guests, agents, visitors or invitees) (but
651 excluding those Hazardous Materials utilized in connection with the operation, maintenance and
652 repair of the Building in the ordinary course and those brought, deposited or disposed of by
653 Tenant, Tenant's Agents or any Permitted Tenant Party with respect to its use of space in the
654 Building); (i) the cost of any electrical service for the tenant portions of the Building; (j) any
655 expenses with respect to the operation, maintenance, management or repair of the Parking
656 Facility during any period of time in which Landlord is not operating the Parking Facility; (k)
657 any expenses with cost of capital expenditures (including depreciation/amortization thereof),
658 except to the extent expressly included pursuant to <u>Section 5.2(b)(6)</u> above; (l) salaries, benefits,
659 wages, fees, etc. for employees above the grade of general/senior property manager or for
660 officers, directors, members, partners or other principals of: (i) Landlord, (ii) its property
661 manager, or (iii) any direct or indirect constituent entity of Landlord, its property manager, or
662 any affiliate thereof; (m) deductions for income tax purposes attributable to depreciation of the
663 Building or any improvements on the Land or any Building equipment, other than amortization
664 of capital expenditures as expressly provided in <u>Section 5.2(b)(6)</u>; (n) the wages and benefits of
665 any employee who does not devote substantially all of his or her employed time to the Building
666 unless such wages and benefits are equitably allocated to the Building; (o) costs of expenses
667 (including fines, penalties and legal fees) incurred due to the violation (as compared to
668 compliance costs, which are included in Operating Charges) by Landlord, its Agents, any tenant
669 (other than Tenant) or other occupant of the Building, and/or any valid applicable Laws that

670 would not have been incurred but for such violation by Landlord, its Agents, tenant, or other
671 occupant, it being intended that each party shall be responsible for the costs resulting from its
672 violation of such leases and Laws; (p) any costs incurred by Landlord in connection with
673 performing compliance actions on the common or public areas of the Building or the Building
674 Structure if required under the ADA or other Laws; (q) leasing commissions, attorneys' fees,
675 marketing costs, disbursements and other expenses incurred by Landlord or its Agents in
676 connection with the actual or prospective sale or financing of any portion of the Building or for
677 the negotiation for leases with tenants, other occupants or prospective tenants or other occupants
678 of the Building, and similar costs incurred in connection with disputes with any prospective
679 purchasers or lenders or disputes and/or enforcement of any leases with tenants, other
680 occupants, or prospective tenants or other occupants of the Building; (r) tenant allowances,
681 tenant concessions, and other costs and expenses (including permit, license, oversight and
682 supervisory fees, inspection fees, and plan review costs) incurred in connection with Landlord
683 or any tenants' or occupants' completing, fixturing, furnishing, renovating or otherwise
684 improving, decorating or redecorating leased premises of the Building or vacant, leasable space
685 in the Building, including space planning/interior architecture fees and/or engineering for same
686 (including, without limitation, the Landlord's Review Costs (as defined in the Work
687 Agreement) and the Landlord's Supervisory Costs (as defined in the Work Agreement); (s) the
688 costs of special services and utilities that are or should be separately charged to particular
689 tenants of the Building; (t) any amounts paid to any person, firm, corporation or other entity
690 related to or otherwise affiliated with Landlord or any member, general partner, officer, director
691 or shareholder of Landlord or any of the foregoing to the extent such amount exceeds the
692 amount payable for such services at then-existing market rates to unrelated persons or entities;
693 (u) penalties for any late payment by Landlord, including, without limitation, taxes and
694 equipment leases; (v) costs or expenses for sculptures, paintings or other works of art including
695 costs incurred with respect to the purchase, ownership, leasing, showing, promotion, securing,
696 repair and/or maintenance of same, other than normal Building decorations customary in
697 Comparable Buildings; (w) interest or amortization of mortgages or any other funds borrowed
698 by Landlord; (x) [intentionally omitted]; (y) funding reserves; (z) costs directly and solely
699 related to the maintenance and operation of the entity that constitutes the Landlord, such as
700 accounting fees incurred solely for the purpose of reporting Landlord's financial condition; (aa)
701 any bad debt loss, rent loss, or reserved for bad debts or rent loss; (bb) political or charitable
702 contributions; (cc) all compensation paid to clerks, parking attendants or other persons in
703 commercial concerns, if any, operated by Landlord or any subsidiary or affiliate of Landlord;
704 (dd) costs in connection with services, items or other benefits of a type, quality or quantity
705 which are not available to Tenant without specific charges therefor, but which are provided to
706 another tenant or occupant of the Building, whether or not such other tenant or occupant is
707 specifically charged therefor by Landlord; (ee) all costs and expenses (including costs of any
708 judgment, settlement or arbitration award) resulting from the tortious conduct or willful
709 misconduct of Landlord, its employees, agents, contractors, subcontractors or assigns or any
710 tenant or other occupants of the Building; (ff) any costs incurred in installing, operating,
711 maintaining or owning any private luncheon or other restaurant or club that is not operated as an
712 Amenity Space (and, if operated as Amenity Space, then only to the extent expressly included
713 as set forth in Section 5.2(b)(14) above); (gg) the costs of insuring any tenant improvements of
714 any tenants in the Building; (hh) all costs associated with any off site offices of Landlord; (ii)
715 cleaning or janitorial costs or expenses with respect to the Premises or any other rentable

16

716    portion of the Building; (jj) any costs or expenses incurred in connection with services or other
717    benefits (A) of a type not available to Tenant (or available to Tenant at separate or additional
718    charge) but that are available to another tenant or occupant of the Building at no charge, or (B)
719    available to other tenants or occupants of the Building at a level greater than that available to
720    Tenant without separate or additional charge, in which case such expenses shall be excluded
721    from Operating Charges to the extent such expenses exceed the amount which would have been
722    incurred to provide such services or other benefits to such other tenant or occupant at the same
723    level as such services or other benefits are available to Tenant; (kk) costs of cleaning any tenant
724    spaces (including the Premises) in the event Tenant provides for its own cleaning of the
725    Premises; (ll) cost of installing, operating and maintaining (and the rentable value thereof) any
726    specialty facility, such as an observatory, lodging, broadcasting facilities, luncheon club,
727    athletic or recreational club, child care facility, auditorium, cafeteria or dining facility,
728    conference center or similar facilities not available to Tenant or for which Tenant must pay a
729    separate fee or charge, including any commercial concessions operated by Landlord, its
730    subsidiaries or Affiliates, including taxes and compensation paid to attendants or other persons;
731    (mm) all costs incurred with respect to a sale or transfer of all or any portion of the Building or
732    any direct or indirect interest therein (including interests in Landlord); (nn) general corporate
733    overhead and administrative expenses incurred by Landlord; (oo) costs relating to withdrawal
734    liability or unfunded pension liability under the Multi-Employer Pension Plan Act or similar
735    Law; (pp) any costs in connection with an expansion of the rentable areas of the Building or the
736    acquisition by Landlord of easements, or additional land, air or development rights (except as
737    required by Law); (qq) cost of providing overtime heat, ventilation and air conditioning
738    furnished to the Premises or any other leasable space in the Building; (rr) all costs and expenses
739    incurred in connection with or arising out of the Building Renovation Work; (ss) all costs of
740    repairing, replacing or otherwise correcting any latent defects in the Base Building Conditions
741    and/or the Building Renovation Work; and (tt) all costs relating or attributable to retail space, if
742    any, in the Building.

743            (d)    If the average occupancy rate for the Building during any calendar year is
744    less than one hundred percent (100%), or if any tenant is separately paying for (or does not
745    require) electricity, janitorial or other utilities or services furnished to its premises, then
746    Landlord shall include in Operating Charges for such year all additional expenses, as reasonably
747    estimated by Landlord, which would have been incurred during such year if such average
748    occupancy rate had been one hundred percent (100%) and if Landlord paid for such utilities or
749    services furnished to such premises.  The extrapolation of Operating Charges under this
750    paragraph shall be performed by appropriately adjusting the cost of those components of
751    Operating Charges that are impacted by changes in the occupancy of the Building.

752            (e)    Tenant shall make estimated monthly payments to Landlord on account of
753    Tenant's Proportionate Share of Operating Charges that are expected to be incurred during each
754    calendar year (or portion thereof) with respect to the Premises.  At least thirty (30) days before
755    the beginning of the second (2nd) Lease Year, and at least thirty (30) days before each calendar
756    year thereafter, Landlord shall submit a reasonably detailed written statement setting forth
757    Landlord's reasonable estimate of such Operating Charges and Tenant's Proportionate Share
758    thereof.  Tenant shall pay to Landlord on the fifth day of each month following receipt of such
759    statement, until Tenant's receipt of the succeeding annual statement, an amount equal to
760    one-twelfth (1/12) of each such share (estimated on an annual basis without proration pursuant

17

761      to <u>Section 5.3</u>).  Not more than once during any calendar year, Landlord may revise Landlord's
762      estimate and adjust Tenant's monthly payments to reflect Landlord's revised estimate.  Within
763      approximately one hundred twenty (120) days after the end of each calendar year, Landlord
764      shall submit a reasonably detailed written statement (an "<u>Operating Charges Reconciliation</u>
765      <u>Statement</u>") showing (1) Tenant's Proportionate Share of Operating Charges incurred during the
766      preceding calendar year and (2) the aggregate amount of Tenant's estimated payments made on
767      account of Operating Charges during such year with respect to the Building.  If an Operating
768      Charges Reconciliation Statement indicates that the aggregate amount of such estimated
769      payments exceeds Tenant's actual liability, then Landlord shall credit the net overpayment
770      toward Tenant's next estimated payment(s) pursuant to this Section and against the next
771      installment(s) of Base Rent due under this Lease, or, if the Lease Term has expired or will
772      expire before such credit can be fully applied, or if Tenant is not otherwise liable to Landlord
773      for further payment of Operating Charges, Landlord shall reimburse Tenant for the amount of
774      such overpayment within thirty (30) days after the delivery of such Operating Charges
775      Reconciliation Statement.  If an Operating Charges Reconciliation Statement indicates that
776      Tenant's actual liability exceeds the aggregate amount of such estimated payments, then Tenant
777      shall pay the amount of such excess as additional rent within thirty (30) days after delivery of
778      such Operating Charges Reconciliation Statement.

779          5.3     (a)      From and after the Initial Rent Commencement Date, subject to the 5-
780      month free rent periods described in <u>Sections 3.1(b)</u> and <u>3.1(c)</u> for certain portions of the
781      Premises, Tenant shall pay as additional rent Tenant's Proportionate Share of Real Estate Taxes
782      with respect to the Building for each calendar year falling entirely or partly with in the Lease
783      Term.  With respect to the Premises, Tenant's Proportionate Share with respect to Real Estate
784      Taxes set forth in <u>Article I</u> has been calculated to be that percentage which is equal to a fraction,
785      the numerator of which is the number of square feet of rentable area in the Premises as set forth
786      in <u>Section 1.2</u>, and the denominator of which is the number of square feet of total rentable area in
787      the Building.

788          (b)     "<u>Real Estate Taxes</u>" shall mean (1) all real estate taxes, vault and/or public
789      space rentals, rates and assessments (including general and special assessments, if any),
790      ordinary and extraordinary, foreseen and unforeseen, which are assessed against the Building or
791      the Land, or Landlord's personal property used in connection therewith, (2) any other present or
792      future taxes or charges that are imposed upon Landlord or assessed against the Building which
793      are in the nature of or in substitution for real estate taxes, including any tax levied on or
794      measured by the gross rents payable by tenants of the Building, any public safety fee or similar
795      charge, any transit, sales, rental, use, receipts or occupancy tax or fee, and any assessment
796      imposed in connection with business improvement or similar districts, and (3) reasonable actual
797      out of pocket expenses (including, without limitation, reasonable attorneys' and consultants'
798      fees and court costs) incurred in reviewing, protesting or seeking a reduction or abatement of, or
799      defending or otherwise participating in any challenge to, real estate taxes, whether or not such
800      protest or reduction is ultimately successful.  Landlord shall bring or cause to be brought an
801      application or proceeding for reduction of the assessed valuation of the Building for each year
802      unless Landlord has failed to do so based upon advice from professional and reputable tax
803      certiorari consultants or counsel that such an application or proceeding would be inadvisable.
804      Landlord shall pursue such reduction in a commercially reasonable manner.  In no event shall
805      Landlord seek to adjust the Real Estate Taxes in any year by consenting to higher Real Estate

806    Taxes in one year for the benefit of lower Real Estate Taxes in any other year or for the benefit
807    of lower Real Estate Taxes on another property owned by Landlord or an Affiliate of Landlord.

808          (c)    Subject to the foregoing, Real Estate Taxes shall not include any excess
809    profits, inheritance, estate, gift, franchise, corporation, net income or net profits, capital stock,
810    mortgage recording or transfer taxes assessed against Landlord from the operation of the
811    Building, federal and state income taxes, and other taxes to the extent applicable to Landlord's
812    general or net income (as opposed to rents, receipts or income attributable to operations at the
813    Building).  Real Estate Taxes shall not include any items included as Operating Charges or
814    interest charges or penalties incurred as a result of Landlord's failure to timely pay Real Estate
815    Taxes; provided, however, that if the taxing authority permits a taxpayer to elect to pay in
816    installments, then, for purposes of determining the amount of Real Estate Taxes, Landlord shall
817    be deemed to have paid such Real Estate Taxes in the maximum number of permitted
818    installments and all interest charges resulting therefrom shall be deemed Real Estate Taxes.
819    Real Estate Taxes shall not include any items included as Operating Charges; any amounts that
820    are attributable to (i) capital improvements made to the Building which Tenant does not receive
821    any benefit from to the extent such capital improvements are the subject of a separate tax bill or
822    are clearly identifiable as the cause of a supplemental assessment; (ii) any sale, reapportionment
823    of proprietary interest, or any other change in the ownership of the Building (other than a tax
824    reassessment of Real Estate Taxes for the entire Building that results from a change in
825    ownership of the Building); (iii) any taxes or fees levied, assessed or imposed on any other
826    tenant's use or occupancy in the Building or its operations, equipment, fixtures, furnishings,
827    inventory or personal property or resulting from another tenant's alterations or alterations on
828    behalf of such tenant in excess of those commonly found in offices in the metropolitan Boston
829    area; or (iv) any other tax, assessment, charge or levy imposed on the rent reserved under this
830    Lease (except to the extent the foregoing are in the nature of or in substitution for Real Estate
831    Taxes).

832          (d)    Landlord reserves the right to subdivide or otherwise impose an alternative
833    Real Estate Tax parcel structure with respect to the Building provided same is equitable and
834    reasonable and otherwise consistent with Comparable Buildings, and, in such event, Tenant's
835    Proportionate Share of Real Estate Taxes with respect to the Building shall be adjusted based
836    upon a fraction, the numerator of which is the number of rentable square feet of the Premises
837    then leased by Tenant and the denominator of which is the total rentable square feet in the
838    applicable tax parcel.

839          (e)    Tenant shall make estimated monthly payments to Landlord on account of
840    Tenant's Proportionate Share of Real Estate Taxes that are expected to be incurred during each
841    calendar year with respect to the Building.  At the beginning of the second (2nd) Lease Year,
842    and at the beginning of each calendar year thereafter, Landlord shall submit a reasonably
843    detailed written statement setting forth Landlord's reasonable estimate of such amount and
844    Tenant's Proportionate Share thereof.  Tenant shall pay to Landlord on the fifth day of each
845    month following receipt of such statement, until Tenant's receipt of the succeeding annual
846    statement, an amount equal to one-twelfth (1/12) of such share (estimated on an annual basis
847    without proration pursuant to Section 5.3).  Not more than once during any calendar year,
848    Landlord may revise Landlord's estimate and adjust Tenant's monthly payments to reflect
849    Landlord's revised estimate.  Within approximately one hundred twenty (120) days after the end

850   of each calendar year (or as soon thereafter as is feasible taking into account the delivery of
851   statements and invoices by the applicable taxing authority), Landlord shall submit a reasonable
852   detailed written statement (a "Real Estate Taxes Reconciliation Statement") showing
853   (1) Tenant's Proportionate Share of Real Estate Taxes incurred during the preceding calendar
854   year and (2) the aggregate amount of Tenant's estimated payments made on account of Real
855   Estate Taxes with respect to the Building during such year.  If a Real Estate Taxes
856   Reconciliation Statement indicates that the aggregate amount of such estimated payments
857   exceeds Tenant's actual liability, then Landlord shall credit the net overpayment toward
858   Tenant's next estimated payment(s) pursuant to this Section and against the next installment(s)
859   of Base Rent due under this Lease, or, if the Lease Term hereof has expired or will expire
860   before such credit can be fully applied, or if Tenant is not otherwise liable for further payment
861   of Real Estate Taxes, Landlord shall reimburse Tenant for the amount of such overpayment
862   within thirty (30) days after delivery of such Real Estate Taxes Reconciliation Statement.  If a
863   Real Estate Taxes Reconciliation Statement indicates that Tenant's actual liability exceeds the
864   aggregate amount of such estimated payments, then Tenant shall pay the amount of such excess
865   as additional rent within thirty (30) days after delivery of such Real Estate Taxes Reconciliation
866   Statement.

867        5.4    If Tenant's obligations under this Article V commence or expire on a day other
868   than the first day or the last day of a calendar year, respectively, then Tenant's liabilities pursuant
869   to this Article for such calendar year shall be apportioned by multiplying the respective amount
870   of Tenant's Proportionate Share thereof for the full calendar year by a fraction, the numerator of
871   which is the number of days during such calendar year falling within the Lease Term, and the
872   denominator of which is three hundred sixty-five (365).

873        5.5    Provided that Tenant has timely paid the undisputed amounts set forth in the
874   applicable Reconciliation Statement, Tenant (through its regular, full-time employees who are
875   reasonably qualified to do so including a requirement that such employees be certified public
876   accountants), or an independent, nationally recognized certified public accountant or real estate
877   services firm (on behalf of Tenant) who is hired by Tenant on a non-contingent fee basis and
878   offers a full range of accounting or real estate audit services (including the employment of
879   certified public accountants) shall have the right, during regular Building Hours, at the
880   management office for the Building, and after giving at least fifteen (15) days' advance written
881   notice to Landlord, to commence to have Landlord's books and records related to Operating
882   Charges and Real Estate Taxes for the immediately preceding calendar year reviewed (and if so
883   commenced, to expeditiously and diligently pursue such review to completion), provided that
884   such review shall be concluded not later than two hundred seventy (270) days following the date
885   that Landlord's books and records are made available to Tenant or its representative.  If Landlord
886   disagrees with the results of Tenant's review and cannot otherwise agree, then Landlord and
887   Tenant's auditor shall together select a neutral auditor of similar qualifications to conduct a
888   review of such books and records (the fees of such neutral auditor to be shared equally by
889   Landlord and Tenant), and the determination of Operating Charges and Real Estate Taxes
890   reached by such neutral auditor shall be final and conclusive.  If the amounts paid by Tenant to
891   Landlord on account of Operating Charges and Real Estate Taxes (a) exceed the amounts to
892   which Landlord is entitled hereunder, then Landlord shall, upon final determination, credit the
893   amount of such excess toward the next monthly payment(s) of rent due hereunder, or (b) are less
894   than the amounts to which Landlord is entitled hereunder, then Tenant shall pay such deficiency

20

895    as additional rent.  All costs and expenses of any such review shall be paid by Tenant; provided,
896    however, that if the amount of Operating Charges and Real Estate Taxes used in such statement
897    to calculate Tenant's Proportionate Share of Operating Charges and Real Estate Taxes was
898    overstated by Landlord by more than four percent (4%), Landlord shall reimburse Tenant for the
899    commercially reasonable, out-of-pocket costs and expenses paid by Tenant in connection with
900    Tenant's review (not to exceed $40,000 in total), and Tenant shall have the right to review
901    Landlord's books and records with respect to the specific line items so overstated for the
902    immediately preceding three (3) calendar years).  Any and all information obtained through any
903    review (including, without limitation, any matters pertaining to Landlord, its managing agent or
904    the Building), and any compromise, settlement or adjustment that may be proposed or reached
905    between Landlord and Tenant, shall be held in strict confidence, and neither Tenant nor any of
906    Tenant's Agents shall disclose any such information to any person or entity other than a
907    Permitted Recipient on a need-to-know basis.  A "Permitted Recipient" shall be the officers,
908    partners and employees of Tenant who are involved in lease administration, Tenant's certified
909    public accountants or real estate services firm who have responsibilities related to Operating
910    Charges, Tenant's attorneys and consultants if involved in the dispute, any employees of
911    Tenant's auditor involved with the review, or any person or entity to whom disclosure is required
912    by applicable judicial or governmental authority.  Prior to disclosing any such information to any
913    Permitted Recipient (including its auditor), Tenant shall instruct such Permitted Recipient to
914    abide by this confidentiality provision.

915        5.6    Notwithstanding anything to the contrary contained herein, if Landlord has not
916    rendered an Operating Charges Reconciliation Statement or a Real Estate Taxes Reconciliation
917    Statement for any calendar year prior to the date that is thirty (36) months after the end of such
918    calendar year (or the end of the applicable tax year, as applicable), then Landlord shall be
919    deemed to have waived its right to claim or receive any additional Operating Charges or Real
920    Estate Taxes for such calendar year (or tax year, as applicable), and (i) Landlord shall no longer
921    have the right to deliver an Operating Charges Reconciliation Statement or Real Estate Taxes
922    Reconciliation Statement, as the case may be, for such calendar year (or tax year, as applicable)
923    for the purpose of collecting a deficiency for such year, (ii) Landlord still shall be obligated to
924    deliver an Operating Charges Reconciliation Statement or a Real Estate Taxes Reconciliation
925    Statement, as the case may be, for such calendar year (or tax year, as applicable), and (iii)
926    Landlord, within thirty (30) days from delivery of such Operating Charges Reconciliation
927    Statement or Real Estate Taxes Reconciliation Statement, as the case may be, shall refund to
928    Tenant the amount of any overpayment by Tenant, together with interest on such overpayment at
929    the Default Rate from the date that is one hundred fifty (150) days following the end of the
930    applicable calendar year (or the end of the applicable tax year, as applicable) to the date the same
931    is refunded to Tenant.

932        5.7    Landlord shall cooperate reasonably with Tenant in connection with Tenant's
933    making arrangements to participate in any tax incentive programs provided at any time and from
934    time to time by any taxing authority. Landlord shall cooperate reasonably with Tenant in
935    arranging Tenant's participation in any such incentive programs in a manner that allows Tenant
936    to realize the benefit thereof.

937                                    ARTICLE VI
938                                  USE OF PREMISES

                                        21

939        6.1    (a)    Tenant shall use and occupy the Premises solely for executive and general
940 (non-medical and non-governmental, provided however, Members who are medical and
941 governmental users may use same for the Permitted Use) office purposes compatible with first
942 class office buildings in downtown Boston, including the uses that are consistent with, ancillary
943 to, or that compliment any of Tenant's businesses, operations and/or services as conducted by
944 Tenant or its Affiliates from time to time in other first-class office buildings in major
945 metropolitan markets, including general, administrative and executive offices (and uses ancillary
946 thereto), flexible workplace center use, event space, other office related uses ancillary to
947 Tenant's operations and services as the same may develop or expand over time, including, but
948 not limited to, training centers, data centers (provided that data center use shall not exceed 5,000
949 rentable square feet in size), conference centers, kitchens, storage, office pantries, recreational
950 areas, restaurants (excluding full-service restaurants), health clubs, spas or other amenities,
951 community facilities or Common Areas intended to serve the occupants and users of a facility
952 described in the preceding sentence including the ancillary service or sale of food, beer, wine and
953 liquor for consumption by Members, Tenant, members "at large" (i.e., licensees of Tenant's or
954 Tenant's Affiliates' services but not affiliated with one particular location), and the employees,
955 invitees and guests of each of the foregoing) (collectively, the "<u>Permitted Use</u>"), and for no other
956 use or purpose. For purposes hereof, the term "flexible workplace center" means, among other
957 things, the operation of a business whose primary purposes shall be providing office suites and
958 shared office workplaces to Members and those third-parties servicing such Members for terms
959 determined by Tenant and which may offer certain office services incidental to the primary
960 office uses (including, without limitation, conference and meeting facilities and services,
961 administrative support, word processing, secretarial support, reception areas, teleconferencing
962 capabilities, high-speed broadband connectivity, furniture and office equipment usage, lounge
963 areas, break-out rooms, recreational areas, and traveling and concierge services), cafe or pantry
964 facilities (which may be operated by Tenant, an Affiliate of Tenant or an operator retained by
965 Tenant and approved by Landlord, such approval not to be unreasonably withheld, conditioned
966 or delayed, and which may sell and/or serve food items, coffee, beverages, beer, wine and liquor
967 solely for consumption by Members, Tenant, members "at large" (i.e., licensees of Tenant's or
968 Tenant's Affiliates' services but not affiliated with one particular location), and the employees,
969 invitees and guests of each of the foregoing), printing services, mail and package services, pop-
970 up retail and service stores, child care facilities (subject to applicable licensing requirements) and
971 any other services which Tenant (or its Affiliates) may then be providing to users of its other
972 shared working environments (including, without limitation, flexible workplace centers,
973 executive/shared office suites, an incubator type office/facility and/or virtual office space).
974 Tenant shall not use or occupy the Premises for any unlawful purpose, or in any manner that will
975 violate the certificate of occupancy for the Premises or the Building or that will constitute waste,
976 nuisance or unreasonable annoyance to Landlord or any other tenant or user of the Building, or
977 in any manner that will increase the number of parking spaces required for the Building or its full
978 occupancy as required by applicable Law (defined below). Landlord represents and warrants to
979 Tenant that, to Landlord's actual knowledge without investigation as of the Execution Date, use
980 of the Premises for the Permitted Use expressly listed above are permitted by all applicable
981 Laws, and to Landlord's actual knowledge without investigation as of the Execution Date, that
982 Tenant's Permitted Use of the Premises will not violate any leases, restrictions, easements,
983 covenants or encumbrances imposed upon the Land, Building or Premises by deed or otherwise.
984 The foregoing representations and warranties of Landlord shall survive Tenant's acceptance of

EAST\162676362.12

985  the Premises.  Landlord acknowledges that the mere use of the Premises as a flexible workplace
986  center as typically operated as of the date hereof under the trade name "WeWork" (without
987  taking into account the nature and identity of any Member or the business conducted by any
988  Member), does not, in and of itself, lower the character of the Building, injure the reputation of
989  the Building, impair the value of the Building, constitute a public nuisance, increase Landlord's
990  insurance cost, invalidate any insurance of Landlord or result in increased premiums under same.

991           (b)      Except to the extent the same are part of Landlord's obligations under this
992  Lease, Tenant shall comply with all present and future laws (including, without limitation, the
993  ADA and Environmental Laws (hereinafter defined) and the regulations promulgated thereunder,
994  as the same may be amended from time to time), ordinances (including without limitation,
995  zoning ordinances and land use requirements), regulations, orders and recommendations
996  (including, without limitation, those made by any public or private agency having authority over
997  insurance rates), requirements, statutes, codes, by-laws and court decisions of the jurisdiction in
998  which the Building is located or the federal government (collectively, "Laws") concerning the
999  use, occupancy and condition of the Premises and all machinery, equipment, furnishings, fixtures
1000 and improvements (including the suite entry doors) therein, all of which shall be complied with
1001 in a timely manner at Tenant's sole expense. Landlord represents and warrants to Tenant that on
1002 each applicable Lease Commencement Date the Land, Building and Premises shall comply in all
1003 material respects with all applicable Laws.   Notwithstanding the foregoing, but subject to
1004 Section 6.3, Landlord at its expense (subject to reimbursement pursuant to Article V, if and to
1005 the extent permitted thereby) shall comply with Laws (including, without limitation, the ADA,
1006 building and fire codes, and Environmental Laws) to the extent the same apply directly to the
1007 Building Structure or Building Systems and Common Areas of the Building as a whole (or
1008 Premises to the extent such non-compliance existed as of the applicable Lease Commencement
1009 Date, if not Tenant's responsibility pursuant to this Section 6.1(b), or if compliance is required
1010 due to the mere use of the Premises for general or executive office use); provided, however, that
1011 to the extent any non-compliance is a result of the particular use or occupancy of the Premises
1012 (as opposed to office use generally) then such compliance shall be at Tenant's cost.
1013 Notwithstanding the foregoing, Tenant may contest, by appropriate proceedings prosecuted
1014 diligently and in good faith, the legality or applicability of any Law with which Tenant is
1015 required to comply hereunder, provided that, during the pendency of any such proceedings or
1016 contest, Tenant complies with applicable Laws, and for so long as, Tenant's aforesaid contest or
1017 Tenant's failure to comply with any such Law (i) does not subject Landlord or any of Landlord's
1018 Affiliates, shareholders, partners, directors, officers, employees, agents and representatives
1019 ("Landlord's Representatives") to imprisonment, prosecution for a crime, monetary damages or
1020 materially increased costs of operation (unless Tenant assumes responsibility for payment of the
1021 same), (ii) does not subject any portion of the Building to condemnation or other similar taking
1022 in lieu thereof, and (iii) does not subject any portion of the Building to suspension or cancellation
1023 of the Certificate of Occupancy, any insurance policy, or any increase in the costs of such
1024 insurance (including deductibles).  Tenant shall give Landlord prior written notice of Tenant's
1025 contesting compliance with any Law as contemplated by this Section 6.1(b).  Tenant shall keep
1026 Landlord regularly advised as to the status of any such contest and shall indemnify and hold
1027 harmless Landlord and any other tenant or occupant of the Building from any liability, cost, loss,
1028 expense or legal action incurred, instituted or threatened against such parties to the extent
1029 resulting from Tenant's failure to comply with any such Law.  If any such Law with which

23

1030 Tenant must comply requires an occupancy or use permit or license for the Premises or requires
1031 Tenant or its employees to obtain licenses or permits to conduct business in the Premises, then
1032 Tenant shall obtain (prior to the date required under applicable Law) and keep current such
1033 permit(s) or license(s) at Tenant's expense and shall promptly deliver a copy thereof to Landlord.
1034 Landlord shall reasonably cooperate with Tenant, at no expense to Landlord, to obtain any such
1035 approvals, licenses and permits. Tenant shall at all times comply with, and cause the compliance
1036 with, the terms and conditions of each of such approvals, licenses and permits.  It is expressly
1037 understood that if any change in the use of the Premises by Tenant, or any Alterations to the
1038 Premises by Tenant, or any future Law requires a new or additional permit from, or approval by,
1039 any governmental agency having jurisdiction over the Building, such permit or approval shall be
1040 obtained by Tenant on its own behalf and at its sole expense.  Without limiting the generality of
1041 the foregoing, Tenant, at its expense, shall install and maintain fire protection devices as may be
1042 required with respect to Tenant's particular use of the Premises (as opposed to office use
1043 generally) from time to time by any agency having jurisdiction thereof and/or the underwriters
1044 insuring the Building. Use of the Premises is subject to all covenants, conditions and restrictions
1045 of record as of the Execution Date; provided however, Landlord hereby represents, warrants and
1046 covenants to Tenant that there are no declarations, leases, occupancy agreements or other
1047 agreements affecting the Building that contain any restrictive covenants that may adversely
1048 affect Tenant's use of the Premises for the Permitted Use, and Landlord hereby covenants that
1049 any future covenants, conditions and restrictions of record entered into by Landlord with respect
1050 to the Building will not increase Tenant's obligations, or decrease Tenant's rights, under this
1051 Lease to more than a *de minimis* extent.  Tenant shall not use any space in the Building or the
1052 Land for the sale of goods to the public at large off the street (as opposed to internet or online
1053 sales).  Landlord shall not modify the certificate of occupancy for the Building in any manner
1054 that would result in the prohibition of office use or flexible workplace center use as is currently
1055 permitted or which would adversely affect the permissible occupancy or density of the Premises.
1056 Tenant has the right to amend the certificate of occupancy with respect to the floors it is leasing
1057 pursuant to this Lease, including to increase the density permitted within the Premises, and
1058 Landlord shall reasonably cooperate with Tenant to obtain any such amendment at no cost to
1059 Landlord.

1060

1061        6.2     Tenant shall pay before delinquency any business, rent or other taxes or fees that
1062 are now or hereafter levied, assessed or imposed upon Tenant's use or occupancy of the
1063 Premises, the conduct of Tenant's business at the Premises, Tenant's equipment, fixtures,
1064 furnishings, inventory or personal property or resulting from or attributable to any Alterations by
1065 or for the account of Tenant to the extent assessed at a valuation in excess of those commonly
1066 found in offices in the metropolitan Boston area.  If any such tax or fee is enacted or altered so
1067 that such tax or fee is levied against Landlord or so that Landlord is responsible for collection or
1068 payment thereof, then Tenant shall pay as additional rent the amount of such tax or fee.

1069        6.3     Hazardous Materials.

1070               (a)     Tenant shall not allow, cause or permit any Hazardous Materials to be
1071 generated, used, treated, released, stored or disposed of in or about the Building or the Land by
1072 Tenant, any Agent of Tenant or any Permitted Tenant Party, provided that Tenant may use and
1073 store normal and reasonable quantities of standard cleaning and office materials in the Premises
1074 as may be reasonably necessary for Tenant to conduct the Permitted Use in the Premises so long

24

as such materials are properly, safely and lawfully stored and used by Tenant and the quantity of same does not equal or exceed a "reportable quantity" as defined in 40 C.F.R. 302 and 305, as amended.  At the expiration or earlier termination of this Lease, with respect to conditions existing on account of Tenant's use or occupancy of the Premises or any action of Tenant, any Agent of Tenant or any Permitted Tenant Party (it being understood that this Section shall not impose upon Tenant any obligation to remove Hazardous Materials existing in any portions of the Premises as of the applicable Lease Commencement Date which were introduced into the Premises by anyone other than Tenant, any Agent of Tenant or any Permitted Tenant Party, unless such condition is knowingly aggravated as a result of Tenant's use or occupancy of the Premises), Tenant shall surrender the Premises to Landlord free of Hazardous Materials and in compliance with all Environmental Laws.  "Hazardous Materials" means (a) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Law or any other applicable Law as a "hazardous substance," "hazardous material," "hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or Toxicity Characteristic Leaching Procedure (TCLP) toxicity, (b) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (c) any petroleum product, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), medical waste, chlorofluorocarbon, lead or lead-based product, and any other substance whose presence could be detrimental to the Building or the Land or hazardous to health or the environment.  "Environmental Law" means any present and future Law and any amendments (whether common law, statute, rule, order, regulation or otherwise), permits and other requirements or guidelines of governmental authorities applicable to the Building or the Land and relating to the environment and environmental conditions or to any Hazardous Material (including, without limitation, CERCLA, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 1101 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., and any so-called "Super Fund" or "Super Lien" law, any Law requiring the filing of reports and notices relating to hazardous substances, environmental laws administered by the Environmental Protection Agency, and any similar state and local Laws, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder concerning the environment, industrial hygiene or public health or safety).  Tenant shall:  (i) give Landlord prompt written notice of any actual or threatened Environmental Default (as defined below) with respect to conditions existing on account of Tenant's use or occupancy of the Premises or any action or inaction of Tenant, any Agent of Tenant or any Permitted Tenant Party, which Environmental Default Tenant shall cure in accordance with all Environmental Laws and only after Tenant has obtained Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed; and (ii) promptly deliver to Landlord copies of any notices or other items received from or submitted to any governmental or quasi-governmental agency, or any claim instituted or

25

threatened by any third party, concerning the existence or potential existence of Hazardous Materials in the Premises.  Upon any Environmental Default, in addition to all other rights available to Landlord under this Lease, at law or in equity, Landlord shall have the right but not the obligation to enter the Premises, to supervise and approve any actions taken by Tenant to address the Environmental Default, and, if Tenant fails to address same in accordance with this Lease, if required by Law and after prior written notice to Tenant, to perform, with respect to conditions existing on account of Tenant's use or occupancy of the Premises or any action of Tenant, any Agent of Tenant or any Permitted Tenant Party, at Tenant's sole cost and expense, any lawful action necessary to address same.  "Environmental Default" means any of the following by Tenant, any Agent of Tenant or any Permitted Tenant Party that is not remedied within a reasonable period following the earlier of (i) Tenant's receipt of actual knowledge of the applicable condition or event, or (ii) Landlord's written notice to Tenant regarding such applicable condition or event: a violation of an Environmental Law; a release, spill or discharge of a Hazardous Material on or from the Premises, the Land or the Building in violation of an Environmental Law; an environmental condition requiring responsive action under applicable Environmental Laws; or an emergency environmental condition.  Landlord represents that it has not received any notice of violation of any Environmental Law which remains uncured, and that, to its knowledge, no Hazardous Substances (other than standard quantities of standard building cleaning, maintenance and repair materials or other de minimis amounts of same and other than substances of a type and in a quantity normally used in connection with construction, which substances shall be held, stored and used in compliance with all applicable Environmental Laws) are present in the Building.  Landlord shall indemnify and hold harmless Tenant of and from any and all actual out-of-pocket losses, costs, damages and liabilities, including remediation costs incurred or suffered by Tenant, or asserted by a third party against Tenant, directly or indirectly due to the presence or removal of, or failure to remove, Hazardous Substances generated, accumulated, stored or released in or about the Building, the Common Areas of the Building, the Land or the Premises except to the extent solely introduced by Tenant, an Agent of Tenant or a Permitted Tenant Party in violation of this Lease.

(b)     Landlord hereby agrees to promptly remediate or remove, or cause the removal or removal of, to the extent required by applicable Environmental Laws, any Hazardous Materials from the Premises except with respect to Hazardous Materials required to be removed by Tenant pursuant to this Lease.  Any such remediation by Landlord will be accomplished in such a manner so as to minimize any unreasonable interference with Tenant's use and occupancy of the Premises.  If and to the extent Tenant is delayed in completing Tenant's Work (as defined in Section 9.1 below) as a result of such remediation, the applicable Rent Commencement Date shall be postponed for the period of such delay.  If such remediation prohibits or interferes with Tenant's ability to conduct business from the Premises from and after the applicable Rent Commencement Date, Rent shall be equitably abated during the period of such interference with respect to that portion of the Premises interfered with.

6.4     Exclusive.

(a)     From and after the Execution Date and during the Lease Term, Landlord shall not directly or indirectly, (i) lease space to any other Competitor in the Building; (ii) contract with any Competitor by selling or leasing to or entering into any ground lease, lease, occupancy agreement, management contract or similar arrangement with any Competitor,  in

26

EAST\162676362.12

1165 each case, with respect to the Building; (iii) to the extent Landlord has approval rights with
1166 respect thereto, permit any Competitor to install signage, branding, advertising or other similar
1167 matters identifying, or otherwise related to, such Competitor on the interior or exterior of the
1168 Building; or (iv) engage in the Restricted Business in the Building (including operation thereof
1169 by an Affiliate of Landlord).  Landlord agrees that, during the Lease Term, Landlord shall
1170 include in all leases and occupancy agreements entered into by Landlord after the date hereof for
1171 any space in the Building the language set forth in Exhibit M attached hereto and made a part
1172 hereof (the "Tenant's Exclusive Language").    Notwithstanding anything to the contrary
1173 contained herein, Landlord may lease space to any other Competitor in the Building solely for
1174 corporate, administration and/or headquarter offices and not for the operation of the Restricted
1175 Business, provided that Landlord shall not permit or allow such Competitor or any affiliate of
1176 such Competitor to engage in the Restricted Business in the Building, or to install any signage,
1177 branding, advertising or other similar matters identifying, or otherwise related to, such
1178 Competitor on the interior or exterior of the Building (other than inclusion in the Building
1179 directory and suite entry signage).  Notwithstanding the foregoing, Landlord shall not be in
1180 breach of its obligations under this Section 6.4 on account of, and Tenant expressly understands
1181 that this Section 6.4 does not apply to, the use by existing tenants of their respective premises in
1182 the Building where such existing tenants' leases (as of the Execution Date) do not include an
1183 express prohibition or otherwise preclude the operation of the Restricted Business (it being
1184 acknowledged that this sentence shall continue to apply following any renewal of such a lease,
1185 expansion of the applicable premises under such a lease, or extension of the term of such a
1186 lease); provided, however, Landlord agrees that it shall not approve the assignment of any such
1187 existing lease or the sublease of space leased thereunder during the Lease Term to any party for
1188 the Restricted Business unless Landlord does not have the right to withhold such consent under
1189 such tenant's lease.

1190            (b)    Tenant acknowledges that (x) Landlord shall (i) include in all leases  for
1191 space in the Building entered into by Landlord after the date hereof and all consents to subleases
1192 for space in the Building entered into after the date hereof, to the extent Landlord has the right to
1193 do so, the Tenant's Exclusive Language, and (ii) use commercially reasonable efforts (including
1194 summary dispossess or eviction proceedings or seeking other injunctive relief) to enforce those
1195 restrictions under any such lease, license or sublease (collectively, "Landlord's Competition
1196 Requirements"), and (y) in no event shall Tenant be entitled to seek to cancel this Lease as a
1197 result of a breach of such restrictions provided Landlord complies with Landlord's Competition
1198 Requirements; provided that a prohibition set forth in this Section 6.4(b) shall not apply to any
1199 lease, license or sublease entered into prior to the date hereof with respect to which Landlord
1200 does not have a consent right or any other right pursuant to which Landlord can reasonably cause
1201 such tenant, licensee or subtenant to, comply with such prohibition.

1202            (c)    If Landlord fails to comply with Landlord's Competition Requirements
1203 due to the action or inaction of any third party, then Landlord shall use commercially reasonable
1204 efforts (including summary dispossess or eviction proceedings or seeking other injunctive relief)
1205 to enforce compliance with Landlord's Competition Requirements with respect to such third
1206 party.

1207            (d)    Landlord acknowledges that a breach of this Section 6.4 would give rise to
1208 irreparable harm to Tenant, for which monetary damages would not be an adequate remedy, and

27

1209 hereby agrees that in the event of a breach by Landlord of any such obligations, Tenant shall be
1210 entitled to equitable relief, including a temporary restraining order, an injunction, specific
1211 performance and any other relief that may be available from a court of competent jurisdiction
1212 (without any requirement to post bond).  Notwithstanding the foregoing, to the extent Tenant
1213 seeks monetary damages on account of a purported breach or violation of the provisions of this
1214 Section 6.4, Landlord and Tenant agree that such damages shall be limited to (and shall not be in
1215 addition to any abatement for) the aggregate amount of Base Rent and additional rent that was
1216 payable by Tenant during the period commencing on the first day of such breach or violation and
1217 ending on the date on which such violation ceases.

1218         (e)    Landlord acknowledges that the restrictions contained in this Section 6.4
1219 are reasonable and necessary to protect the legitimate interests of Tenant and constitute a
1220 material inducement to Tenant to enter into this Lease and consummate the transactions
1221 contemplated by this Lease. In the event that any covenant contained in this Section 6.4 should
1222 ever be adjudicated to exceed the time, geographic, product or service, or other limitations
1223 permitted by applicable Law in any jurisdiction, then any court is expressly empowered to
1224 reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the
1225 maximum time, geographic, product or service, or other limitations permitted by applicable Law.

1226         (f)    The right granted to Tenant pursuant to this Section 6.4 is personal to the
1227 Tenant named herein (and any Permitted Transferee), and shall not inure to the benefit of any
1228 assignee or subtenant (except for a Permitted Transferee).

1229         (g)    As used herein, "Competitor" means any person, business or enterprise to
1230 the extent operating a Restricted Business.  As used herein, "Restricted Business" means the
1231 operating, managing, leasing and/or licensing of a shared working environment (including,
1232 without limitation, a flexible workplace center, executive/shared office suites, an incubator-type
1233 office/facility, and or virtual office space) by third parties operated for profit (i.e., where such
1234 business provides its services for a fee, be it cash, shares or other equity in companies or other
1235 good and valuable consideration).    Tenants and other occupants in the Building whose
1236 employees and their business partners share desks or work in a shared working environment shall
1237 not be considered Competitors and shall not be considered to be operating a Restricted Business.
1238
1239                         ARTICLE VII
1240                 ASSIGNMENT AND SUBLETTING

1241         7.1    Except as otherwise provided in this Article VII, Tenant shall not (a) assign this
1242 Lease (whether by operation of law, transfers of interests in Tenant or otherwise); or
1243 (b) mortgage or encumber Tenant's interest in this Lease, in whole or in part; or (c) sublet, or
1244 permit the subletting of, the Premises or any part thereof; or (d) advertise or authorize a broker to
1245 advertise for a subtenant or assignee, without in each instance, obtaining the prior written
1246 consent of Landlord, which shall not be unreasonably withheld or delayed.  Notwithstanding the
1247 foregoing, Tenant may list the Premises (or a portion thereof) with a broker without obtaining the
1248 prior written consent of Landlord, provided that such listing does not quote a rental rate.  No
1249 assignment, subletting or other transaction contemplated in this Article VII shall release Tenant
1250 from its liability under this Lease or Guarantor from its liability under the Lease Guaranty, the

28

Good Guy Guaranty or any other guaranty delivered hereunder except to the extent expressly set forth in Section 7.3(b) below.

7.2    If Tenant's interest in this Lease shall be assigned in violation of the provisions of this Article VII, such assignment shall be invalid and of no force and effect against Landlord; provided, however, that Landlord may collect an amount equal to the then Base Rent plus any other item of additional rent from the assignee as a fee for its use and occupancy, and shall apply the net amount collected (after deducting therefrom Landlord's reasonable out of pocket costs to collect such sums to the extent permitted under this Lease) to the Base Rent and the items of additional rent reserved in this Lease.  If the Premises or any part thereof are sublet to, or occupied by, or used by, any person other than Tenant, whether or not in violation of this Article VII, Landlord, after an Event of Default by Tenant under this Lease, may collect any item of rent or other sums paid by the subtenant, user or occupant as a fee for its use and occupancy, and shall apply the net amount collected (after deducting therefrom Landlord's reasonable out of pocket costs to collect such sums to the extent permitted under this Lease) to the Base Rent and the items of additional rent reserved in this Lease.  No such assignment, subletting, occupancy, or use, whether with or without Landlord's prior consent, nor any such collection or application of rent or fee for use and occupancy, shall be deemed a waiver by Landlord of any term, covenant or condition of this Lease or the acceptance by Landlord of such assignee, subtenant, occupant or user as Tenant hereunder, nor shall the same, in any circumstances, relieve Tenant of any of its obligations under this Lease except as expressly set forth herein.  The consent by Landlord to any assignment, subletting, occupancy or use shall not constitute a consent to any other or further assignment, subletting, occupancy or use and shall not relieve Tenant from its obligation to obtain the express prior consent of Landlord to any further assignment, subletting, occupancy or use pursuant to the terms of this Article VII.  Any person to which this Lease is assigned with Landlord's consent shall be deemed automatically to have assumed all of the obligations arising under this Lease from and after the date of such assignment and shall execute and deliver to Landlord, upon demand, an instrument confirming such assumption.  Except as expressly set forth herein, notwithstanding and subsequent to any assignment, Tenant's primary liability hereunder shall continue notwithstanding (a) any subsequent amendment of this Lease, or (b) Landlord's forbearance in enforcing against Tenant any obligation or liability, without notice to Tenant, to each of which Tenant hereby consents in advance.  However, if any such amendment operates to increase the obligations of Tenant under this Lease (whether by extending the Term or otherwise), the liability under this Section 7.2 of any predecessor in interest to the then current Tenant shall continue to be no greater than if such amendment had not been made (unless such party shall have expressly consented in writing to such amendment or the assignee is an affiliate of such predecessor in interest).

7.3    (a)    For purposes of this Article VII (but subject in all respects to Section 7.3(b)), (i) the transfer of a majority of the issued and outstanding capital stock of any corporate Tenant or the transfer of a majority of the total ownership interest in any partnership Tenant, or the transfer of control in any general or limited liability partnership Tenant, or the transfer of a majority of the issued and outstanding membership interests in a limited liability company Tenant, however accomplished, whether in a single transaction or in a series of related or unrelated transactions, involving Tenant and/or its parent (including, without limitation, and by way of example only, the transfer of a majority of the outstanding capital stock of a company, which company owns 100% of a second tier company, which in turn owns 51% of the

29

1296   outstanding capital stock of a corporate tenant hereunder), shall be deemed an assignment of this
1297   Lease, except that the transfer of the outstanding capital stock of any corporate Tenant or its
1298   parent shall be deemed not to include the sale of such stock by persons or parties, other than
1299   those deemed "affiliates" of Tenant within the meaning of Rule 144 promulgated under the
1300   Securities Act of 1933, as amended, through the "over-the-counter market" or through any
1301   recognized stock exchange, (ii) any increase in the amount of issued and/or outstanding capital
1302   stock of any corporate Tenant or Tenant's parent, or of the issued and outstanding membership
1303   interests in a limited liability company Tenant or Tenant's parent, and/or the creation of one or
1304   more additional classes of capital stock of any corporate Tenant or Tenant's parent, in a single
1305   transaction or a series of related or unrelated transactions involving Tenant and/or its parent,
1306   resulting in a change in the legal or beneficial ownership of Tenant or its parent so that the
1307   shareholders or members of Tenant or its parent existing immediately prior to such transaction or
1308   series of transactions shall no longer own a majority of the issued and outstanding capital stock
1309   or membership interests of such entity, shall be deemed an assignment of this Lease, (iii) an
1310   agreement by any other person or entity, directly or indirectly, to assume Tenant's obligations
1311   under this Lease shall be deemed an assignment, (iv) any person or legal representative of
1312   Tenant, to whom Tenant's interest under this Lease passes by operation of law, or otherwise,
1313   shall be bound by the provisions of this <u>Article VII</u>, and (v) a modification, amendment or
1314   extension of a sublease (unless such modification, amendment or extension represents the
1315   exercise by a party to such sublease of a right or option expressly set forth in such sublease or
1316   does not involve a modification of any material terms of such sublease) shall be deemed a
1317   sublease.  Tenant agrees to furnish to Landlord on request at any time such information and
1318   assurances as Landlord may reasonably request that neither Tenant, nor any previously permitted
1319   subtenant, has violated the provisions of this <u>Article VII</u>.

1320               (b)    The provisions of <u>Sections 7.4</u>, <u>7.5</u> and <u>7.6</u> hereof shall not apply to (and
1321   Landlord's consent shall not be required for) the following transactions: (i) an Operations
1322   Agreement; (ii) an assignment of this Lease or the subletting of all or any portion of the
1323   Premises to any entity that is an Affiliate; (iii) a Complete Sale Transaction, provided that same
1324   is made for a legitimate business purpose and not for the principal purposes of transferring the
1325   leasehold estate hereunder in violation of the provisions of this <u>Article VII</u>, and subject to the
1326   requirements set forth in the next sentence; (iv) a Partial Sale Transaction, provided same is
1327   made for a legitimate business purpose and not for the principal purpose of transferring the
1328   leasehold estate hereunder, and subject to the requirements of the next sentence; (v) the mere
1329   change of Tenant's name or form of ownership so long as same does not materially adversely
1330   affect Tenant's net worth; (vi) a private or public sale of equity or debt of any member of
1331   Tenant's Affiliated Group (including any initial public offering of stock of any member of
1332   Tenant's Affiliated Group), provided that such sale is made for a legitimate business purpose
1333   and not for the principal purpose of transferring the leasehold estate hereunder, and if any such
1334   sale results in a change of control of Guarantor, then subject to the requirements of the next
1335   sentence; or (vii) an assignment of this Lease to a corporation or other business entity that has a
1336   net worth, calculated in accordance with GAAP, in excess of $100,000,000, provided that such
1337   sale is made for a legitimate business purpose and not for the principal purpose of transferring
1338   the leasehold estate hereunder, and subject to the requirements of the next sentence.
1339   Notwithstanding the foregoing:

1340          (A)   in connection with any Complete Sale Transaction, Partial Sale
1341 Transaction or transaction described in clauses (vi) or (vii) above in which (x) Tenant continues
1342 to operate the Premises as a flexible office space business and (y) the Guarantor (or its successor
1343 by operation of law) remains the Guarantor of this Lease, the transaction shall not be subject to a
1344 net worth test in connection with the transaction;

1345          (B)   in connection with any Complete Sale Transaction, Partial Sale
1346 Transaction or transaction described in clauses (vi) or (vii) above in which (x) Tenant continues
1347 to operate the Premises as a flexible office space business and (y) the Guarantor (or its successor
1348 by operation of law) does not remain the Guarantor of this Lease, any assignee or purchaser shall
1349 have, or shall provide a replacement guarantor with respect to its payment and performance
1350 obligations under this Lease (a "Substitute Guarantor") that has, a net worth, calculated pursuant
1351 to GAAP (excluding good will as an asset and taking into account contingent liabilities), equal to
1352 or in excess of the net worth, calculated pursuant to GAAP (excluding good will as an asset and
1353 taking into account contingent liabilities) equal to or greater than that of Guarantor as of the
1354 Execution Date, and, to the extent the foregoing net worth test is satisfied by a Substitute
1355 Guarantor, such Substitute Guarantor shall execute and deliver to Landlord, not less than fifteen
1356 (15) Business Days prior to the effective date of such transfer (provided, however, that to the
1357 extent Tenant is prohibited from providing fifteen (15) Business Days' prior notice as a result of
1358 applicable Laws or any confidentiality agreement, Tenant shall provide such notice as soon as
1359 reasonably practicable after the effective date of such transfer), and shall provide Landlord with
1360 (x) reasonably acceptable evidence of such Substitute Guarantor's net worth, (y) a guaranty in
1361 the form annexed hereto as Exhibit J, and (z) a good guy guaranty in the form annexed hereto as
1362 Exhibit K, in which event, following completion of the transfer, Tenant and Guarantor shall be
1363 released from all future obligations under this Lease from and after the effective date of the
1364 transfer;

1365          (C)   in connection with any Complete Sale Transaction, Partial Sale
1366 Transaction or transaction described in clauses (vi) or (vii) above in which (x) Tenant shall not
1367 continue to operate the Premises as a flexible office space business and (y) the Guarantor (or its
1368 successor by operation of law) does not remain the Guarantor of this Lease, any assignee or
1369 purchaser shall be reasonably able to pay rent and perform its other obligations under this Lease
1370 (which may include capitalization by its parent entity) and have, or  provide a Substitute
1371 Guarantor that has, a net worth, calculated pursuant to GAAP (excluding good will as an asset
1372 and taking into account contingent liabilities), equal to or in excess of Seven Hundred Fifty
1373 Million Dollars and 00/100 Dollars ($750,000,000.00 and, to the extent the foregoing net worth
1374 test is satisfied by a Substitute Guarantor, such Substitute Guarantor shall execute and deliver to
1375 Landlord, not less than fifteen (15) Business Days' notice prior to the effective date of such
1376 transfer (provided, however, that to the extent Tenant is prohibited from providing fifteen (15)
1377 Business Days' prior notice as a result of applicable Laws or any confidentiality agreement,
1378 Tenant shall provide such notice as soon as reasonably practicable after the effective date of such
1379 transfer), and shall provide Landlord with (x) reasonably acceptable evidence of such Substitute
1380 Guarantor's net worth, (y) a guaranty in the form annexed hereto as Exhibit J, and (z) a good guy
1381 guaranty in the form annexed hereto as Exhibit K, in which event, following completion of the
1382 transfer, Tenant and Guarantor shall be released from all future obligations under this Lease from
1383 and after the effective date of the transfer; and

EAST\162676362.12

(D)    to the extent any assignee or purchaser or Replacement Guarantor does not satisfy the net worth tests described in subparagraphs (B) and (C) above, the assignee or purchaser shall have the right to deposit with Landlord an additional Letter of Credit meeting the requirements of <u>Section 11.2</u> hereof in the full amount of the Guaranties which additional Letter of Credit shall be subject to reduction at the times, in the amounts and on the terms set forth in the Lease Guaranty.

Any party to which this Lease may be sublet, assigned or transferred without the consent of Landlord under this <u>Section 7.3(b)</u> shall be referred to as a "<u>Permitted Transferee</u>", and any such sublease, assignment or transfer shall be referred to as a "<u>Permitted Transfer</u>".  Tenant shall notify Landlord (1) not less than fifteen (15) days  before any Permitted Transfer is consummated unless such prior notice would be a violation of applicable Laws or other regulatory or confidentiality requirements, in which event Tenant shall notify Landlord of such Permitted Transfer promptly following the effective date thereof, and (2) within ten (10) Business Days after any Permitted Transfer that changes Tenant's name or the entity comprising Tenant. For purposes of this <u>Section 7.3(b)</u>,

i.    "<u>Operations Agreement</u>" shall mean any management agreement, operation agreement, license, concession or similar agreement between Tenant and any members of Tenant's Affiliated Group pursuant to which Tenant delegates or grants to such entity the authority to use, operate, maintain, oversee or manage all or a part of the Premises, provided that such Operations Agreement is made for legitimate business purposes and not for the purposes of circumventing any portion of the Lease and provided further that such Operations Agreement shall be expressly subject to the terms of this Lease;

ii.    "<u>Complete Sale Transaction</u>" shall mean the transfer by change of control, merger, consolidation, reorganization or the sale of all or substantially all of the assets or all or substantially all of the outstanding stock or other ownership interests of any direct or indirect parent company of Tenant (including WeWork Companies Inc.);

iii.    "<u>Partial Sale Transaction</u>" shall mean the transfer by change of control, merger, reorganization or sale of all or a portion of the assets or equity interests of one or more entities comprising Tenant's Affiliated Group, resulting in the transfer of (x) twenty-five percent (25%) of the rentable square footage of space marketed and operated as "WeWork" flexible workplace centers in the United States of America, or (y) a transfer of one million (1,000,000) square feet of space marketed and operated as "WeWork" flexible workplace centers in the Boston, Massachusetts metropolitan area (including the Premises).

iv.    "<u>Tenant's Affiliated Group</u>" shall mean Tenant and all Affiliates of Tenant and/or the parent company of Tenant.

(c)    Notwithstanding the provisions of this <u>Article VII</u>, Tenant shall have the right (without Landlord's consent and without triggering any Landlord recapture and/or profit-sharing rights) to (i) allow Members and other Permitted Tenant Parties to use and occupy the Premises, and (ii) sublease or license space in the Premises to Affiliate(s) of Tenant or third-party vendor(s) or service provider(s) for the purposes of concessions serving Tenant's Members and other Permitted Tenant Parties in the Premises, including, without limitation, beer, wine or

32

spirits concessions, and, in each case, and (A) such parties shall not be deemed to be subtenants or assignees of Tenant at the Premises, (B) Tenant shall ensure that such parties comply with all terms and conditions of this Lease, and (C) Tenant shall remain solely responsible with respect to such use and occupancy of the Premises by such parties.  The terms of <u>Section 7.4</u> shall not apply to Members or other Permitted Tenant Parties. Any act or omission (where there is a duty to act under this Lease) by any Permitted Tenant Party (or any person claiming by, through or under Tenant) that is a default of any of the terms, covenants or conditions in this Lease on Tenant's part to observe, perform or comply with shall be deemed to be a default by Tenant, subject to all applicable notice and cure periods under this Lease.

(d)    Without limiting the terms of <u>Section 7.3(c)</u> and notwithstanding anything to the contrary contained in this Lease, Tenant shall be entitled to enter into licenses, subleases and other occupancy agreements (each, an "<u>Occupancy Agreement</u>") for the use and occupancy of the Premises by Members (but not prospects until they become an actual Member).  Any such agreement with a Member (including any strategic alliances or partners that enhance Tenant's business) in the context or form of sublease shall sometimes be referred to herein as an "<u>Enterprise Sublease</u>". Any such Occupancy Agreement(s) between Tenant and any Member (including Enterprise Subleases) shall be upon such terms as shall be determined by Tenant (in its sole and absolute discretion) and such agreement(s) shall not be deemed an assignment, subletting or transfer of this Lease, shall not require Landlord's consent, shall not be subject to Landlord's right to any profit therefrom and shall not be or be deemed to be a breach of this Lease by Tenant.  Members may use the Premises for the Permitted Use.  All Occupancy Agreements granted by Tenant hereunder shall cease and expire automatically upon the expiration or termination of this Lease.

7.4    (a)    If Landlord shall not exercise its rights pursuant to <u>Section 7.4(b)(i)</u> or <u>Section 7.4(b)(ii)</u>, Landlord shall not unreasonably withhold, condition or delay its consent to a proposed subletting of the Premises, or an assignment of this Lease, provided that in each such instance, the following requirements shall have been satisfied (if Tenant proposes a partial sublet, references in this <u>Section 7.4</u> to the Premises shall, unless the context otherwise requires, refer to such portion):

(i)    in the case of a proposed subletting, the listing or advertising for subletting of the Premises shall not have included a proposed rental rate, provided, however, that Tenant may quote in writing directly to prospective subtenants or in responding to brokers' solicitations the proposed rental rate;

(ii)    no Event of Default shall have occurred and be continuing;

(iii)    the proposed subtenant or assignee shall have a financial standing reasonably sufficient to satisfy its obligations under the sublease or this Lease (as applicable), and be engaged in a business and propose to use the Premises in a manner in keeping with the standards in such respects of the other tenancies in the Building;

(iv)    provided that Landlord then has comparable space available for lease in the Building (or reasonably expects to have comparable space available for lease in the Building within the following six (6) month period), the proposed subtenant or assignee shall not

33

1466  be (x) a Person with whom Landlord is then actively negotiating the leasing of space in the
1467  Building; or (y) a tenant in or occupant of the Building;

1468            (v)    any subletting shall be expressly subject to all of the terms,
1469  covenants, conditions and obligations on Tenant's part to be observed and performed under this
1470  Lease and any assignment or subletting shall be subject to the further condition and restriction
1471  that this Lease or the sublease shall not be further assigned, encumbered or otherwise transferred
1472  or the subleased premises further sublet by the subtenant in whole or in part, or any part thereof
1473  suffered or permitted by the assignee or subtenant to be used or occupied by others, without the
1474  prior written consent of Landlord in each instance, which consent shall be granted or withheld in
1475  accordance with the provisions of this Article VII as if, in the case of a subtenant, such subtenant
1476  were Tenant making the request, and if Landlord shall consent to any further subletting by the
1477  subtenant or the assignment of the sublease, Sections 7.5 and 7.6 of this Lease shall apply to any
1478  such transactions as if the further subletting or assignment of the sublease were a proposed
1479  subletting or assignment being made by Tenant under this Lease so that Landlord shall be
1480  entitled to receive all amounts described in such Sections;

1481            (vi)    the subleased premises shall be regular in shape and at no time
1482  shall there be more than four (4) separately demised spaces or units for each full floor in the
1483  subleased premises, all of which shall have direct access through existing corridors (or corridors
1484  constructed by Tenant in compliance with Article IX to accommodate such access) to elevators,
1485  fire stairs and core rest rooms;

1486            (vii)    Tenant shall reimburse Landlord within thirty (30) days after
1487  demand for any reasonable out-of-pocket attorneys' fees that may be incurred by Landlord in
1488  connection with said assignment or sublease;

1489            (viii)    Subject to the provisions of Section 7.8, any sublease shall
1490  expressly provide that in the event of termination, re-entry or dispossession of Tenant by
1491  Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest
1492  of Tenant as sublessor under such sublease, and such subtenant shall, at Landlord's option, attorn
1493  to Landlord pursuant to the then executory provisions of such sublease, except that Landlord
1494  shall not be (i) liable for any previous act or omission of Tenant under such sublease (except for
1495  any such acts or omissions that (x) continue after the date that Landlord succeeds to the interest
1496  of Tenant under such sublease (but only from and after the date Landlord succeeds to the interest
1497  of Tenant under such sublease), and (y) may be remedied by providing a service or performing a
1498  repair), (ii) subject to any offset that theretofore accrued to such subtenant against Tenant, (iii)
1499  bound by any previous modification of such sublease or by any previous prepayment of more
1500  than one month's rent unless previously approved by Landlord (except to the extent that
1501  Landlord actually receives such prepayment), (iv) bound by any covenant to undertake or
1502  complete or make payment to or on behalf of a subtenant with respect to any construction of the
1503  Premises or any portion thereof demised by such sublease and (v) bound by any obligations to
1504  make any other payment to or on behalf of the subtenant, except for services, repairs,
1505  maintenance and restoration provided for under the sublease to be performed after the date of
1506  such termination, reentry or dispossession by Landlord under this Lease and which Landlord is
1507  required to perform hereunder with respect to the subleased space at Landlord's expense; and

34

(ix)    the nature of the occupancy, the use and the manner of use of the Premises by the proposed subtenant or assignee (x) shall not impose on Landlord any requirements of the ADA in excess of those requirements imposed on Landlord in the absence of such proposed subtenant or assignee or such occupancy, use or manner of use, unless such proposed subtenant or assignee shall have agreed to comply with each of such excess requirements, (y) shall not increase the density in the sublet premises in excess of that expressly permitted under this Lease, and (z) shall be in compliance with the terms and conditions of this Lease.

(b)    (i)    If Tenant shall desire to assign this Lease or sublet all or any portion of the Premises under circumstances in which Landlord's consent shall be required, Tenant shall submit to Landlord in writing (the following information being collectively referred to as the "Sublease or Assignment Statement") the material terms, including all economic terms, upon which Tenant is willing to make such assignment or sublease and the particular space proposed to be so subleased, if applicable.  Landlord shall then have the following rights, exercisable within thirty (30) days after Landlord's receipt of the Sublease or Assignment Statement: (A) to terminate this Lease in its entirety (in the case of a proposed assignment of this Lease), or (B) to terminate this Lease with respect to the proposed sublet space (in the case of a proposed sublease) if the proposed sublet space (together with any space previously sublet by Tenant) consists of seventy-five percent (75%) or more of the Premises and the term of the sublease for which Landlord's consent is being requested is for more than five (5) years or ends during the last Lease Year. If Landlord shall fail to notify Tenant within said thirty (30) day period of Landlord's intention to exercise its termination right set forth above in this Section 7.4(b)(i), or to have approved or disapproved the terms of the proposed transaction, then provided that Tenant shall have sent Landlord a second request for approval containing the following language in bold capitalized print:  **"THIS IS A SECOND REQUEST FOR APPROVAL OF THE PROPOSED [ASSIGNMENT] OR [SUBLETTING].  IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS, LANDLORD'S APPROVAL OF THE PROPOSED [ASSIGNMENT] OR [SUBLETTING] TERMS SHALL BE DEEMED GRANTED PURSUANT TO THE PROVISIONS OF THE LEASE"**, and if Landlord shall have failed to respond within such time period, Landlord shall be deemed to have not exercised its right to terminate this Lease and shall be deemed to have approved the terms of such proposed transaction, subject to the terms of Section 7.4(a) and Section 7.4(b)(ii).

(ii)    In the event that Landlord fails to exercise its termination option under Section 7.4(b)(i) and approves (or is deemed to have approved) the terms of the proposed sublease or assignment, Tenant shall have the right, within nine (9) months after Landlord shall have declined or been deemed to have declined to exercise such options, to deliver to Landlord, a fully executed assignment or sublease upon the terms and conditions set forth in the Sublease or Assignment Statement delivered to Landlord pursuant to Section 7.4(b)(i), together with information as to (i) the name and then current business address of the proposed assignee or subtenant; (ii) the nature and character of the business and credit of the proposed assignee or subtenant; (iii) fully executed originals of any and all related agreements, along with Tenant's and the subtenant's (or assignee's) written statement that such sublease or assignment instrument (and the related agreements provided, if any) is/are the true and complete statement of the

35

1553      subletting or assignment and reflect all sums and other consideration passing between the parties
1554      to the sublease or assignment; and (iv) unless previously provided, current financial information
1555      with respect to the proposed assignee or subtenant, including, without limitation, its most recent
1556      financial statements, certified by an independent certified public accountant ("CPA") if such
1557      financial statements are certified by a CPA (or, if not, certified by the chief financial officer or
1558      corporate controller of the proposed assignee or subtenant, or by another officer of the proposed
1559      assignee or subtenant that has actual knowledge of the accuracy of such financial statements, as
1560      being true and correct).  In the event that Tenant fails to deliver a fully executed assignment or
1561      sublease within the nine (9) month period set forth in this Section, then Tenant shall again
1562      comply with all of the provisions and conditions of Section 7.4(b)(i) hereof before assigning this
1563      Lease or subletting all or part of the Premises.  In the event that the fully executed assignment or
1564      sublease delivered to Landlord pursuant to this Section contains provisions which are "materially
1565      different from" (as hereinafter defined) the terms set forth in the Sublease or Assignment
1566      Statement delivered to Landlord pursuant to Section 7.4(b)(i) hereof, then in such event,
1567      Tenant's delivery to Landlord of such fully executed assignment or sublease shall be deemed to
1568      be an irrevocable offer from Tenant to Landlord as to which Landlord shall again have the option
1569      set forth in Section 7.4(b)(i) hereof (and the terms of the Sublease or Assignment Statement shall
1570      be deemed modified accordingly).  The terms of a proposed sublet or proposed assignment shall
1571      be deemed "materially different from" the terms set forth in the notice delivered to Landlord
1572      pursuant to Section 7.4(b)(i) hereof if the net economic terms of such proposed sublet or
1573      assignment on an aggregate basis differ, in favor of the subtenant or assignee, by more than five
1574      percent (5%) from the terms contained in the notice delivered to Landlord pursuant to Section
1575      7.4(b)(i) hereof, taking into account all economic aspects of such proposed transaction.

1576            (c)     The failure by Landlord to exercise its options under Section 7.4(b)(i) or
1577      Section 7.4(b)(ii) with respect to any subletting or assignment shall not be deemed a waiver of
1578      such option with respect to any extension of such subletting or assignment (except to the extent
1579      such extension is expressly provided in the sublease or assignment agreement) or any
1580      subsequent subletting or assignment.

1581         7.5     If Tenant sublets any portion of the Premises to a Person in a transaction for
1582      which Landlord's consent is required, Landlord shall be entitled to and Tenant shall pay to
1583      Landlord, as additional rent (the "Sublease Additional Rent"), a sum equal to fifty percent (50%)
1584      of any rents, additional charges and other consideration payable under the sublease to Tenant by
1585      the subtenant in excess of the Base Rent and additional rent accruing during the term of the
1586      sublease in respect of the subleased space (at the rate per square foot payable by Tenant under
1587      this Lease) pursuant to the terms of this Lease (including, but not limited to, sums paid for the
1588      sale or rental of Tenant's personal property and Alterations less the then net unamortized or
1589      undepreciated cost thereof determined on the basis of Tenant's federal income tax or federal
1590      information returns), and after deducting from any rents, additional charges and other
1591      consideration payable under the sublease to Tenant any commercially reasonable fees or costs
1592      paid or incurred by Tenant in connection with such sublease, including, without limitation, the
1593      reasonable brokerage and marketing costs paid by Tenant in connection with such sublease, the
1594      reasonable legal fees paid by Tenant for the preparation and negotiation of such sublease, any
1595      fees paid to Landlord pursuant to Section 7.4(a)(vii), the leasehold improvement costs paid by
1596      Tenant to demise (if necessary) and prepare the Premises (or portion thereof) for such sublessee,
1597      and any monetary payments (such as an improvement allowance) or free rent provisions actually

<div align="center">36</div>

made by Tenant to induce the sublessee to enter into the transaction (collectively, "Subletting Expenses"), which shall be applied until exhausted. All Sublease Additional Rent payable hereunder by Tenant shall be calculated on a calendar year basis, but shall be paid to Landlord, as additional rent, within thirty (30) days after receipt thereof by Tenant. For the purposes of calculating Sublease Additional Rent, Subletting Expenses, shall first be deducted against any income or revenues on account of such sublease (and carried forward against future revenues until fully credited to Tenant) so that Tenant shall not pay to Landlord any Sublease Additional Rent until Tenant has been reimbursed for all Subletting Expenses.

7.6    If Tenant shall assign this Lease to a Person in a transaction for which Landlord's consent is required, Landlord shall be entitled to and Tenant shall pay to Landlord, as additional rent, an amount equal to fifty percent (50%) of all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale or rental of Tenant's personal property and Alterations less the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax or federal information returns), after first deducting therefrom any commercially reasonable fees or costs paid or incurred by Tenant in connection with such assignment, including, without limitation, the reasonable brokerage and marketing costs paid by Tenant in connection with such transaction, the reasonable legal fees paid by Tenant for the preparation and negotiation of the assignment instrument, any fees paid to Landlord pursuant to Section 7.4(a)(vii), the leasehold improvement costs paid by Tenant to prepare the Premises for such assignee, any monetary payments (such as an improvement allowance) actually made by Tenant to induce the assignee to enter into the transaction. Such additional rent shall be payable within thirty (30) days after received by Tenant from the assignee. Tenant shall furnish to Landlord reasonable documentation evidencing the calculation of such additional rent.

7.7    Landlord shall have no liability for brokerage commissions incurred with respect to any assignment of this Lease or any subletting of all or any part of the Premises by or on behalf of Tenant. Tenant shall pay, and shall indemnify and hold Landlord harmless from and against, any and all cost, expense (including reasonable attorneys' fees and disbursements) and liability in connection with any compensation, commissions or charges claimed by any broker or agent with respect to any such assignment or subletting.

7.8    (a)    Notwithstanding anything to the contrary contained in this Article VII but subject to the terms of this Section 7.8, if Tenant subleases a portion of the Premises with Landlord's consent (or deemed consent) and/or enters into an Enterprise Sublease, and (a) any such sublease constitutes a Qualifying Sublease (as defined below), (b) no Event of Default shall then be continuing under this Lease, and (c) if Landlord were to enter into a Recognition Agreement with the subtenant, not more than one hundred fifty thousand (150,000) rentable square feet of space in the Building would be subject to Recognition Agreements, then upon the written request of Tenant, Landlord shall execute and deliver to the subtenant, an agreement in form and substance reasonably acceptable to Landlord (a "Recognition Agreement"), at Tenant's sole cost and expense, stating, in substance, that so long as such subtenant shall not be in default of any of its obligations under the Qualifying Sublease, beyond any applicable notice and grace period, such subtenant's leasehold estate shall not be terminated or disturbed by reason of the termination of this Lease in the event of the default of Tenant hereunder, provided that (i) such subtenant shall attorn to and recognize Landlord as the sublandlord under such Qualifying

37

1642 Sublease, (ii) upon the recognition and attornment by the subtenant and Landlord, following a
1643 termination of this Lease, the subtenant shall thereafter pay the Base Rent and additional rent
1644 payable under this Lease for such portion of the Premises covered by the Qualifying Sublease
1645 (prorated on a per rentable square foot basis), (iii) with respect to any Qualifying Sublease, such
1646 subtenant Member shall agree that Landlord shall not be required to provide any services under
1647 the Qualifying Sublease above or beyond the services that Landlord provides under this Lease
1648 (i.e., no services typically provided by Tenant to its subtenant Members shall be provided by
1649 Landlord), (iv) such subtenant shall agree not to enter into any material modification,
1650 amendment or abridgement of such Qualifying Sublease without Landlord's consent, which
1651 consent shall not be unreasonably withheld, conditioned or delayed, except to the extent entered
1652 into pursuant to the express terms of the Qualifying Sublease, and (v) with respect to any
1653 Qualifying Sublease for a term of three (3) years or less for which the subtenant has a right to
1654 renew or extend the term of its sublease, the subtenant shall be required to notify Sublandlord in
1655 writing within thirty (30) days following the termination of this Lease, whether such subtenant is
1656 extending the term of such sublease, and once Landlord is so notified, the exercise or failure to
1657 exercise any renewal or extension option set forth in the Qualifying Sublease shall be irrevocable
1658 by such subtenant notwithstanding any contrary provisions or procedures for renewal or
1659 extension of the sublease set forth therein.  After Landlord executes and delivers a Recognition
1660 Agreement to Tenant with respect to a Qualifying Sublease, Landlord shall not be subject to the
1661 terms of any amendment to any such Qualifying Sublease that has a material adverse impact on
1662 Landlord's rights and obligations under such Recognition Agreement, except to the extent
1663 Landlord has approved such an amendment in writing.  For the avoidance of doubt, Landlord
1664 shall not be required to deliver a Recognition Agreement to any subtenant under a Qualifying
1665 Sublease or otherwise if the result thereof would be that at any given time more than one
1666 hundred fifty thousand (150,000) rentable square feet of space are the subject of Recognition
1667 Agreements.

1668          (b)     Upon the attornment and recognition referred to in the preceding sentence,
1669 the Qualifying Sublease shall continue in full force and effect as, or as if it were, a direct lease
1670 between Landlord and such subtenant upon all of the then executory terms, conditions and
1671 covenants as are set forth in such Qualifying Sublease, subject to the terms and conditions of the
1672 Recognition Agreement.

1673          (c)     Tenant shall reimburse Landlord within thirty (30) days after demand for
1674 any reasonable out-of-pocket attorneys' fees incurred by Landlord in connection with
1675 Recognition Agreement under this Section 7.8.

1676          (d)     A "Qualifying Sublease" is a sublease entered into with Landlord's prior
1677 written consent (or deemed consent) in accordance with this Article VII and/or an Enterprise
1678 Sublease, and which (A) is for one or more full contiguous floors (and which also may include
1679 the entire portion of any partial floor leased by Tenant contiguous to such full floor(s)), (B)
1680 either (I) includes the lowest floor or the highest floor of any contiguous block of floors then
1681 constituting the Premises, or (II) if Landlord has previously executed and delivered a
1682 Recognition Agreement under this Section 7.8 that is then in effect then the proposed subleased
1683 premises in question is contiguous to other space that is the subject of such a Recognition
1684 Agreement, (C) is for a term of three (3) years or less or for a term of seven (7) years or more,
1685 and (D) the subtenant under such sublease meets the Non-disturbance Net Worth Test.

38

(e)    The "<u>Non-disturbance Net Worth Test</u>" shall mean that the subtenant (and/or any guarantor of the subtenant's obligations under the Qualifying Sublease) shall have a credit rating (according to Moody's or similar national rating agency) of investment grade or better ("<u>Investment Grade</u>"); provided however, if the subtenant (and/or any guarantor of the subtenant's obligations under the Qualifying Sublease) do not have such required credit rating, Landlord, Tenant and the applicable subtenant and/or guarantor shall work in good faith to agree upon a credit-enhancement package for the benefit of Landlord (including but not limited to letters of credit, surety bonds, and guarantees) that will satisfy Landlord in the exercise of its sole discretion with respect to the creditworthiness and financial condition of the subtenant and/or its guarantor.

<div align="center">

**ARTICLE VIII**
**MAINTENANCE AND REPAIRS**

</div>

8.1    Tenant, at Tenant's sole cost and expense, shall promptly make all repairs and replacements, and perform all maintenance, in and to the Premises (excluding the Building Structure and Building Systems therein) to keep the Premises in good operating condition and repair, in a clean, safe and tenantable condition, well-ventilated and moisture controlled, and otherwise in accordance with the requirements of this Lease.  Tenant shall likewise maintain all fixtures, furnishings and equipment located in, or exclusively serving, the Premises installed by, on behalf of, or at the request of Tenant, and make all required repairs and replacements thereto. Tenant shall also maintain, repair and replace throughout the Lease Term, at Tenant's sole cost and expense, all non-Building standard supplemental heating, ventilation and air conditioning equipment and systems serving exclusively the Premises, and any special tenant areas, facilities and finishes, special fire protection equipment, telecommunications and computer equipment, kitchen/galley equipment and fixtures, all other furniture, furnishings, equipment and systems of Tenant and all Alterations (collectively, "<u>Tenant Items</u>") and shall keep in force customary maintenance and service contracts therefor.  Tenant shall give Landlord prompt written notice of any defects or damage to the structure of, or equipment or fixtures in, the Building or any part thereof, or any mold or moisture condition, of which Tenant has knowledge.  Tenant shall suffer no waste or injury to any part of the Premises, and shall, at the expiration or earlier termination of the Lease Term, surrender all portions of the Premises in an order and condition equal to or better than existed on their applicable Lease Commencement Date, except for ordinary wear and tear and as otherwise provided in <u>Article XIII</u> or <u>Article XVII</u>.  Except as otherwise provided in <u>Article XVII</u>, all injury, breakage and damage to the Premises and to any other part of the Building or the Land caused by any act or omission of any Agents of Tenant or Tenant, shall be repaired by and at Tenant's expense, except that if either an emergency condition exists or the Lease Term has expired or Tenant fails to commence and diligently prosecute to completion repair of any such injury, breakage or damage within a reasonable period (not to exceed ten (10) days) following Tenant's receipt of notice from Landlord, then Landlord shall have the right at Landlord's option to make any such repair and to charge Tenant for all costs and expenses incurred in connection therewith.  Landlord shall provide and install replacement tubes for Building standard fluorescent light fixtures (subject to reimbursement pursuant to <u>Article V</u>).  All other bulbs and tubes for the Premises shall be provided and installed at Tenant's expense; provided that if Tenant elects to supply the bulbs or tubes to Landlord, then Landlord shall provide the labor involved for such replacement at no cost to Tenant.

<div align="center">

39

</div>

8.2     Except as otherwise provided in this Lease and subject to normal wear and tear, Landlord at its expense (subject to reimbursement pursuant to Article V if and to the extent permitted thereby) shall keep the exterior and common area walls, main lobby in the Building, slab floors, exterior windows, load bearing elements, foundations, roof and Common Areas that form a part of the Building, structural components of the Premises (the "Building Structure") and the building standard mechanical, electrical, HVAC and plumbing systems, pipes and conduits (including, elevators) that are provided by Landlord in the operation of the Building (collectively, the "Building Systems"), clean in and good operating condition and, promptly after becoming aware of any item needing repair or replacement, will make such repair or replacement thereto.  Notwithstanding any of the foregoing to the contrary:  (a) maintenance and repair of all Tenant Items shall be the sole responsibility of Tenant and shall be deemed not to be a part of the Building Structure or Building Systems; and (b) subject to the waiver of subrogation provisions set forth in this Lease, Landlord shall have no obligation to make any repairs whatsoever brought about by any act or omission of Tenant, any Agent of Tenant or any Permitted Tenant Party.

8.3     (a) If Landlord fails to perform any repair or maintenance to the Premises required to be performed by Landlord under this Lease, and such failure (i) shall not be occasioned by any negligent act or willful misconduct of Tenant, any Agent of Tenant or any Permitted Tenant Party, and (ii) adversely interferes to more than a *de minimis* extent with Tenant's access to, or use of, a material portion of the Premises for regular conduct of Tenant's business operations, then Tenant may deliver written notice thereof to Landlord (the "Initial Notice").  The Initial Notice shall specifically describe Tenant's asserted failure of Landlord with respect to the Premises.  If, within five (5) Business Days of receiving the Initial Notice, Landlord fails to either (a) cure or commence to cure the items specified in the Initial Notice, (b) provide written notice to Tenant that Landlord reasonably and in good faith believes that Landlord completed the applicable repair or maintenance obligation or that Landlord is not obligated to complete such repair or maintenance obligation, or (c) otherwise fails to respond in writing to Tenant (e.g., to ask for additional information, explain a complicating or mitigating factor, submit a proposed time frame, etc.) then Tenant may deliver to Landlord a second notice (the "Reminder Notice") within five (5) Business Days following the expiration of such five (5) Business Day period.  The Reminder Notice must specify that Tenant will have the rights granted under this Section if Landlord fails to cure or commence to cure the specified items within two (2) Business Days of receipt of the Reminder Notice, and shall also state in bold text "**FAILURE TO CURE OR COMMENCE TO CURE OR RESPOND TO TENANT REGARDING THE ITEMS SPECIFIED HEREIN WITHIN TWO (2) BUSINESS DAYS SHALL RESULT IN TENANT'S RIGHT TO CURE SUCH ITEMS IN ACCORDANCE WITH THE LEASE.**"  If Landlord fails to take or commence to take (and diligently pursue to completion) the required action within two (2) Business Days of receiving the Reminder Notice or fails to provide written notice to Tenant that Landlord reasonably and in good faith believes that Landlord completed the applicable repair and maintenance obligation or that Landlord is not obligated to complete such repair or maintenance obligation or otherwise fails to respond in writing to Tenant, and if Tenant in good faith believes such repairs or maintenance constitute a Permitted Tenant Self-Help Actions, Tenant may proceed to take the required Permitted Tenant Self-Help Actions with respect to the Premises only (but solely on its own behalf, and not as the agent of Landlord) and Landlord shall reimburse Tenant for such reasonable third-party, out-of-pocket costs and expenses in taking such action within thirty (30) days after receiving an invoice

40

1776    from Tenant setting forth a reasonably particularized breakdown of such costs and expenses and
1777    such other supporting documentation as is reasonably requested by Landlord. "Permitted Tenant
1778    Self-Help Actions" are (a) such repairs and maintenance within the Premises which are Non-
1779    Structural Changes or repairs and maintenance, in each case that can be performed solely within
1780    the Premises and can be completed without accessing the premises of any other tenants or
1781    occupants of the Building, in a good and commercially reasonable manner and at a commercially
1782    reasonable cost, without adversely interfering with other occupants' access to, use of, or rights
1783    in, the Building more than to a de minimis extent, and (b) outside of the Premises, such repairs
1784    and maintenance that Tenant reasonably believes must be performed due to an emergency
1785    situation (meaning a situation likely to result in the imminent injury to persons or imminent
1786    material damage to property) that can be completed without accessing the premises of any other
1787    tenants or occupants of the Building, in a good and commercially reasonable manner, without
1788    adversely interfering with other occupants' access to, use of, or rights in, the Building more than
1789    to a de minimis extent, and for which Tenant shall use Landlord's contractors.  Any disputes
1790    between Landlord and Tenant with respect to whether Landlord completed such obligation or is
1791    obligated to complete such repair or maintenance shall be resolved by arbitration in accordance
1792    with Section 27.1 of this Lease. When paid by Landlord, such costs shall be included within
1793    Operating Charges to the extent such costs and expenses are included within the definition of
1794    Operating Charges contained in Article V. Notwithstanding the foregoing, the provisions of this
1795    section shall not apply in the event (x) the Premises are damaged by fire or casualty; or (y) such
1796    failure was caused by (or such cure) is prevented by the negligence or willful misconduct of
1797    Tenant or Tenant's Agents.  Tenant shall have no automatic right to offset amounts due
1798    hereunder against reimbursement amounts due from Landlord pursuant to this Section 8.3(a), but
1799    shall have the right to seek a judgment from a court of competent jurisdiction in the amount of
1800    the actual out-of-pocket costs incurred by Tenant in performing the applicable Permitted Tenant
1801    Self-Help Action under this Section 8.3(a), plus interest accruing at an annual rate of six percent
1802    (6%) beginning on the date on which such costs are incurred and ending on the date on which
1803    such judgment amount is paid in full; provided that if Landlord fails to pay all or any portion of
1804    such judgment to Tenant within thirty (30) days after the date of such judgment, then Tenant
1805    shall thereafter be entitled to deduct or offset the unpaid amount from any installment of Base
1806    Rent then due or thereafter becoming due under this Lease.

1807                    (b)    If Tenant seeks to cure or remedy any default by Landlord as provided in
1808    this Section 8.3, then Tenant shall (i) proceed in accordance with the applicable provisions of
1809    Article IX of this Lease and all applicable Laws; (ii) use only such contractors, suppliers, and
1810    others as are duly licensed in the Commonwealth of Massachusetts and insured to effect such
1811    repairs and who perform such repairs in first class office buildings in the normal course of their
1812    business; (iii) promptly effect such repairs in a good and worker like quality and in a first-class
1813    manner; (iv) use new materials; (v) minimize any unreasonable interference or impact on the
1814    other tenants and occupants of the Building; and (vi) indemnify and hold Landlord harmless
1815    from any and all liability, damage or expense arising from injury to persons or personal property
1816    arising out of or resulting from Tenant's exercise of any such rights (but not the lack of repair or
1817    maintenance in the first instance).

1818                            ARTICLE IX
1819                            ALTERATIONS

41

9.1    Subject to Landlord's satisfaction of the requirements for the Ready for Buildout Condition including, without limitation, the requirements set forth in Exhibit B-2, Landlord's representations and warranties made in this Lease, Landlord's completion of punchlist items, and Landlord's continuing obligations under this Lease, Tenant shall accept the Building and the Premises in its "as is" condition as of Execution Date.  The initial improvement of the Premises under this Lease, as further described on Exhibit B-2 ("Tenant's Work"), shall be accomplished by Tenant or its designated contractor in accordance with Exhibit B-2 and all other applicable provisions of this Lease (including, without limitation, Articles IX, XIII and XIX).  Except as otherwise required by this Lease, Landlord's satisfaction of the requirements for the Ready for Buildout Condition, including, without limitation, the requirements set forth in Exhibit B-2, representations and warranties made in this Lease, completion of the punchlist, and Landlord's ongoing repair, maintenance and compliance with Law obligations, Landlord is under no obligation to make any structural or other alterations, decorations, additions, installations, demolitions, improvements or other changes (collectively, "Alterations") in or to the Premises or the Building except as may be otherwise expressly provided in this Lease.  The procedures and timing for approvals of contractors and plans and specifications and other requirements for Alterations shall be as set forth on Exhibit B-2.  Landlord shall reasonably cooperate with Tenant to obtain any licenses, permits or approvals required for Alterations to be conducted by Tenant, all at Tenant's sole cost and expense.

9.2    Tenant shall not make or permit anyone to make any Alterations in or to the Premises or the Building, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Tenant shall have the right to make Non-Structural Changes (as defined below) within the Premises without requiring the consent of Landlord.  "Non-Structural Changes" shall mean those nonstructural alterations, improvements, changes, additions and/or installations that (i) do not adversely affect, and are not visible from, the exterior of the Building, (ii) do not adversely affect the Building Systems of the Building, (iii) are made in compliance with all applicable Laws and (iv) which cost (including installation) in the aggregate less than One Million Dollars ($1,000,000) per project or series of related projects (as reasonably determined by Landlord).  Notwithstanding the foregoing, or anything herein to the contrary, no approval by Landlord shall be required for non-structural Alterations of a purely decorative or cosmetic nature for which a building permit is not required ("Cosmetic Alterations").  Notwithstanding anything to the contrary contained herein, Landlord hereby approves in concept Tenant's performance of slab cuts and installation of internal staircases between the different floors of the Premises, subject to Landlord's approval of the plans therefor, which approval shall not be unreasonably withheld, conditioned or delayed.  Any Alterations made by Tenant to portions of the Premises, whether done prior to or after the applicable Lease Commencement Date(s) for such portions of the Premises, shall be made: (a) in a good, workmanlike, first-class and prompt manner; (b) using new or comparable quality materials only; (c) except with respect to Cosmetic Alterations, by a contractor reasonably approved in writing by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed); (d)  under the supervision of an architect reasonably approved in writing by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) to the extent an architect is necessary for such work; (e) in accordance with plans and specifications reasonably acceptable to Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) to the extent plans and specifications are normally prepared for such

42

type of work; (f) in accordance with all Laws; and (g) except with respect to Non-Structural Changes or Cosmetic Alterations, with the obligation for Tenant to obtain and deliver to Landlord written, unconditional full or conditional partial (as applicable) waivers of mechanics' and materialmen's liens against the Premises and the Building for all work, labor and services to be performed and materials to be furnished within thirty (30) days after the applicable portion of the Alterations are completed for which lien rights may accrue under applicable Laws. If any lien (or a petition to establish such lien) is filed (the date of such filing, the "Lien Date") in connection with any Alteration made by or on behalf of Tenant, such lien (or petition) shall be discharged by Tenant within thirty (30) days after the Lien Date, at Tenant's sole cost and expense, by the payment thereof or by the filing of a reasonably acceptable bond (the "Lien Cure Period"). Notwithstanding the foregoing, in the event that Tenant is disputing the lien, the Lien Cure Period shall be reasonably extended until such dispute is resolved, subject to the following limitations:

(a)    In the event that, within thirty (30) days following the Lien Date, (i) Tenant continues to dispute the lien, and (ii) the lien has not yet been discharged or cancelled, Tenant shall cause Guarantor to provide a limited guaranty to the Landlord in the contested amount of the lien (the "Lien Guaranty"); provided, however, that Guarantor shall be released from all obligations under such Lien Guaranty, and the Lien Guaranty shall be null and void, upon Tenant causing such lien to be released of record by payment or posting of a bond or otherwise. If the lien is not released, but the amount secured by the lien is reduced due to a partial satisfaction, then the Lien Guaranty shall be reduced accordingly.

(b)    In the event that (x) the lien causes the applicable contractor to commence a foreclosure action against the Building, or (y) the lien causes the Landlord's lender to put the Landlord in default under any loan documents ((x) or (y) being referred to as an "Urgent Lien Matter"), then Tenant shall cause such Lien to be released of record by payment or posting of a bond within ten (10) Business Days of Tenant's receipt of notice of such Urgent Lien Matter.

9.3    All contractors and subcontractors engaged by Tenant in connection with Alterations and Tenant's Work shall be union (other than Tenant's internal general contractor which may be non-union) and insured and licensed by or with the Commonwealth of Massachusetts (if applicable). Tenant shall have the right to use non-union labor in the Building solely for the purpose of providing janitorial services within the Premises and may use its own employees to provide janitorial services and perform routine maintenance services within the Premises; provided that if at any time the entry by or presence of one or more persons furnishing services, labor or materials to the Premises shall create any work stoppage by the Building's operating unions and such stoppage prevents Landlord from operating the Building (or a key component thereof) or utilizing the operations personnel customarily utilized to operate and perform the applicable services in the Building (or a key component thereof) (each of the foregoing, collectively, is referred to herein as a "Stoppage") with the Building's operating unions, then Tenant shall promptly stop work or other activity if such work or activity by Tenant until such Stoppage is resolved. Landlord agrees to reasonably cooperate with Tenant to resolve such Stoppage, including enforcing its rights under its applicable union contract. In the event that any picketing, strikes, labor disruption, dispute, disharmony or any interference (beyond a de minimis extent) (each of the foregoing, collectively, is referred to herein as a "Labor Dispute") interferes with other work in the Building by Landlord or any tenant or occupant of the Building

43

(but does not result in a Stoppage), Tenant shall cooperate with Landlord and shall use commercially reasonable efforts to resolve such Labor Dispute.

9.4    Any Alterations made or constructed by Tenant for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Landlord's consent to such Alterations shall not constitute either Landlord's assumption, in whole or in part, of Tenant's responsibility for compliance with the ADA, or representation or confirmation by Landlord that such Alterations comply with the provisions of the ADA.   Tenant acknowledges that any Alterations are accomplished for Tenant's account, Landlord having no obligation or responsibility in respect thereof.  Landlord's approval of any plans and drawings (and changes thereto) regarding any Alterations or any contractor or subcontractor performing such Alterations shall not constitute Landlord's representation that such approved plans, drawings, changes or Alterations comply with all Laws. Any deficiency in design or construction, although same had prior approval of Landlord, shall be solely the responsibility of Tenant.  Any Tenant Alterations involving the Building Structure or Building Systems shall, at Landlord's election, be performed by Landlord's designated contractor or subcontractor at Tenant's expense (provided the cost therefor is competitive and such parties are readily available).  In connection with any Alteration (other than Non-Structural Alterations or Cosmetic Alterations), Tenant shall reimburse Landlord for any reasonable, out-of-pocket costs and expense incurred by Landlord to review any proposed plans or working drawings (excluding the costs of any in-house employees or consultants employed by Landlord). Within sixty (60) days after the completion of an Alteration (other than a Non-Structural or Cosmetic Alteration), at Landlord's request, Tenant at its expense shall deliver to Landlord three (3) sets of accurate as-built (or record) drawings showing such Alteration in place to the extent obtained by Tenant in the ordinary course.  Tenant may select all contractors, engineers, and architects with respect to Alterations as reasonably approved by Landlord or those contractors listed on Schedule I to Exhibit B-2.  Landlord shall respond to Tenant's request for approval of any contractor within five (5) days following receipt of Tenant's request.  Landlord's failure to respond to Tenant's request for approval of any contractor for five (5) days after a second notice is sent to Landlord shall be deemed Landlord's consent thereto.

9.5    If any Alterations that require Landlord's consent are made without the prior written consent of Landlord, then, if either an emergency condition exists or the Lease Term has expired and Tenant fails to commence and diligently prosecute to completion, removal and correction of such Alterations and restoration of the Premises and the Building to their condition immediately prior thereto within a reasonable period following Tenant's receipt of notice from Landlord, Landlord shall have the right (on reasonable prior written notice to Tenant except where an emergency condition exists or the Lease Term has expired), at Tenant's expense, to so remove and correct such Alterations and restore the Premises and the Building. All Alterations to the Premises or the Building made by either party and at Landlord's expense, or for which Landlord has paid or made a contribution to defray the cost thereof, shall immediately become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of the Lease Term.  Tenant, at any time during the Lease Term (including immediately prior to the expiration or sooner termination thereof), may remove any portion of Alterations, Tenant's Fixtures and Tenant's Personal Property (including trade fixtures, furnishings, equipment, inventory and any improvements identifiable with the "WeWork" brand), provided that Tenant shall repair any damage to the Building caused by any

44

such removal. All Alterations and Tenant's Fixtures (other than Tenant's Fixtures and Tenant's Personal Property that Tenant elects to remove) shall be surrendered with the Premises in their then "as is" condition, unless Tenant, at its sole cost and expense, elects to remove some or all of the same. At all times during and after the Lease Term, all fixtures, improvements, additions, furniture, furnishings, removable trade fixtures, equipment and other items of personal property, installed at the sole expense of Tenant with respect to which Tenant has not been granted any credit or allowance by Landlord, and which are removable without material damage to the Premises shall remain the property of Tenant.  Tenant shall remove at its expense all Alterations and other items that do not constitute typical and customary items installed by typical office tenants that would require removal and repair costs that are materially in excess of the removal and repair costs associated with standard office improvements and all lobby signage ("Required Removables"). Required Removables shall include, without limitation, internal stairways, raised floors, lobby signage, vaults, rolling file systems and structural alterations and modifications, provided that Landlord designates such items in writing for removal at the time of approval of the Alteration.  Required Removables shall not include any of the work performed by Landlord in accordance with the requirements of Exhibit B-1 attached hereto.  Landlord shall make such designation promptly after receipt of a written request by Tenant given with Tenant's request for Landlord's approval of such Alteration.  If such removal causes damage or injury to the Premises or the Building, then Tenant shall repair all damage and injury to the Premises or the Building caused by such removal as aforesaid.  If Tenant's personal property is not removed by Tenant prior to the expiration or earlier termination of the Lease Term, the same shall at Landlord's option be deemed abandoned or become the property of Landlord to be surrendered with the Premises as a part thereof; provided, however, that Landlord shall have the right at Tenant's expense to remove from the Premises any or all such items or to require Tenant to do the same, except as otherwise provided in this Section.  If Tenant fails to return the Premises to Landlord as required by this Section, then Tenant shall pay to Landlord, within thirty (30) days after request from Landlord (accompanied by reasonable supporting documentation), all reasonable actual out of pocket costs incurred by Landlord in effectuating such return, which such reimbursement obligation shall survive the expiration or earlier termination of the Lease Term.

<div align="center">

ARTICLE X

SIGNS

</div>

10.1    Landlord will list, at Landlord's expense, the name of Tenant (and any permitted subtenants and assignees and any Member licensing more than 5,000 square feet of space in the Premises) and its employees (if the Building directory is electronic) in the Building directory (if a Building directory is provided) based on its pro-rata share of rentable square feet leased in the Building and will provide Building standard suite entry signage on one suite entry door.  In addition to Landlord's obligations above, and subject to compliance with applicable Laws, throughout the Lease Term, Tenant shall have the right, at Tenant's sole cost and expense subject to application of the Construction Allowance, to install signage setting forth Tenant's name and/or logo in the size(s) and location(s) (including locations "C" and "D") shown on Exhibit E (the "Preapproved Signage Locations").  In addition, Tenant shall be entitled, at its sole cost and expense and subject to Landlord's reasonable review and approval, to install identifying signage above Tenant's visitor's center in the lobby of the Building and wayfinding signage in the lobby of the Building.  Tenant shall not place, inscribe, paint, affix or otherwise display any sign, advertisement, picture, lettering or notice of any kind (other than the Preapproved Signs, which

<div align="center">45</div>

have been approved by Landlord) on any part of the exterior or interior of the Building (including windows and doors), other than in the Preapproved Signage Locations, which have been approved by Landlord, or on any part of the interior of the Premises which can be seen from outside the Building, without the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed.  Landlord agrees that no other tenant occupying less space than Tenant  will be permitted to install signage larger than that of Tenant's signage, and that Tenant's signage shall be permitted to be at least one-third of the size of the signage of Existing Tenant. If any such item that has not been approved by Landlord is so displayed, then, Landlord shall have the right to remove such item at Tenant's expense.  Subject to <u>Section 6.4</u>, Landlord reserves the right to install and display signs, advertisements and notices on any part of the exterior or interior of the Building; provided, however that Landlord shall only affix, install, or display signs on the interior of the Premises which pertain to the management or operation of the Building.  Without limiting the generality of the foregoing, Tenant hereby agrees that any signage installed by Tenant shall comply with all applicable Laws and the materials, specifications and manner of installation and attachment to the Building or any portion thereof shall be subject to Landlord's review and approval, not to be unreasonably withheld, conditioned or delayed; provided that Landlord hereby approves the signage and locations depicted on <u>Exhibit E</u> annexed hereto (the "<u>Pre-Approved Signs</u>").  Further, Tenant shall have the right, without Landlord's consent, to modify its signage to conform to any new signage package installed at the majority of WeWork co-working locations throughout the United States of America provided such new signage is in compliance with all applicable Laws. Tenant shall have the right, without Landlord's consent, to install signage within the Premises that cannot be seen from outside the Building

10.2    Subject to compliance with applicable Laws, Tenant shall have the right following the date that the Premises are delivered to Tenant in Ready for Buildout Condition and during the performance of Tenant's Work, to install and maintain, at its sole expense, temporary signage on the exterior of the Building or construction barricades announcing Tenant's pending opening and occupancy at the Premises.  Such temporary signage shall be attached to the exterior glass portions of the Building only in a location to be reasonably approved by Landlord. Such temporary signage will be removed by Tenant, at its sole cost and expense, upon the later to occur of (i) the installation of Tenant's permanent exterior signs on the Building, and (ii) the date Tenant opens the Premises for business to its members.

<div align="center">

ARTICLE XI
SECURITY DEPOSIT

</div>

11.1    Within six (6) Business Days after the Execution Date, Tenant shall deposit with Landlord the Security Deposit with respect to the Majority of the Premises as follows: (A) a Letter of Credit (as defined and further described in <u>Section 11.2</u>) in the amount of $24,879,400.00 and (B) a Surety Bond (as defined and further described in <u>Section 11.4</u>) in the amount of $14,216,800.00, as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease.  In addition, not later than fifteen (15) days after Tenant receives Landlord's Subsequent Commencement Date Notice (but in no event earlier than forty-five (45) days prior to the Subsequent Lease Commencement Date), Tenant shall deposit with Landlord the Security Deposit with respect to the Remainder of the Premises as follows: (A) a Letter of Credit in the amount of $10,120,600.00 and (B) a Surety Bond in the

<div align="center">46</div>

2043 amount of $5,783,200.00, as additional security for the faithful performance and observance by
2044 Tenant of the terms, provisions and conditions of the Lease.  Notwithstanding anything to the
2045 contrary contained in this Lease, Tenant, at Tenant's election, may deliver the Security Deposit
2046 with respect to the Remainder of the Premises by an amendment to the existing Letter of Credit
2047 and/or Surety Bond, an additional or new Letter of Credit and/or Surety Bond from the same or a
2048 different issuer, and/or a replacement Letter of Credit and/or Surety Bond from the same or a
2049 different issuer.  To the extent that Tenant fails to deliver any portion of the Letter of Credit or
2050 Security Bond as required under this Article XI, such failure shall be deemed to be an Event of
2051 Default.  Tenant agrees that (i) in the event of the occurrence of an Event of Default or (ii)
2052 Tenant has defaulted in the performance of any of its obligations under this Lease, including the
2053 payment of rent, and Landlord is permitted to draw under such Letter of Credit or Surety Bond
2054 pursuant to applicable bankruptcy or insolvency law, Landlord may draw a portion or the entire
2055 amount of the Letter of Credit and/or Surety Bond in such order as Landlord may determine in
2056 its sole discretion and use, apply or retain the whole or any part of such proceeds, to the extent
2057 required for the payment of any rent, or any other sum as to which Tenant is in default, or for any
2058 sum that Landlord may expend or may be required to expend by reason of the default (including
2059 any damages or deficiency accrued before or after summary proceedings or other re-entry by
2060 Landlord) to the extent permitted under this Lease.  If Landlord applies or retains any portion or
2061 all of the proceeds of the Letter of Credit and/or Surety Bond, Landlord shall so notify Tenant
2062 and Tenant shall promptly restore the amount so applied or retained by delivering an amendment
2063 to the Letter of Credit and/or Surety Bond, an additional or new Letter of Credit and/or Surety
2064 Bond, and/or a replacement Letter of Credit and/or Surety Bond so that, at all times, the amount
2065 of the Security Deposit shall be the amount required under this Article XI (subject to reduction as
2066 contemplated herein). Failure by Tenant to deliver any such amendment, additional or new, or
2067 replacement Letter of Credit or Surety Bond or pay the amount of any reduction in the Security
2068 Deposit or the Surety Bond in cash within ten (10) Business Days after receiving notice from
2069 Landlord that such action is required shall entitle Landlord to draw under the outstanding Letter
2070 of Credit and the Surety Bond and to retain, use and apply the entire proceeds thereof for
2071 application as the Security Deposit to the extent permitted under this Lease.  Landlord may also
2072 draw on the Letter of Credit and the Surety Bond and retain, use and apply the proceeds as the
2073 Security Deposit hereunder if (i) the credit rating of the long-term debt of the issuer of the Letter
2074 of Credit or the Surety Bond (according to Moody's or similar national rating agency) is
2075 downgraded to a grade below Investment Grade, (ii) the issuer of the Letter of Credit or the
2076 Surety Bond shall enter into any supervisory agreement with any governmental authority, or
2077 (iii) the issuer of the Letter of Credit or the Surety Bond shall fail to meet any capital
2078 requirements imposed by applicable law, and Tenant fails to deliver to Landlord a replacement
2079 Letter of Credit or Surety Bond, as applicable, complying with the terms of this Lease or cash in
2080 the amount then required as the Security Deposit within ten (10) Business Days of request
2081 therefor from Landlord.  Each Letter of Credit and Surety Bond shall be for the benefit of
2082 Landlord or its successors and assigns and shall entitle Landlord or its successors or assigns to
2083 draw under the Letter of Credit or Surety Bond, as applicable, from time to time in accordance
2084 with the terms of this Lease, in portions or in whole upon presentation of a sight draft and
2085 statement by Landlord that Landlord is entitled to draw thereunder pursuant to the terms and
2086 provisions of this Lease.  Landlord shall have an unrestricted right to transfer the Letter of Credit
2087 and the Surety Bond at any time and to any successor to Landlord, at Tenant's cost, provided that
2088 any such successor unconditionally assumes in writing all of the obligations of Landlord under

this Lease.  Provided there is no uncured Event of Default outstanding, any balance of the proceeds of the Letter of Credit and/or Surety Bond held by Landlord and not used, applied or retained by Landlord as above provided, and any remaining Letter of Credit and/or Surety Bond, shall be returned to Tenant within sixty (60) days following the last to occur of the end of the Lease Term and delivery of possession of the entire Premises to Landlord in accordance with the terms of this Lease.

11.2    The Security Deposit shall be delivered, in part, by Tenant in the form of a clean, irrevocable and unconditional letter of credit (such letter of credit, together with any amendment thereto or replacement thereof as provided herein, is called a "Letter of Credit") issued and drawn upon any commercial bank reasonably approved by Landlord and either having offices for banking purposes in Boston, Massachusetts or permitting draws via facsimile or overnight courier ("Issuing Bank"), which Letter of Credit shall have a term of not less than one year, be in form and content reasonably satisfactory to Landlord (it being agreed that the form attached hereto as Exhibit G is hereby approved by Landlord), and shall be for the account of Landlord. Landlord hereby approves JP Morgan Chase Bank N.A. as the issuer of the initial Letter of Credit.  The Letter of Credit shall provide that:

(a)    The Issuing Bank shall pay to Landlord or its duly authorized representative an amount up to the face amount of the Letter of Credit upon presentation of the Letter of Credit and a sight draft in the amount to be drawn;

(b)    The Letter of Credit shall be deemed to be automatically renewed, without amendment, for consecutive periods of one year each during the Lease Term, unless the Issuing Bank sends written notice (the "Non-Renewal Notice") to Landlord by certified or registered mail, return receipt requested, at least sixty (60) days prior to the expiration date of the Letter of Credit, to the effect that it elects not to have such Letter of Credit renewed;

(c)    The Letter of Credit delivered in respect of the last year of the Lease Term shall have an expiration date of not earlier than sixty (60) days after the Expiration Date; provided that, the foregoing may be accomplished through the issuance of replacements of the Letter of Credit in the event any Letter of Credit has a final expiration date that is earlier than the Expiration Date; and

(d)    The Letter of Credit shall be transferable by Landlord as provided in Section 11.8.

The amount of the Security Deposit with respect which Landlord can draw under the Letter of Credit (the "LC Amount") shall be automatically reduced to Twenty-Five Million Dollars ($25,000,000.00) on the seventh (7th) anniversary of the date that is five (5) months after the Initial Rent Commencement Date (such date, the "First Burndown Date") and Twenty Million Dollars ($20,000,000.00) on the first (1st) anniversary of the First Burndown Date; provided, however, notwithstanding anything to the contrary set forth in this Section 11.2, in no event shall the LC Amount as set forth above be reduced or burned down during any period during which an Event of Default by Tenant remains uncured, and the applicable reduction or burn down shall be tolled for a period of twelve (12) months from the date of the cure of such Event of Default (the "12-Month Tolling Period") and upon the expiration of such 12-Month Tolling Period, such

48

2130   scheduled reduction or burn down shall automatically take place, provided that no Event of
2131   Default then exists. Notwithstanding the forgoing, in the event any Event of Default occurs
2132   during any 12-Month Tolling Period, the applicable reduction or burn down shall continue to be
2133   tolled for an additional 12-Month Tolling Period commencing upon the cure of such Event of
2134   Default and thereafter the applicable reduction or burn down shall automatically take place upon
2135   the expiration of the last applicable additional 12-Month Tolling Period. Tenant shall have the
2136   right to effectuate such reduction by delivering to Landlord either (i) an amendment to the
2137   existing Letter of Credit reducing the amount thereof, which Landlord shall promptly
2138   countersign or authorize in writing if required by the Issuing Bank or (ii) a replacement Letter of
2139   Credit meeting the requirements of this Article XI in the reduced amount, in which event
2140   Landlord shall promptly return to Tenant the existing Letter of Credit then held by Landlord,
2141   together with any reasonable evidence of authority required by the Issuing Bank authorizing
2142   cancellation.

2143       11.3   Landlord, after receipt of the Non-Renewal Notice with respect to the Letter of
2144   Credit, shall have the right to draw the entire amount of the Letter of Credit and to hold the
2145   proceeds as a cash Security Deposit.  Landlord shall release such proceeds to Tenant upon
2146   delivery to Landlord of a replacement Letter of Credit complying with the terms hereof.

2147       11.4   The Security Deposit shall be delivered, in part, by Tenant in the form of a Lease
2148   Surety Bond (such bond, together with any amendment thereto or replacement thereof as
2149   provided herein, is called a "Surety Bond") issued by a surety insurance company licensed in the
2150   Commonwealth of Massachusetts and reasonably approved by Landlord (the "Surety"), which
2151   Surety Bond shall have a term of not less than one year, be in form and content reasonably
2152   acceptable to Landlord (it being agreed that the form attached hereto as Exhibit H is hereby
2153   approved by Landlord), and name Landlord as obligee.  Landlord approves Westchester Fire
2154   Insurance Company as the initial Surety. The Surety Bond shall provide that:

2155           (a)   The Surety shall pay to Landlord or its duly authorized representative an
2156   amount up to the face amount of the Surety Bond upon presentation of the applicable notice
2157   prescribed therein in the amount to be drawn;

2158           (b)   The Surety Bond shall be automatically renewed, without amendment, for
2159   consecutive periods of one year each during the Lease Term, unless the Surety sends a Non-
2160   Renewal Notice to Landlord by certified or registered mail, return receipt requested, at least
2161   sixty (60) days prior to the expiration date of the Surety Bond, to the effect that it elects not to
2162   have such Surety Bond renewed; and

2163           (c)   The Surety Bond shall be transferable by Landlord as provided in Section
2164   11.8.

2165   Notwithstanding anything to the contrary contained herein, the amount of the Security Deposit
2166   with respect to which Landlord can draw under the Surety Bond (the "SB Amount") shall be
2167   automatically reduced as follows:

2168

| Date of Reduction | Amount of Reduction | Reduced SB Amount |
|---|---|---|
| First Burndown Date | $5,000,000.00 | $15,000,000.00 |
| 1st Anniversary of First Burndown Date | $5,000,000.00 | $10,000,000.00 |
| 5th Anniversary of First Burndown Date | $10,000,000.00 | $0.00 |

2169

2170   Notwithstanding anything to the contrary set forth in this Section 11.4, in no event shall the SB
2171   Amount as set forth above be reduced or burned down during any period during which an Event
2172   of Default by Tenant remains uncured, and the applicable reduction or burn down shall be tolled
2173   for the 12-Month Tolling Period and upon the expiration of such 12-Month Tolling Period, such
2174   scheduled reduction or burn down shall automatically take place, provided that no Event of
2175   Default then exists.  Notwithstanding the forgoing, in the event any Event of Default occurs
2176   during any 12-Month Tolling Period, the applicable reduction or burn down shall continue to be
2177   tolled for an additional 12-Month Tolling Period commencing upon the cure of such Event of
2178   Default and thereafter the applicable reduction or burn down shall automatically take place upon
2179   the expiration of the last applicable additional 12-Month Tolling Period.  Tenant shall have the
2180   right to effectuate such reduction by delivering to Landlord either (i) an amendment to the
2181   existing Surety Bond reducing the amount thereof or (ii) a replacement Surety Bond meeting the
2182   requirements of this Article XI in the applicable reduced amount, in which event Landlord shall
2183   promptly return to Tenant the existing Surety Bond then held by Landlord, together with any
2184   reasonable evidence of authority required by the Surety authorizing cancellation.

2185       11.5   Landlord, after receipt of the Non-Renewal Notice with respect to the Surety
2186   Bond, shall have the right to draw the entire amount of the Surety Bond and to hold the proceeds
2187   as a cash Security Deposit.  Landlord shall release such proceeds to Tenant upon delivery to
2188   Landlord of a replacement Surety Bond complying with the terms hereof.

2189       11.6   Notwithstanding anything to the contrary set forth in this Article XI, if at any time
2190   Tenant has a credit rating that is Investment Grade or better, Tenant's obligation to maintain the
2191   Surety Bond hereunder shall be null and void and Landlord shall, within thirty (30) days after
2192   written request from Tenant (which shall be accompanied by such evidence of Tenant's credit
2193   rating as is reasonably required by Landlord), return the Surety Bond to Tenant; provided that, if
2194   at any time Tenant's credit rating thereafter ceases to be Investment Grade or better, Tenant shall
2195   immediately be required to promptly provide a Surety Bond pursuant to and in accordance with
2196   the terms of Section 11.4.

2197       11.7   Notwithstanding anything to the contrary set forth in this Article XI, at any time
2198   during the Lease Term, Tenant shall have the right to reduce the amount of the Letter of Credit
2199   up to a maximum of Five Million Dollars ($5,000,000.00) by increasing the SB Amount by two
2200   (2) times the amount that the LC Amount is decreased, up to a maximum of Ten Million Dollars
2201   ($10,000,000.00).  Tenant shall effectuate such increase in the SB Amount by delivering to
2202   Landlord either (i) an amendment to the existing Surety Bond increasing the amount thereof or

50

(ii) a replacement Surety Bond meeting the requirements of this <u>Article XI</u> in the applicable increased amount, in which event Landlord shall promptly return to Tenant the existing Surety Bond then held by Landlord, together with any reasonable evidence of authority required by the Surety authorizing cancellation. In addition, Tenant shall have the right to effectuate such reduction in the LC Amount by delivering to Landlord either (i) an amendment to the existing Letter of Credit reducing the amount thereof or (ii) a replacement Letter of Credit meeting the requirements of this <u>Article XI</u> in the applicable reduced amount, in which event Landlord shall promptly return to Tenant the existing Letter of Credit then held by Landlord, together with any reasonable evidence of authority required by the issuer authorizing cancellation.

11.8    In the event of the sale of the Building, Landlord shall transfer the Security Deposit, at Tenant's cost, to the purchaser or lessee, and, provided such purchaser or lessee unconditionally assumes in writing Landlord's obligations hereunder from and after the date of such sale or lease, Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit.  In such event, Tenant agrees to look solely to the new Landlord for the return of said Security Deposit.  It is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new Landlord.  Tenant shall execute such documents as may be necessary to accomplish such transfer or assignment of the Letter of Credit and/or Surety Bond.  Notwithstanding the foregoing or anything to the contrary herein, Tenant acknowledges and agrees that Landlord may mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and/or convey the Security Deposit (including, without limitation, the Letter of Credit and the Surety Bond) to the holder of a Mortgage so long as the Mortgagee shall be subject to the terms and conditions of this Lease.

11.9    Tenant covenants that it will not assign or encumber, or attempt to assign or encumber, the Security Deposit held hereunder, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.

<div align="center">

**ARTICLE XII**
**INSPECTION**

</div>

12.1    Tenant shall permit Landlord, its agents and representatives and the holder of any Mortgage, to enter the Premises at any time and from time to time, without charge therefor and without diminution of the rent payable by Tenant in order to examine, inspect or protect the Premises and the Building, to make such alterations and/or repairs as in the reasonable judgment of Landlord may be deemed necessary or desirable (subject to <u>Section 14.9</u> and <u>Section 23.4</u> hereof), or to exhibit the same to brokers, prospective tenants (during the last twelve (12) months of the Lease Term), lenders, purchasers and others; it being understood, however, that Landlord shall provide Tenant with advance notice (except in the event of an emergency) and may be accompanied by a Tenant escort (provided, however, that Landlord's entry rights shall not be diminished to the extent that Tenant fails to make an escort available).  Landlord's notice shall: (i) include the anticipated time, duration and nature thereof; and (ii) except in the event of an emergency, be given at least forty-eight (48) hours in advance and the commencement of such Landlord activity may be deferred, at Tenant's election by written notice to Landlord given prior to the expiration of such forty-eight (48) hour period, for up to five (5) days.  Landlord shall use commercially reasonable efforts not to interfere, in any material respect, with Tenant's business

<div align="center">51</div>

2246  operations and any such entry shall not violate any provisions of this Lease.  In the event any
2247  work to be performed in connection with such access is expected to unreasonably disturb Tenant
2248  or Permitted Tenant Parties (except in the event of an emergency), Tenant may require such
2249  work to be performed after Building Hours.  Tenant shall have the right to designate certain areas
2250  located entirely within the Premises (not to exceed five percent (5%) of the rentable area of the
2251  Premises in the aggregate) as locked documentation rooms (each a "Secured Access Area") upon
2252  at least thirty (30) days prior written notice to Landlord, provided (a) such written notice includes
2253  a copy of the floor plan clearly designating the Secured Access Area, (b) the area so designated
2254  is clearly and fully marked "Secured Access Area" by signs posted within the Premises, and (c)
2255  at the time of such written notice, Landlord is given a key, pass card, lock combination or similar
2256  access ability (collectively referred to in this Section as a "key") to the Secured Access Area.
2257  Any installations or alterations within or on account of any Secured Access Area shall be subject
2258  to Article IX and the other applicable provisions of this Lease.  Except in the event of an
2259  emergency or other out of the ordinary circumstances, Landlord shall not enter any Secured
2260  Access Area without prior notice to Tenant and unless accompanied by a representative of
2261  Tenant (who Tenant shall make available immediately upon request).  Notwithstanding the
2262  foregoing, Landlord acknowledges that Tenant shall not be required to provide Landlord with a
2263  key to any individual offices located within the Premises.  Tenant shall pay, within ten (10) days
2264  after request therefor, all costs incurred by Landlord in connection with Landlord's compliance
2265  with this Section, including, without limitation, any overtime or additional charges for services
2266  or repair work not performed at the customary times or in the customary manner, provided,
2267  however, that except in the event of an emergency, Landlord shall notify Tenant prior to
2268  incurring any such overtime or additional charges and shall reasonable cooperate with Tenant to
2269  minimize same.  In addition, Tenant shall indemnify and hold harmless Landlord from and
2270  against any cost or liability resulting from Landlord's inability to gain access to or use of the
2271  Premises arising out of the limitation on Landlord's access set forth in this Section, and Landlord
2272  shall not be liable to Tenant for any damage caused to the Premises as a result of Landlord's
2273  entry into areas to which Landlord has not been provided a key in an emergency presenting a
2274  material risk of injury to persons or material property damage.

2275  <div align="center">ARTICLE XIII</div>
2276  <div align="center">INSURANCE</div>

2277       13.1    Tenant shall not conduct or permit to be conducted any activity, or place or permit
2278  to be placed any equipment or other item in or about the Premises or the Building, which will in
2279  any way increase the rate of property insurance or other insurance on the Building.  If any
2280  increase in the rate of property or other insurance is solely, directly and ascertainably due to any
2281  activity, equipment or other item of Tenant, then (whether or not Landlord has consented to such
2282  activity, equipment or other item) Tenant shall pay as additional rent due hereunder the amount
2283  of such increase.  The statement of any applicable insurance company or insurance rating
2284  organization (or other organization exercising similar functions in connection with the
2285  prevention of fire or the correction of hazardous conditions) that an increase is solely due to any
2286  such activity, equipment or other item shall be conclusive evidence thereof.

2287       13.2    (a)    Throughout the Lease Term, Tenant shall obtain and maintain at its sole
2288  cost and expense: (1) commercial general liability insurance (written on an occurrence basis and
2289  having the general aggregate set forth below apply on a per location basis) including coverage

<div align="center">52</div>

2290    for bodily injury (inclusive but not limited to coverage for death), property damage and host
2291    liquor liability coverage, contractual liability coverage, premises and operations coverage, ,
2292    liquor liability coverage (in the event Tenant sells alcohol at the Premises or Building), which
2293    insurance shall include an exception to any pollution exclusion which insures damage or injury
2294    arising out of heat, smoke or fumes from a hostile fire, and a standard separation of insureds
2295    provision; (2) business interruption insurance; (3) "causes of loss – special form" (or equivalent)
2296    property insurance; (4) automobile liability insurance (covering automobiles owned, hired or
2297    used by Tenant in carrying on its business, if any); (5) worker's compensation insurance
2298    (covering Tenant's employees); (6) employer's liability insurance (covering Tenant's
2299    employees); (7) umbrella or excess liability coverage on a following form basis in excess of the
2300    primary commercial liability, business auto liability, and employer's liability coverages specified
2301    above and which insures against bodily injury, property damage, personal injury and advertising
2302    injury claims; (8) boiler and machinery insurance against loss or damage from an accident from
2303    equipment used by Tenant at the Premises; (9) at all times during the period between the
2304    commencement of construction of any Alterations until completion thereof, and during the
2305    performance of Tenant's Work and continuing until the date on which Tenant opens the Premises
2306    for business with the public with a valid certificate of occupancy in place, property insurance in
2307    Builder's Risk Form or equivalent covering Landlord, Landlord's architects, Tenant and
2308    Tenant's contractors, as their interest may appear, against loss or damage by fire, vandalism, and
2309    malicious mischief and other such risks as are customarily covered by the so-called "all risk or
2310    special perils" upon all Alterations, including Tenant's Work in place, Boiler & Machinery, and
2311    all materials stored at the site of such Alterations, including Tenant's Work, and all materials,
2312    equipment, supplies and temporary structures of all kinds incident to such Alterations, including
2313    Tenant's Work and builder's machinery, tools and equipment, all while forming a part of, or on
2314    the Premises, or when adjacent thereto, while on drives, sidewalks, streets or alleys, all on a
2315    completed value basis for the full insurable value at all times, which Builder's Risk Insurance or
2316    equivalent shall contain an express waiver of any right of subrogation by the insurer against
2317    Landlord, its agents and employees.  Such commercial general liability insurance shall be in
2318    minimum amounts typically carried by prudent tenants engaged in similar operations, but in no
2319    event shall be in amounts less than One Million Dollars ($1,000,000) combined single limit per
2320    occurrence, Two Million Dollars ($2,000,000) annual general aggregate (on a per location basis),
2321    One Million Dollars ($1,000,000) products/completed operations aggregate, One Million Dollars
2322    ($1,000,000) personal and advertising injury liability, and One Million Dollars ($1,000,000) fire
2323    damage legal liability.  Such business interruption insurance shall be in minimum amounts
2324    typically carried by prudent tenants engaged in similar operations, but in no event shall be in an
2325    amount less than the Base Rent then in effect.  Such property insurance shall be in an amount not
2326    less than the full replacement cost of all tenant improvements installed in the Premises, all
2327    Alterations and all other contents of the Premises in the event of loss (including, without
2328    limitation, Tenant's trade fixtures, installations, decorations, furnishings, inventory, equipment
2329    and personal property).  Tenant covenants and agrees that, to the maximum extent permitted by
2330    law, all merchandise, furniture, fixtures and property of every kind, nature and description
2331    related or arising out of Tenant's leasehold estate hereunder, shall be at the sole risk and hazard
2332    of Tenant, and that if any part thereof shall be damaged, destroyed, stolen or removed for any
2333    cause or reason whatsoever, no part of such damage or loss shall be charged to, or borne by,
2334    Landlord, unless caused by the gross negligence or willful misconduct of Landlord.  Such
2335    automobile liability insurance shall be in an amount not less than One Million Dollars

53

2336 ($1,000,000) combined single limit for each accident.  Such worker's compensation insurance
2337 shall be in minimum limits as defined by the law of the jurisdiction in which the Building is
2338 located (as the same may be amended from time to time).  Such employer's liability insurance
2339 shall be in an amount not less than One Million Dollars ($1,000,000) for each accident, One
2340 Million Dollars ($1,000,000) disease-policy limit, and One Million Dollars ($1,000,000)
2341 disease-each employee.  Such umbrella or excess liability insurance shall be in minimum
2342 amounts of Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars
2343 ($5,000,000) annual aggregate per location, in addition to the limits stated above for the
2344 commercial general liability, business auto liability and employer's liability insurance.  Such
2345 boiler and machinery coverage shall be in minimum amounts typically covered by prudent
2346 tenants engaged in similar operations.  In the event Tenant subleases all or any part of the
2347 Premises, Tenant shall require its subtenant(s) to also carry and maintain the same insurance
2348 coverage terms and limits as required of Tenant pursuant to this <u>Article XIII</u>.

2349                (b)    All such insurance shall:  (1) be issued by a company that is approved to
2350 do business in the jurisdiction in which the Building is located and that has a rating equal to or
2351 exceeding A-:VII from the most current A.M. Best's Insurance Guide; (2) with respect to the
2352 commercial general liability and umbrella or excess liability insurance, name Landlord, its
2353 advisors, the managing agent of the Building and the holder of any Mortgage, in each case of
2354 whom Landlord gives notice to Tenant, and any other parties, with insurable interest in the
2355 Premises, that Landlord may designate from time to time (the "<u>Landlord Insured Parties</u>") as
2356 additional insureds with respect to liability arising out of Tenant's leasing, maintenance, use or
2357 occupancy of the Premises on a primary basis including completed operations; (3) with respect
2358 to the property insurance and builder's risk insurance, contain no prohibition against the insured
2359 having waived its right of action against any party prior to the occurrence of a loss (Tenant
2360 hereby waiving its right of action and recovery against and releasing Landlord and Landlord's
2361 Representatives from any and all Claims for which they may otherwise be liable to the extent
2362 Tenant is covered by such property and builder's risk insurance carried or required to be carried
2363 under this Lease); (4) provide, if commercially available, that the property and builder's risk
2364 insurer thereunder waives all right of recovery by way of subrogation against Landlord and
2365 Landlord's Representatives in connection with any loss or damage covered by such policy; (5)
2366 with respect to the commercial general liability and umbrella/excess liability insurance be
2367 primary and non-contributory to any insurance carried by Landlord; and (6) to the extent such a
2368 provision is then available from Tenant's commercial general liability insurer, contain an
2369 endorsement prohibiting cancellation of insurance without the insurer first giving Landlord, and
2370 such other parties as may be required from time to time by Landlord, thirty (30) days' (or ten
2371 (10) days' in the event of nonpayment of premiums) prior written notice of such proposed
2372 action.  Limits of insurance may be maintained through a combination of primary and
2373 umbrella/excess insurance. Tenant shall cause Tenant's contractors, sub-contractors and any
2374 sub-subcontractors to secure, pay for, and maintain during the continuance of any Alterations,
2375 or other alterations, improvements, construction, fixturing or related work thereafter performed
2376 within the Building or the Premises, insurance as set forth in the attached <u>Exhibit F</u>.  Any
2377 deductible provision or self-insured retention in such insurance policies shall be in a
2378 commercially reasonable amount based on the size and net worth of Tenant or its parent
2379 company from time to time.  Tenant shall deliver to Landlord prior to the date on which any
2380 portion of the Premises is delivered to Landlord in the Ready for Buildout Condition and,

thereafter, upon written request by Landlord, and, at the request of Landlord to the holder of any Mortgage, an Acord 25 certificate with respect to all liability insurance and an Acord 28 certificate with respect to all property insurance confirming that all insurance requirements in this Article XIII have been met (provided, however, that Tenant's failure to provide evidence of such insurance, and any resulting delay in Tenant being granted access the Premises or the Building, shall not delay a Lease Commencement Date or a Rent Commencement Date hereunder).  If Tenant fails to provide evidence of insurance required to be provided by Tenant hereunder, prior to commencement of the Lease Term and thereafter within thirty (30) days following Landlord's request during the Lease Term, Landlord shall be authorized (but not required) after ten (10) days' prior notice to procure such coverage in the amount stated with all costs thereof to be chargeable to Tenant and payable as additional rent upon written invoice therefor.  Landlord makes no representation or warranty to Tenant that the amount of insurance required to be carried by Tenant under the terms of this Lease is adequate to fully protect Tenant's interest.  Tenant is encouraged to evaluate its insurance needs and obtain whatever additional types or amounts of insurance that it may deem desirable or appropriate.

13.3    Landlord agrees to carry and maintain "causes of loss – special form" (or equivalent) property insurance (with full replacement cost coverage) covering the Building, including boiler and machinery insurance in an amount equal to the replacement cost of the Land and the Building (excluding foundation and footing, and excluding property required to be insured by Tenant) and Landlord's property therein in an amount required by its insurance company to avoid the application of any coinsurance provision, but at least full replacement cost, and business interruption insurance in an amount equal to all rents receivable for a period of twelve (12)  months.  Landlord hereby waives its right of recovery against Tenant and releases Tenant from any and all Claims for which Tenant may otherwise be liable to the extent Landlord receives proceeds from its property insurance therefor.  Landlord shall secure a waiver of subrogation endorsement from its insurance carrier.  Landlord also agrees to carry and maintain commercial general liability insurance and umbrella or excess liability insurance in limits comparable to those carried by landlords of Comparable Buildings (but in no event less than the limits required by Tenant pursuant to Section 13.2).  Landlord may elect to carry such other additional insurance or higher limits as it reasonably deems appropriate.  Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, Tenant's personal property or any Alterations, and that Landlord shall not carry insurance against, or be responsible for any loss suffered by Tenant due to, interruption of Tenant's business.

13.4    Notwithstanding anything to the contrary contained in this Article XIII, Tenant shall, at Tenant's election, be entitled to self-insure its insurance requirements set forth in this Lease, provided that any self-insurance shall be deemed to contain all of the terms and conditions applicable to such insurance as required in this Article XIII, including, without limitation, a waiver of subrogation with respect to property insurance.  With respect to any claims which may result from incidents occurring during the Lease Term, Tenant's self-insurance obligation shall survive the expiration of the Lease Term to the same extent as the insurance required under this Article XIII would survive.  Notwithstanding anything to the contrary contained in this Article XIII, Tenant shall only have the right to self-insure its insurance requirements under this Section 13.4 if Tenant or the ultimate parent company of Tenant continues to maintain a net worth (excluding good will as an asset and taking into account contingent liabilities), as evidenced by Tenant's or Tenant's parent's most recent year-end financial statement audited by a certified

55

2426    public accountant, of equal to or greater than Seven Hundred Fifty Million and 00/100 Dollars
2427    ($750,000,000.00) (the "Financial Requirement"); provided, however, that Tenant's parent's net
2428    worth shall only qualify to meet the Financial Requirement in the event that such entity
2429    undertakes to be responsible for Tenant's insurance obligations under this Lease and
2430    acknowledges such obligation in writing and in a form reasonably acceptable to Landlord. If
2431    self-insuring, Tenant agrees to provide to Landlord, no more than once per calendar year, upon
2432    written request from Landlord within fifteen (15) days following Landlord's request and
2433    provided any reviewing party executes Tenant's commercially reasonable standard non-
2434    disclosure agreement, current annual financial statements accurately reflecting Tenant's and
2435    Tenant's parent's financial condition, which financial statements shall be certified as true and
2436    correct in all material respects by an authorized officer of Tenant or Tenant's parent entity
2437    (Landlord acknowledging that delivery of such financial statements by Tenant may be
2438    accomplished by Tenant providing Landlord with a secure internet link to access such statements
2439    online). Notwithstanding the foregoing, if Tenant's complete financial statements are accessible
2440    online through filings with the United States Securities and Exchange Commission, or any other
2441    governmental authority of which Tenant notifies Landlord and Landlord is readily able to access
2442    the website of the other governmental authority, Tenant shall not be required to independently
2443    provide Landlord or its representatives with the requested financial information. Tenant shall
2444    only be permitted to self-insure its insurance obligations if Tenant maintains a reasonable and
2445    prudent program of self-insurance as part of a regular program of self-insurance, with adequate
2446    cash reserves set aside for reasonable loss contingencies. With respect to such self-insurance,
2447    Tenant hereby waives and releases Landlord from any and all claims, losses, expenses, damages
2448    and liability for which Landlord is or may be held liable based on or arising out of any act,
2449    occurrence or inaction that would have been covered by such insurance had Tenant maintained
2450    same.

2451                                          ARTICLE XIV
2452                                  SERVICES AND UTILITIES

2453        14.1    Landlord shall manage and operate (or cause to be managed and operated) the
2454    Building in a manner consistent with Comparable Buildings (the "Comparable Standard"). From
2455    and after the applicable Lease Commencement Date for each portion of the Premises, Landlord
2456    will provide to such portions of the Premises services and utilities twenty-four (24) hours per
2457    day, seven (7) days per week, three hundred sixty-five (365) days per year (except in the event of
2458    emergencies or as otherwise provided herein), in accordance with applicable Law and in
2459    accordance with the standards set forth below and in accordance with Exhibit B-1 and Exhibit L;
2460    or, if no standards are specified below, in a manner and at a level consistent with the Comparable
2461    Standard: Air-conditioning and heating capable of maintaining the following indoor design
2462    conditions: Winter: 72 degrees Fahrenheit dry bulb with 30% relative humidity and Summer: 74
2463    degrees Fahrenheit dry bulb with 50% relative humidity, janitorial service for the Common
2464    Areas on Monday through Friday (or, at Landlord's option, Sunday through Thursday) only
2465    (excluding Holidays) in accordance with the specifications set forth on Exhibit L attached hereto,
2466    electric power from the utility provider sufficient for customary lighting purposes, and normal
2467    office use in a minimum capacity of 4.5 watts demand load per rentable square foot of the
2468    Premises (exclusive of Building Systems, supplemental HVAC, fan-powered boxes and hot
2469    water heaters) and electricity required to heat water for bathrooms and pantries, hot and cold
2470    water for ordinary lavatory, pantry, drinking and cleaning purposes and if Tenant requires or

                                          56

2471 consumes excess water or water for any additional purpose, then Tenant shall pay Landlord a
2472 charge therefor based on meter readings, as well as any taxes, sewer rents or other charges which
2473 may be imposed by any governmental authority based upon the quantity of water so used by
2474 Tenant); elevator service, landscaping and snow removal during the seasons they are required,
2475 and exterior window-cleaning service.  The parties acknowledge and agree that Tenant has
2476 elected to provide its own janitorial service for the Premises and, accordingly, Landlord shall not
2477 be required to provide any janitorial service to the Premises and the costs of such service to clean
2478 tenant spaces in the Building shall not be included in calculating Operating Charges.  If Tenant
2479 requires air-conditioning or heat beyond the Building Hours, then Landlord will furnish the
2480 same, provided Tenant gives Landlord advance notice of such requirement (by 2:00 p.m. of the
2481 same day for extra service needed Monday through Friday, and 2:00 p.m. on Friday for extra
2482 service needed on Saturday or Sunday).  Tenant shall pay for such extra service in accordance
2483 with Landlord's then current commercially reasonable schedule (which shall not include a profit
2484 increment) which shall be generally consistent with rates charged at Comparable Buildings.  In
2485 the event Tenant desires heating and air-conditioning during the Building Hours (excluding
2486 Holidays) on Saturdays, Tenant must request the same by giving Landlord notice by 2:00 p.m. on
2487 the immediately preceding Friday.  Tenant agrees to cooperate fully with Landlord with regard
2488 to, and to abide by all the reasonable regulations and requirements which Landlord may
2489 prescribe for the proper functioning and protection of the air conditioning system.  All services
2490 provided by Landlord to Tenant are based upon an assumed maximum premises population of
2491 eight (8) persons per one thousand (1,000) square feet of usable area (the "Occupancy
2492 Threshold").  Tenant shall have the right to exceed the Occupancy Threshold to the extent
2493 permitted by applicable Laws; provided, however, that if Tenant elects to exceed the Occupancy
2494 Threshold and actually does occupy the Premises in excess of the Occupancy Threshold, Tenant
2495 shall be responsible for the costs and expenses caused directly from Tenant's actual occupancy
2496 (e.g. costs related to amending the certificate of occupancy for the Premises or the Building, the
2497 installation of a dedicated supplemental HVAC system and the cost of any excess utilities or
2498 services consumed as a result thereof) to the extent such costs and expenses would be Tenant's
2499 responsibility under the Lease, subject to Landlord's maintenance and repair obligations.  To the
2500 extent Tenant provides or contracts for any services relating to any Building Structure or
2501 Building System or any service or utility being provided by Landlord to the Premises directly
2502 from the supplier (which, except as provided herein (e.g., janitorial) Tenant shall not be
2503 permitted to do without Landlord's prior written consent, which consent shall not be
2504 unreasonably withheld, conditioned or delayed), Tenant shall enter into and maintain a service
2505 contract therefor with a contractor licensed to do business in the jurisdiction in which the
2506 Building is located and otherwise approved by Landlord.  From time to time, at Landlord's
2507 request, Tenant shall provide Landlord with copies of all service contracts.  Notwithstanding
2508 anything above to the contrary, Tenant shall have access to the Building twenty-four (24) hours
2509 per day each day of the year (except in the event of an emergency), and Landlord will not
2510 discriminate in the implementation or enforcement of any access limitations or procedures
2511 applicable to any Permitted Tenant Party or Tenant's employees, guests and visitors.  Landlord
2512 shall provide access to the Building and the Parking Facility, including such valet arrangements,
2513 if any, as may be provided or permitted pursuant thereto at times other than Building Hours.
2514 Tenant shall have the right to install its own security access system to the Premises, which shall
2515 be coordinated with the Building and the Parking Facility, if required.  All persons entering or
2516 exiting the Building at times other than the Building Hours without an access key shall, at

57

2517 Landlord's discretion, be required to sign in and out.  In addition to the foregoing, Landlord and
2518 Tenant agree to comply with and all services shall be provided in accordance with the specific
2519 operational requirements set forth on Exhibit L attached hereto, and to the extent of any direct
2520 inconsistency between the terms of this Lease and the term set forth on Exhibit L, the terms set
2521 forth on Exhibit L shall control.

2522       14.2    Landlord may install, at Landlord's expense, checkmeters to electrical circuits
2523 serving Tenant's equipment to verify that Tenant is not consuming excessive electricity (as
2524 defined below).  If such checkmeters indicate that Tenant's electricity consumption is excessive,
2525 then Landlord may install at Tenant's expense submeters to ascertain Tenant's actual electricity
2526 consumption, and Tenant shall thereafter pay for Tenant's entire consumption at the then-current
2527 rates charged by the electric service provider, with Landlord making an appropriate adjustment
2528 to Operating Charges on account thereof).  Tenant's electricity consumption shall be deemed
2529 excessive if the electricity consumption in the Premises per square foot of rentable area
2530 (including, without limitation, electricity consumed in connection with outlets and lighting use)
2531 during any three (3) month billing period exceeds the average electricity consumption per square
2532 foot of rentable area during the same period for typical, similarly situated tenants in the Building,
2533 as reasonably calculated by Landlord in good faith. Landlord shall use commercially reasonable
2534 efforts not to make determinations of excessive consumption of electricity in a manner which
2535 unreasonably discriminates among similarly situated tenants.

2536       14.3    If Landlord reasonably determines that Tenant is using water, sewer and chiller
2537 services in excess of the estimated usage in the Premises (per square foot of rentable area) during
2538 any three (3) month billing period over the average usage (per square foot of rentable area)
2539 during the same period for the entire Building, as reasonably calculated by Landlord in good
2540 faith, then Landlord may install at Tenant's expense submeters to ascertain Tenant's actual
2541 consumption, and Tenant shall thereafter pay for Tenant's entire consumption at the then-current
2542 rates charged by the applicable service provider, with Landlord making an appropriate
2543 adjustment to Operating Charges on account thereof.

2544       14.4    In addition, Tenant may request that Landlord make available additional electrical
2545 capacity to Tenant for the future electrical requirements that Tenant then reasonably anticipates.
2546 Landlord shall make available to Tenant the additional electrical capacity as reasonably
2547 requested by Tenant to the extent that such additional electrical capacity is available in the
2548 Building (taking into consideration future tenant needs) or is reasonably obtainable from the
2549 utility provider. If making such additional electrical capacity available to Tenant necessitates the
2550 installation of an additional riser or any other proper and necessary equipment, including,
2551 without limitation, any switchgear, then Landlord shall perform such installation with reasonable
2552 diligence and in accordance with good construction practice.  Any such installation shall be
2553 made at Tenant's sole cost and expense, based upon the actual out-of-pocket costs incurred by
2554 Landlord, and shall be chargeable and collectible as additional rent and paid within thirty (30)
2555 days after the rendition of a bill to Tenant therefor.  Tenant shall also pay any charges imposed
2556 by the utility company in connection with providing such additional electrical capacity to the
2557 Building. Tenant shall maintain and repair all meters and submeters at Tenant's cost. Tenant's
2558 consumption of electric energy shall be measured by the submeter(s) and the equipment ancillary
2559 thereto installed in the Premises (or in the electrical closet on each floor in which the Premises
2560 are located) by Landlord, at Tenant's sole cost (the "Submeters"), which shall measure the

2561 demand and consumption in the Premises of electric current during each month occurring during
2562 the Lease Term, and Landlord shall operate such Submeters to ascertain Tenant's consumption
2563 of kilowatt hours (herein called "KWH"), by time of day, if applicable, and demand in kilowatts
2564 (herein called "KW") for each month (or other billing period reasonably determined by
2565 Landlord). If there is more than one Submeter, then the readings shall be totaled for purposes of
2566 calculating Tenant's charges hereunder. Tenant shall pay Landlord for the furnishing of
2567 electricity for the Premises as set forth herein, as additional rent within thirty (30) days after
2568 receipt of an invoice from Landlord or Landlord's agent, an amount determined for each billing
2569 period by applying the KWH and KW shown on the Submeters to the rates pursuant to which
2570 Landlord purchases electric current for the Building during the particular billing period,
2571 including any taxes, fuel adjustment charges, surcharges, demand charges, energy charges, time-
2572 of-day charges, rate adjustment charges or other impositions of any nature payable by Landlord
2573 but excluding any profit or markup by Landlord (herein called "Landlord's Rate"). If any tax is
2574 imposed upon Landlord's receipts from the sale or resale of electrical energy to Tenant, then the
2575 pro rata share applicable to the electrical energy service received by, through or under Tenant
2576 shall be passed on to, included in the bill of, and paid by, Tenant if and to the extent permitted by
2577 Law.  If consumption or demand is billed at different rates depending on different subdivisions
2578 or categories of the rate schedule, then Tenant's KWH consumption and KW demand shall be
2579 billed at Landlord's Rate per KW or KWH (as the case may be) for such subdivision or category
2580 (e.g., KWH consumption is currently billed at different rates depending on the time of day of
2581 consumption and accordingly Tenant's KWHs shall be applied separately to the rates applicable
2582 to the period in which each KWH of Tenant's consumption was consumed). Notwithstanding the
2583 foregoing, Tenant shall have the right at any time to contract directly with a utility provider and
2584 to pay for all deposits for, and costs relating to, such service, in lieu of obtaining such utility
2585 service via the Submeters.

2586    14.5   Landlord, at its sole cost and expense, shall construct a visitor's welcome center,
2587 not to exceed five hundred (500) square feet in size, for Tenant's Permitted Parties in the
2588 approximate location in the lobby of the Building shown on Exhibit N, and shall use
2589 commercially reasonable efforts to complete such construction on or before September 1, 2019.
2590 In the event the visitor's welcome center is not completed by such date, Landlord shall install a
2591 safe and aesthetically pleasing barricade between the proposed site of the visitor's welcome
2592 center and the remainder of the lobby of the Building and shall permit Tenant to utilize a
2593 temporary desk to be provided by Landlord for use by Tenant and its employees for the purpose
2594 of welcoming Tenant's Permitted Parties.  Tenant shall have the right, by delivery of written
2595 notice to Landlord within nine (9) months following the Execution Date, to require Landlord to
2596 construct a fitness center, up to fifteen thousand (15,000) square feet in size, within a location of
2597 the Building that is designated by Landlord.  If Tenant so elects, Tenant shall have the right to
2598 operate the fitness center for the benefit of all tenants and occupants of the Building on terms and
2599 conditions as be mutually acceptable to Landlord and Tenant.  In the event that Landlord
2600 constructs a fitness center pursuant to this Section 14.5, Landlord shall install a safe and
2601 aesthetically pleasing barricade between the proposed site of the fitness center and adjacent
2602 Common Areas.

2603    14.6   Landlord shall not have any liability to Tenant, and Tenant shall not be entitled to
2604 terminate this Lease or receive a rent abatement, in the event of Landlord's failure or inability to
2605 furnish any of the utilities or services required to be furnished by Landlord hereunder; provided,

2606  however, if the business of Tenant (or of any Member) is materially adversely affected, as a
2607  result of (i) any failure to provide services, utilities or access to the Premises as required by this
2608  Lease, (ii) Landlord's (or Landlord's Agents') negligence or willful misconduct, or (iii) any
2609  repair, maintenance, alteration or remediation performed by Landlord, or which Landlord failed
2610  to perform as required by this Lease (each an "Abatement Event"), then Tenant shall give
2611  Landlord notice of such Abatement Event, and if such Abatement Event continues for four (4)
2612  consecutive Business Days after Landlord's receipt of any such notice (the "Eligibility Period"),
2613  and Tenant's (or any applicable Member's) ability to use the Premises to conduct its business in
2614  the ordinary course is materially adversely affected, then the Base Rent and Tenant's
2615  Proportionate Share of Operating Charges and Real Estate Taxes shall be abated or reduced, as
2616  the case may be, after expiration of the Eligibility Period for such time that the business of
2617  Tenant (or of any applicable Member) continues to be so materially adversely affected, in the
2618  proportion that the rentable area of the portion of the Premises that is materially adversely
2619  affected bears to the entire rentable area of the Premises, provided, however, that if a portion of
2620  the Premises is materially adversely affected for a period of time in excess of the Eligibility
2621  Period and the remaining portion of the Premises is not sufficient to allow Tenant (or Tenant's
2622  Members) to effectively conduct business therein in the ordinary course, then for such time after
2623  expiration of the Eligibility Period during which Tenant (or Tenant's Members) is so prevented
2624  from effectively conducting business therein in the ordinary course, and actually does not
2625  conduct business therein in the ordinary course, the Base Rent and Tenant's Proportionate Share
2626  of Operating Charges and Real Estate Taxes shall be abated for such time as Tenant (and
2627  Tenant's Members) continues to be so prevented from effectively conducting business therein in
2628  the ordinary course. If, however, the business of Tenant (and of Tenant's Members) is no longer
2629  materially adversely affected during such period, then the applicable rent shall be payable by
2630  Tenant from the date when the business of Tenant (and Tenant's Members) is no longer
2631  materially adversely affected. If any Abatement Event occurs, Landlord shall use prompt and
2632  diligent efforts to commence and complete the repairs or work needed to minimize the impact to
2633  Tenant of such Abatement Event.

2634       14.7    Notwithstanding anything herein to the contrary, Landlord hereby acknowledges
2635  that Tenant shall have the right, at Tenant's expense, to install a security system within the
2636  Premises in accordance with Exhibit L.  Tenant shall have the right to provide security as
2637  appropriate and to Tenant's reasonable standards, which shall include card readers and security
2638  cameras in the Premises and the elevators lobbies and core restrooms on floors fully-leased by
2639  Tenant (provided that any security cameras installed by Tenant shall be removed by Tenant at
2640  the expiration or earlier termination of the Lease Term).  Landlord may not install cameras in the
2641  Premises. Tenant shall have the right to integrate any card access system used for entry to the
2642  Premises with the Building-wide card key security system, so that Tenant's employees and
2643  members would only need to carry a single access card to gain entry to the Premises and the
2644  Building, provided that Landlord's access to the Premises shall not be impeded in any way and at
2645  any time and, if necessary Tenant shall provide Landlord with a "master" card key so that
2646  Landlord shall have access through each entry door to the Premises.  Tenant will provide
2647  Tenant's Members with card keys to access the Premises.  Tenant, at Tenant's sole cost and
2648  expense, shall have the right, but not the obligation, to station one individual (who is either an
2649  employee of Tenant or an independent contractor engaged by Tenant, "Tenant's Security
2650  Personnel") at a security desk in the lobby of the Building as reasonably designated from time to

2651 time by Landlord.  Tenant's Security Personnel shall be entitled to issue guest passes to Tenant's
2652 guests at the Building.  If Tenant at any time does not operate independent security personnel in
2653 the Building lobby, Landlord shall cooperate with Tenant, at no cost to Landlord, to incorporate
2654 the "WeWork Guest Registration Portal" into the Tenant security desk's system so that guests of
2655 Tenant, Tenant's employees and members can be registered through such WeWork Guest
2656 Registration Portal (including the WeWork website and mobile application).

2657        14.8    Notwithstanding anything contained herein to the contrary, Landlord shall provide
2658 Tenant with no less than ten (10) days' prior written notice of any planned service or utility
2659 interruptions or shutdowns and, except in an emergency, Tenant shall have the right to cause
2660 Landlord to postpone such interruption or shutdown for a reasonable period of time to
2661 accommodate Tenant's schedule (or any Members' schedules), provided, however, that Tenant
2662 shall notify Landlord of such requested postponement within two (2) Business Days following
2663 Landlord's delivery of notice regarding such planned service or utility interruptions or
2664 shutdowns and Tenant shall be responsible for any additional actual costs and expenses incurred
2665 by Landlord as a result of such postponement (Landlord hereby agreeing to notify Tenant
2666 promptly following receipt of Tenant's request to postpone any planned service or utility
2667 interruption or shutdown of the estimated additional cost to be incurred as a result of such
2668 postponement).  Except in an emergency, any such interruption or shut-down may only be
2669 performed after Business Hours.  In case of any stoppage of any service provided under this
2670 Article XIV or reduction of the same arising out of, or the ending of which requires, any work by
2671 Landlord or any other person other than a utility company or governmental agency, Landlord
2672 shall prosecute such work (or cause such work to be prosecuted) diligently and continuously so
2673 as to minimize the duration of such service stoppage or reduction.

2674        14.9    (a)    In connection with Tenant's Work, Tenant may, subject to full compliance
2675 with all applicable provisions of this Lease, at Tenant's sole risk, cost and expense, install and
2676 maintain one (1) supplemental HVAC unit to service the Premises (the "Supplemental HVAC
2677 System") on the roof or in another mutually agreeable location, in accordance with the plans and
2678 specifications to be approved by Landlord in advance, such approval not to be unreasonably
2679 withheld, conditioned or delayed.  The location, size, weight, height and all other features and
2680 specifications of the Supplemental HVAC System and the manner of the initial installation of
2681 same shall be subject to Landlord's prior written approval, which approval shall not be
2682 unreasonably withheld, conditioned or delayed.  The Supplemental HVAC System shall use the
2683 same distribution system currently utilized by the Building's HVAC System to service the
2684 Premises.  Notwithstanding the foregoing, Tenant shall not be entitled to install such HVAC
2685 equipment:  (i) if such installation would adversely affect the structure or any of the systems of
2686 the Building, or if such installation would require any structural alteration to the Building, unless
2687 Landlord approves in writing such structural alteration, such approval not to be unreasonably
2688 withheld, conditioned or delayed; (ii) if such installation would violate any Law applicable to the
2689 Building, (iii) unless Tenant has obtained and maintains at Tenant's expense, and has submitted
2690 to Landlord copies of, all permits, licenses, special zoning variances, authorizations and
2691 approvals relating to such Supplemental HVAC System and such installation and maintenance
2692 and pays all taxes and fees related thereto, (iv) unless such Supplemental HVAC System is
2693 installed, at Tenant's sole cost and expense, by a qualified, licensed contractor chosen by Tenant,
2694 and (v) unless Tenant obtains Landlord's prior consent to the manner and time in which such
2695 installation work is to be done, such consent not to be unreasonably withheld, conditioned or

2696      delayed. All plans and specifications concerning such installation shall be subject to Landlord's
2697      prior written approval, which approval shall not be unreasonably withheld, conditioned or
2698      delayed, and Tenant shall reimburse Landlord's actual out of pocket costs incurred in such
2699      review. Any failure to complete the installation of the Supplemental HVAC System shall not
2700      delay a Lease Commencement Date or a Rent Commencement Date. Tenant shall have no right
2701      to any abatement or reduction in rent or any other sums due or payable under this Lease if for
2702      any reason Tenant is unable to obtain any required approval from any party other than Landlord
2703      for installation of the Supplemental HVAC System, or is thereafter unable to use the
2704      Supplemental HVAC System for any reason.

2705      (b)      At all times during the Lease Term, Tenant shall (i) use the Supplemental
2706      HVAC System and all related equipment in a manner that avoids material interference with or
2707      disruption to Landlord and other tenants of the Building, (ii) comply with all requirements of all
2708      Laws and all reasonable and customary requirements of insurance companies which, in either
2709      case, shall impose any order or duty upon Landlord with respect to or affecting the Supplemental
2710      HVAC System or arising out of Tenant's use or manner of use thereof, and (iii) register the
2711      Supplemental HVAC System, if required, with appropriate governmental authorities and keep
2712      same current. Tenant shall, at Tenant's sole cost and expense, maintain a service contract on the
2713      Supplemental HVAC System. Such service contract shall be with a qualified HVAC contractor
2714      selected by Tenant and approved by Landlord, such approval not to be unreasonably withheld,
2715      conditioned or delayed, and shall require that such HVAC contractor maintain the Supplemental
2716      HVAC System and all related equipment in good working order and a clean and safe condition.
2717      All repairs and maintenance to the Building made necessary by reason of the furnishing,
2718      installation, maintenance, operation or removal of the Supplemental HVAC System or any
2719      replacements thereof shall be at Tenant's sole cost.

2720      (c)      At the expiration or earlier termination of the Lease Term, or upon
2721      termination of the operation of the Supplemental HVAC System, Tenant shall, at Tenant's sole
2722      cost, remove such Supplemental HVAC System from the Building (and, if the Building HVAC
2723      System has been disconnected or disabled in any way from servicing the Premises, Tenant shall,
2724      at Landlord's option and at Tenant's cost, re-establish such Building HVAC System connection
2725      to the Premises).

2726      (d)      Upon at least thirty (30) days' prior written notice to Tenant (except in the
2727      event of an emergency, in which case Landlord shall only be required to give such notice as is
2728      reasonably practicable under the circumstances), Landlord shall have the right to relocate the
2729      Supplemental HVAC System if in Landlord's reasonable opinion such relocation is necessary
2730      and provided the performance of such Supplemental HVAC System is not diminished by such
2731      relocation to more than a *de minimis* extent. Any such relocation shall be performed by
2732      Landlord at Landlord's sole cost and expense, including any costs related to rebalancing or
2733      reprogramming such Supplemental HVAC System and in accordance with all of the
2734      requirements of this Section. In connection with any such relocation (except in the event of an
2735      emergency), Landlord shall use reasonable efforts to minimize interference with Tenant's normal
2736      business operations in the Premises.

2737      (e)      It is expressly understood that by granting Tenant the rights hereunder,
2738      Landlord makes no representation as to the legality of any such equipment or its installation. In

<center>62</center>

the event that any federal, state, county, regulatory or other authority requires the removal or relocation of such Supplemental HVAC System, Tenant shall remove or relocate such Supplemental HVAC System at Tenant's sole cost and expense, and Landlord shall under no circumstances be liable to Tenant therefor.  In addition, at Landlord's sole option and discretion, Landlord may require Tenant, at any time prior to the expiration or earlier termination of the Lease, to terminate the operation of the equipment if it is causing physical damage to the structural integrity of the Building, interfering with any other service provided to the Building in more than a de minimis manner, unreasonably interfering with any other tenant's business or causing the violation of any condition or provision of this Lease.

(f)     Tenant shall maintain such insurance (in addition to that required by Article XIII of the Lease) as is appropriate with respect to the installation, operation and maintenance of the Supplemental HVAC System.  Landlord shall have no liability on account of any damage to or interference with the operation of the Supplemental HVAC System (except due to the negligence or willful misconduct of Landlord) and Landlord expressly makes no representations or warranties with respect to the Supplemental HVAC System.  The operation of the Supplemental HVAC System shall be at Tenant's sole and absolute risk.

(g)     Tenant shall indemnify, defend and hold Landlord harmless from and against all Claims suffered by or claimed against Landlord, directly or indirectly, to the extent based on or resulting from any negligence or willful misconduct by Tenant, any Agent of Tenant or any Permitted Tenant Party with respect to the installation, use, operation, maintenance, repair or disassembly of the Supplemental HVAC System.

(h)     The Supplemental HVAC System may be used by Tenant only in the conduct of Tenant's customary business.

(i)     The Supplemental HVAC System shall include meters or other measuring devices specified by Landlord, and, installed by Tenant at Tenant's expense, which meters or other measuring devices will be connected to the base Building monitoring system and record the hours of operation of each unit installed as part of the Supplemental HVAC System and which shall measure the amount of electricity and condenser water used by the Supplemental HVAC System.  During the Lease Term, Landlord shall furnish condenser water during the Building Hours (and after Building Hours at Tenant's sole cost and expense) to the Supplemental HVAC System at Building design criteria up to a maximum of thirty (30) tons per full floor of the Premises, subject to interruption in such service on a semi-annual basis for the purpose of routine maintenance.  Tenant shall not either:  (x) install any additional air conditioning units, whether or not connected to the base Building condenser loop, or (y) increase the capacity of the Supplemental HVAC System or the amount of condenser water used thereby, without obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed (it being understood, however, that in the event the amount of condenser water to be provided by Landlord in accordance with the foregoing or the base Building condenser loop is otherwise not adequate to satisfy Tenant's requirements, Tenant shall be required to design and install a split system to adequately serve the Premises).  Notwithstanding anything to the contrary contained in this Lease, Tenant shall, at its sole cost and expense, maintain and repair the Supplemental HVAC System in good working order and condition at all times during the Lease Term (including the making and maintaining of replacements, if any).

63

<div align="center">ARTICLE XV</div>
<div align="center">LIABILITY OF LANDLORD</div>

15.1     Landlord and Landlord's Representatives shall not be liable to Tenant, any Agent of Tenant, any Permitted Tenant Parties or any other person or entity for any damage, injury, loss or claim based on or arising out of any cause whatsoever (except as otherwise provided in this Section), including without limitation the following:  repair to any portion of the Premises or the Building; interruption in the use of the Premises or the Building or any equipment therein; any accident or damage resulting from any use or operation (by Landlord, Tenant or any other person or entity) of elevators or heating, cooling, electrical, sewage or plumbing equipment or apparatus; termination of this Lease by reason of damage to the Premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance or any other casualty; actions of any other tenant of the Building or of any other person or entity; failure or inability to furnish any service specified in this Lease; and leakage in any part of the Premises or the Building from water, rain, ice or snow that may leak into, or flow from, any part of the Premises or the Building, or from drains, pipes or plumbing fixtures in the Premises or the Building, except as provided in Section 14.7 and except as provided in Section 15.2 below.  Any person receiving an article delivered for Tenant shall be acting as Tenant's agent for such purpose and not as Landlord's agent.  For purposes of this Article, the term "Building" shall be deemed to include the Land.  Notwithstanding the foregoing provisions of this Section, Landlord shall not be released from liability to Tenant for any physical injury to any natural person caused by the negligence or willful misconduct of Landlord or Landlord's Representatives to the extent such injury is not covered by insurance either carried by Tenant (or such person) or required by this Lease to be carried by Tenant.

15.2     (a)     Except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's employees, agents contractors or other Landlord's Representatives, Tenant shall indemnify, defend upon request and hold Landlord and Landlord's Representatives harmless from and against all reasonable costs, damages, claims, liabilities, expenses (including reasonable attorneys' fees), losses, penalties and court costs (collectively, "Claims") suffered by or claimed against them, directly or indirectly, based on or arising out of, in whole or in part: (i) accident, injury or death whatsoever caused to any person or arising from any damage to the property of any person and occurring during the Lease Term in or about the Premises, (ii) any negligent or willful act or omission of Tenant, any Agent of Tenant or any Permitted Tenant Party, (iii) any breach of Tenant's obligations under this Lease, including failure to comply with Laws or surrender the Premises upon the expiration or earlier termination of the Lease Term, or (iv) any entry by Tenant, any Agent of Tenant or any Permitted Tenant Party upon the Land prior to the Initial Lease Commencement Date or upon portions of the Premises before the applicable Lease Commencement Date with respect to such portions of the Premises.  In no event, however, shall Tenant have any liability to Landlord for interruption or loss to Landlord's business or any indirect or consequential damages or for any liability covered by any insurance policy carried (or required by this Lease to be carried) by Landlord or such person, except in connection with any holdover of any portion of the Premises to the extent set forth in Article XXII of this Lease, but only to the extent that Landlord incurs indirect or consequential damages resulting from such holdover.

<div align="center">64</div>

2825         (b)    Except to the extent caused by the negligence or willful misconduct of
2826  Tenant, an Agent of Tenant or a Permitted Tenant Party, Landlord shall reimburse Tenant and
2827  shall indemnify and hold Tenant harmless from and against all Claims suffered or claimed
2828  against Tenant directly or indirectly, based on or arising out of, in whole or in part: (i) accident,
2829  injury or death whatsoever caused to any person or arising from any damage to the property of
2830  any person and occurring during the Lease Term in or about the Building (other than the
2831  Premises), (ii) any negligent or willful act or omission of Landlord or any of Landlord's
2832  Representatives, and (iii) any breach of Landlord's obligations under this Lease. In no event,
2833  however, shall Landlord have any liability to Tenant for interruption or loss to Tenant's
2834  business or any indirect or consequential damages or for any liability covered by any insurance
2835  policy carried (or required by this Lease to be carried) by Tenant or such person.

2836         (c)    If any claim, action or proceeding is made or brought against any of the
2837  parties, with respect to which claim, action or proceeding one of the parties shall be obligated to
2838  indemnify the other party pursuant to the terms of this Lease, then the party seeking
2839  indemnification (the "Indemnitee") shall promptly notify the other party (the "Indemnitor") of
2840  such claim and, upon demand of the Indemnitee, the Indemnitor, at its sole cost and expense,
2841  shall resist or defend such claim, action or proceeding in the Indemnitor's name, if necessary,
2842  by such attorney selected by the Indemnitor and reasonably approved in writing by the
2843  Indemnitee (each party hereby acknowledging that any attorney engaged by the Indemnitor's
2844  insurance company shall be deemed to be acceptable to the Indemnitee). The Indemnitor shall
2845  not settle any such claim, action or proceeding without the prior written consent of the
2846  Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed;
2847  provided that, it shall be reasonable for the Indemnitee to withhold consent if such settlement
2848  involves an admission of liability or other wrongdoing by the Indemnitee). Each party shall
2849  reasonably cooperate with the other, at the sole cost and expense of the Indemnitor, in
2850  defending any such claim or suit. If there exists a conflict of interest which would make it
2851  inadvisable for any of the parties to be represented by counsel for the Indemnitor, or if there are
2852  legal defenses available to any of the parties which are different from or inconsistent with those
2853  available to the Indemnitor, then such other party shall be entitled to retain separate counsel and
2854  the Indemnitor shall pay, upon demand, the reasonable fees and expenses of such separate
2855  counsel.

2856     15.3    No landlord hereunder shall be liable for any obligation or liability based on or
2857  arising out of any event or condition occurring after an assignment by Landlord of its interest in
2858  the Building so long as such assignee has assumed the obligations of Landlord hereunder in
2859  writing or by operation of law. Within ten (10) Business Days after request, Tenant shall attorn
2860  to any transferee landlord and execute, acknowledge and deliver any document submitted to
2861  Tenant confirming such attornment provided such transferee assumes the obligations of Landlord
2862  hereunder which accrue from and after the date of the transfer.

2863     15.4    The obligations of Tenant under this Lease are separate and independent
2864  covenants and agreements, such that all such obligations of Tenant, including, without limitation
2865  the obligation to pay Base Rent, additional rent and other sums due hereunder, shall continue
2866  unaffected, unless the requirement to pay or perform the same shall have been terminated or
2867  abated pursuant to an express provision of this Lease. Such waiver and acknowledgements by
2868  Tenant are a material inducement to Landlord entering into this Lease. Tenant shall not have the

<div align="center">65</div>

2869 right to set off or deduct any amount allegedly owed to Tenant pursuant to any claim against
2870 Landlord from any rent or other sum payable to Landlord except as provided in this Lease.
2871 Tenant's sole remedy for recovering upon such claim shall be to institute an independent action
2872 against Landlord.

2873       15.5    Subject to any offset rights of Tenant set forth in this Lease (including Exhibit B-
2874 2 annexed hereto), Tenant shall look solely to Landlord's interest in the Building and the Land
2875 and this Lease (including any rental proceeds therefrom, security or escrow deposits), proceeds
2876 from any sale, lease, conveyance, financing or other transfer or disposition of the Building and
2877 the Land or any portion thereof (net of all costs with respect to the same) or proceeds of
2878 insurance or a condemnation for recovery of any money judgment from Landlord under this
2879 Lease (subject to the rights of any Mortgage holder). No other asset of Landlord, and no asset of
2880 any of Landlord's Representatives (or any past, present or future board member, partner,
2881 director, member, officer, trustee, employee, agent, representative or advisor of any of them
2882 (each, an "officer")) or any other person or entity, shall be available to satisfy or be subject to
2883 any such judgment. No such Landlord's Representative, officer or other person or entity shall be
2884 held to have personal liability for satisfaction of any claim or judgment whatsoever under this
2885 Lease. Nothing contained herein shall constitute a waiver or release of any of Landlord's
2886 obligations under this Lease or limit the right of Tenant to name any current, former, or future
2887 partner, principal, officer, director, member or employee of Landlord as a party in any action or
2888 suit by Tenant against Landlord to the extent that applicable state Law or court rules or
2889 procedures require Tenant to name such partner, principal, officer, director, member or employee
2890 as parties to obtain a judgment against, or proceed against, Landlord or Landlord's assets;
2891 provided that no judgment resulting from any such suit or action shall be enforced against any
2892 assets of any such partner, principal, officer, director, member or employee.

2893 <div align="center">ARTICLE XVI</div>
2894 <div align="center">RULES</div>

2895       16.1    Tenant, Tenant's Agents and any Permitted Tenant Party shall at all times abide
2896 by and observe the rules and regulations specified in Exhibit C. Tenant, Tenant's Agents and
2897 any Permitted Tenant Party shall also abide by and observe any other rule that Landlord may
2898 reasonably promulgate from time to time for the operation and maintenance of the Building,
2899 provided that at least thirty (30) days' prior written notice thereof is given and such rule is
2900 reasonable and not inconsistent with the provisions of this Lease, is adopted and enforced in a
2901 non-discriminatory manner among similarly-situated tenants, does not result in an increase in
2902 Tenant's obligations under this Lease, a decrease in Tenant's rights under this Lease or a
2903 decrease in Landlord's obligations under this Lease (in each case, other than to a de minimis
2904 extent); provided, however, that in the case of any conflict between the provisions of this Lease
2905 and any such rules, the provisions of this Lease shall control. All rules shall be binding upon
2906 Tenant and enforceable by Landlord as if they were contained herein. Nothing contained in this
2907 Lease shall be construed as imposing upon Landlord any duty or obligation to enforce such rules,
2908 or the terms, conditions or covenants contained in any other lease, as against any other tenant,
2909 and Landlord shall not be liable to Tenant for the violation of such rules by any other tenant or
2910 its employees, agents, assignees, subtenants, invitees or licensees. Landlord shall not to enforce
2911 any rule or regulation in a manner which unreasonably discriminates among similarly situated
2912 tenants and Landlord shall use commercially reasonable efforts to seek compliance by all

<div align="center">66</div>

occupants of the Building with the rules and regulations.  The Building (including the Parking Facility) is a non-smoking facility.

<div align="center">

ARTICLE XVII

DAMAGE OR DESTRUCTION

</div>

17.1    Within sixty (60) days of a fire or other casualty, or both, affecting the Premises or the Building, Landlord shall deliver to Tenant a statement prepared by a licensed professional engineer selected by Landlord setting forth such engineer's estimates of the time required for repair or restoration of the Building and/or the Premises (a "Completion Estimate") If the Premises or the Building are totally or partially damaged or destroyed thereby rendering the Premises totally or partially inaccessible or unusable, then Landlord shall diligently repair and restore the Premises (such restoration of the Premises to exclude tenant improvements existing or installed in the Premises, any Alterations or any other contents of the Premises, including, without limitation, Tenant's trade fixtures, decorations, furnishings, equipment or personal property) and the Building to substantially the same condition they were in prior to such damage or destruction; provided, however, that if the Completion Estimate indicates that such repair and restoration cannot be completed within eighteen (18) months after the occurrence of such damage or destruction (taking into account the time needed for effecting a satisfactory settlement with any insurance company involved, removal of debris, preparation of plans and issuance of all required governmental permits), then Landlord shall have the right to terminate this Lease by giving written notice of termination within sixty (60) days after receipt of the Completion Estimate, provided that with respect to any fire or casualty or both affecting portions of the Building outside of the Premises, Landlord simultaneously terminates all of the other leases of similarly-situated tenants in the Building.  If this Lease is terminated pursuant to this Article, then rent shall be apportioned (based on the portion of the Premises which is usable or used after such damage or destruction for the operation of Tenant's business in the ordinary course) and paid to the earlier of the date of termination or the date Tenant completely vacates and abandons the Premises on account of such damage and Landlord shall be entitled to any insurance proceeds received by Tenant that are attributable to the unamortized portion of the Construction Allowance (as defined in Exhibit B-2).  If this Lease is not terminated as a result of such damage or destruction, then until such repair and restoration of the Premises are substantially complete, Tenant shall be required to pay rent only for the portion of the Premises that is usable for the operation of Tenant's business in the ordinary course while such repair and restoration are being made; provided, however, that if such damage or destruction was caused by the act or omission of Tenant, any Agent of Tenant or any Permitted Tenant Party, then Tenant shall not be entitled to any such rent reduction.  After receipt of all insurance proceeds, Landlord shall proceed with and bear the expenses of such repair and restoration of the Premises and the Building; provided, however, that (x) if such damage or destruction was caused by the act or omission of Tenant, any Agent of Tenant or any Permitted Tenant Party, then Tenant shall pay Landlord's deductible and the amount by which such expenses exceed the insurance proceeds, if any, actually received by Landlord on account of such damage or destruction, (y) Tenant shall pay the amount by which the cost of restoring any item which Landlord is required to restore and Tenant is required to insure exceeds the insurance proceeds received with respect thereto, and (z) Landlord shall not be required to repair or restore any tenant improvements installed in the Premises (except to the extent Landlord receives proceeds therefor from Tenant's insurance), any Alterations or any other contents of the Premises (including, without limitation, Tenant's trade fixtures,

<div align="center">67</div>

decorations, furnishings, equipment or personal property).  Notwithstanding anything herein to the contrary, Landlord shall also have the right to terminate this Lease if (1) zoning or other applicable Laws or regulations do not permit such repair and restoration, or (2) the damage to the Building exceeds fifty percent (50%) of the replacement value of the Building and Landlord is terminating all leases of similarly-situated tenants in the Building.

17.2    If the Completion Estimate indicates that the repairs and restoration cannot be substantially completed within eighteen (18) months after the date of such damage or destruction, and provided Landlord does not elect to terminate this Lease pursuant to this Article, then for a period continuing through the sixtieth (60th) day after receipt of such Completion Estimate, Tenant shall have the right to terminate this Lease by providing written notice to Landlord.  Notwithstanding any of the foregoing to the contrary, Tenant shall not have the right to terminate this Lease if the willful misconduct of Tenant, any Agent of Tenant or any Permitted Tenant Party shall have caused the damage or destruction. If Tenant shall not have exercised its right to terminate this Lease pursuant to this Section 17.2 above, but the damage shall not have been repaired by the date set forth in such estimate (subject to extension due to Force Majeure Delays not to exceed thirty (30) days in the aggregate), Tenant may elect to terminate this Lease by notice to Landlord given not later than thirty (30) days following the period set forth in such Completion Estimate unless prior to the giving of such notice, Landlord shall have substantially completed such repair.

<div align="center">

ARTICLE XVIII
CONDEMNATION

</div>

18.1    If all or substantially all of the Premises, or the use or occupancy thereof, shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose or sold under threat of such a taking or condemnation (collectively, "condemned"), then this Lease shall terminate on the day prior to the date title thereto vests in such authority and rent shall be apportioned as of such date.  If less than all or substantially all of the Premises or occupancy thereof is condemned, then this Lease shall continue in full force and effect as to the part of the Premises not so condemned, except that as of the date title vests in such authority Tenant shall not be required to pay rent with respect to the part of the Premises so condemned.  Landlord shall notify Tenant of any condemnation contemplated by this Section promptly after Landlord receives notice thereof.  Within ten (10) days after receipt of such notice, Tenant shall have the right to terminate this Lease with respect to the remainder of the Premises not so condemned as of the date title vests in such authority if such condemnation renders said remainder of the Premises totally unusable for the Permitted Use in the ordinary course of Tenant's business.  If this Lease is not terminated then Landlord, at Landlord's sole cost and expense, shall restore that part of the Premises not so acquired or condemned to a self-contained rental unit inclusive of Tenant's Alterations and the Building Systems.  Notwithstanding anything herein to the contrary, if twenty-five percent (25%) or more of the Building is condemned, then whether or not any portion of the Premises is condemned, Landlord shall have the right to terminate this Lease as of the date title vests in such authority, provided that Landlord terminates the leases of all similarly situated tenants.

18.2    All awards, damages and other compensation paid on account of such condemnation shall belong to Landlord, and Tenant assigns to Landlord all rights to such awards,

<div align="center">68</div>

damages and compensation.  Tenant shall not make any claim against Landlord or such authority for any portion of such award, damages or compensation attributable to damage to the Premises, value of the unexpired portion of the Lease Term, loss of profits or goodwill, leasehold improvements or severance damages.  Nothing contained herein, however, shall prevent Tenant from pursuing a separate claim against the authority for relocation expenses and for the value of furnishings, equipment and trade fixtures installed in the Premises at Tenant's expense and which Tenant is entitled pursuant to this Lease to remove at the expiration or earlier termination of the Lease Term, the value of the use for the then unexpired Term of this Lease, Tenant's loss of business or goodwill, and the value of Tenant's leasehold interest in the Premises; provided that such claim shall in no way diminish the award, damages or compensation payable to or recoverable by Landlord in connection with such condemnation.

<div align="center">

ARTICLE XIX

DEFAULT

</div>

19.1    (a)    Each of the following shall constitute an "Event of Default": (a) Tenant's failure to make when due any payment of the Base Rent, additional rent or other sum, which failure continues for a period of five (5) days after Landlord delivers written notice thereof to Tenant; (b) Tenant's failure to perform or observe any covenant or condition of this Lease not otherwise specifically described in this Section 19.1, which failure shall continue for a period of thirty (30) days after Landlord sends Tenant written notice thereof; provided, however, that if such cure cannot reasonably be effected within such thirty (30) day period and Tenant begins such cure promptly within such thirty (30) day period and is pursuing such cure in good faith and with diligence and continuity during such thirty (30) day period, then, except in the event of an emergency, Tenant shall have such additional time as is reasonably necessary to effect such cure so long as Tenant continues to prosecute the remedying of such failure with reasonable diligence (Tenant hereby indemnifying Landlord for any actual losses, costs and expenses incurred by Landlord as a result of Tenant's default during the period in which Tenant is effectuating such cure); (c) an Event of Bankruptcy as specified in Article XX; (e) Tenant's dissolution or liquidation; or (d) any Environmental Default as specified in Section 6.3 (subject to the notice and cure periods set forth therein).  It shall also be an Event of Default hereunder if the credit rating of the long-term debt of the issuer of the Letter of Credit or the Surety Bond (according to Moody's or similar national rating agency) is downgraded to a grade below Investment Grade, but Landlord's recourse with respect to such an Event of Default shall be limited to its right to draw upon the Letter of Credit or Surety Bond, as applicable, in accordance with Section 11.1(i).

(b)    Notwithstanding anything contained in Section 19.1(a), Landlord shall only be required to give Tenant two (2) written notices of the non-payment of Base Rent and/or Tenant's Proportionate Share of Operating Charges and Real Estate Taxes in any twelve (12) consecutive month period prior to an Event of Default occurring and Landlord exercising its remedies hereunder; provided, however, that the foregoing shall not limit Landlord's obligation to provide notice to Tenant with respect to any non-payment of rent (other than Base Rent and Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes).

<div align="center">69</div>

19.2    If there shall be an Event of Default (even if prior to a Lease Commencement Date), then the provisions of this Section shall apply.  Landlord shall have the right, at its sole option, to terminate this Lease.  In addition, with or without terminating this Lease, Landlord may re-enter, terminate Tenant's right of possession and take possession of the Premises upon five (5) days' prior notice from Landlord.  If necessary, Landlord may proceed to recover possession of the Premises under applicable Laws, or by such other proceedings, including re-entry and possession, as may be applicable.  If Landlord elects to terminate this Lease and/or elects to terminate Tenant's right of possession, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, however, to Tenant's liability for all Base Rent, additional rent and other sums specified herein.  If Tenant is in Event of Default under this Lease and has vacated the Premises, and if Landlord has terminated this Lease or repossessed the Premises as a result of such Event of Default, then Landlord shall thereafter use reasonable efforts to relet the Premises; provided, however, that Tenant understands and agrees that Landlord's main priority will be the leasing of other space in the Building and in other buildings in the vicinity owned or controlled by Landlord or any Affiliate of Landlord (and not then leased by Landlord or such Affiliate), and the reletting of the Premises will be of lower priority and Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenant for the Premises until Landlord obtains full and complete possession of the Premises.  In no event shall Landlord be required to re-let the Premises: (i) before leasing similar vacant space in the Building; or (ii) for a rental less than the then-current fair market rental value for office space in the Building; or (iii) to any tenant that does not meet Landlord's then-current criteria for direct leases of a comparable amount of space.  Tenant hereby expressly waives, for itself and all persons claiming by, through or under it, any right of redemption, re-entry or restoration of the operation of this Lease under any present or future Law, including without limitation any such right which Tenant would otherwise have in case Tenant shall be dispossessed for an Event of Default, or in case Landlord shall obtain possession of the Premises as herein provided.  Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) (which may extend beyond the date on which the Lease Term would have expired but for Tenant's Event of Default) and on such terms and conditions (which may include any concessions or allowances granted by Landlord) as Landlord, in its sole but reasonable discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet all or any portion of the Premises or to collect any rent due upon such reletting.  Whether or not this Lease and/or Tenant's right of possession is terminated or any suit is instituted, Tenant shall be liable for any Base Rent, additional rent, damages or other sum which may be due or sustained prior to such Event of Default, and for all reasonable, actual out of pocket costs, fees and expenses (including, but not limited to, attorneys' fees and costs, brokerage fees, expenses incurred in placing the Premises in first-class rentable condition, advertising expenses, and any concessions or allowances granted by Landlord) incurred by Landlord in pursuit of its remedies hereunder and/or in recovering possession of the Premises and renting the Premises to others from time to time.  Tenant shall also be liable for additional damages which at Landlord's election shall be either:  (a) an amount equal to the Base Rent and additional rent due or which would have become due from the date of Tenant's Event of Default through the remainder of the Lease Term, less the amount of rental, if any, which Landlord receives during such period from others to whom the Premises may be rented (other than any additional rent received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), which

70

3088    amount shall be computed and payable in monthly installments, in advance, on the first day of
3089    each calendar month following Tenant's Event of Default and continuing until the date on which
3090    the Lease Term would have expired but for Tenant's Event of Default, it being understood that
3091    separate suits may be brought from time to time to collect any such damages for any month(s)
3092    (and any such separate suit shall not in any manner prejudice the right of Landlord to collect any
3093    damages for any subsequent month(s)), or Landlord may defer initiating any such suit until after
3094    the expiration of the Lease Term (in which event such deferral shall not be construed as a waiver
3095    of Landlord's rights as set forth herein and Landlord's cause of action shall be deemed not to
3096    have accrued until the expiration of the Lease Term) and it being further understood that if
3097    Landlord elects to bring suits from time to time prior to reletting the Premises, Landlord shall be
3098    entitled to its full damages through the date of the award of damages without regard to any Base
3099    Rent, additional rent or other sums that are or may be projected to be received by Landlord upon
3100    reletting of the Premises; or (b) an amount equal to the difference between (i) all Base Rent,
3101    additional rent and other sums due or which would be due and payable under this Lease as of the
3102    date of Tenant's Event of Default through the end of the scheduled Lease Term, and (ii) the fair
3103    market value rental of the Premises over the same period (net of all expenses (including
3104    attorneys' fees) and all vacancy periods reasonably projected by Landlord to be incurred in
3105    connection with the reletting of the Premises), as determined by Landlord in its sole and absolute
3106    discretion, which difference shall be discounted at a rate equal to eight percent (8%) per annum,
3107    and which resulting amount shall be payable to Landlord in a lump sum on demand, it being
3108    understood that upon payment of such liquidated and agreed final damages, Tenant shall be
3109    released from further liability under this Lease with respect to the period after the date of such
3110    payment, and that Landlord may bring suit to collect any such damages at any time after an
3111    Event of Default shall have occurred.  Tenant shall pay all reasonable, actual out of pocket
3112    expenses (including attorneys' fees) incurred by Landlord in connection with or as a result of any
3113    Event of Default whether or not a suit is instituted.  The provisions contained in this Section shall
3114    be in addition to, and shall not prevent the enforcement of, any claim Landlord may have against
3115    Tenant for anticipatory breach of this Lease (including, without limitation, the right of injunction
3116    and the right to invoke any remedy allowed at law or in equity as if reentry, summary
3117    proceedings and other remedies were not provided for herein).  Nothing herein shall be construed
3118    to affect or prejudice Landlord's right to prove, and claim in full, unpaid rent accrued prior to
3119    termination of this Lease.  If Landlord is entitled, or Tenant is required, pursuant to any
3120    provision hereof to take any action upon the termination of the Lease Term, then Landlord shall
3121    be entitled, and Tenant shall be required, to take such action also upon the termination of
3122    Tenant's right of possession.

3123       19.3    All rights and remedies of Landlord set forth in this Lease are cumulative and in
3124    addition to all other rights and remedies available to Landlord at law or in equity, including those
3125    available as a result of any anticipatory breach of this Lease.  The exercise by Landlord of any
3126    such right or remedy shall not prevent the concurrent or subsequent exercise of any other right or
3127    remedy.  No delay or failure by Landlord or Tenant to exercise or enforce any of its respective
3128    rights or remedies or the other party's obligations (except to the extent a time period is specified
3129    in this Lease therefor) shall constitute a waiver of any such or subsequent rights, remedies or
3130    obligations.  Neither party shall be deemed to have waived any default by the other party unless
3131    such waiver expressly is set forth in a written instrument signed by the party against whom such
3132    waiver is asserted.  If Landlord waives in writing any default by Tenant, such waiver shall not be

<div align="center">71</div>

construed as a waiver of any covenant, condition or agreement set forth in this Lease except as to the specific circumstances described in such written waiver.

19.4    If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, then the same shall not constitute a waiver of the same or of any other covenant, condition or agreement set forth herein, nor of any of Landlord's rights hereunder.  Neither the payment by Tenant of a lesser amount than the monthly installment of Base Rent, additional rent or of any sums due hereunder nor any endorsement or statement on any check or letter accompanying a check for payment of rent or other sums payable hereunder shall be deemed an accord and satisfaction.  Landlord may accept the same without prejudice to Landlord's right to recover the balance of such rent or other sums or to pursue any other remedy.  Notwithstanding any request or designation by Tenant, Landlord may apply any payment received from Tenant to any payment then due.  No re-entry by Landlord, and no acceptance by Landlord or Landlord's agents of keys from Tenant, shall be considered an acceptance of a surrender of this Lease.  No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the expiration of the Lease Term.  In the event that Tenant at any time desires to have Landlord underlet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive the keys for such purposes without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such underletting.

19.5    If Tenant fails to make any payment to any third party or to do any act herein required to be made or done by Tenant and such failure is an Event of Default, then Landlord may, after at least ten (10) days' written notice to Tenant (given after expiration of any cure period provided for herein), but shall not be required to, make such payment or do such act.  The taking of such action by Landlord shall not be considered a cure of such default by Tenant or prevent Landlord from pursuing any remedy it is otherwise entitled to in connection with such default.  If Landlord elects to make such payment or do such act, then all expenses incurred by Landlord, plus interest thereon at a rate (the "Default Rate") equal to the rate per annum that is four (4) whole percentage points higher than the prime rate published in the Money Rates section of *The Wall Street Journal* (the "Prime Rate"), from the date incurred by Landlord to the date of payment thereof by Tenant, shall constitute additional rent due hereunder; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by applicable Law.

19.6    If Tenant fails to make any payment of Base Rent, additional rent or any other sum on or before the date that is five (5) days after written notice from Landlord (without regard to any grace period that may be specified in Section 19.1), then Landlord shall have the right to impose upon Tenant in writing a late charge of two percent (2%) of the amount of such payment.  In addition, such payment and such late fee shall bear interest at the Default Rate from the date such payment or late fee, respectively, became due to the date of payment thereof by Tenant; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by applicable Law.  Such late charge and interest shall constitute additional rent due hereunder without any notice or demand.  Notwithstanding the foregoing, the first two (2) late payments in any twelve (12) month period shall not be subject to imposition of interest at the Default Rate.

72

19.7    If more than one natural person or entity shall constitute Tenant, then the liability of each such person or entity shall be joint and several.  If Tenant is a general partnership or other entity the partners or members of which are subject to personal liability, then the liability of each such partner or member shall be joint and several.  No waiver, release or modification of the obligations of any such person or entity shall affect the obligations of any other such person or entity.

<div align="center">

## ARTICLE XX
## BANKRUPTCY

</div>

20.1    An "Event of Bankruptcy" is the occurrence with respect to any of Tenant, a Guarantor or any other person liable for Tenant's obligations hereunder (including, without limitation, any general partner of Tenant (a "General Partner")) of any of the following:  (a) such person becoming insolvent, as that term is defined in Title 11 of the United States Code (the "Bankruptcy Code") or under the insolvency laws of any state (the "Insolvency Laws"); (b) appointment of a receiver or custodian for any property of such person, or the institution of a foreclosure or attachment action upon any property of such person; (c) filing by such person of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws; (d) filing of an involuntary petition against such person as the subject debtor under the Bankruptcy Code or Insolvency Laws, which either (1) is not dismissed within sixty (60) days after filing, or (2) results in the issuance of an order for relief against the debtor; or (e) such person making or consenting to an assignment for the benefit of creditors or a composition of creditors.

20.2    Upon occurrence of an Event of Bankruptcy, Landlord shall have all rights and remedies available pursuant to Article XIX; provided, however, that while a case (the "Case") in which Tenant is the subject debtor under the Bankruptcy Code is pending, Landlord's right to terminate this Lease shall be subject, to the extent required by the Bankruptcy Code, to any rights of Tenant or its trustee in bankruptcy (collectively, "Trustee") to assume or assume and assign this Lease pursuant to the Bankruptcy Code.

<div align="center">

## ARTICLE XXI
## SUBORDINATION

</div>

21.1    Conditioned on receipt of a non-disturbance agreement reasonably acceptable to Tenant (which delivery shall be made within six (6) Business Days following the execution of this Lease for any existing Mortgage), this Lease is subject and subordinate to the lien, provisions, operation and effect of all mortgages, deeds of trust, ground leases or other security instruments which may now or hereafter encumber any portion of the Building or the Land (collectively, "Mortgages"), to all funds and indebtedness intended to be secured thereby, and to all renewals, extensions, modifications, recastings or refinancings thereof.  Said subordination and the provisions of this Section shall be self-operative and no further instrument of subordination shall be required to effect such subordination.  The holder of any Mortgage to which this Lease is subordinate shall have the right (subject to any required approval of the holders of any superior Mortgage) at any time to declare this Lease to be superior to the lien, provisions, operation and effect of such Mortgage.  Landlord represents and warrants to Tenant that, as of the Execution Date, the only holder of a Mortgage encumbering all or any portion of

<div align="center">73</div>

the Building or the Land is Morgan Stanley Mortgage Capital Holdings LLC (as agent, on behalf of itself and other lenders).

21.2    Landlord shall secure for Tenant within six (6) Business Days following the execution of this Lease a non-disturbance agreement (recognizing Tenant's rights under this Lease) from the holder of the Mortgage currently encumbering the Building in the form of Exhibit I attached hereto.  Landlord will use commercially reasonable efforts to obtain a non-disturbance agreement from the holder of each Mortgage hereafter encumbering the Building or the Land in form and substance reasonably acceptable to Tenant (and the subordination of this Lease to the lien of such future Mortgage shall be conditioned on the receipt of such non-disturbance agreement).

<div align="center">

ARTICLE XXII

HOLDING OVER

</div>

22.1    Tenant acknowledges that it is extremely important that Landlord have substantial advance notice of the date on which Tenant will vacate the Premises, because Landlord will require an extensive period to locate a replacement tenant and because Landlord plans its entire leasing and renovation program for the Building in reliance on its lease expiration dates.  Tenant also acknowledges that if Tenant fails to surrender the Premises or any portion thereof at the expiration or earlier termination of the Lease Term, then it will be conclusively presumed that the value to Tenant of remaining in possession, and the loss that will be suffered by Landlord as a result thereof, far exceed the Base Rent and additional rent that would have been payable had the Lease Term continued during such holdover period.  Therefore, if Tenant (or anyone claiming through Tenant) does not surrender the Premises or any portion thereof upon the expiration or earlier termination of the Lease Term, then the holdover fee payable by Tenant hereunder shall be equal to the following percentages of the Base Rent then payable immediately prior to the expiration of the Lease Term: one hundred fifty percent (150%) for the first two (2) months of such holdover; one hundred seventy-five percent (175%) for the third (3rd) month of such holdover, and two hundred percent (200%) for each month thereafter (plus one hundred percent (100%) of any additional rent and other sums that would have been payable pursuant to the provisions of this Lease).  Such holdover fee shall be computed by Landlord and paid by Tenant on a monthly basis and shall be payable on the fifth day of such holdover period and the fifth day of each calendar month thereafter during such holdover period until the Premises has been vacated.  Notwithstanding any other provision of this Lease, Landlord's acceptance of such holdover fee shall not in any manner adversely affect Landlord's other rights and remedies, including Landlord's right to evict Tenant and to recover all damages.  Any such holdover shall be deemed to be a tenancy-at-sufferance and not a tenancy-at-will or tenancy from month-to-month.  In no event shall any holdover be deemed a permitted extension or renewal of the Lease Term, and nothing contained herein shall be construed to constitute Landlord's consent to any holdover or to give Tenant any right with respect thereto.  Notwithstanding the foregoing to the contrary, Tenant shall not be liable to Landlord for any consequential damages suffered by Landlord due to such holdover during the first forty-five (45) days of any such holdover, but shall be liable to Landlord for all consequential damages suffered by Landlord during any period of holdover exceeding forty-five (45) days; provided that Tenant shall not be liable for any such consequential damages unless Landlord provides at least thirty (30) days' prior written notice that Landlord has entered into a lease agreement covering all or any portion of the Premises.

<div align="center">74</div>

ARTICLE XXIII
COVENANTS OF LANDLORD

23.1    Landlord covenants that it has the right to enter into this Lease, and, subject to the provisions of this Lease, Tenant shall during the Lease Term peaceably and quietly occupy and enjoy the full possession of the Premises (i.e., quiet enjoyment) without hindrance by Landlord, its employees or agents.

23.2    Subject to other applicable terms and provisions expressly provided in this Lease, Landlord reserves the following rights:  (a) to change the street address and name of the Building (provided Landlord shall not grant any Competitor the right to name the Building) provided that Tenant's access to the Premises is not materially and adversely affected; (b) to change the arrangement and location of entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets or other public parts of, and make additions to, the Building provided that Tenant's access to the Premises is not permanently, materially and adversely affected; (c) to erect, use and maintain pipes, wires, structural supports, ducts and conduits in and through the plenum areas of the Premises (subject to the following paragraphs and provided however, Landlord shall not exercise Landlord's rights under this Lease to install any wet pipes in, over or under Tenant's computer, telecommunications, or other technical areas); (d) to grant to anyone the exclusive right to conduct any particular business in the Building not inconsistent with Tenant's permitted use of the Premises so long as not in violation of Section 6.4 hereof; (e) to exclusively use and/or lease the roof areas, the sidewalks and other exterior areas (provided that Tenant's right as expressly set forth in this Lease and Tenant's access to the Building and the Premises is not materially and adversely affected, Tenant shall not be responsible for any Operating Charges relating to such areas so leased, and Tenant's rights under this Lease and access to the Building or Premises are not adversely affected to more than a de minimis extent; (f) to re-subdivide the Land or to combine the Land with other lands; (g) to relocate any parking areas designated for Tenant's use, provided the same are on the Land and not materially less convenient to access the Premises than parking areas available to Tenant as of the Execution Date; (h) if Tenant abandons the Premises prior to the expiration of the Lease Term, to make Alterations to or otherwise prepare the Premises for re-occupancy without relieving Tenant of its obligation to pay all Base Rent, additional rent and other sums due under this Lease through such expiration; (i) to construct improvements (including kiosks) on the Land and in the public and common areas of the Building; (j) to prohibit smoking (including the use of e-cigarettes, vapor pens, etc.) in certain perimeters surrounding the Building entrances and exits (including the Parking Facility) within which smoking (including the use of e-cigarettes, vapor pens, etc.) shall not be permitted; and (k) if any excavation or other substructure work shall be made or authorized to be made upon land adjacent to the Building or the Land, to enter the Premises for the purpose of doing such work as is required to preserve the walls of the Building and to preserve the land from injury or damage and to support such walls and land by proper foundations, subject to all limitations provided for herein on Landlord's ability to enter the Premises.  With respect to (b), (c), (e), (g), (i) and (k) above, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's normal business operations in the Premises (subject, however, in all cases to governmental requirements, emergencies and/or temporary maintenance and repair activities, and in no event shall Landlord have any obligation to employ contractors or labor at overtime or other premium pay rates or incur any other overtime costs).

75

23.3    Notwithstanding anything contained in this Lease to the contrary, Landlord may at any time elect to alter, rehabilitate, renovate or otherwise improve all or any portion of the Building, the Premises or property of which the Premises are a part so long as such construction does not substantially and unreasonably interfere on more than a temporary basis with Tenant's access to and use of the Premises.  Without limiting the generality of the foregoing but subject to Section 14.5, Tenant acknowledges that Landlord shall undertake major renovations at the Building (including work to the lobby, Building signage and exterior façade) in accordance with the plans and specifications prepared therefore by Landlord, and Landlord shall do so diligently and in such a manner so as to cause as little interference to Tenant, including its use and occupancy of, and access to, the Premises, as reasonably possible, including, without limitation, securing and barricading the work site in a safe and aesthetically pleasing manner, with walkways, if applicable, to minimize the appearance of an on-going construction site.   In connection with any such work, Landlord may erect scaffoldings, sidewalk bridges, and other appurtenances.   During any renovation and construction by Landlord, Landlord shall use commercially reasonable efforts to protect Tenant from any dust, debris and construction noise. No such work shall unreasonably disturb Tenant's ability to operate its business in the ordinary course.

23.4    Notwithstanding anything herein to the contrary:

(a)    Landlord shall not conduct any unsolicited maintenance or repairs in the Premises without giving ten (10) days' prior written notice to Tenant (except in an emergency in which event Landlord shall give such notice as may be reasonable under the circumstances) of the estimated time, duration and nature thereof.

(b)    Landlord shall not voluntarily effect any stoppage or material reduction of any service required to be provided by Landlord under this Lease without giving ten (10) days' prior written notice to Tenant (except in an emergency in which event Landlord shall give such notice as may be reasonable under the circumstances) of the estimated time, duration and nature thereof.

(c)    Without Tenant's consent, but subject to the terms of Article XVII (Damage or Destruction) and Article XVIII (Condemnation) and subject to any changes or modifications required to comply with applicable Laws, Landlord shall not (i) subject to Landlord's reasonable security and safety rules and regulations and as required temporarily in connection with the existence of an emergency condition, impair in any material respect access to the Premises, the Building, and/or the Parking Facility, (ii) degrade in any material respect the nature of the Building as a Comparable Building, (iii) materially alter Tenant's signage and/or the prominence or the visibility thereof, (iv) materially change the size and configuration of the main lobby of the Building in a manner that requires Tenant to gain access to the Building from any street other than Lincoln Street or Essex Street, or (v) cause any of the windows located in the Premises to be blocked (except on a temporary basis in connection with window cleaning and repairs and maintenance to the Building).  Except to the extent an emergency condition exits, Landlord shall not make or cause to be made alterations within the Premises or to any Building Structure or Building Systems exclusively serving the Premises without Tenant's consent, such consent not to be unreasonably withheld, conditioned or delayed.

76

3349         (d)     Any repairs performed (or caused to be performed) or installations made
3350 (or caused to be made) by or on behalf of Landlord pursuant to this Lease (including this
3351 Section) shall be made with due diligence. Landlord shall (i) promptly repair or cause to be
3352 repaired any damage to the Premises, Alterations (including Tenant's Work) or the property of
3353 Tenant or any Permitted Tenant Parties (including, without limitation, any finish work in the
3354 Premises) caused by such the work or repairs in or about the Premises, (ii) take reasonable care
3355 to safeguard the affected portion of the Premises, Alterations (including Tenant's Work) or the
3356 property of Tenant or any Permitted Tenant Parties, (iii) upon completion of such activity,
3357 restore or cause to be restored the portion of the Premises that is the subject of such activity to
3358 substantially the condition existing before such activity, (iv) not cause a reduction in the rentable
3359 square footage within the Premises, and (v) be performed after Business Hours at the request of
3360 Tenant if it is reasonably expected that such work will unreasonably disturb Tenant or Permitted
3361 Tenant Parties.

3362 <div align="center">ARTICLE XXIV</div>
3363 <div align="center">PARKING</div>

3364     24.1   On or before January 1, 2020, Tenant shall notify Landlord in writing of the
3365 number of parking permits Tenant shall require with respect to the Majority of the Premises, and
3366 within six (6) months following the Subsequent Lease Commencement Date, Tenant shall notify
3367 Landlord of writing of the number of parking permits Tenant shall require with respect to the
3368 Remainder of the Premises (and the total number of such permits shall be referred to as the
3369 "Parking Allotment").  Landlord shall make the Parking Allotment available to Tenant on the
3370 later of (i) sixty (60) days after its receipt of Tenant's applicable notification of the number of
3371 parking permits it requires and (ii) the Initial Lease Commencement Date or Subsequent Lease
3372 Commencement Date, as applicable.  Such parking permits shall be for unreserved parking
3373 spaces in the Parking Facility, and the charge for such parking permits shall be the monthly rate
3374 posted from time to time to the general public by Landlord or the operator (the "Operator") of
3375 the Parking Facility if the Parking Facility is not operated by Landlord. Such charges for the
3376 Parking Allotment throughout the Term shall be paid monthly in advance to Landlord or the
3377 Operator, as designated by Landlord.  Except as otherwise provided herein, contracts for the
3378 parking permits shall be with the Operator and shall contain the same terms as are usually
3379 contained in contracts with other customers of the Operator.  During any period in which the
3380 Parking Facility is not operated by Landlord, Tenant and Permitted Tenant Parties shall have the
3381 right to contract directly with the Operator for use of such parking permits.  Notwithstanding the
3382 foregoing, Landlord does not guarantee the availability of parking permits in excess of the
3383 Parking Allotment, provided, however, that if Tenant desires additional parking permits,
3384 Landlord shall exercise commercially reasonable efforts to make such additional parking permits
3385 available to Tenant.  The parking permits may be used by Tenant and the Permitted Tenant
3386 Parties and not by any other person or entity. The current rate posted to the general public for
3387 each monthly parking permit is $475, which such rate, insofar as it applies to Tenant, may be
3388 modified from time to time with not less than thirty (30) days written notice to Tenant. The rights
3389 of Tenant and the Permitted Tenant Parties to park in the Parking Facility shall be non-exclusive
3390 and shall be subject to such reasonable rules and regulations governing the Parking Facility as
3391 may be promulgated by Landlord or the Operator of the Parking Facility from time to
3392 time.  Upon the termination of this Lease, Landlord shall have the right to suspend any or all of
3393 the parking permits without prior notice or warning to Tenant. Use of the Parking Facility is at

<div align="center">77</div>

the sole risk of the users of such facilities, and Landlord assumes no liability for personal injury, theft or property damage, or any other loss occurring during, as a result of, or in connection with such use and Landlord shall have no liability whatsoever to Tenant or any other person (including, without limitation, the Permitted Tenant Parties) for any property damage to vehicles or their contents and/or personal injury which might occur as a result of or in connection with the parking of vehicles in or about the Building, unless caused by the negligence or willful misconduct of Landlord or its employees, agents, or contractors.  Subject to closures in the event of emergencies and, with reasonable prior notice to Tenant, planned repairs, the Parking Facility shall be open for Tenant's use twenty-four hours per day, seven days per week.

<u>ARTICLE XXV</u>
<u>GENERAL PROVISIONS</u>

25.1    Tenant acknowledges that neither Landlord nor any broker, agent or employee of Landlord has made any representation or promise with respect to the Premises or any portion of the Building except as herein expressly set forth, and no right, privilege, easement or license is being acquired by Tenant except as herein expressly set forth.

25.2    Nothing contained in this Lease shall be construed as creating any relationship between Landlord and Tenant other than that of landlord and tenant.  Tenant shall not use the name of the Building for any purpose other than as the address of the business to be conducted by Tenant in the Premises, use the name of the Building as Tenant's business address after Tenant vacates the Premises, or do or permit to be done anything in connection with Tenant's business or advertising which in the reasonable judgment of Landlord may reflect unfavorably on Landlord or the Building or confuse or mislead the public as to any apparent connection or relationship between Landlord, the Building and Tenant.

25.3    Landlord warrants to Tenant that in connection with this Lease it has not employed or dealt with any broker, agent or finder, other than Landlord's Broker and Tenant's Broker.  It is understood that Landlord shall pay Landlord's Broker and Tenant's Broker a commission(s) pursuant to the terms of a separate agreement(s).  Landlord shall indemnify and hold Tenant harmless from and against any claim for brokerage or other commissions asserted by any broker, agent or finder employed by Landlord or with whom Landlord has dealt, including, Landlord's Broker and Tenant's Broker.  Landlord's indemnities set forth in this Section shall survive the expiration or earlier termination of the Lease Term.

25.4    Tenant warrants to Landlord that in connection with this Lease it has not employed or dealt with any broker, agent or finder, other than Tenant's Broker and Landlord's Broker. It is understood that Landlord shall pay Tenant's Broker and Landlord's Broker a commission(s) pursuant to the terms of a separate agreement(s). Tenant shall indemnify and hold Landlord harmless from and against any claim for brokerage or other commissions, or for a lien under any applicable broker's lien law, asserted by any broker, agent or finder employed by Tenant or with whom Tenant has dealt, other than Tenant's Broker and Landlord's Broker. Tenant's indemnities set forth in this Section shall survive the expiration or earlier termination of the Lease Term.

78

25.5   From time to time in connection with a sale, refinancing or recapitalization, upon not less than thirty (30) days' prior written notice, Tenant and Landlord shall execute, acknowledge and deliver to Landlord or Tenant, as applicable, and/or any other person or entity designated by Landlord or Tenant, as applicable, a written statement certifying that:  (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications); (b) the dates to which the rent and any other charges have been paid; (c) to Landlord's or Tenant's knowledge, as applicable, whether or not the other party is in default in the performance of any obligation, and if so, specifying the nature of such default; (d) the address to which notices are to be sent; (e)  that Tenant has accepted the Premises and that all work thereto has been completed (or if such work has not been completed, specifying the incomplete work); and (f) such other matters as Landlord or Tenant, as applicable, may reasonably request.  Any such statement may be relied upon by any owner of the Building or the Land, any prospective purchaser of the Building or the Land, any holder or prospective holder of a Mortgage or any other person or entity.  Tenant acknowledges that time is of the essence to the delivery of such statements and that Tenant's failure to deliver timely such statements may cause substantial damages resulting from, for example, delays in obtaining financing.  Notwithstanding the foregoing, Landlord shall not be obligated to deliver a written statement pursuant to this <u>Section 25.5</u> more than one (1) time per calendar year except in connection with a bona fide investment, financing, sale or recapitalization with respect to Tenant or its parent entity.  Tenant and Landlord shall have no liability to any of the foregoing parties for misrepresentation as a result of any unintentional misstatement contained in any such estoppel certificate, provided, however, that such unintentional misstatement shall not negate the effectiveness of such estoppel certificate as between Landlord or Tenant (as applicable) and the party or parties to whom the estoppel certificate is addressed.

25.6   LANDLORD, TENANT, ALL GUARANTORS AND ALL GENERAL PARTNERS EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.  TENANT CONSENTS TO SERVICE OF PROCESS AND ANY PLEADING RELATING TO ANY SUCH ACTION AT THE PREMISES; PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL BE CONSTRUED AS REQUIRING SUCH SERVICE AT THE PREMISES. LANDLORD, TENANT, ALL GUARANTORS AND ALL GENERAL PARTNERS EACH WAIVES ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT SITUATED IN THE JURISDICTION IN WHICH THE BUILDING IS LOCATED, AND WAIVES ANY RIGHT, CLAIM OR POWER, UNDER THE DOCTRINE OF FORUM NON CONVENIENS OR OTHERWISE, TO TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.

25.7   All notices or other communications required under this Lease shall be in writing and shall be deemed duly given and received when delivered in person (with receipt therefor), on the next Business Day after deposit with a recognized overnight delivery service, or on the second day after being sent by certified or registered mail, return receipt requested, postage prepaid, to the following addresses:  (a) if to Landlord, at the Landlord Notice Address specified in <u>Article I</u>, with a copy to DLA Piper LLP (US), The Marbury Building, 6225 Smith Avenue,

<div align="center">79</div>

3479    Baltimore, MD 21209-3600444, Attention: Naftali Weg, Esq.; (b) if to Tenant, at the Tenant
3480    Notice Address specified in Article I, with a copy to Kasowitz Benson Torres LLP, 1633
3481    Broadway, New York, New York 10019, Attention: Adam M. Endick, Esq.  Either party may
3482    change its address for the giving of notices by written notice given in accordance with this
3483    Section.  If Landlord or the holder of any Mortgage notifies Tenant in writing that a copy of any
3484    default notice to Landlord shall be sent to such holder at a specified address, then Tenant shall
3485    send (in the manner specified in this Section and at the same time such notice is sent to
3486    Landlord) a copy of each such notice to such holder, and no such notice shall be considered duly
3487    sent unless such copy is so sent to such holder.  Any such holder shall have the time period
3488    specified in the subordination, non-disturbance or attornment agreement by and between such
3489    holder and Tenant to cure any Landlord default before Tenant may exercise any right to
3490    terminate the Lease (for reasons other than as set forth in Article XVII or Article XVIII);
3491    provided that Tenant may exercise its abatement rights as expressly set forth in this Lease
3492    notwithstanding any additional cure period granted to such holder.  Any cure of Landlord's
3493    default by such holder shall be treated as performance by Landlord.

3494            25.8    Each provision of this Lease shall be valid and enforceable to the fullest extent
3495    permitted by law.  If any provision of this Lease or the application thereof to any person or
3496    circumstance shall to any extent be invalid or unenforceable, then such provision shall be
3497    deemed to be replaced by the valid and enforceable provision most substantively similar to such
3498    invalid or unenforceable provision, and the remainder of this Lease and the application of such
3499    provision to persons or circumstances other than those as to which it is invalid or unenforceable
3500    shall not be affected thereby.  Nothing contained in this Lease shall be construed as permitting
3501    Landlord to charge or receive interest in excess of the maximum rate allowed by law.

3502            25.9    Feminine, masculine or neuter pronouns shall be substituted for those of another
3503    form, and the plural or singular shall be substituted for the other number, in any place in which
3504    the context may require such substitution.

3505            25.10   The provisions of this Lease shall be binding upon and inure to the benefit of the
3506    parties and each of their respective representatives, successors and assigns, subject to the
3507    provisions herein restricting assignment or subletting by Tenant.

3508            25.11   This Lease contains and embodies the entire agreement of the parties hereto and
3509    supersedes all prior agreements, negotiations, letters of intent, proposals, representations,
3510    warranties, understandings, suggestions and discussions, whether written or oral, between the
3511    parties hereto.  Any representation, inducement, warranty, understanding or agreement that is not
3512    expressly set forth in this Lease shall be of no force or effect.  This Lease may be modified or
3513    changed in any manner only by an instrument signed by both parties.  This Lease includes and
3514    incorporates all Exhibits attached hereto.

3515            25.12   This Lease shall be governed by the Laws of the jurisdiction in which the
3516    Building is located, without regard to the application of choice of law principles.  There shall be
3517    no presumption that this Lease be construed more strictly against the party who itself or through
3518    its agent prepared it (it being agreed that all parties hereto have participated in the preparation of
3519    this Lease and that each party had the opportunity to consult legal counsel before the execution
3520    of this Lease).  No custom or practice which may evolve between the parties in the

80

3521    administration of the terms of this Lease shall be construed to waive Landlord's right to insist on
3522    Tenant's strict performance of the terms of this Lease.

3523          25.13  Headings and subheadings are used for convenience and shall not be considered
3524    when construing this Lease.

3525          25.14  The submission of an unsigned copy of this document to Tenant shall not
3526    constitute an offer or option to lease the Premises.  This Lease shall become effective and
3527    binding only upon execution and delivery by both Landlord and Tenant.  This Lease shall be
3528    effective as of the Execution Date and such date shall be inserted by Landlord on the first page of
3529    this Lease upon the full execution and delivery by Landlord and Tenant of this Lease.

3530          25.15  Time is of the essence with respect to each of Tenant's and Landlord's obligations
3531    hereunder.

3532          25.16  This Lease may be executed in multiple counterparts, each of which shall be
3533    deemed an original and all of which together constitute one and the same document.  Signatures
3534    transmitted electronically (i.e., by .pdf format) shall have the same binding effect as original
3535    signatures.

3536          25.17  This Lease shall not be recorded.  However, Landlord and Tenant shall, at the
3537    request of either party, execute, acknowledge and deliver to the other party a memorandum of
3538    this Lease (the "Lease Memorandum") in recordable form, setting forth the date of this Lease,
3539    the names of the parties hereto, the Lease Commencement Date(s), a description of the Premises
3540    and Building, Tenant's rights to extend the Lease Term, the prohibition on Competitors and such
3541    other matters as may reasonably be requested and as are customarily included in a memorandum
3542    of lease in the Boston, Massachusetts metropolitan area.  Such Lease Memorandum shall not in
3543    any circumstances be deemed to modify or to change any of the provisions of this Lease.  Either
3544    party may elect, at its sole cost and expense, to record the Lease Memorandum.  In the event that
3545    Landlord and Tenant execute such Lease Memorandum, each party shall, agree to execute,
3546    acknowledge and deliver a memorandum in recordable form evidencing the expiration or
3547    termination of this Lease (the "Termination Memorandum"), which Termination Memorandum
3548    shall be recorded on the Lease expiration date or any earlier termination date.  The party that
3549    elects to record such Lease Memorandum shall be responsible to pay all recordation and/or
3550    transfer taxes or fees imposed in connection with such Lease Memorandum or upon this Lease,
3551    and any amendments to the same, and the Termination Memorandum.

3552          25.18  Landlord and Tenant hereby stipulate and agree for all purposes under this Lease
3553    that the rentable area of the Premises is 240,940 rentable square feet and of the Building is
3554    1,114,282 rentable square feet, notwithstanding any different measurement thereof that may be
3555    made thereafter by or on behalf of either party, but subject to any changes on account of any
3556    expansion of the Premises or any other change in the physical size of the Premises or the
3557    Building. Landlord acknowledges and agrees that any and all additional space added to the
3558    Premises, whether by means of any of Tenant's rights under this Lease or otherwise, or to the
3559    Building will be measured by the BOMA 2010 Method A calculation methodology with
3560    accompanying guidelines, using the full building method of measurement, as promulgated by the
3561    Building Owners and Managers Association (the "BOMA Standard").

25.19   Except as otherwise provided in this Lease, any additional rent or other sum owed by Tenant to Landlord, and any cost, expense, damage or liability incurred by Landlord for which Tenant is liable, shall be considered additional rent payable pursuant to this Lease to be paid by Tenant within the time specified in this Lease, or if no specific time period is specified, then no later than thirty (30) days after the date Landlord notifies Tenant of the amount thereof.

25.20   Tenant's and Landlord's liabilities and obligations with respect to the period prior to the expiration or earlier termination of the Lease Term shall survive such expiration or earlier termination.

25.21   If Landlord or Tenant is in any way delayed or prevented from performing any obligation (except, with respect to Tenant, its obligations to pay rent and other sums due under this Lease, any obligation set forth in Exhibit B-2, any obligation with respect to insurance pursuant to Article XIII, any obligation to give notice with respect to extensions, expansions or otherwise, and any holdover) due to fire, act of God, governmental act or failure to act, strike, labor dispute, inability to procure materials, or any cause beyond such party's reasonable control (whether similar or dissimilar to the foregoing events), then the time for performance of such obligation shall be excused for the period of such delay or prevention and extended for a period equal to the period of such delay or prevention.  No force majeure event shall delay the Initial Rent Commencement Date or the Subsequent Rent Commencement Date or excuse the timely payment of all items of rent by Tenant.  Under no circumstances shall the non-payment of money or a failure attributable to a lack of funds be deemed to be (or to have caused) an event of force majeure.  For purposes of this Lease, force majeure delays shall be deemed to exist only if Landlord or Tenant (as the case may be) promptly (but in no event more than five (5) Business Days after the occurrence of such event) notifies the other party in writing of such delay (which notification may be in the form of email) and, after such initial notification promptly after request of the other party, Landlord or Tenant (as the case may be) notifies the other party of the status of such delay.  The party claiming to be delayed by reason of the occurrence of a force majeure event shall use commercially reasonable efforts under the circumstances to minimize such delay.  Notwithstanding the foregoing, the occurrence or existence of one or more events of force majeure will not be deemed to extend the time periods expressly set forth in this Lease for the occurrence, completion or performance of any matter following which the other party has been granted certain rights of termination, deemed consent, abatement or otherwise (except to the extent expressly set forth in such provision).   Landlord and Tenant will each use commercially reasonable and good faith efforts to minimize the effect of any force majeure.

25.22   Landlord's review, approval and consent powers (including the right to review plans and specifications) are for its benefit only and not a representation concerning legality, safety or any other matter.

25.23   The deletion of any printed, typed or other portion of this Lease shall not evidence the parties' intention to contradict such deleted portion.  Such deleted portion shall be deemed not to have been inserted in this Lease.

25.24   At the expiration or earlier termination of the Lease Term, Tenant shall deliver to Landlord all keys and security cards to the Building and the Premises, whether such keys were

furnished by Landlord or otherwise procured by Tenant, and shall inform Landlord of the combination or access code of each lock, safe and vault, if any, in the Premises.

25.25    Tenant and the person executing and delivering this Lease on Tenant's behalf each represents and warrants that such person is duly authorized to so act; that Tenant is duly organized, is qualified to do business in the jurisdiction in which the Building is located, is in good standing under the Laws of the state of its organization and the Laws of the jurisdiction in which the Building is located, and has the power and authority to enter into this Lease; and that all action required to authorize Tenant and such person to enter into this Lease has been duly taken.  Each of Landlord and Tenant, each as to itself, hereby represents its compliance with all applicable anti-money laundering Laws, including, without limitation, the USA Patriot Act, and the Laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224 ("Executive Order").  Each of Landlord and Tenant further represents (i) that it is not, and to its knowledge, it is not owned or controlled directly or indirectly by any person or entity, on the SDN List published by the United States Treasury Department's Office of Foreign Assets Control and (ii) that it is not a person otherwise identified by government or legal authority as a person with whom a U.S. Person is prohibited from transacting business.  As of the Execution Date, a list of such designations and the text of the Executive Order are published under the internet website address www.ustreas.gov/offices/enforcement/ofac.

25.26    Any elimination or shutting off of light, air, or view by any structure which may be erected on lands adjacent to the Building, or any reasonable noise in connection with the activities permitted by this Lease, shall in no way affect this Lease or impose any liability on Landlord.

25.27    Landlord shall have no liability for any consequential damages suffered either by Tenant or by any party claiming through Tenant in connection with this Lease. Tenant shall have no liability for any consequential damages suffered either by Landlord or by any party claiming through Landlord in connection with this Lease, except as expressly set forth in Section 15.2(a).

25.28    In the event Landlord or Tenant is required or elects to take legal action against the other party to enforce the provisions of this Lease, then the prevailing party in such action shall be entitled to collect from the other party its reasonable, actual out of pocket costs and expenses incurred in connection with the legal action (including, without limitation, reasonable third party attorneys' fees and court costs).  Notwithstanding the foregoing, if Landlord shall take any legal action for collection of rent or file any eviction proceedings (whether summary or otherwise) for the non-payment of rent, and Tenant shall make payment of such rent prior to the rendering of any judgment, then Landlord shall be entitled to collect and Tenant shall pay as additional rent all filing fees and other reasonable, actual out of pocket costs in connection therewith (including reasonable third party attorneys' fees).

25.29    (a)    Landlord shall not use (other than in the performance of its obligations under the Lease) or disclose (and shall cause Landlord's Affiliates, partners, members, officers, employees, brokers, contractors, attorneys and other representatives and agents (the "Landlord Confidentiality Parties") not to so use or disclose) and Landlord shall (and shall cause Landlord Confidentiality Parties to) instruct Landlord's (and Landlord Confidentiality Parties') employees,

3645  agents and service providers with knowledge of this transaction not to so use or disclose (i) the
3646  existence (only until the issuance of any public statement by Tenant pursuant to sub-section (d)
3647  below, or posting of Tenant's temporary signage on the Building pursuant to the provisions of
3648  this Lease), and any term or condition, of this Lease (including, without limitation, the names of
3649  the parties involved (including, but not limited to Tenant and/or Guarantor), or any other
3650  identifying details with respect to the provisions of this Lease) (the matters described in this
3651  clause (i) being hereinafter referred to as the "Lease Matters"); (ii) any information (whether or
3652  not in writing, whether or not patentable and whether or not copyrightable) of a private, secret or
3653  confidential nature relating to Tenant's technology, operations, Members, customers, business
3654  plans, promotional and marketing activities, finances and other business affairs that is learned by
3655  or disclosed to Landlord or any of the Landlord Confidentiality Parties with respect to Tenant's
3656  business in connection with this Lease or in connection with the exercise by Landlord of its
3657  rights or the performance by Landlord of its obligations under this Lease (the matters described
3658  in this clause (ii) being hereinafter referred to as the "Business Matters"), and (iii) any and all
3659  design plans, schematic drawings or similar items created by or for Tenant or Landlord in
3660  connection with Tenant's Alterations (including Tenant's Work) (the matters described in this
3661  clause (iii) being hereinafter referred to as the "Design Matters").

3662      (b)    Landlord agrees that all files, documents, letters, memoranda, reports,
3663  records, data sketches, drawings, specifications, models, laboratory notebooks, program listings,
3664  computer equipment or devices, computer programs or other written, photographic, or other
3665  tangible material containing Business Matters, whether created by Landlord or others, which
3666  shall come into its custody or possession, shall be and are the exclusive property of Tenant to be
3667  used by Landlord only in the performance of its obligations under this Lease and shall not be
3668  copied or removed from Landlord's premises except in the performance of the obligations under
3669  this Lease.  All such materials or copies thereof and all tangible property containing Business
3670  Matters of Tenant in the custody or possession of Landlord by virtue of this Lease and which
3671  would reasonably be considered confidential shall be delivered to Tenant, upon the earlier of (i)
3672  a request by Tenant or (ii) the termination of this Lease.  After such delivery, Landlord shall not
3673  retain any such materials or copies thereof or any such tangible property. Landlord agrees that
3674  its obligation not to disclose or to use information and materials of the types set forth in the
3675  preceding paragraph, and its obligation to return materials and tangible property set forth in this
3676  paragraph, extend to such types of information, materials and tangible property of customers of
3677  Tenant or suppliers to Tenant or other third parties who may have disclosed or entrusted the
3678  same to Tenant or to Landlord which would reasonably be considered confidential.

3679      (c)    The above notwithstanding, nothing contained herein shall restrict
3680  Landlord's ability to disclose (or restrict Landlord Confidentiality Parties to disclose) Lease
3681  Matters (i) to Landlord's lenders (or potential lenders), attorneys, accountants and other
3682  professionals with a need to know such information to perform its duties that Landlord retains
3683  such professionals for, provided that such recipients shall agree in writing to keep such
3684  information confidential, (ii) in connection with any arbitration or potential litigation between
3685  the parties under this Lease, or (iii) that are or become known to the general public under
3686  circumstances involving no breach by Landlord or others of the terms of this Section 25.29.
3687  Further, Landlord may disclose Lease Matters, Business Matters or Design Matters, as
3688  applicable, as required by Laws or by a court of competent jurisdiction or any other
3689  governmental authority issuing a subpoena to Landlord, provided that Landlord (A) gives

84

3690    Tenant prior notice sufficient to allow Tenant to seek a protective order or other appropriate
3691    remedy (if, and to the extent, that such prior notice is permitted pursuant to applicable Laws and
3692    there is sufficient time available to give Tenant such notice prior to Landlord's required
3693    compliance), (B) discloses only such information as is required by any governmental authority
3694    (unless to do so would be against the advice of counsel), and (C) uses commercially reasonable
3695    efforts to obtain confidential treatment for any Lease Matters, Business Matters or Design
3696    Matters so disclosed.

3697          (d)    Notwithstanding anything to the contrary in this Section 25.29, (i) Tenant
3698    may issue a public communication regarding the execution of this Lease after first obtaining
3699    Landlord's consent (which consent shall not be unreasonably withheld, conditioned or delayed)
3700    if such public communication includes a reference to Landlord or the Building, and (ii)
3701    following any initial public communication by Tenant, Landlord shall be permitted to issue a
3702    public communication (including a press release) after first obtaining Tenant's consent if such
3703    communication includes a reference to Tenant or Guarantor, which consent shall not be
3704    unreasonably withheld, conditioned or delayed. In no event shall any public communication of
3705    Landlord disclose any deal terms with respect to this Lease (including, without limitation, rent,
3706    square footage, security, term or allowances). However, Landlord and Tenant shall cooperate in
3707    good faith to issue a mutual press release regarding the execution of this Lease at such time as
3708    Tenant determines.

3709          (e)    Landlord shall not take any action or make any statement that is intended
3710    or would be reasonably expected to harm Tenant or its reputation or which would reasonably be
3711    expected to lead to unwanted or unfavorable publicity to Tenant.  Tenant shall not take any
3712    action or make any statement that is intended or would be reasonably expected to harm
3713    Landlord or its reputation or which would reasonably be expected to lead to unwanted or
3714    unfavorable publicity to Landlord.

3715          (f)    Landlord's obligations under this Section 25.29 shall survive the
3716    expiration or earlier termination of this Lease.

3717       25.30  Landlord represents and warrants that Landlord is the fee owner of the Land and
3718    all improvements located thereon (including the Building), and Landlord has full right and
3719    authority to lease the Premises to Tenant on the terms and conditions set forth herein.

3720       25.31  Landlord agrees that Landlord is entering into this Lease with Tenant and, except
3721    pursuant to the express terms and conditions of the Guaranties (as hereinafter defined), Landlord
3722    shall have no recourse, and shall not have the right to make any claim against, any entity other
3723    than Tenant (including any officers, directors, trustees, beneficiaries, shareholders, members,
3724    employees, partners, principals or Affiliates of Tenant, each an "Exculpated Party", and
3725    collectively, the "Exculpated Parties"), with respect to any obligations hereunder or arising in
3726    connection herewith.  Tenant's assets shall specifically exclude the assets of the Exculpated
3727    Parties. Landlord acknowledges and agrees that (a) the foregoing agreement with respect to each
3728    Exculpated Party (the "Exculpated Party Agreement") is an essential and material term of this
3729    Lease, (b) each Exculpated Party shall be a third party beneficiary of the Exculpated Party
3730    Agreement and of Landlord's acknowledgement and agreement in the immediately preceding
3731    clause (a), and the foregoing agreement shall inure to the benefit of Tenant's and the Exculpated

Parties present and future officers, directors, trustees, beneficiaries, shareholders, members, employees, present and future partners, principals or Affiliates of Tenant, and their respective heirs, successors and assigns, (c) Tenant would not have entered this Lease without the Exculpated Party Agreement or the acknowledgments and agreements contained in the immediately preceding clauses (a) and (b), and (d) the Exculpated Parties shall not have any liability for any duties, responsibilities, liabilities or obligations of Tenant under, or in any way related to, this Lease, and Landlord hereby expressly waives and releases such liability on behalf of itself and all persons claiming by, through or under Landlord.  No past, present or future Exculpated Parties shall be named as a party in any suit or other judicial proceeding of any kind or nature whatsoever brought against Tenant with respect to the duties, responsibilities, liabilities or obligations of Tenant under this Lease, unless naming such party is required by applicable Law to effectuate recovery against Tenant.

25.32 Landlord and Tenant agree that existing and future trademarks and other intellectual property (including, without limitation, name/logo, and pictures of the interior of the Premises and Building) and the goodwill associated therewith are the sole and exclusive property of each applicable party and may not be used by the other for any purpose, except (i) to identify Tenant as one of the tenants in the Building, or (ii) with the express prior written consent of the other party.

25.33 (a)    Landlord shall cooperate with Tenant in Tenant's efforts to negotiate, implement and receive the benefits of incentive packages and programs with various governmental authorities (including economic development agencies), and to execute and deliver any supplements or modifications to this Lease that are reasonably required in connection therewith, provided that no such Lease modification or supplement shall (i) increase any obligation of Landlord under this Lease, (ii) adversely affect any right of or benefit to Landlord under this Lease (except to a de minimis extent), (iii) relieve Tenant of or reduce any of its obligations under this Lease, or (iv) interfere in any material respect with Landlord's ability to arrange financing for Landlord's interest in the Premises. Any and all fees, costs and expenses imposed by the applicable governmental authority shall be borne solely by Tenant, and Tenant shall reimburse Landlord within thirty (30) days of Landlord's demand therefor, for any and all reasonable out-of-pocket fees, costs and expenses actually incurred by Landlord in connection with Tenant's requests and in cooperating with Tenant, including, without limitation, the reasonable costs and expenses of Landlord's counsel, consultants and professionals. Notwithstanding anything herein contained to the contrary, any benefits obtained by Tenant (or on behalf of Tenant) at Tenant's sole expense from any governmental authority shall be solely for the benefit of Tenant for so long as Tenant is leasing the Premises, and to the extent that any of the same are granted to Landlord, Landlord shall assign (or pay) the same promptly to Tenant.

(b)    Landlord shall cooperate reasonably with Tenant in connection with Tenant's making arrangements to participate in any incentive programs provided at any time and from time to time by any utility company serving the Building (or such other supplier of electricity with which Tenant contracts). Landlord shall cooperate reasonably with Tenant in arranging Tenant's participation in any such incentive programs in a manner that allows Tenant to realize the entire benefit thereof, including, without limitation, acquiring and/or installing (at Tenant's sole cost and expense) any separate electrical meter, water meter or other utility meters necessary to participate in any such incentive programs. Tenant shall pay to Landlord an

86

3776    amount equal to the out-of-pocket costs incurred by Landlord in so cooperating with Tenant,
3777    within thirty (30) days after Landlord's request therefor from time to time.

3778        25.34  Tenant shall deliver, or cause to be delivered, to Landlord simultaneously with the
3779    execution of this Lease a lease guaranty (the "<u>Lease Guaranty</u>") in form annexed hereto as
3780    <u>Exhibit J</u> from WeWork Companies Inc. ("<u>Guarantor</u>") and a "good guy" guaranty (the "<u>Good
3781    Guy Guaranty</u>", and together with the Lease Guaranty, the "<u>Guaranties</u>") in form annexed hereto
3782    as <u>Exhibit K</u> from Guarantor.

3783        25.35  Within ten (10) days following Landlord's request from time to time in
3784    connection with any sale, refinancing or recapitalization of the Building or the Landlord (which
3785    request shall be made no more frequently than twice in any twelve (12) month period), Tenant
3786    shall cause Guarantor to furnish to Landlord and its lenders such party's most recent annual
3787    audited financial statements. In addition, within forty-five (45) days following Landlord's
3788    request from time to time in connection with any sale, refinancing or recapitalization of the
3789    Building or the Landlord (which request shall be made no more frequently than twice in any
3790    twelve (12) month period), Tenant shall furnish to Landlord and its lenders such party's most
3791    recent unaudited financial statements, provided that in no event shall Landlord make such
3792    request earlier than one hundred twenty (120) days following the end of any calendar year during
3793    the Lease Term. All such financial statements shall be prepared by an independent firm of
3794    certified public accountants. If, and so long as, Tenant or Guarantor is a publicly traded
3795    corporation on a nationally recognized over the counter stock exchange in the United States of
3796    America, such party shall be deemed to satisfy the foregoing requirements by providing
3797    Landlord and its lenders with a copy of its most recent, publicly available audited statements,
3798    which may be via an internet link. If requested by Tenant, such financial statements (other than
3799    publicly available audited statements) shall be furnished pursuant to a confidentiality agreement
3800    in a form reasonably provided by Landlord for such purpose.

3801    <div align="center"><u>ARTICLE XXVI</u></div>
3802    <div align="center"><u>RIGHT OF FIRST OFFER</u></div>

3803        26.1  Subject to the terms and conditions of this <u>Section 26.1</u>, if any full floor of the
3804    Building (each such floor, "<u>ROFO Space</u>") becomes available during the Lease Term as it may
3805    be extended or renewed, and if such space, together with any other Premises in the Building that
3806    Tenant has leased, is not greater than four hundred thousand (400,000) rentable square feet, then
3807    Tenant shall have the right to lease any such ROFO Space for the then remainder of the Lease
3808    Term (as it may have been extended or renewed) pursuant to the following terms and conditions:

3809            (a)    At such time as Landlord reasonably becomes aware of the availability of
3810    any ROFO Space (or, if earlier, the date that is sixty (60) days prior to the scheduled expiration
3811    of an existing lease for such ROFO Space), Landlord shall notify Tenant in writing (the
3812    "<u>Landlord ROFO Availability Notice</u>") of the date of availability of such space ("<u>Anticipated
3813    ROFO Space Delivery Date</u>") and Landlord's determination of the Base Rent and additional
3814    rent with respect to such ROFO Space and the other terms and conditions upon which Landlord
3815    is willing to lease the ROFO Space. Tenant shall have twenty (20) days after receiving the
3816    Landlord ROFO Availability Notice to notify Landlord in writing ("<u>Tenant's ROFO Election
3817    Notice</u>") that Tenant desires to lease such ROFO Space for the then remainder of the Lease

<div align="center">87</div>

Term (as it may have been extended or renewed).  If Tenant does not properly and timely deliver Tenant's ROFO Election Notice to Landlord as set forth above, Landlord shall send Tenant a reminder notice and if Tenant does not exercise the Tenant's ROFO Election Notice within two (2) Business Days following delivery of such reminder notice, Landlord shall be free to lease such ROFO Space in question to any third party on substantially the same terms as set forth in the ROFO Availability Notice; provided, however, that if Landlord shall fail to lease such ROFO Space to a third party on substantially the same terms as set forth in the applicable Landlord ROFO Availability Notice for a period of one (1) year, then Landlord shall be required to re-offer such ROFO Space to Tenant pursuant to this Article XXVI.  For purposes hereof, "substantially the same terms" means that the net economic benefit to Landlord of the terms of a lease to a third party is no less than ninety-five percent (95%) of the net economic benefit of the terms set forth in the applicable Landlord ROFO Availability Notice.  For the avoidance of doubt, the "net economic benefit" shall not include the types or amounts of security (e.g., letters of credit, surety bonds or guarantees) that are required from Tenant hereunder or that Landlord requires from a prospective tenant.

(b)     If Tenant timely and properly exercises its right to lease the ROFO Space pursuant to this Section 26.1, then (i) such ROFO Space shall be added to the Premises as of the date Landlord delivers same to Tenant in the condition required by this Lease with respect to the Premises, including the Ready for Buildout Condition (the "ROFO Space Commencement Date") at an annual Base Rent, tenant allowance and other concessions as may be set forth in the Landlord ROFO Availability Notice, and (ii) Tenant shall provide Landlord with Additional Security, twenty-five percent (25%) of which shall be delivered within thirty (30) days following the date on which Tenant delivers a Tenant's ROFO Election Notice to Landlord, an additional fifty percent (50%) of which shall be delivered within sixty (60) days following the date on which Tenant delivers a Tenant's ROFO Election Notice to Landlord, and the remaining twenty-five percent (25%) of which shall be delivered within ninety (90) days following the date on which Tenant delivers a Tenant's ROFO Election Notice to Landlord.  As used herein, "Additional Security" shall mean an increase in the amount of the Letter of Credit, Surety Bond and cap on the Guaranty attached hereto as Exhibit J, in each case proportionate to the increase in the size of the Premises (e.g., if the size of the Premises increases by 25% as a result of Tenant's exercise of its right of first offer hereunder, each of the Letter of Credit, Surety Bond and cap on the Guaranty attached hereto as Exhibit J shall increase by 25%).  For the avoidance of doubt, the requirement that Additional Security be deposited with Landlord shall not be applicable to any third party entering into a lease agreement with Landlord for the ROFO Space.  Promptly following Tenant's exercise of its right to lease the ROFO Space pursuant to this Section 26.1, the parties shall promptly execute an amendment to this Lease adding the ROFO Space to the Premises and stating the annual Base Rent, tenant allowance and other concessions so determined and any applicable additional terms with respect to the ROFO Space, including but not limited to the requirement for the Additional Security (the "ROFO Amendment").  Notwithstanding anything herein to the contrary, this Article XXVI shall not apply to any floor of the Building that, together with any other Premises in the Building that Tenant is then-leasing, is greater than four hundred thousand (400,000) rentable square feet in size.

(c)     Tenant's rights under this Section 26.1 are subject and subordinate to (i) any expansion rights or rights of first offer granted to any other tenant of the Building in connection with the prior lease-up of the Building, and (ii) Landlord's rights to renew or

88

continue to lease space to any current or future tenant of such space beyond the expiration date of the lease term of such tenant's lease.

(d)    Notwithstanding anything in the Lease to the contrary, delivery of possession of the ROFO Space to Tenant and commencement of Tenant's leasing thereof is and shall be subject to Landlord's obtaining possession from any prior tenant or occupant who holds over beyond the applicable lease expiration date, and Tenant shall have no claim against Landlord (for damages or otherwise) and Landlord shall have no obligation or liability for, on account of or with respect to any holdover in all or any portion of the ROFO Space, except as set forth in this Section 26.1(d).    Tenant shall accept possession of such ROFO Space and commence paying rent therefor on the date of delivery of such space by Landlord in the condition required and otherwise as provided pursuant to this Section 26.1 (the "ROFO Commencement Date").    If Landlord is unable to deliver possession of the ROFO Space so leased on the Anticipated ROFO Space Delivery Date because of the holding over or retention of possession of any tenant, subtenant or occupant in the ROFO Space so leased or otherwise, subject to compliance with the provisions of this Section, then Landlord shall institute and diligently and in good faith prosecute holdover and any other appropriate proceedings against the occupant of such space, and Tenant shall be entitled to a Base Rent credit equivalent to the lesser of one (i) (1) day of Base Rent for every one (1) day of delay in delivery of possession of the ROFO Space, and (ii) any payments or penalties collected from the tenant holding over in excess of the rent due thereunder immediately prior to the expiration of the Lease Term, the "ROFO Space Late Delivery Rent Credit").    In the event that Landlord fails, for any reason whatsoever, to deliver possession of the ROFO Space to Tenant on or before the date that is one hundred twenty (120) days after the Anticipated ROFO Space Delivery Date, Tenant shall have the right in addition to its other rights at law or in equity to elect not to lease the ROFO Space, whereupon neither party shall have any further rights or obligations with respect to the ROFO Space.    The ROFO Space Late Delivery Rent Credit, if any, shall be applied against Rent as and when same comes due under this Lease and is payable until fully applied. Landlord shall keep Tenant reasonably apprised of any changes in the anticipated ROFO Space Delivery Date.

(e)    If a monetary or material non-monetary Event of Default exists on the date Tenant sends Tenant's ROFO Election Notice or on the date such ROFO Space is occupied by Tenant, then, at Landlord's election, Tenant's rights pursuant to this Section 26.1 shall lapse and be of no further force or effect; provided however, if Tenant cures such Event of Default prior to the date that Landlord exercises its right to terminate this Lease or dispossess Tenant from the Premises, if Landlord has not otherwise leased the ROFO Space, Tenant shall again have the rights granted pursuant to this Section 26.1.

(f)    Tenant's rights under this Section 26.1 may be exercised by Tenant only and may not be exercised by or for the benefit of any transferee, sublessee or assignee of Tenant other than a Permitted Transferee.

(g)    If on the date Tenant sends Tenant's ROFO Election Notice or on the ROFO Commencement Date, twenty-five percent (25%) or more of the rentable area of the Premises has been subleased or assigned (excluding Permitted Transferees and licenses or subleases to Permitted Tenant Parties as permitted under Article VII hereof), then Tenant's

89

rights pursuant to this Section 26.1 shall lapse with respect to such ROFO Space, but shall be available for subsequent ROFO Space if such condition is again satisfied.

(h)    Tenant has the right under this Section 26.1 to lease only the entire ROFO Space identified in Landlord's ROFO Availability Notice. Tenant has no right to lease less nor more than the entire ROFO Space so identified. Tenant shall have no right to renew or extend the Lease Term with respect to the ROFO Space except in connection with the renewal of the Lease Term for the entire Premises pursuant to Section 3.5 above.

(i)    Landlord shall have no obligation to offer the ROFO Space to Tenant if there are less than thirty-six (36) months then remaining in the Lease Term. Notwithstanding the foregoing, if there are less than thirty-six (36) months then remaining in the Lease Term and Tenant has available to it the Renewal Term pursuant to Section 3.5 above, to the extent the Renewal Term has not been waived by Tenant or deemed waived, then Landlord shall offer the ROFO Space to Tenant during such period pursuant the terms of this Section 26.1; provided, however, that (i) Landlord shall have no obligation to lease the ROFO Space to Tenant for a term of less than thirty-six (36) months, and (ii) Tenant's right to lease the ROFO Space from Landlord shall be conditioned upon Tenant's irrevocable exercise of such Renewal Term pursuant to Section 3.5 above along with or prior to Tenant's delivery to Landlord of Tenant's ROFO Election Notice, and (iii) if Tenant does not properly and timely deliver Tenant's Renewal Option Notice to Landlord as set forth in Section 3.5 above, then Landlord shall have no further obligation to Tenant with respect to the ROFO Space and Landlord shall be free to lease the ROFO Space to any third party on terms and conditions as determined by Landlord in its sole and absolute discretion. Further, Landlord shall have no obligation to offer the ROFO Space to Tenant from and after the date that is the first to occur of (i) the date on which Tenant leases 400,000 rentable square feet of space or more in the Building or (ii) the date on which Tenant delivers to Landlord any Tenant's ROFO Election Notices which will result in Tenant leasing 400,000 rentable square feet of space or more in the Building in the aggregate; provided that if any space that is the subject of such Tenant's ROFO Election Notices does not become part of the Premises as set forth herein, then Landlord shall once again have the obligation to offer the ROFO Space to Tenant pursuant to this Article XXVI subject to the last sentence of this subsection (i).

<div align="center">

ARTICLE XXVII

ARBITRATION

</div>

27.1    If any dispute arises under this Lease with respect to (i) the terms set forth in Article VII, Article IX or Exhibit B-2 of this Lease, or (ii) any other provision of this Lease (other than a provision with respect to the determination of fair market rent, with respect to which the provisions of the applicable provision shall apply) that expressly permits Landlord and/or Tenant to submit a particular dispute to arbitration, and such party (the "Initiating Party") desires to do so, such dispute shall be shall be submitted to binding arbitration conducted in Boston, Massachusetts pursuant to the expedited procedures provisions of the Commercial Arbitration Rules of the AAA then prevailing in the area ("Expedited Arbitration Proceeding"), and:

<div align="center">90</div>

3946           (a)     The Initiating Party shall submit the dispute to arbitration by delivering
3947 notice (each such notice being herein called an "Arbitration Notice") of its desire to the other
3948 party (the "Responding Party"), which notice shall describe the dispute in question, indicate the
3949 provision(s) of this Lease under which such dispute arose and appoint, and set forth the name
3950 and address of, the person who will act as Arbitrator on the Initiating Party's behalf in
3951 connection with the dispute in question together with a statement of any past or current
3952 relationship Landlord or Tenant, as applicable, has or had with such Arbitrator or the firm that
3953 such Arbitrator is affiliated with or own (a "Disclosure Statement").  An "Arbitrator", as used in
3954 this Section 27.1 shall be an individual who (i) has at least ten (10) years' experience in either
3955 managing Class A office buildings or representing owners in the leasing of Class A office
3956 buildings, (ii) has not represented Landlord or Tenant during the immediately preceding five
3957 years in the Boston, Massachusetts area, and (iii) has general experience and competence in
3958 determining the issue at hand, and is registered with the American Arbitration Association (or
3959 its equivalent, should the American Arbitration Association not then be in existence).  If the
3960 Responding Party disapproves of the Arbitrator selected by the Initiating Party, the Responding
3961 Party shall have the one-time right to provide the Initiating Party written notice of such
3962 disapproval within five (5) Business Days after receipt of the Arbitration Notice and thereafter
3963 the Initiating Party shall specify the name and address of a different Arbitrator together with a
3964 Disclosure Statement.  Failure of the Responding Party to provide a notice of disapproval of an
3965 Arbitrator within any such five (5) Business Day period shall be deemed an approval of the
3966 Arbitrator.

3967           (b)     The Responding Party, within five (5) Business Days after its receipt of
3968 the Arbitration Notice, shall give notice to the Initiating Party, which notice shall appoint, and
3969 set forth the name and address of, a second Arbitrator with respect to the dispute in question (it
3970 being agreed that if (x) the Responding Party fails to appoint a second Arbitrator within such
3971 five (5)-Business Day period and (y) such failure continues for two (2) Business Days after the
3972 Responding Party receives a notice of such failure from the Initiating Party, then the first
3973 Arbitrator may appoint such second Arbitrator).  If the Initiating Party disapproves of the
3974 Arbitrator selected by the Responding Party, the Initiating Party shall have the one-time right to
3975 provide the Responding Party written notice of such disapproval within five (5) Business Days
3976 after receipt of the Responding Party's designation notice and thereafter the Responding Party
3977 shall specify the name and address of a different Arbitrator together with a Disclosure
3978 Statement.  Failure of the Initiating Party to provide a notice of disapproval of an Arbitrator
3979 within any such five (5) Business Day period shall be deemed an approval of the Arbitrator.

3980           (c)     If, within five (5) Business Days (the "Discussion Period") following the
3981 appointment of the second Arbitrator (however such second Arbitrator is appointed), the two (2)
3982 appointed Arbitrators are unable to agree with respect to the issue to be determined, then the
3983 two (2) Arbitrators shall, within five (5) Business Days following the end of the Discussion
3984 Period, appoint, by written instrument delivered to both the Initiating Party and the Responding
3985 Party, a third Arbitrator with respect to the dispute in question (it being agreed that if the two
3986 (2) Arbitrators fail to appoint a third Arbitrator within the aforesaid five (5)-Business Day
3987 period, then either the Initiating Party or the Responding Party may apply to the AAA, or if the
3988 AAA refuses or fails to act, then to a court of competent jurisdiction in Boston, Massachusetts,
3989 for the appointment of such third Arbitrator) and the third Arbitrator alone shall be instructed to
3990 render a decision within eight (8) Business Days of such appointment.

3991           (d)    Landlord and Tenant shall each have the right to appear and be
3992 represented by counsel before the Arbitrators and to submit such data and memoranda in
3993 support of their respective positions in the matter in dispute as may be reasonably necessary or
3994 appropriate in the circumstances.

3995           (e)    Each Arbitrator appointed under this <u>Section 27.1</u> (whether by Landlord,
3996 Tenant or any other person(s), organization or court) shall not then be employed by Landlord,
3997 Tenant or any Affiliate of Landlord or Tenant, and, in all other respects, shall be impartial.  In
3998 addition, each Arbitrator (i) shall meet the qualifications set forth in this Lease requiring or
3999 permitting arbitration of such issue, or (ii) if no such qualifications are so set forth, shall have at
4000 least ten (10) years' experience in the business of leasing, operating and managing commercial
4001 office buildings in the greater Boston area.

4002           (f)    The arbitration shall be conducted as an Expedited Arbitration Proceeding.
4003 Any determination or award in such arbitration shall (i) be in writing, (ii) be final and
4004 conclusive on the parties (and counterpart copies thereof shall be delivered to each of the
4005 parties), and (iii) not add to, subtract from or otherwise modify the provisions of this Lease.
4006 Judgment upon any such determination or award may be entered in any court having
4007 jurisdiction thereof.

4008           (g)    In connection with any Expedited Arbitration Proceeding, the Arbitrators
4009 shall determine the extent to which each party is successful in such Expedited Arbitration
4010 Proceeding in addition to rendering a decision on the dispute submitted. If the Arbitrators
4011 determine that one party is entirely unsuccessful, then such party shall pay all of the fees of the
4012 Arbitrators and reasonable attorneys' fees. If the Arbitrators determine that both parties are
4013 partially successful, then each party shall be responsible for the Arbitrators' and reasonable
4014 attorney's fees only to the extent such party is unsuccessful (e.g., if Landlord is eighty percent
4015 (80%) successful and Tenant is twenty (20%) successful, then Landlord shall be responsible for
4016 twenty percent (20%) of the Arbitrators' fees and reasonable attorneys' fees and Tenant shall be
4017 responsible for eighty percent (80%) of the Arbitrators' reasonable and attorneys' fees). If the
4018 parties reach a settlement prior to the final arbitration decision, each party shall pay its own
4019 expenses and the parties shall each pay one-half of the fees and costs of the third Arbitrator (if
4020 any).

4021 <div align="center">ARTICLE XXVIII</div>
4022 <div align="center">PERMITTED ACCESS AND USE FOR EQUIPMENT; TELECOMMUNICATIONS</div>
4023 <div align="center">SERVICES</div>

4024     28.1    Subject to <u>Article IX</u> of this Lease, Tenant shall have the right, at no additional
4025 charge, to use a reasonable percentage (and in no event more than Tenant's Proportionate Share
4026 without Landlord's consent, which consent shall not be unreasonably withheld, conditioned or
4027 delayed) of all of the risers located in the Building to install, operate, maintain, replace and
4028 remove electrical and telecommunications wiring and related equipment therein (e.g., antennae,
4029 satellite dish(es), microwave dishes, signal repeaters, computer systems and like equipment,
4030 and/or other communications and/or television equipment, together with related equipment,
4031 mountings and supports) (collectively, "<u>Telecom Equipment</u>"). Tenant and its contractors and
4032 other consultants shall be granted access to the risers and communications hardlines 24 hours a

<div align="center">92</div>

4033    day/7 days a week/365(366) days a year entering the Building directly from the street, to the
4034    extent necessary to effectuate Tenant's rights under this Lease. Any conduits required by Tenant
4035    shall be supplied at Tenant's sole cost and expense, subject to the application of the Construction
4036    Allowance. Landlord will provide conduits from the main Building telephone room on the MR
4037    level to the risers. In the risers, Landlord will provide at least four (4) sleeves (minimum 4"), but
4038    not conduits, up to the individual floors.

4039        28.2    Tenant shall also have the right, at no additional charge, to install, operate and
4040    maintain (or allow to be installed, operated and maintained by a third party service provider)
4041    Telecom Equipment, including wireless office and communications services (specifically
4042    including, without limitation, "wi-fi" systems, cellular signal repeaters and/or distributed antenna
4043    systems) for wireless communication ("Wireless Network"), within the Premises or in such
4044    portion of the Building, including the roof or any setbacks reasonably designated by Landlord,
4045    provided that such Telecom Equipment is installed, maintained, and operated exclusively to
4046    serve the operations of Tenant and Tenant's Members and their employees, contractors,
4047    customers, licensees and invitees at the Premises (although incidental benefits enjoyed by
4048    Tenant's employees, contractors, customers, licensees and invitees and others shall not on its
4049    own render such service non-exclusive), without the need for any further consent or approval
4050    from Landlord. Without limiting the generality of the foregoing, but subject to applicable Law
4051    and Landlord's Rules and Regulations as amended from time to time, nothing contained herein
4052    shall be deemed to restrict Tenant's (or any other Permitted Tenant Party's) right to install
4053    Telecom Equipment within the Premises. Landlord shall have no interest in any Telecom
4054    Equipment installed by or for the benefit of Tenant, it being understood and agreed that any and
4055    all such installations shall be and remain the sole property of Tenant and such installations may
4056    be removed from the Premises at any time during the Lease Term by Tenant.

4057        28.3    Landlord and Tenant shall cooperate reasonably with one another to assure that
4058    there is no interference with other wireless communication systems in the Building or by such
4059    other systems with any Wireless Network, and Landlord shall use commercially reasonable
4060    efforts to ensure that no other communication, antenna, microwave or satellite dish or other
4061    equipment interferes with the required lines of sight for any of the Telecom Equipment.
4062    Notwithstanding anything to the contrary contained herein, Tenant shall install and operate its
4063    communications equipment in a manner which will not cause material interference to Landlord,
4064    tenants and other occupants of the Building as of the Execution Date, or any other tenants or
4065    other entities (each, a "Communications Equipment User") installing communications equipment
4066    on the roof of the Building.    For purposes thereof, interference from the operation of
4067    communications equipment shall be deemed to be material if it reduces the operating efficiency
4068    of utility or any equipment, if it adversely affects the purity of any frequency or signal or loss of
4069    information, or if it causes interruption of the signal then used by Landlord or any other
4070    Communications Equipment User.  If Tenant's Telecom Equipment causes such a material
4071    interference, such Tenant shall change the frequency on which it transmits and/or receives and to
4072    take any other steps necessary to eliminate the interference. If said interference cannot be
4073    eliminated within a reasonable period of time, Tenant shall remove from the roof the equipment
4074    that is causing such interference.   The communications equipment of the existing tenants and
4075    occupants of the Building as of the Execution Date shall have primacy over that of Tenant, so
4076    that in the event of interference conflict between such Communications Equipment Users and
4077    Tenant, such other Communications Equipment Users shall prevail.

EAST\162676362.12

28.4    At Tenant's request, Landlord will take all reasonable steps to allow any service provider selected by Tenant from time to time to provide service to the Building for Tenant's operations. The following service providers currently serve the Building: Verizon and Comcast. Tenant may select any of the carriers currently servicing the Building or such other commercially reasonable and reputable carrier or carriers as Tenant shall determine from time to time in connection with Tenant's voice and data needs and any such carrier(s) reasonably selected by Tenant shall have reasonable access to the Building to provide such services to Tenant.  In the event Tenant desires to install any upgrade to the cellular service available at the Building, Tenant shall be entitled to utilize a portion of the roof for such purposes, in a location reasonably designated by Landlord and in accordance with the provisions of this Section 28.4, including but not limited to the provisions set forth above with respect to Communications Equipment Users. Unless required by applicable Laws or permitted under the Existing Lease, Landlord shall not permit any other communication, antenna, microwave or satellite dish or other equipment to be installed in, on or at the Building (including on the roof of the Building) after the installation by Tenant of any Telecom Equipment or Supplemental HVAC System which would interfere (other than to a *de minimis* extent) with the operation of, or reasonable access to, any such Telecom Equipment or Supplemental HVAC System located outside of the Premises.

<div align="center">

ARTICLE XXIX
PERMITTED DOGS

</div>

29.1    Notwithstanding any provision to the contrary contained in this Lease, Landlord hereby permits Tenant and Permitted Tenant Parties, subject to the terms of this Section 29.1 and applicable Laws, to bring to the Building fully domesticated, fully vaccinated, trained dogs weighing no more than 40 pounds (hereinafter referred to individually as a "Permitted Dog", and collectively as the "Permitted Dogs"), which are owned by Tenant's employees and Permitted Tenant Parties as pets (as opposed to guide, signal or service dogs as defined in applicable Laws), and to keep such Permitted Dogs in the Premises during those times in which such employees or Permitted Tenant Parties are present in the Premises.  At no time shall there be more than twenty (20) Permitted Dogs on any full floor of the Premises at any one time. Tenant's community manager or other designated employee, on behalf of Tenant, shall be responsible for monitoring compliance with the provisions of this Section 29.1.  Permitted Dogs shall not be left unattended in the Premises or any part of the Building at any time. In all portions of the Building other than the Premises (specifically including, without limitation, all common areas), Permitted Dogs shall, at all times, remain on a leash and controlled by Tenant's employees or Permitted Tenant Parties, and shall not be permitted to walk or otherwise roam through the Building except for entry and egress to the Premises. Tenant shall be responsible for any damage and/or costs or injuries incurred by Landlord as a result of Permitted Dogs' presence in any portion of the Building. Without limiting the generality of the foregoing, Tenant shall promptly repair any damage caused by Permitted Dogs to the Building, the Premises or any common areas, and Tenant shall indemnify, protect, defend and hold Landlord harmless from and against all losses, damages, claims, actions, causes of action, liabilities, injuries, costs and expenses (including reasonable attorneys' fees) incurred by Landlord in connection with the rights granted to Tenant under this Section 29.1. Tenant's rights under this Section 29.1 are subject to, and Tenant shall comply with, all applicable Laws associated with or governing the presence of dogs at or within the Building.  Landlord shall have the right to require Tenant and the Permitted Tenant Parties to utilize the freight elevators of the Building in entering or exiting

<div align="center">94</div>

4123     the Building and/or the Premises with Permitted Dogs.  The rights granted herein with respect to
4124 Permitted Dogs shall not apply or be transferable to any other animal, and in the event Tenant
4125 wishes to bring an animal or dog other than Permitted Dogs into the Building, Tenant shall
4126 submit a written request to Landlord for its approval, which approval may be withheld in
4127 Landlord's sole and absolute discretion. Further, Tenant agrees not to bring any Permitted Dog to
4128 the Building in the event such Permitted Dog becomes ill or contracts a disease that could
4129 potentially threaten the health or wellbeing of any tenant or occupant of the Building (which
4130 diseases shall include, without limitation, rabies, leptospirosis, flea infestation and Lyme
4131 disease). Landlord shall have the right, by providing a written notice to Tenant, to preclude
4132 access to the Building of any Permitted Dog(s) if such Permitted Dog(s) are, in Landlord's
4133 reasonable judgment, found to habitually violate the prior sentence or to be a substantial
4134 nuisance to the Building (meaning Landlord delivers written notice thereof five (5) or more times
4135 in any consecutive thirty (30) day period) (for purposes hereof, the causes for which Permitted
4136 Dog(s) may be found to be a "substantial nuisance" include but are not limited to (i) repeated
4137 excessively loud barking by such Permitted Dog, (ii) such Permitted Dog biting any occupant or
4138 invitee of the Building, (iii) failure to clean up any defecation or urination by such Permitted
4139 Dog immediately upon verbal or other notice from Landlord, (iv) such Permitted Dog otherwise
4140 damaging or destroying the Building, the Premises or any common areas (or any property in the
4141 Building, the Premises or any common areas) or (v) the Permitted Dog fighting or otherwise
4142 creating a disturbance with other Permitted Dogs).   In no event shall Tenant permit any
4143 dangerous breeds to enter the Premises or the Building. Dangerous breeds include, but are not
4144 limited to the following: Pit Bull, German Shepherd, Boxer, Rottweiler, Chow, Doberman
4145 Pincher, Siberian Husky, or Akita or mixed breeds containing one of the enumerated breeds.

4146                                **[SIGNATURES ON NEXT PAGE]**

EAST\162676362.12

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

**LINCOLN STREET PROPERTY OWNER, LLC**

By: _____
Joel Kestenbaum, President

TENANT:

**1 LINCOLN STREET TENANT LLC**

By: _____
Name: _____
Title: _____ **[SEAL]**

[Signature page to Lease]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

**LINCOLN STREET PROPERTY OWNER, LLC**

By: _____
Name:
Title:


TENANT:

**1 LINCOLN STREET TENANT LLC**

By: _____
Name: Pamela Crowler
Title: Secretary


[Signature Page to Lease]

4154

**EXHIBIT A**

4155

**DESCRIPTION OF THE PREMISES**

4156 The Premises includes the twenty-fourth floor through the thirty-fourth floor of the Building, as
4157 such floors are shown on the floor plans attached hereto.  The rentable square footage within
4158 each such floor is as follows:

| Floor | Rentable Square Footage |
|---|---|
| 24th | 24,814 |
| 25th | 24,902 |
| 26th | 22,064 |
| 27th | 22,384 |
| 28th | 22,384 |
| 29th | 22,106 |
| 30th | 22,106 |
| 31st | 20,111 |
| 32nd | 20,023 |
| 33rd | 20,023 |
| 34th | 20,023 |
| **Total 24th – 34th** | **240,940** |

4159

4160

A-1

**EXHIBIT B-1**

A portion of the Premises shall be deemed to be in Ready for Buildout Condition when the following are met with respect to such portion:

1. The enclosure / envelope of the Building is in good, workable condition.

2. Within such portion of the Premises, perimeter and core walls (including any insulation, interior columns, beams, structural components, etc.) and all penetrations between floors and rated core partitions are fireproofed or firestopped, all in accordance with applicable local building code requirements.

3. Within such portion of the Premises, Landlord has replaced any broken, cracked or scratched windows and any malfunctioning window hardware.

4. Landlord has confirmed that access from the exterior entry point of the Building to any common lobby and to such portion of the Premises complies with the current local accessibility laws and requirements.

5. Landlord has remediated and/or abated Hazardous Materials within such portion of the Premises (e.g. asbestos, lead paint / pipes, spill oil) and has provided all documentation in its possession to Tenant that evidences the absence of Hazardous Materials.

6. Floors within such portion of the Premises are to be delivered such that the vertical elevation change over any 10 foot (3 meter) horizontal length is less than ½ inch (13mm). They will be smooth and ready to accept standard flooring.

7. Elevators serving such portion of the Premises are in a finished condition fully commissioned and operational.

8. Restrooms within such portion of the Premises comply with applicable plumbing, mechanical, and accessibility codes to the extent necessary to accommodate Tenant's proposed use and occupancy of such portion of the Premises.

9. Full tenant floors including elevator lobbies and bathrooms to be fully demolished of all partitions, ceilings, floor finishes, light fixtures, power, data, and furniture. HVAC to be stripped back to existing terminal units. MEP services shall remain active for the provision of temporary services during construction.  Premises to be delivered by Landlord in full code compliant white box condition with sprinkler heads turned up.

10. Janitorial closets with sinks are provided on the same floor as such portion of the Premises.

11. HVAC capacity is provided to such portion of the Premises via central system(s) (which is in good condition, having sufficient remaining useful life to operate reliably throughout the term of the Lease) capable of providing zoned environmental control.

12. The preconditioned and filtered outside ventilation air rate provided with respect to such portions of the Premises are, at a minimum, 0.2 cfm/USF.

13. HVAC systems provided in accordance with Section 2(e) of Exhibit B-2.

14. HVAC systems provided to such portion of the Premises provide cooling year-round and heating year-round to maintain interior conditions of no less than 68°F (20°C) from 9am-6pm

15. Supplemental cooling water, to the extent the same exists within the Building, is available to such portion of the Premises on a 24/7/365 basis and provide no less than 3 tons (10kW) per floor at valved points (provided that, where systems do not exist, roof rights shall be granted in accordance with this Exhibit B-1.

16. Landlord shall provide all mechanical equipment, riser space, louvres and all other accessories necessary to insure the full functionality of the facility, ensuring regulatory compliance of the system with local code.

17. A Building Management/Automation System (BMS/BAS) is provided with respect to such portion of the Premises to control the functionality and alarms of the base building systems, which system Tenant can tie into to control and monitor the additional MEP equipment installed by Tenant within such portion of the Premises in connection with Tenant's Work. Tenant shall be provided read access to BMS/BAS points within such portion of the Premises, and shall be permitted to install secondary hardware to access the BMS/BAS for the purposes of data trending and setpoint adjustment, subject to limits set by Landlord.

18. A metered domestic/potable cold and hot water tie-in is provided with respect to such portion of the Premises to accommodate central restrooms and janitorial services. Sanitary drain and vent risers shall be available for readily accessible direct connection for drainage by gravity to accommodate Tenant's proposed use in accordance with local code.

19. The base building systems serving such portion of the Premises provide a minimum of 4.5 W/USF (48 W/m2 NLA), undiversified, to exclusively serve Tenant for plug (small power) and lighting demand loads within such portion of the Premises.

20. On floor mechanical equipment (excluding any Building HVAC plant) shall be served from a dedicated mechanical services panel provided by the Landlord and sized (capacity and outgoing circuits) to suit the USF of the Tenant demise within such portion of the Premises.

21. Any Building HVAC plant serving such portion of the Premises shall be served from independent distribution panels fed from a metered Landlord supply.

22. Main electrical infrastructure equipment (switchgear, utility connections) shall be provided to such portion of the Premises, along with an appropriately sized connection to such portion of the Premises (busbar/rising busmain or cable).

23. A separate, metered, plug (small power), lighting and mechanical distribution boards shall be provide to such portion of the Premises, and each such board shall be provided with a minimum of 28 three phase circuits for Tenant's use.

24. All electrical infrastructure provided to such portion of the Premises shall have remaining useful life to operate throughout the term life of the Lease and shall be provided in code compliant condition.

4234    25. Connections are provided within such portion of the Premises that are appropriately placed
4235         and sized to suit Tenant's reasonable requirements, including (but not limited to) emergency
4236         power, lighting control and BMS/BAS.

4237    26. Sufficient fire alarm loop capacity and a fire alarm that complies with local code
4238         requirements serves such portion of the Premises, and a reasonable number of points and
4239         local panel(s) are available at a reasonable central location within such portion of the
4240         Premises reasonably sufficient to accommodate the Tenant's Work.

4241    27. All egress stairways and pathways serving such portion of the Premises are available for
4242         Tenant's use in an emergency, and such egress stairways and pathways are reasonably
4243         sufficient for the emergency egress needs of Tenant's proposed floor occupancy with tenant
4244         obtaining, at its sole cost and expense, all building and fire department approvals required for
4245         its proposed occupancy and pays for any base building modifications necessary

4246    28. All fire stair doors and associated hardware within such portion of the Premises comply with
4247         all applicable laws and codes, including relevant accessibility requirements.

4248    29. All necessary occupancy certificates, permits, fire egress permits, and other documentation
4249         have been provided to Tenant to assist Tenant in its evaluate emergency egress, and the
4250         Building's fire strategy has been shared with Tenant.

4251    30. Space to have exposed slab/deck patched, fireproofed and fire-stopped for all deficiencies
4252         and to be in reasonably smooth condition to receive Tenant finishes. Landlord to be
4253         responsible for remediating any and all existing structural defects or unsafe conditions at the
4254         Building

4255    31. Landlord to provide a fully code compliant sprinkler system covering all areas, including
4256         isolation valve assembly with tamper switch, water flow switch, and testing and drain station
4257         on all floors within the Premises. Sprinkler system shall be drained down prior to Tenant
4258         possession of the Premises to enable Tenant to make modifications to the sprinkler head
4259         layout.

4260    32. Where required by code, Landlord to provide temporary sprinkler loop at no less than 8'6''
4261         elevation to ensure code required temporary coverage is provided during the fitout works.

4262    33. Such portion of the Premises includes two (2) separately/diversely routed telecommunication
4263         intake positions (fiber optic where available), Landlord has confirmed to Tenant any legal,
4264         wayleave or jurisdictional requirements that may delay the activation of telecommunication
4265         services to the building or Premises, and Tenant is capable of engaging a cable service
4266         provider of its choosing without penalty.

4267    34. Landlord shall provide a clear horizontal and vertical path of travel from the service point of
4268         entry to the Tenant Premises floors. Landlord agrees to allow Tenant to provide security as
4269         appropriate and to Tenant standards which may include card readers and security cameras at
4270         the entrance to the building, in building lobbies, elevators, elevators lobbies, at fire doors,
4271         and core WCs as required by Tenant. Landlord agrees that Tenant is able to use proprietary
4272         security system and software. Landlord shall allow Tenant to install card readers and CCTV
4273         in elevators with a contractor of Tenant's choice as desired. The contractors used by Tenant

<div align="center">B-1-3</div>

in connection with the work outlined in this Section 34 shall be subject to the reasonable preapproval of the Landlord. In addition, the look and design of the card readers located in the Common Areas shall be subject to the reasonable preapproval of the Landlord.

35. Landlord has agreed to provide access control integration requirements for Tenant. Landlord shall provide full technical details of the existing system, card formats in use, details of (including access to) cable routes, panel locations for each door and grant permission for Tenant to integrate their security system with the Landlord's via a reader-router or similar technology. Should this not be possible, the Landlord grants the right for Tenant to install a parallel system at each location we require members to access. Landlord to provide panel space and local power where necessary.

36. Tenant is subject to the Construction Rules and Regulations for 1 Lincoln Sq. that can be found in Schedule II of Exhibit B-2.

37. Landlord shall grant Tenant right to install supplemental HVAC systems and/or satellite dishes on the roof of the building (provided that Tenant's use of such roof shall not exceed Tenant's Proportionate Share of such space), subject to planning approval and previous tenants' installations, and allow for required routing of associated piping, conduit, etc. to Tenant Premises.

38. Where required by Tenant fit-out, Landlord shall review slab coring and work on floor below for the installation of underfloor power distribution, AV poke-thrus or plumbing offsets and approve it in advance of any work undertaken by Tenant's general contractor Coordination of this work may require after hours or weekend work to limit any disruption to existing tenants.

39. Tenant shall have right to utilize existing fire stairs as access between Tenant floors.

EAST\162676362.12

**EXHIBIT B-2**

**WORK AGREEMENT**

This <u>Exhibit B</u> (which includes Schedules I, II and III attached hereto) is attached to and made a part of that certain Office Lease Agreement dated as of December 31, 2018 (the "<u>Lease</u>"), by and between **LINCOLN STREET PROPERTY OWNER, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), and **1 LINCOLN STREET TENANT LLC**, a New York limited liability company ("<u>Tenant</u>").  Unless the context otherwise requires, each term used in this <u>Exhibit B</u> that is defined in the Lease shall have the same meanings as provided in the Lease.

1.    <u>Authorized Representatives</u>. Authorized Representatives. Tenant designates Vahe Markosian email: vahe.markosian@wework.com and phone: 408-421-7114 ("Tenant's Authorized Representative") as the person authorized to approve in writing all plans, drawings, specifications, change orders, charges and approvals pursuant to this Exhibit on behalf of Tenant. Landlord designates George Wilson email: GWilson@fortispropertygroup.com and phone: 718-907-7732 ("Landlord's Authorized Representative") as the person initially authorized to approve in writing all plans, drawings, specifications, change orders, charges and approvals pursuant to this Exhibit on behalf of Landlord.  Either party may designate a substitute Authorized Representative by written notice to the other party pursuant to the terms of the Lease.  Neither party shall be obligated to respond to any instructions, approvals, changes, or other communications from anyone claiming to act on the other party's behalf other than such other party's Authorized Representative.  All references in this Exhibit to actions taken, approvals granted, or submissions made by a party shall mean that such actions, approvals or submissions have been taken, granted or made, in writing, by such party's Authorized Representative acting for such party.

2.    <u>Work</u>.  (a) Except for the Ready to Build Condition and the Base Building Conditions ("<u>Landlord's Work</u>"), all representations, warranties, and ongoing repair and maintenance obligations required of Landlord under the Lease, Landlord shall not have any obligation whatsoever with respect to the initial improvement or finishing of any portion of the Premises for Tenant's use and occupancy, and the Premises shall be delivered to Tenant containing no improvements or property of any kind (except to the extent such improvements or property are a part of Landlord's Work).  All of the work to be performed in initially preparing, finishing and completing the Premises (including the design, engineering and architectural work required in connection with such work and the connections to pipes, ducts and conduits for the mechanical, electrical and plumbing systems in the Building and the construction of restrooms on all floors of the Building occupied by Tenant (it being acknowledged and agreed that Landlord shall not be required to construct any restrooms on such floors)) (collectively, "<u>Tenant's Work</u>") shall be performed by or on behalf of Tenant pursuant to this Exhibit and <u>Article IX</u> (and all other applicable provisions) of the Lease, including, without limitation, insurance, damage and indemnification provisions, and such work shall be deemed to be Alterations for all purposes of the Lease.  All Tenant's Work shall be performed in a good, workerlike and safe manner, using good quality materials, in accordance with all Laws and in substantial conformity with the approved Leasehold Plans (subject to reasonable changes, substitutions and refinements requested and approved to the extent required pursuant to this

4345 Exhibit B).  Landlord shall have the right to cause Tenant to correct, replace or remove any
4346 improvements installed in the Premises that do not materially comply with the preceding
4347 sentence.  Tenant shall be solely responsible for the progress of construction of the Tenant's
4348 Work and for the quality or fitness thereof, and subject to the waiver of claims/waiver of
4349 subrogation provisions of the Lease, Tenant shall be liable for any damage to the Building or the
4350 Base-building systems caused by Tenant, the Contractor, or any of its subcontractors.

4351 (b) Except as provided in Paragraph 2(c) below, the Landlord's Work shall be
4352 deemed to be "Substantially Complete" when any remaining work left to be completed does not
4353 interfere with, prevent or delay in any material respect Tenant's ability to perform Tenant's
4354 Work or to access or use or occupy the Premises (or the applicable portion thereof) for the
4355 Permitted Use.

4356 (c) Intentionally omitted.

4357 (d) Prior to the Initial Lease Commencement Date with respect to the Majority of the
4358 Premises and prior to the Subsequent Lease Commencement Date with respect to the Remainder
4359 of the Premises, Landlord shall schedule a mutually agreeable time with Tenant to walk through
4360 such portions of the Premises and prepare a punchlist setting forth any defects or incomplete
4361 items of Landlord's Work.  Landlord and Tenant shall work together in good faith to prepare and
4362 agree upon the punchlist; provided, however, in the event the parties cannot agree on any item to
4363 be included or not included on the punchlist within ten (10) days of the identification of such
4364 item, then the determination of whether or not such item should be a punchlist item shall be
4365 made by an independent architect (mutually selected by Landlord and Tenant) acting in its
4366 reasonable professional judgment.  Tenant's taking of possession of the Majority of the Premises
4367 or the Remainder of the Premises shall constitute Tenant's acknowledgement that such portion of
4368 the Premises are in good condition and that all work and materials are satisfactory, except as to
4369 any items set forth in such punchlist and except as to latent defects discovered by Tenant and
4370 about which Tenant has notified Landlord within one (1) year following the applicable Rent
4371 Commencement Date.  Landlord will commercially reasonable, good faith efforts to
4372 promptly correct and complete those defects and incomplete items described in such punchlist
4373 within sixty (60) days following the Initial Lease Commencement Date or the Subsequent Lease
4374 Commencement Date, as applicable.  If punchlist items are not completed by Landlord within the
4375 such time periods, Tenant shall notify Landlord in writing thereof, and if the punchlist items are
4376 not completed by Landlord within two (2) Business Days following receipt of such notice from
4377 Tenant, and if Tenant in good faith believes that it can complete such punchlist items in a good
4378 and commercially reasonable manner, then Tenant shall have the right to complete same and
4379 Landlord shall reimburse Tenant for all reasonable third-party, out-of-pocket costs incurred by
4380 Tenant in connection therewith within thirty (30) days after receiving an invoice from Tenant
4381 setting forth a reasonably particularized breakdown of such costs and such other supporting
4382 documentation as is reasonably requested by Landlord. Landlord shall enforce any available
4383 warranties in connection with Landlord's Work.  A "punchlist item" shall mean an item of
4384 construction which entails one or more minor details of construction, decoration, mechanical
4385 adjustment or installation, the non-completion of which will not materially and adversely affect
4386 Tenant's ability to obtain permits, commence or perform Tenant's Work, or the use or occupancy
4387 of the Premises for the normal and customary conduct of Tenant's business.

(e)    Landlord and Tenant acknowledge that as of the Effective Date, the design criteria for the HVAC system serving the Building is sixty (60) tons per full floor of the Premises. Following the Effective Date, Landlord and Tenant shall work together in good faith to cause the design criteria for the HVAC system serving the Premises to equal eighty (80) tons per full floor of the Premises, and the out-of-pocket costs of working to increase such HVAC capacity (including but not limited to the costs of design, consultant fees, purchase and installation of equipment) shall be shared equally by Landlord and Tenant. As part of Tenant's Work, Tenant will be permitted to perform all work required to increase such capacity to eighty (80) tons per floor, including ventilation required for Tenant's anticipated occupancy, subject to reasonable review and approval by Landlord.    Tenant will procure bids for the work on a competitive open-book basis.    The bids will break out the line item for this shared work. Landlord shall fund its share of the cost of this work in accordance with the procedures in which Landlord is required to fund the Construction Allowance as set forth in this Work Agreement.

3.    <u>Architects and Engineers</u>.  Tenant shall employ an architect, duly licensed in the Commonwealth of Massachusetts, to prepare all plans and specifications ("<u>Architect</u>")for the Tenant's Work, which such architect shall be subject to the approval of Landlord, not to be unreasonably withheld, conditioned or delayed.  Tenant shall employ an engineer, duly licensed in the Commonwealth of Massachusetts,  to prepare the mechanical, electrical, plumbing and life safety ("<u>MEP Engineer</u>") engineering drawings and specifications relating to the Tenant's Work, which such engineer shall be subject to the approval of Landlord, not to be unreasonably withheld, conditioned or delayed.  Landlord hereby approves Cosentini Associates, Inc. as Tenant's MEP Engineer and Bergmeyer Associates, Inc. as Tenant's Architect, and any other MEP Engineer or Architect retained by Tenant in connection with the Tenant's Work shall require Landlord's prior written approval in accordance with the foregoing.

4.    <u>Plans for Tenant's Work</u>.

(a)    Tenant shall cause the Architect to prepare design development drawings and specifications for the Tenant's Work (the "<u>Design Drawings</u>"), in a form approved by Tenant, for submission to Landlord's Authorized Representative (or such other individual as Landlord may designate in writing to Tenant), for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  If Landlord has any comments with respect to the Design Drawings so submitted, Landlord shall make such comments known to Tenant's Authorized Representative in writing (which notice may be by electronic mail) and with reasonable specificity within ten (10) days following receipt by Landlord thereof.

(b)    Tenant shall cause the Architect and the Engineer to prepare and assemble permit drawings in form and content sufficiently complete for submission to the applicable governmental authorities for issuance of building permits ("<u>Permit Submission Drawing Set</u>") for the Tenant's Work, in a form approved by Tenant, for submission to Landlord's Authorized Representative (or such other individual as Landlord may designate in writing to Tenant), for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. If Landlord has any comments with respect to Tenant's Permit Submission Drawing Set so submitted, Landlord shall make such comments known to Tenant's Authorized Representative in writing (which notice may be by electronic mail) and with reasonable specificity within ten (10) days following receipt by Landlord thereof.  Notwithstanding the foregoing, Tenant shall have

EAST\162676362.12

4431 the right to submit plans for permitting for Alterations (including Tenant's Work) to the
4432 applicable governmental authority simultaneously with Tenant's submittal of such plans to
4433 Landlord for its approval, and Tenant shall have the right to begin performance of such
4434 Alterations immediately upon receipt of the applicable permit, provided that Tenant shall make
4435 any changes thereto in the field that Landlord may require in accordance with this Work
4436 Agreement. However, if the applicable governmental entity requires any material modifications
4437 to the plans (or Tenant otherwise materially modifies the plans) as submitted to Landlord, Tenant
4438 must re-submit the modified plans to Landlord for approval pursuant to this Work Agreement.

4439         (c)    Tenant shall cause the Architect and the Engineer to prepare final
4440 construction documents for the Tenant's Work in the entire Premises, in a form approved by
4441 Tenant, for submission to Landlord's Authorized Representative for Landlord's approval, which
4442 consent shall not be unreasonably withheld, conditioned or delayed. If Landlord has any
4443 comments with respect to Tenant's construction documents, Landlord shall make such comments
4444 known to Tenant's Authorized Representative in writing (which notice may be by electronic
4445 mail) and with reasonable specificity within ten (10) days following receipt by Landlord thereof.
4446 The final construction documents for the Tenant's Work, once approved by Landlord shall be
4447 referred to herein as the "Leasehold Plans". Other than Landlord's Review Costs pursuant to
4448 Section 6(a) of this Exhibit B, Tenant shall not be obligated to pay any fee or other charge to or
4449 at the direction of Landlord or any Affiliate thereof in connection with the review of any plans
4450 and specifications of any Alteration, including in respect of Landlord's supervision and/or
4451 administration of the installation thereof. Notwithstanding the foregoing, Tenant shall have the
4452 right to submit Leasehold Plans to the applicable governmental authority simultaneously with
4453 Tenant's submittal of such plans to Landlord for its approval.

4454         (d)    All plans, drawings and documents related to the Tenant's Work (and any
4455 material changes related thereto) prepared by or at the direction of Tenant, shall be submitted to
4456 Landlord for its approval in accordance with this Exhibit, which approval shall be granted or
4457 withheld in accordance with Section 4(e) below. If Landlord reasonably requires that any
4458 submission from Tenant be modified in order to obtain Landlord's approval, then Tenant shall,
4459 within fifteen (15) days after receipt of Landlord's comments, resubmit revised documents,
4460 plans, specifications or other materials, as the case may be, incorporating Landlord's requested
4461 changes and responding to any other issues or questions raised by Landlord in its prior
4462 submission. On each occasion, Landlord will provide to Tenant's Authorized Representative
4463 copies of the marked up plans, drawings and documents to which it has an objection or requires a
4464 resubmission, which marked up plans shall indicate Landlord's objection in reasonable detail. If
4465 Landlord has reviewed a set of plans and specifications and has provided comments/issues to
4466 Tenant, then on iterative rounds of plans and specifications, including further developments
4467 thereof, Landlord shall not have the right to raise comments/issues that were not previously
4468 raised (except to the extent that Tenant's revisions with respect to one aspects of the plans and
4469 specifications impact Landlord's review and analysis of other aspects of the plans and
4470 specifications). Landlord shall respond with its approval, disapproval, or comments as to any
4471 resubmission within five (5) Business Days after submission by Tenant. Such submission and
4472 approval process shall continue pursuant to this Section 4, as applicable, until Landlord's
4473 approval is granted as submitted and Tenant has addressed all other comments reasonably raised
4474 by Landlord. If Landlord fails to provide comments within the applicable time frames set forth
4475 above, then Landlord shall be deemed to have approved the applicable item without comment,

4476 but such deemed approval shall not exonerate Tenant from complying with all applicable Laws
4477 and the provisions of the Lease.  Notwithstanding the foregoing, (i) Landlord shall not be
4478 deemed to approve any of the foregoing, unless and until Tenant shall have provided written
4479 notice to Landlord (whether on the applicable plan, drawing or cost estimation or otherwise)
4480 containing the following legend:  "**MUST BE APPROVED BY LANDLORD WITHIN THE**
4481 **TIME FRAME SET FORTH IN THE LEASE**" on the front page thereof; and (ii) the
4482 applicable time frame for Landlord's review and comment shall be extended for a reasonable
4483 period (not to exceed an additional three (3) Business Days) if and to the extent any plan,
4484 drawing or cost estimation involves a Building Structure or Building System and requires a third-
4485 party consultant to review; provided Landlord has first provided Tenant written notice of such
4486 requirement.

4487      (e)    Notwithstanding the foregoing, Landlord shall not unreasonably withhold,
4488 condition, or delay its consent to any such plans, drawings or specifications (or clarifications
4489 thereof); provided, however, that if any portion of such submission has (i) an adverse effect on
4490 the Building Structure or Building Systems beyond a de minimus extent, or (ii) an adverse effect
4491 on the compliance of the Building with applicable Laws, including without limitation, the terms,
4492 conditions and/or other requirements related to any zoning approval, then Landlord may grant or
4493 withhold its consent in Landlord's sole but reasonable discretion.  Notwithstanding anything to
4494 the contrary contained herein, Landlord hereby approves in concept Tenant's performance of
4495 slab cuts and installation of internal staircases between the different floors of the Premises,
4496 subject to Landlord's approval of the plans therefore, which approval shall not be unreasonably
4497 withheld, conditioned or delayed.  Tenant shall be solely responsible for the compliance of the
4498 Leasehold Plans with all Laws, as well as any risk control or loss control guidelines that may be
4499 established from time to time by Landlord's insurance carrier (but only to the extent Tenant has
4500 received written notice thereof), and Landlord's approval of the Leasehold Plans (or
4501 clarifications thereof) shall not constitute Landlord's representation or approval that the
4502 Leasehold Plans complies with the same, or Landlord's approval of any delays caused by Tenant
4503 and shall not be deemed a waiver of any rights or remedies that may arise as a result of such
4504 delays.

4505     5.    <u>Selection of Contractors</u>.

4506      (a)    Tenant shall select the general contractor (the "<u>Contractor</u>") and
4507 subcontractors for Tenant's Work, subject to the reasonable approval of Landlord. Landlord
4508 hereby preapproves the Contractors set forth on the list attached hereto as <u>Schedule I</u> (provided
4509 each such Contractor is a union Contractor, except Tenant's internal general contractor which
4510 may be non-union).  Tenant shall use union labor for Tenant's Work and Tenant's move into the
4511 Premises (in each case, other than Tenant's internal general contractor and Tenant's employees).
4512 Notwithstanding the foregoing,  if at any time the entry by or presence of one or more persons
4513 furnishing services, labor or materials to the Premises shall create any Stoppage with the
4514 Building's operating unions, then Tenant shall promptly stop work or other activity if such work
4515 or activity by Tenant until such Stoppage is resolved.  Landlord agrees to reasonably cooperate
4516 with Tenant to resolve such Stoppage, including enforcing its rights under its applicable union
4517 contract. In the event that any Labor Dispute interferes with other work in the Building by
4518 Landlord or any tenant or occupant of the Building (but does not result in a Stoppage), Tenant
4519 shall cooperate with Landlord and shall use commercially reasonable efforts to resolve such

4520  Labor Dispute. The contract with the Contractor shall contain at least a one (1) year warranty
4521  from defective work, which warranty may be assignable to Landlord.

4522        (b)    Notwithstanding anything to the contrary set forth in this Exhibit,
4523  including, without limitation, Section 2 above, the Contractor or subcontractors shall perform, at
4524  Tenant's sole cost and expense (which cost shall be reasonable and at competitive rates), those
4525  portions of Tenant's Work related to (i) tie-ins to the base Building's fire and life safety system,
4526  (ii) the Building's exterior envelope (including the roof and base Building glass and glazing
4527  work).  Landlord shall provide the names of the foregoing subcontractors to Tenant within thirty
4528  (30) days following the Execution Date.

4529        (c)    Tenant may employ a professional project management or construction
4530  management firm reasonably approved by Landlord to provide project management services
4531  with respect to the Tenant's Work throughout the design and construction process, and shall pay
4532  any fees due to the project manager for such services; provided that Tenant may draw upon the
4533  Construction Allowance to pay such fees.

4534        (d)    It shall be Tenant's responsibility to cause each of the Contractor and
4535  subcontractors to:

4536              (i)    Provide full-time supervision by superintendent or project manager
4537  of ongoing construction activities in the Premises;

4538              (ii)    Maintain continuous protection of any space adjacent to the Premises in
4539  such a manner (including the use of lights, guardrails, barricades and dust proof partitions where
4540  required) as to prevent any damage to adjacent premises by reason of the performance of
4541  Tenant's Work;

4542  (iii)    Secure all parts of Tenant's Work against accident, storm, and any other hazard.
4543  However, no barricades or other protective device shall extend more than two (2) feet beyond the
4544  Premises.  In addition to the foregoing, Tenant's barricade or other protective device shall be
4545  attractive in appearance, shall extend across the frontage and full height of the Premises and shall
4546  be of materials approved by Landlord; and

4547              (iv)    Use only the Premises for the performance of Tenant's Work.  Entry into
4548  areas unrelated to the performance of Tenant's Work is prohibited.

4549        6.    Cost of Work.

4550        (a)    All costs associated with the Tenant's Work, including design, permitting
4551  and construction costs, all "soft" costs, Landlord's Review Costs (as defined below) and
4552  Landlord's Supervisory Costs (collectively, the "Leasehold Cost") shall be borne by Tenant,
4553  subject to application of the Construction Allowance.  "Landlord's Review Costs" shall mean all
4554  reasonable out-of-pocket costs and expenses actually incurred by Landlord to retain the services
4555  of the Building's mechanical, electrical, plumbing and engineering firm to review any proposed
4556  plans or working drawings which may affect the Building Structure or tie-ins to Building
4557  Systems in accordance with good building practice, such out-of-pocket costs and expenses to be
4558  evidenced by reasonably detailed invoices or back-up therefor.  "Landlord's Supervisory Costs"

B-2-6

4559 shall mean all reasonable out-of-pocket costs and expenses actually incurred by Landlord to
4560 monitor any Tenant's Work that affects the Building Structure or involves tie-ins to the Building
4561 Systems in accordance with good building practice, such out-of-pocket costs and expenses to be
4562 evidenced by reasonably detailed invoices or back-up therefor. Any services provided by the
4563 Base Building Architect or the Base Building Engineers at Tenant's request shall be paid for by
4564 Tenant within thirty (30) days after Tenant's receipt of a bill therefor (which bill shall be
4565 accompanied by reasonable detailed back-up substantiating such costs).   Upon request, Tenant
4566 shall execute a separate agreement between Tenant and the Base Building Architect or the Base
4567 Building Engineers with respect to such services.  Any portion of the Leasehold Cost that is in
4568 excess of the amount of the Construction Allowance that has been applied, disbursed or reserved
4569 shall be borne by Tenant and is referred to herein as "Tenant's Expenses."  Except as otherwise
4570 expressly provided in this Exhibit B, all amounts payable by Tenant to Landlord pursuant to this
4571 Exhibit shall be considered additional rent and subject to the provisions of the Lease, and may be
4572 deducted by Landlord from the Construction Allowance.

4573        (b)    Landlord hereby agrees to grant Tenant the Construction Allowance (as
4574 defined in Section 1.25 of the Lease), subject to the provisions of this Exhibit.  The Construction
4575 Allowance is being provided in order to reimburse Tenant for (i) the hard costs associated with
4576 Tenant's construction of the Tenant's Work actually installed in the Premises, any architectural
4577 and engineering design fees, security installations, data and telephone cabling, and signage, and
4578 (ii) permitting costs, and construction management fees, project consultants, moving costs,
4579 furniture, fixtures, equipment, and other move related expenditures associated with the Tenant's
4580 Work (not to exceed fifteen percent (15%) (in the aggregate) of the Construction Allowance).
4581 Notwithstanding anything to the contrary contained in this Work Agreement, if any portion of
4582 the Construction Allowance provided pursuant to this subparagraph shall have been disbursed
4583 prior to the final determination of the number of square feet of rentable area in the Premises
4584 pursuant to the Lease, then promptly following such determination, the unfunded amount of the
4585 Construction Allowance shall be increased or decreased, whichever is applicable, to account for
4586 any overage or deficiency in the portion of the Construction Allowance funded prior to such
4587 determination.

4588        (c)    Landlord shall have no duty to advance any remaining portion of the
4589 Construction Allowance until the following conditions (the "Disbursement Conditions") are
4590 satisfied:  (A) Tenant begins and is diligently pursuing construction of Tenant's Work; (B)
4591 Landlord shall have approved the final Leasehold Plans pursuant to the provisions of this Work
4592 Agreement; (C) copies of all invoices, bills, vouchers, change orders and other information
4593 relating to the expenses for which reimbursement is being sought as may reasonably be requested
4594 by Landlord shall be made available to Landlord by Tenant, to the extent such items exist; (D)
4595 the work and materials for which payment is requested are in substantial accordance with the
4596 Leasehold Plans approved by Landlord (as evidenced by AIA Form G701 an G702); and (E)
4597 there shall be no material Event of Default under the Lease at the time of such request for
4598 disbursement or at the time that Landlord is prepared to disburse such sums.

4599        (d)    If the Leasehold Cost is equal to or less than the Construction Allowance,
4600 then Landlord shall be responsible for paying the Leasehold Cost from the Construction
4601 Allowance and the balance of the Construction Allowance shall belong to Landlord.

B-2-7

(e)    If the Leasehold Cost is greater than the Construction Allowance, then the full amount of the Construction Allowance (less any amount due to Landlord under this Exhibit, any portion thereof as has previously been disbursed to pay Tenant's architectural, engineering and project management costs, and any amounts withheld by Landlord pursuant to Section 6(f)(I) hereof) shall first be applied toward the Leasehold Cost, and thereafter Tenant shall pay any remaining portion of the Leasehold Cost as part of Tenant's Expenses.

(f)    As Leasehold Costs are incurred, Tenant shall deliver to Landlord a written request for partial payment of the Construction Allowance, which request shall include all of the following (collectively, the "Allowance Request"):  (A) a signed statement from an authorized officer of Tenant certifying that Tenant has incurred and paid Leasehold Costs (for which Tenant has not previously been paid or reimbursed from the Construction Allowance) and the amount requested to be paid from (but not exceeding in the aggregate an amount equal to) the Construction Allowance; (B) invoices for portions of the Tenant's Work for which payment is sought; (C) partial, conditional lien waivers for such work from all persons or entities that could file mechanics' or materialmen's liens ("Potential Lienors") with respect to all hard cost work performed or services or materials provided through the date of each such invoice (subject only to receipt of the requisitioned amount) and full and final lien waivers from any Potential Lienors whose invoices were to be paid from any prior draw; and (D) executed AIA forms G701 and G702.  Tenant shall not be allowed to submit more than one (1) Allowance Request during any calendar month.  If a complete Allowance Request complying with the foregoing requirements is received by Landlord from Tenant, and there is no monetary or material non-monetary Event of Default then continuing, Landlord shall pay to Tenant (or credit against any amounts then due and owing from Tenant to Landlord) the amount properly covered by the Allowance Request (up to the maximum amount of the Construction Allowance in the aggregate) within thirty (30) days after Landlord's receipt of the foregoing. Notwithstanding anything above to the contrary, Landlord shall: (I) have the right to withhold the percentage of the Construction Allowance that is equal to ten percent (10%) until the date which is thirty (30) days following the later to occur of (1) Tenant's opening for business to the public in the Premises fully-staffed and fixtured, (2) Tenant's receipt of a temporary or final certificate of occupancy (or similar required certificate) for the Premises, and (3) Landlord's receipt of a final contractor's affidavit and release and waiver of lien from the Contractor; (II) have the right to first apply portions of the Construction Allowance against the Landlord's Review Costs (provided that Landlord first provides Tenant with a detailed itemized breakdown of such costs); and (III) not be required to reimburse Tenant for any invoice received after one (1) year after the Subsequent Rent Commencement Date.

(g)    In the event Landlord fails to timely disburse all or any portion of the Construction Allowance if, as, and when required in accordance with the terms of this Section 6, and such failure continues for five (5) days after Landlord's receipt of written notice from Tenant of such failure, then Tenant shall send to Landlord a second written notice containing a detailed description of such amounts that Tenant believes are due and stating that Landlord's failure to pay Tenant is a breach of the Lease.  If Landlord fails to timely disburse all or any portion of the Construction Allowance within five (5) days following such second notice, then Tenant shall thereafter be entitled to deduct the unpaid amount, together with interest thereon at the rate of eight percent (8%) per annum from the date such amounts were due to Tenant, from any installment of Base Rent then due or thereafter becoming due under the Lease; provided,

however, that Tenant shall deliver written notice to Landlord that Tenant is exercising its offset rights pursuant to this Section 6(g) not later than five (5) days prior to such offset.

7.    Change Orders; Field Substitutions.

(a)    If, after Tenant has solicited bids for performance of the Tenant's Work, Tenant requests any material change or addition to the work and materials to be provided pursuant to the Leasehold Plans, then such change order shall require Landlord's approval, which approval shall be granted or withheld in accordance with the approval standard set forth in Section 4(e) above.  Landlord shall respond as promptly as practical under the circumstances to Tenant's requests for changes.  In addition, in the event a change order requested and approved by Tenant with respect to the Leasehold Plans causes the Leasehold Cost to exceed (or further exceed) the amount of the Construction Allowance, then all additional expenses attributable to any such change or addition requested and approved by Tenant and approved by Landlord, including Landlord's Review Costs, shall be payable by Tenant pursuant to the provisions of this Exhibit.

(b)    Tenant may make reasonable field substitutions (i.e., by substituting materials of comparable quality, cost and performance specifications) for materials specified for the Tenant's Work if any materials specified for the Tenant's Work cannot reasonably be obtained at the job site in time to be incorporated into the Tenant's Work in the normal progression and diligent prosecution of the Tenant's Work.

8.    Ready for Buildout.  Subject to submitting acceptable insurance certificates and posting of all applicable permits, the Contractor shall be allowed access to portions of the Premises when such portions of the Premises are in Ready for Buildout Condition and have been delivered to Tenant.

9.    Substantial Completion.

(a)    Except as provided in Section 9(b) below, the Tenant's Work shall be deemed to be substantially complete when (A) the Tenant's Work (except for punchlist items) has been completed in substantial conformity with the Leasehold Plans as certified to Landlord by the Architect on a standard form AIA certificate of substantial completion; and (B) there has been issued by applicable government authority a certificate of occupancy or other approval required to permit occupancy of the Premises for office use (an "Occupancy Permit").

(b)    As used in this Lease, "Landlord Delay" means any delay which actually delays Tenant in the performance of Tenant's Work or in Tenant's initial occupancy of any portion of the Premises for the Permitted Use solely and only to the extent caused by any act or failure to act by Landlord, its employees, agents or contractors, including, without limitation, (a) delays by Landlord in the timely giving of authorizations or approvals if expressly required hereunder, (b) Landlord's failure to provide services to Tenant which Landlord is obligated to provide pursuant to the provisions of this Lease or failure to make repairs which Landlord is obligated to perform pursuant to the provisions of this Lease, (c) delays due to latent defects in the Premises or the Building existing as of an applicable Lease Commencement Date that were not reasonably discoverable by a visual inspection by Tenant, and were not caused by Tenant or

B-2-9

any of Tenant's Agents or representatives, (d) delays resulting from ongoing construction at the Building or work performed by Landlord in the Premises following the delivery date of the Premises, if any; (e) any violations of Laws by Landlord or failure to obtain and maintain governmental permits, consents, approvals or other documentation, the compliance with which or the obtaining and maintaining of is not the responsibility of Tenant in accordance with the Lease; or (f) delays due to Landlord's failure to timely perform, or Landlord's performance of, an environmental remediation that Landlord is required to perform pursuant to the terms of this Lease; provided that no such delay shall constitute a Landlord Delay unless Tenant notifies Landlord, within three (3) Business Days after Tenant has actual knowledge of such delay (but if Tenant fails to so notify Landlord within any such three (3)-Business Day period, such delay shall nevertheless be deemed a Landlord Delay from and after the date that Tenant so notifies Landlord of such Landlord Delay). Notwithstanding the foregoing, Landlord shall reasonably cooperate in good faith with Tenant to permit Tenant to perform any such noisy work until 8:00 am to the extent that such work is not reasonably anticipated to unreasonably interfere with the conduct of business of existing tenants currently occupying any space within the Building

10. <u>Work Rules and Coordination</u>. The Contractor and all subcontractors employed by the Contractor shall (i) comply with the work rules and procedures attached hereto as <u>Schedule II</u>, and to any additional or modified work rules that may be reasonably adopted by Landlord for the Building (subject to the limitations in <u>Section 16.1</u> of the Lease) and (ii) reasonably coordinate on an ongoing basis with Landlord's project manager and construction manager concerning construction-related matters. The Contractor shall conduct its activities in the Building in a manner that will not unreasonably delay or interfere with any work being performed in the Building by any other contractor (including the Contractor). Tenant shall have the right to work at all times (24/7/365) subject to compliance with applicable Laws; provided however, the following noisy work shall be performed only during the Building noisy work hours before 7:00 am or after 7:00 pm, Monday through Friday during any period in which another tenant is occupying any space within the Building for the conduct of its business, unless otherwise approved by Landlord: (a) shooting of studs for mechanical fastenings; (b) installation of any vertical support (including, without limitation, via expansions shields in an MEP and Black Iron Application); (c) testing of fire alarm systems (or any work on the fire alarm systems resulting in loud noises, except in case of emergency); (d) core drilling; (e) demolition; and (f) penetration of floors or ceilings.

11. <u>Contractor's Insurance</u>. The Contractor and its subcontractors shall maintain insurance coverages as set forth on <u>Exhibit F</u> attached to the Lease. Tenant assumes the responsibility and liability for any and all injuries or death of any or all persons, including Tenant's contractors and subcontractors, and their respective employees, and for any and all damages to property caused by, or resulting from or arising out of any act or omission on the part of Tenant, its Agents, Contractor and any of its, subcontractors, suppliers or materialmen (and any employees of the foregoing). Tenant agrees to insure this assumed liability in its policy of Broad Form Commercial General Liability insurance and the certificate of insurance or copy of the policy that Tenant will present to Landlord shall so indicate such contractual coverage.

12. <u>Contractor Submittals</u>. Upon Landlord's approval of the Leasehold Plans, Tenant shall submit the following:

<div align="center">B-2-10</div>

4729               i.     Names of Contractor (including main office name, address, phone and
4730                            fax, and, as soon as it becomes available, project manager name, direct
4731                            phone, fax, cell phone and email address, superintendent and field
4732                            supervisor name, direct phone, job phone, cell phone, fax and email
4733                            address) and all subcontractors (with full contact information for office
4734                            and field supervision as listed above for general contractor);

4735              ii.     Proof of financial ability (provided, however, that this will not be
4736                            required with respect to any pre-approved contractor listed on
4737                            <u>Schedule I</u> attached hereto);

4738             iii.     Contractor's/subcontractor's bond if reasonably required by Landlord
4739                            (provided, however, that this will not be required with respect to any
4740                            pre-approved contractor listed on <u>Schedule I</u> attached hereto);

4741             iv.     Evidence of insurance coverage; and

4742             v.     Copy of Building permit(s).

4743     13.     <u>Intentionally omitted</u>.

4744     14.     <u>Final Lien Waivers</u>. Upon completion of the Tenant's Work, simultaneously with
4745 disbursement of the final installment of the Construction Allowance that is to be paid to the
4746 Contractor, Tenant shall obtain and deliver to Landlord final unconditional lien waivers with
4747 respect to all lienable work performed in the Premises and the Building from the Contractor as
4748 well as any other Potential Lienors under applicable law. Should any mechanics' or
4749 materialman's lien be filed against the Premises or the Building with respect to the Tenant's
4750 Work, Tenant shall bond or pay off such lien within thirty (30) days after Tenant has received
4751 notice thereof, including constructive notice (which notice may be by electronic mail), subject to
4752 Tenant's right to contest same pursuant to <u>Article IX</u> of the Lease.

4753     15.     <u>Permits</u>. Tenant shall obtain all governmental permits and approvals relating to
4754 the performance of the Tenant's Work, and Landlord shall obtain all governmental permits and
4755 approvals, if any, relating to the Base Building Conditions. Copies of all building permits,
4756 certificates of occupancy, and other governmental notices, permits or licenses received with
4757 respect to the Tenant's Work shall be promptly furnished to Landlord. Landlord shall reasonably
4758 cooperate with Tenant, at Tenant's cost and expense, to obtain any and all permits, licenses and
4759 approvals required for Tenant's Work.

4760     16.     <u>Close Out Requirements</u>. Upon completion of the Tenant's Work, (i) Tenant shall
4761 cause the Contractor to comply with the requirements of <u>Schedule III</u> and provide Landlord
4762 copies of all documents and materials set forth therein, and (ii) a portion of the Construction
4763 Allowance in an amount equal to ten percent (10%) of the Construction Allowance shall be
4764 retained by Landlord until the Contractor has fully complied with all such close-out
4765 requirements.

4766     17.     <u>Access to Non-Premises Space</u>. If, in connection with any Alterations to the
4767 Premises (including in connection with any plumbing work), Tenant reasonably needs access to

the ceiling of the area on any non-Premises floor immediately beneath any floor of the Premises (the "Non-Premises Space"), Landlord shall arrange a time (which may be after Business Hours, including on the weekend) to allow Tenant access to such other tenant's space to perform the applicable portion of the Alterations. Tenant shall use commercially reasonable efforts in connection with Tenant's access to the Non-Premises Space to minimize interference with the operations of any affected tenants.

18.     Disputes. Any disputes between Landlord and Tenant with respect to Tenant's Work or with respect to any terms or provisions of this Exhibit B shall be resolved by arbitration pursuant to Article XXVII of the Lease.

SCHEDULES TO EXHIBIT B:

SCHEDULE I        –   List of Mutually Approved Contractors
SCHEDULE II       –   Rules and Procedures for Contractors
SCHEDULE III      –   Close-Out Requirements

B-2-12

**EXHIBIT B**

**SCHEDULE I**

**MUTUALLY APPROVED CONTRACTORS**

1. Gilbane Building Company
2. Garland Building
3. Shawmut Design and Construction
4. Suffolk Construction Company
5. Turner Construction Company
6. Tenant's Internal General Contractor (i.e., the general contractor that is under common control with Tenant)

EXH. B-Schedule I-1

4792                                    **EXHIBIT B**

4793                                    **SCHEDULE II**

4794                        **RULES AND PROCEDURES FOR CONTRACTORS**
4795                                        **FOR**
4796                        **TENANT BUILDOUT AND/OR RENOVATION**

4797    **TENANT CONSTRUCTION AND ALTERATIONS**

4798    All proposed tenant construction and alterations must be submitted to the Building Operations
4799    Office prior to initiation of work for approval in accordance with the terms of the Lease and the
4800    Work Agreement. Details of this process can be found in State Street Financial Center One
4801    Lincoln Street Tenant Construction, Alterations and Maintenance Requirements.
4802
4803    **CONSTRUCTION RULES AND REGULATIONS**

4804    All contractors performing work for tenants shall follow the following rules and regulations.

4805    1.  Contractors must comply with the Occupational Safety and Health Administration
4806        (OSHA) Hazard Communication (HAZCOM) Standard, Title 29 Code of Federal
4807        Regulations 1910.1200. This applies to all Contractor work operations where chemicals
4808        are used in the Building.

4809        a.  A file containing the Safety Data Sheets (SDS), for all products used on each
4810            project, will be maintained at the job site and available for inspection by Building
4811            personnel at any time.

4812        b.  It is the Contractor's responsibility to ensure that their employees are provided
4813            HAZCOM training, are knowledgeable in working with assigned chemicals, and
4814            receive the appropriate personal protective equipment from the contractor, prior to
4815            initiating work.

4816    2.  The Contractor is responsible for holding weekly safety meetings and providing copies of
4817        the minutes to Building Operations.

4818    3.  All construction materials are to be brought to the job in proper containers and must be
4819        stored in the tenant's work area. No materials are to be stored in public areas, i.e., service
4820        lobbies, loading dock, stairs, public corridors.

4821    4.  Use of building power, water and other special services must be prearranged with
4822        Building Operations to minimize inconvenience to the tenant.

4823    5.  Contractor and all employees, as well as subcontractors and their employees must be
4824        properly trained and certified for work they perform.

4825    6.  No construction personnel, tools or ladders are allowed in Building common areas or on
4826        occupied floors during the hours of 7:00 a.m. and 7:00 p.m. Monday through Friday and
4827        8:00 a.m. and 2:00 p.m. on Saturdays. The exception is entry and exit from Tenant suite
4828        under construction via closest stairway or service elevator. After hours work in these
4829        areas must be prearranged and scheduled with the Building Operations Office.

EAST\162676362.12

7. No construction personnel are allowed on passenger elevators. All construction materials and workers are restricted to the service elevators.

8. Contractor is responsible for securing all materials and tools as well as that of his subcontractors.

9. No construction personnel are allowed in the lobby at any time.

10. No eating or drinking is allowed in the Building (outside the Premises) or on the property except in work areas, or areas specifically designated by Building Operations. Workers will not litter or loiter while on the job site.

11. No alcoholic beverages, illegal substances, etc. are allowed to be brought on the property by any contractors.

12. Smoking is prohibited.

13. No loud music is allowed in construction areas.

14. Contractor may not display any signs with its company name in any window or structure that is viewable by the public.

15. Areas under construction as well as storage areas, and all unoccupied space are kept clean and in an orderly fashion daily.

    a. They are to be secured when unattended.

16. Contractor is to use only designated areas for working, loading and unloading, and trash containment and removal. Depending on the nature of the project, contractor may only be allowed use of a designated service elevator.

17. The building shall not be responsible for the removal of construction debris or clean up.

    a. The use of the Building compactors and cafeteria wet dumpster is prohibited.

    b. The contractor shall be responsible for providing adequate rubbish removal service at its sole expense.

18. The contractor shall be held responsible for the protection and cleaning of interior glass, blinds and drapes within the Premises. Areas adjacent to the work area to be kept clean and free of stored materials.

19. No material is to be taken through the main lobby or occupied tenant areas (other than the Premises).

    a. It may not be transported across finished flooring, marble, pavers, tile or carpet unless a protective covering or walkway is used, which must be reasonably approved by Building Operations.

    b. A reasonably approved covering must protect all doors and doorframes (elevator, suite entry, interior and stairwell).

20. All dollies, hand trucks, jacks, etc. shall be in proper working condition—iron wheels are not permitted in buildings.

21. The contractor must supply and install polyethylene dust barriers when and where deemed reasonably necessary by Building Operations.

EXH. B-Schedule II-2

a. All public areas such as elevator lobbies, corridors, toilets and service halls shall be protected to the satisfaction of Building Operations.

b. Equipment and other property belonging to the building shall also be protected, and refurbished if damaged during construction, to the satisfaction of the Property Manager.

22. All elevator enclosures, openings in return air ducts as well as openings into public areas shall be protected against dust.

23. Contractor may not dump materials into janitor's slop sinks.

24. It is the Contractor's responsibility to properly dispose of all hazardous materials.

25. Occupied floors with areas under construction are to have all construction debris (vacuumed as needed) removed from Building common areas (corridors, restrooms, elevator lobbies, service elevator lobby, stairwells, electrical and mechanical rooms, etc.) daily.

a. No staging of materials will be permitted in hallways, lobbies, sidewalks or other areas that can be seen by the public.

26. Loading dock area shall be kept free of construction materials and debris (other than in connection with deliveries and trash removal/carting but only during the period necessary for use of the loading dock for deliveries and trash removal/carting).

a. Contractor is responsible for following all loading dock rules and regulations

27. Contractor's failure to remove material or clean-up work areas will result in Building Operations performing the work and holding all costs for the Contractor's account.

28. All deliveries that require significant use of the service elevator must be prearranged through Building Operations.

29. Except as otherwise provided in the Lease or the Work Agreement (including without limitation, Section 10 of the Work Agreement, all/any burning or welding on occupied floors, core drilling and any other extremely noisy or disruptive jobs must be prearranged through Building Operations prior to doing the work and will only be permitted before 7:00 a.m. and after 7:00 p.m.

a. Burning and welding requires prior notification to Building Operations.

30. All Contractors are responsible for securing hot work permits from the Boston Fire Department and following through with all requirements therein including closing the permit

31. Except as otherwise permitted under the Lease or the Work Agreement, no work shall be performed on the base building or life safety systems without prior reasonable approval of Building Operations office. All equipment rooms must be attended at all time during work. If the area is left unattended, it must be secured.

32. Fire Protection/Life Safety Systems shall not be disconnected or otherwise rendered unserviceable without first notifying Building Operations in writing.

a. This must be done at least 48 hours in advance.

EXH. B-Schedule II-3

b. This applies to testing of systems as well which must be done after 7:00 p.m. during the week, after 2:00 p.m. on Saturdays.

c. Restoration of protective systems shall be diligently pursued.

d. No access to the Fire Command Center shall be permitted without prior reasonable consent from Building Operations.

33. Any perforation and/or penetration through any fire-rated assembly must be completely fire-safed.

34. All fireproofing on steel must be replaced to match the existing rating, at Tenant's expense, if damaged by the tenant's contractor.

35. Contractor will be responsible for any charge pertinent to fire alarm system and sprinkler supervisory shutdowns as they relate to contractor's work.

36. Contractor is required to participate, as directed by Building Operations, in fire drills.

a. This may include cessation of work activities and evacuation of the building for several hours for which it is the Contractor's sole financial burden to bear.

37. Stairwell doors are not to be wedged open under any circumstance.

38. The General Contractor will provide a qualified representative for the full duration of his or any of his subcontractor's daily activities within the Building. The representative will be equipped with a mobile telephone and number shall be provided to Building Operations.

39. Identification will be required for all construction personnel and said personnel must comply with all check-in/sign-in procedures as required by Building Operations, including use of one designated building entry exit point, other than in emergencies.

40. All work, material delivery and access to Building before 7:00 a.m. or after 7:00 p.m. and on weekends or holidays must be coordinated with Building Operations two (2) days in advance.

41. Any Contractor acting in a less than professional/ businesslike manner will be removed from the project and prohibited future access (i.e., use of profanity, lude remarks to tenants, etc.).

42. Workers may be assigned to one toilet area (outside of the Premises), which the general contractor will be responsible for cleaning, maintaining and restoring to original condition.

## FIRE SYSTEM SHUTDOWNS AND DRAINDOWNS

1. Authorized tenant representative must request shutdown/drain-down twenty-four hours before the work, via the Facility Manager (FM), and list the following:

a. The time and date of the shutdown/draindown

b. Description of work to be performed

2. Firewatch is the responsibility of the tenant and at a minimum is required for cutting and burning. Boston Fire Department requires 48-hour notice.

3. When work is complete, tenant contractor must notify the FM who in turn notifies the Watch Engineer and Chief Engineer.

4. When devices are added to system, work must be certified by the Fire Alarm Service Provider and signed off by all local authorities as required.

## **TENANT FIRE ALARM AND PROTECTION SYSTEMS**

1. Tenant fire alarm systems consisting of alarm initiating and indicating devices are connected into building panels by way of terminal boxes on each floor or connected to tenant panels that are tied into the base building system.

2. Tenant is responsible to install any additional cards needed in existing base building panels.

3. The interface location for tenant's electric locks that must be released on a fire alarm is via a tenant installed fire alarm control module and relay at each locked door.

4. Tenant must contract with the base building Fire Alarm Service Company to do final termination and program the fire alarm control panel.

5. Tenants are restricted to having their system maintained by the base building Fire Alarm Service Company.

6. Tenants are required to have the base building Fire Alarm Service Company maintain their system consistent with applicable codes and forward appropriate paper work to the Building Operations Office.

Notwithstanding anything to the contrary contained herein, (i) in the event of any conflicts or inconsistencies between the provisions of this Schedule II and the provisions of the Lease, the provisions of the Lease shall govern and control, and (ii) in the event of any conflicts or inconsistencies between the provisions of this Schedule II and the provisions of the Work Agreement (Exhibit B-2), the provisions of the Work Agreement (Exhibit B-2) shall govern and control.

Acknowledged By:

_____

Date: _____

4977                                         **EXHIBIT B**

4978                                         **SCHEDULE III**

4979                               **CLOSE OUT REQUIREMENTS**

4980      1.   Electronic PDF files of final construction documents
4981      2.   Copies of all warranties
4982      3.   HVAC balanced
4983      4.   Hard & electronic copies of O&M Manuals (which include the following: warranties,
4984           product spec information, cleaning/care instructions, etc.)
4985      5.   Updated panel schedules (labeled at the panels)
4986      6.   Copy of the final certificate of occupancy
4987      7.   Project Directory – GC, major suppliers, subcontractors and design team contact
4988           information
4989      8.   All required lien waivers
4990      9.   Any and all permits related to food preparation (if applicable)
4991
4992

## EXHIBIT C

## RULES AND REGULATIONS

1.  The sidewalks, entrances, passages, courts,, elevators, vestibules, corridors and halls shall not be obstructed or encumbered by Tenant or used for any purpose other than ingress and egress to and from the Premises and for delivery of merchandise and equipment in prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord. The Building's fire stairways are for emergency use only; the use thereof for other purposes being expressly prohibited.

2.  No awnings, air-conditioning units, fans or other projections shall be attached to or project through the outside walls or windows of the Building. No curtains, blinds, shades or screens, other than those which conform to Building standards as established by Landlord from time to time, shall be attached to or hung in, or used in connection with, any exterior window or door of the Premises, without the prior written consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned. Such awnings, projections, curtains, blinds, shades, screens or other fixtures must be installed at Tenant's expense and be of a quality, type, design and color, and attached in the manner approved by Landlord, such approval, not to be unreasonably withheld, delayed or conditioned.

3.  The exterior windows and doors that reflect or admit light and air into the Premises or the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any articles be placed on the windowsills. All windows in the Premises shall be kept closed.

4.  No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, without the prior written consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned, nor shall any article obstruct any air-conditioning supply or exhaust without the prior 'written consent of Landlord, such consent not to be unreasonably withheld, delayed or conditioned.

5.  The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags, acids or other substances shall be deposited therein. All damages resulting from any misuse of such fixtures shall be borne by Tenant.

6.  Except to the extent permitted as a part of Tenant's Work or Alterations made in compliance with Article IX of the Lease or the Work Agreement, Tenant shall not mark, paint, drill into, or in any way deface any part of the Premises or the Building. Except to the extent permitted as a part of Tenant's Work or Alterations made in compliance with Article IX of the Lease or the Work Agreement, no boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed, and as Landlord may reasonably direct.

7.  No office space in the Building shall be used for manufacturing, for the storage of merchandise, or for the sale of merchandise, goods or property of any kind at auction or otherwise.

C-1

8. Tenant shall not make, or permit to be made, any unreasonable noises or materially adversely disturb or interfere with occupants of the Building or neighboring buildings or premises or those having business with them, whether by the use of any musical, instrument, radio, television set, tape player, CD player, whistling, singing, or in any other way.

9. Tenant must, upon the termination of its tenancy, return to Landlord all keys of stores, offices and toilet rooms, and in the event of the loss of any keys furnished at Landlord's expense, Tenant shall pay to Landlord the cost thereof.

10. No bicycles, vehicles or animals of any kind except for seeing eye dogs and Permitted Dogs, wheelchairs and other assistive devices for the handicapped shall be brought into or kept by Tenant in or about the Premises or the Building.

11. All removals, or the carrying in or out of any safes, freight, furniture or bulky matter of any description, must take place in the manner and during the hours which Landlord or its agent reasonably may determine from time to time. Unless Landlord grants prior approval, Tenant shall not be permitted to perform any of the foregoing during Operating Hours. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or other provisions of this Lease. Landlord shall have the right to prescribe the weight and position of safes and other objects of excessive weight, and no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept upon the Premises. If, in the judgment of Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of Tenant and in such manner as Landlord shall determine.

12. Tenant shall not occupy or permit any portion of the Premises demised to it to be occupied as an office for a public stenographer or typist, or for the possession, storage, manufacture or sale of liquor, narcotics or drugs, or as a barber or manicure shop, or as an employment bureau. Tenant shall not engage or pay any; employees on the Premises, except those actually working for Tenant at the Premises, or by persons or entities providing out-sourced services to Tenant and its Affiliates (but not to the general public), nor advertise for labor giving an address at the Premises.

13. Tenant shall not purchase drinking water, ice, towels, vending machines, mobile vending service, catering, or other like service, or accept barbering or shoe shining services in the Premises from any company or persons not approved by Landlord, which approval shall not be withheld or delayed unreasonably, or at hours or under regulations other than as reasonably fixed by Landlord.

14. Landlord reserves the right to exclude from the Building other than during Operating Hours all persons who do not present a pass to the Building signed or approved by Landlord. Tenant shall be responsible for all persons for whom a pass shall be issued at the request of Tenant and shall be liable to Landlord for all acts of such persons.

C-2

15. Tenant shall, at its expense, provide artificial light for the employees of Landlord while doing janitor service or other cleaning, and in making repairs or alterations in the Premises.

16. The requirements of Tenant will be attended to only upon written application at the office of the Building. Building employees shall not perform any work or do anything outside of their regular duties, unless under special instructions from the office of Landlord.

17. Canvassing, soliciting and peddling in the Building are prohibited and Tenant shall co-operate to prevent the same.'

18. There shall not be used in any space, or in the public halls of the Building, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

19. Tenant shall not do any cooking, conduct any restaurant, luncheonette or cafeteria for the sale or service of food or beverages to its employees or to others, or cause or permit any odors of cooking or other processes or any unusual or objectionable odors to unreasonably emanate from the Premises. Tenant shall not install or permit the installation or use of any food, beverage, cigarette, cigar or stamp dispensing machine other than for the exclusive use of Tenant's employees and invitees, or permit the delivery of any food or beverage to the Premises, except by such persons delivering the same as shall be approved by Landlord, which approval shall not be unreasonably withheld or delayed, Tenant shall keep the entrance door to the Premises closed at all times except when actually in use.

20. Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character, reputation. or interests of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building. Landlord may require any person leaving the Building with any package or other object to exhibit a pass from the tenant from whose premises the package or object is being removed, but the establishment and enforcement of such requirement shall not impose any responsibility on Landlord for the protection of any tenant against the removal of property from the premises of the tenant.

21. Smoking is prohibited at all times throughout the Building, except in areas specifically designated by Landlord as smoking areas. The main lobby entrances are to be non-smoking areas, unless smoking is specifically allowed by Landlord, Landlord may change the location of the smoking areas from time to time in Landlord's sole discretion.

C-3

5107                              **EXHIBIT D-1**

5108              **CERTIFICATE AFFIRMING A LEASE COMMENCEMENT DATE**

5109             This Certificate is being provided pursuant to that certain Office Lease Agreement dated
5110    as of December ___, 2018 (the "Lease"), by and between **LINCOLN STREET PROPERTY**
5111    **OWNER, LLC**, a Delaware limited liability company ("Landlord"), and **1 LINCOLN**
5112    **STREET TENANT LLC**, a New York limited liability company ("Tenant").  The parties to the
5113    Lease desire to confirm that the [Initial/Subsequent] Lease Commencement Date with respect to
5114    the [Majority of the Premises/Remainder of the Premises] is _____, 20___.

5115             Attached to this Certificate is evidence of payment of premiums for all insurance required
5116    pursuant to the Lease.

5117             IN WITNESS WHEREOF, Landlord and Tenant have executed this Certificate on
5118    _____, 20___.

WITNESS/ATTEST:                    LANDLORD:

                                   **LINCOLN STREET PROPERTY**
                                   **OWNER, LLC**

                                   By: _____
                                   Name: _____
                                   Title: _____


WITNESS/ATTEST:                    TENANT:

                                   **1 LINCOLN STREET TENANT LLC**

_____  By: _____
                                   Name: _____
                                   Title: _____
5119
5120


                                        D-1-1

**EXHIBIT D-2**

**CERTIFICATE AFFIRMING THE RENT COMMENCEMENT DATE**

This Certificate is being provided pursuant to that certain Office Lease Agreement dated as of December ___, 2018 (the "Lease"), by and between **LINCOLN STREET PROPERTY OWNER, LLC**, a Delaware limited liability company ("Landlord"), and **1 LINCOLN STREET TENANT LLC**, a New York limited liability company ("Tenant").  The parties to the Lease desire to confirm the following:

1.    The [Initial/Subsequent] Rent Commencement Date with respect to the [Majority of the Premises/Remainder of the Premises] is _____, 201__.

2.    The initial term of the Lease shall expire on _____, ____.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Certificate on _____, 20___.

WITNESS/ATTEST:                              LANDLORD:

_____        **LINCOLN STREET PROPERTY OWNER, LLC**

By: _____
Name: _____
Title: _____

WITNESS/ATTEST:                              TENANT:

                                             **1 LINCOLN STREET TENANT LLC**

_____        By: _____
Name: _____
Title: _____    **[SEAL]**

D-2-1

5134

**EXHIBIT E**

5135

**TENANT'S SIGNAGE**



5136

E-1



EAST\162676362.12



5138

E-3

EAST\162676362.12

**EXHIBIT F**

**INSURANCE REQUIREMENTS FOR CONTRACTORS**

At all times during the period between the commencement of construction of any Alterations, or other alterations, improvements, construction, fixturing or related work thereafter performed within the Building or the Premises, until completion thereof, including Tenant's Work, Tenant's contractors, sub-contractors and sub-subcontractors shall be required to provide, in addition to the insurance required of Tenant pursuant to Article XIII of the Lease, the following types of insurance:

1.    Worker's Compensation Insurance as required by the jurisdiction in which the Building is located.

2.    Employer's Liability Insurance in the amount of $500,000 each accident for bodily injury by accident, $500,000 each employee for bodily injury by disease, and $500,000 policy limit for bodily injury by disease, or such other amount as may be required by Umbrella/Excess Liability Insurance to effect umbrella coverage.

3.    Commercial General Liability Insurance, including coverage for bodily injury (including coverage for death and mental anguish), Premises-Operations, Products-Completed Operations, Blanket Contractual Liability, Personal Injury and Broad form Property Damage (including coverage for Explosion, Collapse and Underground hazards, if applicable), and including Cross Liability and Severability of Interests, with the following minimum limits:

- $1,000,000    Each Occurrence;

- $2,000,000    General Aggregate;

- $1,000,000    Personal and Advertising Injury; and

- $2,000,000    Products-Completed Operations Aggregate.

Such policy shall provide coverage on a on a per occurrence basis and be endorsed to have the General Aggregate apply on a per location/ per project basis.  Products and Completed Operations insurance shall be maintained for (1) year after Substantial Completion of the Work.

4.    Automobile Liability Insurance, including coverage for owned, non-owned, leased and hired autos, in the minimum amount of $1,000,000. combined single limit for Bodily Injury and Property Damage if automobiles are used in the performance of Contractor's obligations hereunder;

5.    Umbrella/Excess Liability Insurance on a follow form basis with a per occurrence and annual aggregate limit of $1,000,000 per location / project.  Coverage shall be excess of Commercial General Liability Insurance (including products and completed operations coverage), Automobile Liability Insurance and Employer's Liability with such coverage being concurrent with and not more restrictive than the underlying insurance policies to the extent required under this Lease.

F-1

6.      Professional Liability Insurance by Tenant's design professional in the minimum amount of $2,000,000.

All such commercial general liability and umbrella/excess liability insurance shall be primary and non-contributory and shall meet the same additional terms with respect to waiving all rights of recovery and subrogation as required of Tenant and as otherwise set forth in <u>Article XIII</u> of this Lease.   Any deductibles and/or self-insured retentions thereunder shall be commercially reasonable.   All such commercial general liability insurance shall name Landlord, its advisors, the managing agent of the Building and the holder of any Mortgage, in each case of whom Landlord gives notice to Tenant, and any other parties that have a insurable interest in the Building that Landlord may designate from time to time, as additional insureds with respect to liability arising out of such contractor, sub-contractor, or sub-subcontractor's work.   Tenant shall submit, or shall cause each such contractor, sub-contractor, or sub-subcontractor employed by Tenant to submit, certificates evidencing the coverage set forth above to Landlord prior to the commencement of any Alteration, or other alterations, improvements, construction, fixturing or related work thereafter performed within the Building or the Premises, including Tenant's Work, and at least 10 days within policy renewals.

F-2

5191 **EXHIBIT G**

5192 **FORM OF LETTER OF CREDIT**

5193 IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER _____
5194 DATED: _____

5195 To:    LINCOLN STREET PROPERTY OWNER, LLC, C/O FORTIS PROPERTY GROUP,
5196       LLC, 45 MAIN STREET, SUITE 804, BROOKLYN, NY  11201

5197 DEAR SIR/MADAM:

5198 WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR
5199 FAVOR.

5200 BENEFICIARY:    LINCOLN STREET PROPERTY OWNER, LLC
5201                C/O FORTIS PROPERTY GROUP, LLC
5202                45 MAIN STREET, SUITE 804
5203                BROOKLYN, NY  11201

5204 ACCOUNT PARTY: 1 LINCOLN STREET TENANT LLC
5205                115 WEST 18th STREET, 2nd FLOOR
5206                NEW YORK, NEW YORK  10011

5207 DATE OF EXPIRY:  NOVEMBER 5, 2020

5208 PLACE OF EXPIRY: OUR COUNTERS

5209 AMOUNT: THIRTY-FIVE MILLION AND 00/100 DOLLARS ($35,000,000.00)

5210 APPLICABLE RULES: ISP LATEST VERSION

5211 THIS LETTER OF CREDIT IS ISSUED AT THE REQUEST OF ACCOUNT PARTY FOR
5212 THE BENEFIT OF BENEFICIARY.  BENEFICIARY MAY PARTIALLY OR FULLY DRAW
5213 UPON THIS LETTER OF CREDIT FROM TIME TO TIME PURSUANT TO AND IN
5214 ACCORDANCE WITH THE TERMS OF THE LEASE.

5215 FUNDS UNDER THIS CREDIT ARE AVAILABLE AT SIGHT WITH JPMORGAN CHASE
5216 BANK, N.A. UPON PRESENTATION OF BENEFICIARY'S SIGNED AND DATED
5217 STATEMENT READING AS FOLLOWS:

5218 "1 LINCOLN STREET TENANT LLC, AS TENANT, AND LINCOLN STREET PROPERTY
5219 OWNER, LLC, AS LANDLORD ("LANDLORD"), ARE PARTIES TO A CERTAIN LEASE
5220 (THE "LEASE") WITH REGARD TO 1 LINCOLN STREET, BOSTON, MASSACHUSETTS.
5221 [FOR MORTGAGEE DRAWS: BENEFICIARY HAS BEEN ADVISED THAT][1] AN EVENT
5222 HAS OCCURRED UNDER THE LEASE THAT ENTITLES LANDLORD TO DRAW, IN

---

[1] Tenant shall use commercially reasonable efforts to cause the issuer of the Letter of Credit to include this parenthetical, however, Tenant shall not be in default under the Lease if this parenthetical is not included in the Letter of Credit issued by the issuer.

5223   PART OR IN FULL, UPON THAT CERTAIN LETTER OF CREDIT NUMBER ____ ISSUED
5224   BY JPMORGAN CHASE BANK, N.A.  ACCORDINGLY, WE HEREBY DEMAND THE
5225   AMOUNT OF USD _____ UNDER JPMORGAN CHASE BANK, N.A. LETTER OF
5226   CREDIT NUMBER ____."

5227   IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE
5228   AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ADDITIONAL 12
5229   MONTH PERIODS FROM THE PRESENT OR EACH FUTURE EXPIRATION DATE,
5230   UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO THE CURRENT EXPIRY DATE WE
5231   SEND NOTICE IN WRITING TO YOU AT THE ABOVE ADDRESS, THAT WE ELECT
5232   NOT TO AUTOMATICALLY EXTEND THIS LETTER OF CREDIT FOR ANY
5233   ADDITIONAL PERIOD. HOWEVER IN NO EVENT SHALL THIS LETTER OF CREDIT BE
5234   AUTOMATICALLY EXTENDED BEYOND THE FINAL EXPIRY DATE OF NOVEMBER
5235   5, 2020.

5236   THIS LETTER OF CREDIT IS TRANSFERABLE, BUT ONLY IN ITS ENTIRETY, AND
5237   MAY BE SUCCESSIVELY TRANSFERRED.  TRANSFER OF THIS LETTER OF CREDIT
5238   SHALL BE EFFECTED BY US UPON YOUR SUBMISSION OF THIS ORIGINAL LETTER
5239   OF CREDIT, INCLUDING ALL AMENDMENTS, IF ANY, ACCOMPANIED BY OUR
5240   TRANSFER REQUEST FORM DULY COMPLETED AND EXECUTED, THE FORM OF
5241   WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>. IF YOU WISH TO TRANSFER THE
5242   LETTER OF CREDIT, PLEASE CONTACT US FOR THE FORM WHICH WE SHALL
5243   PROVIDE TO YOU UPON YOUR REQUEST.  IN ANY EVENT, THIS LETTER OF CREDIT
5244   MAY NOT BE TRANSFERRED TO ANY PERSON OR ENTITY LISTED IN OR
5245   OTHERWISE SUBJECT TO, ANY SANCTION OR EMBARGO UNDER ANY
5246   APPLICABLE RESTRICTIONS. CHARGES AND FEES RELATED TO SUCH TRANSFER
5247   WILL BE FOR THE ACCOUNT OF THE APPLICANT.

5248   WE ENGAGE WITH YOU THAT DOCUMENTS PRESENTED UNDER AND IN
5249   CONFORMITY WITH THE TERMS AND CONDITIONS OF THIS CREDIT WILL BE
5250   DULY HONORED ON PRESENTATION IF PRESENTED ON OR BEFORE THE
5251   EXPIRATION AT OUR COUNTERS AT 10420 HIGHLAND MANOR DR., 4TH FL., TAMPA,
5252   FL 33610 ATTN: STANDBY LETTER OF CREDIT UNIT.

5253   DRAWINGS HEREUNDER MAY BE PRESENTED VIA OVERNIGHT COURIER
5254   SERVICES OR BY FAX TRANSMISSION TO FAX NO. 856-294-5267 OR SUCH OTHER
5255   FAX NUMBER IDENTIFIED BY JPMORGAN CHASE BANK, N.A. BY WRITTEN NOTICE
5256   TO YOU. TO THE EXTENT A PRESENTATION IS MADE BY FAX TRANSMISSION,
5257   YOU MUST PROVIDE TELEPHONE NOTIFICATION THEREOF TO US AT 800-634-1969,
5258   PRIOR TO OR SIMULTANEOUSLY WITH THE SENDING OF SUCH FAX
5259   TRANSMISSION. IN THE EVENT OF A PRESENTATION VIA FACSIMILE
5260   TRANSMISSION, NO MAIL CONFIRMATION IS NECESSARY THE FACSIMILE
5261   TRANSMISSION WILL BE THE OPERATIVE DRAWING DOCUMENT.

5262   THIS LETTER OF CREDIT MAY BE CANCELLED PRIOR TO EXPIRATION PROVIDED
5263   THE ORIGINAL LETTER OF CREDIT (AND AMENDMENTS, IF ANY) ARE RETURNED
5264   TO JPMORGAN CHASE BANK, N.A., AT OUR ADDRESS AS INDICATED HEREIN,

5265 WITH A STATEMENT SIGNED BY THE BENEFICIARY STATING THAT THE
5266 ATTACHED LETTER OF CREDIT IS NO LONGER REQUIRED AND IS BEING
5267 RETURNED TO THE ISSUING BANK FOR CANCELLATION.

5268 THIS LETTER OF CREDIT IS GOVERNED BY, AND CONSTRUED IN ACCORDANCE
5269 WITH THE LAWS OF THE STATE OF NEW YORK AND, EXCEPT AS OTHERWISE
5270 EXPRESSLY STATED HEREIN, IS SUBJECT TO THE INTERNATIONAL STANDBY
5271 PRACTICES, ICC PUBLICATION NO. 590 (THE "ISP98"), AND IN THE EVENT OF ANY
5272 CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL, WITHOUT
5273 REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

5274 ALL INQUIRIES REGARDING THIS TRANSACTION MAY BE DIRECTED TO OUR
5275 CLIENT SERVICE GROUP AT THE FOLLOWING TELEPHONE NUMBER OR EMAIL
5276 ADDRESS QUOTING OUR REFERENCE _____.

5277 TELEPHONE NUMBER 1-800-634-1969

5278 EMAIL ADDRESS: GTS.CLIENT.SERVICES@JPMCHASE.COM

5279

5280 YOURS FAITHFULLY,

5281 JPMORGAN CHASE BANK, N.A.

5282

5283 …………………………………………..

5284 Authorized Signature

5285

5286

G-3

Request for a **Full Transfer** of the below referenced
**Standby Letter of Credit**

J.P.Morgan

Date: _____

Reference: _____

_____
(Issuing Bank's Letter of Credit Number)

To: JPMorgan Chase Bank, N.A. and/or its subsidiaries and/or affiliates.
" Transferring Bank"

_____
(Advising Bank's Reference Number, if applicable)

We, the undersigned "First Beneficiary", hereby irrevocably transfer all of our rights to draw under the above referenced Letter of Credit ("Credit") in its entirety to:

_____
(Print Name and complete address of the Transferee) "Second Beneficiary"

_____

_____

_____

Advise through:     _____
(Print Name/address of Second Beneficiary's Bank, if known - if left blank, the Transferring Bank will select the advising bank)

_____

In accordance with UCP 600 Article 38 or ISP 98, Rule 6 regarding transfer of drawing rights (whichever set of rules the Credit is subject to), all rights of the undersigned First Beneficiary in such Credit are transferred to the Second Beneficiary. The Second Beneficiary shall have the sole rights as beneficiary thereof, including sole rights relating to any amendments whether increases or extensions or other amendments and whether now existing or hereafter made. All amendments are to be advised directly to the Second Beneficiary without necessity of any consent of or notice to the undersigned First Beneficiary.

The original Credit, including amendments to this date, is attached and the undersigned First Beneficiary requests that you endorse an acknowledgment of this transfer on the reverse thereof. The undersigned First Beneficiary requests that you notify the Second Beneficiary of this Credit in such form and manner as you deem appropriate, and the terms and conditions of the Credit as transferred. The undersigned First Beneficiary acknowledges that you incur no obligation hereunder and that the transfer shall not be effective until you have expressly consented to effect the transfer by notice to the Second Beneficiary.

If you agree to these instructions, please advise the Second Beneficiary of the terms and conditions of the transferred Credit and these instructions.

First Beneficiary represents and warrants to Transferring Bank that (i) our execution, delivery, and performance of this request to Transfer (a) are within our powers and have been duly authorized (b) constitute our legal, valid, binding and enforceable obligation (c) do not contravene any charter provision, by-law, resolution, contract, or other undertaking binding on or affecting us or any of our properties and (d) do not require any notice, filing or other action to, with, or by any governmental authority (ii) we have not presented any demand or request for payment or transfer under the Credit affecting the rights to be transferred, and (iii) the Second Beneficiary's name and address are correct and complete and the transactions underlying the Credit and the requested Transfer do not violate applicable United States or other law, rule or regulation, including without limitation U.S. Foreign Asset Control regulations.

We further agree to indemnify and hold harmless you and each of your directors, officers and employees (each an "Indemnitee" and collectively, "Indemnitees") from and against any losses, damages, liabilities, claims, costs and expenses (including reasonable attorneys' fees) to which any Indemnitee may be subject or which any Indemnitee may incur, directly or indirectly, arising out of or relating to (i) any breach by us of the representations and warranties herein; and (ii) our failure to remit to you, upon demand, funds paid to us despite the Transfer.

Stby Appl Chg Rev. 11/15/2017                    1

5287

5288

EAST\162676362.12

The Effective Date shall be the date hereafter on which Transferring Bank effects the requested transfer by acknowledging this request and giving notice thereof to Second Beneficiary.

WE WAIVE ANY RIGHT TO TRIAL BY JURY THAT WE MAY HAVE IN ANY ACTION OR PROCEEDING RELATING TO OR ARISING OUT OF THIS TRANSFER.

This Request is made subject to the same International Chamber of Commerce Publication as and if stipulated in the Credit (and the ISP 98 if not so stipulated) and is subject to and shall be governed by the laws of the State of New York, without regard to principles of conflict of laws. The undersigned submits to the nonexclusive jurisdiction of any state or federal court located in the Borough of Manhattan, City of New York, New York, for itself and its property and agrees that any such court shall be a proper forum for any action or suit brought by you.

Sincerely yours,

_____
(Print Name of First Beneficiary)

_____
(Print Authorized Signers Name and Title)

_____
(Authorized Signature)

_____
(Print Second Authorized Signers Name and Title, if required)

_____
(Second Authorized Signature, if required)

_____
(Telephone Number/Fax Number)

**SIGNATURE GUARANTEED**

Signature(s) with title(s) conform(s) with that/those on file with us for this individual, entity or company and signer(s) is/are authorized to execute this agreement.

_____
(Print Name of Bank)

_____
(Address of Bank)

_____
(City, State, Zip Code)

_____
(Print Name and Title of Authorized Signer)

_____
(Authorized Signature)

_____
(Telephone Number)

_____
(Date)

---

As an alternative to the above "Signature Guarantee", the following may be executed.

**AUTHORIZED SIGNER CERTIFICATION**

I the undersigned, DO HEREBY CERTIFY that I hold the following title: ☐ Secretary, ☐ Assistant Secretary, ☐ Chief Financial Officer, ☐ Chief Executive Officer, ☐ President, ☐ Vice President, ☐ Treasurer , ☐ Managing Member, ☐ Manager, or ☐ Other _____ and I am authorized to certify on behalf of the First Beneficiary, as of the date of this Authorized Signer Certification, that the person(s) named above presently holds the office set forth below  such person's name, and below the officer designation  is the genuine signature of such person.

That such  person named above (an "Authorized Officer"), is authorized on behalf of the First Beneficiary to enter into or execute and deliver this request to transfer a letter of credit issued by JPMorgan Chase Bank, N.A. and/or any of its domestic or foreign subsidiaries or affiliates (individually and collectively, the "Bank") including the above terms and conditions included in such Request for a Full Transfer of a Standby Letter of Credit.

WITNESS WHEREOF, I have hereunto subscribed my name this        day of        , 20       .

*By: _____
      (Signature)
Name: _____
(*The person making this certification may not be the Authorized Officer signing the above Request for a Full Transfer of a Standby Letter of Credit.)

5289

G-5

**EXHIBIT H**

**FORM OF SURETY BOND**

**SURETY BOND**

Bond No.: _____

Effective Date: _____

## KNOW ALL BY THESE PRESENTS:

That we, 1 Lincoln Street Tenant LLC  with a usual place of business at 115 W. 18th Street, New York, NY 10010 (hereinafter "Principal") and Westchester Fire Insurance Company, a Corporation organized under the Laws of the State of Pennsylvania and authorized to transact the business of Surety in the Commonwealth of Massachusetts (hereinafter "Surety"),   are held and firmly bound unto LINCOLN STREET PROPERTY OWNER, LLC (hereinafter "Obligee") in the penal sum of Twenty Million and 00/100 Dollars ($20,000,000.00), lawful money of the United States of America, to be paid to the said Obligee, or their successors or permitted assigns, for which payment well and truly is to be made, we and each of us do hereby bind ourselves, and each of our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

## THE CONDITION OF THE ABOVE OBLIGATION IS SUCH:

WHEREAS, the Principal and Obligee entered into a lease agreement with the Obligee per that certain Lease, dated _____ (collectively referred to herein as "the Lease"), and;

WHEREAS, in accordance with the terms of the Lease, this Surety Bond (the "Bond") shall be held by the Obligee as financial security according to the terms of the Lease, and;

WHEREAS, the receipt and enforcement of this Bond was and is a material inducement to Obligee to enter into the Lease with Principal.

**NOW, THEREFORE,** the condition of this obligation is such that if the Principal shall comply with the terms of said Lease then no amounts shall be payable under this Bond pursuant to the terms hereof, provided that the terms hereof shall remain in full force and effect for so long as this Bond shall be effective as more particularly provided below.

**PROVIDED FURTHER,** that this Bond is executed by the Principal and Surety and accepted by the Obligee upon the following express conditions:

1. In the event of any default of the Principal under the Lease, Obligee shall notify the Principal and Surety that such a default  has occurred, and should such default continue beyond any applicable notice and cure periods set forth in the Lease, Obligee shall have the right to make a demand for payment of amounts available hereunder by presenting a signed statement in the form of Exhibit A attached hereto ("Payment Demand") delivered by certified mail or traceable overnight courier to the Surety at its office at Attention: Surety Claims, 436 Walnut Street WA10A, Philadelphia, PA 19106-3703, USA.

2. Not later than fifteen (15) business days after receipt by Surety of a Payment Demand, Surety shall pay to the Obligee the amount of such demand. The Obligee's demand to the Surety, either for

H-1

payment or for reimbursement pursuant to the Lease, shall be binding and conclusive evidence of the existence and extent of the liability of the Surety which is the subject of the Payment Demand to the Obligee, without investigation or inquiry, and upon delivery of such Payment Demand, Surety shall be irrevocably and unconditionally obligated to pay the amount set forth in the Payment Demand within said 15 business day period regardless as to the existence of any actual or potential defenses of Principal or Surety.   Notwithstanding the foregoing, by Surety making such payment of a Payment Demand as required hereunder, Principal and/or Surety shall not be deemed to have waived any actual or potential rights, claims or defenses, but it is expressly acknowledged and agreed that any such actual or potential rights, claims or defenses shall in no event delay, hinder or otherwise impair Surety's obligation to pay the amount set forth in any such Payment Demand to Obligee within said 15 business day period.  The Obligee may present one or more demands at any time or from time to time in its sole discretion; provided, however, Surety shall not be obligated to pay an aggregate amount in excess of the penal sum of this Bond, provided, however, that such limitation shall not limit any obligations of Principal to Obligee as may be provided in the Lease.

3.   Surety's obligation under this Bond shall be reduced by, and to the extent of, any payment or payments made by Surety under this Bond.  Surety's liability under this Bond, including all renewals of this Bond, shall not cumulate from year to year, and in the aggregate shall not exceed the penal sum hereof, regardless of the number of claims that may be made by Obligee hereunder.

4.   This Bond shall become effective as of the Effective Date and shall remain in full force and effect thereafter for a period of one year (the initial expiration date) and shall automatically renew for additional one year periods from the initial expiration date hereof, or any future expiration date, unless the Surety provides to Obligee not less than sixty (60) days advance written notice of its intent to not renew this Bond.   Any nonrenewal notice shall not discharge the Surety from its Obligations hereunder with respect to any demand received on or prior to the expiration date. It is understood and agreed that Obligee may deliver to Surety a Payment Demand and recover the full amount of this Bond (less any previous amounts paid to Obligee under this Bond) if (a) Surety provides such 60 day advance written notice of nonrenewal of this Bond and, (b) Obligee has not received substitute collateral from Principal as may be required under the Lease to replace this Bond, or in such other form as may be acceptable to Obligee, within thirty (30) days prior to the effective date of nonrenewal. In such case, Obligee shall have the right to submit a Payment Demand with respect to such draw, and if Obligee timely does so, Surety shall be obligated to pay Obligee subject to the provisions of Paragraph 2 hereof.

5.   Except to the extent the obligations of Principal under the Lease are performed in full, or as otherwise expressly provided in this Bond, there is no circumstance under which Surety shall be discharged from any of its obligations under this Bond.   The terms of this Bond shall not be impaired, modified, changed, released or limited in any manner whatsoever by an impairment, modification, change, release or limitation of the liability of Principal or its estate in bankruptcy resulting from any modification or amendment (whether material or otherwise) of any of the obligations of Principal under the Lease, or the operation of any present or future provision of the United States Bankruptcy Code or other statute regarding reorganization or insolvency, whether or not Surety has been notified thereof or consented thereto.  Surety shall pay in full regardless of, for

H-2

example and not by way of limitation:  (a) any invalidity, illegality or unenforceability of the Lease, or any termination of the Lease for any reason whatsoever; (b) any defense or right of offset or counterclaim; (c) Obligee's waiver of the performance or observance by Principal, Surety or any other party of any covenant or condition contained in the Lease or this Bond; (d) any full or partial assignment of the Lease or subletting of the Premises; (e) Obligee's failure or delay to exercise any right or remedy available to Obligee or any action on the part of Obligee granting indulgence or extension in any form whatsoever; or (f) any other condition or contingency or any other matters whatsoever, whether or not similar to those specifically mentioned herein, other than the full payment and performance of all obligations of Principal under the Lease.

6.  Except as expressly provided in this Bond, Surety waives presentment, notice of dishonor, protest and notice of non-payment, non-performance or non-observance, notice of acceptance of this Bond and notice of any obligations or liabilities contracted or incurred by Principal except as expressly set forth herein within respect to a default under the Lease for which payment is being sought by Obligee.  Surety expressly agrees that its obligations hereunder shall in no way be terminated, affected or impaired by reason of the granting by Principal of any indulgences to Obligee or by reason of the assertion against Obligee of any of the rights or remedies reserved to Principal pursuant to the provisions of the Lease.

7.  Notwithstanding anything in the Lease or this Bond to the contrary, Obligee shall have the right to apply or not apply any security deposit or other credit in favor of Principal as Obligee shall determine in its sole and absolute discretion, and Surety's liability under this Bond shall not be affected in any manner thereby. Obligee may proceed against Surety under this Bond without initiating or exhausting any remedy against Principal (including, without limitation, the application of any security deposit or other credit in favor of Principal), and may proceed against Principal and Surety separately or concurrently. Surety waives any right it may have to require Obligee to institute or prosecute an action against Principal or any other person before proceeding against Surety.

8.  No action, suit or proceeding either at law or in equity shall by maintained against the Surety unless such action, suit or proceeding is commenced within one hundred twenty (120) days after the expiration of this Bond. This Bond shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

9.  No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein and the heirs, executors, administrators, successors and assigns of Obligee under the Lease.  This Bond is transferrable and assignable and may be transferred one or more times, without charge, by Obligee in connection with the sale, mortgage, assignment or transfer of the Lease by Obligee (and may be collaterally assigned to any lender of Obligee), but only so long as Principal or any one of Tenant's Affiliated Group (defined below) remains the tenant under the Lease.  Obligee shall notify Surety of each such transfer.  For the purposes hereof, "Tenant's Affiliated Group" shall mean Principal and all Affiliates of Principal and/or the parent company of Principal, and "Affiliates" shall mean any person, corporation, partnership, limited liability company or other entity which directly or indirectly controls, is controlled by or is under common control with Principal or WeWork Companies Inc. (for this purpose, "control" means either the possession,

H-3

directly or indirectly, of the power to direct or cause the direction of the management and policies of the entity or the distribution of its profits, whether by the ownership of voting securities, partnership shares, by contract or otherwise, or the ownership, directly or indirectly, of more than ten percent (10%) of the then outstanding stock, if the entity is a corporation, or of ten percent (10%) of the ownership interests, if the entity is a partnership, a limited liability company or other entity).

**SIGNED, SEALED, AND DATED this _____ of _____, 2018.**

1 Lincoln Street Tenant LLC (Principal)

By: _____ (Seal)

Westchester Fire Insurance Company (Surety)

By: _____ (Seal)
                       , Attorney-in-Fact

H-4

1       **Exhibit A**

2

3     **SURETY**

4       Attention: Surety Claims, 436 Walnut Street WA10A, Philadelphia, PA 19106-3703,
5             USA Re:      Bond ("Bond") securing the obligations of [PRINCIPAL] pursuant
6             to that certain [LEASE AGREEMENT]

7     The undersigned Obligee demands payment of USD [_____] AND [__]/100
8     DOLLARS (U.S. $[_____.__]) under the Bond.

9     Obligee represents, warrants, certifies and promises that either:

10      (a) Applicant is in default under that certain [_____], dated
11    [_____] (the "Lease"), between [_____], and Obligee is entitled in
12    accordance with the terms and conditions of the Lease to draw the amount requested hereunder,
13    the amount of this drawing remains due and owing under such Lease, and any applicable notice
14    periods and grace periods pertaining to such payment under the Lease have expired; or

15      (b) Obligee has received notice from Surety of its election not to extend the Expiration
16    Date of the Bond for an additional one (1) year period and Obligee has not received collateral
17    from Principal in the form required under the Lease (or a form otherwise acceptable to Obligee)
18    to replace the Bond

19    Obligee further represents, warrants, certifies and promises that the proceeds from this demand
20    under the Bond will be used to satisfy Principal's obligations under such Lease to Obligee.

21    Payment should be made to the account and pursuant to the wire transfer instructions attached
22    hereto.

23    This demand is made as of the date hereof.

24    All capitalized terms not defined herein shall have the meanings given such terms in the Bond.

25

26    Yours faithfully,

27    [OBLIGEE]
28
29
30
31
32
33

<div align="center">H-5</div>

**EXHIBIT I**

**FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

_____

SUBORDINATION, NON-DISTURBANCE, ATTORNMENT AGREEMENT
_____

**MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC**

(Agent)

- and -

_____

(Tenant)

- and -

**LINCOLN STREET PROPERTY OWNER, LLC**

(Landlord)

Dated:            _____, 20__

Location:        1 Lincoln Street
Boston, MA 02111

County:        Suffolk

PREPARED BY:
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
Attention:  Ellen M. Goodwin, Esq.

I-1

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "**Agreement**") is made as of _____, 20__ by and among **MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC**, a New York limited liability company, having an address at 1585 Broadway, New York, NY 10036, as administrative agent on behalf of certain lenders ("**Agent**"), _____, a _____, having an address at _____ ("**Tenant**"), and **LINCOLN STREET PROPERTY OWNER, LLC**, a Delaware limited liability company, having an address at 45 Main Street, Suite 800, Brooklyn, New York 11201 ("**Landlord**").

RECITALS:

A.    Agent, for the benefit of certain Lenders (as defined in the Security Instrument (defined below)), is the present owner and holder of that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Security Instrument**") dated as of November 10, 2016, given by Landlord to Agent for the benefit of certain "**Lenders**" (as defined in the Security Instrument) which encumbers the fee simple absolute estate of Landlord in certain premises described in <u>Exhibit A</u> attached hereto (the "**Property**") and which, among other security instruments, secures the payment of certain indebtedness owed by Landlord to Lenders evidenced by a certain promissory notes given by Landlord to Lenders (collectively, the "**Note**"; the Security Instrument, the Note and each of the other documents executed and/or delivered by Landlord to Agent (for the benefit of Lenders) and/or to the Lenders in connection with the loan, the "**Loan Documents**");

B.    Tenant is the holder of a leasehold estate in a portion of the Property under and pursuant to the provisions of a certain lease dated December 31, 201 between Landlord, as landlord and Tenant, as tenant (as may have been amended the "**Lease**"); and

C.    Tenant has agreed to subordinate the Lease to the lien of Security Instrument and Agent (on behalf of the Lenders) has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions hereinafter set forth.

AGREEMENT:

For good and valuable consideration, Tenant, Agent and Landlord agree as follows:

1.    <u>Subordination</u>.  Subject to the terms of this Agreement, the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the lien of the Security Instrument, as of the date hereof, and as the lien may be affected by all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby and advances made thereunder with the same force and effect as if the Security Instrument had been executed, delivered and recorded prior to the execution and delivery of the Lease.

2.      <u>Non-Disturbance</u>.   Agent agrees that if any action or proceeding is commenced by Agent or any Lender for the foreclosure of the Security Instrument or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law, provided, however, such joinder shall not result in the termination of the Lease or disturb the Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding and the exercise by Agent or any Lender of any of its other rights under the Note, the Security Instrument or the other Loan Documents shall be made subject to all rights of Tenant under the Lease (and the rights of any occupant or tenant licensee rightfully claiming by or under Tenant pursuant to the terms of the Lease), and Tenant's rights (and the rights of any occupant or tenant licensee rightfully claiming by or under tenant pursuant to the terms of the Lease) shall not be diminished or be the subject of any interference by agent, provided that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other remedy by Agent (a) the Lease shall be in full force and effect and (b) Tenant shall not be in default under any terms, covenants or conditions of the Lease or of this Agreement on Tenant's part to be observed or performed beyond any applicable notice-and-cure periods.  Notwithstanding anything to the contrary contained herein, the Security Instrument shall not become a lien on any of Tenant's equipment, fixtures and furniture or other property of Tenant located within the Property.

3.      <u>Attornment</u>.   If Agent, any Lender or any other subsequent purchaser of the Property shall become the owner of the Property by reason of the foreclosure of the Security Instrument or the acceptance of a deed or assignment in lieu of foreclosure or by reason of any other enforcement of the Security Instrument (Agent, such Lender or such other purchaser, as applicable, "**Purchaser**"), and the conditions set forth in Section 2 above have been met at the time Purchaser becomes owner of the Property, the Lease shall not be terminated or affected thereby but shall continue in full force and effect as a direct lease between Purchaser and Tenant upon all of the terms, covenants and conditions set forth in the Lease and in that event, Tenant agrees to attorn to Purchaser so long as Purchaser agrees in writing to be bound by the terms of the Lease.  Purchaser by virtue of such acquisition of the Property shall be deemed to have agreed to accept such attornment, provided, however, that Purchaser shall not be:

(a)      liable for the failure of any prior landlord (any such prior landlord, including Landlord and any successor landlord, being hereinafter referred to as a "**Prior Landlord**") to perform any of its obligations under the Lease which have accrued prior to the date on which Purchaser shall become the owner of the Property, provided that the foregoing shall not limit Purchaser's obligations under the Lease to correct any conditions of a continuing nature that (i) existed as of the date Purchaser shall become the owner of the Property  and (ii) violate Purchaser's obligations as Landlord under the Lease; provided further, however, that Purchaser shall have received written notice of such omissions, conditions or violations and has had a reasonable opportunity to cure the same, all pursuant to the terms and conditions of the Lease;

(b)      subject to any offsets, defenses, abatements or counterclaims which shall have accrued in favor of Tenant against any Prior Landlord prior to the date upon which Purchaser shall become the owner of the Property, provided that the foregoing shall not limit any offsets, defenses, abatements or counterclaims expressly provided for in the

Lease with respect to matters that continue after Purchaser becomes the owner of the Property;

(c)        bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one (1) month in advance to any Prior Landlord unless (i) such sums are actually received by Purchaser, (ii) such prepayment shall have been expressly approved of by Purchaser, or (iii) unless otherwise expressly and specifically required by the Lease (such as, Additional Rent on account of Operating Expenses and Tax Expenses in accordance with the terms of the Lease);

(d)        bound by any agreement terminating or amending or modifying the rent, term, commencement date or other material term of the Lease, or any voluntary surrender of the premises demised under the Lease, made without Agent's prior written consent (such consent shall not be unreasonably withheld, conditioned or delayed, except for any agreement, amendment or modification of the Lease that is entered into to document the exercise of any rights expressly granted to Tenant under the Lease); or

(e)        bound by any assignment of the Lease or sublease of the Property, or any portion thereof, made prior to the time Purchaser succeeded to Landlord's interest other than if pursuant to the provisions of the Lease.

The foregoing subsections (a) through (e) shall not limit Tenant's right to exercise against Purchaser any offsets, defenses, abatements or counterclaims otherwise available to Tenant because of events occurring after the date Purchaser acquires title to the Property.

ALTERNATIVELY, UPON THE WRITTEN REQUEST OF PURCHASER, TENANT SHALL ENTER INTO A NEW LEASE OF THE PREMISES WITH PURCHASER, AT PURCHASER'S COST AND EXPENSE, FOR THE THEN REMAINING TERM OF THE LEASE, UPON THE SAME TERMS AND CONDITIONS AS CONTAINED IN THE LEASE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT.

4.        Notice to Tenant.  After written notice is given to Tenant by Agent that the Landlord is in default under the Note, the Security Instrument and the other Loan Documents and that the rentals under the Lease should be paid to Agent pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Agent in connection therewith, Tenant shall (but subject at all times to compliance with applicable law) thereafter pay to Agent  or as directed by the Agent, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Agent and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments.

5.        Agent's Consent.  Tenant shall not, without obtaining the prior written consent of Agent (which consent shall not be unreasonably withheld, conditioned or delayed), (a) enter into any agreement amending, modifying in any material respect or terminating the Lease (except the following shall not be deemed an amendment, modification or termination requiring Agent's consent: (i) any communications between Landlord and Tenant of any administrative nature relating to the ordinary course of operation of the Property that do not

adversely affect the rights or obligations of Landlord, Agent, any Lender or any Purchaser; or (ii) any amendments confirming the exercise of express rights or options under the Lease), (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof (unless expressly and specifically required by the Lease, such as prepayments of Additional Rent made on account of Operating Expenses and Tax Expenses in accordance with the terms of the Lease), (c) voluntarily surrender the premises demised under the Lease or terminate the Lease without cause or shorten the term thereof unless expressly and specifically permitted under the Lease other than in connection with any breach or default by either party, or (d) assign the Lease or sublet the premises demised under the Lease or any part thereof other than pursuant to the provisions of the Lease; and any such amendment, modification, termination, prepayment, voluntarily surrender, assignment or subletting, without Agent's prior consent, shall not be binding upon Agent and/or any Lender.

6.      <u>Notice to Agent and Right to Cure</u>.  Tenant agrees to provide Agent with copies of all written notices of default sent to Landlord pursuant to the Lease.  Tenant shall notify Agent of any default by Landlord under the Lease and agrees that, notwithstanding any provisions of the Lease to the contrary, no notice of termination or cancellation thereof shall be effective unless Agent shall have received notice of default giving rise to such cancellation or termination and (i) in the case of any such default that can be cured by the payment of money, until fifteen (15) business days shall have elapsed following the giving of such notice or (ii) in the case of any other such default, until a reasonable period for remedying such default shall have elapsed following the giving of such notice and following the time when Agent shall have become entitled under the Security Instrument to remedy the same, including such time as may be necessary to acquire possession of the Property if possession is necessary to effect such cure, provided Agent and/or any Lender, as applicable, with reasonable diligence, shall (a) pursue such remedies as are available to it under the Security Instrument so as to be able to remedy the default, and (b) thereafter shall have commenced and continued to remedy such default or cause the same to be remedied.  Notwithstanding the foregoing, neither Agent nor any Lender shall have any obligation to cure any such default.  Tenant agrees to accept performance by Agent and/or any Lender of any terms of the Lease required to be performed by Landlord with the same force and effect as though performed by Landlord.  Agent acknowledges and agrees that nothing in this Section 6 is intended to limit, or extend the date for Tenant to exercise, any of Tenant's rights and remedies expressly set forth in the Lease with respect to the applicable default (except for Tenant's termination right).

7.      <u>Notices</u>.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S.  Postal Service and sent registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Tenant:          WeWork Companies Inc.
                       115 West 18th Street, 2nd Floor
                       New York, New York 10011
                       Attention: General Counsel

with a copy to:

WeWork Companies Inc.
115 West 18th Street, 2nd Floor
New York, New York 10011
Attention: Real Estate Department

If to Agent:      Morgan Stanley Mortgage Capital Holdings LLC
1585 Broadway
New York, NY 10036
Attention:  George Kok
Facsimile No.  212.507.4859
Email: crelamnotices@morganstanley.com

With a copy to:

Alston & Bird LLP
90 Park Avenue
New York, NY 10016
Attention:  Ellen M. Goodwin
Facsimile No. 212.922.3947

or addressed as such party may from time to time designate by written notice to the other parties. For purposes of this Section 7, the term "**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in the state or commonwealth where the Property is located.  Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

8.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Agent (on behalf of itself and each Lender), Tenant and Purchaser and their respective successors and assigns.

9.      Governing Law.  This Agreement shall be deemed to be a contract entered into pursuant to the laws of the Commonwealth of Massachusetts and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the Commonwealth of Massachusetts.

10.      Miscellaneous.  This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.  If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine,

feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

11.      Joint and Several Liability.  If Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.

12.      Definitions.  The term "Agent" and/or "Lender" as used herein shall include the successors and assigns of Agent, each Lender and any person, party or entity which shall become the owner of the Property by reason of a foreclosure of the Security Instrument or the acceptance of a deed or assignment in lieu of foreclosure or otherwise.  The term "Landlord" as used herein shall mean and include the present landlord under the Lease and such landlord's predecessors and successors in interest under the Lease, but shall not mean or include Agent or any Lender unless and until Agent or such Lender, as applicable, has succeeded to the interest of Landlord under the Lease.  The term "Property" as used herein shall mean the Property, the improvements now or hereafter located thereon and the estates therein encumbered by the Security Instrument.

13.      Further Acts.  Tenant will, at the cost of Tenant, and without expense to Agent or any Lender, do, execute, acknowledge and deliver all and every such further acts and assurances as Agent or any Lender shall, from time to time, require, for the better assuring and confirming unto Agent and each Lender the property and rights hereby intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws.

14.      Limitations on Purchaser's Liability.  In no event shall the Purchaser, nor any heir, legal representative, successor, or assignee of the Purchaser have any personal liability for the obligations of Landlord under the Lease and should the Purchaser succeed to the interests of the Landlord under the Lease, Tenant shall look only to the estate and property of any such Purchaser in the Property (including insurance and condemnation proceeds, Purchaser's interest in the Lease and the proceeds from any sale, lease, license or other disposition of the Property (or any portion thereof) by such Purchaser) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Purchaser as landlord under the Lease, and no other property or assets of any Purchaser shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease; provided, however, that the Tenant may exercise any other right or remedy provided thereby or by law or in equity in the event of any failure by Landlord to perform any such obligation.  Neither Agent nor any Lender shall, either by virtue of the Security Instrument, this Agreement or any of the other Loan Documents, be or become a mortgagee in possession or be or become subject to any liability or obligation under the Lease or otherwise until Agent or such Lender, as applicable, shall have acquired the Landlord's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Agent or such Lender, as applicable, under the Lease (as modified by the terms of this Agreement) shall extend only to those liabilities or obligations accruing subsequent to the date that Agent or such Lender, as applicable, has acquired Landlord's interest in the Property.  Notwithstanding anything contained in this Agreement or the Lease to the contrary, upon Agent's or any Lender's transfer or assignment of Agent's or such Lender's

interests in the Loan, as applicable, the Lease (or any new lease executed pursuant to this Agreement), or the Property, Agent and/or such Lender, as applicable, shall be deemed released and relieved of any obligations under this Agreement, the Lease (or any new lease executed pursuant to this Agreement), and with respect to the Property.

15.     Intentionally Omitted.

16.     Expiration of this Agreement.  Notwithstanding anything to the contrary contained herein, this Agreement shall be of no further force and effect upon the date that the Debt (as defined in the Loan Agreement) owned by Landlord to Agent (on behalf of Lenders) pursuant to the Loan Documents is indefeasibly paid in full.

17.     Mezzanine Lenders.  To the extent not in conflict with, and subject and subordinate to, Agent's and each Lender's rights hereunder, Tenant hereby agrees that each lender whose loan is secured by a direct or indirect interest in Landlord (each, a "**Mezzanine Lender**") shall be entitled to all of the benefits of this Agreement, as if (i) such Mezzanine Lender were Agent and/or Lender, as applicable, and (ii) the applicable pledge securing such Mezzanine Lender's loan to the direct or indirect interest-holder in Landlord were the Security Instrument; provided that such Mezzanine Lender agrees that it shall be bound by the obligations of Lender under this Agreement.  Each Mezzanine Lender shall be an intended third-party beneficiary of this Section 17.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, Agent, Tenant and Landlord have duly executed this Agreement as of the date first above written.

AGENT:

**MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC**, a New York limited liability company

By: _____

Name:

Title:


TENANT:

[TENANT],

a _____

By: _____

Name:

Title:


LANDLORD:

**LINCOLN STREET PROPERTY OWNER, LLC**,

a Delaware limited liability company

By: _____

Name:

Title:

COMMONWEALTH OF MASSACHUSETTS

_____ COUNTY

On this ___ day of _____, 20__, before me, the undersigned notary public, personally appeared _____ (name of document signer) as _____ for _____, a _____, proved to me through satisfactory evidence of identification, which was a _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose.

_____
(official signature and seal of notary)
My commission expires _____

COMMONWEALTH OF MASSACHUSETTS

_____ COUNTY

On this ___ day of _____, 20__, before me, the undersigned notary public, personally appeared _____ (name of document signer) as _____ for _____, a _____, proved to me through satisfactory evidence of identification, which was a _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose.

_____
(official signature and seal of notary)
My commission expires _____

## COMMONWEALTH OF MASSACHUSETTS

_____ COUNTY

On this ___ day of _____, 20__, before me, the undersigned notary public, personally appeared _____ (name of document signer) as _____ for _____, a _____, proved to me through satisfactory evidence of identification, which was a _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose.

_____
(official signature and seal of notary)
My commission expires _____

# EXHIBIT A

## Legal Description of Property

### 1 Lincoln Street, Boston, MA

Parcel 1

A parcel of land in the City of Boston, Central District, County of Suffolk, bounded on the East side by Lincoln Street and the John F. Fitzgerald Expressway, bounded on the South side by Essex Street, bounded on the West side by Kingston Street and bounded on the North side by Bedford Street, shown on a plan entitled, "One Lincoln Street, Plan of Land in Boston, Massachusetts, Central District, Suffolk County, Scale 1:240, 6 April 2001", drawing number 255.77M, prepared by Gunther Engineering, Inc., recorded in Book 26348, Page 341.

Beginning at the southeasterly corner of said parcel, said corner being the intersection of the westerly side of Lincoln Street and the northerly side of Essex Street, being also on the northwesterly location line of the John F. Fitzgerald Expressway; thence running

S 70-15-31 W 61.42 feet by a northwesterly location line of said John F. Fitzgerald Expressway and by an area of said Expressway abandoned and discontinued and again by said location line; thence

S 19-44-29 E 2.08 feet; thence

S 67-17-17 W 42.59 feet to the northerly side of Essex Street, the last two courses being by a northwesterly location line of said John F. Fitzgerald Expressway; thence

N 85-06-13 W 43.41 feet by a northwesterly location line of the John F. Fitzgerald Expressway and by the northerly side of Essex Street to the easterly side of discontinued Columbia Street; thence

N 85-05-34 W     30.00 feet by southerly end of the discontinued Columbia Street; thence

N 81-11-30 W 59.81 feet to land now or formerly of the Kingston 88 Limited Partnership, the last two courses being along the northerly side of Essex Street; thence

N-03-52-59 E 51.94 feet; thence

N 85-48-13 W 0.50 feet; thence

N 03-52-59 E 16.22 feet; thence

N 86-51-07 W 14.12 feet; thence

S 03-08-53 W 0.83 feet; thence

N 86-51-07 W 107.51 feet to the easterly side of Kingston Street, the last six courses being by said land of Kingston 88 Limited Partnership; thence

N 06-31-51 W 0.85 feet; thence

N 06-11-30 W 53.07 feet; thence

N 07-04-10 W 77.15 feet; thence

N 06-40-36 W 10.51 feet to a point of tangency, the last three courses being along the easterly side of Kingston Street; thence

I-12

Northerly 86.56 feet by a curve to the right of 50.00-foot radius to a point of tangency on the southerly side of Bedford Street; thence

S 87-29-10 E 163.31 feet along the southerly side of Bedford Street to the West side of discontinued Columbia Street; thence

S 87-29-10 E 15.01 feet along the northerly end of discontinued Columbia Street to the centerline of said street; thence

S 04-37-02 W 110.71 feet by the centerline of said Columbia Street; thence

S 85-22-58 E 15.00 feet to land now or formerly of Patrick Callahan; thence

S 84-48-30 E 40.19 feet; thence

N 05-11-30 E. 0.17 feet; thence

S 84-48-30 E 22.13 feet; thence

N 06-11-31 E 0.33 feet to said land of Lincoln National Life Insurance Company, the last four courses being by said land of Patrick Callahan; thence

N 06-11-31 E 7.99 feet; thence

S 83-43-56 E 13.60 feet to land now or formerly of Henry C. Brookings, the last two courses being by said land of Lincoln National Life Insurance Company; thence

S 06-16-04 W 0.50 feet; thence

S 83-43-56 E 64.80 feet to the westerly side of Lincoln Street, the last two courses being by said land of Lincoln National Life Insurance Company; thence

S 06-45-32 W 121.75 feet along the westerly side of Lincoln Street and along the northwesterly location line of said John F. Fitzgerald Expressway to the point of beginning.

Containing 70, 906 more or less square feet, or 1.628 more or less acres, or 6,587 square meters, more or less.

Together with the benefit of the following:

1.  Easement Agreement to Kingstone Bedford Joint Venture LLC from Kingston LLC dated November 10, 2000 and recorded in Book 25552, Page 94; affected by Confirmatory Easement Agreement dated November 10, 2000 recorded at Book 25590, Page 2; as further affected by an Easement Agreement and Amendment to Existing Easement Agreement, dated March 31, 2004 by and between First States Investors 228, LLC and Lafayette Lofts LLC, recorded on May 18, 2004 at Book 34556, Page 179.

2.  Easement Agreement in Kingston Bedford Joint Venture LLC from 99 Bedford Limited partnership dated as of July 17, 2000 and recorded in Book 25589, Page 325; as affected by First Amendment of Easement Agreement dated as of September 4, 2002 and recorded on December 5, 2002 in Book 30018, Page 268.

3.  Pedestrian Easement by and between 99 Bedford Limited Partnership and Kingston Bedford Joint Venture LLC dated as of September 4, 2002 and recorded on December 5, 2002 in Book 30018, Page 312.

4.  Service Line Easement by and between 99 Bedford Limited Partnership and Verizon New England, Inc., to Kingston Bedford Joint Venture LLC dated as of September 4, 2002 and recorded on December 5, 2002 at Book 30018, Page 298.

Note: The easements set forth in Items 3 and 4 above are located as shown on a plan entitled "One Lincoln Street Easement Plan of Land in Boston, Massachusetts dated July 30, 2002 by Gunther Engineering, Inc. Drawing No. 255.76M and recorded with the Suffolk County Registry of Deeds on December 5, 2002 in Plan Book 30018, Page 298.

Parcel 2

A parcel of land in the City of Boston, Boston proper, County of Suffolk consisting of a portion of the John F. Fitzgerald Expressway Surface Road as altered and laid out April 12, 1955 as Layout No. 4287 and on October 18, 1955 as Layout 4359, and abandoned on June 14, 2000 as Layout 7601 as recorded in Book 25464, Page 291 and shown on a plan entitled "The Commonwealth of Massachusetts, Plan of Road in the City of Boston, Suffolk County, Altered and Laid Out as a State Highway by the Department of Highways, Scale 20 feet to the Inch, Layout No. 7601, Plan prepared by Gunther Engineering, Inc., Drawing No. 255.57M" dated June 9, 2000, hereinafter referred to as Plan 3, said parcel being located on the northerly side of John F. Fitzgerald Expressway and being further described as follows:

That portion of the following described parcel of land bounded by, and extending upwards from, a lower horizontal plane at elevation 16.00 Boston City Base;

Beginning at a point bearing S 70-15-31 W 9.32 feet from the intersection of the westerly sideline of Lincoln Street and the northwesterly location line of said John F. Fitzgerald Expressway; thence

S 49-37-02 W 19.88 feet; thence

N 40-22-58 W 2.50 feet; thence

S 49-37-02 W 8.21 feet; thence

N 85-22-58 W 18.33 feet to the former location line of said layout 4359 and Layout 4287, the last four courses being by the remaining portion of said John F. Fitzgerald Expressway; thence

N 70-15-31 E 43.87 feet by said former location line of Layout 4359 and Layout 4287 to the point of beginning.

Containing 180 square feet more or less.

I-14

**EXHIBIT J**

**GUARANTY OF LEASE**

THIS GUARANTY OF LEASE (this "Guaranty") is made as of December 31, 2018, by **WEWORK COMPANIES INC.**, a Delaware corporation, and its successors and assigns ("Guarantor"), having an address at 115 West 18th Street, New York, New York 10011 to **LINCOLN STREET PROPERTY OWNER, LLC**, a Delaware limited liability company ("Landlord"), having an address at c/o Fortis Property Group, LLC, 45 Main Street, Suite 800, Brooklyn, New York 11201.

WHEREAS, Landlord has agreed to lease to 1 Lincoln Street Tenant LLC, a New York limited liability company ("Tenant"), certain space (the "Premises") in the building located at 1 Lincoln Street, Boston, Massachusetts (the "Building"), pursuant to that certain lease by and between Landlord and Tenant dated as of December 31, 2018 (the "Lease");

WHEREAS, as a condition to the Landlord's execution and delivery of the Lease, Guarantor has also executed and delivered to Landlord that certain Good Guy Guaranty of even date herewith (the "Good Guy Guaranty"); and

WHEREAS, Guarantor is materially benefited by the Lease, and the undertaking by Guarantor to execute and deliver this Guaranty is a material inducement to Landlord to enter into the Lease.

NOW, THEREFORE, Guarantor agrees with Landlord as follows:

1.      Subject to the terms of this Guaranty (including Paragraph 3), Guarantor guarantees that all sums stated in the Lease to be payable by Tenant shall be promptly paid in full when due in accordance with the Lease and that Tenant shall perform and observe all of its obligations under the Lease. If any such sum or obligation is not timely paid, performed or observed for any reason whatsoever, then Guarantor shall, promptly after notice thereof and prior to the expiration of any applicable grace period granted to Tenant under the Lease, pay or perform the same in full regardless of (a) any defense or right of offset or counterclaim which Tenant or Guarantor may have or assert against Landlord, (b) whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person, (c) termination of the Lease as a result of Tenant's default or any other reason (including Bankruptcy), or (d) any other condition or contingency. Guarantor shall also pay all expenses of collecting any such sum or of otherwise enforcing this Guaranty, including reasonable attorneys' fees ("Enforcement Costs"). This Guaranty is a guaranty of full performance and payment and not merely collection, provided that Guarantor's maximum aggregate liability under this Guaranty with respect to the Enforcement Costs shall not exceed a maximum in the aggregate of $1,000,000.00 (the "Enforcement Costs Cap"). Notwithstanding anything to the contrary contained herein, the Enforcement Costs Cap shall be reduced by any amount paid by Guarantor with respect to Enforcement Costs pursuant to this Guaranty. This Guaranty is a guaranty of payment and not merely collection. Guarantor hereby acknowledges this Guaranty and the Good Guy Guaranty are separate and distinct instruments and undertakings made by Guarantor to Landlord, and that Guarantor's performance under this Guaranty shall have no impact of any kind or nature, and

J-1

46    shall in no event diminish the Landlord's rights or remedies under the Good Guy Guaranty, or
47    constitute or result in a defense, create a right of offset or counterclaim under the Good Guy
48    Guaranty.  Guarantor expressly acknowledges and agrees that Landlord shall be entitled to
49    enforce its rights and remedies under this Guaranty, the Good Guy Guaranty or both, in
50    accordance with the terms of each such instrument.
51
52           2.     This Guaranty is a continuing guaranty (and not a periodic guaranty or a guaranty
53    from month-to-month) and the obligations of Guarantor hereunder are absolute, irrevocable and
54    unconditional.  Except to the extent the obligations of Tenant under the Lease are performed in
55    full, there is no circumstance under which Guarantor shall be discharged from any of its
56    obligations under, or have any defense to the enforcement of, this Guaranty.  Without limiting
57    the generality of the foregoing, Guarantor's obligations and covenants under this Guaranty shall
58    in no way be affected or impaired by reason of the happening from time to time of any of the
59    following, whether or not Guarantor has been notified thereof or consented thereto:  (a) any
60    invalidity, illegality or unenforceability of the Lease, or any termination of the Lease for any
61    reason whatsoever (including a Bankruptcy); (b) any defenses or rights of set-off or counterclaim
62    of Tenant or Guarantor; (c) Landlord's waiver of the performance or observance by Tenant,
63    Guarantor or any other party of any covenant or condition contained in the Lease or this
64    Guaranty; (d) any extension, in whole or in part, of the time for payment by Tenant or Guarantor
65    of any sums owing or payable under the Lease or this Guaranty, or of any other sums or
66    obligations under or arising out of or on account of the Lease or this Guaranty, or the renewal of
67    the Lease or this Guaranty; (e) any full or partial assignment of the Lease or subletting of the
68    Premises; (f) any modification or amendment (whether material or otherwise) of any of the
69    obligations of Tenant or Guarantor under the Lease or this Guaranty; (g) the doing or the
70    omission of any act referred to in the Lease or this Guaranty (including the giving of any consent
71    referred to in the Lease or this Guaranty); (h) Landlord's failure or delay to exercise any right or
72    remedy available to Landlord or any action on the part of Landlord granting indulgence or
73    extension in any form whatsoever; (i) the voluntary or involuntary liquidation, dissolution, sale
74    of any or all of the assets, marshaling of assets and liabilities, receivership, conservatorship,
75    insolvency, bankruptcy, assignment for the benefit of creditors, trusteeship, reorganization,
76    arrangement, composition or readjustment of, or other similar proceeding affecting, Tenant or
77    Guarantor or any of Tenant's or Guarantor's assets (a "<u>Bankruptcy</u>"); (j) the release of Tenant or
78    Guarantor from the performance or observance of any covenant or condition contained in the
79    Lease or this Guaranty by operation of law; or (k) any other matters whatsoever, whether or not
80    similar to those specifically mentioned herein, other than the full performance of all obligations
81    of Tenant under the Lease.  Notwithstanding the foregoing, if Guarantor is no longer an affiliate
82    of Tenant, Guarantor shall not be liable for any amendment, modification, extension or renewal
83    of the Lease unless Guarantor has consented thereto in writing, provided, that Tenant has notified
84    Landlord in writing that Guarantor is no longer an affiliate of Tenant, which notice must state in
85    all caps and bold: "**THIS NOTICE LIMITS GUARANTOR'S LIABILITY**."    Further,
86    Guarantor shall be released of all liabilities under this Guaranty in accordance with the
87    provisions of <u>Section 7.3(b)</u> of the Lease.
88
89           3.     Notwithstanding anything herein to the contrary, (i) during the first twelve (12)
90    Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty
91    (exclusive of Enforcement Costs) shall be limited to Sixty Million Dollars ($60,000,000.00) and

J-2

(ii) during the last three (3) Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty (exclusive of Enforcement Costs) shall be limited to Twenty Million Dollars ($20,000,000.00).

4.      Guarantor shall notify Landlord in writing whenever Guarantor shall make any payment to Landlord on account of the liability of Guarantor under this Guaranty. No payments by Guarantor pursuant to any provision of this Guaranty shall entitle Guarantor, by subrogation, indemnification or otherwise, to the rights of Landlord, to any payment by Tenant, or to any recovery from any property of Tenant. Guarantor waives any right Guarantor may now or hereafter have against Tenant (and/or any other guarantor of Tenant's obligations under the Lease) with respect to this Guaranty (including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification or similar right, and any right to participate in any claim, right or remedy of Landlord against Tenant or any security which Landlord now or hereafter has with respect to the Lease), whether such right arises under an express or implied contract, by operation of law, or otherwise. Guarantor shall be deemed not to be a "creditor" (as defined in Section 101 of the Bankruptcy Code (as defined in the Lease)) of Tenant by reason of the existence of this Guaranty in the event that Tenant becomes a debtor in any proceeding under the Bankruptcy Code. Should Landlord repay to Tenant or Guarantor, or be obligated by applicable law to repay to Tenant or Guarantor, any amounts previously paid, then this Guaranty shall be reinstated in the amount Landlord repays or is so obligated to repay.

5.      If all or any part of the Lease is rejected, disaffirmed or otherwise avoided pursuant to applicable law affecting creditors' rights, then Guarantor shall, and does hereby (without the necessity of any further agreement or act), assume all obligations and liabilities of Tenant under the Lease to the same extent as if Guarantor were originally named Tenant under the Lease and there had been no such rejection, disaffirmance or avoidance. Guarantor shall upon Landlord's request promptly confirm in writing such assumption.

6.      Guarantor waives presentment, notice of dishonor, protest and notice of non-payment, non-performance or non-observance, notice of acceptance of this Guaranty and notice of any obligations or liabilities contracted or incurred by Tenant; except after an assignment if Guarantor is no longer an Affiliate of Tenant.

7.      This Guaranty shall be governed by the laws of the jurisdiction in which the Building is located (without regard to the application of choice of law principles), may not be modified or amended except by a written agreement duly executed by the parties, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. Any references in this Guaranty to "Tenant" shall include the named Tenant and its trustee in bankruptcy, receiver, conservator, and other successors and assigns.

8.      Guarantor's liability under this Guaranty is direct and primary, and not secondary, and shall be joint and several with that of Tenant. Notwithstanding anything in the Lease or this Guaranty to the contrary, Landlord shall have the right to apply or not apply any security deposit or other credit in favor of Tenant as Landlord shall determine in its sole and absolute discretion, and Guarantor's liability under this Guaranty shall not be affected in any manner thereby. Landlord may proceed against Guarantor under this Guaranty without initiating or exhausting

J-3

137  any remedy against Tenant (including, without limitation, the application of any security deposit
138  or other credit in favor of Tenant), and may proceed against Tenant and Guarantor separately or
139  concurrently.  All remedies afforded to Landlord by reason of this Guaranty are separate and
140  cumulative.  Guarantor waives any right it may have to require Landlord to institute or prosecute
141  an action against Tenant or any other person before proceeding against Guarantor.  If more than
142  one natural person and/or entity shall constitute Guarantor, then the liability of each such person
143  or entity shall be joint and several.  If Guarantor is a general partnership or other entity the
144  partners or members of which are subject to personal liability, then the liability of each such
145  partner or member shall be joint and several.  No waiver, release or modification of the
146  obligations of any such person or entity shall affect the obligations of any other such person or
147  entity.
148
149       9.      Within thirty (30) days after Landlord's written request, Guarantor shall execute
150  and deliver to Landlord a written statement certifying the continued validity of this Guaranty.
151
152       10.     Any notice which Landlord may elect to send shall be binding upon Guarantor if
153  mailed to Guarantor's address set forth above or to the last address known to Landlord, by
154  United States certified or registered mail, return receipt requested, or by Federal Express or other
155  overnight courier.
156
157       11.     GUARANTOR AND LANDLORD EACH HEREBY WAIVES TRIAL BY
158  JURY IN ANY ACTION OR PROCEEDING AT LAW, IN EQUITY OR OTHERWISE,
159  BROUGHT ON, UNDER OR BY VIRTUE OF THIS GUARANTY.  GUARANTOR WAIVES
160  ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT IN THE
161  JURISDICTION IN WHICH THE PREMISES IS LOCATED AND WAIVES ANY RIGHT
162  UNDER THE DOCTRINE OF FORUM NON CONVENIENS OR OTHERWISE TO
163  TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.
164
165       12.     Guarantor hereby consents to the exercise of personal jurisdiction over Guarantor
166  by any federal or local court in the jurisdiction in which the Building is located.  Guarantor
167  appoints CSC, having an address at 1090 Vermont Avenue N.W., Washington, DC 20005, as
168  Guarantor's agent for service of process on Guarantor's behalf in connection with any suit, writ,
169  attachment, execution or discovery or supplementary proceedings in connection with the
170  enforcement of this Guaranty.  Service shall be effected by any means permitted by the court in
171  which any action is filed, or, at Landlord's option, by mailing process, postage prepaid, by
172  certified mail, return receipt requested, either to Guarantor's agent at the foregoing address or to
173  Guarantor at Guarantor's address set forth on the first page of this Guaranty.  Service shall be
174  deemed effective upon receipt.  Guarantor shall designate a change of address or agent by written
175  notice given by certified mail, return receipt requested, at least ten (10) days before such change
176  is to become effective.
177
178       13.     Guarantor represents and warrants that Landlord's execution of the Lease is a
179  material and direct economic benefit to Guarantor and constitutes good, valuable and sufficient
180  consideration for Guarantor's execution of this Guaranty, notwithstanding any future rejection or
181  other termination of all or any part of the Lease.  Guarantor represents and warrants that to
182  Guarantor's actual knowledge, all financial statements of Guarantor and information regarding

<center>J-4</center>

183  Guarantor that have been delivered to Landlord are true and correct in all material respects.
184  Guarantor warrants and represents that each individual signing this Guaranty is duly authorized
185  to execute and deliver this Guaranty, and that, if Guarantor is a corporation, Guarantor is a duly
186  organized corporation in good standing under the laws of the state of its incorporation, and has
187  the power and authority to enter into this Guaranty, and that all corporate action requisite to
188  authorize Guarantor to enter into this Guaranty has been duly taken.
189
190      14.    The officers, directors, trustees, beneficiaries, shareholders, members, employees,
191  partners, principals or Affiliates of Guarantor ("Exculpated Parties") shall not have any liability
192  for the liabilities of Guarantor under, or in any way related to, this Guaranty, and no past, present
193  or future Exculpated Parties shall be named as a party in any suit or other judicial proceeding of
194  any kind or nature whatsoever brought against Guarantor with respect to the duties,
195  responsibilities, liabilities or obligations of Guarantor under this Guaranty, except if and to the
196  extent that the naming of such party is necessary in order to effectuate service of such suit or
197  judicial proceeding.
198

199      15.    Notwithstanding anything to the contrary contained in this Guaranty, each
200  reference herein to Guarantor shall be deemed to include the heirs, distributees, executors,
201  successors and assigns of Guarantor including, without limitation, any successor by reason of
202  merger or consolidation, all of whom shall be bound by the provisions of this Guaranty.
203
204                                    [Signature pages attached]
205
206
207

208       Executed as of the date first above written.

209

      WITNESS:                             GUARANTOR:

      _____      **WEWORK COMPANIES INC.**, a
Delaware corporation

                                           By: _____
                                         Name: _____
                                       Title: _____

210

211

212

213     _____)

214                     ) ss

215     _____)

216

217      I, _____, a notary public in and for the above

218   jurisdiction, do certify that _____, whose name is signed to

219   the writing above bearing the date _____, has acknowledged the same

220   before me in the jurisdiction aforesaid.

221

222      Given under my hand this ____ day of December, 2018.

                                          _____

                                                Notary Public

                                            My Commission Expires

                                          _____

223

224

J-6

**EXHIBIT K**

**GOOD GUY GUARANTY**

THIS GOOD GUY GUARANTY (this "Guaranty") is made as of December 31, 2018, by **WEWORK COMPANIES INC.**, a Delaware corporation, and its successors and assigns ("Guarantor"), having an address at  115 West 18th Street, New York, New York 10011 to **LINCOLN STREET PROPERTY OWNER, LLC**, a Delaware limited liability company ("Landlord"), having an address at c/o Fortis Property Group, LLC, 45 Main Street, Suite 800, Brooklyn, New York  11201.

WHEREAS, Landlord has agreed to lease  to  1 Lincoln Street Tenant LLC, a New York limited liability company ("Tenant"), certain space (the "Premises") in the building located at 1 Lincoln Street, Boston, Massachusetts (the "Building"), pursuant to that certain lease by and between Landlord and Tenant dated as of December 31, 2018 (the "Lease");

WHEREAS, as a condition to the Landlord's execution and delivery of the Lease, Guarantor has also executed and delivered to Landlord that certain Guaranty of Lease of even date herewith (the "Guaranty of Lease"); and

WHEREAS, Guarantor is materially benefited by the Lease, and the undertaking by Guarantor to execute and deliver this Guaranty is a material inducement to Landlord to enter into the Lease.

NOW, THEREFORE, Guarantor agrees with Landlord as follows:

1.      Subject to the terms of this Guaranty (including Paragraph 3), Guarantor guarantees (a) the payment in full of all Base Rent and Tenant's Proportionate Share of Operating Charges and Real Estate Taxes payable by Tenant to Landlord under the Lease when due in accordance with the Lease (collectively, the "Rent Obligations") until the Rent Obligations Termination Date (as hereinafter defined) and (b) the payment of the Restoration Obligations (as hereinafter defined) until the Restoration Obligations Termination Date. If any such sum is not timely paid by Tenant for any reason whatsoever and such non-payment continues beyond the expiration of applicable notice and cure periods provided to Tenant under the Lease, then Guarantor shall, within thirty (30) days after notice thereof, pay the same in full regardless of (i) any defense or right of offset or counterclaim which Tenant or Guarantor may have or assert against Landlord, (ii) whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person, (iii) termination of the Lease as a result of Tenant's default or any other reason (including a Bankruptcy), or (iv) any other condition or contingency, except as otherwise provided in this Guaranty. Guarantor shall also pay all actual reasonable out-of-pocket expenses incurred by Landlord in connection with enforcing this Guaranty, including reasonable attorneys' fees (collectively, "Enforcement Costs"), within thirty (30) days after written demand, provided that Guarantor's maximum aggregate liability under this Guaranty with respect to the Enforcement Costs shall not exceed a maximum aggregate amount of $1,000,000.00 (the "Enforcement Costs Cap").   Notwithstanding anything to the contrary

K-1

contained herein, the Enforcement Costs Cap shall be reduced by any amount paid by Guarantor with respect to Enforcement Costs pursuant to this Guaranty. This Guaranty is a guaranty of payment and not merely collection.  Guarantor hereby acknowledges this Guaranty and the Guaranty of Lease are separate and distinct instruments and undertakings made by Guarantor to Landlord, and that Guarantor's performance under this Guaranty shall have no impact of any kind or nature, and shall in no event diminish the Landlord's rights or remedies under the Guaranty of Lease, or constitute or result in a defense, create a right of offset or counterclaim under the Guaranty of Lease.  Guarantor expressly acknowledges and agrees that Landlord shall be entitled to enforce its rights and remedies under this Guaranty, the Lease Guaranty or both, in accordance with the terms of each such instrument.

2.      Subject to the terms of this Guaranty (including Paragraph 3), this Guaranty is a continuing guaranty (and not a periodic guaranty or a guaranty from month-to-month) and the obligations of Guarantor hereunder are absolute, irrevocable and unconditional. Notwithstanding anything to the contrary contained herein, Guarantor shall have all defenses and rights of set-off that would be available to it if it were a primary co-obligor jointly and severally liable with Tenant, with respect to the Rent Obligations and the Restoration Obligations. However, subject to the foregoing sentence and Paragraph 3 below, Guarantor's obligations under this Guaranty shall in no way be affected or impaired by reason of the happening from time to time of any of the following, whether or not Guarantor has been notified thereof or consented thereto, except as otherwise provided in this Guaranty:  (a) any invalidity, illegality or unenforceability of the Lease, or any termination of the Lease for any reason whatsoever (including a Bankruptcy); (b) any defenses or rights of set-off or counterclaim of Tenant or Guarantor; (c) Landlord's waiver of the performance or observance by Tenant of any covenant or condition contained in the Lease or this Guaranty; (d) any extension, in whole or in part, of the time for payment by Tenant or Guarantor of any sums owing or payable under the Lease or this Guaranty, or of any other sums or obligations under or arising out of or on account of the Lease or this Guaranty, or the renewal of the Lease or this Guaranty; (e) any full or partial assignment of the Lease or subletting of the Premises; (f) any modification or amendment (whether material or otherwise) of any of the obligations of Tenant under the Lease; (g) the doing or the omission of any act referred to in the Lease or this Guaranty (including the giving of any consent referred to in the Lease or this Guaranty); (h) Landlord's failure or delay to exercise any right or remedy available to Landlord or any action on the part of Landlord granting indulgence or extension in any form whatsoever; (i) the voluntary or involuntary liquidation, dissolution, sale of any or all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, trusteeship, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting, Tenant or any of Tenant's assets (a "Bankruptcy"); (j) the release of Tenant or Guarantor from the performance or observance of any covenant or condition contained in the Lease or this Guaranty by operation of law; or (k) any other matters whatsoever, whether or not similar to those specifically mentioned herein, other than the payment of the Rent Obligations and Restoration Obligations, as applicable,. Notwithstanding the foregoing, if Guarantor is no longer an affiliate of Tenant, Guarantor shall not be liable for any amendment, modification, extension or renewal of the Lease unless Guarantor has consented thereto in writing, provided, that Tenant has notified Landlord in writing that Guarantor is no longer an affiliate of Tenant, which notice must state in all caps and bold: "**THIS NOTICE LIMITS GUARANTOR'S LIABILITY**."   Further, Guarantor shall be

K-2

released of all liabilities under this Guaranty in accordance with the provisions of <u>Section 7.3(b)</u> of the Lease.

3.      Notwithstanding anything contained herein to the contrary, Guarantor's obligations and liabilities under this Guaranty with respect to the Rent Obligations shall terminate on the earliest date (the "<u>Rent Obligations Termination Date</u>") upon which all of the following conditions shall have been satisfied: (i) Tenant has surrendered actual physical possession of the Premises to Landlord in its then as-is condition, free and clear of all subtenants, licensees, Members, other occupants and possessory rights (the "<u>Vacate Date</u>") and (ii) all Rent Obligations have been paid to Landlord up to the Vacate Date.  From and after the Rent Obligations Termination Date, this Guaranty shall be of no further force or effect with respect to the Rent Obligations and Guarantor shall be released from all liabilities under this Guaranty with respect to the Rent Obligations. Notwithstanding the foregoing, this Guaranty, and Guarantor's obligations and liabilities under this Guaranty, with respect to the Restoration Obligations only shall remain in full force and effect, irrespective of whether Guarantor has been released from liability under this Guaranty with respect to Guarantor's Rent Obligations as set forth in this Paragraph 3. This Guaranty and Guarantor's liabilities under this Guaranty with respect to the Restoration Obligations shall terminate on the date (the "<u>Restoration Obligations Termination Date</u>") on which the Restoration Obligations are paid in full, and from and after the Restoration Obligations Termination Date, this Guaranty shall be of no further force or effect with respect to the Restoration Obligations and Guarantor shall be released from all liabilities under this Guaranty with respect to the Restoration Obligations. For purposes hereof, "<u>Restoration Obligations</u>" shall mean, only in the event that the Premises shall not be surrendered on the Vacate Date in the condition that the Premises are required to be delivered to Landlord under the Lease upon the expiration or earlier termination of the Lease (the "<u>Lease Surrender Condition</u>"), the estimated out-of-pocket expenses to be incurred by Landlord to put the Premises in Lease Surrender Condition.  Within ninety (90) days following the Vacate Date, Landlord shall obtain three (3) bids from reputable contractors reasonably acceptable to Guarantor to estimate the amount of the Restoration Obligations and Landlord shall select the lowest estimate provided by such contractors.  In the event Tenant disputes the amount of the Restoration Obligations based on the estimate of the contractor selected by Landlord, Tenant shall have the right to cause the amount of the Restoration Obligations to be determined by arbitration in accordance with the Expedited Arbitration Proceeding provisions set forth in <u>Article XXVII</u> of the Lease, and the determination of the Arbitrator shall be binding on the parties.

4.      Guarantor shall notify Landlord in writing whenever Guarantor shall make any payment to Landlord on account of the liability of Guarantor under this Guaranty. No payments by Guarantor pursuant to any provision of this Guaranty shall entitle Guarantor, by subrogation, indemnification or otherwise, to the rights of Landlord, to any payment by Tenant, or to any recovery from any property of Tenant. Guarantor waives any right of subrogation, reimbursement, exoneration, contribution, indemnification or similar right, and any right to participate in any claim, right or remedy of Landlord against Tenant or any security which Landlord now or hereafter has with respect to the Lease, whether such right arises under an express or implied contract, by operation of law, or otherwise.  Guarantor shall be deemed not to be a "creditor" (as defined in Section 101 of the Bankruptcy Code (as defined in the Lease)) of Tenant by reason of the existence of this Guaranty in the event that Tenant becomes a debtor in any proceeding under the Bankruptcy Code. Should Landlord repay to Tenant or Guarantor, or

K-3

be obligated by applicable law to repay to Tenant or Guarantor, any amounts previously paid, then this Guaranty shall be reinstated in the amount Landlord repays or is so obligated to repay, subject to the Enforcement Expenses Cap. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if it in good faith and on the advice of counsel believes that such obligation exists.

5.      If all or any part of the Lease is rejected, disaffirmed or otherwise avoided pursuant to applicable law affecting creditors' rights, then Guarantor shall, and does hereby (without the necessity of any further agreement or act), assume all obligations and liabilities of Tenant under the Lease with respect to the Rent Obligations and the Restoration Obligations to the same extent as if Guarantor were originally named Tenant under the Lease and there had been no such rejection, disaffirmance or avoidance.  Guarantor shall upon Landlord's request promptly confirm in writing such assumption.

6.      Guarantor waives presentment, notice of dishonor, protest and notice of non-payment, non-performance or non-observance, notice of acceptance of this Guaranty and notice of any obligations or liabilities contracted or incurred by Tenant; except after an assignment if Guarantor is no longer an Affiliate of Tenant and as otherwise expressly provided in this Guaranty.

7.      This Guaranty shall be governed by the laws of the jurisdiction in which the Building is located (without regard to the application of choice of law principles), may not be modified or amended except by a written agreement duly executed by the parties, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. Any references in this Guaranty to "Tenant" shall include the named Tenant and its trustee in bankruptcy, receiver, conservator, and other successors and assigns (except as otherwise provided in the Lease or this Guaranty).

8.      Guarantor's liability under this Guaranty is direct and primary, and not secondary, and shall be joint and several with that of Tenant. Notwithstanding anything in the Lease or this Guaranty to the contrary, Landlord shall have the right to apply or not apply any security deposit or other credit in favor of Tenant as Landlord shall determine in its sole and absolute discretion, and Guarantor's liability under this Guaranty shall not be affected in any manner thereby. Landlord may proceed against Guarantor under this Guaranty without initiating or exhausting any remedy against Tenant (including, without limitation, the application of any security deposit or other credit in favor of Tenant), and may proceed against Tenant and Guarantor separately or concurrently.  All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative.  Guarantor waives any right it may have to require Landlord to institute or prosecute an action against Tenant or any other person before proceeding against Guarantor. If more than one natural person and/or entity shall constitute Guarantor, then the liability of each such person or entity shall be joint and several. If Guarantor is a general partnership or other entity the partners or members of which are subject to personal liability, then the liability of each such partner or member shall be joint and several. No waiver, release or modification of the obligations of any such person or entity shall affect the obligations of any other such person or entity.

K-4

9.     Within thirty (30) days after Landlord's written request (but not more than once per calendar year, Guarantor shall execute and deliver to Landlord a written statement certifying the continued validity of this Guaranty.

10.     Any notice, demand or other communication (each, a "notice") which Landlord sends or may elect to send shall be binding upon Guarantor if mailed to Guarantor's address set forth above, by United States certified or registered mail, return receipt requested, or by Federal Express or other overnight courier (with signature required), with a copy to Kasowitz Benson Torres LLP, 1633 Broadway, New York, New York 10019, Attention: Adam Endick, Esq. All notices shall be deemed given or served on the date a notice is received or refused. Guarantor may change the address to which notice shall be delivered to it by notice in accordance with this paragraph, at least ten (10) days before such change is to become effective.

11.     GUARANTOR AND LANDLORD EACH HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING AT LAW, IN EQUITY OR OTHERWISE, BROUGHT ON, UNDER OR BY VIRTUE OF THIS GUARANTY. GUARANTOR WAIVES ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT IN THE JURISDICTION IN WHICH THE PREMISES IS LOCATED AND WAIVES ANY RIGHT UNDER THE DOCTRINE OF FORUM NON CONVENIENS OR OTHERWISE TO TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.

12.     Guarantor hereby consents to the exercise of personal jurisdiction over Guarantor by any federal or local court in the jurisdiction in which the Building is located. Guarantor appoints CSC, having an address at 251 Little Falls Drive, Wilmington, DE 19808, as Guarantor's agent for service of process on Guarantor's behalf in connection with any suit, writ, attachment, execution or discovery or supplementary proceedings in connection with the enforcement of this Guaranty.  Service shall be effected by any means permitted by the court in which any action is filed, or, at Landlord's option, by mailing process, postage prepaid, by certified mail, return receipt requested, either to Guarantor's agent at the foregoing address or to Guarantor at Guarantor's address set forth on the first page of this Guaranty. Service shall be deemed effective upon receipt.  Guarantor shall designate a change of address or agent by written notice given by certified mail, return receipt requested, at least ten (10) days before such change is to become effective.

13.     Guarantor represents and warrants that Landlord's execution of the Lease is a material and direct economic benefit to Guarantor and constitutes good, valuable and sufficient consideration for Guarantor's execution of this Guaranty, notwithstanding any future rejection or other termination of all or any part of the Lease. Guarantor represents and warrants that to Guarantor's actual knowledge, all financial statements of Guarantor and information regarding Guarantor that have been delivered to Landlord are true and correct in all material respects. Guarantor represents and warrants that each individual signing this Guaranty is duly authorized to execute and deliver this Guaranty, and that, if Guarantor is a corporation, Guarantor is a duly organized corporation in good standing under the laws of the state of its incorporation, and has the power and authority to enter into this Guaranty, and that all corporate action requisite to authorize Guarantor to enter into this Guaranty has been duly taken.

K-5

14.    The officers, directors, trustees, beneficiaries, shareholders, members, employees, partners, principals or Affiliates of Guarantor ("Exculpated Parties") shall not have any liability for the liabilities of Guarantor under, or in any way related to, this Guaranty, and no past, present or future Exculpated Parties shall be named as a party in any suit or other judicial proceeding of any kind or nature whatsoever brought against Guarantor with respect to the duties, responsibilities, liabilities or obligations of Guarantor under this Guaranty, except if and to the extent that the naming of such party is necessary in order to effectuate service of such suit or judicial proceeding.

15.    Notwithstanding anything to the contrary contained in this Guaranty, each reference herein to Guarantor shall be deemed to include the heirs, distributees, executors, successors and assigns of Guarantor including, without limitation, any successor by reason of merger or consolidation, all of whom shall be bound by the provisions of this Guaranty.

[Signature pages attached]

EAST\162676362.12

2       IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day
3  and year first above written.

GUARANTOR:

WEWORK COMPANIES INC., a
Delaware corporation

By:_____
Name: _____
Title: _____

_____

5  _____)
6             ) ss
7  _____)
9      I, _____, a notary public in and for the above
10  jurisdiction, do certify that _____, whose name is signed to
11  the writing above bearing the date _____, has acknowledged the same
12  before me in the jurisdiction aforesaid.

14      Given under my hand this _____ day of _____, 2018.

_____
Notary Public

My Commission Expires

_____

K-7

## EXHIBIT L

## CERTAIN SPECIFIC OPERATIONAL REQUIREMENTS

1. **BUSINESS HOURS**
   a. "Business Hours" are 7am - 7pm Monday through Friday and 8am-2pm Saturday.

2. **ELEVATORS**
   a. Passenger Elevators:
      i. There are 22 passenger elevators in the Building. 6 of which will provide Tenant with service and access to its Premises.
      ii. Landlord shall provide minimum of passenger elevators as follows:
         1. 100% during Business Hours
         2. 50% at all other times
         3. No fewer than 4 elevators during any period of maintenance and repairs of the elevators.
      iii. If elevator requires service, Landlord to supply vendor within 3 hours of request (within 5 hours if after Business Hours)
   b. Freight Elevators:
      i. There are 3 freight elevators in the Building; 2 of which will provide Tenant with service and access to the Premises.
      ii. Freight elevator service is available on call 24/7on a first come first serve basis.
      iii. Freight use after Business Hours requires Landlord staffing. Actual cost is $35 per hour with a 4 hour minimum requirement.
      iv. In case of required advance notice for overtime freight use, Tenant must provide notice no later than 3pm same day.
      v. No cost for freight elevator usage (including associated labor and including after Business Hours) during initial buildout of Premises, move-in to Premises, move-out of Premises.
      vi. If elevator requires emergency servicing, Landlord to supply vendor within 3 hours of request (within 5 hours if after Business Hours).
      vii. No tenant shall be granted exclusive freight elevator and/or loading dock access during Business Hours.
      viii. Tenant shall have the right to use the Building's loading dock(s) at all times at no additional cost to Tenant. Tenant

L-1

shall not be permitted to use the loading dock such that vehicles are double parked and other vehicles cannot gain access to the dock due to such stacking style of parking.

c. Tenant shall have the right to install branded signage indicating the main management office floor of the Premises within each elevator cab adjacent to the applicable floor number.

3. **SECURITY/ACCESS**

a. Tenant and its members and employees shall have access to the Premises on a 24/7/365 basis.

b. Landlord to provide first-class security personnel and procedures for the Building 24/7/365.

   i. Number of lobby personnel: 1

c. Landlord to manage and staff lobby front desk and lobby no less than 24/7/365 (subject to emergencies and temporary absences to roam the Building):

   i. Tenant may integrate Tenant web-based guest registration software into Landlord's front desk system/computer so Landlord can print guest passes or otherwise admit guests to the Premises.

   ii. Tenant's rights include the right to place iPad and/or other tablet check-in devices in the lobby to facilitate guest check-in.

d. Tenant's Security/Access

   i. Tenant has the right to install a security system within the Premises.

   ii. Tenant may integrate its keycard with the base Building system at all points of access control along path of access to the Premises and/or to common Building facilities (including the Building lobby, elevators, turnstiles, stairways, and/or elevators lobbies and core restrooms) as required for normal operations.

      1. If Tenant system cannot be integrated into the Landlord's existing system, then Tenant has right to install multi-class readers at Building access and amenity access points provided such changes will be made at Tenant's cost.

   iii. Tenant may install reader routers at all points of access control along path of access to premises and/or to common Building facilities as required for normal operation, such that Tenant may independently control activation and

L-2

deactivation of Tenant keycards without Landlord involvement at each point of access.

1. If Landlord elevator system is "Destination Control", then Landlord agrees to work with Tenant in good faith to allow Tenant to integrate their access control management system into Landlord Destination Control system. Such integration may include, but shall not be limited to, MC Readers and Reader Routers as described above, and/or a middle-ware solution as needed.

iv. Tenant may install security cameras at access points to the Premises, and within the Premises.

1. Landlord does not have right to install cameras within Premises.

v. Tenant has the right, but not the obligation to place a dedicated employee or contractor in main office lobby to check-in guests and provide general information to Tenant members and guests.

**4. COMMON AREA CLEANING**

a. Landlord to provide first-class janitorial and cleaning services for the Building and all Common Areas, including, without limitation:

i. Provision of commercially reasonable pest control services no less than monthly. In the event a pest issue from the Common Areas affects the Premises, Landlord shall provide appropriate pest control services to the Premises.

ii. Cleaning of sidewalk and keep it free of trash and debris (swept/mopped no less than once per week) and snow/ice.

iii. Having street-level exterior glass cleaned no less than on a 2x per month basis.

iv. Keeping Common Area glass doors and entryway surfaces clean with not less than daily spot cleanings.

v. Performing dusting of Common Area surfaces and ledges in the same manner and frequency as any other Class A building in the surrounding Boston area.

vi. Restocking/maintaining any Common Area bathrooms not less than daily.

vii. All exterior windows washed by Landlord not less than once per year thereafter.

5. **FIRE SAFETY**

    a. Landlord is responsible for all Fire and Life Safety and Landlord shall provide a fire safety director at all times as required by law.

    **b.** Landlord to provide fire safety/emergency action plan for the Building.

    c. Landlord to ensure fire alarm testing will be conducted after Business Hours to the extent permitted by any applicable laws.

    d. Landlord shall provide the results of any fire alarm test to Tenant as reasonably requested by Tenant after conducting same.

6. **TRASH REMOVAL**

    a. Tenant may bring trash out of premises 24/7 through the freight elevator to a trash container located in the freight elevator each day that will be disposed of daily.

    b. Landlord responsible for carting trash out of the Building at no cost or expense to Tenant (except through operating expenses if permitted in the Lease, provided such service is offered with no additional mark-up over Landlord's cost).

7. **PETS**

    a. Dogs are permitted within the Building and Premises, subject to the terms further outlined in Section 29.1 of the Lease. Except as otherwise provided for in such section, pets are not permitted within the Building and Premises (except as required by Law).

8. **BIKE STORAGE**

    a. Subject to the terms of the Lease, Tenant and its members may bring bicycles through the freight elevator to the Premises for storage within the Premises.

9. **PARKING**

    a. Subject to and in accordance with the terms of Article 24 of the Lease Tenant's monthly rate for spaces billed on  the monthly rate posted from time to time to the general public by Landlord or the operator (the "Operator") of the Parking Facility" .

    b. Tenant may have members contract directly with the Operator (if one is operating the garage) or Landlord (if no garage operator is operating the garage) for spaces.

    c. In connection with Article 24 of the Lease, Tenant may ramp-up number of reserved parking spaces during the time periods set forth

<div align="center">L-4</div>

in such section, and has the right to revisit and adjust reservations with 30 days' notice (but not more than monthly) pending availability.

d. The parking complex holds approximately 900 spaces and the current rate (as of the Lease Commencement Date) posted to the general public for each monthly parking permit is $475.

**10. STORAGE -** N/A

**11. SERVICES AND UTILITIES**

a. Overtime HVAC (as defined as HVAC usage outside of the Business Hours) will be provided at a rate equal to $30/hour/floor.

b. There shall be no minimum number of hours for overtime HVAC.

c. In case of overtime HVAC request, Tenant must provide reasonable advance prior notice.

d. Landlord is responsible for and will maintain all HVAC units servicing the Premises and the Building (excluding any supplemental HVAC installed by Tenant).

e. Tenant wishes to enter into direct contracts with utility providers. If that is not possible, Tenant shall pay Landlord utility fees based on Tenant's actual usage, as determined by submeters installed and maintained by Landlord.

f. Tenant may access all base Building closets required for Tenant's alterations and operations on floors fully leased by Tenant (and its pro-rata share on partially leased floors).

g. Landlord to provide list of utilities that Tenant needs to transfer and reasonable notice to perform such transfer.

h. Building engineer will either be onsite or available by phone at least during Business Hours.

i. If cell service is deemed to be insufficient in the Building, then subject to the terms of the Lease, Tenant shall have access to the roof for the purpose of installing equipment to improve and provide adequate cell service in the Premises.

j. Landlord to provide 24/7/365 cooling source for Tenant's IT room and Landlord shall charge Tenant for the condenser water used for such cooling, all in accordance with the Lease.

**12. JANITORIAL WORK**

a. Subject to Section 9.3 of the Lease, Tenant has the right to use own employees or any third-party contractor for cleaning purposes within

the Premises, all of which is subject to the labor harmony provisions of the Lease.

**13. FIRE STAIRS ACCESS**

    a. Subject to Building rules and regulations, Tenant shall have the right to utilize the existing fire stairs as access between the floors, and will be allowed to install a card key access system.  Tenant shall have the right to cosmetically upgrade the fire stairs, provided that such cosmetic upgrades comply with all applicable codes and laws.

**14. SHAFT SPACE**

    a. Subject to review of Tenant's plans and availability, Landlord will provide Tenant with its pro rata share of shaft space for Tenant conduits from the "Point of Entry" room in the Building to the Premises and from the Premises to the roof.

    b. At Tenant's request, Landlord shall take all reasonable steps to allow any IT, Voice and Data service provider to provide service to the Building for Tenant's operations.

**15. DIGITAL CONNECTIVITY**

    a. If available, Landlord shall provide Wired Certification level achieved (Platinum, Gold, Silver or Certified) and attach the WiredScore Fact Sheet.

    b. If not available, please describe the independent service providers currently servicing the building, the network type of those providers (cable, fiber, satellite, etc.), and the supporting physical infrastructure that is in place to ensure connectivity is redundant, secure, and accessible.

**16. ALCOHOL**

    a. Subject to the terms of Section 13.2 of the Lease, within the Premises, Tenant shall have the right to sell and/or serve alcohol solely to members and members' guests, subject to Tenant obtaining all required permits and insurance. Landlord shall reasonably cooperate, at no cost to Landlord, in connection with obtaining such permits.

**17. REPAIRS AND MAINTENANCE**

L-6

    a.  Subject to the terms of Article 9, Tenant shall have the right to perform cosmetic repairs and basic maintenance within the premises as needed, with no need for prior notice.

**18. CONSTRUCTION**

    a.  As of the Lease Commencement Date, to the best of Landlord 's knowledge, except for the lobby and cafeteria common area renovation, Landlord is currently unaware of any planned construction related to the project, lobby, and/or Common Areas.

**19. CONFLICTS**

    a.  Notwithstanding anything to the contrary in the Lease, to the extent that any provisions of this Exhibit conflict with any provisions of the Lease, then the terms and provisions of this Exhibit shall control, without limitation. No changes shall be effective to this Exhibit unless agreed to, in writing, by Landlord and Tenant. All of the pricing set forth herein is subject to the terms of the Lease.

L-7

**EXHIBIT M**

**RESTRICTIONS ON COMPETITOR LANGUAGE TO BE INSERTED IN FUTURE
LEASES**

Tenant and its affiliates or anyone claiming by, through or under Tenant shall not operate, manage, lease and/or license within the Building a shared working environment (including, without limitation, a flexible workplace center, executive/shared office suites, an incubator-type office/facility, and or virtual office space) operated for profit (i.e., where such business provides its services for a fee, be it cash, shares in other companies or other good and valuable consideration).  The foregoing shall not prohibit Tenant or its affiliates from permitting its employees and their business partners to share desks or work in a shared working environment.

M-1

**EXHIBIT N**

**DEPICTION OF LOCATION OF TENANT'S VISITOR'S CENTER**



N-1

*Execution Version*

## PARTIAL TERMINATION AND SECOND AMENDMENT TO OFFICE LEASE AGREEMENT

THIS PARTIAL TERMINATION AND SECOND AMENDMENT TO OFFICE LEASE (this "**Agreement**") is made and entered into as of August 1, 2022 (the "**Effective Date**"), by and between LINCOLN STREET PROPERTY OWNER, LLC, a Delaware limited liability company ("**Landlord**"), 1 LINCOLN STREET TENANT LLC, a New York limited liability company ("**Tenant**") and WEWORK COMPANIES LLC, a Delaware limited liability company ("**Guarantor**"), (collectively, Tenant and Guarantor are the "**Tenant Parties**" and individually, a **Tenant Party**"). Landlord and Tenant Parties, individually or collectively, shall sometimes hereinafter be referred to as "**Party**" or "**Parties**."

### RECITALS:

A.      Landlord and Tenant entered into that certain Office Lease Agreement, dated as of December 31, 2018 (as amended by that certain First Amendment to Office Lease Agreement dated as of August 10, 2020, the "**Lease**"), for those certain premises in the building located at One Lincoln Street, Boston, Massachusetts (the "**Premises**"), as more particularly described in the Lease.

B.      Ancillary to the Lease, WeWork Companies, Inc. (Guarantor's predecessor-in-interest) executed a Guaranty of Lease, dated as of December 31, 2018 ("**Guaranty**"), which Guaranty was reaffirmed and ratified by Guarantor on July 23, 2019;

C.      The Parties desire to amend the Lease to provide for the surrender of the entire 33rd and 34th floors of the Building and in the Premises (the "**33rd Floor Premises**" and "**34th Floor Premises**," respectively) and the termination of the Lease solely as it relates to the 33rd and 34th Floor Premises, and to otherwise amend the Lease, all pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the agreements of the parties set forth in this Agreement and other valuable consideration, the receipt and adequacy of which is hereby acknowledged, Landlord, Tenant and Guarantor agree as follows:

### AGREEMENT:

1.      Incorporation of Recitals; Defined Terms. The Recitals are incorporated herein by this reference as though fully set forth in this Agreement. All capitalized terms in this Agreement not otherwise defined in this Agreement, but defined in the Lease, shall have the same meaning in this Agreement as in the Lease.

2.      Surrender of Possession. Tenant shall surrender possession of the 33rd Floor Premises and the 34th Floor Premises to Landlord, with respect to each floor as of the Effective Date (the "**Surrender Date**") in its "as-is", "where-is" condition on such date, free and clear of all tenancies, subtenancies and occupancies, and all of Tenant's right, title and interest in and to the 33rd Floor Premises and 34th Floor Premises under the Lease, with the intent and purpose that the Lease Term be extinguished (solely with respect to the 33rd Floor Premises and 34th Floor

Premises, as applicable) in the same manner and with the same effect as if the Lease Term had expired. Tenant may, but does not have the obligation to remove, any leasehold improvements, furniture, fixtures, and equipment (collectively, the "**Tenant's Property**") from the 33rd Floor Premises and 34th Floor Premises; provided, however, that all Tenant's Property in the 33rd Floor Premises and 34th Floor Premises, other than the Tenant's Property listed on Schedule A attached hereto (the "**Removable Property**", and any such Tenant's Property not on Schedule A, the "**Surrendered Property**") is hereby conveyed to Landlord, which Surrendered Property shall remain in the 33rd Floor Premises and 34th Floor Premises and not constitute Tenant's Property, and Tenant warrants and represents to Landlord that ownership of the Surrendered Property is being conveyed to Landlord free and clear of any liens, security interests or other encumbrances (but subject to Section 19 concerning Tenant's intellectual property). From and after the Surrender Date for the applicable floor, Tenant shall have no further rights of possession or occupancy to the 33rd Floor Premises and/or the 34th Floor Premises, as applicable, and no Rent shall be due or owing (and if Tenant has paid Rent in advance for such month, Tenant shall receive a prorated credit of the Rental amounts for the 33rd Floor Premises and/or 34th Floor Premises, as applicable, against the next installment of Rent coming due); provided, however, that if the Surrender Date for a floor is earlier than August 1, 2022, Tenant and its employees, agents, contractors or invitees of Tenant shall have a non-exclusive license to enter the 33rd and/or 34th Floor Premises, as applicable, until August 1, 2022 in order to remove the Removable Property(the "**Removal Deadline**"). Any Tenant's Property (including the Removable Property) that remains in the Premises after the Removal Deadline shall be deemed to have been abandoned and either may be retained by Landlord as its property or may be disposed of in such manner as Landlord may see fit as provided in the Lease; provided, however, that any removal, disposal or use of the Tenant's Property shall be at Landlord's sole cost and expense. From and after the Surrender Date, the "Premises" shall mean the entire rentable area of the 24th through the 32nd floors of the Building. In consideration for the transfer of the Surrendered Property, Landlord shall, concurrently with the execution of this Agreement, make a payment to Tenant in the amount of $180,000.00 pursuant to the wire instructions attached as Exhibit B hereto.

3.    Partial Release of Landlord by Tenant Parties.  For the consideration set forth in this Agreement and subject thereto, Tenant Parties, for themselves, their predecessors, successors and assigns, affiliates, subsidiaries, related entities, directors, officers, shareholders, partners, agents, attorneys and employees, and each of them, does hereby release and forever discharge Landlord, its predecessors, successors and assigns, affiliates, subsidiaries, related entities, directors, officers, shareholders, partners, agents, attorneys and employees, and each of them (collectively, the "**Landlord Released Parties**"), of and from any and all claims, demands, costs, attorneys' fees, damages, debts, liabilities, actions and causes of action of every kind and nature whatsoever, in law or equity, whether now known or unknown, which Tenant Parties ever had, now has, or may hereafter have, against the Landlord Released Parties, arising out of, based upon, or relating to, any act, omission, event, matter or thing relating to, arising out of, or in connection with the 33rd Floor Premises and 34th Floor Premises, up to and through the Surrender Date; provided, however, that the foregoing release and discharge shall not apply to, nor shall anything herein be deemed a waiver of,  Tenant's rights, claims, remedies or defenses arising pursuant to the Lease from or relating to (i) Tenant's rights under Section 5.5 of the of the Lease with respect to all Operating Charges Reconciliation Statements applicable to calendar year 2021 and each subsequent year thereafter and (ii) any third party indemnification claims with respect to the 33rd Floor Premises or 34th Floor Premises that would survive the termination or earlier expiration of

the Lease and which occurred prior to the Surrender Date, such rights, claims and remedies in the foregoing items (i) and (ii) are expressly reserved.

4.      Partial Release of Tenant Parties by Landlord.  For the consideration set forth in this Agreement and subject thereto, Landlord, for itself, its predecessors, successors and assigns, affiliates, subsidiaries, related entities, directors, officers, shareholders, partners, agents, attorneys and employees, and each of them, does, as of the Surrender Date, hereby release and forever discharge Tenant Parties, their predecessors, successors and assigns, affiliates, subsidiaries, related entities, directors, officers, shareholders, partners, agents, attorneys and employees, and each of them (collectively, the "**Tenant Released Parties**"), of and from any and all claims, demands, costs, attorneys' fees, damages, debts, liabilities, actions and causes of action of every kind and nature whatsoever, in law or equity, whether now known or unknown, which Landlord ever had, now has, or may hereafter have, against the Tenant Released Parties, arising out of, based upon, or relating to, any act, omission, event, matter or thing, relating to, arising out of, or in connection with 33rd Floor Premises and 34th Floor Premises, up and through the Surrender Date; provided, however, that the foregoing release shall not be deemed to waive or release any third party indemnification claims with respect to the 33rd Floor Premises or 34th Floor Premises that would survive the termination or earlier expiration of the Lease and which occurred prior to the Surrender Date.

5.      Tenant's Proportionate Share.  The Parties agree that, as of the Surrender Date, Tenant's Proportionate Share shall be 18.03% (i.e., 200,894 RSF of the Premises divided by 1,114,282 RSF of the Building).  Landlord represents to Tenant that the measurement of the rentable square footage of the Building is consistent with its measurement in the other leases with tenants at the Building.

6.      Letter of Credit Reduction.

(a)      Section 1.15 of the Lease is hereby deleted in its entirety and replaced by the following:

"1.15   Security Deposit:  Letter of Credit in the Amount of $45,858,595.50, subject to reductions in accordance with and as further described in Article 11 below."

(b)      The first five sentences of Section 11.1 of the Lease are hereby deleted in its entirety and replaced by the following:

"11.1   Landlord and Tenant acknowledge and agree that Tenant has previously deposited with Landlord the following Security Deposit with respect to the Premises as follows:  a Letter of Credit (as defined in further described in Section 11.2) in the amount of $ $45,858,595.50."

(c)      The first sentence of the last paragraph of Section 11.2 of the Lease is hereby deleted and replaced with the following:

"The amount of the Security Deposit with respect to which Landlord can draw under the Letter(s) of Credit shall be automatically reduced to (i) $33,351,705.82 on April 5, 2027, (ii) $25,013,799.36 on April 5, 2028 and (iii) $16,675,852.91 on April 5, 2032; provided, however,

notwithstanding anything to the contrary set forth in this Section 11.2, in no event shall the LC Amount as set forth above be reduced or burned down during any period during which an Event of Default by Tenant remains uncured, and the applicable reduction or burn down shall be tolled for a period of twelve (12) months from the date of the cure of such Event of Default (the "**12-Month Tolling Period**") and upon the expiration of such 12-Month Tolling Period, such scheduled reduction or burn down shall automatically take place, provided that no Event of Default then exists."

7.    Guaranty. Guarantor shall, concurrently with the execution of this Amendment, execute the First Amendment to and Reaffirmation of Guaranty of Lease set forth on Exhibit A attached hereto.

8.    Waiver of Tenant's Right of First Offer. Effective as of the Effective Date, Article 26 of the Lease (Right of First Offer) is hereby deleted in its entirety.

9.    Return of Lobby Desk. Notwithstanding anything in the Lease to the contrary, the Parties acknowledge that, effective as of the Surrender Date, Tenant shall no longer have the right to station Tenant's Security Personnel at the security desk in the lobby of the Building.

10.    Operating Charges. For the avoidance of doubt, the Parties agree that, from and after the Effective Date, except for the Amenity Spaces (but subject to the Amenity Space Cap), the cost of any new amenities built or provided in the Building shall not be included in the calculation of Tenant's Proportionate Share of Operating Charges unless Tenant has elected in writing to use the same.

11.    Signage. Section 10.1 of the Original Lease is hereby deleted in its entirety and replaced by the following:

"10.1 Landlord will list, at Landlord's expense, the name of Tenant (and any permitted subtenants and assignees and any Member licensing more than 5,000 square feet of space in the Premises) and its employees (if the Building directory is electronic) in the Building directory (if a Building directory is provided) based on its pro-rata share of rentable square feet leased in the Building and will provide Building standard suite entry signage on one suite entry door. In addition to Landlord's obligations above, and subject to compliance with applicable Laws, throughout the Lease Term, Tenant shall have the right, at Tenant's sole cost and expense to install signage setting forth Tenant's name and/or logo in the size(s) and location(s) shown on Exhibit E (the "Preapproved Signage Locations"). In addition, Tenant shall be entitled, at its sole cost and expense and subject to Landlord's reasonable review and approval and the rights of the tenant ("HarbourVest") under Landlord's lease with HarbourVest Partners, LLC, a Delaware limited liability company, to install wayfinding signage in the lobby of the Building. Tenant shall not place, inscribe, paint, affix or otherwise display any sign, advertisement, picture, lettering or notice of any kind (other than the Preapproved Signs, which have been approved by Landlord) on any part of the exterior or interior of the Building (including windows and doors), other than in the Preapproved Signage Locations, which have been approved by Landlord, or on any part of the interior of the Premises which can be seen from outside the Building, without the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed. Except for the top of Building signage and HarbourVest's signage rights, Landlord agrees that no other tenant occupying less space than Tenant will be permitted to install signage larger than that of Tenant's

signage. If any such item that has not been approved by Landlord is so displayed, then, Landlord shall have the right to remove such item at Tenant's expense. Notwithstanding the foregoing or anything in this Lease to the contrary, Tenant acknowledges that HarbourVest is entitled to exclusive signage rights to the top of Building location and in the main lobby of the Building behind an reception desk. Subject to Section 6.4, Landlord reserves the right to install and display signs, advertisements and notices on any part of the exterior or interior of the Building; provided, however that Landlord shall only affix, install, or display signs on the interior of the Premises which pertain to the management or operation of the Building. Without limiting the generality of the foregoing, Tenant hereby agrees that any signage installed by Tenant shall comply with all applicable Laws and the materials, specifications and manner of installation and attachment to the Building or any portion thereof shall be subject to Landlord's review and approval, not to be unreasonably withheld, conditioned or delayed; provided that Landlord hereby approves the signage and locations depicted on Exhibit E annexed hereto (the "Pre-Approved Signs"). Further, Tenant shall have the right, without Landlord's consent, to modify its signage to conform to any new signage package installed at the majority of WeWork co-working locations throughout the United States of America provided such new signage is in compliance with all applicable Laws. Tenant shall have the right, without Landlord's consent, to install signage within the Premises that cannot be seen from outside the Building."

12.    Operating Charges Audit.  Tenant and Landlord acknowledge that, in connection with the calculation of Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes from January 2020 through May 2020, Tenant has, prior to the date hereof, received abated Rent in the amount of $520,129.00 ("**Rent Abatement**").  In consideration of the Rent Abatement, Tenant does hereby release discharge Landlord and the Landlord Released Parties, of and from any and all claims, demands, costs, attorneys' fees, damages, debts, liabilities, actions and causes of action of every kind and nature whatsoever, in law or equity, against Landlord solely with respect to the calculation of Tenant's Proportionate Share Operating Expenses and Real Estate Taxes for the Operating Charges Reconciliation Statements for calendar years 2019 and 2020.

13.    Reimbursement of Legal Fees.  Landlord shall, on the Effective Date, make a payment to Tenant in the amount of $222,218.83 pursuant to the wire instructions attached as Exhibit B hereto, representing a repayment of Landlord's legal costs impermissibly billed to and paid by Tenant on or about June 25, 2020.  Additionally, Landlord hereby withdraws its October 2020 and December 2020 demands for Tenant to repay its legal costs in the aggregate amount of $98,050.18, and the Parties agree that Tenant is not responsible for the payment of the same.

14.    Contraction of Premises.

(a)    The first sentence of Section 25.18 of the Lease is hereby deleted in its entirety and replaced by the following:

"Landlord and Tenant hereby stipulate and agree for all purposes under this Lease that the rentable area of the Premises is (a) 240,940 rentable square feet prior to the Surrender Date, and (b) 200,894 rentable square feet after the Surrender Date, and the rentable area of the Building is 1,114,282 rentable square feet, notwithstanding any different measurement thereof that may be made thereafter by or on behalf of either party, but subject to any changes on account of any expansion of the Premises or any other change in the physical size of the Premises or the Building."

(b)       Unless otherwise set forth in this Agreement, the reduction of the size of the Premises will not affect any of Tenant's rights or obligations in the Lease, including, without limitation, any of Tenant's rights or obligations based on any occupancy percentage, total square footage or other thresholds; it being expressly agreed that Tenant shall remain entitled thereto and obligated therefor notwithstanding the contraction of Premises set forth herein. Notwithstanding the foregoing, for the avoidance of doubt: (i) for the purposes of Sections 3.5(d), 14.2 and 14.3 of the Lease, the terms "square feet of rentable area" and "square foot of rentable area" shall mean the rentable area of the Premises as set forth in Section 25.18 of the Lease, and (ii) after the Surrender Date, the term "Tenant's Proportionate Share" shall mean Tenant's Proportionate Share as set forth in Section 5 above.

15.    <u>Representations and Warranties</u>.  The Parties make the following representations and warranties, which shall survive the consummation or termination of this Agreement:

(a)       Landlord represents and warrants to Tenant that Landlord holds the entire interest of the "Landlord" under the Lease and that the person(s) executing this Agreement on behalf of Landlord are authorized to do so and to bind Landlord to this Agreement.

(b)       Tenant represents and warrants to Landlord that Tenant holds the entire interest of the "Tenant" under the Lease and that the person executing this Agreement on behalf of Tenant is authorized to do so and to bind Tenant to this Agreement.

(c)       Landlord represents and warrants to Tenant and Tenant represents and warrants to Landlord that, as of the Effective Date, neither Landlord nor Tenant, each to its actual knowledge, has any claims, counterclaims, defenses or set-offs against the other with respect to the Lease, except as set forth in this Agreement.

(d)       Landlord represents and warrants to Tenant that Landlord has taken all necessary actions and received all necessary approvals and consents from any holder of any mortgage or security interest in the Building ("**Mortgagee**") to enter into this Agreement as required pursuant any written agreements between Landlord (or any affiliate or related party of Landlord) and Mortgagee (or any affiliate or related party of Mortgagee).

16.    <u>Brokerage Commission</u>. Landlord and Tenant each warrants and represents to the other that it has not dealt with any broker in connection with the consummation of this Agreement. In the event any claim is made against Landlord by any broker or agent alleging dealings with Tenant in connection with this Agreement, Tenant shall defend Landlord against such claim, using counsel approved by Landlord, such approval not to be unreasonably withheld, and save harmless and indemnify Landlord on account of any loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and disbursements) which may be suffered or incurred by Landlord by reason of such claim. In the event any claim is made against Tenant by any broker or agent alleging dealings with Landlord, Landlord shall defend Tenant against such claim, using counsel approved by Tenant, such approval not to be unreasonably withheld, and save harmless and indemnify Tenant on account of any loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and disbursements) which may be suffered or incurred by Tenant by reason of such claim. The provisions of this <u>Section 16</u> shall survive the Effective Date.

17.    Confidentiality. The terms of this Agreement, and all communications between the Parties related thereto (collectively, "**Confidential Information**") shall be maintained in strict confidence by the Parties and their respective employees, agents, attorneys, and the Parties will take commercially reasonable efforts to ensure that the Confidential Information is maintained in strict confidence by their respective consultants (which may include implementing non-disclosure agreements). Confidential Information may not be disclosed by the Parties or their respective employees, agents, attorneys contractors, subcontractors, suppliers, architects, or consultants except: (i) as required by law or order of the court or other government authority or as necessary to enforce this Agreement; (ii) as reasonably necessary to be disclosed to HarbourVest, actual or prospective lenders or purchasers, the Parties' accountants, tax advisors, affiliates, attorneys, and others who reasonably need access (provided such recipients are informed of the confidentiality obligations of this Agreement), or (iii) as required by public company disclosure obligations. The Parties and their counsel further agree that if any of them are required by legal process to disclose Confidential Information, they will notify the related Party and such Party will notify the other Party with at least ten (10) business days' written notice prior to the required disclosure so that such other Party may seek a protective order or other appropriate relief.

18.    Non-Disparagement. The Parties agree not to take actions or make statements, written or oral, and the Parties will take commercially reasonable efforts to ensure that their respective contractors, subcontractors, suppliers, architects, and consultants do not take actions or make statements (including implementing non-disparagement agreements with each), written or oral, that (i) denigrate, disparage or defame the goodwill or reputation of the other Party, or (ii) otherwise attempt to injure or interfere with the other Party's reputation, affairs or business, including those of the Party's affiliates, parent entities, subsidiaries, divisions, branches, predecessors, successors, assigns, trustees, security holders, shareholders, partners, agents and former and current employees, officers, directors, managers, or members.

19.    Intellectual Property.    Tenant uses certain intellectual property, including trademark, trade dress, copyright, patent, and design rights, in connection with its design and operation of the Premises ("**Tenant IP**"), and Landlord acknowledges Tenant's exclusive rights to the Tenant IP.  No license or other right to use Tenant IP, except as set forth herein, is conferred to Landlord, including any right to reproduce, modify, or create derivatives, and Landlord shall have no right to the continued use of Tenant IP at the Building after the Expiration Date or for another project or business.  Notwithstanding the foregoing, Tenant hereby acknowledges that: (i) all Surrendered Property is being conveyed to Landlord subject to a nonexclusive, perpetual and non-revocable license with respect to the Tenant IP (the "**Tenant IP License**") and that Landlord shall be entitled to use Tenant IP related to the Surrendered Property in connection with Landlord's ownership of the same, (ii) the Tenant IP License is freely assignable in connection with a transfer of ownership of the Surrendered Property and to any occupant of the 33rd Floor Premises or 34th Floor Premises, (iii) Landlord and any occupant of the 33rd Floor Premises or 34th Floor Premises shall have the right to rearrange or modify (but not to reproduce or create derivatives of) the Surrendered Property or any portion thereof in any manner, in its sole discretion, and (iv) in the event that after Landlord gives written notice to Tenant that Landlord plans to dispose of the Surrendered Property Tenant has not removed the Surrendered Property within 30 days from receipt of such notice, the Tenant IP License shall be deemed terminated.

20.    <u>Governing Law</u>. This Agreement shall be governed by the law in the state which the Premises are located. This Agreement shall be construed in accordance with the common meaning of its terms and not presumptively for or against either Party.

21.    <u>Integration Clause</u>. This Agreement and the Lease contain the entire agreement of the Parties concerning the subject matter of this Agreement and supersedes any and all prior and contemporaneous written or oral representations, agreements, arrangements or understandings among them concerning such subject matter. There are no representations, agreements, arrangements or understandings, oral or written, among the Parties relating to the subject matter of this Agreement that are not fully expressed herein or in the Lease.

22.    <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision shall be invalid or prohibited hereunder, such provision shall be ineffective to the extent of such prohibition or invalidation but shall not invalidate the remainder of such provision or the remaining provisions.

23.    <u>Ratification</u>. Except as modified by this Agreement, all of the terms, covenants and conditions of the Lease are hereby ratified and confirmed and shall remain in full force and effect.

24.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[Signatures appear on following page.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Landlord:**

LINCOLN STREET PROPERTY OWNER, LLC, a
Delaware limited liability company

By:_____
Name:_____
Title:_____

**Tenant:**

1 LINCOLN STREET TENANT LLC,
a New York limited liability company

By: _____
Name: _____
Title:_____

**Guarantor**, with respect to Sections 3 and 7 of this
Agreement, only:

WEWORK COMPANIES LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Signature page – Partial Termination and Second Amendment to Office Lease Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Landlord:**

LINCOLN STREET PROPERTY OWNER, LLC, a Delaware limited liability company

By:_____

Name:_____

Title:_____


**Tenant:**

1 LINCOLN STREET TENANT LLC, a New York limited liability company

By: _____

Name: Pamela Swidler

Title: Authorized Signatory


**Guarantor**, with respect to Sections 3 and 7 of this Agreement, only:

WEWORK COMPANIES LLC, a Delaware limited liability company

By: _____

Name: Peter Greenspan

Title: Assistant Secretary


[Signature page – Partial Termination and Second Amendment to Office Lease Agreement]

EXHIBIT A

## FIRST AMENDMENT AND REAFFIRMATION OF
## GUARANTY OF LEASE

This First Amendment and Reaffirmation of Guaranty of Lease (this "**First Amendment and Reaffirmation**") made as of June ___, 2022 (the "**Effective Date**") by WEWORK COMPANIES LLC, a Delaware limited liability company ("**Guarantor**") to and for the benefit of LINCOLN STREET PROPERTY OWNER, LLC, a Delaware limited liability company ("**Landlord**").

### W I T N E S S E T H:

A.     **WHEREAS,** Landlord and 1 Lincoln Street Tenant, a New York limited liability company ("**Tenant**"), are parties to that certain Office Lease Agreement dated as of December 31, 2018, as amended by that certain First Amendment to Office Lease Agreement dated as August 10, 2020 (collectively, the "**Original Lease**"), pursuant to which Landlord currently leases to Tenant the certain premises in the building commonly known as One Lincoln Street, Boston MA;

B.     **WHEREAS,** Guarantor's predecessor-in-interest signed and delivered to Landlord that certain Guaranty of Lease dated December 31, 2018 (the "**Original Guaranty**"), provided by Guarantor's predecessor-in-interest in connection with the Original Lease, which Original Guaranty was reaffirmed and ratified by Guarantor on July 23, 2019;

C.     **WHEREAS,** Landlord and Tenant are entering into a Partial Termination and Second Amendment to Office Lease Agreement dated as of even date herewith (the "**Second Lease Amendment**") (the Original Lease, as amended pursuant to the Second Lease Amendment, and as hereafter amended, the "**Lease**"); and

D.     **WHEREAS**, Landlord and Tenant desire to amend the Original Guaranty on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for good and valuable consideration, Guarantor hereby represents, warrants, ratifies and affirms, certifies to and for the benefit of Landlord as follows:

1.     All capitalized terms used herein but not specifically defined in this First Amendment and Reaffirmation shall have the meanings ascribed thereto in the Original Guaranty. The term "**Guaranty**" where used in the Lease and this First Amendment and Reaffirmation shall hereafter refer to the Original Guaranty as amended by this First Amendment and Reaffirmation.

2.     Guarantor hereby consents to and agrees with the Second Lease Amendment and acknowledges the continuing validity of the Guaranty and reaffirms and ratifies in all respects all the covenants, agreements, representations, warranties, terms and obligations of the Guaranty, which shall remain in full force and effect with respect to the Lease.

EAST\191948958.10

3.      Notwithstanding anything in the Guaranty to the contrary (including, without limitation, Section 3 of the Guaranty), effective as of the Surrender Date (as defined in the Second Lease Amendment), Section 3 of the Original Guaranty is hereby deleted in its entirety and replaced with the following:

> "3.      Notwithstanding anything herein to the contrary, (i) during the first twelve (12) Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty (exclusive of Enforcement Costs) shall be limited to Fifty Million Twenty-Seven Thousand Five Hundred Fifty Eight Dollars and Seventy-Three Cents ($50,027,558.73) and (ii) during the last three (3) Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty (exclusive of Enforcement Costs) shall be limited to Sixteen Million Six Hundred Seventy Five Thousand Eight Hundred Fifty Two Dollars and 91 Cents ($16,675,852.91)."

4.      To expedite the execution of this First Amendment and Reaffirmation, telecopied signatures or signatures transmitted by email in portable document format may be used instead of original signatures. Guarantor intends to be bound by the signature on such telecopied or emailed document, and is aware that Landlord will rely on such telecopied or emailed signature, and waives any defenses to the enforcement of the terms of this First Amendment and Reaffirmation based on such telecopied or emailed signature. Promptly following request of Landlord, Guarantor shall provide Landlord with an original signature.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, Guarantor has executed this First Amendment and Reaffirmation the day and year first above written.

WEWORK COMPANIES LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

ACCEPTED AND AGREED:

LINCOLN STREET PROPERTY OWNER, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**[Signature Page to First Amendment and Reaffirmation of
Guaranty of Lease]**

Exhibit B

Tenant's Wire Instructions



7/6/2022

1 Lincoln Street Tenant LLC

To Whom It May Concern:

Please find our bank details below for the above referenced account

| JP MORGAN CHASE EFT INSTRUCTIONS | |
|---|---|
| BENEFICIARY | 1 Lincoln Street Tenant LLC |
| ACCOUNT NUMBER | 362737329 |
| ROUTING NUMBER | 021000021 |
| SWIFT CODE | CHASUS33 |
| BANK NAME | JP Morgan Chase Bank, N.A. |
| BANK ADDRESS | JPMorgan Chase New York, NY 10017 |

We value your business. If you have additional questions, please contact us.

Sincerely,

WeWork Treasury Operations

---

WeWork
575 Fifth Avenue, New York, NY 10017
payments@wework.com
www.wework.com

4

## Schedule A

### Removable Property

- Remove vinyl, paint over any WeWork branded murals / art, remove any additional WeWork likeness / intellectual property / signage (including lobby signage, if applicable).
- All leased property, consisting of Shred-It Bins, Quench Machines and Coffee Machines.
- Cisco Kits x 16.
- Televisions x 16.
- Removal of WeWork branding from any Surrendered Property.

5

*Execution Version*

## FIRST AMENDMENT AND REAFFIRMATION OF
## GUARANTY OF LEASE

This First Amendment and Reaffirmation of Guaranty of Lease (this "**First Amendment and Reaffirmation**") made as of August 1, 2022 (the "**Effective Date**") by WEWORK COMPANIES LLC, a Delaware limited liability company ("**Guarantor**") to and for the benefit of LINCOLN STREET PROPERTY OWNER, LLC, a Delaware limited liability company ("**Landlord**").

### W I T N E S S E T H:

A.  **WHEREAS,** Landlord and 1 Lincoln Street Tenant, a New York limited liability company ("**Tenant**"), are parties to that certain Office Lease Agreement dated as of December 31, 2018, as amended by that certain First Amendment to Office Lease Agreement dated as August 10, 2020 (collectively, the "**Original Lease**"), pursuant to which Landlord currently leases to Tenant the certain premises in the building commonly known as One Lincoln Street, Boston MA;

B.  **WHEREAS,** Guarantor's predecessor-in-interest signed and delivered to Landlord that certain Guaranty of Lease dated December 31, 2018 (the "**Original Guaranty**"), provided by Guarantor's predecessor-in-interest in connection with the Original Lease, which Original Guaranty was reaffirmed and ratified by Guarantor on July 23, 2019;

C.  **WHEREAS,** Landlord and Tenant are entering into a Partial Termination and Second Amendment to Office Lease Agreement dated as of even date herewith (the "**Second Lease Amendment**") (the Original Lease, as amended pursuant to the Second Lease Amendment, and as hereafter amended, the "**Lease**"); and

D.  **WHEREAS,** Landlord and Tenant desire to amend the Original Guaranty on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for good and valuable consideration, Guarantor hereby represents, warrants, ratifies and affirms, certifies to and for the benefit of Landlord as follows:

1.  All capitalized terms used herein but not specifically defined in this First Amendment and Reaffirmation shall have the meanings ascribed thereto in the Original Guaranty. The term "**Guaranty**" where used in the Lease and this First Amendment and Reaffirmation shall hereafter refer to the Original Guaranty as amended by this First Amendment and Reaffirmation.

2.  Guarantor hereby consents to and agrees with the Second Lease Amendment and acknowledges the continuing validity of the Guaranty and reaffirms and ratifies in all respects all the covenants, agreements, representations, warranties, terms and obligations of the Guaranty, which shall remain in full force and effect with respect to the Lease.

3.      Notwithstanding anything in the Guaranty to the contrary (including, without limitation, Section 3 of the Guaranty), effective as of the Surrender Date (as defined in the Second Lease Amendment), Section 3 of the Original Guaranty is hereby deleted in its entirety and replaced with the following:

> "3.      Notwithstanding anything herein to the contrary, (i) during the first twelve (12) Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty (exclusive of Enforcement Costs) shall be limited to Fifty Million Twenty-Seven Thousand Five Hundred Fifty Eight Dollars and Seventy-Three Cents ($50,027,558.73) and (ii) during the last three (3) Lease Years of the Lease Term, Guarantor's maximum aggregate liability under this Guaranty (exclusive of Enforcement Costs) shall be limited to Sixteen Million Six Hundred Seventy Five Thousand Eight Hundred Fifty Two Dollars and 91 Cents ($16,675,852.91)."

4.      To expedite the execution of this First Amendment and Reaffirmation, telecopied signatures or signatures transmitted by email in portable document format may be used instead of original signatures. Guarantor intends to be bound by the signature on such telecopied or emailed document, and is aware that Landlord will rely on such telecopied or emailed signature, and waives any defenses to the enforcement of the terms of this First Amendment and Reaffirmation based on such telecopied or emailed signature. Promptly following request of Landlord, Guarantor shall provide Landlord with an original signature.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, Guarantor has executed this First Amendment and Reaffirmation the day and year first above written.

WEWORK COMPANIES LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

ACCEPTED AND AGREED:

LINCOLN STREET PROPERTY OWNER, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to First Amendment and Reaffirmation of
Guaranty of Lease]

IN WITNESS WHEREOF, Guarantor has executed this First Amendment and Reaffirmation the day and year first above written.

WEWORK COMPANIES LLC,
a Delaware limited liability company

By: _____

Name: Peter Greenspan

Title: Assistant Secretary

ACCEPTED AND AGREED:

LINCOLN STREET PROPERTY OWNER, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**[Signature Page to First Amendment and Reaffirmation of
Guaranty of Lease]**

**EXHIBIT B**

Lincoln Street Property Owner LLC
45 Main Street, Suite 800
Brooklyn, NY 11201

January __, 2024

1 LINCOLN STREET TENANT LLC
WeWork Companies, LLC
75 Rockefeller Plaza, Fl 10
New York, NY 10019
Attn: General Counsel
copies to: (same address) Real Estate Department & Global Lease Management
Email: legalnotices@wework.com

## NOTICE OF EVENT OF DEFAULT AND RESERVATION OF RIGHTS

RE:      Office Lease Agreement dated December 31, 2018, as amended by the First Amendment to Office Lease
Agreement dated August 10, 2020, as further amended by the Partial Termination and Second Amendment
to Office Lease Agreement dated August 1, 2022, by and between LINCOLN STREET PROPERTY
OWNER, LLC, as Landlord ("Landlord"), and 1 Lincoln Street Tenant LLC, as Tenant ("Tenant"),
concerning premises known as 1 Lincoln Street located in Boston, Massachusetts (as so amended, the
"Lease")

Gentlemen:

Capitalized terms not otherwise defined herein have the meanings given to them in the Lease.

This letter constitutes notice from Landlord to Tenant that Tenant has failed to timely and fully pay Base Rent, Tenant's Proportionate Share of Operating Charges, and Tenant's Proportionate Share of Real Estate Taxes for the month of January 2024 in accordance with Section 19.1(a) of the Lease. Such failure to pay constitutes an Event of Default under the Lease. While Landlord did receive a payment of $354,553.89 from Tenant for the January 2024 Rent ("Partial January 2024 Payment"), this is a partial and not full payment of the amounts payable under the Lease and was received after due date set forth in the Lease; and therefore, does not cure or waive the aforementioned Event of Default, notwithstanding that Landlord has accepted such payment. Furthermore, the aforementioned failure to pay sums that arose after the petition date is also an intentional violation of Section 365(d)(3) of the Bankruptcy Code.

As you know, Landlord previously provided Tenant with three separate written notices of the non-payment of rent and other sums due under the Lease. The first such notice was dated March 24, 2023, and sent with respect to Tenant's failure to timely pay, among other things, Base Rent for March 2023 and Tenant's Proportionate Share of Operating Charges, and Tenant's Proportionate Share of Real Estate Taxes due for November through March 2022-2023; the second such notice was dated April 10, 2023, and sent with respect to Tenant's failure to pay, among other things, Base Rent, Tenant's Proportionate Share of Operating Charges, and Tenant's Proportionate Share of Real Estate Taxes due for April 2023; and the third such notice was dated May 8, 2023, and sent with respect to Tenant's failure to pay Base Rent, Tenant's Proportionate Share of Operating Charges, and Tenant's Proportionate Share of Real Estate Taxes due for May 2023. Pursuant to Section 19.1(b) of the Lease, Landlord was required to give Tenant only two (2) written notices of the non-payment of Base Rent and/or Tenant's Proportionate Share of Operating Charges and Real Estate Taxes in any twelve (12) consecutive month period prior to an immediate Event of Default occurring upon Tenant's subsequent failure to timely pay Base Rent and/or Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes and Landlord being authorized to exercise its remedies under the Lease.

By identifying and giving notice of the failures of Tenant to comply with the Lease and Section 365(d)(3) of the Bankruptcy Code that are identified above, Landlord is not waiving any other existing known or unknown failures,

ACTIVE 692658352v3

ACTIVE 692658352v3

breaches or defaults.  Landlord expressly reserves all of its rights, remedies, actions, causes of action, suits, claims and demands of every kind and nature whatsoever, whether under the Lease, in law, in admiralty or in equity (including, without limitation, drawing the full amount of the Letter of Credit to offset damages owed by Tenant), with respect to Tenant defaults described herein and any outstanding obligations owed by Tenant under the Lease.

Neither the Partial January 2024 Payment nor the payment of any money to Landlord after receipt of this notice, will revoke this notice or waive Landlord's right, remedies, actions, causes of action, suits, claims and demands of every kind and nature whatsoever, whether under the Lease, in law, in admiralty or in equity.

Regards,

**LINCOLN STREET PROPERTY OWNER, LLC**

By: _____
      Name:
      Title:

ACTIVE 692658352v3

ACTIVE 692658352v3

**EXHIBIT C**

Case 23-19865-JKS    Doc 1303-1    Filed 02/06/24    Entered 02/06/24 23:05:05    Desc
Exhibit Exhibit A - Declaration of Terrence Storey    Page 210 of 210

Page 1

# Lease Ledger

| Lease Information |
|---|

**Lease Administration**
**WeWork Companies LLC**
**45 West 18th Street, 6th FL**
**New York , NY , 10011**

| | |
|---|---|
| **Date** | 02/05/2024 |
| **Lease Id** | t0001087 |
| **Property** | lsp |
| **Location** | Lincoln Street Property, LLC |
| **Assigned Space(s)** | 2400, 2500, 2600, 2700, 2800, 2900, 3000, 3100, 3200 |
| **Customer** | |
| **ICS Code** | |
| **Lease Type** | Office |
| **Lease Term** | From 04/01/2019 To 04/30/2035 |
| **Lease Area** | 200,894(Gross Lease) |
| **Monthly Rent** | 1030418.82 |
| **Office Phone** | |
| **Fax  No** | |
| **E-Mail** | landlordpayments@wework.com |

| Date | Description | Unit | Charges | Payments | Balance |
|---|---|---|---|---|---|
| 12/01/23 | Office Rent (12/2023) | 2400,2600,2900,3000,3100,3200 | 673,069.77 | | 673,069.77 |
| 12/01/23 | Office Rent (12/2023) | 2500,2700 | 242,537.78 | | 915,607.55 |
| 12/01/23 | Office Rent (12/2023) | 2800 | 114,811.27 | | 1,030,418.82 |
| 12/01/23 | Operating Escalation (12/2023) | 2400,2600,2900,3000,3100,3200 | 281,456.00 | | 1,311,874.82 |
| 12/01/23 | Real Estate Taxes (12/2023) | 2400,2600,2900,3000,3100,3200 | 265,342.00 | | 1,577,216.82 |
| 12/05/23 | WIRE | | | 1,577,216.82 | 0.00 |
| 12/18/23 | 10-23 Electric Charges | | 13,869.07 | | 13,869.07 |
| 12/18/23 | Misc Charges 10-23 | | 842.30 | | 14,711.37 |
| 01/01/24 | Office Rent (01/2024) | 2400,2600,2900,3000,3100,3200 | 673,069.77 | | 687,781.14 |
| 01/01/24 | Office Rent (01/2024) | 2500,2700 | 242,537.78 | | 930,318.92 |
| 01/01/24 | Office Rent (01/2024) | 2800 | 114,811.27 | | 1,045,130.19 |
| 01/01/24 | Operating Escalation (01/2024) | 2400,2600,2900,3000,3100,3200 | 281,456.00 | | 1,326,586.19 |
| 01/01/24 | Real Estate Taxes (01/2024) | 2400,2600,2900,3000,3100,3200 | 265,342.00 | | 1,591,928.19 |
| 01/09/24 | WIRE | | | 354,553.89 | 1,237,374.30 |
| 01/15/24 | Nov 23 OT Hvac | | 288.00 | | 1,237,662.30 |
| 01/15/24 | Nov 23 Electricity | | 12,982.97 | | 1,250,645.27 |
| 01/31/24 | Dec 23 Electric | | 13,759.02 | | 1,264,404.29 |
| 02/01/24 | Office Rent (02/2024) | 2400,2600,2900,3000,3100,3200 | 673,069.77 | | 1,937,474.06 |
| 02/01/24 | Office Rent (02/2024) | 2500,2700 | 242,537.78 | | 2,180,011.84 |
| 02/01/24 | Office Rent (02/2024) | 2800 | 114,811.27 | | 2,294,823.11 |
| 02/01/24 | Operating Escalation (02/2024) | 2400,2600,2900,3000,3100,3200 | 281,456.00 | | 2,576,279.11 |
| 02/01/24 | Real Estate Taxes (02/2024) | 2400,2600,2900,3000,3100,3200 | 265,342.00 | | 2,841,621.11 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 1,249,692.92 | 1,591,928.19 | 0.00 | 0.00 | 2,841,621.11 |