**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:   (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al.*, | Case No. 23-19865 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OMNIBUS OBJECTION**
**TO THE MOTIONS OF CERTAIN LANDLORD**
**PARTIES TO (I) COMPEL PAYMENT OF RENT, (II) COMPEL**
**REJECTION OF LEASES, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE JOHN K. SHERWOOD UNITED STATES BANKRUPTCY

COURT FOR THE DISTRICT OF NEW JERSEY

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

# TABLE OF CONTENTS

**Page**

**Preliminary Statement** ................................................................................................................ 1

**Background** .................................................................................................................................. 4
    A.    The Debtors' Leases of Nonresidential Real Property ................................................ 4
    B.    The Debtors' Prepetition Restructuring Efforts. ........................................................ 6
    C.    The Chapter 11 Filing and Post-Petition Developments. ........................................... 8

**Argument** .................................................................................................................................. 10

**I.**    **The Debtors' Obligations Under Section 365(d)(3) Can and Should Be Satisfied by
the LCs and Related Security.** ....................................................................................... 11
    A.    Sections 544 and 1107(a) of the Bankruptcy Code Entitle the Debtors to Apply the
Doctrine of Marshaling. ........................................................................................... 12
          1.    The Debtors Have Standing to Compel Marshaling. ..................................... 12
          2.    The Secured Landlords Are Secured Creditors for Purposes of Marshaling.
                  .................................................................................................................... 13
          3.    The Landlords Can Access Two Funds Whereas Other Creditors Can Only
Access One. ................................................................................................... 16
          4.    The Secured Landlords Will Not Be Prejudiced by Marshaling. ..................... 16
    B.    The Court's Equitable and Inherent Powers Further Support the Application of
Marshaling Principles. ............................................................................................. 18

**II.**    **Alternatively, the Debtors' Rights of Recoupment and Setoff Eliminate Their
Obligations to Many Movants.** ....................................................................................... 20
    A.    Recoupment. ............................................................................................................. 21
    B.    Setoff ....................................................................................................................... 23

**III.**    **Section 365(d)(3) Does Not Require the Remedy Movants Request.** ............................ 25
    A.    Legal Landscape Surrounding Section 365(d)(3). ..................................................... 26
    B.    An Award of Immediate Payment Is Neither Required by Section 365(d)(3) nor
Warranted by the Facts at Hand. .............................................................................. 29
          1.    Applicable Law Forecloses any Award of Immediate Payment or
Superpriority. ............................................................................................... 29
          2.    The Facts Do Not Support An Award of Immediate Payment. ....................... 34
    C.    The Movants' Other Requested Remedies Are Inappropriate Here. ........................... 36
          1.    The Movants Cannot Establish Entitlement to Attorney's Fees. ..................... 36
          2.    The Bankruptcy Code Expressly Precludes the Kind of Penalty Rates or
Provisions the Movants Seek to Apply. ........................................................ 39
          3.    The Movants Are Not Entitled to Stub Rent at this Time. ............................... 43
          4.    The Movants Seeking Adequate Protection Already Have It. .......................... 45

**IV.**    **The Debtors Request the Movants Comply with Bankruptcy Rule 2019.** ..................... 46

**V.**    **The Debtors Are Willing to Mediate Lease Issues.** ...................................................... 49

**Conclusion** ................................................................................................................................ 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re A.H. Robins Co., Inc.*,
880 F.2d 694 (4th Cir. 1989) ...................................................................................19

*A.H. Robins Co., Inc. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ...................................................................................18

*Am. Bridge Co. of New York v. City of Bos.*,
88 N.E. 1089 (Mass. 1909).......................................................................................22

*In re America's Hobby Ctr., Inc.*,
223 B.R. 275 (Bankr. S.D.N.Y. 1998) ....................................................................13

*In re Antell*,
155 B.R. 921 (Bankr. E.D. Pa. 1992) ......................................................................50

*In re APF Co.*,
270 B.R. 363 (Bankr. D. Del. 2001) ........................................................................13

*In re B&L Oil Co.*,
782 F.2d 155 (10th Cir. 1986) ............................................................................21, 22

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
321 B.R. 147 (D.N.J. 2005) ................................................................................51, 53

*Beecher v. Peter A. Vogt Mfg. Co.*,
227 N.Y. 468 (N.Y. 1920) ........................................................................................24

*In re Beltway Medical, Inc.*,
358 B.R. 448 (Bankr. S.D. Fla. 2006) ...............................................................41, 43

*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023) .....................................................................................18

*Bichler v. DEI Systems, Inc.*,
220 P.3d 1203 (Utah 2009)........................................................................................24

*Bogdan v. Ausema*,
179 N.E.2d 401 (Ill. App. Ct. 1962) ........................................................................22

*Bramham v. Lanier Bros.*,
200 S.W. 830 (Tenn. 1918)........................................................................................24

*In re Builders Transport, Inc.*,
    471 F.3d 1178 (11th Cir. 2006) .................................................. 14

*In re Burival*,
    613 F.3d 810 (8th Cir. 2010) ..................................................... 38

*In re Caesars Ent. Operating Co.*,
    808 F.3d 1186 (7th Cir. 2015) ................................................... 18

*In re Café Partners/Washington 1983, A New York Ltd. P'ship*,
    81 B.R. 175 (Bankr. D.D.C. 1988) ............................................. 50

*CDI Tr. v. U.S. Elec., Inc. (In re Commc'n Dynamics, Inc.)*,
    382 B.R. 219 (Bankr. D. Del. 2008) ........................................... 22

*In re Chi-Chi's*,
    305 B.R. 396 (Bankr. D. Del. 2004) ........................................... 27

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995) .................................................................... 23

*City of New York v. Pike Realty Corp.*,
    160 N.E. 359 (N.Y. 1928) .......................................................... 22

*In re Claremont Acquisition Corp., Inc.*,
    113 F.3d 1029 (9th Cir. 1997) ................................................... 44

*Coburn v. Carstarphen*,
    194 N.C. 368 (N.C. 1927) .......................................................... 24

*Collard v. Nagle Const., Inc.*,
    57 P.3d 603 (Utah Ct. App. 2002) ............................................. 22

*Commissioner of Ins. v. Munich Am. Reins. Co.*,
    429 Mass. 140 (Mass. 1999) ...................................................... 24

*In re Compuadd Corp.*,
    166 B.R. 862 (Bankr. W.D. Tex.) ......................................... 30, 31

*In re Congoleum Corp.*,
    No. 03-51524, 2005 WL 712540 (Bankr. D.N.J. Mar. 24, 2005) ........... 53

*In re Continental Airlines*,
    203 F.3d 203 (3d Cir. 2000) ....................................................... 18

*In re Continental Airlines, Inc.*,
    146 B.R. 520 (Bankr. D. Del. 1992) ........................................... 49

*Continental. Law v. Siegel,*
   571 U.S. 415 (2014) ................................................................................. 18

*In re Corso Stein Enters, Inc.,*
   79 B.R. 584 (Bankr. D.N.J. 1987) ...................................................... 13, 16

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ................................................................................. 36

*In re DBSI, Inc.,*
   407 B.R. 159 (Bankr. D. Del. 2009) .................................................... 27, 30

*Dean v. U.S.,*
   556 U.S. 568 (2009) ............................................................................ 29, 35

*In re Donnay,*
   184 B.R. 767 (Bankr. D. Minn. 1995) ...................................................... 44

*In re Dow Corning Corp.,*
   280 F.3d 658 (6th Cir. 2002) ............................................................... 2, 11

*Fisher v. State Bank of Annawan,*
   163 Ill.2d 177 (Ill. 1994) ........................................................................ 24

*Fitzgerald v. Wiley,*
   22 App. D.C. 329 (D.C. Ct. App. 1903) ................................................... 25

*In re Fleming Companies, Inc.,*
   305 B.R. 85 (Bankr. D. Del. 2003) .......................................................... 27

*In re Gantos, Inc.,*
   181 B.R. 903 (Bankr. W.D. Mich. 1995) .................................................. 41

*In re Garden Ridge Corp.,*
   323 B.R. 135 (Bankr. D. Del. 2005) ......................................................... 48

*General Elec. Capital Corp. v. Future Media Productions, Inc.,*
   547 F.3d 956 (9th Cir. 2008) ................................................................... 46

*In re Genesis Health Ventures, Inc.,*
   280 B.R. 339 (Bankr. D. Del. 2002) ......................................................... 19

*In re Glob. Home Prod., LLC,*
   No. 06-10340 KG, 2006 WL 3791955 (Bankr. D. Del. Dec. 21, 2006) .......... 39, 48

*In re Global Home Prods., LLC,*
   2006 Bankr. LEXIS *3608 (Bankr. D. Del. Dec. 21, 2006) ......................... 49

*In re Golden Seahorse LLC,*
   652 B.R. 593 (Bankr. S.D.N.Y. 2023) ..............................................................45, 47

*In re Goody's Family Clothing, Inc.,*
   392 B.R. 604 (Bankr. D. Del. 2008), *aff'd* 401 B.R. 656 (D. Del. 2009), *aff'd*
   610 F.3d 812 (3d Cir. 2010)...........................................................................48

*In re Goody's Family Clothing Inc.,*
   610 F.3d 812 (3d Cir. 2010)................................................................9, 32, 42, 48

*In re GP Exp. Airlines, Inc.,*
   200 B.R. 222 (Bankr. D. Neb. 1996) ...............................................................44

*In re Graham Square,*
   126 F.3d 823 (6th Cir. 1997) ..........................................................................14

*In re Granada,*
   88 B.R. 369 (Bankr. D. Utah 1988) .................................................................35

*Granmo v. Superior Ct. In & For Pima Cnty.,*
   122 Ariz. 510, 596 P.2d 36 (Ariz. Ct. App. 1979)...........................................22

*Matter of Handy Andy Home Improvement Centers, Inc.,*
   144 F.3d 1125 (7th Cir. 1998) ........................................................................27

*Harrison v Adams,*
   128 P.2d 9 (1942)............................................................................................24

*In re Hechinger Inv. Co. of Delaware, Inc.,*
   2001 WL 1820320 (Bankr. D. Del. Jan. 29, 2001)...........................................21

*In re High Strength Steel, Inc.,*
   269 B.R. 560 (Bankr. D. Del. 2001) ...........................................................13, 17

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.,*
   547 U.S. 651 (2006)........................................................................................36

*Ingols v. Plimpton,*
   10 Colo. 535 (Colo. 1887) ..............................................................................24

*In re J.T. Rapps, Inc.,*
   225 B.R. 257 (Bankr. D. Mass. 1998) .............................................................30

*Matter of Jack Dillon Constr. Co.,*
   54 B.R. 136 (Bankr. D.N.J. 1984) ...............................................................12, 16

*In re John Q. Hammons Fall 2006, LLC,*
   612 B.R. 779 (Bankr. D. Kan. 2020) ...............................................................46

*In re Johns-Manville Corp.,*
    26 B.R. 420 (Bankr. S.D.N.Y. 1983) .................................................................................18

*Johnson v. City of Aberdeen,*
    147 Wash. 482 (Wash. 1928) ..........................................................................................25

*In re Johnson,*
    215 B.R. 381 (Bankr. N.D. Ill. 1997) ..............................................................................13

*In re Johnston,*
    38 B.R. 34 (Bankr. D. Vt. 1983) ......................................................................................50

*In re Kaiser Group Int'l, Inc.,*
    399 F.3d 558 (3d Cir. 2005) .............................................................................................14

*In re Kirsch,*
    242 B.R. 77 (Bankr. M.D. Fla. 1999) ..............................................................................27

*Korlann v. E-Z Pay Plan, Inc.,*
    428 P. 172 (Or. 1967) ......................................................................................................25

*In re Lakeshore Const. Co. of Wolfeboro, Inc.,*
    390 B.R. 751 (Bankr. D.N.H. 2008) ................................................................................38

*In re Leather Factory, Inc.,*
    475 B.R. 710 (Bankr. C.D. Cal. 2012) .......................................................................20, 27

*Lee v. Schweiker,*
    739 F.2d at 875 .........................................................................................................21, 23

*Lee v. Schweiker,*
    739 F.3d 870 (3d Cir. 1984) .............................................................................................21

*Lofchie v. Washington Square Ltd. P'ship,*
    520 A.2d 665 (D.C. Ct. App. 1990) .................................................................................22

*In re LTL Mgmt, LLC,*
    638 B.R. 291 (Bankr. D.N.J. 2022) .................................................................................18

*In re Ludwig Honold Mfg. Co.,*
    34 B.R. 645 (Bankr. E.D. Pa. 1983) ................................................................................13

*Masterson v. Goodlett,*
    46 Tex. 402 (Tex. 1877) ..................................................................................................24

*In re Mayan Networks Corp.,*
    306 B.R. 295 (B.A.P. 9th Cir. 2004) ...............................................................................14

*In re McCabe*,
212 B.R. 21 (Bankr. D. Mass. 1996) (Kenner, Bankr. J.)......................................................30

*Meyer v. United States*,
375 U.S. 233 (1963)...................................................................................................12, 16

*In re Microvideo Learning Sys., Inc.*,
227 F.3d 474 (2d Cir. 2000) (per curiam).............................................31, 34, 35, 37

*In re Microvideo Learning Systems, Inc.*,
232 B.R. 602 (Bankr. S.D.N.Y. 1999)................................................................31, 34

*In re Midway Airlines Corp.*,
406 F.3d 229 (4th Cir. 2005) ............................................................................... *passim*

*In re Mirant Corp.*,
2004 WL 5643668 (Bankr. N.D. Tex. Sept. 15, 2004)................................44, 45, 46

*In re MJ 500, Inc.*,
217 B.R. 93 (Bankr. D. Mass. 1998) (Kenner, Bankr. J.)......................................................30

*In re Monongahela Rye Liquors*,
141 F.2d 864 (3d Cir. 1944).................................................................................21

*In re Montgomery Ward Holding Corp.*,
268 F.3d (3d Cir. 2001)...............................................................................27, 47

*In re Moody Nat. SHS Houston H. LLC*,
426 B.R. 667 (Bankr. S.D. Tex. 2010) ............................................................45

*In re Motions Seeking Access to 2019 Statements*,
585 B.R. 733 (D. Del. 2018), *aff'd sub nom. In re A C & S Inc*, 775 F. App'x
78 (3d Cir. 2019)..............................................................................................1, 52

*In re Mr. Gatti's, Inc.*,
164 B.R. 929 (Bankr. W.D. Tex. 1994)..........................................26, 27, 30, 33

*In re Muralo Co., Inc.*,
295 B.R. 512 (Bankr. D.N.J. 2003) ...........................................................52

*Nelson Co. v. Goodrich*,
292 P. 406 (Wash. 1930)........................................................................22

*In re Northeastern Int'l Airways, Inc.*,
99 B.R. 487 (Bankr. S.D. Fla 1989)......................................................13

*In re Northwest Airlines Corp.*,
363 B.R. 701 (Bankr. S.D.N.Y. 2007)..................................................52

*In re Onecast Media, Inc.*,
  439 F.3d 558 (9th Cir. 2006) ...........................................................................14

*In re Orexigen Therapeutics, Inc.*,
  990 F.3d 748 (3d Cir. 2021)..............................................................................23

*In re Orient River Invs., Inc.*,
  112 B.R. .....................................................................................................26, 38

*In re Pac. Arts Publishing, Inc.*,
  198 B.R. 319 (Bankr. C.D. Cal. 1996).....................................................27, 41, 42

*In re Papercraft Corp.*,
  126 B.R. 926 (Bankr. W.D. Pa. 1991) ...............................................................21

*In re Papercraft Corp.*,
  127 B.R. 346 (Bankr. W.D. Pa. (1991)) ............................................................24

*In re Patella*,
  102 B.R. 223 (Bankr. D.N.M. 1989) ...........................................................31, 32

*In re Pelican Pool & Ski Center, Inc.*,
  2009 WL 2244573 (D. N.J. Jul. 27, 2009)....................................................41, 43

*Penn. Dep't of Pub. Welfare v. Davenport*,
  495 U.S. 552 (1990)........................................................................................29

*Pepper v. Litton*,
  308 U.S. 238 (1939)........................................................................................15

*In re Phoenix Bus. Park Ltd. P'ship*,
  257 B.R. 517 (Bankr. D. AZ. 2001)..................................................................45

*In re Pittsburgh Corning Corp.*,
  2005 WL 6128987 (W.D. Pa. Sept. 27, 2005), *aff'd*, 260 F. App'x 463 (3d Cir.
  2008) ...........................................................................................................52

*In re PPI Enterprises*,
  324 F.3d 197 (3d Cir. 2003)........................................................................13, 30

*In re Prince Sports, Inc.*,
  2013 WL 6906717 (Bankr. D. Del. Dec. 11, 2013).........................................22, 24

*In re Pudgie's Dev. of NY, Inc.*,
  202 B.R. 832 (Bankr. S.D.N.Y. 1996)..........................................................41, 42

*In re Rare Coin Galleries of Am., Inc.*,
  72 B.R. 415 (Bankr. D. Mass. 1987) .................................................................27

*In re Rickel Home Centers, Inc.*,
209 F.3d 291 (3d Cir. 2000) ..................................................................50

*Rocco v. J.P. Morgan Chase Bank*,
255 Fed.Appx. 638 (3d Cir. 2007) ..........................................................50

*Rouge River Mgmt. Co. v. Shaw*,
411 P.2d 440 (Or. 1996) ........................................................................22

*Russello v. United States*,
464 U.S. 16 (1983) ................................................................................29

*S. Pac. Co. v. Porter*,
160 Tex. 329, 331 S.W.2d 42 (Tex. 1960) ..............................................22

*In re Sabratek Corp.*,
257 B.R. 732 (Bankr. D. Del. 2000) ......................................................15

*In re San Jacinto Glass Industries, Inc.*,
93 B.R. 934 (Bankr. S.D. Tex. 1988) ....................................................12

*Security Sav. & Trust Co. v. Portland Flour Mills Co.*,
124 Or. 276 (Or. 1927) ....................................................................2, 24

*In re SemCrude, L.P.*,
399 B.R. 388 (Bankr. D. Del. 2009) ......................................................24

*Settlers Edge Holding Co., LLC v. RES-NC Settlers Edge, LLC*
*793 S.E.2d 722* (N.C. Ct. App. 2016) ....................................................22

*In re Shane Co.*,
464 B.R. 32 (Bankr. D. Colo. 2012) ......................................................13

*In re Simbaki, Ltd.*,
2015 WL 1493888 (Bankr. S.D. Tex. Apr. 3, 2015) ..............................26

*In re Simbaki, Ltd*,
2015 WL 1593888 (Bankr. S.D. Tex. Apr. 3, 2015) ..............................38

*In re Southwest Aircraft Servs., Inc.*,
831 F.2d 848 (9th Cir. 1987) *cert denied*, 487 U.S. 1206 (1988)..............27, 30, 33

*Sowell v. Federal Reserve Bank*,
268 U.S. 449 (1925) ..............................................................................17

*In re Stanwood Devries, Inc.*,
72 B.R. 140 (Bankr. D.N.J. 1987) ........................................................43

*In re Steepologie, LLC*,
   2024 WL 117525 (Bankr. W.D. Tex. Jan. 10, 2024)............................................30, 31, 33, 39

*Stern v. Sunset Rd. Oil Co.*,
   190 P. 651 (Cal. Ct. App. 1920) ...............................................................................22

*Strang v. Murphy*,
   29 P. 298 (Colo. App. 1892)......................................................................................22

*Matter of T & H Diner, Inc.*,
   108 B.R. 448 (D.N.J. 1989) .......................................................................................30

*In re Tammey Jewels, Inc.*,
   116 B.R. 292 (Bankr. M.D. Fla. 1990) ......................................................................27

*In re Tammey Jewels, Inc.*,
   166 B.R. 292 (Bankr. M.D. Fla. 1990) ......................................................................31

*In re Tampa Chain Co., Inc.*,
   53 B.R. 772 (Bankr. S.D.N.Y. 1985) .........................................................................13

*In re Telesphere Comm's, Inc.*,
   148 B.R. 525 (Bankr. N.D. Ill. 1992) ........................................................................31

*Tennessee Indus. Machinery Co., Inc. v. Accuride Corp*,
   139 S.W.3d 290 (Tenn. Ct. App. 2004)......................................................................22

*In re Timberline Property Development*,
   136 B.R. 382 (Bankr. D.N.J. 1992) ...........................................................................45

*Toibb v. Radloff*,
   501 U.S. 157 (1991)...................................................................................................12

*In re Univ. Med. Center*,
   973 F.2d 1065 (3d Cir. 1992)........................................................................21, 22, 23

*In re Utica Floor Maintenance, Inc.*,
   25 B.R. 1010 (N.D.N.Y. 1982)..................................................................................14

*In re Van Fleet*,
   383 B.R. 782 (Bankr. D. Colo. 2008) ........................................................................41

*Varsity Carpet Services, Inc. v. Richardson (In re Colortex Industries, Inc.)*,
   19 F.3d 1371 (11th Cir. 1994) ...................................................................................39

*In re Vermont Toy Works, Inc.*,
   135 B.R. 762 (D. Vt. 1991)........................................................................................13

*In re Virginia Packing Supply Co., Inc.,*
122 B.R. 491 (Bankr. E.D. Va. 1990) ..............................................................27, 31

*In re W.R. Grace & Co.,*
386 B.R. 17 (Bankr. D. Del. 2008) ........................................................................18

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,*
537 U.S. 371 (2003) ...............................................................................................36

*In re Washington Mut., Inc.,*
419 B.R. 271 (Bankr. D. Del. 2009) ......................................................................51

*In re West Electronics, Inc.,*
158 B.R. 37 (Bankr. D.N.J. 1993) .........................................................................43

*In re Wheeling-Pittsburgh Steel Corp.,*
54 B.R. 385 (Bankr. W.D.Pa. 1985) ......................................................................49

*Whitman v. Am. Trucking Ass'n, Inc.,*
531 U.S. 457 (2001) (Scalia, J.).............................................................................35

*In re Women First Healthcare, Inc.,*
345 B.R. 131 (Bankr. D. Del. 2006) ............................................................ *passim*

*In re Zamani,*
390 B.R. 680 (Bankr. N.D. Ca. 2008) ...................................................................45

*Zayler v. Dep't of Agric. (In re Supreme Beef Processors, Inc.),*
468 F.3d 248 (5th Cir. 2006) (en banc) .................................................................36

**Statutes**

11 U.S.C. § 348(d) .........................................................................................................37

11 U.S.C. § 363(e) .........................................................................................................50

11 U.S.C. § 503(b)(1) .......................................................................................... *passim*

11 U.S.C. § 503(b)(7) .....................................................................................................29

11 U.S.C. § 506(a)(1) .....................................................................................................13

11 U.S.C. §§ 507(b) ................................................................................................35, 37

11 U.S.C. § 541(a)(1) .....................................................................................................14

11 U.S.C. § 544(a) ...................................................................................................12, 13

11 U.S.C. § 553(a) .........................................................................................................24

11 U.S.C. § 1129(a)(9) ................................................................................34, 37, 38

11 U.S.C. § § 503(b)(7) .............................................................................................35

47 Bus. Law. 1367, 1425 n. 215 (1992) ...................................................................50

365(b)(2)(D) in the Bankruptcy Reform Act of 1994 ..............................................45

Bankruptcy Code Section 105(a) ...............................................................18, 19, 54

Bankruptcy Code section 361 ...................................................................................51

Bankruptcy Code section 365(d)(3) ................................................................. *passim*

Bankruptcy Code Sections 544 and 1107(a) ............................................................12

Bankruptcy Code Section 558 ................................................................20, 21, 22, 24

Bankruptcy Code section 1129(a) ...........................................................25, 39, 49

Code: (1) ...................................................................................................................28

Code § 363 ................................................................................................................50

Code Section 507 ......................................................................................................34

Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, tit. X, § 1001,
   134 Stat. 1182 (116th Congr. Dec. 27, 2020) ...................................................29

Federal Judgeship Act of 1984 .................................................................................28

**Rules**

Fed. R. Bankr. P. 2019(a)(2) .....................................................................................52

Fed. R. Bankr. P. 2019(b) .........................................................................................52

Fed. R. Bankr. P. 2019(c) .........................................................................................53

Fed. R. Bankr. P. 2019(c)(2)(B), (c)(3)(B) ..............................................................52

Fed. Rule Bankr. P. 2019(e) ....................................................................................51

Rule 2019 ............................................................................................51, 52, 53, 54

Rule 2019(a) ......................................................................................................51, 53

**Other Authorities**

130 Cong.Rec. S8894 (daily ed. June 29, 1984) (statement of Sen. Hatch) ..................................42

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) .................................................................................................37

Bankruptcy: The Shopping Center Protection Improvement Act of 1982: Hearing Before the Subcomm. on Courts of the Committee of the Judiciary of the United States Senate, 97th Cong. 3 (statement of Wallace R. Woodbury, Chairman, Woodbury Corp, Salt Lake City, Utah, Representing the International Council of Shopping Centers) ...........................................................28

Bankruptcy: The Shopping Center Protection Improvement Act of 1982: Hearing Before the Subcomm. on Courts of the Committee of the Judiciary of the United States Senate, 97th Cong. 6-7 .....................................................................28

Brubaker, *Default Rates of Interest, Part II*.................................................................47

H.R. No. 103-835 (1994) .............................................................................................45

H.R. Rep. 95-595 ........................................................................................................51

Joshua Fruchter, *To Bind or Not to Bind - Bankruptcy Code S 365(d) (3): Statutory Minefield*, 68 Am. Bankr. L.J. 437, 438, n.21 (1994) .............................26

Konrad Putzier, *Office Landlords Can't Get a Loan Anymore*, Wall Street Journal (Nov. 20, 2023) ..........................................................................................................8

Lee R. Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—of Interest and Principal, of Principles and Interests* ................................................50

S. Rep. 98-65 (1983)....................................................................................................28

S. Rep. No. 97-527 (1982) ...........................................................................................28

S. Rep. No. 2297 (1982) ..............................................................................................27

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (this "Objection") to the various motions to compel payment or rejection of leases and seeking related relief (the "Motions") against 24 Debtor-tenants (the "Tenant SPVs"), filed by [24] landlords (the "Movants") at Docket Nos. 1147, 1148, 1176, 1177, 1180, 1193, 1213, 1216, 1230, 1238, 1239, 1249, 1255, 1256, 1258, 1265, 1267.[1]  Subsequently, motions filed at Docket Nos. 1213, 1265, 1267, and at Docket No. 1216 (with respect to certain Movants party thereto) were withdrawn by agreement of the parties.[2]  In support of this Objection, the Debtors respectfully state as follows:

## Preliminary Statement

1.      These chapter 11 cases are at a critical juncture.  The Debtors began these cases with the central goal of renegotiating their lease portfolio with their landlords, and despite the Debtors' best efforts, the process will require more time and money.  As a result, the Debtors have begun efforts to raise new money financing and are actively pursuing confirmation of a chapter 11 plan.  This is the only clear path to a successful reorganization that preserves over 2,500 jobs and maximizes value for all stakeholders—including landlords, who stand poised to receive billions of dollars in future rent payments if they stand by WeWork.

2.      A subset of landlords stands in the way of that goal.  They failed to engage with the Debtors in the first instance in favor of a "wait-and-see" approach while they collect above-market rent.  And they now ask this Court to ignore the existence of their LCs and instead compel the immediate use of estate cash to pay postpetition rent, penalty default rates, and attorneys' fees—a

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motions and the *Declaration of David Tolley, Chief Executive Officer of WeWork, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "First Day Declaration"), as applicable.  As used herein, all references to sections refer to sections of the Bankruptcy Code, unless otherwise specified.

[2]     *See* Notices of Withdrawal filed at Docket Nos. 1352, 1353, 1354, 1355, 1356, 1362, 1363.

result that would meaningfully jeopardize these chapter 11 cases and harm every other stakeholder. These remedies are inconsistent with the law, and the Movants are not entitled to them. Accepting their arguments would require the Court to not only adopt Movants' theory that section 365(d)(3) created some kind of *sub silentio* superpriority status, but also deprive the Debtors of several statutory, common law, and equitable rights. The Court should decline to grant this relief for three primary reasons.

3.      ***First***, before forcing the Debtors to expend precious estate resources, the Movants can and should be compelled to use seek recourse against the collateral and funding the Debtors have already provided. The vast majority of Movants have access to letters of credit ("LCs"), surety bonds secured by such LCs, and/or security deposits (collectively, the "Security"), and this Security was provided precisely to satisfy obligations under the leases. It is well established that "a creditor has no right to choose which of two funds will pay his claim." *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002) (citations omitted). The Movants may not ignore funds the Debtors already provided merely so they can compel the Debtors to pay *more*, depleting remaining assets that should be used to fund the business for the benefit of all stakeholders. Many of the Debtors' landlords have already elected to recover from their Security in satisfaction of their claims. The Movants must do the same from the millions of dollars in Security that they hold.

4.      ***Second***, the Debtors have also satisfied their obligations under section 365(d)(3) with respect to those Movants who owe the Debtors tenant allowance credits, offsets for overpayment of operating expenses and other charges, and other credits under the terms of the Leases, which have gone unpaid or unapplied by the Movants. Taken together, these sums reduce or eliminate certain of the Movants' claims, and the Debtors are entitled to realize those reductions via various rights to setoff, recoupment, and related doctrines.

2

5.      ***Third***, even ignoring the foregoing and assuming the Tenant SPVs did not comply

with section 365(d)(3), neither the Bankruptcy Code nor case law support the relief Movants seek.

The text of section 365(d)(3) and the legislative history, several canons of statutory construction

and Supreme Court directives, and other provisions of the Bankruptcy Code all support this

conclusion.    Put simply, the text of section 365(d)(3) provides no specific remedy for

noncompliance, and courts interpreting this silence have reached dramatically different

conclusions in the 40 years since its enactment.    The best-reasoned approach provides courts broad

discretion to fashion an appropriate remedy, if any.    Here, to the extent the Movants are owed

amounts in excess of the Security they hold and the offsets available to the Debtors, the best that

Movants can hope for is an administrative claim under section 503(b)—payable upon the plan

effective date and *pari passu* with general administrative claimants.[3]

6.      Certain Movants make various arguments that they are somehow entitled to more,

but each is unsupportable.    Indeed, courts in other recent cases have, by and large, firmly rejected

similar attempts.[4]    More importantly, these requests for relief risk causing all parties to lose the

forest for the trees.    The success of these chapter 11 cases will require everyone to shoulder some

of the load.    The Debtors' secured lenders have sacrificed billions in support of this goal and are

being asked to provide additional new money to finance the Debtors' reorganization.    The Debtors'

contract counterparties have also made meaningful sacrifices to assist the reorganization, as have

most of the Debtors' other landlords, who have engaged in good faith and continue to be

---

[3]     While some courts have even required landlords to demonstrate their entitlement to administrative priority
notwithstanding section 365(d)(3), the Debtors are willing to concede that point if it resolves remaining concerns.

[4]     *See In re Steepologie, LLC*, Case No. 23-10671-CGB, 2024 WL 117525 at *4 (Bankr. W.D. Tex Jan. 10. 2024)
(rejecting a near-carbon copy of the Motion filed by certain Movants in these chapter 11 cases [Docket
No. 1216]); *see also id.* [ECF #32]; *In re Pier 1 Imports, Inc.*, 615 B.R. 196, 204 (Bankr. E.D. Va. 2020) (rejecting
arguments similar to those made by certain Movants here, concluding that immediate payment of postpetition
rent was not warranted, and reasoning that "Lessors are merely one group among many that must make
concessions in order to benefit all").

constructive business partners.  The Debtors, for their part, have thus far declined to pursue several forms of potential relief against landlords[5] in an attempt to build goodwill.  But Movants ignore the Debtors' efforts and other stakeholders' sacrifices and have to date refused to reciprocate.

7.    The Debtors can no longer provide the Movants with a "free ride" in a case where virtually every other party, including numerous other landlords, are making significant concessions for the benefit of the business and all of its stakeholders.  Contrary to the Movants' suggestions, the Debtors cannot borrow their way to profitability, and their stakeholders are unwilling to continue funding losses at the Tenant SPVs for the Movants' benefit.  For the reasons set forth herein, the Debtors request that the Motions be denied.

## **Background**

8.    The Debtors, together with their non-Debtor affiliates (collectively, "<u>WeWork</u>"), are the global leader in flexible workspace, where thousands of members—from freelancers to Fortune 100 companies—come together to create new businesses and develop novel products. WeWork was founded in 2010, became a publicly traded company in 2021, and grew to employ over 2,650 full-time workers around the world by 2023 (including nearly 1,500 employees in the U.S. and Canada).  Despite these successes, however, COVID-19 and other obstacles prevented the Debtors from outgrowing their burdensome rent obligations.  As a result, and following extensive efforts to avoid chapter 11 (as described below), the Debtors have turned to chapter 11 as their last clear chance to restructure the business and rationalize their lease portfolio.

### **A.    The Debtors' Leases of Nonresidential Real Property.**

9.    WeWork is party to hundreds of leases of nonresidential real property around the world, including nearly 200 locations in the United States and Canada.  These leases are a key

---

[5]    For example, seeking initial rent deferrals under section 365(d)(3), withholding cash rent in December where appropriate, and pursuing aggressive collection of various amounts owed to the Debtors, among other things.

component of the Debtors' current fiscal challenges—consuming over ***three-quarters*** of the Debtors' revenue in fiscal year 2023.  In many instances, the pricing of the leases is dramatically out of step with current market conditions, and addressing this mismatch is a necessary part of building a viable WeWork.  Each Lease is between a certain Debtor (usually a special purpose vehicle) on the one hand, a landlord on the other hand, and Debtor WeWork Companies U.S. LLC generally serves as guarantor.

10.    These leases are often bespoke arrangements that are more complex than a simple "tenant pays landlord" agreement.  For many of the leases, the Debtors have also provided the landlords with various forms of Security (the landlords holding such security, the "Secured Landlords").  Such Security gives the Secured Landlords a standalone source of funding they can draw upon to cover the Debtors' rent or other obligations under the lease upon a default.  For the LCs and surety bonds, the landlord collects cash directly from an intermediary issuer (the "Issuing Bank"), which is then reimbursed by the Debtors or their co-obligor.[6]

11.    Any amounts drawn on LCs by Landlords in excess of the default amount are returned to the Debtors upon termination of the Lease.  The express terms of many of the leases allow for funds drawn under the LCs to satisfy any default, including expressly authorizing the payment of rent.

12.    Moreover, a number of leases provide the Debtors with various allowances, credits, or other offsets, which generally inure back to the Debtors through rent crediting or other mechanics.[7]  The Debtors believe the Movants owe millions of dollars in credits and excess draws

---

[6]    The Issuing Bank's reimbursement claim is secured by a first-priority lien on substantially all of the Debtors' assets.

[7]    Under certain leases, the Debtors are entitled to an allowance for:  costs associated with:  (a) space planning, including blueprints, plumbing, and structural design; (b) permit and license fees incurred in connection with improvements; (c) construction of improvements to the premises, including electrical and wiring work, HVAC

in the U.S. and Canada.  While the Debtors have thus far preferred a consensual, more holistic resolution to lease issues (including with respect to credits), the Debtors now must address them more directly as well.

### B.    The Debtors' Prepetition Restructuring Efforts.

13.    Acknowledging the need to right-size its portfolio and cut lease costs in the face of these issues confronting the entire commercial real estate industry, prior to the Petition Date, WeWork had successfully amended over 590 leases and implemented a series of measures to enhance operational efficiency, reducing future rent obligations by over $12 billion and general and administrative expenses by approximately $1.8 billion.

14.    Yet WeWork still had hundreds of unprofitable or minimally profitable locations with above-market rents, which are the single largest source of cash outflow for the Debtors.  The company also had $4.2 billion in funded debt generating $516 million in interest expense annually. And while this increased debt load was important to service the Debtors' bloated lease portfolio, it proved insufficient in light of the significant, above market rents that saddle the Debtors.  *See* First Day Declaration at ¶¶ 11-12.

15.    In early 2023, the Debtors renewed their request to their landlords to reduce rents to market-based levels.  While some landlords agreed to negotiate and provide short term relief, many other landlords (including the Movants) declined to make concessions in earnest, and the Debtors were forced to turn to their lenders for assistance.  To that end, the Debtors negotiated a notes exchange transaction with their lenders (including SoftBank and a majority of public noteholders) in May 2023.  Through this transaction, WeWork (a) secured over $1 billion of total

---

work, odor control, and other special systems; (d) costs to install personal property, including furniture, fixtures, and equipment; and (e) soft costs such as moving costs.

funding and capital commitments; (b) canceled or equitized approximately $1.5 billion of total

debt; and (c) extended the maturity of approximately $1.9 billion of debt from 2025 to 2027.

16.     After securing these concessions from their lenders, the Debtors continued to

engage with their landlord constituency with the goal of achieving long-term savings that would

fix the cost structure of their leases permanently.  Once again, many landlords were content to

"wait and see" and attempt to avoid making needed concessions.

17.     By September 2023, the Debtors' liquidity profile began to deteriorate, and the

company and its advisors began exploring restructuring alternatives.  On October 2, 2023, the

Debtors withheld $37.3 million of cash interest payments due under certain of the Debtors' secured

notes, allowing WeWork to preserve liquidity and maintain flexibility.[8]   The missed interest

payment triggered a 30-day cure period (until default) and accelerated discussions with lenders.

Alongside these lender discussions, the Debtors continued to engage with their landlords in an

effort to consensually restructure their lease portfolio.  While these discussions provided some

savings, they were insufficient to capture the cost reduction necessary to preserve the Debtors'

business as a going concern.

18.     While landlord negotiations fell short, lender negotiations proved productive.

Shortly before the Petition Date, the Debtors' secured lenders agreed to forbear from exercising

remedies and continue negotiations around a potential restructuring strategy.  As part of those

discussions, 92% of the Debtors' secured lenders agreed to support a chapter 11 strategy, as

memorialized in a restructuring support agreement with SoftBank, the Ad Hoc Group, and Cupar

(the "RSA").[9]  The RSA contemplates the full equitization of the WeWork's 1L Notes, 2L Notes,

---

[8]     The Debtors also withheld $57.9 million in PIK interest payments due under their [secured notes].

[9]     To facilitate entry into the RSA and to enable the Debtors to renew LCs, Softbank provided $1.46 billion in
       financing to repay $179.5 million of obligations under the senior tranche of the LC Facility, $542.6 million of

and the LC Facility and reduces WeWork's funded debt by approximately $3 billion. Certain RSA parties allowed the Debtors to use $173 million of their cash collateral to finance these chapter 11 cases and fund the Debtors' ongoing operations—including payments to employees, vendors, and landlords.

### C.    The Chapter 11 Filing and Post-Petition Developments.

19.    With the RSA in hand, WeWork Inc. and its 516 Debtor affiliates commenced these chapter 11 cases on November 6, 2023, and continued their efforts to reach sustainable agreements with their landlords. During the first day hearing, the Debtors reiterated the "need [for] our landlord counter-parties to engage" and "come to the table quickly" so that "we can emerge a healthy and stable company." Nov. 8, 2023 Hr'g. Tr. at 18:5-7. Such engagement would not only help save the Debtors' business, but also preserve value for landlords while the overall commercial real estate market suffers from declining occupancy, increased vacancies, rising interest rates, and few viable alternatives for stable tenants.[10]

20.    From the outset, the Debtors have sought to work constructively with landlords towards a successful reorganization. The Debtors opted not to defer their rent obligations during the first 60 days of these chapter 11 cases, despite the ability to do so under section 365(d)(3) of the Bankruptcy Code, and acceded to numerous landlord requests regarding first day relief.[11] In addition, the Debtors agreed to provide landlords with a stub rent reserve in connection with the

---

obligations under the junior tranche of the LC Facility, and post $808.8 million to cash collateralize remaining undrawn amounts under the LC Facility.

[10]    *See* Konrad Putzier, *Office Landlords Can't Get a Loan Anymore*, Wall Street Journal (Nov. 20, 2023), https://www.wsj.com/real-estate/commercial/office-landlords-cant-get-a-loan-anymore-ee8a0b08    ("Remote work and rising vacancies have hit building profits, making it harder to pay interest.").

[11]    For example, the Debtors (a) agreed to amend the [interim Cash Collateral Order] to address landlord concerns regarding the attachment of adequate protection liens, (b) provide comfort language in the utilities order [Docket No. 73], (c) amend the DIP Order with respect to secured parties' rights of entry of leased premises.

final Cash Collateral Order, notwithstanding that the landlords are not entitled to one.[12]  And, most importantly, the Debtors spent significant resources arranging the DIP LC Facility to provide landlords with renewed LCs, which otherwise would have expired.[13]  Finally, the Debtors have also been working to raise additional new money financing to fund the remainder of these chapter 11 cases.  Given the magnitude of rent the Debtors pay, a large majority of any financing will fund obligations to landlords.

21.    Despite all these efforts and significant lender concessions, many landlords had yet to engage constructively by year-end 2023.  To be clear, not all landlords have been intransigent— many have agreed to significant concessions, and many more remain engaged in meaningful discussions.  And, since January 2024, the pace of negotiations has indeed improved, providing a clear line of sight to a profitable, sustainable WeWork.  But a small subset of landlords, including the Movants, have thus far refused to assist the Debtors in rationalizing their leases.  Instead, they have demanded that others make concessions while they make none, content to coast while all other stakeholders shoulder the cost of the Debtors' rehabilitation.

22.    This delay tactic has impeded the progress of this restructuring and drained the Debtors' liquidity—with cash on hand down to $134 million as of December 31, 2023.  While the Debtors remain optimistic about the viability of their business, their year-end cash balances and adjusted forecasts meant they could not continue gratuitous cash rent payments at all locations where they pay far above current market rates.  To that end, the Debtors reevaluated all such locations to identify instances where their rent obligations either have been or could be satisfied

---

[12]   *See In re Goody's Family Clothing Inc.*, 610 F.3d 812, 815 (3d Cir. 2010) (holding that while "stub rent" is not a section 365(d)(3) obligation *because* it arose prepetition, landlords are not precluded from seeking to prove entitlement to an administrative expense pursuant to section 503(b)(1)).

[13]   Because all LCs had expired due to the chapter 11 filing and the attendant event of default, the DIP LC Facility was the only path to preserving the landlords' LCs.

by alternative means, including credits, offsets, prepayments, draws on their Security, and/or other theories of recovery. While the Debtors initially declined to pursue such alternatives (largely in the hope of landlord engagement and a desire to avoid disputes), the Debtors can no longer afford to avoid exercising such rights.

23.     In early January 2024, while the Debtors paid cash rent to most landlords, they opted to satisfy rent obligations to Movants via alternative means. The Debtors further provided concrete details regarding the foregoing at a meeting the Debtors' CEO held with members of the Committee.

24.     Numerous landlords accepted the Debtors' renewed invitation to dialogue. And numerous landlords appropriately applied their Security and/or the Debtors' earned credits under the leases to any amounts owed for January.[14] The Movants, however, chose a different path again to attempt to benefit from the concessions made by other stakeholders while making none of their own.

### <u>Argument</u>

25.     The Motions should be denied for several independent reasons. ***First***, this Court should direct the Movants to first use the dedicated Security they have been provided with before rushing to deplete the Debtors' shared, limited cash. ***Second***, Movants who have already drawn, but not applied, their Security or otherwise owe the Debtors various credits under the leases are not entitled to the cash payments they demand, and they fail to carry their burden of proving otherwise. Any Movants with net claims against the Debtors can and should be required to first apply amounts owed to the Debtors before draining the Debtors' dwindling cash to the detriment

---

[14]     Notably, certain of the landlords who opted to apply their Security are represented by *the same counsel* as certain of the Movants, making the decision to come to court and further drain estate resources all the more baffling.

of all stakeholders.[15]  **_Third_**, even if the Debtors are not in strict compliance with section 365(d)(3), the text of that provision does not provide the Movants with any specific remedy.  At most, case law supports awarding the Movants a general administrative claim, but stops far short of supporting the superpriority status they demand.  Nor does applicable law support certain Movants' alternative requests for relief, such as penalty rates, attorneys' fees, stub rent, and adequate protection.  **_Fourth_**, aside from the merits, many of the Motions can be denied under Bankruptcy Rule 2019 alone, which requires important disclosures many Movants declined to provide.

## I.    The Debtors' Obligations Under Section 365(d)(3) Can and Should Be Satisfied by the LCs and Related Security.

26.    The Movants have already been provided with a direct and viable path to recover their claims which does not require immediate diminishment of other estate resources.  They must first recover from their existing Security before draining estate cash.  "[I]t is an 'ancient but very much alive doctrine . . . [that] . . . a creditor has no right to choose which of two funds will pay his claim.'"  _In re Dow Corning Corp._, 280 F.3d 648, 656 (6th Cir. 2002) (quoting _In re A.H. Robins Co., Inc._, 880 F.2d 694, 701 (4th Cir. 1989)).  This doctrine fits hand in glove with the Bankruptcy Code's general policy of maximizing value for all stakeholders.  _Toibb v. Radloff_, 501 U.S. 157, 163 (1991).  Despite these principles, the Secured Landlords seek to deplete estate cash even though the Debtors dedicated other assets to satisfy their claims.  But the Bankruptcy Code and principles of equity demand the opposite result—and this Court has the authority to ensure it via (a) traditional marshaling and/or (b) its inherent equitable powers.

---

[15]    A schedule detailing the availability of Security is set forth on **Exhibit A** hereto.  Facts referenced in this section with respect to individual leases are supported by the information furnished on **Exhibit A**.

**A.      Sections 544 and 1107(a) of the Bankruptcy Code Entitle the Debtors to Apply the Doctrine of Marshaling.**

27.      The Secured Landlords seek to deplete doubly charged assets of the estate where a singly charged fund exists to satisfy their claims.  Instead, to protect the Debtors and their other creditors, the Secured Landlords should be compelled to marshal their assets, first recovering from the Security already provided by the Debtors before depleting the cash shared by all creditors and required to operate the business.

28.      Fortunately, the Bankruptcy Code expressly provides the Debtors with tools to prevent a value destructive outcome from befalling their estates and other creditors.  Here, this includes leveraging sections 544 and 1107 to compel marshaling.  In its traditional form, the doctrine of marshaling is approved where:  (1) a hypothetical lien creditor, with a claim junior to the Secured Landlords', could exist with a claim to the Debtors' assets; (2) the assets for which marshaling is sought belong to the Debtors; and (3) there exists a singly-charged fund where only the Secured Landlords may recover and a doubly-charged fund accessible to other creditors.  *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 937 (Bankr. S.D. Tex. 1988) (citing *Meyer v. United States*, 375 U.S. 233, 236 (1963)); 11 U.S.C. § 544(a).  Further, some courts also engage in a prejudice analysis.[16]  Each element is satisfied here.

**1.      The Debtors Have Standing to Compel Marshaling.**

29.      The text of the Bankruptcy Code provides, and the weight of authority confirms, that chapter 11 debtors may compel marshaling as hypothetical lien creditors.  In chapter 11, the Debtors are authorized by statute to stand in the shoes of a hypothetical junior lien creditor.  11

---

[16]      Courts within this District that engage in a prejudice analysis are split as to whether the appropriate subject of a prejudice analysis is the secured creditor against whom marshaling is sought or to all parties.  *Matter of Jack Dillon Constr. Co.*, 54 B.R. 136, 137 (Bankr. D.N.J. 1984) (marshaling must be fair to all parties (quoting *Meyer*, 375 U.S. at 237); *In re Corso Stein Enters, Inc.*, 79 B.R. 584, 588 (Bankr. D.N.J. 1987) ("[C]ourts have taken into account the question of prejudice to the secured creditor.")

U.S.C. § 544(a).  This power is vested in the Debtors *regardless* of whether the Debtor is aware

of any actual junior lien creditor's existence.  *Id.*  Courts consistently hold that the strong-arm

powers of section 544(a) of the Bankruptcy Code permit the Debtors to compel marshaling.  *See,*

*e.g.*, *In re Tampa Chain Co., Inc.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985) ("Neither the language

of the [section 544(a)] nor its legislative history gives the slightest indication that Congress

contemplated that such 'strong arm' rights and powers are not to apply in a marshaling context.").[17]

### 2.    The Secured Landlords Are Secured Creditors for Purposes of Marshaling.

30.    A creditor is secured to the extent of the "value of such creditor's interest in the

estate's interest in such property, or to the extent of the amount subject to setoff."  11 U.S.C.

§ 506(a)(1).  In this Circuit, LCs provided in lieu of a security deposit *are* security deposits as a

matter of law.  *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 210 (3d Cir. 2003) (ruling that

LCs held by landlords must be applied to reduce their claims for rejection damages).[18]  Because

the Third Circuit and other courts treat LCs on these facts as security deposits,[19] the Secured

Landlords are secured creditors for traditional marshaling purposes.  Here, the landlords' Security,

whether an LC, a surety bond, or formal security deposit, functions as a security deposit.

---

[17]    *See also*, *In re High Strength Steel, Inc.*, 269 B.R. 560, 537–74 (Bankr. D. Del. 2001); *In re Ludwig Honold Mfg. Co.*, 34 B.R. 645, 646 (Bankr. E.D. Pa. 1983); *In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *In re Vermont Toy Works, Inc.*, 135 B.R. 762, 768 (D. Vt. 1991).

[18]    Notably, neither the 1978 Code nor subsequent amendments altered the pre-Code practice of first applying security in satisfaction of rent claims—which remains good law.  That this practice went unchanged is meaningful, since courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure."  *Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 563 (1990).

[19]    *In re APF Co.*, 270 B.R. 363, 364 (Bankr. D. Del. 2001) ("A landlord is a secured creditor to the extent of any security deposit it holds." (quotations and citation omitted)); *see also*, *In re Shane Co.*, 464 B.R. 32, 43 (Bankr. D. Colo. 2012) (agreeing landlords with security deposits are secured creditors); *In re Johnson*, 215 B.R. 381, 385 (Bankr. N.D. Ill. 1997) ("In general, a creditor holding a debtor's security deposit as collateral to insure future payment is entitled to setoff, and thus is a secured creditor to the extent of the security deposit." (citing *In re Ne. Int'l Airways, Inc.*, 99 B.R. 487, 488–89 (Bankr. S.D. Fla 1989))).

Moreover, many of the leases expressly label the LC or surety bond as provided as (or in lieu of) a security deposit.

31.     As with a cash security deposit, the Debtors retain a reversionary interest in the proceeds of the LCs in the event that a draw exceeds the cost of any breach.[20]  Courts hold that security deposits constitute property of the estate where the Debtors retain a reversionary interest. *See, e.g.*, *In re Utica Floor Main,, Inc.*, 25 B.R. 1010, 1011 n.5 (N.D.N.Y. 1982) (noting that whether a security deposit was property of the estate was considered "so obvious").  Whatever distinction between a cash security deposit and an LC the Movants may seek to assert is of no moment where, as here, the cash collateralizing the LC was provided by the Debtors via the proceeds of the DIP Term Loan.  *In re Mayan Networks Corp.*, 306 B.R. 295, 299 (B.A.P. 9th Cir. 2004).

32.     Further, each LC is supported by the DIP LC Facility, which is cash collateralized by cash posted directly by the Debtors from the proceeds of the DIP Term Loan.  Such cash proceeds are held in segregated accounts and are available only for the purposes of collateralizing LC draws by the Secured Landlords.  Where any aspect of the Security is secured by a non-debtor's assets, that non-debtor has a reimbursement obligation against the Debtors secured by a blanket first lien on the Debtors' assets.[21]  Courts that have excluded LCs from the estate were presented

---

[20]    Any reversionary right is subject to any other security arrangements to which the Debtors are party.

[21]    While an LC is typically treated as an independent obligation between a bank and a third-party, the Third Circuit has held that it will look past the independence principle when the matter pertains to the collateral of a debtor. *In re Kaiser Group Int'l, Inc.*, 399 F.3d 558, 566–67 (3d Cir. 2005) ("[T]he letter of credit itself and the payments thereunder may not be property of [the] debtor, but the collateral pledged as a security interest for the letter of credit is . . . where the claim centers around the *collateral* pledged to the bank and *not* the distribution of the proceeds themselves, 'the fact that the letters of credit themselves are not property of the estate is a red herring.'" (quoting *In re Mayan Networks Corp.*, 306 B.R. at 299)) (emphasis in original); *see also In re Builders Transport, Inc.*, 471 F.3d 1178, 1186 (11th Cir. 2006) ("[T]he doctrine of independence protects only the *distribution* of the proceeds of the letter of credit." (quoting *In re Graham Square*, 126 F.3d 823, 827 (6th Cir. 1997))); *In re Onecast Media, Inc.*, 439 F.3d 558, 564 (9th Cir. 2006) ("The Trustee now seeks to recover so much of the security deposit as exceeded the Landlord's damages.  The Trustee's interest in those funds is property of the estate, 11 U.S.C. § 541(a)(1), and thus within the bankruptcy court's jurisdiction.").

primarily with situations wherein the debtor sought turnover of LC proceeds or to enjoin a party from drawing on an LC.[22]

33.     Here, the LC is part of an integrated LC facility directly backed by the Debtors' collateral.  The LC functions as an intermediary mechanism allowing the landlords to receive payments secured by cash posted directly by the Debtors or by the Debtors' collateral.  The banks holding such collateral bear the risk of default, not the Debtors.

34.     Further, prior to being drawn, the cash that collateralizes the LCs, is held in interest bearing accounts.  The interest accruing therefrom is property of the estates.  By prematurely drawing on the LCs before a monetary breach had occurred *and* by failing to apply such draws now, the Secured Landlords have precluded the Debtors from obtaining valuable interest revenue from these accounts, further diminishing the estates.

35.     Given the law of this Circuit and the clear reversionary right the Debtors have to the cash collateralizing the Security and to the excess draws, the Secured Landlords are secured creditors, secured by assets of the estates.  To deny this reality is to treat form over substance. *Pepper v. Litton*, 308 U.S. 238, 304–05 (1939) (explaining bankruptcy courts have exercised equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.").  Accordingly, the availability of the Security makes the Secured Landlords secured creditors such that marshaling can be compelled.  Therefore, the second prong of marshaling—the presence of a senior secured creditor with access to the Debtors' assets—is met.

---

[22]   *In re Sabratek Corp.*, 257 B.R. 732, 738 (Bankr. D. Del. 2000)

### 3. The Landlords Can Access Two Funds Whereas Other Creditors Can Only Access One.

36.     In order to satisfy the "two funds" rule, there must exist both a singly and a doubly charged fund of the Debtors. "A singly charged fund is property in which only one creditor (the paramount creditor) has a lien. A doubly charged fund is property in which both creditors, the paramount creditor and the creditor requesting marshalling, have liens." *Matter of Jack Dillon Constr. Co., Inc.,* 54 B.R. at 137.

37.     Here, the LCs are a singly charged fund both as a matter of fact and as a matter of law in the Third Circuit. A singly charged fund is one in which only one creditor (here the Secured Landlords) has a right of recovery. *Id.* Conversely, a doubly charged fund is against which the paramount creditor (again, the Secured Landlords) and other creditors may claim. *Id*.

38.     Accordingly, the Security is a singly charged fund accessible solely to the Secured Landlords. On the other hand, the doubly charged fund (i.e. the Debtors' assets) is currently being used to fund postpetition rent. As a result, the Secured Landlords are claiming from the doubly charged fund while retaining access on demand to the singly charged fund to the detriment of other creditors of the estate.

### 4. The Secured Landlords Will Not Be Prejudiced by Marshaling.

39.     As noted previously, there is some disagreement (even within this district) regarding whether a marshaling-prejudice-analysis centers on prejudice to the senior creditor or to creditors generally. *Id*. (marshaling must be fair to all parties (quoting *Meyer*, 375 U.S. at 237)); *In re Corso Stein Enters, Inc.*, 79 B.R. 584, 588 (Bankr. D.N.J. 1987) ("[C]ourts have taken into account the question of prejudice to the secured creditor."). Here, marshaling will actively benefit creditors writ large by preventing a highly secured group from depleting estate assets in the first instance.

40.    To the extent the Debtors need to prove that no prejudice will befall the Secured

Landlords, they can also easily satisfy that test.  Courts find that a senior secured party suffers

prejudice where its "rights will be endangered or injuriously delayed or there is a reasonable doubt

of the availability of another fund to satisfy the senior secured creditor's demand." *In re High

Strength Steel*, 269 B.R. at 575.  Here, however, marshaling would not prejudice the Secured

Landlords.  To the contrary, their postpetition rent claims (if any) would be satisfied in full under

either scenario.  The Secured Landlords are not being asked to recover against speculative funds

or through complex and uncertain proceedings.  Instead, the Debtors are requesting that, to the

extent payment is compelled at all, the Secured Landlords recover from (a) funds that they have

already drawn or (b) funds which a well-capitalized bank will tender to them on demand.  The

Secured Landlords have not shown that they will face any material delay or diminished likelihood

of recovery on account of postpetition rent simply because it must be paid from their Security

(including the LCs).  To the contrary, certain Secured Landlords have already satisfied their

asserted rent claims with LC draws rather than filing motions to compel.  The Secured Landlords

should be made to do likewise.

41.    Because the Secured Landlords can simply draw on another, readily accessible fund

without delay or need to initiate an alternative proceeding, the Movants will face no prejudice if

the Court compels marshaling.

*    *    *

42.    Nearly a century ago, the Supreme Court instructed that "a creditor having two

funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor,

who may resort to only one of the funds."  *Sowell v. Fed. Resrv. Bank*, 268 U.S. 449, 456–57

(1925).  That truism holds today as it did then.  The Secured Landlords have access to two funds

17

and should not be allowed to defeat the other creditors of the estate when they can first satisfy their

claims with the Security.

> **B.      The Court's Equitable and Inherent Powers Further Support the Application of Marshaling Principles.**

43.      In addition to traditional marshaling, this Court's inherent and equitable powers

should be employed to fashion a similar result and foster a successful reorganization.

Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

§ 105(a).  Under this provision and this Court's inherent powers, this Court has broad authority to

fashion appropriate relief based on the facts before it.  *See, e.g.*, *In re Cont'l Airlines*, 203 F.3d

203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically

enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out

provisions of the Bankruptcy Code.").[23]  Invoking such power is particularly appropriate where,

as here, it will assist the Court's administration of the estate including by providing for greater

recovery to other creditors.  *See, e.g.*, *In re W.R. Grace & Co.*, 386 B.R. 17, 31-32 (Bankr. D. Del.

2008).[24]

---

[23]    While section 105(a) does not authorize conduct which directly contravenes a provision of the Bankruptcy Code, the Debtors respectfully submit that here, there is ample justification to use it to supplement the Bankruptcy Code in keeping with *Continental*.  *Law v. Siegel*, 571 U.S. 415, 422-23 (2014) (holding that section 105(a) cannot be used to directly contravene express provisions of the Bankruptcy Code).  The Bankruptcy Code's silence on an issue does not deprive a bankruptcy court of equitable authority under section 105(a).  Only a direct adversity to the Bankruptcy Code does that.  *See In re Caesars Ent. Operating Co.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (holding that section 105(a) provides a bankruptcy court with extensive equitable powers to perform their duties and admonishing lower courts for a "cramped" interpretation of section 105(a)).  Indeed, courts post-*Siegel* have continued to apply 105(a) in similar, equitable ways as before.  *See, e.g.*, *In re Bestwall LLC*, 71 F.4th 168 (4th Cir. 2023); *In re LTL Mgmt., LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022) (same).   Here, the equitable relief the Debtors seek augments and supports section 544 and is analogous to an injunction upon creditors limiting their recovery to the singly charged fund in the first instance.  Applying a marshaling-type remedy does not defeat the Bankruptcy Code, it carries out its purpose.

[24]    *See also*, *In re Johns-Manville Corp.*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983) (the court's power under section 105(a) allows for an extension of the automatic stay under section 362 to enjoin proceedings against non-debtors which would deplete the estate); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1001-02 (4th Cir. 1986) (holding

44.     In fact, courts across the country have long used their equitable and inherent powers pursuant to section 105(a) to compel creditors with two paths to recovery to choose the one that did not diminish the amount of the *res* available to other creditors.   Section 105(a) gives a bankruptcy court ample authority to channel creditor recovery in this way.   *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701-02 (4th Cir. 1989) ("We think the ancient but very much alive doctrine of marshaling of assets is analogous here.   A creditor has no right to choose which of two funds will pay his claim.   The bankruptcy court has the power to order a creditor who has two funds to satisfy his debt to resort to the fund that will not defeat other creditors.").   Accordingly, this Court should not countenance a creditor's me-first decision to deplete a shared fund when a dedicated means of recovery is available to them.

45.     Here, the application of marshaling or analogous equitable relief is well within this Court's sound discretion under section 105(a).   Doing so would not only *not* contravene any express section of the Bankruptcy Code, but doing so would, in fact, *help* this Court carry out both the text and intent of sections 544 and 1107, which expressly empower the Debtors to use their strong-arm power to compel marshaling.   Doing so would also serve the Court's purpose of fostering successful reorganizations.   *In re Genesis Health Ventures, Inc.*, 280 B.R. 339, 346 (Bankr. D. Del. 2002) ("Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies.").

46.     As discussed herein, exercising equitable relief, akin to marshaling, would prevent an undue double recovery to the Movants at the expense of creditors without access to two funds. And doing so would dramatically increase the chances of a successful reorganization by

---

that a bankruptcy court has authority both under section 362 and 105(a) to enjoin proceedings which could affect the estate).

(a) bringing a thus-far intransigent minority of landlords to the negotiating table and (b) preserving the Debtors' doubly charged assets for recovery to other creditors who do not have access to Security. Further, compelling marshaling or other equitable remedies would allow the Debtors to preserve estate resources to satisfy claims upon confirmation. Accordingly, to the extent that the Movants are entitled to any payment after first applying setoff or recoupment, as applicable, this Court should compel marshaling to prevent significant inequity and needless diminution of the estates.

## II.      Alternatively, the Debtors' Rights of Recoupment and Setoff Eliminate Their Obligations to Many Movants.

47.      To the extent this Court is disinclined to compel marshaling or analogous equitable relief, certain of the Movants are further not entitled to cash payments at this time because, on a net basis, they are not owed any money. Instead, the Movants' asserted claims should be reduced by amounts they owe the Debtors both due to excess, unapplied draws upon Security and credits available to the Debtors under the leases. Section 558 of the Bankruptcy Code expressly preserves the Debtors' right to exercise such common law rights of setoff and/or recoupment. In certain cases, these adjustments reduce Movants' claims to zero, meaning they are entitled to nothing under section 365(d)(3).[25]

48.      "The doctrines of 'setoff' and 'recoupment' had their origins in the era of common law pleading, under which the scope of a 'case' was far less inclusive than it is today, and under

---

[25]   Certain of the Movants cite to *In re Leather Factory, Inc.*, 475 B.R. 710 (Bankr. C.D. Cal. 2012) for the proposition that a landlord may not be compelled to satisfy postpetition obligations from a security deposit. *See, Motion of Multiple Landlords to Compel Payment of Post-Petition Lease Obligations, Request for Adequate Protection and for Other Appropriate Relief* [Docket No. 1216, at ¶28]. However, *Leather Factory*, reaches its decision after considering setoff under section 553, which applies to a creditors' right. Here, the Debtors seek to apply common law and equitable defenses available to them under section 558 of the Bankruptcy Code. Moreover, in *Leather Factory*, the security deposit at issue was insufficient to cover either prepetition or postpetition rent charges. *In re Leather Factory, Inc.*, 475 B.R. at 720. Here, however, the Security is far more ample and the prepetition unpaid liabilities (if any) are far fewer. As a result, this Court is not presented with the same issue statutorily or factually that Judge Mund did in *Leather Factory*.

which the claim of joinder was far narrower." *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). These doctrines served the important function of permitting countervailing claims to be asserted together, rather than having to proceed on reciprocal claims in separate trials, when in effect, the damages would net. *Id*. Both doctrines have important, but distinct places in bankruptcy. Particularly where, as here, the presence of available LC proceeds has "fully compensated [Movants] for the Postpetition Rent Claims." *In re Hechinger Inv. Co. of Del., Inc.*, 2001 WL 1820320, at *8 (Bankr. D. Del. Jan. 29, 2001).

A.   **Recoupment.**

49.    Section 558 of the Bankruptcy Code preserves the Debtors' common law right to assert a defense of recoupment to any debt asserted against them. *In re Papercraft Corp.*, 126 B.R. 926, 931 (Bankr. W.D. Pa. 1991). Indeed, the right to assert recoupment is a longstanding one in the bankruptcy context. *See In re Monongahela Rye Liquors*, 141 F.2d 864 (3d Cir. 1944). The doctrine of recoupment applies where the parties are debtors vis-à-vis each other as part of the same transaction (i.e., the reciprocal obligations arise from the same transaction). *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992) ("Recoupment is the setting up of a demand *arising from the same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." (internal quotations omitted)).

50.    In effect, recoupment is a defense to a creditor's claim under a transaction, rather than a mutual obligation. *Lee v. Schweiker*, 739 F.2d at 875 (citing *In re Monongahela Rye Liquors*, 141 F.2d at 869). To be eligible for recoupment, the relevant claims need not have yet crystalized. Instead, recoupment may be applied for advance payments based on estimates of what would be owed, subject to subsequent correction. *In re Univ. Med. Center*, 973 F.2d at 1079 (quoting *In re B&L Oil Co.*, 782 F.2d 155, 157 (10th Cir. 1986)). As a right of the Debtors under the relevant state common law, recoupment is a defense available to the Debtors even where the

21

leases do not provide for it. *Id.* at 1080. Importantly, here, each applicable state's common law provides for recoupment as an affirmative defense.[26] Thus, section 558 expressly reserves that right for the Debtors.

51.    Additionally, the Debtors are free to assert recoupment where prepetition amounts are owed to them against any postpetition arrears. Section 558 contains no restriction on applying the doctrine of recoupment to postpetition obligations, including rental arrearages. *In re Prince Sports, Inc.*, 2013 WL 6906717, at *2 (Bankr. D. Del. Dec. 11, 2013) (allowing debtor, under theory of recoupment, to apply prepetition credit to reduce postpetition administrative rent claim under section 365(d)(3)). "Because both setoff and recoupment are equitable remedies, [the debtor's] right to assert those remedies is not impaired by the Lease provisions." *Id.*; *see also CDI Trust v. U.S. Electronics, Inc. (In re Commc'n Dynamics, Inc.)*, 382 B.R. 219, 226 (Bankr. D. Del. 2008) ("Setoff and recoupment are not dependent on the parties' contract; rather, they are equitable remedies available independent of any contractual remedy." (citing *In re Univ. Med. Center*, 973 F.2d at 1080)). Recoupment's "same transaction" test is loose and does not constrain parties to a single event in time. For example, a division order in the oil and gas context applying royalties on a go-forward basis has been found to constitute a single transaction. *In re B&L Oil Co.*, 782 F.2d at 156.

---

[26]    *See Am. Bridge Co. of New York v. City of Bos.*, 88 N.E. 1089 (Mass. 1909) (providing for recoupment where the reciprocal obligations arose from the same contract); *City of New York v. Pike Realty Corp.*, 160 N.E. 359 (N.Y. 1928); *Stern v. Sunset Rd. Oil Co.*, 190 P. 651 (Cal. Ct. App. 1920); *S. Pac. Co. v. Porter*, 160 Tex. 329, 331 S.W.2d 42 (Tex. 1960); *Tenn. Indus. Mach. Co., Inc. v. Accuride Corp*, 139 S.W.3d 290, 294 (Tenn. Ct. App. 2004); *Collard v. Nagle Const., Inc.*, 57 P.3d 603 (Utah Ct. App. 2002); *Strang v. Murphy*, 29 P. 298 (Colo. App. 1892); *Rouge River Mgmt. Co. v. Shaw*, 411 P.2d 440, 442 (Or. 1996); *Settlers Edge Holding Co., LLC v. RES-NC Settlers Edge, LLC 793 S.E.2d 722, 732* (N.C. Ct. App. 2016); *Bogdan v. Ausema*, 179 N.E.2d 401, 403 (Ill. App. Ct. 1962); *Nelson Co. v. Goodrich*, 292 P. 406, 408 (Wash. 1930); *Granmo v. Superior Ct. In & For Pima Cnty.*, 596 P.2d 36, 38 (Ariz. Ct. App. 1979); *Lofchie v. Wash. Square Ltd. P'ship*, 520 A.2d 665 (D.C. Ct. App. 1990).

52.     That standard is easily met here.  Each of the leases expressly contemplate the provision of Security (including LCs) and/or entitle the Debtors to credits for various prepayments, improvements, and other amounts.  Because the Debtors' rent payments are contractually linked to the credits to which the Debtors are entitled, such amounts "aris[e] from the same transaction" and qualify for recoupment.  *In re Univ. Med. Center*, 973 F.2d at 1079.  Through recoupment, the Movants' claims are reduced by the amounts they owe the Debtors.  This result is not only lawful but also equitable where, as here, any amounts drawn in excess of any monetary default, are required to be returned to the Debtors upon the relevant LC's maturity.  Allowing the Movants to hold estate assets while simultaneously collecting additional cash consideration is a deleterious double-dip which leaves fewer assets for all other creditors.

### B.     Setoff.

53.     Similar to recoupment, the common law right to setoff allows the Debtors to reduce any debt they owe a party by the amount such party owes to the Debtors.  *See In re Univ. Med. Center*, 973 F.2d at 1079; *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (setoff avoids "the absurdity of making A pay B when B owes A.").  Claims to be setoff, in effect, represent mutual obligations in bankruptcy.  *Lee v. Schweiker*, 739 F.2d at 875.

54.     Mutuality of obligations exists between the Debtors and the Movants.  In this Circuit, mutuality merely means there are debts "owing from a creditor directly to the debtor and, in turn, owing from the debtor directly to that creditor."  *In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 754 (3d Cir. 2021).  Here, mutual debts exist as a result of any asserted rental arrears on the one hand and due credits under the terms of the leases and excess LC draws on the part of the Movants.  Because the mutual debts are by and among the specific debtor entity party to a Lease (in each case a special purpose vehicle) and the landlord entity party to such Lease, the parties then incurred the debts in the same capacities such that setoff is available.  Further, because the Debtors

retain all defenses available to them prepetition pursuant to section 558, they are not precluded from meeting mutuality merely by dint of their status as debtors in possession.  11 U.S.C. § 558.

55.     Like recoupment, a debtor's setoff rights emanate from state law and are incorporated into chapter 11 via section 558 of the Bankruptcy Code.  *See* 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate . . . .").  Unlike a creditor's setoff rights, which are restricted by section 553, "there is no such restrictive language in section 558 and, consequently, Courts have concluded that a debtor may set off pre-petition claims against post-petition obligations it owes."  *In re Women First Healthcare, Inc.*, 345 B.R. 131, 134 (Bankr. D. Del. 2006).[27]  This conclusion plainly applies to section 365(d)(3) claims, and courts in this circuit have allowed debtors to use prepetition credits to setoff against postpetition rent obligations.  *In re Prince Sports, Inc.*, 2013 WL 6906717, at *2 (Bankr. D. Del. Dec. 11, 2013) ("[I]t does not matter that [the debtor] seeks setoff of a post-petition rent claim, so long as there are valid, mutual debts between the same two parties.").

56.     On these facts, the law of every state governing the leases would allow the Debtors to setoff against postpetition rent.[28]  Further, as at least one state notes, setoff is "favored in

---

[27]     A creditor's right to setoff is limited by statute to prepetition debts.  11 U.S.C. § 553(a); *see also In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009).  However, the Debtors' right to setoff are not incorporated into chapter 11 via section 553.  Instead, they arise under section 558.  Any attempt to apply section 553's prepetition limitation to a *debtor's* setoff rights is improper and in conflict with the text of section 558, which affords the Debtors the rights to assert *any defense*, not just with respect to prepetition debts.  11 U.S.C. §558; *In re Papercraft Corp.*, 127 B.R. 346, 350 (Bankr. W.D. Pa. (1991)).

[28]     The state law governing the leases is consistent that for setoff to be applied, the debts must be mutual.  *See Commissioner of Ins. v. Munich Am. Reins. Co.*, 429 Mass. 140, 142 (Mass. 1999) ("[S]etoff is appropriate between mutual debtor-creditors, even if one of them is insolvent at the time the right to setoff is asserted."); *Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468 (N.Y. 1920) (holding that setoff applies where mutual debts are owed by the same parties); *Harrison v Adams*, 128 P.2d 9 (1942) (same); *Masterson v. Goodlett*, 46 Tex. 402 (Tex. 1877) (same); *Bramham v. Lanier Bros.*, 200 S.W. 830, 831 (Tenn. 1918) ("We have found no case in which is adjudged the rights of parties where the petition was a voluntary one; but we hold that there was wanting the essential element of mutuality to support the set-off or counterclaim"); *Bichler v. DEI Systems, Inc.*, 220 P.3d 1203 (Utah 2009) (holding that a setoff requires a cognizable counterclaim to satisfy a mutual debt); *Ingols v. Plimpton*, 10 Colo. 535 (Colo. 1887) (holding that there can be no setoff without mutuality); *Coburn v. Carstarphen*, 194 N.C. 368 (N.C. 1927) (holding that setoff applies where mutual debts are owed by the same parties); *Security Sav. & Trust Co. v. Portland Flour Mills Co.*, 124 Or. 276 (Or. 1927) (same); *Fisher v. State*

bankruptcy." *Korlann v. E-Z Pay Plan, Inc.*, 428 P. 172, 175 (Or. 1967). As a result, the Debtors should not be denied their common law right to setoff.

57.      Because the Debtors are within their rights to setoff such postpetition arrearages, to the extent they exist and are not already satisfied by the Security, the Debtors' right to setoff preempts any entitlement the Movants might have had to cash payment today. Accordingly, any amounts owed to the Movants on account of postpetition rent must be reduced by the amounts of any excess, unapplied Security draws and applicable credits under the leases. If the Court is inclined to order further payment, the Debtors should be able to reduce their liabilities based on due improvement credits and excess LC draws.

## III.      Section 365(d)(3) Does Not Require the Remedy Movants Request.

58.      Even if this Court rejects the Debtors' rights to compel marshaling, recoupment, or setoff, and instead concludes the Debtors did not comply with section 365(d)(3), that provision still would not provide the Movants with the remedies they seek. In fact, the plain text of section 365(d)(3) provides no specific remedy for noncompliance, and courts interpreting this silence have reached dramatically different conclusions. The best-reasoned conclusion is that courts have broad discretion to fashion an appropriate remedy (if any). The weight of case law suggests that the Movants are, at most, entitled to an administrative claim paid *pari passu* with other administrative claimants—upon the effective date. This is particularly true where, as here, absent further financing, there is legitimate doubt about the Tenant SPVs' abilities to comply with section 1129(a) of the Bankruptcy Code.

---

*Bank of Annawan*, 163 Ill.2d 177 (Ill. 1994) (same); *Johnson v. City of Aberdeen*, 147 Wash. 482 (Wash. 1928); *Martin v. Wells, Fargo & Co.'s Express*, 28 P. 958 (Mem) (Ariz. Terr. 1892); *Fitzgerald v. Wiley*, 22 App. D.C. 329 (D.C. Ct. App. 1903) (same).

59.     The Movants disagree.  In their mind, this is a simple issue—section 365(d)(3) requires immediate cash payment of all lease obligations, no matter what, and everyone knows it.[29]  This view, while understandably pervasive among the landlord legal community, is wrong.  It has no basis in the plain text of section 365(d)(3) or the legislative history; it contradicts several canons of statutory construction and disregards Third Circuit and Supreme Court directives; and it contravenes other provisions of the Bankruptcy Code and undermines its core principles.

### A.     Legal Landscape Surrounding Section 365(d)(3).

60.     Section 365(d)(3) was enacted in 1984 to provide landlords with similar treatment to other administrative claimants.[30]  While seemingly simple, "deciphering § 365(d)(3) has been akin to navigating a freshly sown battlefield—like hidden mines, each clause construed has triggered considerable debate as to its intent and meaning."[31]  Just last month, an opinion observed as follows:

> Nearly every court characterizes unpaid § 365(d)(3) obligations as 'administrative claims' or 'administrative expenses' because those are the general terms used in bankruptcy law for fees incurred in administering the bankruptcy estate . . . .  But from that point of general agreement, courts have split in several different ways.

*In re Steepologie, LLC*, 2024 WL 117525, at *4 (Bankr. W.D. Tex. Jan. 10, 2024).

61.     Much of this disagreement concerns the appropriate remedy for noncompliance with section 365(d)(3), and courts have created several competing theories.  As an initial matter, several courts view Congress's silence as a grant of discretion to fashion an appropriate remedy.

---

[29]  *See, e.g.*, *Motion of Multiple Landlords to Compel Payment of Post-Petition Lease Obligations, Request for Adequate Protection and for Other Appropriate Relief* [Docket No. 1216 at ¶ 13] ("The plain language of Section 365(d)(3) and applicable case law require Debtors' immediate payment of the post-petition, pre-rejection obligations under the Lease.").

[30]  *See* Bankruptcy Amendments and Federal Judgeship Act of 1984; *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 817–18 (3d Cir. 2010) (Ambro, J.) *cert. denied sub nom.*, *Goody's Family Clothing, Inc. v. Mountaineer Property Co. II, LLC*, 560 U.S. 1064 (2010).

[31]  Joshua Fruchter, *To Bind or Not to Bind - Bankruptcy Code S 365(d) (3): Statutory Minefield*, 68 Am. Bankr. L.J. 437, 438, n.21 (1994) (describing the "numerous ambiguities that plague § 365(d)(3)").

*See, e.g.*, *In re Southwest Aircraft Services*, 831 F.2d at 854 ("We believe that Congress intended the bankruptcy courts to have the discretion to consider all of the particular facts and circumstances involved in each bankruptcy case and to decide whether the consequence of a violation of subsection (d)(3) should be forfeiture of the unassumed lease, some other penalty, ***or no penalty at all***." (emphasis added)), *cert. denied*, 487 U.S. 1206 (1988).[32]   But other courts have reached the opposite result, concluding section 365(d)(3) necessarily requires courts to award some form of priority payment.[33]

62.    Many courts view section 503(b) as the appropriate source of authority for any priority award, whereas other courts instead rely on section 365(d)(3) itself as a source of authority, sometimes in combination with section 363(c)(1).[34]   While a subset of these latter courts ordered immediate payment and/or awarded landlords with super-priority status above other priority claimants,[35] the "vast majority of courts have held that § 365(d)(3) does not create, *sub silentio*, an additional class of super-priority administrative claims."[36]   These courts, including the Fourth Circuit, represent a "large number of cases that require the lessor to stand in line with other administrative expense claimants" for which "the time of payment is within the discretion of the bankruptcy court."[37]   Courts frequently diverge on the appropriate process to obtain priority payment, with various decisions requiring: (a) full compliance with section 503(b)(1)(A),

---

[32]   *See also Matter of T & H Diner, Inc.*, 108 B.R. 448, 453 (D.N.J. 1989); *In re DBSI, Inc.*, 407 B.R. 159, 196 (Bankr. D. Del. 2009); [*In re J.T. Rapps, Inc.*, 225 B.R. 257, 263 (Bankr. D. Mass. 1998);] *In re Mr. Gatti's Inc.*, 164 B.R. at 943; *In re Tammey Jewels, Inc.*, 166 B.R. 292, 294-95 (Bankr. M.D. Fla. 1990); *In re Patella*, 102 B.R. 223 (Bankr. D.N.M. 1989).

[33]   *See, e.g.*, *In re Compuadd Corp.*, 166 B.R. 862 (Bankr. W.D. Tex. 1994).

[34]   *See In re Telesphere Comm's, Inc.*, 148 B.R. 525, 531–32 (Bankr. N.D. Ill. 1992).

[35]   *See id.*; *but see In re Virginia Packaging Supply Co., Inc.*, 122 B.R. 491, 495 (Bankr. E.D. Va. 1990) (holding "that administrative expenses arising from § 365(d)(3) obligations retain the same priority as assigned to all administrative expenses by § 507(a)," meaning they need not be paid until confirmation).

[36]   *Microvideo*, 232 B.R. at 605, *aff'd* 227 F.3d 474 (2d Cir. 2000) (per curium).

[37]   *Midway*, 406 F.3d at 241–42 (internal citations and alterations omitted).

27

including the need to establish an estate benefit and reasonable value;[38] (b) partial compliance with

section 503(b)'s general requirements of notice and a hearing, but not its remaining restrictions;[39]

or (c) no compliance with section 503 at all (i.e., an automatic priority claim for the full lease

amount, independent of section 503).

63.    Despite these divergences, the Third Circuit Court of Appeals has never directly

addressed the remedy for non-performance under section 365(d)(3).   The Third Circuit did,

however, squarely consider the interaction between sections 365(d)(3) and 503(b) in the context

of stub rent.  *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 818 (3d Cir. 2010) (Ambro, J.)

*cert. denied sub nom.*, *Goody's Family Clothing, Inc. v. Mountaineer Property Co. II, LLC*, 560

U.S. 1064 (2010).   That decision provided several important insights into the Third Circuit's

thinking.   First, the Third Circuit explained that "§ 365(d)(3) does not supplant or preempt

§ 503(b)(1)," *id.* at 818, thus foreclosing a common premise behind the "365(d)(3) administrative

claim" concept endorsed by some courts.   Second, the Third Circuit explained that

section 365(d)(3) primarily applies to leases where the debtor has vacated the premises but not yet

rejected the lease:

> The [legislative history] supports our conclusion that § 365(d)(3) does not cover
> the situation in our case.  [The debtor] never vacated the space.  On the contrary, it
> continued to occupy the Landlords' properties to conduct store-closing sales.  The
> purpose of § 365(d)(3) is to protect landlords from the burdensome requirements of
> § 503(b)(1) in securing payment from *non-occupying* debtors . . . .  When a debtor
> occupies post-petition non-residential space it leases, that § 365(d)(3) provides
> when the rent obligation arises does not erase when lessors may make § 503(b)(1)
> claims for the value conferred post-petition by that occupancy.[40]

---

38   *See, e.g.*, *In re Patella*, 102 B.R. at 225.

39   *See, e.g.*, *In re Midway Airlines Corp.*, 406 F.3d 229, 236 (4th Cir. 2005).

40   *Id.* (emphasis added).

64.     While Movants may claim their view is the majority (or only) view, "[t]he empirical foundation for the [asserted] majority characterization is not clear." *In re Steepologie, LLC*, 2024 WL 117525, at *5, n.36.

**B.      An Award of Immediate Payment Is Neither Required by Section 365(d)(3) nor Warranted by the Facts at Hand.**

65.     Section 365(d)(3) does not require any particular remedy for noncompliance, and the weight of authority indicates this Court has broad discretion to fashion (or decline to provide) a remedy for Movants, if appropriate. *See, e.g.*, *In re Southwest Aircraft Services*, 831 F.2d at 854; *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 946 (Bankr. W.D. Tex. 1994) ("Congress chose not to spell out the consequences of default under Section 365(d)(3), not because it believed that courts would somehow discern its intent to automatically allow an administrative or superpriority claim, but because it felt that the landlord's interest was now adequately protected by other provisions in the Code."). Thus, to the extent this Court even reaches these issues, it would be well within this Court's sound discretion to provide no remedy at all—particularly considering Movants' ability to draw upon their Security.

66.     Nevertheless, if this Court is inclined to award some form of priority payment, such award should be limited to an administrative claim payable under section 503(b) and governed by the terms of that provision (i.e., payable upon the plan effective date, *pari passu* with other administrative claimants). Any award of higher priority or earlier payment would be inconsistent with applicable law and inappropriate given the facts of these chapter 11 cases, as explained below.

**1.      Applicable Law Forecloses any Award of Immediate Payment or Superpriority.**

67.     While applicable caselaw is far from uniform, the best-reasoned opinions and recent trends strongly disfavor awarding immediate payment or superpriority as a remedy for noncompliance with section 365(d)(3)—particularly when facing uncertainty regarding a debtor's

ability to satisfy section 1129(a)(9), in which case immediate payment effectively provides superpriority status.  In fact, every circuit court to squarely consider the issue has rejected the immediate/superpriority award Movants request.[41]  As explained by these courts and others, the immediate/superpriority theory suffers from several fatal defects.  Two are particularly noteworthy.

68.    **First**, the superpriority theory reads section 365(d)(3) to provide administrative priority independent of sections 503(b) and 507—but that interpretation defies several canons of statutory construction as well as common sense.  "Section 507 of the Code establishes the order of priorities for various types of claims against the estate," including "administrative expenses allowed under section 503(b)."  *Midway* at 235; 11 U.S.C. § 507.  "Notably absent from the list of priorities is any reference to an independent § 365(d)[3] administrative expense."  *Midway* at 235.  This omission stands in stark contrast to other landlord claims, for which Congress expressly conferred administrative status in section 503.  *See* 11 U.S.C. § § 503(b)(7) (conferring administrative status upon section 365(g)(2)(A) claims).  These issues compound when considering the superpriority status advanced by this theory,[42] where courts "bestow super-priority

---

[41]    *See In re Midway Airlines Corp.*, 406 F.3d 229, 235 (4th Cir. 2005) [hereinafter "*Midway*"]; *In re Microvideo Learning Sys., Inc.*, 227 F.3d 474 (2d Cir. 2000) (per curiam), *affirming* 232 B.R. 602 (Bankr. S.D.N.Y. 1999) [hereinafter "*Microvideo*"].  Two points are worth noting.  First, while *Midway* technically considers section 365(d)(5) (then section 365(d)(10)), the relevant text of those provisions is the same, and courts frequently cite such cases interchangeably (absent narrow circumstances not present here).  *See* 406 F.3d at 234 ("Section 365(d)(10) is modeled on a very similar provision of the Code, § 365(d)(3) . . . .  As a result, in construing § 365(d)(10), courts often look to decisions construing § 365(d)(3).").  Second, in *Microvideo*, the Second Circuit did not write a new opinion; instead, it effectively adopted the bankruptcy court's opinion as its own, ignoring the district court altogether.  227 F.3d at 474 (("We affirm for the reasons stated by the Bankruptcy Court in *In re Microvideo Learning Systems, Inc.*, 232 B.R. 602 (Bankr. S.D.N.Y. 1999) (Gallet, Bankr. J.).").

[42]    *See Midway* at 241 ("[Landlord] it argues that a lessor who is allowed an administrative expense against the estate for unpaid lease obligations due under § 365(d)(10) is entitled to be paid before all other administrative expense creditors; in other words, the lessor's administrative expense claim has superpriority over other administrative expenses of the estate.  Second, [Landlord] argues that when a lessor is allowed an administrative expense pursuant to § 365(d)(10) and § 503(b), it is entitled to immediate payment.  We reject both arguments."); *Microvideo* at 607 (explaining how proponents of this theory "conclude that Congress must have intended to confer upon landlords a de facto super-priority administrative payment under § 365(d)(3)").

status on landlords' [section 365(d)(3)] claims"—even "though the Code is devoid of any such language." *Id.* "Yet, in the three other sections of the Code that confer such treatment, the statute is explicit." *Id.* (citing 11 U.S.C. §§ 507(b); 364(c)(1); 726(b)). "[A]s a matter of fundamental statutory interpretation, no super-priority status can be read into § 365(d)(3)," and the courts who do so "overlook[] a fundamental principle in statutory construction." *Microvideo* at 607.[43]

69.     Such defects are particularly problematic where, as here, they attempt to alter the Bankruptcy Code's bedrock priority scheme.  Movants' proposed alteration is illustrated in the

---

[43]     "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. U.S.*, 556 U.S. 568, 573 (2009) (cleaned up). "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001) (Scalia, J.); *see also Microvideo* at 607 (explaining that "congress knew how to grant super-priority status when that was the outcome it wanted" (cleaned up)); *In re Granada*, 88 B.R. 369, 373 (Bankr. D. Utah 1988) ("[P]riorities are fixed by Congress, and courts are not free to fashion their own rules of super-priorities or sub-priorities within any given priority class. That course belongs to Congress." (citations omitted)).

chart below, which compares the existing priority scheme (assuming a best-case scenario for the

Movants) vs. their proposed priority scheme:



70.    Had Congress intended such a stark departure from the existing priority scheme, it

would have done so expressly.  But Congress did not do so, and "provisions allowing preferences

must be tightly construed."  *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667

(2006).  Absent the consent of all parties, courts cannot eschew the ordinary priority scheme when

doing so could diminish recovery for many others who have not consented.  *Czyzewski v. Jevic*

*Holding Corp.*, 580 U.S. 451, 465 (2017).  To the extent the Movants argue otherwise, respectfully,

Congress has made a different judgment, and its silence in that regard is meaningful.

71.    **Second**, the immediate or superpriority theory propounded by the Movants is

inconsistent with several other provisions of the Bankruptcy Code—contrary to the "'cardinal rule

that a statute is to be read as a whole,' in order not to render portions of it inconsistent or devoid

of meaning."  *Zayler v. Dep't of Agric. (In re Supreme Beef Processors, Inc.)*, 468 F.3d 248, 253

(5th Cir. 2006) (en banc) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 n.7 (2003))).[44]  For example, upon conversion to chapter 7, section 348(d) transforms pre-conversion administrative expenses into prepetition claims, except for "claim[s] specified in section 503(b)," which retain their administrative priority but are subordinated to post-conversion administrative claims.  *See* 11 U.S.C. § 348(d); *Midway* at 238–39.  Thus, if landlords receive post-petition rent claims under section 365(d)(3)—rather than section 503(b)—then upon conversion to chapter 7, either their "superpriority" claims would be treated as prepetition unsecured claims or the bankruptcy court would need to award payment in direct violation of section 348(d) and the Code's priority scheme.  *See Midway* at 239.

72.    Similar problems arise regarding the "the perplexing task of deciding whether this super-priority treatment is superior to, or inferior to, the explicit super-priority classes." *Microvideo* at 608; *see also* 11 U.S.C. §§ 507(b); 364(c)(1); 726(b).  In addition, an "administrative claim" arising from section 365(d)(3) would have no place in section 1129(a)(9), which requires certain treatment for administrative priorities in section 507(a) (including section 503(b))—but nowhere mentions section 365(d)(3).  *See* 11 U.S.C. § 1129(a)(9).  In other words, a chapter 11 plan could be confirmed despite providing no recovery to "superpriority" administrative claims arising under section 365(d)(3).[45]  If that is the Movants' preference, the Debtors will not object.  But that cannot be the law, whether Movants admit it or not.

---

[44]    Under the harmonious-reading canon of statutory construction, "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012).

[45]    While sections 1129(a)(1)-(3) impose general confirmation requirements, caselaw clearly confines those requirements to circumstances outside rent payment.  *See* 7 Collier on Bankruptcy P 1129.02[1] (16th 2023) (explaining that, under section 1129(a)(1), "the applicable provisions are those governing the plan's internal structure and drafting . . . such as section 1122 and 1123, governing classification and contents of plan"); *id.* at 1129.02[2] (explaining that, under section 1129(a)(2), the courts "focus[] on compliance by the plan proponent with the disclosure and solicitation requirements of sections 1125 and 1126").

73.     Finally, many of the foregoing concepts are exacerbated by—but do not depend entirely upon—a chapter 11 debtor's eventual ability to comply with section 1129(a)(9).  As such, some courts presume the presence of that risk unless the movant establishes that the estate will be able to satisfy all future administrative claims in full.[46]  And while other courts express no position on which party bears the burden on the issue, most courts treat any uncertainty as a significant factor weighing against immediate payment, unless they already adhere to the superpriority theory critiqued above.[47]

## 2.     The Facts Do Not Support An Award of Immediate Payment.

74.     Even if immediate or superpriority awards for noncompliance could be appropriate in some cases, such awards are inappropriate in these chapter 11 cases—particularly now, when such awards would risk seriously undermining the Debtors' prospects for a successful reorganization.  These cases are at a critical juncture.  In addition to heated negotiations with most landlords, the Debtors are also actively raising a new money DIP facility and negotiating its implications with existing secured lenders, who not only have consent rights under the RSA but are also key supporters of the Debtors' use of cash collateral.  All of these dynamics are critical to the success of the Debtors' reorganization, and none of them would benefit from an order requiring immediate (or superpriority) payment of millions of dollars in dwindling cash to a handful of landlords impeding the process.

---

[46]     *See, e.g.*, *In re Orient River Investments*, 112 B.R. at 134 ("[A] landlord will not be allowed immediate payment of rentals due under a lease in effect during the period between the bankruptcy filing and rejection or assumption of a lease unless it establishes that there is a likelihood that the debtor will pay all administrative claims in full.").

[47]     *See, e.g.*, *Midway*, at 241(ordering the "lessor to stand in line with other [administrative expense] claimants" where it was "not clear from the record whether the estate in this case is administratively insolvent," and noting that "[i]f it is [administratively insolvent], then [the landlord] must bear its proportional burden"); *see also In re Burival*, 613 F.3d 810, 812 (8th Cir. 2010), *In re Simbaki, Ltd*, 2015 WL 1593888, at *4 (Bankr. S.D. Tex. Apr. 3, 2015); *In re Lakeshore Const. Co. of Wolfeboro, Inc.*, 390 B.R. 751, 761 (Bankr. D.N.H. 2008).

75.     More importantly, at this time, without successfully raising a new money DIP facility there is a material risk that the Debtors may be unable to comply with section 1129(a) of the Bankruptcy Code.   Until the Movants are able to demonstrate that the Debtors will affirmatively be able to comply with that provision, their requests for relief are nothing more than demands for superpriority status vis-à-vis other administrative claimants.   While the Debtors are optimistic that they will be able to raise the new money DIP financing necessary to pay all allowed administrative claims in full, that deal is premised on the Debtors making the very progress toward a rational lease portfolio that the Movants seek to impede.

76.     Many of the Movants have made similar points at one time or another, often in connection with their concerns regarding payment of stub rent and related issues.   Some of them even imply as much in their Motions.   And none of them have even attempted to show that the Debtors are positioned to comply with section 1129(a) at the conclusion of these chapter 11 cases. Absent such a showing, the Movants are not entitled to an immediately payable administrative claim for unpaid rent.   And this Court should not provide one.   As the Fourth Circuit instructed in *Midway*, most courts confronting these issues "require the lessor[s] to stand in line with other administrative expense claimants" and wait "until confirmation of a plan or the distribution in a liquidation" before receiving payment.[48]   If this Court is inclined to award some form of priority

---

[48]   *Midway*, 406 F.3d at 241–42 (internal citations and alterations omitted).   The fact that other landlords received payment of postpetition rent does nothing to undermine this conclusion. *First*, those payments can be viewed as timely payment of ordinary course expenses under section 363(c)(1) rather than early payment of administrative claims under section 503(b), and the fact that non-payment of ordinary course expenses can give rise to administrative claims does not transform the former into the latter. *See, e.g.*, *In re Steepologie, LLC*, 2024 WL 117525, at *4 (Bankr. W.D. Tex. Jan. 10, 2024).   *Second*, even if other landlords were paid as administrative claimants, "the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court." *Varsity Carpet Services, Inc. v. Richardson (In re Colortex Industries, Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994); *see also Midway*, 406 F.3d at 242 (explaining that "bankruptcy courts have wide latitude" regarding timing of payment of administrative expenses); *In re Glob. Home Prod., LLC*, No. 06-10340 KG, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).   This Court would be well within its discretion to approve early payment to other landlords given their cooperation with the Debtors (unlike the Movants). *Finally*, the Movants

payment, it should adhere to that approach.  At best, any monetary award should be confined to

section 503(b) and governed by its terms—payments no sooner than the plan effective date, *pari*

*passu* with other administrative claimants.  Either way, the Motions should be denied.

### C.     The Movants' Other Requested Remedies Are Inappropriate Here.

77.     The Movants seek a number of alternative remedies including (1) recovery of

attorney's fees, (2) payment of penalty interest rates, (3) payment of stub rent, and (4) provision

of adequate protection.  The Court should likewise deny these requests.  ***First***, the Movants are not

entitled to attorney's fees either as a matter of law or fact.  Attorney's fees are not within the ambit

of section 365(d)(3).  Even if they were, the Movants have not tried *at all* to show that the fees

they seek are reasonable or necessary, or that they were incurred enforcing the lease rather than in

connection with the rest of the bankruptcy.  ***Second***, the Movants seek penalty interest rates that

section 365(b)(2)(D) expressly bars.  ***Third***, prevailing Third Circuit law prohibits payment of stub

rent under section 365(d)(3), and instead requires landlords to establish their entitlement to

administrative priority under section 503(b).  The Movants have not done so, and even if they had,

any such amounts would be paid at the end of the case.  ***Fourth***, many courts conclude landlords

are not entitled to seek adequate protection as a matter of law, and even if they were, the Movants

already have adequate protection in the form of their Security.  Given the foregoing, and as set

forth herein, the alternative relief sought by the Movants should be denied.

### 1.     The Movants Cannot Establish Entitlement to Attorney's Fees.

78.     The Movants' request for attorney's fees should be denied for several reasons.

***First***, the movants are not entitled to attorney's fees under section 365(d)(3).  The plain text of

section 365(d)(3) clearly indicates that Congress intended only to include postpetition rental

---

can only assert claims against largely unprofitable Tenant SPVs, whereas other landlords receive payment from
different Debtor entities in different financial positions; the latter has no bearing on the former.

36

payments and other similar charges in its ambit.  *In re Gantos, Inc.*, 181 B.R. 903, 908 (Bankr. W.D. Mich. 1995) (finding that absent prior, willful disregard of court orders, no case law allows the payment of attorney's fees as part of a section 365(d)(3) claim).  ***Second***, the Movants must demonstrate that any amounts to be recovered from the Debtors' estate as attorney's fees are "reasonable," which is treated as a question of fact.  An attorney fee award cannot be granted without that showing.  *See In re Pelican Pool & Ski Center, Inc.*, 2009 WL 2244573 at *16 (D. N.J. Jul. 27, 2009); *In re Beltway Medical, Inc.*, 358 B.R. 448, 453 (Bankr. S.D. Fla. 2006).  Here dozens of motions with even more exhibits have been filed and not one Movant has even sought to show reasonableness.

### a.   Section 365(d)(3) Does Not Cover Attorney's Fees.

79.   Courts have determined that attorney's fees are not due to landlords pursuant to section 365(d)(3) on two key grounds.  ***First***, by its express terms, section 365(d)(3) does not provide for the assessment of attorney's fees.  *In re Van Fleet*, 383 B.R. 782, 796 (Bankr. D. Colo. 2008).  Instead, the use of the word "timely" prior to "perform" shows that Congress intended to include only those obligations that accrued on a regular, scheduled basis, like rent, late charges, and other similar fees, but not contingent obligations like attorney's fees.  *In re Pudgie's Dev. of NY, Inc.*, 202 B.R. 832, 837 (Bankr. S.D.N.Y. 1996).  ***Second***, because an obligation to reimburse attorney's fees stems from a prepetition lease, it is not an obligation which arises "from and after the order for relief," and therefore is not entitled to timely performance under section 365(d)(3). *In re Pac. Arts Publ'g, Inc.*, 198 B.R. 319, 324 (Bankr. C.D. Cal. 1996).

80.   The Movants invite this Court to both accept a significant departure from the ordinary priority scheme of chapter 11 and to disregard the natural implication of "timely" in the statute.   That invitation should be declined.   The use of the adverb "timely" to condition performance in the relevant portion of section 365(d)(3) ("[t]he trustee shall timely perform all the

obligations of the debtor") is meaningful only with respect to obligations that arise periodically. Specifically rent and certain shared utility charges are obligations paid in a timely manner according to a set schedule and on specific due dates. Conversely, such modifier is meaningless as to attorney's fees which "may fortuitously arise before or after the time period in question." *Pudgie's Dev.*, 198 B.R. at 837. Further, and as noted elsewhere in this Objection, if section 365(d)(3) is interpreted so as to result in a departure from the normal priority scheme contained within the Bankruptcy Code, any implications of such an interpretation should be strictly construed. *Id.* If Congress intended to create a superpriority category of payment for fees incurred in connection with lease disputes, it would have said so. Instead, both in section 365(d)(3)'s text and in its statements surrounding section 365(d)(3)'s passage, Congress has been consistent that it applies to periodic payments. *See* 130 Cong.Rec. S8894, S8895 (daily ed. June 29, 1984) (statement of Sen. Hatch) ("[t]his timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease."); *accord In re Goody's Family Clothing Inc.*, 610 F.3d 812.

81.     The attorney's fees sought by the Movants would be compensation for an alleged breach of a prepetition lease by the Debtors. However, section 365(d)(3) only requires timely performance of obligations where they are "arising from and after the order for relief." 11 U.S.C. § 365(d)(3); *see Pac. Arts Publ'g.*, 198 B.R at 324. Because the Movants attorney's fees are being incurred due to the alleged breach of a prepetition lease, they do not "arise from" the Debtors' bankruptcy cases.

          **b.**      **The Movants Fail to Demonstrate that Their Requested Fees Are Reasonable.**

82.     For a creditor to establish their entitlement to attorney's fees, the burden is squarely on the Movants to show that such fees are reasonable. *See, generally, In re West Electronics, Inc.*,

158 B.R. 37, 40 (Bankr. D.N.J. 1993); *In re Stanwood Devries, Inc.*, 72 B.R. 140, 141 (Bankr. D.N.J. 1987).  This requirement is contained in many of the leases as well.  Even where it is not, in order to protect the estates from needless diminution, courts exercise their inherent powers to review requested fees for reasonableness.  *See Beltway Medical*, 358 B.R. at 453 ("[A]ny request for attorney's fees must be reviewed for reasonableness.").

83.     Even where a court has granted an award of attorney's fees to a movant enforcing section 365(d)(3), the court will still conduct a searching inquiry as to the necessity of each service for which the estate is being billed.  *Pelican Pool & Ski Center*, 2009 WL 2244573 at *16 ("[A] fee award is limited to those charges that are reasonable under the circumstances.").  This has resulted in courts reducing such fee awards by thousands of dollars for tasks it deemed unreasonable.  *See Beltway Medical*, 358 B.R. at 455 (reducing an attorney fee award by thousands of dollars where the court deemed work repetitive and overstaffed).  The issue of reasonableness is a factual question that must be proven by the Movants.  *See Pelican Pool & Ski Center*, 2009 WL 2244573 at*16 (withholding an award of attorney's fees until such fees had been certified as reasonable).  An award of attorney's fees cannot be approved on their mere assertion; instead, the Movants must affirmatively prove that the fees they seek to charge are reasonable.  Because no Movant has put forth any evidence as to the reasonableness of their asserted attorney's fees, their requests must be denied.

      **2.     The Bankruptcy Code Expressly Precludes the Kind of Penalty Rates or Provisions the Movants Seek to Apply.**

84.     Certain of the Movants have asked this Court to peek into the Debtors' comparatively shallow pocket and apply usurious rates (ranging, in some instances, well above

12%).[49]  The Bankruptcy Code protects debtors from such a shakedown.  By its express terms, section 365(d)(3) absolves the Debtors from needing to perform obligations "specified in section 365(b)(2)," which precludes "the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease."  11 U.S.C. §§ 365(d)(3), 365(b)(2)(D).  The interest rates asserted by the Movants are charged as a penalty for nonperformance of periodic charges.  Accordingly, they are a penalty rate or provision such that they are prohibited by the Bankruptcy Code.  As a matter of law, Movants are not entitled to recover such fees.

> **a.    Section 365(b)(2)(D) Precludes Payment of Penalty Rates or Provisions, Even When Monetary.**

85.    By its plain terms, section 365(b)(2)(D) precludes the application of any penalty rates.  Courts have found that 365(b)(2)(D)'s carve out applies to penalty rates imposed for a breach of a monetary obligation.  *In re Mirant Corp.*, 2004 WL 5643668 at *4 (Bankr. N.D. Tex. Sept. 15, 2004) ("[S]ection 365(b)(2)(D) will aid Debtors only if the obligation to pay Alternative Rent arises either as the cure of a non monetary default or is, to the extent of the difference from Periodic Rent, a penalty."); *see also, In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1034 (9th Cir. 1997) (clarifying that Congress intended subsection (D) to address a single issue: the payment of penalties where "the first clause addresses penalty rates which are commonly imposed where a debtor's breach was monetary in nature."); *In re GP Exp. Airlines, Inc.*, 200 B.R. 222, 233 (Bankr. D. Neb. 1996) ("The statutory term 'rate' refers to interest rate, in my view . . . . This suggests that subsection (D)'s reference to 'penalty rate' has reference to the interest rate payable on a monetary obligation").  With the addition of 365(b)(2)(D) in the Bankruptcy Reform Act of

---

[49]    Absent any other issues, usurious rates are not permitted.  *See, e.g.*, *In re Donnay*, 184 B.R. 767 (Bankr. D. Minn. 1995).

1994, Congress stated that the purpose of Section 365(b) was to clarify that "a lease can be cured at a nondefault rate (i.e., it would not need to pay penalty rates)." 5 U.S. Congressional & Administrative News at 3357 (1994) (H.R. No. 103-835 (1994). In short, the statutory text, applicable case law, and legislative history indicate that Debtors need not pay penalty interest rates under section 365(d)(3).

### b.     The Proposed Interest Is a Prohibited Penalty Rate.

86.     In determining whether a default interest rate is a penalty rate, courts have found that an interest rate that is meant to coerce payment, rather than to compensate for the administrative costs of a delay, is a penalty. *In re Timberline Property Development*, 136 B.R. 382, 386 (Bankr. D.N.J. 1992) (finding a clause providing for a 3% increase upon default was an unenforceable penalty where it was designed to induce payment); *In re Zamani*, 390 B.R. 680, 688 (Bankr. N.D. Ca. 2008) (declining to allow a default rate of 5% over the basic contract rate because the bank failed to establish the compensatory nature of the default interest rate). As a result, case law varies on the exact amount required. In *Mirant*, the Court found that a requirement to pay alternative rent, resulting in only a 0.5% rental increase, could qualify as a penalty provision under 365(b)(2)(D). *In re Mirant Corp.*, 2004 WL 5643668 at *4 (Bankr. N.D. Tex. Sept. 15, 2004). Here, of course, the rates requested by the options range between two and six times as punitive of these penalty rates, meaning they constitute "penalty rates" under section 365(b)(2)(D).

87.     Two lines of cases exist that allow significant penalty rates, but neither one applies here. First, prior to the enactment of section 365(b)(2)(D), courts allowed very high interest rates.[50]

---

[50]     The Court in *In re Entertainment* allowed the landlord to collect an 18% default interest rate, but in doing so cited cases in support that were pre-1994, before 365(b)(2)(D) existed, and did not address whether 365(b)(2)(D) applied. 223 B.R. 141, 150-51 (Bankr. N.D. Ill. 1998).

Second, courts are more willing to enforce default rates when the debtor is solvent.[51]   Here, however, the statute has been amended to prohibit such penalty rates and thus the pre-1994 cases are patently unpersuasive, and the Movants have provided precisely zero evidence that the Tenant SPVs are solvent.    Accordingly, the penalty rates sought by the Movants, while perhaps permissible three decades ago, are of the sort that are now statutorily disallowed.

<h3 style="text-align:center;">c.      Public Policy Further Limits Payment of Penalty Rates.</h3>

88.      In its seminal opinion in *Bankvest*, the First Circuit observed that not allowing for the payment of default interest serves to maximize creditor recoveries by preventing a lopsided recovery to certain favored creditors.    Such construction of section 365(b)(2)(D) furthers the overarching goals of Chapter 11 to facilitate reorganization and maximize creditor recoveries. Even courts which do allow penalty rates acknowledge that doing so is at odds with the Bankruptcy Code's purpose which "would be promoted by reading §365(b)(2)(D) to excuse payment of default interest, because default interest provisions can operate in a fashion similar to *ipso facto* clauses: if sufficiently extreme, they can be impossible for a debtor to cure." *In re Golden Seahorse LLC,* 652 B.R. at 615 (citing Brubaker, *Default Rates of Interest, Part II,* at 2 & n 7).

89.      Here, the Movants ask this court not only to compel penalty rates in contravention to the Bankruptcy Code, but to do so as a superpriority claim payable today at the expense of the recoveries of others.  This is even more unconscionable where, as here, the Movants' claims should be reduced by their own corresponding obligations to the Debtors or otherwise called upon the Security available to them.  Instead, they ask this Court to increase the quantum of their claim unduly.  That invitation should be declined both as a matter of law and policy.

---

[51]    *See In re John Q. Hammons Fall 2006, LLC,* 612 B.R. 779, 801-02 (Bankr. D. Kan. 2020) (finding default rate that was 5% higher than normal contract was not an unenforceable penalty where the estate was solvent).

### 3.    The Movants Are Not Entitled to Stub Rent at this Time.

90.    Several Movants demand immediate payment of rent due for the period from November 6, 2023 to November 30, 2023 (such rent, "Stub Rent"), but they are not entitled to such relief under Third Circuit law.  To the contrary, the Third Circuit has made clear that section 365(d)(3) does not apply to Stub Rent, and landlords can only obtain such payments by carrying their burden under section 503(b) like every other administrative claimant.  The Movants have not done so, meaning their request for Stub Rent must be denied.

91.    Under the Third Circuit's "billing date" approach, section 365(d)(3) only applies to rent that comes due after the petition date.  *In re Montgomery Ward Holding Corp.*, 268 F.3d at 211.  In other words, the Debtors are not required to pay November Stub Rent under section 365(d)(3) as a matter of law in this circuit.  While landlords may still seek payment of Stub Rent as a general administrative claim under section 503(b), the Third Circuit has made clear that landlords would need to satisfy the strict standards of that provision:

> For a commercial lessor's claim to get administrative expense treatment under § 503(b)(1), the debtor's occupancy of the leased premises must confer an actual and necessary benefit to the debtor in the operation of its business.  Proving this is the lessor's burden.  Thus, the Landlords must carry the heavy burden of demonstrating that the 'stub rent' for which they seek payment provided an actual benefit to the estate and that incurring 'stub rent' was necessary to preserve the value of the estate assets.

*In re Goody's Family Clothing Inc.*, 610 F.3d at 818 (citations, quotations, brackets, and ellipses omitted).

92.    No Movant has even attempted to establish the estate benefit necessary to earn an administrative claim under this standard, so their request for Stub Rent should be denied outright.

93.    Yet even if such Movants were entitled to Stub Rent, they certainly would not be entitled to payment today.  Administrative claims are generally paid upon emergence; and while the timing of such payments is within the Court's discretion, a claimant must show "necessity" to

43

qualify for "exceptional immediate payment." *In re Global Home Products, LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (denying request for immediate payment where debtors would "suffer a substantial hardship").  Courts in this circuit weigh three factors when considering immediate payment of administrative expenses:  (1) the prejudice to the debtors; (2) the hardship to the claimant; and (3) the potential detriment to other creditors.  *See In re Garden Ridge Corp.*, 323 B.R. 135, 143 (Bankr. D. Del. 2005).  In applying this test, Courts generally defer to a debtor's business judgment and have generally declined to require immediate payment of stub rent in similar circumstances.  *See In re Goody's Family Clothing, Inc.*, 392 B.R. 604, 617 (Bankr. D. Del. 2008) (explaining that an "equal distribution among creditors" does not require simultaneous distribution), *aff'd* 401 B.R. 656 (D. Del. 2009), *aff'd* 610 F.3d 812 (3d Cir. 2010).

94.     The application of these factors weighs strongly against requiring the immediate payment of the stub rent.  *First*, immediate payment of the stub rent will prejudice the Debtors because it will negatively impact the Debtors' already strained balance sheet.  *Second*, the immediate payment of Stub Rent may diminish recoveries to other administrative claimants where, as here, the Movants have not shown the Debtors will be able to comply with section 1129(a).  *Third*, even if the Movants *had* shown that all administrative claims would be paid in full, to compel immediate payment of the Stub Rent, the Movants must also show that they will face some harm if they do not receive such payment.  *In re Continental Airlines, Inc.*, 146 B.R. 520, 531 (Bankr. D. Del. 1992).  Instead, the Movants are being asked to bear no greater burden than holders of all types of administrative claims bear in every chapter 11 case.  *Fourth*, paying the Stub Rent now will prejudice other creditors, as it would favor Landlords over other administrative creditors that hold administrative expense claims, disrupting the goal of an orderly and equal distribution

among similarly situated creditors.  *See, e.g., In re Global Home Prods., LLC*, 2006 Bankr. LEXIS

*3608, at *10-11 (Bankr. D. Del. Dec. 21, 2006).  For these reasons, the Movants fail to establish

that they meet any of these factors.

### 4.    The Movants Seeking Adequate Protection Already Have It.

95.    Certain Movants re-style their demand for immediate cash payments as a request

for adequate protection under section 363(e),[52] but that request must fail as well.  As an initial

matter, courts in this Circuit and elsewhere have held that landlords are not entitled to adequate

protection of postpetition rent payments as a matter of law.  *See, e.g.*, *In re Wheeling-Pittsburgh*

*Steel Corp.*, 54 B.R. 385, 390 (Bankr. W.D. Pa. 1985) ("[L]essors are not entitled to adequate

protection pending the lessee's decision to assume or reject."); *see also In re Café*

*Partners/Washington 1983, A New York Ltd. P'ship*, 81 B.R. 175, 180 (Bankr. D.D.C. 1988); *In*

*re Sweetwater*, 40 B.R. 733 (Bankr. Utah 1984).[53]    While Congress subsequently amended

section 363(e) to give personal property lessors the right to request adequate protection (exclusive

of stay relief), it declined to do so for real property lessors like the Movants.  11 U.S.C. § 363(e).

And although the Third Circuit has observed "the split in authority regarding whether a lessor is

entitled to adequate protection under section 363(e)," it has never resolved it.  *See In re Rickel*

*Home Centers, Inc.*, 209 F.3d 291, 303 (3d Cir. 2000) (citing Lee R. Bogdanoff, *The Purchase and*

*Sale of Assets in Reorganization Cases—of Interest and Principal, of Principles and Interests*, 47

Bus. Law. 1367, 1425 n. 215 (1992)).

---

[52]    *See* Docket Nos. 1213, 1216, 1303.

[53]    While Congress subsequently amended section 363(e) to give personal property lessors the right to request adequate protection (exclusive of stay relief), it declined to do so for leases of real property (whether nonresidential or otherwise).  11 U.S.C. § 363(e).  While the Third Circuit has observed controversy on this point, it has never resolved it.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 303 (3d Cir. 2000) ("We are aware that '[t]he application of Code § 363 ... to executory contracts is not without controversy.'" (quoting Lee R. Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—of Interest and Principal, of Principles and Interests*, 47 Bus. Law. 1367, 1425 n. 215 (1992))

96.     Even assuming real property lessors could request adequate protection under section 363(e), they already have it.  While the Bankruptcy Code does not define "adequate protection," courts in this Circuit generally employ a flexible standard, only disapproving where the proposed protection is so speculative in nature that it could not reliably protect the creditor. *Rocco v. J.P. Morgan Chase Bank*, 255 Fed.Appx. 638, 641 (3d Cir. 2007).  In this instance, the Movants requesting adequate protection hold Security that is accessible on demand, fully cash collateralized, and backed by the biggest banks in the world.  Collectively, their Security exceeds $56 million, while the January rent they request is approximately $4 million.[54]  Such Security is ironclad, and no creditor could ever be entitled to anything more.  Accordingly, Movants are not entitled to additional adequate protection beyond what they already hold.

## IV.     The Debtors Request the Movants Comply with Bankruptcy Rule 2019.

97.     Merits aside, many of the Motions can be denied for the simple reason that the relevant attorneys declined to comply with Bankruptcy Rule 2019 ("Rule 2019"), which plainly requires such attorneys to file verified statements disclosing the identities and economic interests of their clients, and authorizes this Court to "refuse to permit [the Movants] to be heard" or "grant other appropriate relief" for "failure to comply" with the rule.  Fed. Rule Bankr. P. 2019(e).

98.     Rule 2019 is a rule of disclosure which ensures that all parties are apprised of the identities and relevant economic interests of participants in a bankruptcy case. *See In re Washington Mut., Inc.*, 419 B.R. 271, 277 (Bankr. D. Del. 2009).  This disclosure provision was "designed to ensure that lawyers involved in the Chapter 11 reorganization process adhere to certain ethical standards and approach all reorganization related matters openly and subject to the

---

[54]     The same pattern is true for each individual Movant that has a pending Motion requesting adequate protection. *See* **Exhibit A**; Docket Nos. 1213, 1216, 1303.

scrutiny of the court."  *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 165 (D.N.J. 2005).  To that end, "Rule 2019(a) requires entities, *including counsel*, who would represent in a chapter 11 case more than one creditor, to file a verified statement . . . ."  *In re Muralo Co., Inc.*, 295 B.R. 512, 524 (Bankr. D.N.J. 2003).[55]  In this context, the term "'represents' means to take a position before the court," among other things.  Fed. R. Bankr. P. 2019(a)(2). Once triggered, the rule requires disclosure of not only basic identifying information, but also "the nature and amount of each disclosable economic interest held in relation to the debtor."  Fed. R. Bankr. P. 2019(c)(2)(B), (c)(3)(B).  Thus, applicable attorneys and their clients must disclose "any economic interest that could affect the legal and strategic positions a stakeholder takes in a chapter 9 or chapter 11 case."  Fed. R. Bankr. P. 2019 Advisory Committee Notes.  Courts considering Rule 2019 have concluded "there is no basis for failure to apply it as written," and noted "there is no shortage of cases applying it."  *In re Northwest Airlines Corp.*, 363 B.R. 701, 704 (Bankr. S.D.N.Y. 2007).[56]

99.    Notably, Rule 2019 also requires disclosure of all fee-sharing and co-counsel arrangements among attorneys—a conclusion reached by several courts considering the prior version of Rule 2019, and a result required by the text of the rule today.[57]  Under the prior (narrower) version, several courts concluded that "fee sharing, co–counsel and referral

---

[55]    *See also* Fed. R. Bankr. P. 2019(b) ("[A] verified statement . . . shall be filed by . . . every entity that represents[] multiple creditors . . . that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another.")

[56]    *See also In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 739–40 (D. Del. 2018) (describing "a series of [Third Circuit] 2019 Orders," pursuant to which "lawyers representing multiple claimants were required to file 2019 Statements"), *aff'd sub nom. In re A C & S Inc*, 775 F. App'x 78 (3d Cir. 2019); *Muralo*, 295 B.R. at 524; *In re Pittsburgh Corning Corp.*, 2005 WL 6128987, at *2 (W.D. Pa. Sept. 27, 2005) ("[E]verybody who contends that they represent a creditor in the case and represents more than one, must comply with this rule. Period, end of story." (quoting Aug. 27, 2004 Hr'g Tr., *In re Pittsburgh Corning Corp.*, Case No. 00-22876 (Bankr. W.D. Pa. Aug. 27, 2004))), *aff'd*, 260 F. App'x 463 (3d Cir. 2008).

[57]    In 2011, Rule 2019 was "substantially amended to *expand* the *scope* of its coverage *and* the *content* of its disclosure requirements."  Fed. R. Bankr. P. 2019 Advisory Committee Notes (emphasis added).

relationships (and the potential conflicts of interest that may arise therefrom) are indeed 'pertinent facts and circumstances in connection with the employment of the entity,'" meaning the "precise nature of these relationships falls well within the literal language of the Rule." *Baron & Budd*, 321 B.R. 147, 167 (D.N.J. 2005) (citing Fed. R. Bankr. P. 2019(a) (pre-2011 amendment)).[58]  The same is true under the current (broader) version of Rule 2019, which not only retained the same language courts previously relied on to compel disclosure of such relationships, but also expanded required disclosures to encompass any "disclosable economic interest." Fed. R. Bankr. P. 2019(c).

100.    Several attorneys filed joint Motions on behalf of numerous landlords,[59] and other attorneys filed multiple (identical) Motions on behalf of individual landlords[60] requesting the same relief.  In either case, such Movants are requesting the same relief through the same counsel, meaning they are "acting in concert" for purposes of Rule 2019.  These attorneys also appeared before this Court on February 5 and touted these representations, but declined to disclose or verify the details.  *See* Feb. 5, 2024 Hr'g Tr. at 33:23-24 ("And remember I represent more people than these seven [landlords]."); *id.* at 41:9-12, 42:12-13.

101.    The Debtors and the Court need to understand the network of such landlord-attorney relationships, the identities and incentives of the ultimate decisionmakers, and the

---

[58]    *See also In re Congoleum Corp.*, No. 03-51524, 2005 WL 712540, at *4 (Bankr. D.N.J. Mar. 24, 2005) ("On September 2, 2004, this court entered an order [under Rule 2019] that required [Motley Rice] to produce 'a list and a detailed explanation of any type of co-counsel, consultant or fee-sharing relationships and arrangements whatsoever.' ('2019 order')  [Motley] Rice requested a stay pending appeal of the 2019 order which the court denied.  Despite that, Rice did not comply with the 2019 order.  Judge Chesler affirmed the 2019 order on appeal and Judge Chesler denied a stay of his order.")

[59]    *See* Docket No. 1213 (joint Motion filed by Kelley Drye & Warren LLP on behalf of two landlords); Docket No. 1216 (joint Motion filed by Kelley Drye & Warren LLP and Allen Matkins Leck Gamble Mallory & Natsis LLP on behalf of nine landlords); Docket No. 1238 (joint Motion filed by Walsh Pizzo O'Reilly Falanga LLP on behalf of three landlords).

[60]    *See* Docket Nos. 1147, 1148 (individual Motions filed by Sills Cummis & Gross P.C. requesting identical relief for two landlords); Docket Nos. 1180, 1193 (individual Motions filed by Dorsey & Whitney LLP requesting identical relief for two landlords); Docket Nos. 1256, 1303 (individual motions filed by Greenberg Traurig, LLP requesting identical relief for two landlords).

disclosable economic interests involved—including any mortgages or cash sweeping rights held by the landlords' lenders.  Rule 2019 requires such disclosures, and this Court should enforce it.

**V.        The Debtors Are Willing to Mediate Lease Issues.**

102.    This Court previously noted the importance of accelerating business discussions regarding lease issues.  Feb. 5, 2024 Hr'g Tr. at 63:1-3.  The Debtors agree strongly and have been working around the clock to negotiate lease amendments with their landlords.  Given the complex and layered issues presented by the Motions and the Debtors' defenses thereto, the Debtors see meaningful value in mediation, and would support entry of an order directing mediation of these issues with the Movants and related parties in interest—including their lenders.

## Conclusion

103.    For the reasons set forth herein, the Motions should be denied.  The Debtors must not be compelled to diminish their estates before (a) marshaling or other equitable relief pursuant to section 105(a) is provided, (b) their statutory and common law rights to setoff and recoupment may be applied, (c) a determination regarding a remedy with respect to 365(d)(3) claims is made, (d) the Movants first look to the Security for adequate protection, and (e) counsel to the Movants complies with the clear and unequivocal mandate of Rule 2019.  Even if the Court finds that the Debtors have breached, compelling payment at this time is unwarranted on the facts of this case.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, for the reasons set forth herein, the Debtors request that the Court deny

the Motions.

Dated: February 13, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## <u>Exhibit A</u>

**Rent Support by Movant**

| Movant Short Name | Docket No. | Motion Status[1] | Jan. Rent Deferred[2] | Security Drawn | Security Remaining |
|---|---|---|---|---|---|
| Pea Green Owner | 1129 | Withdrawn | $229 | - | - |
| CIO Terraces | 1147 | Pending | $257 | | |
| CIO Block, 23 | 1148 | Pending | $129 | $2,000 | $1,000 |
| 600 California Owner | 1177 | Pending | $1,470 | - | - |
| Esplanade Owner | 1180 | Pending | $192 | $500 | - |
| 729 Washington Property | 1193 | Pending | $321 | - | $1,432 |
| T-C 501 Boylston Street | 1213 | Withdrawn | $539 | - | $619 |
| T-C 33 Arch Street | 1213 | Withdrawn | $554 | - | $694 |
| 655 New York | 1216 | Withdrawn | $748 | - | - |
| BSREP II SJ Towers | 1216 | Pending | $230 | $360 | $2,801 |
| 400 Concar Dr | 1216 | Pending | $736 | - | $5,955 |
| Madison-OFC 5161 CA | 1216 | Withdrawn | $171 | - | $872 |
| Riverpark Tower I | 1216 | Pending | $416 | - | $468 |
| SOF-Dearborn, L.P. | 1216 | Withdrawn | $266 | - | - |
| SOF-XI PCT Single Tower | 1216 | Withdrawn | $485 | - | - |
| Trinity Centre | 1230 | Pending | $580 | $503 | $1,617 |
| NW 524 Soho | 1238 | Pending | $1,175 | $6,257 | - |
| Kato International | 1239 | Pending | $598 | | $11,500 |
| Power & Light Building | 1249 | Pending | $234 | $1,899 | - |
| Trinity Hudson Holdings | 1255 | Pending | $163 | - | $973 |
| 1900 McKinney Harwood | 1256 | Pending | $337 | - | $181 |
| AGRE Williams Square | 1258 | Pending | $151 | $172 | $2,827 |
| RXR Atlas | 1265 | Pending | $572 | - | $6,230 |
| 575 Lex Property | 1267 | Withdrawn | $464 | $6,301 | $2,776 |
| 575 Fifth Office Owner | 1279 | Pending | $427 | $2,210 | - |
| 1 Lincoln St | 1303 | Pending | $1,577 | - | $45,859 |

---

[1]   The above chart is for summary purposes only and subject to change.
[2]   All numbers are shown in thousands.