**PAUL HASTINGS LLP**
Kristopher M. Hansen, Esq. (admitted *pro hac vice*)
Frank A. Merola, Esq. (admitted *pro hac vice*)
Gabriel E. Sasson, Esq.
Emily L. Kuznick, Esq. (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
krishansen@paulhastings.com
frankmerola@paulhastings.com
gabesasson@paulhastings.com
emilykuznick@paulhastings.com

Paul R. Genender, Esq. (admitted *pro hac vice*)
Conrad Coutinho, Esq. (admitted *pro hac vice*)
Jake Rutherford (admitted *pro hac vice*)
Marijana Kralt, Esq. (admitted *pro hac vice*)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
paulgenender@paulhastings.com
conradcoutinho@paulhastings.com
jakerutherford@paulhastings.com
marikralt@paulhastings.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

**RIKER DANZIG LLP**
Joseph L. Schwartz, Esq.
Tara J. Schellhorn, Esq.
Daniel A. Bloom, Esq.
Gregory S. Toma, Esq.
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tschellhorn@riker.com
dbloom@riker.com
gtoma@riker.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR (I) LEAVE, STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY

---

[1]A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 2

JURISDICTION AND VENUE ............................................................................... 6

RELIEF REQUESTED ............................................................................................ 7

RELEVANT BACKGROUND .............................................................................. 7

LEGAL STANDARD .............................................................................................. 12

ARGUMENT ............................................................................................................ 15

I.      Each of the Proposed Claims Is Colorable ................................................. 15

    A.      The Uptier Transactions Should Be Unwound as Fraudulent Transfers.......................... 15

        1.      The Debtors Did Not Receive Reasonably Equivalent Value for the Fraudulent Transfers. ................................................................... 16

        2.      The Debtors Were Insolvent at All Relevant Times ............................................. 19

    B.      The SoftBank Redemption and the SoftBank Uptier Transaction Should Be Unwound as Avoidable Preferences ............................................................... 23

    C.      SoftBank, the SoftBank Directors and Other Members of the Board Breached Their Fiduciary Duties .......................................................................... 25

        1.      SoftBank and Son Owed Fiduciary Duties to WeWork in Its Capacity as a Controlling Shareholder or Part of a Control Group ............................................. 28

        2.      SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Does Breached Their Fiduciary Duties to WeWork's Creditors by Driving WeWork's Uncontrolled Expansion ..................................................................... 29

        3.      The Fiduciary Defendants Breached Their Duty of Loyalty by Choosing The MTA Financing ................................................................................................... 32

        4.      The Fiduciary Defendants Breached Their Duty of Loyalty by Refusing to Draw On All of the Capital Commitments Associated with the 2019 Master Transaction Agreement. ...................................................................................... 33

        5.      The Fiduciary Defendants Breached Their Duties of Loyalty in Negotiating and Executing the Uptier Transactions ................................................................... 33

    D.      SoftBank's Claims Should Be Equitably Subordinated .................................................. 34

    E.      SoftBank's Claims Should Be Recharacterized as Equity ............................................. 36

        1.      The SoftBank Uptier Notes Claims Should Be Recharacterized as Equity ......... 38

        2.      The SoftBank LC Facility Claims Should Be Recharacterized as Equity .......... 43

    F.      The Unencumbered Assets Are Not Subject To Any Security Interests and Any Purported Liens on the Non-Perfected Assets Should Be Avoided .................................................. 44

    G.      Claims on Account of Unmatured Interest and the Make-Whole Premium Should be Disallowed. ........................................................................................................ 46

II.     The Debtors' Unwillingness to Pursue the Proposed Claims Is Unjustified ................... 48

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 5

RELIEF REQUESTED ............................................................................................................ 6

RELEVANT BACKGROUND ............................................................................................... 6

LEGAL STANDARD ............................................................................................................ 11

ARGUMENT ......................................................................................................................... 14

I.     Each of the Proposed Claims Is Colorable ................................................................ 14

    A.     The Uptier Transactions Should Be Unwound as Fraudulent Transfers .......... 14

        1.     The Debtors Did Not Receive Reasonably Equivalent Value for the Fraudulent Transfers. ........................................................................................ 15

        2.     The Debtors Were Insolvent at All Relevant Times ............................. 18

    B.     The SoftBank Redemption and the SoftBank Uptier Transaction Should Be Unwound as Avoidable Preferences .......................................................... 22

    C.     SoftBank, the SoftBank Directors and Other Members of the Board Breached Their Fiduciary Duties ...................................................................... 24

        1.     SoftBank and Son Owed Fiduciary Duties to WeWork in Its Capacity as a Controlling Shareholder or Part of a Control Group ............................ 27

        2.     SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Does Breached Their Fiduciary Duties to WeWork's Creditors by Driving WeWork's Uncontrolled Expansion .................................... 28

        3.     The Fiduciary Defendants Breached Their Duty of Loyalty by Choosing The MTA Financing ........................................................................................ 31

        4.     The Fiduciary Defendants Breached Their Duty of Loyalty by Refusing to Draw On All of the Capital Commitments Associated with the 2019 Master Transaction Agreement. ....................................................................... 32

        5.     The Fiduciary Defendants Breached Their Duties of Loyalty in Negotiating and Executing the Uptier Transactions ........................................................ 32

    D.     SoftBank's Claims Should Be Equitably Subordinated .................................... 33

    E.     SoftBank's Claims Should Be Recharacterized as Equity ................................ 35

        1.     The SoftBank Uptier Notes Claims Should Be Recharacterized as Equity ......... 37

        2.     The SoftBank LC Facility Claims Should Be Recharacterized as Equity .......... 42

    F.     The Unencumbered Assets Are Not Subject To Any Security Interests and Any Purported Liens on the Non-Perfected Assets Should Be Avoided .................... 44

    G.     Claims on Account of Unmatured Interest and the Make-Whole Premium Should be Disallowed. ......................................................................................... 45

II.    The Debtors' Unwillingness to Pursue the Proposed Claims Is Unjustified ............ 47

III.    Prosecution of the Proposed Claims Would Benefit the Estate ........................................ 49

IV.    The Committee Should Be Granted Exclusive Authority to Settle the Proposed Claims  50

NOTICE .................................................................................................................................... 51

NO PRIOR REQUEST ............................................................................................................. 51

RESERVATION OF RIGHTS ................................................................................................. 51

CONCLUSION .......................................................................................................................... 51

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ...............................................................11, 12

*Adelphia Communs. Corp. v. Bank of Am., N.A. (In re Adelphia Communs. Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) .......................................................................40

*In re Adler, Coleman Clearing Corp.*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) .....................................................................34

*In re AtlanticRancher, Inc.*,
    279 B.R. 411 (Bankr. D. Mass. 2002) .....................................................................40

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
    473 B.R. 525 (Bankr. D. Del. 2012) ...................................................................14, 34

*In re AutoStyle Plastics, Inc.*,
    269 F.3d 726 (6th Cir. 2001) ............................................................................36, 41

*In re Bernier*,
    282 B.R. 773 (Bankr. D. Del. 2002) ...................................................................19, 20

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) .....................................................................42

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .......................................................................................25

*Burtch v. Opus LLC (In re Opus E. LLC)*,
    Bankruptcy Case No. 09-12261 (D. Del. Mar. 31, 2016) .........................................18

*In re Carter*,
    236 B.R. 173 (Bankr. E.D. Pa. 1999) ......................................................................19

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993) .......................................................................................25

*In re Conex Holdings, LLC*,
    518 B.R. 269 (Bankr. D. Del. 2014) ........................................................................23

*In re Coven*,
   No. 04-24703(RTL), 2006 WL 2385423 (Bankr. D.N.J. Aug. 17, 2006), *aff'd*,
   No. 04-24703 (RTL), 2007 WL 1160332 (D.N.J. Apr. 17, 2007)...........................................19

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023) ....................................................................................30

*Off. Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003).....................................................................................12, 49, 50

*In re DeCurtis Holdings LLC*,
   23-10548 (JKS), (Bankr. D. Del. Aug. 14, 2023) ...................................................................13

*In re Demeza*,
   582 B.R. 868 (Bankr. M.D. Pa. 2018) ...................................................................................13

*In re Diocese of Camden, New Jersey*,
   No. 20-21257 (JNP), 2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022) ..........................14, 51

*In re Exide Techs., Inc.*,
   299 B.R. 732 (Bankr. D. Del. 2003) .....................................................................................36

*In re Fabricators, Inc.*,
   926 F.2d 1458 (5th Cir.1991) ...............................................................................................37

*In re Fedders North America, Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ..................................................................................21, 38

*Feltman v. Wells Fargo Bank, N.A. (In re TS Employment, Inc.)*,
   597 B.R. 494 (Bankr. S.D.N.Y. 2019)....................................................................................17

*Flint Indus., Inc. v. Comm'r*,
   82 T.C.M. (CCH) 778, 2001 WL 1195725 (U.S. Tax Ct.2001)...............................................46

*In re Franklin Indus. Complex, Inc.*,
   2007 Bankr. LEXIS 3004 (Bankr. N.D.N.Y. 2007) ................................................................39

*Frederick Hsu Living Trust v. ODN Holding Corporation*,
   2017 WL 1437308 (Del. Ch. 2017) .......................................................................................26

*In re G-I Holdings, Inc.*,
   313 B.R. 612 (Bankr. D.N.J. 2004) ...................................................................................13, 14

*Garfield v. Blackrock Morg. Ventures (In re Garfield)*,
   2019 LEXIS 1400, 2019 WL 7168004 (Del. Ch. 2019)..........................................................29

*In re Hedged-Investments Assocs., Inc.*,
   380 F.3d 1292 (10th Cir. 2004) .......................................................................38

*In re iPCS, Inc.*,
   297 B.R. 283 (Bankr. N.D. Ga. 2003) ..............................................................14

*Kartzman v. Latoc, Inc. (In re Mall at the Galaxy)*,
   Nos. 10-12435 (VFP), 2-1769 (VFP), 2022 Bankr. LEXIS 1180 (Bankr.
   D.N.J. Apr. 29, 2022).......................................................................................17

*In re Klein*,
   No. 86 B 19937, 1991 WL 242169 (Bankr. N.D. Ill. June 21, 1991).....................21

*Leeper v. Pennsylvania Higher Educ. Assistance Agency (PHEAA)*,
   49 F.3d 98 (3d Cir. 1995) ................................................................................48

*In re Live Primary, LLC*,
   626 B.R. 171 (Bankr. S.D.N.Y. 2021)................................................................44

*Lockton v. Rogers*,
   No. 2021-0058-SG, 2022 Del. Ch. LEXIS 47 (Del. Ch. Mar. 1, 2022) ................35

*LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*,
   961 F.2d 378 (2d Cir. 1992)..............................................................................48

*In re Lyondell Chem. Co. ("Lyondell")*,
   544 B.R. 75 (Bankr. S.D.N.Y. 2016).....................................................38, 42, 44

*In re Marin Motor Oil, Inc.*,
    689 F.2d 445 (3rd Cir. 1982) ..........................................................................12

*Mellon Bank, N.A. v. Metro Comm., Inc.*,
   945 F.2d 635 (3d Cir. 1991)..............................................................................16

*Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L. (In re
   R.M.L.)*,
   92 F.3d 139 (3d Cir. 1996)................................................................................16

*Mervyn's, LLC v. LubertAdler Group IV, LLC* (*In re Mervyn's Holdings, LLC* ),
   426 B.R. 488 (Bankr. D. Del. 2010) .................................................................17

*Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 366 (Bankr. E.D.
   Okla. 2010) .....................................................................................................43

*MSGI Liquidation Tr. v. Modell (In re Modell's Sporting Goods, Inc.)*,
   Nos. 20-14179 (VFP), 22-1076 (VFP), 2023 Bank. LEXIS 1031 (Bankr.
   D.N.J. Apr. 14, 2023)........................................................................................16

*MSKP Oak Grove, LLC v. Venuto*,
   875 F. Supp. 2d 426 (D.N.J. 2012) ........................................................................22

*In re MultiPlan Corp. S'holders Litig.*,
   268 A.3d 784 (Del. Ch. 2022) .......................................................................28, 36

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
   930 A.2d 92 (Del. 2007) .........................................................................................26

*In re Nathan & Miriam Barnert Mem'l Hosp. Ass'n*,
   No. 07-21631(DHS), 2009 WL 3230789 (Bankr. D.N.J. Oct. 5, 2009) ..................23

*In re National Forge Co.*,
   304 B.R. 214 (Bankr. W.D. Pa. 2004) ....................................................................53

*In re National Forge Co.*,
   326 B.R. 532 (W.D. Pa. 2005) ...............................................................................52

*Newark Watershed Conservation & Dev't Corp. v. Watkins-Brasher*,
   560 B.R. 129 (Bankr. D.N.J. 2016) ........................................................................14

*In re Our Alchemy, LLC*,
   2019 Bankr. LEXIS 2903 (Bankr. D. Del. Sep. 16, 2019) .....................................23

*In re Pack Liquidating, LLC*,
   2024 WL 409830 (Bankr. D. Del. 2024) ................................................................52

*Patel v. Duncan*,
   2021 Del. Ch. LEXIS 227, 2021 WL 4482157 (Del. Ch. Sept. 30, 2021), *as
   corrected* (Oct. 4, 2021).....................................................................................25, 28

*In re Qimonda Richmond, LLC*,
   467 B.R. 318 (Bankr. D. Del. 2012) .......................................................................17

*Quadrant Structured Prod. Co. v. Vertin*,
   102 A.3d 155 (Del. Ch. 2014)................................................................................27

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
   115 A.3d 535 (Del. Ch. 2015)................................................................................26

*In re Radnor Holdings Corp.*,
   353 B.R. 820 (Bankr. D. Del. 2006) .......................................................................38

*Roth Steel Tube Co. v. Comm'r.*,
   800 F.2d 625, 631 (6th Cir. 1986) .........................................................................43

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*,
  680 F.3d 1298 (11th Cir. 2012) ............................................................17

*Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited*,
  2021 WL 3184591 (Del. Ch. 2021) .......................................................26

*In re SubMicron Systems Corp.*,
  432 F.3d 448 (3d Cir. 2006)............................................................ *passim*

*In re Tire Kings of Am., Inc.*,
  164 B.R. 40 (Bankr. M.D. Pa. 1993) ...................................................25

*In re Tops Holding II Corp.*,
  646 B.R. 617 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, No. 22-CIV-
  9450 (NSR), 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023) ........................27

*In re Trades Publ'g Inc.*,
  Nos. 10-21483 (MBK), 10-2531 (MBK), 2011 Bankr. LEXIS 4738 (Bankr.
  D.N.J. Oct. 11, 2011) ............................................................17, 19, 24

*U.S. v State St. Bank and Trust Co.*,
  520 B.R. 29 (Bankr. D. Del. 2014) .................................................38, 40

*In re USA Detergents, Inc.*,
  418 B.R. 533 (Bankr. D. Del. 2009) .....................................................27

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ........................26, 27

**Statutes**

11 U.S.C.

§ 101(2)(A) ...................................................................................................22
§ 101(31) .....................................................................................................22
§ 101(32) .....................................................................................................19
§ 510(c) .......................................................................................................35
§ 544 ...........................................................................................15, 16, 20, 21
§ 547 ...........................................................................................................23
§ 548 ....................................................................................................... *passim*
§ 1103(c) .....................................................................................................12
§ 1109(b) .....................................................................................................12

28 U.S.C.

§ 157 ...........................................................................................................6
§ 502(b)(2) ..................................................................................................48
§ 1334 ..........................................................................................................6
§ 1408 ..........................................................................................................7
§ 1409 ..........................................................................................................7

N.Y. Debt. & Cred. Law § 279 .................................................................16

Uniform Commercial Code

§ 9-108(a) ...................................................................................................46
§ 9-203(b)(3)(A) ..........................................................................................46

**Other Authorities**

Fed. R. of Civ. P. 12(b)(6) ....................................................................13, 28

Ron Meisler et al., *Debt Recharacterization in Bankruptcy: Overview and Developments*, 28 NORTON J. BANKR. L. & PRAC. no. 3 .................................38, 41

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of WeWork, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**," the "**Company**," or "**WeWork**"), by and through its undersigned counsel, hereby moves this Court for entry of an order granting the Committee: (i) leave, standing, and authority to commence and prosecute certain claims and causes of action (the "**Proposed Claims**") on behalf of the Debtors' estates (the "**Estates**"), as set forth in more detail in the draft adversary complaint attached hereto as **Exhibit A** and incorporated for all purposes herein (the "**Proposed Complaint**"); and (ii) exclusive authority to settle such claims on behalf of the Estates (the "**Motion**"). In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Since 2016, nearly all of WeWork's important business decisions were influenced or controlled by Softbank Group Corp. ("**SBG**") and its affiliates (collectively, "**SoftBank**"), the Debtors' largest equity holders and purportedly secured creditors. Notwithstanding SoftBank's outsized control over the Debtors, its presence on the Debtors' board of directors (the "**Board**") and the control it wielded over the Debtors' founder, Adam Neumann ("**Neumann**"), SoftBank never had the best interests of the Debtors' other constituencies in mind. Indeed, from the outset, SoftBank drove WeWork's and its founder's unsustainable business model and rapid expansion in the hopes of bolstering its investment reputation and its equity returns. To this day, the Debtors continue to hemorrhage money, fail to satisfy their administrative expenses as they come due, and urgently seek new capital to sustain their daily operations because of decisions that SoftBank has imposed, and continues to impose, upon the Debtors.

2.      Viewed as the perfect vehicle for SoftBank to flaunt the successes of its brand new technology-focused venture capital funds (collectively, the "**Vision Funds**"), SoftBank infused

WeWork with equity capital through its Vision Funds at ever-increasing valuations while pressuring WeWork to expand like a technology company, despite the fact that WeWork was not, in fact, a technology company. The constant injections of cash, the artificially inflated valuations, and the blackbox nature of the Company's then-private finances allowed SoftBank to outwardly portray WeWork as its shining jewel, despite its knowledge to the contrary. Indeed, WeWork has been insolvent since at least 2019.

3.      From WeWork's failed initial public offering (the "**IPO**") in 2019 to March 2020, its valuation plummeted from $47 billion to a purported valuation of $3 billion. Perhaps more ominously, from the date of the failed IPO, SoftBank ██████████████████████████ ████████████████████████. SoftBank desperately tried to make sure its equity investment in WeWork was not a complete loss. While WeWork obtained additional funding from SoftBank via a rescue financing package and from the public markets in connection with a de-SPAC transaction, WeWork was never able to recover. The model SoftBank had pushed, and the amassed catalogue of overpriced leases, continued to drain the Company of cash.

4.      In May 2023, with bankruptcy on the horizon, SoftBank and an ad hoc group of unsecured noteholders representing 62% of the Company's Unsecured Notes outstanding at the time (the "**Ad Hoc Group**") orchestrated the Uptier Transactions (as defined below) to mitigate their losses and elevate their position in the Company's capital structure. While the purported purpose of the Uptier Transactions was to extend the Debtors' runway, the real motivation was to elevate SoftBank's and the Ad Hoc Group's positions in the Company's capital structure and repay $300 million in debt owed to SoftBank in advance of maturity, at par. Although the Uptier Transactions included a new money component, this was a clear attempt to improve SoftBank's and the Ad Hoc Group's chances of recovery at the expense of unsecured creditors in the

bankruptcy that both parties knew to be imminent, and any new cash funded cannot be used to justify the totality of the Uptier Transactions. In short, the Uptier Transactions created over $2 billion of new secured claims and collateralized previously unsecured debt while offering the Debtors little value, at the direct expense of unsecured creditors.

5.       Through a series of events that highlighted the gross mismanagement of WeWork by all controlling persons,[1] WeWork's once-promising legacy ended in catastrophic failure. This failure should not benefit the implicated bad actors simply because they orchestrated a scheme to mitigate their losses on the eve of bankruptcy, all at the expense of the Company and its unsecured creditors.

6.       In light of this history, immediately upon its appointment, the Committee, through its advisors, commenced an investigation into these transactions and others, as well as a review of SoftBank's and the other purportedly secured parties' collateral packages.[2] While the investigation remains ongoing, the Committee has determined that there exist colorable and valuable claims, including, among others: (i) for breach of fiduciary duty against the SoftBank Directors and SoftBank, including claims for urging and directing the rapid expansion of WeWork and for entering into the Uptier Transactions; (ii) to avoid preferential transfers related to the $300 million SoftBank Redemption (as defined below), the termination of SoftBank's outstanding required commitment to purchase $200 million in additional secured notes and the grant of liens to SoftBank on account of unsecured debt within one year of the Petition Date; (iii) to avoid actual

---

[1] The discovery conducted by the Committee to date has revealed that, at all relevant times, SoftBank was in a control position and was making decisions and investments from the viewpoint of an equity holder. ██████████████████████████████████████████████████████████████████████████████

[2] In connection with its investigation, the Committee has provided both the Debtors and SoftBank with discovery requests. While the Debtors and SoftBank have produced certain documents responsive to the Committee's requests on an informal basis, discovery, as well as the Committee's investigation overall, remains ongoing. The Committee intends to serve discovery on the Ad Hoc Group to determine its intent and understanding of the Debtors' business at the time of the Uptier Transactions.

and constructive fraudulent transfers in connection with the Uptier Transactions; (iv) to equitably
subordinate SoftBank's prepetition debt claims; (v) to recharacterize all of SoftBank's prepetition
debt as equity; and (vi) to avoid certain unperfected or improperly perfected liens. The Committee
also seeks declaratory judgments regarding the attachment of prepetition liens to certain assets and
a determination that certain assets do not fall within the collateral package granted to the
Prepetition Secured Parties.

7.      The Proposed Claims discussed herein and outlined in the Proposed Complaint
attribute culpability for WeWork's epic failure in an effort to capture some value for the benefit of
unsecured creditors.  As the only party with an exclusive fiduciary duty to the unsecured creditor
body, the Committee is in the best position to maximize the value of the Proposed Claims.  As
such, through this Motion, the Committee seeks standing both to pursue and prosecute the
Proposed Claims on a derivative basis, and for the sole authority to settle, the Proposed Claims.
Absent granting this Motion, unsecured creditors will be left with no recovery on account of their
claims, as set forth in the Debtors' proposed chapter 11 plan, and the Proposed Claims will be
released by the Debtors for no consideration.

8.      As discussed more fully below, the Committee satisfies all requirements for
derivative standing. Prosecution of the Proposed Claims is critical to ensuring a recovery to
unsecured creditors in these Chapter 11 Cases, as success may result in, among other things,
hundreds of millions of dollars coming into the Estates (including the proceeds of the preference
action related to the $300 million SoftBank Redemption) and the subordination of claims that are
currently structurally senior to such creditors. While the special committee of the Board (the
"**Special Committee**") is investigating potential claims on behalf of the Debtors, the Committee
does not have confidence in the Special Committee, which it does not view as free from the

influence of SoftBank and the Company's numerous advisors. As a result, the Committee believes that its own ongoing investigation and its prosecution of the Proposed Claims identified herein and in the Proposed Complaint are the ones to be trusted as non-biased and truly independent. Moreover, neither the Debtors nor the Special Committee have indicated to the Committee when the Special Committee's investigation will be complete. For their part, the Debtors remain beholden to SoftBank and the Ad Hoc Group via SoftBank's board representation and majority shareholder status, as well as through the binding restructuring support agreement that the Debtors entered into with SoftBank and the Ad Hoc Group that requires the Debtors to pursue a chapter 11 plan of reorganization that respects the secured claims of SoftBank and the Ad Hoc Group and delivers them the reorganized Company upon exit. The Debtors are therefore unable to bring the Proposed Claims, claims that they already released and waived in connection with the Cash Collateral Order (as defined below).

9.       Accordingly, the Committee must be granted standing to pursue the Proposed Claims to the fullest extent possible under the law for the benefit of all unsecured creditors in these Chapter 11 Cases.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b) and the Standing Order of the United State District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.

11.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.       The statutory predicates for relief requested herein are sections 1103 and 1109 of chapter 11 of section 11 of the United States Code (the "**Bankruptcy Code**").

**RELIEF REQUESTED**

13.     By this Motion, the Committee requests that the Court grant it leave, standing, and authority to (a) prosecute the Proposed Claims, and (b) if appropriate, propose and effectuate settlements for all or a portion of the Proposed Claims on an exclusive basis, subject to further order of this Court.

**RELEVANT BACKGROUND**

14.     Adam Neumann and Miguel McKelvey founded WeWork in 2010 and opened their first location in New York City in 2010.[3] After an initial seed funding round of $1 million, the Company quickly expanded to twenty-three additional locations in four years, including international locations in the United Kingdom and Israel.[4] After continued growth and expansion into numerous other international markets, including China, Mexico and South Korea, WeWork turned to SoftBank (through its Vision Fund) for the first of many capital infusions, raising $4.4 billion at a valuation of approximately $20 billion in 2017.[5]

15.     The Vision Fund, one of the world's largest technology-focused venture capital funds, targets investment in late-stage companies seeking between 20% and 40% ownership interests. SoftBank's investment in WeWork followed the Vision Fund playbook—repeated investments in equity, at increasing valuations, over a period of years. In fact, SoftBank and the Vision Fund are not in the business of being lenders to their portfolio companies—they comprise venture capital funds that buy equity. In all, SoftBank invested over $10 billion in equity and, as

---

[3] *See Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "**First Day Declaration**") at ¶ 1.
[4] *Id*. at ¶ 4.
[5] *Id*. at ¶ 4, 5.

of the Petition Date, it owned approximately 72% of WeWork's common stock, with warrants to purchase even more.[6]

16.    As demonstrated in the below timeline, SoftBank has been, at all relevant times, an insider of, and the main capital source for the Debtors and has primarily operated as an equity investor of the Company.



17.    While SoftBank was accumulating its equity position, WeWork generated billions in operating losses and burned through billions in capital executing its business plan. WeWork operated at a loss at least as far back as 2016 and has required near-constant infusions of new capital to feed its ravenous cash burn. The Company was constantly undercapitalized and carried a "highly speculative" grade credit rating at all relevant times. Moreover, because of its "asset-light" business model, WeWork had limited "hard" assets that could be monetized.

18.    In August 2019, following years of mismanagement and with a continued need for liquidity, the Debtors filed a Registration Statement as part of their efforts to go public through the

---

[6] *See* WeWork Inc., Beneficial Ownership Report (Form 13-D) (Oct. 30, 2023).

IPO.[7]  This was the first public disclosure WeWork had made of its operating results, projections, related party transactions and complicated governance issues. The disclosures included details on profitability (or the lack thereof), the Company's unsustainable cash burn and a "Risk Factor" that acknowledged that the Company may be unable to achieve profitability in the foreseeable future.[8] The market reaction to the disclosures in the Registration Statement was nearly immediate and disastrous.[9]  By the end of September, SoftBank had postponed the IPO and was in negotiations to "divorce" Neumann from the Company. SoftBank was developing a rescue financing that was to be implemented through that certain master transaction agreement, as of October 22, 2019  (as may be amended or superseded from time to time, the "**MTA**").[10]

19.    SoftBank's bubble had burst. It could no longer pretend that the company it effectively controlled had any semblance of a successful, let alone reasonable, business model. In order to preserve its reputation and equity investment, SoftBank pushed Neumann out, paid for his separation from WeWork, enhanced his exit package to meet Neumann's demands and drove the negotiation of releases between Neumann and the Company. With Neumann out of the picture, SoftBank's constructive control over WeWork was formalized with five out of ten seats on the Board and a majority of shares.

20.    During this period, the lenders under the Debtors' existing credit agreement made clear that they were unwilling to renew their lending relationship with the Debtors, including the letter of credit facility crucial to the Debtors' business, without significant credit enhancements. As a result, in December 2019, WeWork entered into a new, $1.75 billion Credit Agreement,

---

[7] The We Company, Registration Statement (Form S-1) (Aug. 14, 2019).
[8] *Id.*
[9] *See* First Day Declaration at ¶ 21.
[10] *Id*.

which included the LC Facility, but this time with Softbank as a co-obligor.[11] SoftBank became an obligor under the LC Credit Agreement because the issuing banks would not extend credit absent SoftBank's commitment, and the unavailability of an LC Facility would make it impossible to sign new leases.[12]

21.    Thereafter, in February 2020, WeWork and SoftBank entered into a Reimbursement Agreement pursuant to which: (i) the Debtors agreed to reimburse SoftBank for any amounts it was called upon to pay under the LC Credit Agreement; (ii) SoftBank agreed to pay substantially all the fees and expenses due under the LC Credit Agreement; (iii) WeWork would reimburse SoftBank for those fees and expenses and pay SoftBank a fee based on a percentage of the amount of LCs outstanding; and (iv) SoftBank would be subrogated to the rights of the Issuing Banks for payments made under the LC Facility.[13] In sum, the SoftBank LC Facility Claims (as defined below) are a "claim" for losses under the LC Credit Agreement on which SoftBank was already an obligor and "fees" related to providing that credit support.

22.    As of the Petition Date, SoftBank's claims consist of the following (the "**SoftBank Claims**"): (i) approximately $1.5 billion in aggregate principal amount arising based on SoftBank's exposure as Co-Obligor under the LC Credit Agreement and LC Facility (which are asserted against the Debtors pursuant to the Reimbursement Agreement (the "**SoftBank LC Facility Claims**"); (ii) $306.25 million in aggregate principal amount of Series II 1L Notes; (iii) $187.5 million in aggregate principal amount of 2L Exchangeable Notes; and (iv) $269.6 million in aggregate principal amount of 3L Exchangeable Notes. Apart from the

---

[11] *Id*. at ¶ 22.
[12] On the eve of WeWork's bankruptcy, in order to avoid the termination of the LC Facility, SoftBank paid approximately $772.7 million under the LC Facility and posted approximately $808.8 million in cash collateral to secure undrawn amounts under the LC Facility. *See* First Day Declaration at ¶ 47.
[13] WeWork Inc., Quarterly Filing (Form 10-Q) (May 10, 2023).

SoftBank LC Facility Claims, all of the claims stem from the purportedly secured notes issued as part of the Uptier Transactions that were orchestrated approximately six months before the Petition Date (the "**SoftBank Uptier Notes Claims**").

23.     While WeWork floundered under an unserviceable capital structure, in March 2023, SoftBank and the Ad Hoc Group engineered the creation of over $2 billion dollars in new purportedly secured claims, which offered the Debtors insufficient value in return. With SoftBank sitting on both sides of the transaction, WeWork entered into a series of transactions (collectively, the "**Uptier Exchanges**") that exchanged the unsecured notes held by SoftBank and the Ad Hoc Group for a combination of secured notes and equity and provided the Company with marginal additional capital to dress up the transactions, which only funded the Debtors' operations for a few months. In connection therewith, WeWork also redeemed $300 million of purportedly secured notes held by SoftBank, in advance of maturity, at par, and terminated SoftBank's outstanding required commitment to purchase an additional $200 million of additional secured notes (the "**SoftBank Redemption**," and together with the Uptier Exchanges, the "**Uptier Transactions**"). Upon consummation of these transactions, WeWork's general unsecured creditors (including landlords and holders of approximately $180 million in Unsecured Notes) were left subordinate to $2.4 billion[14] in newly created secured debt.

24.     The Debtors had no ability to service the newly created secured notes nor the rent due on hundreds of leases. SoftBank and the Ad Hoc Group knew these transactions were only a "band aid," as evidenced by SoftBank's ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████" In fact,

---

[14] Such amount includes approximately $1.88 billion in aggregate principal amount as well as approximately $520 million in payment-in-kind (PIK) interest and other accrued transaction costs and fees.

WeWork lasted barely six months after the transactions closed. SoftBank, for its part, acknowledged ███████████████████████████████████████████████████ ████████ Through the Uptier Transactions, the Debtors, SoftBank, and the Ad Hoc Group intentionally depleted the assets available to general unsecured creditors by conveying collateral to previously unsecured creditors and creating substantial secured claims required to be paid ahead of general unsecured creditors.

25.     The Uptier Transactions did exactly what they were intended to do: solidify SoftBank's and the Ad Hoc Group's senior position in the Debtors' capital structure and ensure that only those parties would retain any value from the Debtors' Estates following the eventual bankruptcy filing.

## LEGAL STANDARD

26.     This Court has broad authority to grant the Committee standing to file and pursue claims derivatively on behalf of the Estates. The Bankruptcy Code expressly authorizes formation of an official committee of unsecured creditors to protect the rights of all unsecured creditors. *See* 11 U.S.C. § 1103(c). Such committee may raise, appear, and be heard "on any issue" in a chapter 11 case. *See* 11 U.S.C. § 1109(b). The right to be heard "includes the right to sue where a trustee or debtor in possession will not." *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 456 n.11 (3rd Cir. 1982) (quoting *Matter of Joyanna Holitogs, Inc.*, 21 Bankr. 323, 326 (Bankr. S.D.N.Y. 1982)). It is well settled and "unmistakably clear" in the Third Circuit "that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate." *Off. Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery ("**Cybergenics**")*, 330 F.3d 548, 567 (3d Cir. 2003); *see also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.*), 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) ("The practice of authorizing the prosecution of actions on behalf of an estate by committees . . . upon a showing

that such is in the interests of the estate, is one of long standing, and nearly universally

recognized."). "[T]he ability to confer derivative standing upon creditors' committees is a

straightforward application of bankruptcy courts' equitable powers." *Id.*

27.    For a court to grant standing, the movant must demonstrate that (i) a claim is

"colorable," (ii) it would be beneficial to the estate, and (iii) the debtor in possession has failed to

bring that claim. *See In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004) ("A

committee may have derivative standing to initiate an avoidance action on behalf of the debtor

where . . . a colorable claim that would benefit the estate if successful exists.") (citing Seventh

Circuit cases and noting that the Third Circuit cited with approval opinions on this issue by the

Seventh and Second Circuits).

28.    The requisite showing to establish a claim is colorable "is a relatively easy one to

make." *Adelphia*, 330 B.R. at 376-77. Claims are colorable if they would survive a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6). *In re DeCurtis Holdings LLC*, 23-10548

(JKS), at *7–8 (Bankr. D. Del. Aug. 14, 2023); *see also In re Demeza*, 582 B.R. 868 (Bankr. M.D.

Pa. 2018) (holding that, in assessing whether a movant has alleged a colorable claim that would

benefit the estate, a "colorable claim is a plausible claim that would survive a motion to dismiss"

for failure to state a claim.). Courts do not need to conduct a mini-trial on the issues of whether

the asserted claims are "colorable," but can consider "'the probability of success and financial

recovery,' as well as the anticipated costs of litigation as part of a cost/benefit analysis conducted

to determine whether the colorable claims are likely to benefit the estate." *In re iPCS, Inc.*, 297

B.R. 283, 291 (Bankr. N.D. Ga. 2003) (quoting *In re America's Hobby Center, Inc.*, 223 B.R. 275,

282 (Bankr.S.D.N.Y.1998)); *see also In re Diocese of Camden, New Jersey*, No. 20-21257 (JNP),

2022 WL 884242, at *9 (Bankr. D.N.J. Mar. 24, 2022) ("While a mini-trial is not necessary, the

court 'should assure itself that there is a likelihood of success [for the claims] to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce'") (quoting *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985)). Extensive review of the merits is neither required nor preferred in evaluating the colorability of claims to determine standing. *See Adelphia,* 330 B.R. at 376.

29.    Accordingly, the Committee's claims are colorable if they are pled with "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*; *accord In re G-I Holdings, Inc.*, 313 B.R. at 630-31 (quoting *Jordan v. N.J. Dep't of Corr.*, 881 F. Supp. 947 (D.N.J. 1995); *Newark Watershed Conservation & Dev't Corp. v. Watkins-Brasher*, 560 B.R. 129, 145 (Bankr. D.N.J. 2016) (rejecting a debtor's attempt to contest well-pleaded facts at motion to dismiss stage, stating "asserted facts . . . are entitled to be tested by the Debtor through discovery, rather than being decided on a motion to dismiss.").

30.    The Committee may have standing to bring the asserted claims if, in addition to being colorable, the asserted claims are "likely to benefit the estate." *In re G-I Holdings, Inc.*, 313 B.R. at 629 (quoting *STN*, 779 F.2d at 905). Claims are beneficial if "the proposed litigation will not be a *hopeless fling*." *Adelphia,* 330 B.R. at 386 (emphasis added).

31.    As demonstrated herein, each of the Proposed Claims satisfies the requisite showing. The Proposed Claims are well-founded, colorable, and highly valuable to unsecured creditors. Indeed, the Proposed Claims may be the only source of recovery to unsecured creditors in these Chapter 11 Cases. Pursuant to the *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 428] (the "**Cash Collateral Order**"), the Debtors have stipulated and agreed to not prosecute the Proposed Claims, leaving

13

only the Committee to act as the only fiduciary for unsecured creditors. In addition, the Special

Committee does not appear willing or able to assert the Proposed Claims on the Debtors' behalf.

Accordingly, this Motion should be granted.

**ARGUMENT**[15]

**I.    Each of the Proposed Claims Is Colorable**

        **A.    The Uptier Transactions Should Be Unwound as Fraudulent Transfers**

32.    The Public Noteholders Uptier Transaction and the SoftBank Uptier Transaction

(including the SoftBank Redemption) (collectively, the "**Fraudulent Transfers**") should be

unwound as actual and constructive fraudulent transfers. The Fraudulent Transfers fall squarely

within the purview of sections 544 and 548 of the Bankruptcy Code.

        *i.    The Constructive Fraudulent Transfer Claims Are Colorable*

33.    Section 548 of the Bankruptcy Code provides that a transfer or an obligation is

avoidable as constructively fraudulent if it can be shown that: (i) the transfer made or obligation

incurred was for less than reasonably equivalent value; and (ii) the debtor was (a) insolvent on the

date of the transaction or was rendered insolvent thereby, (b) had unreasonably small capital, or

(c) intended to incur, or reasonably should have known it would incur, debts that it could not pay

as they matured. 11 U.S.C. § 548(a)(1)(B). Section 544(b) of the Bankruptcy Code similarly gives

debtors the right to avoid any transfer or obligations pursuant to state fraudulent transfer law. *Id.*

at § 544(b). Here, New York law governs the transactions and imposes requirements substantially

identical to those set forth in section 548 of the Bankruptcy Code. *Compare id. with* N.Y. Debt. &

Cred. Law § 279; *see MSGI Liquidation Tr. v. Modell (In re Modell's Sporting Goods, Inc.)*, Nos.

20-14179 (VFP), 22-1076 (VFP), 2023 Bank. LEXIS 1031, at *81 (Bankr. D.N.J. Apr. 14, 2023)

---

[15] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Proposed Complaint.

14

("In short, federal bankruptcy law and New York and New Jersey fraudulent transfer law all have similar standards."). As outlined below and in the Proposed Complaint, colorable bases exist to unwind the Fraudulent Transfers.

> **1.    The Debtors Did Not Receive Reasonably Equivalent Value for the Fraudulent Transfers.**

34.    The Bankruptcy Code does not define the term "reasonably equivalent value." Rather, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).

35.    When determining whether reasonably equivalent value exists, "[t]he touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). "[T]he question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors." *Id*. "[I]f the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine 'whether the debtor got roughly the value it gave.'" *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 568 (Bankr. D. Del. 2012); *Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 149 (3d Cir. 1996) (delineating a factually dependent inquiry to determine whether the value received was reasonably equivalent).

36.    "[T]he issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss." *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D. Del. 2012). "The Third Circuit requires the application of a 'totality of the circumstances' test, including consideration of factors such as market value, good faith, and

whether the transaction was at arms['] length." *Id*. (citing *In re R.M.L.*, 92 F.3d at 153); *Kartzman v. Latoc, Inc. (In re Mall at the Galaxy)*, Nos. 10-12435 (VFP), 2-1769 (VFP), 2022 Bankr. LEXIS 1180, at *36 (Bankr. D.N.J. Apr. 29, 2022) ("Once it has been established that some value has been transferred, a 'totality of the circumstances' test is applied to determine whether reasonably equivalent value has been transferred."); *see also Mervyn's, LLC v. LubertAdler Group IV, LLC (In re Mervyn's Holdings, LLC*), 426 B.R. 488, 498 (Bankr. D. Del. 2010) (quoting *Buckley v. Merrill Lynch & Co. Inc. (In re DVI, Inc.*), 2008 Bankr. LEXIS 2338, 2008 WL 4239120 at *9 (Bankr. D. Del. Sept. 16, 2008)) (With regard to constructive fraudulent transfer claims, "[a]ll that is needed at [the pleading] stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.").

37.    Moreover, in the Third Circuit, "[t]he opportunity to avoid a default or bankruptcy may not necessarily constitute reasonably equivalent value." *Feltman v. Wells Fargo Bank, N.A. (In re TS Employment, Inc.)*, 597 B.R. 494, 528-29 (Bankr. S.D.N.Y. 2019) (internal citations omitted); *In re Trades Publ'g Inc.*, Nos. 10-21483 (MBK), 10-2531 (MBK), 2011 Bankr. LEXIS 4738, at *27 (Bankr. D.N.J. Oct. 11, 2011) (holding that determining whether indirect, intelligible, economic benefits constituted a reasonably equivalent value is a fact issue precluding summary judgment); *see also Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.*), 680 F.3d 1298, 1311 (11th Cir. 2012) (concluding that under the facts of the case, the indirect benefit received by subsidiaries in avoiding bankruptcy did not constitute reasonably equivalent value for the liens they provided to collateralize the parent company's obligation, as it only delayed the inevitable).

38.    The Debtors contend that the Uptier Transactions were a successful recapitalization that "secured over $1 billion of total funding and capital commitments, cancelled or equitized

approximately $1.5 billion of total debts through the equitization and discounted exchanges of over $1 billion of unsecured notes held by SoftBank and the participating public noteholders (including the Ad Hoc Group, the "**Public Noteholders**"), and extended the maturity of approximately $1.9 billion of *pro forma* debts from 2025 to 2027."[16] However, the transactions had the following effects: (i) granting new liens to secure over $2 billion in new claims immediately prior to the Debtors filing for bankruptcy; (ii) encumbering unencumbered assets of the Debtors; (iii) elevating the priority of SoftBank's and the Public Noteholders' unsecured debt to the detriment of unsecured creditors' *pari passu* claims; and (iv) temporarily delaying the Debtors' inevitable chapter 11 filing by, at most, a matter of months well within the original maturity dates. Overall, in exchange for $2.4 billion in new secured debt, WeWork received only about one-fourth of that amount in new money (and, in the case of SoftBank, that money was the result of re-contributing the $300 million payment received from the SoftBank Redemption); the rest of the new secured debt was issued in exchange for the Unsecured Notes that were well "out of the money" at the time of the Uptier Exchanges.

39.    Here, the extension of maturity through 2027 was completely illusory. Both the Debtors, Softbank and the Ad Hoc Group knew (or should have known) that the Uptier Exchanges did not give the Company sufficient liquidity to survive for long. Indeed, these Chapter 11 Cases were commenced approximately six months after entry into the Uptier Transactions and within the original maturity of the Unsecured Notes. Accordingly, any asserted justification of significantly more time is insufficient to establish reasonably equivalent value.

40.    Additionally, in applying the "totality of the circumstances" test, courts may look beyond the dollars and cents of the transaction and consider factors such as "good faith," and

---

[16] First Day Declaration at ¶ 71.

"whether the transaction was at arm's length." *Trades Publi'g*, 2011 Bankr. LEXIS at *28 (citing *In re R.M.L.*, 92 F.3d at 153). Here, the Proposed Complaint alleges that the Uptier Transactions were not arm's length transactions and were not implemented in good faith.

### 2. The Debtors Were Insolvent at All Relevant Times

41.    As described herein and in the Proposed Complaint, WeWork's financial disclosures demonstrate that WeWork, at all relevant times, was insolvent under the balance sheet test, in satisfaction of the requisite elements under section 548(a)(1)(B) of the Bankruptcy Code.[17] The Bankruptcy Code provides that a company is "insolvent" when the "sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of exempt property and any property transferred in actual fraudulent transfers. 11 U.S.C. § 101(32). The formula described is often referred to as the "balance sheet" test of insolvency. *See, e.g.*, *Burtch v. Opus LLC (In re Opus E. LLC)*, Bankruptcy Case No. 09-12261 (D. Del. Mar. 31, 2016).

---

[17] Under section 548 of the Bankruptcy Code, there are three tests for insolvency – the "balance sheet" test, the "capital adequacy test," and the "cash flow" test – only one of which must be met. Here, the Debtors were insolvent, at all relevant times, under the balance sheet test. However, upon information and belief, WeWork was also insolvent under the other two tests. First, WeWork had insufficient capital to pay its debts as they matured and, thus, was also insolvent at all relevant times under the cash flow test. Second, at all relevant times, WeWork was unable to generate sufficient profits to sustain operations.

42.    Based upon an independent fair value assessment of the Debtors' business and as demonstrated in the below chart, at all relevant times, WeWork had negative equity.



43.    Irrespective of whether the present value of WeWork's leasehold commitment liabilities were included as debt in the balance sheet, its total debt materially exceeded the asset value and the enterprise value of WeWork's business. █████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

ii.    *The Actual Fraudulent Transfer Claims Are Colorable*

44.    Section 548(a)(1)(A) of the Bankruptcy Code provides that a bankruptcy trustee may avoid a transfer of an interest of the debtor in property, or an obligation incurred by the debtor, that was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Similarly, under section 544(b) of the Bankruptcy Code, a bankruptcy trustee may avoid a transfer of property or obligation that is voidable under state fraudulent transfer law. 11 U.S.C. § 544(b).

45.    Given that section 548(a)(1)(A) is written in the disjunctive, the Committee need only prove that the Company acted with the "intent to hinder, delay, *or* defraud [its] creditors." *In re Fedders North America, Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009) (emphasis added); *see also In re Coven*, No. 04-24703(RTL), 2006 WL 2385423, at *13 (Bankr. D.N.J. Aug. 17, 2006), *aff'd*, No. 04-24703 (RTL), 2007 WL 1160332 (D.N.J. Apr. 17, 2007) ("The intent required is defined in the disjunctive, meaning it is not necessary to show fraudulent intent, rather an intent to hinder or delay is sufficient."). "Wrongful intent is a question of fact for the court . . . [and] courts focus on the intent of the debtor at the time the transfer was made rather than the effect of the transfer." *In re Bernier*, 282 B.R. 773, 780 (Bankr. D. Del. 2002); *see also In re Carter*, 236 B.R. 173, 182 (Bankr. E.D. Pa. 1999) (requiring a showing "that at the time of the transfer, the debtor possessed the requisite intent to hinder, delay or defraud a creditor"). It is not necessary to show that the transferee had a desire to harm creditors; rather, the required showing is that the party intended to remove or conceal the assets to make it more difficult for creditors to collect payment. *See In re Klein*, No. 86 B 19937, 1991 WL 242169, at *15 (Bankr. N.D. Ill. June 21, 1991) (finding that a transfer was avoidable under section 548 of the Bankruptcy Code as such transfers were made in an effort "to conceal assets from creditors and place funds beyond their reach").

46.    "Recognizing the difficulty of proving actual intent to hinder, delay or defraud, courts have identified several 'badges of fraud' or wrongful intent which, if present in the circumstances surrounding the transaction, may establish the requisite actual intent." *Bernier*, 282 B.R. at 781.[18]  "In addition to these badges of fraud, other factors indicative of an actual intent to

---

[18] Such badges of fraud include: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial

hinder or delay a creditor are: whether the transaction is conducted at arm's length; whether the

debtor is aware of the existence of a significant judgment or over-due debt; whether a creditor is

in hot pursuit of its judgment or claim and whether the debtor knows this; and the timing of the

transfer relative to the filing of the petition." *Bernier*, 282 B.R. at 781. The Proposed Complaint

adequately alleges that the Uptier Transactions were entered into with an intent to hinder, delay

and defraud creditors and that several badges of fraud and other indications of intent to hinder,

delay, or defraud creditors are present in connection with the Public Noteholders Uptier

Transaction and the SoftBank Uptier Transaction.

47.      Specifically, the Proposed Complaint alleges that:

(a) As to SoftBank, the applicable transfers were made to an insider that controlled well
over 50% of the Company's stock and had the ability to hand-pick half of the Board;

(b) SoftBank sat on both sides of the transactions, with the SoftBank Directors not recusing
themselves from Board consideration of the Uptier Transactions;

(c) The Uptier Transactions were consummated at a time when the Debtors were insolvent;

(d) SoftBank and the Public Noteholders knew these transactions were only a "band aid";
and

(e) █████████████████████████████████████████████████████████████

48.      At bottom, the Uptier Transactions represent an intentional effort by SoftBank and

the Public Noteholders to serve their own interests at the direct expense of the general unsecured

creditors. The real purpose of the Uptier Transactions was to ensure that when—not if—the

Debtors filed for chapter 11 protection, SoftBank and the Public Noteholders party to the Uptier

Transactions would recover on their claims before general unsecured creditors. Their actions,

which were arranged and consummated through complicated transactions involving various

---

debt was incurred; and; (k) the debtor transferred the essential assets of the business to a lienor who transferred the
assets to an insider of the debtor. *See MSKP Oak Grove, LLC v. Venuto,* 875 F. Supp. 2d 426, 435 (D.N.J. 2012)
(internal citations omitted).

professionals with full knowledge of the repercussions, demonstrate the Debtors' actual intent to

hinder, delay, and defraud the rights of general unsecured creditors.

B.    The SoftBank Redemption and the SoftBank Uptier Transaction Should Be Unwound as Avoidable Preferences

49.    Section 547 of the Bankruptcy Code provides that certain transfers of an interest in

the Debtors' property can be avoided as preferential transfers. To avoid a transfer under section

547(b) of the Bankruptcy Code, a plaintiff must show that the transfer: (i) was made to or for the

benefit of a creditor; (ii) was for or on account of an antecedent debt; (iii) was made while the

debtor was insolvent; (iv) was made on or within 90 days of the petition date or one year if the

creditor was an insider; and (v) enables such creditor to receive more than it would have if the case

were a chapter 7 liquidation. *See* 11 U.S.C. § 547(b), (g); *In re Our Alchemy, LLC*, 2019 Bankr.

LEXIS 2903, at *14 (Bankr. D. Del. Sep. 16, 2019) (citing 11 U.S.C. § 547(b)); *In re Nathan &*

*Miriam Barnert Mem'l Hosp. Ass'n*, No. 07-21631(DHS), 2009 WL 3230789, at *1 (Bankr. D.N.J.

Oct. 5, 2009). The SoftBank Redemption and the SoftBank Uptier Transaction represent exactly

the kind of inequitable actions that preference claims are designed to redress.

50.    As noted above and in the Proposed Complaint, SoftBank unquestionably qualifies

as a statutory "insider" under section 547(b)(4) of the Bankruptcy Code. The Bankruptcy Code's

definition of "insider" includes "directors" and "affiliates" of a debtor or persons in control of a

debtor. 11 U.S.C. §§ 101(31)(B) and (E). The Bankruptcy Code in turn defines "affiliate" to mean,

as relevant here, an "entity that directly or indirectly owns, controls, or holds with power to vote,

20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(A). At

a minimum, since well before the one-year statutory lookback period for preferences to insiders,

SoftBank has, directly or indirectly through its subsidiaries, held significantly more than 20% of

the outstanding voting securities of the Company. SoftBank therefore qualifies as an affiliate, and

by way of extension, an insider of the Company. *See Trades Publi'g*, 2011 Bankr. LEXIS at \*13
("To be considered an affiliate, and by way of extension an insider of the Debtor, an entity need
only hold as little as a twenty-percent block of a debtor's voting securities.") (citing *In re Bayonne
Med. Ctr.*, 429 B.R. 152, 176 (Bankr. D.N.J. 2010)). This is not in dispute, as the Debtors
themselves acknowledge that SoftBank is an insider.[19] Accordingly, the one-year statutory
lookback period for insiders applies, and since both the SoftBank Uptier Transaction and the
SoftBank Redemption occurred in May 2023, they fall within that period.

51.    As discussed herein and in the Proposed Complaint, the SoftBank Uptier
Transaction and the SoftBank Redemption were effectuated when the Company was insolvent.
Moreover, in both transactions a transfer of value was made to SoftBank, a creditor, on account of
antecedent debt, and resulted in SoftBank receiving more than it would have in a chapter 7
liquidation. In determining whether a transferee received more than it would have received in a
hypothetical chapter 7 liquidation, the relevant inquiry is whether the party "would have received
a 100 percent payout" in such liquidation. *In re Conex Holdings, LLC*, 518 B.R. 269, 278 (Bankr.
D. Del. 2014). If not, then the "requirements of Section 547(b)(5) are met." *Id*.

52.    Here, as a result of the SoftBank Uptier Transaction, SoftBank exchanged its
antecedent debt, the SoftBank Unsecured Notes, for higher priority 2L Exchangeable Notes and
3L Exchangeable Notes that are now set to receive a recovery under the Debtors' proposed chapter
11 plan, while the Unsecured Notes are set to receive nothing. Additionally, WeWork paid
SoftBank a par recovery on account of its now-redeemed SoftBank Secured Notes. Yet had
WeWork been in a chapter 7 liquidation, a par recovery on such debt, given the extent of the
collateral package and WeWork's poor liquidation prospects (particularly given the limited

---

[19] *See Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtors' Schedules
of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 594] at 2.17.

liquidation value of its over-market lease portfolio), would never have been achieved. *See In re Tire Kings of Am., Inc.,* 164 B.R. 40 (Bankr. M.D. Pa. 1993) (concluding that the chapter 7 liquidation element was met where testimony showed that the debtor's liabilities outweighed its assets on the petition date).

       C.     SoftBank, the SoftBank Directors and Other Members of the Board Breached Their Fiduciary Duties

53.     Directors and officers of a Delaware corporation owe companies two duties: the duty of care and the duty of loyalty. "Delaware law [also] imposes fiduciary duties on those who effectively control a corporation." *Patel v. Duncan*, 2021 Del. Ch. LEXIS 227, 2021 WL 4482157, at \*24 (Del. Ch. Sept. 30, 2021), *as corrected* (Oct. 4, 2021) (quoting *Voigt v. Metcalf*, 2020 Del. Ch. LEXIS 55, 2020 WL 614999, at \*11 (Del. Ch. Feb. 10, 2020)). The Proposed Complaint alleges that SoftBank, as a controlling entity, Son, as a controlling person, SoftBank's designees to, and certain other former members of, the Board, in their capacities as directors, owed fiduciary duties to the Debtors and their unsecured creditors.

54.     Under Delaware law, the fiduciary duties of officers and directors are ordinarily owed to the shareholders. However, upon insolvency, Delaware law recognizes that the duties owed extend to creditors. *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015) (holding once "a corporation becomes insolvent, creditors gain standing to assert claims derivatively for breach of fiduciary duty"); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007) (holding that "the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties" and a "corporation's insolvency 'makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value'"). As described above and in the Proposed Complaint, the Company was insolvent at all relevant times.

55.    "The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citations and internal quotations omitted). The duty of care is violated when the directors and officers act with gross negligence or demonstrate a "reckless indifference to or a deliberate disregard of" their duties or undertake "actions which are without the bounds of reason." *Id*. at 750 (citations and internal quotations omitted).[20]  Damages are not an element of the claim. *Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited*, 2021 WL 3184591, *18 (Del. Ch. 2021).

56.    The duty of loyalty generally obligates a fiduciary to act in "good faith" and to refrain from conflicts and from putting its interests ahead of those of the corporation. *See In re USA Detergents, Inc.*, 418 B.R. 533, 545 (Bankr. D. Del. 2009) ("The duty of loyalty 'mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'") (quoting *Fedders*, 405 B.R. at 540); *see also In re Tops Holding II Corp.*, 646 B.R. 617, 697 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, No. 22-CIV-9450 (NSR), 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023) (Under Delaware law, a director must act with "undivided and unselfish loyalty to the corporation," with "no conflict between duty and self-interest."). Typically, the duty of loyalty is violated where either a director or officer "intentionally fails to

---

[20] Note that a single transaction is not necessary to assert a breach of fiduciary duty claim. *See Frederick Hsu Living Trust v. ODN Holding Corporation*, 2017 WL 1437308, *15 (Del. Ch. 2017) (holding that a five-year long scheme of "abandoning the Company's growth strategy which was benefitting its common stockholders in favor of selling off whole business lines and hoarding cash in order to provide the maximum amount [defendant] could extract non-ratably from the Company by exercising its redemption right" breached a fiduciary duty).

act in the face of a known duty to act, demonstrating a conscious disregard for his duties" or appears on both sides of a transaction, expects to derive personal financial benefit from the transaction in the sense of self-dealing, or is beholden to an interested party. *Walt Disney Co. Derivative Litig.*, 907 A.2d at 755; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) (subsequent history omitted).

57.     Although the business judgment rule requires a presumption that a director acted on an informed basis and in good faith, *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014), such presumption can be overcome by demonstrating that "the directors [or officers] are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264 n. 66 (Del. Ch. 2000). Once it is determined that the fiduciary did not act independently or in good faith, its conduct must be measured against a standard of "entire fairness," which is the "most onerous standard of review" and shifts the burden of proof to the defendants "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders." *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 815 (Del. Ch. 2022) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. Ch. 2006)). In doing so, directors must prove that both the process of the transaction and the course of dealing – including the structure, negotiations, disclosures and timing—were fair. The entire fairness inquiry is "fact intensive, making it nearly impossible for defendants to succeed in dismissing those claims on a motion to dismiss." *MultiPlan Corp. S'holders Litig.*, 268 A.3d at 815-16 ("'It is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review.'") (citing *Tornetta v. Musk*, 250 A.3d 793, 812 (Del. Ch. 2019)).

1.      **SoftBank and Son Owed Fiduciary Duties to WeWork in Its Capacity as a Controlling Shareholder or Part of a Control Group**

58.    The analysis of whether a party is effectively in control of a corporation "'must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes.'"  *Patel v. Duncan*, 2021 Del. Ch. LEXIS 227, 2021 WL 4482157, at *24-25 (quoting *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003)). "[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry." *Id* at *24 (internal citations omitted). SoftBank easily satisfies this standard for a number of reasons. There can be no doubt that SoftBank effectively controlled the Debtors through its aggregate voting shares of the Debtors and ability to name five directors on the Board.

59.    First, since 2019, SoftBank has held at least 55% of the Company's equity and had the right to appoint half of the Board, including its Executive Chairman. ███████████████
████████████████████████████████████████████████████████████
Additionally, as of the Petition Date, SoftBank (through its affiliates) owned at least 72% of the Company's equity.[21]   SoftBank is therefore a classic fiduciary, owing fiduciary duties to the Company's other stockholders and creditors.

60.    To the extent that it is determined that the SoftBank entities should be treated separately, they would undoubtedly constitute a control group in the aggregate. A group of stockholders constitutes a control group if they are "connected in some legally significant way— such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal," and such group likewise owes fiduciary duties to other stockholders and, in the case of insolvency, creditors. *Garfield v. Blackrock Morg. Ventures (In re Garfield)*, 2019

---

[21] *See* the *Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Docket No. 1] at 10.

LEXIS 1400, 2019 WL 7168004, at *22 (Del. Ch. 2019) (quoting *Sheldon v. Pinto Tech. Ventures,*

*L.P.*, 220 A.3d 245, 252 (Del. Ch. 2019)). Here, among other things, the SoftBank entities are

connected by common ownership and thus constitute a control group.[22]

61.    Likewise, Masayoshi Son ("**Son**") exercised control both through his position as

CEO of WeWork's biggest shareholder, SoftBank, and through his control of Neumann. Not only

was Son one of Neumann's most trusted advisors, but Son would also call Neumann and direct the

continued unsustainable growth of the Company. Once Neumann was ousted, Son gave direct

orders to Marcelo Claure ("**Claure**"), one of the SoftBank Directors and the Executive Chairman

of the Board appointed after Neumann's ouster, on how to continue to run the company.

62.    For each of the foregoing reasons, the SoftBank entities are fiduciaries of the

Company and owed fiduciary duties to the Company's other shareholders and creditors.

**2.    SoftBank, the SoftBank Directors, the MTA Directors, Son, and the
Fiduciary Does Breached Their Fiduciary Duties to WeWork's
Creditors by Driving WeWork's Uncontrolled Expansion**

63.    As alleged in the Proposed Complaint, SoftBank, the SoftBank Directors, Son, Lew

Frankfort and Bruce Dunlevie (Frankfort and Dunlevie, collectively, the "**MTA Directors**") and

the Fiduciary Does (collectively, the "**Fiduciary Defendants**") breached their fiduciary duty of

care by driving WeWork's uncontrolled and irresponsible expansion at a time when WeWork was

---

[22] Indeed, SoftBank describes the interrelated nature of the SoftBank entities as follows:

> SBG is the sole shareholder of SB Global Advisers Limited, which has been
> appointed as manager and is exclusively responsible for making final decisions
> related to the acquisition, structuring, financing and disposal of SoftBank Vision
> Fund II-2 L.P.'s investments, including as held by SVF II Aggregator (Jersey)
> L.P., which is the sole member of SVF II Holdings (DE) LLC, and SVF II WW
> Holdings (Cayman) Limited. SoftBank Vision Fund II-2 L.P is the sole limited
> partner of SVF II-2 L.P. is the sole limited partner of SVF II Aggregator (Jersey)
> L.P., which is the sole member of SVF II Holdings (DE) LLC, which is the sole
> member of SVF II WW (DE) LLC. SVF II WW Holdings (Cayman) Limited is a
> wholly owned subsidiary of SVF II WW (DE) LLC.

SoftBank Group Corp., SEC Form 3 (Apr. 1, 2023).

insolvent, to the detriment of its creditors and shareholders. As described in the Proposed Complaint, SoftBank launched the $100 billion Vision Fund in 2017 with the intent of investing in tech companies and highlighting the investing skills of SoftBank's founder and CEO, Son. WeWork, a buzzy real estate company, was the perfect target for SoftBank to tout as a SoftBank success story, despite the fact that, unlike the Vision Fund's other investments, WeWork was *not* a technology company. In 2016, Neumann met with Son and convinced him to invest $4.4 billion into WeWork. Not only did this expand WeWork's capital by over 50%, it also poised two SoftBank executives to take positions on the Board.

64.     SoftBank and Son exerted power over WeWork from the outset, such that ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████ As Son was the person Neumann listened to the most, Son exerted significant influence over Neumann.

65.     Son, acting in the best interests of the Vision Fund (not WeWork), used Neumann's loyalty to his advantage and spurred on the Company's uncontrolled expansion. Son would show Neumann PowerPoint presentations of other companies who expanded fast and demanded he do the same. Even in moments when the relationship between the two had soured, it was still difficult for Neumann to disagree with Son on any matter. While Neumann controlled WeWork, it was evident that Son controlled Neumann.

66.     After its initial investment, SoftBank continued to invest money in WeWork, ultimately investing over $16 billion. And throughout their partnership, SoftBank used its position

to encourage and direct the Company's uncontrolled growth, even as it failed to turn a profit and took on more and more decade-long commercial leases.

67.    As illustrated in the below chart, WeWork's financial obligations, and in particular its un-cancellable long-term lease obligations, were extraordinary and off-market compared to its peers in the real estate arbitrage space.



68.    Additionally, the Fiduciary Defendants inappropriately treated WeWork like the technology company it was not. For example, following Neumann's departure, the Company implemented a "co-CEO structure" – which is common among start-up technology companies – where Arthur Minson ("**Minson**") functioned as head of real estate and Sebastian Gunningham ran certain undefined technology aspects of the Company. The Fiduciary Defendants, in treating WeWork like a tech company and forcing expansion like a tech company failed to act in good faith and breached their fiduciary duties. *See In re Cred Inc.,* 650 B.R. 803, 822 (Bankr. D. Del. 2023) (holding that allegations that corporate officers' general course of conduct, including that they caused the debtor to take on more debt than could be serviced, used false marketing materials to

induce investments, and failed to ensure that the debtor's investments were secured or made pursuant to properly executed contracts were sufficient to state claim for breach of duty of care under Delaware law).

### 3.   The Fiduciary Defendants Breached Their Duty of Loyalty by Choosing The MTA Financing

69.   When WeWork's 2019 IPO ended in failure, it was left in a precarious liquidity position. Two options presented themselves: a JPMorgan rescue financing and a SoftBank financing. SoftBank's package had one major drawback, however, that concerned former co-CEO Minson – SoftBank would formally solidify its constructive control of WeWork. Minson championed the JPMorgan package as a way for WeWork to slow its uncontrolled growth and focus on making the Company profitable. However, the MTA Special Committee, comprised of two allegedly independent directors, chose SoftBank. In doing so, the MTA Special Committee approved a plan that ousted Neumann as CEO and put the Company squarely in SoftBank's control through its designation of half of the Board and the ability to install Claure, a SoftBank executive, as a member of the Board, who – according to two former WeWork CEOs – was brought in to run the company.

70.   The MTA Directors, despite being purportedly independent directors, breached their duty of loyalty to WeWork by working for or with SoftBank in connection with the MTA.[23] SoftBank sat on both sides of the rescue financing transaction and unfairly caused WeWork to enter into a transaction that caused harm to the Debtors. The MTA Directors acted to further the interests of SoftBank by giving it the company in which it had invested billions. In doing so, they

---

[23] Prior to the execution of the MTA, ███████████, an executive of SoftBank, stated that SoftBank had to ██████████████████████████████████████████████████████████████. The extent of SoftBank's plot to ███████████ is yet unclear.

breached their duty of good faith by intentionally acting not in the best interests of WeWork, but instead in the best interests of SoftBank, which was preparing for WeWork's bankruptcy.

### 4. The Fiduciary Defendants Breached Their Duty of Loyalty by Refusing to Draw On All of the Capital Commitments Associated with the 2019 Master Transaction Agreement.

71.     After the MTA was executed, WeWork should have had the liquidity it needed to bring the Company toward profitability. However, in reality, SoftBank's financing plan was a bait-and-switch to formalize its control over the Company so that it could continue to drive the Company toward the bankruptcy it was preparing for and disallow the actual drawing of the committed capital. Once the MTA was consummated and SoftBank gained 72% control of WeWork, it became clear that SoftBank did not intend to make available all of its committed capital to WeWork. Indeed, Claure received orders from SoftBank and Son to ***not*** draw down on all of Softbank's committed capital, leading the Company right back to where it started prior to entry into the MTA. As a result, by placing SoftBank's interests above those of the Company, the Fiduciary Defendants breached their duty of loyalty to WeWork.

### 5. The Fiduciary Defendants Breached Their Duties of Loyalty in Negotiating and Executing the Uptier Transactions

72.     SoftBank and the SoftBank Directors also breached their duty of loyalty by approving the Uptier Transactions. As alleged in the Proposed Complaint, in early 2023, SoftBank was aware that WeWork was dangerously low on cash and at risk of a negative going concern opinion and imminent bankruptcy. In order to position itself favorably in the capital structure in anticipation of a bankruptcy, SoftBank, an interested party that lacked independence, facilitated the Uptier Transactions. Through the transactions, SoftBank pushed the Debtors to intentionally deplete the assets available to general unsecured creditors and transfer cash and other collateral to SoftBank, elevating SoftBank's potential for recovery in a bankruptcy.

73.     SoftBank's goals in negotiating the Uptier Exchanges and the SoftBank Redemption were to maximize its recoveries and position itself as the fulcrum creditor in a bankruptcy. Indeed, SoftBank used the transactions to receive $300 million in cash, cancel its commitment to purchase an additional $200 million of secured notes, and obtain additional secured notes, which were convertible to equity unlike those received by public noteholders. Even though "a creditor or preferred stockholder cannot misuse a fiduciary position to try to advantage himself in his creditor or preferred stockholder capacity," *Lockton v. Rogers*, No. 2021-0058-SG, 2022 Del. Ch. LEXIS 47 at *32-33 (Del. Ch. Mar. 1, 2022), every facet of the Uptier Transactions was designed to benefit SoftBank over WeWork's other creditors.

74.     Because SoftBank appeared on both sides of the transactions and secured benefits for itself to the detriment of all others, SoftBank breached its fiduciary duty of loyalty. In negotiating and approving these transactions, SoftBank and SoftBank's hand-picked WeWork directors breached their fiduciary duties to WeWork's creditors.

D.     SoftBank's Claims Should Be Equitably Subordinated

75.     The Bankruptcy Code authorizes bankruptcy courts to subordinate equity interests to other equity interests based on equitable considerations. *See* 11 U.S.C. § 510(c).[24]  In the Third Circuit, the three-part test for equitable subordination requires a showing that: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *In re SubMicron Systems Corp. ("SubMicron")*, 432 F.3d 448, 462 (3d Cir. 2006) (citing *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding*

---

[24] Section 510(c)(1) provides that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1).

*Unsecured Claims* 160 F.3d 982, 986-87 (3d Cir. 1998)). "[C]ourts recognize that determining whether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss." *Autobacs Strauss, Inc.*, 473 B.R. at 583. Inequitable conduct "is not limited to fraud, but includes even lawful conduct that shocks one's good conscience." *See In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).

76.    Where, as here, the defendant is an insider, the defendant "must have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *In re Exide Techs., Inc.*, 299 B.R. 732, 744 (Bankr. D. Del. 2003) (internal citation omitted). As alleged in the Proposed Complaint, SoftBank is an insider that exercised control over the Debtors at all relevant times. Its actions are therefore subject to heightened scrutiny. When dealings with a controlling shareholder are challenged, the burden is on the shareholder to show not only good faith, but the inherent fairness of the transaction. *See MultiPlan Corp. S'holders Litig.*, 268 A.3d at 815.

77.    SoftBank engaged in wrongful and inequitable conduct by orchestrating the Uptier Transactions and designing such transactions to elevate its unsecured debt into a senior position in the Debtors' capital structure. Specifically, by March 2023, recognizing the Debtors' options were narrowing and bankruptcy was imminent, SoftBank made a last-ditch effort to elevate its interests. SoftBank's self-serving goals for entering into the Uptier Transactions are evidenced by ██████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████ By negotiating and consummating the Uptier Transactions with the Debtors and the Public Noteholders, SoftBank

achieved its goals, protected its downside risk, and improved its position in the priority scheme at the expense of other creditors.

78.    As alleged in the Proposed Complaint, the elements of an equitable subordination claim are satisfied:

(a) *First,* the exchange of unsecured debt for secured debt mere months before the Debtors initiated these Chapter 11 Cases unfairly elevated SoftBank in the capital structure at a time when the Uptier Parties had actual or constructive knowledge that the Company was insolvent.[25]

(b) *Second*, the misconduct resulted in injury to the creditors and conferred an unfair advantage on SoftBank. By advancing its own interests in this way, SoftBank necessarily pushed other creditors further back in the recovery line while also depleting the assets available for their recovery. Therefore, SoftBank used its control of the Company and direct knowledge of its cash position to assume an unfair advantage in the chapter 11 cases it knew to be imminent.

(c) *Third*, equitable subordination of SoftBank's claims based on these transactions is consistent with the provisions of the Bankruptcy Code. One overarching purpose of the Bankruptcy Code seeks to protect creditors, advocating for similar treatment for all similarly situated claims. Before the Uptier Transactions, general unsecured creditors stood in the same position as SoftBank with regard to its unsecured claims. Yet, through these transactions, SoftBank used its insider knowledge to elevate its own interests at the expense of the general unsecured creditors—a clearly inequitable result that should be remedied.

E.    <u>SoftBank's Claims Should Be Recharacterized as Equity</u>

79.    Through the Proposed Complaint, the Committee has also asserted colorable claims to recharacterize the SoftBank Claims as equity.

80.    "The ability to recharacterize . . . emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance." *In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991); *see also SubMicron*, 432 F.3d at 457 (affirming lower court's recharacterization determination); *In re Lyondell Chem. Co. ("Lyondell")*, 544 B.R. 75, 93 (Bankr.

---

[25] ████████████████████████████████████████████████████
████████████████████████████████

S.D.N.Y. 2016) ("[T]here can be little doubt that bankruptcy courts have the power to recharacterize debt as equity when such is warranted by the facts."). "The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." *Fedders*, 405 B.R. at 554.

81.    Although the recharacterization inquiry focuses on the intent of the parties when the investment was made, *SubMicron*, 432 F.3d at 457, courts will look at the complete record of the parties' history. *U.S. v State St. Bank and Trust Co*., 520 B.R. 29, 74-75 (Bankr. D. Del. 2014). Moreover, in defining the recharacterization inquiry, the Third Circuit has noted the various multi-factor tests adopted by other courts but did not adopt one over another. *See SubMicron*, 432 F.3d at 456 ("No mechanistic scorecard suffices. And none should"). Rather, courts will consider a variety of factors and no one factor is dispositive.[26]    "While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *Id*. at 456. Accordingly, the intent of the parties and the expected source of repayments are key factors to the recharacterization analysis. *See* Ron Meisler et al., *Debt Recharacterization in Bankruptcy: Overview and Developments*, 28 NORTON J. BANKR. L. & PRAC. no. 3, at art. 1 [hereinafter *Debt Recharacterization in Bankruptcy*] (stating that

---

[26] Such factors include: (1) names given to instruments, if any, evidencing alleged indebtedness; (2) presence or absence of fixed maturity date and schedule of payments; (3) presence or absence of fixed rate of interest and interest payments; (4) source of repayments; (5) adequacy or inadequacy of debtor's capitalization; (6) identity of interest between creditor and stockholder; (7) security, if any, for advances; (8) corporate debtor's ability to obtain financing from outside lending institutions; (9) extent to which advances were subordinated to the claims of outside creditors; (10) extent to which advances were used to acquire capital assets; and (11) presence or absence of sinking fund to provide repayments. *SubMicron*, 432 F.3d at 455, n.8.  *See also In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001) ("No one factor is controlling or decisive."); *In re Hedged-Investments Assocs., Inc.*, 380 F.3d 1292, 1298–99 (10th Cir. 2004) ("None of these factors is dispositive and their significance may vary depending upon circumstances."); *In re Radnor Holdings Corp.*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (stating "the intent of the parties at the time of the transaction, [is] determined not by applying any specific factor").

recharacterization addresses "whether the debtor-borrower and the putative debtholder intended to grant the latter an enforceable right of payment irrespective of the former's financial performance")
(citing *SubMicron*, 432 F.3d at 456). The degree of affiliation between the parties involved also affects the analysis. *See In re Franklin Indus. Complex, Inc.*, 2007 Bankr. LEXIS 3004, *49-50 (Bankr. N.D.N.Y. 2007) ("[T]he degree of affiliation between the creditor and the debtor will be positively correlated with the level of scrutiny to which the transactions are subjected in recharacterization requests.").

82.    Moreover, the Third Circuit has explained that courts must ultimately reach a "commonsense conclusion" as to whether "the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *SubMicron*, 432 F.3d at 456. "That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by case." *Id*. As further described below and in the Proposed Complaint, the commonsense conclusion here is that SoftBank at all times invested its funds as an investor and, accordingly, that the SoftBank Claims should be recharacterized as equity.

### 1.    The SoftBank Uptier Notes Claims Should Be Recharacterized as Equity

83.    By March 2023, when SoftBank and the Debtors began negotiating the Uptier Transactions, SoftBank knew that: (i) the Company was insolvent; (ii) there was no path to profitability in the foreseeable future; and (iii) a massive restructuring, most likely through a bankruptcy, was imminent. Recognizing the warning signs, SoftBank sought to protect its investment through the Uptier Transactions, pursuant to which it exchanged over a billion dollars

of nearly worthless unsecured notes for convertible secured notes and equity. While the Uptier Transactions were designed to provide SoftBank downside protection vis-a-vis other unsecured creditors and was documented as debt on paper, unlike true lenders, SoftBank was acting to protect its existing equity position and never expected repayment on account of its new claims.

84.     This was consistent with SoftBank's broader financial objectives, as SoftBank generally does not extend debt to its portfolio companies. As (i) stated by a WeWork executive and (ii) supported by SoftBank's website[27] and historical investment practices, SoftBank's business is in partnering with founders and investing in the growth of companies, not collecting fees and interest on account of debt instruments. Any issuance of true debt would be an outlier for SoftBank. In fact, SoftBank's aversion to debt is demonstrated by its continuous quest to accumulate equity in the Company. Of the various capital infusions SoftBank contributed to WeWork, the vast majority were expressly in the form of equity. SoftBank's long history as an equity investor of WeWork should inform the Court as to the real intention of the parties. *See U.S. v. State St. Bank and Trust Co*., 520 B.R. at 74-75 ("A recharacterization analysis . . . must be considered in light of the entire relationship of the parties, with particular emphasis on parties' intent at the initial funding."). Additionally, in the view of a former co-CEO of the Company, SoftBank never acted like a lender and instead always acted as an equity holder and partner.

85.     The Debtors and SoftBank also worked together to ensure that the Uptier Transactions furthered SoftBank's stated goals of: (i) minimizing cash outlays from SoftBank; (ii) implementing downside protection by creating senior debt but also creating optionality in *equity value*; (iii) improving its *equity value* through deleveraging; (iv) maximizing the pathway to cash recoveries across all its positions; and (v) providing potential for future *equity* in the

---

[27] SoftBank's Vision Fund website touts, "We *partner* with ambitious founders . . . ." and "We are long-term, patient *investors* who stand by our founders . . . ."

business. As demonstrated by ████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████ SoftBank's self-serving goals are further

corroborated █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ The total of 1.6 billion

Common Shares SoftBank was entitled to in connection with the SoftBank Uptier Transaction is

far from a grant of "an enforceable right of payment irrespective of the former's financial

performance." *See Debt Recharacterization in Bankruptcy* (citing *SubMicron*, 432 F.3d at 456).

86.    The identity of interests between SoftBank and WeWork further supports

recharacterization, as "the paradigmatic situation for recharacterization [is] where the same

individuals or entities (or affiliates of such) control both the transferor and the transferee, and

inferences can be drawn that funds were put into an enterprise with little or no expectation that

they would be paid back along with other creditor claims." *Adelphia Communs. Corp. v. Bank of

Am., N.A. (In re Adelphia Communs. Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007); *see

Lyondell*, 544 B.R. at 97 n.96 (quoting the same). Such was the case with WeWork and SoftBank.

As described above, at all relevant times, SoftBank was (and still is) the majority shareholder of

---

[28] ████████████████████████████████████████████████████████████████
████████████████████████████████████

WeWork and an insider of the Debtors. SoftBank exerted an immense amount of control over the Company since its initial investment, and that control drastically increased after SoftBank provided WeWork with financing after its failed IPO. Additionally, given that the Board was dominated by SoftBank appointees, the Debtors had no true "independent" directors to evaluate the Uptier Transactions.

87.     SoftBank's effective control over and history of prior contributions to WeWork indicate that the Uptier Transactions were an investment into the Company to salvage SoftBank's earlier cash infusions. *See In re AtlanticRancher, Inc.*, 279 B.R. 411, 435-36 (Bankr. D. Mass. 2002) (deciding transaction was equity where holder of convertible note had "extraordinary ability to direct the company's affairs" and "was extremely involved in the daily operations of the [d]ebtor"). *Submicron* observed this exact scenario, explaining that:

> "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."

*SubMicron,* 432 F.3d at 457 (internal quotation marks and citations omitted). Accordingly, the "commonsense" conclusion is that WeWork issued the notes underlying the SoftBank Uptier Notes Claims as a disguised equity contribution.

88.     Moreover, several additional factors relevant to the analysis strongly support recharacterization of the SoftBank Uptier Notes Claims, including: (i) the inadequacy of the Debtors' capitalization; (ii) the source of repayments; and (iii) the Debtors' inability to obtain financing from outside lending institutions. *See SubMicron*, 432 F.3d at 455-56 (referring to such factors as "pertinent").

89.     *First*, as discussed herein, WeWork was severely undercapitalized at all relevant times (a fact which SoftBank was uniquely aware of given its insider status) and in need of

SoftBank's infusions of liquidity to survive due to its long-term lease obligations and unstainable business model. This was particularly the case at the time of the SoftBank Uptier Transaction. ■

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

90.　　*Second*, the source of repayments to SoftBank solely depended on the Company's success. Where, as here, "the capital structure of the entity is such that future profits are the only hope of repayment, and a lender knows or should know that, the transaction sounds in equity." *Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 366 (Bankr. E.D. Okla. 2010) ("The question is whether the lender has any reasonable expectation of payment if the business fails."); *see also AutoStyle*, 269 F.3d at 751 (finding that repayment based on earnings indicates dependency on the success of the business and weighs in favor of equity classification); *Roth Steel Tube Co. v. Comm'r.*, 800 F.2d 625, 631 (6th Cir. 1986) ("An expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness."). The Debtors operated on a cash flow negative basis and there were no "hard" assets that could be monetized. The Debtors consistently missed their internal and publicly available projections by substantial amounts, and constantly rolled forward the period when a turnaround to profitability was projected to occur. There was no rational basis to think that the "debt" in question would be repaid pursuant to its terms. Rather, the contribution was further risk investment in the Company that could only be repaid upon a substantial turnaround.

91.     *Third*, by the time of the SoftBank Uptier Transaction, the Company had already tapped out the realm of private investments and failed to realize enough capital from the public markets. Absent the ability to exchange unsecured notes for secured notes, even the Public Noteholders would not participate. The fact that no reasonable creditor would have acted in the same manner is "strong evidence" that the SoftBank Uptier Notes "were capital contributions rather than loans." *See In re BH S & B Holdings LLC*, 420 B.R. 112, 158 (Bankr. S.D.N.Y. 2009) (citing *AutoStyle*, 269 F.3d at 752). No reasonable creditor with SoftBank's knowledge would "have made a loan to the debtor on similar terms." *In re Live Primary, LLC*, 626 B.R. 171, 203 (Bankr. S.D.N.Y. 2021); *Lyondell*, 544 B.R. at 99.

92.     Accordingly, the totality of the circumstances more than establishes the minimum showing required for a colorable claim to recharacterize the SoftBank Uptier Notes Claims.

## 2.     The SoftBank LC Facility Claims Should Be Recharacterized as Equity

93.     As described herein and in the Proposed Complaint, the Committee also presents a colorable claim for recharacterization with regard to the SoftBank LC Claim, which arises from SoftBank's exposure as a co-obligor under the LC Credit Agreement and the LC Facility.

94.     The SoftBank LC Facility Claims satisfy several of the factors for recharacterization (many of which overlap with the factors warranting recharacterization of the SoftBank Uptier Notes Claims):

(a) SoftBank was (and still is) the majority shareholder of, and an insider of, the Debtors. There is an identity of interest between "creditor" and shareholder;

(b) The Debtors had no true "independent" directors to evaluate the Uptier Transactions. The Board was dominated by SoftBank appointees;

(c) Immediately after the failed IPO, the Debtors' finances were in shambles. Not only did they need to enter into a new Credit Agreement to support their continued operations. ███████████████████

(d) Third-parties were unwilling to extend credit without credit support from SoftBank;

(e) There was no source of repayment of claims under the Reimbursement Agreement—the Debtors operated on a cash flow negative basis and there were no "hard" assets that could be monetized; and

(f) Claims under the Reimbursement Agreement had no fixed maturity or schedule of payments—amounts due were to be paid on the next business day as presented.

95.    Indeed, the most compelling argument for recharacterization of the SoftBank LC Facility Claims is how the parties dealt with claims under the Reimbursement Agreement. ▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ ▮ █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ ▮

Referred to internally as the "band aid" amendment, this gamesmanship by SoftBank evidences the fact that it never expected to be paid as a creditor on the SoftBank LC Facility Claims and was at all times acting from its actual position as an equity holder. *See Flint Indus., Inc. v. Comm'r*, 82 T.C.M. (CCH) 778, 2001 WL 1195725, *12 (U.S. Tax Ct. 2001) ("Evidence that a creditor did not intend to enforce payment or was indifferent as to the exact time the advance was to be repaid belies an arm's-length debtor-creditor relationship.").

---

[29] Fourth Amendment to Reimbursement Agreement § 2.1(b).
[30] Amended and Restated Reimbursement Agreement  § 2.1(b).

F.    <u>The Unencumbered Assets Are Not Subject To Any Security Interests and Any
Purported Liens on the Non-Perfected Assets Should Be Avoided.</u>

96.    Through its investigation, the Committee has determined that, pursuant to the

applicable loan and collateral documentation, the Prepetition Liens do not extend to a significant

number of material unencumbered assets. As set forth below and as more fully described in the

Proposed Complaint, such assets (collectively the "**Unencumbered Assets**") include:

(a)    <u>Commercial Tort Claims</u>. Commercial tort claims with a value under $10 million
are Excluded Property under the LC Credit Agreement and the Indentures and,
therefore, are not subject to the Prepetition Liens.[31] Moreover, any commercial
claims of $10 million or more would have needed to be specifically identified prior
to the Petition Date for the applicable collateral agent to have a perfected security
interest. Pursuant to sections 9-108(a) and 9-203(b)(3)(A) of the Uniform
Commercial Code, a security agreement covering commercial tort claims must
provide a detailed description of the collateral to properly pledge and perfect a lien
on commercial tort claims. The Debtors, however, did not describe any commercial
tort claims with a value of $10 million or more in any relevant debt documents or
financing statements. Accordingly, any Prepetition Liens on any and all
commercial tort claims were unperfected as of the Petition Date;

(b)    <u>Leasehold Interests</u>. Under the LC Credit Agreement and the Indentures, the
Debtors' real property leasehold are Excluded Property and, therefore, are not
subject to the Prepetition Liens.[32] Moreover, as alleged in the Proposed Complaint,
the Committee has determined that many of the Debtors' agreements with its
Member Companies (as defined in the First Day Declaration) (such agreements, the
"**Member Agreements**") constitute Leasehold Interests under the LC Credit
Agreement and Indentures and, therefore, are also not subject to the Prepetition
Liens;

(c)    <u>Excluded Equity Interests</u>. Under the LC Credit Agreement and the Indentures,
Excluded Equity Interests are explicitly carved out of the definition of Collateral
securing the Prepetition Liens.[33] As such, all Excluded Equity Interests, including
35% of the equity interests of any CFC or CFC Holdco, including, without
limitation, 9670416 CANADA Inc. and The We Company Worldwide Limited, do
not attach to the Prepetition Liens and such equity interests are, therefore,
unencumbered;

(d)    <u>Excluded Accounts</u>. Under the LC Credit Agreement and the Indentures, Excluded
Accounts are explicitly carved out of the definition of Collateral securing the

---

[31] *See* LC Credit Agreement § 1.1
[32] *See* LC Credit Agreement § 1.1.
[33] *See* LC Credit Agreement § 1.1.

Prepetition Liens.[34] As such, the applicable collateral agents under the Credit Agreement and Indentures do not possess a perfected security interest in any and all Excluded Accounts; and

(e) <u>Excluded Debtors</u>. Through its investigation, the Committee has determined that the Prepetition Liens do not extend to the assets of certain Debtors, (the "**Excluded Debtors**"). The Excluded Debtors did not enter into any security agreement with the applicable collateral agents to guaranty or pledge their respective assets to secure the obligations under the LC Credit Agreement and/or the Indentures. Such assets are unencumbered because (i) the applicable collateral agent did not file, nor did it have authority to file, UCC-1 financing statements against any assets held by the Excluded Debtors, or (ii) the Excluded Debtors are not a party to the LC Credit Agreement and/or the Indentures.

97.    As such, the Committee has colorable claims for a declaration that the Unencumbered Assets are not subject to the Prepetition Liens and available for distribution to the Debtors' general unsecured creditors.

G.    <u>Claims on Account of Unmatured Interest and the Make-Whole Premium Should be Disallowed.</u>

98.    Based on the facts and circumstances herein, the Committee also has colorable claims for disallowance of any claims for any unaccreted original issue discount of the Prepetition Notes as well as the "make-whole" provision under the First Lien Notes Indenture.[35]

99.    The claims under the Prepetition Indentures are substantially undersecured or are otherwise unsecured, and thus they are subject to section 502(b)(2) of the Bankruptcy Code. Section 502(b)(2) of the Bankruptcy Code provides that "unmatured interest" is disallowed. *See Leeper v. Pennsylvania Higher Educ. Assistance Agency, (PHEAA)*, 49 F.3d 98, 100–01 (3d Cir. 1995) ("Under section 502(b)(2), creditors are not entitled to include unmatured (or 'post-petition') interest as part of their claims in the bankruptcy proceedings."). Additionally, unaccreted original issue discount ("**OID**") is considered unmatured interest and, as such, is impermissible under

---

[34] *See* LC Credit Agreement  § 1.1.
[35] Indeed, the Debtors note that an aggregate of $230.6 million in accrued and unpaid interest, make-whole, and fees attributed to the Prepetition Notes was outstanding as of the Petition Date. *See* First Day Declaration ¶ 44.

section 502(b)(2) of the Bankruptcy Code. *See LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.*), 961 F.2d 378, 380 (2d Cir. 1992) (finding that unamortized OID is "unmatured interest" within the meaning of section 502(b)(2)). Each of the Prepetition Indentures indicate that the Prepetition Notes may have been issued with OID. Because such unaccreted OID constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code, it should be disallowed.

100.    Moreover, under the First Lien Notes Indenture, upon any Event of Default (as defined in the First Lien Notes Indenture) the 1L Notes are immediately due and payable (including accrued and unpaid interest thereon).[36] However, if such Event of Default occurs prior to November 1, 2024, an "Applicable Premium" equal to the greater of (i) 1.00% of the principal amount of such 1L Note and (ii) the excess, if any, of the present value as of such date of (a) the redemption price of such 1L Note on November 1, 2024, plus (b) all required interest payments due on such 1L Note through November 1, 2024 (computed using a discount rate equal to the Treasury Rate as of the date of redemption plus 50 basis points) (such premium, the "**Make-Whole Premium**") is also immediately due and payable.[37]  As such, the Make-Whole Premium provides for the payment of unmatured interest and should be disallowed for this reason. Additionally, the Make-Whole Premium, in fact, functions as an impermissible penalty (providing for an additional year of interest for loans that were outstanding for only six months) and should therefore be disallowed. This penalty drastically exceeds any reasonable calculation of damages to holders of the 1L Notes for the return of their funds, and is not otherwise a quantified penalty that could have been reasonably assumed to approximate damages that would be incurred for the return of funds. It too should therefore be disallowed

---

[36] *See* First Lien Notes Indenture § 6.02(e).
[37] *Id*.

## II.    The Debtors' Unwillingness to Pursue the Proposed Claims Is Unjustified

101.    Where, as here, proposed claims are colorable, a presiding court moves on to the

second step in the analysis: whether the "debtor in possession unjustifiably failed to bring suit."

*Off. Comm. ex rel. Cybergenics*, 330 F.3d at 566 (citing *STN,* 779 F.2d at 904). As one example

of an unjustifiable failure to bring suit, the Third Circuit has acknowledged that "the debtor-in-

possession often acts under the influence of conflicts of interest." *Id.* at 573 (internal citation

omitted). This is because "if managers can devise any opportunity to avoid bringing a claim that

would amount to reputational self-immolation, they will seize it." *Id*. "For example, a debtor may

be unwilling to pursue claims against individuals or businesses . . . with whom it has an ongoing

relationship that it fears damaging." *Id*. As a result, "[t]he possibility of a derivative suit by a

creditors' committee provides a critical safeguard against lax pursuit of avoidance actions." *Id*.

102.    Here, the Debtors are clearly acting "under the influence of conflicts of interest"

with respect to their pursuit of claims against the proposed defendants, who consist of their present

and former officers and directors, their largest equity holder and anticipated majority owner of the

Company, and their financial lifeline in these Chapter 11 Cases and potentially on a going concern

basis. Indeed, the Debtors' relationship with SoftBank is almost a decade long, and from the outset

of their relationship SoftBank has invested over $16 billion into the Company. Moreover,

SoftBank, via its designated directors, either flatly authorized or sat on both sides of the

transactions at issue.

103.    While the Debtors appointed the Special Committee to purportedly investigate the

Proposed Claims and other potential claims and causes of action, the Debtors have attempted to

"devise any opportunity to avoid bringing" these claims. They have expressed a clear intent of

releasing the parties in question from all claims and causes of action, despite a purported investigation, via the Cash Collateral Order and the Debtors' proposed chapter 11 plan.[38]

104.    Indeed, by entering the Chapter 11 Cases with a restructuring support agreement with SoftBank and the Ad Hoc Group, which is accompanied by a plan term sheet that provides no recovery to unsecured creditors, these Chapter 11 Cases are being run for the primary benefit of SoftBank and the Ad Hoc Group—the proposed defendants in the Proposed Complaint. And after nearly four months of conducting its own investigation, the Special Committee does not appear to be any closer to pursuing actions against the proposed defendants as it was at its inception.

105.    The Special Committee's Investigation has progressed at an unreasonably slow pace and is being conducted in a manner that avoids scrutinizing or otherwise inconveniencing SoftBank. The Company's fealty to SoftBank is particularly underscored by correspondence between ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████

106.    While the Committee would have preferred to file this Motion after the Special Committee announced that its investigation was complete, the Committee does not have that luxury given the challenge deadline imposed by the Cash Collateral Order. While the Committee's investigation remains far from complete—which is no surprise given the duration of the Special Committee's investigation to date—based on its investigation to date, the Committee has determined that multiple colorable and valuable claims exist. It is evident that the Debtors and the

---

[38] *See* Cash Collateral Order at 29–30 (Debtors stating they plan to "absolutely, unconditionally and irrevocably release[] and forever discharge[] and acquit[] the Prepetition Secured Parties and their respective Representatives (as defined herein) (collectively, the "Released Parties"), from any and all [Released Claims]").

Special Committee have already concluded that they will not be pursuing the Proposed Claims, and thus the Committee should be permitted to do so.[39]

### III.    Prosecution of the Proposed Claims Would Benefit the Estate

107.    Prosecution of the Proposed Claims would unquestionably benefit the Debtors' Estates. In determining whether an action would benefit the estates, the court should engage in a limited cost-benefit analysis. *Diocese of Camden, New Jersey*, No. 20-21257 (JNP), 2022 WL at *10 ("Ultimately, in determining whether a debtor unjustifiably refuses to bring proposed claims, the court must perform a cost-benefit analysis[.]"). One way courts conduct this analysis is by considering "the probability of success and the potential costs of the litigation . . . whether there exists a conflict of interest between the debtor and the parties against whom the derivative action is directed and whether the creditors' interests are otherwise protected in view of the debtor's refusal." *In re National Forge Co.*, 326 B.R. 532, 548 (W.D. Pa. 2005); *In re Pack Liquidating, LLC*, 2024 WL 409830, *21 (Bankr. D. Del. 2024).

108.    Here, the Proposed Claims are not only viable, but also have significant potential value and could improve the recoveries of unsecured creditors materially, outweighing any delay and cost associated with litigating them. Indeed, the Proposed Claims could result in a finding that a significant portion of the Debtors' property is unencumbered, dramatically shifting the recoveries and materially increasing the recoveries for the unsecured creditors. Further, the subordination or recharacterization of SoftBank's claims would put a substantial portion of currently secured claims behind the unsecured creditors in the priority scheme. In addition, the Proposed Claims – and, in

---

[39] Based upon discussions with the Special Committee's professionals, the Committee does not expect that the Special Committee will determine to bring the claims and causes of action set forth in the Proposed Complaint. To the extent that the Debtors successfully convince the Court that more time is needed to make this determination given the Special Committee's ongoing investigation, the Challenge Period should be extended so that the Committee's rights are preserved for the benefit of unsecured creditors.

particular, the preference claims related to the SoftBank Redemption – could result in the affirmative recovery of **hundreds of millions of dollars** for the benefit of unsecured creditors. Finally, the Committee understands that the Debtors have approximately $50 million of director and officer liability coverage, which provides a third party source of significant recoverable value to the Debtors' Estates for the benefit of unsecured creditors.

109.    Accordingly, the benefits to be gained from pursuing the Proposed Claims are substantial and significantly outweigh any concerns about delay and expense. There is no justification for refraining from prosecuting the Proposed Claims at this juncture in the Chapter 11 Cases.

## IV.    <u>The Committee Should Be Granted Exclusive Authority to Settle the Proposed Claims</u>

110.    The Debtors' inability and/or refusal to bring the Proposed Claims also makes the Debtors unable to effectively manage or settle any resulting litigation. Indeed, the Debtors have shown repeatedly throughout these Chapter 11 Cases that they are disinterested in scrutinizing or otherwise inconveniencing their principal investor, SoftBank. Moreover, it is indisputable that any decision to settle any of the Proposed Claims will have a disproportionate economic impact on the Debtors' unsecured creditors, whose interests the Committee represents in these Chapter 11 Cases. As a result, the Committee should be granted the exclusive right to settle and compromise the Proposed Claims. *See*, *e.g.*, *In re National Forge Co.*, 304 B.R. 214, 217 (Bankr. W.D. Pa. 2004) (explaining why the Creditors' Committee was granted the authority to assert, pursue, and/or settle claims filed on behalf of the estate).

## NOTICE

111.    Notice of this Motion will be given to all parties entitled to notice pursuant to the

Case Management Order.[40]

## NO PRIOR REQUEST

112.    No prior request for the relief sought in this Motion has been made by the

Committee.

## RESERVATION OF RIGHTS

113.    The Committee reserves all rights with respect to the Motion and these Chapter 11

Cases, including the right to amend and/or supplement this Motion, the right to participate in

additional briefing, and the right to be heard at any hearing or trial related to the Motion. Nothing

contained herein shall constitute a waiver of any of the rights or remedies of the Committee, each

of which is expressly reserved.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Committee respectfully requests that this

Court enter the proposed form of order filed contemporaneously herewith: (a) granting the

Committee standing to pursue the Proposed Claims; (b) granting the Committee exclusive

settlement authority with respect to the Proposed Claims; and (c) granting to the Committee such

other and further relief, at law or in equity, as this Court may deem just and proper.

---

[40] *See* Docket No. 100.

February 28, 2024
Morristown, New Jersey

**RIKER DANZIG LLP**

By: */s/* Joseph L. Schwartz
Joseph L. Schwartz, Esq.
Tara J. Schellhorn, Esq.
Daniel A. Bloom, Esq.
Gregory S. Toma, Esq.
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tschellhorn@riker.com
dbloom@riker.com
gtoma@riker.com

-and-

**PAUL HASTINGS LLP**

Kristopher M. Hansen, Esq. (admitted *pro hac vice*)
Frank A. Merola, Esq. (admitted *pro hac vice*)
Gabriel E. Sasson, Esq.
Emily L. Kuznick, Esq. (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
krishansen@paulhastings.com
frankmerola@paulhastings.com
gabesasson@paulhastings.com
emilykuznick@paulhastings.com

-and-

Paul R. Genender, Esq. (admitted *pro hac vice*)
Conrad Coutinho, Esq. (admitted *pro hac vice*)
Jake Rutherford, Esq. (admitted *pro hac vice*)
Marijana Kralt, Esq. (admitted *pro hac vice*)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
paulgenender@paulhastings.com
conradcoutinho@paulhastings.com
jakerutherford@paulhastings.com
marikralt@paulhastings.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

**<u>EXHIBIT A</u>**

**Proposed Complaint**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al.*, | Case No. 23-19865(JKS) |
| Debtors.[1] | (Jointly Administered) |

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WEWORK, INC., et al, on behalf of the estates of the Debtors,

*Plaintiffs,*

*v.*

SOFTBANK GROUP CORPORATION, SOFTBANK GROUP INTERNATIONAL, SOFTBANK GLOBAL ADVISERS LTD., SOFTBANK VISION FUND, SOFTBANK VISION FUND II, SVF II AGGREGATOR (JERSEY) L.P., SVF II GP (JERSEY) LTD., SVF II WW (DE) LLC, SVF II WW HOLDINGS (CAYMAN) LTD., SOFTBANK WW INVESTMENTS LTD., SOFTBANK WW CAYMAN, SOFTBANK WW HOLDINGS (CAYMAN) LTD., STARBRIGHT WW LP, RON FISHER, MARCELO CLAURE, MICHAEL COMBES, SAURABH JALAN, VIKAS J. PAREKH, DAVID TOLLEY, LEWIS FRANKFORT, BRUCE DUNLEVIE, MASAYOSHI SON, U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee and Collateral Agent under each of the First Lien Notes Indenture, Second Lien Notes Indenture, Second Lien Exchangeable Notes Indenture, and the Third Lien Exchangeable Notes Indenture, Collateral Agent under the Third Lien Notes Indenture, and Trustee and Collateral Agent under the Senior Secured Notes,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

DELAWARE TRUST COMPANY, as Trustee
under the Third Lien Notes Indenture,
GOLDMAN SACHS INTERNATIONAL
BANK, as senior administrative and collateral
agent; KROLL AGENCY SERVICES
LIMITED, as junior administrative and collateral
agent, CUPAR GRIMMOND, LLC, HOLDER
DOES 1-100, and FIDUCIARY DOES 1-100, et
al.

*Defendants*

## [PROPOSED] ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "**Committee**") of WeWork, Inc., and its affiliated debtors and debtors in possession (collectively, "**WeWork,**" the "**Company**"' or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), files as Plaintiff on behalf of the Debtors' estates this complaint (the "**Complaint**") against SoftBank Group Corporation ("**SBG**") and certain affiliates, subsidiaries, and investment funds under its control, including SoftBank Group International, SoftBank Global Advisers Ltd., SoftBank Vision Fund ("**SBVF**"), SoftBank Vision Fund II ("**SBVFII**"), SVF II Aggregator (Jersey) L.P. ("**SVFII**"), SVF II GP (Jersey) Ltd. ("**SVFIIGP**"), SVF II WW (DE) LLC ("**SVFIIWW**"), SVF II WW Holdings (Cayman) Ltd. ("**SVFIIC**," and collectively, with SBVF, SBVFII, SVFII, SVFIIGP, SVFIIWW, the "**Vision Fund**" or the "**SoftBank Vision Fund**"), SoftBank WW Investments Ltd., SoftBank WW Cayman, SoftBank WW Holdings (Cayman) Ltd., Starbright WW LP (together, the "**SoftBank Affiliates**," and together with SBG, collectively, "**SoftBank**"); the employees or other designees of SoftBank that have served on WeWork's board of directors (the "**Board**") or as officers of WeWork, including Ron Fisher, Marcelo Claure, Michael Combes, Saurabh Jalan, Vikas J. Parekh, and David Tolley (collectively, the "**SoftBank Directors**"); Lewis Frankfort and Bruce Dunlevie; the CEO of SoftBank, Masayoshi Son ("**Son**"); U.S. Bank Trust Company, National Association ("**U.S. Bank**") as Trustee under each of the First Lien Notes Indenture ("**1L Public Notes Trustee**"), Second Lien Notes Indenture ("**2L Public Notes Trustee**"), Second Lien Exchangeable Notes Indenture ("**2L Exchangeable Notes Trustee**"), and the Third Lien Exchangeable Notes Indenture ("**3L Exchangeable Notes Trustee**"), as Collateral Agent under each of the First Lien Notes Indenture ("**1L Public Notes Collateral Agent**"), the Second Lien Notes Indenture ("**2L Public Notes**

Collateral Agent"), the Third Lien Notes Indenture ("**3L Public Notes Collateral Agent**"),

Second Lien Exchangeable Notes Indenture ("**2L Exchangeable Notes Collateral Agent**"), and

the Third Lien Exchangeable Notes Indenture ("**3L Exchangeable Notes Collateral Agent**");

Delaware Trust Company ("**Delaware Trust**") in its capacity as trustee under the Third Lien Notes

Indenture ("**3L Public Notes Trustee**") (each indenture as defined below, and collectively, the

"**Prepetition Indentures**" and the notes issued pursuant thereto, the "**Prepetition Notes**"); U.S.

Bank Trust Company, National Association as the trustee and collateral agent under the Senior

Secured Notes (as defined below) (the "**SSN Trustee**"); the holders of Prepetition Notes (as

defined below, the "**Prepetition Noteholders**"); Goldman Sachs International Bank, as senior

administrative and collateral agent (the "**Senior Administrative Agent**"); Cupar Grimmond, LLC

("**Cupar**"), Kroll Agency Services Limited, as junior administrative and collateral agent (the

"**Junior Administrative Agent**" and together with the Senior Administrative Agent, the

"**Administrative Agents**"); any holders of any equity, debt, or liens or recipients of any other

transfers described below that are necessary to effectuate any requested relief and any subsequent

transferees of the transfers sought to be avoided (the "**Holder Does 1-100**," and collectively, the

"**Holder Doe Defendants**"); and any individuals and entities otherwise controlled by SoftBank

that breached fiduciary duties owed to Debtors (the "**Fiduciary Does**," and collectively, the

"**Fiduciary Doe Defendants**") (collectively, the "**Defendants**"). In support of this Complaint, and

based upon knowledge, information, belief, and its investigation to date, the Committee alleges as

follows:

<u>**PRELIMINARY STATEMENT**</u>

1.       SoftBank has always been much more than a financial sponsor of WeWork. From

the first 2016 meeting between Adam Neumann ("**Neumann**") and Son, the billionaire technology

investor who controls SoftBank, both parties understood that SoftBank would be a partner to WeWork. SoftBank and Son spurred on WeWork's aggressive expansion without regard for profitability. SoftBank was willing to invest billions in equity to fund WeWork's expansion plans, and in exchange for that investment, SoftBank insisted on unquestioning loyalty from WeWork.

2.      Ultimately, Neumann and WeWork took multiple rounds of SoftBank investment (at ever-increasing valuations), totaling approximately $10 billion by 2019, and implemented their growth strategy to expand the WeWork footprint – generating hundreds of millions of dollars in operating losses, entering into unsustainable agreements, and burning through billions of dollars of capital in the process.

3.      By 2019, SoftBank's internal analyses concluded that Neumann's explosive growth strategy, which SoftBank funded and drove, offered no realistic path to profitability, and SoftBank immediately sought ways to protect and extricate itself from its investment in WeWork. By pushing WeWork to pursue an initial public offering ("**IPO**"), SoftBank hoped to find a supplemental source of capital for WeWork's nearly insatiable need for cash and a public market that could limit some of SoftBank's exposure in WeWork's equity.

4.      In August 2019, WeWork filed an IPO Registration Statement that, for the first time, publicly disclosed its disastrous operating results, enormous cash burn, flawed corporate governance structure, and the extent of Neumann's self-dealing.[2] As a result, the IPO failed spectacularly, and in late September 2019, Neumann resigned from his position as Chief Executive Officer, and WeWork withdrew the IPO Registration Statement.

---

[2] One of the SoftBank Directors described WeWork as follows: ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

5.      At the time of the failed IPO and at all times thereafter, WeWork was hopelessly

insolvent. At all relevant times, WeWork had never generated an operating profit, had amassed

billions in long-term lease obligations, which failed to generate the required earnings to satisfy the

cost of the underlying liabilities, and had a constant need for new capital to fund its business plan

and operating expenses.

6.      Following the IPO failure and the precipitous decline in WeWork's perceived

enterprise value, SoftBank commenced its own version of damage control – acting not to fix the

problems at WeWork or to protect its creditors (which it had a fiduciary duty to do) – but instead

to insulate the reputations of SoftBank and Son. From that point forward, ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ delaying the inevitable WeWork implosion

that would reflect poorly on SoftBank's investing acumen while identifying others to blame for

the WeWork debacle.

7.      Its first step was to scapegoat Neumann and eliminate any role for him in

WeWork's future. In doing so, SoftBank was instrumental in negotiating and committing to fund

a complicated and expensive business divorce between WeWork and its founder. The next step

was to tie Neumann's exit to a SoftBank rescue financing package (the Master Transaction

Agreement or "**MTA**"). The MTA provided for additional equity investments, approximately $5

billion in debt financing and a $3 billion tender offer to fund the Neumann "buyout." After entering

into the MTA in October 2019, WeWork and SoftBank amended the agreement in December 2019

to extend the deadline for the commencement and consummation of the tender offer.[3]

---

[3] In addition, WeWork's largest equity holder, SoftBank, agreed to become Co-Obligor on its debt, knowing WeWork would not be able to support that debt. Upon information and belief, given the precarious state of the Company, landlords required significant credit enhancement (primarily in the form of letters of credit) as a precondition to any lease.  The lenders that had previously provided a letter of credit facility were unwilling to renew it given WeWork's

8.      When the time came to launch the Tender Offer, SoftBank, leery of investing additional capital into WeWork, announced on April 1, 2020, that certain conditions precedent had not been satisfied and that it was pulling the tender offer. Litigation ensued, and for nearly a year, at the height of the COVID-19 pandemic, while WeWork continued to bleed cash, SoftBank refused to consummate the executory parts of the MTA it had negotiated.

9.      Then, in February 2021, WeWork and SoftBank entered into a settlement that included a modified tender offer, this time in the amount of approximately $921 million. The settlement also included additional payments from SoftBank to Neumann in the form of an approximately $106 million cash settlement and $578 million equity purchase, several changes to the flawed governance provisions, and an agreement to access the public markets, either through a de-SPAC merger or direct listing. The settlement was implemented in the spring of 2021, and the de-SPAC merger closed in October 2021, avoiding the need for a public registration statement or other similar public disclosures. Upon the consummation of the de-SPAC transaction, SoftBank owned more than 65% of WeWork's outstanding equity shares and was entitled to appoint a majority of the Board and designate its Executive Chairman.

10.     Yet neither the de-SPAC merger nor the Neumann business divorce did much to fix the problems with WeWork's business plan or capital structure. WeWork materially missed its de-SPAC projections within six months of release,[4] and by the fourth quarter of 2022, ██████

██████████████████████████████████████████████████████████

---

precarious finances, and no other lenders were willing to replace the existing letter of credit facility. As a result, in December 2019, WeWork and SoftBank entered into a new $1.75 billion Credit Agreement, which included a new Letter of Credit Facility ("**LC Facility**"), pursuant to which SoftBank agreed to serve as Co-Obligor under the new Credit Agreement.  Pursuant to a Reimbursement Agreement, any losses incurred by SoftBank under the Credit Agreement could then be asserted as a secured claim against WeWork.

[4] In 2022, WeWork revenues ($3.2 billion) and Adj. EBITDA (loss of $477 million) were substantially lower than the projections on which the de-SPAC was based – the aggregate EBITDA "miss" for 2021 and 2022 was approximately $1.6 billion.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

11.     Despite recognizing the dire situation that WeWork was in, rather than file for bankruptcy and begin the operational restructuring and lease rationalization that WeWork desperately needed, in March of 2023, SoftBank acted as the anchor in the Debtors' Uptier Transactions (defined below). Via the Uptier Transactions, WeWork issued new secured notes in exchange for a cash contribution and unsecured notes held by SoftBank and public debtholders. For SoftBank's benefit, the Uptier Transactions, among other things, (a) terminated SoftBank's obligation under a 2021 agreement to purchase up to $500 million in purportedly secured notes (of which $300 million had been purchased); (b) redeemed the $300 million outstanding of such secured notes; (c) enabled SoftBank to relend that $300 million as first lien debt with commitment fees in the amount of $6.25 million; and (d) exchanged SoftBank's unsecured notes for secured notes that were convertible into equity. When the dust settled, the Uptier Transactions elevated SoftBank and the other noteholders' positions in the capital structure on the eve of bankruptcy, for insufficient value at the expense of WeWork's other unsecured creditors, and solidified SoftBank's position as WeWork's largest equity holder and the party poised to be the largest equity holder in a reorganized WeWork capital structure.[5]

---

[5] In an effort to further solidify their position at the top of WeWork's capital structure, in connection with the Uptier Transactions, SoftBank (and other participating noteholders) sought to perfect liens in substantially all of WeWork's assets. However, the Committee has identified certain unencumbered assets that are not subject to prepetition liens or are subject to security interests that were not properly perfected and should, therefore, be avoided. Most notably, SoftBank's Member Agreements are not all the same form of document. Many of the larger Member Agreements are, in fact, disguised subleases that convey an interest in real estate. As subleases, the revenue from these contracts are rents that can only be pledged through an assignment of rents that is properly perfected by recording in local real estate records. None of the Debtors' prepetition lenders purport to have a security interest in any real estate assets, including the disguised subleases.

12.    Ultimately, the new money funded through the Uptier Transactions was woefully inadequate to fund WeWork's cash needs. By August 2023, just a few months after the Uptier Transactions, the Debtors' SEC filings included a going concern warning due to poor operating results and low liquidity. The Chairman of the Board and two other Directors resigned immediately due to "a material disagreement regarding Board governance and the Company's strategic and tactical direction." And, on November 6, 2023, the Debtors commenced these Chapter 11 Cases.

13.    For the foregoing reasons, and as more particularly set forth herein, the actions underlying the Estate Claims have damaged unsecured creditors of the Debtors' estates and have forced the Committee to bring this Complaint on behalf of the Debtors for the benefit of the estates and all stakeholders.

## NATURE OF THE CLAIM

14.    By this Complaint, the Committee asserts, on behalf of the Debtors' estates, claims (the "**Estate Claims**") that could result in: (i) the avoidance of over a billion dollars of obligations, (ii) the avoidance of liens on estate assets purportedly securing such obligations, (iii) the recharacterization of all claims of SoftBank as equity of the Debtors; (iv) the recovery of hundreds of millions of dollars fraudulently or preferentially transferred by the Debtors, and (v) substantial damages for breach of fiduciary duty, for the benefit of the estates.

15.    The Estate Claims arise from SoftBank's longstanding relationship with WeWork as a partner, investor, and driver of WeWork's business strategy, as well as the Uptier Transactions consummated only six months prior to the Petition Date (as defined below), pursuant to which, among other things, (i) SoftBank exchanged unsecured notes for secured notes and equity (the "**SoftBank Uptier Exchange**"), (ii) the Debtors' made a $300 million payment to SoftBank to redeem the Senior Secured Notes and terminated SoftBank's obligation to purchase an additional

$200 million of Senior Secured Notes (the "**SoftBank Redemption**," and together with the SoftBank Uptier Exchange, the "**SoftBank Uptier Transaction**"), and (iii) participating public noteholders (the "**Public Noteholders**") exchanged unsecured notes for secured notes and equity (the "**Public Noteholders Uptier Transaction,**" and together with the SoftBank Uptier Transaction, the "**Uptier Transactions**").

16.    The Committee seeks remedies for (i) constructive fraudulent transfers against SoftBank and the Notes Trustees who engaged in and benefitted from the Uptier Transactions that provided the Debtors with less than reasonably equivalent value at a time when the Debtors were insolvent; (ii) actual fraudulent transfers against SoftBank and the Notes Trustees who participated in the Uptier Transactions with the intent of hindering the recoveries of other creditors; (iii) preferences against SoftBank, as an insider, for the $300 million payment it received through the SoftBank Redemption and the termination of SoftBank's obligation to purchase an additional $200 million of notes, as well as the collateralization of its previously unsecured debt through the SoftBank Uptier Transaction – both of which are transfers made while the Debtors were insolvent; (iv) equitable subordination of SoftBank's claims on account of the Prepetition Notes received through the SoftBank Uptier Transaction it orchestrated to advance its own interests at the expense of other creditors; (v) recharacterization of SoftBank's prepetition debt, including its debt claims resulting from the SoftBank Uptier Transactions as well as claims arising under the prepetition letter of credit facility, as they are all disguised equity contributions; (vi) breaches of the fiduciary duty of care against SoftBank and the SoftBank Directors for encouraging and directing the Debtors to grow excessively and unsustainably; and (vii) breaches of the fiduciary duty of loyalty against SoftBank and the SoftBank Directors in connection with the Uptier Transactions for approving fraudulent transfers and preferences made for the benefit of SoftBank, which controlled

8

the Debtors and consistently prioritized its own interests over those of the Company and its creditors. The Committee also seeks avoidance of certain unperfected or improperly perfected liens and declaratory judgments regarding the attachment of prepetition liens to certain assets of the Debtors.

## **PARTIES**

17.    The Committee was appointed in the Chapter 11 Cases on November 16, 2023, pursuant to section 1102(a) of Title 11 of the United States Code (the "**Bankruptcy Code**") by the United States Trustee for Regions 3 and 9. *Notice of Appointment of Official Committee of Unsecured Creditors* [Dkt. No. 150]. The Committee is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors, and any other matter relevant to the case.

18.    The Committee brings this action derivatively, on behalf of the estates of each of the Debtors (collectively, the "**Estates**"). Standing was granted to the Committee to file this Complaint by the *Order Granting the Official Committee of Unsecured Creditors' Motion For Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estate and Exclusive Settlement Authority*, entered by this Court in an order dated _____, 2024 [Dkt. No. ---].

19.    SoftBank is a major, public reporting, Japanese corporation organized under the laws of Japan and headquartered in Minato, Tokyo. At all times relevant to this Complaint, Son was the largest shareholder of and the controlling shareholder of SBG. SBVF is an investment fund wholly controlled by SoftBank, which was started in 2017 with $100 billion dollars and

invests in technology startup companies and is the vehicle through which SoftBank made many of its investments in WeWork.

20.    The SoftBank Affiliates are part of SoftBank's broader network of influence, through which SoftBank exercised its control over WeWork. As discussed above, the SoftBank Affiliates include: SoftBank Group Corp., SoftBank Vision Fund II-2 L.P., SVF II Aggregator (Jersey) L.P., SB Global Advisers Limited, SVF II WW (DE) LLC, SVF II Holdings (DE) LLC, and SVF II WW Holdings (Cayman) Ltd. The SoftBank Affiliates are further described as follows.

21.    SoftBank Group Corp., including funds and/or accounts, or subsidiaries of such funds or accounts, managed, advised or controlled by SoftBank Group Corp., or a subsidiary or affiliate thereof.  SoftBank Group Corp. is a corporation formed under the laws of Japan, with its principal place of business at 1-7-1 Kaigan, Minato-ku, Tokyo, Japan M0 105-7537.

22.    SoftBank Vision Fund II-2 L.P., including funds and/or accounts, or subsidiaries of such funds or accounts, managed, advised or controlled by SoftBank Vision Fund II-2 L.P. or a subsidiary or affiliate thereof.  SoftBank Vision Fund II-2 L.P. is a limited partnership formed under the laws of Jersey, with its address at Crestbridge Limited, 47 Esplanade St. Helier, Jersey, JE1 0BD.

23.    SVF II Aggregator (Jersey) L.P., including funds and/or accounts, or subsidiaries of such funds or accounts, managed, advised or controlled by SVF II Aggregator (Jersey) L.P. or a subsidiary or affiliate thereof.  SVF II Aggregator (Jersey) L.P. is a limited partnership formed under the laws of Jersey, with its address at Crestbridge Limited, 47 Esplanade St. Helier, Jersey, JE1 0BD.

24.    SB Global Advisers Limited, including funds and/or accounts, or subsidiaries of such funds or accounts, managed, advised or controlled by SB Global Advisers Limited or a

subsidiary or affiliate thereof. SB Global Advisers Limited is a limited company formed under

the laws of England and Wales, with its address at 69 Grosvenor Street, London X0 W1K 3JP,

United Kingdom.

25.     SVF II WW (DE) LLC, including funds and/or accounts, or subsidiaries of such

funds or accounts, managed, advised or controlled by SVF II WW (DE) LLC or a subsidiary or

affiliate thereof. SVF II WW (DE) LLC is a Delaware limited liability company, with its address

at 251 Little Falls Drive, Wilmington DE 19808.

26.     SVF II Holdings (DE) LLC, including funds and/or accounts, or subsidiaries of

such funds or accounts, managed, advised or controlled by SVF II Holdings (DE) LLC or a

subsidiary or affiliate thereof. SVF II Holdings (DE) LLC is a Delaware limited liability company,

with its address at 251 Little Falls Drive, Wilmington DE 19808.

27.     SVF II WW Holdings (Cayman) Ltd., including funds and/or accounts, or

subsidiaries of such funds or accounts, managed, advised or controlled by SVF II WW Holdings

(Cayman) Ltd. or a subsidiary or affiliate thereof. SVF II WW Holdings (Cayman) Ltd. is an

exempted company formed under the laws of the Cayman Islands, with its address at 190 Elgin

Ave., Georgetown, Grand Cayman, E9 KY1-9008.

28.     The Holder Doe Defendants any holders of any equity, debt, or liens or recipients

of any other transfers described below that are necessary to effectuate any requested relief and any

subsequent transferees of the transfers sought to be avoided.

29.     The Fiduciary Doe Defendants are any individuals and entities otherwise controlled

by SoftBank that breached fiduciary duties owed to Debtors.

30.     The SoftBank Directors are individuals who were (i) employed by SoftBank prior to and/or during the time of their service on the Board, and (ii) appointed by SoftBank or nominated by SoftBank and confirmed to the Board.

31.     Ron Fisher is a former member of the Board.

32.     Marcelo Claure is a former member of the Board.

33.     Michael Combes is a former member of the Board.

34.     Saurabh Jalan is a former member of the Board.

35.     Vikas J. Parekh is a current member of the Board.

36.     Lew Frankfort is a former member of the Board.

37.     Bruce Dunlevie is a former member of the Board.

38.     David Tolley is a former member of the Board and WeWork's current Chief Executive Officer.

39.     Masayoshi Son is the founder, CEO and largest shareholder of SoftBank.

40.     U.S. Bank Trust Company, National Association is a national banking association organized under the laws of the United States and the National Bank Act, with its principal office located in the state of Minnesota. It currently serves as the 1L Public Notes Trustee, 1L Public Notes Collateral Agent, 2L Public Notes Trustee, 2L Public Notes Collateral Agent, 2L Exchangeable Notes Trustee, 2L Exchangeable Notes Collateral Agent, 3L Exchangeable Notes Trustee, 3L Exchangeable Notes Collateral Agent and the 3L Public Notes Collateral Agent.

41.     Delaware Trust Company is a non-depository trust company organized under the laws of Delaware. It serves as the 3L Public Notes Trustee.

42.     Goldman Sachs International Bank ("**Goldman**") is a private unlimited company organized under the laws of the United Kingdom. It serves as the senior administrative agent on the LC Facility.

43.     Cupar Grimmond, LLC is a Delaware limited liability company with its address at 251 Little Falls Drive, Wilmington DE 19808.

44.     Kroll Agency Services Limited ("**Kroll**") is a private unlimited company organized under the laws of the United Kingdom. It serves as the junior administrative agent on the LC Facility.

## **JURISDICTION AND VENUE**

45.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b), 1334(a) and 1367 and the Standing Order of the United State District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.

46.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

47.     This Court has personal jurisdiction over the Defendants pursuant to Rule 7004 of the Bankruptcy Rules.

48.     The Bankruptcy Court for the District of New Jersey has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and 157(b) and the Standing Order of the United State District Court dated July 10, 1984, as amended September 18, 2012 referring all bankruptcy cases to the bankruptcy court.

49.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

50.     Pursuant to Rule 7008 of the Bankruptcy Rules, the Committee consents to the

entry of final orders or judgment by the Court if it is determined that the Court, absent consent of

the parties, cannot enter final orders or judgment consistent with Article III of the United States

Constitution.

## **FACTUAL BACKGROUND**

A.     **WeWork in the Neumann Era**

**WeWork's Founding (2010)**

51.     WeWork was founded in the SoHo neighborhood of Manhattan in February 2010

with a simple goal – to create a flexible workspace for people and companies to work in without

having to make long-term real estate commitments. At its core, WeWork's business strategy

centered around entering into long-term leases, renting out that space on a short-term basis, and

(in theory) collecting the margin as profit.

52.     From its inception, WeWork's founder and then-CEO Neumann had a vision of

disrupting the stereotypical, stiff, monotone, cubicle-heavy office by building a creative,

collaborative, community friendly space, and offering its "members" kombucha, craft beer, and

regular happy hours. With a modest initial seed fund of $1 million, WeWork went on to enter into

a number of leases every year, building to a purported 2012 valuation of $97 million after a

$17 million Series A funding round. As time passed, WeWork's model gained traction. WeWork

leased over 1 million square feet in New York City by 2013, drawing attention from powerhouse

investors like JP Morgan Chase, T. Rowe Price, and Goldman Sachs. By 2015, WeWork was

named one of Fast Company's 50 Most Innovative Companies, and with the addition of Artie

Minson, the former Chief Financial Officer of Time Warner Cable, the company was set to

continue its path toward success.

**SoftBank's Entry**

53.     By 2016, WeWork's aggressive expansion caught the attention of SoftBank, a multinational investment holding company holding $178.7 billion in assets and ranked the 36th largest public company in the world at the time. SoftBank, under the direction of Son, approached Neumann with deep pockets and one goal in mind – bolster its own investor perception by buying an innovative company outside of its normal focus in the technology space and growing it like a technology company.

54.     In 2016, Son met with Neumann in New York to tour the WeWork offices and to hear an investment pitch. At the close of the meeting, which lasted only 28 minutes, Son agreed to invest $4.4 billion in WeWork at an approximate $20 billion valuation, investing $3 billion into WeWork directly, via primary and secondary shares, and $1.4 billion into three subsidiaries, WeWork China, WeWork Japan, and WeWork Pacific. This investment expanded WeWork's capital by 50% and was far removed from WeWork's modest beginnings. In exchange, SoftBank received a substantial equity stake in the Company and the right to appoint two directors to the Board.

55.     The relationship between Son and Neumann played a pivotal role in WeWork's rapid expansion. Indeed, at Son and SoftBank's urging, Neumann's goal for WeWork was transformed from "elevat[ing] the world's consciousness" to a "need to have the biggest valuation." SoftBank's financial backing enabled WeWork to secure large leases, renovate office spaces, and fund its new ambitious global expansion plans. Son's goal was for SoftBank's newest investment to be seen as a highly valued and innovative company, leading him to urge faster and

further expansion. Son also dictated which companies WeWork could invest in,[6] focusing more on SoftBank's potential exit, rather than WeWork's profitability.[7]

56.     Without regard for WeWork's future, Son dangled the SoftBank checkbook in front of Neumann and advised him to "grab as much market share as possible as quickly as possible" without worrying about profitability. Neumann, in turn, told his staff that SoftBank wanted WeWork to grow faster, and indeed, SoftBank facilitated this growth by continuously pouring money into the company to offset its rapid cash burn, inflating WeWork's purported valuation to $47 billion in March 2019 after multiple rounds of funding. All told, SoftBank invested over $16 billion into WeWork from 2017 through May 2023, with over $10 billion facially in the form of equity.

57.     Although WeWork was a real estate company, Son's experiences with large tech companies like T-Mobile and NVIDIA steered the ship.[8] Rapid expansion had worked for SoftBank's technology investments for a simple reason – with a software company, the initial investment is the largest. A piece of technology is then either acquired or developed, and from there, users acquire the product to drive profits. As more users exert pressure on the software, the primary goal of the company is scalability, i.e., making sure the product continues to work as intended for a growing user base. Scaling the business generally incurs marginal additional cost compared to the initial investment—a downward bending cost curve—providing massive upside.

---

[6] In 2016, for example, Son emailed Neumann, stating Neumann could not ███████████████ ███████████

[7] In 2019, ████████████████████████████████████████████████ ████████████████████████████████████████

[8] Indeed, at one point, WeWork had one of two co-CEOs focused purely on technology and automation.

58.    However, real estate companies like WeWork operate on a linear cost curve. Each additional location WeWork acquired came with similar or increased costs as real estate values fluctuate. While WeWork's competitors invested in property only to meet demand and operated within a budget based off profits, WeWork, spurred on by SoftBank, operated like a tech company and continued to make large investments without regard for sustainability.

59.    The below is a sample comparable company set, which overlays operating lease obligations and funded debt. The comparable set demonstrates that WeWork had significantly more un-cancelable, long-term obligations compared to its competitors. Indeed, WeWork had over three times more operating lease obligations compared to IWG, the company with the next largest liability amount, despite WeWork generating less in revenue. Unlike its competitors, WeWork's obligations made its pathway to profitability difficult, if not impossible.



**SoftBank and the Board Encourage and Enable Neumann's Mass Spending and Self-Dealing**

60.    SoftBank was well-aware that Neumann's rapid, unsustainable expansion was saddling WeWork with onerous leases that were unlikely to ever be profitable for the Company

and encouraged him, and WeWork, to expand at an unsustainable rate. Motivated purely by its own desire to showcase the increase in capital expenditures it inspired, SoftBank did not care about WeWork's profitability. Rather, it wanted to tout WeWork's success as part of its brand new Vision Fund, so it continued to fund WeWork's operations and expansion through large infusions of capital, ignoring WeWork's growing vulnerability to real estate market downturns. All that mattered to SoftBank and Son was that WeWork's rapid expansion and pie-in-the-sky valuations made the Vision Fund (and thus SoftBank and Son) look good by proxy.

61.    SoftBank's impact was palpable. In 2014, prior to SoftBank's initial investment, WeWork was launching ten locations a year; by 2019, it was an international phenomenon with 528 locations in 29 countries and was the largest commercial tenant in Manhattan. SoftBank pushed Neumann to expand faster and harder. Indeed, in response to concerns about WeWork's ever-increasing spending levels, Son told Neumann to "be crazier." To emphasize his desire for growth, Son would sometimes sit Neumann down and show him PowerPoint presentations of rapidly growing companies, encouraging him to grow faster. According to a former WeWork CEO, Softbank never acted as a passive investor and always had very significant influence over Neumann, and Neumann complied with Son's demands to grow faster due to the control exerted by Son. Ultimately, Son and SoftBank pressured Neumann to increase WeWork's market share until the inability to bring the Company's costs under control drove it into bankruptcy.

**Failed 2019 IPO Highlights Board Mismanagement**

62.    After years of massive expenditures courtesy of long-term lease obligations and an unsustainable business model, WeWork was running out of money. In a haphazard attempt to raise capital from parties other than SoftBank, which had already invested over $10 billion in WeWork,

the Company attempted to go public.[9] On August 14, 2019, WeWork filed its Form S-1 registration statement (the "**Registration Statement**") with the Securities and Exchange Commission in connection with a proposed IPO.

63.    Prior to the Registration Statement, WeWork's finances were shrouded in mystery, allowing SoftBank to perpetuate the misconception that WeWork was a well-managed unicorn that thrived under its direction. The Registration Statement shattered that illusion by bringing to light the myriad corporate governance issues within the Company: the concentration of power in Neumann's hands via twenty-times voting power; the lack of checks and balances; the various self-interested transactions and dealings; and the control SoftBank wielded via its investments. It also revealed that WeWork was burning through cash at an unsustainable rate and was unlikely to ever become profitable.

64.    Investor reaction was swift. Investors were turned off by the Company's finances, mismanagement, and misuse of funds. The public finally understood that WeWork had never turned a profit, prompting skepticism about WeWork's business model, growth prospects, and the validity of its valuation. In 2016, WeWork lost $429 million on $436 million in revenue. In 2017, those losses increased to $884 million on $886 million in revenue. In 2018, WeWork lost $1.6 billion despite revenue of $1.8 billion.[10] ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

---

[9] ████████████████████████████████████████████████████████████

[10] WeWork, Inc. Form S-1 (August 14, 2019).

65.    In response to the disclosures and negative investor reactions, WeWork's valuation plummeted. From a high of $47 billion in January 2019, SoftBank was internally valuing WeWork at $7.8 billion by September 2019. The valuation eventually fell below $7.3 billion in December 2019. Ultimately, Neumann resigned as Chief Executive Officer on September 24, 2019, and the Company withdrew its IPO Registration Statement shortly thereafter.

**SoftBank Ousts Neumann and Exercises Further Control**

66.    When the IPO failed, WeWork found itself in the same frenzied and cash-strapped state it was in before, but this time in the public eye and with limited funding options. Despite years of intense patronage and encouragement from SoftBank, a modicum of public market scrutiny on Neumann's cost-insensitive business model had exposed what SoftBank and others knew or should have known: WeWork had been mismanaged for years with encouragement from SoftBank, and there was no plausible path to profitability under Neumann and SoftBank's model. And indeed, it was then that SoftBank started to limit its own exposure and prepare for an ultimate bankruptcy, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████

67.    Publicly, SoftBank could no longer pretend its investment was a success, as its failures were broadcasted to the world. Son publicly conceded that his judgment in investing in WeWork was "poor" and taught him a "very harsh lesson." The only option was to shift blame solely onto Neumann and "save" SoftBank's investment by sacrificing the scapegoat.

68.    At the same time, the Company continued to be in urgent need of liquidity. It once again turned to its main partner and majority equity holder. On October 12, 2019, the Board

established a special committee comprised of two non-SoftBank directors, Bruce Dunlevie and

Lewis Frankfort (the "**MTA Special Committee,**" and the directors the "**MTA Directors**"), to

negotiate and evaluate a potential rescue financing transaction with SoftBank and its Vision Fund.

69.    After a short period of negotiations, WeWork, SoftBank, the Vision Fund, and

Neumann entered into the MTA on October 22, 2019, despite being offered a preliminary, non-

binding alternative financing package by JP Morgan, an alternative recommended by then-CEO

Arthur Minson ("**Minson**"), as it would not require formal control to be handed over to SoftBank.[11]

Minson's suggestion, however, was not heeded by the Board or the allegedly disinterested MTA

Directors[12] on the MTA Special Committee, and thus the SoftBank rescue financing was instead

adopted.

70.    The MTA was designed to provide funding to the Company, facilitate Neumann's

exit as the Company's CEO, and provide liquidity to Neumann and the minority stockholders of

the Company. It also positioned SoftBank to increase its equity stake in the Company while

shoring up SoftBank's credit exposure by permitting SoftBank to invest financing from a

structurally senior position as a secured creditor. At the same time, SoftBank agreed to finance

Neumann's exit from the Company. Specifically, pursuant to the MTA, SoftBank committed to

the following:[13]

---

[11] SoftBank's proposal featured a commitment of capital, unlike the "best efforts" feature contained in the JP Morgan proposal.  Given WeWork's tumultuous cash-flow position, the committed capital feature of the SoftBank proposal was an enticing proposition – likely solving its liquidity problem.  However, WeWork's then co-CEO communicated that JP Morgan could get comfortable with a committed capital feature if negotiations continued, but the MTA Directors declined to have the Company executives pursue these negotiations.

[12] ███████████████████████████████████████████████████████████

[13] WeWork Inc., Form 10-Q (March 31, 2023).

(i)   *Accelerated Warrant.* SoftBank agreed to immediately provide the Company with $1.5 billion of equity financing by accelerating an existing warrant[14] from April 2020 to October 30, 2019;[15]

(ii)  *Tender Offer.* SoftBank agreed to purchase up to $3 billion of the Company's stock from Neumann and other stockholders in a tender offer (the "**Tender Offer**"); and

(iii) *Debt Financing.* SoftBank agreed to provide the Company with up to $5.05 billion of debt financing following completion of the Tender Offer, consisting of:

(a)  $1.1 billion in 5% senior secured notes (the "**Senior Secured Notes**") or a first lien term loan facility;

(b)  $2.2 billion in 5% senior unsecured notes (the "**SoftBank Unsecured Notes**") with associated warrants issued to SoftBank to purchase 71,541,399 shares of the Company's Series H-3 Convertible Preferred Stock at an exercise price of $0.01 per share[16]; and

(c)  Provide credit support under a $1.75 billion letter of credit facility (the "**LC Facility**"), pursuant to which SoftBank would become a co-obligor under WeWork's letter of credit facility, with associated warrants issued to SoftBank to purchase 35,770,699 shares of the Company's Series H-3 Convertible Preferred Stock or Series H-4 Convertible Preferred Stock at an exercise price of $0.01 per share.

71.    The MTA also required the entry into a stockholder's agreement by Neumann, SoftBank and some of its affiliates and subsidiaries, and WeWork, which provided for the following changes to the Company's governance structure: (i) Neumann would execute a proxy giving voting control of his super-voting founder shares to the Board; (ii) SoftBank and the Vision Fund would have the right to designate five of the Company's ten directors; (iii) SoftBank would have the right to designate one of its directors as executive chairman of the Board; (iv) Benchmark

---

[14] In January 2019, SoftBank entered into a mandatory warrant agreement with WeWork, pursuant to which it agreed to provide $1.5 billion in financing in exchange for additional shares in the Company at $110 per share.  The terms of the warrant provided that it would be funded in April 2020.

[15] The exercise price of the warrant was also amended from $110 per share to $11.60 per share for a new security in the form of Series H-1 or H-2 Convertible Preferred Stock.

[16] The warrants were exercised by December 2021 for $1 million, and the preferred shares were valued at $569 million at issuance.  WeWork Inc., Quarterly Report (Form 10-Q) (March 31, 2023).

Capital & Hony Capital (early investors in WeWork) would have the right to designate one director each to the Board; (v) the remaining shareholders would have the right to appoint two directors to the Board; and (vi) Frankfort (an independent director) would remain on the Board until consummation of the Tender Offer, at which point WeWork's CEO would select Frankfort's replacement.

72. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

73. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████

74. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ The other key components under the MTA are described in detail below.

75.    In conjunction with the execution of the MTA, Marcelo Claure ("**Claure**"), who was the then COO of SoftBank, became Executive Chairman of the Board. From that point on, despite having co-CEOs Minson and Sebastian Gunningham in place, Claure and SoftBank were effectively running the Company.

76.    To that end, despite the Board choosing SoftBank's rescue financing over JP Morgan's, Son gave orders to Claure to not draw all of the committed capital, despite the fact that this would have helped to improve WeWork's liquidity position, according to Minson. Minson, who was more focused on WeWork's profitability than pleasing Son and SoftBank, was subsequently ousted as well.

a.    **The SoftBank Unsecured Notes**

77.    As outlined above, the debt financing provisions of the MTA were conditioned on the completion of the Tender Offer ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████

78.    As of June 30, 2021, the full $2.2 billion of SoftBank Unsecured Notes had been drawn. As further described below, in May 2023, $550 million of the $1.65 billion SoftBank Unsecured Notes were tendered in connection with the Uptier Transactions and exchanged for purportedly secured debt. The remaining $1.1 billion of SoftBank Unsecured Notes was equitized.

**b.    The LC Facility and Reimbursement Facility**

79.    Another requirement under the MTA was that SoftBank would provide credit support to WeWork's business via a letter of credit facility. This was critical to WeWork's failing business, as a significant portion of the Company's leases require that the Company, as tenant, provide letters of credit ("**LCs**") as credit support to its landlords. What's more, as a result of concerns about WeWork's creditworthiness, the Issuing Banks (defined below) made an unorthodox requirement: that SoftBank, WeWork's majority equity holder and financial backer, must functionally step into WeWork's shoes as a co-obligor.

80.    Accordingly, on December 27, 2019, in connection with the MTA, the Debtors entered into a credit agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**LC Credit Agreement**") by and among Goldman, in its capacity as senior administrative agent (the "**LC Administrative Agent**"), Kroll, in its capacity as junior administrative agent, OneIM Fund I LP, and certain other financial institutions as issuing banks (collectively, the "**Issuing Banks**"), WeWork Companies U.S. LLC (a WeWork entity) (the "**WeWork LC Obligor**"), SoftBank Vision Fund II-2 L.P. (a SoftBank affiliate) (the "**SoftBank LC Obligor**," and together with the WeWork LC Obligor, the "**LC Co-Obligors**"), and the other parties from time to time thereto.

25

81.    Thereafter, on February 10, 2020, the parties entered into a security agreement in connection therewith[17] (the "**LC Security Agreement**," and together with the LC Credit Agreement and other documents executed and delivered in connection therewith, the "**LC Credit Agreement Documents**"). According to the LC Security Agreement, the Debtors' obligations under the LC Credit Agreement are secured by a first priority interest in and continuing lien on certain assets of the Debtors (the "**Credit Agreement Liens**").[18] The SoftBank LC Obligor has also provided security for the LC Facility by collaterally assigning its rights to call up to approximately $2.5 billion in capital from SoftBank. The LC Facility is guaranteed by substantially all of the domestic wholly-owned subsidiaries of WeWork Companies LLC (collectively, the "**LC Guarantors**").

82.    On February 10, 2020, the LC Co-Obligors entered into a reimbursement agreement (the "**Reimbursement Agreement**"), pursuant to which (i) the SoftBank LC Obligor agreed to pay substantially all of the fees and expenses due in connection with the Credit Agreement up front, including commitment fees, fronting fees, and reimbursing Issuing Banks for customary costs and expenses; (ii) the Company agreed to reimburse SoftBank for certain of the fees and expenses and pay SoftBank a fee based on a percentage of the amount of all outstanding letters of

---

[17] The Pledge and Security Agreement was entered by and among WeWork Companies LLC, the other grantors party thereto from time to time and the LC Administrative Agent.

[18]



credit; and (iii) the LC Guarantors would guarantee the WeWork LC Obligor's obligations under the Reimbursement Agreement.[19] Additionally, to the extent that the SoftBank LC Obligor pays, reimburses, or cash collateralizes obligations under the LC Facility and the WeWork LC Obligor does not reimburse such payments, reimbursements, and cash collateral, the SoftBank LC Obligor is subrogated to the rights of the Issuing Banks and other secured parties against the WeWork LC Obligor.

83.    On March 25, 2021, the LC Co-Obligors entered into a letter agreement (the "**Credit Support Letter**"), pursuant to which SoftBank consented to an extension of the termination date of the LC Facility from February 10, 2023, to February 10, 2024 (the "**LC Facility Extension**").[20] In November 2021, the LC Co-Obligors amended the Credit Support Letter (the "**Amended Credit Support Letter**") to effectuate a reduction of the total commitment under the LC Facility from $1.75 billion to $1.25 billion.[21]

84.    And consistent with SoftBank's desire to expand its equity position at every opportunity, in December 2021, in connection with the LC Facility Extension, the Company issued the SoftBank LC Obligor a warrant to purchase nearly 12 million Common Shares at a price per share equal to 1 cent, valued at $102 million at issuance.[22]

---

[19] WeWork Inc., Quarterly Report (Form 10-Q) (March 31, 2023).

[20] *Id.*

[21] *Id.*

[22] *Id.*

85. The LC Facility was amended and divided into two tranches in May 2022: (i) a $1.25 billion senior tranche and (ii) a $350 million junior tranche.[23]

86. All of the Debtors' LCs under the LC Facility that have been drawn to date have been funded by Softbank, on the Debtors' behalf, and all of the cash collateral securing the undrawn LCs has been posted by Softbank, on the Debtors' behalf. Specifically, on October 30, 2023, just before the Petition Date, WeWork, SoftBank, Goldman, Kroll, and certain other Issuing Banks executed a Satisfaction Letter and Forbearance Agreement (the "**Satisfaction Letter**"), pursuant to which, on October 31, 2023, the SoftBank LC Obligor reimbursed the Issuing Banks approximately $179.5 million for the senior tranche and approximately $542.6 million for the junior tranche of the LC Facility. Additionally, the SoftBank LC Obligor posted approximately $808.8 million of cash collateral to the Issuing Banks for the undrawn senior tranche of the LC Facility and paid approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement. Each of these payments were made by SoftBank.

87. Because of its cash outlay, SoftBank was purportedly subrogated to the Issuing Banks' and other secured parties' rights under the LC Facility Credit Agreement. As a result, the Debtors and SoftBank assert that SoftBank has a subrogation claim against the Debtors in an amount not less than approximately $1.6 billion as of the Petition Date.

### c. The Tender Offer

88. Another key component of the MTA was the Tender Offer. However, on April 1, 2020, SoftBank announced that it was pulling out of the Tender Offer. In doing so, SoftBank cited several of WeWork's shortcomings, including: (1) its failure to obtain necessary antitrust approvals by a certain deadline; (2) its failure to sign and close the rollups of several Asian joint

---

[23] WeWork Inc. Form 10-K (December 31, 2022).

ventures by a certain deadline; (3) the existence of new, significant pending criminal and civil investigations involving WeWork; and (4) the restrictions of the COVID-19 pandemic directly impacting WeWork's operations.

89.    On April 7, 2020, the Special Committee brought a lawsuit on behalf of the Company against SoftBank to compel consummation of the Tender Offer and/or award damages (the "**Tender Offer Litigation**"). Neumann also filed suit on May 4, 2020 against SoftBank and the Vision Fund. The actions were consolidated on May 28, 2020, and, after several months of litigation and only with a potential de-SPAC transaction on the horizon that would minimize SoftBank's risk exposure (discussed below), SoftBank agreed to enter into a settlement agreement (the "**Settlement Agreement**").

90.    The final terms of the Settlement Agreement included the following: ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

### d.    The Senior Secured Notes

91.    As a result of SoftBank's unilateral cancelation of the Tender Offer in April 2021, the $1.1 billion note purchase agreement with SoftBank for the Senior Secured Notes agreed to under the MTA was also considered terminated.

92.    Thereafter, WeWork and SoftBank agreed to reduce the aggregate amount of secured debt that would be issued. The note purchase agreement was amended in March 2021 to allow the Company to borrow up to an aggregate principal amount of $550 million of 7.50% senior secured notes. In connection therewith, in October 2021, the Company and SoftBank entered into an Amended and Restated Master Senior Secured Notes Note Purchase Agreement (as amended, waived or otherwise modified from time to time, the "**Secured SoftBank NPA**") for an aggregate principal amount of up to $550 million of senior secured debt in the form of 7.50% senior secured notes (the "**SoftBank Secured Notes**").

93.    Then, only two months later, SoftBank began to retrace its steps. The SoftBank Secured NPA was amended, pursuant to which SoftBank agreed to extend its commitment from February 12, 2023 to February 12, 2024. Thereafter, in November 2022, the Secured SoftBank NPA was further amended and among other things, the Commitment, Draw Period (each as defined in the SoftBank Secured NPA), and maturity date of the Secured Notes were extended from February 12, 2024 to March 15, 2025, and the maximum aggregate principal amount of SoftBank Secured Notes was reduced to $500 million, and the Company agreed to pay SVF II a commitment fee of $10 million.

94.    On January 3, 2023, pursuant to the Secured SoftBank NPA, WeWork and the SSN Notes Trustee entered into a Senior Secured Notes Indenture, and WeWork issued SoftBank $250 million in aggregate principal amount of SoftBank Secured Notes.

95.     By April 2023, $300 million had been drawn on the Senior Secured Notes and $200 million remained outstanding. As further described below, the Senior Secured Notes were redeemed and repaid in full in May 2023, nearly two years prior to maturity and the outstanding obligations were cancelled.

**WeWork Is Taken Public Via a SPAC Transaction**

96.     Despite the rescue financing provided under the MTA, as modified by the Settlement Agreement, due to WeWork's unsustainable business model, the Company continued to burn cash at an unmitigated rate, missing its 2021 year end EBITDA by $624 million.

97.     In order to raise additional cash, in 2021, WeWork once again attempted to access the public markets, this time avoiding SEC and public scrutiny by employing a SPAC transaction as a vehicle. SPACs, or so-called "blank check" companies, raise cash via IPO with plans to eventually merge with a then-unidentified target company.

98.     On or about February 4, 2021, BowX and WeWork entered into a term sheet for the "SPAC/de-SPAC" Business Combination (the "**Merger Agreement**"). Pursuant to the Merger Agreement, a wholly owned subsidiary of BowX merged with and into WeWork, and BowX issued 851,300,000 shares of its Class A common stock to WeWork's shareholders. Because it was BowX that went public – not WeWork – WeWork was able to circumvent traditional IPO disclosure requirements and utilize funding raised by the SPAC.

99.     Pursuant to the LC Facility Extension entered into in March 2021, BowX also agreed to issue SoftBank warrants to purchase 14 million shares of BowX common stock.

100.    On March 25, 2021, the Board unanimously adopted the Merger Agreement. The surviving entity changed its name to WeWork Inc. and issued up to approximately 61.3 million

units and resold up to approximately 628.3 million units of class A common stock with a proposed maximum offering price per share of $9.72, raising approximately $1.3 billion.[24]

101.    On October 20, 2021, WeWork successfully closed its de-SPAC transaction and began trading the following day on the market.[25]

**The Going Concern Qualifications**

102.    Unfortunately, neither the SPAC/de-SPAC and "going public" transaction nor SoftBank's additional credit support generated sufficient liquidity to plug WeWork's continued cash bleed. The same onerous cost structure and unfavorable leases continued to leave the Company insolvent and teetering on the edge of bankruptcy, and the Company continued to substantially miss its internal and publicly available projections.[26]

103.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

104.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[24] WeWork, Inc. Form S-4 (May 14, 2021).

[25] WeWork, Inc. Form 8-K (October 26, 2021).

[26] As noted above, the aggregate EBITDA "miss" for 2021 and 2022 was approximately $1.6 billion.



**The Uptier Transactions (March – May 2023)**

108.    In an effort to avoid a bankruptcy filing while SoftBank's holdings consisted primarily of unsecured debt and equity (i.e., when SoftBank stood to lose most of its investment in WeWork), in March 2023 (months before independent directors were installed in August 2023), the Debtors undertook a significant liability management transaction, raising even more secured debt despite severe economic distress.

███████████████████████████████ [27] WeWork negotiated the Uptier Transactions with an ad hoc group of unsecured noteholders representing 62% of the Company's Unsecured Notes (as defined below) outstanding at the time (the "**Ad Hoc Group**"), SoftBank, and a third-party investor, Cupar (together with the Debtors, the Ad Hoc Group, SoftBank, and the Public Noteholders, the "**Uptier Parties**").

109.    Through the Uptier Transactions, the Company issued over a billion dollars in aggregate principal amount of 1L Notes (as defined below) to elevate the positions of SoftBank and the members of the Ad Hoc Group in the capital structure, exchanging their unsecured notes for a combination of secured 1L Notes and equity, with relatively little benefit to the Company.[28] Additionally, as further described below, the Public Noteholders and SoftBank were issued a combination of 2L Notes, 3L Notes, and equity. As dictated by their respective notes indentures (discussed in detail below), certain of the 1L Notes, 2L Notes, and 3L Notes, may have been issued with an original issue discount.

110.    The 1L Notes were issued with an aggregate face value of $1,012,500,000 and consisted of: (i) $500 million of 15.00% First Lien Senior Secured PIK Notes due 2027, Series I (the "**Series I 1L Notes**"), which was offered to all holders of Unsecured Notes and backstopped

---

[27] ███████████████████████████████████████████████

[28] The 1L Notes were issued pursuant to that certain First Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Notes Indenture," collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "First Lien Notes Documents," and together with the Credit Agreement Documents, the "Prepetition First Lien Debt Documents"), by and among WeWork Companies U.S. LLC and WW Co-Obligor Inc. as the co-issuers, the guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee (the "First Lien Trustee"). The obligations under the First Lien Notes Indenture are secured by a first priority security interest in and continuing lien on the Collateral (the "First Lien Notes Liens" and together with the Credit Agreement Liens, the "First Priority Liens") and rank pari passu with the LC Credit Agreement Liens pursuant to that certain Amended and Restated Pari Passu Intercreditor Agreement, dated as of May 5, 2023, by and among the LC Administrative Agent and the First Lien Trustee.

by the Ad Hoc Group; (ii) $25 million of Series I 1L Notes issued to the Ad Hoc Group as a backstop fee; (iii) $300,000,000 in 15.00% First Lien Senior Secured PIK Notes due 2027, Series II (the "**Series II 1L Notes**") issued to SoftBank (the "**SoftBank Delayed Draw Notes**"), which was funded by the $300 million paid to SoftBank via the SoftBank Redemption (as defined below); (iv) $6,250,000 of Series II 1L Notes issued to SoftBank as a commitment fee; (v) $175,000,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series III (the "**Series III 1L Notes**," and, together with the Series II 1L Notes, the "**1L Delayed Draw Notes**" and, collectively with the Series I 1L Notes and the Series II 1L Notes, the "**1L Notes**") issued to Cupar, and (vi) $6,250,000 of Series III 1L Notes issued to Cupar as a commitment fee (the "**Cupar Delayed Draw Notes**").

111.    Additionally, the First Lien Notes Indenture contains a "make-whole" provision. Under this provision, upon an event of default, the 1L Notes are accelerated and become immediately due and payable. The First Lien Notes Indenture provides that if such default and acceleration occurs before November 1, 2024, the "Applicable Premium" that otherwise would have been payable upon an optional redemption of the 1L Notes also immediately becomes due and payable. The Applicable Premium is inclusive of all required interest payments due on the 1L Notes through November 1, 2024 (computed at a discount rate of the Treasury Rate as of the date of redemption, plus 50 basis points).

112.    Indeed, the Debtors note that an aggregate of $230.6 million in accrued and unpaid interest, make-whole, and fees attributed to the Prepetition Notes was outstanding as of the Petition Date.[29]

---

[29] Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petition and First Day Motions (Dkt. No. 21, the "**Tolley Declaration**") at ¶ 44.

<u>The Public Noteholders Uptier Transaction</u>

113.    Immediately prior to the Public Noteholders' Uptier Transaction, public noteholders held $669 million in aggregate principal amount of 7.875% Senior Unsecured Notes due 2025 (the "**Old 7.875% Notes**") and $550 million in aggregate principal amount of the 5.00% Senior Unsecured Notes due 2025, Series II (the "**Old 5.00% Notes**," and together with the Old 7.875% Notes, the "**Unsecured Public Notes**").[30] Prior to the consummation of the Public Noteholders Uptier Transaction, the Old 7.875% Notes and the Old 5.00% Notes were trading at 53 cents each.

114.    Through the Public Noteholders Uptier Transaction, WeWork proposed an exchange of the Unsecured Public Notes for a combination of secured notes and equity based on holders' participation.[31] While all participating noteholders were entitled to exchange their Unsecured Notes for 2L Notes[32] or 3L Notes[33], critically, their participation depended on whether the holder was willing to contribute new money to the Company by purchasing its *pro rata* share of $500 million of Series I 1L Notes.

---

[30] WeWork, Inc. Form 8-K (May 8, 2023).

[31] *Id.*

[32] The 2L Notes were issued pursuant to that certain Second Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Notes Indenture," collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Second Lien Notes Documents") by and among WeWork Companies LLC and WW Co-Obligor Inc., as co-issuers and U.S. Bank Trust Company, National Association, as trustee (the "Second Lien PIK Trustee"). The Company's obligations under the Second Lien Notes Indenture are secured by a second priority security interest in and continuing lien (the "Second Lien Notes Liens") on the Collateral.

[33] The 3L Notes were issued pursuant to that certain Third Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Third Lien Notes Indenture," collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Third Lien Notes Documents"), by and among WeWork Companies LLC and WW Co-Obligor Inc., as co-issuers and U.S. Bank Trust Company, National Association, as trustee (the "Third Lien PIK Trustee"). The obligations under the Third Lien Notes Indenture are secured by a third priority security interest in and continuing lien (the "Third Lien Notes Liens") on the Collateral.

115.    Specifically, a noteholder that exchanged all of its Unsecured Notes and fully purchased its pro rata share of $500 million of Series I 1L Notes (such holder, a "**New Money Participant**"), was entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 11% Second Lien Senior Secured Notes due 2027 (the "**2L Notes**") and $150 of Common Shares at the Equity Exchange Price, or (ii) $900 of Common Shares at the Equity Exchange Price. A holder of Unsecured Notes that participated in the Public Noteholders Uptier Transaction but did not purchase its pro rata share of Series I 1L Notes (such holder, a "**Non-New Money Participant**"), was entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 12% Third Lien Senior Secured Notes due 2027 (the "**3L Notes**") and $150 of Common Shares at the Equity Exchange Price, or (ii) $900 of Common Shares at the Equity Exchange Price.[34]

116.    The choice facing the unsecured noteholders was stark: contribute money to a company that would soon be in bankruptcy or have your debt subordinated by a brand new class of noteholders. Unsurprisingly, of the aggregate principal amount of Unsecured Notes outstanding at the time of the Uptier Transactions, 85.9% participated in the Public Noteholders Uptier Transaction, comprised of (i) $506.9 million of the Old 7.875% Notes (75.8% of the aggregate principal amount), and (ii) $540.7 million of the Old 5.00% Notes (98.3% of the aggregate principal amount). The vast majority of public noteholders (approximately 68% of holders of Old 7.875% Notes and 88% of the Old 5.00% Notes) elected to put in new money. However, only $400 million in aggregate principal amount of Series I 1L Notes were subscribed by New Money Participants, so, pursuant to that certain Backstop Commitment Agreement, dated as of March 17, 2023, the Ad Hoc Group funded the $100 million shortfall. In exchange, the Ad Hoc Group

---

[34] Tolley Declaration at ¶ 73.

received $25 million in aggregate principal amount of 1L Notes as a backstop commitment fee (the "**Backstop Commitment Fee**").[35]

117.    Through the Public Noteholders Uptier Transaction, the Company issued (i) $687,212,250 in aggregate principal amount of 2L Notes to New Money Participants (in exchange for $456 million Old 7.875% Notes and $483.4 million Old 5.00% Notes), (ii) $22,653,750 in aggregate principal amount of 3L Notes to Non-New Money Participants (in exchange for $26.3 million Old 7.875% Old Notes and $5 million Old 5.00% Notes), and (iii) 250,373,598 shares of Class A Common Stock to the Public Noteholders.[36] Of the $669 million in aggregate principal amount of Old 7.875% Notes and the $550 million in aggregate principal amount of Old 5.00% Notes, $4.8 million (0.72%) and $36.1 million (6.56%), respectively, in aggregate principal were exchanged solely for Common Shares.

<u>The SoftBank Uptier Transactions and the SoftBank Redemption</u>

118.    At the same time and in an effort to solidify its place at the top of the Company's capital structure and to ensure its equity investment was protected, pursuant to the May 5, 2023 Exchange Agreement (the "**Exchange Agreement**"), by and among WeWork Inc., WeWork Companies LLC, WW Co-Obligor Inc., and SoftBank, the SoftBank Uptier Transactions was consummated.[37]

119.    Prior to the SoftBank Uptier Transaction, SoftBank held approximately $1.65 billion in aggregate principal amount of the SoftBank Unsecured Notes and $300 million in aggregate principal amount of the Senior Secured Notes (collectively, the "**SoftBank Notes**").[38]

---

[35] WeWork, Inc. Form 8-K (May 8, 2023).

[36] *Id*.; *see also* Tolley Declaration at ¶¶ 48, 51, 56.

[37] *Id.*

[38] WeWork Inc. Form 8-K Ex. 10.1 (May 8, 2023).

120.    Pursuant to the SoftBank Uptier Transaction, (i) for $250 million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $750 of Second Lien Senior Secured Exchangeable Notes due 2027 (the "**2L Exchangeable Notes**")[39], for a total of $187,500,000 2L Exchangeable Notes, and $150 of Common Shares at the Equity Exchange Price; (ii) for approximately $360 million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $750 of Third Lien Senior Secured Notes due 2027 (the "**3L Exchangeable Notes**,"[40] and together with the 2L Exchangeable Notes, the "**Exchangeable Notes**"), for a total of $269,625,000 3L Exchangeable Notes,  and $150 of Common Shares at the Equity Exchange Price; and (iii) for the remaining approximately $1.04 billion in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged

---

[39] The 2L Exchangeable Notes were issued pursuant to that certain Second Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Exchangeable Notes Indenture," collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Second Lien Exchangeable Notes Documents," and together with the Second Lien Notes Documents, the "Prepetition Second Lien Notes and Exchangeable Notes Documents"), by and among WeWork Companies LLC and WW Co-Obligor Inc., as co-issuers and U.S. Bank Trust Company, National Association, as trustee (the "Second Lien Exchangeable Trustees" and together with the Second Lien PIK Trustee, the "Second Lien Trustee"). The obligations under the Second Lien Exchangeable Notes Indenture are secured by a second priority security interest in and continuing lien (the "Second Lien Exchangeable Notes Liens," and together with the Second Lien Notes Liens, the "Second Priority Liens") on the Collateral and rank pari passu with the Second Lien Notes Liens pursuant to that certain Intercreditor Agreement, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "1L/2L/3L Intercreditor Agreement"), by and among the Administrative Agent, the First Lien Trustee, the Second Lien Trustees and the Third Lien Trustees (as defined below).

[40]The 3L Exchangeable Notes were issued pursuant to that certain Third Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Third Lien Exchangeable Notes Indenture," and together with the First Lien Notes Indenture, the Second Lien Notes Indenture, the Second Lien Exchangeable Notes Indenture and the Third Lien Notes Indenture, the "Indentures"), by and among WeWork Companies LLC and WW Co-Obligor Inc., as co-issuers and U.S. Bank Trust Company, National Association, as trustee (the "Third Lien Exchangeable Trustee" and together with the Third Lien PIK Trustee, the "Third Lien Trustees").  The obligations under the Third Lien Exchangeable Notes Indenture are secured by a third priority security interest in and continuing lien (the "Third Lien Exchangeable Notes Liens," and together with the Third Lien Notes Liens, the "Third Priority Liens," and the Third Priority Liens together with the First Priority Liens, and the Second Priority Liens, the "Prepetition Liens") on the Collateral and rank pari passu with the Third Lien Notes Liens pursuant to the 1L/2L/3L Intercreditor Agreement.

at face value into $900 of Common Shares at the Equity Exchange Price, for a total of 1,112,900,605 shares of the Company's Class A Common Stock.[41]

121.     While participating Public Noteholders and SoftBank all received second and/or third lien secured notes in exchange for their Unsecured Notes, the secured notes that SoftBank received were convertible to equity – a feature that the notes given to Public Noteholders did not contain.

122.     Furthermore, in conjunction with the SoftBank Uptier Transaction, and pursuant to the Exchange Agreement, the Debtors effectuated the SoftBank Redemption, paying SoftBank $300 million to redeem the 7.5% Senior Secured Notes.[42] With the redemption, WeWork repaid the full outstanding amount of the Senior Secured Notes, in advance of maturity, and terminated SoftBank's outstanding required commitment to purchase an additional $200 million of Senior Secured Notes.

123.     In connection with the Exchange Agreement, WeWork Companies LLC and WW Co-Obligor Inc. (as issuers) and SVF II (a SoftBank entity) entered into the Master First Lien Senior Secured PIK Notes Note Purchase Agreement, dated as of May 5, 2023 (the "**First Lien NPA**"), pursuant to which the issuers agreed to issue and sell, at their option, and SVF II agreed to purchase, up to $300 million in aggregate principal amount of the Series II 1L Notes, which bore an interest rate of 15%.[43] Such purchases were made in July and August 2023, in the amount of $116,666,667 and $189,583,333, respectively (inclusive of fees totaling $6.25 million).

---

[41] Tolley Declaration at ¶ 74.

[42] WeWork, Inc. Form 8-K (May 8, 2023).

[43] *Id.*

124.    Through the Uptier Transactions, WeWork added $715 million of liquidity, substantially decreased its unsecured debt, increased its secured debt by nearly $2 billion, and issued additional equity.

125.    The debt on the Company prior to and following the Uptier Transactions is summarized below:

| Debt Instrument | Outstanding Principal Prior to the Uptier Transactions ($ millions) | Outstanding Principal as a result of the Uptier Transactions ($ millions) |
|---|---|---|
| 7.5% Secured Notes | $300 | $0 |
| Senior LC Tranche | $988.3 | $988.3 |
| Junior LC Tranche | $470 | $470 |
| 1L Notes | $0 | $525 |
| 1L Delayed Draw Notes | $0 | $488 |
| 2L Notes | $0 | $687 |
| 2L Exchangeable Notes | $0 | $188 |
| 3L Notes | $0 | $23 |
| 3L Exchangeable Notes | $0 | $270 |
| **Total Secured Debt** | **$1, 758.3** | **$3,639.3** |
| 7.875% Senior Notes | $669 | $164 |
| 5% Senior Notes, Series I | $1,650 | $0 |
| 5% Senior Notes, Series II | $550 | $9 |
| **Total Unsecured Debt** | **$2,869** | **$173** |
| **Total Debt** | **$4,627.3** | **$3,812.3** |

126.    Overall, in exchange for new secured debt, WeWork received only about one fourth of that amount in new money (and, in the case of SoftBank, that money was the result of re-contributing the payment received from the SoftBank Redemption); the rest of the new secured debt was issued in exchange for the Unsecured Notes which appear to be well "out of the money"

at the time of the Uptier Exchanges, as confirmed by the Debtors' proposed chapter 11 plan which provides no distribution on account of Unsecured Notes.

127.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Accordingly, on July 17, 2023, and August 25, 2023, the Company drew on the full amounts of the commitments under both the SoftBank Delayed Draw Notes ($300 million) and the Cupar Delayed Draw Notes ($175 million) and issued an additional $6.25 million of both SoftBank Delayed Draw Notes and the Cupar Delayed Draw Notes as commitment fees.[44]

**Unencumbered Assets and Excluded Collateral**

128.  Finally, while the obligations under the LC Credit Agreement and the Indentures are purportedly secured by substantially all of the Debtors' assets and property, the Committee has identified a significant number of material unencumbered assets not subject to the Prepetition Liens or which the purported security interests were not properly perfected. Such assets are, instead, available for distribution to the Debtors' general unsecured creditors. These assets include commercial tort claims, real estate and leasehold interests, and certain other excluded property and collateral under the Credit Agreement and Indentures. Each category of assets is summarized in the attached **Exhibit A** and is incorporated by reference as if stated here.

**WeWork Was Insolvent at All Relevant Times**

129.  As described herein, at all relevant times, WeWork's financial disclosures demonstrate that WeWork was either entirely insolvent or otherwise intended to incur debts beyond its ability to repay when mature.

---

[44] Tolley Declaration at ¶ 50.

130.    WeWork's financial disclosures indicate that WeWork has never generated positive net income, and in fact, its cumulative cash burn was almost equal to its funded capital.

131.    Furthermore, WeWork's financial disclosures indicate that its debt to capital ratio, which is used to measure a Company's solvency and adequacy of capital by valuation experts, was over 100% from 2021 through the filing date, and WeWork's book value of shareholder equity remained negative as the Company operated at a continual loss, and its debt increased. The combination of WeWork's unprofitability and titanic rate of cash burn demonstrates that WeWork's debts have always been greater than the fair value of its assets. Indeed, WeWork's public filings demonstrate that at all relevant times, WeWork had negative equity. A chart depicting this information is below.



132.    Additionally, WeWork entered into the Uptier Transactions knowing it would be unable to pay debts it incurred when they matured. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████   Therefore, WeWork was insolvent since at least 2016, and thus, it was insolvent during the Uptier Transactions.

**Chapter 11 Bankruptcy Cases**

133.    On November 6, 2023, WeWork Inc. and 516 of its affiliates filed these Chapter 11 Cases. Also on the Petition Date, the Company entered into a Restructuring Support Agreement (the "**RSA**") with holders representing approximately 92 percent of its secured notes including SoftBank, the Ad Hoc Group (representing approximately 87 percent of the Company's Series I 1L Notes and 2L Notes), and Cupar.[45] The RSA is centered on reducing $3 billion of funded debt by fully equitizing the 1L Notes, the 2L Notes, and the LC Facility, essentially priming SoftBank to own a substantially reorganized WeWork.[46] Through the Chapter 11 Cases, the Company also seeks to rationalize its commercial office lease portfolio.

---

[45] Tolley Declaration at ¶ 13.

[46] *Id.*

134.    As of the Petition Date, the Debtors reported approximately $4.2 billion in aggregate outstanding principal, accrued interest and other fees in funded debt obligations:

| Debt | Maturity | Approximate Principal | Approximate Interest & Fees | Approximate Amount Outstanding |
|---|---|---|---|---|
| Senior LC Tranche | 5/14/2025 | $988.3 | $88.9 | $1,077.2 |
| Junior LC Tranche | 3/7/2025 | $470 | $82 | $552 |
| Series I 1L Notes | 8/15/2027 | $525 | $89.2 | $614.2 |
| Series II 1L Notes | 8/15/2027 | $306.3 | $39 | $345.2 |
| Series III 1L Notes | 8/15/2027 | $181.3 | $22.9 | $204.1 |
| 2L Notes | 8/15/2027 | $687.2 | $45.8 | $733 |
| 2L Exchangeable Notes | 8/15/2027 | $187.5 | $12.5 | $200 |
| 3L Notes | 8/15/2027 | $22.7 | $1.6 | $24.3 |
| 3L Exchangeable Notes | 8/15/2027 | $269.6 | $19.5 | $289.1 |
| **Total Secured Debt:** | | $3,637.9 | $401.4 | $4,039.1 |
| 7.875% Senior Notes | 5/1/2025 | $163.5 | $6.6 | $170.1 |
| 5% Senior Notes | 7/10/2025 | $9.3 | $0.1 | $9.5 |
| **Total Unsecured Debt:** | | $172.8 | $6.7 | $179.6 |
| **Total Debt:** | | $3,810.7 | $408.1 | $4,218.7 |

135.    Specific to SoftBank, such obligations include those arising under the: (i)  LC Facility; (ii)  Series II 1L Notes; (iii)  2L Exchangeable Notes; and (iv)  3L Exchangeable Notes. Apart from the $1.6 billion scheduled as a claim pursuant to the LC Facility, of the remainder of SoftBank's alleged debt stems from the SoftBank Uptier Transactions (collectively, the "**SoftBank Claims**").

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Constructive Fraudulent Conveyance
Under Bankruptcy Code §§ 544, 548, 550, and 551 and Applicable New York Law[47]
(Against the Public Noteholders, Cupar, the Holder Doe Defendants, the 1L Public Notes
Trustee, the 1L Public Notes Collateral Agent, the 2L Public Notes Trustee, the 2L Public
Notes Collateral Agent, the 3L Public Notes Trustee, and the 3L Public Notes Collateral
Agent)**

136.     The Committee incorporates all the preceding paragraphs by reference.

137.     The Debtors caused the following transfers to be made and obligations to be
incurred in connection with the Public Noteholders Uptier Transaction (collectively, with any other
transfers received by the applicable Defendants or obligations incurred by the Debtors in
connection therewith, the "**Public Noteholders Uptier Transaction Avoidable Transfers**"):

- The Prepetition Liens on the Collateral granted to the Public Noteholders
  through the Public Noteholders Uptier Transaction, including:

    o   the First Lien Notes Liens on the Collateral granted to the New
        Money Participants through the Series I 1L Notes;

    o   the Second Lien Notes Liens on the Collateral granted to the New
        Money Participants through the 2L Notes; and

    o   the Third Lien Notes Liens on the Collateral granted to the Non-
        New Money Participants through the 3L Notes.

- The obligations underlying the Prepetition Notes issued to the Public
  Noteholders through the Public Noteholders Uptier Transaction, including:

    o   The obligations underlying the Series I 1L Notes issued to the New
        Money Participants through the Public Noteholders Uptier
        Transaction;

    o   The obligations underlying the 2L Notes issued to the New Money
        Participants through the Public Noteholders Uptier Transaction; and

---

[47] Note that should this Court find the applicable laws are under New Jersey or Delaware, the relevant statutes are
virtually identical, and the analysis would be the same.

o  The obligations underlying the 3L Notes issued to the New Money Participants through the Public Noteholders Uptier Transaction.

- The payment of the Backstop Commitment Fee to the Ad Hoc Group.

138.    At the time the Public Noteholders Uptier Transaction Avoidable Transfers were made and the obligations arising therefrom were incurred, WeWork was insolvent.

139.    Specifically, before, on, and after the dates of the Public Noteholders Uptier Transaction Avoidable Transfers, the sum of WeWork's debts exceeded the fair value of its assets.[48] WeWork had massive rent and capex obligations and funded indebtedness before the consummation of each of the Public Noteholders Uptier Transaction Avoidable Transfers. Upon information and belief, WeWork knew at the time the Public Noteholders Uptier Transaction Avoidable Transfers were made that it could not reasonably satisfy its liabilities and indebtedness, as they matured or accrued, with either existing assets (including any reserve fund, if any) or with revenue they could reasonably generate as a going concern.

140.    WeWork did not receive fair consideration, or reasonably equivalent value, in exchange for the Public Noteholders Uptier Transaction Avoidable Transfers. The benefits received by WeWork (if any) were far outweighed by – and did not even come close to approximating – the value lost and burdens incurred in making the Public Noteholders Uptier Transaction Avoidable Transfers. The unsecured notes were trading substantially below par, and that debt was exchanged at a premium to the then-current market prices.

---

[48] Under section 548 of the Bankruptcy Code, there are three tests for insolvency – the "balance sheet" test, the "capital adequacy test," and the "cash flow" test – only one of which must be met. Here, the Debtors were insolvent, at all relevant times, under the balance sheet test. However, upon information and belief, WeWork was also insolvent under the other two tests. First, WeWork had insufficient capital to pay its debts as they matured and, thus, was also insolvent at all relevant times under the cash flow test. Second, at all relevant times, WeWork was unable to generate sufficient profits to sustain operations.

141.   The Public Noteholders Uptier Transaction was not conducted at arm's length. SoftBank appeared on both sides of the Uptier Transactions and maintained control over the Debtors. Upon information and belief, SoftBank leveraged its insider knowledge and exerted its considerable control over the Debtors in the course of this transaction to obtain benefits it otherwise would not have received.

142.   The Uptier Transaction was not conducted in good faith.

143.   The Public Noteholders Uptier Transaction Avoidable Transfers were made within two years of the Petition Date.

144.   Thus, each of the Public Noteholders Uptier Transaction Avoidable Transfers should be avoided under (i) section 548 of the Bankruptcy Code or (ii) section 544(b) of the Bankruptcy Code and the substantially similar fraudulent conveyance provision of New York's Uniform Voidable Transactions Act ("**NYUVTA**"). N.Y. Debt. & Cred. Law § 279.

145.   Under sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (i) to recover the property conveyed through the Public Noteholders Uptier Transaction Avoidable Transfers or the value thereof, for the benefit of the Estates, and (ii) for the Estates to step into the shoes of the former lienholders.

<u>**SECOND CAUSE OF ACTION**</u>

**Constructive Fraudulent Conveyance**
**Under Bankruptcy Code §§ 544, 548, 550, and 551 and Applicable New York Law[49]**
**(Against SoftBank, the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the 2L Exchangeable Notes Trustee, the 2L Exchangeable Notes Collateral Agent, the 3L Exchangeable Notes Trustee, the 3L Exchangeable Notes Collateral Agent, and the SSN Notes Trustee)**

146.   The Committee incorporates all the preceding paragraphs by reference.

---

[49] Note that should this Court find the applicable laws are under New Jersey or Delaware, the relevant statutes are virtually identical, and the analysis would be the same.

147.    The Debtors caused the following transfers to be made and obligations to be incurred in connection with the SoftBank Uptier Transaction (collectively, with any other transfers received by the applicable Defendants or obligations incurred by the Debtors in connection, therewith, the "**SoftBank Avoidable Transfers**"):

- The Prepetition Liens on the Collateral granted to SoftBank through the SoftBank Uptier Transaction (collectively, the "**SoftBank Uptier Liens**"), including:

  o the First Lien Notes Liens on the Collateral granted to SoftBank through the SoftBank Delayed Draw Notes;

  o the Second Lien Exchangeable Notes Liens on the Collateral granted to SoftBank through the 2L Exchangeable Notes; and

  o the Third Lien Exchangeable Notes Liens on the Collateral granted to SoftBank through the 3L Exchangeable Notes.

- The obligations underlying the Prepetition Notes issued to SoftBank through the SoftBank Uptier Transaction (collectively, the "**SoftBank Uptier Debt**"), including:

  o The obligations underlying the SoftBank Delayed Draw Notes issued to SoftBank through the SoftBank Uptier Transaction;

  o The obligations underlying the 2L Exchangeable Notes issued to SoftBank through the SoftBank Uptier Transaction; and

  o The obligations underlying the 3L Exchangeable Notes issued to SoftBank through the SoftBank Uptier Transaction.

- the issuance of an additional $6.25 million of SoftBank Delayed Draw Notes as a commitment fee (collectively, with the SoftBank Uptier Liens and the SoftBank Uptier Debt, the "**SoftBank Uptier Exchange Transactions**");

- in connection with the SoftBank Redemption, the $300 million payment to SoftBank to redeem the Senior Secured Notes; and

- in connection with the SoftBank Redemption, the termination of SoftBank's outstanding commitment to purchase an additional $200 million of Senior Secured Notes.

148.    At the time the SoftBank Avoidable Transfers were made and the obligations arising therefrom were incurred, WeWork was insolvent.

149.    Specifically, before, on, and after the dates of the SoftBank Uptier Exchange Transactions, the sum of WeWork's debts exceeded the fair value of its assets.[50] WeWork had massive rent and capex obligations and funded indebtedness before the consummation of each of the SoftBank Avoidable Transfers. Upon information and belief, WeWork knew at the time the SoftBank Avoidable Transfers were made that it could not reasonably satisfy its liabilities and indebtedness, as they matured or accrued, with either existing assets (including any reserve fund, if any) or with revenue they could reasonably generate as a going concern.

150.    WeWork did not receive fair consideration, or reasonably equivalent value, in exchange for the SoftBank Avoidable Transfers. The benefits received by WeWork (if any) were far outweighed by – and did not come close to approximating – the value lost and burdens incurred in making the SoftBank Avoidable Transfers.

151.    The SoftBank Avoidable Transfers were not conducted at arm's length. SoftBank appeared on both sides of the SoftBank Avoidable Transfers, and maintained control over the Debtors. Upon information and belief, SoftBank leveraged its insider knowledge and exerted its considerable control over the Debtors in the course of these transactions to obtain benefits it otherwise would not have received.

152.    The SoftBank Avoidable Transfers were not conducted in good faith.

153.    The SoftBank Avoidable Transfers were made within two years of the Petition Date.

154.    Thus, each of the SoftBank Avoidable Transfers should be avoided under (i) section 548 of the Bankruptcy Code or (ii) section 544(b) of the Bankruptcy Code and the

---

[50] As stated before, under section 548 of the Bankruptcy Code, there are three tests for insolvency: the so-called "balance sheet" test, the "capital adequacy test," and the "cash flow" test. Only one test needs to be met. Here, the Committee has demonstrated, at a minimum, that the Debtors are insolvent under the "balance sheet" test. Upon information and belief, the Company was also insolvent under the other two tests at all relevant times.

substantially similar fraudulent conveyance provision of the NYUVTA. N.Y. Debt. & Cred.

Law § 279.

155.    Under sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (i) to

recover the property conveyed through the SoftBank Avoidable Transfers or the value thereof, for

the benefit of the Estates, and (ii) for the Estates to step into the shoes of the former lienholders.

### THIRD CAUSE OF ACTION

**Actual Fraudulent Conveyance**
**Under Bankruptcy Code §§ 544(b), 548, 550, and 551 and Applicable New York Law**
**(Against the Public Noteholders, Cupar, the Holder Doe Defendants, the 1L Public Notes**
**Trustee, the 1L Public Notes Collateral Agent, the 2L Exchangeable Notes Trustee, the 2L**
**Exchangeable Notes Collateral Agent, the 3L Exchangeable Notes Trustee, and the 3L**
**Exchangeable Notes Collateral Agent)**

156.    The Committee incorporates all the preceding paragraphs by reference.

157.    The Notes Trustees caused the above-described Public Noteholders Uptier

Transaction Avoidable Transfers to be made, and obligations incurred, by WeWork.

158.    Upon information and belief, the Public Noteholders Uptier Transaction Avoidable

Transfers were made with actual intent to hinder or delay unsecured creditors in realizing the value

of their claims. Such transfers were made with the intention to impede or obstruct unsecured

creditors' enforcement and collection of their unsecured claims, and with the knowledge that the

natural consequence and effect of the Public Noteholders Uptier Transaction Avoidable Transfers

would be to encumber certain assets of the Company and its subsidiaries that would otherwise be

available for collection by unsecured creditors.

159.    Upon information and belief, the Public Noteholders Uptier Transaction Avoidable

Transfers were designed, in part, to move the participating public noteholder's unsecured debt

ahead of unsecured creditors' *pari passu* debt and, thereby, to hinder, delay, or stall the ability of

unsecured creditors to realize the value of their unsecured claims.

160.    The intent to hinder or delay unsecured creditors in realizing the value of their

unsecured claims is further established by at least the following badges of fraud:

(a)    the transfer was made or obligation was incurred to or for the benefit of SoftBank, who was, at all relevant times, an insider of the Debtors ;

(b)    the transfer was not made in the ordinary course of WeWork's business;

(c)    the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(d)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

(e)    the transfer occurred shortly before or shortly after a substantial debt was incurred.

161.    Therefore, the Public Noteholders Uptier Transaction Avoidable Transfers should

be avoided under (i) section 548 of the Bankruptcy Code or (ii) section 544(b) of the Bankruptcy

Code and the substantially similar fraudulent conveyance provision of the NYUVTA.

162.    Under sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (i) to

recover the property conveyed through the Public Noteholders Uptier Transaction Avoidable

Transfers or the value thereof, for the benefit of the Estates, and (ii) for the Estates to step into the

shoes of the former lienholders.

**FOURTH CAUSE OF ACTION**

**Actual Fraudulent Conveyance**
**Under Bankruptcy Code §§ 544(b), 548, 550, and 551 and Applicable New York Law**
**(Against SoftBank, the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the**
**2L Exchangeable Notes Trustee, the 2L Exchangeable Notes Collateral Agent, the 3L**
**Exchangeable Notes Trustee, the 3L Exchangeable Notes Collateral Agent, and the SSN**
**Notes Trustee)**

163.    The Committee incorporates all the preceding paragraphs by reference.

164.    SoftBank caused the above-described SoftBank Avoidable Transfers to be made,

and obligations incurred, by WeWork.

165.   Upon information and belief, the SoftBank Avoidable Transfers were made with actual intent to hinder or delay unsecured creditors in realizing the value of their claims. Such transfers were made with the intention to impede or obstruct unsecured creditors' enforcement and collection of their unsecured claims, and with the knowledge that the natural consequence and effect of the SoftBank Avoidable Transfers would be to encumber certain assets of the Company and its subsidiaries that would otherwise be available for collection by unsecured creditors.

166.   Upon information and belief, the SoftBank Avoidable Transfers were designed, in part, to move SoftBank's unsecured debt ahead of unsecured creditors' *pari passu* debt and, thereby, to hinder, delay, or stall the ability of unsecured creditors to realize the value of their unsecured claims.

167.   The intent to hinder or delay unsecured creditors in realizing the value of their unsecured claims is further established by at least the following badges of fraud:

(a)   the transfer was made  or obligation was incurred to or for the benefit of SoftBank, who was, at all relevant times, an insider of the Debtors;

(b)   the transfer was not made in the ordinary course of WeWork's business;

(c)   the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(d)   the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

(e)   the transfer occurred shortly before or shortly after a substantial debt was incurred.

168.   Therefore, the SoftBank Avoidable Transfers should be avoided under (i) section 548 of the Bankruptcy Code or (ii) section 544(b) of the Bankruptcy Code and the substantially similar fraudulent conveyance provision of the NYUVTA.

169.    Under sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (i) to recover the property conveyed through the SoftBank Avoidable Transfers or the value thereof, for the benefit of the Estates, and (ii) for the Estates to step into the shoes of the former lienholders.

### FIFTH CAUSE OF ACTION

**Avoidance of Preferential Transfers – SoftBank Redemption
Bankruptcy Code § 547
(Against SoftBank and the SSN Notes Trustee)**

170.    The Committee incorporates all the preceding paragraphs by reference.

171.    In the one-year period prior the commencement of these Chapter 11 cases, SoftBank was a majority shareholder with the right to appoint half of the Directors to the Board. Accordingly, SoftBank was an insider of WeWork.

172.    The SoftBank Redemption occurred when WeWork was insolvent. WeWork's debts and liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its maturing obligations or to satisfy its liabilities as they came due in the ordinary course of its business.

173.    Pursuant to the SoftBank Redemption, the Debtors transferred $300 million to SoftBank on account of an antecedent debt, namely, the Senior Secured Notes, and terminated SoftBank's obligation to purchase an additional $200 million of Senior Secured Notes. The payment made by WeWork for the SoftBank Redemption was for the full outstanding amount of the Senior Secured Notes.

174.    Both the $300 million transfer and the cancellation of SoftBank's obligation to purchase an additional $200 million of Senior Secured Notes constituted the transfer of an interest in property of the transferring Debtor.

175.    The SoftBank Redemption was made for or on account of antecedent debt.

176.    The SoftBank Redemption was made to benefit SoftBank, a creditor (within the meaning of 11 U.S.C. § 101(10)) of the Debtors.

177.    The SoftBank Redemption enabled SoftBank to receive more than it would have received if (1) the Debtors' cases were under chapter 7 of the Bankruptcy Code, (2) the transfer had not been made, and (3) SoftBank received payment of such debt to the extent provided by the Bankruptcy Code. In a chapter 7 liquidation, the Debtors' assets are insufficient to provide for a full payment on account of secured debt.

178.    Accordingly, the Softbank Redemption should be avoided as a preference pursuant to section 547 of the Bankruptcy Code, and the Committee should be allowed to recover from SoftBank the full amount of such transfer, plus interest from the transfer date, for the benefit of the Estates.

## SIXTH CAUSE OF ACTION

**Preference – Liens Granted to SoftBank Pursuant to the SoftBank Uptier Exchange
Transactions
Bankruptcy Code § 547
(Against SoftBank, the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the
2L Exchangeable Notes Trustee, the 2L Exchangeable Notes Collateral Agent, the 3L
Exchangeable Notes Trustee, and the 3L Exchangeable Notes Collateral Agent)**

179.    The Committee incorporates all the preceding paragraphs by reference.

180.    In the one-year period prior the commencement of these Chapter 11 cases, SoftBank was a majority shareholder with the right to appoint half of the Directors to the Board. Accordingly, SoftBank was an insider of WeWork.

181.    The SoftBank Uptier Exchange Transactions occurred when WeWork was insolvent.

182.    WeWork's debts and liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its maturing obligations or to satisfy its liabilities as they came due in the ordinary course of its business.

183.    Pursuant to the SoftBank Uptier Exchange Transactions, the Debtors collateralized previously unsecured debt and issued new secured liens in connection therewith on account of an antecedent debt.

184.    Such transfers constituted the transfer of an interest in property of the transferring Debtor.

185.    The SoftBank Uptier Exchange Transactions were made for or on account of antecedent debt.

186.    The SoftBank Uptier Exchange Transactions were made to benefit SoftBank, a creditor (within the meaning of 11 U.S.C. § 101(10)) of the Debtors.

187.    The SoftBank Uptier Exchange Transactions allowed SoftBank to exchange its unsecured antecedent debt for higher priority secured debt that is now set to receive a recovery under the Debtors' proposed chapter 11 plan. As such, the SoftBank Uptier Exchange Transactions enabled SoftBank to receive more than it would have received if (1) the Debtors' cases were under chapter 7 of the Bankruptcy Code, (2) the transfer had not been made, and (3) SoftBank received payment of such debt to the extent provided by the Bankruptcy Code. In a chapter 7 liquidation, the Debtors' assets are insufficient to provide for a full payment on account of secured debt.

188.    Accordingly, the SoftBank Uptier Exchange Transactions should be avoided as preferences pursuant to the section 547 of the Bankruptcy Code, and the Committee should be allowed to recover from SoftBank the full amount of such transfers, plus interest from the transfer dates, for the benefit of the Estates.

## SEVENTH CAUSE OF ACTION

**Breach of Fiduciary Duty of Care**
**Under Delaware Law**
**(Against SoftBank, the SoftBank Directors, the MTA Directors, Son and the Fiduciary Doe**
**Defendants)**

189.    The Committee incorporates all the preceding paragraphs by reference.

190.    At all relevant times, as set forth above, WeWork was insolvent. Its debts and

liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its

maturing obligations or to satisfy its existing or probable liabilities as they came due in the ordinary

course of its business.

191.    As early as 2016, and at all relevant times, SoftBank constructively controlled

WeWork through the force its CEO, Son – and his company's capital – exerted on Neumann. That

control was formalized after Neumann's exit in late 2019, with SoftBank acquiring the ability to

appoint five out of ten directors and owning over 70% of WeWork's equity. SoftBank was and is

in control of WeWork and therefore owed and owes WeWork and residual claimants fiduciary

duties.

192.    SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Doe

Defendants (collectively, the "**Fiduciaries**") owe both WeWork and residual claimants, including

but not limited to unsecured creditors, an independent fiduciary duty to act in good faith to exercise

the care that an ordinarily careful and prudent person would use in similar circumstances and to

act on an informed basis after considering relevant and reasonably available information. Such

duty included the obligation to preserve the assets of WeWork's estate for the benefit of creditors.

193.    The Fiduciaries breached their fiduciary duty of care through the forced expansion

of WeWork as a technology company for their own gain, without regard to WeWork's solvency

and without exercising the care that an ordinarily careful and prudent person would exercise in

similar circumstances; by not considering relevant and reasonably available material information; or in acting with gross negligence or reckless indifference to the interests of unsecured creditors.

194.    The Fiduciaries, by those breaches of fiduciary duties, did not act to maximize the value or the long-term wealth-creating capacity of the insolvent Company as a whole for the benefit of all stakeholders.

195.    The Fiduciaries' breaches of their fiduciary duties caused substantial damage to unsecured creditors, in an amount to be proven at trial. But for such breaches of fiduciary duty, unsecured creditors would not have suffered such damage.

## EIGHTH CAUSE OF ACTION

**Breach of Fiduciary Duty of Loyalty – MTA Draw
Under Delaware Law
(Against SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Doe
Defendants)**

196.    The Committee incorporates all the preceding paragraphs by reference.

197.    At all relevant times, as set forth above, WeWork was insolvent. Its debts and liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its maturing obligations or to satisfy its existing or probable liabilities as they came due in the ordinary course of its business.

198.    The Fiduciaries therefore owed both WeWork and its residual claimants, including but not limited to unsecured creditors, an independent fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of the WeWork's estate and, at all times, to subordinate their personal interests to the interests of the WeWork.

199.    As early as 2016, and at all relevant times, SoftBank was in control of WeWork and therefore owed and owes WeWork and residual claimants fiduciary duties. SoftBank constructively controlled WeWork through the force its CEO, Son, and his company's capital

exerted on Neumann. That control was formalized after Neumann's exit in late 2019, with SoftBank acquiring the ability to appoint five out of ten directors and owning over 70% of WeWork's equity.

200.    The Fiduciaries breached their fiduciary duty of loyalty to WeWork as well as to the residual claimants, including but not limited to the unsecured creditors, by acting in bad faith, failing to act in the best interests of WeWork as a whole, and failing to subordinate their personal interests to the interests of WeWork, in not drawing down on all of the capital committed by SoftBank as part of the MTA.

201.    Specifically, among other acts and omissions in breach of their fiduciary duty of loyalty, the Fiduciaries, in approving the Uptier Transactions:

(f)    were not disinterested, or independent of persons directly interested, in the Uptier Transactions;

(g)    were beholden to, and acted at the behest and for the sole benefit of, Softbank, by prioritizing Softbank's interests, while failing to act in the best interest of the insolvent Company as a whole; and

(h)    placed their personal interests in satisfying the interests of Softbank, to whom they were beholden, ahead of the interests of *both* WeWork *and* unsecured creditors.

202.    In addition, the SoftBank Directors were simultaneously directors of SoftBank, thereby owing fiduciary duties to both WeWork and SoftBank simultaneously. Given their dual loyalties, the Fiduciaries could not, and did not, make informed, neutral, good-faith, and independent determinations to approve the Uptier Transactions.

203.    The Fiduciaries' breaches of their fiduciary duties caused substantial damage to unsecured creditors, in an amount to be proven at trial. But for such breaches of fiduciary duty, unsecured creditors would not have suffered such damage.

60

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty of Loyalty – JPM Financing
### Under Delaware Law
### (Against SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Doe Defendants)

204.    The Committee incorporates all the preceding paragraphs by reference.

205.    At all relevant times, as set forth above, WeWork was insolvent. Its debts and liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its maturing obligations or to satisfy its existing or probable liabilities as they came due in the ordinary course of its business.

206.    The Fiduciaries therefore owed both the WeWork and its residual claimants, including but not limited to unsecured creditors, an independent fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of the WeWork's estate and, at all times, to subordinate their personal interests to the interests of the WeWork.

207.    As early as 2016, and at all relevant times, SoftBank was and is in control of WeWork and therefore owed and owes WeWork and residual claimants fiduciary duties. SoftBank constructively controlled WeWork through the force its CEO, Son, and his company's capital exerted on Neumann. That control was formalized after Neumann's exit in late 2019, with SoftBank acquiring the ability to appoint five out of ten directors and owning over 70% of WeWork's equity.

208.    The Fiduciaries breached their fiduciary duty of loyalty to WeWork as well as to the residual claimants, including but not limited to the unsecured creditors, by acting in bad faith, failing to act in the best interests of WeWork as a whole, and failing to subordinate their personal interests to the interests of WeWork, in choosing the SoftBank rescue financing over the JPM financing.

209. Specifically, among other acts and omissions in breach of their fiduciary duty of loyalty, the Fiduciaries, in approving the Uptier Transactions:

(i)  were not disinterested, or independent of persons directly interested, in the Uptier Transactions;

(j)  were beholden to, and acted at the behest and for the sole benefit of, Softbank, by prioritizing Softbank's interests, while failing to act in the best interest of the insolvent Company as a whole; and

(k)  placed their personal interests in satisfying the interests of Softbank, to whom they were beholden, ahead of the interests of *both* WeWork *and* unsecured creditors.

210. In addition, the SoftBank Directors were simultaneously directors of SoftBank, thereby owing fiduciary duties to both WeWork and SoftBank simultaneously. Given their dual loyalties, the Fiduciaries could not, and did not, make informed, neutral, good-faith, and independent determinations to approve the Uptier Transactions.

211. The Fiduciaries' breaches of their fiduciary duties caused substantial damage to unsecured creditors, in an amount to be proven at trial. But for such breaches of fiduciary duty, unsecured creditors would not have suffered such damage.

**TENTH CAUSE OF ACTION**

**Breach of Fiduciary Duty of Loyalty – Uptier Transactions
Under Delaware Law
(Against SoftBank, the SoftBank Directors, the MTA Directors, Son, and the Fiduciary Doe
Defendants)**

212. The Committee incorporates all the preceding paragraphs by reference.

213. At all relevant times, as set forth above, WeWork was insolvent. Its debts and liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its maturing obligations or to satisfy its existing or probable liabilities as they came due in the ordinary course of its business.

214.    The Fiduciaries therefore owed both the WeWork and its residual claimants, including but not limited to unsecured creditors, an independent fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of the WeWork's estate and, at all times, to subordinate their personal interests to the interests of the WeWork.

215.    As early as 2016, SoftBank was in control of WeWork and therefore owed WeWork and residual claimants fiduciary duties. SoftBank constructively controlled WeWork through the force its CEO, Son, and his company's capital exerted on Neumann. That control was formalized after Neumann's exit in late 2019, with SoftBank acquiring the ability to appoint five out of ten directors and owning over 70% of WeWork's equity.

216.    The Fiduciaries breached their fiduciary duty of loyalty to WeWork as well as residual claimants, including but not limited to the unsecured creditors, by acting in bad faith, failing to act in the best interests of WeWork as a whole, and failing to subordinate their personal interests to the interests of WeWork, in approving the Uptier Transactions.

217.    Specifically, among other acts and omissions in breach of their fiduciary duty of loyalty, the Fiduciaries, in approving the Uptier Transactions:

(l)    were not disinterested, or independent of persons directly interested, in the Uptier Transactions;

(m)    were beholden to, and acted at the behest and for the sole benefit of, Softbank, by prioritizing Softbank's interests, while failing to act in the best interest of the insolvent Company as a whole; and

(n)    placed their personal interests in satisfying the interests of Softbank, to whom they were beholden, ahead of the interests of *both* WeWork *and* unsecured creditors.

218.    In addition, the SoftBank Directors were simultaneously directors of SoftBank, thereby owing fiduciary duties to both WeWork and SoftBank simultaneously. Given their dual loyalties, the Fiduciaries could not, and did not, make informed, neutral, good-faith, and independent determinations to approve the Uptier Transactions.

63

219.    The Fiduciaries' breaches of their fiduciary duties caused substantial damage to unsecured creditors, in an amount to be proven at trial. But for such breaches of fiduciary duty, unsecured creditors would not have suffered such damage.

## ELEVENTH CAUSE OF ACTION

**Equitable Subordination**
**Bankruptcy Code § 510**
**(Against the Ad Hoc Group)**

220.    The Committee incorporates all the preceding paragraphs by reference.

221.    At all relevant times, SoftBank had the ability to control and did control WeWork, by virtue of, among other reasons:

(a)    SoftBank was at all relevant times an insider of the Debtors,

(b)    SoftBank's unfettered access to the Company's management (including frequent communications through telephone, text message, email, and one-on-one meetings) and its superior access to information concerning the Company, including non-public information;

(c)    SoftBank's ability, as of October 2019, to appoint half of the Board; and

(d)    SoftBank's eventual ownership of over 70% of WeWork's equity.

222.    Alternatively, if the SoftBank entities are treated separately, they are connected by common ownership and thereby constitute a control group. Additionally, even lacking the common ownership of the control group, their control is demonstrated by their 72% equity ownership, concurrence of interests, historical ties as equity partners since 2016, and their transaction-specific coordination.

223.    SoftBank was able to use its control over WeWork to obtain measures and concessions falling well outside the debtor-creditor relationship, for instance by influencing management and operational issues and having extensive direct dialogue with senior Company decision-makers with respect to the Company's approval and entry into the Uptier Transactions.

224.    SoftBank engaged in wrongful and inequitable conduct in connection with the

Uptier Transactions by, among other acts and omissions:

(a)    orchestrating and directing the negotiation, formulation, and effectuation of the
Uptier Transactions, which were not at arm's length, for the purpose of causing
SoftBank's unsecured debt to inequitably move ahead of unsecured creditors'
claims, elevating its own interests at the expense of other creditors and providing
little to no benefit to WeWork;

(b)    engaging in the above-described scheme with the knowledge that doing so would
cause WeWork to be unable to satisfy unsecured creditors' claims;

(c)    knowingly causing WeWork to effectuate, and knowingly receiving the benefits of,
the Uptier Transactions, as set forth above;

225.    The Public Noteholders engaged in wrongful and inequitable conduct in connection

with the Uptier Transactions by, among other acts and omissions:

(d)    participating in the Public Noteholders Uptier Transactions, which were not at
arm's length, for the purpose of causing the Public Noteholder's unsecured debt to
inequitably move ahead of unsecured creditors' claims, elevating their own
interests at the expense of other creditors and providing little to no benefit to
WeWork;

(e)    engaging in the above-described scheme with the knowledge that doing so would
cause WeWork to be unable to satisfy the unsecured creditors' claims; and

(f)    knowingly causing WeWork to effectuate the Uptier Transactions, and knowingly
receiving the benefits thereof, as set forth above.

226.    The wrongful and inequitable conduct of SoftBank and the Public Noteholders

directly caused substantial damage to unsecured creditors, including but not limited to a reduction

in, and an impeded ability to realize, the value of unsecured creditors' claims due to the unlawful

subordination of such claims. But for the above-specified wrongful and inequitable conduct,

unsecured creditors would not have suffered the damages alleged.

227.    The wrongful conduct of SoftBank and the Public Noteholders also resulted in

unjust benefits to those parties, including SoftBank's and the Public Noteholders' unsecured

claims moving ahead of other unsecured creditors' structurally *pari passu* unsecured indebtedness.

228.    The wrongful conduct of SoftBank and the Public Noteholders, the resulting harm
to unsecured creditors, and the resulting unjust benefit to SoftBank and the Public Noteholders
merits equitable subordination of the SoftBank Uptier Notes to the claims of unsecured creditors.

229.    The equitable subordination requested herein is consistent with the Bankruptcy
Code.

230.    Pursuant to section 510(c) of the Bankruptcy Code, the claims of SoftBank, and the
Public Noteholders (as filed by the respective trustees and collateral agents) on account of the
Uptier Notes should be subordinated to all unsecured creditors' claims and unsecured creditors
should be decreed to step into the shoes of the liens granted to secure the Uptier Transactions.

## TWELFTH CAUSE OF ACTION

**Recharacterization of the Debt Issued to SoftBank as Equity**
**Bankruptcy Code §§ 105(a), 502(b)**
**(Against SoftBank, the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the**
**2L Exchangeable Notes Trustee, the 2L Exchangeable Notes Collateral Agent, the 3L**
**Exchangeable Notes Trustee, the 3L Exchangeable Notes Collateral Agent,  and the**
**Administrative Agents)**

231.    The Committee incorporates all the preceding paragraphs by reference.

232.    The SoftBank Claims are in economic substance equity investments.

233.    Considering the totality of the circumstances, the SoftBank Claims should be
recharacterized as equity.

234.    Since the beginning of SoftBank's relationship with WeWork, the relationship was
one of partnership rather than creditor/debtor.

235.    In incurring the SoftBank Claims, SoftBank, extended funding to the Company at
a time and on terms on which no legitimate, third-party lender would have agreed to lend. Indeed,
absent SoftBank's various investments in WeWork, the Debtors' would have otherwise been
unable to obtain financing on the same or similar terms.

236.     Upon information and belief, SoftBank is not in the practice of extending debt; it is a long-term investor. The majority of capital contributions SoftBank made to the Debtors, including pursuant to the LC Facility and the Reimbursement Agreement, were in the form of or associated with equity raises. Of the over $16 billion that SoftBank invested in WeWork, over $10 billion was expressly in the form of equity.

237.     Furthermore, SoftBank and WeWork entered into the MTA, the LC Facility and the Reimbursement Agreement shortly after the Company's failed IPO. At this point, SoftBank had direct knowledge as an insider that the Company was undercapitalized and was not expecting to be repaid on its "debt." Unlike true lenders, despite putting in a limited amount of capital as "debt," SoftBank was relying exclusively on the fortunes of WeWork's business for repayment.

238.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

239.     This lack of independence continued through the Petition Date, including during the negotiation of and entry into the Uptier Transactions.

240.     By March 2023 when the parties began negotiating the Uptier Transactions, SoftBank had direct knowledge of WeWork's dire liquidity issues and knew that there would not be enough funds from operations to repay the obligations under the Uptier Transactions.

241.     Upon information and belief, SoftBank only agreed to participate in the LC Facility and Uptier Transactions to protect and expand (through the receipt of equity shares and secured

notes convertible to equity) its existing equity investments in the Company, to advance its own business interests and to gain seniority and ensure payment ahead of the Committee's constituents. This is evidenced in part by the Company's failure to establish a sinking fund to repay the debt underlying the SoftBank Claims.

242.    In summary, SoftBank and WeWork intended the funding underlying the SoftBank Claims to be an equity investment in WeWork because: (1) in supplying such funding, SoftBank acted as an equity investor of WeWork; (2) due to SoftBank's insider status, it did not operate at arm's length in connection with the transactions underlying the SoftBank Claims; (3) WeWork was always insolvent or otherwise undercapitalized, including at the time of each of the transactions underlying the SoftBank Claims; (4) WeWork would have otherwise been unable to obtain capital from a non-SoftBank entity on the same or similar terms and (5) no sinking fund was established to repay the debts underlying the SoftBank Claims.

243.    For the reasons set forth above, the SoftBank Claims should be recharacterized as equity.

## THIRTEENTH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens Do Not Attach to the Excluded Commercial Tort Claims**
**(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L Exchangeable Notes Collateral Agent, and Administrative Agents)**

244.    The Committee incorporates all the preceding paragraphs by reference.

245.    The Debtors' commercial tort claims with a value under $10 million are Excluded Property under the Credit Agreement and the Indentures and, therefore, are expressly carved out of the definition of Collateral and not subject to the Prepetition Liens.

246.    This Court is authorized to resolve this dispute pursuant to section 506 of the
Bankruptcy Code and Bankruptcy Rule 7001(2).

247.    The Committee is entitled to a declaration that the Prepetition Liens do not attach
to the Excluded Commercial Tort Claims and the proceeds thereof.

## FOURTEENTH CAUSE OF ACTION

**Avoidance of Liens and Preservation for Benefit of Debtors' Estates
Bankruptcy Code §§ 544, 551
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and Administrative Agents)**

248.    The Committee incorporates all the preceding paragraphs by reference.

249.    The Credit Agreement and the Indentures purports to include any commercial tort
claims that are expected to be in excess of $10 million of the Debtors as Collateral.

250.    UCC § 9-203 and § 9-108(e)(1) require commercial tort claims to be identified in
a security agreement with specificity in order for a lien to attach in such assets.

251.    UCC § 9-502(a) and § 9-504 require commercial tort claims to be identified in a
UCC-1 financing statement with specificity in order to perfect a lien in such assets.

252.    No commercial tort claims have been identified in the LC Credit Agreement, the
Security Agreement or the Indentures. The Debtors have also not identified any commercial tort
claims with specificity in any UCC-1 financing statement.

253.    Accordingly, the Defendants' purported prepetition liens on the Debtors'
commercial tort actions (the "**Unperfected Commercial Tort Claims**") did not properly attach
and are not properly perfected.

254.    As a result, any such unperfected or improperly perfected liens should be avoided
under section 544(a)(1)-(2) of the Bankruptcy Code for the benefit of the Debtors' estates and
preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code.

## FIFTEENTH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens
Do Not Attach to the Debtors' Leasehold Interests
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and the Administrative Agents)**

255.    The Committee incorporates all the preceding paragraphs by reference.

256.    Under the Credit Agreement and the Indentures, Leasehold Interests are Excluded Property and, therefore, are not subject to the Prepetition Liens.

257.    The applicable collateral agent under the Credit Agreement and/or the Indentures did not file, nor did it have authority to file, leasehold mortgages against the Leasehold Interests in the county where such Leasehold Interests are located, as is required to perfect an interest in a debtor's leasehold interest.

258.    As a result, any security interest claimed in the Leasehold Interests, including the related fixtures, are unperfected as of the Petition Date.

259.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Leasehold Interests, including the fixtures associated with such Leasehold Interests and any proceeds thereof.

260.    This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2).

261.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Leasehold Interests.

## SIXTEENTH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens
Do Not Attach to the Specified Member Agreements
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and Administrative Agents)**

262.    The Committee incorporates all the preceding paragraphs by reference.

263.    Under the Credit Agreement and the Indentures, the Specified Member Agreements constitute Leasehold Interests and, therefore, are Excluded Property and not subject to the Prepetition Liens.

264.    The applicable collateral agent under the Credit Agreement and/or the Indentures did not file, nor did it have authority to file, leasehold mortgages against the Specified Member Agreements in the county where such Specified Member Agreements are located, as is required to perfect an interest in a debtor's leasehold interest.

265.    As a result, any security interest claimed in the Specified Member Agreements, including the related fixtures, are unperfected as of the Petition Date.

266.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Specified Member Agreements, including the fixtures associated with such Specified Member Agreements.

267.    This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2).

268.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Specified Member Agreements.

## SEVENTEETH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens
Do Not Attach to the Excluded Equity Interests
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and Administrative Agents)**

269.    The Committee incorporates all the preceding paragraphs by reference.

270.    "Excluded Equity Interests," as defined under the LC Credit Agreement and the Indentures, including 35% of the equity interests of any CFC or CFC Holdco, are expressly carved out of the definition of Collateral and not subject to the Prepetition Liens.

271.    As a result, any security interest claimed in the Excluded Equity Interests was not and could not be perfected as of the Petition Date.

272.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Excluded Equity Interests.

273.    This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2).

274.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Excluded Equity Interests, including 35% of the equity interests of any CFC or CFC Holdco and the proceeds thereof.

## EIGHTEENTH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens
Do Not Attach to the Excluded Accounts
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and Administrative Agents)**

275.    The Committee incorporates all the preceding paragraphs by reference.

276.    "Excluded Accounts," as defined under the Credit Agreement and the Indentures, are expressly carved out of the definition of Collateral and not subject to the Prepetition Liens.

72

277.    As a result, any security interest claimed in the Excluded Accounts was not and could not be perfected as of the Petition Date.

278.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Excluded Accounts.

279.    This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2).

280.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Excluded Accounts and the proceeds thereof.

## NINETEENTH CAUSE OF ACTION

**Declaratory Judgment that the Prepetition Liens
Do Not Attach to the Assets of the Excluded Debtors
(Against the 1L Public Notes Collateral Agent, the 2L Public Notes Collateral Agent, the 2L
Exchangeable Notes Collateral Agent, the 3L Public Notes Collateral Agent, the 3L
Exchangeable Notes Collateral Agent, and Administrative Agents)**

281.    The Committee incorporates all the preceding paragraphs by reference.

282.    The Excluded Debtors are either not parties to the Prepetition Facilities, or the applicable collateral agents under the Credit Agreement and/or Indentures did not file, nor did they have authority to file, UCC-1 financing statements against any assets held by the Excluded Debtors.

283.    The Excluded Debtors did not enter into any security agreement with the applicable agent to guaranty or pledge their respective collateral to secure the obligations of the Debtors under the Credit Agreement and/or the Indentures. As such, any such purported lien asserted against the assets any such Excluded Debtor is void.

284.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to any assets of the Excluded Debtors.

285.     This Court is authorized to resolve this dispute pursuant to section 506 of the

Bankruptcy Code and Bankruptcy Rule 7001(2).

286.     The Committee is entitled to a declaration that the Prepetition Liens do not attach

to the assets of the Excluded Debtors and their proceeds.

## TWENTIETH CAUSE OF ACTION

**Disallowance of Claims under 11 U.S.C. §§ 502(b)(1); 502(b)(2); and 506(b)
(Against SoftBank, the Public Noteholders, the 1L Public Notes Trustee and the 1L Public
Notes Collateral Agent)**

287.     The Committee incorporates all the preceding paragraphs by reference.

288.     Under section 502(a) of the Bankruptcy Code, a proof of claim is "deemed allowed,

unless a party in interest . . . objects." When faced with an objection refuting at least one of the

claim's essential elements, the claimant bears the burden of demonstrating the validity of the claim.

*Id.*

289.     As described above, the First Lien Notes Indenture's "Make-Whole" provision

provides for claims on unmatured interest. The 1L Notes are undersecured. Because, claims for

unmatured interest are disallowed under the Bankruptcy Code, 11 U.S.C. § 502(b)(2), all claims

premised upon the "Make-Whole" provision of the First Lien Notes Indenture should be

disallowed and expunged.

290.     Furthermore, under section 502(b)(1) of the Bankruptcy Code, a claim may

disallowed where "such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law." As described herein, the Make-Whole is an unenforceable

penalty and should be disallowed for this reason as well.

291.     Lastly, to the extent that the 1L Notes are not undersecured, the applicable law in

section 506(b) of the Bankruptcy Code provides that a secured lender may only claim fees, costs,

or charges to the extent they are "reasonable." As discussed above, the "Make-Whole" provision

of the First Lien Notes Indenture provides for a payment of an additional year of interest for loans
that were outstanding for only six months. This penalty drastically exceeds any reasonable
calculation of damages to holders of the 1L Notes for the return of their funds, and is not otherwise
a quantified penalty that could have been reasonably assumed to approximate damages that would
be incurred for the return of funds.

292.    Moreover, due to the calculation of the penalty under the "Make-Whole" provision
of the First Lien Notes Indenture, claims arising from the "Make-Whole" provision would overlap
with the terms of the present DIP Order, which already provides for the payment of current interest
payments that come due during the pendency of this bankruptcy. This overlap would result in
impermissible double-counting.

293.    For the foregoing reasons, claims based upon the First Lien Notes Indenture's
"Make-Whole" provision should be disallowed and expunged under sections 502 and 506 of the
Bankruptcy Code.

## TWENTY-FIRST CAUSE OF ACTION

**Disallowance of Original Issue Discount under 11 U.S.C. §§ 105, 502, and 506
(Against the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the 2L Public
Notes Trustee, the 2L Public Notes Collateral Agent, the 2L Exchangeable Notes Trustee,
the 2L Exchangeable Notes Collateral Agent, the 3L Public Notes Trustee, the 3L Public
Notes Collateral Agent, the 3L Exchangeable Notes Trustee, and the 3L Exchangeable
Notes Collateral Agent)**

294.    The Committee incorporates all the preceding paragraphs by reference.

295.    Under section 502(a) of the Bankruptcy Code, a proof of claim is "deemed allowed,
unless a party in interest . . . objects." When faced with an objection refuting at least one of the
claim's essential elements, the claimant bears the burden of demonstrating the validity of the claim.

296.    Each of the Defendants are holders of secured notes in the form of 1L Notes, 2L
Notes, 2L Exchangeable Notes, 3L Notes and/or 3L Exchangeable Notes.

297.    The Prepetition Indentures each provide for the issuance of notes with an original issue discount.

298.    As set forth above, to the extent not recharacterized as equity, the 1L Notes, 2L Notes, 2L Exchangeable Notes, 3L Notes, and 3L Exchangeable Notes are unsecured or undersecured.

299.    Because the liens are unsecured or undersecured, the original issue discounts on the 1L Notes, 2L Exchangeable Notes, 2L Notes, 3L Notes, and 3L Exchangeable Notes should be disallowed as claims for unmatured interest under section 105, 502, and 506 of the Bankruptcy Code.

300.    Additionally, because they are unsecured or undersecured, the portion of the original issue discount that has not yet been amortized or accreted by the Petition Date should be disallowed as unmatured interest.

## TWENTY-SECOND CAUSE OF ACTION

### Disallowance of Claims under 11 U.S.C. § 502(b)(1)
**(Against the 1L Public Notes Trustee, the 1L Public Notes Collateral Agent, the 2L Public Notes Trustee, the 2L Public Notes Collateral Agent, the 2L Exchangeable Notes Trustee, the 2L Exchangeable Notes Collateral Agent, the 3L Public Notes Trustee, the 3L Public Notes Collateral Agent, the 3L Exchangeable Notes Trustee, the 3L Exchangeable Notes Collateral Agent, and the Administrative Agents)**

301.    The Committee incorporates all the preceding paragraphs by reference.

302.    Under section 502(a) of the Bankruptcy Code, a proof of claim is "deemed allowed, unless a party in interest . . . objects." When faced with an objection refuting at least one of the claim's essential elements, the claimant bears the burden of demonstrating the validity of the claim.

303.    Under section 502(b)(1) of the Bankruptcy Code, a claim may disallowed where "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."

304.    The Defendants have filed proofs of claim against the Debtor predicated on the 1L Notes, 2L Notes, 2L Exchangeable Notes, 3L Notes, Senior LC Facility, and/or the Junior LC Facility.

305.    As described above, the Defendants' conduct was inequitable and has harmed the Debtors' estates and, by extension, the Debtors' unsecured creditors. Specifically, in connection with the Defendants' inequitable conduct, the Debtors undertook liens and considerable high-priority debt obligations on the eve of bankruptcy, significantly reducing their ability to satisfy their obligations to general unsecured creditors.

306.    Allowing the Defendants to recover on the basis of their proofs of claim would therefore be unfair and inequitable. Accordingly, the Defendants' claims should be disallowed and expunged.

## TWENTY-THIRD CAUSE OF ACTION

### Disallowance of Claims under 11 U.S.C. § 502(d)
### (Against all Defendants)

307.    The Committee incorporates all the preceding paragraphs by reference.

308.    To the extent the Defendants assert any claims against any of the Debtors, such claims should be disallowed unless and until the Defendants, as appropriate, return to the Debtors the value of any transfer(s) avoided pursuant to this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, the Committee respectfully requests that the Court enter an order consistent with the relief sought in the above listed causes of action: (i) unwinding the fraudulent transfers; (ii) unwinding the preference transactions; (iii) finding Defendants liable for their breaches of fiduciary duty; (iv) equitably subordinating the Defendants' claims; (v) recharacterizing the Defendants' claims as equity interests and disallowing such claims;

(vi) granting lien avoidance;  (vii) granting declaratory relief; and (viii) granting such other and further relief, at law or in equity, to which the Committee is justly entitled.

Dated:  [], 2024

**RIKER DANZIG LLP**

By: */s/ Draft_____*
Joseph L. Schwartz, Esq.
Tara J. Schellhorn, Esq.
Daniel A. Bloom, Esq.
Gregory S. Toma, Esq.
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tschellhorn@riker.com
dbloom@riker.com
gtoma@riker.com

-and-

**PAUL HASTINGS LLP**
Kristopher M. Hansen, Esq. (admitted *pro hac vice*)
Frank A. Merola, Esq. (admitted *pro hac vice*)
Gabriel E. Sasson, Esq.
Emily L. Kuznick, Esq. (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
krishansen@paulhastings.com
frankmerola@paulhastings.com
gabesasson@paulhastings.com
emilykuznick@paulhastings.com

-and-

Paul R. Genender, Esq. (admitted *pro hac vice*)
Conrad Coutinho, Esq. (admitted *pro hac vice*)
Jake Rutherford, Esq. (admitted *pro hac vice*)
Marijana Kralt, Esq. (admitted *pro hac vice*)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
paulgenender@paulhastings.com
conradcoutinho@paulhastings.com
jakerutherford@paulhastings.com
marikralt@paulhastings.com

*Co-Counsel to the Official
Committee of Unsecured Creditors*[51]

---

[51] To the extent either of the co-counsel to the Official Committee of Unsecured Creditors may have a potential conflict with respect to prosecuting claims against certain defendants, the other co-counsel will prosecute those claims.

**<u>Exhibit A</u>**

## I. *Excluded Collateral*

1.      Pursuant to the LC Credit Agreement and the Indentures, the Prepetition Liens are not secured by "**Excluded Property**," "**Excluded Equity Interests**," or "**Excluded Accounts**." "**Excluded Property**" includes, among other things: (i) any commercial tort claims that are not expected to be in excess of $10 million, (ii) any fee owned real property and any real property leasehold rights and interests, and (iii) any asset of any CFC, any CFC Holdco, or any subsidiary of any CFC or CFC Holdco, as such terms are defined in the Credit Agreement. *See* Credit Agreement § 1.1. Moreover, Excluded Equity Interests is defined, in part, as any equity interest of any of any CFC or CFC Holdco in excess of 65% of the total combined voting power of all classes of voting stock. *Id.*

2.      *Commercial Tort Claims*. The Collateral securing the Prepetition Liens includes "commercial tort claims," which term was ascribed the meaning set forth in the Uniform Commercial Code (the "**UCC**"). Commercial tort claims are defined under Article 9 of the UCC as claims "arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual." UCC § 9-102(13).

3.      Under the LC Credit Agreement and the Indentures, any commercial tort claims that are not expected to be in excess of $10 million are Excluded Property and therefore not subject to the Prepetition Liens (the "**Excluded Commercial Tort Claims**"). Moreover, any commercial tort claims in excess of $10 million are also not subject to the Prepetition Liens. For a lien to attach in certain collateral, the security agreement must contain a description of the collateral that reasonably identifies the collateral. UCC §§ 9-108(a) and 9-203(b)(3)(A)). Merely listing

"commercial tort claim" as a type of collateral is insufficient for a lien to attach to such property. UCC § 9-108(e)(1).

4.        Neither the Credit Agreement, the Indentures nor any financing statements list any commercial tort claims, and therefore do not provide the specificity required under the UCC that perfect any liens in any commercial tort claims. Accordingly, the Prepetition Liens do not extend to any of the Debtors' commercial tort claims or their proceeds.[1]

5.        *Leasehold Interests*. Under the Credit Agreement and the Indentures, Excluded Property is defined, in part, as "any real property leasehold rights and interests" (the "**Leasehold Interests**"). *See* Credit Agreement § 1.1. As such, the Debtors' real property Leasehold Interests are Excluded Property and, therefore, are not subject to the Prepetition Liens.

6.        Through its investigation, the Committee has determined that many of the Debtors' agreements with its Member Companies (as defined in the First Day Dec.) (such agreements, the "**Member Agreements**") constitute Leasehold Interests under the Credit Agreement and Indentures and, therefore, are not subject to the Prepetition Liens. Upon information and belief, many of the Member Agreements, particularly the Membership Agreements that have larger square footage are, in actuality, subleases that convey an interest in real estate (the "**Specified Membership Agreements**").[2] As demonstrated above, any real property interests, are Excluded Property and, therefore, are not subject to the Prepetition Liens.

---

[1] *See, e.g., Helms v. Certified Packaging Corp.,* 551 F.3d 675, 681 (7th Cir. 2008) ("The agreement does not mention [two tort claims] and while it purports to grant [the secured creditor] a security interest in after-acquired property, such a grant is ineffective when the property is a commercial tort claim.").

[2] As part of its investigation, the Committee has requested copies of the Debtors' top twenty (20) Member Agreements. While the Debtors are continuing to produce such documents on a rolling basis, to date, the Committee has yet to receive a full suite of the relevant Member Agreements, as well as the corresponding amendments and ancillary documents that are key to the Committee's review. As a result, the Committee is unable to state with specificity how many or which Member Agreements are, in fact, Leasehold Interests that are not subject to the Prepetition Liens.

7.     Moreover, as subleases, any and all revenue derived from the Specified Membership Agreements are rents of the Debtors that can only be pledged as collateral through an assignment of rents that is properly perfected by recording in the real estate records. The collateral agent or trustee, as applicable, under the Credit Agreement and/or the Indentures did not file leasehold mortgages nor assignments of rents against the Specified Membership Agreements in the county where such Specified Membership Agreements are located.

8.     As a result, such collateral agents do not have a perfected security interest in the Specified Membership Agreements nor the rents generated by them, including the related fixtures or any proceeds that may be realized in these cases.

9.     *Excluded Equity Interests*. Under the Credit Agreement and the Indentures, "**Excluded Equity Interests**" is defined, in part, as "any other interest treated as an equity interest for U.S. federal income Tax purposes) of any CFC or CFC Holdco in excess of 65% of the 'total combined voting power of all classes of voting stock' (within the meaning of Treasury Regulations section 1.956-2(c)(2)) of such CFC or CFC Holdco, as the case may be." *See* Credit Agreement § 1.1. To that end, 35% of the equity interests of any CFC or CFC Holdco, including, without limitation, 9670416 CANADA Inc. and The We Company Worldwide Limited, do not attach to the Prepetition Liens and such equity interests are, therefore, unencumbered.

10.     *Excluded Accounts*. Under the Credit Agreement and the Indentures, "**Excluded Accounts**" is defined as:

"(a) any accounts used for payroll, taxes or retiree and/or employee benefits, (b) any accounts used for escrow, customs or other fiduciary purposes, (c) any accounts with amounts on deposit in which do not exceed an average daily balance (determined on a monthly basis) of $50,000,000 for all such accounts in the aggregate at any one time, (d) any accounts consisting of withheld income taxes and federal, state or local employment taxes in such amounts as are required in the reasonable judgment of the Issuer in the ordinary course of business to be paid to the Internal Revenue Service or state or local government agencies with respect to current or former employees of the Issuer or any

3

other Grantor and (e) any accounts described in clause (e) of the definition of "Excluded Account" in the Letter of Credit Facility as in effect on the date hereof; provided that Liens securing an aggregate outstanding principal amount of obligations at any one time of up to $100,000,000 shall be exempted from the requirements of this parenthetical)."

11.    As such, the applicable collateral agents under the Credit Agreement and Indentures do not possess a perfected security interest in any and all Excluded Accounts, as they are explicitly carved out of the definition of Collateral which secures Prepetition Liens.

## II.    *Excluded Debtors*

12.    Moreover, through its investigation, the Committee has determined that the Prepetition Liens do not extend to the assets of the following Debtors: (i) 1090 West Pender Street Tenant LP; (ii) 4635 Lougheed Highway Tenant LP; (iii) 700 2 Street Southwest Tenant LP; (iv) 9670416 Canada Inc.; (v) Euclid WW Holdings Inc.; (vi) The We Company Management Holdings L.P.; (vii) The We Company PI L.P.; (viii) WW Holdco LLC; (ix) WW Worldwide C.V.; (x) The We Company Management LLC; (xi) The We Company MC LLC[3]; (xii) WeWork Canada GP ULC; and (xiii) Wework Canada LP ULC (collectively, the "**Excluded Debtors**"). Specifically, all assets of the Excluded Debtors are unencumbered and not subject to the Prepetition Liens because, either (i) the applicable agents under the Credit Agreement and/or Indentures did not file, or did not have the authority to file, UCC-1 financing statements against any of the assets held by such Excluded Debtors, or (ii) they are not a party to the Credit Agreement or the Indentures.

---

[3] A UCC-1 financing statement was filed by Goldman Sachs International Bank ("**GSIB**"), in its capacity as Senior Tranche Administrative Agent and Shared Collateral Agent under the Credit Agreement, against the assets of the Debtor, The We Company MC LLC. However, The We Company MC LLC is not a party to the Credit Agreement and did not enter into any security agreement with GSIB to guaranty or pledge their respective collateral to secure the obligations of the Debtors under the Credit Agreement or the Indentures. As a result, such lien did not properly attach causing the UCC-1 financing statement filed by GSIB to be invalid.

4