**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:   (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

**NOTICE OF FILING OF FIRST**
**AMENDED DICLOSURE STATEMENT RELATING**
**TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF WEWORK INC. AND ITS DEBTOR SUBSIDIARIES**

**PLEASE TAKE NOTICE** that on February 4, 2024, the above-captioned debtors and

debtors in possession (the "Debtors"), by and through their undersigned counsel, filed the

*Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of WeWork Inc. and*

*Its Debtor Subsidiaries* [Docket No. 1291] (the "Initial Disclosure Statement").

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Claims Agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* (the "Amended Disclosure Statement"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a comparison between the Initial Disclosure Statement and the Amended Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/WeWork.   You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

2

Dated: April 19, 2024

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**

Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:    (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

*Co-Counsel for Debtors and*
*Debtors in Possession*

## Exhibit A

**Amended Disclosure Statement**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:       (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al.*, | Case No. 23-19865 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT**
**RELATING TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION OF WEWORK INC. AND ITS DEBTOR SUBSIDIARIES**

THIS DRAFT OF THE DISCLOSURE STATEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE SOLICITATION VERSION MAY CONTAIN MATERIAL DIFFERENCES.  FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION ON A FINAL BASIS, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO FINAL APPROVAL HEREOF.  THE DEBTORS SHALL FILE A REDLINE VERSION WITH THE BANKRUPTCY COURT CONCURRENTLY WITH THE FILING OF ANY AMENDED OR MODIFIED VERSION OF THIS DISCLOSURE STATEMENT.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.   THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF WEWORK INC. AND ITS DEBTOR AFFILIATES.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE [VIII]</u> HEREIN.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS, STATUTORY PROVISIONS, OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  A COPY OF THE PLAN TO WHICH THIS**

ii

**DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL, STATE, OR OTHER SECURITIES LAWS OR OTHER SIMILAR LAWS.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS.  NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW**

INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, AND AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE [XI] OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, THE PLAN AND ARTICLE [VIII] OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION CONTAINED IN AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS

iv

**(INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE [IX] OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.**

**THE CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE CONSUMMATION OF THE PLAN TO HOLDERS (INCLUDING BENEFICIAL OWNERS) OF ALLOWED CLAIMS AND INTERESTS ARE NOT DESCRIBED HEREIN.  HOLDERS (AND BENEFICIAL OWNERS) OF ALLOWED CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE CANADIAN FEDERAL, PROVINCIAL, AND LOCAL TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, HAVING REGARD TO THEIR PARTICULAR CIRCUMSTANCES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE TO THE EXTENT APPROPRIATE.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign federal regulatory authority.  Neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The securities to be issued pursuant to the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").  Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from or in a transaction not subject to the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Interests under the Plan [(other than any New Interests issued pursuant to the MIP)], and to the extent such exemption is not available, then such New Interests will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

[Any shares of the New Interests, or any other Securities, issued in reliance upon the exemption from registration provided by section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act (or an available exemption therefrom) and in compliance with other applicable Law and such transfer will be subject to any restrictions in the New Corporate Governance Documents.  The offering, issuance, distribution, and sale of such securities shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act.]

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.  Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute forward-looking statements.  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates.  These statements are subject to significant risks, uncertainties, and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements

vi

regarding anticipated or future matters, including the following, to be forward-looking statements:

- **Plans, objectives, and expectations;**

- **Business strategy, including the Debtors' ability to rationalize and manage its real estate footprint;**

- **Financial condition, revenues, cash flows, and expenses;**

- **Levels of indebtedness, liquidity, and compliance with debt covenants;**

- **Financial strategy, budget, projections, and operating results;**

- **Successful results from the Debtors' operations;**

- **Costs of conducting the Debtors' operations;**

- **The ability or inability to maintain positive relationships with employees and other third parties as a result of these Chapter 11 Cases or other failure of such parties to comply with their contractual obligations;**

- **Level of uncertainty regarding the Debtors' future operations;**

- **The amount, nature, and timing of the Debtors' capital expenditures;**

- **The terms of capital available to the Debtors;**

- **The adequacy of the debtors' capital resources and liquidity to satisfy both short and long-term liquidity needs;**

- **The risks associated with certain of the Debtors' business activities, including from any joint venture or franchise agreement, any merger, acquisition, or divestiture, and any management agreement;**

- **The effects of asset and property acquisitions or dispositions on the Debtors' cash position;**

- **The effectiveness of the Debtors' risk management activities;**

- **The Debtors' exposure to future currency exchange and interest rates;**

- **Taxation applicable to the Debtors and any changes thereto;**

- **Counterparty credit risk;**

- **The outcome of pending and future litigation or arbitration;**

- **The overall condition of the commercial real estate market and the flexible workspace industry; and**

- **General economic and business conditions.**

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors; (l) the effect of competitive products, services, or procurements by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the Exit Facilities, Rights Offering (if applicable), and the New Interests to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain leases and other key commercial agreements and any disruptions to relationships with landlords, suppliers, and partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

viii

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..............................................................................................................1

II.  PRELIMINARY STATEMENT ........................................................................................1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
     STATEMENT AND PLAN.................................................................................................6

    A.   What is chapter 11?.................................................................................................6
    B.   Why are the Debtors sending me this Disclosure Statement? .................................7
    C.   What is the effect of the Plan on the Debtors' ongoing business?...........................7
    D.   Am I entitled to vote on the Plan? ..........................................................................7
    E.   What will I receive from the Debtors if the Plan is consummated? ........................9
    F.   What will I receive from the Debtors if I hold an Allowed Administrative
        Claim, DIP Administrative Claim, Professional Fee Claim, or Priority Tax
        Claim?....................................................................................................................12
    G.   Can the Plan be modified, revoked, or withdrawn?...............................................17
    H.   What happens to my recovery if the Plan is not confirmed or does not
        go effective?..........................................................................................................18
    I.   If the Plan provides that I get a distribution, do I get it upon Confirmation
        or when the Plan goes effective, and what is meant by "Confirmation,"
        "Effective Date," and "Consummation?" ..............................................................18
    J.   Are any regulatory approvals required to consummate the Plan? .........................18
    K.   Is there potential litigation related to Confirmation of the Plan?...........................19
    L.   Will the final amount of Allowed General Unsecured Claims affect my
        recovery under the Plan?.......................................................................................19
    M.   How will the preservation of the Causes of Action impact my recovery
        under the Plan?......................................................................................................20
    N.   Are there risks to owning New Interests upon emergence from Chapter
        11?.........................................................................................................................21
    O.   What is the MIP and how will it affect the distribution I receive under the
        Plan?.....................................................................................................................21
    P.   Will there be releases and exculpation granted to parties in interest as part
        of the Plan? ...........................................................................................................22
    Q.   How will undeliverable distributions and unclaimed property be treated
        under the Plan?......................................................................................................23
    R.   Are there minimum distribution restrictions?.......................................................23
    S.   What steps did the Debtors take to evaluate alternatives to a chapter 11
        filing?....................................................................................................................24
    T.   Will any party have significant influence over the corporate governance
        and operations of the Reorganized Debtors? .......................................................24
    U.   What is the deadline to vote on the Plan?..............................................................25
    V.   How do I vote for or against the Plan? ..................................................................25
    W.   Why is the Bankruptcy Court holding a Combined Hearing?..............................25

X.      When is the Combined Hearing set to occur?..........................................................26
Y.      What is the effect of Confirmation of the Plan? ...................................................26
Z.      Whom do I contact if I have additional questions with respect to this
        Disclosure Statement or the Plan? ........................................................................26
AA.     Do the Debtors recommend voting in favor of the Plan? ....................................27
BB.     Who supports the Plan? .........................................................................................27

IV.     THE DEBTORS' PLAN...........................................................................................27

        A.      Restructuring Transactions ...................................................................27
        B.      Reorganized Debtors.............................................................................28
        C.      Sources of Consideration for Plan Distributions ..................................29
        D.      Employee-Related Matters....................................................................31
        E.      Preservation of Causes of Action..........................................................32
        F.      Treatment of Executory Contracts and Unexpired Leases ....................33
        G.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims..........42
        H.      Settlement, Release, Injunction, and Related Provisions.......................46
        I.      Conditions Precedent to Consummation of the Plan .............................55

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW .............................................................................................................58

        A.      The Debtors' Corporate History ............................................................58
        B.      The Debtors' Business Operations.........................................................60
        C.      Prepetition Capital Structure.................................................................61

VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS..........................................67

        A.      Economic and Operational Headwinds..................................................67
        B.      March 2023 Notes Exchange Transaction ..............................................68
        C.      Enhanced Corporate Governance ..........................................................69
        D.      Prepetition Negotiations and the Restructuring Support Agreement.....69
        E.      Corporate Division.................................................................................71

VII.    EVENTS OF THE CHAPTER 11 CASES.................................................................72

        A.      First Day Relief......................................................................................72
        B.      Second Day Relief .................................................................................77
        C.      Approval of the DIP LC/TLC Facility...................................................78
        D.      DIP New Money Facility .......................................................................79
        E.      Retention of the Debtors' Professionals ................................................80
        F.      Schedules and Statements ......................................................................81
        G.      Appointment of the Creditors' Committee .............................................82
        H.      Lease Rationalization.............................................................................82
        I.      Dispute with Cushman & Wakefield .....................................................88
        J.      Claims Reconciliation Process...............................................................90
        K.      Extension of Certain Key Dates.............................................................92
        L.      The Special Committee's Independent Investigation .............................93

|   | M. | Litigation Matters | 96 |
|---|----|--------------------|----|
|   | N. | The Examiner Motion | 97 |
|   | O. | Miscellaneous Matters | 98 |
|   | P. | The Canadian CCAA Recognition Proceeding | 99 |
| VIII. | | RISK FACTORS | 100 |
|   | A. | Bankruptcy Law Considerations | 100 |
|   | B. | Risks Related to Recoveries Under the Plan | 108 |
|   | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 111 |
|   | D. | Risks Related to the Offer and Issuance of Securities Under the Plan | 116 |
| IX. | | SOLICITATION AND VOTING PROCEDURES | 118 |
|   | A. | Holders of Claims Entitled to Vote on the Plan | 119 |
|   | B. | Voting Record Date | 119 |
|   | C. | Voting on the Plan | 119 |
|   | D. | Ballots Not Counted | 120 |
| X. | | CONFIRMATION OF THE PLAN | 121 |
|   | A. | The Combined Hearing | 121 |
|   | B. | Requirements for Confirmation of the Plan | 121 |
| XI. | | CERTAIN SECURITIES LAW MATTERS | 124 |
|   | A. | Issuance of Securities under the Plan | 125 |
|   | B. | Subsequent Transfers | 125 |
| XII. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 129 |
|   | A. | Introduction | 129 |
|   | B. | Tax Status of Certain Debtors | 132 |
|   | C. | General Assumptions | 132 |
|   | D. | Certain U.S. Federal Income Tax Considerations of the Plan to the Debtors | 132 |
|   | E. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 137 |
|   | F. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote. | 144 |
|   | G. | FIRPTA | 147 |
|   | H. | FATCA | 147 |
|   | I. | Information Reporting and Backup Withholding | 148 |
| XIII. | | RECOMMENDATION | 149 |
| Exhibit A | | | 151 |

Exhibit B ........................................................................................................................152

Exhibit C ........................................................................................................................153

Exhibit D ........................................................................................................................154

Exhibit E ........................................................................................................................155

Exhibit F.........................................................................................................................156

## EXHIBITS

EXHIBIT A    Plan

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Organizational Structure Chart

EXHIBIT D    Valuation Analysis

EXHIBIT E    Financial Projections

EXHIBIT F    Liquidation Analysis

## I.    INTRODUCTION

WeWork Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "WeWork" or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors with respect to the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1690] (as may be amended, supplemented, or modified from time to time, the "Plan"), dated April 19, 2024.[2] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in [Article I.B] of the Plan shall govern the interpretation of this Disclosure Statement.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.    PRELIMINARY STATEMENT[3]

The Debtors, together with their non-Debtor affiliates, are the global leader in flexible workspace, where they integrate community, member services, and technology.  Founded in 2010 and headquartered in New York City, WeWork's mission is to create a collaborative work environment where people and companies across a variety of industries, from freelancers to Fortune 100 companies, come together to optimize performance.  After its founding, WeWork embarked on a path of rapid expansion, investing billions of dollars in creating one of the most expansive private commercial real estate portfolios in the world, spanning more than 800 locations across thirty-seven countries on six continents and becoming one of the top providers of commercial office space in business hubs that include New York City, London, Dublin, Boston, and Miami.

---

[2]    Capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan or the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "First Day Declaration").  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[3]    Unless otherwise specified, capitalized terms used but not defined in the Preliminary Statement shall have the meaning ascribed to them later in the Disclosure Statement.

1

In the wake of its unsuccessful initial public offering in 2019 and the subsequent change in management, WeWork pivoted from rapid growth to focusing on operational efficiency, lease portfolio optimization, and sustainable development and profitability.  However, the COVID-19 pandemic and an onslaught of compounding factors upended the commercial real estate market and disrupted WeWork's turnaround.

The pandemic significantly, and perhaps permanently, changed the way people work and the demand for office space.  New sales volumes declined sharply while customer churn accelerated, largely due to the massive and often permanent shift of companies large and small to a work-from-home regime.  Given the pandemic's significant impact, WeWork doubled down on its portfolio and operational optimization strategy, engaging with landlords to secure rent abatements, deferrals, or outright exits and withdrawing from non-core businesses, while accelerating the digitization of its services and offering discounts and deferrals to customers. Motivated in part by the initial success of these initiatives, WeWork went public on the New York Stock Exchange through a de-SPAC transaction in October 2021.

Since the de-SPAC transaction, WeWork has continued to rationalize its lease portfolio and optimize its operations toward profitability, amending over 590 leases, reducing future rent obligations by over $12 billion, and reducing administrative expenses by approximately $1.8 billion.  Yet rapidly rising interest rates have compelled landlords and office tenants alike to enter the commercial real estate market, offering leases and subleases at reduced rates and more flexible terms and creating significant competition for WeWork's target customers.  Furthermore, post-pandemic return to the office has been slower than expected, leading to a corresponding drag on WeWork's sales.  Saddled with many sub-optimal leases characterized by above-market rents and fixed annual rent escalation without rent resets or lessee-friendly termination rights, WeWork's existing business became increasingly difficult to maintain in the changing real estate market.

In early 2023, recognizing the need for extra time and liquidity to complete its strategic turnaround, WeWork, with the assistance of its advisors, negotiated the Notes Exchange Transactions with the SoftBank Parties, the Ad Hoc Group, and Cupar, obtaining over $1 billion of funding and capital commitments, canceling or equitizing approximately $1.5 billion of total debt, and extending the maturity of approximately $1.9 billion of debt from 2025 to 2027. Unfortunately, these extraordinary efforts of the Company's management team and employees could not overcome the legacy real estate costs and industry headwinds WeWork faced. Recognizing that the situation now required a more holistic solution, the Company engaged professionals from Kirkland & Ellis LLP ("Kirkland"), PJT Partners LP ("PJT"), Hilco Real Estate, LLC ("Hilco"), and Alvarez & Marsal North America LLC ("A&M") to chart a path of value preservation and maximization.

Beginning in September 2023, WeWork, with the assistance of its advisors, led initially by Hilco, began engaging with hundreds of landlords to secure amendments or exits to substantially all of its real estate leases as part of an accelerated and comprehensive lease rationalization on a global scale.  In parallel, Kirkland, PJT, and A&M engaged with the SoftBank Parties, the Ad Hoc Group, and the other major holders of the Company's funded debt to negotiate the terms of a comprehensive restructuring transaction.

2

On the eve of these Chapter 11 Cases and after good faith, arm's length negotiations, WeWork reached an agreement with the SoftBank Parties, the Ad Hoc Group, and Cupar (collectively, the "Consenting Stakeholders") on the terms of a comprehensive restructuring transaction, embodied in the RSA. Among other things, the RSA contemplated (i) the equitization of Drawn DIP TLC Claims (other than up to $100 million of such Claims, which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests; (ii) the cancelation of all other indebtedness and preexisting equity interests (other than any equity interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by other parties, the SoftBank Parties would contribute claims in exchange for its retention of its equity interests); and (iii) the issuance of a New 1L Exit Term Loan Facility in an aggregate amount equal to (a) the lesser of (I) the total amount of all Drawn DIP TLC Claims and (II) $100 million, plus, in each case, (b) the aggregate amount of DIP TLC Fee Claims.[4]

On November 6, 2023 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). At the First Day Hearing on November 8, 2023, the Bankruptcy Court granted all the relief the Debtors requested in their First Day Motions on an interim or final basis, including authorizing the Debtors to continue using their cash management system, pay the prepetition wages and salaries of their employees, maintain and administer their customer programs, maintain insurance, pay the prepetition claims of critical vendors, and provide adequate assurance for future utility services. In addition, after weeks of hard-fought, arm's-length negotiations, the Debtors reached an agreement with the Consenting Stakeholders concerning the consensual use of approximately $164 million of cash collateral on hand as of the Petition Date and the provision of various forms of adequate protection to the Prepetition Secured Parties.

After the First Day Hearing, the Debtors, recognizing the need for continued access to letters of credit to comply with rent support obligations under their existing leases and to facilitate their lease rationalization efforts, began engaging with their prepetition lenders to negotiate the DIP LC/TLC Facility. Following good-faith, arm's-length negotiations, the Debtors, the DIP LC Issuers, and certain other parties in interest agreed to the principal terms of a DIP LC/TLC Facility in an amount not to exceed 105 percent of the lesser of (i) $650 million plus certain adjustments and (ii) the USD equivalent of the aggregate face value of the undrawn and unexpired letters of credit issued under the Prepetition LC Credit Agreement plus certain adjustments. The DIP LC/TLC Facility, which was approved by the Bankruptcy Court on December 11, 2023, allows the Debtors to amend, renew, reissue, or replace expiring letters of credit that support their rent obligations under the leases.

On November 16, 2023, the U.S. Trustee appointed the Creditors' Committee. Since then, the Debtors have devoted significant time and resources to providing diligence and engaging with the Creditors' Committee and its advisors to bring them up to speed on the developments in the Chapter 11 Cases, including reaching a settlement regarding the terms of the DIP LC/TLC Facility. The Plan does not currently contemplate any recovery for Holders of General Unsecured Claims.

---

[4]   Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the RSA.

Since the Petition Date, the Debtors have utilized the tools of the Bankruptcy Code to accelerate their lease rationalization efforts.  As of the date hereof, the Debtors have determined a final path forward at 90 percent of the locations in its global real estate portfolio through amended leases, new management agreements, or via the lease rejection process.  Specifically, the Debtors have (i) reached agreements in principle to amend approximately 150 leases, (ii) determined to assume or leave in place approximately 150 leases where the existing terms support the Debtors' current go-forward business plan, and (iii) determined to reject or negotiate exit of approximately 150 leases.[5]  Collectively, as of the date hereof, the Debtors' lease rationalization efforts would result in an over $8 billion (over 40 percent) reduction in total future rent commitments.

In January 2024, the Debtors and their advisors determined it may be prudent for the Debtors to raise new money, debtor-in-possession financing to carry the Debtors through the remainder of the Chapter 11 Cases.  Accordingly, PJT began the marketing process for potential debtor-in-possession financing.  While the Debtors and their advisors continue to engage in arm's-length negotiations with potential funding parties to achieve the best possible terms for a potential DIP New Money Facility, the Debtors have yet to agree to terms of debtor-in-possession financing that are satisfactory to the Debtors.  As of the date hereof, the Debtors are prepared to fund these Chapter 11 Cases through the Combined Hearing without debtor-in-possession financing if necessary.  However, the Debtors and their advisors continue to believe that obtaining debtor-in-possession financing may be prudent so long as it is available on acceptable terms and will enable the Debtors to pay all administrative claims in full in cash to confirm the Plan and emerge from these Chapter 11 Cases.  The Debtors remain open to all proposals for debtor-in-possession financing whether in the form of a DIP New Money Facility, a Rights Offering, or otherwise, and the open points in the Debtors' negotiations with the Consenting Stakeholders for a potential DIP New Money Facility have significantly narrowed in recent days.

Pursuant to [Article III.B] of the Plan, Holders of Allowed Claims will receive, except to the extent that a Holder of an Allowed Claim agrees to less favorable treatment, the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holders' Claims and Interests:

- Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and subject to the consent rights set forth in the RSA, either (i) payment in full in Cash of its Allowed Other Secured Claims, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code;

- Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and subject to the consent rights set forth in the RSA, either (i) payment in full in Cash of its Allowed Other Priority Claim or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code;

---

[5]   [Article VII.H] of this Disclosure Statement discusses the Debtors' lease rationalization efforts in more details.

- Each Holder of an Allowed Drawn DIP TLC Claim shall receive its Pro Rata share of the Drawn DIP TLC Equity Distribution;

- Each Holder of an Allowed Undrawn DIP TLC Claim shall receive (i) in the case of an Excess DIP TLC Claim, shall be paid in full in cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, shall be converted into obligations under the Exit LC Facility on a dollar for dollar basis;

- Each Holder of an Allowed Prepetition LC Facility Claim shall receive its Pro Rata share of the 1L Equity Distribution;

- Each Holder of an Allowed 1L Notes Claim shall receive its Pro Rata share of the 1L Equity Distribution, subject to the Exit Commitment Netting Transaction;

- Each Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution;

- Each Holder of an Allowed 3L Notes Claim shall not receive or retain any distribution, property, or other value on account of such Allowed 3L Notes Claim; *provided*, *however*, that, to the extent the aggregate value of the Allowed 3L Notes Claims exceeds the value of the collateral securing such Claims and there are unencumbered assets held by the Debtor against which such Claims are Allowed, each Holder of an Allowed 3L Notes Claim shall receive on account of and in full and final satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed Unsecured Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is allowed;

- Each Holder of an Allowed Unsecured Notes Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election;

- Each Holder of an Allowed General Unsecured Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election;

- Each Go-Forward Guaranty Claim shall be Reinstated;

- Each Allowed Intercompany Claim shall be (i) Reinstated, (ii) converted to equity, (iii) canceled, released, or discharged, or (iv) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and subject to

the consent rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit;

- Each Allowed Intercompany Interest shall be (i) Reinstated, (ii) canceled, released, or discharged, or (iii) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and subject to the consent rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit;

- Each Allowed Parent Interests, shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Allowed Parent Interests shall not receive any distribution on account of such Interests, except as otherwise provided in the Restructuring Transactions Exhibit, and subject to the consent rights set forth in the RSA; and

- All Allowed Section 510(b) Claims against any applicable Debtor shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims.

The Restructuring Transactions embodied in the Plan, the RSA, and the Plan Supplement that will, among other things, effectuate the foregoing distributions, are a significant achievement that will enable the Debtors to progress toward profitability in light of an evolving commercial real estate market. Despite the many challenges that WeWork faced on the eve of these Chapter 11 Cases, the Debtors have negotiated a plan of reorganization that will put the Reorganized Debtors on strong financial and operational footing with a rationalized lease portfolio and optimized operations.

The Debtors strongly believe that the Plan is in the best interests of their Estates and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to ensure their long-term viability and success. The Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until a chapter 11 plan is consummated.

6

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of the debtor (whether such creditor or equity interest holder voted to accept the chapter 11 plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a chapter 11 plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern following emergence from these Chapter 11 Cases.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the first Business Day after the Confirmation Order is entered by the Bankruptcy Court on which (a) all conditions precedent to the occurrence of the Effective Date set forth in [Article IX.A] of the Plan have been satisfied or waived in accordance with [Article IX.B] of the Plan and (b) the Plan is declared effective by the Debtors.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [April 22], 2024).  Each category of Holders of Claims or Interests, as set forth in [Article III] of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.  The definitions contained in [Article I.A] of the Plan describe what Claims or Interests, as applicable, are included in each Class.

7

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| Class 3A | Drawn DIP TLC Claims | Impaired | Entitled to Vote |
| Class 3B | Undrawn DIP TLC Claims | Impaired | Entitled to Vote |
| Class 4A | Prepetition LC Facility Claims | Impaired | Entitled to Vote |
| Class 4B | 1L Notes Claims | Impaired | Entitled to Vote |
| Class 5 | 2L Notes Claims | Impaired | Entitled to Vote |
| Class 6 | 3L Notes Claims | Impaired | Entitled to Vote / Deemed to Reject |
| Class 7 | Unsecured Notes Claims | Impaired | Deemed to Reject |
| Class 8 | General Unsecured Claims | Impaired | Deemed to Reject |
| Class 9 | Go-Forward Guaranty Claims | Unimpaired | Presumed to Accept |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| Class 12 | Parent Interests | Impaired | Deemed to Reject |
| Class 13 | Section 510(b) Claim | Impaired | Deemed to Reject |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan. As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

8

**E.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  The amount of such distributions is also based on the total amount of Claims Allowed in the applicable Class, which is based on factors that are not within the Debtors' control, including future litigation regarding, among other things, the amount and allowances of Claims against the Debtors.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[6]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | In full and final satisfaction of such Allowed Other Secured Claims, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and subject to the consent rights set forth in the RSA:  (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $[●] | 100% |
| 2 | Other Priority Claims | In full and final satisfaction of such Allowed Other Priority Claims, each Holder of an Allowed Other Priority Claim shall receive, at the option of the | $[●] | 100% |

---

[6]   The projected recoveries set forth in this table may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | applicable Debtor (or Reorganized Debtor, as applicable) and subject to the consent rights set forth in the RSA: (i) payment in full in Cash of its Other Priority Claim or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | | |
| 3A | Drawn DIP TLC Claims | In full and final satisfaction of such Allowed Drawn DIP TLC Claims, the Holder of each Allowed Drawn DIP TLC Claim shall receive its Pro Rata share of the Drawn DIP TLC Equity Distribution. | $[●] | [●]% |
| 3B | Undrawn DIP TLC Claims | In full and final satisfaction of such Allowed Undrawn DIP TLC Claims, each Allowed Undrawn DIP TLC Claim: (i) in the case of an Excess DIP TLC Claim, shall be paid in full in cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, shall be converted into obligations under the Exit LC Facility on a dollar-for-dollar basis. | $[●] | [●]% |
| 4A | Prepetition LC Facility Claims | In full and final satisfaction of such Allowed Prepetition LC Facility Claims, each Holder of Allowed Prepetition LC Facility Claims shall receive its Pro Rata share of the 1L Equity Distribution. | $[●] | [●]% |
| 4B | 1L Notes Claims | In full and final satisfaction of such Allowed 1L Notes Claims, each Holder of Allowed 1L Notes Claims shall receive its Pro Rata share of the 1L Equity Distribution, subject to the Exit Commitment Netting Transaction. | $[●] | [●]% |
| 5 | 2L Notes Claims | In full and final satisfaction of such Allowed 2L Notes Claims, each Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution. | $[●] | [●]% |
| 6 | 3L Notes Claims | In full and final satisfaction of such Allowed 3L Notes Claims, each Allowed 3L Notes Claim shall be discharged and released, and each Holder of an Allowed 3L Notes Claim shall not receive or retain any distribution, property, or other value on account of such Allowed 3L Notes Claim; *provided, however,* that, to the extent the aggregate value of the Allowed 3L Notes Claims exceeds the value of the collateral securing such Claims and there are unencumbered assets held by the Debtor against which such Claims | $[●] | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | are Allowed, each Holder of an Allowed 3L Notes Claim shall receive on account of and in full and final satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed Unsecured Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is allowed. | | |
| 7 | Unsecured Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Unsecured Notes Claim, each Holder of an Allowed Unsecured Notes Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election. | $[●] | [●]% |
| 8 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election. | $[●] | [●]% |
| 9 | Go-Forward Guaranty Claims | Each Allowed Go-Forward Guaranty Claim shall be Reinstated. | $[●] | [100]% |
| 10 | Intercompany Claims | Each Allowed Intercompany Claim shall be (i) Reinstated, (ii) converted to equity, (iii) canceled, released, or discharged, or (iv) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and subject to the consent rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit. | $[●] | [●]% |
| 11 | Intercompany Interests | Each Allowed Intercompany Interest shall be (i) Reinstated, (ii) canceled, released, or discharged, or (iii) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and subject to the consent rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit. | $[●] | [●]% |
| 12 | Parent Interests | Each Allowed Parent Interests, shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Allowed Parent Interests shall not receive any distribution on account of such Interests, except as otherwise provided | $[●] | [0]% |

11

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | in the Restructuring Transactions Exhibit, subject to the consent rights set forth in the RSA. | | |
| 13 | Section 510(b) Claims | All Allowed Section 510(b) Claims against any applicable Debtor shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims. | $[●] | [0]% |

F.      **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Administrative Claim, Professional Fee Claim, or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Treatment of Administrative Claims, Professional Fee Claims, DIP Administrative Claims, and Priority Tax Claims are instead set forth in Article II of the Plan and copied below.

1.      Administrative Claims

Except as otherwise provided under the Plan, and except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

12

All Adequate Protection Obligations and Adequate Protection Claims (each as defined in the Cash Collateral Orders) including accrued or unpaid interest, as well as fees and expenses, including legal expenses, as of the Effective Date pursuant to the terms of the Cash Collateral Orders, will be indefeasibly paid by the Debtors in full in Cash or will be provided such other treatment acceptable to the Debtors and subject to the consent rights set forth in the RSA without the need to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Adequate Protection Obligations and Adequate Protection Claims. The Debtors' obligation to pay such Adequate Protection Obligations and Adequate Protection Claims, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Except as otherwise provided below in Article II of the Plan, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date. Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date. Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE CLAIMS FOR UNPAID INVOICES THAT ARISE IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS AND WHICH ARE NOT DUE AND PAYABLE ON OR BEFORE THE EFFECTIVE DATE SHALL BE PAID IN THE ORDINARY COURSE OF BUSINESS IN ACCORDANCE WITH THE TERMS THEREOF AND NEED NOT FILE ADMINISTRATIVE CLAIMS.**

2.      DIP Administrative Claims

The DIP Administrative Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Agreements as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Agreements as of the Effective Date). Except as otherwise expressly provided in the DIP Agreements, or the DIP Orders, upon the indefeasible payment or satisfaction in full of all Allowed DIP Claims, all commitments under the DIP Agreements shall terminate and all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Except to the extent that a Holder of a DIP Administrative Claim agrees to less favorable treatment, on the Effective Date, in full satisfaction, settlement, discharge, and release of, and in exchange for, the

13

DIP Administrative Claims, each Holder of an Allowed DIP Administrative Claim shall receive the following treatment:

1.     Each Holder of an Allowed DIP TLC Fee Claim shall receive its Pro Rata share of the DIP TLC Fee Equity Distribution.

2.     To the extent the Debtors enter into a DIP New Money Facility, the Debtors expect the provider of such DIP financing to seek superpriority, administrative expense status for its claim.  The granting of any such superpriority, administrative status should be subject to the consent rights set forth in the RSA and, if agreed upon by such parties, each Holder of an Allowed DIP New Money Claim shall receive payment in full in Cash, or other treatment in a manner to be acceptable to the Debtors, the Required Consenting Stakeholders, and the requisite majority of DIP New Money Lenders pursuant to the terms of the DIP New Money Documents.  Each Holder of 1L Series 1 Notes Claims and 2L Secured Notes Claims is expected to be offered the opportunity to participate in the DIP New Money Facility.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facilities, and the DIP Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to [Article II.B] of the Plan) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agents, and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agents, and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

3.     Professional Fee Claims

(a)     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims

14

owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of Plan.

(b)      Professional Fee Escrow Account

No later than the Effective Date, the Debtors incorporated in the U.S. shall, in consultation with the Required Consenting Stakeholders, establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee applications.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, further,* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors or, solely as it pertains to the final fee applications, the Creditors' Committee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary

15

course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and the Reorganized Debtors, as applicable, shall pay, within 10 Business Days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable Claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable.  If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### 4.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.      Payment of Statutory Fees and Reporting to the U.S. Trustee

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  All monthly reports shall be Filed, and all fees due and payable pursuant to section 1930(a) of title 28 of the United States Code, shall be paid by the Debtors or the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors), as applicable, on the Effective Date.  Following the Effective Date, the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors) shall (a) pay such fees as such fees are assessed and come due for each quarter (including any fraction thereof) and (b) File quarterly reports in a form consistent with the Revised Joint Administration Order and reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### 6.      Payment of Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with the terms of the RSA, the Cash Collateral Orders, or any other Final Order of the Bankruptcy Court without any requirement to (1) File a fee application with the Bankruptcy Court, or (2) for review or approval by the Bankruptcy Court; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses.  All Restructuring

Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least 3 Business Days before the anticipated Effective Date; provided, however, that such estimates (and related invoices) shall not be considered an admission or limitation with respect to such Restructuring Expenses. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course [(but no sooner than within 5 Business Days of receipt of an invoice)], Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses.

### G.      Can the Plan be modified, revoked, or withdrawn?

Yes. Except as otherwise specifically provided in the Plan and subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification (whether material or immaterial) shall be acceptable in form and substance to the Required Consenting Stakeholders. Subject to those restrictions on modifications set forth in the Plan, the RSA, the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

To the extent permitted by the RSA and subject to the consent rights set forth therein, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if either Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any claims by the Debtors, Claims or Interests, or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

17

**H.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* [Article X] of this Disclosure Statement, entitled "*Confirmation of the Plan*."

As set forth in [Article X.B] of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in significantly reduced creditor recoveries as compared to the Plan.  This is due to, among other things, the significant additional administrative expenses associated with the appointment of a chapter 7 trustee and the administration of a chapter 7 liquidation, including additional Claims that may be entitled to administrative priority.

**I.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court by entering the Confirmation Order.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  A "Notice of Effective Date" will be Filed on the Bankruptcy Court docket notifying all parties when the conditions precedent to the Effective Date have been satisfied.  *See* [Article IV.I] of this Disclosure Statement, entitled "*Conditions Precedent to Consummation of the Plan*," for a discussion of the conditions precedent to Consummation of the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means:  (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.  Note that Holders of certain types of Claims may not receive any distributions until the Debtors or the Reorganized Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

**J.     Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**K.      Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, and any of these objections could potentially give rise to litigation.  *See* [Article VIII.A] of this Disclosure Statement, entitled "*Bankruptcy Law Considerations*."

Certain Classes are deemed to reject the Plan, and it is also possible that one or more Class(es) will vote to reject the Plan.  If it becomes necessary, the Debtors may seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See id.*

**L.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately \$[●] – \$[●].  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, the aggregate amount of General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided in the Plan, which difference could be material.

*First*, the Debtors may, in the future, reject certain Executory Contracts and Unexpired Leases, which may result in additional General Unsecured Claims for rejection damages not accounted for in this estimate.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Holders of General Unsecured Claims.

*Second*, as of the Petition Date, certain Debtors were party to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amount estimated by the Debtors in the Plan, the value of recoveries to Holders of Allowed General Unsecured Claims could materially change as well.

*Finally*, the Debtors, Reorganized Debtors, the Creditors' Committee, or other parties in interest may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could materially affect recoveries to Holders of Allowed General Unsecured Claims.

The higher the aggregate amount of Allowed General Unsecured Claims is, the lower the recovery each Holder of an Allowed General Unsecured Claim will receive.  However, in no event will a Holder of an Allowed General Unsecured Claim receive less recovery under the Plan than it would have received under a hypothetical liquidation under chapter 7 of the Bankruptcy Code.

**M.     How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.[7]

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than any Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in [Article VIII] of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

**The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors (as applicable) expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity (except as set forth in <u>Article VIII.C</u> of the Plan).  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Reorganized Debtors, as applicable, and the objecting party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or

---

[7]     All releases are subject to the Special Committee's ongoing investigation.  *See* [Article VII.L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except as otherwise released in the Plan.

**N.      Are there risks to owning New Interests upon emergence from Chapter 11?**

Yes.  *See* [Article VIII] of this Disclosure Statement, entitled "*Risk Factors*," for a discussion of such risks.

**O.      What is the MIP and how will it affect the distribution I receive under the Plan?**

[Pursuant to the Plan, the MIP means an equity incentive plan that will (i) reserve up to [●]% of the New Common Stock (determined on a fully diluted and fully distributed basis) for awards to management (the "Pool"), and (ii) provide for the grant as of the Effective Date of up to 100% of the Pool to members of management selected by the New Board in the form of restricted stock unit awards (or the equivalent) vesting in ratable annual installments on each of the first three anniversaries of the Effective Date, and (iii) include other terms and conditions determined by the New Board. The amount of the Pool will not be subject to dilution from common stock issued to Softbank or its affiliates at or after the Emergence Date on account of the cash collateral assigned to the Debtors.

The MIP shall be established and reserved for grants to be made from time to time from such pool to employees (including officers), and directors of the Reorganized Debtors at the discretion of the New Board following the Effective Date. The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; provided that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to retain or recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the MIP, structure, and vesting, determined by, in each case, the Required Consenting Stakeholders.]

**P.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The discharge, release of liens, releases, third-party releases, exculpation, and injunction provisions included in the Plan, all of which are set forth in their entirety in Article [IV.H] of this Disclosure Statement, are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining support for the Plan.[8]

These provisions are the product of extensive good faith, arm's-length negotiations, were material inducements for the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Required Consenting Stakeholders. Moreover, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, the release and exculpation of the Released Parties and the Exculpated Parties, respectively, as set forth in the Plan is warranted.

All releases are subject to the Special Committee's ongoing investigation. As of the date hereof, the Special Committee has not made a determination regarding bringing claims or making changes to the releases and exculpations contained in the Plan. In deciding whether to vote for or against the Plan, parties entitled to vote on the Plan should assume that the releases and exculpations contained in the Plan will remain unchanged. If the Special Committee determines to alter the releases or exculpations, it will improve recoveries under the Plan for an affected class or be the result of a change agreed to by an affected party. Notice of any material change to the Plan will be provided to the extent required and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any order of the Bankruptcy Court.[9]

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN; (II) ARE DEEMED TO ACCEPT THE PLAN WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (III) ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; OR (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF NONVOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN WILL**

---

[8]    All releases are subject to the Special Committee's ongoing investigation. *See* [Article VII.L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

[9]    *See* [Article VII.L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

**BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE REORGANIZED DEBTORS.**

**Q.    How will undeliverable distributions and unclaimed property be treated under the Plan?**

Except as otherwise provided in the Plan or the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests, as applicable, as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution (to the extent such address is not available in the Debtors' records, such Holder must provide sufficient information to deliver the distribution); *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date without interest.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to [Article VI.D] of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 90 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or state escheatment, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Interests, such New Interests shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, released, discharged, and forever barred notwithstanding any applicable federal or state escheatment, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the distributions of the New Interests to reflect any such cancelation.

**R.    Are there minimum distribution restrictions?**

The Disbursing Agent shall not make any distributions to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash or otherwise where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, as applicable, would otherwise result in the issuance of a number of shares of the New Interests that is not a whole number, the actual distribution of shares of the New Interests shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher

23

whole number; and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of the New Interests to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.  No fractional shares of the New Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  Each Allowed Claim or Interest to which these limitations apply shall be discharged pursuant to [Article VIII.A] of the Plan and its Holder shall be forever barred pursuant to [Article VIII.A] of the Plan from asserting that Claim against or Interest in the Reorganized Debtors or their property pursuant to [Article VIII.A] of the Plan.

Any amounts owed to a Holder of an Allowed Claim that is entitled to distributions in an amount less than $250 shall not receive distributions on account thereof, and each Claim shall be discharged pursuant to [Article VIII.A] of the Plan and its Holder is forever barred pursuant to [Article VIII.A] of the Plan from Asserting that Claim against the Reorganized Debtors or their property and such amount shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court).

**S.     What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in the First Day Declaration, prior to the Petition Date, the Debtors evaluated numerous potential alternatives to rationalize their lease portfolio, increase operational efficiency, and address their funded indebtedness.  In light of the changing commercial real estate market and a slower-than-expected return to office, the Debtors determined, in their sound business judgment, to pursue a comprehensive restructuring of their lease portfolio and balance sheet through a chapter 11 filing.

**T.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local Law requirements, the New Corporate Governance Documents (which shall be consistent with the Plan and the Plan Supplement) shall be automatically adopted or amended in a manner consistent with the terms and conditions set forth in the Corporate Governance Term Sheet, which shall be reasonable and customary, and shall be acceptable to the Debtors, Cupar, and subject to the consent rights set forth in the RSA and shall supersede any existing organizational documents.  To the extent required under the Plan, the Plan Supplement, or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Law of the respective state or country of organization.  The New Corporate Governance Documents will (a) authorize the issuance of the New Interests and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, each Reorganized Debtor may amend and restate its respective New Corporate Governance Documents as permitted by Laws of the respective states, provinces, or countries of incorporation and the New Corporate Governance Documents.

24

On the Effective Date, Reorganized WeWork shall enter into and deliver the New Stockholders Agreement and the Registration Rights Agreement with respect to each Holder of New Interests, which shall become effective and be deemed binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule or the vote, consent, authorization, or approval of an Entity (other than the relevant consents required by any Definitive Document). Holders of New Interests shall be deemed to have executed the New Stockholders Agreement and the Registration Rights Agreement and be parties thereto, without the need to deliver signature pages thereto.

Assuming that the Plan Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Interests may be in a position to influence matters requiring approval by the holders of shares of New Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**U.    What is the deadline to vote on the Plan?**

The Voting Deadline is [May 23], 2024, at 4:00 p.m. (prevailing Eastern Time).

**V.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims who are entitled to vote on the Plan.  For your vote to be counted, your ballot containing your vote must be completed and signed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent (the "Claims Agent") by **[May 23], 2024, at 4:00 p.m. (prevailing Eastern Time)**.

Holders of Claims in the Voting Classes may submit their Ballots via (i) the E-Ballot Portal by clicking the "E-Ballot" section of the Claims Agent's website at https://dm.epiq11.com/WeWork, or (ii) mail or hand-delivery to the Claims Agent at WeWork Inc Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.  Ballots submitted to the Claims Agent by any means other than expressly provided for in these Solicitation and Voting Procedures, including email, facsimile, or electronic means other than the E-Ballot Portal, *shall not be valid and will not be counted*.

If a Class of Claims is eligible to vote, and no Holder of Claims in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**W.    Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan.  In addition, the Debtors are seeking approval of this Disclosure Statement on a final basis at such Confirmation Hearing (the "Combined Hearing").

25

**X.       When is the Combined Hearing set to occur?**

The Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled.  The Combined Hearing may be adjourned from time to time without further notice.

Objections to the final approval of the Disclosure Statement and Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than **[May 28], 2024, at [4:00 p.m.] (prevailing Eastern Time)** in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

The Debtors will publish the notice of the Combined Hearing, which will contain the Voting Deadline, the Combined Objection Deadline, and the date and time of the Combined Hearing, in *The New York Times* (national edition) and the *Financial Times* (global edition) to provide notice to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Combined Hearing in such trade or other publications as the Debtors may choose.

**Y.       What is the effect of Confirmation of the Plan?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtors, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges the debtors from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Specifically, subject to Article IX.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, after the Plan is confirmed and upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**Z.       Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims Agent:

> ***By first-class mail at:***
> WeWork Inc. Ballot Processing Center

26

c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4420

*By regular mail, hand delivery, or overnight mail at:*
WeWork Inc. Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

*By electronic mail at:*
WeWorkinfo@epiqglobal.com
(with a reference to "Solicitation Inquiry" in the subject line)

*By telephone at:*
+1 (877) 959-5845 (Toll Free)
+1 (503) 852-9067 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims Agent at https://dm.epiq11.com/WeWork (free of charge) or the Bankruptcy Court's website at www.njb.uscourts.gov (for a fee).

## AA.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would result from any other available alternative.  The Debtors believe that the Plan, which significantly deleverages the Debtors' balance sheet and enables them to expeditiously emerge from these Chapter 11 Cases, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## BB.    Who supports the Plan?

The Plan is supported by the Debtors, [and the other Consenting Stakeholders, including the SoftBank Parties, the Ad Hoc Group (representing approximately 87 percent of the Company's Series I 1L Notes and 2L Notes), and Cupar].

## IV.    THE DEBTORS' PLAN

The Plan contemplates the following key terms, among others, described herein and therein:

### A.    Restructuring Transactions

On or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtors, subject to the consent rights set forth in the RSA,

shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the RSA, and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the RSA, and the Plan Supplement and having other terms for which the applicable Entities may agree; (c) the execution, delivery, and Filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law, including any applicable New Corporate Governance Documents; (d) such other transactions and/or Bankruptcy Court filings that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations or those conducted pursuant to the Restructuring Transactions Exhibit (including, for the avoidance of doubt, if so provided in the Restructuring Transactions Exhibit, all transactions necessary to provide for the sale/purchase of all or substantially all of the assets or Interests of any of the Debtors, which purchase may be structured as a taxable transaction for U.S. federal income tax purposes); (e) the execution, delivery, and Filing of the DIP New Money Documents; (f) the execution, delivery, and Filing of the Exit Financing Documents; (g) the implementation of the Rights Offering (if any) pursuant to the Rights Offering Documents (if any) and the issuance of Rights Offering Securities (if any) in connection therewith; (h) the execution of the Exit Commitments Netting Transaction; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

## B.     Reorganized Debtors

On the Effective Date, in accordance with the terms of the RSA and the Corporate Governance Term Sheet, the New Board shall be appointed, and the Reorganized Debtors shall adopt the New Corporate Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan so long as such agreements, documents, instruments, and actions satisfy the requirements of the RSA. Cash payments to be made pursuant to the Plan will be made by the Debtors, the Reorganized Debtors, or the Disbursing Agent (as applicable). The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the

28

Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

## C.   Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors shall fund distributions under the Plan, as applicable, with (a) the proceeds from the Exit Equity Commitment Consideration; (b) Cash or other proceeds from the sale of the Rights Offering Securities (if any, as applicable) in connection with the Rights Offering (if any); (c) the New Interests; (d) Cash or other proceeds from the sale of Estate property (if any); and (e) the Debtors' Cash on hand, as applicable. The issuance, distribution, or authorization, as applicable or as described in the Restructuring Transaction Exhibit, of certain Securities in connection with the Plan, including the New Interests will be exempt from SEC registration to the fullest extent permitted by Law, as more fully described in Article IV.E of the Plan.

### 1.   Exit LC Facility

On the Effective Date, if the Debtors and Required Consenting Stakeholder agree that entry into the Exit LC Facility is necessary and advisable, the Reorganized Debtors shall enter into such Exit LC Facility on the terms set forth in the applicable Exit LC Facility Documents.

To the extent not already approved, Confirmation shall be deemed approval of the Exit LC Facility and the Exit LC Facility Documents, as applicable, and all transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Debtors or the Reorganized Debtors (as applicable), without further notice to or order of the Bankruptcy Court, to enter into and execute the Exit LC Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit LC Facility. Execution of the Exit LC Facility Documents by the Exit LC Facility Agents shall be deemed to bind all Exit LC Facility Lenders as if each such Exit LC Facility Lender had executed the applicable Exit LC Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit LC Facility Documents, to the extent applicable: (i) shall be deemed to be granted; (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit LC Facility Documents; (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit LC Facility Documents; and (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

29

To the extent applicable, the Reorganized Debtors, the applicable non-Debtor Affiliates, and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents, and to take any other actions necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such Filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be in accordance with the Exit LC Facility Documents and necessary under applicable Law to give notice of such Liens and security interests to third parties.

2.      Exit Equity Commitment

If, in an exercise of their business judgment and subject to the consent rights set forth in the RSA, the Debtors determine that additional funding is necessary or desirable, and have entered into the Exit New Money Facility, the Debtors shall distribute the Exit New Money Shares on behalf of the Reorganized Debtors as set forth in this Plan and the Exit New Money Documents in exchange for the Exit Equity Commitment Consideration (if any).  The Exit Equity Commitment (if any) shall be made and consummated on the terms and conditions of, and in accordance with the Exit Equity Commitment Documents (if any).

The Exit New Money Shares (if any) shall be offered in the allocations specified in the Exit Equity Commitment Documents (if any) and this Plan.  Any Exit New Money Shares shall be subject to dilution on account of the MIP.

On the Effective Date, the rights and obligations of the Debtors under the Exit Equity Commitment Documents (if any) shall vest in the Reorganized Debtors, as applicable.  The proceeds of the Exit Equity Commitment Consideration (if any) shall be used by the Reorganized Debtors to repay the DIP New Money Facility (if applicable) and for other general corporate purposes.

3.      Rights Offering

If the Debtors and the Required Consenting Stakeholders in good faith determine that additional funding is necessary or desirable, the Debtors shall distribute the Subscription Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Documents.  The Rights Offering (if any) shall be conducted and consummated on the terms and conditions of, and in accordance with the Rights Offering Documents (if any).

The Rights Offering Securities (if any) shall be offered in the allocations specified in the Rights Offering Documents (if any) and the Plan.  Any Rights Offering Securities shall be subject to dilution on account of the MIP.

On the Effective Date, the rights and obligations of the Debtors under the Rights Offering Documents (if any) shall vest in the Reorganized Debtors, as applicable.  The proceeds of the Rights Offering (if any) shall be used by the Reorganized Debtors for general corporate purposes.

4.      Subscription Rights and New Interests

If the Debtors and the Required Consenting Stakeholders determine, in good faith, that additional funding is necessary or desirable, Reorganized WeWork shall be authorized to issue a certain number of shares of Rights Offering Securities to certain Holders of Claims pursuant to Articles II and Article III of the Plan.  Such Rights Offering Securities (if any) shall be issued to applicable Holders of Claims, and/or Rights Offering Participants pursuant to the Rights Offering Documents (if any), and the New Corporate Governance Documents.  Reorganized WeWork shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such Rights Offering Securities (if any).  All such Subscription Rights and Rights Offering Securities (if any), and any other shares of New Interests issued pursuant to the Plan, shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Corporate Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Interests and/or Rights Offering Securities (if any) shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

**D.      Employee-Related Matters**

1.      Management Incentive Plan

[The MIP shall be established and reserved for grants to be made from time to time from such pool to employees (including officers) and directors of the Reorganized Debtors at the discretion of the New Board following the Effective Date.  The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; *provided* that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to retain or recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the MIP, structure, and vesting, determined by, in each case, the Required Consenting Stakeholders.]

2.      Employee and Retiree Benefits

Subject to the consent rights set forth in the RSA, and except as otherwise provided in [Article IV.N] of the Plan, all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors [and the Reorganized Debtors shall be authorized to continue the Compensation and Benefits Programs and shall continue to honor the terms thereof]; *provided*, *however*, that in accordance with the New Corporate Governance Documents, the Reorganized Debtors may review, amend, terminate, or modify any of the foregoing programs in accordance with applicable Law and the terms of the applicable Compensation and Benefits Program.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the

31

Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

### E.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than any Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

**The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors (as applicable) expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity (except as set forth in H.3).  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Reorganized Debtors, as applicable, and the objecting party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall

32

vest in the Reorganized Debtors.  The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in the Plan.

### F.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (i) are Unexpired Leases of non-residential real property that are not expressly assumed as set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases; (ii) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be subject to the consent rights set forth in the RSA; (iii) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto, forfeiture, or by operation of law; (iv) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (v) any obligations of WeWork Inc. arising under contracts or leases that are not assumed; or (vi) are, as of the Effective Date, the subject of (a) a motion to reject that is pending or (b) an order of the Bankruptcy Court that is not yet a Final Order.  For the avoidance of doubt, the Unexpired Leases and Executory Contracts described in subsection (i) of this paragraph will be deemed rejected pursuant to section 365 of the Bankruptcy Code.

For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, as clarified by the Extension Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases (in each case, including with agreed modifications as applicable) as set forth in the Plan, or the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, in the Schedule of Rejected Executory Contracts and Unexpired Leases, or in the Schedule of Assumed Executory Contracts and Unexpired Leases (as applicable), assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date (unless approved by the Court pursuant to an early order).  Notwithstanding anything in the Plan to the contrary, with respect to any Unexpired Lease that is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, the effective date of the rejection of any such Unexpired Lease shall be the later of (a) the date set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases (b) the date upon which the Debtors notify the affected

landlord and such landlord's counsel (if known to Debtors' counsel) in writing (email being sufficient) that they have surrendered the premises and, as applicable, (i) turning over keys issued by the landlord, key codes, and/or security codes, if any, to the affected landlord or (ii) notifying such affected landlord or such landlord's counsel (if known to Debtors' counsel) in writing (email being sufficient) that the property has been surrendered, all WeWork-issued key cards have been disabled and, unless otherwise agreed as between the Debtors and the landlord, each affected landlord is authorized to disable all WeWork-issued key cards (including those of any members using the leased location) and the landlord may rekey the leased premises. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors and the counterparties to the applicable Executory Contract or Unexpired Lease during these Chapter 11 Cases and effective upon assumption by the Debtors; *provided* that, prior to the Effective Date and in connection with such assumption, any such terms that are rendered unenforceable by the provisions of the Plan or the Bankruptcy Code shall remain unenforceable solely in connection therewith. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final Order on or after the Confirmation Date in accordance with any applicable terms in the Plan (including any consent rights set forth in the RSA), unless otherwise settled by the applicable Debtors and counterparties. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases or Schedule of Assumed Executory Contracts and Unexpired Leases identified in Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date, subject to the consent rights set forth in the RSA.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof (subject to the other provisions of Article V.A of the Plan) shall be deemed satisfied by Confirmation. To the

34

extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases as of the Confirmation Date may not be assumed by the applicable Debtor(s) unless the applicable lessor or contract counterparty has (a) consented to such assumption, (b) objected to the rejection of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be rejected and should instead be assumed (and such objection remains outstanding), or (c) in the case of Unexpired Leases, consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's prior consent, the "Deferred Deadline"), in which case for purposes of clause (c) the applicable Debtor(s) shall have until the Deferred Deadline to assume such Unexpired Lease, subject to the applicable lessor's right to object to such assumption, or such Unexpired Lease shall be deemed rejected.  For any Executory Contract or Unexpired Lease assumed pursuant to this paragraph, all Cure Obligations shall be satisfied on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to the Cure Obligation, such dispute shall be addressed in accordance with [Article V.D] of the Plan.

For the avoidance of doubt, at any time prior to the applicable deadlines set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, and as the same may be extended, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion Filed with the Bankruptcy Court.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Combined Hearing (to the extent not resolved by the parties prior to the Combined Hearing).

If the effective date of any rejection of an Executory Contract or Unexpired Lease is after the Effective Date pursuant to the terms in the Plan, the Reorganized Debtors shall serve a notice on the affected counterparty setting forth the deadline for Filing any Claims arising from such rejection.

2. <u>Indemnification Obligations</u>

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, restructuring advisors, and other professionals and/or agents or representatives of, or acting on behalf, of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and subject to the consent rights set forth in the RSA, shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, than those that existed prior to the Effective Date; *provided* that the Reorganized Debtors shall retain the ability not to indemnify former directors of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct (subject to the consent rights set forth in the RSA); *provided*, *further*, that nothing in the Plan shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

3. <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Entry of the Confirmation Order shall constitute a Final Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases on the Schedule of Rejected Executory Contracts and Unexpired Leases. Any objection to the rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 10 days after the service of notice of rejection on the affected counterparty. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims Agent within 30 days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the

36

premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by Filing a Claim in accordance with [Article V.C] of the Plan. Claims arising from the rejection of any of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, satisfy all Cure Obligations relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan; *provided* that, if the effective date of such assumption occurs prior to the Effective Date, such payment shall be on the effective date of such assumption or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cure Obligations set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases must be Filed with the Bankruptcy Court on or before 14 days after the service of the Schedule of Assumed Executory Contracts and Unexpired Leases on affected counterparties. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Obligations shall be deemed fully satisfied, released, and discharged upon satisfaction by the Debtors or the Reorganized Debtors of the applicable Cure Obligations; *provided*, *however*, that nothing in the Plan shall prevent the Reorganized Debtors from satisfying any Cure Obligations despite the failure of the relevant counterparty to File such request for satisfaction of such Cure Obligations. The Reorganized Debtors also may settle Cure Obligations or disputes related thereto without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 14 days after the service of notice of assumption on affected counterparties. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure Obligations, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then satisfaction of any Cure Obligations shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute and approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors or the Reorganized Debtors, as applicable, at the earliest convenience of the Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty and the Debtors or the Reorganized Debtors, as applicable, and that no such hearing shall be

37

scheduled less than 30 days after the Effective Date unless agreed to between the Debtors or the Reorganized Debtors, as applicable, and the affected counterparty.

In the event of a Court-Ordered Cure Obligation, the Debtors shall have the right (subject to the consent rights set forth in the RSA) to (a) satisfy the Court-Ordered Cure Obligation as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms in the Plan or, (b) within 14 days of such determination, add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of the (i) date of entry of the Court-Ordered Cure Obligation and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of an Unexpired Lease, the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be added to the Schedule of Rejected Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be assumed and should instead be rejected, including alleging an incurable default (and such objection remains outstanding), or (3) the court orders a Court-Ordered Cure Obligation.  Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Obligation dispute.

At least 7 days prior to the first day of the Combined Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Obligations to be sent to applicable parties.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Obligations, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption, upon the satisfaction of all applicable Cure Obligations.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption, or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court;** *provided, however*, **that nothing in the Plan shall affect the allowance of Claims or any Cure Obligation agreed to by the Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease**

38

**(subject to the consent rights set forth in the RSA) prior to assumption pursuant to the Plan or otherwise**.

Notwithstanding anything in the Plan to the contrary, upon assumption of an Unexpired Lease, the Debtors or the Reorganized Debtors, as applicable, shall be obligated to pay or perform, unless waived or otherwise modified by any amendment to such Unexpired Lease mutually agreed to by the applicable landlord and Debtor(s), any accrued, but unbilled and not yet due to be paid or performed, obligations as of the applicable deadline to File objections or disputes to the Cure Obligations for such Unexpired Lease under such assumed Unexpired Lease, including, but not limited to, common area maintenance charges, taxes, year-end adjustments, indemnity obligations, and repair and maintenance obligations, under the Unexpired Lease, regardless of whether such obligations arose before or after the Effective Date, when such obligations become due in the ordinary course; *provided* that all rights of the parties to any such assumed Unexpired Lease to dispute amounts asserted thereunder are fully preserved; *provided, further*, that nothing in the Plan shall relieve the Debtors or the Reorganized Debtors, as applicable, from any amounts that come due between (a) the applicable deadline to File objections or disputes to the Cure Obligation for such Unexpired Lease and (b) the effective date of assumption for such Unexpired Lease.

5. <u>Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases</u>

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

6. <u>Insurance Policies</u>

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance

39

Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect, on or after the Petition Date, with respect to conduct occurring prior to, on, or after the Petition Date, and all members, directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such members, directors, managers, and officers remain in such positions after the Effective Date[; *provided*, *however*, that the Reorganized Debtors shall retain the ability to terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies for any Causes of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence, bad faith, or willful misconduct.]

### 7.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, subject to the consent rights set forth in the RSA, or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9.    Employee Compensation and Benefits

(a)    Compensation and Benefit Programs

Subject to the RSA (including the consent rights set forth therein) and the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)    all employee equity or equity-based incentive plans (and the awards granted thereunder), and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Parent Interests; *provided* that, notwithstanding the foregoing or anything to the contrary in the Plan, the Debtors are authorized and directed to pay the Cash component of any bonus programs in accordance with the terms of such program (including, for the avoidance of doubt, the timing of any payments, which shall not be accelerated);

40

(b)     Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court;

(c)     any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Program; and

(d)     any Compensation and Benefits Programs for the benefit of the Existing Board Members.

Any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, or termination (including, in each case, any similar provisions therein) or (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Plan. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

(b)     Workers' Compensation Programs

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

10.     Intellectual Property Licenses and Agreements

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors or Reorganized Debtors, as applicable, and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors as set forth in the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

41

### 11. Contracts and Leases Entered into after the Petition Date

Contracts (including applicable order forms or purchase orders) and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, except as may be agreed to by the counterparties to such contracts and leases.

### G.   Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1. Disputed Claims Process

**The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority (subject with respect to any Stub Rent Claims, to the consent rights set forth in the Bar Date Order and the RSA, as applicable) to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  All Proofs of Claim required to be Filed by the Plan that are Filed after the date that they are required to be Filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

#### 2. Allowance of Claims

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. The Debtors, in their sole discretion, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

#### 3. Claims Administration Responsibilities

With respect to all Classes of Claims and Interests, and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority (subject with respect to any Stub Rent Claims, to the consent rights set forth in the Bar Date Order and the RSA, as applicable) to:  (a) File and prosecute Claim Objections; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all Claim Objections, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve

any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with their fiduciary duties and pursuant to the terms of the Plan.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all the rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to [Article IV.N] of the Plan, unless such Causes of Action were released pursuant to [Article VIII] of the Plan.

4.      Estimation of Claims and Interests

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 7 days after the date on which such Claim or Interest is estimated.  Each of the foregoing Claims and Interests and objection, estimation, and resolution procedures are cumulative, not exclusive of one another, and shall be consistent with any procedures set forth in the Bar Date Order and subject to the consent rights set forth in the RSA.  Claims or Interest may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.      Disputed Claims Reserve

On or before the Effective Date, the Reorganized Debtors incorporated in the U.S., subject to the consent rights set forth in the RSA, shall establish one or more reserves of the applicable consideration for any Claims against any Debtor that are Disputed Claims as of the Distribution Record Date other than General Unsecured Claims, which reserves shall be administered by the Disbursing Agent.

43

After the Effective Date, the applicable Disbursing Agent shall hold such consideration in such reserve(s) in trust for the benefit of such Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date. The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under [Article III] of the Plan solely to the extent of the amounts available in the applicable reserve(s).

Upon a Disputed Claim becoming disallowed by a Final Order or pursuant to [Article VII.A] of the Plan, the applicable amount of the consideration that was in the disputed claims reserve on account of such Disputed Claim shall be canceled by the Reorganized Debtors or the applicable Disbursing Agent. The Disbursing Agent shall adjust the distributions of the consideration to reflect any such cancelation.

[The Debtors may take the position that grantor trust treatment applies in whole or in part to any assets held in a disputed claims reserve. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as if such beneficiaries had received an interest in such account or fund's assets and then contributed such interests (in accordance with the Restructuring Transactions Exhibit) to such account or fund. Alternatively, any assets held in a disputed claim reserve may be subject to the tax rules that apply to "disputed ownership funds" under section 1.468B–9 of the Treasury Regulations.][10] To the extent such U.S. federal income tax treatment applies, any such assets will be subject to entity-level taxation, which will be borne by such disputed ownership funds and the Reorganized Debtors, shall be required to comply with the relevant rules. However, it is unclear whether these U.S. tax principles will apply to any such reserve and, as a result, the tax consequences of such reserve may vary.

### 6.    Adjustment to Claims or Interests without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Reorganized Debtors (without the Reorganized Debtors having to File an application, motion, complaint, objection, Claim Objection, or any other legal proceeding seeking to object to such Claim or Interest) and without any further notice to or action, order, or approval of the Bankruptcy Court.

---

[10]   Subject to ongoing review by all parties' tax teams pending finalization of the structure. This particular language is meant to cross-refer to Treasury Regulations Section 1.468B-1(k).

44

7.      Time to File Objections to Claims

Any objections to Claims or Interests shall be Filed on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors, as applicable.

8.      Disallowance of Claims or Interests

Except as otherwise expressly set forth in the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided in the Plan or as agreed to by the Debtors or Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such disallowed Claims shall not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order;** *provided, however,* **that not less than 14 days' notice to any Holders of General Unsecured Claims affected by the foregoing in this paragraph shall be provided (which such notice may be served on the affected claimants and may be Filed on an aggregate basis consistent with Bankruptcy Rule 3007(d)).**

9.      Amendments to Claims

Except as provided in the Plan or the Confirmation Order, on or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable Law.

10.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### 11.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of such date, without any interest to be paid on account of such Claim or Interest.

### 12.    Single Satisfaction of Claims

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interests, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed the amount of the Allowed Claim or Allowed Interest.

## H.    Settlement, Release, Injunction, and Related Provisions[11]

The Plan provides the following settlement, release, injunction, and related provisions.

"Released Parties" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) the Postpetition Lenders; (e) the Creditors' Committee; (f) each Creditors' Committee Member; (g) the Releasing Parties; (h) each Agent; (i) each Related Party of each such Entity in clause (a) through (i); *provided* that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases described in Article VIII.D of the Plan; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation[; *provided*, *further*, that notwithstanding the foregoing, [●] are not Released Parties].[12]

"Releasing Parties" means, collectively, and in each case in its capacity as such:  (a) each Debtor, (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each of the Postpetition Lenders; (e) each Agent; (f) the Creditors' Committee; (g) each Creditors' Committee Member; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the

---

[11]   All releases are subject to the Special Committee's ongoing investigation.  *See* [Article VII.L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

[12]   For the avoidance of doubt, all releases remain subject to the ongoing investigation of the Special Committee.

Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of nonvoting status indicating that they opt not to grant the releases provided in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that an Entity in clause (i) through clause (k) shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in <u>Article VIII.D</u> of the Plan; or (y) timely objects to the releases contained in <u>Article VIII.D</u> of the Plan and such objection is not resolved before Confirmation.

"Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; and (c) with respect to each of the foregoing Entities in clauses (a) through (b), each of the Related Parties of such Entity [(excluding [●])].[13]

1. <u>Discharge of Claims and Termination of Interests</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims), Interests (other than the Intercompany Interests that are Reinstated), and Causes of Action subject to the occurrence of the Effective Date.

---

[13] For the avoidance of doubt, all exculpations remain subject to the ongoing investigation of the Special Committee.

47

2.      Release of Liens

**Except as otherwise provided in the Plan, in the Exit Financing Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the DIP New Money Agents, the Exit LC Facility Agents, that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

3.      Releases by the Debtors

**Except as expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, finally, and forever released, waived, and discharged, to the fullest extent permissible under applicable Law, by each and all of the Debtors, and each of their respective current and**

48

former non-SoftBank Parties Affiliates, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, fixed or contingent, liquidated or unliquidated, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or any other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Debt Documents and, the RSA, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the Notes Exchange Transactions, the decision to File the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Restructuring Transactions, and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable the Definitive Documents or any other contract instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (b) any Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties'

49

**contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) an exercise of the Debtors' business judgment.**

4.      <u>Releases by the Releasing Parties</u>

**Effective as of the Effective Date, except as expressly set forth in the Plan or the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the fullest extent permissible under applicable Law, each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, fixed or contingent, liquidated or unliquidated, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Debt Documents and the RSA, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the Notes Exchange Transactions, the decision to File the Chapter 11 Cases, any intercompany transactions, and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Definitive Documents or any other contract instrument, release or other agreement or document created or entered into in connection with the Definitive Documents, or the Restructuring Transactions, the pursuit of**

**Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section 4, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases set forth in this Section D is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to Article VIII.D of the Plan; (e) in the best interests of the Debtors and their estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to Article VIII.D of the Plan.**

5.    Exculpation

**Except as otherwise specifically provided in the Plan or the Confirmation Order, and to the fullest extent permitted by law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any and all Claims, Interests, obligations, rights, suits, damages, or Causes of Action whether direct or derivative, for any claim related to any act or omission arising prior to the Effective Date, in connection with, relating to, or arising out of, the administration of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Chapter 11 Cases, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors in connection with the Plan and the Restructuring Transactions, or the transactions**

51

in furtherance of any of the foregoing, or upon any other act or omission, transaction, agreements, event, or other occurrence taking place on or before the Effective Date related to or relating to any of the foregoing (including, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for Claims or Causes of Action related to any act or omission of an Exculpated Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.[14]

6.    Injunction

Upon entry of the Confirmation Order, except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been extinguished, released, discharged, or are subject to exculpation, whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, Affiliates, and Related Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property

---

[14]   For the avoidance of doubt, all exculpations remain subject to the ongoing investigation of the Special Committee.

52

of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has timely Filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation, or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, Cause of Action, liability or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Action released or settled pursuant to the Plan; and (f) if such Entity (alone or together with a group of people that is treated as a single entity under the applicable rules) is a "50-percent shareholder" as defined under section 382(g)(4)(D) of the Tax Code with respect to any Debtor, claiming a worthless stock deduction for U.S. federal income tax purposes with respect to the Interests of WeWork Parent for any tax period of such Entity ending prior to the Effective Date.

Upon entry of the Confirmation Order, all Holders of Claims and Interests shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

With respect to Claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases (including the Filing and administration thereof), the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the RSA, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transactions, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or Filing of the RSA and the Definitive Documents, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the Notes and the Indentures, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such

**Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action.  To the extent the Bankruptcy Court may have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.**

7.      Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.

8.      Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.      Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

10.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**I.     Conditions Precedent to Consummation of the Plan**

1.     Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied, subject to the consent rights set forth in the RSA, (and, solely with respect to Article IX.A.6 of the Plan as it pertains to the Agent Professionals, to the applicable Agents) or waived, subject to the consent rights set forth in the RSA (and, solely with respect to Article IX.A.6 of the Plan as it pertains to the Agent Professionals, the applicable Agents (or as otherwise indicated)), pursuant to the provisions of Article IX.B of the Plan:

(a)    the Final Cash Collateral Order shall be consistent with the RSA in all respects (including the consent rights set forth therein) and shall not have been vacated, stayed, or modified without the prior written consent of the Required Consenting Stakeholders;

(b)    the DIP LC/TLC Order shall be consistent with the RSA in all respects (including the consent rights set forth therein) and shall not have been vacated, stayed, or modified without the prior written consent of the Required Consenting Stakeholders;

(c)    each document or agreement constituting a Definitive Document and all documents contemplated by the RSA shall have been executed and/or effectuated, in form and substance consistent with the RSA and subject to the consent rights set forth therein;

(d)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(e)    all obligations of the Debtors and the DIP New Money Lenders under the Exit Equity Commitment Documents (if any), including those required to effectuate the Exit Equity Commitment, shall have been satisfied in accordance with the terms thereof and the Plan;

55

(f)     all obligations of the Debtors under the Rights Offering Documents (if any) shall have been satisfied;

(g)     the Rights Offering (if any) shall have been fully consummated pursuant to the Rights Offering Procedures and the Rights Offering Documents and consistent in all material respects with the Plan and the RSA;

(h)     the Exit Equity Commitment Documents shall have been duly executed and delivered by all Entities party thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Equity Commitment Documents shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Equity Commitment Documents and the execution of the Exit Equity Commitment shall have occurred;

(i)     if applicable, the Exit Facility LC Documents shall have been duly executed and delivered by all Entities party thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit LC Facility Documents shall have been satisfied or duly waived in writing in accordance with the terms of the Exit LC Facility Documents and the closing of the Exit LC Facility shall have occurred;

(j)     all fees, expenses, and premiums payable pursuant to the RSA, Plan, Definitive Documents, or pursuant to any order of the Bankruptcy Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable, and the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall have been paid in full in Cash on the Effective Date as set forth in Article II.F of the Plan;

(k)     all Allowed Professional Fee Claims required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account as set forth in, and in accordance with, the Plan;

(l)     the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the RSA and subject to the consent rights set forth therein, and such order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless waived by the Required Consenting Stakeholders;

(m)     the Debtors shall have otherwise substantially consummated the Restructuring Transactions, all transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein), and all transactions contemplated by the Plan and in the Definitive Documents,

in a manner consistent in all respects with the Plan, unless waived by the Required Consenting Stakeholders;

(n)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment(s) thereto) shall have been Filed and all documents therein shall continue to satisfy the RSA in all respects;

(o)     all financing necessary for the Plan shall have been obtained and any documents related thereto, without duplication of the conditions described otherwise in [Article IX.A] of the Plan, shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred, having been satisfied or waived), and subject to the conset rights set forth in the RSA; and

(p)     immediately prior to the Effective Date, the Debtors shall possess no less than $300 million in cash (inclusive of Exit Equity Commitment but exclusive of any proceeds generated by the Japan/India Sales).

## 2.      Waiver of Conditions

Except as otherwise specified in the Plan, and subject to the limitations contained in and other terms of the RSA, any one or more of the conditions to Consummation (or any component thereof) set forth in Article IX of the Plan may be waived only if waived in writing (email being sufficient) by the Debtors and the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## 3.      Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the RSA, or any other Definitive Document shall: (a) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, any Holders of Claims or Interests, or any other Entity; *provided* that all provisions of the Plan, the RSA, or any other Definitive Document that survive termination thereof shall remain in effect in accordance with the terms thereof.

## 4.      Substantial Consumation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

57

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW

        A.      The Debtors' Corporate History

        In 2010, co-founders Adam Neumann and Miguel McKelvey opened WeWork's first
location in SoHo, far from the traditional corporate neighborhoods of midtown and downtown
Manhattan.      As a flexible workspace provider, WeWork offered affordable and
community-centered office space to small businesses and individuals who previously struggled to
find dedicated workspaces.

        But WeWork's ambitions went far beyond the office space it provided.  For the founders,
WeWork promised to change how people worked by creating inspiring environments where people
and companies, spanning countless industries and a wide range of interests, could come together
to create community and pursue their professional passions and aspirations.

        With that mission in mind, and following great success at its initial locations, WeWork
pursued global expansion.  Within four years, WeWork had grown to twenty-three locations across
eight cities and opened its first international locations in the United Kingdom and Israel.  In the
years that followed, WeWork continued its trajectory of dramatic growth, opening its first
locations in Australia, Canada, China, Mexico, and South Korea in 2016.

        WeWork attracted many sophisticated investors to finance this capital-intensive growth.
Among them, the SoftBank Parties were—and remain to this day—the most significant.
WeWork's relationship with the SoftBank Parties began in 2017.  In succeeding years, WeWork
continued to rely on the SoftBank Parties for financing, capital, and general financial support.  Two
years after the SoftBank Parties provided WeWork with its initial $4.4 billion investment,
WeWork raised an additional $2 billion from the SoftBank Parties.

        WeWork then prepared to go public.  As one of its first steps, in August 2019, WeWork
filed a registration statement (the "Initial Registration Statement") in connection with an initial
public offering ("IPO").  Investors generally reacted negatively to the Initial Registration
Statement and pushed back on the Company's private market valuation.  With the IPO in doubt,
Adam Neumann announced his resignation in September 2019.  On September 30, 2019, six days
after Neumann announced his resignation, the Company filed a formal request to withdraw the
Initial Registration Statement.

        The unsuccessful IPO left the Company under significant financial pressure.  Certain
SoftBank Parties stepped in to provide the Company with much-needed support, this time in the
form of rescue financing (the "2019 Rescue Package").  Specifically, the 2019 Rescue Package
included (i) approximately $5 billion in new financing, comprising commitments for $1.1 billion
in senior secured notes and $2.2 billion in unsecured notes, and a $1.75 billion letter of credit
facility; (ii) a tender offer (the "2019 Tender Offer") to purchase $3 billion of the Company's
equity securities from eligible equity holders at a price of $19.19 per share, subject to certain
conditions; (iii) the acceleration of the SoftBank Parties' April 2020 $1.5 billion payment
obligation at $11.60 per share, subject to shareholder approval; and (iv) SoftBank Vision Fund's
("SVF") swapping of all of its interests in regional joint ventures outside of Japan for shares in

WeWork at $11.60 per share. Had it been fully implemented, the 2019 Rescue Package would have brought the SoftBank Parties' fully diluted economic ownership of WeWork to approximately 80 percent.

Prior to April 1, 2020, the SoftBank Parties informed WeWork that it believed the conditions necessary to launch the 2019 Tender Offer had not been met. These unmet conditions included WeWork's alleged failure to (i) secure antitrust approvals, (ii) complete the roll-up of certain joint ventures with certain SoftBank Parties in Asia, and (iii) resolve ongoing government investigations. As a result, on April 1, 2020, the SoftBank Parties purported to terminate its 2019 Tender Offer. In addition, the SoftBank Parties' purported termination of the tender offer meant that it was no longer obligated to provide WeWork with $1.1 billion in additional secured debt financing.

In response, WeWork sued certain SoftBank Parties in the Delaware Court of Chancery for breach of contract and breach of fiduciary duty. On February 25, 2021, WeWork and certain SoftBank Parties entered into a settlement agreement, resulting in the SoftBank Parties' purchase or promise to purchase half of the shares it initially agreed to purchase in the 2019 Tender Offer, the capping of the voting power of the SoftBank Parties at 49.9 percent pursuant to a proxy agreement, and confirmation of the financing package.

The unsuccessful IPO also prompted certain changes to WeWork's management team and a strategic pivot from short-term rapid expansion to a focus on long-term profitability. The plan included (i) a five-year strategic plan focused on growth-led transformation; (ii) a five-year financial plan to position WeWork to achieve profitability on an adjusted EBITDA basis by 2021 and positive free cash flow by 2022; (iii) robust management of expenses; (iv) a strategic exit from non-core businesses; and (v) optimization of its real estate portfolio. On February 2, 2020, WeWork also announced that Sandeep Mathrani would join the Company as Chief Executive Officer and a member of the board of directors of WeWork Inc. (the "Board"), effective February 18, 2020.

Less than a month later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. In the months that followed, COVID-19 prompted governments to impose numerous restrictions, including travel bans, quarantines, stay-at-home orders, social distancing requirements, and mandatory closures of "nonessential" businesses. COVID-19 restrictions on in-person work initiated a remote work trend that has since changed the way businesses operate and their need for physical office space.

The COVID-driven shift to remote work negatively impacted WeWork's primary offering—space-as-a-service—and in turn led to customer attrition, delayed or withheld customer payments, and increased customer requests for payment concessions, deferrals, and cancelations. Memberships declined from the start of the pandemic until the beginning of 2021.

To adapt to remote work and macroeconomic developments, WeWork accelerated efforts to digitize its services by launching the WeWork Access products, which offer more flexibility than traditional memberships in terms of price and location. WeWork Access, however, has not fully made up for the loss of traditional memberships.

On October 20, 2021, WeWork successfully closed a de-SPAC transaction and began trading the following day on the New York Stock Exchange.  Specifically, BowX Acquisition Corp. ("Legacy BowX"), a Delaware special purpose acquisition company ("SPAC"), consummated a business combination by and among Legacy BowX, BowX Merger Subsidiary Corp. ("Merger Sub"), a Delaware corporation and a direct, wholly owned subsidiary of Legacy BowX, and New WeWork Inc. ("Legacy WeWork"), a Delaware corporation formerly known as WeWork Inc.  First, Merger Sub merged with and into Legacy WeWork, with Legacy WeWork surviving as a wholly owned subsidiary of Legacy BowX (the "First Merger").  Next, Legacy WeWork merged with and into BowX Merger Subsidiary II, LLC, a Delaware limited liability company ("Merger Sub II"), with Merger Sub II surviving as a direct, wholly owned subsidiary of Legacy BowX (the "Second Merger" and together with the First Merger, the "Mergers").

In connection with the Mergers, Legacy BowX changed its name to WeWork Inc. and upon completion of the de-SPAC transaction, WeWork Inc. became publicly listed on the New York Stock Exchange.  At that time, WeWork had an equity valuation of approximately $9.5 billion.

Since the successful de-SPAC transaction, WeWork has continued to grow its business and execute on its strategic plan, benefiting from a cyclical recovery from the depths of the pandemic but also burdened by the need to adapt to permanent changes among companies and employees in work and work-from-home behaviors.  Acknowledging the need to right-size its portfolio and cut lease costs in the face of these issues confronting the entire commercial real estate industry, WeWork has successfully amended over 590 leases and implemented a series of measures to enhance operational efficiency, reducing future rent obligations by over $12 billion and selling, general, and administrative expenses by approximately $1.8 billion prepetition.

### B.      The Debtors' Business Operations

As of the Petition Date, WeWork's customer base included over 600,000 individuals and companies across six continents, from Fortune 500 companies to small startups.  Customers can choose from a suite of WeWork services depending on their unique commercial needs.

#### 1.      WeWork Private Workspace

The vast majority of WeWork's revenue comes from its core "space-as-a-service" products, which offer members access to flexible workspace and related business amenities and services ("WeWork Private Workspace").  WeWork Private Workspace offers Member Companies (as defined below) a flexible workspace, whether they are looking for a dedicated desk, private office, or fully customized floor, on an hourly, daily, or monthly-subscription basis or through a multi-year membership agreement.  Memberships include much more than access to physical space and provide a suite of amenities and services, such as dedicated community staff, private phone booths, internet access, high-speed business printers and copiers, mail and package handling, front desk services, coffee and other beverages, off-peak building access, unique common areas, WeWork-sponsored events and networking, daily enhanced cleaning, and a host of business and technical service solutions, such as remote workforce solutions, connections to human resources benefits and professional services benefits, dedicated bandwidth, and IT equipment co-location.

2.      WeWork Access

In 2020, WeWork launched WeWork All Access and WeWork On Demand (together, "WeWork Access," and customers of WeWork Private Workspace and WeWork Access, the "Member Companies") to make WeWork's real estate portfolio digitally accessible to its global customer base in the post-pandemic world.  WeWork All Access is a monthly subscription-based model that provides Member Companies with access to over 500 participating WeWork locations, giving users maximum flexibility to choose when, where, and how they work.  WeWork On Demand is a pay-as-you-go membership service that allows Member Companies to book dedicated workspaces by the hour or by the day on the WeWork mobile application.  WeWork On Demand launched successfully in New York City and has since expanded to the United States, Canada, and select markets in the European and Pacific regions.

3.      WeWork Workplace

In addition to WeWork's core "space-as-service" offerings, WeWork also offers WeWork Workspace, a proprietary office management software and data analytics platform that was jointly developed with Yardi Systems.  WeWork Workplace provides subscribers with the ability to manage and optimize their workspaces, whether at a WeWork location or in a customer's own offices, in exchange for a monthly licensing fee.  Since its launch in July 2022, WeWork Workplace has serviced over 200 companies, with over 42,000 licenses sold as of December 2022.

**C.      Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $4.2 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below:

61

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Make-Whole, and Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **Senior LC Facility** | May 14, 2025 | $988.3 million[15] | $88.9 million | $1,077.2 million |
| **Junior LC Facility** | Mar. 7, 2025 | $470.0 million | $82.0 million | $552.0 million |
| **1L Notes (Series I)** | Aug. 15, 2027 | $525.0 million | $89.2 million | $614.2 million |
| **1L Notes (Series II)** | Aug. 15, 2027 | $306.3 million | $39.0 million | $345.2 million |
| **1L Notes (Series III)** | Aug. 15, 2027 | $181.3 million | $22.9 million | $204.1 million |
| **2L Notes** | Aug. 15, 2027 | $687.2 million | $45.8 million | $733.0 million |
| **2L Exchangeable Notes** | Aug. 15, 2027 | $187.5 million | $12.5 million | $200.0 million |
| **3L Notes** | Aug. 15, 2027 | $22.7 million | $1.6 million | $24.3 million |
| **3L Exchangeable Notes** | Aug. 15, 2027 | $269.6 million | $19.5 million | $289.1 million |
| *Total Secured Debt* | | *$3,637.8 million* | *$401.5 million* | *$4039.3 million[16]* |
| **7.875% Senior Notes** | May 1, 2025 | $163.5 million | $6.6 million | $170.1 million |
| **5.000% Senior Notes** | Jul. 10, 2025 | $9.3 million | $0.1 million | $9.5 million |
| *Total Funded Debt Obligations:* | | *$3,810.7 million* | *$408.2 million* | *$4,218.9 million* |

     1.     LC Facility

As of the Petition Date, Goldman Sachs International Bank ("Goldman"), OneIM Fund I LP ("OneIM"), and certain other financial institutions (collectively, the "Issuing Banks") had issued several letters of credit in two tranches on behalf of the Debtors pursuant to that certain Credit Agreement, dated as of December 27, 2019 (as amended, supplemented, or otherwise modified from time to time, the "LC Facility Credit Agreement," and the facility issued thereunder, the "LC Facility") prior to the Petition Date, by and among the Issuing Banks, WeWork Companies U.S. LLC, formerly known as WeWork Companies LLC (the "WeWork Obligor"), SoftBank Vision Fund II-2 L.P. (the "SVF Obligor," and jointly and severally liable on the LC Facility with the WeWork Obligor, the "Obligors"), Goldman as the administrative agent for the senior tranche and shared collateral agent, Kroll Agency Services Limited ("Kroll") as the administrative agent for the junior tranche, and the other parties from time to time thereto. Pursuant to the terms of the

---

[15]    Amount is based on drawn amount funded by and undrawn amount cash collateralized by the SoftBank Parties pursuant to the Satisfaction Letter (as defined below).

[16]    Includes approximately $31.5 million in fees incurred in connection with certain prepetition transactions with respect to the LC Facility.

LC Facility Credit Agreement, the SVF Obligor was subrogated to the Issuing Banks' and other secured parties' rights against the WeWork Obligor as of the date the SVF Obligor paid, reimbursed, or cash collateralized any obligations under the LC Facility, and such payments, reimbursements, and cash collateral were not reimbursed by the WeWork Obligor pursuant to that certain Amended and Restated Reimbursement Agreement, dated as of December 20, 2022 (as amended, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Reimbursement Agreement") by and among the Obligors.

The obligations under the LC Facility (including with respect to obligations owed to the SVF Obligor as Subrogee) are secured by the assets and equity interests of certain Debtor entities.

In connection with the Satisfaction Letter executed by the WeWork Obligor, the SVF Obligor, Goldman, Kroll, and certain of the Issuing Banks including Goldman and OneIM, the SVF Obligor paid and satisfied approximately $542.4 million for the junior tranche of the LC Facility, posted approximately $873.9 million of cash collateral for the undrawn senior tranche of the LC Facility, and paid approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement. Before the execution of the Satisfaction Letter, the SVF Obligor also reimbursed approximately $114.4 million of letters of credit that had been drawn but not reimbursed by the WeWork Obligor. As of the Petition Date, the WeWork Obligor's total indebtedness to the SVF Obligor in its capacity as subrogee under the LC Facility with respect to such reimbursement, cash collateral, and other payments was not less than approximately $1.6 billion. In connection with the DIP LC/TLC Facility approved by the Bankruptcy Court on December 11, 2023, approximately $671.2 million of the cash collateral posted by the SoftBank Parties to collateralize the senior tranche of the LC Facility pursuant to the Satisfaction Letter was released and immediately funded, via transfer by Goldman to specified accounts at Goldman and JPMorgan Chase Bank, N.A. at the discretion of the SVF Obligor, as the DIP TLC Facility. As a result, as of the Petition Date and pro forma for the DIP LC/TLC Facility, total indebtedness to the SVF Obligor under the LC Facility is approximately $958 million.

2.    1L Notes

Pursuant to that certain First Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "1L Notes Indenture"), by and among WeWork Companies U.S. LLC and WW Co-Obligor Inc. as the co-issuers (together, the "Notes Issuers"), the guarantors party thereto (the "Notes Guarantors"), and U.S. Bank Trust Company, National Association ("U.S. Bank"), as trustee and collateral agent, the Notes Issuers issued $1,012,500,000 in aggregate principal amount of 1L Notes. The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 1L Notes.

Pursuant to the 1L Notes Indenture, the 1L Notes were originally issued with a face value of $1,012,500,000, comprising: (i) $525,000,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series I (the "Series I 1L Notes"), (ii) $306,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series II (the "Series II 1L Notes"), and (iii) $181,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series III (the "Series III 1L Notes," and, together with

63

the Series II 1L Notes, the "1L Delayed Draw Notes" and, collectively with the Series I 1L Notes and the Series II 1L Notes, the "1L Notes").

In connection with the Notes Exchange Transactions, the Series I 1L Notes were issued and sold to the New Money Participants as a requirement to be able to exchange their Unsecured Notes into 2L Notes. The Series I 1L Notes were backstopped by an ad hoc group of noteholders (the "Ad Hoc Group") that represented approximately 62 percent of the Unsecured Notes outstanding at the time. The Series II 1L Notes were issued to SVF II, initially in the form of a delayed draw commitment, following the redemption of the $300 million in aggregate principal amount of Secured Notes due 2025 held by SVF II (the "SoftBank Secured Notes") that were outstanding at the time in connection with the Notes Exchange Transactions. The Company drew on the $300 million delayed draw commitment of Series II 1L Notes on July 17, 2023, and August 25, 2023, and issued an additional $6.25 million of Series II 1L Notes as a commitment fee on account of the delayed draw commitment. The Series III 1L Notes were issued to Cupar Grimmond, LLC ("Cupar"), in connection with its $175 million delayed draw commitment. The Company similarly exercised its delay-draw option and drew on the commitment on July 17, 2023, and August 25, 2023 and issued $6.25 million of Series III 1L Notes as a commitment fee on account of the delayed draw commitment. As of the Petition Date, the Debtors were liable for approximately $1,012,500,000 in outstanding aggregate principal amount of the 1L Notes, plus approximately $151.1 million on account of accrued and unpaid interest, plus all other fees and expenses (including make-whole premiums) on account of the 1L Notes.

3.    2L Notes

Pursuant to that certain Second Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $687,212,250 in aggregate principal amount of 11.00% Second Lien Senior Secured PIK Notes due 2027 (the "2L Notes") to the New Money Participants in connection with the Notes Exchange Transactions. The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 2L Notes.

In connection with the Notes Exchange Transactions, New Money Participants were entitled to receive in exchange for $1,000 in principal amount of Unsecured Notes being exchanged (i) $750 in principal amount of new 2L Notes, and (ii) a number of WeWork's Common Shares equal to $150, calculated at $0.9236 per share (the "Equity Exchange Price").[17] As of the Petition Date, the Debtors were liable for approximately $687,212,250 in outstanding aggregate principal amount of the 2L Notes, plus approximately $45.8 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 2L Notes.

---

[17]    The Equity Exchange Price was determined, prior to the Reverse Stock Split, based on the twenty-day volume weighted average price of WeWork's Common Shares during the period starting ten trading days prior to the commencement of the Exchange Offers and ending ten trading days after the commencement of the Exchange Offers.

4.      2L Exchangeable Notes

Pursuant to that certain Second Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L Exchangeable Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $187,500,000 in aggregate principal amount of 11.00% Second Lien Exchangeable Senior Secured PIK Notes due 2027 (the "2L Exchangeable Notes") to a SoftBank Party in connection with the Notes Exchange Transactions.  The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 2L Exchangeable Notes.

Pursuant to the 2L Exchangeable Notes Indenture, the 2L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily by the holder at any time or (ii) mandatorily by the Company after November 5, 2024, if certain conditions are met.

In connection with the Notes Exchange Transactions, a SoftBank Party was entitled to exchange $250,000,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $187,500,000 in aggregate principal amount of 2L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to approximately $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price.  As of the Petition Date, the Debtors were liable for approximately $187,500,000 in outstanding aggregate principal amount, plus approximately $12.5 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 2L Exchangeable Notes.

5.      3L Notes

Pursuant to that certain Third Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, Delaware Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee, and U.S. Bank Trust Company, National Association, as collateral agent, the Notes Issuers issued $22,653,750 in aggregate principal amount of 12.00% Third Lien Senior Secured PIK Notes due 2027 (the "3L Notes") in connection with the Notes Exchange Transactions.  The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 3L Notes.

In connection with the Notes Exchange Transactions, Non-New Money Participants were entitled to receive in exchange for every $1,000 in principal amount of Unsecured Notes being exchanged, (i) (a) $750 in principal amount of 3L Notes, and (b) a number of WeWork's Common Shares equal to $150, calculated at the Equity Exchange Price, or (ii) a number of WeWork's Common Shares equal to $900, calculated at the Equity Exchange Price.  As of the Petition Date, the Debtors were liable for approximately $22,653,750 in outstanding aggregate principal amount, plus approximately $1.6 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 3L Notes.

6.      3L Exchangeable Notes

Pursuant to that certain Third Lien Exchangeable Senior Secured PIK Note Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Exchangeable Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $269,625,000 in aggregate principal amount of 12.00% Third Lien Exchangeable Senior Secured PIK Notes due 2027 (the "3L Exchangeable Notes," and together with the 1L Notes, the 2L Notes, the 2L Exchangeable Notes, and the 3L Notes, the "Secured Notes") to a SoftBank Party in connection with the Notes Exchange Transactions.

The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 3L Exchangeable Notes.  Pursuant to the 3L Exchangeable Notes Indenture, the 3L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily by the holder at any time or (ii) mandatorily by the Company after November 5, 2024, if certain conditions are met.

In connection with the Notes Exchange Transactions, a SoftBank Party was entitled to exchange $359,500,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $269,625,000 in aggregate principal amount of 3L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to approximately $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price.  As of the Petition Date, the Debtors were liable for approximately $269,625,000 in outstanding aggregate principal amount, plus approximately $19.5 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 3L Exchangeable Notes.

7.      Unsecured Notes

Holders of the 7.875% Senior Notes due 2025 (the "7.875% Senior Notes") and the 5.000% Senior Notes due 2025, Series II (the "5.000% Senior Notes" and together with the 7.875% Senior Notes, the "Unsecured Notes") who did not participate in the Notes Exchange Transactions continue to hold Unsecured Notes.  As of the Petition Date, the Debtors were liable for approximately $164 million in outstanding aggregate principal amount, plus approximately $6.6 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 7.875% Senior Notes, and approximately $9.3 million in outstanding aggregate principal amount, plus approximately $123,000 on account of accrued and unpaid interest, plus all other fees and expenses on account of the 5.000% Senior Notes.

8.      Equity

WeWork Inc.'s certificate of incorporation authorizes the Board to issue 4,874,958,334 shares of Class A common stock, par value $0.0001 per share (the "Common Shares"), 25,041,666 shares of Class C common stock, par value $0.0001 per share, and 100 million shares of preferred stock ("Preferred Shares").  Approximately 52.83 million Common Shares and

66

approximately 497,000 shares of Class C common stock were outstanding as of the Petition Date.[18] The Common Shares previously traded on the New York Stock Exchange under the ticker symbol "WE" and currently trade in the OTC Pink Marketplace under the ticker "WEWKQ."[19]  To date, WeWork has not issued any Preferred Shares.

## VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.     Economic and Operational Headwinds

As the world emerged from the pandemic, WeWork was on track toward profitability.  In 2022, WeWork's total revenue increased by $675 million, which was primarily driven by an increase in total membership and service revenue.  As of December 2022, memberships had increased by 17 percent to approximately 547,000.  Simultaneously, lease costs decreased by $60 million, pre-opening location expenses decreased by $38 million, location operating expenses decreased by $171 million, and selling, general, and administrative expenses decreased by $276 million.  Nevertheless, WeWork's progress toward profitability was disrupted by a series of compounding factors.

#### 1.     Changing Commercial Real Estate Landscape

Since late 2021, to curb inflation, central banks around the world have continuously raised interest rates.  In the United States, the Federal Reserve raised its benchmark short-term rate eleven times since March 2022, reaching 5.5 percent in July 2023, its highest level since 2001.  The historically rapid rise in interest rates, coupled with slower than expected post-COVID return to office (as further discussed below), pressured WeWork's liquidity and drove increasing economic distress in the commercial real estate sector.  Consequently, landlords have been more willing than in the past to reduce rent prices and offer flexible leasing terms to attract new tenants.  Moreover, many office tenants are adjusting to the global shift to a hybrid work environment by consolidating their footprints and attempting to sublease their excess space, often at a rent significantly discounted to their original cost.  As a result, commercial office space, especially in the large cities where WeWork operates, has become available and accessible at unprecedented prices and in significant volume, amounting to much greater competition in WeWork's target market.

Because many of WeWork's leases were entered into in a much more robust real estate market and are characterized by above-market rents without rent resets or lessee-friendly termination rights, WeWork lacked the necessary financial flexibility to adjust to the rapidly shifting commercial real estate market.  WeWork's prepetition business model has become increasingly difficult to maintain and must be repriced to align with the current real estate market.

---

[18]   This outstanding number of shares reflects a 1-for-40 reverse stock split (the "Reverse Stock Split") of WeWork's outstanding shares of Class A common stock and Class C common stock, effective on September 1, 2023, that was approved by the Board and within the ratio range authorized by WeWork's shareholders at the June 2023 annual meeting.  No other references to the number of shares in this Disclosure Statement reflect the Reverse Stock Split.

[19]   On November 7, 2023, the New York Stock Exchange suspended the trading of the Common Shares and announced that it would commence delisting proceedings on account of these Chapter 11 Cases.

        2.       <u>Slower-than-Expected Return to Office</u>

While the supply of office space has surged, demand has receded as businesses continue to follow hybrid work policies first adopted during the pandemic. Many businesses and individuals have emerged from the pandemic eschewing the traditional office environment in favor of remote or hybrid work arrangements. The slower-than-expected return to office among customers led to a corresponding reduction in WeWork's sales, revenue, and membership demand. Consequently, WeWork's membership numbers have not grown at a rate sufficient to support the Company's capital structure. In an attempt to retain memberships, the Company has often offered additional discounts and deferrals, negatively impacting the Company's top and bottom line. In light of its operational and economic challenges, the Company began consulting with Kirkland and PJT in early 2023 to evaluate potential refinancing and restructuring options.

**B.**       **March 2023 Notes Exchange Transaction**

In March 2023, with the assistance of Kirkland and PJT, WeWork negotiated a comprehensive recapitalization transaction (the "<u>Notes Exchange Transactions</u>") with the Ad Hoc Group, the SoftBank Parties, and Cupar, and such Notes Exchange Transactions were consummated in May 2023. As a result of the Notes Exchange Transactions, WeWork secured over $1 billion of total funding and capital commitments, canceled or equitized approximately $1.5 billion of total debts through the equitization and discounted exchanges of over $1 billion of unsecured notes held by the SoftBank Parties and over $1 billion of Unsecured Notes held by the participating public noteholders (including the Ad Hoc Group), and extended the maturity of approximately $1.9 billion of *pro forma* debts from 2025 to 2027.

Among other things, WeWork (i) offered to all public holders of the Unsecured Notes the opportunity to purchase $500 million in aggregate principal amount of Series I 1L Notes (the "<u>Exchange Offers</u>"), which was backstopped by the Ad Hoc Group, in connection with the exchange of their Unsecured Notes for 2L Notes and/or Common Shares (as described below); (ii) transferred $300 million in aggregate principal amount of the SoftBank Secured Notes into a new $300 million delayed draw commitment for Series II 1L Notes; and (iii) obtained a commitment to purchase $175 million of Series III 1L Notes from Cupar, who also agreed to purchase 35 million Common Shares at $1.15 per Common Share.

If a holder of Unsecured Notes participated in the Notes Exchange Transactions to exchange all of its Unsecured Notes and fully purchased its *pro rata* share of $500 million of 1L Notes (such holder, a "<u>New Money Participant</u>"), it was entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 2L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price. If a holder of Unsecured Notes participated in the Notes Exchange Transactions but did not purchase its *pro rata* share of Series I 1L Notes (such holder, a "<u>Non-New Money Participant</u>"), it was only entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 3L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price.

Of the approximately $1.65 billion in aggregate principal amount of 5.000% Senior Notes due 2025, Series I (the "<u>SoftBank Unsecured Notes</u>") held by the SoftBank Parties, (i) for $250

million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $750 of 2L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; (ii) for approximately $360 million in aggregate principal amount, every $1,000 of such SoftBank Unsecured Notes was exchanged at face value into $750 of 3L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; and (iii) for the remaining approximately $1.04 billion in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $900 of Common Shares at the Equity Exchange Price.

### C.      Enhanced Corporate Governance

On August 8, 2023, four experienced and disinterested directors—Paul Aronzon, Paul Keglevic, Elizabeth LaPuma, and Henry Miller (collectively, the "Independent Directors")—were appointed as independent directors to the Board.  On August 17, 2023, in connection with its contingency planning efforts and in consultation with its advisors, the Board reviewed the Company's existing corporate governance infrastructure and determined that it was advisable and in the best interest of the Company and its stakeholders to establish a special committee of the Board comprising the Independent Directors (the "Special Committee").  The Board delegated to the Special Committee certain rights, authority, and powers in connection with any matters in which a conflict of interests exists or is reasonably likely to exist between the Company, on the one hand, and any of its related parties, including current and former directors, managers, officers, equity holders, employees, advisors, and certain other parties on the other hand (the "Conflict Matters").  On October 3, 2023, the Special Committee retained Munger, Tolles & Olson LLP ("MTO") as independent counsel and Province, Inc. ("Province") as independent financial advisor. The Bankruptcy Court entered orders approving the retention of Province [Docket No. 386] and MTO [Docket No. 484] on December 8 and December 21, 2023, respectively.

### D.      Prepetition Negotiations and the Restructuring Support Agreement

The Company's lease rationalization process accelerated in the months prior to these Chapter 11 Cases in connection with the Company's broader restructuring efforts.  In August 2023, the Company engaged Hilco to assist with an accelerated and comprehensive lease rationalization on a global scale.  Beginning in September of 2023, the Company and Hilco began engaging with hundreds of landlords to secure amendments or exits to substantially all of the Company's real estate leases.  Ultimately, however, the deliberate pace of that process, together with the Company's finite liquidity, did not provide the Company with sufficient runway to complete an out-of-court rationalization of the Company's lease portfolio, and the Company began to take steps to extend its liquidity while it negotiated a comprehensive restructuring transaction with parties in interest.

At the beginning of October 2023, the Company withheld (i) approximately $95.2 million of interest payments on its 1L Notes, 2L Notes, 2L Exchangeable Notes, 3L Notes, and 3L Exchangeable Notes, approximately $37.3 million of which was payable in cash and the remaining $57.9 million were payable in-kind; and (ii) approximately $78 million of rent payments at certain locations across its lease portfolio, including approximately $37 million in the United States and approximately $41 million in international locations ((i) and (ii) collectively, the "Payment Withholding").  Under the Notes Indentures, the Company had a thirty-day grace period to make the missed interest payments before the non-payment crystalized into an event of default.

Contemporaneously with its decision regarding the Payment Withholding, the Company began negotiations with key stakeholders across its capital structure, including the Consenting Stakeholders.

In the weeks following the Payment Withholding, the Company, with the assistance of their advisors, engaged extensively with key stakeholders to chart a value-maximizing path forward in preparation for these Chapter 11 Cases. To that end, on October 30, 2023, the Company and the Consenting Stakeholders entered into an agreement (the "Forbearance Agreement") pursuant to which the Consenting Stakeholders agreed to forbear from exercising remedies following the Payment Withholding until November 6, 2023. That same day, WeWork Obligor, SVF Obligor, Goldman, Kroll, and certain other Issuing Banks under the LC Facility executed that certain Satisfaction Letter and Forbearance Agreement (the "Satisfaction Letter") pursuant to which (i) the SVF Obligor agreed to pay and satisfy approximately $542.4 million for the junior tranche of the LC Facility, post approximately $873.9 million of cash collateral for the undrawn amounts under the senior tranche of the LC Facility, and pay approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement; and (ii) Goldman, Kroll, and certain other Issuing Banks, constituting the requisite majority of Issuing Banks of the LC Facility, agreed to forbear the exercise of any rights or remedies against the Company with respect to the Company's potential cross default on the LC Facility while the SVF Obligor's payment and cash collateralization was pending. On October 31, 2023, the SVF Obligor paid the entire $1,466,955,937.39 in accordance with the Satisfaction Letter. Before the execution of the Satisfaction Letter, the SVF Obligor also reimbursed approximately $114.4 million of letters of credit that had been drawn but not reimbursed by the WeWork Obligor.

Seven days after the execution of the Satisfaction Letter, on the Petition Date, the Debtors, the SoftBank Parties, the Ad Hoc Group, and Cupar reached an agreement on the terms of a comprehensive restructuring transaction, embodied in the restructuring support agreement (the "RSA," and the transactions contemplated in the RSA, the "RSA Transactions").

The RSA Transactions contemplate:[20]

i.      the equitization of the Drawn DIP TLC Claims (other than up to $100 million of such Claims which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests, as set forth, and subject to the conditions set forth, in the RSA;

ii.     the cancelation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth in the RSA (other than any equity Interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by the Parties to the RSA, a SoftBank Party contributes its Claims in exchange for the retention of its equity interests);

---

[20]    Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the RSA attached as Exhibit B to the First Day Declaration.

70

iii.   issuance of a New 1L Exit Term Loan Facility in an amount equal to (a) the lesser of (x) the total amount of all Drawn DIP TLC Claims and (y) $100 million, plus (b) the DIP TLC Fee Claims;

iv.   a DIP TLC Facility that, among other things:  (a) deems certain outstanding, undrawn, letters of credit under the prepetition LC Facility (other than undrawn letters of credit issued in connection with certain leases/locations to be identified and agreed upon by the Company Parties and the Consenting Stakeholders no later than the Petition Date) whether replaced, renewed, reissued, or amended (the "DIP LCs") to be obligations under the DIP TLC Facility and all associated cash collateral posted for each letter of credit to continue as credit support under the DIP TLC Facility, in each case on a dollar-for-dollar basis; and (b) provides for the replacement, renewal, reissuance, and/or amendment of the DIP LCs, which facility shall rank *pari passu* in lien and claim priority with the Prepetition LC Facility Claims and 1L Notes Claims (other than with respect to (1) amounts funded by the SoftBank Parties or their Affiliates to the Company Parties in the form of "Term Loan C" (on which (x) the creditors under the DIP TLC Facility shall have a first lien and claim priority, and (y) the Prepetition LC Facility Claims and 1L Notes Claims shall not have any lien) and (2) certain fees thereunder as further set forth in the DIP TLC Term Sheet attached to the RSA as Exhibit E) on the terms and subject to the conditions set forth in the DIP TLC Term Sheet, any subsequent DIP TLC term sheet agreed by the Company Parties and Consenting Stakeholders, the DIP TLC Orders, and the Cash Collateral Orders, as applicable; and

v.   a binding commitment by certain SoftBank Parties to, subject to the following sentence, provide credit support in the form of providing cash to be used as collateral for a New LC Facility on the terms and subject to the conditions set forth in the New LC Facility Term Sheet attached to the RSA as Exhibit F.  For the avoidance of doubt, credit support provided under the New LC Facility, if any, shall not exceed the amount of undrawn and outstanding letters of credit under the DIP TLC Facility (and shall be reduced on a dollar-for-dollar basis based on drawn letters of credit that occur prior to the Plan Effective Date).

The RSA also established certain case milestones to ensure that these Chapter 11 Cases proceed at an appropriate and efficient pace, thereby avoiding an unnecessarily prolonged stay in chapter 11.  The RSA Milestones were subsequently amended on several occasions by mutual agreement among the Consenting Stakeholders following execution of the RSA.

Following entry into the RSA, the Debtors commenced these Chapter 11 Cases to rationalize their lease portfolio, right-size their balance sheet, and position WeWork for sustainable, long-term growth.

### E.   Corporate Division

Immediately prior to commencing the Chapter 11 Cases, WeWork Companies LLC was WeWork's primary operating company, meaning it was (i) the borrower under WeWork's LC Facility, (ii) the issuer of WeWork's Secured Notes and Unsecured Notes, (iii) the direct and

71

indirect equityholder for substantially all of WeWork's other subsidiaries, and (iv) the guarantor under most of WeWork's leases.  On November 6, 2023, before the commencement of the Chapter 11 Cases, WeWork Companies LLC changed its name to WeWork Companies U.S. LLC (the "Dividing Company") and then underwent a corporate division pursuant to section 18-217 of the Delaware Limited Liability Company Act (the "Corporate Division"), whereby the Dividing Company became two companies: WeWork Companies U.S. LLC ("WWCUS") and WeWork Companies LLC ("WWC").  The Corporate Division allocated the assets and liabilities of the Dividing Company as follows:

- **WWC** retained all guarantee obligations associated with any leases that related to real property located in Ireland, the United Kingdom, or Australia (the "Excluded Countries"), where such lease (or the associated guarantee obligations) remained in effect as of November 6, 2023 (such obligations, the "Excluded Guarantee Obligations"), and was allocated an absolute indemnity from WWCUS by which WWCUS is obligated to indemnify WWC with respect to any losses arising from the guarantee or surety obligations allocated to WWC; and

- **WWCUS** retained all other obligations (*i.e.*, except the Excluded Guarantee Obligations), including all guarantee obligations associated with (i) all leases for real property located in the United States, Canada, and any other country except the Excluded Countries, and/or (ii) leases for real property in Excluded Countries if such leases were forfeited (and occupation of such real property permanently ceased) prior to November 6, 2023 (including those leases for real property located at 12 Moorgate, 52 Bedford Row, and/or 91 Baker Street, in London, England), and was allocated an indemnification obligation to WWC and nearly all assets of the Dividing Company.

Following the Corporate Division, WWCUS filed for chapter 11 and is a Debtor in these Chapter 11 Cases; WWC did not file for chapter 11 and is not a Debtor in these Chapter 11 Cases. WWCUS is the sole guarantor, by operation of law, with respect to all obligations other than the Excluded Guarantee Obligations.

## VII.   EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Relief

On the Petition Date, 517 WeWork entities each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Contemporaneously therewith, the Debtors filed various motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, maintaining the Debtors' relationships with employees, vendors, customers, and other third parties following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration filed on the Petition Date.

Following a hearing on November 8, 2023 (the "First Day Hearing"), the Bankruptcy Court entered orders granting all of the relief requested in the First Day Motions on an interim or final basis (such interim orders, the "Interim First Day Orders"), and on December 6, December 11, and

72

December 20, 2023, as applicable, the Bankruptcy Court entered orders granting certain of the First Day Motions on a final basis (such final orders, along with the orders entered on a final basis immediately after the First Day Hearing, the "Final First Day Orders").  The Interim First Day Orders and the Final First Day Orders include:[21]

- **Cash Collateral Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 43] (the "Cash Collateral Motion"), which, among other things, sought authority to access the cash collateral to fund the Chapter 11 Cases.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on an interim basis [Docket No. 103] (the "Interim Cash Collateral Order").  On December 11, 2023, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on a final basis [Docket No. 428] (the "Final Cash Collateral Order", and together with the Interim Cash Collateral Order, the "Cash Collateral Orders").

  [The Cash Collateral Orders govern the Debtors' consensual use of approximately $164 million of cash collateral on hand as of the Petition Date and provide for various forms of adequate protection to the Prepetition Secured Parties as more fully set forth therein.  As a result of arm's-length, good faith negotiations in the days and weeks immediately following the Creditors' Committee's appointment, the Debtors, the Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee reached a settlement on various issues relating to, among other things, the creation of a "stub" rent reserve included in the Final Cash Collateral Order (the "Stub Rent Reserve").  The Stub Rent Reserve consists of a segregated account (which shall remain part of the Prepetition Collateral and subject to the Prepetition Liens and the Adequate Protection Liens, as such terms are defined in the Final Cash Collateral Order) established for paying unpaid rent obligations for the period from and including the Petition Date through November 30, 2023.  The Stub Rent Reserve shall be funded in one-third portions of the Debtors' estimated stub rent upon the occurrence of certain events as set forth in the Final Cash Collateral Order.]

  On January 26, 2024, the Creditors' Committee, the SoftBank Parties, and the Ad Hoc Group agreed to extend the Creditors' Committee's Challenge Period (as defined in the Final Cash Collateral Order) to February 20, 2024 [Docket No. 1233].

- **Cash Management Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records; (II) Authorizing the Debtors to Continue to Perform Intercompany Transactions; (III) Waiving Certain U.S. Trustee Requirements; and (IV) Granting Related Relief* [Docket No. 20] (the "Cash Management Motion"), which, among other things, sought

---

[21]    The First Day Motions, Petitions, and all entered orders for relief in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/WeWork.

authority to maintain their cash management system in the ordinary course.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 105].

On January 22, 2024, the U.S. Trustee filed a limited objection [Docket No. 1182] to the Cash Management Motion, challenging the Debtors' request to waive the requirement of section 345(b) of the Bankruptcy Code on the ground that the Debtors' funds, held in certain accounts in foreign branches of JPMorgan Chase Bank, were subject to a risk of loss.  On January 29, 2024, the Debtors filed a reply [Docket No. 1244] arguing, among other things, that estate funds are sufficiently protected and cause exists to waive the requirement of section 345(b) of the Bankruptcy Code with respect to certain Debtor bank accounts.

On January 30, 2024, the Bankruptcy Court entered a second interim order [Docket No. 1248], authorizing the Debtors to continue using the cash management system and granting other related relief the Debtors requested in the Cash Management Motion on an interim basis.  After a hearing on February 5, 2024, the Bankruptcy Court overruled the U.S. Trustee's objection and entered an order authorizing the Debtors to use their cash management system and granting other related relief the Debtors requested in the Cash Management Motion on a final basis [Docket No. 1302] (the "Final Cash Management Order").

- **Epiq Retention Application**: The *Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 5] (the "Epiq Retention Application"), which sought authority to retain Epiq Corporate Restructuring, LLC ("Epiq") as the Claims Agent.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Epiq Retention Application [Docket No. 91].

- **NOL Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 16] (the "NOL Motion"), which sought authority to establish the notification and hearing procedures for certain transactions of the Debtors' equity interests.  On November 8, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on an interim basis [Docket No. 89].  On December 6, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 339].

- **Taxes Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 10] (the "Taxes Motion"), which sought authority to pay certain taxes assessed against the Debtors.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Taxes Motion on an interim basis [Docket No. 93].  On December 6, 2023, the Bankruptcy Court entered an Order approving the Taxes Motion on a final basis [Docket No. 335].

74

- **Assumption and Rejection Procedures Motion**:  The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 12] (the "Assumption and Rejection Procedures Motion"), which sought authority to establish procedures to streamline the process of accepting and rejecting executory contracts and unexpired leases.  On November 29, 2023, the Bankruptcy Court entered an Order approving the Assumption and Rejection Procedures Motion [Docket No. 289].

- **Insurance Motion**:   The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations Thereto and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief* [Docket No. 7] (the "Insurance Motion"), which sought authority, among other things, to maintain the Debtors' prepetition insurance and surety coverage.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on an interim basis [Docket No. 109].  On December 6, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 334].

- **Critical Vendors Motion**:  The *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 15] (the "Critical Vendor Motion"), which sought authority, among other things, to pay the prepetition claims of certain of the Debtors' vendors.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 96], and on December 6, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 338].

- **Utilities Motion**:   The *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Fee Payments to the Utility Agent, and (V) Granting Related Relief* [Docket No. 11] (the "Utilities Motion"), which sought authority to, among other things, provide adequate assurance of future payment to the Debtors' utility providers.  On November 8, 2023, the Bankruptcy Court entered an order approving the Utilities Motion on an interim basis [Docket No. 99].  On December 6, 2023, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 336].

- **Wages Motion**:   The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief* [Docket No. 13] (the "Wages Motion"),

75

which sought authority to, among other things, pay the prepetition wages and salaries of the Debtors' employees.  On November 8, 2023, the Bankruptcy Court entered an order approving the Wages Motion on an interim basis [Docket No. 88].  On December 6, 2023, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 337].

- **Schedule and Statement Extension Motion**:  The *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief* [Docket No. 9] (the "Schedule and Statement Extension Motion"), which sought authority to extend the deadline by which the Debtors have to file their Schedule and Statements to January 6, 2024.  On November 8, 2023, the Bankruptcy Court entered an order approving the Schedule and Statement Extension Motion [Docket No. 97].

- **Customer Programs Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs, (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* [Docket No. 6] (the "Customer Programs Motion"), which sought authority to, among other things, maintain and administer the Debtors' customer programs.  On November 8, 2023, the Bankruptcy Court entered an order approving the Customer Programs Motion on an interim basis [Docket No. 86].  On December 6, 2023, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 333].

- **Creditor Matrix Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact or Withhold Certain Confidential Information of Customers, and (D) Redact Certain Personally Identifiable Information; (II) Waiving the Requirement to File a List of Equity Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief* [Docket No. 17] (the "Creditor Matrix Motion"), which sought authority to, among other things, redact certain information of the Debtors' customers and creditors from the papers filed in these Chapter 11 Cases.  On November 8, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on an interim basis [Docket No. 90].  On December 20, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 473].

- **Foreign Representative Motion**:  The *Debtors' Motion for Entry of Order (I) Authorizing WeWork Inc. to Act as Foreign Representative and (II) Granting Related Relief* [Docket No. 8] (the "Foreign Representative Motion"), which sought authority to appoint WeWork Inc. as the Foreign Representative of the Chapter 11 Cases in the Canadian Proceeding (each, as defined below).  On November 8, 2023, the Bankruptcy Court entered an order approving the Foreign Representative Motion [Docket No. 95].

76

- **Automatic Stay Motion**:  The *Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Ipso Facto Protections, and Anti-Discrimination Provisions of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 19] (the "Automatic Stay Motion"), which sought entry of an order restating and enforcing the worldwide automatic stay, among other things.  On November 9, 2023, the Bankruptcy Court entered an order approving the Automatic Stay Motion [Docket No. 104] (the "Automatic Stay Order").

- **Joint Administration Motion**: The *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 41] (the "Joint Administration Motion"), which sought entry of an order authorizing the joint administration of these Chapter 11 Cases for procedural purposes only.  On December 22, 2023, the Debtors filed a revised proposed form of *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 495] (the "Revised Proposed Joint Administration Order").  On November 8, 2023, the Bankruptcy Court entered an order approving the Joint Administration Motion [Docket No. 87], and on January 8, 2024, the Bankruptcy Court entered an order in the form of the Revised Proposed Joint Administration Order [Docket No. 1116].

- **Case Management Motion**:   The *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 18] (the "Case Management Motion"), which sought authority to establish certain case management procedures.   On November 8, 2023, the Bankruptcy Court entered an order approving the Case Management Motion [Docket No. 100].

B.      **Second Day Relief**

On November 15, 2023, the Debtors filed several motions (the "Second Day Motions") to allow the Debtors to continue to progress in these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered orders granting each of the Second Day Motion on certificates of no objection (such orders, the "Second Day Orders").

- **De Minimis Settlement Motion**:   The *Debtors' Motion for Entry of an Order (I) Authorizing and Establishing Procedures for the Compromise and Settlement of De Minimis Claims, (II) Approving the Form and Manner of the Notice of Settlement, and (III) Granting Related Relief* [Docket No. 140] (the "De Minimis Settlement Motion"), which sought authority to, among other things, establish procedures to streamline the settlement of certain claims against or held by the Debtors (the "De Minimis Settlement Procedures").  On December 6, 2023, the Bankruptcy Court entered an Order approving the De Minimis Settlement Motion [Docket No. 341].

- **De Minimis Asset Sale Motion**:   The *Debtors' Motion for Entry of an Order (I) Authorizing and Establishing Procedures for the De Minimis Asset Transactions; (II) Authorizing and Establishing Procedures for De Minimis Asset Abandonment;*

77

*(III) Approving the Form and Manner of the Notice of De Minimis Asset Transactions and Abandonment; and (IV) Granting Related Relief* [Docket No. 142] (the "De Minimis Asset Sale Motion"), which sought authority to, among other things, establish procedures to streamline the sale or abandonment of certain *de minimis* assets of the Debtors.  On December 6, 2023, the Bankruptcy Court entered an Order approving the De Minimis Asset Sale Motion [Docket No. 343].

- **OCP Motion**:  The *Debtors' Motion for Entry of an Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 141] (the "OCP Motion"), which sought authority to, among other things, employ and pay certain professionals the Debtors utilized in their ordinary course of business for matters unrelated to these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered an Order approving the OCP Motion [Docket No. 342].

- **Interim Compensation Motion**:  The *Debtors' Motion for Entry of an Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of This Court* [Docket No. 139] (the "Interim Compensation Motion"), which sought authority to, among other things, establish procedures for the allowance and payment of the fees and expenses of the professionals retained by the Debtors in connection with these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered an Order approving the Interim Compensation Motion [Docket No. 340].

### C.      Approval of the DIP LC/TLC Facility [22]

It is critical that the Debtors maintain access to letters of credit ("LCs") during the Chapter 11 Cases through the DIP Facilities.  A significant portion of the leases in the Debtors' and non-Debtors' real estate portfolio requires that such parties, in their capacities as tenants, provide LCs as security for the lease.  If the Debtors fail to maintain the LCs (including failing to replace the LCs in advance of an expiration date), the Debtors may be in default under such leases and the landlords would be able to draw in full under the applicable LCs.  Failure to obtain access to the DIP LC Facility and replacement LCs would have led to, among other things, an onslaught of LC draws, which would be highly disruptive to the Debtors' operations and restructuring efforts.

Accordingly, on November 19, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 186] (the "DIP Motion"), requesting the Bankruptcy Court's approval of (i) a senior secured, first priority cash collateralized debtor-in-possession "first out" letter of credit facility (the "DIP LC Facility") in an aggregate amount of $650 million; and (ii) a senior secured, first priority debtor-in-possession "last out" term loan C facility (the "DIP TLC Facility," together with the DIP LC Facility, the "DIP LC/TLC

---

[22]   Capitalized terms used but not defined in this section has the meaning ascribed to them in the DIP Motion, as applicable.

78

Facility") in an aggregate principal amount equal to $671,237,045.94, which would fully cash collateralize letters of credit under the DIP LC Facility.

On December 11, 2023, the Bankruptcy Court entered a fully consensual order approving the DIP LC/TLC Facility [Docket No. 427] (the "DIP Order"). The relief granted in the DIP Order incorporates the terms of a settlement with the Creditors' Committee, which engaged in constructive dialogue with the Debtors with respect thereto. As a result of arm's-length, good faith negotiations in the days and weeks that immediately followed the Creditors' Committee's appointment, the Debtors, the Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee reached a settlement on various issues relating to, among other things, the scope of DIP Liens, notice and challenge period rights, milestone extensions, and compliance with the U.S. Trustee's requirement regarding Authorized Depository.

The LC capacity the Debtors obtained pursuant to the DIP Order allows the Debtors to pursue a successful lease rationalization strategy and maximize value for all stakeholders in these Chapter 11 Cases. Pursuant to the DIP Order, the Debtors are using the proceeds of the DIP TLC Facility to fund approximately fourteen interest-bearing DIP LC Loan Collateral Accounts established with the DIP LC Issuers. The DIP LC Loan Collateral Accounts serve as cash collateral in support of the issuance of cash collateralized DIP LCs under the DIP LC Facility consistent with the structure of the prepetition LC Facility. By design the LC structure under the DIP LC Facility affords the Debtors and their non-Debtor affiliates with the requisite LC capacity to renew and maintain standby LCs to support their third-party obligations and avoid unnecessary value-destructive LC draws, in a manner consistent with their historical practice. Specifically, under the DIP LC/TLC Facility, the Debtors are now able to obtain renewals or replacement of certain LCs prior to expiration, which has been essential to WeWork's ongoing operations and to preserving the value of their Estates for the benefit of all stakeholders.

### D.    DIP New Money Facility

In January 2024, the Debtors and their advisors determined that it may be prudent for the Debtors to seek to raise new money, debtor-in-possession financing to carry the Debtors through the remainder of the Chapter 11 Cases. Accordingly, on February 1, 2024, the Debtors circulated an initial term sheet for a potential DIP New Money Facility to the Consenting Stakeholders. Over the following several weeks, the Debtors and their advisors continued to engage with the Consenting Stakeholders to negotiate the framework both of a debtor-in-possession financing facility and terms of postpetition financing that would provide the Debtors with the necessary liquidity on an appropriate timeline while also preserving the framework of the RSA and retaining the support of the Consenting Stakeholders representing approximately 92 percent of the Debtors' Secured Notes.

In February 2024, the Debtors, with the assistance of PJT, began a formal marketing process designed to canvas the market and identify the best possible solution to the Debtors' financing needs. This marketing process ran in parallel with the Debtors' engagement with the Consenting Stakeholders regarding their potential provision of DIP financing and postpetition financing. PJT began the marketing process by developing a list of thirty sophisticated institutions, including seven banking institutions and twenty-three non-bank alternative lenders, capable of providing both DIP and additional postpetition financing on a junior basis. Upon finalizing the

list, and in connection with the DIP financing marketing process, PJT, on behalf of the Debtors, reached out to each of the thirty potential DIP financiers. Four parties demonstrated an initial interest and executed non-disclosure agreements with the Debtors. Immediately thereafter, the Debtors began sharing diligence with the potential DIP financiers.

The Debtors and their advisors continue to engage in arm's-length negotiations with potential funding parties to achieve the best possible terms of a potential DIP New Money Facility and postpetition financing. As of the date hereof, the Debtors are prepared to fund these Chapter 11 Cases through the Combined Hearing without debtor-in-possession financing if necessary. However, the Debtors and their advisors continue to believe that obtaining debtor-in-possession financing may be prudent so long as it is available on acceptable terms and will enable the Debtors to pay all administrative claims in full in cash to confirm the Plan and emerge from these Chapter 11 Cases. The Debtors remain open to all proposals for debtor-in-possession financing whether in the form of a DIP New Money Facility, a Rights Offering, or otherwise, and the open points in the Debtors' negotiations with the Consenting Stakeholders for a potential DIP New Money Facility have significantly narrowed in recent days. It is expected that, to the extent the Debtors reach a deal as to the terms of the DIP New Money Facility, the DIP New Money Claims shall be repaid in full in cash, as will be provided in an acceptable Plan and the DIP New Money Documents (if applicable).

### E.    Retention of the Debtors' Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications (collectively, the "Retention Applications") requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:

- Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as co-counsel to the Debtors [Docket No. 213];

- Cole Schotz P.C., as co-counsel to the Debtors [Docker No. 215];

- PJT Partners LP, as investment banker to the Debtors [Docket No. 218];

- Alvarez and Marsal North America, LLC, as financial advisor to the Debtors [Docket No. 214];

- MTO, as counsel to the Special Committee [Docket No. 217];

- Province, as financial advisor to the Special Committee [Docket No. 219];

- Epiq, as the Claims Agent of the Debtors [Docket No. 5];

- Deloitte Tax LLP, as tax advisor to the Debtor [Docket No. 1439];

- Hilco Real Estate, LLC, as real estate advisor to the Debtor [Docket No. 1237]; and

80

- McManimon, Scotland & Baumann, LLC, as local counsel to the Special Committee [Docket No. 1472].

The Bankruptcy Court entered orders approving all Retention Applications on certificates of no objection [Docket Nos. 91, 347, 386, 425, 479, 484, 522, 1410, 1523, 1537].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Code.

## F.    Schedules and Statements

As summarized above, the order approving the Creditor Matrix Motion [Docket No. 90] (the "Interim Creditor Matrix Order") granted, on an interim basis and among other relief, the authority to redact from any filings with the Bankruptcy Court or made publicly available in these Chapter 11 Cases (i) the names, addresses, and email addresses of their customers pursuant to section 107(b) of the Bankruptcy Code, and (ii) (a) the home and email addresses of all natural persons who are United States citizens located in the United States and (b) the names, home and email addresses, and other Personal Data of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state pursuant to section 107(c) of the Bankruptcy Code. The Interim Creditor Matrix Order was entered notwithstanding the objection of the U.S. Trustee to the redaction of customer information and the names of individuals located in the United Kingdom and European Economic Area.

In addition, as summarized above, the order approving the Schedule and Statement Extension Motion extended the deadline for the Debtors to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") to January 8, 2024.

On November 29, 2023, the U.S. Trustee filed a formal objection to the final approval of the Creditor Matrix Motion, citing general principles of disclosure and transparency and the public's right of access to judicial records, among other bases [Docket No. 269]. The Debtors filed a reply [Docket No. 454], noting that the customer list is the Debtors' most important asset, and that the filing of unredacted Schedules and Statements would amount to the public disclosure of the Debtors' location-specific customer list and would, among other things, significantly undermine the Debtors' business and reorganizational efforts. The Creditors' Committee filed a joinder to the Debtors' reply [Docket No. 455].

After hard fought negotiations, the Debtors reached an agreement with the U.S. Trustee, subject to the U.S. Trustee's right to re-raise the issue at the Combined Hearing, to redact from any filings with the Bankruptcy Court or made publicly available in these Chapter 11 Cases: (i) the names, addresses, and email addresses of their customers; and (ii) (a) the home and email addresses of all natural persons who are United States citizens located in the United States and (b) the home and email addresses and other Personal Data (as defined in the Creditor Matrix Motion) of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member

81

state.  On December 20, 2023, the Bankruptcy Court entered an order granting the Creditor Matrix Motion on a final basis on these terms [Docket No. 473].

On January 7, 2024, the Debtors filed their Schedules and Statements [Docket Nos. 590–1107].

## G.    Appointment of the Creditors' Committee

On November 16, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 150], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases.  The Creditors' Committee currently consists of seven members: Computershare Trust Company, National Association; Beacon Capital Partners, LLC; Nuveen Real Estate; Carr Properties; Delaware Trust Company; Hudson Pacific Properties, Inc.; and ABM Industry Groups, LLC.  On December 21 and December 22, 2023, the Creditors' Committee filed applications to retain Paul Hastings LLP ("Paul Hastings") as legal counsel [Docket No. 490], Berkeley Research Group, LLC ("Berkeley") as financial advisor [Docket No. 492], and Moelis & Company LLC ("Moelis") as investment banker [Docket No. 502].  On January 17, 2024, the Bankruptcy Court entered orders authorizing the retention of Paul Hastings, Berkeley, and Moelis [Docket Nos. 1156, 1158, and 1159].

The Debtors held their first and second meetings of creditors pursuant to section 341 of the Bankruptcy Code (a "341 Meeting") on December 13, 2023 and February 7, 2024, respectively.

### 1.    Creditors' Committee's Standing Motion

On February 28, 2024, the Creditors' Committee filed the *Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1436] (the "Committee Standing Motion") seeking, among other relief, derivative standing to pursue certain claims, including actual and constructive fraudulent transfer, preference avoidance, breach of fiduciary duties, equitable subordination, recharacterization, lien avoidance, and claim disallowance, on behalf of the Debtors' estates against certain SoftBank Parties and other affiliates of SoftBank Group Corporation, certain employees or other designees of SoftBank that have served on the Board or as officers of WeWork, Lewis Frankfort, Bruce Dunlevie, Masayoshi Son, U.S. Bank as the indenture trustee and collateral agent of certain Secured Notes, holders of the Secured Notes including members of the Ad Hoc Group, and Cupar, among other parties.

As of the date hereof, the Committee Standing Motion is scheduled for a hearing on a date to be determined.

## H.    Lease Rationalization

The Debtors intend to utilize the tools provided by the Bankruptcy Code to continue to right-size their lease portfolio by identifying locations for potential lease renegotiation, rejection, and closure in both the United States and Canada.  As of the Petition Date, Hilco was in active negotiations with over 400 landlords to consummate lease amendment agreements.  As rent

82

payments are the single most significant cash outflow of the Debtors, right sizing the lease portfolio is essential to the Reorganized Debtors' profitability and long-term business plan.  The Debtors have taken—and will continue to take—great care to minimize the impact of out-of-court exits and in-court rejection of leases on Member Companies.

A summary of the Debtors' lease rationalization progress to date is provided below:

- On November 7, 2023, the Debtors filed the Assumption and Rejection Procedures Motion, seeking relief to establish procedures (the "Assumption and Rejection Procedures") for assuming and rejecting executory contracts and unexpired leases to reduce the costs and administrative burden of having to file a motion for every assumption or rejection.  On November 29, 2023, the Bankruptcy Court entered an order authorizing the Assumption and Rejection Procedures [Docket No. 289].

- On November 7, 2023, the Debtors filed the *Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date; and (II) Granting Related Relief* [Docket No. 14] (the "Rejection Motion"), seeking authorization to reject over sixty leases for certain locations in the U.S. and Canada that the Debtors have determined to be unnecessary and burdensome to their Estates.  On November 29, 2023, the Bankruptcy Court entered an order granting the relief requested in the Rejection Motion [Docket No. 290].

- Since December 12, 2023, pursuant to the Assumption and Rejection Procedures, the Debtors have filed the following notices of assuming or rejecting certain unexpired leases.

| Notice Type | Docket Number | Debtor Entity | Status |
|---|---|---|---|
| Rejection | 297 | 245 Livingston St Q, LLC<br>Common Coffee, LLC<br>35-37 36th Street Tenant, LLC<br>130 5th Avenue Tenant, LLC<br>880 3rd Ave Tenant, LLC<br>75 Arlington Street Tenant, LLC[23] | Order entered [Docket No. 433] |
| Assumption | 430 | 1440 Broadway Tenant, LLC | Order entered [Docket No. 541] |
| Rejection | 531 | Common Desk OC, LLC<br>71 Stevenson Street Q LLC<br>1115 Howell Mill Road Tenant LLC | Order entered [Docket No. 1126] |

---

[23] On December 12, 2023, the Bankruptcy Court entered the *Stipulation and Agreed Order By and Between Debtor 75 Arlington Street Tenant LLC and MT Back Bay One LLC With Respect to Notice of Rejection of Lease and Objection Thereto* [Docket No. 434], providing that the sixth lease identified in the First Rejection Notice, located at 75 Arlington Street, Boston, MA 02116, was terminated effective as of November 3, 2023.

| | | WeWork Canada LP ULC<br>Common Desk DE, LLC | |
|---|---|---|---|
| Assumption | 580 | 7272 Wisconsin Avenue Tenant LLC | Order entered<br>[Docket No. 1168] |
| Assumption | 1245 | 71 5th Avenue Tenant LLC<br>800 North High Street Tenant LLC<br>901 North Glebe Road Tenant LLC<br>410 North Scottsdale Road Tenant LLC | Order entered<br>[Docket No. 1333] |
| Assumption | 1247 | WW Brooklyn Navy Yard LLC | Order entered<br>[Docket No. 1334] |
| Rejection | 1276 | 200 Berkeley Street Tenant LLC<br>405 Mateo Street Tenant LLC<br>1725 Hughes Landing Boulevard Tenant LLC<br>101 East Washington Street Tenant LLC<br>920 SW 6th Avenue Tenant LLC<br>1557 West Innovation Way Tenant LLC<br>75 Rock Plz Tenant LLC<br>214 West 29th Street Tenant LLC<br>WW 115 W 18th Street LLC | Order entered<br>[Docket No. 1360] |
| Assumption | 1401 | 830 NE Holladay Street Tenant LLC<br>1100 15th Street Tenant LLC<br>881 Peachtree Northeast Tenant LLC | Order entered<br>[Docket No. 1449] |
| Assumption | 1431 | 1 Beacon Street Tenant LLC<br>408 Broadway Tenant LLC<br>154 W 14th Street Tenant LLC | Order entered<br>[Docket No. 1473] |
| Rejection | 1441 | 1547 9th Street HQ LLC<br>WW 555 West 5th Street LLC<br>1525 11th Ave Tenant LLC | Order entered<br>[Docket No. 1474] |
| Assumption | 1511 | WeWork Canada LP ULC<br>33 West San Carlos Tenant LLC<br>1600 7th Avenue Tenant LLC<br>400 Capitol Mall Tenant LLC<br>10250 Constellation Tenant LLC<br>18 West 18th Street Tenant LLC<br>135 Madison Ave Tenant LLC<br>1155 Perimeter Center West Tenant LLC | Order entered<br>[Docket No. 1597] |
| Rejection | 1522 | 177 E Colorado Blvd Tenant LLC<br>WW 2015 Shattuck LLC<br>16 East 34th Street Tenant LLC | Order entered<br>[Docket No. 1620] |
| Rejection | 1590 | 250 E 200 S Tenant LLC | Order entered |

| | | | [Docket No. 1635] |
|---|---|---|---|
| Assumption | 1591 | 1175 Peachtree Tenant LLC<br>200 Massachusetts Ave NW Tenant LLC<br>WeWork Canada LP ULC<br>110 Corcoran Street Tenant LLC | Order pending |
| Rejection | 1609 | 655 New York Avenue Northwest Tenant LLC<br>125 West 25th Street Tenant LLC<br>5215 North O'Connor Boulevard Tenant LLC<br>3090 Olive Street Tenant LLC<br>2425 East Camelback Road Tenant LLC<br>1840 Gateway Dr Tenant LLC<br>6655 Town Square Tenant LLC<br>756 W Peachtree Tenant LLC<br>6900 North Dallas Parkway Tenant LLC<br>10885 NE 4th Street Tenant LLC<br>Legacy Tenant LLC<br>609 Greenwich Street Tenant LLC<br>1333 New Hampshire Avenue Northwest Tenant LLC<br>150 4th Ave N Tenant LLC | Order pending |
| Assumption | 1612 | WeWork Canada LP ULC<br>6543 South Las Vegas Boulevard Tenant LLC<br>21 Penn Plaza Tenant LLC<br>1001 Woodward Avenue Tenant LLC<br>1449 Woodward Avenue Tenant LLC | Order pending |
| Rejection | 1651 | 429 Lenox Ave Tenant LLC<br>2211 Michelson Drive Tenant LLC | Order pending |
| Assumption | 1653 | WeWork Canada LP ULC<br>3280 Peachtree Road NE Tenant LLC<br>1100 Ludlow Street Tenant LLC<br>5161 Lankershim Boulevard Tenant LLC | Order pending |

The Debtors, with the assistance of their advisors, continue to evaluate their lease portfolio and the status of ongoing negotiations with their landlord counterparties and will, subject to the consent rights set forth in the RSA, make decisions regarding the rejection or assumption of their unexpired leases and other executory contracts on a rolling basis during the course of the Chapter 11 Cases, and with respect to unexpired nonresidential real property leases consistent with the terms and conditions as set forth in Article V of the Plan.

85

      1.      <u>Motions Regarding Rent Payment</u>

Since January 9, 2024, certain landlords filed motions seeking orders compelling the Debtors to pay past-due rent, allow such past-due rent as administrative expenses, and/or decide whether to assume or reject the applicable lease, among other relief (such motions collectively, the "<u>Rent Motions</u>"). On January 23, 2024, the Creditors' Committee filed a statement in support of certain Rent Motions [Docket No. 1194].

On February 14, 2024, the Debtors filed the *Debtors' Omnibus Objection to the Motions of Certain Landlord Parties to (I) Compel Payment of Rent, (II) Compel Rejection of Leases, and (III) Granting Related Relief* [Docket No. 1364], objecting to the Rent Motions on the grounds that (i) where applicable, the moving landlords should be compelled to first seek recovery from the security, such as letters of credit, surety bonds, and/or security deposits, the Debtors have already provided for the leases before seeking additional payment from the Debtors; (ii) the Debtors have satisfied some of their obligations under section 365(d)(3) of the Bankruptcy Code with respect to certain moving landlords by exercising their rights of setoff or recoupment against tenant allowance credits, overpayments, and other credits under the leases; and (iii) section 365(d)(3) of the Bankruptcy Code provides no specific remedy for noncompliance and, at best, allows the moving landlords an administrative claim under section 503(b) that is payable only upon the Effective Date of the Plan.

Following good-faith, arms'-length negotiations between the Debtors and the moving landlords, all Rent Motions that were scheduled for a hearing on February 5, February 20, March 20, and April 18, 2024, were either withdrawn or adjourned to subsequent hearings.

As of the date hereof, pursuant to the consensual resolution of certain Rent Motions, the Debtors have agreed to pay approximately $[●] of Allowed Administrative Claims in favor of certain movants pursuant to the Plan. The Debtors anticipate that they will have sufficient cash on hand, including the proceeds from the DIP New Money Facility, to satisfy all Allowed Administrative Claims in accordance with the Plan.

The table below summarizes the movant, the applicable Debtor-tenant, and the status of each Rent Motion.

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| Pea Green Owner, LLC | 1129 | WW 210 N Green LLC | Withdrawn [Docket No. 1197] |
| CIO Terraces, LLC | 1147 | 5960 Berkshire Tenant LLC | Withdrawn [Docket No. 1378] |
| CIO Block 23, LLC | 1148 | 101 East Washington Street Tenant LLC | Withdrawn [Docket No. 1377] |
| Chris Neilson, as receiver of Trigild IVL | 1176, 1177 | 600 California Street Tenant, LLC | Withdrawn [Docket Nos. 1663, 1664] |
| Esplanade Owner LLC | 1180 | 2425 East Camelback Road Tenant LLC | Withdrawn [Docket No. 1372] |

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| 729 Washington Property Owner LLC | 1193 | 729 Washington Ave Tenant LLC | Withdrawn [Docket No. 1371] |
| T-C 501 Boylston Street LLC; T-C 33 Arch Street LLC | 1213 | Boylston Street Tenant LLC<br>33 Arch Street Tenant LLC | Withdrawn [Docket No. 1363] |
| Multiple Landlords | 1216 | Multiple Debtors | Withdrawn [Docket Nos. 1353, 1354, 1355, 1356, 1383, 1384, 1385] |
| Trinity Centre LLC | 1230 | 115 Broadway Tenant LLC | Withdrawn [Docket No. 1373] |
| NW 524 SOHO LLC | 1238 | 524 Broadway Tenant LLC | Withdrawn [Docket No. 1387] |
| Kato International LLC | 1239 | 12 East 49th Street Tenant LLC | Withdrawn [Docket No. 1380] |
| Power & Light Building, LLC | 1249 | 920 SW 6th Avenue Tenant LLC | Withdrawn [Docket No. 1381]<br>Rejection approved [Docket No. 1360] |
| Trinity Hudson Holdings, LLC | 1255 | 160 Varick Street Tenant LLC | Withdrawn [Docket No. 1369] |
| 1900 McKinney Harwood LLC | 1256 | 1920 McKinney Avenue Tenant LLC | Withdrawn [Docket No. 1382] |
| AGRE Williams Square Holdings, LLC | 1258 | 5215 North O'Connor Boulevard Tenant LLC | Withdrawn [Docket No. 1389] |
| RXR Atlas LLC | 1265 | 75 Rock Plz Tenant LLC | Withdrawn [Docket No. 1362]<br>Rejection approved [Docket No. 1360] |
| 575 Lex Property Owner, LLC | 1267 | 575 Lexington Avenue Tenant, LLC | Withdrawn [Docket No. 1352] |
| 575 Fifth Office Owner LLC[24] | 1279 | 575 5th Avenue Tenant LLC | Withdrawn [Docket No. 1394] |
| J.G. Capital Hill, LLC | 1295 | 1525 11th Ave Tenant, LLC | Withdrawn [Docket No. 1391]<br>Rejection approved [Docket No. 1474] |
| Lincoln Street Property Owner, LLC | 1303 | 1 Lincoln Street Tenant LLC | Hearing Scheduled for May 7, 2024 |
| Corrigan Station, LLC | 1343 | 1828 Walnut Tenant LLC | Withdrawn [Docket No. 1442] |
| Simon Property Group, Inc. | 1374 | 5049 Edwards Ranch Tenant LLC | Withdrawn [Docket No. 1465] |

---

[24]  575 Fifth Office Owner LLC filed a joinder to certain Rent Motions on February 1, 2024.

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| HSRE-Portman Tech Square, LLC | 1426 | 756 W Peachtree Tenant LLC | Withdrawn [Docket No. 1521] |
| Gregg Williams, as receiver for Maguire Properties – 555 West 5th Street, LLC | 1434 | WW 555 West 5th Street LLC | Withdrawn [Docket No. 1481]<br>Rejection approved [Docket No. 1474] |
| Capitol View JV-E | 1468 | 500 11th Ave North Tenant LLC | Withdrawn [Docket No. 1632] |
| GW Property Services, LLC | 1475 | 205 North Detroit Street Tenant LLC | Withdrawn [Docket No. 1637] |
| NW 524 SOHO LLC | 1484 | 524 Broadway Tenant LLC | Withdrawn [Docket No. 1622] |
| 1201 Tab Owner, LLC | 1492 | 1201 3rd Avenue Tenant LLC | Withdrawn [Docket No. 1492] |
| CoStar Central Place HQ, LLC | 1494 | 1201 Wilson Blvd Tenant LLC | Hearing scheduled for April 24, 2024 |
| Westview on 12th – Arc LLC | 1496 | 316 West 12th Street Tenant LLC | Hearing scheduled for April 24, 2024 |
| MCMIF Crossroads HoldCo, LLC | 1498 | 1825 South Grant Street Tenant LLC | Withdrawn [Docket No. 1611] |
| AFIAA 125 West 25th Street, LLC | 1499 | 125 West 25th Street Tenant LLC | Withdrawn [Docket No. 1546] |
| MSI Holyoke, LLC | 1565 | WW 107 Spring Street LLC | Withdrawn [Docket No. 1623] |
| Unico 250 East 200 South Tower LLC | 1567 | 250 E 200 S Tenant LLC | Withdrawn [Docket No. 1621] |
| 625 W. Adams, LLC | 1571 | 625 West Adams Street Tenant LLC | Withdrawn [Docket No. 1641] |
| Legacy West Investors, LP | 1576 | Legacy Tenant LLC | Scheduled for a hearing on April 24, 2024 |
| GT RP Halcyon, LLC | 1577 | 6655 Town Square Tenant LLC | Withdrawn [Docket No. 1618] |
| Trinity Hudson Holdings, LLC | 1580 | 160 Varick Street Tenant LLC | Withdrawn [Docket No. 1631] |
| Met Tower Owner LLC | 1630 | 142 W 57th Street Tenant LLC | Scheduled for a hearing on May 7, 2024 |

## I.    Dispute with Cushman & Wakefield

Cushman & Wakefield U.S., Inc. ("Cushman") provides facility management services (the "Services") to substantially all of the Debtors' locations in North American pursuant to that certain Master Services Agreement (the "MSA") and that certain Schedule for Facilities Management Services (the "FM Schedule" and together with the MSA, the "Cushman Contract").

On December 6, 2023, Cushman filed the *Motion of Cushman & Wakefield U.S., Inc. for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 348] (the "Cushman Motion") and the *Application for Order Shortening Time* [Docket No. 354] (the "First Application"), seeking to compel the Debtors to decide whether to assume or reject the Cushman Contract and to schedule a hearing on the Cushman Motion on December 11, 2023.  Upon the Debtors' limited objection [Docket No. 355] to the shortened notice and after a hearing on December 11, 2024, the Bankruptcy Court entered an order scheduling the Cushman Motion for hearing on January 9, 2024.

On December 13, 2023, after receiving a $2.56 million payment from the Debtors with instructions as to what amount of the payment should be allocated to each subcontractor, Cushman filed the second *Application for Order Shortening Time* [Docket No. 446] (the "Second Application"), seeking (i) to schedule a hearing on the Cushman Motion no later than December 20, 2023 and (ii) the Bankruptcy Court's instruction as to how to deploy the $2.56 million payment.

After the Debtors filed a second limited objection [Docket No. 449] to the Second Application on December 15, 2023, the Debtors and Cushman engaged in good-faith, arm's length negotiations and agreed to resolve or otherwise postpone their disputes.  On December 21, 2023, the Debtors filed and the Bankruptcy Court entered the *Stipulation and Consent Order Between the Debtors and Cushman & Wakefield U.S. Inc.* [Docket No. 485] (the "Cushman Stipulation"), which provided, among other things, that the Debtors and Cushman would engage in good faith negotiations regarding the potential amendment and assumption of the Cushman Contract and that the hearing on the Cushman Motion would be postponed to February 20, 2024.  On February 13, 2024, the Debtors and Cushman agreed to further postpone the hearing on the Cushman Motion to March 27, 2024.  *See* Docket No. 1361.

On March 22, 2024, the Debtors filed the *Debtors' Objection to Motion of Cushman & Wakefield U.S., Inc. for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 1536] (the "Cushman Objection") objecting to the Cushman Motion on the grounds that, among other reasons, (i) the Cushman Motion was moot because the Debtors had timely paid Cushman on account of (a) all prepetition invoices of Cushman's subcontractors pursuant to the Cushman Stipulation, and (b) all postpetition obligations under the Cushman Contract; (ii) the Debtors and Cushman had been negotiating an amended Cushman Contract, and the Bankruptcy Court's involvement was not necessary; and (iii) Cushman had not demonstrated why the Bankruptcy Court should shorten the time period provided by section 365(d)(2) of the Bankruptcy Code.  On March 25, 2024, Cushman filed the *Reply of Cushman & Wakefield U.S., Inc. to Debtors' Objection to Motion for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 1555].

On March 27, 2024, the Debtors and Cushman agreed to enter into the *Second Stipulation and Consent Order Between the Debtors and Cushman & Wakefield U.S., Inc.* (the "Second Cushman Stipulation") which provided, among other things, (i) the Debtors and Cushman would continue negotiating the terms of a potential amendment and assumption of the Cushman Contract in good faith until April 10, 2024, and (ii) the Cushman Motion would be fully resolved.  On March

28, 2024, the Bankruptcy Court entered an order approving the Second Cushman Stipulation [Docket No. 1575].

On April 10, 2024, after arm's-length, good-faith negotiation with Cushman, the Debtors and Cushman reached an agreement to amend and assume the Cushman Contract. The amended Cushman Contract provides for, among other things, (i) significant cost savings and enhanced operational flexibility for the Debtors, while enabling the Debtors to continue providing services to their members without the disruption of transitioning to a new facility management service provider; (ii) cure payment in the amount of $3 million, 50 percent of which is to be paid upon assumption, and the remaining 50 percent of which is to be paid in installments over six months; and (iii) a nine-month "lock-up" period during which the Debtors and Cushman agree not to exercise their respective termination-for-convenience rights under the Cushman Contract.

### J.      Claims Reconciliation Process

#### 1.      Bar Dates

On January 7, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code; (II) Establishing an Amended Schedules Bar Date, a Rejection Damages Bar Date, and a Stub Rent Bar Date; (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim; (IV) Approving Notices Thereof; and (V) Granting Related Relief* [Docket No. 1108] (the "Bar Date Motion"). The Bar Date Motion seeks entry of an order to establish certain bar dates by which certain entities holding Claims against Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim.

On January 23, 2024, certain landlords filed the *Limited Objection of Multiple Landlords to Debtors' Motion for Entry of an Order Setting Bar Dates for Submitting Proofs of Claim, Etc.* [Docket No. 1198] (the "Bar Date Objection"), objecting to the Bar Date Motion on the grounds that the Stub Rent Notice and the related procedures are "unnecessary and duplicative" and that the Debtors' proposal to send their calculation of each Stub Rent Claimant's Stub Rent Claim through an individualized Stub Rent Notice is too "secretive." The Bar Date Objection was joined by landlord Kato International LLC [Docket No. 1208]. Following good faith, arm's-length negotiation, on February 1, 2024, the Debtors filed a certificate of no objection with respect to a revised form of order approving the Bar Date Motion [Docket No. 1282] setting forth certain amended Bar Dates (as defined below) and providing, among other things, that the Debtors will (i) file a schedule of all Stub Rent Claims (the "Stub Rent Claim Schedule") on the docket and (ii) provide each Stub Rent Claimant with a tailored proof of claim for the exclusive purpose of filing its Stub Rent Claim.

- **General Claims Bar Date**:  **March 12, 2024**, as the last date and time for all persons and entities to file Proofs of Claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code and unsecured priority claims specified in the Bar Date Motion against any Debtor (the "General Claims Bar Date");

- **Member Claims Bar Date**:  **March 12, 2024**, as the last date and time for a Member Claimant (as defined in the Bar Date Motion) to file a Proof of Claim if the Member

90

Claimant disagrees with the amount of Member Claims (as defined in the Bar Date Motion) listed on its Member Notice (as defined in the Bar Date Motion) (the "Member Claims Bar Date");

- **Governmental Bar Date**:   **May 6, 2024**, as the last date and time for each governmental unit to file Proofs of Claim asserting claims ("Governmental Claims") against any Debtor that arose or are deemed to have arisen on or before the Petition Date (the "Governmental Bar Date");

- **Amended Schedules Bar Date**:  in the event that the Debtors amend or supplement their Schedules, **the later of (i) the applicable Bar Date and (ii) the date that is thirty (30) calendar days from the date on which the Debtors serve notice of the amendment to the Schedules,** as the last date and time by which claimants holding claims affected by the amendment must file Proofs of Claim with respect thereto against any Debtor (such later date, the "Amended Schedules Bar Date");

- **Rejection Damages Bar Date**:  solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, **the later of (a) (i) the General Claims Bar Date or (ii) the Governmental Bar Date, as applicable, and (b) the date that is thirty (30) calendar days after the later of (i) entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease and (ii) the effective date of such rejection,** as the last date and time by which claimants holding claims based upon such rejection must file Proofs of Claim with respect thereto against any Debtor, **unless otherwise ordered by the Bankruptcy Court** (such later date, the "Rejection Damages Bar Date"); and

- **Stub Rent Bar Date**:  solely as to claims that arise in connection with the occupation of a lease of nonresidential real property (a "Leased Premise") in the period from and including November 6, 2023, through and including November 30, 2023 (each a "Stub Rent Claim," and each claimant, a "Stub Rent Claimant"), and solely in the event that a Stub Rent Claimant disagrees with the amount of its Stub Rent Claim identified on the Stub Rent Claim Schedule and do not resolve such disagreement with the Debtors in accordance with the reasonable consent rights provided for in the Bar Date Order, **the date that is forty-five (45) calendar days after the Debtors serve the Stub Rent Claim Schedule on each Stub Rent Claimant and any other party entitled to receive notice of the same pursuant to the Case Management Order**, as the last date and time by which Stub Rent Claimants must file Proofs of Claim with respect to Stub Rent Claims against any Debtor (the "Stub Rent Bar Date").

On February 2, 2024, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 1285] (the "Bar Date Order").

Following entry of the Bar Date Order, on February 7, 2024, the Debtors filed a schedule (the "Stub Rent Claim Schedule") detailing the amount of the vast majority of Stub Rent Claimant's Stub Rent Claims [Docket No. 1316].  On February 9, 2024, the Debtors filed a supplemental schedule (the "Supplemental Stub Rent Claim Schedule") detailing the amount of five additional Stub Rent Claimant's Stub Rent Claim [Docket No. 1336].  Service of the Stub

91

Rent Claim Schedule and the Supplemental Stub Rent Claim Schedule was completed on February 8 and February 9, 2024, respectively [Docket Nos. 1325, 1340]. In accordance with the Bar Date Order, the Stub Rent Bar Date for the Stub Rent Claimants whose Stub Rent Claims were scheduled in the Stub Rent Claim Schedule and the Supplement Stub Rent Claim Schedule were March 24 and March 25, 2024, respectively.

### 2.    Claims Objection Procedures

On April 13, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving (A) Omnibus Claims Objection Procedures and Form of Notice, (B) Omnibus Substantive Claims Objections, and (C) Satisfaction Procedures and Form of Notice; (II) Waiving Bankruptcy Rule 3007(e)(6); and (III) Granting Related* Relief [Docket No. 1647] (the "Claims Objection Procedures Motion"). The Claims Objection Procedures Motion seeks the Bankruptcy Court's approval of, among other things, (i) the claims objection procedures and related notices, (ii) omnibus claims objection pursuant to Bankruptcy Rule 3007(c)–(d), and (iii) claims satisfaction procedures and related notices. As of the date hereof, the Claims Objections Procedures Motion is scheduled for a hearing on May 7, 2024.

## K.    Extension of Certain Key Dates

### 1.    Exclusivity

On March 4, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1452] (the "Exclusivity Motion"). The Exclusivity Motion seeks to extend the Debtors' exclusive right to file a chapter 11 plan by 120 days through and including July 3, 2024, and to solicit votes thereon for 120 days through and including September 3, 2024. As of the date hereof, the Exclusivity Motion is scheduled for a hearing on [April 29, 2024].

### 2.    Assumption or Rejection of Non-Residential Leases

On March 4, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending Debtors' Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 1453] (the "365(d)(4) Motion"). The 365(d)(4) Motion seeks to extend the time under section 365(d)(4) of the Bankruptcy Code within which the Debtors may assume or reject unexpired leases of non-residential real property by up to ninety (90) days for a total of up to 210 days from the Petition Date, through and including the earlier of Confirmation and June 3, 2024. On March 27, April 17, and April 18, 2024, respectively, Legacy West Investors, IQHQ-Aventine West, LP ("Aventine"), and CoStar Central Place HQ, LLC each filed an objection [Docket Nos. 1674, 1682] to the 365(d)(4) Motion on various grounds, including that (i) the Debtors had not timely performed certain postpetition obligations under their leases, and (ii) the plain language of section 365(d)(4) of the Bankruptcy Code caused the Debtors' unexpired lease with IQHQ to be deemed rejected as of March 5, 2024, among others. The objection filed by Aventine was joined by Kato International LLC [Docket No. 1675] and Simon Property Group,

92

Inc. [Docket No. 1681].  As of the date hereof, the 365(d)(4) Motion is scheduled for a hearing on [April 29, 2024].

       3.      Removal Period

On January 9, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 1131] (the "Removal Extension Motion"), seeking authority to enlarge the period of time set forth in Bankruptcy Rule 9027(a)(2)–(3) during which the Debtors may seek removal of certain actions pursuant to 28 U.S.C. § 1452 up to and including June 4, 2024.  On January 30, 2024, the Bankruptcy Court entered an order approving the Removal Extension Motion [Docket No. 1252].

### L.      The Special Committee's Independent Investigation[25]

As described in [Article VI.C] herein, the Board established the Special Committee and delegated to it certain rights, authority, and powers in connection with "Conflicts Matters." Conflict Matters include any matters in which a conflict of interest exists or is reasonably likely to exist between WeWork, on the one hand, and any of its current and former directors, managers, officers, investment commitment members, or certain other parties in interest, on the other hand (each, a "Related Party").  The Special Committee retained MTO and Province as independent counsel and independent financial advisor, respectively, to assist the Special Committee in carrying out its responsibilities with respect to the Conflicts Matters.

Under the direction of the Special Committee, MTO and Province have been conducting an independent investigation of the Conflict Matters beginning in early October 2023 (the "Independent Investigation"), including potential Claims that could be asserted by the Debtors' Estates with respect to such matters.

In furtherance of this investigation, MTO and Province have carried out extensive diligence into the Debtors' relationship with and transactions involving Related Parties.  Starting on October 10, 2023, MTO has made numerous document requests to the Debtors regarding Related Party transactions.  Province has made separate document requests to the Debtors and the Debtors' advisors as part of its analysis of WeWork's financial condition and the economic terms of certain Related Party transactions.

MTO has also made requests for documents and information from other parties.  MTO made requests to the Debtors' former outside counsel, Debevoise & Plimpton LLP ("Debevoise"), relating to certain government investigations of WeWork, and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  MTO made requests relating to the work performed by former special committees of independent directors of WeWork (each, a "Former Special Committee"), represented by Wilson Sonsini LLP ("Wilson Sonsini").  And MTO made requests to the SoftBank

---

[25]    This section of the Disclosure Statement is subject to the Special Committee's ongoing review.

Parties, including the production of investment memorandum relating to the SoftBank Parties' historical investments in WeWork's debt and equity, and to Adam Neumann.

In response to these various requests, MTO and Province have received and reviewed more than 600,000 documents, totaling more than 4 million pages, including more than 30,000 documents and 225,000 pages produced by the SoftBank Parties.

In addition to reviewing the relevant documents that have been produced, MTO and Province have reviewed publicly available information concerning Related Party transactions, including WeWork's SEC financial statements.

On top of its document review, MTO has interviewed several current and former employees of WeWork, including its current and former general counsel, other in-house counsel, and personnel in the finance, treasury, and financial, planning & analysis departments. MTO has also interviewed WeWork's former outside counsel at Debevoise, Skadden, and Wilson Sonsini, as well as Alvarez & Marsal Valuation Services.

MTO has also been in regular communication with the Creditors' Committee since the Creditors' Committee's appointment, both to apprise the Creditors' Committee on the general scope and status of the Independent Investigation and to facilitate the Creditors' Committee's own investigation. These efforts have included providing non-privileged documents collected in the Independent Investigation and coordinating on further document collection and information gathering efforts with the Creditors' Committee.

In addition, MTO and Province have worked with the Creditors' Committee to facilitate and conduct joint interviews in January and February of 2024. These have included the former chief executive officers of the Debtors, Perella Weinberg Partners (which provided advice to the former boards of directors of WeWork Inc. and the Former Special Committees), and Lincoln Financial, which provided various fairness opinions to the former boards and to the Former Special Committees regarding transactions with SoftBank Parties or other Related Parties.

Broadly speaking, the scope of the Independent Investigation encompasses transactions between WeWork and Related Parties as far back as 2017. Among them are (1) WeWork's transactions with Neumann; (2) the SoftBank Parties' initial equity investments in WeWork in 2017; (3) the 2019 Rescue Package and related agreements and transactions and available alternatives; (4) the litigation filed by a Former Special Committee and by Neumann against the SoftBank Parties relating to the latter's failure to consummate the 2019 Tender Offer, and the settlement thereof; (5) the settlement agreements entered into between WeWork and Neumann; (6) the SoftBank Parties' investments in WeWork's joint ventures; (7) the Creator Fund;[26] (8) the

---

[26] During 2018, the Company launched a fund (the "Creator Fund") that previously made investments in recipients of WeWork's "Creator Awards" and other investments through use of a venture capital strategy. A wholly-owned subsidiary of the Company was the managing member of the Creator Fund. As of September 17, 2020, the Creator Fund had received contributions from SoftBank Group Capital Limited totaling $72 million, representing 99.99% of the interest of the Creator Fund. In September 2020, the Company agreed to transfer its rights as managing member and all of its other rights, titles, interests, obligations and commitments in respect of the Creator Fund to an affiliate of SoftBank Group Corp. Accordingly, as of the Petition Date, the Company no longer has a variable interest in and is no longer the primary beneficiary of the Creator Fund.

94

Unsecured Notes and the payments thereunder; (9) the Softbank Secured Notes and the payments thereunder; (10) the SoftBank Parties' role as co-obligor under the LC Facility Credit Agreement and party to the Prepetition Reimbursement Agreement, including payments made thereunder; (11) the 2021 de-SPAC transaction; and (12) the Notes Exchange Transaction and available alternatives.

Potential claims being evaluated in connection with these transactions include claims for, among other things, (a) fraudulent transfer; (b) preference; (c) breach of fiduciary duty and aiding and abetting breach of fiduciary duty; (d) fraud; (e) recharacterization; and (f) equitable subordination.  In addition, the Independent Investigation has been evaluating claims raised by parties in interest, including the claims raised in the Examiner Motion (as defined herein) and the Committee Standing Motion.

With respect to such potential claims, MTO and Province have evaluated, among other issues, WeWork's financial condition at the time of transactions; whether WeWork received reasonably equivalent value; the relationship and course of dealing between WeWork and the Related Parties; the governance and decision making process with respect to each transaction, including whether transactions were approved by independent directors, such as a Former Special Committee; whether any fairness opinions were issued or independent legal or financial advice provided with respect to a transaction; whether the transactions were entered into in the ordinary course of business and on market terms; and the effect each transaction or decision had on WeWork and its stakeholders.  MTO has also analyzed potential defenses to any potential claims asserted on these transactions, including releases in prior settlement agreements in 2019 and 2021, statutes of limitations, and the "safe harbor" defense under section 546(e) of the Bankruptcy Code.

MTO and Province have regularly provided updates to, and received direction from, the Special Committee, regarding the Independent Investigation.  The Plan provides that the releases and exculpation are subject to the Special Committee's Independent Investigation.  The Special Committee has engaged in an ongoing analysis with MTO and Province of the terms of the Plan and the positions of various constituents and the course of action that will maximize the value of the Debtors for the benefit of its stakeholders in light of the merits of and defenses to any potential claims, the potential incremental recoveries to the Debtors' estates from pursuit of potential claims, the impact on recoveries of any potential claims, the cost and delay of litigation of any potential claims, the value of preserving a going concern reorganization of the Debtors to overall value and to secured creditors and unsecured creditors such as landlords, trade creditors, and employees, the liquidation value of the Debtors, the ability to obtain financing to preserve going concern value of the Debtors and to fund any going concern reorganization of the Debtors at emergence, the ability to obtain such funding while litigating the potential clams, and the compromises and value incorporated into the Plan under the existing RSA.

In addition to the Independent Investigation, the Special Committee, with the advice of MTO and Province, has been independently monitoring and reviewing matters in connection with the restructuring of the Debtors that involves Related Parties, including, among other things, tax matters relating to the restructuring, the entry into the RSA, and the terms of the Interim and Final Cash Collateral Orders, the DIP LC/TLC Facility, and additional postpetition debtor-in-possession or exit financing.

95

**M.    Litigation Matters**

1.    General Litigation

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

2.    Motion to Enforce Automatic Stay Against Hudson's Bay Company

Debtor WeWork Canada LP ULC ("WeWork Canada") and Hudson's Bay Company ULC ("HBC") are parties to a Management Agreement, dated as of July 31, 2018, pursuant to which WeWork Canada operates a flexible workspace center at 176 Yonge Street in Toronto, Ontario ("176 Yonge"), in exchange for certain compensation paid to HBC.  On November 30, 2023, when the Debtors were scheduled to move Debtor-owned furniture from 176 Yonge to another location in Toronto, Ontario (the "Move"), HBC prevented the Debtors from using the freight elevators to complete the Move.

On December 2, 2023, the Debtors filed *Debtors' Motion for Entry of an Order (I) Enforcing the Automatic Stay, (II) Ordering Hudson's Bay Company to Cease All Violations of the Automatic Stay, and (III) Granting Related Relief* [Docket No. 305] (the "Stay Violation Motion"), seeking to enforce the automatic stay and prevent HBC from further interfering with the Move.  After productive negotiations, the Debtors and HBC came to agreement on a form of order that was submitted to the Bankruptcy Court (the "Agreed Order").  On December 4, 2023, the Bankruptcy Court entered the Agreed Order granting the majority of the relief requested in the Stay Violation Motion [Docket No. 310].

3.    Dataminr, Inc.'s Motion to Confirm Rejection of Membership Agreement

On December 29, 2023, Dataminr Inc. ("Dataminr") filed the *Motion of Dataminr, Inc. For Order Confirming Debtors' Rejection of Executory Contract* [Docket No. 532] (the "Dataminr Motion"), seeking to confirm that because one Debtor, 6 East 32nd Street WW Q LLC, rejected its sublease with Dataminr pursuant to the Rejection Motion where Dataminr was the space provider, another Debtor, 135 Madison Avenue Tenant LLC (the premises thereof, "135 Madison Avenue"), has also rejected its membership agreement with Dataminr where Dataminr was the space user.

After the Dataminr Motion was filed, the Debtors and Dataminr engaged in good-faith, arm's length negotiations and reached a settlement (the "Dataminr Settlement") pursuant to which, among other things, Dataminr will (i) vacate 135 Madison Avenue on or before February 29, 2024,

96

and (ii) pay the Debtors the February membership fee of $377,504.00 in the ordinary course of business, and the Debtors will (x) deduct $450,000.00 from Dataminr's service retainer and (y) refund Dataminr certain amounts in the event the Debtors reject the master lease of 135 Madison Avenue before February 29, 2024.  On January 23, 2024, the Bankruptcy Court entered the *Stipulation and Consent Order Between the Debtors and Dataminr, Inc.* [Docket No. 1206] approving the Dataminr Settlement.  On January 25, 2024, pursuant to the Dataminr Settlement, Dataminr withdrew the Dataminr Motion with prejudice [Docket No. 1212].

4.       Motion to Compel Wasserstein Enterprises L.L.C.'s Performance

On January 22, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling Wasserstein Enterprises L.L.C. To Perform Under the Lease, (II) Enforcing the Automatic Stay, (III) Ordering Wasserstein Enterprises L.L.C. To Cease All Violations of the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1188] (the "LC Reduction Motion"), seeking an order requiring landlord Wasserstein Enterprises L.L.C. ("Wasserstein") to reduce the aggregate amount of letters of credit posted by Debtor-tenant WW 115 W 18th Street LLC from more than $4.6 million to approximately $1.5 million.  On February 13, 2024, Wasserstein filed the *Wasserstein Enterprises L.L.C.'s Objection to Debtors' Motion for Entry of an Order (I) Compelling Wasserstein Enterprises L.L.C. To Perform Under the Lease, (II) Enforcing the Automatic Stay, (III) Ordering Wasserstein Enterprises L.L.C. to Cease All Violations of the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1358].  On April 15, 2024, the Debtors and Wasserstein reached an agreement with regard to the LC Reduction Motion.  Subject to final documentation and approval by the Bankruptcy Court, Wasserstein has agreed to reduce their letters of credit to $2,530,160.00.  An order reflecting the settlement will be submitted to the Bankruptcy Court for approval in due course.

**N.       The Examiner Motion**

On January 16, 2024, an ad hoc group of holders of the Unsecured Notes (the "Unsecured Ad Hoc Group") filed a verified statement pursuant to Bankruptcy Rule 2019.  *See* Docket No. 1149.  The Unsecured Ad Hoc Group currently consists of three members:  Antara Capital Master Fund LP, Esopus Creek Value Series Fund LP – Series "A", and HZ Investments LLC.

On February 9, 2024, the Unsecured Ad Hoc Group filed the *Motion of the Ad Hoc Group of Noteholders Requesting (I) the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code, and (II) Derivative Standing to Prosecute Estate Causes of Action* [Docket No. 1337] (the "Examiner Motion"), seeking (i) the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate certain of the Debtors' past transactions with the SoftBank Parties and the Ad Hoc Group, including the Notes Exchange Transaction, and (ii) derivative standing to pursue certain causes of action on behalf of the Debtors' estates, including the recharacterization, subordination, or avoidance of the Secured Notes held by the SoftBank Parties and the Ad Hoc Group.

On February 20, 2024, as a supplement to the Examiner Motion, the Unsecured Ad Hoc Group filed a proposed complaint setting forth the defendants and the causes of action it plans to pursue should the applicable relief it requested in the Examiner Motion be granted [Docket No. 1400].  The potential defendants are certain SoftBank Parties, the Ad Hoc Group, Cupar, and

U.S. Bank in its capacity as the trustee and collateral agent of certain Secured Notes.  The potential causes of action are (i) with respect to the SoftBank Parties, (a) recharacterization of their debts under the LC Facility and their Secured Notes as equity, (b) breach of fiduciary duty as an alleged controlling shareholder of WeWork, (c) insider preference in connection with the Notes Exchange Transaction; (ii) with respect to the Ad Hoc Group and Cupar, aiding and abetting the SoftBank Parties' alleged breach of fiduciary duty; (iii) with respect to the SoftBank Parties and the Ad Hoc Group, unjust enrichment; (iv) with respect to the SoftBank Parties, the Ad Hoc Group, and Cupar, equitable subordination of their claims on account of their holdings of Secured Notes; (v) with respect to all potential defendants, (a) intentional and/or constructive fraudulent transfer in connection with the Notes Exchange Transaction and (b) disallowance of certain claims.

As of the date hereof, Examiner Motion is scheduled for a hearing on a date to be determined.

## O.    Miscellaneous Matters

### 1.    Stipulation with Community Matters Holdings, Inc. and Bending Spoons S.P.A.

A Debtor entity held 10 shares (the "MeetUp Shares") in MeetUp Holdings, Inc., an indirect subsidiary of Community Matters Holdings, Inc. ("CMH"), and was a party to that certain stockholders' agreement (the "CMH Stockholders' Agreement") with CMH pursuant to which CMH could issue a call notice (the "CMH Call Notice") to convert the MeetUp Shares into shares of CMH (the "CMH Shares").  CMH entered into an agreement (the "CMH Merger Agreement") that would result in a subsidiary of Bending Spoons S.p.A. being merged with and into CMH (such transaction, the "Bending Spoon Merger").  Prior to the signing of the CMH Merger Agreement, CMH effectively issued the CMH Call Notice and converted the 10 MeetUp Shares into 4,500,000 CHM Shares (the "CMH Exchange").  On the terms and subject to the conditions set forth in the CMH Merger Agreement, the Debtor entity holding the MeetUp Shares is entitled to receive its proportionate share of the merger consideration, which amounts to several million dollars.

On January 8, 2024, the Debtors filed the *Debtors' Amended Application in Lieu of Motion in Support of Entry of Stipulation and Consent Order Between the Debtors, Community Matters Holdings, Inc., And Bending Spoons S.P.A.* [Docket No. 1122] (the "CMH Stipulation"), seeking the Bankruptcy Court's approval of the CMH Call Notice and the CMH Exchange.  The Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee all supported the CHM Stipulation and the consummation of the Bending Spoon Merger.  On January 17, 2024, the Bankruptcy Court entered an order approving the CHM Stipulation, the CHM Call Notice, and the CHM Exchange [Docket No. 1160].

### 2.    Stipulation with Certain State Court Plaintiffs

Throughout the course of these Chapter 11 Cases, the Debtors filed, and the Bankruptcy Court approved, various stipulations with state court plaintiffs that modified the automatic stay to allowed the latter to prosecute personal injury actions in state courts, with recovery from any judgment or settlement limited solely to the proceeds of the Debtors' insurance coverage and/or any excess insurance coverage that were in effect on the date of the alleged injury, insofar as such

proceeds are not assets of the Debtors' estates or otherwise available for distribution to the Debtors' creditors. *See* Docket No. 1196 (stipulation with Michael Miller); Docket No. 1284 (the Bankruptcy Court's order approving the same); Docket No. 1416 (stipulation with Alex Olivera Arteaga); Docket No. 1448 (the Bankruptcy Court's order approving the same).

### 3.      Certain De Minimis Settlements

Pursuant to the De Minimis Settlement Procedures, the Debtors have entered into certain *de minimis* settlements, including with respect to disputes regarding membership agreements.

### P.      The Canadian CCAA Recognition Proceeding

The Debtors' operations in Canada are primarily run through a number of Canadian entities:  (i) WeWork Canada GP ULC and WeWork Canada LP ULC are Canadian unlimited liability corporations; (ii) 700 2 Street Southwest Tenant LP, 4635 Lougheed Highway Tenant LP, and 1090 West Pender Street Tenant LP are Canadian limited partnerships; and (iii) 9670416 CANADA Inc. is a Canadian corporation (the entities listed in (i)–(iii), collectively, the "Canadian Debtors").  WeWork Inc. is the ultimate parent and holds substantially all of the economic interests in the Canadian Debtors.

On November 7, 2023, WeWork Inc., in its capacity as the proposed foreign representative (the "Foreign Representative")[27] of the Chapter 11 Cases, brought an application before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") for an order (the "Interim Stay Order") pursuant to the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 as amended (the "CCAA"), and obtained the Interim Stay Order, among other things, granting a stay of proceedings in respect of the Canadian Debtors and WeWork Companies U.S. LLC (as the a guarantor of the Canadian Debtors' lease obligations in Canada).  On November 8, 2023, WeWork Inc., was appointed as the Foreign Representative by the Bankruptcy Court pursuant to the Foreign Representative Motion for the purposes of the ancillary recognition proceeding in Canada (the "Canadian Proceeding").

The purposes of the Canadian Proceeding have been to obtain an initial recognition order and various supplemental orders:

- declaring WeWork Inc. as the Foreign Representative with respect to the Chapter 11 Cases in the Canadian Proceeding;

- declaring the Chapter 11 Cases as a "foreign main proceeding" under the applicable provisions of the CCAA;

---

[27]    A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding with respect to a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

99

- staying all proceedings with respect to the Canadian Debtors' respective directors and officers, business and property, and in respect of WeWork Companies U.S. LLC, to, among other things, protect the Debtors' assets and operations in Canada;

- appointing Alvarez & Marsal Canada Inc. as the information officer in respect of the Canadian Proceeding, with a responsibility as a Court-appointed officer to, among other things, report material developments in the Chapter 11 Cases to the Canadian Court;

- recognizing in Canada certain interim, final, and other orders entered by the Bankruptcy Court in the Chapter 11 Cases that are applicable to the Canadian Debtors, including the Automatic Stay Order [Docket No. 104]; and

- providing other necessary protection for the Canadian Debtors' property or the interests of the Canadian Debtors' creditors.

On November 16, 2023, the Canadian Court granted the order declaring Debtor WeWork Inc. as the Foreign Representative in respect of the Chapter 11 Cases in the Canadian Proceeding and granted the other relief referenced above. On November 16, 2023, December 14, 2023, January 18, 2024, and February 22, 2024, respectively, the Canadian Court recognized and gave full force and effect in Canada to certain Interim First Day Orders, Final First Day Orders, Second Day Orders, and certain other orders by the Bankruptcy Court, including the Automatic Stay Order, the DIP Order, the Final Cash Collateral, certain orders approving the Debtors' assumption or rejection of certain executory contracts and unexpired leases, the Cushman Stipulation, the Final Cash Management Order, and the Bar Date Order. The Canadian Debtors, through the Foreign Representative, will continue to seek formal recognition of relevant Bankruptcy Court orders for the remainder of these Chapter 11 Cases.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

2.      There Is a Risk of Termination of the RSA

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the Confirmation and Consummation of the Plan, the appointment of a chapter 11 trustee in, the dismissal of, or the conversion to a case under chapter 7 of the Bankruptcy Code of, one or more Chapter 11 Cases, and breaches by the Debtors and/or the Required Consenting Stakeholders of their respective obligations under the documents.  In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

3.      The RSA Is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy

There are certain material conditions that must be satisfied under the RSA, including the timely satisfaction of milestones in the Chapter 11 Cases (unless otherwise agreed to by the Debtors and the required Consenting Stakeholders).  The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

101

4.      The Debtors May Not Be Able to Obtain New Money Financing

As of the date hereof, the Debtors and the Consenting Stakeholders are still negotiating the terms of the DIP New Money Facility and there is no guarantee that the Debtors and the Consenting Stakeholders will reach an agreement with respect thereto.  In the event that the Debtors do not obtain the DIP New Money Facility, the Debtors believe that they have sufficient cash on hand to fund the remainder of the Chapter 11 Cases.  In order to emerge from the Chapter 11 Cases and confirm the Plan, however, the Debtors anticipate needing to raise new money financing to pay all claims of a kind specified in section 507(a)(2) of the Bankruptcy Code in full in cash on the Effective Date of the Plan pursuant to section 1129(a)(9) of the Bankruptcy Code.  Absent the Bankruptcy Court's approval of the DIP New Money Facility, the Rights Offering, or other exit financing, the Debtors' ability to satisfy the requirement of section 1129(a)(9) of the Bankruptcy is subject to risks and uncertainties.

5.      The Creditors' Committee's Standing Motion And/or the Examiner Motion May Be Granted.

As of the date hereof, both the Creditors' Committee's Standing Motion and the Examiner Motion are scheduled for a hearing on a date to be determined.  The Debtors and the Consenting Stakeholders continue to engage in good-faith negotiation with both the Creditors' Committee and the Unsecured Ad Hoc Group regarding a consensual resolution of their respective motions. Nevertheless, there is no guarantee that a consensual resolution on either motion can be achieved, or that the Bankruptcy Court would deny one or both motions, even though the Debtors believe that both motions are without merit.  The Bankruptcy Court's entry of an order granting one or both motions would constitute a termination event under the RSA and would cause significant disruption to the Debtors' reorganization process, including, without limitation, significantly delaying the Debtors' emergence from the Chapter 11 Cases or forcing the Debtors to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

6.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

7.      [The Conditions Precedent to the Rights Offering May Not Occur

As more fully set forth in the Rights Offering Documents, the consummation of the Rights Offering is subject to a number of conditions precedent.  Additionally, if these conditions precedent are not satisfied or waived, the Rights Offering may not be conducted or consummated. If the Debtors and the Required Consenting Stakeholders in good faith determine that additional funding is necessary or desirable through the consummation of the Rights Offering, and the

consummation of the Rights Offering thereby becomes a condition precedent to the Effective Date, the Effective Date may not take place if the Rights Offering, if any, is not consummated.]

### 8.  The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan.  In any event, the Debtors do not believe that any such alternative chapter 11 plan or transaction exists or is likely to exist that would be more beneficial to the Estates or Holders of Claims than the Plan.

### 9.  The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

Confirmation of the Plan is also subject to certain conditions as described in Article XII of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, that is less favorable than the treatment currently provided in the Plan. Such a less favorable treatment could include distribution of property with a value less than what is currently provided for in the Plan or no distribution whatsoever under the Plan.

### 10.  The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and,

as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses related to professional compensation.

11.     The Debtors May Continue to Face Certain Risks Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic and geopolitical conditions, changes in the broader commercial real estate industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  See [Article VIII.C] of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

12.     The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

13.     One or More of the Chapter 11 Cases May Be Dismissed

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack a reasonable likelihood of rehabilitation or the ability to

104

effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which inability may ultimately result in significantly reduced distributions to creditors relative to those provided for in the Plan.

14.    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

15.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX.A of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived by the Debtors and the Required Consenting Stakeholders pursuant to Article IX.B of the Plan, the Effective Date will not take place.

16.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

17.    Risk that Foreign Courts Will Not Enforce the Confirmation Order

After the Effective Date, the Reorganized Debtors will maintain business operations in certain Non-U.S. jurisdictions, including Canada. Additionally, implementation of the Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain affiliates of the Debtors or Reorganized Debtors incorporated in

105

certain foreign jurisdictions, including in Canada.  There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

### 18.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

### 19.     Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May be Less Favorable to Certain of the Debtors' Constituencies than the Plan

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the petition date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims or Interests.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

20.    The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts and Unexpired Leases

The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, subject to certain exceptions.  The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible.  However, with respect to some limited classes of executory contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the Executory Contract or Unexpired Lease.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the Executory Contracts or Unexpired Leases unattractive.  The Debtors would then be required to either forego the benefits offered by such Executory Contract or Unexpired Leases or to find alternative arrangements to replace them.

21.    Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer."  A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value for the property transferred.  A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the date of filing of the bankruptcy petition or one year before the date of filing of the petition if the creditor, at the time of such transfer, was an insider.  If any transfer is challenged in the Bankruptcy Court and found to have occurred with respect to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer, which may impact recoveries under the Plan.

22.    The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated by the Debtors

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' Estates may be materially higher than the Debtors have estimated, which may materially reduce the recovery of each Holder of Allowed General Unsecured Claims, if any.[28]

23.    The Total Amount of Allowed Administrative and Priority Claims May Be Higher than Anticipated by the Debtors

The amount of Cash the Debtors ultimately receive prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims may be higher than anticipated.[29]  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash

---

[28]    *See* [Articles III.L and VII.P] of this Disclosure Statement.

[29]    *See* [Article VII.P] of this Disclosure Statement.

107

all Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

24.   The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation

The Debtors reserve the right, prior to the Confirmation or substantial consummation of the Plan, subject to the provisions of section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment, waiver, or modification on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments, waivers, or modification required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**B.   Risks Related to Recoveries Under the Plan**

1.   The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections (as defined herein) to be attached hereto will represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry in which the Debtors operate, including the commercial real estate industry, in particular.  The inclusion of the Financial Projections should not be regarded as an indication that the Debtors or any other person considered, or now consider, the Financial Projections to be a reliable prediction of future events, and does not constitute an admission or representation by any person that the expectations, beliefs, opinions, and assumptions that underlie such forecasts remain the same as of the date of this Disclosure Statement, and readers are cautioned not to place undue reliance on the Financial Projections.  While the Debtors believe that the Financial Projections to be contained in this Disclosure Statement are reasonable, the Financial Projections are forward-looking in nature and relate to multiple future years and such information, by its nature, becomes less predictive with each succeeding day.  There can be no assurance that the Financial Projections will be realized.  Actual future financial results may vary from such forward-looking information in a material way.  The Financial Projections only speak as of the date they are made and the Debtors are not under any obligation, and expressly disclaim any obligation, to update, alter or otherwise revise the Financial Projections.  If the Reorganized Debtors do not achieve their projected financial results, the value of the New Interests may be negatively affected and the

Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

> 2. <u>If the Restructuring Transactions are consummated, Certain Significant Holders of Shares of New Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date</u>

Holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Interests may be in a position to influence matters requiring approval by the holders of shares of New Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  The holders may have interests that differ from those of the other holders of shares of New Interests and may vote in a manner adverse to the interests of other holders of shares of New Interests.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Interests.  In addition, a holder of a significant number of shares of New Interests may sell all or a large portion of its shares of New Interests within a short period of time, which sale may adversely affect the trading price of the shares of New Interests.  A holder of a significant number of shares of New Interests may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by holders of a significant number of shares of New Interests may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

> 3. <u>Estimated Valuation of the Exit Facilities, the New Interests, and Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values</u>

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (i) the successful reorganization of the Debtors; (ii) an assumed date for the occurrence of the Effective Date; (iii) the Debtors' ability to maintain adequate liquidity to fund operations; (iv) the assumption that capital and equity markets remain consistent with current conditions; and (v) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

> 4. <u>The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful</u>

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level

109

of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

5.     The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court

The terms of the Exit Facilities Documents have not been finalized and are subject to negotiations between the Debtors and, among others, the Consenting Stakeholders.  The results of such negotiations may affect the rights of the holders of the New Interests following the Effective Date.  As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

6.     A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable.  Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

7.     The New Interests Are Subject to Dilution

The ownership percentages represented by the Prepetition Secured Equity Distribution and the Exit New Money Shares, respectively, are subject to dilution on account of the New Money Equity Distribution, the MIP, the Equity Election, and the DIP TLC Fee Equity Distribution.

8.     Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors

Holders of Allowed Claims should carefully review [Article XII] of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

110

**C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on or refinance their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities upon emergence.

2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (i) the ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan or an alternative transaction; (ii) the ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) the ability to maintain relationships with suppliers, service providers, customers, employees, vendors, landlords, and other third parties; (iv) the ability to maintain contracts that are critical to the Debtors' operations; (v) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (vi) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (vii) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, landlords, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will require prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

The Debtors' future performances will depend upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management and other key personnel will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations, and the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

Further, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.      Financial Results May Be Volatile and May Not Reflect Historical Trends

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Interests and the ability of the Debtors to make payments with respect to their indebtedness. In particular, if the Debtors fail to realize target levels of rent reductions as part of the Debtors' ongoing negotiations with landlords, the Debtors' financial results would be negatively impacted.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract and lease terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviation from the Debtors' existing business plan would likely lead to variance from the Financial Projections.

5.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6.    The Debtors' Substantial Liquidity Needs May Impact Revenue

If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for and prosecuting the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including their ability to meet ongoing operational obligations, will depend, among other things, on:  (i) their ability to comply with the terms and conditions of the DIP Orders and Cash Collateral Orders; (ii) their ability to maintain adequate cash on hand; (iii) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (iv) the cost, duration, and outcome of the Chapter 11 Cases.  In the event that cash on hand, cash flow from operations, and cash provided through access to cash collateral are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited,

113

if available at all.  The Debtors can provide no assurance that such conditions will be satisfied. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

7.     <u>Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks</u>

Holders of Common Shares in WeWork Parent will not receive any distribution on account of such Parent Interests.  Accordingly, any trading in the Debtors' securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of Parent Interests.  In particular, the New York Stock Exchange has suspended the trading of Parent Interests on account of the Chapter 11 Cases since the Petition Date.

8.     <u>The Debtors' and the Reorganized Debtors' Operation and Business May Be Impacted by the High Interest Rates, the Changing Commercial Real Estate Market, and the Reduced Demand for Office Space</u>

The combined effects of the COVID-19 pandemic and rising interest rates have had and could continue to have a long-lasting and significant impact on the commercial real estate market and the flexible workspace industry in general, and the Debtors' and the Reorganized Debtors' business in particular.  The historically rapid rise in interest rates, in combination with slower than expected return to office post-COVID, has pressured liquidity and driven increasing economic distress in the commercial real estate sector.  At the same time, demand for office space has receded as businesses continue to follow hybrid work policies first adopted in the pandemic.  As a result, landlords are more willing than in the past to reduce rent and offer flexible leasing terms, and many office tenants are adjusting to the global shift to hybrid work by consolidating their footprints and attempting to sublease their excess space, often at a rent significantly discounted to their original cost.  Consequently, commercial office space, especially in large cities where WeWork operates, has become available and accessible at unprecedented prices and in significant volume, which amounts to greater competition in the Debtors' and the Reorganized Debtors' target market.

The high interest rate, the heightened competition in the commercial real estate landscape and flexible workspace industry, and the reduced demand for office space may persist after the Reorganized Debtors emerge from bankruptcy, and may continue to have a materially adverse effect on the Reorganized Debtors' businesses, financial condition, results of operations, and prospects.

9.     <u>The Loss of Member Companies Could Adversely Affect the Debtors' Operations</u>

The Debtors' and the Reorganized Debtors' business are dependent on maintaining a stable base of Member Companies.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for Member Companies.  At the same time, the supply of flexible workspace as well as competitors' attempts to target Member Companies of the Debtors have increased.  As a result, the Debtors may experience increased levels of Member Company attrition.  In the short term, it may be difficult for the Debtors to find immediate replacements, and

114

the loss of Member Companies could adversely affect the Debtors' and the Reorganized Debtors' businesses and the results of operations.

> 10.   The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods

The Debtors' business operations are subject to risks associated with fluctuations in currency exchange rates. The Reorganized Debtors' expected reporting currency will be U.S. dollars. A large portion of the Debtors' revenue, assets, and liabilities is currently denominated in currencies other than the U.S. dollar, including Pound Sterling and euro. Changes in exchange rates will affect the value of the reported earnings and the value of those assets and liabilities denominated in foreign currencies and may also impact operating expenses where such operating expenses are in a currency other than the currency in which financing is obtained or in which revenue is generated.

> 11.   The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time-consuming to bring or defend against. Such litigation could result in settlements or judgments that could significantly affect the Reorganized Debtors' financial results. It is not possible to predict the potential litigation the Reorganized Debtors may become party to or the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

> 12.   The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers and a skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and other key employees. As a result, the Debtors may experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

D.      **Risks Related to the Offer and Issuance of Securities Under the Plan**

1.      The Reorganized Debtors Do Not Intend to Register the Offer or Sale of New Interests and Certain Holders of the New Interests May be Restricted in their Ability to Transfer or Sell their Securities

The Reorganized Debtors do not intend to register the New Interests issued under the Plan under the Securities Act or any Blue-Sky Laws. As a result, certain of the New Interests may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

To the extent that the New Interests issued under the Plan may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, that such New Interests may not be freely resold under the Securities Act if, at the time of transfer, the holder is an "affiliate," as defined in Rule 144(a)(1) of the Securities Act, of the Reorganized Debtors or has been such an "affiliate" within 90 days of such transfer. Further, resales by Holders of Claims or Interests (as applicable) who receive such securities pursuant to the Plan and are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration under the Securities Act if they can comply with an applicable exemption from registration under the Securities Act.

To the extent that the New Interests are issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. [In addition, the New Interests are not expected to be registered under any local or state securities Laws.] The Debtors make no representation regarding the right of any holder of New Interests to freely transfer or resell the New Interests. Resale restrictions and other restrictions on transfer are discussed in more detail in Article [XII] of this Disclosure Statement, entitled "Certain Securities Law Matters." Further, the New Corporate Governance Documents may also impose certain restrictions on transfer of the New Interests.

2.      A Liquid Trading Market for the Shares of the New Interests May Not Develop

The New Interests will be a new issuance of securities, and there is no established trading market for the New Interests. The Reorganized Debtors do not intend to apply to list the New Interests on a recognized U.S. securities exchange (or comparable non-U.S. securities exchange) on or about the Effective Date. Although the Reorganized Debtors may apply to list the New Interests on a recognized securities exchange in the future, the Debtors make no assurance that they may make such an application or, even if such an application is made, that they will be able to obtain such a registration or listing for the New Interests in the future. Even if the Debtors do, a liquid trading market for shares of the New Interest may not develop. The liquidity of any market

116

for shares of the New Interests will depend upon, among other things, the number of holders of shares of the New Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Interests will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell the New Interests may be substantially limited, and the price for shares of the New Interests may decline or may be considered unfavorable. You may be required to bear the financial risk of your ownership of the New Interests indefinitely.

If the New Interests are not listed on a national securities exchange, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and holders of the New Interests will not be entitled to any information except as expressly required by the New Corporate Governance Documents. As a result, the information that the Debtors are required to provide in order to issue the New Interests may be less than the Debtors would be required to provide if the New Interests were registered under the Exchange Act (as defined herein) or listed on a national securities exchange. Among other things, the Debtors may not be required to provide: (i) separate financial information for any subsidiary; (ii) selected historical consolidated financial data of WeWork; (iii) selected quarterly financial data of WeWork; (iv) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Interests.

3.     The Trading Price for the Shares of the New Interests May Be Depressed Following the Effective Date

Following the Effective Date, it is expected that Reorganized WeWork will issue the New Interests, including pursuant to the MIP. Following the Effective Date, shares of the New Interests may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, Holders of the New Interests may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of the New Interests available for trading could cause the trading price for the shares of the New Interests to be depressed, particularly in the absence of an established trading market for the New Interests.

4.     Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan (including the New Interests) are not covered by section 1145 of the Bankruptcy Code, such securities shall be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. Any securities issued pursuant to Section 4(a)(2) under the Securities Act, including the New Interests, will be deemed "restricted securities" (as defined under the Securities Act and the rules

117

promulgated thereunder) that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered under the Securities Act and may not resell them except in accordance with an available exemption from registration under the Securities Act.

Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale. Such current public information is not expected to be available on or about the Effective Date. An affiliate, or a non-affiliate who has been an affiliate of the issuer during the preceding three months, may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities may be required to hold their restricted securities for at least one year and potentially indefinitely.

Given that whether any particular person would be an affiliate depends on various facts and circumstances applicable to that person, the Debtors make no representation concerning the ability of a person to dispose of the securities issued under the Plan. Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal, state, or non-U.S. securities laws and the circumstances under which securities may be sold in reliance on such laws.

## IX.    SOLICITATION AND VOTING PROCEDURES[30]

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines (the "Solicitation and Voting Procedures") are set forth in Exhibit 2 attached to the Disclosure Statement Order.

**THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.**

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS
> SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER
> ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION
> OF THE SOLICITATION AND VOTING PROCESS.

---

[30]    [To be updated per Solicitation and Voting Procedures]

118

### A.      Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in [Article III.D] of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table in [Article III.D] of this Disclosure Statement, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in [Classes 3A, 3B, 4A, 4B, 5, 6, 7, and 8] (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in [Classes 1, 2, 9, 10, 11, 12, or 13].  [Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been or will be paid pursuant to a separate order of the Bankruptcy Court, are not entitled to vote to accept or reject the Plan].

### B.      Voting Record Date

**The Voting Record Date is [April 22], 2024**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.      Voting on the Plan

**The Voting Deadline is [May 23], 2024, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Claims Agent on or before the Voting Deadline:

---

### DELIVERY OF BALLOTS

Holders of Claims in the Voting Classes may submit their Ballots via:

---

**First Class Mail, Overnight Courier, or Hand Delivery:**

WeWork Inc Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

---

---

**Electronic, Online Submission:**

To submit your Ballot via the Claims Agent's online portal, visit
https://dm.epiq11.com/WeWork, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.**

Ballots submitted to the Claims Agent by any means other than expressly provided for in the
Solicitation and Voting Procedures, including email, facsimile, or electronic means other than
the online voting portal, *shall not be valid and will not be counted.*

---

D.      **Ballots Not Counted**

**The following Ballots shall not be counted in determining the acceptance or rejection
of the Plan**:   (i) any Ballot that is illegible or contains insufficient information to permit the
identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a
Claim in a Voting Class; (iii) any unsigned Ballot or Ballot lacking an original signature (for the
avoidance of doubt, a Ballot submitted via the Claims Agent's online balloting portal, and Master
Ballots submitted via email, shall be deemed to contain an original signature); (iv) any Ballot not
marked to accept or reject the Plan or marked both to accept and reject the Plan; (v) any Ballot
transmitted by any other means not specifically approved pursuant to the  Disclosure Statement
Order or contemplated by these Solicitation and Voting Procedures or by separate order of the
Court; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the
Debtors' advisors (other than the Claims Agent); and (vii) any Ballot submitted by any Entity not
entitled to vote pursuant to the Solicitation and Voting Procedures. **Please refer to the Disclosure
Statement Order for additional requirements with respect to voting to accept or reject the
Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING
PROCESS, PLEASE CONTACT THE CLAIMS AGENT AT**

**Toll Free within U.S. and Canada: +1 (877) 959-5845
International: +1 (503) 852-9067
Email:  weworkinfo@epiqglobal.com,
with reference "WEWORK" in the subject line**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT
BE COUNTED.**

---

## X.    CONFIRMATION OF THE PLAN

### A.    The Combined Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  At the Combined Hearing, in addition to seeking Confirmation of the Plan, the Debtors will also seek final approval of the Disclosure Statement.  The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

**The Combined Hearing is scheduled for [May 30, 2024, at [●] a.m.], prevailing Eastern Time, subject to the Bankruptcy Court's availability.  The deadline to file an objection to the confirmation of the Plan or the final approval of the Disclosure Statement (the "Combined Objection Deadline") is [May 28, 2024, at 4:00 p.m.], prevailing Eastern Time.**  Within one business days after the Bankruptcy Court conditionally approves the adequacy of this Disclosure Statement and permits the Debtors to solicit votes for the Plan, the Debtors will publish a notice of the Voting Deadline, the Combined Objection Deadline, and the time of the Combined Hearing in *The New York Times* (national edition) and the *Financial Times* (global edition).

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (i) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

#### 1.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the

121

plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[31]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Pursuant to [Article III.E] of the Plan, if a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

2.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one (1) impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, by utilizing the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  The Debtors reserve all rights to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code and in each case in accordance with the terms of the RSA, including any consent rights set forth therein.

(a)      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent but rather that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number

---

[31]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

of factors in determining whether a plan discriminates unfairly. A plan could treat two (2) classes differently without unfairly discriminating against either class.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured claims versus unsecured claims). For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2) of the Bankruptcy Code. Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest. Additionally, for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claim).

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. In the event any Debtor does not have one or more Impaired Classes of Claims, all Classes of Claims against such Debtor are presumed to have accepted the Plan. With respect to the "no unfair discrimination" requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. As to the "fair and equitable requirement," with respect to each class that is deemed to reject the Plan, no class of claims or interests junior to such a class will receive any distribution under the Plan on account of such junior claims or interests, and no class of creditors will receive more than 100% of its claim. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors are preparing their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"), to be filed at a later date. Creditors and other interested parties should review Article [VIII] of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based on the Financial Projections to be filed, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

123

### 4. Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirm a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Debtors intend to file a liquidation analysis (the "Liquidation Analysis") at a later date. As will be reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## XI.    CERTAIN SECURITIES LAW MATTERS[32]

As discussed herein, the Plan [and the Plan Supplement] provide for the offer, issuance, sale, and distribution of New Interests to certain Holders of prepetition Claims against the Debtors. The Debtors believe that the class of New Interests will be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.

Except as otherwise provided herein, in the Plan, and in the Plan Supplement, the New Interests issued under the Plan will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) to the maximum extent permitted by law or (ii) to the extent such exemption is not available, including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws.  The Debtors believe the shares of the New Interests, the options, or other equity awards (including any New Interests underlying such awards) to be issued pursuant to the post-emergence MIP will be issued pursuant to Section 4(a)(2) under the Securities Act, Regulation D promulgated thereunder and/or another available exemption from registration under the Securities Act, and will be considered "restricted securities."  Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

---

[32]    Article XI "Certain Securities Law Matters" remains subject to ongoing review and update in all respects.

124

### A.      Issuance of Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or an affiliate thereof participating in the plan or reorganization, or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or an affiliate thereof participating in the plan of reorganization, or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the New Interests should satisfy the requirements of section 1145(a) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder.  Accordingly, no registration statement will be filed under the Securities Act or any local or state securities laws with respect to the initial offer, issuance, and distribution of New Interests.  Recipients of the New Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable Blue-Sky Laws, other local law.  As discussed below, the exemptions provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.      Subsequent Transfers

1.      Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code.

Subject to the limitations in the New Corporate Governance Documents, any New Interests, to the extent that such issuance is exempt under section 1145 of the Bankruptcy Code (collectively, the "Section 1145 Securities"), (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:"  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities

125

could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of the Section 1145 Securities who are deemed to be "underwriters" may be entitled to resell their Section 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public resale of securities received by such Person if the required holding period has been met and, in certain cases, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Section 1145 Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Section 1145 Securities and, in turn, whether any Person may freely trade such Section 1145 Securities. Moreover, it is not expected that Reorganized WeWork Parent will have adequate current public information on or about the Effective Date, and, as a result, Rule 144 may not be available for resales of Section 1145 Securities by holders deemed to be "underwriters."

Further, even if issued pursuant section 1145 of the Bankruptcy Code, the Section 1145 Securities may not be freely resold if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate." Affiliate considerations are discussed further below.

126

2.      [Subsequent Transfers After Reorganized Debtors' issuance of Securities
pursuant to Section 4(a)(2) of the Securities Act.]

[Unlike any shares of New Interests that may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, certain shares of the New Interests or certain other Securities will be issued in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act) (collectively, "4(a)(2) Securities"), subject to, in each case, other applicable securities Laws. Such 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred under the Securities Act unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.]

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is an issuer subject to the reporting requirements of section 13 or 15(d) of the Exchange Act and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer who has not been an affiliate of the issuer during the preceding 90 days may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 (as amended, the "Exchange Act") during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.  It is not expected that Reorganized WeWork Parent will have adequate current public information on or about the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than

127

$50,000, an affiliate must file or cause to be filed with the SEC an electronic notice of proposed sale on Form 144.

The Rule 144 exemption may not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) if the required public information regarding the issuer to permit the use of Rule 144 is not provided or if the Rule 144 exemption is otherwise not available. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and potentially longer. Thereafter, such holders may only sell them in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

****

*Legend*. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES [AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF SUCH SECURITIES] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above. The Reorganized Debtors reserve the right to include a customary legend for any Securities issued pursuant to section 1145 as well. The Reorganized Debtors reserve the right to stop the transfer of any shares of New Interests if such transfer would be prohibited by the New Organizational Documents.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

128

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT OR OTHER APPLICABLE LOCAL OR STATE LAW, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN, INCLUDING THE RIGHTS OFFERING SHARES (IF ANY). THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT WITH THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY TRANSFER, INCLUDING RESELL, SUCH SECURITIES.**

3.    The New Interests & MIP

The Confirmation Order shall authorize the board of directors of the Reorganized Debtors to adopt the MIP. Awards issued under the MIP that are settled in the New Interests will dilute all of the New Interests outstanding. The New Interests are also subject to dilution in connection with the conversion of any other options, convertible securities or other securities that may be issued post-emergence.

The New Interests issued pursuant to the MIP shall be 4(a)(2) Securities (as defined herein) and exempt from any registration requirements under any federal securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN[33][34]

### A.    Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the (i) consummation of the Plan[35] to the Debtors and the Reorganized Debtors and (ii) the ownership and disposition of New Interests to certain Holders (which solely for purposes of this discussion means the beneficial owners for U.S. federal income tax purposes) of certain Allowed

---

[33]   Article XII "Certain U.S. Federal Income Tax Consequences of the Plan" remains subject to ongoing review and update in all respects.

[34]   The Canadian federal income tax consequences of the consummation of the Plan to Holders (including beneficial owners) of Allowed Claims and Interests are not described herein. Holders (and beneficial owners) of Allowed Claims and Interests should consult with their own tax advisors regarding the Canadian federal, provincial, and local tax consequences to them of the consummation of the Plan, having regard to their particular circumstances.

[35]   For purposes of Article XII, references to the term "Plan" shall be deemed to include the "Plan Supplement."

129

Claims in the Voting Classes.  The following summary does not address the U.S. federal income tax consequences to (a) Holders of Allowed Claims or Interests not entitled to vote to accept or reject the Plan, Holders whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, Holders of Allowed Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan (including, for the avoidance of doubt, any Holders of Drawn DIP TLC Claims or Undrawn DIP TLC Claims), or Holders that are deemed to reject the Plan or (b) the Debtors in connection with any potential sale of assets or other potential transaction not described in the Plan.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, together with the fact that numerous elements of the corporate and capital structure of the Reorganized Debtors and distributions pursuant to the Plan have not been determined, there is substantial uncertainty regarding the tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims.  No opinion of counsel will be provided with respect to any element of the Plan.  No assurance can be given regarding the positions of any taxing authority or court regarding any element of the Plan.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed Claims in light of their individual circumstances, nor does it address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, partnerships or other pass-through entities or arrangements, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, persons subject to alternative minimum tax or subject to special accounting rules under Section 451(b) of the IRC except to the limited extent discussed herein, Holders of Allowed Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan (including, for the avoidance of doubt, any Holders of Drawn DIP TLC Claims or Undrawn DIP TLC Claims), Holders who are themselves in bankruptcy, real estate investment trusts, expatriates or former long-term residents of the United States, regulated investment companies and those holding, or who will hold, Claims, New Interests or any other consideration to be received under the Plan as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop premiums or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from those described below.  This discussion does not address any U.S. federal non-income (including estate or gift tax or the Medicare tax imposed on certain net investment income), state, local, territorial, or non-U.S. tax considerations, or considerations under any applicable tax treaty.  Furthermore, this discussion

130

assumes that a Holder of an Allowed Claim holds only Allowed Claims in a single Class and holds such Allowed Claims as "capital assets" within the meaning of Section 1221 of the IRC (generally, property held for investment).  This summary also assumes that the various debt instruments and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims described below also may vary depending on the nature and structure of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity validly treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of Section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of Section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).  Partners of any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is a Holder are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

Holders of Allowed Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  THE STRUCTURE OF THE RESTRUCTURING TRANSACTIONS IS SUBJECT TO CHANGE AND AS SUCH, THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED HEREIN ARE UNCERTAIN AND SUBJECT TO CHANGE.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, TERRITORIAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

### B.      Tax Status of Certain Debtors

For U.S. federal income tax purposes, the Debtors have taken the position that (i) WW Co-Obligor Inc. is not treated as the issuer of any of the Debtors' funded debt obligations; (ii) WeWork Companies U.S. LLC, a Delaware limited liability company ("WeWork Companies") is treated as an entity disregarded as separate from its regarded owner for U.S. federal income tax purposes; and (iii) WeWork Companies' sole owner, The We Company Management Holdings L.P., a Cayman Islands exempted limited partnership ("The We Company"), treated as a partnership for U.S. federal income tax purposes, has historically been treated as the issuer of the Debtors' funded debt obligations. The structure and issuer of the Exit Facilities (if any) will be determined upon the finalization of the Debtors' exit structure.

### C.      General Assumptions

Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the structure of Reorganized WeWork, the ownership of New Interests, certain exit financing, whether the Rights Offering will occur, whether the distribution of Exit New Money Shares will occur, and the Restructuring Transactions that will be utilized to achieve that corporate and capital structure, have not yet been determined.  Accordingly, the U.S. federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims cannot currently be known, and Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

[The following discussion assumes that: (1) Reorganized WeWork will be a corporation incorporated in the United States and (2) the Restructuring Transactions will be structured to include (a) a contribution of certain Allowed Claims to Reorganized WeWork in exchange for the New Interests, (b) the cancelation and reissuance of all of the equity of certain Reorganized Debtors to Reorganized WeWork in satisfaction of such Allowed Claims and (c) the retention by Reorganized WeWork of all or substantially all of the Debtor's existing assets (directly or indirectly).][36]  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and that any Allowed Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the IRC.  In the event that any transaction (including any transaction resulting from any sale or marketing process, including pursuant to any amended Plan) results in a taxable transaction with respect to the assets of the Debtors or any of their subsidiaries, the tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims would be materially different from what is described below.  Any such alternative transaction and the transaction steps required to implement such transaction shall be described in the Restructuring Transaction Exhibits included in the Plan Supplement.

### D.      Certain U.S. Federal Income Tax Considerations of the Plan to the Debtors

Certain of the Debtors (including The We Company) are currently treated as partnerships or as entities that are disregarded as separate from their owners for U.S. federal income tax purposes (such Debtors, the "Flow-Through Debtors").  As described above, prior to the Effective

---

[36]   The Restructuring Transactions remain subject to ongoing review.

Date, the Flow-Through Debtors include The We Company, which is treated as a partnership for U.S. federal income tax purposes and WeWork Companies, which is treated as an entity disregarded as separate from The We Company for U.S. federal income tax purposes.

[The Debtors may, on or prior to the Effective Date (and if on the Effective Date, pursuant to the Restructuring Transactions contemplated by the Plan) form a new entity ("The New We Company") that will be treated as a partnership for U.S. tax purposes. The New We Company may acquire, directly or indirectly, pursuant to one or more transactions, all, or substantially all, of the equity interests in WeWork Companies. In connection with the formation of The New We Company and its acquisition of equity interest in WeWork Companies, The New We Company is intended to be treated as a "continuation" of The We Company for U.S. federal income tax purposes. If formed prior to the Effective Date, The New We Company would be a Flow-Through Debtor.][37]

Accordingly, the U.S. federal income tax consequences to the Debtors of consummating the Plan generally will be borne by the Debtors only to the extent such consequences are allocable to one or more other Debtors that are not themselves Flow-Through Debtors under U.S. federal income tax law.  Holders of Interests in any Flow-Through Debtor (that are not themselves Debtors) should consult their own tax advisors regarding the tax consequences of the consummation of the Plan to them.

### 1.      Cancelation of Debt and Reduction of Tax Attributes

As a result of the Restructuring Transactions, Reorganized WeWork is expected to recognize a substantial amount of income as a result of cancelation of indebtedness ("CODI") of the Debtors (directly or indirectly through its ownership interest in one or more Flow-Through Debtors).  In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such CODI excluded from U.S. federal taxable income under Section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration with a fair market value less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash, (ii) the issue price of any new indebtedness issued by the Issuer and (iii) the fair market value of any consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange, except to the extent that payment of indebtedness would have given rise to a deduction or another exception is available.

However, under Section 108 of the IRC, a debtor will not be required to include any amount of CODI in its gross income (a) if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy

---

[37]      Formation of any new entities and their treatment for U.S. federal income tax purposes remains subject to ongoing review.

Exception") or (b) to the extent that the debtor is insolvent before the discharge, but only to the extent of the debtor's insolvency (the "Insolvency Exception").

Special rules apply to entities that are treated as partnerships for U.S. federal income tax purposes and partners in such partnerships that realize CODI. In particular, CODI is allocated to the partners under applicable U.S. federal income tax principles, so the Bankruptcy Exception is only available if the partner is under the jurisdiction of a court in a title 11 case. Under Section 108(d)(6) of the IRC, when an entity that is a pass-through entity (such as the Flow-Through Debtors) recognizes CODI, its partners are treated as receiving their allocable share of such CODI and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of equity in the Flow-Through Debtors (including WeWork Inc.) will be treated as receiving their allocable share, if any, as determined for U.S. federal income tax purposes, of the CODI recognized by the Flow-Through Debtors.

A debtor must reduce its tax attributes by the amount of CODI excluded from gross income under the Bankruptcy Exception or the Insolvency Exception pursuant to Section 108 of the IRC. Such reduction in tax attributes occurs on the first day of the taxable year following the taxable year in which the debt discharge occurs. In general, tax attributes will be reduced in the following order: (a) U.S. federal net operating losses (the "NOLs") and NOL carryovers; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the debtor may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the debtors will make this election. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The exact amount of CODI (if any) that will be realized by the Debtors (including whether the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any) should be considered as consideration given in satisfaction of any Allowed Claims) will not be determinable until after the consummation of the Plan. Accordingly, the Debtors are currently unable to determine the precise effect that the CODI rules will have on the Debtors and their U.S. federal income tax attributes.

2.    Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC

After giving effect to the reduction in tax attributes from excluded CODI, the ability of the Debtors to use any tax attributes post-emergence will be subject to certain limitations under Sections 382 and 383 of the IRC.

134

(a)      General Sections 382 and 383 Annual Limitations

Under Sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under Section 163(j) of the IRC ("163(j) Carryovers"), tax credit carryforwards, net unrealized built-in losses (a "NUBIL"), and possibly certain other attributes of such corporation allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future U.S. federal taxable income generally are subject to an annual limitation.  For this purpose, if a corporation has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's NUBIL will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  Based on information currently available to the Debtors, the Debtors may have a NUBIL as of the expected Effective Date.

The rules of Sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Interests pursuant to the Plan could result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses may be subject to an annual limitation, unless the special 382(l)(5) Exception (described below) applies.

(b)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: [3.45% for May] 2024).  The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change ("Recognition Period"), or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, though the Debtors do not currently anticipate these rules will apply to them as a result of their expected NUBIL.[38] If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition

---

[38]   Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Plan.

Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. Any unused portion of the Section 382 Limitation that is not used in a given year may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if subsequent to an ownership change, a corporation and its subsidiaries do not continue the corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, precluding utilization of the corporation's Pre-Change Losses (other than increases in such limitation for recognized built-in gain). Special rules (discussed immediately below) may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

(c)      Special Bankruptcy Rules.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in a case under the Bankruptcy Code receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in a case under the Bankruptcy Code) pursuant to a confirmed plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. Rather, the resulting limitation from a subsequent

136

ownership change would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception and, regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**E.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and as described above.  Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the jurisdiction of the Reorganized Debtors, the form of any New Interests issued, the jurisdiction of the issuers of any Exit Financing, whether any Rights Offering will occur and the Restructuring Transactions that will be implemented to achieve that corporate and capital structure, have not yet been determined.  Accordingly, the tax consequences of the Plan to U.S. Holders cannot currently be known, and U.S. Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

1.      General U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions

As discussed above, the capital structure of the Reorganized Debtors, and the mechanical steps being utilized to put such capital structure in place, have not yet been determined. Accordingly, the tax consequences of the Plan to Holders cannot currently be known, and Holders should consult their own tax advisors with respect to any potential tax consequences of the Plan.

As a general matter, the exchange of Allowed Claims for consideration under the Plan may be taxable either in whole under Section 1001 of the IRC (in which case all taxable gains and losses could be recognized) or in part under other provisions of the IRC (in which case it is possible that certain gains, but not losses, could be recognized, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount)).  These consequences will depend in significant part on the final mechanisms that result in the consummation of the transactions contemplated by the Plan.

To the extent any gain or loss is recognized by a U.S. Holder of an Allowed Claim upon the receipt of the consideration under the Plan in the form of New Interests, the amount of such recognition will generally depend on the difference between such U.S. Holder's adjusted tax basis in such Claim compared to the fair market value of the consideration received in exchange for such Claim (including, if applicable, the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any), if such right is properly considered as

137

consideration given in satisfaction of such Allowed Claim).  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  To the extent received in a wholly taxable exchange, such U.S. Holder should obtain an initial tax basis in the New Interests received equal to the fair market value of the New Interests as of the Effective Date and such U.S. Holder's holding period in any property received in respect of a taxable exchange will begin on the day following the Effective Date.  To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such Holder's holding period in such property should include the holding period of such Holder's underlying Claim.

To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

> 2.  U.S. Federal Income Tax Consequences to U.S. Holders of Drawn DIP TLC Claims (Class 3A) and Undrawn DIP TLC Claims (Class 3B)

As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Drawn DIP TLC Claim, on the Effective Date, each U.S. Holder of an Allowed Drawn DIP TLC Claim shall receive its Pro Rata share of the Drawn DIP TLC Equity Distribution.

As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Undrawn DIP TLC Claim, on the Effective Date, each U.S. Holder of an Allowed Undrawn DIP TLC Claim shall receive:  (i) in the case of an Excess DIP TLC Claim, payment in full in cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, conversion into obligations under the Exit LC Facility on a dollar-for-dollar basis.[39]

The Debtors understand that there is a single Holder of Claims in Classes 3A–3B and that Holder is of a type that is subject to special treatment and generally carved out from disclosure (see [Article XII.A] of this Disclosure Statement, entitled "Introduction"), such that disclosure based on a "hypothetical investor" would not be "typical" of an investor in Classes 3A–3B. Accordingly, the Debtors are not providing specific disclosure in respect of the tax consequences to the Holder of Claims in Classes 3A–3B.

---

[39]   As used herein, "New LC Equity Allocation" means New Interests equal to 1.25% of the total New Interests.

3.  U.S. Federal Income Tax Consequences to U.S. Holders of Allowed
    Prepetition LC Facility Claims and Allowed 1L Notes Claims (Class 4A
    and Class 4B)

As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Prepetition LC Facility Claim and each Allowed 1L Notes Claim, on the Effective Date, each U.S. Holder of an Allowed Prepetition LC Facility Claim and each U.S. Holder of an Allowed 1L Notes Claim shall receive its Pro Rata share of the 1L Equity Distribution (subject, in the case of Holders of Allowed 1L Notes Claims, to the Exit Commitment Netting Transaction).

The Restructuring Transactions may be structured in a manner such that the issuance of New Interests to U.S. Holders of Allowed Prepetition LC Facility Claims and Allowed 1L Notes Claims in exchange for such claims is fully taxable under Section 1001 of the IRC.  In such case, a U.S. Holder of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of the New Interests received in respect of such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim (other than any New Interests treated as received in satisfaction of accrued but unpaid interest on such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim as discussed below under "Accrued Interest") (and, if applicable, the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any), if such right is properly considered as consideration given in satisfaction of such Allowed Claim) less (b) such U.S. Holder's adjusted tax basis in such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim.  A U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date.  A U.S. Holder's holding period for the New Interests would begin the day following the exchange.  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount."  Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed Prepetition LC Facility Claim is greater than one year at the time of the exchange.  Because the obligations under Prepetition LC Facility may have arisen, and the 1L Notes were issued, within one year of the date of this Disclosure Statement, depending on the Effective Date of the Plan, such holding period requirement may not be met by U.S. Holders of such Claims.  The deductibility of capital losses is subject to limitations.

Alternatively, the Restructuring Transactions may be structured in whole or in part in a manner that is eligible for nonrecognition treatment under the IRC. The exact consequences to U.S. Holders of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim will depend on the structure and mechanics selected and the provisions of the IRC giving rise to such treatment.  However, in general, under such nonrecognition provisions of the IRC, exchanging Holders could be treated as recognizing certain gains, but not losses, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount as described below).  To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such U.S.

139

Holder's holding period in such property should include the holding period of such U.S. Holder's underlying Claim. To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

Notwithstanding the foregoing, it is possible that, whether or not the Restructuring Transactions are treated as a fully taxable exchange or a nonrecognition transaction under the IRC, proceeds received with respect to the Exit Commitment Netting Transactions could be treated as a taxable fee paid to U.S. Holders of Allowed 1L Notes Claims in exchange for their consent to the Restructuring Transactions. If this treatment applied, the proceeds of the Exit Commitment Netting Transactions would not be taxed as described above and would instead generally be treated as ordinary income to the U.S. Holder receiving such proceeds. The tax consequences to a U.S. Holder of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim will depend in significant part on the final mechanism that results in the consummation of the transactions contemplated by the Plan. Holders of such claims should consult their tax advisors.

Additionally, whether the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares should be considered, for these purposes, as a recovery in respect of the First Lien Claims (along with the other consideration under the Plan), or, instead, as a separate legal entitlement (including as the exercise of options to acquire the property that is subject to the Rights Offering Securities (if any, as applicable)) is uncertain.

The tax consequences of the Exit Equity Commitment and the distribution of the Exit New Money Shares to U.S. Holders cannot currently be known, and U.S. Holders should consult their own tax advisors as to the relevant considerations and tax consequences.[40]

    4.    <u>U.S. Federal Income Tax Consequences to U.S. Holders of Allowed 2L Notes Claims (Class 5)</u>

As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed 2L Notes Claim, on the Effective Date, each U.S. Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution.

The Restructuring Transactions may be structured in a manner such that the issuance of New Interests to U.S. Holders of Allowed 2L Notes Claims in exchange for such claims is fully taxable under Section 1001 of the IRC. In such case, a U.S. Holder of an Allowed 2L Notes Claim generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of the New Interests received in respect of such Allowed 2L Notes Claim (other than any New Interests treated as received in satisfaction of accrued but unpaid interest on such Allowed 2L Notes Claim as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Allowed 2L Notes Claim. A U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date. A U.S. Holder's holding period for the New Interests would begin the day following the exchange.

---

[40]    Whether participation in the Exhibit Equity Commitment and receive the distribution of the Exit New Money Shares (if any) is treated as a recovery under the Plan is subject to further review pending review of the terms of the related documents (if any).

Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed 2L Claim is greater than one year at the time of the exchange. Because the 2L Notes were issued within one year of the date of this Disclosure Statement, depending on the Effective Date of the Plan, such holding period requirement may not be met by U.S. Holders of such Claims. The deductibility of capital losses is subject to limitations.

Alternatively, the Restructuring Transactions may be structured in whole or in part in a manner that is eligible for nonrecognition treatment under the IRC. The exact consequences to U.S. Holders of an Allowed 2L Notes Claim will depend on the structure and mechanics selected and the provisions of the IRC giving rise to such treatment. However, in general, under such nonrecognition provisions of the IRC, exchanging Holders could be treated as recognizing certain gains, but not losses, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount as described below). To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such U.S. Holder's holding period in such property should include the holding period of such U.S. Holder's underlying Claim. To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

The tax consequences to a U.S. Holder of an Allowed 2L Notes Claim will depend in significant part on the final mechanism that results in the consummation of the transactions contemplated by the Plan. Holders of such claims should consult their tax advisors.

5.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims (Class 7 and Class 8)

[In full and final satisfaction, settlement, release, and discharge of, and in exchange for, any Allowed Unsecured Notes Claims and Allowed General Unsecured Claim, each Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim (as applicable) shall receive, at such Holder's election, such Holder's Pro Rata Share of either (A) the Cash Election or (B) the Equity Election.]

Although not free from doubt, the Debtors expect that the Restructuring Transactions in which the U.S. Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims exchange such Claims for their Pro Rata share of either (A) the Cash Election or (B) the Equity Election, in each case as elected by the Holder of the Allowed Unsecured Notes Claim or Allowed General Unsecured Claim (as applicable), will be treated as a fully taxable exchange under section 1001 of the IRC. In such case, a U.S. Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as applicable, generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of such Holder's Pro Rata share

141

of (A) the Cash Election or (B) the Equity Election, in each case as elected by such Holder (other than any portion thereof treated as received in satisfaction of accrued but unpaid interest on such Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as applicable, as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Allowed Unsecured Notes Claim or Allowed General Unsecured Claim.  To the extent the Equity Election includes New Interests, a U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date and such U.S. Holder's holding period for the New Interests would begin the day following the exchange.  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Accrued Interest" and "Market Discount," below. Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed Unsecured Notes Claim or Allowed General Unsecured Claim is greater than one year at the time of the exchange.

The tax consequences to a U.S. Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim will depend in significant part on the final mechanism that results in the consummation of the transactions contemplated by the Plan.  Holders of such Claims should consult their tax advisors.

6.      General

(a)      Accrued Interest

To the extent that any amount received by a U.S. Holder of an Allowed Claim under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount would be expected to be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder), even if consideration was otherwise being received without the recognition of gain.  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest.  Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by the U.S. Holder is expected to be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the proper allocation of the consideration received by them in respect of their Claims under the Plan.

(b)      Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) in the case of a debt instrument issued without original issue discount, the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount is expected to be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to their Claims.

(c)      Limitations on Use of Capital Losses

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

7.      U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Interests

(a)      Distributions on New Interests

Any distributions of cash or property made to a U.S. Holder with respect to the New Interests generally will be includible in gross income by such U.S. Holder as dividend income to the extent such distribution is paid out of Reorganized WeWork's current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  To the extent those distributions exceed Reorganized WeWork's current and accumulated earnings and profits, the distribution will be treated (i) as a non-taxable return of the U.S. Holder's adjusted basis in the New Interests and (ii) thereafter as capital gain taxable (as discussed below under "—Sale, Redemption or Repurchase of New Interests").  A distribution that is treated as a dividend and paid

143

to a corporate U.S. Holder of the New Interests may be eligible for the dividends-received deduction, and a distribution that is treated as a dividend and paid to a non-corporate U.S. Holder of the New Interests may be subject to tax at the preferential tax rates applicable to "qualified dividend income," provided that certain holding period and other requirements are satisfied.

In addition, if Reorganized WeWork is a "U.S. real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes (as discussed below under "—FIRPTA") and distributions on the New Interests exceed Reorganized WeWork's current and accumulated earnings and profits, Reorganized WeWork may be required to withhold on certain distributions made with respect to the New Interests unless such U.S. Holder provides a properly completed and duly executed IRS Form W-9 (or applicable successor form).

(b)     Sale, Redemption, or Repurchase of New Interests

Unless a non-recognition provision of the IRC applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, repurchase, or other taxable disposition of the New Interests.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Interests for more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.

A U.S. Holder may be required to provide evidence that it is a U.S. person, either on a duly executed IRS Form W-9, applicable successor form or other evidence as provided under the applicable Treasury Regulations in order to avoid withholding under Section 1445 of the Code (as discussed below under "FIRPTA").

**F.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and as described above. Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the jurisdiction of the Reorganized Debtors, the form of any New Interests issued, the jurisdiction of the issuers of any Exit Financing, whether any Rights Offering will occur and the Restructuring Transactions that will be implemented to achieve that corporate and capital structure, have not yet been determined. Accordingly, the U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Claims cannot currently be known, and Non-U.S. Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

1.     General U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Consummation of the Restructuring Transactions

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the

Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly completed and duly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Notwithstanding the discussion above, in the event that an Allowed Claim is treated as an interest other than "solely as a creditor" for purposes of Section 897 of the IRC, a Non-U.S. Holder may be subject to U.S. federal income tax as discussed below under "—FIRPTA." The Debtors intend to take the position (and the remainder of this discussion assumes) that each Allowed Claim is treated as an interest solely as a creditor for purposes of Section 897 of the IRC. Each Non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of FIRPTA (as defined below) on such Non-U.S. Holder.

2.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Interests

(a)    Distributions on New Interests

Any distributions made with respect to New Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Interests, as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to New Interests that are held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Interests held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business

145

(and if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

In addition, if Reorganized WeWork is a USRPHC (discussed below under "—FIRPTA") and any distribution on the New Interests exceeds Reorganized WeWork's current and accumulated earnings and profits, Reorganized WeWork will need to choose to satisfy its withholding requirements either by treating the entire distribution as a dividend, subject to U.S. federal withholding tax at a rate of 30 percent or a lower applicable treaty rate as described above (and withhold at a minimum rate of 15 percent or such lower rate as may be specified by an applicable income tax treaty for distributions from a USRPHC), or by treating only the amount of the distribution equal to a reasonable estimate of Reorganized WeWork's current and accumulated earnings and profits as a dividend, with the excess portion of the distribution being subject to withholding at a rate of 15 percent or such lower rate as may be specified by an applicable income tax treaty as if such excess were the result of a sale of shares in a USRPHC.

(b)      Sale, Redemption, or Repurchase of New Interests

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption treated as a sale) of New Interests unless: (a) such Non-U.S. Holder is an individual who is present in the United States for one hundred eighty-three (183) days or more in the taxable year of disposition and certain other conditions are met; (b) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States); or (c) the entity issuing the New Interests is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Interests. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The third exception is described below under "FIRPTA".

146

### G.      FIRPTA

Under legislation commonly referred to as the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected income ("ECI") that is subject to U.S. federal income tax even if such Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

The FIRPTA rules may apply to the New Interests.  In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the five-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation.  Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Person's adjusted tax basis in such interest) will constitute ECI.  Further, any purchaser that acquires such corporation's stock from a Non-U.S. Holder may be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

Although there can be no assurances in this regard, WeWork Inc. has been, in the past, and Reorganized WeWork may be as of or after the Effective Date, a USRPHC.  As such, withholding under FIRPTA may apply to Non-U.S. Holders in connection with distributions on, or sales or other dispositions of, the New Interests.  Non-U.S. Holders should consult their own tax advisors regarding the applicability of FIRPTA to their ownership of New Interests, including any associated tax payment or tax return filing obligations.

### H.      FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final

147

regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW INTERESTS.**

## I.        Information Reporting and Backup Withholding

The Debtors, the Reorganized Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan.  Further, the Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE**

148

**APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a greater distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept and support Confirmation of the Plan.

149

Respectfully submitted, as of the date first set forth above,

WEWORK INC.
(on behalf of itself and all other Debtors)

Dated:  April 19, 2024          */s/ David Tolley*
                                 David Tolley
                                 Chief Executive Officer
                                 WeWork Inc.

Prepared by:

**COLE SCHOTZ P.C.**                    **KIRKLAND & ELLIS LLP**
Michael D. Sirota, Esq.                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
Warren A. Usatine, Esq.                 Edward O. Sassower, P.C.
Felice R. Yudkin, Esq.                  Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ryan T. Jareck, Esq.                    Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street       Ciara Foster (admitted *pro hac vice*)
Hackensack, New Jersey 07601            601 Lexington Avenue
Telephone:      (201) 489-3000          New York, New York 10022
msirota@coleschotz.com                  Telephone:      (212) 446-4800
wusatine@coleschotz.com                 Facsimile:      (212) 446-4900
fyudkin@coleschotz.com                  edward.sassower@kirkland.com
rjareck@coleschotz.com                  joshua.sussberg@kirkland.com
                                        steven.serajeddini@kirkland.com
                                        ciara.foster@kirkland.com

*Co-Counsel for Debtors and*            *Co-Counsel for Debtors and*
*Debtors in Possession*                 *Debtors in Possession*

**<u>Exhibit A</u>**

**Plan**

[Filed at Docket No. 1690]

**Exhibit B**

**RSA**

[Attached as Exhibit B to the First Day Declaration]

## Exhibit C

## Organizational Structure Chart



## Exhibit D

## Valuation Analysis

[*To be filed before the Disclosure Statement hearing*]

**<u>Exhibit E</u>**

**Financial Projections**

[*To be filed before the Disclosure Statement hearing*]

**<u>Exhibit F</u>**

**Liquidation Analysis**

[*To be filed before the Disclosure Statement hearing*]

**<u>Exhibit B</u>**

**Redline**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:      (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al*., | Case No. 23-19865 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT**
**RELATING TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION OF WEWORK INC. AND ITS DEBTOR SUBSIDIARIES**

THIS DRAFT OF THE DISCLOSURE STATEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE SOLICITATION VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION ON A FINAL BASIS, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO FINAL APPROVAL HEREOF. THE DEBTORS SHALL FILE A REDLINE VERSION WITH THE BANKRUPTCY COURT CONCURRENTLY WITH THE FILING OF ANY AMENDED OR MODIFIED VERSION OF THIS DISCLOSURE STATEMENT.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

2

THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.   THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF WEWORK INC. AND ITS DEBTOR AFFILIATES.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE [VIII] HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS, STATUTORY PROVISIONS, OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS

EXHIBIT A.    FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.   THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL, STATE, OR OTHER SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS. NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW

ii

INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED.    INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, AND AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE [XI] OF THE PLAN.    THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, THE PLAN AND ARTICLE [VIII] OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.    THE SUMMARIES OF THE FINANCIAL INFORMATION CONTAINED IN AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

iii

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE [IX] OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.**

**THE CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE CONSUMMATION OF THE PLAN TO HOLDERS (INCLUDING BENEFICIAL OWNERS) OF ALLOWED CLAIMS AND INTERESTS ARE NOT DESCRIBED HEREIN.  HOLDERS (AND BENEFICIAL OWNERS) OF ALLOWED CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE CANADIAN FEDERAL, PROVINCIAL, AND LOCAL TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, HAVING REGARD TO THEIR PARTICULAR CIRCUMSTANCES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE TO THE EXTENT APPROPRIATE.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign federal regulatory authority. Neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. The securities to be issued pursuant to the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"). Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from or in a transaction not subject to the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Interests under the Plan [(other than any New Interests issued pursuant to the MIP)], and to the extent such exemption is not available, then such New Interests will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

[Any shares of the New Interests, or any other Securities, issued in reliance upon the exemption from registration provided by section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act (or an available exemption therefrom) and in compliance with other applicable Law and such transfer will be subject to any restrictions in the New Corporate Governance Documents. The offering, issuance, distribution, and sale of such securities shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act.]

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements." However, not all forward-looking statements in this Disclosure Statement may contain one or more of these

identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates.  These statements are subject to significant risks, uncertainties, and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- **Plans, objectives, and expectations;**

- **Business strategy, including the Debtors' ability to rationalize and manage its real estate footprint;**

- **Financial condition, revenues, cash flows, and expenses;**

- **Levels of indebtedness, liquidity, and compliance with debt covenants;**

- **Financial strategy, budget, projections, and operating results;**

- **Successful results from the Debtors' operations;**

- **Costs of conducting the Debtors' operations;**

- **The ability or inability to maintain positive relationships with employees and other third parties as a result of these Chapter 11 Cases or other failure of such parties to comply with their contractual obligations;**

- **Level of uncertainty regarding the Debtors' future operations;**

- **The amount, nature, and timing of the Debtors' capital expenditures;**

- **The terms of capital available to the Debtors;**

- **The adequacy of the debtors' capital resources and liquidity to satisfy both short and long-term liquidity needs;**

- **The risks associated with certain of the Debtors' business activities, including from any joint venture or franchise agreement, any merger, acquisition, or divestiture, and any management agreement;**

- **The effects of asset and property acquisitions or dispositions on the Debtors' cash position;**

- **The effectiveness of the Debtors' risk management activities;**

- **The Debtors' exposure to future currency exchange and interest rates;**

- **Taxation applicable to the Debtors and any changes thereto;**

- **Counterparty credit risk;**

- **The outcome of pending and future litigation or arbitration;**

- **The overall condition of the commercial real estate market and the flexible workspace industry; and**

- **General economic and business conditions.**

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors; (l) the effect of competitive products, services, or procurements by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the Exit Facilities, Rights Offering (if applicable), and the New Interests to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain leases and other key commercial agreements and any disruptions to relationships with landlords, suppliers, and partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The**

vii

**projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     PRELIMINARY STATEMENT ...............................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN ........................................................................................6

        A.      What is chapter 11? .........................................................................................6
        B.      Why are the Debtors sending me this Disclosure Statement? ..........................7
        C.      What is the effect of the Plan on the Debtors' ongoing business? ...................7
        D.      Am I entitled to vote on the Plan? ...................................................................7
        E.      What will I receive from the Debtors if the Plan is consummated? ..................9
        F.      What will I receive from the Debtors if I hold an Allowed Administrative
                Claim, DIP Administrative Claim, Professional Fee Claim, or Priority Tax
                Claim? ...........................................................................................................12
        G.      Can the Plan be modified, revoked, or withdrawn? ........................................17
        H.      What happens to my recovery if the Plan is not confirmed or does not
                go effective? .................................................................................................18
        I.      If the Plan provides that I get a distribution, do I get it upon Confirmation
                or when the Plan goes effective, and what is meant by "Confirmation,"
                "Effective Date," and "Consummation?" .......................................................18
        J.      Are any regulatory approvals required to consummate the Plan? ..............19~~8~~
        K.      Is there potential litigation related to Confirmation of the Plan? ...................19
        L.      Will the final amount of Allowed General Unsecured Claims affect my
                recovery under the Plan? ...............................................................................19
        M.      How will the preservation of the Causes of Action impact my recovery
                under the Plan? ..............................................................................................20
        N.      Are there risks to owning New Interests upon emergence from Chapter
                11? .................................................................................................................21
        O.      What is the MIP and how will it affect the distribution I receive under the
                Plan? ..............................................................................................................21
        P.      Will there be releases and exculpation granted to parties in interest as part
                of the Plan? ...................................................................................................22
        Q.      How will undeliverable distributions and unclaimed property be treated
                under the Plan? ...........................................................................................22~~3~~
        R.      Are there minimum distribution restrictions? .................................................23
        S.      What steps did the Debtors take to evaluate alternatives to a chapter 11
                filing? ............................................................................................................24
        T.      Will any party have significant influence over the corporate governance
                and operations of the Reorganized Debtors? ..................................................24
        U.      What is the deadline to vote on the Plan? ......................................................25
        V.      How do I vote for or against the Plan? ...........................................................25
        W.      Why is the Bankruptcy Court holding a ~~Confirmation~~Combined Hearing? ........25

| | | | |
|---|---|---|---|
| X. | When is the ~~Confirmation~~Combined Hearing set to occur? | 2~~5~~6 |
| Y. | What is the effect of Confirmation of the Plan? | 26 |
| Z. | Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 26 |
| AA. | Do the Debtors recommend voting in favor of the Plan? | 27 |
| BB. | Who supports the Plan? | 27 |

| | | |
|---|---|---|
| IV. | THE DEBTORS' PLAN | 27 |

| | | | |
|---|---|---|---|
| A. | Restructuring Transactions | 27 |
| B. | Reorganized Debtors | 28 |
| C. | Sources of Consideration for Plan Distributions | 29 |
| D. | Employee-Related Matters | 31 |
| E. | Preservation of Causes of Action | 3~~1~~2 |
| F. | Treatment of Executory Contracts and Unexpired Leases | 3~~2~~3 |
| G. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 4~~1~~2 |
| H. | Settlement, Release, Injunction, and Related Provisions | 46 |
| I. | Conditions Precedent to Consummation of the Plan | 5~~4~~5 |

| | | |
|---|---|---|
| V. | THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW | 5~~7~~8 |

| | | | |
|---|---|---|---|
| A. | The Debtors' Corporate History | 5~~7~~8 |
| B. | The Debtors' Business Operations | ~~59~~60 |
| C. | Prepetition Capital Structure | 6~~0~~1 |

| | | |
|---|---|---|
| VI. | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 6~~6~~7 |

| | | | |
|---|---|---|---|
| A. | Economic and Operational Headwinds | 6~~6~~7 |
| B. | March 2023 Notes Exchange Transaction | 6~~7~~8 |
| C. | Enhanced Corporate Governance | 6~~8~~9 |
| D. | Prepetition Negotiations and the Restructuring Support Agreement | 6~~8~~9 |
| E. | Corporate Division | 71 |

| | | |
|---|---|---|
| VII. | EVENTS OF THE CHAPTER 11 CASES | 72 |

| | | | |
|---|---|---|---|
| A. | First Day Relief | 72 |
| B. | Second Day Relief | 77 |
| C. | Approval of the DIP LC/TLC Facility | 78 |
| D. | DIP New Money Facility | 79 |
| ~~D~~E. | Retention of the Debtors' Professionals | ~~79~~80 |
| ~~E~~F. | Schedules and Statements | 8~~0~~1 |
| F. | ~~The Canadian CCAA Recognition Proceeding~~ | ~~80~~ |
| G. | Appointment of the Creditors' Committee | 82 |
| H. | Lease Rationalization | 82 |
| I. | ~~Vendor Engagement~~ Dispute with Cushman & Wakefield | 84~~8~~ |
| J. | ~~Establishment of~~ Claims ~~Bar Dates~~ ~~85~~Reconciliation Process | 90 |
| K. | Extension of Certain Key Dates | 92 |

KL.       The Special Committee's Independent Investigation .......... 8693
LM.       Litigation Matters .......... 896
N.        The Examiner Motion .......... 97
MO.       Miscellaneous Matters .......... 918
P.        The Canadian CCAA Recognition Proceeding .......... 99

VIII.     RISK FACTORS .......... 92100

A.        Bankruptcy Law Considerations .......... 93100
B.        Risks Related to Recoveries Under the Plan .......... 1008
C.        Risks Related to the Debtors' and the Reorganized Debtors' Businesses .......... 10211
D.        Risks Related to the Offer and Issuance of Securities Under the Plan .......... 10716

IX.       SOLICITATION AND VOTING PROCEDURES .......... 1108

A.        Holders of Claims Entitled to Vote on the Plan .......... 1109
B.        Voting Record Date .......... 1109
C.        Voting on the Plan .......... 1119
D.        Ballots Not Counted .......... 11120

X.        CONFIRMATION OF THE PLAN .......... 1121

A.        The Confirmation Combined Hearing .......... 1121
B.        Requirements for Confirmation of the Plan .......... 1121

XI.       CERTAIN SECURITIES LAW MATTERS .......... 11524

A.        Issuance of Securities under the Plan .......... 11625
B.        Subsequent Transfers .......... 11625

XII.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
          OF THE PLAN .......... 1209

A.        Introduction .......... 1209
B.        Tax Status of Certain Debtors .......... 1322
C.        General Assumptions .......... 1322
D.        Certain U.S. Federal Income Tax Considerations of the Plan to the
          Debtors .......... 1323
E.        Certain U.S. Federal Income Tax Consequences of the Plan to U.S.
          Holders of Allowed Claims Entitled to Vote. .......... 1237
F.        Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S.
          Holders of Allowed Claims Entitled to Vote. .......... 13344
G.        FIRPTA .......... 13547
H.        FATCA .......... 13647
I.        Information Reporting and Backup Withholding .......... 13648

XIII.     RECOMMENDATION .......... 13749

- iv -

Exhibit A ................................................................................................................................ 1~~39~~51

Exhibit B ................................................................................................................................ 1~~40~~52

Exhibit C ............................................................................................................................... 153

Exhibit D ............................................................................................................................... 154

Exhibit E ............................................................................................................................... 155

Exhibit ~~C~~F ............................................................................................................................. 1~~41~~56

## **EXHIBITS**

EXHIBIT A      Plan

EXHIBIT B      Restructuring Support Agreement

EXHIBIT C      Organizational Structure Chart

EXHIBIT D      Valuation Analysis

EXHIBIT E      Financial Projections

EXHIBIT F      Liquidation Analysis

## I.    INTRODUCTION

WeWork Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "WeWork" or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors with respect to the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 12690] (as may be amended, supplemented, or modified from time to time, the "Plan"), dated ~~February 4~~April 19, 2024.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in [Article I.B] of the Plan shall govern the interpretation of this Disclosure Statement.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.    PRELIMINARY STATEMENT[3]

The Debtors, together with their non-Debtor affiliates, are the global leader in flexible workspace, where they integrate community, member services, and technology.  Founded in 2010 and headquartered in New York City, WeWork's mission is to create a collaborative work environment where people and companies across a variety of industries, from freelancers to Fortune 100 companies, come together to optimize performance.  After its founding, WeWork embarked on a path of rapid expansion, investing billions of dollars in creating one of the most expansive private commercial real estate portfolios in the world, spanning more than 800 locations across thirty-seven countries on six continents and becoming one of the top providers of commercial office space in business hubs that include New York City, London, Dublin, Boston, and Miami.

---

[2]   Capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan or the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "First Day Declaration").  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[3]   Unless otherwise specified, capitalized terms used but not defined in the Preliminary Statement shall have the meaning ascribed to them later in the Disclosure Statement.

1

In the wake of its unsuccessful initial public offering in 2019 and the subsequent change in management, WeWork pivoted from rapid growth to focusing on operational efficiency, lease portfolio optimization, and sustainable development and profitability.  However, the COVID-19 pandemic and an onslaught of compounding factors upended the commercial real estate market and disrupted WeWork's turnaround.

The pandemic significantly, and perhaps permanently, changed the way people work and the demand for office space.  New sales volumes declined sharply while customer churn accelerated, largely due to the massive and often permanent shift of companies large and small to a work-from-home regime.  Given the pandemic's significant impact, WeWork doubled down on its portfolio and operational optimization strategy, engaging with landlords to secure rent abatements, deferrals, or outright exits and withdrawing from non-core businesses, while accelerating the digitization of its services and offering discounts and deferrals to customers.  Motivated in part by the initial success of these initiatives, WeWork went public on the New York Stock Exchange through a de-SPAC transaction in October 2021.

Since the de-SPAC transaction, WeWork has continued to rationalize its lease portfolio and optimize its operations toward profitability, amending over 590 leases, reducing future rent obligations by over $12 billion, and reducing administrative expenses by approximately $1.8 billion.  Yet rapidly rising interest rates have compelled landlords and office tenants alike to enter the commercial real estate market, offering leases and subleases at reduced rates and more flexible terms and creating significant competition for WeWork's target customers.  Furthermore, post-pandemic return to the office has been slower than expected, leading to a corresponding drag on WeWork's sales.  Saddled with many sub-optimal leases characterized by above-market rents and fixed annual rent escalation without rent resets or lessee-friendly termination rights, WeWork's existing business became increasingly difficult to maintain in the changing real estate market.

In early 2023, recognizing the need for extra time and liquidity to complete its strategic turnaround, WeWork, with the assistance of its advisors, negotiated the Notes Exchange Transactions with the SoftBank Parties, the Ad Hoc Group, and Cupar, obtaining over $1 billion of funding and capital commitments, canceling or equitizing approximately $1.5 billion of total debt, and extending the maturity of approximately $1.9 billion of debt from 2025 to 2027.  Unfortunately, these extraordinary efforts of the Company's management team and employees could not overcome the legacy real estate costs and industry headwinds WeWork faced.  Recognizing that the situation now required a more holistic solution, the Company engaged professionals from Kirkland & Ellis LLP ("Kirkland"), PJT Partners LP ("PJT"), Hilco Real Estate, LLC ("Hilco"), and Alvarez & Marsal North America LLC ("A&M") to chart a path of value preservation and maximization.

Beginning in September 2023, WeWork, with the assistance of its advisors, led initially by Hilco, began engaging with hundreds of landlords to secure amendments or exits to substantially all of its real estate leases as part of an accelerated and comprehensive lease rationalization on a global scale.  In parallel, Kirkland, PJT, and A&M engaged with the SoftBank Parties, the Ad Hoc Group, and the other major holders of the Company's funded debt to negotiate the terms of a comprehensive restructuring transaction.

2

On the eve of these Chapter 11 Cases and after good faith, arm's length negotiations, WeWork reached an agreement with the SoftBank Parties, the Ad Hoc Group, and Cupar (collectively, the "Consenting Stakeholders") on the terms of a comprehensive restructuring transaction, embodied in the RSA. Among other things, the RSA contemplated (i) the equitization of Drawn DIP TLC Claims (other than up to $100 million of such Claims, which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests; (ii) the cancelation of all other indebtedness and preexisting equity interests (other than any equity interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by other parties, the SoftBank Parties would contribute claims in exchange for its retention of its equity interests); and (iii) the issuance of a New 1L Exit Term Loan Facility in an aggregate amount equal to (a) the lesser of (I) the total amount of all Drawn DIP TLC Claims and (II) $100 million, plus, in each case, (b) the aggregate amount of DIP TLC Fee Claims.[4]

On November 6, 2023 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). At the First Day Hearing on November 8, 2023, the Bankruptcy Court granted all the relief the Debtors requested in their First Day Motions on an interim or final basis, including authorizing the Debtors to continue using their cash management system, pay the prepetition wages and salaries of their employees, maintain and administer their customer programs, maintain insurance, pay the prepetition claims of critical vendors, and provide adequate assurance for future utility services. In addition, after weeks of hard-fought, arm's-length negotiations, the Debtors reached an agreement with the Consenting Stakeholders concerning the consensual use of approximately $164 million of cash collateral on hand as of the Petition Date and the provision of various forms of adequate protection to the Prepetition Secured Parties.

After the First Day Hearing, the Debtors, recognizing the need for continued access to letters of credit to comply with rent support obligations under their existing leases and to facilitate their lease rationalization efforts, began engaging with their prepetition lenders to negotiate the DIP LC/TLC Facility. Following good-faith, arm's-length negotiations, the Debtors, the DIP LC Issuers, and certain other parties in interest agreed to the principal terms of a DIP LC/TLC Facility in an amount not to exceed 105 percent of the lesser of (i) $650 million plus certain adjustments and (ii) the USD equivalent of the aggregate face value of the undrawn and unexpired letters of credit issued under the Prepetition LC Credit Agreement plus certain adjustments. The DIP LC/TLC Facility, which was approved by the Bankruptcy Court on December 11, 2023, allows the Debtors to amend, renew, reissue, or replace expiring letters of credit that support their rent obligations under the leases.

On November 16, 2023, the U.S. Trustee appointed the Creditors' Committee. Since then, the Debtors have devoted significant time and resources to providing diligence and engaging with the Creditors' Committee and its advisors to bring them up to speed on the developments in the Chapter 11 Cases, including reaching a settlement regarding the terms of the

---

[4] Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the RSA.

3

DIP LC/TLC Facility.  The Plan does not currently contemplate any recovery for Holders of General Unsecured Claims.

Since the Petition Date, the Debtors have utilized the tools of the Bankruptcy Code to accelerate their lease rationalization efforts.  ~~In addition to obtaining the Bankruptcy Court's approval of the Assumption and Rejection Procedures Motion that streamlined the process for assuming or rejecting unexpired leases,~~ As of the date hereof, the Debtors have determined a final path forward at 90 percent of the locations in its global real estate portfolio through amended leases, new management agreements, or via the lease rejection process.  Specifically, the Debtors have (i) reached agreements in principle to amend approximately 150 leases, (ii) determined to assume or leave in place approximately 150 leases where the existing terms support the Debtors' current go-forward business plan, and (iii) determined to reject or negotiate exit of approximately 150 leases.[5]   Collectively, as of the date hereof, the Debtors~~, with the consent of the Consenting Stakeholders, have exited more than [ninety] locations through lease rejection or termination, amended and assumed the leases at [two] locations, and achieved more than $330 million in annual rent savings.[5]The Debtors also have a line of sight to deals with approximately [65] to [70] percent of their remaining lease portfolio.  At the same time, the Debtors have taken great care to minimize the impact of the Chapter 11 Cases in general and the~~' lease rationalization efforts ~~in particular on its customers~~would result in an over $8 billion (over 40 percent) reduction in total future rent commitments.

In January 2024, the Debtors and their advisors determined it may be prudent for the Debtors to raise new money, debtor-in-possession financing to carry the Debtors through the remainder of the Chapter 11 Cases.  Accordingly, PJT began the marketing process for potential debtor-in-possession financing.  While the Debtors and their advisors continue to engage in arm's-length negotiations with potential funding parties to achieve the best possible terms for a potential DIP New Money Facility, the Debtors have yet to agree to terms of debtor-in-possession financing that are satisfactory to the Debtors.  As of the date hereof, the Debtors are prepared to fund these Chapter 11 Cases through the Combined Hearing without debtor-in-possession financing if necessary.  However, the Debtors and their advisors continue to believe that obtaining debtor-in-possession financing may be prudent so long as it is available on acceptable terms and will enable the Debtors to pay all administrative claims in full in cash to confirm the Plan and emerge from these Chapter 11 Cases.  The Debtors remain open to all proposals for debtor-in-possession financing whether in the form of a DIP New Money Facility, a Rights Offering, or otherwise, and the open points in the Debtors' negotiations with the Consenting Stakeholders for a potential DIP New Money Facility have significantly narrowed in recent days.

Pursuant to [Article III.B] of the Plan, Holders of Allowed Claims will receive, except to the extent that a Holder of an Allowed Claim agrees to less favorable treatment, the following

---

[5]    [Article VII.H] of this Disclosure Statement discusses the Debtors' lease rationalization efforts in more details.

[5]    ~~In addition, as of the date hereof, the Debtors' assumption of the amended leases at five additional locations are pending approval by the Bankruptcy Court, and the Debtors are in the process of amending and assuming many other leases.  [Article VII.H] of this Disclosure Statement discusses the Debtors' lease rationalization efforts in more details.~~

4

treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holders' Claims and Interests:

- Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and ~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, either (i) payment in full in Cash of its Allowed Other Secured Claims, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code;

- Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and ~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, either (i) payment in full in Cash of its Allowed Other Priority Claim or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code;

- Each Holder of an Allowed Drawn DIP TLC Claim shall receive ~~(i) in the case of the Rolled Drawn DIP TLC Claim, loans under the Exit TLC Facility on a dollar-for-dollar basis, and (ii) in the case of an Equitized Drawn DIP TLC Claim,~~ its Pro Rata share of the Drawn DIP TLC Equity Distribution;

- Each Holder of an Allowed Undrawn DIP TLC Claim shall receive (i) in the case of an Excess DIP TLC Claim, ~~payment~~shall be paid in full in ~~C~~cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility~~,~~; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, shall be converted into obligations under the Exit LC Facility on a dollar- for- dollar basis~~, *plus* its Pro Rata share of the New LC Equity Allocation~~;

- Each Holder of an Allowed Prepetition LC Facility Claim shall receive its Pro Rata share of the 1L Equity Distribution;

- Each Holder of an Allowed 1L Notes Claim shall receive its Pro Rata share of the 1L Equity Distribution, subject to the Exit Commitment Netting Transaction;

- Each Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution;

- Each ~~Allowed 3L Notes Claim shall be discharged and released, and each~~ Holder of an Allowed 3L Notes Claim shall not receive or retain any distribution, property, or other value on account of such Allowed 3L Notes Claim; *provided*,

5

*however*, that, to the extent the aggregate value of the Allowed 3L Notes Claims exceeds the value of the collateral securing such Claims and there are unencumbered assets held by the Debtor against which such Claims are Allowed, each Holder of an Allowed 3L Notes Claim shall receive on account of ~~an~~and in full and final satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed Unsecured Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is allowed;

- ~~Each Allowed Unsecured Notes Claim shall be discharged and released, and each Holder of an Allowed Unsecured Notes Claim shall not receive or retain any distribution, property, or other value on account of such Allowed Unsecured Notes Claim; *provided, however*, that, to the extent there are unencumbered assets held by the Debtor against which an Unsecured Notes Claim is Allowed, each Holder of such Allowed Claim shall receive, on account of and in full and final satisfaction of such Allowed Claim its Pro Rata share (together with each Holder of an Allowed 3L Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is Allowed;~~

- ~~Each Allowed General Unsecured Claim shall be discharged and released, and each Holder of an Allowed General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such Allowed General Unsecured Claim, *provided, however*, that, to the extent there are unencumbered assets held by the Debtor against which a General Unsecured Claim is Allowed, each Holder of an Allowed Claim shall receive, on account of and in full satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed 3L Notes Claim and an Allowed Unsecured Notes Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is Allowed;~~

- Each Holder of an Allowed Unsecured Notes Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election;

- Each Holder of an Allowed General Unsecured Claim shall receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election;

- Each Go-Forward Guaranty Claim shall be Reinstated;

- Each Allowed Intercompany Claim shall be (i) Reinstated, (ii) converted to equity, (iii) canceled, released, or discharged, or (iv) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and ~~with~~subject to the ~~reasonable~~ consent ~~of the Required Consenting~~

6

~~Stakeholders~~rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit;

- Each Allowed Intercompany Interest shall be (i) Reinstated, (ii) canceled, released, or discharged, or (iii) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and ~~with~~subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit;

- Each Allowed Parent Interests, shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Allowed Parent Interests shall not receive any distribution on account of such Interests, except as otherwise provided in the Restructuring Transactions Exhibit, ~~with the reasonable~~and subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA; and

- All Allowed Section 510(b) Claims against any applicable Debtor shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims.

The Restructuring Transactions embodied in the Plan, the RSA, and the Plan Supplement that will, among other things, effectuate the foregoing distributions, are a significant achievement that will enable the Debtors to progress toward profitability in light of an evolving commercial real estate market. Despite the many challenges that WeWork faced on the eve of these Chapter 11 Cases, the Debtors have negotiated a plan of reorganization that will put the Reorganized Debtors on strong financial and operational footing with a rationalized lease portfolio and optimized operations.

~~Each of the Debtors and the Consenting Stakeholders that have executed the RSA support the Plan, and the~~The Debtors strongly believe that the Plan is in the best interests of their Estates and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to ensure their long-term viability and success. The Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

7

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until a chapter 11 plan is consummated.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of the debtor (whether such creditor or equity interest holder voted to accept the chapter 11 plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a chapter 11 plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern following emergence from these Chapter 11 Cases. Following Confirmation, the Plan will be consummated on the Effective Date, which is the first Business Day after the Confirmation Order is entered by the Bankruptcy Court on which (a) all conditions precedent to the occurrence of the Effective Date set forth in [Article IX.A] of the Plan have been satisfied or waived in accordance with [Article IX.B] of the Plan and (b) the Plan is declared effective by the Debtors.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### D.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [●April 22], 2024). Each category of Holders of Claims or Interests, as set forth in [Article III] of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth

8

below.  The definitions contained in [Article I.A] of the Plan describe what Claims or Interests, as applicable, are included in each Class.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| Class 3A | Drawn DIP TLC Claims | Impaired | Entitled to Vote |
| Class 3B | Undrawn DIP TLC Claims | Impaired | Entitled to Vote |
| Class 4A | Prepetition LC Facility Claims | Impaired | Entitled to Vote |
| Class 4B | 1L Notes Claims | Impaired | Entitled to Vote |
| Class 5 | 2L Notes Claims | Impaired | Entitled to Vote |
| Class 6 | 3L Notes Claims | Impaired | Entitled to Vote / Deemed to Reject |
| Class 7 | Unsecured Notes Claims | Impaired | ~~Entitled to Vote /~~ Deemed to Reject |
| Class 8 | General Unsecured Claims | Impaired | ~~Entitled to Vote /~~ Deemed to Reject |
| Class 9 | Go-Forward Guaranty Claims | Unimpaired | Presumed to Accept |
| Class ~~9~~10 | Intercompany Claims | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| Class 1~~0~~1 | Intercompany Interests | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| Class 1~~1~~2 | Parent Interests | Impaired | Deemed to Reject |
| Class 1~~2~~3 | Section 510(b) Claim | Impaired | Deemed to Reject |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth in the Plan.  Certain of the Debtors may not have

9

Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

### E.      What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  The amount of such distributions is also based on the total amount of Claims Allowed in the applicable Class, which is based on factors that are not within the Debtors' control, including future litigation regarding, among other things, the amount and allowances of Claims against the Debtors.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[6]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | In full and final satisfaction of such Allowed Other Secured Claims, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and ~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA: (i) payment in full in Cash of its Allowed | $[●] | 100% |

---

[6]   The projected recoveries set forth in this table may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

10

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Other Priority Claims | In full and final satisfaction of such Allowed Other Priority Claims, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (or Reorganized Debtor, as applicable) and ~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA: (i) payment in full in Cash of its Other Priority Claim or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $[●] | 100% |
| 3A | Drawn DIP TLC Claims | In full and final satisfaction of such Allowed Drawn DIP TLC Claims, the Holder of each Allowed Drawn DIP TLC Claim shall receive ~~(i) in the case of the Rolled Drawn DIP TLC Claim, loans under the Exit TLC Facility on a dollar for dollar basis, and (ii) in the case of an Equitized Drawn DIP TLC Claim,~~ its Pro Rata share of the Drawn DIP TLC Equity Distribution. | $[●] | [●]% |
| 3B | Undrawn DIP TLC Claims | In full and final satisfaction of such Allowed Undrawn DIP TLC Claims, each Allowed Undrawn DIP TLC Claim: (i) in the case of an Excess DIP TLC Claim, shall be paid in full in cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, shall ~~(A)~~ be converted into obligations under the Exit LC Facility on a dollar-for-dollar basis~~, and (B) receive its Pro Rata share of the New LC Equity Allocation~~. | $[●] | [●]% |
| 4A | Prepetition LC Facility Claims | In full and final satisfaction of such Allowed Prepetition LC Facility Claims, each Holder of Allowed Prepetition LC Facility Claims shall receive its Pro Rata share of the 1L Equity Distribution. | $[●] | [●]% |
| 4B | 1L Notes Claims | In full and final satisfaction of such Allowed 1L Notes Claims, each Holder of Allowed 1L Notes Claims shall receive its Pro Rata share of the 1L Equity | $[●] | [●]% |

11

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Distribution, subject to the Exit Commitment Netting Transaction. | | |
| 5 | 2L Notes Claims | In full and final satisfaction of such Allowed 2L Notes Claims, each Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution. | $[●] | [●]% |
| 6 | 3L Notes Claims | In full and final satisfaction of such Allowed 3L Notes Claims, each Allowed 3L Notes Claim shall be discharged and released, and each Holder of an Allowed 3L Notes Claim shall not receive or retain any distribution, property, or other value on account of such Allowed 3L Notes Claim; *provided*, *however*, that, to the extent the aggregate value of the Allowed 3L Notes Claims exceeds the value of the collateral securing such Claims and there are unencumbered assets held by the Debtor against which such Claims are Allowed, each Holder of an Allowed 3L Notes Claim shall receive, on account of an~~and~~ in full and final satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed Unsecured Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is allowed. | $[●] | [~~0~~●]% |
| 7 | Unsecured Notes Claims | ~~In~~On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction ~~of~~, compromise, settlement, release, and discharge of and in exchange for such Allowed Unsecured Notes Claim, each ~~Allowed Unsecured Notes Claim shall be discharged and released, and each~~ Holder of an Allowed Unsecured Notes Claim shall ~~not receive or retain any distribution, property, or other value on account of such Allowed Unsecured Notes Claim; provided, however, that, to the extent there are unencumbered assets held by the Debtor against which an Unsecured Notes Claim is Allowed, each Holder of such Allowed Claim shall receive, on account of and in full and final satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed 3L Notes Claim and an Allowed General Unsecured Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is Allowed~~receive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election. | $[●] | [~~0~~●]% |
| 8 | General | ~~In~~On the Effective Date, or as soon as reasonably | $[●] | [~~0~~●]% |

12

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | Unsecured Claims | practicable thereafter, in full and final satisfaction of, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each General Unsecured Claim shall be discharged and released, and each Holder of an Allowed General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such Allowed General Unsecured Claim, provided, however, that, to the extent there are unencumbered assets held by the Debtor against which a General Unsecured Claim is Allowed, each Holder of an Allowed Claim shall receive, on account of and in full satisfaction of such Allowed Claim, its Pro Rata share (together with each Holder of an Allowed 3L Notes Claim and an Allowed Unsecured Notes Claim against the applicable Debtor) of the liquidation value of the unencumbered assets held by the Debtor against which such Claim is Allowedreceive, at such Holder's election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election. | | |
| 9 | Go-Forward Guaranty Claims | Each Allowed Go-Forward Guaranty Claim shall be Reinstated. | $[●] | [100]% |
| 910 | Intercompany Claims | Each Allowed Intercompany Claim shall be (i) Reinstated, (ii) converted to equity, (iii) canceled, released, or discharged, or (iv) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and withsubject to the reasonable consent of the Required Consenting Stakeholdersrights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit. | $[●] | [●]% |
| 101 | Intercompany Interests | Each Allowed Intercompany Interest shall be (i) Reinstated, (ii) canceled, released, or discharged, or (iii) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors, and withsubject to the reasonable consent of the Required Consenting Stakeholdersrights set forth in the RSA, in each case in accordance with the Restructuring Transactions Exhibit. | $[●] | [●]% |
| 112 | Parent Interests | Each Allowed Parent Interests, shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Allowed Parent Interests shall not receive any distribution on account of such Interests, except as otherwise provided in the Restructuring Transactions | $[●] | [0]% |

13

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Exhibit, ~~with~~subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA. | | |
| 1~~2~~3 | Section 510(b) Claims | All Allowed Section 510(b) Claims against any applicable Debtor shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims. | $[●] | [0]% |

**F.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Administrative Claim, Professional Fee Claim, or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan.  Treatment of Administrative Claims, Professional Fee Claims, DIP Administrative Claims, and Priority Tax Claims are instead set forth in <u>Article II</u> of the Plan and copied below.

1.      <u>Administrative Claims</u>

Except as otherwise provided under the Plan, and except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as

14

applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

All Adequate Protection Obligations and Adequate Protection Claims (each as defined in the Cash Collateral Orders) including accrued or unpaid interest, as well as fees and expenses, including legal expenses, as of the Effective Date pursuant to the terms of the Cash Collateral Orders, will be indefeasibly paid by the Debtors in full in Cash or will be provided such other treatment acceptable to the Debtors and the Required Consenting Stakeholders subject to the consent rights set forth in the RSA without the need to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Adequate Protection Obligations and Adequate Protection Claims.  The Debtors' obligation to pay such Adequate Protection Obligations and Adequate Protection Claims, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Except as otherwise provided below in Article II of the Plan, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date.  Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date.  Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE CLAIMS FOR UNPAID INVOICES THAT ARISE IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS AND WHICH ARE NOT DUE AND PAYABLE ON OR BEFORE THE EFFECTIVE DATE SHALL BE PAID IN THE ORDINARY COURSE OF BUSINESS IN ACCORDANCE WITH THE TERMS THEREOF AND NEED NOT FILE ADMINISTRATIVE CLAIMS.**

2.      DIP Administrative Claims

The DIP Administrative Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Agreements as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Agreements as of the Effective Date).  Except as otherwise expressly provided in the DIP Agreements, or the DIP Orders, upon the indefeasible payment or satisfaction in full of all Allowed DIP Claims, all commitments under the DIP Agreements shall terminate and all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and

15

effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Except to the extent that a Holder of a DIP Administrative Claim agrees to less favorable treatment, on the Effective Date, in full satisfaction, settlement, discharge, and release of, and in exchange for, the DIP Administrative Claims, each Holder of an Allowed DIP Administrative Claim shall receive the following treatment:

1.      Each Holder of an Allowed DIP TLC Fee Claim shall receive its Pro Rata share of the ~~loans under the Exit TLC Facility on a dollar-for-dollar basis~~DIP TLC Fee Equity Distribution.

2.      ~~[To the extent the Debtors enter into a~~ ~~[DIP New Money Facility]~~, the Debtors expect the provider of such DIP financing to seek superpriority, administrative expense status for its claim.  The granting of any such superpriority, administrative status should be subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA and, if agreed upon by such parties, each Holder of an Allowed ~~[DIP New Money Claim]~~ shall receive payment in full in Cash, or other treatment in a manner to be acceptable to the Debtors, the Required Consenting Stakeholders, and the requisite majority of DIP New Money Lenders pursuant to the terms of the DIP New Money Documents.~~]~~ Each Holder of 1L Series 1 Notes Claims and 2L Secured Notes Claims is expected to be offered the opportunity to participate in the DIP New Money Facility.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facilities, and the DIP Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to [Article II.B] of the Plan) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agents, and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agents, and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

16

3.      <u>Professional Fee Claims</u>

(a)      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with <u>Article II.A</u> of Plan.

(b)      Professional Fee Escrow Account

No later than the Effective Date, the Debtors incorporated in the U.S. shall, in consultation with the Required Consenting Stakeholders, establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee applications.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the

17

amount to be funded to the Professional Fee Escrow Account; *provided, further,* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors or, solely as it pertains to the final fee applications, the Creditors' Committee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and the Reorganized Debtors, as applicable, shall pay, within 10 Business Days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable Claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable.   If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

4.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.      Payment of Statutory Fees and Reporting to the U.S. Trustee

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  All monthly reports shall be Filed, and all fees due and payable pursuant to section 1930(a) of title 28 of the United States Code, shall be paid by the Debtors or the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors), as applicable, on the Effective Date.  Following the Effective Date, the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors) shall (a) pay such fees as such fees are assessed and come due for each quarter (including any fraction

18

thereof) and (b) File quarterly reports in a form consistent with the Revised Joint Administration Order and reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

6.  Payment of Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with the terms of the RSA, the Cash Collateral Orders, or any other Final Order of the Bankruptcy Court without any requirement to (1) File a fee application with the Bankruptcy Court, or (2) for review or approval by the Bankruptcy Court; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least 3 Business Days before the anticipated Effective Date; provided, however, that such estimates (and related invoices) shall not be considered an admission or limitation with respect to such Restructuring Expenses. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course [(but no sooner than within 5 Business Days of receipt of an invoice)], Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses.

**G.      Can the Plan be modified, revoked, or withdrawn?**

Yes. Except as otherwise specifically provided in the Plan and subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification (whether material or immaterial) shall be acceptable in form and substance to the Required Consenting Stakeholders. Subject to those restrictions on modifications set forth in the Plan, the RSA, the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

19

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

To the extent permitted by the RSA and subject to the consent rights set forth therein, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if either Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any claims by the Debtors, Claims or Interests, or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**H.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* [Article X] of this Disclosure Statement, entitled "*Confirmation of the Plan.*"

As set forth in [Article X.B] of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in significantly reduced creditor recoveries as compared to the Plan. This is due to, among other things, the significant additional administrative expenses associated with the appointment of a chapter 7 trustee and the administration of a chapter 7 liquidation, including additional Claims that may be entitled to administrative priority.

**I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court by entering the Confirmation Order. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. A "Notice of Effective Date" will be Filed on the Bankruptcy Court docket notifying all parties when the conditions precedent to the Effective Date have been satisfied. *See*

20

[Article IV.I] of this Disclosure Statement, entitled "*Conditions Precedent to Consummation of the Plan*," for a discussion of the conditions precedent to Consummation of the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means:  (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.  Note that Holders of certain types of Claims may not receive any distributions until the Debtors or the Reorganized Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

**J.      Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**K.      Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, ~~which~~and any of these objections ~~potentially~~ could potentially give rise to litigation.  *See* [Article VIII.A] of this Disclosure Statement, entitled "*Bankruptcy Law Considerations*."

Certain Classes are deemed to reject the Plan, and it is also possible that one or more Class(es) will vote to reject the Plan.  If it becomes necessary, the Debtors may seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See id.*

**L.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

~~The aggregate final amount of all Allowed General Unsecured Claims against a Debtor may affect the recoveries of Holders  of Allowed General Unsecured Claims  against that Debtor if that Debtor holds unencumbered assets.  Otherwise, Holders of Allowed General Unsecured Claims will not receive any recoveries under the Plan on account of their Allowed General Unsecured Claims.~~  The Debtors estimate that Allowed General Unsecured Claims total approximately $[●] – $[●].  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, the aggregate amount of General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided in the Plan, which difference could be material.

~~Moreover~~*First*, the Debtors may, in the future, reject certain Executory Contracts and Unexpired Leases, which may result in additional General Unsecured Claims for rejection

21

damages not accounted for in this estimate.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Holders of General Unsecured Claims.

~~Furthermore~~*Second*, as of the Petition Date, certain Debtors were party to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amount estimated by the Debtors in the Plan, the value of recoveries to Holders of Allowed General Unsecured Claims could materially change as well.

*Finally*, the Debtors, Reorganized Debtors, the Creditors' Committee, or other parties in interest may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could materially affect recoveries to Holders of Allowed General Unsecured Claims.

The higher the aggregate amount of Allowed General Unsecured Claims is, the lower the recovery each Holder of an Allowed General Unsecured Claim will receive.  However, in no event will a Holder of an Allowed General Unsecured Claim receive less recovery under the Plan than it would have received under a hypothetical liquidation under chapter 7 of the Bankruptcy Code.

**M.**     **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.[7]

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than any Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in [Article VIII] of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

**The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors**

---

[7]   All releases are subject to the Special Committee's ongoing investigation.  *See* [Article VII.~~K~~L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

22

**or the Reorganized Debtors will not pursue any and all available Retained Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors (as applicable) expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity (except as set forth in** Article VIII.C **of the Plan). Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Reorganized Debtors, as applicable, and the objecting party for 30 days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except as otherwise released in the Plan.

**N.     Are there risks to owning New Interests upon emergence from Chapter 11?**

Yes. *See* [Article VIII] of this Disclosure Statement, entitled "*Risk Factors*," for a discussion of such risks.

**O.     What is the MIP and how will it affect the distribution I receive under the Plan?**

[Pursuant to the Plan, the MIP means an equity incentive plan that will (i) reserve up to [●]% of the New Common Stock (determined on a fully diluted and fully distributed basis) for awards to management (the "Pool"), and (ii) provide for the grant as of the Effective Date of up

23

to 100% of the Pool to members of management selected by the New Board in the form of restricted stock unit awards (or the equivalent) vesting in ratable annual installments on each of the first three anniversaries of the Effective Date, and (iii) include other terms and conditions determined by the New Board. The amount of the Pool will not be subject to dilution from common stock issued to Softbank or its affiliates at or after the Emergence Date on account of the cash collateral assigned to the Debtors.

Pursuant to the Plan, theThe MIP shall be established and reserved for grants to be made from time to time from such pool to employees (including officers), and directors of the Reorganized Debtors at the discretion of the New Board following the Effective Date. The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; provided that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to retain or recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the MIP, structure, and vesting, determined by, in each case, the Required Consenting Stakeholders.]

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The discharge, release of liens, releases, third-party releases, exculpation, and injunction provisions included in the Plan, all of which are set forth in their entirety in Article [IV.H] of this Disclosure Statement, are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining support for the Plan.[8]

These provisions are the product of extensive good faith, arm's-length negotiations, were material inducements for the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Required Consenting Stakeholders.  Moreover, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, the release and exculpation of the Released Parties and the Exculpated Parties, respectively, as set forth in the Plan is warranted.

All releases are subject to the Special Committee's ongoing investigation.  As of the date hereof, the Special Committee has not made a determination regarding bringing claims or making changes to the releases and exculpations contained in the Plan.  In deciding whether to vote for or against the Plan, parties entitled to vote on the Plan should assume that the releases and exculpations contained in the Plan will remain unchanged.  If the Special Committee determines to alter the releases or exculpations, it will improve recoveries under the Plan for an affected class or be the result of a change agreed to by an affected party.  Notice of any material

---

[8]   All releases are subject to the Special Committee's ongoing investigation.  *See* [Article VII.KL] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

24

change to the Plan will be provided to the extent required and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any order of the Bankruptcy Court.[9]

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN; (II) ARE DEEMED TO ACCEPT THE PLAN WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (III) ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; OR (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF NONVOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE REORGANIZED DEBTORS.**

> **Q.     How will undeliverable distributions and unclaimed property be treated under the Plan?**

Except as otherwise provided in the Plan or the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests, as applicable, as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution (to the extent such address is not available in the Debtors' records, such Holder must provide sufficient information to deliver the distribution); *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date without interest.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to [Article VI.D] of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 90 days after distribution shall be deemed unclaimed property under

---

[9]   *See* [Article VII.L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

25

section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or state escheatment, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Interests, such New Interests shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, released, discharged, and forever barred notwithstanding any applicable federal or state escheatment, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the distributions of the New Interests to reflect any such cancelation.

### R.    Are there minimum distribution restrictions?

The Disbursing Agent shall not make any distributions to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash or otherwise where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, as applicable, would otherwise result in the issuance of a number of shares of the New Interests that is not a whole number, the actual distribution of shares of the New Interests shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of the New Interests to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.  No fractional shares of the New Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  Each Allowed Claim or Interest to which these limitations apply shall be discharged pursuant to [Article VIII.A] of the Plan and its Holder shall be forever barred pursuant to [Article VIII.A] of the Plan from asserting that Claim against or Interest in the Reorganized Debtors or their property pursuant to [Article VIII.A] of the Plan.

Any amounts owed to a Holder of an Allowed Claim that is entitled to distributions in an amount less than $250 shall not receive distributions on account thereof, and each Claim shall be discharged pursuant to [Article VIII.A] of the Plan and its Holder is forever barred pursuant to [Article VIII.A] of the Plan from Asserting that Claim against the Reorganized Debtors or their property and such amount shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court).

### S.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in the First Day Declaration, prior to the Petition Date, the Debtors evaluated numerous potential alternatives to rationalize their lease portfolio, increase operational efficiency, and address their funded indebtedness.  In light of the changing commercial real estate market and a slower-than-expected return to office, the Debtors determined, in their sound

26

business judgment, to pursue a comprehensive restructuring of their lease portfolio and balance sheet through a chapter 11 filing.

**T.**   **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local Law requirements, the New Corporate Governance Documents (which shall be consistent with the Plan and the Plan Supplement) shall be automatically adopted or amended in a manner consistent with the terms and conditions set forth in the Corporate Governance Term Sheet, which shall be reasonable and customary, and shall be acceptable to the Debtors and Required Consenting Stakeholders, Cupar, and subject to the consent rights set forth in the RSA and shall supersede any existing organizational documents.   To the extent required under the Plan, the Plan Supplement, or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Law of the respective state or country of organization.   The New Corporate Governance Documents will (a) authorize the issuance of the New Interests and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

The New Board will be composed of 7 directors, including (a) 3 members appointed by the SoftBank Parties, (b) 2 members to be appointed by the Required Consenting AHG Noteholders, (c) 1 independent member appointed as set forth in the Corporate Governance Term Sheet, and (d) the Chief Executive Officer.

After the Effective Date, each Reorganized Debtor may amend and restate its respective New Corporate Governance Documents as permitted by Laws of the respective states, provinces, or countries of incorporation and the New Corporate Governance Documents.

On the Effective Date, Reorganized WeWork shall enter into and deliver the New Stockholders Agreement and the Registration Rights Agreement with respect to each Holder of New Interests, which shall become effective and be deemed binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule or the vote, consent, authorization, or approval of an Entity (other than the relevant consents required by any Definitive Document).   Holders of New Interests shall be deemed to have executed the New Stockholders Agreement and the Registration Rights Agreement and be parties thereto, without the need to deliver signature pages thereto.

Assuming that the Plan Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Interests may be in a position to influence matters requiring approval by the holders of shares of New Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

27

**U.     What is the deadline to vote on the Plan?**

The Voting Deadline is [●May 23], 2024, at 4:00 p.m. (prevailing Eastern Time).

**V.     How do I vote for or against the Plan?[9]**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims who are entitled to vote on the Plan.  For your vote to be counted, your ballot containing your vote must be completed and signed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent (the "Claims Agent") by **[●May 23], 2024, at 4:00 p.m. (prevailing Eastern Time)**.

Holders of Claims in the Voting Classes may submit their Ballots via (i) the E-Ballot Portal by clicking the "E-Ballot" section of the Claims Agent's website at https://dm.epiq11.com/WeWork, or (ii) mail or hand-delivery to the Claims Agent at WeWork Inc Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.  Ballots submitted to the Claims Agent by any means other than expressly provided for in these Solicitation and Voting Procedures, including email, facsimile, or electronic means other than the E-Ballot Portal, *shall not be valid and will not be counted*.

If a Class of Claims is eligible to vote, and no Holder of Claims in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**W.     Why is the Bankruptcy Court holding a ~~Confirmation~~Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan.  In addition, the Debtors are seeking approval of this Disclosure Statement on a final basis at such Confirmation Hearing (the "Combined Hearing").

**X.     When is the ~~Confirmation~~Combined Hearing set to occur?**

The ~~Confirmation~~Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the ~~Confirmation~~Combined Hearing once scheduled.  The ~~Confirmation~~Combined Hearing may be adjourned from time to time without further notice.

Objections to the final approval of the Disclosure Statement and Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than **[●May 28], 2024, at [~~time~~4:00 p.m.] (prevailing Eastern Time)** in accordance with the notice of the ~~Confirmation~~Combined Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

---

[9]  ~~[To be updated per Solicitation and Voting Procedures].~~

The Debtors will publish the notice of the ~~Confirmation~~Combined Hearing, which will contain the Voting ~~d~~Deadline ~~for objections to the Plan~~, the Combined Objection Deadline, and the date and time of the ~~Confirmation~~Combined Hearing, in ~~the national edition of the~~*The New York Times* (national edition) and the *Financial Times* (global edition) to provide notice to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the ~~Confirmation~~Combined Hearing in such trade or other publications as the Debtors may choose.

**Y.      What is the effect of Confirmation of the Plan?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtors, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges the debtors from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Specifically, subject to Article IX.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, after the Plan is confirmed and upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**Z.      Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims Agent:

> ***By first-class mail at:***
> WeWork Inc. Ballot Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4422
> Beaverton, OR 97076-4420
>
> ***By regular mail, hand delivery, or overnight mail at:***
> WeWork Inc. Ballot Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.

29

Beaverton, OR 97005

***By electronic mail at:***
WeWorkinfo@epiqglobal.com
(with a reference to "Solicitation Inquiry" in the subject line)

***By telephone at:***
+1 (877) 959-5845 (Toll Free)
+1 (503) 852-9067 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims Agent at https://dm.epiq11.com/WeWork (free of charge) or the Bankruptcy Court's website at www.njb.uscourts.gov (for a fee).

### AA.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would result from any other available alternative.  The Debtors believe that the Plan, which significantly deleverages the Debtors' balance sheet and enables them to expeditiously emerge from these Chapter 11 Cases, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### BB.    Who supports the Plan?

The Plan is supported by the Debtors, [and the other Consenting Stakeholders, including the SoftBank Parties, the Ad Hoc Group (representing approximately 87 percent of the Company's Series I 1L Notes and 2L Notes), and Cupar].

## IV.    THE DEBTORS' PLAN

The Plan contemplates the following key terms, among others, described herein and therein:

30

## A.      Restructuring Transactions

On or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtors, ~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the RSA, and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the RSA, and the Plan Supplement and having other terms for which the applicable Entities may agree; (c) the execution, delivery, and Filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law, including any applicable New Corporate Governance Documents; (d) such other transactions and/or Bankruptcy Court filings that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations or those conducted pursuant to the Restructuring Transactions Exhibit (including, for the avoidance of doubt, if so provided in the Restructuring Transactions Exhibit, all transactions necessary to provide for the sale/purchase of all or substantially all of the assets or Interests of any of the Debtors, which purchase may be structured as a taxable transaction for U.S. federal income tax purposes); (e) the execution, delivery, and Filing of the ~~Exit Facility~~DIP New Money Documents; (f) the execution, delivery, and Filing of the Exit Financing Documents; (g) the implementation of the Rights Offering (if any) pursuant to the Rights Offering Documents (if any) and the issuance of Rights Offering Securities (if any) in connection therewith; (h) the execution of the Exit Commitments Netting Transaction; and (~~g~~h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

## B.      Reorganized Debtors

31

On the Effective Date, in accordance with the terms of the RSA and the Corporate Governance Term Sheet, the New Board shall be appointed, and the Reorganized Debtors shall adopt the New Corporate Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan so long as such agreements, documents, instruments, and actions satisfy the requirements of the RSA.  Cash payments to be made pursuant to the Plan will be made by the Debtors, the Reorganized Debtors, or the Disbursing Agent (as applicable).  The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### C.      Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors shall fund distributions under the Plan, as applicable, with (a) the proceeds from the Exit ~~Facilities;~~ [Equity Commitment Consideration; (b) Cash or other proceeds from the sale of the Rights Offering Securities (if any, as applicable) in connection with the Rights Offering (if any);] (c) the New Interests; (d) Cash or other proceeds from the sale of Estate property (if any); and (e) the Debtors' Cash on hand, as applicable.  The issuance, distribution, or authorization, as applicable or as described in the Restructuring Transaction Exhibit, of certain Securities in connection with the Plan, including the New Interests will be exempt from SEC registration to the fullest extent permitted by Law, as more fully described in Article IV.E of the Plan.

#### 1.      Exit LC Facilit~~ies~~y

On the Effective Date, if the Debtors and Required Consenting Stakeholder agree that entry into the Exit LC Facilit~~ies~~y is necessary and advisable, the Reorganized Debtors shall enter into such Exit LC Facilit~~ies~~y on the terms set forth in the applicable Exit LC Facility Documents.

To the extent not already approved, Confirmation shall be deemed approval of the Exit LC Facilit~~ies~~y and the Exit LC Facility Documents, as applicable, and all transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Debtors or the Reorganized Debtors (as applicable), without further notice to or order of the Bankruptcy Court, to enter into and execute the Exit LC Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit LC Facilit~~ies~~y.  Execution of the Exit LC Facility Documents by the Exit LC Facility Agents shall be deemed to bind all Exit LC Facility Lenders as if each such Exit LC Facility Lender~~s~~ had executed the applicable Exit LC Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit LC Facility Documents, to the extent applicable:  ~~(i)~~ (i) shall be deemed to be granted; ~~(ii)~~ (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable

32

Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit LC Facility Documents; (iii) (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit LC Facility Documents; and (iv) (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent applicable, the Reorganized Debtors, the applicable non-Debtor Affiliates, and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents, and to take any other actions necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such Filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be in accordance with the Exit LC Facility Documents and necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 2.    Exit Equity Commitment

If, in an exercise of their business judgment and subject to the consent rights set forth in the RSA, the Debtors determine that additional funding is necessary or desirable, and have entered into the Exit New Money Facility, the Debtors shall distribute the Exit New Money Shares on behalf of the Reorganized Debtors as set forth in this Plan and the Exit New Money Documents in exchange for the Exit Equity Commitment Consideration (if any).  The Exit Equity Commitment (if any) shall be made and consummated on the terms and conditions of, and in accordance with the Exit Equity Commitment Documents (if any).

The Exit New Money Shares (if any) shall be offered in the allocations specified in the Exit Equity Commitment Documents (if any) and this Plan.  Any Exit New Money Shares shall be subject to dilution on account of the MIP.

On the Effective Date, the rights and obligations of the Debtors under the Exit Equity Commitment Documents (if any) shall vest in the Reorganized Debtors, as applicable.  The proceeds of the Exit Equity Commitment Consideration (if any) shall be used by the Reorganized Debtors to repay the DIP New Money Facility (if applicable) and for other general corporate purposes.

### 3.    2. Rights Offering

If the Debtors and the Required Consenting Stakeholders in good faith determine that additional funding is necessary or desirable, the Debtors shall distribute the Subscription Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Documents.  The Rights Offering (if any) shall be conducted and

33

consummated on the terms and conditions of, and in accordance with the Rights Offering Documents (if any).

The Rights Offering Securities (if any) shall be offered in the allocations specified in the Rights Offering Documents (if any) and the Plan.  [Any Rights Offering Securities shall be subject to dilution on account of the MIP and the New LC Equity Allocation.].

On the Effective Date, the rights and obligations of the Debtors under the Rights Offering Documents (if any) shall vest in the Reorganized Debtors, as applicable.  The proceeds of the Rights Offering (if any) shall be used by the Reorganized Debtors for general corporate purposes.

4.        3. Subscription Rights and New Interests

If the Debtors and the Required Consenting Stakeholders determine, in good faith, that additional funding is necessary or desirable, Reorganized WeWork shall be authorized to issue a certain number of shares of Rights Offering Securities to certain Holders of Claims pursuant to Articles II and Article III of the Plan.  Such Rights Offering Securities (if any) shall be issued to applicable Holders of Claims, and/or [Rights Offering Participants]  pursuant to the Rights Offering Documents (if any), and the New Corporate Governance Documents.  Reorganized WeWork shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such Rights Offering Securities (if any).  All such Subscription Rights and Rights Offering Securities (if any), and any other shares of New Interests issued pursuant to the Plan, shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Corporate Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Interests and/or Rights Offering Securities (if any) shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

**D.        Employee-Related Matters**

1.        Management Incentive Plan

[The MIP shall be established and reserved for grants to be made from time to time from such pool to employees (including officers) and directors of the Reorganized Debtors at the discretion of the New Board following the Effective Date.  The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; *provided* that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to retain or recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions,

34

including, but not limited to, with respect to form, allocated percentage of the MIP, structure, and vesting, determined by, in each case, the Required Consenting Stakeholders.]

2.      Employee and Retiree Benefits

Subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, and except as otherwise provided in [Article IV.N] of the Plan, all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors [and the Reorganized Debtors shall be authorized to continue the Compensation and Benefits Programs and shall continue to honor the terms thereof]; *provided*, *however*, that in accordance with the New Corporate Governance Documents, the Reorganized Debtors may review, amend, terminate, or modify any of the foregoing programs in accordance with applicable Law and the terms of the applicable Compensation and Benefits Program.   For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

**E.      Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than any Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

**The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors (as applicable) expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity (except as set forth in H.3).  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the

35

Debtors or the Reorganized Debtors, as applicable, and the objecting party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in the Plan.

### F.      Treatment of Executory Contracts and Unexpired Leases

#### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (i) are Unexpired Leases of non-residential real property that are not expressly assumed as set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases; (ii) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be ~~reasonably acceptable to the Required Consenting Stakeholders~~subject to the consent rights set forth in the RSA; (iii) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto, forfeiture, or by operation of law; (iv) have been previously assumed or rejected by the Debtors pursuant to a Final Order; ~~or~~ (v) any obligations of WeWork Inc. arising under contracts or leases that are not assumed; or (vi) are, as of the Effective Date, the subject of (a) a motion to reject that is pending or (b) an order of the Bankruptcy Court that is not yet a Final Order.  For the avoidance of doubt, the Unexpired Leases and Executory Contracts described in subsection (i) of this paragraph will be deemed rejected pursuant to section 365 of the Bankruptcy Code.

For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan

36

Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, as clarified by the Extension Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases (in each case, including with agreed modifications as applicable) as set forth in the Plan, or the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, in the Schedule of Rejected Executory Contracts and Unexpired Leases, or in the Schedule of Assumed Executory Contracts and Unexpired Leases (as applicable), assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date (unless approved by the Court pursuant to an early order).  Notwithstanding anything in the Plan to the contrary, with respect to any Unexpired Lease that is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, the effective date of the rejection of any such Unexpired Lease shall be the later of (a) the date set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases (b) the date upon which the Debtors notify the affected landlord and such landlord's counsel (if known to Debtors' counsel) in writing (email being sufficient) that they have surrendered the premises and, as applicable, (i) turning over keys issued by the landlord, key codes, and/or security codes, if any, to the affected landlord or (ii) notifying such affected landlord or such landlord's counsel (if known to Debtors' counsel) in writing (email being sufficient) that the property has been surrendered, all WeWork-issued key cards have been disabled and, unless otherwise agreed as between the Debtors and the landlord, each affected landlord is authorized to disable all WeWork-issued key cards (including those of any members using the leased location) and the landlord may rekey the leased premises.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors and the counterparties to the applicable Executory Contract or Unexpired Lease during these Chapter 11 Cases and effective upon assumption by the Debtors; *provided* that, prior to the Effective Date and in connection with such assumption, any such terms that are rendered unenforceable by the provisions of the Plan or the Bankruptcy Code shall remain unenforceable solely in connection therewith.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final Order on or after the Confirmation Date in accordance with any applicable terms in the Plan (including any consent rights set forth in the RSA), unless otherwise settled by the applicable Debtors and counterparties.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases or Schedule of Assumed Executory Contracts and Unexpired Leases identified in Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date, ~~with~~subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all

37

modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease.  Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof (subject to the other provisions of Article V.A of the Plan) shall be deemed satisfied by Confirmation.  To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases as of the Confirmation Date may not be assumed by the applicable Debtor(s) unless the applicable lessor or contract counterparty has (a) consented to such assumption, (b) objected to the rejection of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be rejected and should instead be assumed (and such objection remains outstanding), or (c) in the case of Unexpired Leases, consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's prior consent, the "Deferred Deadline"), in which case for purposes of clause (c) the applicable Debtor(s) shall have until the Deferred Deadline to assume such Unexpired Lease, subject to the applicable lessor's right to object to such assumption, or such Unexpired Lease shall be deemed rejected.  For any Executory Contract or Unexpired Lease assumed pursuant to this paragraph, all Cure Obligations shall be satisfied on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to the Cure Obligation, such dispute shall be addressed in accordance with [Article V.D] of the Plan.

For the avoidance of doubt, at any time prior to the applicable deadlines set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, and as the same may

38

be extended, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion Filed with the Bankruptcy Court.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the ~~Confirmation~~Combined Hearing (to the extent not resolved by the parties prior to the ~~Confirmation~~Combined Hearing).

If the effective date of any rejection of an Executory Contract or Unexpired Lease is after the Effective Date pursuant to the terms in the Plan, the Reorganized Debtors shall serve a notice on the affected counterparty setting forth the deadline for Filing any Claims arising from such rejection.

2.      Indemnification Obligations

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, restructuring advisors, and other professionals and/or agents or representatives of, or acting on behalf, of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, than those that existed prior to the Effective Date; *provided* that the Reorganized Debtors shall retain the ability not to indemnify former directors of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct (subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA); *provided*, *further*, that nothing in the Plan shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

39

3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Final Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases on the Schedule of Rejected Executory Contracts and Unexpired Leases.  Any objection to the rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 10 days after the service of notice of rejection on the affected counterparty.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims Agent within 30 days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by Filing a Claim in accordance with [Article V.C] of the Plan.  Claims arising from the rejection of any of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, satisfy all Cure Obligations relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan; *provided* that, if the effective date of such assumption occurs prior to the Effective Date, such payment shall be on the effective date of such assumption or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cure Obligations set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases must be Filed with the Bankruptcy Court on or before 14 days after the service of the Schedule of Assumed Executory Contracts and Unexpired Leases on affected counterparties.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or the Reorganized Debtors or any other party in interest or any further notice to or

40

action, order, or approval of the Bankruptcy Court.  Any Cure Obligations shall be deemed fully satisfied, released, and discharged upon satisfaction by the Debtors or the Reorganized Debtors of the applicable Cure Obligations; *provided*, *however*, that nothing in the Plan shall prevent the Reorganized Debtors from satisfying any Cure Obligations despite the failure of the relevant counterparty to File such request for satisfaction of such Cure Obligations.  The Reorganized Debtors also may settle Cure Obligations or disputes related thereto without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 14 days after the service of notice of assumption on affected counterparties.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure Obligations, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then satisfaction of any Cure Obligations shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute and approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors or the Reorganized Debtors, as applicable, at the earliest convenience of the Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty and the Debtors or the Reorganized Debtors, as applicable, and that no such hearing shall be scheduled less than 30 days after the Effective Date unless agreed to between the Debtors or the Reorganized Debtors, as applicable, and the affected counterparty.

In the event of a Court-Ordered Cure Obligation, the Debtors shall have the right (~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA) to (a) satisfy the Court-Ordered Cure Obligation as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms in the Plan or, (b) within 14 days of such determination, add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of the (i) date of entry of the Court-Ordered Cure Obligation and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of an Unexpired Lease, the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be added to the Schedule of Rejected Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the

41

assumption or cure of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be assumed and should instead be rejected, including alleging an incurable default (and such objection remains outstanding), or (3) the court orders a Court-Ordered Cure Obligation.  Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Obligation dispute.

At least 7 days prior to the first day of the ~~Confirmation~~Combined Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Obligations to be sent to applicable parties.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Obligations, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption, upon the satisfaction of all applicable Cure Obligations.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption, or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court;** *provided, however*, **that nothing in the Plan shall affect the allowance of Claims or any Cure Obligation agreed to by the Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease (subject to the ~~reasonable~~ consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA) prior to assumption pursuant to the Plan or otherwise**.

Notwithstanding anything in the Plan to the contrary, upon assumption of an Unexpired Lease, the Debtors or the Reorganized Debtors, as applicable, shall be obligated to pay or perform, unless waived or otherwise modified by any amendment to such Unexpired Lease mutually agreed to by the applicable landlord and Debtor(s), any accrued, but unbilled and not yet due to be paid or performed, obligations as of the applicable deadline to File objections or disputes to the Cure Obligations for such Unexpired Lease under such assumed Unexpired Lease, including, but not limited to, common area maintenance charges, taxes, year-end adjustments, indemnity obligations, and repair and maintenance obligations, under the Unexpired Lease, regardless of whether such obligations arose before or after the Effective Date, when such obligations become due in the ordinary course; *provided* that all rights of the parties to any such assumed Unexpired Lease to dispute amounts asserted thereunder are fully preserved; *provided, further*, that nothing in the Plan shall relieve the Debtors or the Reorganized Debtors, as applicable, from any amounts that come due between (a) the applicable deadline to File objections or disputes to the Cure Obligation for such Unexpired Lease and (b) the effective date of assumption for such Unexpired Lease.

42

5.        Preexisting Obligations to the Debtors under Executory Contracts and
          Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

6.        Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect, on or after the Petition Date, with respect to conduct occurring prior to, on, or after the Petition Date, and all members, directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such members, directors, managers, and officers remain in such positions after the Effective Date[; *provided*, *however*, that the Reorganized Debtors shall retain the ability to terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies for any Causes of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence, bad faith, or willful misconduct.]

43

7.  Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, subject to the consent rights ~~of~~set forth in the ~~Required Consenting Stakeholders~~RSA, or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

8.  Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.  Employee Compensation and Benefits

(a)  Compensation and Benefit Programs

Subject to the ~~reasonable~~RSA (including the consent ~~of the Required Consenting Stakeholders, the RSA,~~rights set forth therein) and the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)  all employee equity or equity-based incentive plans (and the awards granted thereunder), and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Parent Interests; *provided* that, notwithstanding the foregoing or anything to the contrary in the Plan, the Debtors are authorized and directed to pay the Cash component of any bonus programs in accordance with the terms of such program (including, for the avoidance of doubt, the timing of any payments, which shall not be accelerated);

(b)  Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court;

(c)  any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Program; and

(d)  any Compensation and Benefits Programs for the benefit of the Existing Board Members.

Any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, or termination (including, in each case, any similar provisions therein) or (ii) an event of "Good

44

Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Plan. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

(b)    Workers' Compensation Programs

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such contracts, agreements, policies, programs, and plans; *provided*, *further*, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

10.    Intellectual Property Licenses and Agreements

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors or Reorganized Debtors, as applicable, and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors as set forth in the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

11.    Contracts and Leases Entered into after the Petition Date

Contracts (including applicable order forms or purchase orders) and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, except as may be agreed to by the counterparties to such contracts and leases.

45

### G.        Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

####     1.        Disputed Claims Process

**The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority (subject with respect to any Stub Rent Claims, to the consent rights ~~of the Required Consenting Stakeholders~~ set forth in the Bar Date Order and the RSA, as applicable) to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  All Proofs of Claim required to be Filed by the Plan that are Filed after the date that they are required to be Filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

####     2.        Allowance of Claims

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. The Debtors, in their sole discretion, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

####     3.        Claims Administration Responsibilities

With respect to all Classes of Claims and Interests, and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority (subject with respect to any Stub Rent Claims, to the consent rights ~~of the Required Consenting Stakeholders~~ set forth in the Bar Date Order and the RSA, as applicable) to:  (a) File and prosecute Claim Objections; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all Claim Objections, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with their fiduciary duties and pursuant to the terms of the Plan.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all the rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed

46

Claim, including the Causes of Action retained pursuant to [Article IV.N] of the Plan, unless such Causes of Action were released pursuant to [Article VIII] of the Plan.

### 4. Estimation of Claims and Interests

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim or Interest and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 7 days after the date on which such Claim or Interest is estimated. Each of the foregoing Claims and Interests and objection, estimation, and resolution procedures are cumulative, not exclusive of one another, and shall be consistent with any procedures set forth in the Bar Date Order and subject to the consent rights set forth in the RSA. Claims or Interest may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 5. Disputed Claims Reserve

On or before the Effective Date, the Reorganized Debtors incorporated in the U.S., subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, shall establish one or more reserves of the applicable consideration for any Claims against any Debtor that are Disputed Claims as of the Distribution Record Date other than General Unsecured Claims, which reserves shall be administered by the Disbursing Agent.

After the Effective Date, the applicable Disbursing Agent shall hold such consideration in such reserve(s) in trust for the benefit of such Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date. The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the

47

Effective Date under [Article III] of the Plan solely to the extent of the amounts available in the applicable reserve(s).

Upon a Disputed Claim becoming disallowed by a Final Order or pursuant to [Article VII.A] of the Plan, the applicable amount of the consideration that was in the disputed claims reserve on account of such Disputed Claim shall be canceled by the Reorganized Debtors or the applicable Disbursing Agent. The Disbursing Agent shall adjust the distributions of the consideration to reflect any such cancelation.

[The Debtors may take the position that grantor trust treatment applies in whole or in part to any assets held in a disputed claims reserve. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as if such beneficiaries had received an interest in such account or fund's assets and then contributed such interests (in accordance with the Restructuring Transactions Exhibit) to such account or fund. Alternatively, any assets held in a disputed claim reserve may be subject to the tax rules that apply to "disputed ownership funds" under section 1.468B–9 of the Treasury Regulations.][10] To the extent such U.S. federal income tax treatment applies, any such assets will be subject to entity-level taxation, which will be borne by such disputed ownership funds and the Reorganized Debtors, shall be required to comply with the relevant rules. However, it is unclear whether these U.S. tax principles will apply to any such reserve and, as a result, the tax consequences of such reserve may vary.

### 6.  Adjustment to Claims or Interests without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Reorganized Debtors (without the Reorganized Debtors having to File an application, motion, complaint, objection, Claim Objection, or any other legal proceeding seeking to object to such Claim or Interest) and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.  Time to File Objections to Claims

Any objections to Claims or Interests shall be Filed on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors, as applicable.

---

[10]  Subject to ongoing review by all parties' tax teams pending finalization of the structure. This particular language is meant to cross-refer to Treasury Regulations Section 1.468B-1(k).

48

8.      Disallowance of Claims or Interests

Except as otherwise expressly set forth in the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided in the Plan or as agreed to by the Debtors or Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such disallowed Claims shall not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order; *provided, however*, that not less than 14 days' notice to any Holders of General Unsecured Claims affected by the foregoing in this paragraph shall be provided (which such notice may be served on the affected claimants and may be Filed on an aggregate basis consistent with Bankruptcy Rule 3007(d)).**

9.      Amendments to Claims

Except as provided in the Plan or the Confirmation Order, on or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable Law.

10.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

11.      Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that

49

the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of such date, without any interest to be paid on account of such Claim or Interest.

### 12. Single Satisfaction of Claims

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interests, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed the amount of the Allowed Claim or Allowed Interest.

## H.    Settlement, Release, Injunction, and Related Provisions[11]

The Plan provides the following settlement, release, injunction, and related provisions.

"Released Parties" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) the Postpetition Lenders; (e) the Creditors' Committee; (f) each Creditors' Committee Member; (g) the Releasing Parties; (h) each Agent; (i) each Related Party of each such Entity in clause (a) through (i); *provided* that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases described in Article VIII.D of the Plan; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation[; *provided*, *further*, that notwithstanding the foregoing, [●] are not Released Parties].[12]

"Releasing Parties" means, collectively, and in each case in its capacity as such:  (a) each Debtor, (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each of the Postpetition Lenders; (e) each Agent; (f) the Creditors' Committee; (g) each Creditors' Committee Member; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of nonvoting status indicating that they opt not to grant the releases provided in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause

---

[11]    All releases are subject to the Special Committee's ongoing investigation.  *See* [Article VII.~~K~~L] of this Disclosure Statement, entitled "The Special Committee's Independent Investigation."

[12]    For the avoidance of doubt, all releases remain subject to the ongoing investigation of the Special Committee.

(a) through (l) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that an Entity in clause (i) through clause (k) shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in <u>Article VIII.D</u> of the Plan; or (y) timely objects to the releases contained in <u>Article VIII.D</u> of the Plan and such objection is not resolved before Confirmation.

"<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; and (c) with respect to each of the foregoing Entities in clauses (a) through (b), each of the Related Parties of such Entity [(excluding [●])].[13]

1. <u>Discharge of Claims and Termination of Interests</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims), Interests (other than the Intercompany Interests that are Reinstated), and Causes of Action subject to the occurrence of the Effective Date.

2. <u>Release of Liens</u>

**Except as otherwise provided in the Plan, in the Exit ~~LC Facility Documents, Exit TLC Facility~~<u>Financing</u> Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made**

---

[13]    For the avoidance of doubt, all exculpations remain subject to the ongoing investigation of the Special Committee.

51

**pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases.  The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the DIP New Money Agents, the Exit LC Facility Agents, that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

### 3. Releases by the Debtors

**Except as expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, finally, and forever released, waived, and discharged, to the fullest extent permissible under applicable Law, by each and all of the Debtors, and each of their respective current and former non-SoftBank Parties Affiliates, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities who may**

52

purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, fixed or contingent, liquidated or unliquidated, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or any other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Debt Documents and, the RSA, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the Notes Exchange Transactions, the decision to File the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Restructuring Transactions, and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable the Definitive Documents or any other contract instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (b) any Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and

53

Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) an exercise of the Debtors' business judgment.

4.    Releases by the Releasing Parties

Effective as of the Effective Date, except as expressly set forth in the Plan or the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the fullest extent permissible under applicable Law, each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, fixed or contingent, liquidated or unliquidated, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Debt Documents and the RSA, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the Notes Exchange Transactions, the decision to File the Chapter 11 Cases, any intercompany transactions, and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, consummation, entry into, or Filing of, as applicable, the Definitive Documents or any other contract instrument, release or other agreement or document created or entered into in connection with the Definitive Documents, or the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance

54

of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section 4, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases set forth in this Section D is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to Article VIII.D of the Plan; (e) in the best interests of the Debtors and their estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to Article VIII.D of the Plan.

5.      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, and to the fullest extent permitted by law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any and all Claims, Interests, obligations, rights, suits, damages, or Causes of Action whether direct or derivative, for any claim related to any act or omission arising prior to the Effective Date, in connection with, relating to, or arising out of, the administration of the Chapter 11 Cases,     the     formulation,     preparation,     dissemination,     negotiation, consummation, entry into, or Filing of, as applicable, the Chapter 11 Cases, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, or upon any other act or omission, transaction, agreements, event, or other occurrence taking place on or

55

before the Effective Date related to or relating to any of the foregoing (including, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for Claims or Causes of Action related to any act or omission of an Exculpated Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.[14]

6.      Injunction

Upon entry of the Confirmation Order, except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been extinguished, released, discharged, or are subject to exculpation, whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, Affiliates, and Related Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection

---

[14]   For the avoidance of doubt, all exculpations remain subject to the ongoing investigation of the Special Committee.

56

with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has timely Filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation, or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, Cause of Action, liability or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Action released or settled pursuant to the Plan; and (f) if such Entity (alone or together with a group of people that is treated as a single entity under the applicable rules) is a "50-percent shareholder" as defined under section 382(g)(4)(D) of the Tax Code with respect to any Debtor, claiming a worthless stock deduction for U.S. federal income tax purposes with respect to the Interests of WeWork Parent for any tax period of such Entity ending prior to the Effective Date.

Upon entry of the Confirmation Order, all Holders of Claims and Interests shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

With respect to Claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases (including the Filing and administration thereof), the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the RSA, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transactions, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or Filing of the RSA and the Definitive Documents, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the Notes and the Indentures, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and

57

**a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action. To the extent the Bankruptcy Court may have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.**

7.      Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.

8.      Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.      Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

58

10.   Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**I.     Conditions Precedent to Consummation of the Plan**

1.   Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied, ~~in a manner acceptable to the Required Consenting Stakeholders~~subject to the consent rights set forth in the RSA, (and, solely with respect to Article IX.A.6 of the Plan as it pertains to the Agent Professionals, to the applicable Agents) or waived, ~~with~~subject to the ~~prior written~~ consent ~~(email being sufficient) of the Required Consenting Stakeholders~~rights set forth in the RSA (and, solely with respect to Article IX.A.6 of the Plan as it pertains to the Agent Professionals, the applicable Agents (or as otherwise indicated)), pursuant to the provisions of Article IX.B of the Plan:

(a) ~~the RSA shall remain in full force and effect, all conditions shall have been satisfied or waived thereunder (other than any conditions related to the occurrence of the Effective Date), and there shall be no breach thereunder that, after the expiration of any applicable notice or any cure period, would give rise to a right to terminate the RSA;~~

(a)   ~~(b)~~ the Final Cash Collateral Order shall be consistent with the RSA in all respects (including the consent rights set forth therein) and shall not have been vacated, stayed, or modified without the prior written consent of the Required Consenting Stakeholders;

(b)   ~~(c)~~ the DIP LC/TLC Order shall be consistent with the RSA in all respects (including the consent rights set forth therein) and shall not have been vacated, stayed, or modified without the prior written consent of the Required Consenting Stakeholders;

(c)   ~~(d)~~ each document or agreement constituting a Definitive Document and all documents contemplated by the RSA shall have been executed and/or effectuated, in form and substance consistent with the RSA and ~~acceptable to the Required Consenting Stakeholders~~subject to the consent rights set forth therein;

(d)   ~~(e)~~ the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and

59

effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(e)  (f) [all obligations of the Debtors underand the DIP New Money Lenders under the Exit Equity Commitment Documents (if any), including those required to effectuate the Exit Equity Commitment, shall have been satisfied in accordance with the terms thereof and the Plan;]

(f)  (g) all obligations of the Debtors under the Rights Offering Documents (if any) shall have been satisfied;

(g)  (h) [the Rights Offering (if any) shall have been fully consummated pursuant to the Rights Offering Procedures and the Rights Offering Documents and consistent in all material respects with the Plan and the RSA;]

(h)  the Exit Equity Commitment Documents shall have been duly executed and delivered by all Entities party thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Equity Commitment Documents shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Equity Commitment Documents and the execution of the Exit Equity Commitment shall have occurred;

(i)  [if applicable, the Exit Facility LC Documents shall have been duly executed and delivered by all Entities party thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit LC Facility Documents shall have been satisfied or duly waived in writing in accordance with the terms of the Exit LC Facility Documents and the closing of the Exit LC Facilitiesy shall have occurred;]

(j)  all fees, expenses, and premiums payable pursuant to the RSA, Plan, Definitive Documents, or pursuant to any order of the Bankruptcy Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable, and the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall have been paid in full in Cash on the Effective Date as set forth in Article II.F of the Plan;

(k)  all Allowed Professional Fee Claims required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account as set forth in, and in accordance with, the Plan;

(l)  the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the RSA and acceptable to the Required Consenting Stakeholderssubject to the consent rights set

60

forth therein, and such order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless waived by the Required Consenting Stakeholders;

(m)     the Debtors shall have otherwise substantially consummated the Restructuring Transactions, all transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein), and all transactions contemplated by the Plan and in the Definitive Documents, in a manner consistent in all respects with the Plan, unless waived by the Required Consenting Stakeholders;

(n)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment(s) thereto) shall have been Filed and all documents therein shall continue to satisfy the RSA in all respects; ~~and~~

(o)     all financing necessary for the Plan shall have been obtained and any documents related thereto, without duplication of the conditions described otherwise in [Article IX.A] of the Plan, shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred, having been satisfied or waived), and ~~shall be in a form and substance acceptable to the Required Consenting Stakeholders.~~ subject to the conset rights set forth in the RSA; and

(p)     immediately prior to the Effective Date, the Debtors shall possess no less than $300 million in cash (inclusive of Exit Equity Commitment but exclusive of any proceeds generated by the Japan/India Sales).

2.     Waiver of Conditions

Except as otherwise specified in the Plan, and subject to the limitations contained in and other terms of the RSA, any one or more of the conditions to Consummation (or any component thereof) set forth in Article IX of the Plan may be waived only if waived in writing (email being sufficient) by the Debtors and the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

3.     Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the RSA, or any other Definitive Document shall:  (a) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, any Holders of Claims or Interests, or any other Entity;

61

*provided* that all provisions of the Plan, the RSA, or any other Definitive Document that survive termination thereof shall remain in effect in accordance with the terms thereof.

4.      Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.      The Debtors' Corporate History

In 2010, co-founders Adam Neumann and Miguel McKelvey opened WeWork's first location in SoHo, far from the traditional corporate neighborhoods of midtown and downtown Manhattan.   As a flexible workspace provider, WeWork offered affordable and community-centered office space to small businesses and individuals who previously struggled to find dedicated workspaces.

But WeWork's ambitions went far beyond the office space it provided.  For the founders, WeWork promised to change how people worked by creating inspiring environments where people and companies, spanning countless industries and a wide range of interests, could come together to create community and pursue their professional passions and aspirations.

With that mission in mind, and following great success at its initial locations, WeWork pursued global expansion.  Within four years, WeWork had grown to twenty-three locations across eight cities and opened its first international locations in the United Kingdom and Israel. In the years that followed, WeWork continued its trajectory of dramatic growth, opening its first locations in Australia, Canada, China, Mexico, and South Korea in 2016.

WeWork attracted many sophisticated investors to finance this capital-intensive growth. Among them, the SoftBank Parties were—and remain to this day—the most significant. WeWork's relationship with the SoftBank Parties began in 2017.  In succeeding years, WeWork continued to rely on the SoftBank Parties for financing, capital, and general financial support. Two years after the SoftBank Parties provided WeWork with its initial $4.4 billion investment, WeWork raised an additional $2 billion from the SoftBank Parties.

WeWork then prepared to go public.  As one of its first steps, in August 2019, WeWork filed a registration statement (the "Initial Registration Statement") in connection with an initial public offering ("IPO").   Investors generally reacted negatively to the Initial Registration Statement and pushed back on the Company's private market valuation.  With the IPO in doubt, Adam Neumann announced his resignation in September 2019.  On September 30, 2019, six days after Neumann announced his resignation, the Company filed a formal request to withdraw the Initial Registration Statement.

The unsuccessful IPO left the Company under significant financial pressure.  Certain SoftBank Parties stepped in to provide the Company with much-needed support, this time in the form of rescue financing (the "2019 Rescue Package").  Specifically, the 2019 Rescue Package

62

included (i) approximately $5 billion in new financing, comprising commitments for $1.1 billion in senior secured notes and $2.2 billion in unsecured notes, and a $1.75 billion letter of credit facility; (ii) a tender offer (the "2019 Tender Offer") to purchase $3 billion of the Company's equity securities from eligible equity holders at a price of $19.19 per share, subject to certain conditions; (iii) the acceleration of the SoftBank Parties' April 2020 $1.5 billion payment obligation at $11.60 per share, subject to shareholder approval; and (iv) SoftBank Vision Fund's ("SVF") swapping of all of its interests in regional joint ventures outside of Japan for shares in WeWork at $11.60 per share.  Had it been fully implemented, the 2019 Rescue Package would have brought the SoftBank Parties' fully diluted economic ownership of WeWork to approximately 80 percent.

Prior to April 1, 2020, the SoftBank Parties informed WeWork that it believed the conditions necessary to launch the 2019 Tender Offer had not been met.  These unmet conditions included WeWork's alleged failure to (i) secure antitrust approvals, (ii) complete the roll-up of certain joint ventures with certain SoftBank Parties in Asia, and (iii) resolve ongoing government investigations.  As a result, on April 1, 2020, the SoftBank Parties purported to terminate its 2019 Tender Offer.  In addition, the SoftBank Parties' purported termination of the tender offer meant that it was no longer obligated to provide WeWork with $1.1 billion in additional secured debt financing.

In response, WeWork sued certain SoftBank Parties in the Delaware Court of Chancery for breach of contract and breach of fiduciary duty.  On February 25, 2021, WeWork and certain SoftBank Parties entered into a settlement agreement, resulting in the SoftBank Parties' purchase or promise to purchase half of the shares it initially agreed to purchase in the 2019 Tender Offer, the capping of the voting power of the SoftBank Parties at 49.9 percent pursuant to a proxy agreement, and confirmation of the financing package.

The unsuccessful IPO also prompted certain changes to WeWork's management team and a strategic pivot from short-term rapid expansion to a focus on long-term profitability.  The plan included (i) a five-year strategic plan focused on growth-led transformation; (ii) a five-year financial plan to position WeWork to achieve profitability on an adjusted EBITDA basis by 2021 and positive free cash flow by 2022; (iii) robust management of expenses; (iv) a strategic exit from non-core businesses; and (v) optimization of its real estate portfolio.  On February 2, 2020, WeWork also announced that Sandeep Mathrani would join the Company as Chief Executive Officer and a member of the board of directors of WeWork Inc. (the "Board"), effective February 18, 2020.

Less than a month later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic.  In the months that followed, COVID-19 prompted governments to impose numerous restrictions, including travel bans, quarantines, stay-at-home orders, social distancing requirements, and mandatory closures of "nonessential" businesses.  COVID-19 restrictions on in-person work initiated a remote work trend that has since changed the way businesses operate and their need for physical office space.

The COVID-driven shift to remote work negatively impacted WeWork's primary offering—space-as-a-service—and in turn led to customer attrition, delayed or withheld

63

customer payments, and increased customer requests for payment concessions, deferrals, and cancelations.  Memberships declined from the start of the pandemic until the beginning of 2021.

To adapt to remote work and macroeconomic developments, WeWork accelerated efforts to digitize its services by launching the WeWork Access products, which offer more flexibility than traditional memberships in terms of price and location.  WeWork Access, however, has not fully made up for the loss of traditional memberships.

On October 20, 2021, WeWork successfully closed a de-SPAC transaction and began trading the following day on the New York Stock Exchange.  Specifically, BowX Acquisition Corp. ("Legacy BowX"), a Delaware special purpose acquisition company ("SPAC"), consummated a business combination by and among Legacy BowX, BowX Merger Subsidiary Corp. ("Merger Sub"), a Delaware corporation and a direct, wholly owned subsidiary of Legacy BowX, and New WeWork Inc. ("Legacy WeWork"), a Delaware corporation formerly known as WeWork Inc.  First, Merger Sub merged with and into Legacy WeWork, with Legacy WeWork surviving as a wholly owned subsidiary of Legacy BowX (the "First Merger").  Next, Legacy WeWork merged with and into BowX Merger Subsidiary II, LLC, a Delaware limited liability company ("Merger Sub II"), with Merger Sub II surviving as a direct, wholly owned subsidiary of Legacy BowX (the "Second Merger" and together with the First Merger, the "Mergers").

In connection with the Mergers, Legacy BowX changed its name to WeWork Inc. and upon completion of the de-SPAC transaction, WeWork Inc. became publicly listed on the New York Stock Exchange.  At that time, WeWork had an equity valuation of approximately $9.5 billion.

Since the successful de-SPAC transaction, WeWork has continued to grow its business and execute on its strategic plan, benefiting from a cyclical recovery from the depths of the pandemic but also burdened by the need to adapt to permanent changes among companies and employees in work and work-from-home behaviors.  Acknowledging the need to right-size its portfolio and cut lease costs in the face of these issues confronting the entire commercial real estate industry, WeWork has successfully amended over 590 leases and implemented a series of measures to enhance operational efficiency, reducing future rent obligations by over $12 billion and selling, general, and administrative expenses by approximately $1.8 billion prepetition.

## B.      The Debtors' Business Operations

As of the Petition Date, WeWork's customer base included over 600,000 individuals and companies across six continents, from Fortune 500 companies to small startups.  Customers can choose from a suite of WeWork services depending on their unique commercial needs.

### 1.      WeWork Private Workspace

The vast majority of WeWork's revenue comes from its core "space-as-a-service" products, which offer members access to flexible workspace and related business amenities and services ("WeWork Private Workspace").  WeWork Private Workspace offers Member Companies (as defined below) a flexible workspace, whether they are looking for a dedicated desk, private office, or fully customized floor, on an hourly, daily, or monthly-subscription basis or through a multi-year membership agreement.  Memberships include much more than access to

64

physical space and provide a suite of amenities and services, such as dedicated community staff, private phone booths, internet access, high-speed business printers and copiers, mail and package handling, front desk services, coffee and other beverages, off-peak building access, unique common areas, WeWork-sponsored events and networking, daily enhanced cleaning, and a host of business and technical service solutions, such as remote workforce solutions, connections to human resources benefits and professional services benefits, dedicated bandwidth, and IT equipment co-location.

2.      WeWork Access

In 2020, WeWork launched WeWork All Access and WeWork On Demand (together, "WeWork Access," and customers of WeWork Private Workspace and WeWork Access, the "Member Companies") to make WeWork's real estate portfolio digitally accessible to its global customer base in the post-pandemic world.  WeWork All Access is a monthly subscription-based model that provides Member Companies with access to over 500 participating WeWork locations, giving users maximum flexibility to choose when, where, and how they work.  WeWork On Demand is a pay-as-you-go membership service that allows Member Companies to book dedicated workspaces by the hour or by the day on the WeWork mobile application.  WeWork On Demand launched successfully in New York City and has since expanded to the United States, Canada, and select markets in the European and Pacific regions.

3.      WeWork Workplace

In addition to WeWork's core "space-as-service" offerings, WeWork also offers WeWork Workspace, a proprietary office management software and data analytics platform that was jointly developed with Yardi Systems.  WeWork Workplace provides subscribers with the ability to manage and optimize their workspaces, whether at a WeWork location or in a customer's own offices, in exchange for a monthly licensing fee.  Since its launch in July 2022, WeWork Workplace has serviced over 200 companies, with over 42,000 licenses sold as of December 2022.

## C.      Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $4.2 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Make-Whole, and Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **Senior LC Facility** | May 14, 2025 | $988.3 million[15] | $88.9 million | $1,077.2 million |

---

[15]    Amount is based on drawn amount funded by and undrawn amount cash collateralized by the SoftBank Parties pursuant to the Satisfaction Letter (as defined below).

65

| | | | | |
|---|---|---|---|---|
| **Junior LC Facility** | Mar. 7, 2025 | $470.0 million | $82.0 million | $552.0 million |
| **1L Notes (Series I)** | Aug. 15, 2027 | $525.0 million | $89.2 million | $614.2 million |
| **1L Notes (Series II)** | Aug. 15, 2027 | $306.3 million | $39.0 million | $345.2 million |
| **1L Notes (Series III)** | Aug. 15, 2027 | $181.3 million | $22.9 million | $204.1 million |
| **2L Notes** | Aug. 15, 2027 | $687.2 million | $45.8 million | $733.0 million |
| **2L Exchangeable Notes** | Aug. 15, 2027 | $187.5 million | $12.5 million | $200.0 million |
| **3L Notes** | Aug. 15, 2027 | $22.7 million | $1.6 million | $24.3 million |
| **3L Exchangeable Notes** | Aug. 15, 2027 | $269.6 million | $19.5 million | $289.1 million |
| *Total Secured Debt* | | *$3,637.8 million* | *$401.5 million* | *$4039.3 million[16]* |
| **7.875% Senior Notes** | May 1, 2025 | $163.5 million | $6.6 million | $170.1 million |
| **5.000% Senior Notes** | Jul. 10, 2025 | $9.3 million | $0.1 million | $9.5 million |
| *Total Funded Debt Obligations:* | | *$3,810.7 million* | *$408.2 million* | *$4,218.9 million* |

1. LC Facility

As of the Petition Date, Goldman Sachs International Bank ("Goldman"), OneIM Fund I LP ("OneIM"), and certain other financial institutions (collectively, the "Issuing Banks") had issued several letters of credit in two tranches on behalf of the Debtors pursuant to that certain Credit Agreement, dated as of December 27, 2019 (as amended, supplemented, or otherwise modified from time to time, the "LC Facility Credit Agreement," and the facility issued thereunder, the "LC Facility") prior to the Petition Date, by and among the Issuing Banks, WeWork Companies U.S. LLC, formerly known as WeWork Companies LLC (the "WeWork Obligor"), SoftBank Vision Fund II-2 L.P. (the "SVF Obligor," and jointly and severally liable on the LC Facility with the WeWork Obligor, the "Obligors"), Goldman as the administrative agent for the senior tranche and shared collateral agent, Kroll Agency Services Limited ("Kroll") as the administrative agent for the junior tranche, and the other parties from time to time thereto. Pursuant to the terms of the LC Facility Credit Agreement, the SVF Obligor was subrogated to the Issuing Banks' and other secured parties' rights against the WeWork Obligor as of the date the SVF Obligor paid, reimbursed, or cash collateralized any obligations under the LC Facility, and such payments, reimbursements, and cash collateral were not reimbursed by the WeWork Obligor pursuant to that certain Amended and Restated Reimbursement Agreement, dated as of December 20, 2022 (as amended, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Reimbursement Agreement") by and among the Obligors.

---

[16]   Includes approximately $31.5 million in fees incurred in connection with certain prepetition transactions with respect to the LC Facility.

66

The obligations under the LC Facility (including with respect to obligations owed to the SVF Obligor as Subrogee) are secured by the assets and equity interests of certain Debtor entities.

In connection with the Satisfaction Letter executed by the WeWork Obligor, the SVF Obligor, Goldman, Kroll, and certain of the Issuing Banks including Goldman and OneIM, the SVF Obligor paid and satisfied approximately $542.4 million for the junior tranche of the LC Facility, posted approximately $873.9 million of cash collateral for the undrawn senior tranche of the LC Facility, and paid approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement.  Before the execution of the Satisfaction Letter, the SVF Obligor also reimbursed approximately $114.4 million of letters of credit that had been drawn but not reimbursed by the WeWork Obligor.  As of the Petition Date, the WeWork Obligor's total indebtedness to the SVF Obligor in its capacity as subrogee under the LC Facility with respect to such reimbursement, cash collateral, and other payments was not less than approximately $1.6 billion.  In connection with the DIP LC/TLC Facility approved by the Bankruptcy Court on December 11, 2023, approximately $671.2 million of the cash collateral posted by the SoftBank Parties to collateralize the senior tranche of the LC Facility pursuant to the Satisfaction Letter was released and immediately funded, via transfer by Goldman to specified accounts at Goldman and JPMorgan Chase Bank, N.A. at the discretion of the SVF Obligor, as the DIP TLC Facility.  As a result, as of the Petition Date and pro forma for the DIP LC/TLC Facility, total indebtedness to the SVF Obligor under the LC Facility is approximately $958 million.

2.    1L Notes

Pursuant to that certain First Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "1L Notes Indenture"), by and among WeWork Companies U.S. LLC and WW Co-Obligor Inc. as the co-issuers (together, the "Notes Issuers"), the guarantors party thereto (the "Notes Guarantors"), and U.S. Bank Trust Company, National Association ("U.S. Bank"), as trustee and collateral agent, the Notes Issuers issued $1,012,500,000 in aggregate principal amount of 1L Notes.  The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 1L Notes.

Pursuant to the 1L Notes Indenture, the 1L Notes were originally issued with a face value of $1,012,500,000, comprising:  (i) $525,000,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series I (the "Series I 1L Notes"), (ii) $306,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series II (the "Series II 1L Notes"), and (iii) $181,250,000 in aggregate principal amount of 15.00% First Lien Senior Secured PIK Notes due 2027, Series III (the "Series III 1L Notes," and, together with the Series II 1L Notes, the "1L Delayed Draw Notes" and, collectively with the Series I 1L Notes and the Series II 1L Notes, the "1L Notes").

In connection with the Notes Exchange Transactions, the Series I 1L Notes were issued and sold to the New Money Participants as a requirement to be able to exchange their Unsecured Notes into 2L Notes.  The Series I 1L Notes were backstopped by an ad hoc group of noteholders (the "Ad Hoc Group") that represented approximately 62 percent of the Unsecured Notes outstanding at the time.  The Series II 1L Notes were issued to SVF II, initially in the form of a

67

delayed draw commitment, following the redemption of the $300 million in aggregate principal amount of Secured Notes due 2025 held by SVF II (the "SoftBank Secured Notes") that were outstanding at the time in connection with the Notes Exchange Transactions. The Company drew on the $300 million delayed draw commitment of Series II 1L Notes on July 17, 2023, and August 25, 2023, and issued an additional $6.25 million of Series II 1L Notes as a commitment fee on account of the delayed draw commitment. The Series III 1L Notes were issued to Cupar Grimmond, LLC ("Cupar"), in connection with its $175 million delayed draw commitment. The Company similarly exercised its delay-draw option and drew on the commitment on July 17, 2023, and August 25, 2023 and issued $6.25 million of Series III 1L Notes as a commitment fee on account of the delayed draw commitment. As of the Petition Date, the Debtors were liable for approximately $1,012,500,000 in outstanding aggregate principal amount of the 1L Notes, plus approximately $151.1 million on account of accrued and unpaid interest, plus all other fees and expenses (including make-whole premiums) on account of the 1L Notes.

3.      2L Notes

Pursuant to that certain Second Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $687,212,250 in aggregate principal amount of 11.00% Second Lien Senior Secured PIK Notes due 2027 (the "2L Notes") to the New Money Participants in connection with the Notes Exchange Transactions. The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 2L Notes.

In connection with the Notes Exchange Transactions, New Money Participants were entitled to receive in exchange for $1,000 in principal amount of Unsecured Notes being exchanged (i) $750 in principal amount of new 2L Notes, and (ii) a number of WeWork's Common Shares equal to $150, calculated at $0.9236 per share (the "Equity Exchange Price").[17] As of the Petition Date, the Debtors were liable for approximately $687,212,250 in outstanding aggregate principal amount of the 2L Notes, plus approximately $45.8 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 2L Notes.

4.      2L Exchangeable Notes

Pursuant to that certain Second Lien Exchangeable Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "2L Exchangeable Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $187,500,000 in aggregate principal amount of 11.00% Second Lien Exchangeable Senior Secured PIK Notes due 2027 (the "2L Exchangeable Notes") to a SoftBank Party in connection with the Notes Exchange Transactions. The Notes Guarantors

---

[17]   The Equity Exchange Price was determined, prior to the Reverse Stock Split, based on the twenty-day volume weighted average price of WeWork's Common Shares during the period starting ten trading days prior to the commencement of the Exchange Offers and ending ten trading days after the commencement of the Exchange Offers.

68

unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 2L Exchangeable Notes.

Pursuant to the 2L Exchangeable Notes Indenture, the 2L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily by the holder at any time or (ii) mandatorily by the Company after November 5, 2024, if certain conditions are met.

In connection with the Notes Exchange Transactions, a SoftBank Party was entitled to exchange $250,000,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $187,500,000 in aggregate principal amount of 2L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to approximately $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price. As of the Petition Date, the Debtors were liable for approximately $187,500,000 in outstanding aggregate principal amount, plus approximately $12.5 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 2L Exchangeable Notes.

5.      3L Notes

Pursuant to that certain Third Lien Senior Secured PIK Notes Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, Delaware Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee, and U.S. Bank Trust Company, National Association, as collateral agent, the Notes Issuers issued $22,653,750 in aggregate principal amount of 12.00% Third Lien Senior Secured PIK Notes due 2027 (the "3L Notes") in connection with the Notes Exchange Transactions. The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 3L Notes.

In connection with the Notes Exchange Transactions, Non-New Money Participants were entitled to receive in exchange for every $1,000 in principal amount of Unsecured Notes being exchanged, (i) (a) $750 in principal amount of 3L Notes, and (b) a number of WeWork's Common Shares equal to $150, calculated at the Equity Exchange Price, or (ii) a number of WeWork's Common Shares equal to $900, calculated at the Equity Exchange Price. As of the Petition Date, the Debtors were liable for approximately $22,653,750 in outstanding aggregate principal amount, plus approximately $1.6 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 3L Notes.

6.      3L Exchangeable Notes

Pursuant to that certain Third Lien Exchangeable Senior Secured PIK Note Indenture, dated as of May 5, 2023 (as amended, supplemented, or otherwise modified from time to time, the "3L Exchangeable Notes Indenture"), by and among the Notes Issuers, the Notes Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Notes Issuers issued $269,625,000 in aggregate principal amount of 12.00% Third Lien Exchangeable Senior Secured PIK Notes due 2027 (the "3L Exchangeable Notes," and together with the 1L

69

Notes, the 2L Notes, the 2L Exchangeable Notes, and the 3L Notes, the "Secured Notes") to a SoftBank Party] in connection with the Notes Exchange Transactions.

The Notes Guarantors unconditionally and irrevocably guaranteed the obligations of the Notes Issuers with respect to the 3L Exchangeable Notes. Pursuant to the 3L Exchangeable Notes Indenture, the 3L Exchangeable Notes are exchangeable for WeWork's Common Shares at a share price that was initially set at 130 percent of the Equity Exchange Price either (i) voluntarily by the holder at any time or (ii) mandatorily by the Company after November 5, 2024, if certain conditions are met.

In connection with the Notes Exchange Transactions, a SoftBank Party was entitled to exchange $359,500,000 in aggregate principal amount of SoftBank Unsecured Notes into (i) $269,625,000 in aggregate principal amount of 3L Exchangeable Notes and (ii) a number of WeWork's Common Shares equal to approximately $150 per $1,000 of SoftBank Unsecured Notes being exchanged, calculated at the Equity Exchange Price. As of the Petition Date, the Debtors were liable for approximately $269,625,000 in outstanding aggregate principal amount, plus approximately $19.5 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 3L Exchangeable Notes.

### 7.    Unsecured Notes

Holders of the 7.875% Senior Notes due 2025 (the "7.875% Senior Notes") and the 5.000% Senior Notes due 2025, Series II (the "5.000% Senior Notes" and together with the 7.875% Senior Notes, the "Unsecured Notes") who did not participate in the Notes Exchange Transactions continue to hold Unsecured Notes. As of the Petition Date, the Debtors were liable for approximately $164 million in outstanding aggregate principal amount, plus approximately $6.6 million on account of accrued and unpaid interest, plus all other fees and expenses on account of the 7.875% Senior Notes, and approximately $9.3 million in outstanding aggregate principal amount, plus approximately $123,000 on account of accrued and unpaid interest, plus all other fees and expenses on account of the 5.000% Senior Notes.

### 8.    Equity

WeWork Inc.'s certificate of incorporation authorizes the Board to issue 4,874,958,334 shares of Class A common stock, par value $0.0001 per share (the "Common Shares"), 25,041,666 shares of Class C common stock, par value $0.0001 per share, and 100 million shares of preferred stock ("Preferred Shares"). Approximately 52.83 million Common Shares and approximately 497,000 shares of Class C common stock were outstanding as of the Petition Date.[18] The Common Shares previously traded on the New York Stock Exchange under the

---

[18] This outstanding number of shares reflects a 1-for-40 reverse stock split (the "Reverse Stock Split") of WeWork's outstanding shares of Class A common stock and Class C common stock, effective on September 1, 2023, that was approved by the Board and within the ratio range authorized by WeWork's shareholders at the June 2023 annual meeting. No other references to the number of shares in this Disclosure Statement reflect the Reverse Stock Split.

70

ticker symbol "WE" and currently trade in the OTC Pink Marketplace under the ticker "WEWKQ."[19]  To date, WeWork has not issued any Preferred Shares.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Economic and Operational Headwinds

As the world emerged from the pandemic, WeWork was on track toward profitability.  In 2022, WeWork's total revenue increased by $675 million, which was primarily driven by an increase in total membership and service revenue.  As of December 2022, memberships had increased by 17 percent to approximately 547,000.  Simultaneously, lease costs decreased by $60 million, pre-opening location expenses decreased by $38 million, location operating expenses decreased by $171 million, and selling, general, and administrative expenses decreased by $276 million.  Nevertheless, WeWork's progress toward profitability was disrupted by a series of compounding factors.

### 1.    Changing Commercial Real Estate Landscape

Since late 2021, to curb inflation, central banks around the world have continuously raised interest rates.  In the United States, the Federal Reserve raised its benchmark short-term rate eleven times since March 2022, reaching 5.5 percent in July 2023, its highest level since 2001.  The historically rapid rise in interest rates, coupled with slower than expected post-COVID return to office (as further discussed below), pressured WeWork's liquidity and drove increasing economic distress in the commercial real estate sector.  Consequently, landlords have been more willing than in the past to reduce rent prices and offer flexible leasing terms to attract new tenants.  Moreover, many office tenants are adjusting to the global shift to a hybrid work environment by consolidating their footprints and attempting to sublease their excess space, often at a rent significantly discounted to their original cost.  As a result, commercial office space, especially in the large cities where WeWork operates, has become available and accessible at unprecedented prices and in significant volume, amounting to much greater competition in WeWork's target market.

Because many of WeWork's leases were entered into in a much more robust real estate market and are characterized by above-market rents without rent resets or lessee-friendly termination rights, WeWork lacked the necessary financial flexibility to adjust to the rapidly shifting commercial real estate market.  WeWork's prepetition business model has become increasingly difficult to maintain and must be repriced to align with the current real estate market.

### 2.    Slower-than-Expected Return to Office

While the supply of office space has surged, demand has receded as businesses continue to follow hybrid work policies first adopted during the pandemic.  Many businesses and individuals have emerged from the pandemic eschewing the traditional office environment in

---

[19]    On November 7, 2023, the New York Stock Exchange suspended the trading of the Common Shares and announced that it would commence delisting proceedings on account of these Chapter 11 Cases.

71

favor of remote or hybrid work arrangements. The slower-than-expected return to office among customers led to a corresponding reduction in WeWork's sales, revenue, and membership demand. Consequently, WeWork's membership numbers have not grown at a rate sufficient to support the Company's capital structure. In an attempt to retain memberships, the Company has often offered additional discounts and deferrals, negatively impacting the Company's top and bottom line. In light of its operational and economic challenges, the Company began consulting with Kirkland and PJT in early 2023 to evaluate potential refinancing and restructuring options.

B.        **March 2023 Notes Exchange Transaction**

In March 2023, with the assistance of Kirkland and PJT, WeWork negotiated a comprehensive recapitalization transaction (the "Notes Exchange Transactions") with the Ad Hoc Group, the SoftBank Parties, and Cupar, and such Notes Exchange Transactions were consummated in May 2023. As a result of the Notes Exchange Transactions, WeWork secured over $1 billion of total funding and capital commitments, canceled or equitized approximately $1.5 billion of total debts through the equitization and discounted exchanges of over $1 billion of unsecured notes held by the SoftBank Parties and over $1 billion of Unsecured Notes held by the participating public noteholders (including the Ad Hoc Group), and extended the maturity of approximately $1.9 billion of *pro forma* debts from 2025 to 2027.

Among other things, WeWork (i) offered to all public holders of the Unsecured Notes the opportunity to purchase $500 million in aggregate principal amount of Series I 1L Notes (the "Exchange Offers"), which was backstopped by the Ad Hoc Group, in connection with the exchange of their Unsecured Notes for 2L Notes and/or Common Shares (as described below); (ii) transferred $300 million in aggregate principal amount of the SoftBank Secured Notes into a new $300 million delayed draw commitment for Series II 1L Notes; and (iii) obtained a commitment to purchase $175 million of Series III 1L Notes from Cupar, who also agreed to purchase 35 million Common Shares at $1.15 per Common Share.

If a holder of Unsecured Notes participated in the Notes Exchange Transactions to exchange all of its Unsecured Notes and fully purchased its *pro rata* share of $500 million of 1L Notes (such holder, a "New Money Participant"), it was entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 2L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price. If a holder of Unsecured Notes participated in the Notes Exchange Transactions but did not purchase its *pro rata* share of Series I 1L Notes (such holder, a "Non-New Money Participant"), it was only entitled to exchange every $1,000 of its Unsecured Notes at face value into either (i) $750 of 3L Notes and $150 of Common Shares at the Equity Exchange Price or (ii) $900 of Common Shares at the Equity Exchange Price.

Of the approximately $1.65 billion in aggregate principal amount of 5.000% Senior Notes due 2025, Series I (the "SoftBank Unsecured Notes") held by the SoftBank Parties, (i) for $250 million in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $750 of 2L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; (ii) for approximately $360 million in aggregate principal amount, every $1,000 of such SoftBank Unsecured Notes was exchanged at face value into $750 of 3L Exchangeable Notes and $150 of Common Shares at the Equity Exchange Price; and (iii) for the

72

remaining approximately $1.04 billion in aggregate principal amount, every $1,000 of SoftBank Unsecured Notes was exchanged at face value into $900 of Common Shares at the Equity Exchange Price.

### C.        Enhanced Corporate Governance

On August 8, 2023, four experienced and disinterested directors—Paul Aronzon, Paul Keglevic, Elizabeth LaPuma, and Henry Miller (collectively, the "Independent Directors")—were appointed as independent directors to the Board.  On August 17, 2023, in connection with its contingency planning efforts and in consultation with its advisors, the Board reviewed the Company's existing corporate governance infrastructure and determined that it was advisable and in the best interest of the Company and its stakeholders to establish a special committee of the Board comprising the Independent Directors (the "Special Committee").  The Board delegated to the Special Committee certain rights, authority, and powers in connection with any matters in which a conflict of interests exists or is reasonably likely to exist between the Company, on the one hand, and any of its related parties, including current and former directors, managers, officers, equity holders, employees, advisors, and certain other parties on the other hand (the "Conflict Matters").  On October 3, 2023, the Special Committee retained Munger, Tolles & Olson LLP ("MTO") as independent counsel and Province, Inc. ("Province") as independent financial advisor.  The Bankruptcy Court entered orders approving the retention of Province [Docket No. 386] and MTO [Docket No. 484] on December 8 and December 21, 2023, respectively.

### D.        Prepetition Negotiations and the Restructuring Support Agreement

The Company's lease rationalization process accelerated in the months prior to these Chapter 11 Cases in connection with the Company's broader restructuring efforts.  In August 2023, the Company engaged Hilco to assist with an accelerated and comprehensive lease rationalization on a global scale.  Beginning in September of 2023, the Company and Hilco began engaging with hundreds of landlords to secure amendments or exits to substantially all of the Company's real estate leases.  Ultimately, however, the deliberate pace of that process, together with the Company's finite liquidity, did not provide the Company with sufficient runway to complete an out-of-court rationalization of the Company's lease portfolio, and the Company began to take steps to extend its liquidity while it negotiated a comprehensive restructuring transaction with parties in interest.

At the beginning of October 2023, the Company withheld (i) approximately $95.2 million of interest payments on its 1L Notes, 2L Notes, 2L Exchangeable Notes, 3L Notes, and 3L Exchangeable Notes, approximately $37.3 million of which was payable in cash and the remaining $57.9 million were payable in-kind; and (ii) approximately $78 million of rent payments at certain locations across its lease portfolio, including approximately $37 million in the United States and approximately $41 million in international locations ((i) and (ii) collectively, the "Payment Withholding").  Under the Notes Indentures, the Company had a thirty-day grace period to make the missed interest payments before the non-payment crystalized into an event of default.  Contemporaneously with its decision regarding the Payment

73

Withholding, the Company began negotiations with key stakeholders across its capital structure, including the Consenting Stakeholders.

In the weeks following the Payment Withholding, the Company, with the assistance of their advisors, engaged extensively with key stakeholders to chart a value-maximizing path forward in preparation for these Chapter 11 Cases.  To that end, on October 30, 2023, the Company and the Consenting Stakeholders entered into an agreement (the "Forbearance Agreement") pursuant to which the Consenting Stakeholders agreed to forbear from exercising remedies following the Payment Withholding until November 6, 2023.  That same day, WeWork Obligor, SVF Obligor, Goldman, Kroll, and certain other Issuing Banks under the LC Facility executed that certain Satisfaction Letter and Forbearance Agreement (the "Satisfaction Letter") pursuant to which (i) the SVF Obligor agreed to pay and satisfy approximately $542.4 million for the junior tranche of the LC Facility, post approximately $873.9 million of cash collateral for the undrawn amounts under the senior tranche of the LC Facility, and pay approximately $50.6 million for various fees and expenses under the LC Facility Credit Agreement; and (ii) Goldman, Kroll, and certain other Issuing Banks, constituting the requisite majority of Issuing Banks of the LC Facility, agreed to forbear the exercise of any rights or remedies against the Company with respect to the Company's potential cross default on the LC Facility while the SVF Obligor's payment and cash collateralization was pending.  On October 31, 2023, the SVF Obligor paid the entire $1,466,955,937.39 in accordance with the Satisfaction Letter.  Before the execution of the Satisfaction Letter, the SVF Obligor also reimbursed approximately $114.4 million of letters of credit that had been drawn but not reimbursed by the WeWork Obligor.

Seven days after the execution of the Satisfaction Letter, on the Petition Date, the Debtors, the SoftBank Parties, the Ad Hoc Group, and Cupar reached an agreement on the terms of a comprehensive restructuring transaction, embodied in the restructuring support agreement (the "RSA," and the transactions contemplated in the RSA, the "RSA Transactions").

The RSA Transactions contemplate:[20]

i.      the equitization of the Drawn DIP TLC Claims (other than up to $100 million of such Claims which shall be satisfied with loans under a New 1L Exit Term Loan Facility), Prepetition LC Facility Claims, the 1L Notes Claims, and the 2L Notes Claims into New Interests, as set forth, and subject to the conditions set forth, in the RSA;

ii.     the cancelation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth in the RSA (other than any equity Interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by the Parties to the RSA, a SoftBank Party contributes its Claims in exchange for the retention of its equity interests);

---

[20]   Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the RSA attached as Exhibit B to the First Day Declaration.

74

iii.      issuance of a New 1L Exit Term Loan Facility in an amount equal to (a) the lesser of (x) the total amount of all Drawn DIP TLC Claims and (y) $100 million, plus (b) the DIP TLC Fee Claims;

iv.      a DIP TLC Facility that, among other things: (a) deems certain outstanding, undrawn, letters of credit under the prepetition LC Facility (other than undrawn letters of credit issued in connection with certain leases/locations to be identified and agreed upon by the Company Parties and the Consenting Stakeholders no later than the Petition Date) whether replaced, renewed, reissued, or amended (the "DIP LCs") to be obligations under the DIP TLC Facility and all associated cash collateral posted for each letter of credit to continue as credit support under the DIP TLC Facility, in each case on a dollar-for-dollar basis; and (b) provides for the replacement, renewal, reissuance, and/or amendment of the DIP LCs, which facility shall rank *pari passu* in lien and claim priority with the Prepetition LC Facility Claims and 1L Notes Claims (other than with respect to (1) amounts funded by the SoftBank Parties or their Affiliates to the Company Parties in the form of "Term Loan C" (on which (x) the creditors under the DIP TLC Facility shall have a first lien and claim priority, and (y) the Prepetition LC Facility Claims and 1L Notes Claims shall not have any lien) and (2) certain fees thereunder as further set forth in the DIP TLC Term Sheet attached to the RSA as Exhibit E) on the terms and subject to the conditions set forth in the DIP TLC Term Sheet, any subsequent DIP TLC term sheet agreed by the Company Parties and Consenting Stakeholders, the DIP TLC Orders, and the Cash Collateral Orders, as applicable; and

v.      a binding commitment by certain SoftBank Parties to, subject to the following sentence, provide credit support in the form of providing cash to be used as collateral for a New LC Facility on the terms and subject to the conditions set forth in the New LC Facility Term Sheet attached to the RSA as Exhibit F. For the avoidance of doubt, credit support provided under the New LC Facility, if any, shall not exceed the amount of undrawn and outstanding letters of credit under the DIP TLC Facility (and shall be reduced on a dollar-for-dollar basis based on drawn letters of credit that occur prior to the Plan Effective Date).

The RSA also established certain case milestones to ensure that these Chapter 11 Cases proceed at an appropriate and efficient pace, thereby avoiding an unnecessarily prolonged stay in chapter 11. The RSA Milestones, ~~which~~ were subsequently amended on several occasions by mutual agreement among the Consenting Stakeholders following execution of the RSA~~, are set forth as below:~~.

| RSA Milestone | Original Date | Current Date |
|---|---|---|
| ~~Commencement of these Chapter 11 Cases~~ | ~~November 6, 2023~~ | ~~November 6, 2023~~ |
| ~~Entry of the interim cash collateral order~~ | ~~November 9, 2023~~ | ~~November 9, 2023 [Docket No. 103]~~ |

75

| Entry of the final cash collateral order and the Final DIP TLC Order | December 11, 2023 | December 11, 2023 [Docket Nos. 427, 428] |
| --- | --- | --- |
| Filing of a chapter 11 plan and the disclosure statement | February 4, 2024 | February 4, 2024 |
| Filing of the disclosure statement motion | February 4, 2024 | February 11, 2024 |
| Entry of the order approving the adequacy of the disclosure statement | February 24, 2024 | February 24, 2024 |
| Entry of the order confirming the chapter 11 plan, and the occurrence of the effective date of the chapter 11 plan. | March 5, 2024 | March 19, 2024[21] |

Following entry into the RSA, the Debtors commenced these Chapter 11 Cases to rationalize their lease portfolio, right-size their balance sheet, and position WeWork for sustainable, long-term growth.

### E.    Corporate Division

Immediately prior to commencing the Chapter 11 Cases, WeWork Companies LLC was WeWork's primary operating company, meaning it was (i) the borrower under WeWork's LC Facility, (ii) the issuer of WeWork's Secured Notes and Unsecured Notes, (iii) the direct and indirect equityholder for substantially all of WeWork's other subsidiaries, and (iv) the guarantor under most of WeWork's leases. On November 6, 2023, before the commencement of the Chapter 11 Cases, WeWork Companies LLC changed its name to WeWork Companies U.S. LLC (the "Dividing Company") and then underwent a corporate division pursuant to section 18-217 of the Delaware Limited Liability Company Act (the "Corporate Division"), whereby the Dividing Company became two companies: WeWork Companies U.S. LLC ("WWCUS") and WeWork Companies LLC ("WWC"). The Corporate Division allocated the assets and liabilities of the Dividing Company as follows:

- **WWC** retained all guarantee obligations associated with any leases that related to real property located in Ireland, the United Kingdom, or Australia (the "Excluded Countries"), where such lease (or the associated guarantee obligations) remained in effect as of November 6, 2023 (such obligations, the "Excluded Guarantee Obligations"), and was allocated an absolute indemnity from WWCUS by which WWCUS is obligated to indemnify WWC with respect to any losses arising from the guarantee or surety obligations allocated to WWC; and

- **WWCUS** retained all other obligations (*i.e.*, except the Excluded Guarantee Obligations), including all guarantee obligations associated with (i) all leases for real property located in the United States, Canada, and any other country except the Excluded Countries, and/or (ii) leases for real property in Excluded Countries if such leases were

---

[21].   Pursuant to the Final Cash Collateral Order (as defined below), the milestones for the Confirmation of the Plan and the Effective Date were extended for fourteen days to March 19, 2024, solely for purposes of the Final Cash Collateral Order.

76

forfeited (and occupation of such real property permanently ceased) prior to November 6, 2023 (including those leases for real property located at 12 Moorgate, 52 Bedford Row, and/or 91 Baker Street, in London, England), and was allocated an indemnification obligation to WWC and nearly all assets of the Dividing Company.

Following the Corporate Division, WWCUS filed for chapter 11 and is a Debtor in these Chapter 11 Cases; WWC did not file for chapter 11 and is not a Debtor in these Chapter 11 Cases.  WWCUS is the sole guarantor, by operation of law, with respect to all obligations other than the Excluded Guarantee Obligations.

## VII.    EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, 517 WeWork entities each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Contemporaneously therewith, the Debtors filed various motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, maintaining the Debtors' relationships with employees, vendors, customers, and other third parties following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration filed on the Petition Date.

Following a hearing on November 8, 2023 (the "First Day Hearing"), the Bankruptcy Court entered orders granting all of the relief requested in the First Day Motions on an interim or final basis (such interim orders, the "Interim First Day Orders"), and on December 6, December 11, and December 20, 2023, as applicable, the Bankruptcy Court entered orders granting certain of the First Day Motions on a final basis (such final orders, along with the orders entered on a final basis immediately after the First Day Hearing, the "Final First Day Orders").  The Interim First Day Orders and the Final First Day Orders include:[21]

- **Cash Collateral Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 43] (the "Cash Collateral Motion"), which, among other things, sought authority to access the cash collateral to fund the Chapter 11 Cases.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on an interim basis [Docket No. 103] (the "Interim Cash Collateral Order").  On December 11, 2023, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on a final basis [Docket No. 428] (the "Final Cash Collateral Order", and together with the Interim Cash Collateral Order, the "Cash Collateral Orders").

---

[21]  The First Day Motions, Petitions, and all entered orders for relief in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/WeWork.

77

[The Cash Collateral Orders govern the Debtors' consensual use of approximately $164 million of cash collateral on hand as of the Petition Date and provide for various forms of adequate protection to the Prepetition Secured Parties as more fully set forth therein.  As a result of arm's-length, good faith negotiations in the days and weeks immediately following the Creditors' Committee's appointment, the Debtors, the Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee reached a settlement on various issues relating to, among other things, the creation of a "stub" rent reserve included in the Final Cash Collateral Order (the "Stub Rent Reserve").  The Stub Rent Reserve consists of a segregated account (which shall remain part of the Prepetition Collateral and subject to the Prepetition Liens and the Adequate Protection Liens, as such terms are defined in the Final Cash Collateral Order) established for paying unpaid rent obligations for the period from and including the Petition Date through November 30, 2023.  The Stub Rent Reserve shall be funded in one-third portions of the Debtors' estimated stub rent upon the occurrence of certain events as set forth in the Final Cash Collateral Order.]

On January 26, 2024, the Creditors' Committee, the SoftBank Parties, and the Ad Hoc Group agreed to extend the Creditors' Committee's Challenge Period (as defined in the Final Cash Collateral Order) to February 20, 2024 [Docket No. 1233].

- **Cash Management Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records; (II) Authorizing the Debtors to Continue to Perform Intercompany Transactions; (III) Waiving Certain U.S. Trustee Requirements; and (IV) Granting Related Relief* [Docket No. 20] (the "Cash Management Motion"), which, among other things, sought authority to maintain their cash management system in the ordinary course.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 105].

  On January 22, 2024, the U.S. Trustee filed a limited objection [Docket No. 1182] to the Cash Management Motion, challenging the Debtors' request to waive the requirement of section 345(b) of the Bankruptcy Code on the ground that the Debtors' funds, held in certain accounts in foreign branches of JPMorgan Chase Bank, were subject to a risk of loss.  On January 29, 2024, the Debtors filed a reply [Docket No. 1244] arguing, among other things, that estate funds are sufficiently protected and cause exists to waive the requirement of section 345(b) of the Bankruptcy Code with respect to certain Debtor bank accounts.

  On January 30, 2024, the Bankruptcy Court entered a second interim order [Docket No. 1248], authorizing the Debtors to continue using the cash management system and granting other related relief the Debtors requested in the Cash Management Motion on an interim basis.  ~~As of the date hereof, the~~ <u>entry of an Order approving</u> <u>After a hearing on February 5, 2024, the Bankruptcy Court overruled the U.S. Trustee's objection and entered an order authorizing the Debtors to use their cash management system and granting other related relief the Debtors requested in</u> the

Cash Management Motion on a final basis ~~is pending a hearing on February 5, 2024, before the Bankruptcy Court~~[Docket No. 1302] (the "Final Cash Management Order").

- **Epiq Retention Application**: The *Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 5] (the "Epiq Retention Application"), which sought authority to retain Epiq Corporate Restructuring, LLC ("Epiq") as the Claims Agent.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Epiq Retention Application [Docket No. 91].

- **NOL Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 16] (the "NOL Motion"), which sought authority to establish the notification and hearing procedures for certain transactions of the Debtors' equity interests.  On November 8, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on an interim basis [Docket No. 89].  On December 6, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 339].

- **Taxes Motion**:   The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 10] (the "Taxes Motion"), which sought authority to pay certain taxes assessed against the Debtors.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Taxes Motion on an interim basis [Docket No. 93].  On December 6, 2023, the Bankruptcy Court entered an Order approving the Taxes Motion on a final basis [Docket No. 335].

- **Assumption and Rejection Procedures Motion**:  The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 12] (the "Assumption and Rejection Procedures Motion"), which sought authority to establish procedures to streamline the process of accepting and rejecting executory contracts and unexpired leases.  On November 29, 2023, the Bankruptcy Court entered an Order approving the Assumption and Rejection Procedures Motion [Docket No. 289].

- **Insurance Motion**:   The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations Thereto and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief* [Docket No. 7] (the "Insurance Motion"), which sought authority, among other things, to maintain the Debtors' prepetition insurance and surety coverage.  On November 9, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on an interim basis [Docket No. 109].  On December 6, 2023, the Bankruptcy

79

Court entered an Order approving the Insurance Motion on a final basis [Docket No. 334].

- **Critical Vendors Motion**: The *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 15] (the "Critical Vendor Motion"), which sought authority, among other things, to pay the prepetition claims of certain of the Debtors' vendors.  On November 8, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 96], and on December 6, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 338].

- **Utilities Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Fee Payments to the Utility Agent, and (V) Granting Related Relief* [Docket No. 11] (the "Utilities Motion"), which sought authority to, among other things, provide adequate assurance of future payment to the Debtors' utility providers.  On November 8, 2023, the Bankruptcy Court entered an order approving the Utilities Motion on an interim basis [Docket No. 99].  On December 6, 2023, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 336].

- **Wages Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief* [Docket No. 13] (the "Wages Motion"), which sought authority to, among other things, pay the prepetition wages and salaries of the Debtors' employees.  On November 8, 2023, the Bankruptcy Court entered an order approving the Wages Motion on an interim basis [Docket No. 88].  On December 6, 2023, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 337].

- **Schedule and Statement Extension Motion**:  The *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief* [Docket No. 9] (the "Schedule and Statement Extension Motion"), which sought authority to extend the deadline by which the Debtors have to file their Schedule and Statements to January 6, 2024.  On November 8, 2023, the Bankruptcy Court entered an order approving the Schedule and Statement Extension Motion [Docket No. 97].

- **Customer Programs Motion**:  The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs, (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting*

80

*Related Relief* [Docket No. 6] (the "Customer Programs Motion"), which sought authority to, among other things, maintain and administer the Debtors' customer programs. On November 8, 2023, the Bankruptcy Court entered an order approving the Customer Programs Motion on an interim basis [Docket No. 86]. On December 6, 2023, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 333].

- **Creditor Matrix Motion**: The *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact or Withhold Certain Confidential Information of Customers, and (D) Redact Certain Personally Identifiable Information; (II) Waiving the Requirement to File a List of Equity Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief* [Docket No. 17] (the "Creditor Matrix Motion"), which sought authority to, among other things, redact certain information of the Debtors' customers and creditors from the papers filed in these Chapter 11 Cases. On November 8, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on an interim basis [Docket No. 90]. On December 20, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 473].

- **Foreign Representative Motion**: The *Debtors' Motion for Entry of Order (I) Authorizing WeWork Inc. to Act as Foreign Representative and (II) Granting Related Relief* [Docket No. 8] (the "Foreign Representative Motion"), which sought authority to appoint WeWork Inc. as the Foreign Representative of the Chapter 11 Cases in the Canadian Proceeding (each, as defined below). On November 8, 2023, the Bankruptcy Court entered an order approving the Foreign Representative Motion [Docket No. 95].

- **Automatic Stay Motion**: The *Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Ipso Facto Protections, and Anti-Discrimination Provisions of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 19] (the "Automatic Stay Motion"), which sought entry of an order restating and enforcing the worldwide automatic stay, among other things. On November 9, 2023, the Bankruptcy Court entered an order approving the Automatic Stay Motion [Docket No. 104] (the "Automatic Stay Order").

- **Joint Administration Motion**: The *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 41] (the "Joint Administration Motion"), which sought entry of an order authorizing the joint administration of these Chapter 11 Cases for procedural purposes only. On December 22, 2023, the Debtors filed a revised proposed form of *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 495] (the "Revised Proposed Joint Administration Order"). On November 8, 2023, the Bankruptcy Court entered an order approving the Joint Administration Motion [Docket

81

No. 87], and on January 8, 2024, the Bankruptcy Court entered an order in the form of the Revised Proposed Joint Administration Order [Docket No. 1116].

- **Case Management Motion**:  The *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 18] (the "Case Management Motion"), which sought authority to establish certain case management procedures.  On November 8, 2023, the Bankruptcy Court entered an order approving the Case Management Motion [Docket No. 100].

### B.      Second Day Relief

On November 15, 2023, the Debtors filed several motions (the "Second Day Motions") to allow the Debtors to continue to progress in these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered orders granting each of the Second Day Motion on certificates of no objection (such orders, the "Second Day Orders").

- **De Minimis Settlement Motion**:  The *Debtors' Motion for Entry of an Order (I) Authorizing and Establishing Procedures for the Compromise and Settlement of De Minimis Claims, (II) Approving the Form and Manner of the Notice of Settlement, and (III) Granting Related Relief* [Docket No. 140] (the "De Minimis Settlement Motion"), which sought authority to, among other things, establish procedures to streamline the settlement of certain claims against or held by the Debtors (the "De Minimis Settlement Procedures").  On December 6, 2023, the Bankruptcy Court entered an Order approving the De Minimis Settlement Motion [Docket No. 341].

- **De Minimis Asset Sale Motion**:  The *Debtors' Motion for Entry of an Order (I) Authorizing and Establishing Procedures for the De Minimis Asset Transactions; (II) Authorizing and Establishing Procedures for De Minimis Asset Abandonment; (III) Approving the Form and Manner of the Notice of De Minimis Asset Transactions and Abandonment; and (IV) Granting Related Relief* [Docket No. 142] (the "De Minimis Asset Sale Motion"), which sought authority to, among other things, establish procedures to streamline the sale or abandonment of certain *de minimis* assets of the Debtors.  On December 6, 2023, the Bankruptcy Court entered an Order approving the De Minimis Asset Sale Motion [Docket No. 343].

- **OCP Motion**:  The *Debtors' Motion for Entry of an Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 141] (the "OCP Motion"), which sought authority to, among other things, employ and pay certain professionals the Debtors utilized in their ordinary course of business for matters unrelated to these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered an Order approving the OCP Motion [Docket No. 342].

- **Interim Compensation Motion**:  The *Debtors' Motion for Entry of an Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of This Court* [Docket No. 139] (the "Interim Compensation Motion"), which sought

82

authority to, among other things, establish procedures for the allowance and payment of the fees and expenses of the professionals retained by the Debtors in connection with these Chapter 11 Cases.  On December 6, 2023, the Bankruptcy Court entered an Order approving the Interim Compensation Motion [Docket No. 340].

### C.   Approval of the DIP LC/TLC Facility [2322]

It is critical that the Debtors maintain access to letters of credit ("LCs") during the Chapter 11 Cases through the DIP Facilities.  A significant portion of the leases in the Debtors' and non-Debtors' real estate portfolio requires that such parties, in their capacities as tenants, provide LCs as security for the lease.  If the Debtors fail to maintain the LCs (including failing to replace the LCs in advance of an expiration date), the Debtors may be in default under such leases and the landlords would be able to draw in full under the applicable LCs.  Failure to obtain access to the DIP LC Facility and replacement LCs would have led to, among other things, an onslaught of LC draws, which would be highly disruptive to the Debtors' operations and restructuring efforts.

Accordingly, on November 19, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 186] (the "DIP Motion"), requesting the Bankruptcy Court's approval of (i) a senior secured, first priority cash collateralized debtor-in-possession "first out" letter of credit facility (the "DIP LC Facility") in an aggregate amount of $650 million; and (ii) a senior secured, first priority debtor-in-possession "last out" term loan C facility (the "DIP TLC Facility," together with the DIP LC Facility, the "DIP LC/TLC Facility") in an aggregate principal amount equal to $671,237,045.94, which would fully cash collateralize letters of credit under the DIP LC Facility.

On December 11, 2023, the Bankruptcy Court entered a fully consensual order approving the DIP LC/TLC Facility [Docket No. 427] (the "DIP Order").  The relief granted in the DIP Order incorporates the terms of a settlement with the Creditors' Committee, which engaged in constructive dialogue with the Debtors with respect thereto.  As a result of arm's-length, good faith negotiations in the days and weeks that immediately followed the Creditors' Committee's appointment, the Debtors, the Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee reached a settlement on various issues relating to, among other things, the scope of DIP Liens, notice and challenge period rights, milestone extensions, and compliance with the U.S. Trustee's requirement regarding Authorized Depository.

The LC capacity the Debtors obtained pursuant to the DIP Order allows the Debtors to pursue a successful lease rationalization strategy and maximize value for all stakeholders in these Chapter 11 Cases.  Pursuant to the DIP Order, the Debtors are using the proceeds of the DIP TLC Facility to fund approximately fourteen interest-bearing DIP LC Loan Collateral Accounts established with the DIP LC Issuers.  The DIP LC Loan Collateral Accounts serve as cash collateral in support of the issuance of cash collateralized DIP LCs under the DIP LC

---

[2322] Capitalized terms used but not defined in this section has the meaning ascribed to them in the DIP Motion, as applicable.

83

Facility consistent with the structure of the prepetition LC Facility.  By design the LC structure under the DIP LC Facility affords the Debtors and their non-Debtor affiliates with the requisite LC capacity to renew and maintain standby LCs to support their third-party obligations and avoid unnecessary value-destructive LC draws, in a manner consistent with their historical practice. Specifically, under the DIP LC/TLC Facility, the Debtors are now able to obtain renewals or replacement of certain LCs prior to expiration, which has been essential to WeWork's ongoing operations and to preserving the value of their Estates for the benefit of all stakeholders.

### D.        DIP New Money Facility

In January 2024, the Debtors and their advisors determined that it may be prudent for the Debtors to seek to raise new money, debtor-in-possession financing to carry the Debtors through the remainder of the Chapter 11 Cases.  Accordingly, on February 1, 2024, the Debtors circulated an initial term sheet for a potential DIP New Money Facility to the Consenting Stakeholders. Over the following several weeks, the Debtors and their advisors continued to engage with the Consenting Stakeholders to negotiate the framework both of a debtor-in-possession financing facility and terms of postpetition financing that would provide the Debtors with the necessary liquidity on an appropriate timeline while also preserving the framework of the RSA and retaining the support of the Consenting Stakeholders representing approximately 92 percent of the Debtors' Secured Notes.

In February 2024, the Debtors, with the assistance of PJT, began a formal marketing process designed to canvas the market and identify the best possible solution to the Debtors' financing needs.  This marketing process ran in parallel with the Debtors' engagement with the Consenting Stakeholders regarding their potential provision of DIP financing and postpetition financing.  PJT began the marketing process by developing a list of thirty sophisticated institutions, including seven banking institutions and twenty-three non-bank alternative lenders, capable of providing both DIP and additional postpetition financing on a junior basis.  Upon finalizing the list, and in connection with the DIP financing marketing process, PJT, on behalf of the Debtors, reached out to each of the thirty potential DIP financiers.  Four parties demonstrated an initial interest and executed non-disclosure agreements with the Debtors.  Immediately thereafter, the Debtors began sharing diligence with the potential DIP financiers.

The Debtors and their advisors continue to engage in arm's-length negotiations with potential funding parties to achieve the best possible terms of a potential DIP New Money Facility and postpetition financing.  As of the date hereof, the Debtors are prepared to fund these Chapter 11 Cases through the Combined Hearing without debtor-in-possession financing if necessary.  However, the Debtors and their advisors continue to believe that obtaining debtor-in-possession financing may be prudent so long as it is available on acceptable terms and will enable the Debtors to pay all administrative claims in full in cash to confirm the Plan and emerge from these Chapter 11 Cases.  The Debtors remain open to all proposals for debtor-in-possession financing whether in the form of a DIP New Money Facility, a Rights Offering, or otherwise, and the open points in the Debtors' negotiations with the Consenting Stakeholders for a potential DIP New Money Facility have significantly narrowed in recent days. It is expected that, to the extent the Debtors reach a deal as to the terms of the DIP New Money Facility, the DIP New Money Claims shall be repaid in full in cash, as will be provided in an acceptable Plan and the DIP New Money Documents (if applicable).

84

### E.    ~~D.~~ Retention of the Debtors' Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications (collectively, the "Retention Applications") requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:

- Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as co-counsel to the Debtors [Docket No. 213];

- Cole Schotz P.C., as co-counsel to the Debtors [Docker No. 215];

- PJT Partners LP, as investment banker to the Debtors [Docket No. 218];

- Alvarez and Marsal North America, LLC, as financial advisor to the Debtors [Docket No. 214];

- MTO, as counsel to the Special Committee [Docket No. 217];

- Province, as financial advisor to the Special Committee [Docket No. 219];

- Epiq, as the Claims Agent of the Debtors [Docket No. 5];

- Deloitte Tax LLP, as tax advisor to the Debtor [Docket No. ~~[●]] (the "Deloitte Retention Application")~~ 1439]; ~~and~~

- Hilco Real Estate, LLC, as real estate advisor to the Debtor [Docket No. 1237] ~~(the "Hilco Retention Application").~~; and

- McManimon, Scotland & Baumann, LLC, as local counsel to the Special Committee [Docket No. 1472].

~~[Except for the Deloitte Retention Application and the Hilco Retention Application, which were filed on [●] and pending the Bankruptcy Court's approval], the~~The Bankruptcy Court entered orders approving all Retention Applications on certificates of no objection [Docket Nos. 91, 347, 386, 425, 479, 484, 522, 1410, 1523, 1537].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Code.

### F.    ~~E.~~ Schedules and Statements

As summarized above, the order approving the Creditor Matrix Motion [Docket No. 90] (the "Interim Creditor Matrix Order") granted, on an interim basis and among other relief, the

85

authority to redact from any filings with the Bankruptcy Court or made publicly available in these Chapter 11 Cases (i) the names, addresses, and email addresses of their customers pursuant to section 107(b) of the Bankruptcy Code, and (ii) (a) the home and email addresses of all natural persons who are United States citizens located in the United States and (b) the names, home and email addresses, and other Personal Data of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state pursuant to section 107(c) of the Bankruptcy Code. The Interim Creditor Matrix Order was entered notwithstanding the objection of the U.S. Trustee to the redaction of customer information and the names of individuals located in the United Kingdom and European Economic Area.

In addition, as summarized above, the order approving the Schedule and Statement Extension Motion extended the deadline for the Debtors to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") to January 8, 2024.

On November 29, 2023, the U.S. Trustee filed a formal objection to the final approval of the Creditor Matrix Motion, citing general principles of disclosure and transparency and the public's right of access to judicial records, among other bases [Docket No. 269]. The Debtors filed a reply [Docket No. 454], noting that the customer list is the Debtors' most important asset, and that the filing of unredacted Schedules and Statements would amount to the public disclosure of the Debtors' location-specific customer list and would, among other things, significantly undermine the Debtors' business and reorganizational efforts. The Creditors' Committee filed a joinder to the Debtors' reply [Docket No. 455].

After hard fought negotiations, the Debtors reached an agreement with the U.S. Trustee, subject to the U.S. Trustee's right to re-raise the issue at the ~~Confirmation~~Combined Hearing, to redact from any filings with the Bankruptcy Court or made publicly available in these Chapter 11 Cases: (i) the names, addresses, and email addresses of their customers; and (ii) (a) the home and email addresses of all natural persons who are United States citizens located in the United States and (b) the home and email addresses and other Personal Data (as defined in the Creditor Matrix Motion) of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state. On December 20, 2023, the Bankruptcy Court entered an order granting the Creditor Matrix Motion on a final basis on these terms [Docket No. 473].

On January 7, 2024, the Debtors filed their Schedules and Statements [Docket Nos. 590–1107].

### ~~F. The Canadian CCAA Recognition Proceeding~~

~~The Debtors' operations in Canada are primarily run through a number of Canadian entities: (i) WeWork Canada GP ULC and WeWork Canada LP ULC are Canadian unlimited liability corporations; (ii) 700 2 Street Southwest Tenant LP, 4635 Lougheed Highway Tenant LP, and 1090 West Pender Street Tenant LP are Canadian limited partnerships; and (iii) 9670416 CANADA Inc. is a Canadian corporation (the entities listed in (i) (iii), collectively, the~~

86

"Canadian Debtors").   WeWork Inc. is the ultimate parent and holds substantially all of the economic interests in the Canadian Debtors.

On November 7, 2023, WeWork Inc., in its capacity as the proposed foreign representative (the "Foreign Representative")[24] of the Chapter 11 Cases, brought an application before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") for an order (the "Interim Stay Order") pursuant to the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 as amended (the "CCAA"), and obtained the Interim Stay Order, among other things, granting a stay of proceedings in respect of the Canadian Debtors and WeWork Companies U.S. LLC (as the a guarantor of the Canadian Debtors' lease obligations in Canada). On November 8, 2023, WeWork Inc., was appointed as the Foreign Representative by the Bankruptcy Court pursuant to the Foreign Representative Motion for the purposes of the ancillary recognition proceeding in Canada (the "Canadian Proceeding").

The purposes of the Canadian Proceeding have been to obtain an initial recognition order and various supplemental orders:

- declaring WeWork Inc. as the Foreign Representative with respect to the Chapter 11 Cases in the Canadian Proceeding;

- declaring the Chapter 11 Cases as a "foreign main proceeding" under the applicable provisions of the CCAA;

- staying all proceedings with respect to the Canadian Debtors' respective directors and officers, business and property, and in respect of WeWork Companies U.S. LLC, to, among other things, protect the Debtors' assets and operations in Canada;

- appointing Alvarez & Marsal Canada Inc. as the information officer in respect of the Canadian Proceeding, with a responsibility as a Court-appointed officer to, among other things, report material developments in the Chapter 11 Cases to the Canadian Court;

- recognizing in Canada certain interim and final orders entered by the Bankruptcy Court in the Chapter 11 Cases that are applicable to the Canadian Debtors, including the Automatic Stay Order [Docket No. 104]; and

- providing other necessary protection for the Canadian Debtors' property or the interests of the Canadian Debtors' creditors.

On November 16, 2023, the Canadian Court granted the order declaring Debtor WeWork Inc. as the Foreign Representative in respect of the Chapter 11 Cases in the Canadian Proceeding and granted the other relief referenced above.  On November 16, 2023, December 14, 2023, and

---

[24]  A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding with respect to a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

87

January 18, 2024, respectively, the Canadian Court recognized and gave full force and effect in Canada to certain Interim First Day Orders, Final First Day Orders, Second Day Orders, and certain other orders by the Bankruptcy Court, including the Automatic Stay Order, the DIP Order, the Second Rejection Order (as defined herein), and the Cushman Stipulation (as defined herein).  The Canadian Debtors, through the Foreign Representative, will continue to seek formal recognition of relevant Bankruptcy Court orders for the remainder of these Chapter 11 Cases.

**G.      Appointment of the Creditors' Committee**

On November 16, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 150], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases.  The Creditors' Committee currently consists of seven members: Computershare Trust Company, National Association; Beacon Capital Partners, LLC; Nuveen Real Estate; Carr Properties; Delaware Trust Company; Hudson Pacific Properties, Inc.; and ABM Industry Groups, LLC.  On December 21 and December 22, 2023, the Creditors' Committee filed applications to retain Paul Hastings LLP ("Paul Hastings") as legal counsel [Docket No. 490], Berkeley Research Group, LLC ("Berkeley") as financial advisor [Docket No. 492], and Moelis & Company LLC ("Moelis") as investment banker [Docket No. 502].  On January 17, 2024, the Bankruptcy Court entered orders authorizing the retention of Paul Hastings, Berkeley, and Moelis [Docket Nos. 1156, 1158, and 1159].

The Debtors held their first and second meetings of creditors pursuant to section 341 of the Bankruptcy Code (a "341 Meeting") on December 13, 2023.  The Debtors are scheduled to hold a second, continued 341 Meeting on and February 7, 2024.  *See* Docket No. 1127., respectively.

1.      Creditors' Committee's Standing Motion

On February 28, 2024, the Creditors' Committee filed the *Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1436] (the "Committee Standing Motion") seeking, among other relief, derivative standing to pursue certain claims, including actual and constructive fraudulent transfer, preference avoidance, breach of fiduciary duties, equitable subordination, recharacterization, lien avoidance, and claim disallowance, on behalf of the Debtors' estates against certain SoftBank Parties and other affiliates of SoftBank Group Corporation, certain employees or other designees of SoftBank that have served on the Board or as officers of WeWork, Lewis Frankfort, Bruce Dunlevie, Masayoshi Son, U.S. Bank as the indenture trustee and collateral agent of certain Secured Notes, holders of the Secured Notes including members of the Ad Hoc Group, and Cupar, among other parties.

As of the date hereof, the Committee Standing Motion is scheduled for a hearing on a date to be determined.

88

### H.        Lease Rationalization

The Debtors intend to utilize the tools provided by the Bankruptcy Code to continue to right-size their lease portfolio by identifying locations for potential lease renegotiation, rejection, and closure in both the United States and Canada.  As of the Petition Date, Hilco was in active negotiations with over 400 landlords ~~in an effort~~ to consummate lease amendment agreements.  As rent payments are the single most significant cash outflow of the Debtors, right sizing the lease portfolio is essential to the Reorganized Debtors' profitability and long-term business plan.  The Debtors have taken—and will continue to take—great care to minimize the impact of out-of-court exits and in-court rejection of leases on Member Companies.

A summary of the Debtors' lease rationalization progress to date is provided below:

- On November 7, 2023, the Debtors filed the Assumption and Rejection Procedures Motion, seeking relief to establish procedures (the "Assumption and Rejection Procedures") for assuming and rejecting executory contracts and unexpired leases to reduce the costs and administrative burden of having to file a motion for every assumption or rejection.  On November 29, 2023, the Bankruptcy Court entered an order authorizing the Assumption and Rejection Procedures [Docket No. 289].

- On November 7, 2023, the Debtors filed the *Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date; and (II) Granting Related Relief* [Docket No. 14] (the "Rejection Motion"), seeking authorization to reject over sixty leases for certain locations in the U.S. and Canada that the Debtors have determined to be unnecessary and burdensome to their Estates.  On November 29, 2023, the Bankruptcy Court entered an order granting the relief requested in the Rejection Motion [Docket No. 290].

- Since December 12, 2023, pursuant to the Assumption and Rejection Procedures, the Debtors have filed the following notices of assuming or rejecting certain unexpired leases.

| Notice Type | Docket Number | Debtor Entity | Status |
|---|---|---|---|
| Rejection | 297 | 245 Livingston St Q, LLC<br>Common Coffee, LLC<br>35-37 36th Street Tenant, LLC<br>130 5th Avenue Tenant, LLC<br>880 3rd Ave Tenant, LLC<br>75 Arlington Street Tenant, LLC[23] | Order entered<br>[Docket No. 433] |

---

[23] On December 12, 2023, the Bankruptcy Court entered the *Stipulation and Agreed Order By and Between Debtor 75 Arlington Street Tenant LLC and MT Back Bay One LLC With Respect to Notice of Rejection of Lease and Objection Thereto* [Docket No. 434], providing that the sixth lease identified in the First Rejection Notice, located at 75 Arlington Street, Boston, MA 02116, was terminated effective as of November 3, 2023.

89

| Assumption | 430 | 1440 Broadway Tenant, LLC | Order entered [Docket No. 541] |
|---|---|---|---|
| Rejection | 531 | Common Desk OC, LLC<br>71 Stevenson Street Q LLC<br>1115 Howell Mill Road Tenant LLC<br>WeWork Canada LP ULC<br>Common Desk DE, LLC | Order entered [Docket No. 1126] |
| Assumption | 580 | 7272 Wisconsin Avenue Tenant LLC | Order entered [Docket No. 1168] |
| Assumption | 1245 | 71 5th Avenue Tenant LLC<br>800 North High Street Tenant LLC<br>901 North Glebe Road Tenant LLC<br>410 North Scottsdale Road Tenant LLC | ~~Pending~~ Order entered [Docket No. 1333] |
| Assumption | 1247 | WW Brooklyn Navy Yard LLC | ~~Pending~~ Order entered [Docket No. 1334] |
| Rejection | 1276 | 200 Berkeley Street Tenant LLC<br>405 Mateo Street Tenant LLC<br>1725 Hughes Landing Boulevard Tenant LLC<br>101 East Washington Street Tenant LLC<br>920 SW 6th Avenue Tenant LLC<br>1557 West Innovation Way Tenant LLC<br>75 Rock Plz Tenant LLC<br>214 West 29th Street Tenant LLC<br>WW 115 W 18th Street LLC | ~~Pending~~ Order entered [Docket No. 1360] |
| Assumption | 1401 | 830 NE Holladay Street Tenant LLC<br>1100 15th Street Tenant LLC<br>881 Peachtree Northeast Tenant LLC | Order entered [Docket No. 1449] |
| Assumption | 1431 | 1 Beacon Street Tenant LLC<br>408 Broadway Tenant LLC<br>154 W 14th Street Tenant LLC | Order entered [Docket No. 1473] |
| Rejection | 1441 | 1547 9th Street HQ LLC<br>WW 555 West 5th Street LLC<br>1525 11th Ave Tenant LLC | Order entered [Docket No. 1474] |
| Assumption | 1511 | WeWork Canada LP ULC<br>33 West San Carlos Tenant LLC<br>1600 7th Avenue Tenant LLC<br>400 Capitol Mall Tenant LLC<br>10250 Constellation Tenant LLC<br>18 West 18th Street Tenant LLC<br>135 Madison Ave Tenant LLC | Order entered [Docket No. 1597] |

90

| | | 1155 Perimeter Center West Tenant LLC | |
|---|---|---|---|
| Rejection | 1522 | 177 E Colorado Blvd Tenant LLC <br> WW 2015 Shattuck LLC <br> 16 East 34th Street Tenant LLC | Order entered [Docket No. 1620] |
| Rejection | 1590 | 250 E 200 S Tenant LLC | Order entered [Docket No. 1635] |
| Assumption | 1591 | 1175 Peachtree Tenant LLC <br> 200 Massachusetts Ave NW Tenant LLC <br> WeWork Canada LP ULC <br> 110 Corcoran Street Tenant LLC | Order pending |
| Rejection | 1609 | 655 New York Avenue Northwest Tenant LLC <br> 125 West 25th Street Tenant LLC <br> 5215 North O'Connor Boulevard Tenant LLC <br> 3090 Olive Street Tenant LLC <br> 2425 East Camelback Road Tenant LLC <br> 1840 Gateway Dr Tenant LLC <br> 6655 Town Square Tenant LLC <br> 756 W Peachtree Tenant LLC <br> 6900 North Dallas Parkway Tenant LLC <br> 10885 NE 4th Street Tenant LLC <br> Legacy Tenant LLC <br> 609 Greenwich Street Tenant LLC <br> 1333 New Hampshire Avenue Northwest Tenant LLC <br> 150 4th Ave N Tenant LLC | Order pending |
| Assumption | 1612 | WeWork Canada LP ULC <br> 6543 South Las Vegas Boulevard Tenant LLC <br> 21 Penn Plaza Tenant LLC <br> 1001 Woodward Avenue Tenant LLC <br> 1449 Woodward Avenue Tenant LLC | Order pending |
| Rejection | 1651 | 429 Lenox Ave Tenant LLC <br> 2211 Michelson Drive Tenant LLC | Order pending |
| Assumption | 1653 | WeWork Canada LP ULC <br> 3280 Peachtree Road NE Tenant LLC <br> 1100 Ludlow Street Tenant LLC <br> 5161 Lankershim Boulevard Tenant LLC | Order pending |

The Debtors, with the assistance of their advisors, continue to evaluate their lease portfolio and the status of ongoing negotiations with their landlord counterparties and will,

91

~~with~~subject to the consent ~~of the Required Consenting Stakeholders~~rights set forth in the RSA, make decisions regarding the rejection or assumption of their unexpired leases and other executory contracts on a rolling basis during the course of the Chapter 11 Cases, and with respect to unexpired nonresidential real property leases consistent with the terms and conditions as set forth in Article V of the Plan.

1. Motions Regarding Rent Payment

Since January 9, 2024, certain landlords filed motions seeking orders compelling the Debtors to pay past-due rent, allow such past-due rent as administrative expenses, and/or decide whether to assume or reject the applicable lease, among other relief (such motions collectively, the "Rent Motions"). On January 23, 2024, the Creditors' Committee filed a statement in support of certain Rent Motions [Docket No. 1194].

On February 14, 2024, the Debtors filed the *Debtors' Omnibus Objection to the Motions of Certain Landlord Parties to (I) Compel Payment of Rent, (II) Compel Rejection of Leases, and (III) Granting Related Relief* [Docket No. 1364], objecting to the Rent Motions on the grounds that (i) where applicable, the moving landlords should be compelled to first seek recovery from the security, such as letters of credit, surety bonds, and/or security deposits, the Debtors have already provided for the leases before seeking additional payment from the Debtors; (ii) the Debtors have satisfied some of their obligations under section 365(d)(3) of the Bankruptcy Code with respect to certain moving landlords by exercising their rights of setoff or recoupment against tenant allowance credits, overpayments, and other credits under the leases; and (iii) section 365(d)(3) of the Bankruptcy Code provides no specific remedy for noncompliance and, at best, allows the moving landlords an administrative claim under section 503(b) that is payable only upon the Effective Date of the Plan.

Following good-faith, arms'-length negotiations between the Debtors and the moving landlords, all Rent Motions that were scheduled for a hearing on February 5, February 20, March 20, and April 18, 2024, were either withdrawn or adjourned to subsequent hearings.

As of the date hereof, pursuant to the consensual resolution of certain Rent Motions, the Debtors have agreed to pay approximately $[●] of Allowed Administrative Claims in favor of certain movants pursuant to the Plan. The Debtors anticipate that they will have sufficient cash on hand, including the proceeds from the DIP New Money Facility, to satisfy all Allowed Administrative Claims in accordance with the Plan.

The table below summarizes the movant, the applicable Debtor-tenant, and the status of each Rent Motion.

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| Pea Green Owner, LLC | 1129 | WW 210 N Green LLC | Withdrawn [Docket No. 1197] |
| CIO Terraces, LLC | 1147 | 5960 Berkshire Tenant LLC | Withdrawn [Docket No. 1378] |

92

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| CIO Block 23, LLC | 1148 | 101 East Washington Street Tenant LLC | Withdrawn [Docket No. 1377] |
| Chris Neilson, as receiver of Trigild IVL | 1176, 1177 | 600 California Street Tenant, LLC | Withdrawn [Docket Nos. 1663, 1664] |
| Esplanade Owner LLC | 1180 | 2425 East Camelback Road Tenant LLC | Withdrawn [Docket No. 1372] |
| 729 Washington Property Owner LLC | 1193 | 729 Washington Ave Tenant LLC | Withdrawn [Docket No. 1371] |
| T-C 501 Boylston Street LLC; T-C 33 Arch Street LLC | 1213 | Boylston Street Tenant LLC<br>33 Arch Street Tenant LLC | Withdrawn [Docket No. 1363] |
| Multiple Landlords | 1216 | Multiple Debtors | Withdrawn [Docket Nos. 1353, 1354, 1355, 1356, 1383, 1384, 1385] |
| Trinity Centre LLC | 1230 | 115 Broadway Tenant LLC | Withdrawn [Docket No. 1373] |
| NW 524 SOHO LLC | 1238 | 524 Broadway Tenant LLC | Withdrawn [Docket No. 1387] |
| Kato International LLC | 1239 | 12 East 49th Street Tenant LLC | Withdrawn [Docket No. 1380] |
| Power & Light Building, LLC | 1249 | 920 SW 6th Avenue Tenant LLC | Withdrawn [Docket No. 1381]<br>Rejection approved [Docket No. 1360] |
| Trinity Hudson Holdings, LLC | 1255 | 160 Varick Street Tenant LLC | Withdrawn [Docket No. 1369] |
| 1900 McKinney Harwood LLC | 1256 | 1920 McKinney Avenue Tenant LLC | Withdrawn [Docket No. 1382] |
| AGRE Williams Square Holdings, LLC | 1258 | 5215 North O'Connor Boulevard Tenant LLC | Withdrawn [Docket No. 1389] |
| RXR Atlas LLC | 1265 | 75 Rock Plz Tenant LLC | Withdrawn [Docket No. 1362]<br>Rejection approved [Docket No. 1360] |
| 575 Lex Property Owner, LLC | 1267 | 575 Lexington Avenue Tenant, LLC | Withdrawn [Docket No. 1352] |
| 575 Fifth Office Owner LLC[24] | 1279 | 575 5th Avenue Tenant LLC | Withdrawn [Docket No. 1394] |
| J.G. Capital Hill, LLC | 1295 | 1525 11th Ave Tenant, LLC | Withdrawn [Docket No. 1391] |

---

[24] 575 Fifth Office Owner LLC filed a joinder to certain Rent Motions on February 1, 2024.

93

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| | | | Rejection approved [Docket No. 1474] |
| Lincoln Street Property Owner, LLC | 1303 | 1 Lincoln Street Tenant LLC | Hearing Scheduled for May 7, 2024 |
| Corrigan Station, LLC | 1343 | 1828 Walnut Tenant LLC | Withdrawn [Docket No. 1442] |
| Simon Property Group, Inc. | 1374 | 5049 Edwards Ranch Tenant LLC | Withdrawn [Docket No. 1465] |
| HSRE-Portman Tech Square, LLC | 1426 | 756 W Peachtree Tenant LLC | Withdrawn [Docket No. 1521] |
| Gregg Williams, as receiver for Maguire Properties – 555 West 5th Street, LLC | 1434 | WW 555 West 5th Street LLC | Withdrawn [Docket No. 1481] Rejection approved [Docket No. 1474] |
| Capitol View JV-E | 1468 | 500 11th Ave North Tenant LLC | Withdrawn [Docket No. 1632] |
| GW Property Services, LLC | 1475 | 205 North Detroit Street Tenant LLC | Withdrawn [Docket No. 1637] |
| NW 524 SOHO LLC | 1484 | 524 Broadway Tenant LLC | Withdrawn [Docket No. 1622] |
| 1201 Tab Owner, LLC | 1492 | 1201 3rd Avenue Tenant LLC | Withdrawn [Docket No. 1492] |
| CoStar Central Place HQ, LLC | 1494 | 1201 Wilson Blvd Tenant LLC | Hearing scheduled for April 24, 2024 |
| Westview on 12th – Arc LLC | 1496 | 316 West 12th Street Tenant LLC | Hearing scheduled for April 24, 2024 |
| MCMIF Crossroads HoldCo, LLC | 1498 | 1825 South Grant Street Tenant LLC | Withdrawn [Docket No. 1611] |
| AFIAA 125 West 25th Street, LLC | 1499 | 125 West 25th Street Tenant LLC | Withdrawn [Docket No. 1546] |
| MSI Holyoke, LLC | 1565 | WW 107 Spring Street LLC | Withdrawn [Docket No. 1623] |
| Unico 250 East 200 South Tower LLC | 1567 | 250 E 200 S Tenant LLC | Withdrawn [Docket No. 1621] |
| 625 W. Adams, LLC | 1571 | 625 West Adams Street Tenant LLC | Withdrawn [Docket No. 1641] |
| Legacy West Investors, LP | 1576 | Legacy Tenant LLC | Scheduled for a hearing on April 24, 2024 |
| GT RP Halcyon, LLC | 1577 | 6655 Town Square Tenant LLC | Withdrawn [Docket No. 1618] |
| Trinity Hudson Holdings, LLC | 1580 | 160 Varick Street Tenant LLC | Withdrawn [Docket No. 1631] |
| Met Tower Owner LLC | 1630 | 142 W 57th Street Tenant LLC | Scheduled for a hearing on May 7, 2024 |

94

## ~~I. Vendor Engagement~~

## I.     ~~1.~~ Dispute with Cushman & Wakefield

Cushman & Wakefield U.S., Inc. ("Cushman") provides facility management services (the "Services") to substantially all of the Debtors' locations in North American pursuant to that certain Master Services Agreement (the "MSA") and that certain Schedule for Facilities Management Services (the "FM Schedule" and together with the MSA, the "Cushman Contract").

On December 6, 2023, Cushman filed the *Motion of Cushman & Wakefield U.S., Inc. for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 348] (the "Cushman Motion") and the *Application for Order Shortening Time* [Docket No. 354] (the "First Application"), seeking to compel the Debtors to decide whether to assume or reject the Cushman Contract and to schedule a hearing on the Cushman Motion on December 11, 2023.  Upon the Debtors' limited objection [Docket No. 355] to the shortened notice and after a hearing on December 11, 2024, the Bankruptcy Court entered an order scheduling the Cushman Motion for hearing on January 9, 2024.

On December 13, 2023, after receiving a $2.56 million payment from the Debtors with instructions as to what amount of the payment should be allocated to each subcontractor, Cushman filed the second *Application for Order Shortening Time* [Docket No. 446] (the "Second Application"), seeking (i) to schedule a hearing on the Cushman Motion no later than December 20, 2023 and (ii) the Bankruptcy Court's instruction as to how to deploy the $2.56 million payment.

After the Debtors filed a second limited objection [Docket No. 449] to the Second Application on December 15, 2023, the Debtors and Cushman engaged in good-faith, arm's length negotiations and agreed to resolve or otherwise postpone their disputes.  On December 21, 2023, the Debtors filed and the Bankruptcy Court entered the *Stipulation and Consent Order Between the Debtors and Cushman & Wakefield U.S. Inc.* [Docket No. 485] (the "Cushman Stipulation"), which provided, among other things, that the Debtors and Cushman would engage in good faith negotiations regarding the potential amendment and assumption of the Cushman Contract and that the hearing on the Cushman Motion would be postponed~~.  As of the date hereof~~ to February 20, 2024.  On February 13, 2024, the Debtors ~~are continuing to engage with~~and Cushman ~~pursuant to~~agreed to further postpone the hearing on the Cushman ~~Stipulation regarding the potential amendment and assumption of the Cushman Contract.~~Motion to March 27, 2024. *See* Docket No. 1361.

On March 22, 2024, the Debtors filed the *Debtors' Objection to Motion of Cushman & Wakefield U.S., Inc. for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 1536] (the "Cushman Objection") objecting to the Cushman Motion on the grounds that, among other reasons, (i) the Cushman Motion was moot because the Debtors had timely paid Cushman on account of (a) all prepetition invoices of Cushman's subcontractors pursuant to the Cushman Stipulation, and (b) all postpetition obligations under the Cushman Contract; (ii) the Debtors and Cushman had been negotiating an amended Cushman Contract, and the Bankruptcy Court's involvement was not

95

necessary; and (iii) Cushman had not demonstrated why the Bankruptcy Court should shorten the time period provided by section 365(d)(2) of the Bankruptcy Code.  On March 25, 2024, Cushman filed the *Reply of Cushman & Wakefield U.S., Inc. to Debtors' Objection to Motion for Order Compelling Assumption or Rejection of Executory Contract or in the Alternative, for Relief from the Automatic Stay* [Docket No. 1555].

On March 27, 2024, the Debtors and Cushman agreed to enter into the *Second Stipulation and Consent Order Between the Debtors and Cushman & Wakefield U.S., Inc.* (the "Second Cushman Stipulation") which provided, among other things, (i) the Debtors and Cushman would continue negotiating the terms of a potential amendment and assumption of the Cushman Contract in good faith until April 10, 2024, and (ii) the Cushman Motion would be fully resolved.  On March 28, 2024, the Bankruptcy Court entered an order approving the Second Cushman Stipulation [Docket No. 1575].

On April 10, 2024, after arm's-length, good-faith negotiation with Cushman, the Debtors and Cushman reached an agreement to amend and assume the Cushman Contract.  The amended Cushman Contract provides for, among other things, (i) significant cost savings and enhanced operational flexibility for the Debtors, while enabling the Debtors to continue providing services to their members without the disruption of transitioning to a new facility management service provider; (ii) cure payment in the amount of $3 million, 50 percent of which is to be paid upon assumption, and the remaining 50 percent of which is to be paid in installments over six months; and (iii) a nine-month "lock-up" period during which the Debtors and Cushman agree not to exercise their respective termination-for-convenience rights under the Cushman Contract.

**J.**      ~~**Establishment of**~~ **Claims** ~~**Bar Dates**~~**Reconciliation Process**

1.      Bar Dates

On January 7, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code; (II) Establishing an Amended Schedules Bar Date, a Rejection Damages Bar Date, and a Stub Rent Bar Date; (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim; (IV) Approving Notices Thereof; and (V) Granting Related Relief* [Docket No. 1108] (the "Bar Date Motion").  The Bar Date Motion seeks entry of an order to establish certain bar dates by which certain entities holding Claims against Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim.

On January 23, 2024, certain landlords filed the *Limited Objection of Multiple Landlords to Debtors' Motion for Entry of an Order Setting Bar Dates for Submitting Proofs of Claim, Etc.* [Docket No. 1198] (the "Bar Date Objection"), objecting to the Bar Date Motion on the grounds that the Stub Rent Notice and the related procedures are "unnecessary and duplicative" and that the Debtors' proposal to send their calculation of each Stub Rent Claimant's Stub Rent Claim through an individualized Stub Rent Notice is too "secretive."  The Bar Date Objection was joined by landlord Kato International LLC [Docket No. 1208].  Following good faith, arm's-length negotiation, on February 1, 2024, the Debtors filed a certificate of no objection with respect to a revised form of order approving the Bar Date Motion [Docket No. 1282] setting forth certain amended Bar Dates (as defined below) and providing, among other things, that the

96

Debtors will (i) file a schedule of all Stub Rent Claims (the "Stub Rent Claim Schedule") on the docket and (ii) provide each Stub Rent Claimant with a tailored proof of claim for the exclusive purpose of filing its Stub Rent Claim.

- **General Claims Bar Date**:  **March 12, 2024**, as the last date and time for all persons and entities to file Proofs of Claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code and unsecured priority claims specified in the Bar Date Motion against any Debtor (the "General Claims Bar Date");

- **Member Claims Bar Date**:  **March 12, 2024**, as the last date and time for a Member Claimant (as defined in the Bar Date Motion) to file a Proof of Claim if the Member Claimant disagrees with the amount of Member Claims (as defined in the Bar Date Motion) listed on its Member Notice (as defined in the Bar Date Motion) (the "Member Claims Bar Date");

- **Governmental Bar Date**:  **May 6, 2024**, as the last date and time for each governmental unit to file Proofs of Claim asserting claims ("Governmental Claims") against any Debtor that arose or are deemed to have arisen on or before the Petition Date (the "Governmental Bar Date");

- **Amended Schedules Bar Date**:  in the event that the Debtors amend or supplement their Schedules, **the later of (i) the applicable Bar Date and (ii) the date that is thirty (30) calendar days from the date on which the Debtors serve notice of the amendment to the Schedules,** as the last date and time by which claimants holding claims affected by the amendment must file Proofs of Claim with respect thereto against any Debtor (such later date, the "Amended Schedules Bar Date");

- **Rejection Damages Bar Date**:  solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, **the later of (a) (i) the General Claims Bar Date or (ii) the Governmental Bar Date, as applicable, and (b) the date that is thirty (30) calendar days after the later of (i) entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease and (ii) the effective date of such rejection,** as the last date and time by which claimants holding claims based upon such rejection must file Proofs of Claim with respect thereto against any Debtor, **unless otherwise ordered by the Bankruptcy Court** (such later date, the "Rejection Damages Bar Date"); and

- **Stub Rent Bar Date**:  solely as to claims that arise in connection with the occupation of a lease of nonresidential real property (a "Leased Premise") in the period from and including November 6, 2023, through and including November 30, 2023 (each a "Stub Rent Claim," and each claimant, a "Stub Rent Claimant"), and solely in the event that a Stub Rent Claimant disagrees with the amount of its Stub Rent Claim identified on the Stub Rent Claim Schedule and do not resolve such disagreement with the Debtors in accordance with the reasonable consent rights provided for in the Bar Date Order, **the date that is forty-five (45) calendar days after the Debtors serve the Stub Rent Claim Schedule on each Stub Rent Claimant and any other party entitled to receive notice of the same pursuant to the Case Management Order**, as the last date and time

97

by which Stub Rent Claimants must file Proofs of Claim with respect to Stub Rent Claims against any Debtor (the "Stub Rent Bar Date").

On February 2, 2024, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 1285] (the "Bar Date Order").

Following entry of the Bar Date Order, on February 7, 2024, the Debtors filed a schedule (the "Stub Rent Claim Schedule") detailing the amount of the vast majority of Stub Rent Claimant's Stub Rent Claims [Docket No. 1316].  On February 9, 2024, the Debtors filed a supplemental schedule (the "Supplemental Stub Rent Claim Schedule") detailing the amount of five additional Stub Rent Claimant's Stub Rent Claim [Docket No. 1336].  Service of the Stub Rent Claim Schedule and the Supplemental Stub Rent Claim Schedule was completed on February 8 and February 9, 2024, respectively [Docket Nos. 1325, 1340].  In accordance with the Bar Date Order, the Stub Rent Bar Date for the Stub Rent Claimants whose Stub Rent Claims were scheduled in the Stub Rent Claim Schedule and the Supplement Stub Rent Claim Schedule were March 24 and March 25, 2024, respectively.

### 2. Claims Objection Procedures

On April 13, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving (A) Omnibus Claims Objection Procedures and Form of Notice, (B) Omnibus Substantive Claims Objections, and (C) Satisfaction Procedures and Form of Notice; (II) Waiving Bankruptcy Rule 3007(e)(6); and (III) Granting Related* Relief [Docket No. 1647] (the "Claims Objection Procedures Motion").  The Claims Objection Procedures Motion seeks the Bankruptcy Court's approval of, among other things, (i) the claims objection procedures and related notices, (ii) omnibus claims objection pursuant to Bankruptcy Rule 3007(c)–(d), and (iii) claims satisfaction procedures and related notices.  As of the date hereof, the Claims Objections Procedures Motion is scheduled for a hearing on May 7, 2024.

### K. Extension of Certain Key Dates

### 1. Exclusivity

On March 4, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1452] (the "Exclusivity Motion").  The Exclusivity Motion seeks to extend the Debtors' exclusive right to file a chapter 11 plan by 120 days through and including July 3, 2024, and to solicit votes thereon for 120 days through and including September 3, 2024.  As of the date hereof, the Exclusivity Motion is scheduled for a hearing on [April 29, 2024].

### 2. Assumption or Rejection of Non-Residential Leases

On March 4, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending Debtors' Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 1453] (the "365(d)(4) Motion").  The 365(d)(4) Motion seeks to extend the time under section 365(d)(4) of the Bankruptcy Code within which the Debtors may assume or reject

98

unexpired leases of non-residential real property by up to ninety (90) days for a total of up to 210 days from the Petition Date, through and including the earlier of Confirmation and June 3, 2024.   On March 27, April 17, and April 18, 2024, respectively, Legacy West Investors, IQHQ-Aventine West, LP ("Aventine"), and CoStar Central Place HQ, LLC each filed an objection [Docket Nos. 1674, 1682] to the 365(d)(4) Motion on various grounds, including that (i) the Debtors had not timely performed certain postpetition obligations under their leases, and (ii) the plain language of section 365(d)(4) of the Bankruptcy Code caused the Debtors' unexpired lease with IQHQ to be deemed rejected as of March 5, 2024, among others.   The objection filed by Aventine was joined by Kato International LLC [Docket No. 1675] and Simon Property Group, Inc. [Docket No. 1681].   As of the date hereof, the 365(d)(4) Motion is scheduled for a hearing on [April 29, 2024].

### 3.    Removal Period

On January 9, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 1131] (the "Removal Extension Motion"), seeking authority to enlarge the period of time set forth in Bankruptcy Rule 9027(a)(2)–(3) during which the Debtors may seek removal of certain actions pursuant to 28 U.S.C. § 1452 up to and including June 4, 2024.   On January 30, 2024, the Bankruptcy Court entered an order approving the Removal Extension Motion [Docket No. 1252].

## L.    K. The Special Committee's Independent Investigation[2625]

As described in [Article VI.C] herein, the Board established the Special Committee and delegated to it certain rights, authority, and powers in connection with "Conflicts Matters." which Conflict Matters include any matters in which a conflict of interest exists or is reasonably likely to exist between WeWork, on the one hand, and any of its current and former directors, managers, officers, investment commitment members, or certain other parties in interest, on the other hand (each, a "Related Party").   The Special Committee retained MTO and Province as independent counsel and independent financial advisor, respectively, to assist the Special Committee in carrying out its responsibilities with respect to the Conflicts Matters.

Under the direction of the Special Committee, MTO and Province have been conducting an independent investigation of the Conflict Matters beginning in early October 2023 (the "Independent Investigation"), including potential Claims that could be asserted by the Debtors' Estates with respect to such matters.

In furtherance of this investigation, MTO and Province have carried out extensive diligence into the Debtors' relationship with and transactions involving Related Parties.   Starting on October 10, 2023, MTO has made numerous document requests to the Debtors relating toregarding Related Party transactions.   Province has made separate document requests to the Debtors and the Debtors' advisors as part of its analysis of WeWork's financial condition and the

---

[2625] This section of the Disclosure Statement is subject to the Special Committee's ongoing review.

99

economic terms of certain Related Party transactions.  ~~In response to these requests, the Debtors have produced more than 542,000 documents, totaling more than 3.6 million pages, to MTO.  As of the date hereof, the Debtors' production of documents in response to MTO's and Province's diligence requests is ongoing.~~

MTO has also made request~~ed~~s ~~and received~~for documents ~~from~~and information from other parties.  MTO made requests to the Debtors' former outside counsel, Debevoise & Plimpton LLP ("Debevoise"), relating to certain government investigations of WeWork, and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  MTO ~~also~~made request~~ed~~s ~~and obtained documents~~ relating to the work performed by former special committees of independent directors of WeWork (each, a "Former Special Committee"), ~~which were formed to review transactions with the SoftBank Parties and parties related thereto, including the 2019 Rescue Package and related financings and the Notes Exchange Transactions.  Each of the Former Special Committees was~~ represented by Wilson Sonsini LLP ("Wilson Sonsini").  And MTO ~~has also~~made request~~ed~~s ~~and obtained documents and information from~~to the SoftBank Parties, including the production of investment memorandum relating to the SoftBank Parties' historical investments in WeWork's debt and equity~~.  the SoftBank Parties' production of documents in response to MTO's requests is also ongoing as of the date hereof.  MTO also requested documents and information from Adam Neumann but, through his counsel, Neumann has declined to cooperate voluntarily with the Independent Investigation.~~, and to Adam Neumann.

In response to these various requests, MTO and Province have received and reviewed more than 600,000 documents, totaling more than 4 million pages, including more than 30,000 documents and 225,000 pages produced by the SoftBank Parties.

In addition to reviewing the relevant documents that have been produced, MTO and Province have reviewed ~~relevant documents produced in response to their diligence requests, as well as~~ publicly available information concerning Related Party transactions, including WeWork's SEC financial statements.

~~In addition~~On to~~p of~~ its document review, MTO has interviewed several current and former employees of WeWork, including its current and former general counsel, other in-house counsel, and personnel in the finance~~,~~, treasury, and financial, planning & analysis~~; and treasury personnel~~ departments.  MTO has also interviewed WeWork's former outside counsel at Debevoise, Skadden, and Wilson Sonsini, as well as Alvarez & Marsal Valuation Services.

MTO has also been in regular communication with the Creditors' Committee since the Creditors' Committee's appointment, both to apprise the Creditors' Committee on the general scope and status of the Independent Investigation and to facilitate the Creditors' Committee's own investigation.  These efforts have included providing non-privileged documents collected in the Independent Investigation and coordinating on further document collection and information gathering efforts with the Creditors' Committee.

In addition, MTO and Province have worked with the Creditors' Committee to facilitate and conduct joint interviews in January and February of 2024.  These have included the former chief executive officers of the Debtors, Perella Weinberg Partners (which provided advice to the former boards of directors of WeWork Inc. and the Former Special Committees), and Lincoln

100

Financial, which provided various fairness opinions to the former boards and to the Former Special Committees regarding transactions with SoftBank Parties or other Related Parties.

Broadly speaking, the scope of the Independent Investigation encompasses transactions between WeWork and Related Parties as far back as 2017.  Among them are (1) WeWork's transactions with Neumann; (2) the SoftBank Parties' initial equity investments in WeWork in 2017; (3) the 2019 Rescue Package and related agreements and transactions and available alternatives; (4) the litigation filed by a Former Special Committee and by Neumann against the SoftBank Parties relating to the latter's failure to consummate the 2019 Tender Offer, and the settlement thereof; (5) the settlement agreements entered into between WeWork and Neumann; (6) the SoftBank Parties' investments in WeWork's joint ventures; (7) the Creator Fund;[26] (8) the Unsecured Notes and the payments thereunder; (9) the Softbank Secured Notes and the payments thereunder; (10) the SoftBank Parties' role as co-obligor under the LC Facility Credit Agreement and party to the Prepetition Reimbursement Agreement, including payments made thereunder; (11) the 2021 de-SPAC transaction; and (12) the Notes Exchange Transaction and available alternatives.

Potential claims being evaluated in connection with these transactions include claims for, among other things, (a) fraudulent transfer; (b) preference; (c) breach of fiduciary duty and aiding and abetting breach of fiduciary duty; (d) fraud; (e) recharacterization; and (f) equitable subordination.  In addition, the Independent Investigation has been evaluating claims raised by parties in interest, including the claims raised in the Examiner Motion (as defined herein) and the Committee Standing Motion.

With respect to such potential claims, MTO and Province have evaluated, among other issues, WeWork's financial condition at the time of transactions; whether WeWork received reasonably equivalent value; the relationship and course of dealing between WeWork and the Related Parties; the governance and decision making process with respect to each transaction, including whether transactions were approved by independent directors, such as a Former Special Committee; whether any fairness opinions were issued or independent legal or financial advice provided with respect to a transaction; whether the transactions were entered into in the ordinary course of business and on market terms; and the effect each transaction or decision had on WeWork and its stakeholders.  MTO has also analyzed potential defenses to any potential claims asserted on these transactions, including releases in prior settlement agreements in 2019 and 2021, statutes of limitations, and the "safe harbor" defense under section 546(e) of the Bankruptcy Code.

___

[26] During 2018, the Company launched a fund (the "Creator Fund") that previously made investments in recipients of WeWork's "Creator Awards" and other investments through use of a venture capital strategy.  A wholly-owned subsidiary of the Company was the managing member of the Creator Fund.  As of September 17, 2020, the Creator Fund had received contributions from SoftBank Group Capital Limited totaling $72 million, representing 99.99% of the interest of the Creator Fund.  In September 2020, the Company agreed to transfer its rights as managing member and all of its other rights, titles, interests, obligations and commitments in respect of the Creator Fund to an affiliate of SoftBank Group Corp.  Accordingly, as of the Petition Date, the Company no longer has a variable interest in and is no longer the primary beneficiary of the Creator Fund.

101

MTO and Province have regularly provided updates to, and received direction from, the Special Committee, regarding the Independent Investigation. The Plan provides that the releases and exculpation are subject to the Special Committee's Independent Investigation. The Special Committee has engaged in an ongoing analysis with MTO and Province of the terms of the Plan and the positions of various constituents and the course of action that will maximize the value of the Debtors for the benefit of its stakeholders in light of the merits of and defenses to any potential claims, the potential incremental recoveries to the Debtors' estates from pursuit of potential claims, the impact on recoveries of any potential claims, the cost and delay of litigation of any potential claims, the value of preserving a going concern reorganization of the Debtors to overall value and to secured creditors and unsecured creditors such as landlords, trade creditors, and employees, the liquidation value of the Debtors, the ability to obtain financing to preserve going concern value of the Debtors and to fund any going concern reorganization of the Debtors at emergence, the ability to obtain such funding while litigating the potential clams, and the compromises and value incorporated into the Plan under the existing RSA.

MTO and Province have regularly provided updates to, and received direction from, the Special Committee, regarding the Independent Investigation.

MTO has also been in regular communication with the Creditors' Committee since the Creditors' Committee's appointment, both to apprise the Creditors' Committee on the general scope and status of the Independent Investigation and to facilitate the Creditors' Committee's own investigation. These efforts have included providing non-privileged documents collected in the Independent Investigation to and coordinating on further document collection and information gathering efforts with the Creditors' Committee.

As of the date hereof, the Independent Investigation is ongoing.

In addition to the Independent Investigation, the Special Committee, with the advice of MTO and Province, has been independently monitoring and reviewing matters in connection with the restructuring of the Debtors that involves Related Parties, including, among other things, tax matters relating to the restructuring, the entry into the RSA, and the terms of the Interim and Final Cash Collateral Orders and, the DIP LC/TLC Facility, and additional postpetition debtor-in-possession or exit financing.

### M. L. Litigation Matters

#### 1. General Litigation

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11,

102

with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

2.       Motion to Enforce Automatic Stay Against Hudson's Bay Company

Debtor WeWork Canada LP ULC ("WeWork Canada") and Hudson's Bay Company ULC ("HBC") are parties to a Management Agreement, dated as of July 31, 2018, pursuant to which WeWork Canada operates a flexible workspace center at 176 Yonge Street in Toronto, Ontario ("176 Yonge"), in exchange for certain compensation paid to HBC.  On November 30, 2023, when the Debtors were scheduled to move Debtor-owned furniture from 176 Yonge to another location in Toronto, Ontario (the "Move"), HBC prevented the Debtors from using the freight elevators to complete the Move.

On December 2, 2023, the Debtors filed *Debtors' Motion for Entry of an Order (I) Enforcing the Automatic Stay, (II) Ordering Hudson's Bay Company to Cease All Violations of the Automatic Stay, and (III) Granting Related Relief* [Docket No. 305] (the "Stay Violation Motion"), seeking to enforce the automatic stay and prevent HBC from further interfering with the Move.  After productive negotiations, the Debtors and HBC came to agreement on a form of order that was submitted to the Bankruptcy Court (the "Agreed Order").  On December 4, 2023, the Bankruptcy Court entered the Agreed Order granting the majority of the relief requested in the Stay Violation Motion [Docket No. 310].

3.       Dataminr, Inc.'s Motion to Confirm Rejection of Membership Agreement

On December 29, 2023, Dataminr Inc. ("Dataminr") filed the *Motion of Dataminr, Inc. For Order Confirming Debtors' Rejection of Executory Contract* [Docket No. 532] (the "Dataminr Motion"), seeking to confirm that because one Debtor, 6 East 32nd Street WW Q LLC, rejected its sublease with Dataminr pursuant to the Rejection Motion where Dataminr was the space provider, another Debtor, 135 Madison Avenue Tenant LLC (the premises thereof, "135 Madison Avenue"), has also rejected its membership agreement with Dataminr where Dataminr was the space user.

After the Dataminr Motion was filed, the Debtors and Dataminr engaged in good-faith, arm's length negotiations and reached a settlement (the "Dataminr Settlement") pursuant to which, among other things, Dataminr will (i) vacate 135 Madison Avenue on or before February 29, 2024, and (ii) pay the Debtors the February membership fee of $377,504.00 in the ordinary course of business, and the Debtors will (x) deduct $450,000.00 from Dataminr's service retainer and (y) refund Dataminr certain amounts in the event the Debtors reject the master lease of 135 Madison Avenue before February 29, 2024.  On January 23, 2024, the Bankruptcy Court entered the *Stipulation and Consent Order Between the Debtors and Dataminr, Inc.* [Docket No. 1206] approving the Dataminr Settlement.  On January 25, 2024, pursuant to the Dataminr Settlement, Dataminr withdrew the Dataminr Motion with prejudice [Docket No. 1212].

~~4.  Motions Regarding Rent Payment~~

~~Since January 9, 2024, certain landlords filed motions seeking an order compelling the Debtors to pay past-due rent, allow such past-due rent as administrative expenses, and/or decide whether to assume or reject the applicable lease, among other relief (such motions collectively,~~

103

the "Rent Motions").  The table below summarizes the movant, the applicable Debtor-tenant, and the current status of each Rent Motion.  On January 23, 2024, the Creditors' Committee filed a statement in support of certain Rent Motions [Docket No. 1194].

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| Pea Green Owner, LLC | 1129 | WW 210 N Green LLC | Withdrawn [Docket No. 1197] |
| CIO Terraces, LLC | 1147 | 5960 Berkshire Tenant LLC | Scheduled for hearing on February 20, 2024 |
| CIO Block 23, LLC | 1148 | 101 East Washington Street Tenant LLC | Scheduled for hearing on February 20, 2024 Rejection pending [Docket No. 1276] |
| Chris Neilson, as receiver of Trigild IVL | 1176, 1177 | 600 California Street Tenant, LLC | Scheduled for hearing on February 20, 2024 |
| Esplanade Owner LLC | 1180 | 2425 East Camelback Road Tenant LLC | Scheduled for hearing on February 20, 2024 |
| 729 Washington Property Owner LLC | 1193 | 729 Washington Ave Tenant LLC | Scheduled for hearing on February 20, 2024 |
| T-C 501 Boylston Street LLC; T-C 33 Arch Street LLC | 1213 | Boylston Street Tenant LLC; 33 Arch Street Tenant LLC | Scheduled for hearing on February 20, 2024, with a preliminary hearing on February 5, 2024 (*see* Docket No. 1234) |
| Multiple Landlords | 1216 | Multiple Debtors | Scheduled for hearing on February 20, 2024, with a preliminary hearing on February 5, 2024 (*see* Docket No. 1236) |
| Trinity Centre LLC | 1230 | 115 Broadway Tenant LLC | Scheduled for hearing on February 20, 2024 |
| NW 524 SOHO LLC | 1238 | 524 Broadway Tenant LLC | Scheduled for hearing on February 20, 2024 |
| Kato International LLC | 1239 | 12 East 49th Street Tenant LLC | Scheduled for hearing on February 20, 2024 |
| Power & Light Building, LLC | 1249 | 920 SW 6th Avenue Tenant LLC | Scheduled for hearing on February 20, 2024 Rejection pending [Docket No. 1276] |
| Trinity Hudson Holdings, LLC | 1255 | 160 Varick Street Tenant LLC | Scheduled for hearing on February 20, 2024 |
| 1900 McKinney Harwood LLC | 1256 | 1920 McKinney Avenue Tenant LLC | Scheduled for hearing on February 20, 2024 |
| AGRE Williams Square Holdings, LLC | 1258 | 5215 North O'Connor Boulevard Tenant LLC | Scheduled for hearing on February 20, 2024 |
| RXR Atlas LLC | 1265 | 75 Rock Plz Tenant LLC | Scheduled for hearing on February 20, 2024 Rejection pending [Docket No. 1276] |
| 575 Lex Property Owner, LLC | 1267 | 575 Lexington Avenue Tenant, LLC | Scheduled for hearing on February 20, 2024 |
| 575 Fifth Office | 1279 | 575 5th Avenue Tenant LLC | |

104

| Movant | Motion Docket Number | Tenant | Status |
|---|---|---|---|
| Owner LLC | | | N/A[28] |

4. 5. Motion to Compel Wasserstein Enterprises L.L.C.'s Performance

On January 22, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling Wasserstein Enterprises L.L.C. To Perform Under the Lease, (II) Enforcing the Automatic Stay, (III) Ordering Wasserstein Enterprises L.L.C. To Cease All Violations of the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1188] (the "LC Reduction Motion"), seeking an order requiring landlord Wasserstein Enterprises L.L.C. ("Wasserstein") to reduce the aggregate amount of letters of credit posted by Debtor-tenant WW 115 W 18th Street LLC from more than $4.6 million to approximately $1.5 million. As of the date hereof, the LC Reduction Motion is scheduled for hearing on February 20, 2024. On February 13, 2024, Wasserstein filed the *Wasserstein Enterprises L.L.C.'s Objection to Debtors' Motion for Entry of an Order (I) Compelling Wasserstein Enterprises L.L.C. To Perform Under the Lease, (II) Enforcing the Automatic Stay, (III) Ordering Wasserstein Enterprises L.L.C. to Cease All Violations of the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1358]. On April 15, 2024, the Debtors and Wasserstein reached an agreement with regard to the LC Reduction Motion. Subject to final documentation and approval by the Bankruptcy Court, Wasserstein has agreed to reduce their letters of credit to $2,530,160.00. An order reflecting the settlement will be submitted to the Bankruptcy Court for approval in due course.

### N. The Examiner Motion

On January 16, 2024, an ad hoc group of holders of the Unsecured Notes (the "Unsecured Ad Hoc Group") filed a verified statement pursuant to Bankruptcy Rule 2019. *See* Docket No. 1149. The Unsecured Ad Hoc Group currently consists of three members: Antara Capital Master Fund LP, Esopus Creek Value Series Fund LP – Series "A", and HZ Investments LLC.

On February 9, 2024, the Unsecured Ad Hoc Group filed the *Motion of the Ad Hoc Group of Noteholders Requesting (I) the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code, and (II) Derivative Standing to Prosecute Estate Causes of Action* [Docket No. 1337] (the "Examiner Motion"), seeking (i) the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate certain of the Debtors' past transactions with the SoftBank Parties and the Ad Hoc Group, including the Notes Exchange Transaction, and (ii) derivative standing to pursue certain causes of action on behalf of the Debtors' estates, including the recharacterization, subordination, or avoidance of the Secured Notes held by the SoftBank Parties and the Ad Hoc Group.

On February 20, 2024, as a supplement to the Examiner Motion, the Unsecured Ad Hoc Group filed a proposed complaint setting forth the defendants and the causes of action it plans to pursue should the applicable relief it requested in the Examiner Motion be granted [Docket

---

[28] 575 Fifth Office Owner LLC filed a joinder to certain Rent Motions on February 1, 2024.

105

No. 1400].  The potential defendants are certain SoftBank Parties, the Ad Hoc Group, Cupar, and U.S. Bank in its capacity as the trustee and collateral agent of certain Secured Notes.  The potential causes of action are (i) with respect to the SoftBank Parties, (a) recharacterization of their debts under the LC Facility and their Secured Notes as equity, (b) breach of fiduciary duty as an alleged controlling shareholder of WeWork, (c) insider preference in connection with the Notes Exchange Transaction; (ii) with respect to the Ad Hoc Group and Cupar, aiding and abetting the SoftBank Parties' alleged breach of fiduciary duty; (iii) with respect to the SoftBank Parties and the Ad Hoc Group, unjust enrichment; (iv) with respect to the SoftBank Parties, the Ad Hoc Group, and Cupar, equitable subordination of their claims on account of their holdings of Secured Notes; (v) with respect to all potential defendants, (a) intentional and/or constructive fraudulent transfer in connection with the Notes Exchange Transaction and (b) disallowance of certain claims.

As of the date hereof, Examiner Motion is scheduled for a hearing on a date to be determined.

### O.   ~~M.~~ Miscellaneous Matters

1.   Stipulation with Community Matters Holdings, Inc. and Bending Spoons S.P.A.

A Debtor entity held 10 shares (the "MeetUp Shares") in MeetUp Holdings, Inc., an indirect subsidiary of Community Matters Holdings, Inc. ("CMH"), and was a party to that certain stockholders' agreement (the "CMH Stockholders' Agreement") with CMH pursuant to which CMH could issue a call notice (the "CMH Call Notice") to convert the MeetUp Shares into shares of CMH (the "CMH Shares").  CMH entered into an agreement (the "CMH Merger Agreement") that would result in a subsidiary of Bending Spoons S.p.A. being merged with and into CMH (such transaction, the "Bending Spoon Merger").  Prior to the signing of the CMH Merger Agreement, CMH effectively issued the CMH Call Notice and converted the 10 MeetUp Shares into 4,500,000 CHM Shares (the "CMH Exchange").  On the terms and subject to the conditions set forth in the CMH Merger Agreement, the Debtor entity holding the MeetUp Shares is entitled to receive its proportionate share of the merger consideration, which amounts to several million dollars.

On January 8, 2024, the Debtors filed the *Debtors' Amended Application in Lieu of Motion in Support of Entry of Stipulation and Consent Order Between the Debtors, Community Matters Holdings, Inc., And Bending Spoons S.P.A.* [Docket No. 1122] (the "CMH Stipulation"), seeking the Bankruptcy Court's approval of the CMH Call Notice and the CMH Exchange.  The Ad Hoc Group, the SoftBank Parties, and the Creditors' Committee all supported the CHM Stipulation and the consummation of the Bending Spoon Merger.  On January 17, 2024, the Bankruptcy Court entered an order approving the CHM Stipulation, the CHM Call Notice, and the CHM Exchange [Docket No. 1160].

~~2. Motion to Extend Removal Period~~

~~On January 9, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting*~~

106

~~*Related Relief* [Docket No. 1131] (the "Removal Extension Motion"), seeking authority to enlarge the period of time set forth in Bankruptcy Rule 9027(a)(2)–(3) during which the Debtors may seek removal of certain actions pursuant to 28 U.S.C. § 1452 up to and including June 4, 2024.  [As of the date hereof, the Removal Extension Motion is scheduled for a hearing before the Bankruptcy Court on February 5, 2024].~~

2.    ~~3.~~ Stipulation with ~~Michael Miller~~ Certain State Court Plaintiffs

~~On January 23, 2024~~Throughout the course of these Chapter 11 Cases, the Debtors file~~d~~ ~~the *Debtors' Application in Lieu of Motion in Support of Entry of Stipulation and Order Granting Limited Relief from the Automatic Stay as it Applies to Michael Miller* [Docket No. 1196] (the "Miller Stipulation"), seeking~~, and the Bankruptcy Court~~'s~~ approv~~aled of the~~, various stipulation~~s between the Debtors and Michael Miller~~with state court plaintiffs that modified the automatic stay to allowed ~~Mr. Miller~~the latter to prosecute ~~a~~personal injury action~~s~~ in ~~New York~~ state court~~s~~, with recovery from any judgment or settlement limited solely to the proceeds of the Debtors' insurance coverage and/or any excess insurance coverage that were in effect on the date of the alleged injury, insofar as such proceeds are not assets of the Debtors' estates or otherwise available for distribution to the Debtors' creditors.  ~~On February 2, 2024, the Bankruptcy Court entered an order approving the Miller Stipulation [Docket No. 1284]~~*See* Docket No. 1196 (stipulation with Michael Miller); Docket No. 1284 (the Bankruptcy Court's order approving the same); Docket No. 1416 (stipulation with Alex Olivera Arteaga); Docket No. 1448 (the Bankruptcy Court's order approving the same).

3.    ~~4.~~ Certain De Minimis Settlements

Pursuant to the De Minimis Settlement Procedures, the Debtors have entered into certain *de minimis* settlements, including with respect to disputes regarding membership agreements.

**P.    The Canadian CCAA Recognition Proceeding**

The Debtors' operations in Canada are primarily run through a number of Canadian entities:  (i) WeWork Canada GP ULC and WeWork Canada LP ULC are Canadian unlimited liability corporations; (ii) 700 2 Street Southwest Tenant LP, 4635 Lougheed Highway Tenant LP, and 1090 West Pender Street Tenant LP are Canadian limited partnerships; and (iii) 9670416 CANADA Inc. is a Canadian corporation (the entities listed in (i)–(iii), collectively, the "Canadian Debtors").  WeWork Inc. is the ultimate parent and holds substantially all of the economic interests in the Canadian Debtors.

On November 7, 2023, WeWork Inc., in its capacity as the proposed foreign representative (the "Foreign Representative")[27] of the Chapter 11 Cases, brought an application before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") for an order (the "Interim Stay Order") pursuant to the *Companies' Creditors Arrangement Act,* R.S.C.

---

[27]  A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding with respect to a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

107

1985, c. C-36 as amended (the "CCAA"), and obtained the Interim Stay Order, among other things, granting a stay of proceedings in respect of the Canadian Debtors and WeWork Companies U.S. LLC (as the a guarantor of the Canadian Debtors' lease obligations in Canada). On November 8, 2023, WeWork Inc., was appointed as the Foreign Representative by the Bankruptcy Court pursuant to the Foreign Representative Motion for the purposes of the ancillary recognition proceeding in Canada (the "Canadian Proceeding").

The purposes of the Canadian Proceeding have been to obtain an initial recognition order and various supplemental orders:

- declaring WeWork Inc. as the Foreign Representative with respect to the Chapter 11 Cases in the Canadian Proceeding;

- declaring the Chapter 11 Cases as a "foreign main proceeding" under the applicable provisions of the CCAA;

- staying all proceedings with respect to the Canadian Debtors' respective directors and officers, business and property, and in respect of WeWork Companies U.S. LLC, to, among other things, protect the Debtors' assets and operations in Canada;

- appointing Alvarez & Marsal Canada Inc. as the information officer in respect of the Canadian Proceeding, with a responsibility as a Court-appointed officer to, among other things, report material developments in the Chapter 11 Cases to the Canadian Court;

- recognizing in Canada certain interim, final, and other orders entered by the Bankruptcy Court in the Chapter 11 Cases that are applicable to the Canadian Debtors, including the Automatic Stay Order [Docket No. 104]; and

- providing other necessary protection for the Canadian Debtors' property or the interests of the Canadian Debtors' creditors.

On November 16, 2023, the Canadian Court granted the order declaring Debtor WeWork Inc. as the Foreign Representative in respect of the Chapter 11 Cases in the Canadian Proceeding and granted the other relief referenced above. On November 16, 2023, December 14, 2023, January 18, 2024, and February 22, 2024, respectively, the Canadian Court recognized and gave full force and effect in Canada to certain Interim First Day Orders, Final First Day Orders, Second Day Orders, and certain other orders by the Bankruptcy Court, including the Automatic Stay Order, the DIP Order, the Final Cash Collateral, certain orders approving the Debtors' assumption or rejection of certain executory contracts and unexpired leases, the Cushman Stipulation, the Final Cash Management Order, and the Bar Date Order. The Canadian Debtors, through the Foreign Representative, will continue to seek formal recognition of relevant Bankruptcy Court orders for the remainder of these Chapter 11 Cases.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below,

108

these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

## A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' Estates.   The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

2.      There Is a Risk of Termination of the RSA

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the Confirmation and Consummation of the Plan, the appointment of a chapter 11 trustee in, the dismissal of, or the conversion to a case under chapter 7 of the Bankruptcy Code of, one or more Chapter 11 Cases, and breaches by the Debtors and/or the Required Consenting

109

Stakeholders of their respective obligations under the documents.  In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

      3.     <u>The RSA Is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy</u>

There are certain material conditions that must be satisfied under the RSA, including the timely satisfaction of milestones in the Chapter 11 Cases (unless otherwise agreed to by the Debtors and the required Consenting Stakeholders).  The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

      4.     <u>The Debtors May Not Be Able to Obtain New Money Financing</u>

As of the date hereof, the Debtors and the Consenting Stakeholders are still negotiating the terms of the DIP New Money Facility and there is no guarantee that the Debtors and the Consenting Stakeholders will reach an agreement with respect thereto.  In the event that the Debtors do not obtain the DIP New Money Facility, the Debtors believe that they have sufficient cash on hand to fund the remainder of the Chapter 11 Cases.  In order to emerge from the Chapter 11 Cases and confirm the Plan, however, the Debtors anticipate needing to raise new money financing to pay all claims of a kind specified in section 507(a)(2) of the Bankruptcy Code in full in cash on the Effective Date of the Plan pursuant to section 1129(a)(9) of the Bankruptcy Code.  Absent the Bankruptcy Court's approval of the DIP New Money Facility, the Rights Offering, or other exit financing, the Debtors' ability to satisfy the requirement of section 1129(a)(9) of the Bankruptcy is subject to risks and uncertainties.

      5.     <u>The Creditors' Committee's Standing Motion And/or the Examiner Motion May Be Granted.</u>

As of the date hereof, both the Creditors' Committee's Standing Motion and the Examiner Motion are scheduled for a hearing on a date to be determined.  The Debtors and the Consenting Stakeholders continue to engage in good-faith negotiation with both the Creditors' Committee and the Unsecured Ad Hoc Group regarding a consensual resolution of their respective motions.  Nevertheless, there is no guarantee that a consensual resolution on either motion can be achieved, or that the Bankruptcy Court would deny one or both motions, even though the Debtors believe that both motions are without merit.  The Bankruptcy Court's entry of an order granting one or both motions would constitute a termination event under the RSA and would cause significant disruption to the Debtors' reorganization process, including, without limitation, significantly delaying the Debtors' emergence from the Chapter 11 Cases or forcing the Debtors to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

      6.     <u>4. Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy

110

Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

5. [The Conditions Precedent to the Consummation of the Exit Facilities May Not Occur

As more fully set forth in the Exit Facility Documents, the consummation of the Exit Facilities is subject to a number of conditions precedent.  If these conditions precedent are not satisfied or waived, one or more parts of the Exit Facilities may not be consummated, and because effectiveness of the Exit Facility Documents is itself a condition precedent to the Effective Date, the Effective Date may not take place.]

7.      6. [The Conditions Precedent to the Rights Offering May Not Occur

As more fully set forth in the Rights Offering Documents, the consummation of the Rights Offering is subject to a number of conditions precedent.  Additionally, if these conditions precedent are not satisfied or waived, the Rights Offering may not be conducted or consummated.  If the Debtors and the Required Consenting Stakeholders in good faith determine that additional funding is necessary or desirable through the consummation of the Rights Offering, and the consummation of the Rights Offering thereby becomes a condition precedent to the Effective Date, the Effective Date may not take place if the Rights Offering, if any, is not consummated.]

8.      7. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan.  In any event, the Debtors do not believe that any such alternative chapter 11 plan or transaction exists or is likely to exist that would be more beneficial to the Estates or Holders of Claims than the Plan.

111

### 9.    8. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

Confirmation of the Plan is also subject to certain conditions as described in Article XII of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, that is less favorable than the treatment currently provided in the Plan.  Such a less favorable treatment could include distribution of property with a value less than what is currently provided for in the Plan or no distribution whatsoever under the Plan.

### 10.    9. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses related to professional compensation.

### 11.    10. The Debtors May Continue to Face Certain Risks Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other

112

changes in economic and geopolitical conditions, changes in the broader commercial real estate industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  See [Article VIII.C] of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 12.   11. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 13.   12. One or More of the Chapter 11 Cases May Be Dismissed

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which inability may ultimately result in significantly reduced distributions to creditors relative to those provided for in the Plan.

### 14.   13. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an

113

objection.   Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 15.    ~~14.~~ Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As more fully set forth in Article IX.A of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived by the Debtors and the Required Consenting Stakeholders pursuant to Article IX.B of the Plan, the Effective Date will not take place.

### 16.    ~~15.~~ Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 17.    ~~16.~~ Risk that Foreign Courts Will Not Enforce the Confirmation Order

After the Effective Date, the Reorganized Debtors will maintain business operations in certain Non-U.S. jurisdictions, including Canada.  Additionally, implementation of the Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain affiliates of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including in Canada.  There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

### 18.    ~~17.~~ Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, or the Released Parties, as applicable.   The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest

114

and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

19.    ~~18.~~ Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May be Less Favorable to Certain of the Debtors' Constituencies than the Plan

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the petition date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims or Interests.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

20.    ~~19.~~ The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts and Unexpired Leases

The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, subject to certain exceptions.  The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible.  However, with respect to some limited classes of executory contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the Executory Contract or Unexpired Lease.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the Executory Contracts or Unexpired Leases unattractive.  The

115

Debtors would then be required to either forego the benefits offered by such Executory Contract or Unexpired Leases or to find alternative arrangements to replace them.

21. 20. Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value for the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the date of filing of the bankruptcy petition or one year before the date of filing of the petition if the creditor, at the time of such transfer, was an insider. If any transfer is challenged in the Bankruptcy Court and found to have occurred with respect to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer, which may impact recoveries under the Plan.

22. 21. The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated by the Debtors

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' Estates may be materially higher than the Debtors have estimated, which may materially reduce the recovery of each Holder of Allowed General Unsecured Claims, if any.[28]

23. 22. The Total Amount of Allowed Administrative and Priority Claims May Be Higher than Anticipated by the Debtors

The amount of Cash the Debtors ultimately receive prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims may be higher than anticipated.[29] Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims, DIP Administrative Claims, Professional Fee Claims, and Priority Tax Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

24. 23. The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation

The Debtors reserve the right, prior to the Confirmation or substantial consummation of the Plan, subject to the provisions of section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact

---

[28] *See* [Articles III.L and VII.P] of this Disclosure Statement.

[29] *See* [Article VII.P] of this Disclosure Statement.

116

of any such amendment, waiver, or modification on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments, waivers, or modification required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

## B.      Risks Related to Recoveries Under the Plan

### 1.      The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) to be attached hereto will represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry in which the Debtors operate, including the commercial real estate industry, in particular.  The inclusion of the Financial Projections should not be regarded as an indication that the Debtors or any other person considered, or now consider, the Financial Projections to be a reliable prediction of future events, and does not constitute an admission or representation by any person that the expectations, beliefs, opinions, and assumptions that underlie such forecasts remain the same as of the date of this Disclosure Statement, and readers are cautioned not to place undue reliance on the Financial Projections.  While the Debtors believe that the Financial Projections to be contained in this Disclosure Statement are reasonable, the Financial Projections are forward-looking in nature and relate to multiple future years and such information, by its nature, becomes less predictive with each succeeding day.  There can be no assurance that the Financial Projections will be realized.  Actual future financial results may vary from such forward-looking information in a material way.  The Financial Projections only speak as of the date they are made and the Debtors are not under any obligation, and expressly disclaim any obligation, to update, alter or otherwise revise the Financial Projections.  If the Reorganized Debtors do not achieve their projected financial results, the value of the New Interests may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

117

2.    If the Restructuring Transactions are consummated, Certain Significant Holders of Shares of New Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Interests may be in a position to influence matters requiring approval by the holders of shares of New Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  The holders may have interests that differ from those of the other holders of shares of New Interests and may vote in a manner adverse to the interests of other holders of shares of New Interests.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Interests.  In addition, a holder of a significant number of shares of New Interests may sell all or a large portion of its shares of New Interests within a short period of time, which sale may adversely affect the trading price of the shares of New Interests.  A holder of a significant number of shares of New Interests may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by holders of a significant number of shares of New Interests may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

3.    Estimated Valuation of the Exit Facilities, the New Interests, and Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (i) the successful reorganization of the Debtors; (ii) an assumed date for the occurrence of the Effective Date; (iii) the Debtors' ability to maintain adequate liquidity to fund operations; (iv) the assumption that capital and equity markets remain consistent with current conditions; and (v) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

4.    The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay

118

investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

### 5. The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court

The terms of the Exit Facilities Documents have not been finalized and are subject to negotiations between the Debtors and, among others, the Consenting Stakeholders. The results of such negotiations may affect the rights of the holders of the New Interests following the Effective Date. As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

### 6. A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

### 7. The New Interests Are Subject to Dilution

The ownership percentages represented by the ~~1L~~Prepetition Secured Equity Distribution~~, the 2L Equity Distribution, and the Drawn DIP TLC Equity Distribution~~ and the Exit New Money Shares, respectively, are subject to dilution on account of the New Money Equity Distribution, the MIP, the Equity Election, and the ~~New~~DIP TLC Fee Equity ~~Allocation~~Distribution.

### 8. Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors

Holders of Allowed Claims should carefully review [Article XII] of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

119

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

1.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on or refinance their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.   The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities upon emergence.

2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.   These risks include the following:  (i) the ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan or an alternative transaction; (ii) the ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) the ability to maintain relationships with suppliers, service providers, customers, employees, vendors, landlords, and other third parties; (iv) the ability to maintain contracts that are critical to the Debtors' operations; (v) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (vi) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (vii) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.   For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, landlords, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.   Also, the Debtors will require prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

120

3.     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

The Debtors' future performances will depend upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management and other key personnel will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations, and the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

Further, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.     Financial Results May Be Volatile and May Not Reflect Historical Trends

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Interests and the ability of the Debtors to make payments with respect to their indebtedness.  In particular, if the Debtors fail to realize target levels of rent reductions as part of the Debtors' ongoing negotiations with landlords, the Debtors' financial results would be negatively impacted.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract and lease terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

121

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviation from the Debtors' existing business plan would likely lead to variance from the Financial Projections.

5.      The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6.      The Debtors' Substantial Liquidity Needs May Impact Revenue

If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for and prosecuting the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including their ability to meet ongoing operational obligations, will depend, among other things, on:  (i) their ability to comply with the terms and conditions of the DIP Orders and Cash Collateral Orders; (ii) their ability to maintain adequate cash on hand; (iii) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (iv) the cost, duration, and outcome of the Chapter 11 Cases.  In the event that cash on hand, cash flow from operations, and cash provided through access to cash collateral are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to

122

additional financing is, and for the foreseeable future likely will continue to be, extremely limited, if available at all. [In addition, the Debtors' ability to consummate the Plan is dependent on, among other things, their ability to satisfy the conditions precedent to the Exit Facilities.] The Debtors can provide no assurance that such conditions will be satisfied. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

7.     Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks

Holders of Common Shares in WeWork Parent will not receive any distribution on account of such Parent Interests. Accordingly, any trading in the Debtors' securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of Parent Interests. In particular, the New York Stock Exchange has suspended the trading of Parent Interests on account of the Chapter 11 Cases since the Petition Date.

8.     The Debtors' and the Reorganized Debtors' Operation and Business May Be Impacted by the High Interest Rates, the Changing Commercial Real Estate Market, and the Reduced Demand for Office Space

The combined effects of the COVID-19 pandemic and rising interest rates have had and could continue to have a long-lasting and significant impact on the commercial real estate market and the flexible workspace industry in general, and the Debtors' and the Reorganized Debtors' business in particular. The historically rapid rise in interest rates, in combination with slower than expected return to office post-COVID, has pressured liquidity and driven increasing economic distress in the commercial real estate sector. At the same time, demand for office space has receded as businesses continue to follow hybrid work policies first adopted in the pandemic. As a result, landlords are more willing than in the past to reduce rent and offer flexible leasing terms, and many office tenants are adjusting to the global shift to hybrid work by consolidating their footprints and attempting to sublease their excess space, often at a rent significantly discounted to their original cost. Consequently, commercial office space, especially in large cities where WeWork operates, has become available and accessible at unprecedented prices and in significant volume, which amounts to greater competition in the Debtors' and the Reorganized Debtors' target market.

The high interest rate, the heightened competition in the commercial real estate landscape and flexible workspace industry, and the reduced demand for office space may persist after the Reorganized Debtors emerge from bankruptcy, and may continue to have a materially adverse effect on the Reorganized Debtors' businesses, financial condition, results of operations, and prospects.

9.     The Loss of Member Companies Could Adversely Affect the Debtors' Operations

The Debtors' and the Reorganized Debtors' business are dependent on maintaining a stable base of Member Companies. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for Member Companies. At the same time, the

123

supply of flexible workspace as well as competitors' attempts to target Member Companies of the Debtors have increased.  As a result, the Debtors may experience increased levels of Member Company attrition.  In the short term, it may be difficult for the Debtors to find immediate replacements, and the loss of Member Companies could adversely affect the Debtors' and the Reorganized Debtors' businesses and the results of operations.

10.     The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods

The Debtors' business operations are subject to risks associated with fluctuations in currency exchange rates.  The Reorganized Debtors' expected reporting currency will be U.S. dollars.  A large portion of the Debtors' revenue, assets, and liabilities is currently denominated in currencies other than the U.S. dollar, including Pound Sterling and euro.  Changes in exchange rates will affect the value of the reported earnings and the value of those assets and liabilities denominated in foreign currencies and may also impact operating expenses where such operating expenses are in a currency other than the currency in which financing is obtained or in which revenue is generated.

11.     The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors.  In the future, the Reorganized Debtors may become party to litigation.  In general, litigation can be expensive and time-consuming to bring or defend against.  Such litigation could result in settlements or judgments that could significantly affect the Reorganized Debtors' financial results.  It is not possible to predict the potential litigation the Reorganized Debtors may become party to or the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

12.     The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers and a skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and other key employees.  As a result, the Debtors may experience increased levels of employee attrition.  The Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

124

**D.      Risks Related to the Offer and Issuance of Securities Under the Plan**

1.      The Reorganized Debtors Do Not Intend to Register the Offer or Sale of New Interests and Certain Holders of the New Interests May be Restricted in their Ability to Transfer or Sell their Securities

The Reorganized Debtors do not intend to register the New Interests issued under the Plan under the Securities Act or any Blue-Sky Laws. As a result, certain of the New Interests may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

To the extent that the New Interests issued under the Plan may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, that such New Interests may not be freely resold under the Securities Act if, at the time of transfer, the holder is an "affiliate," as defined in Rule 144(a)(1) of the Securities Act, of the Reorganized Debtors or has been such an "affiliate" within 90 days of such transfer.  Further, resales by Holders of Claims or Interests (as applicable) who receive such securities pursuant to the Plan and are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such Holders would only be permitted to sell such securities without registration under the Securities Act if they can comply with an applicable exemption from registration under the Securities Act.

To the extent that the New Interests are issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  [In addition, the New Interests are not expected to be registered under any local or state securities Laws.]  The Debtors make no representation regarding the right of any holder of New Interests to freely transfer or resell the New Interests.  Resale restrictions and other restrictions on transfer are discussed in more detail in Article [XII] of this Disclosure Statement, entitled "Certain Securities Law Matters."  Further, the New Corporate Governance Documents may also impose certain restrictions on transfer of the New Interests.

2.      1. A Liquid Trading Market for the Shares of the New Interests May Not Develop

The New Interests will be a new issuance of securities, and there is no established trading market for the New Interests.  The Reorganized Debtors do not intend to apply to list the New Interests on a recognized U.S. securities exchange (or comparable non-U.S. securities exchange) on or about the Effective Date.  Although the Reorganized Debtors may apply to list the New Interests on a recognized securities exchange in the future, the Debtors make no assurance that they may make such an application or, even if such an application is made, that they will be able to obtain such a registration or listing for the New Interests in the future.  Even if the Debtors do, a liquid trading market for shares of the New Interest may not develop.  The liquidity of any

125

market for shares of the New Interests will depend upon, among other things, the number of holders of shares of the New Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Interests will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Interests may be substantially limited, and the price for shares of the New Interests may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the New Interests indefinitely.

If the New Interests are not listed on a national securities exchange, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and holders of the New Interests will not be entitled to any information except as expressly required by the New Corporate Governance Documents.  As a result, the information that the Debtors are required to provide in order to issue the New Interests may be less than the Debtors would be required to provide if the New Interests were registered under the Exchange Act (as defined herein) or listed on a national securities exchange.  Among other things, the Debtors may not be required to provide: (i) separate financial information for any subsidiary; (ii) selected historical consolidated financial data of WeWork; (iii) selected quarterly financial data of WeWork; (iv) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Interests.

### 3. ~~2.~~ The Trading Price for the Shares of the New Interests May Be Depressed Following the Effective Date

Following the Effective Date, it is expected that Reorganized WeWork will issue the New Interests, including pursuant to the MIP.  Following the Effective Date, shares of the New Interests may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of the New Interests may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of the New Interests available for trading could cause the trading price for the shares of the New Interests to be depressed, particularly in the absence of an established trading market for the New Interests.

### 4. ~~3.~~ Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan (including the New Interests) are not covered by section 1145 of the Bankruptcy Code, such securities shall be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws.  Any securities issued pursuant to Section 4(a)(2) under the Securities Act, including the New Interests, will be deemed "restricted securities" (as defined under the Securities Act and the rules

126

promulgated thereunder) that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered under the Securities Act and may not resell them except in accordance with an available exemption from registration under the Securities Act.

Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale. Such current public information is not expected to be available on or about the Effective Date. An affiliate, or a non-affiliate who has been an affiliate of the issuer during the preceding three months, may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities may be required to hold their restricted securities for at least one year and potentially indefinitely.

Given that whether any particular person would be an affiliate depends on various facts and circumstances applicable to that person, the Debtors make no representation concerning the ability of a person to dispose of the securities issued under the Plan. Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal, state, or non-U.S. securities laws and the circumstances under which securities may be sold in reliance on such laws.

4. Certain Holders of the New Interests May be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the New Interests issued under the Plan may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, that such New Interests may not be freely resold under the Securities Act if, at the time of transfer, the holder is an "affiliate," as defined in Rule 144(a)(1) of the Securities Act, of the Reorganized Debtors or has been such an "affiliate" within 90 days of such transfer. Further, resales by Holders of Claims or Interests (as applicable) who receive such securities pursuant to the Plan and are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration under the Securities Act if they can comply with an applicable exemption from registration under the Securities Act.

To the extent that the New Interests are issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are

127

~~registered, or an exemption from registration applies, under the Securities Act.  [In addition, the New Interests are not expected to be registered under any local or state securities Laws.]  The Debtors make no representation regarding the right of any holder of New Interests to freely transfer or resell the New Interests.  Resale restrictions and other restrictions on transfer are discussed in more detail in Article [XII] of this Disclosure Statement, entitled "Certain Securities Law Matters."  Further, the New Corporate Governance Documents may also impose certain restrictions on transfer of the New Interests.~~

## IX.  SOLICITATION AND VOTING PROCEDURES~~29~~30

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines (the "Solicitation and Voting Procedures") are set forth in Exhibit 2 attached to the Disclosure Statement Order.

**THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.**

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS
SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER
ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION
OF THE SOLICITATION AND VOTING PROCESS.

---

### A.  Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in [Article III.D] of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table in [Article III.D] of this Disclosure Statement, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in [Classes 3A, 3B, 4A, 4B, 5, 6, 7, and 8] (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in [Classes 1, 2, 9, 10, 11, ~~or~~ 12, or 13].  [Additionally, the Disclosure Statement Order provides that certain

---

~~29~~30 [To be updated per Solicitation and Voting Procedures]

128

Holders of Claims in the Voting Classes, such as those Holders whose Claims have been or will be paid pursuant to a separate order of the Bankruptcy Court, are not entitled to vote to accept or reject the Plan].

### B.        Voting Record Date

**The Voting Record Date is [•April 22], 2024**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.        Voting on the Plan

**The Voting Deadline is [•May 23], 2024, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Claims Agent on or before the Voting Deadline:

| DELIVERY OF BALLOTS |
| --- |
| Holders of Claims in the Voting Classes may submit their Ballots via: |
| **First Class Mail, Overnight Courier, or Hand Delivery:**<br>WeWork Inc Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |
| **Electronic, Online Submission:**<br><br>To submit your Ballot via the Claims Agent's online portal, visit https://dm.epiq11.com/WeWork, click on the "E-Ballot" section of the website (the "E-Ballot Portal"), and follow the instructions to submit your Ballot.<br><br>**Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.** |
| Ballots submitted to the Claims Agent by any means other than expressly provided for in the Solicitation and Voting Procedures, including email, facsimile, or electronic means other than the online voting portal, ***shall not be valid and will not be counted.*** |

129

D.      **Ballots Not Counted**

**The following Ballots shall not be counted in determining the acceptance or rejection of the Plan**:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Claims Agent's online balloting portal, and Master Ballots submitted via email, shall be deemed to contain an original signature); (iv) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (v) any Ballot transmitted by any other means not specifically approved pursuant to the Disclosure Statement Order or contemplated by these Solicitation and Voting Procedures or by separate order of the ~~Bankruptcy~~ Court; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation and Voting Procedures~~; and (viii) any Ballots not actually received by the Claims Agent by the Voting Deadline~~.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AGENT AT**
>
> **Toll Free within U.S. and Canada: +1 (877) 959-5845**
> **International: +1 (503) 852-9067**
> **Email:  weworkinfo@epiqglobal.com,**
> **with reference "WEWORK" in the subject line**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

X.      **CONFIRMATION OF THE PLAN**

A.      **The ~~Confirmation~~Combined Hearing**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  ~~The~~At the Combined Hearing, in addition to seeking Confirmation of the Plan, the Debtors will also seek final approval of the Disclosure Statement.  The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the ~~Confirmation~~Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be filed with the

130

Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

**The Combined Hearing is scheduled for [May 30, 2024, at [●] a.m.], prevailing Eastern Time, subject to the Bankruptcy Court's availability.  The deadline to file an objection to the confirmation of the Plan or the final approval of the Disclosure Statement (the "Combined Objection Deadline") is [May 28, 2024, at 4:00 p.m.], prevailing Eastern Time.** Within one business days after the Bankruptcy Court conditionally approves the adequacy of this Disclosure Statement and permits the Debtors to solicit votes for the Plan, the Debtors will publish a notice of the Voting Deadline, the Combined Objection Deadline, and the time of the Combined Hearing in *The New York Times* (national edition) and the *Financial Times* (global edition).

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (i) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims and Interests.

At the ~~Confirmation~~Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

#### 1.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[3031]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept

---

[3031] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

131

the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Pursuant to [Article III.E] of the Plan, if a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### 2.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one (1) impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, by utilizing the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  The Debtors reserve all rights to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code and in each case in accordance with the terms of the RSA, including any consent rights ~~thereunder~~set forth therein.

#### (a)    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent but rather that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two (2) classes differently without unfairly discriminating against either class.

#### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured claims versus unsecured claims).  For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2) of the Bankruptcy Code.  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.  Additionally, for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claim).

132

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. In the event any Debtor does not have one or more Impaired Classes of Claims, all Classes of Claims against such Debtor are presumed to have accepted the Plan. With respect to the "no unfair discrimination" requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. As to the "fair and equitable requirement," with respect to each class that is deemed to reject the Plan, no class of claims or interests junior to such a class will receive any distribution under the Plan on account of such junior claims or interests, and no class of creditors will receive more than 100% of its claim. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors are preparing their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"), to be filed at a later date. Creditors and other interested parties should review Article [VIII] of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based on the Financial Projections to be filed, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

4.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirm a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Debtors intend to file a liquidation analysis (the "Liquidation Analysis") at a later date. As will be reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management

133

believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## XI.      CERTAIN SECURITIES LAW MATTERS[3132]

As discussed herein, the Plan [and the Plan Supplement] provide for the offer, issuance, sale, and distribution of New Interests to certain Holders of prepetition Claims against the Debtors. The Debtors believe that the class of New Interests will be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.

Except as otherwise provided herein, in the Plan, and in the Plan Supplement, the New Interests issued under the Plan will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) to the maximum extent permitted by law or (ii) to the extent such exemption is not available, including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws.  The Debtors believe the shares of the New Interests, the options, or other equity awards (including any New Interests underlying such awards) to be issued pursuant to the post-emergence MIP will be issued pursuant to Section 4(a)(2) under the Securities Act, Regulation D promulgated thereunder and/or another available exemption from registration under the Securities Act, ~~subject to, in each case, other applicable securities Laws. In addition, the issuance of shares of the New Interests under the Plan will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus in a Relevant State under the Prospectus Regulation, and therefore any participant that is resident or located in a Relevant State will be required to confirm that they are a qualified investor (as defined in Article 2(e) of the Prospectus Regulation) in order to participate in the Rights Offering (if any).~~and will be considered "restricted securities."  Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

### A.      Issuance of Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the

---

[3132] Article XI "Certain Securities Law Matters" remains subject to ongoing review and update in all respects.

134

recipients of the securities must hold prepetition or administrative expense claims against the debtor or <u>an affiliate thereof participating in the plan or reorganization, or</u> interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or <u>an affiliate thereof participating in the plan of reorganization, or</u> "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the New Interests should satisfy the requirements of section 1145(a) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder.  ~~No~~<u>Accordingly, no</u> registration statement will be filed under the Securities Act or any local or state securities laws <u>with respect to the initial offer, issuance, and distribution of New Interests</u>.  Recipients of the New Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable ~~state~~ Blue-Sky Laws, other local law.  As discussed below, the exemptions provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.      Subsequent Transfers

1.      <u>Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code.</u>

Subject to the limitations in the New Corporate Governance Documents, any New Interests, to the extent that such issuance is exempt under section 1145 of the Bankruptcy Code (collectively, the "<u>Section 1145 Securities</u>"), ~~may be freely transferred in compliance with~~<u>(i) will not be "restricted securities" as defined in Rule 144(a)(3) under</u> the Securities Act ~~by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from~~<u>, and (ii) will be transferable without</u> registration under the Securities Act ~~and state securities laws, unless the holder is an "underwriter" or an "affiliate" with respect to such securities~~<u>in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code</u>.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:" (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

135

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of the Section 1145 Securities who are deemed to be "underwriters" may be entitled to resell their Section 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public resale of securities received by such Person if the required holding period has been met and, in certain cases, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Section 1145 Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Section 1145 Securities and, in turn, whether any Person may freely trade such Section 1145 Securities. Moreover, it is not expected that Reorganized WeWork Parent will have adequate current public information on or about the Effective Date, and, as a result, Rule 144 may not be available for resales of Section 1145 Securities by holders deemed to be "underwriters."

Further, even if issued pursuant section 1145 of the Bankruptcy Code, the Section 1145 Securities may not be freely resold if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."  Affiliate considerations are discussed further below.

136

2.      [Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to Section 4(a)(2) of the Securities Act.]

[Unlike any shares of New Interests that may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, certain shares of the New Interests or certain other Securities will be issued in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act) (collectively, "4(a)(2) Securities"), subject to, in each case, other applicable securities Laws. Such 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred under the Securities Act unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.]

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is an issuer subject to the reporting requirements of section 13 or 15(d) of the Exchange Act and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer who has not been an affiliate of the issuer during the preceding 90 days may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 (as amended, the "Exchange Act") during the twelve months preceding the sale of the restricted securities.   If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.  It is not expected that Reorganized WeWork Parent will have adequate current public information on or about the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale

137

price greater than $50,000, an affiliate must file or cause to be filed with the SEC an electronic notice of proposed sale on Form 144.

The Rule 144 exemption may not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) if the required public information regarding the issuer to permit the use of Rule 144 is not provided or if the Rule 144 exemption is otherwise not available. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and potentially longer. Thereafter, such holders may only sell them in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

**\*\*\*\***

*Legend*. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES [AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF SUCH SECURITIES] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above. The Reorganized Debtors reserve the right to include a customary legend for any Securities issued pursuant to section 1145 as well. The Reorganized Debtors reserve the right to stop the transfer of any shares of New Interests if such transfer would be prohibited by the New Organizational Documents.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

138

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT OR OTHER APPLICABLE LOCAL OR STATE LAW, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN, INCLUDING THE RIGHTS OFFERING SHARES (IF ANY).   THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT WITH THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY TRANSFER, INCLUDING RESELL, SUCH SECURITIES.**

3.      The New Interests & MIP

The Confirmation Order shall authorize the board of directors of the Reorganized Debtors to adopt the MIP.  Awards issued under the MIP that are settled in the New Interests will dilute all of the New Interests outstanding.  The New Interests are also subject to dilution in connection with the conversion of any other options, convertible securities or other securities that may be issued post-emergence.

The New Interests issued pursuant to the MIP shall be 4(a)(2) Securities (as defined herein) and exempt from any registration requirements under any federal securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

139

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN[32][33][34]

### A.   Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the (i) consummation of the Plan[34][35] to the Debtors and the Reorganized Debtors and (ii) the ownership and disposition of New Interests to certain Holders (which solely for purposes of this discussion means the beneficial owners for U.S. federal income tax purposes) of certain Allowed Claims in the Voting Classes.  The following summary does not address the U.S. federal income tax consequences to (a) Holders of Allowed Claims or Interests not entitled to vote to accept or reject the Plan ~~or to~~, Holders whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, Holders of Allowed Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan (including, for the avoidance of doubt, any Holders of Drawn DIP TLC Claims or Undrawn DIP TLC Claims), or Holders that are deemed to reject the Plan or (b) the Debtors in connection with any potential sale of assets or other potential transaction not described in the Plan.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, together with the fact that numerous elements of the corporate and capital structure of the Reorganized Debtors and distributions pursuant to the Plan have not been determined, there is substantial uncertainty regarding the tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims.  No opinion of counsel will be provided with respect to any element of the Plan.  No assurance can be given regarding the positions of any taxing authority or court regarding any element of the Plan.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed Claims in light of their individual circumstances, nor does it address tax issues with respect to such Holders that are subject to

---

[32] ~~Article XII "Certain U.S. Federal Income Tax Consequences of the Plan" remains subject to ongoing review and update in all respects.~~

[33] ~~The Canadian~~ Article XII "Certain U.S. ~~f~~Federal ~~i~~Income ~~t~~Tax ~~c~~Consequences ~~of the consummation of the Plan to Holders (including beneficial owners) of Allowed Claims and Interests are not described herein.  Holders (and beneficial owners) of Allowed Claims and Interests should consult with their own tax advisors regarding the Canadian federal, provincial, and local tax consequences to them of the consummation of the Plan, having regard to their particular circumstances~~ of the Plan" remains subject to ongoing review and update in all respects.

[34] The Canadian federal income tax consequences of the consummation of the Plan to Holders (including beneficial owners) of Allowed Claims and Interests are not described herein.  Holders (and beneficial owners) of Allowed Claims and Interests should consult with their own tax advisors regarding the Canadian federal, provincial, and local tax consequences to them of the consummation of the Plan, having regard to their particular circumstances.

[34][35] For purposes of Article XII, references to the term "Plan" shall be deemed to include the "Plan Supplement."

140

special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, partnerships or other pass-through entities or arrangements, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, persons subject to alternative minimum tax or subject to special accounting rules under Section 451(b) of the IRC except to the limited extent discussed herein, Holders of Allowed Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan (including, for the avoidance of doubt, any Holders of Drawn DIP TLC Claims or Undrawn DIP TLC Claims), Holders who are themselves in bankruptcy, real estate investment trusts, expatriates or former long-term residents of the United States, regulated investment companies and those holding, or who will hold, Claims, New Interests or any other consideration to be received under the Plan as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop premiums or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from those described below.  This discussion does not address any U.S. federal non-income (including estate or gift tax or the Medicare tax imposed on certain net investment income), state, local, territorial, or non-U.S. tax considerations, or considerations under any applicable tax treaty.  Furthermore, this discussion assumes that a Holder of an Allowed Claim holds only Allowed Claims in a single Class and holds such Allowed Claims as "capital assets" within the meaning of Section 1221 of the IRC (generally, property held for investment).  This summary also assumes that the various debt instruments and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims described below also may vary depending on the nature and structure of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity validly treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of Section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of Section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

141

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes). Partners of any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is a Holder are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

Holders of Allowed Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. THE STRUCTURE OF THE RESTRUCTURING TRANSACTIONS IS SUBJECT TO CHANGE AND AS SUCH, THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED HEREIN ARE UNCERTAIN AND SUBJECT TO CHANGE. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, TERRITORIAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B.     Tax Status of Certain Debtors

For U.S. federal income tax purposes, the Debtors have taken the position that (i) WW Co-Obligor Inc. is not treated as the issuer of any of the Debtors' funded debt obligations; (ii) WeWork Companies U.S. LLC, a Delaware limited liability company ("WeWork Companies") is treated as an entity disregarded as separate from its regarded owner for U.S. federal income tax purposes; and (iii) WeWork Companies U.S. LLC's' sole owner, The We Company Management Holdings L.P., a Cayman Islands exempted limited partnership ("The We Company"), treated as a partnership for U.S. federal income tax purposes, ishas historically been treated as the issuer of the Debtors' funded debt obligations. The structure and issuer of the Exit Facilities (if any) will be determined upon the finalization of the Debtors' exit structure.

### C.     General Assumptions

Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the structure of Reorganized WeWork, the ownership of New Interests, certain exit financing, whether the Rights Offering will occur, whether the distribution of Exit New Money Shares will occur, and the Restructuring Transactions that will be utilized to achieve that corporate and capital structure, have not yet been determined. Accordingly, the U.S. federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims cannot currently be known, and Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

142

[The following discussion assumes that: (1) Reorganized WeWork will be a corporation incorporated in the United States and (2) the Restructuring Transactions will be structured to include (a) a contribution of certain Allowed Claims to Reorganized WeWork in exchange for the New Interests, (b) the cancelation and reissuance of all of the equity of certain Reorganized Debtors to Reorganized WeWork in satisfaction of such Allowed Claims and (c) the retention by Reorganized WeWork of all or substantially all of the Debtor's existing assets (directly or indirectly).][36]  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and that any Allowed Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the IRC.  In the event that any transaction (including any transaction resulting from any sale or marketing process, including pursuant to any amended Plan) results in a taxable transaction with respect to the assets of the Debtors or any of their subsidiaries, the tax consequences of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Claims would be materially different from what is described below.  Any such alternative transaction and the transaction steps required to implement such transaction shall be described in the Restructuring Transaction Exhibits included in the Plan Supplement.

## D.  Certain U.S. Federal Income Tax Considerations of the Plan to the Debtors

Certain of the Debtors (including The We Company) are currently treated as partnerships or as entities that are disregarded as separate from their owners for U.S. federal income tax purposes (such Debtors, the "Flow-Through Debtors").  As described above, prior to the Effective Date, the Flow-Through Debtors include The We Company, which is treated as a partnership for U.S. federal income tax purposes and WeWork Companies, which is treated as an entity disregarded as separate from The We Company for U.S. federal income tax purposes.

[The Debtors may, on or prior to the Effective Date (and if on the Effective Date, pursuant to the Restructuring Transactions contemplated by the Plan) form a new entity ("The New We Company") that will be treated as a partnership for U.S. tax purposes. The New We Company may acquire, directly or indirectly, pursuant to one or more transactions, all, or substantially all, of the equity interests in WeWork Companies. In connection with the formation of The New We Company and its acquisition of equity interest in WeWork Companies, The New We Company is intended to be treated as a "continuation" of The We Company for U.S. federal income tax purposes. If formed prior to the Effective Date, The New We Company would be a Flow-Through Debtor.][37]

Accordingly, the U.S. federal income tax consequences to the Debtors of consummating the Plan generally will be borne by the Debtors only to the extent such consequences are allocable to one or more other Debtors that are not themselves Flow-Through Debtors under U.S. federal income tax law.  Holders of Interests in any Flow-Through Debtor (that are not themselves Debtors) should consult their own tax advisors regarding the tax consequences of the consummation of the Plan to them.

---

[36]   The Restructuring Transactions remain subject to ongoing review.

[37]   Formation of any new entities and their treatment for U.S. federal income tax purposes remains subject to ongoing review.

143

1.      Cancelation of Debt and Reduction of Tax Attributes

As a result of the Restructuring Transactions, Reorganized WeWork is expected to recognize a substantial amount of income as a result of cancelation of indebtedness ("CODI") of the Debtors (directly or indirectly through its ownership interest in one or more Flow-Through Debtors). In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such CODI excluded from U.S. federal taxable income under Section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration with a fair market value less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash, (ii) the issue price of any new indebtedness issued by the Issuer and (iii) the fair market value of any consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange, except to the extent that payment of indebtedness would have given rise to a deduction or another exception is available.

However, under Section 108 of the IRC, a debtor will not be required to include any amount of CODI in its gross income (a) if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (b) to the extent that the debtor is insolvent before the discharge, but only to the extent of the debtor's insolvency (the "Insolvency Exception").

Special rules apply to entities that are treated as partnerships for U.S. federal income tax purposes and partners in such partnerships that realize CODI. In particular, CODI is allocated to the partners under applicable U.S. federal income tax principles, so the Bankruptcy Exception is only available if the partner is under the jurisdiction of a court in a title 11 case. Under Section 108(d)(6) of the IRC, when an entity that is a pass-through entity (such as the Flow-Through Debtors) recognizes CODI, its partners are treated as receiving their allocable share of such CODI and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of equity in the Flow-Through Debtors (including WeWork Inc.) will be treated as receiving their allocable share, if any, as determined for U.S. federal income tax purposes, of the CODI recognized by the Flow-Through Debtors.

A debtor must reduce its tax attributes by the amount of CODI excluded from gross income under the Bankruptcy Exception or the Insolvency Exception pursuant to Section 108 of the IRC. Such reduction in tax attributes occurs on the first day of the taxable year following the taxable year in which the debt discharge occurs. In general, tax attributes will be reduced in the following order: (a) U.S. federal net operating losses (the "NOLs") and NOL carryovers; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the debtor may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest,

144

but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the debtors will make this election.  Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The exact amount of CODI (if any) that will be realized by the Debtors (including whether the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any) should be considered as consideration given in satisfaction of any Allowed Claims) will not be determinable until after the consummation of the Plan.  Accordingly, the Debtors are currently unable to determine the precise effect that the CODI rules will have on the Debtors and their U.S. federal income tax attributes.

2.       Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC

After giving effect to the reduction in tax attributes from excluded CODI, the ability of the Debtors to use any tax attributes post-emergence will be subject to certain limitations under Sections 382 and 383 of the IRC.

(a)       General Sections 382 and 383 Annual Limitations

Under Sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under Section 163(j) of the IRC ("163(j) Carryovers"), tax credit carryforwards, net unrealized built-in losses (a "NUBIL"), and possibly certain other attributes of such corporation allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future U.S. federal taxable income generally are subject to an annual limitation.  For this purpose, if a corporation has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's NUBIL will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  Based on information currently available to the Debtors, the Debtors may have a NUBIL as of the expected Effective Date.

The rules of Sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Interests pursuant to the Plan could result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses may be subject to an annual limitation, unless the special 382(l)(5) Exception (described below) applies.

(b)       General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change"

145

(with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: [3.8145% for FebruaryMay] 2024).  The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change ("Recognition Period"), or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, though the Debtors do not currently anticipate these rules will apply to them as a result of their expected NUBIL.[35][38] If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period.  Any unused portion of the Section 382 Limitation that is not used in a given year may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if subsequent to an ownership change, a corporation and its subsidiaries do not continue the corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, precluding utilization of the corporation's Pre-Change Losses (other than increases in such limitation for recognized built-in gain).  Special rules (discussed immediately below) may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

(c)      Special Bankruptcy Rules.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in a case under the Bankruptcy Code receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in a case under the Bankruptcy Code) pursuant to a confirmed plan (the "382(l)(5) Exception").   Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be

---

[35][38] Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Plan.

146

effectively eliminated in their entirety. If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. Rather, the resulting limitation from a subsequent ownership change would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception and, regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### E.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and as described above. Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the jurisdiction of the Reorganized Debtors, the form of any New Interests issued, the jurisdiction of the issuers of any Exit Financing, whether any Rights Offering will occur, the implementation of any Disputed Claims Reserve and the Restructuring Transactions that will be implemented to achieve that corporate and capital structure, have not yet been determined. Accordingly, the tax consequences of the Plan to U.S. Holders cannot currently be known, and U.S. Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

147

      1.      <u>General U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions</u><s>; in General</s>

As discussed above, the capital structure of the Reorganized Debtors, and the mechanical steps being utilized to put such capital structure in place, have not yet been determined. Accordingly, the tax consequences of the Plan to Holders cannot currently be known, and Holders should consult their own tax advisors with respect to any potential tax consequences of the Plan.

As a general matter, the exchange of Allowed Claims for consideration under the Plan may be taxable either in whole under Section 1001 of the IRC (in which case all taxable gains and losses could be recognized) or in part under other provisions of the IRC (in which case it is possible that certain gains, but not losses, could be recognized, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount)). These consequences will depend in significant part on the final mechanisms that result in the consummation of the transactions contemplated by the Plan.

To the extent any gain or loss is recognized by a U.S. Holder of an Allowed Claim upon the receipt of the consideration under the Plan in the form of New Interests, the amount of such recognition will generally depend on the difference between such U.S. Holder's adjusted tax basis in such Claim compared to the fair market value of the consideration received in exchange for such Claim <u>(including, if applicable, the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any), if such right is properly considered as consideration given in satisfaction of such Allowed Claim)</u>. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. To the extent received in a wholly taxable exchange, such U.S. Holder should obtain an initial tax basis in the New Interests received equal to the fair market value of the New Interests as of the Effective Date and such U.S. Holder's holding period in any property received in respect of a taxable exchange will begin on the day following the Effective Date.

To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such Holder's holding period in such property should include the holding period of such Holder's underlying Claim.

To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

148

2.      U.S. Federal Income Tax Consequences to U.S. Holders of Drawn DIP TLC Claims (Class 3A) and Undrawn DIP TLC Claims (Class 3B)

~~In~~As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Drawn DIP TLC Claim, on the Effective Date, each U.S. Holder of an Allowed Drawn DIP TLC Claim shall receive ~~(i) in the case of the Rolled Drawn DIP TLC Claim, loans under the Exit TLC Facility on a dollar-for-dollar basis, and (ii) in the case of an Equitized Drawn DIP TLC Claim,~~ its Pro Rata share of the Drawn DIP TLC Equity Distribution.

~~In~~As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Undrawn DIP TLC Claim, on the Effective Date, each U.S. Holder of an Allowed Undrawn DIP TLC Claim shall receive:  (i) in the case of an Excess DIP TLC Claim, payment in full in cash in an amount equal to such Excess DIP TLC Claim from amounts remaining from the proceeds of the DIP TLC Facility (or, for the avoidance of doubt, interest accrued on the amounts funded pursuant to the DIP TLC Facility), which amounts shall be funded solely from amounts remaining in the DIP LC Loan Collateral Accounts (as defined in the DIP LC/TLC Order) after the funding of the SoftBank Parties' obligations to back the Exit LC Facility; and (ii) in the case of a Rolled Undrawn DIP TLC Claim, ~~(A)~~ conversion into obligations under the Exit LC Facility on a dollar-for-dollar basis~~, and (B) its Pro Rata share of the New LC Equity Allocation.~~[36] [39]

The Debtors understand that there is a single Holder of Claims in Classes 3A–3B and that Holder is of a type that is subject to special treatment and generally carved out from disclosure (see [Article XII.A] of this Disclosure Statement, entitled "Introduction"), such that disclosure based on a "hypothetical investor" would not be "typical" of an investor in Classes 3A–3B. Accordingly, the Debtors are not providing specific disclosure in respect of the tax consequences to the Holder of Claims in Classes 3A–3B.

3.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Prepetition LC Facility Claims and Allowed 1L Notes Claims (Class 4A and Class 4B)

~~In~~As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Prepetition LC Facility Claim and each Allowed 1L Notes Claim, on the Effective Date, each U.S. Holder of an Allowed Prepetition LC Facility Claim and each U.S. Holder of an Allowed 1L Notes Claim shall receive its Pro Rata share of the 1L Equity Distribution (subject, in the case of Holders of Allowed 1L Notes Claims, to the Exit Commitment Netting Transaction).

The Restructuring Transactions may be structured in a manner such that the issuance of New Interests to U.S. Holders of Allowed Prepetition LC Facility Claims and Allowed 1L Notes Claims in exchange for such claims is fully taxable under Section 1001 of the IRC.  In such case, a U.S. Holder of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim

---

[36] ~~As used herein, "New LC Equity Allocation" means New Interests equal to 1.25% of the total New Interests.~~

[39] As used herein, "New LC Equity Allocation" means New Interests equal to 1.25% of the total New Interests.

149

generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of the New Interests received in respect of such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim (other than any New Interests treated as received in satisfaction of accrued but unpaid interest on such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim as discussed below under "Accrued Interest") (and, if applicable, the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares (if any), if such right is properly considered as consideration given in satisfaction of such Allowed Claim) less (b) such U.S. Holder's adjusted tax basis in such Allowed Prepetition LC Facility Claim or Allowed 1L Notes Claim.  A U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date.  A U.S. Holder's holding period for the New Interests would begin the day following the exchange.  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount."  Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed Prepetition LC Facility Claim is greater than one year at the time of the exchange.  Because the obligations under Prepetition LC Facility may have arisen, and the 1L Notes were issued, within one year of the date of this Disclosure Statement, depending on the Effective Date of the Plan, such holding period requirement may not be met by U.S. Holders of such Claims.  The deductibility of capital losses is subject to limitations.

Alternatively, the Restructuring Transactions may be structured in whole or in part in a manner that is eligible for nonrecognition treatment under the IRC. The exact consequences to U.S. Holders of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim will depend on the structure and mechanics selected and the provisions of the IRC giving rise to such treatment.  However, in general, under such nonrecognition provisions of the IRC, exchanging Holders could be treated as recognizing certain gains, but not losses, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount as described below).  To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such U.S. Holder's holding period in such property should include the holding period of such U.S. Holder's underlying Claim.  To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

Notwithstanding the foregoing, it is possible that, whether or not the Restructuring Transactions are treated as a fully taxable exchange or a nonrecognition transaction under the IRC, proceeds received with respect to the Exit Commitment Netting Transactions could be treated as a taxable fee paid to U.S. Holders of Allowed 1L Notes Claims in exchange for their consent to the Restructuring Transactions.  If this treatment applied, the proceeds of the Exit Commitment Netting Transactions would not be taxed as described above and would instead generally be treated as ordinary income to the U.S. Holder receiving such proceeds.  The tax consequences to a U.S. Holder of an Allowed Prepetition LC Facility Claim or an Allowed 1L Notes Claim will depend in significant part on the final mechanism that results in the

150

consummation of the transactions contemplated by the Plan.  Holders of such claims should consult their tax advisors.

Additionally, whether the right to participate in the Exit Equity Commitment and receive the distribution of the Exit New Money Shares should be considered, for these purposes, as a recovery in respect of the First Lien Claims (along with the other consideration under the Plan), or, instead, as a separate legal entitlement (including as the exercise of options to acquire the property that is subject to the Rights Offering Securities (if any, as applicable)) is uncertain.

The tax consequences of the Exit Equity Commitment and the distribution of the Exit New Money Shares to U.S. Holders cannot currently be known, and U.S. Holders should consult their own tax advisors as to the relevant considerations and tax consequences.[40]

4.     U.S. Federal Income Tax Consequences to U.S. Holders of Allowed 2L Notes Claims (Class 5)

~~In~~As described above, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed 2L Notes Claim, on the Effective Date, each U.S. Holder of an Allowed 2L Notes Claim shall receive its Pro Rata share of the 2L Equity Distribution.

The Restructuring Transactions may be structured in a manner such that the issuance of New Interests to U.S. Holders of Allowed 2L Notes Claims in exchange for such claims is fully taxable under Section 1001 of the IRC.  In such case, a U.S. Holder of an Allowed 2L Notes Claim generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of the New Interests received in respect of such Allowed 2L Notes Claim (other than any New Interests treated as received in satisfaction of accrued but unpaid interest on such Allowed 2L Notes Claim as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Allowed 2L Notes Claim.  A U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date.  A U.S. Holder's holding period for the New Interests would begin the day following the exchange.  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount."  Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed 2L Claim is greater than one year at the time of the exchange. Because the 2L Notes were issued within one year of the date of this Disclosure Statement, depending on the Effective Date of the Plan, such holding period requirement may not be met by U.S. Holders of such Claims.  The deductibility of capital losses is subject to limitations.

Alternatively, the Restructuring Transactions may be structured in whole or in part in a manner that is eligible for nonrecognition treatment under the IRC. The exact consequences to U.S. Holders of an Allowed 2L Notes Claim will depend on the structure and mechanics selected and the provisions of the IRC giving rise to such treatment.  However, in general, under such nonrecognition provisions of the IRC, exchanging Holders could be treated as recognizing

---

[40]   Whether participation in the Exhibit Equity Commitment and receive the distribution of the Exit New Money Shares (if any) is treated as a recovery under the Plan is subject to further review pending review of the terms of the related documents (if any).

151

certain gains, but not losses, or, in certain circumstances, it may be that no gain or loss is recognized (other than with respect to any amounts received that are attributable to accrued but untaxed interest, and subject to the rules relating to market discount as described below).  To the extent property is received without the recognition of gain or loss, a U.S. Holder should obtain an aggregate tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, and subject to the rules relating to market discount, equal to the adjusted tax basis of the Claim exchanged therefor, and such U.S. Holder's holding period in such property should include the holding period of such U.S. Holder's underlying Claim.  To the extent a portion of the consideration received under the Plan is allocable to accrued but untaxed interest or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

The tax consequences to a U.S. Holder of an Allowed 2L Notes Claim will depend in significant part on the final mechanism that results in the consummation of the transactions contemplated by the Plan.  Holders of such claims should consult their tax advisors.

5.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims (Class 7 and Class 8)

[In full and final satisfaction, settlement, release, and discharge of, and in exchange for, any Allowed Unsecured Notes Claims and Allowed General Unsecured Claim, each Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim (as applicable) shall receive, at such Holder's election, such Holder's Pro Rata Share of either (A) the Cash Election or (B) the Equity Election.]

Although not free from doubt, the Debtors expect that the Restructuring Transactions in which the U.S. Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims exchange such Claims for their Pro Rata share of either (A) the Cash Election or (B) the Equity Election, in each case as elected by the Holder of the Allowed Unsecured Notes Claim or Allowed General Unsecured Claim (as applicable), will be treated as a fully taxable exchange under section 1001 of the IRC. In such case, a U.S. Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as applicable, generally would recognize gain or loss in an amount equal to (a) the fair market value, as of the Effective Date, of such Holder's Pro Rata share of (A) the Cash Election or (B) the Equity Election, in each case as elected by such Holder (other than any portion thereof treated as received in satisfaction of accrued but unpaid interest on such Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as applicable, as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Allowed Unsecured Notes Claim or Allowed General Unsecured Claim.  To the extent the Equity Election includes New Interests, a U.S. Holder's initial aggregate tax basis in the New Interests received would generally equal their fair market value as of the Effective Date and such U.S. Holder's holding period for the New Interests would begin the day following the exchange.  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Accrued Interest" and "Market Discount," below. Capital gain will generally be taxable at preferential rates to any non-corporate U.S.

152

Holder whose holding period in its Allowed Unsecured Notes Claim or Allowed General Unsecured Claim is greater than one year at the time of the exchange.

The tax consequences to a U.S. Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim will depend in significant part on the final mechanism that results in the consummation of the transactions contemplated by the Plan. Holders of such Claims should consult their tax advisors.

6. ~~5.~~ General

(a) Accrued Interest

To the extent that any amount received by a U.S. Holder of an Allowed Claim under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount would be expected to be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder), even if consideration was otherwise being received without the recognition of gain. Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder is expected to be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the proper allocation of the consideration received by them in respect of their Claims under the Plan.

(b) Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) in the case of a debt instrument issued without original issue discount, the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt

153

instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount is expected to be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to their Claims.

(c)      Limitations on Use of Capital Losses

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

7.      6. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Interests

(a)      Distributions on New Interests

Any distributions of cash or property made to a U.S. Holder with respect to the New Interests generally will be includible in gross income by such U.S. Holder as dividend income to the extent such distribution is paid out of Reorganized WeWork's current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  To the extent those distributions exceed Reorganized WeWork's current and accumulated earnings and profits, the distribution will be treated (i) as a non-taxable return of the U.S. Holder's adjusted basis in the New Interests and (ii) thereafter as capital gain taxable (as discussed below under "—Sale, Redemption or Repurchase of New Interests").  A distribution that is treated as a dividend and paid to a corporate U.S. Holder of the New Interests may be eligible for the dividends-received deduction, and a distribution that is treated as a dividend and paid to a non-corporate U.S. Holder of the New Interests may be subject to tax at the preferential tax rates applicable to "qualified dividend income," provided that certain holding period and other requirements are satisfied.

In addition, if Reorganized WeWork is a "U.S. real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes (as discussed below under "—FIRPTA") and distributions on the New Interests exceed Reorganized WeWork's current and accumulated earnings and profits, Reorganized WeWork may be required to withhold on certain distributions

154

made with respect to the New Interests unless such U.S. Holder provides a properly completed and duly executed IRS Form W-9 (or applicable successor form).

(b)      Sale, Redemption, or Repurchase of New Interests

Unless a non-recognition provision of the IRC applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, repurchase, or other taxable disposition of the New Interests.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Interests for more than one year.  Long-term capital gains of ~~an individual~~a non-corporate taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.

A U.S. Holder may be required to provide evidence that it is a U.S. person, either on a duly executed IRS Form W-9, applicable successor form or other evidence as provided under the applicable Treasury Regulations in order to avoid withholding under Section 1445 of the Code (as discussed below under "FIRPTA").

**F.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and as described above. Multiple material elements of the corporate and capital structure of the Reorganized Debtors, including the jurisdiction of the Reorganized Debtors, the form of any New Interests issued, the jurisdiction of the issuers of any Exit Financing, whether any Rights Offering will occur~~, the implementation of any Disputed Claims Reserve~~ and the Restructuring Transactions that will be implemented to achieve that corporate and capital structure, have not yet been determined. Accordingly, the U.S. federal income tax consequences of the Plan to ~~U~~Non-U.S. Holders of Allowed Claims cannot currently be known, and Non-U.S. Holders of Allowed Claims should consult their own tax advisors with respect to any potential tax consequences of the Plan.

1.      General U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Consummation of the Restructuring Transactions

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

155

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly completed and duly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Notwithstanding the discussion above, in the event that an Allowed Claim is treated as an interest other than "solely as a creditor" for purposes of Section 897 of the IRC, a Non-U.S. Holder may be subject to U.S. federal income tax as discussed below under "—FIRPTA." The Debtors intend to take the position (and the remainder of this discussion assumes) that each Allowed Claim is treated as an interest solely as a creditor for purposes of Section 897 of the IRC. Each Non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of FIRPTA (as defined below) on such Non-U.S. Holder.

2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Interests

(a)     Distributions on New Interests

Any distributions made with respect to New Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Interests, as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Interests that are held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Interests held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S.

156

Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

In addition, if Reorganized WeWork is a USRPHC (discussed below under "—FIRPTA") and any distribution on the New Interests exceeds Reorganized WeWork's current and accumulated earnings and profits, Reorganized WeWork will need to choose to satisfy its withholding requirements either by treating the entire distribution as a dividend, subject to U.S. federal withholding tax at a rate of 30 percent or a lower applicable treaty rate as described above (and withhold at a minimum rate of 15 percent or such lower rate as may be specified by an applicable income tax treaty for distributions from a USRPHC), or by treating only the amount of the distribution equal to a reasonable estimate of Reorganized WeWork's current and accumulated earnings and profits as a dividend, with the excess portion of the distribution being subject to withholding at a rate of 15 percent or such lower rate as may be specified by an applicable income tax treaty as if such excess were the result of a sale of shares in a USRPHC.

(b) Sale, Redemption, or Repurchase of New Interests

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption treated as a sale) of New Interests unless: (a) such Non-U.S. Holder is an individual who is present in the United States for one hundred eighty-three (183) days or more in the taxable year of disposition and certain other conditions are met; (b) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States); or (c) the entity issuing the New Interests is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Interests. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The third exception is described below under "FIRPTA".

G. FIRPTA

Under legislation commonly referred to as the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected

157

income ("ECI") that is subject to U.S. federal income tax even if such Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

The FIRPTA rules may apply to the New Interests. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the five-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Person's adjusted tax basis in such interest) will constitute ECI. Further, any purchaser that acquires such corporation's stock from a Non-U.S. Holder may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

Although there can be no assurances in this regard, WeWork Inc. has been, in the past, and Reorganized WeWork may be as of or after the Effective Date, a USRPHC. As such, withholding under FIRPTA may apply to Non-U.S. Holders in connection with distributions on, or sales or other dispositions of, the New Interests. Non-U.S. Holders should consult their own tax advisors regarding the applicability of FIRPTA to their ownership of New Interests, including any associated tax payment or tax return filing obligations.

## H.    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

158

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW INTERESTS.**

I.       **Information Reporting and Backup Withholding**

The Debtors, the Reorganized Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan.  Further, the Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

159

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a greater distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept and support Confirmation of the Plan.

160

Respectfully submitted, as of the date first set forth above,

WEWORK INC.
(on behalf of itself and all other Debtors)

Dated: ~~February 4~~April 19, 2024

*/s/ David Tolley*

David Tolley
Chief Executive Officer
WeWork Inc.

Prepared by:

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:     (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

*Co-Counsel for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Plan ~~of Reorganization~~**

[Filed at Docket No. 1~~2~~690]

## Exhibit B

## RSA

[Attached as Exhibit B to the First Day Declaration]

**Exhibit C**

**Organizational Structure Chart**



**Exhibit D**

**Valuation Analysis**

[*To be filed before the Disclosure Statement hearing*]

**Exhibit E**

**Financial Projections**

[*To be filed before the Disclosure Statement hearing*]

*[Link-to-previous setting changed from on in original to off in modified.]*.

**Exhibit F**

**Liquidation Analysis**

[*To be filed before the Disclosure Statement hearing*]

*[Link-to-previous setting changed from on in original to off in modified.]*.