**FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP**
Robert J. Lack
Andrew M. Englander
Blair R. Albom
1 Gateway Center
Newark, NJ 07102-5311
Telephone: (973) 877-6400
Facsimile:  (973) 877-6409
rlack@fklaw.com
aenglander@fklaw.com
balbom@fklaw.com

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Alex Spiro *(pro hac vice)*
Susheel Kirpalani *(pro hac vice)*
Benjamin Finestone *(pro hac vice)*
Kenneth Hershey *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
alexspiro@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
kenhershey@quinnemanuel.com

*Co-Counsel to Adam Neumann, Flow
Global Holdings LLC, and Nazare Asset
Management, LP*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>WEWORK INC., *et al.*,<br><br>Debtors.[1] | Case No. 23-19865 (JKS)<br><br>Chapter 11<br><br>Hon. John K. Sherwood |

**RESPONSE OF ADAM NEUMANN ET AL. TO OBJECTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION TO EXTEND EXCLUSIVE PERIODS AND
REQUEST PURSUANT TO 11 U.S.C. § 105(d) FOR CONFERENCE
<u>CONCERNING UNEQUAL ACCESS TO DUE DILIGENCE MATERIALS</u>**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

Adam Neumann and Nazare Asset Management, LP ("**Respondents**"), parties-in-interest[2] in the above-captioned chapter 11 cases of WeWork, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," the "**Company**," or "**WeWork**"), on behalf of themselves and Flow Global Holdings LLC ("**Flow**"), by and through their undersigned counsel, hereby file this response to the *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1698] (the "**Exclusivity Objection**").  Respondents respectfully request that a conference be held, pursuant to 11 U.S.C. §§ 105(d) and 1109(b), at the earliest opportunity when all interested parties may be heard, which is April 29, 2024, at 10:00 a.m.  So as to provide the Court with additional background of assertions made in the Exclusivity Objection, Respondents will confirm that the Debtors have refused to provide equal access to existing financial and due diligence materials to the Flow Group (as defined below) despite the Flow Group's repeated efforts to present their *bona fide* interest to acquire the Debtors and to provide debtor-in-possession financing to bridge to such a sale.  Judicial intervention is necessary to consider appropriate conditions that may be imposed under sections 105(a) and 1107(a) of the Bankruptcy Code (including the conditions set forth in the Exclusivity Objection) and, in support thereof, Respondents respectfully state as follows.

---

[2] Mr. Neumann is a creditor of certain of the Debtors.  *See* Proofs of Claim Nos. 87, 88.  Nazare Asset Management, LP is a shareholder of the Debtors.  Respondents join in the Exclusivity Objection and reserve the right to be heard on any issue in these cases under section 1109(b) of the Bankruptcy Code.

2

**PRELIMINARY STATEMENT**

1. It is a bedrock principle of bankruptcy law that a debtor in possession is a fiduciary for all creditors and must pursue transactions that the debtor reasonably believes in good faith maximize the value of the going concern enterprise. In recognition of the Debtors' failure to fulfill that obligation, the Official Committee of Unsecured Creditors (the "*Committee*") filed the Exclusivity Objection. The Exclusivity Objection seeks to limit any extension of the Debtors' exclusive periods to a maximum of thirty days and to condition any such extension on "the Debtors' immediate engagement with third-party financing sources and potential purchasers and the establishment of an appropriate marketing process that the Debtors should have started months ago." Exclusivity Objection ¶ 4. Respondents hereby join in the Exclusivity Objection and write separately to explain the constructive, value-maximizing role Respondents and the Flow Group can play in these chapter 11 cases.

2. Specifically and as set forth further below, Respondents seek a status conference pursuant to section 105(d) of the Bankruptcy Code to explain why their proposal to purchase WeWork or its assets warrants the Debtors' good-faith consideration and why providing Respondents with equal access to due diligence information that is already being provided to other interested parties would advance the resolution of these cases. In light of the Debtors' unwillingness to provide due diligence to the Flow Group as a means to maximize value (even by creating a competitive landscape), pursuant to the Court's authority in sections 105(a) and 1107(a) of the Bankruptcy Code, the Debtors' continued possession and operation of assets should be conditioned on providing such access.

**STATEMENT OF RELEVANT FACTS**

3. As the Court is aware, the Debtors commenced these chapter 11 cases with a Restructuring Support Agreement (the "*RSA*") among themselves and existing creditors who were

3

party to the Debtors' prepetition uptier transaction. The RSA has always contemplated a change-of-control transaction whereby ownership of reorganized WeWork would be transferred to the participants in that deal at a valuation that the parties were negotiating behind closed doors. The RSA, however, did not commit the Debtors to pursuing such a transaction, and instead expressly preserved the Debtors' right to "consider, respond to, and facilitate any unsolicited Alternative Restructuring Proposals" as well as to "provide access to non-public information concerning any Company Party to any Entity and enter into Confidentiality Agreements or nondisclosure agreements."[3]

4. Taking the Debtors at their word, Adam Neumann, former chief executive officer and co-founder of WeWork, approached the Debtors and their advisors on behalf of himself and potential co-investors (collectively, the "**Flow Group**") in December 2023. The Flow Group expressed a sincere interest in acquiring WeWork or its assets as part of the chapter 11 process. To demonstrate their good-faith intent to engage in a value-maximizing transaction, the Flow Group retained experienced transaction counsel (Mr. Gregg Galardi of Ropes & Gray LLP) in order to negotiate the Debtors' form non-disclosure agreement ("**NDA**") and request the information necessary to conduct diligence on the Company and develop a proposal. On February 5, 2024, Mr. Galardi delivered an NDA on behalf of the Flow Group to the Debtors' advisors, together with a letter to Debtors' counsel reiterating the Flow Group's interest in submitting a detailed proposal to purchase the Company or its assets. But the Debtors' advisors neither returned the NDA (despite its being in nearly finished form) nor provided any of the information needed by the Flow Group to further refine its proposal. In a letter dated February 14,

---

[3] RSA § 7.02. The RSA is filed at ECF No. 21, as Exhibit B to the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions.*

4

2024, the Debtors' counsel asserted that the NDA delivered by Mr. Galardi "remains unacceptable" without further explanation. *Nearly 10 weeks have elapsed*, and the Debtors have never clarified what issues with the NDA remain outstanding, despite Mr. Galardi's diligent repeated efforts to obtain an answer.

5.  Notwithstanding the Debtors' refusal to engage constructively, Mr. Neumann and the Flow Group have monitored these chapter 11 cases and have continued to express interest in delivering the greatest possible value to WeWork and its stakeholders. To that end, the Flow Group provided yet another transaction proposal to the Company on March 11, 2024. The proposal included a detailed signed term sheet and an offer to provide incremental DIP financing. Like any financing proposal, however, it is subject to the receipt of non-public information from the Company and the satisfactory completion of due diligence, which the Company still refuses to provide without explanation despite the Flow Group's repeated efforts to sign an NDA. That refusal is unwarranted and cannot be reconciled with the Debtors' duty to maximize the value of their estates.

## **ARGUMENT**

6.  "In exchange for the authority to continue to manage the business affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the estate." *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998)); *see In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) ("[A] trustee has a fiduciary relationship with *all* creditors of the estate."). The debtor in possession's fiduciary duties include the "fiduciary duty to maximize the value of the estate," *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010), as well as the duty of loyalty, which "requires the avoidance of self-dealing and conflicts of interest," *In re Morningstar*

5

*Marketplace*, 544 B.R. at 303. "The rights of a debtor in possession . . . are not absolute and may be forfeited if these fiduciary duties are neglected." *Id.*

7. The Debtors clearly understand these duties and hold themselves out as complying with them. For example, the Disclosure Statement the Debtors filed with their proposed plan announces—in all capital letters—that "THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS."[4] Indeed, the Debtors go one step further, declaring that their proposed plan "REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES."[5] But the Debtors' obligation to maximize value for their stakeholders requires more than including boilerplate language in their Disclosure Statement. Rather, it requires that the Debtors take concrete actions to ensure that value is in fact maximized. *See In re Martin*, 91 F.3d at 394 ("[I]t is the trustee's duty to both the debtor and the creditor to realize from the estate all that is possible for distribution among the creditors.") (quoting 4 *Collier on Bankruptcy* ¶ 704.01 (15th ed. 1993)). Likewise, the Debtors' duty of loyalty requires more than simply representing that the Debtors subjectively *believe* that their plan is better than all competing alternatives. Instead, the Debtors must actually "refrain from self-dealing, [ ] avoid conflicts of interests and the appearance of impropriety, [and] **treat all parties to the case fairly**." *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 98 (Bankr. S.D.N.Y. 2017) (emphasis added).

8. But the Debtors' conduct in these cases—particularly as it concerns their engagement (or lack thereof) with the Flow Group—belies the naked assertions that they are doing

---

[4] *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [ECF No. 1691], at 1.

[5] *Id.*

6

all they can to maximize value. As set forth above, Mr. Neumann and the Flow Group have repeatedly expressed their sincere interest in providing a value-maximizing offer to purchase WeWork or its assets as part of the bankruptcy case. They have demonstrated the credibility of their proposals by engaging transaction counsel, negotiating the terms of an NDA, adapting their proposal to the Debtors' stated preferences (to the extent provided), meeting with some of the most sophisticated investors and real estate operators in the world who have expressed interest in backing the Flow Group, and furnishing those names to the Debtors through their advisors along with a willingness to have the Debtors speak directly to them.

9. Despite these efforts, the Debtors have rebuffed the Flow Group—often without any explanation—at every turn. Most notably, the Debtors have consistently refused to provide any information to the Flow Group that it can use to further develop and refine its proposal, notwithstanding that the parties have had a market-standard NDA in essentially final form for 11 weeks. The reason for the Debtors' continued refusal to provide such information, despite offers to sign an NDA, is as obvious as it is unacceptable: The Debtors have no interest in pursuing all paths to maximize the value of their estates, but rather want to use the chapter 11 process to rubber stamp a pre-petition RSA, deliver control of WeWork to the Debtors' own hand-picked buyers, obtain releases for those involved, and move on. But "[i]t is a basic principle that a debtor in possession must never give an insider a competitive advantage over others with regard to matters affecting the administration of its bankruptcy estate." *In re Simon Transp. Servs., Inc.*, 292 B.R. 207, 218 (Bankr. D. Utah 2003). "Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation." *Id.* (quoting *Pepper v. Litton*, 308 U.S. 295, 311 (1939)).

10. The Debtors have yet to disclose the full extent of how the transaction contemplated by the RSA has morphed into sale of control to another entity providing new money capital. But that only puts a spotlight on what process was run with this hand-picked group of parties enjoying greater access to information than other interested parties—particularly when the declared "highest bidder" in that closed-door negotiation may be affiliated with another entity that has substantial and unique visibility into the Debtors' business operations. *See, e.g.*, Amelia Pollard and Sujeet Indap, *WeWork Races to Raise Cash as Adam Neumann Offers to Outbid Rivals*, FINANCIAL TIMES (Apr. 18, 2024), https://www.ft.com/content/ac28423a-7708-4da9-9388-34dfb09055ce (noting that WeWork may raise funds from "Yardi Systems, a real estate tech provider that has partnered with [WeWork] on various projects . . . [and] has only been named in court filings under a pseudonym of 'Cupar Grimmond'"); Franco Faraudo, *What is Yardi's Relationship with WeWork*, PROPMODO (Apr. 18, 2024), https://propmodo.com/what-is-yardis-relationship-with-wework/ ("Yardi's decision to mask its investment in WeWork raises red flags.").[6] Indeed, regardless of "who" is buying control of the Debtors,[7] it is clear that such control *is* for sale. As aptly put by

---

[6] Respondents also note that under the Debtors' proposed chapter 11 plan of reorganization, Cupar Grimmond (*i.e.*, Yardi) has a veto right over the Debtors' post-emergence governance structure. *See First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [ECF No. 1690] (the "**Amended Plan**"), at 8 ("'Corporate Governance Term Sheet' means that certain corporate governance term sheet, **which shall be subject to the consent of Cupar,** . . . .") (emphasis added).

[7] While all of the relevant facts today remain opaque, it bears emphasizing that the Third Circuit has set forth the criteria of when parties may be considered an "insider" for Bankruptcy Code purposes: "[I]t is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship between debtor and creditor and anything other than closeness to suggest that any transactions were not conducted at arm's length.'" *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396-97 (3d Cir. 2009) (quoting *In re U.S. Med.*, 531 F.3d 1272, 1277 (10th Cir. 2008)) (brackets and alterations omitted); *see* S. REP. NO. 95-989, at 25 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."); *see also In re Miller Homes, LLC*, 2009 WL 4430267, at *6 (Bankr. D.N.J. Nov. 25, 2009) ("The Bankruptcy Code's concern is

the Committee: "[T]he capital provided on a post-petition basis … will sweep the Debtors' distributable value. In those circumstances, the Debtors are effectively being sold and the appropriate exercise of fiduciary duties requires the Debtors to run a thorough marketing process." Exclusivity Objection ¶ 16.

11. To rectify this state of affairs and ensure that the Court has a proper record from which to determine whether the Debtors faithfully complied with their fiduciary duties, Respondents seek narrow relief that is well within the Court's broad equitable and *express statutory powers* to provide.

12. Respondents request a status conference before the Court pursuant to section 105(d) of the Bankruptcy Code so that they can show the Court their prior proposal and demonstrate their sincere interest in achieving an efficient and value-maximizing resolution to these cases. Section 105(d) provides that "[t]he court . . . on the request of a party in interest . . . shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case." 11 U.S.C. § 105(d). These cases have languished in substantial part because the Debtors remain eager to push through a members-only plan that offers little (if anything) to unsecured creditors and WeWork's most important go-forward constituency: Its landlords.[8] In that regard,

---

whether a person is able to exert influence over a debtor so as to gain a more favorable position.") (quoting *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 428 (Bankr. S.D.N.Y. 2005)) (internal quotation marks omitted); *In re Foothills of Tex., Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) ("The Third Circuit's focus of inquiry is in accord with the plain meaning of insider–'a person who is within some society, organization, etc.; a person who is party to a secret, *esp. so as to gain an unfair advantage.*'") (quoting I Shorter Oxford English Dictionary 1394).

[8] On February 4, 2024, the Debtors filed their initial *Joint Chapter 11 Plan of Reorganization* [ECF No. 1290] (the "***Initial Plan***"). The Initial Plan contemplated no recovery for general unsecured claims, providing that such claims would be "discharged and released" and that general unsecured creditors would not "receive or retain any distribution, property, or value on account of" their claims. Initial Plan at 37. The Amended Plan that the Debtors filed on April 19, 2024 is scarcely better, stating only that holders of unsecured claims will be entitled

9

Respondents note that certain landlords have repeatedly objected to how they have been treated by the Debtors and others have recently filed legal arguments suggesting the Debtors allowed the statutory deadline under section 365(d)(4) to lapse, thereby threatening the ability of the Debtors to reorganize.[9] Respondents respectfully submit that having the opportunity to present their proposal to the Court will ultimately help steer these cases off the path of contentious litigation and may mitigate the unhelpful negotiating dynamics—that have led to what appears to be a falling knife—that are the product of the Debtors' chosen process.

13. The Court has ample statutory power under sections 105(a) and 1107(a) of the Bankruptcy Code to condition the Debtors' continued possession on ensuring an even playing field for all existing stakeholders (including Mr. Neumann) so they have as fair an opportunity as the RSA parties (or their hand-picked counterparts) have had to make a binding proposal. Critically, Respondents are not asking the Court to compel the Debtors to do anything outside the ordinary course of what they have already been doing on their own accord—such as establishing a data room that does not already exist or embarking on a change-of-control transaction when they have not themselves sought to do so. Just today, the Debtors confirmed that WeWork is reviewing proposals from third parties "in the ordinary course." *See* Steven Church, *WeWork Creditors Demand Company Negotiate with Potential Buyers*, BLOOMBERG (Apr. 22, 2024), https://www.bloomberg.com/news/articles/2024-04-22/wework-creditors-demand-company-

---

to receive their *pro rata* shares of either a "Cash Election" or an "Equity Election." Amended Plan at 37. The Amended Plan does not specify how much cash or equity will be made available to satisfy claims under these "elections," and thus—like the Initial Plan—effectively promises no recovery to general unsecured creditors.

[9] *See* ECF Nos. 1568, 1674, 1681, 1682, 1699. Respondents are still evaluating this new revelation but remain undeterred in pursuing their going concern offer, even if it requires a greater focus on individual negotiations with key landlords who are familiar to Respondents or their counsel.

negotiate-with-potential-buyers. Accordingly, Respondents ask the Court to hold the Debtors to their word when they voluntarily put the control of reorganized WeWork in play and simultaneously announced that they would, in keeping with their fiduciary duties, consider alternative proposals in good faith and provide access to potential bidders as needed to maximize value of the estate.[10]

14.  "The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (en banc). If a debtor in possession shirks its "paramount duty . . . to act on behalf of the bankruptcy estate . . . for the benefit of the creditors," the equitable powers of the bankruptcy court "are most valuable, for the court[ ] [is] able to craft flexible remedies that, while not expressly authorized by the Code, effect the result that the Code was designed to obtain." *Id.* at 568.

---

[10] Respondents anticipate that, among other reasons the Debtors will resist the relief requested, the Debtors will assert they have devised the best available change-of-control transaction possible that would garner support from the existing RSA parties. *That is not the right standard.* The Flow Group is confident that its proposal will offer more value of the enterprise than the Debtors' new proposed transaction, which merely seeks to transfer estate value to preferred parties who are injecting new capital for use by management of the reorganized Debtors. That does not make the proposal a better one for creditors, as contemplated by the Bankruptcy Code. *Cf. In re Polichuk*, 506 B.R. 405, 431 (Bankr. E.D. Pa. 2014) (referring to "section 502(b), which mandates that the court resolve objections to claims by determining the amount of the claim 'as of the date of the filing of the petition,'" as evidence of Congress's intent that there was to be an important "date of cleavage" such that "the trustee's power to assemble a bankruptcy estate for the benefit of all creditors [would not] be subject to manipulation by parties in interest."). In any event, there is no good reason why the Debtors should not allow the Flow Group to finalize its proposal following the receipt of due diligence so that it may be considered against the status quo. After all, "competition produces better products at lower prices." *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993). By analogy to antitrust law, bankruptcy law is designed to protect creditor (consumer) welfare, not any specific funding creditor's (one company's) profit margins. *Brunswick Corp. v. Pueblo Bowl-O-Mat., Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for the protection of competition, not competitors.").

15. But the Court need not rely solely on its equitable powers (although such authority is sufficient). Section 105(a) codifies the broad powers of the bankruptcy courts, providing that "[t]he court may issue **any order, process, or judgment** that is necessary or appropriate **to carry out the provisions of this title**." 11 U.S.C. § 105(a) (emphasis added). Here, Respondents request that the Court enter an order pursuant to section 105(a) directing the Debtors to provide the Flow Group with requested information as a condition on management and the Board remaining in possession of WeWork's assets pursuant to section 1107(a) of the Bankruptcy Code—relief plainly available under the text. While section 105(a) "may not be used to create substantive rights that are not provided for in the Code," *In re LTL Mgmt., LLC*, 636 B.R. 610, 622 (Bankr. D.N.J. 2022), Respondents do not seek the relief requested herein based on any purported "right" to the Debtors' nonpublic information. Rather, Respondents contend that the Debtors' inexplicable refusal to provide the Flow Group with the information necessary to complete diligence on a proposed acquisition of WeWork or its assets is fundamentally at odds with its obligation to maximize value. Under these circumstances, section 105(a) "can be and should be used to assure that the trustee does not act in an arbitrary or capricious matter." *Id.* at 623 (citation omitted).

16. Section 1107(a) of the Bankruptcy Code provides that "[s]ubject to any limitations on a trustee serving in a case under this chapter, **and to such limitations or conditions as the court prescribes,** a debtor in possession shall have all the rights, . . . and shall perform all the functions and duties, . . . of a trustee serving in a case under this title." 11 U.S.C. § 1107 (emphasis added). As noted above, a debtor's right to maintain possession of its assets as debtor in possession is a contingent one that can be modified if the court finds that to be appropriate. *In re Morningstar Marketplace*, 544 B.R. at 303. Respondents are not (at this stage) requesting any drastic remedy, but rather that the Court condition the Debtors' continued right to shepherd their assets as debtors

12

in possession on good faith engagement with the Flow Group, including by providing the Flow Group with information that is already assembled and being provided to the RSA parties (and apparently others).

17.  The requested relief falls comfortably within the scope of section 1107(a), which "expressly authorizes a bankruptcy court . . . to prescribe at least some kinds of 'limitations or conditions' on the rights, powers, and duties of a debtor in possession." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 665 (Bankr. S.D.N.Y. 2006).  Moreover, imposing such "limitations or conditions" on the Debtors as are in furtherance of their repeatedly acknowledged fiduciary duties is appropriate and warranted under the circumstances.  *See id.* at 670-71 (concluding that using section 1107(a) to enforce compliance with the debtor in possession's fiduciary duties "is a modest limit on the exercise of the powers of the debtors in possession, [ ] does not tread on areas otherwise addressed by the Code[,] . . . and is in the interest of creditors").

## CONCLUSION

18.  For the reasons set forth above, Respondents respectfully request that the Court schedule a conference pursuant to section 105(d) of the Bankruptcy Code for the next opportunity when parties in interest may be heard, on April 29, 2024, at 10:00 a.m.

Dated: April 22, 2024

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

*/s/ Robert J. Lack*

Robert J. Lack
Andrew M. Englander
Blair R. Albom
1 Gateway Center
Newark, NJ 07102-5311
Telephone: (973) 877-6400
Facsimile:  (973) 877-6409
Email: rlack@fklaw.com
    aenglander@fklaw.com
    balbom@fklaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Alex Spiro *(pro hac vice)*
Susheel Kirpalani *(pro hac vice)*
Benjamin Finestone *(pro hac vice)*
Kenneth Hershey *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: alexspiro@quinnemanuel.com
    susheelkirpalani@quinnemanuel.com
    benjaminfinestone@quinnemanuel.com
    kenhershey@quinnemanuel.com

*Co-Counsel to Adam Neumann, Flow Global Holdings LLC, and Nazare Asset Management, LP*

14