**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:   (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>           Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

**NOTICE OF FILING VALUATION ANALYSIS,**
**FINANCIAL PROJECTIONS, AND LIQUIDATION**
**ANALYSIS AS EXHIBITS TO THE DISCLOSURE STATEMENT**

      **PLEASE TAKE NOTICE** that on February 4, 2024, the above-captioned debtors and

debtors in possession (the "Debtors"), by and through their undersigned counsel, filed the

*Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of WeWork Inc. and*

*Its Debtor Subsidiaries* [Docket No. 1291] (the "Initial Disclosure Statement").

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Claims
    Agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business
    is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is
    WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

**PLEASE TAKE FURTHER NOTICE** that on April 19, 2024, the Debtors, by and through their undersigned counsel, filed the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1691] (the "Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the following documents as additional exhibits to the Disclosure Statement, as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit D** | Valuation Analysis |
| **Exhibit E** | Financial Projections |
| **Exhibit F** | Liquidation Analysis |

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/WeWork.   You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: April 22, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:   (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com


*Co-Counsel for Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com


*Co-Counsel for Debtors and*
*Debtors in Possession*

**<u>Exhibit D</u>**

**Valuation Analysis**

**Valuation Analysis**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("PJT"), as restructuring advisors to the Debtors, has estimated a potential range of total enterprise value ("Enterprise Value") and implied equity value ("Equity Value") for the Reorganized Debtors *pro forma* for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis utilizes certain financial and other information provided by the Debtors' management, as well as the Financial Projections attached to the Disclosure Statement as Exhibit D, and information provided by other sources, subject in all respects to the disclaimers and the description of PJT's methodology set forth herein. The Valuation Analysis is as of April 20, 2024, with an assumed Effective Date of June 1, 2024. The Valuation Analysis utilizes market data as of April 20, 2024. The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques to the extent deemed appropriate by PJT.

A. General Methodology

The estimated values set forth in this Valuation Analysis: (i) assume the Plan and transactions contemplated thereby are consummated; (ii) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan; (iii) do not constitute a recommendation to any Holders of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan; and (iv) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the Valuation Analysis, PJT, among other things: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (iii) discussed the Debtors' operations and future prospects with the Debtors' senior management team and the Debtors' other advisors; (iv) reviewed certain publicly available financial data for, and considered the market value of, public companies that could be comparable in certain respects to the Reorganized Debtors; (v) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors; and (vi) considered binding and non-binding proposals received for an acquisition of the company or certain of its assets. PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

In preparing the Valuation Analysis, PJT considered two sources of value: (i) the company's operations in its wholly-owned jurisdictions; and (ii) the company's operations or assets in non-wholly owned jurisdictions and joint venture entities. In respect of the assets referred to in the foregoing clause (i), PJT considered a variety of factors and evaluated a variety of financial analyses, including (a) discounted cash flow analysis; and (b) comparable companies analysis. While PJT considered incorporating a precedent transactions analysis, PJT chose not to do so due to a lack of recent and publicly available financial information for relevant precedent transactions. In respect of the assets referred to in the foregoing clause (ii), PJT considered information provided by the Debtors' management team and, in certain cases, bids received for a sale of the assets. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

B. Enterprise and Equity Value

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, is approximately $650 million to approximately $850 million (with the mid-point of such range being approximately $750 million).

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, PJT estimated the potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less funded indebtedness plus excess balance sheet cash on the Effective Date. PJT has assumed that the Reorganized Debtors will have, as of the assumed Effective Date, approximately $15 million of excess cash and no funded indebtedness.

Based upon the estimated range of Enterprise Value of the Reorganized Debtors described above, and assuming excess cash of approximately $15 million, PJT estimated that the potential range of Equity Value for the Reorganized Debtors is between approximately $665 million and approximately $865 million (with the mid-point of such range being approximately $765 million).

C. Additional Considerations

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the Effective Date. In addition, PJT assumed that, as of the assumed Effective Date, there will be no material change in economic, monetary, market, industry, regulatory, and other conditions that would impact any of the material information made available to PJT. PJT makes no representation as to the achievability or reasonableness of such assumptions. The Debtors undertake no obligation to update or revise statements to reflect events or circumstances that arise after the date of the Disclosure Statement or to reflect the occurrence of unanticipated events. PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

PJT did not independently evaluate the tax consequences of the Plan or the Debtors' estimates of the Reorganized Debtors' tax liability and did not independently analyze the value of any tax attributes of the Reorganized Debtors. The estimate of tax liability utilized for the Valuation Analysis is based on a preliminary analysis by the Debtors' tax team and reflects U.S. federal income tax treatment of the Debtors tax attributes under Section 382(l)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), and numerous other assumptions. The Debtors expect that actual cash taxes may vary significantly based on a variety of factors, including the Debtors' economic performance, the form of their restructuring transactions, and the availability of their tax attributes. Tax analysis with respect to Debtors remains ongoing and subject to material change in all respects. The Valuation Analysis does not separately ascribe value to tax attributes or attempt to "risk adjust" for the variability of tax results that could occur under the Plan. Any changes in the estimated tax liability of the Reorganized Debtors, or a change in the structure utilized to consummate the reorganization or the amount or ability to use any tax attributes, could materially change the conclusions reached in the Valuation Analysis.

Management of the Debtors advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The Valuation Analysis assumes that the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the company and the Enterprise Value thereof.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF APRIL 20, 2024. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO, EXCEPT AS REQUIRED BY APPLICABLE LAW.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED TO PREPARE THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS OR LIABILITIES WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL OR AN ESTIMATE OF THE LIQUIDATION VALUE OF THE DEBTORS OR THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT FROM THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE REORGANIZED DEBTORS' MANAGEMENT INCENTIVE PLANS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

THE VALUATION ANALYSIS DOES NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS, OR ANY OTHER PERSON, AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN.  PJT HAS NOT BEEN REQUESTED TO, AND DOES NOT EXPRESS ANY VIEW AS TO, THE POTENTIAL TRADING VALUE OF THE REORGANIZED DEBTORS' SECURITIES ON ISSUANCE OR AT ANY OTHER TIME THEREAFTER.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS RESTRUCTURING ADVISOR TO THE DEBTORS, AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN, OR OTHERWISE.

**<u>Exhibit E</u>**

**Financial Projections**

**WeWork Inc.**
**Overview of Financial Projections**

The Debtors[1] believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors. In connection with the planning and development of a plan of reorganization and for purposes of determining whether the Plan will satisfy this feasibility standard, the Debtors have analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtor's prepared the following financial projections (the "**Financial Projections**") on a Wholly Owned basis for the period from June 2024 through December 2028 (the "**Projection Period**") based on information available to them. The Financial Projections were prepared in good faith by the Debtors' management team ("**Management**") with the assistance of its advisors and are based on several assumptions made by Management within the bounds of their knowledge of their business and operations, with respect to the future performance of the Reorganized Debtors' operations assuming the Plan is Consummated. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. The Company prepared the Financial Projections based on information available to it. No representations or warranties, expressed or implied, are provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE U.S. SECURITIES AND EXCHANGE COMMISSION, U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION OR ANY OTHER APPLICABLE GUIDELINES.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT ACCOUNTING FIRM.

***Safe Harbor Under the Private Securities Litigation Reform Act of 1995***

The Financial Projections and the assumptions that the Debtors believe to be significant to the Financial Projections contain certain statements that may be deemed "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. When used in the Financial Projections, or the assumptions, the words "anticipate," "believe," "project," "estimate," "will," "may," "intend," "strategy," "future," "opportunity," "plan," "pipeline," "expect," "target," "model," "can," "could," "should," "would" or similar expressions should be generally identified as forward-looking statements. While the Debtors believe that the plans, intentions, and expectations reflected in the forward-looking statements are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Disclosure Statement Relating to the joint chapter 11 plan of WeWork inc. and its debtor subsidiaries, dated April 19, 2024, to which these Financial Projections are attached as Exhibit E.

1

cautioned that any such forward-looking statements are not guarantees of future performance, involve significant risks, uncertainties, and assumptions, and that actual results may differ materially and adversely from those expressed or implied by such forward-looking statements. Except as required by law, the Company expressly disclaims any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

### Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements and projections. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to ASC 852-10 or ASC 842, as issued by the Financial Accounting Standards Board.

### Risk Factors

The Financial Projections are based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance, or achievements to differ materially and adversely from any future results, performance, or achievements expressed or implied by these forward-looking statements.

Additional details regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially and adversely from those expressed in the Financial Projections. Furthermore, new factors could cause actual results to differ materially and adversely from those described in the Financial Projections, and it is not possible to predict all such factors or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a guarantee of the Company's future performance.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

### General Assumptions

The Debtor's, with the aid of their advisors have prepared the Financial Projections covering the time from the estimated Effective Date through fiscal year 2028 for the Projection Period. The Financial Projections are based on a number of assumptions with respect to the future performance of the Company's operations assuming the Plan is Consummated.

The Financial Projections are based upon, and assume the successful implementation of, the Plan. The Financial Projections assume that the Effective Date will be June 1, 2024 and that the Reorganized Debtors continue to operate substantially similar to their current business. If the Effective Date is significantly delayed,

additional expenses, including, without limitation, professional fees, may be incurred and operating results may be negatively impacted. The Financial Projections also take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and Management. The Debtors operate in the co-working industry, providing space-as-a-service to its members. Furthermore, the Debtors also generate monthly revenue from related product offerings and branding agreements, which are further described herein.

However, the assumptions do not necessarily take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Company to achieve the projected results of operations, financial condition, or cash flow. In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan should make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

## Business Overview

WeWork is a flexible workspace provider, offering affordable and community-centered office space to both large and small businesses as well as individuals who previously struggled to find dedicated workspaces. WeWork's customer base includes individuals and companies across six continents, from Fortune 500 companies to small startups. Customers can choose from a suite of WeWork services depending on their unique commercial needs.

WeWork's core offering is its traditional "space-as-a-service" products, which offer members access to flexible workspace and related business amenities and services. Flexibility is provided by offering Member Companies access to dedicated workspaces on a month-to-month or fixed-term basis. Member Companies have the option to choose the type of membership that best fits their needs, with a range of flexible offerings that provide access on an hourly, daily, or monthly-subscription basis or through a multi-year membership agreement. Membership also allows for access to ancillary amenities on a pay-to-use-basis that are not included in monthly membership or are in excess of monthly allowances.

In addition to WeWork's core space-as-a-service offering, the Debtors also generate revenue from:
i.    WeWork Workplace, a proprietary office management software platform that allows subscribers to manage and optimize their workspaces in exchange for a monthly licensing fee; and
ii.   Franchising, Licensing arrangements, and Joint Ventures.

With a global presence on six continents and in thirty-seven countries, WeWork is one of the largest flexible space providers in the world, with a go-forward portfolio of approximately 24 million rentable square feet globally, including approximately 12 million rentable square feet in the United States and Canada. Beginning in September 2023, WeWork, with the assistance of its advisors, led initially by Hilco, began engaging with hundreds of landlords to secure amendments or exits to substantially all of its real estate leases as part of an accelerated and comprehensive lease rationalization on a global scale. As of the beginning of April 2024, the Company has reached agreement on amending the leases at over 170 locations and exiting more than 160 locations, resulting in more than $800 million in annual rent savings. The pro forma footprint at emergence is expected to be smaller and more profitable, with a total of 337 locations, consisting of 178 domestic locations across 38 cities in the US and Canada and 159 international locations across 21 countries.

WeWork is currently listed on OTC Markets under the ticker symbol WEWKQ and was formerly publicly traded on the New York Stock Exchange under the ticker symbol WE.

**WeWork Inc.**
**Projected Statement of Operations**

*($ in millions)*
*Non-GAAP and Unaudited*

| | Notes | 6/1/2024 12/31/2024 FY2024 | 1/1/2025 12/31/2025 FY2025 | 1/1/2026 12/31/2026 FY2026 | 1/1/2027 12/31/2027 FY2027 | 1/1/2028 12/31/2028 FY2028 |
|---|---|---|---|---|---|---|
| **Projected Statement of Operations** | | | | | | |
| Net License Fee | [1] | $1,007 | $1,824 | $1,926 | $2,014 | $2,107 |
| Access Revenue | [2] | 117 | 192 | 197 | 202 | 207 |
| Ancillary & Service Revenue | [3] | 52 | 91 | 96 | 101 | 105 |
| Penalties & Set Up Fees | [4] | 33 | 59 | 61 | 63 | 65 |
| Other Revenues | [5] | 21 | 33 | 33 | 33 | 33 |
| **Total Revenue** | | **$1,231** | **$2,200** | **$2,314** | **$2,413** | **$2,517** |
| Occupany Costs | [6] | (739) | (1,250) | (1,279) | (1,313) | (1,360) |
| Building Operating Expenses | [7] | (196) | (341) | (352) | (363) | (374) |
| **Building Profit** | | **$296** | **$609** | **$682** | **$737** | **$784** |
| Indirect Operating Expenses | [8] | (68) | (123) | (128) | (133) | (138) |
| **Market Contribution Margin** | | **$228** | **$486** | **$554** | **$604** | **$646** |
| SG&A | [9] | (183) | (302) | (302) | (302) | (302) |
| **Cash AEBITDA** | | **$45** | **$184** | **$252** | **$302** | **$344** |

*Memo: Cash AEBITDA to Net Income Walk*

| | Notes | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 |
|---|---|---|---|---|---|---|
| Cash AEBITDA | | $45 | $184 | $252 | $302 | $344 |
| - Interest Expense & Other Non-Recurring Costs | [10] | (15) | (6) | (6) | (5) | (5) |
| - Taxes | [11] | – | (8) | (18) | (25) | (32) |
| - Non-Cash Adjustments | [12] | (45) | (68) | (26) | 16 | 35 |
| **Net Income / (Loss)** | | **($15)** | **$101** | **$202** | **$288** | **$343** |

**Key Drivers & Metrics**

| | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 |
|---|---|---|---|---|---|
| Ending Locations | 335 | 330 | 329 | 329 | 329 |
| Ending Workstation Capacity | 391,909 | 387,239 | 386,589 | 386,589 | 386,589 |
| Ending Physical Members | 297,319 | 307,633 | 316,339 | 321,108 | 327,330 |
| Occupancy % | 75.9% | 79.4% | 81.8% | 83.1% | 84.7% |
| Physical Member ARPM | $493 | $503 | $514 | $528 | $538 |
| Square Footage (M) | 24.5 | 24.3 | 24.2 | 24.2 | 24.2 |
| Revenue Per Square Foot | $81.1 | $85.8 | $90.5 | $94.6 | $98.9 |
| Cash Occupancy Per Square Foot | $50.8 | $50.7 | $52.0 | $53.3 | $55.2 |
| Building Opex Per Square Foot | $13.7 | $14.0 | $14.5 | $15.0 | $15.4 |

**Notes to Projected Statement of Operations**

Revenues

The company's revenue includes membership and service revenue as well as other revenue as described below.

1)     NLF Revenue: Net License Fee (NLF) revenue represents membership fees, net of discounts, from sales of WeWork memberships for a specific WeWork location. The price of each membership varies based on the type of workplace solution selected by the member, the geographic location, and any monthly allowances for business services, such as conference room reservations and printing or copying allotments, that are included in the base membership fee. The projections assume an average growth rate of ~4.9% per annum from FY'25 through FY'28. NLF revenue forecast is driven by members and Average Revenue Per Member (ARPM). No new locations are assumed to be added during the forecast period and membership growth at existing locations is projected to offset churn and rise to target occupancy levels. New locations would require additional capital and would only be pursued if accretive to the business and driven by market demand. Forecast assumes ~2.5% ARPM growth from FY'25 through FY'28 to offset cost increases during the same period.

2)     Access Revenue: Represents membership fees, net of discounts, from sales of WeWork All Access and On Demand revenue. These services are a monthly subscription offering that provides members with access to participating WeWork locations and allows for booking of workspaces, conference rooms and private offices right from their phones. The forecast assumes an average growth rate of approximately 2.5% per annum from FY'25 through FY'28.

3)     Ancillary & Service Revenue: Represents revenue generated from value-add service offerings that compliment monthly membership and allow members to take advantage of amenities not included in their monthly membership or services in excess of their monthly allowances e.g., access to conference rooms, printing, photocopies, phone and IT services, parking fees and other services. Revenues are forecast as a percentage of NLF revenues, consistent with historical run rates.

4)     Penalties & Set Up Fees: Forecast to grow approximately 3% per annum.

5)     Other Revenues: Other revenue is inclusive of management fees, licensing fees, and franchise fees for India, South Africa, China, Israel, and Costa Rica. Revenues are expected to remain flat during the forecast period.

Costs and Net Income Adjustments

6)     Occupancy Costs: Includes rent and tenancy costs paid to landlords. The structure and amount of occupancy costs vary by location. Occupancy costs have been forecast at the location level consistent with the terms of the lease documents and any subsequent amendments or agreements. The Company is still actively negotiating with landlords. Where an agreement has not yet been reached with a landlord, the projections use best information currently available to make assumptions related to go-forward occupancy costs.

6

7)      Building Operating Expenses: Costs associated with personnel and related costs for maintaining and operating each location. Examples of costs include cleaning, repair and maintenance, utilities, telecom, consumables, building technology, and other expenses. Building Operating Expenses are forecast at the location level and assumed to grow between 2.5% to 3% per annum through FY28.

8)      Indirect Operating Expenses: Costs of staff and related expenses for the teams that run community operations, such as member relations, natural new member sales and member retention, and facilities management. They also include bad debt expense. Variable costs are forecast to increase proportionate with NLF revenue, while fixed costs are projected to stabilize as the Company actively controls costs and actions various cost savings initiatives.

9)      Selling General & Administrative (SG&A) expenses: Expenses related to personnel costs and corporate employees, technology, consulting, legal and other professional services expenses, and costs of corporate offices, such as costs associated with billings, collections, purchasing and accounts payable functions. General sales and marketing efforts, such as advertising costs, and other overhead costs are also part of SG&A expenses. SG&A expenses are projected to decline slightly through FY24 and remain flat thereafter.

10)      Interest Expense and Other Costs: Primarily includes interest expense associated with $400 million exit LC Facility at 170bps per annum. Interest expense decreases annually as LCs are assumed to burndown over time. In addition to interest expense, the forecast includes certain non-recurring costs in 3Q24 related to restructuring items.

11)      Cash Taxes: Estimated cash taxes based on a preliminary analysis by the Debtors' tax team and reflect U.S. federal income tax treatment of the Debtors' tax attributes under Section 382(l)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), and numerous other assumptions. The Debtors expect that actual cash taxes may vary significantly based on a variety of factors, including the Debtors' economic performance, the form of their restructuring transactions, and the availability of their tax attributes. Using such assumptions, the projections reflect an aggregate of approximately $83 million in cash income taxes payable from FY'24 through FY'28.

12)      Non-Cash Adjustments: Primarily related to depreciation expense and other non-cash accounting items included in net income.

**WeWork Inc.**
**Projected Pro Forma Balance Sheet (Non-GAAP and Unaudited)**

| ($ in millions) Non-GAAP and Unaudited | Fcst FY2024 | Fcst FY2025 | Fcst FY2026 | Fcst FY2027 | Fcst FY2028 |
|---|---|---|---|---|---|
| **Projected Consolidated Balance Sheet** | | | | | |
| Cash and Cash Equivalents | $341 | $411 | $545 | $720 | $934 |
| Accounts Receivable and Accrued Revenue, net | 83 | 88 | 93 | 96 | 100 |
| Prepaid Expenses | 113 | 115 | 117 | 119 | 120 |
| Other Current Assets | 170 | 170 | 170 | 170 | 170 |
| **Total Current Assets** | **$707** | **$784** | **$925** | **$1,105** | **$1,324** |
| Property and Equipment, net | 1,976 | 1,788 | 1,620 | 1,475 | 1,345 |
| Lease Right-of-Use Assets, net | 2,348 | 2,274 | 2,174 | 2,036 | 1,868 |
| Non-Current Assets | 858 | 858 | 858 | 858 | 858 |
| **Total Long-Term Assets** | **$5,181** | **$4,920** | **$4,651** | **$4,369** | **$4,071** |
| **Total Assets** | **$5,889** | **$5,704** | **$5,576** | **$5,474** | **$5,395** |
| Accounts Payable & Accrued Expenses | 243 | 242 | 243 | 243 | 244 |
| Members' Service Retainers | 280 | 287 | 291 | 293 | 297 |
| Other Current Liabilities | 426 | 413 | 403 | 389 | 374 |
| **Total Current Liabilities** | **$949** | **$942** | **$937** | **$926** | **$915** |
| Lease Obligations | 3,966 | 3,686 | 3,360 | 2,979 | 2,566 |
| Other Non-Current Liabilities | 123 | 123 | 123 | 123 | 123 |
| **Total Long-Term Liabilities** | **$4,089** | **$3,809** | **$3,483** | **$3,103** | **$2,690** |
| **Total Liabilities** | **$5,038** | **$4,751** | **$4,420** | **$4,028** | **$3,604** |
| **Total Equity** | **$851** | **$953** | **$1,157** | **$1,446** | **$1,790** |
| **Total Liabilities & Equity** | **$5,889** | **$5,704** | **$5,576** | **$5,474** | **$5,395** |

**Notes to Projected Pro Forma Balance Sheet**

Lease Related Assets and Liabilities

Lease Right of Use Assets ("ROU") and Long-Term Lease Obligations on the Pro Forma balance sheet have been adjusted to reflect modified lease terms as a result of completed negotiations and expected outcomes related to ongoing negotiations. In accordance with ASC 842, Leases, a lease obligation and corresponding right-of-use asset are recognized based on the initial present value of the fixed lease payments using the Company's incremental borrowing rates for the portfolio of leases. The incremental borrowing rate represents the rate of interest the Company would have to pay to borrow over a similar term, and with a similar security, in a similar economic environment, an amount equal to the fixed lease payments. The Company's leases do not provide a readily determinable implicit discount rate. Therefore, management estimates the incremental borrowing rate used to discount the lease payments based on the information available at lease commencement. The Company utilized a model consistent with the credit quality of their

outstanding debt instruments to estimate their specific incremental borrowing rates that align with applicable lease terms.

Capital Structure and Liquidity

The Pro Forma balance sheet accounts for the reorganization and related adjustments pursuant to the Plan, and assumes a $400 million capital contribution at emergence. The new debt-light capital structure enables the Company to maintain a sufficient minimum cash balance and fund obligations arising under the Financial Projections and the business plan with operating cash flow and cash on hand.

The company maintains a Letter of Credit (LC) facility primarily utilized as security in its lease agreements with landlords. The LC facility is fully funded by a cash collateral reserve and may be utilized under specific circumstances, the likelihood of which is uncertain and dependent on future events. The corresponding liability and asset are not reflected on the balance sheet. The liability associated with the LC facility is fully offset by a corresponding asset, resulting in no impact on the company's net assets as currently presented.

Equity

The Reorganized Debtors' equity value is assumed to be $765 million as of the Effective Date, as per the mid-point of the Valuation Analysis. The Financial Projections assume no dividends are paid during the Projection Period.

Reorganization and Fresh-Start Adjustments

Pursuant to the Reorganization Plan, reorganization adjustments include distribution of the Reorganized Debtors' equity, debt and cash in exchange for certain pre-petition claims, adjustments to certain asset balances, cancellation of certain pre-petition liabilities subject to compromise, entry into new exit financing, payment of estimated administrative due on the Effective Date, and additional emergence costs.

**WeWork Inc.**
**Projected Pro Forma Cash Flows (Non-GAAP and Unaudited)**

| ($ in millions)<br>_Non-GAAP and Unaudited_ | _6/1/2024_<br>_12/31/2024_ | _1/1/2025_<br>_12/31/2025_ | _1/1/2026_<br>_12/31/2026_ | _1/1/2027_<br>_12/31/2027_ | _1/1/2028_<br>_12/31/2028_ |
|---|---|---|---|---|---|
| | **FY2024** | **FY2025** | **FY2026** | **FY2027** | **FY2028** |
| **Projected Statement of Cash Flow** | | | | | |
| Net Income/(Loss) | ($15) | $101 | $202 | $288 | $343 |
| Non-Cash Adjustments | | | | | |
| Depreciation and amortization | 184 | 288 | 268 | 245 | 230 |
| Other Non-Cash Adjustments | (139) | (220) | (242) | (261) | (265) |
| Changes in Working Capital | 7 | (6) | 2 | 2 | 2 |
| **Net cash provided by (used in) operating activities** | **$37** | **$163** | **$230** | **$273** | **$310** |
| Capital Expenditures & Capitalized Software | (49) | (100) | (100) | (100) | (100) |
| Proceeds from Sale of Subsidiary | 100 | – | – | – | – |
| **Net cash provided by (used in) investing activities** | **$52** | **($100)** | **($100)** | **($100)** | **($100)** |
| Net change in membership service retainers | 12 | 7 | 4 | 2 | 4 |
| **Net cash provided by (used in) financing activities** | **$12** | **$7** | **$4** | **$2** | **$4** |
| **Change in Cash** | **$100** | **$70** | **$134** | **$175** | **$213** |
| **Beginning Cash** | **$240** | **$341** | **$411** | **$545** | **$720** |
| **Ending Cash** | **$341** | **$411** | **$545** | **$720** | **$934** |

## Notes to Projected Pro Forma Cash Flows

Changes in Working Capital: The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, accounts payable and others, continue to perform according to the historical relationships with respect to revenue and expense activity. Notably, this assumes all vendors are treated consistent with agreed upon payment terms.

Capital Expenditures: Primarily related to investments required to maintain current locations.

Proceed from Sale of Subsidiary: Reflects sale of India and final installment related to sale of interest in Japan.

Net change in membership service retainers: The Financial Projections forecast member service retainers based on member growth. Net change in membership service retainers decreases as locations reach target occupancy and member growth stabilizes.

**<u>Exhibit F</u>**

**Liquidation Analysis**

**<u>Liquidation Analysis</u>**

## I.      INTRODUCTION

Section 1129(a)(7)(A)(i)–(ii) of the Bankruptcy Code, often called the "best interests" test, requires that "[w]ith respect to each impaired class of claims or interests each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."

The Debtors, with assistance from their restructuring advisors, have prepared the following hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>") in connection with the Plan and Disclosure Statement.[1] The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.  The values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan, which does not contemplate a liquidation.

The Liquidation Analysis shows the estimated recoveries that may be obtained by each Class of Claims or Interests assuming a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  As illustrated by the Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  Additionally, Holders of Claims or Interests in Impaired Classes would receive a recovery on account of their Claims or Interest in a hypothetical liquidation under chapter 7 of the Bankruptcy Code that is no better than the recovery they would receive on account of their Claims or Interests under the Plan.  Furthermore, no Holder of a Claim or Interest would receive or retain property on account of their Claim or Interest under the Plan of a value that is less than such Holder would receive on account of such Claim or Interest in a hypothetical chapter 7 liquidation.  Accordingly, as described in greater detail below, the Plan satisfies the "best interests" test set forth in section 1129(a)(7)(A)(i)–(ii) of the Bankruptcy Code.

## II.      OVERVIEW AND GENERAL ASSUMPTIONS

Hypothetical chapter 7 recoveries set forth in the Liquidation Analysis were determined through multiple steps, as set forth below.  The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of May 31, 2024 (the "<u>Conversion Date</u>") and the net costs to execute the administration of the liquidation of the Estates.  The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a single court-appointed chapter 7 trustee (a "<u>Trustee</u>").  The selection of a separate chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the chapter 7 cases from a large duplication of effort by each trustee and their professionals.

**<u>Summary Notes to Liquidation Analysis:</u>**

1.  **Dependence on Assumptions.**  The Liquidation Analysis depends on several assumptions. These assumptions were developed and considered reasonable by the Debtors' management

---

[1]    Unless otherwise specified, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Affiliates* [Docket No. 1690] (as may be amended, supplemented, or modified from time to Time, the "<u>Disclosure Statement</u>") or the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Affiliates* [Docket No. 1691] (as amended, supplemented, or modified from time to time, the "<u>Plan</u>"), as applicable.

team and restructuring advisors.  The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the hypothetical liquidation process would be resolved.

2.  **Dependence on a Forecast Balance Sheet.**  The Liquidation Analysis primarily utilizes the book values of the Debtors' assets and liabilities as of December 31, 2023, as a starting point, or more recent values where available.  The Debtors' management team believes that the December 31, 2023, book value of certain assets and liabilities are an acceptable proxy for certain book values as of the Conversion Date, whereas other balances are projected (*e.g.*, cash).

3.  **DIP Facilities Assumptions.**  The Liquidation Analysis assumes that, upon conversion of the Debtors' Chapter 11 Cases to chapter 7 cases, parties to the DIP New Money Facility and the DIP LC/TLC Facility will seek relief from the automatic stay to foreclose on the Debtors' assets under the Bankruptcy Court's jurisdiction to recover on their outstanding Claims.  For purposes of the Liquidation Analysis, it is assumed that the conversion from chapter 11 to chapter 7 would take place on the Conversion Date and that the lenders under the DIP New Money Facility and the DIP LC/TLC Facility would have the ability to recover on their respective collateral under such facilities.  Furthermore, for purposes of this Liquation Analysis, it is assumed that all Debtor entities will be subject to liens and related encumbrances under the DIP New Money Facility.

4.  **Chapter 7 Liquidation Process.**  The liquidation of the Debtors' assets and the Estates are assumed to be managed by a Trustee and largely completed over a three-month period.  The Trustee would oversee the liquidation, during which all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of parties in interest (generally at distressed prices).  A Trustee would also appoint professionals (*e.g.*, attorneys, investment bankers, financial advisors, accountants and tax advisors, consultants, appraisers and liquidators, and other experts) to assist in the liquidation as necessary.  Costs for a Trustee and supporting chapter 7 professionals are estimated in the Liquidation Costs section below (section VI).

    ▪  In this hypothetical chapter 7 liquidation, it is assumed a Trustee would shut down operations as quickly as possible by rejecting and exiting leases at all wholly owned locations to preserve what cash remains while they attempt to monetize the remaining assets.  Without additional liquidity to fund a sales process and given the many operational risks noted below, it is unlikely a Trustee would try to effectuate a sale of the business or individual locations.  Instead, the Trustee's focus would be on the collection of open accounts receivable invoices, the selling of any furniture, fixtures, and equipment ("<u>FF&E</u>") that can be easily removed from the lease locations, and recovery of certain prepaid assets, prepaid taxes, deposits, and other receivables.

- The Trustee would need to consider various risks of continuing to operate in chapter 7. The ability to maintain employee and vendor support would be at risk due to non-payment of chapter 11 administrative expenses as a result of the conversion. Loss of employees and vendor disruption would likely hinder the Trustee's ability to operate the buildings and provide the experience expected by the Company's members. The supporting technology and back office support would be impacted, further damaging the member experience. For all of these reasons, member churn would likely increase after a liquidation is announced. Furthermore, the sales team's ability to maintain new member sales would be similarly harmed. Certain revenue streams, including all location access memberships and day bookings, could quickly decline. Enterprise customers would begin to look for alternatives and potentially exit memberships early.

- The foreign operations would similarly be impacted by this liquidation. Additional legal entities providing lease guarantees would become debtors in the chapter 7 leading to additional issues with foreign landlords. No funding would be available from the U.S. parent entity. It is estimated that all foreign locations would also be required to stop operations in order to limit liability and losses on future trading.

- The remaining joint venture interests are projected to be sold or liquidated after the Conversion Date.

- The Liquidation Analysis assumes that lenders under the DIP New Money financing facility would seek to recover first from otherwise unencumbered assets before seeking to recover from assets encumbered by prepetition liens.

5. **Non-Debtors.** The Liquidation Analysis assumes all wholly owned U.S. non-debtors would commence proceedings in chapter 7 and all wholly owned foreign legal entities would begin liquidation processes in their respective countries under local rules. The Liquidation Analysis assumes that any asset proceeds are used to (i) satisfy the liquidation costs arising from the liquidation of that legal entity; and (ii) satisfy indebtedness outstanding with respect to Claims against those entities, according to the priority waterfall pursuant to local rules. The material assumptions of the non-debtors' hypothetical liquidation analyses are substantially consistent with the assumptions underlying the liquidation of the Debtors. The interests in non-debtor joint ventures are assumed to be sold by a Trustee, with the net proceeds available at the respective parent entity.

6. **Claims Estimates.** In preparing the Liquidation Analysis, the Debtors and their advisors developed preliminary estimates of Allowed Claims and Allowed Administrative Claims for each Class based upon a review of the Debtors' estimated balance sheet. Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date. As explained in Article VII.L of the Disclosure Statement, the Special Committee initiated an independent investigation into potential causes of action on account of, among other things, (i) fraudulent transfer; (ii) preference; (iii) breach of fiduciary duty and aiding and abetting breach of fiduciary duty; (iv) fraud; (v) recharacterization; and (vi) equitable subordination. In addition, the independent investigation has been evaluating claims raised by parties in interest, including the claims raised in the *Motion of the Ad Hoc Group of Noteholders Requesting (I) the Appointment of an Examiner Pursuant to Section*

3

*1104(c) of the Bankruptcy Code, and (II) Derivative Standing to Prosecute Estate Causes of Action Filed by an Ad Hoc Group of Holders of Unsecured Notes* [Docket No. 1337], and in the *Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors Estates and (II) Exclusive Settlement Authority Filed by the Creditors Committee* [Docket No. 1436].  The Debtors are not including any value for these potential claims.  No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the estimated amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amounts of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The Claims Bar Date was March 12, 2024, the Supplemental Stub Rent Bar Date was March 25, 2024, the Governmental Bar Date is May 6, 2024, and the Rejection Damages Bar Date that results from a rejection of an executory contract or lease is no later than thirty (30) days after the later of (i) entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease and (ii) the effective date of such rejection.  The Debtors will reconcile such claims for a period thereafter.

7. **Distributions of Net Proceeds to Claimants.**  The analysis was performed on a legal entity-by-entity basis.  The value received by the Debtors from non-debtors entities are shown through the intercompany asset row (recovery on account of intercompany receivables from those entities to U.S. Debtors pursuant to local liquidation rules).  Any available net proceeds would be allocated to the applicable Holders of Claims and Interests of each Debtor in strict priority in accordance with section 726 of the Bankruptcy Code.

III.    **CONCLUSION**

AS SUMMARIZED IN THE FOLLOWING ANALYSIS, CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY ON ACCOUNT OF THEIR CLAIMS THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE ON ACCOUNT OF THEIR CLAIMS IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

## IV.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors.[2]

*Conversion Date: 5/31/2024*

| Assets | Notes | Estimated Book Value ($mm) | Asset Recovery Estimate (%) Low | Asset Recovery Estimate (%) High | Asset Recovery Estimate ($mm) Low | Asset Recovery Estimate ($mm) High |
|---|---|---|---|---|---|---|
| **All Debtor Entities** | | | | | | |
| **Gross Liquidation Proceeds:** | | | | | | |
| Cash and Cash Equivalents | [ 1 ] | $75.7 | 100.0% | 100.0% | $75.7 | $75.7 |
| Accounts Receivable | [ 2 ] | 44.4 | 53.2% | 77.8% | 23.6 | 34.6 |
| Prepaid Expenses | [ 3 ] | 73.3 | 8.8% | 12.9% | 6.4 | 9.4 |
| Intercompany Assets | [ 4 ] | 2,484.0 | 3.4% | 4.5% | 85.2 | 111.1 |
| Furniture, Fixtures, and Equipment | [ 5 ] | 1,448.1 | 0.8% | 2.5% | 11.9 | 35.6 |
| Other Assets | [ 6 ] | 50.5 | 26.0% | 34.8% | 13.2 | 17.6 |
| Lease Right-of-Use Assets | [ 7 ] | 2,319.9 | - | - | - | - |
| Intangible Assets | [ 8 ] | 652.9 | - | - | - | - |
| Investment In Subsidiaries | [ 9 ] | 2,660.9 | - | - | - | - |
| **A: Gross Liquidation Proceeds** | | **$9,809.7** | **2.2%** | **2.9%** | **$216.0** | **$284.1** |

| Less: Liquidation Costs: | Notes | Expense Estimate ($mm) Low | Expense Estimate ($mm) High |
|---|---|---|---|
| Operating and Overhead Expenses | [ 10 ] | ($23.0) | ($23.0) |
| Professional Fees Carve Out | [ 11 ] | (75.0) | (75.0) |
| Chapter 7 Professional Fees | [ 12 ] | (3.9) | (5.2) |
| Chapter 7 Trustee Fees | [ 13 ] | (3.9) | (5.2) |
| **B: Liquidation Costs** | | **($105.8)** | **($108.4)** |

| | | Low | High |
|---|---|---|---|
| **A-B: Net Liquidation Proceeds Available for Distribution to Creditors** | | **$110.2** | **$175.7** |

| Liquidation Claims: | Notes | Estimated Claims ($mm) Low | Estimated Claims ($mm) High | Claim Recovery Estimate (%) Low | Claim Recovery Estimate (%) High | Claim Recovery Estimate ($mm) Low | Claim Recovery Estimate ($mm) High |
|---|---|---|---|---|---|---|---|
| **All Debtor Entities** | | | | | | | |
| DIP New Money Claims | [ 14 ] | $50.0 | $50.0 | 100.0% | 100.0% | $50.0 | $50.0 |
| DIP TLC Claims *(secured; 1L pari)* | [ 15 ] | $671.2 | $671.2 | 2.2% | 4.5% | $14.5 | $30.2 |
| Prepetition LC Facility Claims *(secured; 1L pari)* | [ 16 ] | 958.0 | 958.0 | 2.2% | 4.5% | 20.6 | 43.1 |
| 1L Notes Claims *(secured; 1L pari)* | [ 17 ] | 1,163.6 | 1,163.6 | 2.2% | 4.5% | 25.1 | 52.4 |
| 2L Notes Claims *(secured, 2L)* | [ 18 ] | 933.0 | 933.0 | - | - | - | - |
| 3L Notes Claims *(secured, 3L)* | [ 19 ] | 313.4 | 313.4 | - | - | - | - |
| Administrative Claims | [ 20 ] | 442.4 | 443.3 | - | - | - | - |
| Priority Claims | [ 21 ] | 35.8 | 35.8 | - | - | - | - |
| Unsecured Notes Claims | [ 22 ] | 179.6 | 179.6 | - | - | - | - |
| General Unsecured Claims | [ 23 ] | 26,507.0 | 26,434.8 | - | - | - | - |
| **Claims / Claim Recovery** | | **$31,254.1** | **$31,182.8** | **0.4%** | **0.6%** | **$110.2** | **$175.7** |
| *Memo: General Unsecured Claims Detail* | | | | | | | |
| *General Unsecured Claims (Other)* | | *$4,018.5* | *$4,017.6* | *-* | *-* | *-* | *-* |
| *Intercompany Claims* | | *17,147.2* | *17,147.2* | *-* | *-* | *-* | *-* |
| *Deficiency Claims* | | *3,979.1* | *3,913.6* | *-* | *-* | *-* | *-* |
| *Parent Guaranty Claims* | | *993.7* | *989.0* | *-* | *-* | *-* | *-* |
| *Indemnification Claims* | | *368.4* | *367.3* | *-* | *-* | *-* | *-* |
| ***Total General Unsecured Claims*** | | ***$26,507.0*** | ***$26,434.8*** | ***-*** | ***-*** | ***-*** | ***-*** |

---

[2]    The estimated Claims on this and the following pages may differ from the estimated Claims included in the Disclosure Statement because of differing assumptions between a Chapter 11 reorganization and a hypothetical chapter 7 liquidation.

## V.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### Note [1] – Cash and Cash Equivalents

The Liquidation Analysis assumes 100% recovery on the projected cash balance at the Conversion Date.[3]

### Note [2] – Accounts Receivable

Accounts receivable consists primarily of receivables from members, credit card sales, landlord receivables, and other miscellaneous receivables.  Recovery on customer accounts receivable invoices includes the impact of member service retainers that customers would likely set off against balances owed, the belief that collection efforts of the Trustee would focus on the larger customer balances, and assumes that certain accounts would be settled at less than the full amounts owed when disputed.  Credit card reimbursements, landlord receivables, and other receivables were analyzed separately.  The resulting recovery assumes a blended recovery between 53.2% and 77.8%.

### Note [3] – Prepaid Expenses

Prepaid expenses consist of amounts related to insurance contracts, software licenses, professional service retainers, and other prepaid expenses.  Insurance policies were analyzed for cancellation clauses, license contracts were reviewed, and other prepaid expense categories were reviewed.  The resulting recovery assumes a blended recovery between 8.8% and 12.9%.

### Note [4] – Intercompany Assets

The Liquidation Analysis assumes that all ordinary course intercompany claims are Allowed in the amount set forth herein as of the Conversion Date.  The U.S. Debtors' intercompany claims are shown as administrative claims for postpetition periods and general unsecured claims for the prepetition period.  All other entities have only general unsecured claims as of the Conversion Date.[4]  The result is a blended recovery between 3.4% and 4.5%.  For the avoidance of doubt, the intercompany amounts shown as recovered by the Debtors in the Liquidation Analysis Results section include only amounts received from non-Debtors.

---

[3]    The Debtors' cash balance does not include the ~$640 million of cash remaining (as of 2/29/2024) in the DIP LC Loan Collateral Accounts cash collateralizing the DIP LC Facility pursuant to the *Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 427] (the "DIP LC/TLC Order").  *See* DIP LC/TLC Order ¶ 5 ("Other than the DIP LC Secured Parties and, upon the Deemed Assignment, the DIP Term Lender, no party shall have any right to the DIP LC Loan Collateral (including, for the avoidance of doubt, the DIP LC Loan Collateral Accounts).").  Although the Debtors retain a reversionary interest in the DIP LC Cash Collateral, such interest is not expected to lead to any recovery in a chapter 7 liquidation due to the rights of the DIP LC Secured Parties and, upon the Deemed Assignment, the DIP Term Lender, with respect to the DIP LC Cash Collateral and the outstanding obligations owed to the DIP LC Secured Parties and the DIP Term Lender equaling or exceeding the DIP LC Cash Collateral amounts.  *See id.* ("The DIP LC Loan Collateral is for the sole and exclusive benefit of the DIP LC Secured Parties unless and until a Deemed Assignment, at which time the DIP LC Loan Collateral will be for the sole and exclusive benefit of the DIP Term Lender . . . .").

[4]    In certain international jurisdictions, intercompany claims are subordinated to other general unsecured claims pursuant to local rules.

**Note [5] – Furniture, Fixtures, and Equipment**

Furniture, fixtures, and equipment ("FF&E") consists of office furniture, kitchen appliances, computers, networking and related audio/video equipment, and other miscellaneous assets. The assumed recoveries exclude any recoveries on account of leasehold improvements and construction in progress assets. The Liquidation Analysis assumes that the chapter 7 Trustee would attempt to monetize certain FF&E assets when profitable (*i.e.*, where the cost of removing, warehousing, marketing, and transporting is less than the realizable market value of the used assets sold in a compressed period of time). Where not profitable, FF&E would be abandoned. The result is a blended recovery between 0.8% and 2.5%.

**Note [6] – Other Assets**

Other assets consist of tax assets and other deposits. The liquidation analysis assumes that tax attributes associated with net operating losses ("NOLs") would not be monetizable in the liquidation as contemplated. U.S. tax rules impose material restrictions on the usability of NOLs following an ownership change, and the company does not expect to be able to use its NOLs under these restrictions. Certain VAT and deferred tax assets outside of the U.S. would likely be recoverable and estimates for those are included in the local jurisdictions' liquidation analyses. The result is a blended recovery between 26.0% and 34.8%.

**Note [7] – Lease Right of Use Assets**

Lease right-of-use assets and corresponding lease obligations are recorded at lease commencement and are evaluated for recoverability when events or changes in circumstances impact future cash flows expected to result from the continued use of the asset. After the Conversion Date, there are no future cash flows expected to result from the continued use of the lease assets and therefore there is no assumed recovery.

**Note [8] – Intangible Assets**

Intangible assets consist of registered and non-registered intellectual property ("IP") and other miscellaneous intangible assets. IP primarily consists of trademarks, copyrights, patents, domain names, and other miscellaneous intangible assets. Due to the liquidation of the estate and discontinuance of global operations, there is no assumed recovery.

**Note [9] – Investment in Subsidiaries**

Investment in subsidiaries represents the recorded investment values in each of the Debtor entities' direct foreign subsidiaries. There are no expected equity recoveries from non-Debtor subsidiaries to Debtors.

## VI.   NOTES FOR LIQUIDATION COSTS

**Note [10] – Operating and Overhead Expenses**

As stated above, the liquidation of the Debtors' assets and liquidation of the Estates are assumed to be largely completed over a three-month period as managed by a chapter 7 trustee with the continuing support of a subset of the company's current employees and chapter 7 professionals. Operating and overhead expenses consist of employee costs as well as a minimal level of vendor expenses and rents. It is assumed that all Debtor leases would be rejected on or around the Conversion Date with all non-Debtor leases also exited through local insolvency procedures. The main ongoing operating activities would be the collection of open accounts receivable invoices, attempted monetization of other balance sheet assets including FF&E, prepaid and other assets (as described above), support for the liquidation of foreign operations, and the maintenance of company books and statutory and tax-related filings.

**Note [11] – Professional Fees Carve Out**

The carve out for professional fees was ordered pursuant to the Final Cash Collateral Order[5] approved on December 11, 2023.  The estimated Allowed Professional Fees as of the Conversion Date is $55 million and the estimate of Allowed Professional Fees after delivery of a Carve Out Trigger Notice is $20 million.

**Note [12] – Chapter 7 Professional Fees**

It is assumed that the chapter 7 trustee would hire certain professionals to assist with the management and liquidation of the Estate.  Other professional fees are estimated to be 3% of gross proceeds available for distribution excluding value received from non-Debtors.

**Note [13] – Chapter 7 Trustee Fees**

Per statutory guidelines, the chapter 7 Trustee is eligible to receive compensation based on the gross proceeds available for distribution to interested parties.  The Liquidation Analysis assumes a chapter 7 Trustee fee of 3% of gross proceeds available for distribution excluding value received from non-Debtors.

## VII.    NOTES FOR SECURED CLAIMS[6]

**Note [14] – DIP New Money Claims[7]**

The Liquidation Analysis assumes that amounts outstanding under the DIP New Money Facility is $50.0 million at the Conversion Date.  The DIP New Money Facility is secured by superpriority priming liens upon substantially all of the Debtors' assets, other than the DIP LC Loan Collateral Accounts or the DIP LC Loan Collateral, including a first priority senior secured lien upon all tangible and intangible prepetition and postpetition property of the Debtor non-guarantor parties.  The DIP New Money Facility has priority over the DIP LC/TLC Facility and the prepetition letters of credit governed by the Prepetition LC Facility Documents with respect to such assets, *provided* that the liens securing the DIP New Money Facility are subject and subordinate to Carve Outs. The inclusion of certain Debtor non-guarantor parties to the DIP New Money Facility is subject to ongoing negotiations.

**Note [15] – DIP TLC Claims**

The DIP TLC Claims (Plan Class 3) are assumed to be $671.2 million, comprising the principal under the DIP LC/TLC Facility.  The postpetition DIP TLC Claims rank junior to the DIP New Money Claims and pari passu with the Prepetition First Priority Liens[8] and the First Lien Adequate Protection Liens held by the secured parties under the Prepetition LC Facility granted under the Cash Collateral Order.

---

[5]   Capitalized terms used but not otherwise defined in this Note [11] shall have the meaning ascribed to them in the *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 428].

[6]   The aggregate amount of and the recovery estimate in a hypothetical chapter 7 for the Allowed Other Secured Claims (Plan Class 1) has not been calculated because no estimates of the value of the collateral securing the Allowed Other Secured Claims have been made.  Under the Plan, Other Secured Claims are unimpaired.

[7]   Capitalized terms used but not otherwise defined in this Note [14] shall have the meaning ascribed to them in the DIP LC/TLC Order or the DIP New Money Order, as applicable.

[8]   Capitalized terms used but not otherwise defined in this Note [15] shall have the meaning ascribed to them in the DIP LC/TLC Order.

**Note [16] – Prepetition LC Facility Claims**

The Prepetition LC Facility Claims (Plan Class 4A) are assumed to be $958.0 million, comprising principal, accrued interest and fees, and premiums as of the Conversion Date, which amount includes, for the avoidance of doubt, the amounts paid to achieve the Date of Full Satisfaction (as defined in the LC Facility Credit Agreement) and the amounts due under the Prepetition Reimbursement Agreement. The Prepetition LC Facility Claims include Claims under both the Senior LC Facility and the Junior LC Facility. The Prepetition LC Facility Claims benefit from first priority liens (which rank junior to the DIP New Money Claims and pari passu with the other first lien priority obligations) covering substantially all the assets of each guarantor Debtor entity.

**Note [17] – 1L Notes Claims**

The 1L Notes Claims (Plan Class 4B) are assumed to be $1,163.6 million, comprising principal, accrued interest, fees, and premiums as of the Conversion Date. The 1L Notes Claims include obligations under the Series I 1L Notes, Series II 1L Notes, and Series III 1L Notes.

The 1L Notes Claims benefit from first priority liens (which rank junior to the DIP New Money Claims and pari passu with the other first lien priority obligations) covering substantially all the assets of each guarantor Debtor entity.

**Note [18] – 2L Notes Claims**

The 2L Notes Claims (Plan Class 5) are assumed to be $933.0 million, comprising principal, accrued interest, fees, and premiums as of the Conversion Date. The 2L Notes Claims include obligations under the 2L Notes and the 2L Exchangeable Notes.

The 2L Notes Claims benefit from second priority liens (which rank junior to the DIP New Money Claims and the first lien priority obligations) covering substantially all the assets of each guarantor Debtor entity.

**Note [19] – 3L Notes Claims**

The 3L Notes Claims (Plan Class 7) are assumed to be $313.4 million, comprising principal, accrued interest, fees, and premiums as of the Conversion Date. The 3L Notes Claims include obligations under the 3L Notes and the 3L Exchangeable Notes.

The 3L Notes Claims benefit from third priority liens (which rank junior to the DIP New Money Claims, first and second lien priority obligations) covering substantially all the assets of each guarantor Debtor entity.

## VIII.    NOTES FOR ADMINISTRATIVE AND PRIORITY CLAIMS

**Note [20] – Administrative Claims**

Administrative Claims include amounts such as claims pursuant to section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims"), other postpetition accounts payable, deferred rent and stub rent, postpetition member service retainers, postpetition intercompany claims, and other Administrative Claims. Administrative Claims are estimated in the range of approximately $442.4 million to $443.3 million as of the Conversion Date.

**Note [21] – Priority Claims**

Priority Claims (included in Plan Class 2) include amounts such as accrued and unpaid wages and benefits, payroll taxes, other taxes and fees, and other Priority Claims.  Priority Claims are estimated at approximately $35.8 million as of the Conversion Date.


IX.    **NOTES FOR UNSECURED CLAIMS**

**Note [22] – Unsecured Notes Claims**

The Unsecured Notes Claims (Plan Class 7) are assumed to be $179.6 million, comprising principal, accrued interest, and fees as of the Conversion Date.  The Unsecured Note Claims include obligations under the 7.875% Senior Notes and the 5.000% Senior Notes, which were issued on an unsecured basis.

**Note [23] – General Unsecured Claims**

General Unsecured Claims (Plan Class 8) include estimated operating trade claims and prepetition deferred revenue, lease and contract rejection claims, prepetition member service retainers, litigation claims, indemnification claims, secured loan deficiency claims, and other unsecured claims estimated as of the Conversion Date.  The General Unsecured Claims pool as shown in Section IV also includes Guaranty Claims (Class 9) and prepetition Intercompany Claims (Class 10). The Liquidation Analysis estimates the total General Unsecured Claims at a range from approximately $26.4 billion to $26.5 billion.

- Accounts payable represent the Debtors' consolidated estimated prepetition accounts payable balance reduced by estimates of 503(b)(9) Claims.
- Rent rejection claims represent unpaid prepetition rent and estimated rejection damages claims arising from the Debtors' rejection of certain unexpired leases pursuant to section 365 of the Bankruptcy Code as of the Conversion Date.  Rent rejection claims were estimated on a property-by-property basis consistent with the Bankruptcy Code pursuant to section 502(b)(6) which limits claims to the greater of (a) one year's rent; and (b) 15% of the remaining lease term, not to exceed three-years' rent.
- Contract rejection claims represent the estimated rejection damage claims arising from the Debtors' rejection of certain executory contracts pursuant to section 365 of the Bankruptcy Code as of the Conversion Date.
- Litigation claims represent fixed litigation claims based on the Debtors' Schedules of Assets and Liabilities.  All other non-fixed litigation claim estimates are assumed at $0 for purposes of this hypothetical Liquidation Analysis.
- Indemnification claims relate to the agreement between WeWork Companies U.S. LLC ("WWCUS") and WeWork Companies LLC ("WWC") whereby WWCUS indemnified WWC for any parent guarantee obligations.
- Deficiency Claims relate to remaining estimated liabilities after available proceeds are distributed to Secured liabilities at a given legal entity.  For presentation purposes, the Deficiency Claims are shown asserted only once in the chart in section IV above instead of duplicating across all Debtor Guarantor entities.
- Guaranty claims relate to real estate lease claims in which a parent guarantee was provided pursuant to the lease.  These are shown primarily at WeWork Companies LLC and WeWork Companies U.S. LLC.

- Intercompany claims comprise promissory notes and receivables that exist between Debtor entities to reflect prepetition intercompany transactions incurred during the Debtors' ordinary course of business.

Holders of General Unsecured Claims (Plan Class 8) will not receive any recovery on account of their Claims under the Plan.  However, such Holders will receive, at such Holders' election, such Holder's Pro Rata share of either (A) the Cash Election or (B) the Equity Election.  For the avoidance of doubt, such recoveries are *not* on account of such Holders' General Unsecured Claims.  The value represented by the Cash Election or the Equity Election is subject to the ongoing negotiation among the Debtors, the Creditors' Committee, and the Required Consenting Stakeholders.  For the avoidance of doubt, in no event will Holders of General Unsecured Claims receive a lower recovery on account of their Claims under the Plan than they would receive on account of such Claims under a hypothetical chapter 7 liquidation.

## X.    STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, a hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of reasonable estimates and assumptions that are based upon the Debtors' business judgment and input from certain of their advisors.  These reasonable estimates and assumptions may be subject to business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.

The Liquidation Analysis was prepared for the purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were hypothetically liquidated in accordance with chapter 7 of the Bankruptcy Code.  The actual amounts of Claims that would ultimately be Allowed against the Debtors' estates could vary from the estimates stated herein, depending on the nature and amounts of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary from the values set forth in this Liquidation Analysis.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.

**NO ORDER OR FINDING HAS BEEN ENTERED OR MADE BY THE BANKRUPTCY COURT ESTIMATING OR OTHERWISE FIXING THE AMOUNT OF CLAIMS AT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS.   THE ESTIMATES OF THE AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN.**