**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
edward.sassower@kirkland.com
joshua.sussberg@kirkland.com
steven.serajeddini@kirkland.com
ciara.foster@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Ryan T. Jareck, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:   (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>                          Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

**OMNIBUS REPLY IN**
**SUPPORT OF DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER (I) EXTENDING THE DEBTORS'**
**EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND**
**SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121**
**OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") in support of the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

*Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1452] (the "Motion")[2] and in response to the (i) *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptance Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1698] (the "Committee Objection," and the objecting party, the "Committee"), (ii) *Response of Adam Neumann et al. to Objection of Official Committee of Unsecured Creditors to Debtors' Motion to Extend Exclusive Periods and Request Pursuant to 11 U.S.C. § 105(d) for Conference Concerning Unequal Access to Due Diligence Materials* [Docket No. 1704] (the "Flow Objection," and the objecting parties, the "Flow Parties"), and (iii) *Objection of the Ad Hoc Group of Noteholders to Debtors' (A) Motion to Extend Exclusivity, (B) Application to Shorten the Notice Period, and (C) Motion to Approve Amended Disclosure Statement; Cross-Request that the Court (1) Re-Calendar the Examiner Motion for a Near-Term Hearing and (2) Immediately Refer this Bankruptcy For Judicial Mediation* [Docket No. 1705] (the "Unsecured AHG Objection," and the objecting party, the "Unsecured AHG," and the Committee Objection, the Flow Objection, and the

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion, the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1691] (as amended, supplemented, or modified from time to time, the "Disclosure Statement"), or the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1690] (as amended, supplemented, or modified from time to time, the "Plan"), or the Objections, as applicable. Contemporaneously herewith, the Debtors filed the *Omnibus Declaration of Daniel O'Brien in Support of (A) Debtors' Motion for Entry of an Order (I) Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending Debtors' Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief; and (B) Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* (the "O'Brien Declaration"), the *Declaration of Jamie Baird in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* (the "Baird Declaration"), and the *Declaration of Brian Corio in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* (the "Corio Declaration"), in support of the Motion and in response to the Objections.

2

Unsecured AHG Objection, collectively, the "Objections," and the Committee, the Flow Parties, and the Unsecured AHG, collectively, the "Objecting Parties"). In support of this Reply and in response to the Objections, the Debtors state the following:

## Reply

1. After a hard-fought six months, the Debtors are ready to confirm the Plan on May 30, 2024. This extraordinary accomplishment is possible because the Debtors have made tremendous progress negotiating with all key stakeholders in these exceedingly complex chapter 11 cases, demonstrated good faith progress toward emergence, and filed a viable Plan that enjoys the support of the Consenting Stakeholders—all factors that courts consider when determining whether to extend the period during which only a debtor may file and solicit a plan.[3] The Motion seeks an extension of the Exclusivity Periods so that the Debtors can finish what they started and exit chapter 11 on their proposed timeline. The Objections ignore this progress and focus instead on false accusations that are irrelevant to the applicable legal standard.

2. Even more troubling is the Objecting Parties' argument that the Debtors refused to engage with the Flow Parties. This argument misstates the facts and the law, is irrelevant to the *Adelphia* factors, and, like the other arguments raised in the Objections, should not be allowed to hinder the Debtors' ability to reorganize and bring these chapter 11 cases to a value-maximizing conclusion. For the reasons set forth herein, the Objections should be overruled, and the Motion should be granted without prejudice to future extensions.

---

[3] *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006).

3

**Argument**

3.  The Court should grant the Debtors' Motion seeking their first extension of the Exclusivity Periods, which is routinely granted in chapter 11 cases,[4] because the Debtors have made tremendous progress in these exceedingly complex chapter 11 cases and have a path to confirmation in just over four weeks. More specifically, as a result of the thousands of hours the Debtors and their advisors have spent engaging with all key stakeholders over the course of the last several months and the breathing spell afforded to the Debtors by the Exclusivity Periods, the Debtors have, among other things, (i) filed a viable chapter 11 plan and disclosure statement; (ii) obtained approval of a debtor-in-possession letter of credit facility that allows the Debtors to continue to operate in the ordinary course; (iii) reached resolution on approximately ninety percent of the Company's expected go-forward lease portfolio of approximately 330 locations globally; and (iv) filed schedules and statements for all 517 Debtor entities. To build on this momentum, it is imperative that the Debtors have additional time to finalize and prosecute the Plan without the unnecessary costs, distraction, and confusion that would result from the existence of untenable, competing plans.

4.  The Debtors recognize that these chapter 11 cases must progress quickly. To that end, the Debtors have constructed the following confirmation schedule to satisfy the statutory notice periods, provide the time needed to solicit and tabulate votes, and bring these chapter 11 cases to an expeditious and value-maximizing conclusion:

---

[4] *See, e.g.*, *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Sept. 21, 2023) (granting an initial exclusivity extension of 120 days); *In re Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK) (Bankr. D.N.J. Aug. 14, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Aug. 2, 2023) (granting an initial exclusivity extension of ninety days); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Apr. 19, 2023) (granting an initial filing exclusivity extension of forty-eight days and a solicitation exclusivity extension of seventy-three days); *In re Nat'l Realty Inv. Advisors LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Oct. 5, 2022) (granting an initial exclusivity extension of 120 days).

| Revised Confirmation Schedule | | |
|---|---|---|
| **Action** | **Original Date** | **Proposed New Date** |
| Filing Exclusivity Expiration | March 6, 2024 | **July 3, 2024** |
| Proposed Disclosure Statement Objection Deadline | March 19, 2024 | **May 28, 2024, at 4:00 p.m., prevailing Eastern Time** |
| Proposed Disclosure Statement Hearing | March 26, 2024, at 10:00 a.m., prevailing Eastern Time | **April 29, 2024, at 10:00 a.m., prevailing Eastern Time[5]** |
| Proposed Plan Objection Deadline | March 19, 2024 | **May 28, 2024, at 4:00 p.m., prevailing Eastern Time** |
| Proposed Combined Hearing | May 2, 2024, subject to Court availability | **May 30, 2024, subject to Court availability** |
| Solicitation Exclusivity Expiration | May 6, 2024[6] | **September 3, 2024** |

5. This proposed timeline is absolutely necessary in light of the Debtors' mounting administrative expenses, which all parties in interest should seek to minimize.[7] The Objecting Parties ignore this reality, however, and argue that the Debtors are moving too quickly toward confirmation,[8] have not engaged with the Flow Parties, and therefore have not established sufficient cause to warrant an extension of the Exclusivity Periods beyond thirty days.[9] None of

---

[5] The April 29, 2024 hearing is scheduled for conditional approval of the Disclosure Statement only. The Debtors intend to put on their case-in-chief as to why the Disclosure State contains "adequate information" at the Combined Hearing on May 30, 2024.

[6] The Exclusivity Periods set forth in sections 1121(b) and 1121(c) of the Bankruptcy Code expired on March 6, 2024, and May 6, 2024, respectively, and were automatically extended "until the Court acts on the Motion." *See Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 100] (the "Case Management Procedures"). For the avoidance of doubt, the Solicitation Exclusivity Period expired Saturday, May 4, 2024, but was automatically extended to May 6, 2024, by operation of Bankruptcy Rule 9006(a) in addition to the extension granted under the Case Management Procedures.

[7] *See generally* Hr'g Tr. at 21–22, 36–38, *In re WeWork, Inc., et al.*, No. 23-19865 (JKS) (Bankr. D.N.J. Apr. 23, 2024) (attorneys for to the Committee and certain landlords voicing concerns regarding the Debtors' administrative expenses).

[8] The Objectors directly contradict themselves in demanding that these cases be slowed down while simultaneously arguing they are not proceeding quickly enough. *See* Committee Objection ¶ 4; Unsecured AHG Objection ¶ 3; *compare* Unsecured AHG Objection ¶ 3 with Unsecured AHG Objection ¶ 5.

[9] *See* Committee Objection ¶ 12 (conceding that an extension of the Exclusivity Periods is warranted at least for thirty days). Notably, the dispute between the Debtors and the Objecting Parties regarding the requested extension comes down to a disagreement over approximately one month (*i.e.*, May 29 or July 3), hardly a discrepancy sufficient to warrant the Court's intervention.

5

these arguments are relevant for the Court to decide whether to grant the Motion.[10] Thus, the Objections should be overruled for several reasons.

6. **First**, the Committee's argument that the pace of the Debtors' lease negotiations is moving too slowly[11] is divorced from reality. The Debtors operate one of the most expansive portfolios of commercial office space in the world and, as a result, are party to hundreds of unexpired leases with hundreds of counterparties. Because of the unique and individualized nature of such leases, negotiations are labor intensive and time consuming. Even so, on account of their extraordinary efforts to date, the Company has reached agreements on amending the leases at over 170 locations and exiting more than 160, effectively reaching resolutions on approximately ninety percent of the Company's expected go-forward lease portfolio in the United States and Canada. And over the next five weeks, the Debtors expect to finish documenting and executing the lease amendments necessary to complete the lease rationalization process.

7. Moreover, on April 22, 2024, the Debtors filed all the necessary exhibits to the Disclosure Statement, including the Valuation Analysis (Exhibit D), Financial Projections (Exhibit E), and Liquidation Analysis (Exhibit F),[12] and the Debtors anticipate filing a revised Plan and Disclosure Statement prior to the April 29, 2024, Disclosure Statement hearing that will detail

---

[10] *See Mo v. H.S.B.C. Bank USA, N.A. (In re Mo)*, 650 B.R. 193, 227–28 (Bankr. D.N.J. 2023) (when determining whether to grant a request to extend a debtor's exclusive right to file and solicit a plan under section 1121 of the Bankruptcy Code, courts look to the following factors, none of which are dispositive in the analysis: (i) the size and complexity of the case(s); (ii) the existence of good faith progress toward reorganization; (iii) the necessity of sufficient time to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan; (iv) whether the debtor is paying its debts as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress negotiating with creditors; (vii) the length of time a case has been pending; (viii) whether the debtor is seeking an extension to pressure creditors; and (ix) whether or not unresolved contingencies exist) (quoting *In re Cent. Jersey Airport Servs.*, 282 B.R. at 184); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987))).

[11] *See* Committee Objection ¶ 6.

[12] *See Notice of Filing Valuation Analysis, Financial Projections, and Liquidation Analysis as Exhibits to the Disclosure Statement* [Docket No. 1706].

many of the other disclosures the Committee and the Unsecured AHG demanded in their objections and all information that the Court requested be included at the April 23, 2024 hearing.[13] The Debtors then intend to pursue confirmation of the Plan on May 30, 2024. The Debtors' proposed expedited timeline for confirmation of the Plan directly contradicts the Objecting Parties' allegations about delay in these cases.

8.    The Committee's argument that the Debtors have missed certain RSA milestones is similarly unconvincing.[14] After moving RSA milestones with support from their secured lenders, the Debtors' anticipated new-money facility will contemplate additional milestone extensions that will provide the Debtors with sufficient runway to finalize their lease rationalization efforts, prosecute the Plan, and emerge from chapter 11 before the start of the summer. These proposed extensions will be value-maximizing and benefit all stakeholders.

9.    Terminating exclusivity now, while the Debtors enter the home stretch of these chapter 11 cases, would do nothing other than cause value-destructive delay, distraction, unnecessary costs, and doubt among all parties in interest. In fact, in similar circumstances courts have, not surprisingly, held that termination of exclusivity just weeks before plan confirmation would be "at odds with moving the case forward" and that allowing competing plans to be filed at such a stage "might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push [the] process back to square one."[15]

---

[13]   *See* Hr'g Tr. at 9–10, 31, 36 *In re WeWork, Inc., et al.*, No. 23-19865 (JKS) (Bankr. D.N.J. Apr. 23, 2024) (the Court describing the information that will be included in the revised Disclosure Statement).

[14]   *See* Committee Objection ¶ 2("[T] the Debtors have missed nearly all of the RSA milestones . . . .").

[15]   *See Adelphia Commc'ns Corp.*, 352 B.R. at 590.

7

10. **_Second_**, the Debtors are navigating through exceedingly complex chapter 11 cases, and the Objecting Parties do not suggest otherwise.[16] Indeed, these chapter 11 cases include 517 Debtor entities with a vast network of operations, thousands of parties in interest, a complex corporate and capital structure that includes over $4.2 billion in funded debt obligations, and two pending motions seeking derivative standing, one of which also seeks to appoint an examiner.

11. These chapter 11 cases also include parallel investigations being conducted by the Special Committee and the Committee. These investigations have entailed massive amounts of formal and informal discovery, including hundreds of thousands of documents totaling more than four million pages and numerous witness interviews. While bankruptcy courts typically examine several factors to determine whether sufficient cause exists to warrant an extension of the Exclusivity Periods, both Congress and courts have recognized that the size and complexity of a debtor's case alone may constitute sufficient cause for an extension of the Exclusivity Periods.[17] If there were ever a company whose chapter 11 cases were sufficiently complex to warrant an extension of exclusivity, WeWork's cases are it. The Motion can and should be granted based on complexity alone.

---

[16] The Committee's attempt to leverage _GMG Capital Partners_ in support of its arguments is misguided. _See_ Objection ¶ 19 (citing to _In re GMG Cap. Partners III, L.P._, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014)). In _GMG Capital Partners_, the court denied a motion to extend exclusivity where the debtors were a non-operating company with no business to restructure and had "not even commenced plan negotiations" with the holders of 88% of their prepetition debt. _In re GMG Cap. Partners III, L.P._, 503 B.R. at 602. The facts in _GMG Capital Partners_ are clearly distinguishable as the Debtors have already filed a viable Plan and Disclosure Statement and there is no serious dispute that these cases are exceedingly complex.

[17] _See_ H.R. Rep. No. 95 595, at 231–32, 406 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6191 ("[I]f an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement.") (emphasis added); _see also In re Texaco Inc._, 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987) (holding that size and complexity of the chapter 11 case provided sufficient cause to extend exclusivity); _Cont'l Casualty Co. v. Burns and Roe Enters., Inc. (In re Burns and Roe Enters., Inc.)_, 2005 WL 6289213, at *3 (D.N.J. Nov. 2, 2005) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods." (quoting _Texaco_, 76 B.R. at 326)).

12. **Third**, the Objecting Parties all point to the Debtors' alleged lack of a marketing process to secure debtor-in-possession financing and a refusal to entertain alternative proposals to the Debtors' preferred path in these chapter 11 cases, specifically an investment proposal from the Flow Parties,[18] as a basis for terminating the Exclusivity Periods.[19] These arguments, however, do not relate to the actual factors courts consider when deciding whether to extend exclusivity and are nothing more than premature objections to the Plan and an expected motion to approve debtor-in-possession financing.[20] Moreover, these arguments ignore the reality that the unsecured creditors in these chapter 11 cases are billions of dollars out-of-the-money, and no party, including the Flow Parties, has proposed a path forward that would clear the Debtors' secured debt and provide a recovery to unsecured creditors.

13. As an initial matter, the Debtors will entertain all third-party financing options that they believe, in full compliance with their fiduciary duties and exercising their business judgment, are credible and warrant further inquiry. If the Flow Parties (or anyone else) wishes to submit a proposal that addresses the inadequacies included in the Flow DIP Proposals described below, they can do so by utilizing the myriad sources of publicly-available information that creditors will use to vote on the Plan.[21] And if that happens, the Debtors will consider any such proposal(s) in good

---

[18] Ironically, after filing two separate motions seeking derivate standing to sue Mr. Neumann (among others), both the Unsecured Ad Hoc Group and the Committee, in an inexplicable about-face, now argue that engaging with the Flow Parties is necessary to maximize value for their constituents and preserve the business as a going concern.

[19] *See generally* Flow Parties Objection; *see also* Committee Objection ¶ 3; and AHG Objection ¶ 7.

[20] *See supra* n.10 (emphasis added). Additionally, the Committee's reliance on *Bank of Am. Nat'l Trust & Sav, Assoc. v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 454 (1999) similarly has nothing to do with the Debtors' request for an extension of the Exclusivity Periods. *LaSalle* is a case about the absolute priority rule in connection with plan confirmation and whether a junior equity holder can buy a debtor out of bankruptcy over the objection of a senior tranche of debt. *LaSalle* is entirely inapposite to the present dispute.

[21] Notably, the Flow Parties submitted the Flow DIP Proposals based on publicly available information without the benefit of the NDA, as the Debtors are currently operating in chapter 11 and are required under the Bankruptcy Code to publicly disclose all sorts of information about their business.

9

faith. But as discussed above, the Debtors have not received any third-party proposal that has the support of the Consenting Stakeholders and will clear the Debtors' nearly $4 billion in secured debt.[22] Accordingly, the Plan remains the Debtors' only viable path forward at this time.

14. With respect to the Debtors' marketing process, the Debtors concluded at the outset of these chapter 11 cases that they did not have an immediate need for postpetition financing because the Debtors had sufficient liquidity to address their operational needs during the initial weeks of bankruptcy. Since that time, the Debtors and their advisors have remained focused on developing a plan to resolve the key financial and operational needs the Debtors now face, including the Debtors' need for new-money financing. To that end, since the beginning of 2024, the Debtors and their advisors have engaged extensively with the Debtors' secured lenders to negotiate the framework of a potential postpetition financing facility that would provide the Debtors with the necessary liquidity to operate their business in the ordinary course and pay all administrative claims in full. During these conversations, the Debtors' secured lenders indicated that (i) they were willing to provide DIP financing, subject to mutually agreeable terms, (ii) they were unwilling to consent to a priming DIP facility provided by a third party, including the Flow Parties, and (iii) if the Debtors pursued a new DIP financing proposal lacking the secured lenders' consent, they would terminate the consensual use of cash collateral, accelerate the DIP LC Facility, and terminate the RSA.

15. In parallel, PJT, the Debtors' investment banker, conducted a formal marketing process designed to canvas the market and identify an optimal solution for the Debtors' financing

---

[22] *See, e.g.*, Hr'g Tr. at 21:4–11, *In re WeWork, Inc., et al.*, No. 23-19865 (JKS) (Bankr. D.N.J. Apr. 23, 2024) ("I guess my last question regarding what [Committee counsel] brought up. [Committee Counsel] talked about entertaining proposals from third parties. [The Court] understand[s] that, but is that really practical or likely in this case because of the existence of I think $4 billion of funded pre-petition secured debt, not to mention the DIP. I mean why should the Debtor entertain a proposal unless it's in excess of the DIP and the pre-petition 11 secured?").

needs. PJT began the marketing process by developing a list of, and then reaching out to, thirty potential counterparties, including seven banks and twenty-three non-bank alternative lenders capable of providing postpetition financing. Four of those parties demonstrated an initial interest, and so the Debtors began sharing diligence with the potential DIP financiers. PJT also held a series of initial discussions with these third parties about their willingness to provide DIP financing on a junior basis given the amount of secured debt in the existing capital structure or on a non-consensual priming basis.

16. Furthermore, while it is true that the Flow Parties reached out to the Debtors in December 2023 requesting to participate in the Debtors' marketing process for third-party postpetition financing and expressed an interest in a potential acquisition of the Company, the Debtors did not, contrary to the Objecting Parties' assertions, stonewall Adam Neumann and the Flow Parties. In fact, following an in-person meeting in mid-December 2023 and several subsequent diligence calls in late December 2023 and early January 2024, the Flow Parties sent the Debtors a term sheet that proposed a new-money debtor-in-possession financing facility that sought to prime the Debtors' existing secured lenders (the "<u>Initial Flow DIP Proposal</u>").

17. A few days after receiving the Initial Flow DIP Proposal, WeWork's board of directors, consistent with its fiduciary duties, considered the Initial Flow DIP Proposal and determined that the Initial Flow DIP Proposal did not constitute an actionable offer and would be value-destructive for several reasons: (i) the Consenting Stakeholders would not consent to being primed, so pursuing the Initial Flow DIP Proposal would have resulted in a costly, distracting, and value-destructive priming fight; (ii) entering into a priming facility that lacked support from the Consenting Stakeholders would have resulted in the termination of the RSA, the termination of

11

the consensual use of cash collateral, and the immediate acceleration of the DIP LC Facility; and (iii) the Flow Parties' ability to finance the Initial Flow DIP Proposal was uncertain.

18. Contrary to the Objecting Parties misleading accusations, and even though the Debtors determined in their business judgment that the Initial Flow DIP Proposal was not actionable, the parties continued discussions (as they would have with any interested third-party, consistent with their obligations as fiduciaries to the estates). In fact, in late January 2024 and early February 2024, the Debtors informed the Flow Parties of the deficiencies in the Initial Flow DIP Proposal and engaged in telephonic discussions specifically designed to enhance the Initial Flow DIP Proposal, including discussing examples of debtor-in-possession financing that have been successful in chapter 11 cases of similar size and complexity. The Debtors informed the Flow Parties that a priming DIP is likely not actionable without the support of the Consenting Stakeholders and provided the Flow Parties with information on the requisite number and/or percentage of Consenting Stakeholders who would need to support a priming DIP to avoid a termination of the RSA.

19. Following these discussions, the Flow Parties provided the Debtors with a revised debtor-in-possession financing proposal in early March 2024 that again sought to prime the Debtors' existing secured lenders (the "Revised Flow DIP Proposal," together with the Initial Flow DIP Proposal, the "Flow DIP Proposals"). The Revised Flow DIP Proposal addressed several inadequacies included in the Initial Flow DIP Proposal, including by indicating that the Flow Parties had some financial support, but given that the consideration offered to existing secured creditors in the Revised Flow DIP Proposal was well below the amount required to pay off the Debtors' nearly $4 billion in secured debt obligations, the Consenting Stakeholders would not consent to a facility that primed their debt. As a result, the Revised Flow DIP Proposal failed to

12

sufficiently address the same issues that made the Initial Flow DIP Proposal not actionable. As of the date hereof, the Debtors have not received a revised proposal from the Flow Parties remedying the Debtors' concerns with the Flow DIP Proposals.

20.     **Fourth**, the Flow Parties Objection also fails to articulate any legitimate basis as to why, at this stage and under these circumstances, the Court should compel the Debtors to turn over material non-public information to the Flow Parties under sections 105(d) or 1109 of the Bankruptcy Code, which by their plain terms only give parties the opportunity to be heard, and in any event do not justify the extraordinary relief that the Flow Parties are seeking.[23] To the extent the Flow Parties Objection seeks to force the Debtors to provide the Flow Parties with material non-public information, the request should be denied.[24]

21.     **Finally**, contrary to the Committee's assertions,[25] the Debtors are timely paying the vast majority of their bills in the ordinary course of business. During these chapter 11 cases, the Debtors have engaged in extensive negotiations with a subset of their landlords with respect to the Debtors' payment of postpetition rent. As the Debtors have stated publicly on several occasions, certain rent payments were strategically withheld to force negotiations forward and bring these chapter 11 cases toward an expeditious resolution.[26] While the Committee may disagree with this approach, it has worked and helped the Debtors capture significant rent savings and therefore

---

[23]   *See generally* Flow Parties Objection.

[24]   The Flow Parties cannot credibly argue that the extraordinary relief they seek was properly brought before the Court in a pleading styled as a "response" to the Committee Objection. After all, it is the Debtors' Motion that is up for hearing, not the Flow Parties'. *See* Local Rule 9013-1 (requiring cross-motions to include: "(1) a notice of motion stating the date, time, and place of the hearing; (2) a certification containing the facts supporting the relief requested in compliance with Local [] Rule 7007-1; (3) a memorandum of law stating the legal basis for the relief requested, or a statement why a memorandum of law is unnecessary; (4) a proposed order; and (5) Local Form Certification of Service.").

[25]   *See* Committee Objection ¶ 19.

[26]   *See, e.g.*, Hr'g Tr. at 7:2–18, *In re WeWork, Inc., et al.*, No. 23-19865 (JKS) (Bankr. D.N.J. Feb. 5, 2024) (the Debtors' counsel explaining that some rent payments were withheld to force negotiations with the landlords).

13

achieved the same result the Objecting Parties seek in the Objections—namely, a value-maximizing conclusion to these chapter 11 cases. And, even if this factor weighs against the Debtors, courts consistently grant extensions of the exclusivity period based on a subset of the *Adelphia* factors.[27]

## Conclusion

22. For the reasons set forth herein and in the Motion, the Exclusivity Periods should be extended. To do otherwise would introduce chaos and waste precious resources at a time when the Debtors simply cannot afford it. Accordingly, the Court should overrule the Objections and grant the relief requested in the Motion.

---

[27] *See, e.g.*, *In re Express One Int'l Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (identifying four of the factors as relevant in determining whether "cause" exists to extend exclusivity); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (finding that the debtor showed "cause" to extend exclusivity based upon three of the factors).

14

Dated: April 25, 2024

/s/ *Michael D. Sirota*

| | |
|---|---|
| **COLE SCHOTZ P.C.** | **KIRKLAND & ELLIS LLP** |
| Michael D. Sirota, Esq. | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Warren A. Usatine, Esq. | Edward O. Sassower, P.C. |
| Felice R. Yudkin, Esq. | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Ryan T. Jareck, Esq. | Steven N. Serajeddini, P.C. (admitted *pro hac vice*) |
| Court Plaza North, 25 Main Street | Ciara Foster (admitted *pro hac vice*) |
| Hackensack, New Jersey 07601 | 601 Lexington Avenue |
| Telephone: (201) 489-3000 | New York, New York 10022 |
| msirota@coleschotz.com | Telephone: (212) 446-4800 |
| wusatine@coleschotz.com | Facsimile: (212) 446-4900 |
| fyudkin@coleschotz.com | edward.sassower@kirkland.com |
| rjareck@coleschotz.com | joshua.sussberg@kirkland.com |
| | steven.serajeddini@kirkland.com |
| | ciara.foster@kirkland.com |
| | |
| *Co-Counsel for Debtors and* | *Co-Counsel for Debtors and* |
| *Debtors in Possession* | *Debtors in Possession* |