| | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Edward O. Sassower, P.C.<br>Joshua A. Sussberg, P.C. (admitted *pro hac vice*)<br>Steven N. Serajeddini, P.C. (admitted *pro hac vice*)<br>Ciara Foster (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:  (212) 446-4800<br>Facsimile:  (212) 446-4900<br>edward.sassower@kirkland.com<br>joshua.sussberg@kirkland.com<br>steven.serajeddini@kirkland.com<br>ciara.foster@kirkland.com | **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Ryan T. Jareck, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone:  (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br>rjareck@coleschotz.com |
| *Co-Counsel for Debtors and*<br>*Debtors in Possession* | *Co-Counsel for Debtors and*<br>*Debtors in Possession* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

**DECLARATION OF JAMIE BAIRD IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) EXTENDING**
**THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11**
**PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION**
**1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

I, James H. Baird, III, hereby declare under penalty of perjury as follows:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT").  PJT is a global investment banking firm listed on the New York Stock Exchange and has its principal offices at 280 Park Avenue, New York, New York 10017.  PJT

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims Agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Companies U.S. LLC c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

has been engaged as the investment banker for the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2. For the past seven months, my team and I have worked closely with the Debtors on their current restructuring process. As such, I am familiar with the Debtors' operations, business affairs, financial performance, and restructuring efforts.

3. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1452] (the "Motion")[2] and in response to the (i) *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptance Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1698] (the "Committee Objection," and the objecting party, the "Committee"), (ii) *Response of Adam Neumann et al. to Objection of Official Committee of Unsecured Creditors to Debtors' Motion to Extend Exclusive Periods and Request Pursuant to 11 U.S.C. § 105(d) for Conference Concerning Unequal Access to Due Diligence Materials* [Docket No. 1704] (the "Flow Objection," and the objecting parties, the "Flow Parties"), and (iii) *Objection of the Ad Hoc Group of Noteholders to Debtors' (A) Motion to Extend Exclusivity, (B) Application to Shorten the Notice Period, and (C) Motion to Approve Amended Disclosure Statement; Cross-Request that the Court (1) Re-Calendar the Examiner Motion for a Near-Term*

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion, the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1691] (as amended, supplemented, or modified from time to time, the "Disclosure Statement"), or the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1690] (as amended, supplemented, or modified from time to time, the "Plan"), or the Objections, as applicable.

2

*Hearing and (2) Immediately Refer this Bankruptcy For Judicial Mediation* [Docket No. 1705] (the "Unsecured AHG Objection," and the objecting party, the "Unsecured AHG," and the Committee Objection and the Flow Objection, together with the Unsecured AHG Objection, the "Objections").

4. Except as otherwise noted, all statements set forth in this Declaration are based on my experience, my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, information I have learned from my review of relevant documents, information supplied to me by employees and members of Debtors' management and/or their other advisors, or information that I have received from employees of PJT working directly with me or under my supervision or direction. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional that has been retained by the Debtors. If called to testify as a witness, I would testify competently to the statements set forth herein.

## Qualifications

5. PJT is a leading global financial advisory firm with more than 1,000 employees in eleven offices in the United States, Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in connection with chapter 11 cases. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

6. I joined PJT when it first spun off from The Blackstone Group L.P. ("Blackstone") in 2015. I started at Blackstone in 2002 and over the years held numerous positions there, including as a Managing Director in the Restructuring and Reorganization Group immediately prior to the spin-off. I hold a Master of Business Administration with a concentration in finance from Columbia Business School and a Bachelor of Arts from Bowdoin College.

7. I have over twenty years of experience advising financially distressed companies, municipalities, creditors, and sponsors in chapter 11 restructurings, out-of-court workouts, and other special situations, and my representations have collectively involved over $150 billion in liabilities. I have worked across numerous industries including municipals, gaming, media and telecom, retail, automotive, industrials, aerospace, financials, real estate, insurance, and oil and gas. Select publicly disclosed transactions on which I have worked include: 24 Hour Fitness, AIG, Bon-Ton Stores, Centric Brands, Covia, Cumulus Media, Deluxe Entertainment, Detroit, Ford Motor Company, FullBeauty Brands, General Motors, Gibson Brands, Houghton Mifflin, Hovnanian Enterprises, iHeartMedia, ILFC, J. Crew, Loyalty Ventures, Mohegan Tribal Gaming Authority, Monitronics, Noranda Aluminum, Preferred Sands, Puerto Rico, Sequa, SemGroup, Star Tribune, and Tailored Brands.

8. PJT was most recently engaged by the Debtors on or around September 1, 2023, to provide advisory and investment banking services in connection with the Debtors' potential restructuring. Since its engagement at that time, PJT has been involved in negotiations with the Debtors' capital structure constituents on the terms of the RSA, the Debtors' efforts to obtain the consensual use of cash collateral, and the Debtors' efforts to obtain both the DIP LC Facility and other debtor-in-possession financing. Prior to its September 2023 engagement, PJT was engaged

to provide financial advisory services to the company in connection with its merger with BowX Acquisition Corp. in October 2021. In addition, subsequent to that transaction, PJT was engaged by the company in December 2022 in connection with potential refinancing, restructuring and/or recapitalization transactions which culminated with the consummation in May 2023 of a recapitalization transaction.

9. As a result of the prepetition and postpetition work performed by PJT on behalf of the Debtors, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, capital structure, assets, key stakeholders, financing documents, and other related materials and information.

### The DIP Marketing Process

10. At the beginning of these cases, the Debtors, with the help of PJT and their other advisors, concluded that they did not have an immediate need for postpetition financing at the outset of these chapter 11 cases because the Debtors had sufficient liquidity to address their operational needs during the initial weeks of bankruptcy. However, the Debtors and their advisors have since become focused on developing a plan to resolve the key financial and operational needs the Debtors now face, including the Debtors' need for new-money financing. To that end, since the beginning of 2024, PJT and the Debtors' other advisors have engaged extensively with the Debtors' secured lenders to negotiate the framework of a potential postpetition financing facility that would provide the Debtors with the necessary liquidity to operate their business in the ordinary course and pay all administrative claims in full. During these conversations, the Debtors' secured lenders indicated that (i) they were willing to provide DIP financing, subject to mutually agreeable terms, (ii) they were unwilling to consent to a priming DIP facility provided by any third-party, including the Flow Parties, and (iii) if the

5

Debtors pursued a new DIP financing proposal lacking their consent, they may seek to terminate the consensual use of cash collateral, accelerate the DIP LC Facility, and terminate the RSA.

11. In parallel, the Special Committee authorized PJT to commence a formal marketing process designed to canvas the market and identify an optimal solution for the Debtors' financing needs. PJT began the marketing process by developing a list of, and then reaching out to, thirty potential counterparties, including seven banks and twenty-three non-bank alternative lenders capable of providing postpetition financing. Four of those parties demonstrated an initial interest, and so the Debtors began sharing diligence with the potential DIP financiers. PJT also held a series of initial discussions with these third parties about their willingness to provide DIP financing on a junior basis. Ultimately, none of the third parties were willing to provide financing on a junior basis given the amount of secured debt in the existing capital structure or on a non-consensual priming basis. Nonetheless, the Debtors have made substantial progress in negotiations with their secured lenders to date, and an extension of the Exclusivity Periods is necessary to provide the Debtors additional time to finalize the negotiations and document an agreement.

### The Debtors' Interaction with the Flow Parties During these Chapter 11 Cases

12. In December 2023, before PJT commenced the above-described marketing process to obtain third-party postpetition financing, the Flow Parties, a group of co-investors affiliated with Adam Neumann, WeWork's co-founder and former chief executive officer, reached out to the Debtors requesting to participate in the Debtors' marketing process for third-party postpetition financing and expressing an interest in a potential acquisition of the company. PJT participated in an initial in-person meeting with the Flow Parties on December 14, 2023. PJT subsequently held business diligence calls with the Flow Parties,

6

specifically members of 166 2nd Financial Services, the family office of Adam Neumann, on December 20, 2023, January 2, 2024, and January 4, 2024, respectively. After a series of discussions, on January 26, 2024, the Flow Parties sent the Debtors a term sheet that proposed a new-money debtor-in-possession financing facility that sought to prime the Debtors' existing secured lenders (the "Initial Flow DIP Proposal").

13. On January 30, 2024, WeWork's board of directors considered the Initial Flow DIP Proposal at a board meeting and determined that it did not constitute an actionable offer and would be value-destructive for several reasons: (i) the Consenting Stakeholders would not consent to being primed, so pursuing the Initial Flow DIP Proposal would have resulted in a costly, distracting, and value-destructive priming fight; (ii) entering into a priming facility that lacked support from the Consenting Stakeholders would have resulted in termination of the RSA, termination of the consensual use of cash collateral, and immediate acceleration of the DIP LC Facility; and (iii) the Flow Parties' ability to finance the Initial Flow DIP Proposal was uncertain.

14. Even though the Debtors determined in their business judgment that the Initial Flow DIP Proposal was not actionable, the parties continued discussions in the weeks that followed. In late January 2024 and early February 2024, the Debtors informed the Flow Parties of the deficiencies in the Initial Flow DIP Proposal and engaged in telephonic discussions to discuss the potential enhancement of the Initial Flow DIP Proposal, including discussing examples of debtor-in-possession financing that have been successful in chapter 11 cases of similar size and complexity. The Debtors informed the Flow Parties that a priming DIP is likely not actionable without the support of the Consenting Stakeholders and provided the Flow Parties with information on the requisite number and/or percentage of Consenting Stakeholders who would need to support a priming DIP to avoid a termination of the RSA.

15. Following these discussions, on March 11, 2024, the Flow Parties provided the Debtors with a subsequent non-consensual priming debtor-in-possession financing proposal (the "Revised Flow DIP Proposal," together with the Initial Flow DIP Proposal, the "Flow DIP Proposals"). In my opinion, while the Revised Flow DIP Proposal addressed some inadequacies of the Initial Flow DIP Proposal, including by indicating that the Flow Parties had some financial support, it still was not actionable. In particular, given that the consideration offered to existing secured creditors in the Revised Flow DIP Proposal was well below the amount required to pay-off the Debtors' nearly $4 billion in secured debt obligations, my understanding is that, the consent of the secured creditors would be required for the Debtors to put in place the priming DIP proposed by the Flow Parties. I understand that the Consenting Stakeholders are not willing to provide such consent. Therefore, I believe that the Revised Flow DIP Proposal failed to sufficiently address the same issues that made the Initial Flow DIP Proposal not actionable and would not, in any event, have provided a recovery for unsecured creditors in these chapter 11 cases.

16. As of the date hereof, I am not aware of a different proposal from the Flow Parties other than the Flow Dip Proposals discussed above. Nor am I aware of any other actionable proposals. Therefore, at this juncture and under these circumstances, I believe that the Plan is the most viable and value maximizing path forward.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 26, 2024

/s/ *James H. Baird, III*
James H. Baird, III
Partner
PJT Partners LP