**PAUL HASTINGS LLP**
Kristopher M. Hansen, Esq. (admitted *pro hac vice*)
Frank A. Merola, Esq. (admitted *pro hac vice*)
Gabriel E. Sasson, Esq.
Emily L. Kuznick, Esq. (admitted *pro hac vice*)
Matthew D. Friedrick, Esq. (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
krishansen@paulhastings.com
frankmerola@paulhastings.com
gabesasson@paulhastings.com
emilykuznick@paulhastings.com
matthewfriedrick@paulhastings.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

**RIKER DANZIG LLP**
Joseph L. Schwartz, Esq.
Tara J. Schellhorn, Esq.
Daniel A. Bloom, Esq.
Gregory S. Toma, Esq.
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tschellhorn@riker.com
dbloom@riker.com
gtoma@riker.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>WEWORK INC., *et al.*,<br><br>             Debtors.[1] | Chapter 11<br><br>Case No. 23-19865 (JKS)<br><br>(Jointly Administered) |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND VOTING PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork.  The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of WeWork Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Amended Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Information Contained in the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1687] (the "Conditional DS Motion").  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      The Amended Disclosure Statement describes a Proposed Plan that is incomplete and is merely a placeholder for the Debtors to further amend when they eventually settle on the final economic terms of a plan of reorganization.  To be clear, as drafted, the Proposed Plan specifies neither the terms and conditions of the new capital necessary to allow the Debtors to continue as a going-concern and consummate a chapter 11 plan (the "sources" of the Proposed Plan), nor the details of what consideration will be provided on account of that new capital and that distributions that will be made to creditors on account of their claims (the "uses" of the Proposed Plan).  A cursory review of the Amended Disclosure Statement reveals critical blanks and missing terms – ranging from the failure to specify recoveries for some classes to confusing

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Conditional DS Motion, the *First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1690] (the "Proposed Plan"), or the accompanying *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of WeWork Inc. and Its Debtor Subsidiaries* [Docket No. 1691] (the "Amended Disclosure Statement"), as applicable.

and obtuse descriptions of the new money required to confirm the Proposed Plan – all of which need to be included in any meaningful disclosure statement. The Debtors simply cannot ignore the requirements of adequate disclosure because they are only seeking "conditional" approval of the Amended Disclosure Statement (a concept that is not utilized in this District and is found nowhere in the Bankruptcy Code or Bankruptcy Rules). In addition, the Debtors' arguments that the Committee should not have a voice in determining adequate disclosure because unsecured creditors (who are set to receive a recovery) are deemed to reject the Proposed Plan similarly holds no water. The Debtors have run roughshod over their obligations under the Bankruptcy Code and Bankruptcy Rules over the course of these cases and now seek to embark on an expensive confirmation process without the agreement of any parties-in-interest in these cases.[3] The Debtors cannot be permitted to solicit a plan that, on its face, is incomplete, with an inadequate disclosure statement.

2.      For whatever strategic reason, at the outset of these Chapter 11 Cases, the Debtors and the RSA Parties elected to operate these cases without "new money" postpetition financing. Having failed to secure such much-needed financing to date, they have proceeded to effectively finance the Chapter 11 Cases by breaching their obligation to pay certain Administrative Claims as they became due. The recently filed Liquidation Analysis (Exhibit F to the Amended Disclosure Statement) estimates **unpaid** Administrative Claims of nearly **half a billion dollars**. Yet, the Amended Disclosure Statement provides no description of the nature or extent of these unpaid

---

[3]  As of the filing of this Objection, the Debtors have not filed any revisions to the Proposed Plan and Amended Disclosure Statement notwithstanding the Debtors' promises to do so well in advance of the hearing to consider approval of the Amended Disclosure Statement. Accordingly, this Objection is based upon the terms set forth in the Proposed Plan and Amended Disclosure Statement, and the Committee reserves the right to supplement this Objection as and when any revisions to the Amended Disclosure Statement and Proposed Plan are filed.

Administrative Claims,[4] nor does it demonstrate that the Debtors will have adequate liquidity on the Effective Date to make all cash payments[5] necessary to consummate the Proposed Plan. Since the Debtors need financing, as this Court noted during the hearing to consider expedited relief with respect to the Amended Disclosure Statement, the Amended Disclosure Statement *must* contain adequate information regarding the Debtors' funding need to confirm the Proposed Plan, including the size and scope of both the DIP New Money Facility and Exit Equity Commitment.

3.     The need to remedy these deficiencies well in advance of seeking approval (even if conditional) of a disclosure statement and permission to solicit a plan on file is clear, and the Committee's requests for the inclusion of such information have been largely ignored. Indeed, as early as March 7, 2024, the Committee shared with the Debtors a preliminary list of the information required to address the deficiencies in the Original Disclosure Statement (discussed herein). Nearly two months later, many of these deficiencies remain unaddressed. Beyond the easily identifiable infirmities, the Amended Disclosure Statement also lacks any meaningful discussion of the potential that the Committee's Standing Motion[6] and Proposed Complaint, if successful, would result in value flowing to unsecured creditors. Notably, the Amended Disclosure Statement does not even include sufficient detail that would enable parties to determine how the New Interests will be allocated between creditor groups – as the result of postpetition or exit financing – nor how the Rights Offering (and any fees in respect thereof) or MIP would impact those distributions.

---

[4]  By ignoring their obligation to pay rent on a current basis, the Debtors owe landlords over $50 million of postpetition rent.

[5]  In addition to unpaid Administrative Claims, the Liquidation Analysis estimates Priority Claims at $35.8 million.

[6]  *See Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1436] (the "Standing Motion") and the proposed complaint attached thereto as Exhibit A (the "Proposed Complaint").

4.    The Committee has sought to work cooperatively with the Debtors and to negotiate a consensual resolution of these Chapter 11 Cases that provides a meaningful distribution to unsecured creditors on account of the colorable estate claims identified in the Standing Motion and Proposed Complaint.  The Debtors, however, have been focused on serving the interests of their largest equityholder, SoftBank, and *purportedly* secured creditors to the exclusion of all other constituents and without exploring investment or sale inquires by third parties.  Indeed, the terms of the Proposed Plan and to-be-agreed-upon postpetition financing, when read together, demonstrate the Debtors' intent to effectively sell their assets to the RSA Parties (including their largest equityholder) without engaging in a market test.  The Debtors, for their part, cite to the RSA Parties' substantial prepetition debt and unwillingness to accept any priming financing, but these arguments do not insulate the Debtors from running a fair and open marketing process.

5.    Accordingly, as set forth herein, the Committee respectfully submits that the Disclosure Statement lacks clarity and sufficient disclosures regarding issues of material importance to the Debtors' unsecured creditors and should not be approved unless such issues are adequately addressed.

## **RELEVANT BACKGROUND**

6.    On November 6, 2023, in connection with the commencement of these cases, the Debtors, SoftBank Group Corp. (together with its affiliates that are party to the RSA, "SoftBank"), in its capacity as a holder of 1L Notes, 2L Exchangeable Notes, 3L Exchangeable Notes, and/or equity in WeWork, an ad hoc group representing approximately 87 percent of the Debtors' Series I 1L Notes and 2L Notes (the "Ad Hoc Group"), and Cupar Grimmond, LLC ("Cupar", and collectively with SoftBank and Ad Hoc Group, the "RSA Parties"), a large holder of 1L Notes

entered into the restructuring support agreement (the "RSA").[7]  Among other things, the RSA contemplates the equitization of the Debtors' prepetition secured debt, the cancellation of all other indebtedness, and effectively no distribution to general unsecured creditors.  Notwithstanding the fact that the Debtors' Special Committee had only recently begun its investigation of claims against insiders, the RSA provided for broad releases of Softbank and the other RSA Parties.

7.      On February 4, 2024, the Debtors filed an initial chapter 11 plan (the "Original Plan") and disclosure statement for the Original Plan (the "Original Disclosure Statement"),[8] and then, on April 19, 2024, the Debtors filed the Proposed Plan and the Amended Disclosure Statement.  The Proposed Plan, consistent with the RSA, provides that 100% of the equity in the Reorganized Debtors will be vested in the RSA Parties and the Debtors' management.  The Proposed Plan also classifies the Debtors' unsecured creditors into two classes, Unsecured Notes Claims (Class 7) and General Unsecured Claims (Class 8), and provides that holders of claims in each class – neither of which are purportedly entitled to vote but will receive an Opt-Out Form – will receive, upon their election, either the Cash Election or the Equity Election.  Both the Cash Election and the Equity Election are blank.

8.      The Proposed Plan also contains broad releases for the Debtors and an extensive list of non-Debtor third parties, including SoftBank, the other RSA Parties, and related persons and entities (collectively, the "Released Parties") – specifically those parties that are subject to the claims and causes of action described in the Committee's Standing Motion and Proposed

---

[7]  *See Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "First Day Declaration"), ¶ 13.

[8]  The RSA provided for a series of Milestones.  The failure of the Debtors to satisfy a Milestone was a breach of the RSA and entitled the RSA Parties to terminate the RSA.  The February 4 filing of the Original Plan was the last Milestone the Debtors satisfied.  The Amended Disclosure Statement contains no information regarding the status of the RSA given the Debtors' breaches.

Complaint.[9]  *See* Proposed Plan Art. VIII.C (the "<u>Debtor Releases</u>"), Art. VIII.D (the "<u>Third Party Releases</u>").  The Proposed Plan also provides that the Released Parties will receive third party releases from all holders of Claims (including holders of General Unsecured Claims who are not entitled to vote but are set to receive a distribution) who (a) vote to accept the Proposed Plan, (b) are deemed to accept the Proposed Plan, who do not affirmatively opt out of the releases, (c) that abstain from voting on the Proposed Plan and do not affirmatively opt out of the releases provided by the Proposed Plan, and (d) that vote to reject or are deemed to reject the Proposed Plan and do not affirmatively opt out of the releases provided by the Proposed Plan.  *Id.* at Art. I.A.  The Proposed Plan also provides for broad exculpation of the Released Parties, including "Related Parties" of the Debtors.  *Id.* at Arts. I.A, VIII.E.

## **OBJECTION**

## I.    **The Amended Disclosure Statement Does Not Provide Adequate Information as Required by the Bankruptcy Code**

9.    The Amended Disclosure Statement fails to provide adequate information within the meaning of section 1125(b) of the Bankruptcy Code and, therefore, should not be approved. Section 1125(b) of the Bankruptcy Code prohibits the solicitation of votes in respect of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement . . . containing adequate information."  *See* 11 U.S.C. § 1125(b).  Adequate information is defined in section 1125(a) of the Bankruptcy Code as "information of a kind, and

---

[9] The Released Parties include:

> . . .  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) the DIP Lenders; (e) the Creditors' Committee; (f) each Creditors' Committee Member; (g) the Releasing Parties; (h) each Agent; (i) each Related Party of each such Entity in clause (a) through (i); provided that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases described in Article VIII.D of this Plan; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

The releases are subject to the ongoing investigation of the special committee of independent directors of the board.

in sufficient detail . . . that would enable [] a hypothetical investor . . . to make an informed

judgment about the plan." *Id.* at § 1125(a)(1).

10.    The primary purpose of a disclosure statement is to give creditors adequate

information necessary to make an ***informed*** decision about a plan of reorganization. *See* 11 U.S.C.

§ 1125(a)(1).  Indeed, the Third Circuit has underscored the importance of adequate disclosure in

connection with proposed chapter 11 plans, stating that, given the reliance creditors and

bankruptcy courts place on disclosure statements, "we cannot overemphasize the debtor's

obligation to provide sufficient data to satisfy the Code['s] standard of 'adequate information.'"

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *see also*

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321 (3d

Cir. 2003) (citing 11 U.S.C. § 1125(a)(1) and observing that the proponent of the proposed plan

has "an affirmative duty to provide creditors with a disclosure statement containing 'adequate

information' to 'enable a creditor to make "an informed judgment" about the [p]lan.'").  To be

approved, a disclosure statement must provide enough information for creditors to understand the

*financial ramifications* of the outcome of plan approval, *see In re McLean Indus., Inc.,* 87 B.R.

830, 834 (Bankr. S.D.N.Y. 1987), and courts determine the adequacy of information in a disclosure

statement based on the facts and circumstances of each case.  *See Abel v. Shugrue* (*In re Ionosphere*

*Clubs, Inc.*), 179 B.R. 24, 29 (S.D.N.Y. 1995); *see also In re Ashley River Consulting, LLC,* No.

14-13406 (MG), 2015 WL 6848113, at *1, *7–8 (Bankr. S.D.N.Y. Nov. 6, 2015) ("Congress

purposely left vague the standard for judging what constitutes adequate information to allow the

Court to make a case-by-case determination[.]"); *In re Fullmer*, 2009 WL 2778303, at *2 (Bankr.

N.D. Tex. Sept. 2, 2009) ("the determination of whether the disclosure statement contains adequate

information is made on a case-by-case basis").  Importantly, a disclosure statement should not be

approved where the required disclosures are incomplete or inaccurate. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system."). The Debtors have failed to meet these requirements.

11.     Here, the Amended Disclosure Statement falls remarkably short of the standard of adequacy required by the Bankruptcy Code and lacks a majority of the factors considered by courts, as cited in the Conditional DS Motion, including: (a) a description of the available assets and their value; (b) the Debtors' anticipated future performance; (c) the Debtors' condition while in chapter 11; (d) the claims asserted against the Debtors; (e) the future management of the Debtors; (f) the chapter 11 plan or a summary thereof; (g) information relevant to the risks posed to creditors under the plan; and (j) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers. Conditional DS Motion ¶ 13 (citations omitted), *see also, In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Puff*, No. BR 10-01877, 2011 WL 2604759, at *3 (Bankr. N.D. Iowa June 30, 2011); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001).

12.     The Proposed Plan and the Amended Disclosure Statement are nowhere near final form and cannot be solicited. As far as the Committee is aware: (a) the Debtors are continuing to negotiate both the DIP New Money Facility and Exit Equity Commitment required to fund any reorganization; (b) the Amended Disclosure Statement does not provide creditors with any information to determine the necessity or adequacy of the DIP New Money Facility and the Exit Equity Commitment; (c) the Debtors have not yet determined the terms and condition of an Exit LC Facility that will facilitate contractually required credit enhancement to landlords; (d) a Rights Offering is contemplated but there is no economic detail as to its terms and conditions; (e) the

Proposed Plan contains blanks in respect of distributions for various classes of claims; (f) the

Amended Disclosure Statement does not disclose that success by the Committee on its Standing

Motion[10] and Proposed Complaint – and potentially by the Unsecured Ad Hoc Group with respect

to its Examiner Motion and related request for standing – would leave the Proposed Plan, on its

face, unconfirmable; and (g) the Amended Disclosure Statement does not provided creditors with

adequate information to evaluate the comprehensive set of releases[11] and injunctions issued to

protect the RSA Parties and other insiders.  Despite these infirmities, the Debtors now seek

conditional approval of an Amended Disclosure Statement, on a shortened timeline, for a Proposed

Plan that fails the most basic objective of providing a pathway to exit in order to maintain the

semblance of "progress."  Absent significant modifications to correct these deficiencies, the

Amended Disclosure Statement cannot be approved.

**A.      The Amended Disclosure Statement Does Not Contain Adequate Information Regarding the Debtors' Future Business and Prospects of a Successful Reorganization**

13.      The Debtors' are currently running on fumes and the Debtors' restructuring is

premised upon the Debtors obtaining a DIP New Money Facility and Exit Equity Commitment to

fund the implementation of the Proposed Plan and appropriately capitalize the Reorganized

Debtors' business.  Every creditor is interested in the ongoing viability of the Reorganized Debtors.

Yet, the Amended Disclosure Statement provides no details as to the terms and conditions of either

the DIP New Money Facility or Exit Equity Commitment – not even the identity of the party or

parties that will be providing these capital infusions or information as to whether there is any

---

[10] *The Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1436] (the "Standing Motion") and Exhibit A to the Standing Motion (the "Proposed Complaint").

[11] In addition to releases by the Debtors and their estates, the Plan includes third party releases of the RSA Parties and other insiders by creditors that will receive no distribution under the Plan.

commitment to do so.  Notwithstanding the fact that there is no financing deal, the Debtors continue to push forward with consideration of the Amended Disclosure Statement without even describing *any* potential risks of failure or adequately describing the Debtors' liquidity need.

14.     Relatedly, the Amended Disclosure Statement fails to clearly state that the Debtors are effectively administratively insolvent and the Equity Exit Commitment must provide sufficient liquidity to satisfy all administrative claims on the Effective Date[12] of the Proposed Plan.  As the Court is well-aware, the Debtors have now failed to pay a portion of rent for each of January, February, March and April of this year.  And, utilizing a liberal (and bad-faith) approach to the agreed-upon stub rent procedures set forth in the Court's Cash Collateral Orders and Bar Date Order, the Debtors have failed to reserve the full amount of stub rent accrued, as required under the Cash Collateral Orders.  Although the Debtors have claimed the need to play "hardball" with their landlords to reach agreements on new leases, the Debtors have failed to fully disclose the ramifications of that process – the accrual of over $50 million in postpetition unpaid rent that the Debtors will be required to pay in full, in cash, on the effective date of the Proposed Plan.  But the unpaid rents are only the tip of the administrative insolvency iceberg.  The recently filed Liquidation Analysis (Exhibit F to the Amended Disclosure Statement) estimates **unpaid** Administrative Claims of nearly **half a billion dollars**.  At the same time, the Amended Disclosure Statement contains no discussion as to the nature and extent of these unpaid Administrative Claim nor any detail regarding either the DIP New Money Facility or Exit Equity Commitment that would enable a creditor to evaluate their economics or adequacy.

---

[12] In addition to paying all Administrative Claims and Priority Claims in cash, in full, the Proposed Plan includes a condition to the Effective Date that requires the Debtors to have no less than $300 million in cash-on-hand immediately prior to the Effective Date.  Proposed Plan, IX.A.16.

15.     In fact, the Amended Disclosure Statement contains no detail about any of the Debtors' proposed financing solutions.  While the Proposed Plan floats a broad menu of financings that are (or might be) crucial to the Proposed Plan's implementation, not even the most basic information is provided for any of these facilities.  The Proposed Plan provides for a DIP New Money Facility, an Exit LC Facility, an Exit Equity Commitment and/or a Rights Offering, yet the Amended Disclosure Statement provides no detail on any of these financings, such as:

- Who are the lenders/investors?
- Are the lenders/investors insiders?
- Are the lenders/investors defendants in the Committee's Proposed Complaint?
- Is there a written commitment with respect to any financing?
- What are the conditions to any commitments made?
- What are the fees/costs related to any commitments made?
- What was the competitive marketing process that resulted in that commitment?
- What are the terms and condition of the loan/investment, including, but not limited to (i) amount of the loan/investment, (ii) the term/maturity, (iii) the interest rate, and (iv) covenants?

16.      While the Debtors appear to wish to preserve flexibility, flexibility is not an option when seeking approval of a disclosure statement and requesting authority to solicit a plan.  Absent modifications, the Amended Disclosure Statement cannot be approved.

**B.      The Amended Disclosure Statement Does Not Contain Adequate Information Regarding the Creditor Claims and Estimated Recoveries, or Potential Sources of Unencumbered Value**

17.     The Amended Disclosure Statement fails to include *any* estimated recovery for the majority of classes under the Proposed Plan, including the classes of unsecured creditors.  Because the Debtors have not yet reached agreement regarding the allocation of New Interests on account of the DIP New Money Facility, the Exit LC Facility and Exit Equity Commitment, it is impossible to determine what is left for other creditors under the Proposed Plan.  Further, until the lease rationalization process is complete and all potential rejection damage claims are known, it will be impossible to determine the total quantum of unsecured claims in Class 8.  Therefore, in effect,

the numerator *and* the denominator for Class 8 are completely unknowable based on the Amended Disclosure Statement.

### C. The Amended Disclosure Statement Does Not Contain Adequate Information Regarding Ongoing Investigations and Justifications for the Debtor Releases and Third Party Releases

18.     The Amended Disclosure Statement is deafeningly silent on the issues of claims against SoftBank, the remaining RSA Parties and Debtors' management, as detailed in the Committee's Proposed Complaint and the Unsecured Ad Hoc Group's Examiner Motion.  There is no attempt to detail the twenty-three causes of action asserted in the Proposed Complaint or their merits.  Nor is there any discussion about the Debtors' process by which they agreed to blanket releases of the RSA Parties, including SoftBank, *before* conducting any investigation of potential claims.  All of these claims remain subject to investigation by the Committee and the Special Committee.[13]  Although the Amended Disclosure Statement mentions the existence of the Special Committee's investigation, including the causes of action considered, and acknowledges that the Committee's Standing Motion and the pending Examiner Motion were filed, it fails to disclose *any* material risks to the Proposed Plan that results from either the Standing Motion or the Examiner Motion or *any* material benefit that could be available to the estate as a result of such success.  Nor does the Amended Disclosure Statement contain any analysis or evaluation of the claims and causes of action listed in the Committee's Proposed Complaint or the Unsecured Ad Hoc Group's Examiner Motion.

19.     First, as evidenced by the Committee's Standing Motion, the Committee believes that potentially valuable estate claims exist that, in the event the Committee, or any other party, is successful in pursuing them, would render the Proposed Plan unconfirmable for a number of

---

[13] In addition, the Unsecured Ad Hoc Group has requested the appointment of an examiner to investigate claims against the RSA Parties and other insiders and the standing to prosecute such claims.

reasons.  The Committee's causes of action, if successful, would reshape the Debtors' capital structure by potentially subordinating and recharacterizing hundreds of millions of dollars of prepetition secured debt held by certain prepetition creditors, including SoftBank, as equity.  In addition, the Committee's proposed avoidance actions and breach of fiduciary duty claims against SoftBank would result in affirmative recoveries for the Debtors' estates, thus unlocking incremental value for unsecured creditors.

20.     Second, the Amended Disclosure Statement fails to disclose when the Debtors' Special Committee is expected to complete its investigation or the risk that the Special Committee determines that the releases under the Proposed Plan are not appropriate.  The Committee understands that the Ballots and Notice of Non-Voting Status, each containing the Opt-Out Form, will be mailed prior to the conclusion of the Special Committee's investigation (*i.e.* within 5 business days of entry of the order approving the Amended Disclosure Statement).[14]  With no discussion in the Amended Disclosure Statement about the Special Committee's investigation, creditors cannot be expected to make a reasoned and informed decision regarding the Opt-Out Form and such Third Party Releases.

21.     Consequently, the Amended Disclosure Statement contains surprisingly little information regarding the Debtor Releases contained in the Proposed Plan, their impact, or why they are necessary.  At minimum, the Amended Disclosure Statement must provide the legal and factual bases for the Debtors to release the Released Parties in connection with the Proposed Plan, including the contributions (if any) made by each of the Released Parties.  In connection therewith, the Debtors must detail the potential value of any claims being released – which the Committee believes have substantial value – and explain, in detail, the evaluation the Debtors undertook in

---

[14] *See* Conditional DS Motion, ¶ 1.k. (noting the Solicitation Mailing Deadline is 5 business days following the entry of the order approving the Conditional DS Motion, without any reference to the Special Committee investigation).

determining to settle and release such claims in connection with the Proposed Plan rather than pursue litigation and any consideration received by the Debtors in exchange. The Amended Disclosure Statement must also explain the consideration given by the Released Parties in connection with the Third Party Releases and why such releases are necessary to the Proposed Plan. Without these modifications, the Amended Disclosure Statement does not explain or justify the releases contained in the Proposed Plan.

    **D.**    **Additional Inadequacies with the Amended Disclosure Statement**

    22.    In addition to the foregoing, the Amended Disclosure Statement and related solicitation procedures should be modified as follows:

- The Amended Disclosure Statement must include a clear, plain English explanation of the consequences of failing to opt out of the proposed Third Party Releases, including but not limited to, the impact of the release of SoftBank and other prepetition creditors;

- The Amended Disclosure Statement should include a description of the Debtors' postpetition marketing efforts and their determination as to why the Plan was the best alternative;

- The Amended Disclosure Statement should include a complete and current description of the Debtors' process in its lease negotiations;

- The Proposed Plan and Amended Disclosure Statement must indicate whether the Debtors will be consolidated for any purpose, including distribution to creditors, or how value is being allocated on a debtor-by-debtor basis;

- The Amended Disclosure Statement must include (i) a description of the methodology used to calculate the value of any collateral and allowed amounts of any secured claims, including the 1L Notes, the 2L Notes, and the 2L Exchangeable Notes and (ii) a list of the Debtors' unencumbered or potentially unencumbered assets;

- The Proposed Plan contemplates that the directors of the New Board of the Reorganized Debtors will establish a management incentive plan. The terms of any management incentive plan must be disclosed and included in the Amended Disclosure Statement in detail;

- Noteholders should be provided at least forty-five days (currently less than approximately twenty-five days) to opt-out of the releases[15] due to the volume of publicly held 3L Notes and Unsecured Notes; and[16]

- The Proposed Plan cannot provide the Debtors with forty-five days after the effective date to continue to reject expired leases or executory contracts.[17] As described in the Committee's objection to the Debtors' motion to extend time to assume or reject leases under section 365(d)(4) of the Bankruptcy Code [Docket No. 1699], the Debtors' should assume or reject all leases prior to April 30, 2024.

## II.    The Amended Disclosure Statement Cannot be Approved Because the Proposed Plan is Patently Unconfirmable

23.    In addition to its disclosure deficiencies, the Amended Disclosure Statement cannot be approved because the Proposed Plan is patently unconfirmable.  As the Third Circuit held in *In re American Capital Equipment, LLC*, 688 F.3d 145 (3d Cir. 2012) ("*Skinner II*"), "that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."  *Id.* at 154; *see also In re Surma*, 504 B.R. 770, 773 (Bankr. D.N.J. 2014) ("It is within the Court's discretion to deny approval of a disclosure statement if the accompanying plan is unconfirmable on its face."); *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed."); *In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996) (same); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (same); 7 Collier on Bankruptcy ¶ 1125.03[4] (16th ed. 2023) ("[M]ost courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable on its face").  "A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting

---

[15] In the alternative, the Proposed Plan should be modified to provide for an opt-in mechanic given the shortened notice period the Debtors have sought.

[16] *See id.* (including 5 business days from the Voting Record Date for the distribution of the Solicitation Packages).

[17] *See* Proposed Plan Art. V.A.

results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *Skinner II,* 688 F.3d at 154–55. Here, the Proposed Plan is patently unconfirmable for a host of reasons including, but not limited to, because it (i) is not feasible, (ii) is not the result of any marketing process for the "new value" to be contributed by existing equityholders, (iii) contains nonconsensual releases, and (iv) does not allow Holders of Claims in Class 7 or Class 8 to vote.

### A.    The Proposed Plan is Not Feasible

24.    Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of plan of reorganization "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . ." U.S.C. § 1129(a)(11).  The Amended Disclosure Statement provides no evidence that the Proposed Plan is feasible as required by section 1129.  As discussed, the Amended Disclosure Statement admits that the Debtors have not secured financing to confirm the Proposed Plan at this time.  *See* Amended Disclosure Statement Art. VIII.A.4.  As a result, at this stage, the Disclosure Statement does not completely describe *this* restructuring, and the Debtors admit that the Proposed Plan cannot be confirmed and consummated without that financing, rendering it infeasible as we sit here today.

### B.    The Proposed Plan Does Not Satisfy the New Value Exception

25.    The Proposed Plan contemplates that the RSA Parties (which include the Debtors' largest equityholders), will (hopefully) provide postpetition capital to consummate the Proposed Plan and, on account of that new financing, will receive nearly all of the equity in the Reorganized Debtors.  Courts have long recognized that holders of existing equity interests cannot receive or retain equity in a reorganized debtor unless the new value contributed actually constitutes reasonably equivalent value, pursuant to the "new value exception."  *Case v. L.A. Lumber Prods.*

*Co.*, 308 U.S. 106, 121-22 (1939) (noting that if a debtor's plan cannot possibly satisfy all the requirements of the new value exception, it cannot be confirmed as a matter of law); *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 101 n.8 (D.N.J. 1993) (noting that new value exception would only apply if the value added was "reasonably equivalent in value to the investment that will be kept"). As the doctrine has evolved, Courts have expressly held that existing equity holders may not retain the exclusive right to contribute new value to a reorganized company. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 437, 458 (1999) (finding that section 1129(b)(2)(B)(ii) could not be satisfied if existing equity holders were provided the exclusive right to provide new capital); *In re PWS Holding Corp.*, 228 F.3d 224, 237-38 (3d Cir. 2000) (same).

26.     The Committee is keenly aware that the Debtors require significant new money financing in order to continue as a viable business and to confirm a plan of reorganization and does not object to the general premise of the RSA Parties' contributing new money to the Debtors in exchange for equity in the Reorganized Debtors. However, in exchange for any equity in the Reorganized Debtors, the RSA Parties must provide reasonably equivalent value, and that reasonably equivalent value must be determined by a market test. *See 203 N. Lasalle St. P'ship* 526 U.S. at 454 ("Even when old equity would pay its top dollar and that figure was as high as anyone else would pay, ***the price might still be too low unless the old equity holders paid more than anyone else would pay***, on the theory that the "necessity" required to justify old equity's participation in a new value plan is a necessity for the participation of old equity as such. On this interpretation, disproof of a bargain would not satisfy old equity's burden; ***it would need to show that no one else would pay as much***.") (emphasis added).

27.    Since early December, the Committee has pushed the Debtors to run a formal postpetition financing and/or sale process, responding to interest from third parties.  Despite being repeatedly rebuffed over the course of these cases, the Committee continued to renew its arguments and engaged with specific parties-in-interest who wished to potentially sign a non-disclosure agreement with the Debtors.  Nevertheless, the Debtors never ran any process to solicit interest in potential financing avenues or meaningfully engaged with any third parties regarding alternative plan or financing proposals.  A nominal process was run to solicit interest in providing potential postpetition financing, but the Committee understands that the Debtors only solicited proposals that would be junior to any existing purportedly secured debt.  Further, these conversations did not include Flow and certain third-party financial firms (the "<u>Flow Parties</u>"), who have repeatedly expressed interest in providing both postpetition financing and exit financing.  Given the interest of potential third parties, the Debtors and the RSA Parties cannot provide any evidence that reasonably equivalent value has been provided in connection with any postpetition financing that effectively buys nearly all of the equity in the Reorganized Debtors.  As a result, and as a matter of law, the Proposed Plan cannot be confirmed under section 1129(b)(2)(B)(ii) and, therefore, the Amended Disclosure Statement cannot be approved.

**C.    The Releases Contained in the Proposed Plan Cannot be Approved**

28.    The Proposed Plan seeks to bind certain creditors, whether voting or not voting, to the Third Party Releases so long as the respective creditor does not affirmatively opt out of the Third Party Releases in their respective Ballot or Opt-Out Form.  This opt out process is not appropriate in light of the minimal consideration provided to holders of unsecured claims under the Proposed Plan, and the lack of appropriate notice and an opportunity to opt-out for such holders, including public noteholders, who likely will not receive such forms in advance of the

Debtors' proposed deadline.  The Debtors propose to provide – *at most* – twenty-five days from

the mailing of the solicitation packages for creditors, including unsecured creditor who are deemed

to reject the Proposed Plan, to opt out of the Third Party Releases.  To the extent the Debtors wish

to rush to confirmation, the rights of unsecured creditors with respect to the Third Party Releases

cannot be ignored.  As such, absent an extension of the period to opt-out or modifications to the

Third Party Releases to provide for an "opt-in" mechanic, the Amended Disclosure Statement

should not be approved.

29.     In addition, the Third Party Releases are inappropriate in light of the pending ruling

in *Harrington v. Purdue Pharma L.P.* (the "*Purdue* Ruling") regarding the propriety of third party

releases under the Bankruptcy Code.  Specifically, while the *Purdue* Ruling may result in several

potential outcomes, some of which may not impact the Proposed Plan, there are many likely

outcomes that would render the Debtors' opt out structure unenforceable.  In the event that the

*Purdue* Ruling finds that consent is required to provide a third party release, it may also find,

among other things, that creditors must affirmatively opt in to a third party release in order to

provide such consent.  Under those circumstances, or a myriad of similar potential outcomes, the

Debtors will be required to modify and potentially resolicit (or abandon) their releases.  Given the

uncertainty at this stage, the Court should not approve the Amended Disclosure Statement absent

a modification to the Third Party Releases.

**E.     Unsecured Creditors in Class 7 and Class 8 Are Entitled to Vote**

30.     The Proposed Plan contemplates that Holders of Claims in Class 7 and Class 8 are

entitled to either the Cash Election or the Equity Election "at such Holder's election."  *See*

Proposed Plan Art. III.B.  Yet, despite providing a distribution to such Holders *and* requiring that

an affirmative election be made with respect to that recovery, claims in  both Class 7 and Class 8

have been deemed to reject the Proposed Plan and are purportedly not having their votes

solicited.[18]  Section 1126(a) of the Bankruptcy Code is unequivocal – a holder of an allowed claim

"may accept or reject a plan."  *See* U.S.C. § 1126(a).  Section 1126(g) further provides that classes

of claims can be deemed to reject when the claims within that class "do not entitle the holders of

such claims or interests to receive or retain any property under the plan."  *See*

U.S.C. § 1126(g).  Here, the Proposed Plan provides that Classes 7 and 8 will receive *some*

recovery, even if unknown, under the Proposed Plan and, therefore, Bankruptcy Code section

1126(g) does not apply.  The Debtors, however, ignore the mandate of section 1126(a) and strip

Classes 7 and 8 of their right to vote on the Proposed Plan, rendering the Proposed Plan

unconfirmable on its face.

## III.    The Solicitation Materials Should Include a Letter from the Committee

31.    Finally, the Debtors should be required to include a letter from the Committee

setting forth its views on the Proposed Plan, and the releases contained therein, as part of the

solicitation materials.  The letter that the Committee proposes to enclose with the solicitation

materials will provide, among other things, a plain language explanation addressing the

confirmation-related issues that the Committee has identified and the Committee's Standing

Motion and related investigation.  A form of the letter will be provided to the Court in advance of

any contemplated solicitation.

## RESERVATION OF RIGHTS

32.    The Committee continues to review the Amended Disclosure Statement and

Proposed Plan and reserves all rights in connection with any further revised Amended Disclosure

Statement or Proposed Plan the Debtors may file.  The Committee submits this Objection without

---

[18] Although the Debtors are eager to strip unsecured creditors of their right to vote on the Proposed Plan, as noted above, all creditors in Classes 7 and 8 will be solicited to "opt out" of the Third Party Releases of the SoftBank, the other RSA Parties and the Debtors' management.  The Debtors are apparently eager to engage the unsecured creditors to expand the scope of insider releases, but not interested in their view on the rest of the Proposed Plan.

prejudice to, and with a full reservation of, the Committee's rights to supplement or amend this Objection in advance of, or in connection with, the hearing to approve the Amended Disclosure Statement and/or confirmation of the Proposed Plan.  Nothing herein is intended to be a waiver by the Committee of any right, objection, argument, claim or defense with respect to any matter, including matters involving the Amended Disclosure Statement and the Proposed Plan, all of which are hereby expressly.

## <u>CONCLUSION</u>

WHEREFORE, for all the foregoing reasons, the Committee respectfully requests that the Court (x) deny the Conditional DS Motion until the deficiencies identified herein are addressed and (y) provide the Committee such other and further relief as the Court may deem just, proper and equitable.

*[Remainder of Page Intentionally Left Blank]*

Dated:      April 26, 2024

**RIKER DANZIG LLP**

By:   */s/ Joseph L. Schwartz*
Joseph L. Schwartz, Esq.
Tara J. Schellhorn, Esq.
Daniel A. Bloom, Esq.
Gregory S. Toma, Esq.
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey  07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tschellhorn@riker.com
dbloom@riker.com
gtoma@riker.com

-    and   -

**PAUL HASTINGS LLP**
Kristopher M. Hansen, Esq. (admitted *pro hac vice*)
Frank A. Merola, Esq. (admitted *pro hac vice*)
Gabriel E. Sasson, Esq.
Emily L. Kuznick, Esq. (admitted *pro hac vice*)
Matthew D. Friedrick, Esq. (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
krishansen@paulhastings.com
frankmerola@paulhastings.com
gabesasson@paulhastings.com
emilykuznick@paulhastings.com
matthewfriedrick@paulhastings.com

*Co-Counsel to the Official*
*Committee of Unsecured Creditors*

4855-6446-6105, v. 1