**FRIEDMAN KAPLAN SEILER**
**ADELMAN & ROBBINS LLP**
Robert J. Lack
Andrew M. Englander
Blair R. Albom
1 Gateway Center, 25th Floor
Newark, New Jersey 07102-5311
Telephone: (973) 877-6400
Facsimile:  (973) 877-6409
rlack@fklaw.com
aenglander@fklaw.com
balbom@fklaw.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Alex Spiro *(pro hac vice)*
Susheel Kirpalani *(pro hac vice)*
Benjamin Finestone *(pro hac vice)*
Kenneth Hershey *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
kenhershey@quinnemanuel.com

*Co-Counsel to Adam Neumann, Flow*
*Global Holdings LLC, and Nazare Asset*
*Management, LP*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No. 23-19865 (JKS) |
| WEWORK INC., *et al.*, | Chapter 11 |
| Debtors.[1] | Hon. John K. Sherwood |

**OBJECTION OF ADAM NEUMANN ET AL. TO THE DEBTORS'**
**AMENDED MOTION FOR AN ORDER (I) CONDITIONALLY APPROVING THE**
**ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE**
**STATEMENT, (II) APPROVING THE SOLICITATION AND VOTING PROCEDURES**
**WITH RESPECT TO CONFIRMATION OF THE PLAN, (III) APPROVING THE FORMS**
**OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING**
**CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

Adam Neumann and Nazare Asset Management, LP, parties-in-interest[2] in the above-captioned chapter 11 cases of WeWork, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," the "**Company**," or "**WeWork**"), on behalf of themselves and Flow Global Holdings LLC ("**Flow**," and collectively with Flow and potential co-investors, the "**Flow Group**"), by and through their undersigned counsel, hereby file this objection to the *Debtors' Amended Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Information Contained in the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect To Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices In Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [ECF No. 1687] (the "**Motion**"), and, in support thereof, respectfully state as follows.

## PRELIMINARY STATEMENT

1.      The Debtors' proposed disclosure statement [ECF No. 1691] (the "**Proposed Disclosure Statement**" or "**Proposed DS**") credits Mr. Neumann as a co-founder who "promised to change how people worked by creating inspiring environments where people and companies, spanning countless industries and a wide range of interests, could come together to create community and pursue their professional passions and aspirations." Proposed DS at 58. Nevertheless, for reasons they refuse to disclose, the Debtors desperately have resisted any scenario where Mr. Neumann, working in conjunction with the Flow Group—a group of sophisticated investors and individuals with expertise in real estate—could give WeWork a second chance at success. What is clear from the Debtors' behavior towards the Flow Group is that they

---

[2]      Mr. Neumann is a creditor of certain of the Debtors. *See* Proofs of Claim Nos. 87, 88. Nazare Asset Management, LP is a shareholder of the Debtors. Respondents accordingly have the right to be heard on any issue in these cases under section 1109(b) of the Bankruptcy Code.

2

will do anything—even provide less value for creditors and put forward a plan that is not feasible

and is likely to lead to chapter 22—to avoid Mr. Neumann reacquiring control of the Company he

founded.[3]    Be that as it may, the bankruptcy process is about maximizing value; it is not a

popularity contest.

2.      Chapter 11 was to be the opportunity to use the tools of the Bankruptcy Code to

rationalize the Company's lease portfolio, deleverage its balance sheet, and rebuild stakeholder

support—particularly from landlords that were critical to WeWork's success.    While the Debtors

tout some degree of success in those efforts, the Proposed Disclosure Statement contains gaping

holes that undermine the assertions that the proposed plan of reorganization [ECF No. 1690]

(the "**New Plan**") actually "maximizes the value of the Debtors' estates."    Proposed DS at 1.    As

explained further below, the problems with the New Plan run the gamut from patent legal

infirmities to undercapitalization.    In addition, the selective disclosure of half-truths render the

Debtors' statements  misleading and therefore by definition "inadequate."

3.      Most significantly, the Proposed Disclosure Statement fails even to describe the

cornerstone of the New Plan—that it is a sale of control of 80% of Reorganized WeWork primarily

to Cupar Grimmond, LLC ("**Cupar**"), which appears to be an affiliate of Yardi Systems, the

Debtors' "operating partner."[4]    It also fails to disclose that Cupar is acquiring that super-majority

stake by paying cash for shares at a deep discount of 34.6% to the Debtors' own calculation of

equity value.    These omissions are fatal to the Proposed Disclosure Statement because, contrary to

---

[3]    Mr. Neumann has expressly stated that he would not serve as chief executive officer of the
Reorganized Debtors or sit on their board of directors.

[4]    *See* Amelia Pollard and Sujeet Indap, *WeWork Races to Raise Cash as Adam Neumann Offers
to Outbid Rivals*, FINANCIAL TIMES (Apr. 18, 2024), https://www.ft.com/content/ac28423a
-7708-4da9-9388-34dfb09055ce (describing Yardi Systems as "a real estate tech provider that
has partnered with [WeWork] on various projects . . . [and] has only been named in court
filings under a pseudonym of 'Cupar Grimmond'").

the impression given to the Court, the New Plan looks nothing like the prior version (which was a simple debt-for-equity swap contemplated by a restructuring support agreement).  The failure to adequately describe what's really going on in the New Plan dooms the Debtors' hope of a rushed approval based on stale disclosures filed over two months ago (when no sale at all was contemplated).  Moreover, the Debtors' choice to forgo a marketing process in favor of a privately negotiated sale to its "operating partner" renders *all* the Proposed DS's references to maximizing value improper.  Put simply, because the Debtors chose not to run a marketing process, and even actively refused to provide due diligence when requested, they cannot make empty statements that they "believe" the New Plan maximizes value.  The statement is false because the Debtors have had in their hands for weeks an offer from the Flow Group that, subject only to confirmatory due diligence, values the enterprise materially higher than the sale-of-control transaction sponsored by Cupar.

## **OBJECTION**

4.      "The primary purpose of a disclosure statement, which is mandated by 11 U.S.C. § 1125, is to give creditors the 'adequate information' necessary for them to decide whether to accept a proposed plan."  *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987).  As set forth below, the Proposed Disclosure Statement for which the Debtors seek "conditional approval" falls far short of meeting this standard.  The Proposed DS not only omits material information and context about the New Plan, but also mischaracterizes the Debtors' conduct in these cases and glosses over glaring legal deficiencies that make the New Plan unconfirmable. The Motion should be denied.

## I.   The Disclosure Statement Does Not Even Describe The Actual Plan On File

5.      As an initial matter, the Motion should be denied because the Proposed Disclosure Statement fails to even adequately describe the Plan on file and in fact goes out of its way to obscure critical aspects thereof.

6.      Under the initial plan filed by the Debtors on February 4, 2024 [ECF No. 1290] (the "***Initial Plan***"), the Debtors' senior secured creditors were to exchange their debt for equity in the Reorganized Debtors.  For example, each holder of 1L Notes Claims would receive, "[i]n full and final satisfaction of [its] Allowed 1L Notes Claims . . . its Pro Rata share of the 1L Equity Distribution."  Initial Plan at 36.  Similarly, holders of 2L Notes Claims would receive their pro rata shares of "the 2L Equity Distribution."  *Id.*  Junior classes of claims and interests did not receive any distribution on account of their claims or interests under the plan.  *See, e.g.*, *id.* at 37 (providing that holders of "Allowed 3L Notes Claims . . . shall not receive or retain any distribution, property, or other value on account of such Allowed 3L Claim").  The Initial Plan thus proposed to transfer ownership and control of WeWork to its senior secured creditors on account of their prepetition secured claims, while leaving all other creditors and equityholders fully impaired.  This comported with the Debtors' prepetition restructuring support agreement ("***RSA***"), which likewise provided for a transfer of 100% of the equity in Reorganized WeWork in satisfaction and discharge of secured claims while providing junior classes of claims and interests with no recovery.[5]  Consistent with the RSA, at no point in the Initial Plan process did the Debtors offer to sell a controlling stake in the Reorganized Company's equity for cash.

---

[5]      *See Declaration of David Tolley, Chief Executive Officer of WeWork Inc., In Support of Chapter 11 Petitions and First Day Motions* [ECF No. 21] (the "***Tolley Decl.***") ¶ 13 ("The RSA is centered on the full equitization of the Company's 1L Notes, 2L Notes, and the LC Facility."); *id.* ¶ 80 ("Pursuant to the RSA, the Restructuring Transactions contemplate[ ] . . . the equitization of the Drawn DIP TLC Claims . . . , Prepetition LC Facility Claims, the 1L

7.      Yet this is the central (albeit undisclosed) feature of the New Plan—a sale of 80% of Reorganized WeWork to Cupar and others, including the Debtors' largest shareholder.  Of course, the Court would not be aware that the New Plan actually contemplates the sale of the Debtors from reading the Disclosure Statement because the Disclosure Statement never discloses such an obviously important fact.  The Debtors have not adequately informed the Court or any party in interest what their proposed Plan of Reorganization even *is—a sale to an "operating partner" at a deep 34.6% discount to the Debtors' own investment banker's valuation.* Creditors cannot find a reference to any of these material changes in the Proposed Disclosure Statement that supposedly contains "adequate information."  Indeed, in order to get a hearing to "conditionally approve" the Disclosure Statement scheduled on improperly short notice, the Debtors urged that there is nothing new to see:  "We want to set a hearing for a disclosure statement that we originally filed about two months ago, and ***the changes that we've made to it since are minimal*** and in the nature of providing greater specificity."  Apr. 23, 2024 Hr'g Tr. at 7:9–12 (emphasis added).  But the Debtors' attempt to downplay the changes they made to the Disclosure Statement only highlight the inadequacy of their disclosure.  In fact, the only mention of the buyer's name at the last hearing by the Debtors was in a throw-away sentence that did not even highlight Cupar's role as the New Plan's equity sponsor:  "[Cupar] is both an operating partner as well as a large holder of first lien claims." *Id.* at 6:2–3.[6]

---

Notes Claims, and the 2L Notes Claims into New Interests; [and] the cancellation of all other indebtedness and preexisting equity Interests in the Reorganized Company.").

[6]      Cupar's role as equity sponsor is also confirmed (albeit obliquely) by the change to the plan indicating that Cupar will have a veto right over the Reorganized Debtors' governance structure.  *See* New Plan at 8 (noting that the term sheet dictating the corporate governance of the Reorganized Debtors "shall be subject to the consent of Cupar").

8.      Beyond failing to disclose the identity of WeWork's future owner, the Proposed Disclosure Statement goes out of its way to conceal the basic fact that the New Plan is a sale of the Debtors for new money.  Indeed, the Proposed Disclosure Statement makes no explicit mention of this sea change from the Initial Plan, leaving it to the reader to wade through a thicket of overlapping defined terms to discover monumental changes in plan structure.  Worse still, the Proposed Disclosure Statement presents the sale of WeWork to the "DIP New Money Lenders" as a *mere possibility* by suggesting that the DIP financing may not be forthcoming,[7] notwithstanding that the Debtors are actively negotiating the DIP New Money Facility with the "Consenting Stakeholders" (including Cupar)[8] and list "the proceeds from the Exit Equity Commitment Consideration," *i.e.*, $400 million, as the principal source for "fund[ing] distributions under th[e] Plan."  New Plan at 41.

## II.      The Proposed Disclosure Statement's Risk Factors Do Not Adequately Disclose The Plan's Lack of Feasibility

9.      The Debtors' boilerplate set of risk factors contained in Section VIII of the Proposed Disclosure Statement make no serious effort to explain how the New Plan undercapitalizes the Company and that the biggest risk is the lack of feasibility caused by the razor-thin margin for error in the Debtors' optimistic projections.  The Debtors include a "Projected Statement of Operations" as an exhibit to the Proposed Disclosure Statement.  That projection

---

[7]    The Debtors represent in the Proposed Disclosure Statement that they "are prepared to fund these Chapter 11 Cases through the Combined Hearing without debtor-in-possession financing if necessary," Proposed Disclosure Statement at 4, and the New Plan consistently appends the parenthetical "(if any)" to defined terms concerning the DIP New Money Facility and Exit New Money Shares, *see, e.g.*, New Plan at 11-12, 14-15, 20.

[8]    *See* Proposed Disclosure Statement at 4 ("[T]he open points in the Debtors' negotiations with the Consenting Stakeholders for a potential DIP New Money Facility have significantly narrowed in recent days.").  The "Consenting Stakeholders" are the parties to the RSA.  *See id.* at 3.

includes expected results through December 31, 2028.  Looking at two important variables, Occupancy % and Physical Member ARPM (Average Revenue per Physical Member), the projections cannot be reconciled with the Company's historic performance or even the market-leaders in the shared workspace industry.

10.    The Debtors' projections predict a hockey-stick type of increase in occupancy percentage—anticipating a climb of historical occupancy from the mid-70% range to an eye-popping 85%.  *See* Proposed DS, Ex. E (Financial Projections), at 5 (assuming increased occupancy from 75.9% at emergence to 79.4%, 81.8%, 83.1%, and 84.7% in the ensuing years). No explanation is given for how the Debtors reasonably expect to achieve such unprecedented levels, or how those numbers can even be reconciled with the "All Access" membership plans promoted by the Debtors—where a certain cushion of available space must always be accessible. Equally inexplicable is the Debtors' proposed ARPM increasing from $493/month to $538/month—representing anticipated price hikes that find no comparable expectation in the industry and that are difficult to square with the Debtors' projections of increased sales (given the inverse relationship between prices and demand).  Just assuming flat and steady occupancy and ARPM over the projection period (no downturn or negative stress of any kind), the Debtors are woefully undercapitalized and would become cash-flow negative by 2025 and fully deplete its cash by 2027.

11.    Notwithstanding the Bankruptcy Code's requirements to disclose the identity and affiliation of all individuals who will serve as a director or officer of Reorganized WeWork, creditors are left to speculate who Cupar will install to see this vision of never-before-seen success through to conclusion.  Who will be the new CEO of Reorganized WeWork under Cupar's

8

control?  Who will be on the board?  What experience do they have in the shared workspace industry such that the projections underlying the Plan's feasibility can be considered credible?

12.     To an outsider, these projections appear to have been made-to-order so as to make it seem that the New Plan's proposed capitalization with merely $400 million of cash (the price paid for 80% of the Reorganized Debtors' equity) will be sufficient to make it through the projection period.  But even small misses in the Debtors' projections would quickly doom the Company to chapter 22.  This risk is the most relevant one, and it is not adequately disclosed.

13.     Beyond disclosure, the Court has an independent duty to find that a plan is "feasible" as that term is used in section 1129(a)(11) of the Bankruptcy Code.  That section requires that a plan's confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  That finding is a critical feature of confirming a chapter 11 plan that cannot be solved with creditor consent.  As one court aptly explained:

> The Code separates the feasibility requirement from any requirement related to creditor consent. *Compare* 11 U.S.C. § 1129(a)(8) (voting requirement) *with* 11 U.S.C. § 1129(a)(11) (feasibility requirement). ***Put another way, satisfaction of the feasibility requirement resists negotiation and consent as a solution; the requirement does not dissolve upon proof that no party objected***. As stated in *Collier on Bankruptcy,* a leading bankruptcy treatise: "The bankruptcy judge is not passive during confirmation. The court has a mandatory, independent duty to review plans and ensure they comply with the requirements of section 1129 . . . . ***The judge's independent duty will come into play often with respect to the feasibility requirement***." 7 *Collier on Bankruptcy* ¶ 1129.05[1][e] (Henry Sommer & Alan Resnick, eds., 16th ed. 2011).

*In re Las Vegas Monorail Co.*, 462 B.R. 795, 798 (Bankr. D. Nev. 2011) (emphasis added).

14.     Good faith is an independent requirement of confirmation, but even when a debtor proposes a plan in good faith, it can still fail for lack of feasibility.  As explained by another court:

> [While the test only requires a reasonable probability,] "establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success." Thus, a bankruptcy court must adopt a level-headed approach and evaluate the plan's chances based on objective facts. Although the court need not view a debtor's future cynically, measured realism is warranted since "[o]ne purpose of the feasibility test is to weed out plans that promise more than debtors can deliver."

*In re Claar Cellars LLC*, 623 B.R. 578, 595–96 (Bankr. E.D. Wash. 2021) (rejecting plan despite presence of good faith because of "overly optimistic" projections that ignored industry challenges and the fact that the company's actual "revenues have rapidly, consistently, and significantly trended downward during the last five years").

### III.   Statements About Maximizing Value Must Be Stricken As No Market Test Was Conducted

15.     As set forth above, the New Plan proposes to sell 80% of the equity in Reorganized WeWork for $400 million, which implies a value of $500 million for 100% of the equity of Reorganized WeWork.   Yet the valuation analysis provided by the Debtors' own investment banker estimates that the Reorganized Debtors have a mid-point equity value of $765 million.[9] To the extent that Cupar and others are acquiring an 80% stake in the Reorganized Debtors at a 34.6% discount to plan value,[10] that discount is an asset of the Debtors' estates for which the Debtors must seek the greatest attainable value.  *See, e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010) ("[D]ebtors-in-possession have a fiduciary duty to maximize the value of the estate.").   Yet the Proposed Disclosure Statement does not describe any efforts to market the equity of the Reorganized Debtors (because no such efforts were undertaken), leaving

---

[9]   *See Notice of Filing Valuation Analysis, Financial Projections, and Liquidation Analysis as Exhibits to the Disclosure Statement* [ECF No. 1706] ("***Valuation and Liquidation Analysis***") Exhibit D, at 2.

[10]   $500 million is $265 million less than the mid-point valuation of $765 million, representing a 34.6% discount to fair value of the equity.

4860-7165-0233.1

stakeholders with no way of knowing whether the Debtors have complied with their basic fiduciary duties or whether a better deal may be at hand.

16.    In this regard, the Proposed Disclosure Statement also misleadingly states that the Debtors have in fact obtained the greatest possible value for stakeholders while supplying no basis for that alleged belief.  The Proposed Disclosure Statement declares, in all capital letters, that "THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS."  Proposed DS at 1.  The Proposed Disclosure Statement further states that the Debtors "BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES."  *Id.* But throughout their exclusive period to formulate a plan, the Debtors chose ***not*** to conduct ***any*** marketing process for their assets or equity in the reorganized entity.  As such, there is no basis for the Debtors' assertion that they "believe" value has been maximized.  *See Till v. SCS Credit Corp.*, 541 U.S. 465, 499 (2004) ("The best way to determine value is exposure to a market.").  The statement can only be understood to misinform parties in interest and the Court and cannot be reconciled with the record of an intentional decision to keep all discussions about formulating a plan to a members-only group of lenders.  Accordingly, these statements should be deleted.

## IV.   Statements About Alternative Plans Are Inappropriate Half-Truths And As Such Must Be Stricken

17.    Having put the Debtors in play, the Debtors cannot seriously contend that they do not have to maximize value.  It is likely for this very reason that the Debtors repeatedly assert they are doing so.  *See* Proposed Disclosure Statement at 1, 2, 22, 70, 79, 95, 101, 109.  Doubling down on that baseless assertion, the only disclosures about "alternative plans" are that they "may be less favorable" than the New Plan.  *Id.* at 101.  But the Debtors fail to explain why all such alternative

plans are necessarily "less favorable" than the New Plan when the Debtors are aware that the Flow Group has made an offer, subject to limited confirmatory due diligence, that provides a higher value for the Debtors' estates.[11]

18.    While the Bankruptcy Code does not require a disclosure statement to refer to alternative plans, the law governing disclosures in similar contexts prohibit half-truths. Put differently, the Debtors may have no affirmative duty to speak about alternatives, but if they choose to speak, they must give full and fair disclosure on the subject. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 891 (2024) ("Literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("Once a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading."); *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994) ("Encompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated.").

19.    Accordingly, either the Debtors must include the fact that an unsolicited offer from the Flow Group that valued the Debtors higher than the transaction contained in the New Plan was

---

[11]    In this respect, the *Declaration of Jamie Baird in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1737] (the "**Baird Declaration**") is misleading in the extreme. In his declaration, Mr. Baird parrots the Proposed Disclosure Statement's assertions about maximizing value and asserts that he is "not aware" of any proposal from the Flow Group other than its proposals to provide DIP financing, notwithstanding that the Flow Group transmitted a proposal to purchase the equity of the Reorganized Debtors (for a greater value than that provided under the New Plan) directly to Mr. Baird (among others) on March 11, 2024.

4860-7165-0233.1

received and that the Debtors refused to provide the Flow Group any due diligence, or the Debtors must remove the misleading assertion that all alternative plans "may be less favorable."

## V.    The Disclosure Statement Provides Confusing and Contradictory Information About Recoveries to Unsecured Creditors

20.    The Motion also should be denied because the Proposed Disclosure Statement contains inadequate information concerning the recoveries provided to unsecured creditors under the Plan.  The Initial Plan proposed by the Debtors stated clearly that unsecured creditors would not receive any distribution on account of their claims, providing that both "Unsecured Notes Claims" and "General Unsecured Claims" would be "discharged and released" and that the holders of such claims would not "receive or retain any distribution, property, or other value on account of" such claims.  Initial Plan at 37–38.  In accordance with such treatment, the Initial Plan provided that unsecured creditors would not be entitled to vote to accept or reject the Plan unless such creditors hold allowed claims against any Debtors with unencumbered assets.  *Id.*

21.    The New Plan, however, purports to provide a recovery to unsecured creditors, stating that holders of "Unsecured Notes Claims" and "General Unsecured Claims" will receive a *pro rata* share of either a "Cash Election" or "Equity Election."  New Plan at 37.  But the New Plan (and Proposed Disclosure Statement) then sow confusion by providing further that the holders of such claims "are conclusively deemed to have rejected this Plan" and thus "are not entitled to vote to accept or reject this Plan," *id.*, which implies that unsecured creditors will receive no recovery under the Plan.  *See* 11 U.S.C. § 1126(g) ("[A] class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.").  And indeed, the Debtors have sought to side-step the objections of the Official Committee of Unsecured Creditors (the "***Creditors' Committee***") and an ad hoc group of

13

unsecured bondholders to the Proposed Disclosure Statement on the ground that their constituencies have no right to vote on the Plan. *See* Apr. 23, 2024 Hr'g Tr. at 7:5-7 ("[N]one of the creditors or parties who have objected to holding a conditional DS hearing on Monday are actually entitled to vote on the plan.").

22.     But the Debtors' position makes no sense, and it appears to be little more than a contrived effort to prevent unsecured creditors from voicing their legitimate concerns about the Proposed Disclosure Statement and New Plan.  To be sure, section 1126(a) of the Bankruptcy Code unambiguously provides that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a).  The ***only*** recognized exceptions to this rule are that holders of unimpaired claims are conclusively deemed to accept a plan, while holders receiving nothing under a plan are conclusively deemed to reject it. *See id.* §§ 1126(f)-(g).  Neither exception is satisfied as to unsecured creditors in this case because such creditors, while impaired, are not receiving nothing under the New Plan; to the contrary, unsecured creditors have the right to elect to receive either cash or equity "in full and final satisfaction" of their prepetition claims.  New Plan at 37.  The Debtors' apparent position that unsecured creditors may nevertheless be barred from voting on the Plan is legally unsupportable and cannot be squared with section 1126.

23.     Just as unsupportable is the Debtors' ludicrous assertion (buried deep in their liquidation analysis) that the Cash and Equity Elections "are *not* on account of such Holders' General Unsecured Claims."[12]  Unable to come up with a coherent explanation for this assertion, the Debtors state only that "[t]he value represented by the Cash Election or the Equity Election is subject to the ongoing negotiation among the Debtors, the Creditors' Committee, and the Required

---

[12]    Valuation and Liquidation Analysis Ex. F, at 11.

Consenting Stakeholders." *Id.*  But parties cannot determine what "value" the Cash or Equity

Election "represent" by their mere say-so, nor can they override what the New Plan itself plainly

admits—that the Cash and Equity Election are provided on account of unsecured creditors'

prepetition claims. *See* New Plan at 37 ("On the Effective Date, . . . ***in full and final satisfaction***

***. . . and in exchange for such Allowed General Unsecured Claim,*** each Holder of an Allowed

General Unsecured Claim shall receive, at such Holder's election, such Holder's Pro Rata share of

either (A) the Cash Election or (B) the Equity Election.") (emphasis added).[13]

24.    None of this is explained (let alone adequately) by the Proposed Disclosure

Statement, which, like the New Plan, provides that holders of unsecured claims shall receive the

Cash Election or Equity Election "in full and final satisfaction, compromise, settlement, release,

and discharge of, and in exchange for" their unsecured claims, while at the same time inexplicably

declaring that holders of Unsecured Notes Claims and General Unsecured Claims are "Deemed to

Reject" the Plan. *See* Disclosure Statement at 4–5, 8.  If unsecured creditors are to receive a

recovery on account of their claims, they must be permitted to vote on the New Plan pursuant to

section 1126(a) of the Bankruptcy Code.  If no such vote is taken, then the New Plan cannot be

confirmed; at a minimum, the Proposed Disclosure Statement must be revised to reconcile the

recovery afforded to unsecured creditors with their apparent disenfranchisement.

## VI.    The Stated Amount Of Secured Claims Is Misleading

25.    The Proposed Disclosure Statement provides obvious misinformation in describing

the amount of secured claims against the Debtors.  Taking the Debtors at their word, and perhaps

abetted by the misleading claim that the New Plan is just like the Initial Plan (in that no sale is

---

[13]    The New Plan has identical language, *mutatis mutandis*, for Unsecured Notes Claims.
*See* New Plan at 36–37.

occurring and this is just the RSA's debt-for-equity swap), the Court appeared to accept that the relevant amount of actual secured claims was in the neighborhood of $4 billion. Rather than clarify when asked, the Debtors were more than happy to lean into that misimpression—even after the Creditors' Committee tried to explain. Based on the Proposed Disclosure Statement's poorly worded table, disclosing "**$4039.3 million**" of "**Total Secured Debt**," the Court understandably believed that entertaining third-party offers seemed impractical.[14] But the Debtors never disclose that they have valued the collateral underlying the "Total Secured Debt," and it is a tiny fraction of the number displayed—only $153 million.

26.      Section 506 of the Bankruptcy Code bifurcates all pre-petition secured claims into an allowed "secured" portion and an allowed unsecured deficiency claim. *See* 11 U.S.C. § 506. The Debtors' own Plan valuation unequivocally states that the mid-point valuation of the reorganized Debtors' equity is $765 million. *See* Proposed DS, Ex. D, at 2. Inasmuch as the distribution on account of pre-petition secured claims under the New Plan is capped at 20% of that amount, or $153 million, the value of "secured" claims (in other words, the "allowed amount" of such secured claims under section 506 of the Bankruptcy Code) can at most be $153 million.[15]

27.      Moreover, the Debtors have gone on record that this is the *highest* value those secured creditors could obtain in these chapter 11 cases: "THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING

---

[14]   In response to the Creditors' Committee's complaints that there has been no third-party marketing of the Debtors' assets, the Court stated: "I understand that, but is that really practical or likely in this case because of the existence of I think $4 billion of funded pre-petition secured debt, not to mention the DIP. I mean why should the Debtor entertain a proposal unless it's in excess of the DIP and the pre-petition 11 secured?" Apr. 23, 2024 Hr'g Tr. at 21:6–11.

[15]   The Debtors cannot walk back from that valuation's import to the determination of seccured status required by the Bankruptcy Code. Section 506(a) expressly states that "[s]uch value *shall be determined* . . . in conjunction with any hearing . . . *on a plan affecting such creditor's interest*." 11 U.S.C. § 506(a) (emphasis added).

SUPPORT AGREEMENT SUPPORT THE PLAN, AND **THE DEBTORS BELIEVE THAT THE PLAN** IS FAIR AND EQUITABLE, **MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES**, AND **PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS** AND INTERESTS." Proposed DS at 1 (emphasis added).

28.     Despite this legal reality as to the actual value of allowed secured claims that must be satisfied in full in cash (or its indubitable equivalence), the Debtors simply have chosen the path of least resistance: "Absent the consent of our lenders, or a sale price that clears the secured debt, we do not have an actionable path to sale here." Apr. 23, 2024 Hr'g Tr. at 24:4–6. But why would the Debtors *want* to give one group of creditors holding allowed secured claims worth $153 million a veto right over an alternative path to maximizing value? Why wouldn't the Debtors inform the Court and parties in interest that the Plan will satisfy its pre-petition secured claims of $4 billion with just $153 million in the form of equity? These questions must be answered in a disclosure statement that contains "adequate" (as opposed to misleading) information.

29.     Moreover, given that secured lenders have accepted $153 million as the actual value of their secured claims, the Debtors should be open to a true open market change-of-control sale that can provide a greater recovery to unsecured creditors. In light of the valuation that the Debtors' secured creditors ascribe to their own claims, the Debtors' assertion that there is no "actionable path to a sale" unless if a bidder comes up with "a sale price that clears the secured debt" is blatantly false. As the Debtors are aware, on March 11, 2024, the Flow Group offered to purchase the equity of Reorganized WeWork for $650 million—vastly more than the $153 million value that the New Plan ascribes to secured claims against the Debtors.[16] And that price could go up further if the Debtors were to provide the confirmatory due diligence requested by the Flow

---

[16]   *See generally* the Declaration of Adam Neumann filed contemporaneously herewith.

Group.  The Debtors' contention that the New Plan provides the only viable pathway out of chapter

11 and maximizes value for all stakeholders is simply not credible.

## VII.    The New Plan Violates The Absolute Priority Rule And As Such Is Patently Unconfirmable

30.     The Court should deny the Motion for the additional reason that the proposed Plan

is patently unconfirmable.  *See, e.g., In re Am. Cap. Equip.*, 688 F.3d 145, 154 (3d Cir. 2012)

("[A] court should not proceed with the time-consuming and expensive proposition of hearings on

a disclosure statement and plan when the plan may not be confirmable because it does not comply

with confirmation requirements.") (brackets omitted).  The New Plan proposed by the Debtors is

not confirmable because it violates the absolute priority rule.

31.     "The absolute priority rule is codified at 11 U.S.C. § 1129(b)(2)(B)(ii) and provides

that a dissenting class of unsecured creditors must be provided for in full before any junior class

can receive or retain any property under a plan." *In re LaForgia*, 2019 WL 4894870, at *1 (Bankr.

D.N.J. Sept. 3, 2019).  Under the New Plan, two classes of unsecured creditors are conclusively

deemed to reject the New Plan,[17] thus triggering application of the rule.

32.     The New Plan violates the absolute priority rule because it provides the Debtors'

controlling shareholder with an opportunity to purchase equity in the Reorganized Debtors that is

not offered to creditors at large.  The exclusive opportunity to purchase equity in the reorganized

debtor counts as "property" distributed under a plan for purposes of the absolute priority rule.  *See*

*Bank of Am. Nat'l Tr. & Sav'gs Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 455 (1999) (an

exclusive opportunity to bid for the debtor's equity is "in no economic sense distinguishable from

the advantage of exclusively entitled offeror or option holder . . . [and] should . . . be treated as an

---

[17]    Holders of Unsecured Notes Claims (Class 7) as well as General Unsecured Claims (Class 8) are "conclusively deemed to have rejected this Plan."  New Plan at 37.

item of property in its own right").  Since the beginning of these cases, the RSA has contemplated that the Debtors' largest shareholder would be permitted to retain its equity interests in the Debtors, purportedly in exchange for "contribut[ing] its claims in exchange for the retention of its equity interests."[18]  Whether or not that right would itself have triggered the absolute priority rule, the New Plan now provides an exclusive opportunity to certain stakeholders, including the largest shareholder, to purchase a stake in the Reorganized Debtors for a price that has never been market-tested.[19]  It is of no moment that that opportunity is also enjoyed by other parties to the RSA; for the purposes of the absolute priority rule, an opportunity is "exclusive" when it is not shared with the market as a whole.  *See 203 N. LaSalle*, 526 U.S. at 456 ("If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness . . . . [I]t is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price . . . [that] renders the [ ] right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection.").

33.      Nor does it matter that a shareholder also happens to be a secured creditor of the Debtors.  To the extent that any existing equity stake in (and concomitant control over) the Debtors played ***any role*** in its obtaining the exclusive right to bid for the equity of the Reorganized Debtors, then it received property on account of its existing equity interests in violation of the absolute priority rule.  *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 96 (2d Cir. 2011) ("[A] transfer *partly* on account of factors other than the prior interest is still partly 'on account of' that interest. . . .

---

[18]    Tolley Decl. ¶ 80(ii).

[19]    *See* Disclosure Statement at 14 ("Each Holder of 1L Series 1 Notes Claims and 2L Secured Notes Claims is expected to be offered the opportunity to participate in the DIP New Money Facility."); New Plan at 14 (defining the "Exit Equity Commitment" as "the commitment of the DIP New Money Lenders . . . to purchase the Exit New Money Shares in exchange for the Exit Equity Commitment Consideration").

[R]eceipt of property partly on account of the existing interest [is] enough for the absolute priority rule to bar confirmation of the plan.") (citing *203 N. LaSalle*, 526 U.S. at 456–58).

34.     At a bare minimum, under the facts of this case, the sale of control of the Reorganized Debtors must be market-tested by a process that provides the Court with evidence sufficient to satisfy the Supreme Court's precedent.

**VIII.   Statements About Being Open to Third Parties Must Be Stricken As False**

35.     Statements in the Proposed Disclosure Statement concerning the Debtors' outreach to third-party capital providers—particularly as it concerns debtor-in-possession ("***DIP***") financing—misleadingly omit the Debtors' refusal to entertain a credible offer for DIP financing from the Flow Group (as well as the Debtors' refusal to provide the Flow Group with basic diligence) and accordingly must be stricken as false.

36.     Specifically, the Proposed Disclosure Statement provides that "[i]n February 2024, the Debtors, with the assistance of PJT, began a formal marketing process designed to canvas the market and identify the best possible solution to the Debtors' financing needs." Proposed DS at 79. The Proposed Disclosure Statement further provides that in response to these marketing efforts, "[f]our parties demonstrated an initial interest and executed non-disclosure agreements with the Debtors," following which "the Debtors began sharing diligence with the potential DIP financiers." *Id.* at 80. And the Debtors, according to the Proposed Disclosure Statement, "continue to engage in arm's-length negotiations with potential funding parties to achieve the best possible terms of a potential DIP New Money Facility" and "remain open to all proposals for debtor-in-possession financing." *Id.*

37.     The Debtors' engagement (or lack thereof) with the Flow Group belies these assertions. Omitted entirely from the Debtors' account of their efforts to obtain DIP financing is that on or around January 19, 2024, Mr. Neumann met with the Debtors' Chief Executive Officer

David Tolley on behalf of the Flow Group with a conditional offer to buy the Company, subject to the receipt of adequate due diligence information.  Rather than entertain Mr. Neumann's offer, Mr. Tolley suggested that Mr. Neumann provide a DIP financing offer instead, which the Flow Group promptly did, supplying a detailed DIP term sheet to the Debtors on January 26, 2024. Simultaneously with the delivery of said term sheet, counsel to the Flow Group provided a mark-up of the form NDA that the Debtors had previously provided.  On February 5, 2024, counsel to the Flow Group returned a further revised mark-up of the NDA addressing a concern raised by the Debtors.  The Debtors, however, refused to return an executed copy of the NDA, asserting in a letter dated February 14, 2024 that the Flow Group's proposed NDA "remains unacceptable" without explaining why.  Notably, the letter did not cite any substantive issues with the Flow Group's DIP proposal, and despite counsel to the Flow Group's repeated efforts, to this day the Debtors have refused to explain what issues with the NDA remain outstanding and have refused to provide even basic due diligence to the Flow Group.[20]

38.     The Proposed Disclosure Statement's representation that the Debtors are "open to all proposals for debtor-in-possession financing" is therefore misleading and must be stricken. Indeed, the Debtors appear to be committed to a strategy (expressed by Mr. Tolley to members of

---

[20]   As detailed more fully in the Declaration of Adam Neumann filed contemporaneously herewith, the assertions contained in the Baird Declaration as well as the *Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant To Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1736] concerning the purported shortcomings of the Flow Group's proposals to provide DIP financing to the Debtors are tendentious and misleading.  Most importantly, the Flow Group indicated its willingness to allow the Debtors' existing DIP lenders to participate in the Flow Group's DIP facility on a *pari passu* basis and even indicated a willingness to provide DIP financing on a junior priority basis, subject to (among other things) the completion of satisfactory due diligence.  As is by now well known, the Debtors refused to provide such due diligence rather than constructively engage with the Flow Group on any of its proposals.

the Flow Group in December 2023) of starving the Debtors of liquidity to strengthen the Debtors'

hand in negotiations with landlords.    Contrary to the Debtors' professed openness to "all

proposals" for DIP financing, the Debtors refused to entertain the Flow Group's credible proposal

for DIP financing and have inexplicably spurned their efforts to execute an NDA and obtain due

diligence.  This statement must be stricken from the Proposed Disclosure Statement as false.

## IX.    Mr. Neumann and the Flow Group Reiterate Their Request To Participate In Section 105(d) Conference Being Held At Request Of The Debtors

39.    The sole statutory basis for the Debtors' requested "conditional approval" of the

Disclosure Statement followed by a "combined hearing" on it and the proposed Plan is section

105(d) of the Bankruptcy Code.  *See* ECF No. 1687 at ¶ 48 ("Section 105(d)(2)(B)(vi) of the

Bankruptcy Code expressly authorizes the Court to 'issue an order . . . that . . . provides that the

hearing on approval of the disclosure statement may be combined with the hearing on confirmation

of the plan' where the Court deems a combined hearing to be 'appropriate to ensure that the case

is handled expeditiously and economically.'").  As the Court is aware, Mr. Neumann *et al.*

similarly requested that the Court hold a conference under section 105(d), *see* ECF No. 1704,[21]

and now that one will occur at the Debtors' request, Mr. Neumann *et al.* respectfully requests that

the Court address why the Debtors' refusal to provide a two-week due diligence window to the

---

[21]    In their *Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1736], the Debtors fault the Flow Group for purportedly failing to comply with Local Rule 9013-1 in requesting a status conference with the Court pursuant to section 105(d) of the Bankruptcy Code.  But as set forth above, the Debtors already requested such a conference with the Court pursuant to section 105(d), and the Flow Group has only requested to be heard at that already-scheduled hearing.

Flow Group in a parallel process between now and the proposed confirmation hearing is the in the best interest of the estates.[22]

## **CONCLUSION**

40.    For the reasons set forth above, the Court should deny the Motion.

---

[22]  Mr. Neumann regrets that he can only attend through counsel due to the last day of the religious holiday occurring on April 29th, to the extent that date holds for the requested conference.  To the extent the Court would like to hear directly from Mr. Neumann on the serious problems with the current Plan and why the Flow Group is better positioned to maximize value of the Debtors' estates, he would be available at the Court's convenience, including on April 30th.

4860-7165-0233.1

Dated: April 26, 2024

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

*/s/ Robert J. Lack*

Robert J. Lack
Andrew M. Englander
Blair R. Albom
1 Gateway Center, 25th Floor
Newark, New Jersey 07102-5311
Telephone: (973) 877-6400
Facsimile:  (973) 877-6409
Email: rlack@fklaw.com
      aenglander@fklaw.com
      balbom@fklaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Alex Spiro *(pro hac vice)*
Susheel Kirpalani *(pro hac vice)*
Benjamin Finestone *(pro hac vice)*
Kenneth Hershey *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: alexspiro@quinnemanuel.com
      susheelkirpalani@quinnemanuel.com
      benjaminfinestone@quinnemanuel.com
      kenhershey@quinnemanuel.com

*Co-Counsel to Adam Neumann, Flow Global Holdings LLC, and Nazare Asset Management, LP*

4860-7165-0233.1