| | |
|---|---|
| **FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP** <br> Robert J. Lack <br> Andrew M. Englander <br> Blair R. Albom <br> 1 Gateway Center, 25th Floor <br> Newark, New Jersey 07102-5311 <br> Telephone: (973) 877-6400 <br> Facsimile:  (973) 877-6409 <br> rlack@fklaw.com <br> aenglander@fklaw.com <br> balbom@fklaw.com | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** <br> Alex Spiro *(pro hac vice)* <br> Susheel Kirpalani *(pro hac vice)* <br> Benjamin Finestone *(pro hac vice)* <br> Kenneth Hershey *(pro hac vice)* <br> 51 Madison Avenue, 22nd Floor <br> New York, New York 10010 <br> Telephone: (212) 849-7000 <br> Facsimile: (212) 849-7100 <br> alexspiro@quinnemanuel.com <br> susheelkirpalani@quinnemanuel.com <br> benjaminfinestone@quinnemanuel.com <br> kenhershey@quinnemanuel.com <br> <br> *Co-Counsel to Adam Neumann, Flow Global Holdings LLC, and Nazare Asset Management, LP* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re: <br> <br> WEWORK INC., *et al.*, <br> <br> Debtors.[1] | Case No. 23-19865 (JKS) <br> <br> Chapter 11 <br> <br> Hon. John K. Sherwood |

**DECLARATION OF ADAM NEUMANN IN SUPPORT OF OBJECTION TO THE DEBTORS' AMENDED MOTION FOR AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND VOTING PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

4886-8902-8793.1

I, Adam Neumann, hereby declare under penalty of perjury as follows:[2]

1.      I am the co-founder of WeWork, Inc. and served as the Company's chief executive officer from its founding through September 2019. I am also the founder and chief executive officer of Flow Global Holdings LLC, a residential real estate business.

2.      Over the past several months, I have led efforts on behalf of myself, Flow, and potential co-investors (collectively, the "**Flow Group**") to provide a value-maximizing offer to purchase the Debtors or their assets or, in the alternative, to supply debtor-in-possession ("**DIP**") financing to the Debtors.

3.      I submit this declaration (this "**Declaration**") in response to the *Declaration of Jamie Baird in Support of Debtors' Motion for Entry of An Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1737] (the "**Baird Declaration**"). The Baird Declaration contains numerous false and misleading statements about the Debtors' engagement (or lack thereof) with myself and the Flow Group. This Declaration is intended to rebut the false allegations in the Baird Declaration and correct the record.

## THE FLOW GROUP'S ENGAGEMENT WITH THE DEBTORS

4.      In December 2023, I met with David Tolley, the chief executive officer of WeWork, to express the Flow Group's interest in making an offer to purchase the Company.

---

[2]  Capitalized terms used but not defined herein shall bear the meanings ascribed to such terms in the *Objection of Adam Neumann et al. to the Debtors' Amended Motion for an Order (I) Conditionally Approving the Adequacy of the Information Contained in the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect To Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices In Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* (the "**Flow Group Objection**"), filed contemporaneously herewith.

2

4886-8902-8793.1

Mr. Tolley advised me that the Company was "not for sale" and suggested that I make a proposal to provide DIP financing instead.

5. The Flow Group promptly hired transaction counsel, Mr. Gregg Galardi of Ropes & Gray LLP, and began working on a proposal for DIP financing. On January 26, 2024, a colleague of Mr. Galardi's delivered a term sheet for up to $200 million of DIP financing on behalf of the Flow Group (the "**Initial Flow DIP Proposal**") to the Debtors' advisors, including Mr. Baird. The cover email submitting the Initial Flow DIP Proposal is attached hereto as **Exhibit A**, and the Initial Flow DIP Proposal is attached hereto as **Exhibit B.** The Initial Flow DIP Proposal was accompanied by a mark-up of the Debtors' form non-disclosure agreement ("**NDA**") to facilitate the provision of due diligence to the Flow Group.

6. The Baird Declaration states that the Initial Flow DIP Proposal "sought to prime the Debtors' existing secured lenders" and was therefore rejected by WeWork's board of directors. Baird Decl. ¶¶ 12–13. But the Baird Declaration fails to mention that the Initial Flow DIP Proposal explicitly indicated that the Flow Group was willing to allow lenders under the existing DIP facility to participate in the Flow Group's DIP on a *pari passu* basis, including by allowing such parties to "roll up" a portion of their 1L Notes into the DIP. *See* Ex. B at 1 n.1. Similarly, the Baird Declaration fails to mention that the Flow Group expressly indicated that the Flow Group was "willing to discuss a *pari* **or junior priority structure** based, in part, on (i) the results of due diligence, (ii) satisfactory intercreditor agreements, and/or (iii) the pursuit of a 363 sale process with corresponding milestones." *Id.* at 2 n.2 (emphasis added). Mr. Baird's unqualified characterization of the Initial Flow DIP Proposal as a priming proposal is therefore false and misleading.

4886-8902-8793.1

7. Moreover, the Baird Declaration provides that the Debtors "shar[ed] diligence with [four] potential DIP financiers" that "demonstrated an initial interest" in supplying DIP financing to the Debtors. Baird Decl. ¶ 11. The Baird Declaration further provides that the Company "[u]ltimately" decided not to move forward with these financing parties—*after providing diligence to them*—because those parties were not "willing to provide financing on a junior basis . . . or on a non-consensual priming basis." *Id.* Neither the Debtors nor Mr. Baird, however, have explained why the Flow Group was denied access to basic due diligence that was shared with other parties notwithstanding that the Flow Group indicated its willingness to supply DIP financing on a *pari passu* or junior priority basis.

8. To this day, the Debtors have not returned the Flow Group's mark-up of their NDA, which Mr. Galardi revised on April 5, 2024 to address a concern raised by the Debtors.

9. On March 11, 2024, the Flow Group provided the Debtors with a revised proposal for up to $250 million of DIP financing (the "***Revised Flow DIP Proposal***") which, as Mr. Baird concedes, addressed the Debtors' purported concern that the Flow Group did not have the wherewithal to provide the financing offered. *See* Baird Decl. ¶ 15. The Revised Flow DIP Proposal is attached hereto as **Exhibit C**. The Baird Declaration again misleadingly characterizes the Revised Flow DIP Proposal as a "non-consensual priming debtor-in-possession financing proposal," *id.*, notwithstanding that the Revised Flow DIP Proposal—like the Initial Flow DIP Proposal—indicated that the Flow Group was willing to allow existing DIP lenders to participate in its DIP facility on a *pari passu* basis and would even consider supplying DIP financing on a junior priority basis. *See* Ex. C at 1 n.1., 2 n.2. The Baird Declaration's assertion that "the Revised Flow DIP Proposal failed to sufficiently address the same issues that made the Initial Flow DIP Proposal not actionable," Baird Decl. ¶ 15, is also misleading because, as noted, both proposals

4

4886-8902-8793.1

indicated the Flow Group's willingness to negotiate concerning the issues that supposedly made the proposals "not actionable."

10. The Baird Declaration further provides that Mr. Baird is "not aware of a different proposal from the Flow Parties other than the Flow DIP Proposals discussed above." *Id.* ¶ 16. But on March 11, 2024, the Flow Group provided the Debtors and their advisors—including Mr. Baird—with an offer to purchase WeWork or its assets for $650 million, subject to the receipt and completion of adequate due diligence (the "**Flow Group Offer**"). Because the Flow Group Offer was submitted directly to Mr. Baird, Mr. Baird's declaration that he is "not aware" of any other proposals from the Flow Group can only mean he never even bothered to review the Flow Group Offer or he did not review his declaration before authorizing his name to be attached to it. A copy of the cover email submitting the Flow Group Offer is attached hereto as **Exhibit D**,[3] and the Flow Group Offer is attached hereto as **Exhibit E**.[4]

11. The Baird Declaration states that Mr. Baird "believe[s] that the Plan is the most viable and value maximizing path forward." Baird Decl. ¶ 16. That belief however is unsustainable given that the Plan sells 80% of the equity of Reorganized WeWork to Cupar (and possibly other "Consenting Stakeholders") for $400 million, a price reflecting just $500 million of equity value. This appears to be a 34.6% discount to the midpoint equity value of $765 million estimated by Mr. Baird's own firm.[5] The Flow Group Offer to purchase WeWork's equity for

---

[3] The Revised Flow DIP Proposal was submitted to the Debtors with the Flow Group Offer. It is attached as a separate exhibit to this Declaration solely for the sake of convenience.

[4] To protect the confidentiality of certain members of the Flow Group, references to those members on the signature pages have been removed, and Schedule I to the Flow Group Offer has been omitted, from Exhibit E.

[5] The $500 million equity value ascribed to the Debtors by the New Plan is $265 million less than $765 million midpoint equity value estimated by PJT Partners in its Valuation and

5

$650 million vastly exceeds the value afforded by the sale contemplated by the Plan. There is accordingly no basis for Mr. Baird to assert that the Plan maximizes value for the Debtors and their stakeholders.

12. Mr. Baird's belief that the Plan provides "the most viable" path forward is likewise unsustainable in light of the razor-thin margin for error baked into the Plan's financial projections. For example, the "Projected Statement of Operations" attached as an exhibit to the Proposed Disclosure Statement includes projections for "Occupancy %" and "Physical Member ARPM" (Average Revenue per Physical Member) that cannot be reconciled with the Company's historic performance after the onset of the COVID-19 pandemic.

13. Additionally, the Debtors' projections predict a hockey-stick type of increase in occupancy percentage—anticipating a climb of historical occupancy from the mid-70% range to 85%.[6] Neither the Proposed DS nor the Valuation and Liquidation Analysis provide an explanation for how the Debtors reasonably expect to achieve such unprecedented levels, or how those numbers can even be reconciled with the "All Access" membership plans promoted by the Debtors—where a certain cushion of available space must always be accessible.

14. The Debtors also provide no explanation for the projected increase in APRM from $493/month to $538/month—representing anticipated price hikes that find no comparable expectation in the industry. Just assuming flat and steady occupancy and ARPM over the projection period (no downturn or negative stress of any kind), the Debtors are woefully

---

Liquidation Analysis. The discount provided to Cupar and other purchasers under the New Plan is $265 million / $765 million, or 34.6%, of the equity value of the Reorganized Debtors.

[6] See Proposed DS, Ex. E (Financial Projections), at 5 (assuming increased occupancy from 75.9% at emergence to 79.4%, 81.8%, 83.1%, and 84.7% in the ensuing years).

6

undercapitalized and would become cash-flow negative by 2025, and would fully deplete their cash by 2027.

15. Accordingly, the proposed Plan hinges upon overly optimistic financial revenue and cost projections that cannot be reconciled with the Debtors' historic performance. If these unrealistic projections fail to materialize, the Debtors are likely to find themselves undercapitalized and cash-flow negative in the not-too-distant future, which could result in a return of WeWork to chapter 11. This makes the proposed Plan commercially unviable, contrary to Mr. Baird's assertion.

16. The due diligence list that the Flow Group previously provided to the Debtors is attached hereto as **Exhibit F**. The Flow Group believes that it can complete its due diligence review within two weeks of receiving the requested information.

17. I am unable to attend the Court's hearing scheduled for April 29, 2024 due to religious observance but am available to testify to the matters asserted herein on April 30, 2024 as well as thereafter.

4886-8902-8793.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 26, 2024

DocuSigned by:
_Adam Neumann_
71E225357B55425...
Adam Neumann

8

4886-8902-8793.1