**EXHIBIT B**

ROPES & GRAY LLP DRAFT
JANUARY 26, 2024
HIGHLY CONFIDENTIAL
SUBJECT TO FRE 408 AND
STATE LAW EQUIVALENTS

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION TERM LOAN FACILITY TERM SHEET

| | |
|---|---|
| Set forth below is a summary (the "Flow DIP Term Sheet") of the principal terms and conditions for a proposed debtor-in-possession financing facility (the "Flow DIP Facility"). This Flow DIP Term Sheet is intended for discussion purposes only and does not constitute a commitment to lend.  This Flow DIP Term Sheet is non-binding and the proposals contained herein are subject to, among other things, the Flow DIP Lenders' (as defined below) investment committee approval, satisfactory due diligence results, and the negotiation, documentation and execution of definitive documentation acceptable to the Flow DIP Lenders. Only execution (if at all) and delivery of the definitive documentation relating to the transactions referred to herein shall result in any binding or enforceable obligations of any party relating to the transactions. The terms and conditions for the extensions of credit described herein are dependent upon, among other things, authorization and approval by the Bankruptcy Court (as defined below). | |
| **Parties** | **Borrower**: WeWork Companies U.S. LLC (the "Borrower"). **Guarantors**: Each of the subsidiaries and affiliates of the Borrower who are guarantors of the Initial DIP Facility (as defined below), and such other companies as may be required by the Flow DIP Lenders (together with the Borrower, the "Loan Parties"). The Borrower and each Guarantor shall continue to be a debtor and debtor-in-possession (collectively, the "Debtors") in the chapter 11 cases (the "Chapter 11 Cases") commenced on November 6, 2023 in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") consolidated under Case No. 23-19865 (JKS). **Lenders**: Flow Global Holdings LLC and certain of its affiliates or designees (together with their successors and assigns, the "Flow DIP Lenders").[1] **Agent**:  A third party administrative and collateral agent to be appointed by the Flow DIP Lenders and reasonably acceptable to the Borrower (the "Flow DIP Agent," and together with the Flow DIP Lenders, the "Flow DIP Secured Parties"). |
| **Initial DIP Facility** | That certain Senior Secured Debtor-in-Possession Credit Agreement, dated on or around December 11, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Initial DIP Credit Agreement"), by and among the Borrower, the lenders party thereto from time to time (the "Initial DIP Lenders"), |

---

[1] [**Note to Draft**: The Flow DIP Secured Parties are willing to discuss (i) SoftBank Vision Fund II-2 L.P., its affiliates, and the lenders under the Initial DIP Facility and (ii) the holders (the "1L Noteholders") of the 1L Notes (as defined in the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed with the Bankruptcy Court at Docket No. 21) participating in the Flow DIP Facility on a *pari passu* basis, with, in the case of clause (ii), such 1L Noteholders "rolling up" a portion of their 1L Notes in a ratio to be agreed.]

| | |
|---|---|
| | Goldman Sachs International Bank, as Senior LC Facility Administrative Agent and Shared Collateral Agent, and SoftBank Vision Fund II-2 L.P., as Junior TLC Facility Administrative Agent (together with GSIB, the "Administrative Agents"), among others.<br><br>The Initial DIP Lenders and the Administrative Agents are collectively referred herein as the "Initial DIP Secured Parties."<br><br>All instruments and documents executed at any time in connection with the Initial DIP Credit Agreement shall be referred to collectively as the "Initial DIP Documents." The Obligations (as defined under the Initial DIP Documents) shall be referred to herein as the "Initial DIP Obligations". |
| **DIP Facility; Use of Proceeds** | **Flow DIP Facility**: The Flow DIP Facility shall be composed of superpriority term loans in an aggregate amount of up to $200 million (the "Flow DIP Loans"), which Flow DIP Loans shall be senior to the Initial DIP Obligations.[2]<br><br>Amounts paid or prepaid under the Flow DIP Facility may not be reborrowed. As used herein, "Flow DIP Obligations" shall mean the Flow DIP Loans, including all principal and accrued interest on the Flow DIP Loans, all fees (including all prepayment or similar fees), and all reimbursement, indemnity, and other obligations under the Flow DIP Facility.<br><br>**Use of Proceeds**: Subject to the terms and conditions herein, including the restrictions on Use of Proceeds set forth below, the proceeds of the Flow DIP Loans will be used in accordance with the terms of the 13-Week Cash Flow Forecast (as defined below), subject to Permitted Variances (as defined below) to: (a) pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of the unsecured creditors' committee appointed in the Chapter 11 Cases (the "Committee"), (b) pay professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the Flow DIP Agent and/or the Flow DIP Lenders as provided under the Flow DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the Flow DIP Facility, (c) provide for the working capital, and for other general corporate purposes of the Debtors, (d) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (e) fund the Stub Rent Reserve in accordance with the terms of the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 428] (the "Final Cash Collateral Order").<br><br>No portion of the proceeds of the Flow DIP Facility, the Collateral (as defined below), or the Carve-Out (to be defined in the Flow DIP Orders (as defined below)) may be used: |

---

[2] [**Note to Draft**: The Flow DIP Lenders are willing to discuss a *pari* or junior priority structure based, in part, on (i) the results of due diligence, (ii) satisfactory intercreditor arrangements, and/or (iii) the pursuit of a 363 sale process with corresponding milestones.]

2

|  |  |  |
|---|---|---|
|  | (a) | for any purpose that is prohibited under title 11 of the United States Code (the "Bankruptcy Code") or the Flow DIP Orders; |
|  | (b) | directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the Flow DIP Secured Parties and/or the Initial DIP Secured Parties or (ii) any other action, which with the giving of notice or passing of time, would result in an event of default under the Flow DIP Facility; |
|  | (c) | directly or indirectly for the payment of fees, expenses, interest, or principal under any financing agreement or arrangement junior in priority to the Flow DIP Facility (other than adequate protection payments permitted under the Flow DIP Orders and the applicable 13-Week Cash Flow Forecast); and |
|  | (d) | except as otherwise agreed in writing by the Flow DIP Agent and Flow DIP Lenders, to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "Plan of Reorganization") that does not provide for the indefeasible payment in full in cash of the Flow DIP Obligations. |
| **Availability** | **Interim Facility**: During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order approving the Flow DIP Facility (the "Flow Interim Order") but prior to the entry of a final order approving the Flow DIP Facility (the "Flow Final Order", and together with the Flow Interim Order, the "Flow DIP Orders", as applicable), or if earlier, the occurrence of a maturity event, the maximum amount available under the Flow DIP Facility shall be limited to one draw in the amount of $[•] million of Flow DIP Loans.<br><br>**Full Availability**:  Upon the Bankruptcy Court's entry of the Flow Final Order (the "Final Order Entry Date"), the full amount of the Flow DIP Loans shall be made available in a single draw. | |
| **13-Week Cash Flow Forecast and Permitted Variances** | The Flow DIP Facility and the Flow DIP Orders shall contain provisions similar in form and scope with the Initial DIP Credit Agreement and the Bankruptcy Court order approving the Initial DIP Facility relating to delivery of, and updates to, a 13-week forecast of anticipated cash receipts and disbursements, to be set forth on a weekly basis, including the anticipated uses of the Flow DIP Facility for such period (each as approved by the Flow DIP Lenders in their sole discretion, a "13-Week Cash Flow Forecast").<br><br>**Forecast Variances**:  Commencing for the second week following the date of entry of the Flow Interim Order (and delivered during the third week following such date), and continuing weekly thereafter, the Loan Parties shall deliver to the Flow DIP Agent a report (each, a "Variance Report") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements during the preceding testing period (which testing period initially shall be the prior two weeks, then the prior three weeks, | |

3

| | |
|---|---|
| | then the prior 4 weeks thereafter (the "Testing Period")) as compared to the projected, aggregate cash receipts and disbursements provided by the then-current 13-Week Cash Flow Forecast for each Testing Period (such difference, a "Variance"). <br><br> "Permitted Variance" means a Variance from the then-current 13-Week Cash Flow Forecast during any Testing Period that (x) does not exceed the total aggregate amount of cash disbursements in such 13-Week Cash Flow Forecast by more than 20% and (y) is not less than 80% of the aggregate cash receipts in such 13-Week Cash Flow Forecast.[3] <br><br> The Loan Parties hereby agree that during any Testing Period, the Variance from the then-current 13-Week Cash Flow Forecast shall not exceed the Permitted Variance. |
| **Collateral; Priority**[4] | **Collateral**: All property and assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), excluding all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "Avoidance Actions") and the proceeds of such Avoidance Actions as permitted under applicable law (together with the Avoidance Actions, the "Avoidance Action Assets").[5] <br><br> **Priority**: All obligations of the Loan Parties to the Flow DIP Lenders and the Flow DIP Agent under the Flow DIP Facility shall, subject in all respects to the Carve-Out, at all times: <br><br> (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the Flow DIP Facility shall be superior to all other claims; <br><br> (b) pursuant to section 364(c)(2) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof); <br><br> (c) pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), other than as set forth in clause (d) immediately below; and <br><br> (d) pursuant to section 364(d) of the Bankruptcy Code, have liens of a priority senior to those granted under the Initial DIP Facility. |

---

[3] [**Note to Draft**: If pursuing a *pari* or junior priority structure, clauses (x) and (y) to be revised to 10% and 90%, respectively.]

[4] [**Note to Draft**: The agreed intercreditor relationship between the Flow DIP Secured Parties and Initial DIP Secured Parties may require some adjustments to this language.]

[5] [**Note to Draft**: If pursuing a *pari* or junior priority structure, Avoidance Actions and proceeds thereof shall constitute Collateral.]

4

|  | All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements.<br><br>The Flow DIP Orders shall contain provisions prohibiting each Loan Party from incurring any indebtedness which (x) ranks senior to the Flow DIP Obligations or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code. |
|---|---|
| **Carve-Out** | "Carve-Out" shall mean, collectively, the Carve Out and the JPM Carve Out (each as defined in the Final Cash Collateral Order). |
| **Adequate Protection** | "Adequate Protection" shall have the meaning set forth in the Flow DIP Orders, which, in the case of a senior priority structure, shall include a grant of a lien on the Avoidance Action Assets in favor of the beneficiaries of such Adequate Protection. |
| **Flow DIP Orders** | The Flow DIP Orders shall, among other things, (i) upon entry of the Flow Interim Order, provide that in no event shall the Flow DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, (ii) upon entry of the Flow Final Order, approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (iii) otherwise be in form and substance satisfactory to the Flow DIP Lenders. |
| **Closing Date** | The closing date of the Flow DIP Facility (the "Closing Date") shall occur within one (1) business day of the date of entry of the Flow Interim DIP Order and shall be the first business day on which the conditions precedent set forth in definitive documentation governing the Flow DIP Facility have been satisfied or waived by the Flow DIP Agent and the Flow DIP Lenders. |
| **Maturity** | All Flow DIP Obligations shall be due and payable in full and in cash, and the commitments (if any) shall terminate, on the earlier to occur (the "Maturity Date") of (i) nine months from the Closing Date, (ii) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (iii) 25 days after the Interim Order Entry Date unless on or before such day the Flow Final Order shall have been entered by the Bankruptcy Court, and (iv) a sale of all or substantially all of the assets of the Debtors.<br><br>Any confirmation order entered in the Chapter 11 Cases ("Confirmation Order") shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the Flow DIP Agent and the Flow DIP Lenders under the Flow DIP Facility, other than after the payment in full and in cash to the Flow DIP Agent and the Flow DIP Lenders of all obligations under the Flow DIP Facility on or before the effective date of such Plan of Reorganization. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate, and fees under the Flow DIP Facility are set forth in Annex I hereto. |

| | |
|---|---|
| | Interest shall accrue on the principal balance of the Flow DIP Loans, from time to time, based on a 360 day year and charged for the actual number of days outstanding. Borrower shall pay interest monthly in kind in arrears on the last business day of each calendar month and on the Maturity Date. All fees and default interest shall be required to be paid in cash on the dates to be specified in the definitive documentation. |
| **Conditions Precedent** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Conditions Precedent to Extensions of Credit** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Covenants** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement), including, without limitation, (i) certain milestones (as set forth below)), (ii) access to the business and operations of the Loan Parties and to senior and downstream management, (iii) compliance with the 13-Week Cash Flow Forecast (subject to Permitted Variance) and with the provisions of this Flow DIP Term Sheet, (iv) a prohibition on transferring any cash or cash equivalents that constitute Collateral to a non-Loan Party except as otherwise agreed by the Flow Required Lenders (as defined below), (v) compliance with the Flow DIP Orders, (vi) a prohibition on filing, proposing, or supporting any plan of reorganization that does not indefeasibly satisfy the Flow DIP Obligations in full in cash, and (vii) maintaining its cash management system in a manner reasonably acceptable to the Flow DIP Agent.<br><br>Milestones. The Debtors shall comply with the following milestones, and the failure timely to comply shall constitute an immediate event of default under the Flow DIP Facility:<br><br>(a) No later than [•], 2024, file a motion to approve the Flow DIP Facility (the "Motion Filing Date");<br><br>(b) [If interim borrowing is requested, obtain entry by the Bankruptcy Court of the Flow Interim Order no later than [three (3)] business days after the Motion Filing Date;] and<br><br>(c) Obtain entry by the Bankruptcy Court of the Flow Final Order as soon as reasonably practicable but in no event later than [twenty-five (25)] calendar days after the Motion Filing Date. |
| **Representations and Warranties** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Events of Default** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement), including (i) non-compliance with the Milestones and the covenants set forth in this Flow DIP Term Sheet, (ii) any request made by the Debtors for, or the reversal, modification, amendment, stay, |

| | |
|---|---|
| | reconsideration or vacatur of, a Flow DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the Flow Required Lenders, (iii) the occurrence and/or continuance of an "Event of Default" under the Initial DIP Credit Agreement, and (iv) the dismissal of the Cases or the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code. |
| **Credit Bidding** | The Flow DIP Agent, upon the instruction of a majority (by reference to dollar amount of outstanding Flow DIP Loans) of Flow DIP Lenders (the "Flow Required Lenders"), shall have the right to credit bid up to the full amount of the outstanding Flow DIP Obligations. |

Ropes & Gray LLP Draft
January 26, 2024
Highly Confidential
Subject to FRE 408 and
State Law Equivalents

### Annex I

### Interest, Fees, Etc.

| | |
|---|---|
| **Interest Rate** | Flow DIP Loans will bear interest at the Term SOFR Rate (as defined in the Initial DIP Credit Agreement) plus 5%. |
| **Default Interest**: | During the continuance of an event of default, the Flow DIP Loans and all other outstanding obligations under the Flow DIP Facility will bear interest at an additional 2% *per annum* above the interest rate otherwise applicable. |
| **Agency Fees**: | As agreed with the Flow DIP Agent. |
| **Upfront Fee:** | 1% paid in kind on the Closing Date. |
| **Exit Fee:** | 1% paid in cash upon any repayment of the Flow DIP Loans. |