**EXHIBIT E**

*Private & Confidential*

March 11, 2024

Dear Mr. David Tolley and WeWork Inc. Board of Directors:

On behalf of the undersigned, we are pleased to submit to you and the board of directors of WeWork Inc. ("WeWork" or the "Company") a proposal to acquire the entirety of WeWork's post-restructuring equity for $650 million, subject to our satisfactory conclusion of additional diligence and disclosure of necessary material information.

With a vision that aligns leadership and management in partnership with its landlords and enterprise tenants, WeWork is uniquely positioned to provide an enhanced office experience for the future of work. Through the optimization of existing leases and locations and the elimination of a burdensome debt overhang, WeWork can reengage on the mission it set out to deliver to its community members and stakeholders.

An optimal restructuring can be accomplished through partnering with landlords, empowering employees, and providing a clear vision for the future. Our group's formal proposal provides much needed new capital, enabling existing debtholders to participate in the Company's future or cash out of their positions. Landlords who choose to constructively partner with us can enjoy longer term leasing arrangements and an opportunity to share in the future economic success of the Company through, among other possibilities, an equity-like debt instrument.

Underpinning our proposal is our assessment that at present WeWork has an equity value of $650 million. Our valuation analysis considers a combination of methodologies, including comparative competitor analysis and implied equity valuation based on current bond prices. This analysis also provides that the Company will have sufficient working capital on emergence, based on estimated starting cash in January 2024, plus additional debtor-in-possession financing (which we estimate will be up to $250 million and which members of our group are willing to provide), less restructuring costs and operating expenses through the date of emergence, subject to our satisfactory conclusion of additional diligence and disclosure of necessary material information.

In a hybrid work world where demand for WeWork's product should be greater than ever, we believe that the synergies and management expertise offered by our group can re-establish WeWork as the global leader in the future of work. Our team is positioned to work with the existing leadership team to embrace and expand relationships with enterprise tenants as well as individual members and to improve ongoing relationships with WeWork's landlord partners.

In addition to the undersigned parties, there are a number of sophisticated financial institutions and individuals who are aware of the content of this letter and its attachments and who are simultaneously contacting the Company's financial advisor to state that, if the requested information is provided, they will seriously and expeditiously evaluate such information to determine if they want to participate in the offer, the debtor-in-possession financing, or both.

We look forward to completing our diligence and negotiating definitive documents as soon as additional material information is provided. While the above equity value is our best assessment based on available information, additional diligence will allow us to swiftly advance the process and, we believe, result in a better outcome for all stakeholders. We expect that WeWork, in the best interest of its stakeholders, will engage with us on the potential benefits of our proposal and promptly provide additional material information.

Sincerely,

Adam Neumann

_____

Flow Global Holdings LLC

By:    _____

         Name:  Ilan Stern
         Title:    Authorized Signatory

cc:     Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP

*[Signature Page to Offer Letter to WeWork Inc.]*

### Proposal

(annexed hereto)

*Privileged and Confidential*

**THIS TERM SHEET (THIS "<u>TERM SHEET</u>")[1] HAS BEEN PRODUCED AT THE REQUEST OF COUNSEL TO AND THE INVESTMENT BANKERS FOR THE DEBTORS FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS. UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE (AS DEFINED BELOW) OF THE RSA (AS DEFINED BELOW), NOTHING CONTAINED IN THIS TERM SHEET SHALL BE DEEMED BINDING ON ANY OF THE PARTIES.**

*RESTRUCTURING TERM SHEET*

**INTRODUCTION**

The Term Sheet sets forth the principal terms of the Restructuring Transactions and certain related transactions concerning the Debtors (as defined below) agreed to by Flow Global Holdings LLC and its relevant affiliates and such other parties identified on **<u>Schedule 1</u>** hereto (as may be amended and supplemented from time to time) (collectively, the "**<u>Flow Parties</u>**").

The restructuring contemplated by this Term Sheet (the "**<u>Restructuring</u>**") will be accomplished through the confirmation and implementation of the chapter 11 Plan described herein in the chapter 11 cases of WeWork, Inc. ("**<u>WeWork</u>**") and its affiliated debtors and debtors in possession (together with WeWork, collectively, the "**<u>Debtors</u>**"), jointly administered in the United States Bankruptcy Court for the District of New Jersey (the "**<u>Bankruptcy Court</u>**") under lead Case No. 23-19865 (JKS) (the "**<u>Chapter 11 Cases</u>**").

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring Transactions, which documents remain subject to negotiation and completion in accordance with applicable law and shall be subject to a customary restructuring support agreement to be negotiated and entered into by the Debtors and the Flow Parties (any such agreement, the "**<u>RSA</u>**"). The Restructuring Transactions, the Definitive Documents, and the RSA shall be consistent in all respects with this Term Sheet and shall be subject to the consent and approval rights set forth herein.

| **<u>GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS</u>** | |
|---|---|
| **Restructuring Summary** | The Restructuring Transactions will be consummated pursuant to the Definitive Documents through confirmation of the Plan (and any equivalent Foreign Plan, to the extent applicable). In general, this Term Sheet contemplates:<br><br>(a) the satisfaction of Drawn DIP TLC Claims and Undrawn DIP TLC Claims with |

---

[1]  Capitalized terms used but not defined in this Term Sheet have the meanings given to such terms in the Restructuring Support Agreement attached as <u>Exhibit B</u> to *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed at Docket No. 21 in the Chapter 11 Cases.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | loans and obligations, as applicable, under the New LC Facility on a dollar-for-dollar basis; |
| | (b) except as otherwise set forth herein, the payment of the Prepetition LC Facility Claims, the 1L Notes Claims, and 2L Notes Claims with cash from the Equity Purchase Price; |
| | (c) the satisfaction of 3L Notes Claims, Unsecured Notes Claims, and General Unsecured Claims with the Unsecured Claims Distribution; and |
| | (d) the cancellation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth herein (other than any equity Interests held by the Flow Parties with respect to which, pursuant to the Plan, a Flow Party contributes its Claims and/or its share of the Equity Purchase Price in exchange for the retention of its equity Interests, as further provided herein). |
| | As described in greater detail herein, the Flow Parties have agreed to support the Restructuring Transactions contemplated by this Term Sheet, subject to entry into the RSA with the Debtors. |
| **Flow DIP Facility** | In addition to the Equity Purchase Price, the Flow Parties are willing to provide a debtor-in-possession financing facility, as more fully described on **Annex C** hereto (the "Flow DIP Facility"). |
| **New Interests** | On the Plan Effective Date, the Reorganized Debtors will distribute the New Interests to the Flow Parties (or their designees) as set forth herein. |
| **Definitive Documents** | All Definitive Documents and any other documents that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in the RSA. Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |

\* \* \*

| **TREATMENT OF PREPETITION CLAIMS AND INTERESTS** |
|---|

Each Holder of a Claim or Interest, as applicable, shall receive, on the Plan Effective Date or as soon as is reasonably practicable thereafter, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Claim or Interest**, except to the extent different treatment is agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of such Claim or Interest, as applicable, with the consent of the Flow Parties**.

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| N/A | **Administrative Claims** | Each Holder of an Administrative Claim shall receive payment, in full, in cash.[2] | N/A |
| N/A | **Priority Tax Claims** | Each Holder of a Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.[2] | N/A |
| | | **Classified Claims and Interests** | |
| Class 1 | **Other Secured Claims** | Each Holder of an Other Secured Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.[2] | Unimpaired / Deemed to Accept |
| Class 2 | **Other Priority Claims** | Each Holder of an Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.[2] | Unimpaired / Deemed to Accept |
| Class 3A | **Drawn DIP TLC Claims** | Each Holder of a Drawn DIP TLC Claim shall receive its *pro rata* share of the loans under the New LC Facility on a dollar-for-dollar basis. | Impaired / Entitled to Vote |
| Class 3B | **Undrawn DIP TLC Claims** | Each Undrawn DIP TLC Claim shall be exchanged on a dollar-for-dollar basis into obligations under the New LC Facility. | Impaired / Entitled to Vote |
| [Class 3C] | **[DIP TLC Fee Claims]** | [Each Holder of a DIP TLC Fee Claim shall receive its pro rata share of the loans under the New LC Facility on a dollar-for-dollar basis.] | [Unimpaired / Deemed to Accept] |
| Class 4 | **Prepetition LC Facility Claims and 1L Notes Claims** | Each Holder of Prepetition LC Facility Claims, and 1L Notes Claims shall receive a share of the Equity Purchase Price to be allocated on terms to be agreed among such Holders and the Holders | Impaired / Entitled to Vote |

---

[2]   To be paid with cash on hand.

| TREATMENT OF PREPETITION CLAIMS AND INTERESTS | | | |
|---|---|---|---|
| | | of Claims in Class 5; *provided*, that each such Holder may elect to receive such share in the form of New Interests (without any discount to Plan value) up to the New Interests Cap; *provided*, *further*, that, to the extent Holders of Claims in Class 4 and Class 5 elect to receive their share of the Equity Purchase Price in the form of New Interests such that the amount of such New Interests would exceed the New Interests Cap, each such Holder's election shall be reduced *pro rata* such that, following such reduction, all such Holders receive, in the aggregate, an amount of New Interests equal to the New Interests Cap; *provided*, *further*, that the Equity Purchase Price shall be reduced dollar-for-dollar for the value of New Interests (without any discount to Plan value) received by Holders of Claims in Class 4 and Class 5 (the "<u>Election Reduction Proviso</u>"); [*provided*, *further*, that any New Interests received by any SoftBank Party shall be subordinated in right of payment to all other New Interests until $[•] in distributions have been made to all other Holders of such New Interests.] | |
| Class 5 | **2L Notes Claims** | Each Holder of 2L Notes Claims shall receive a share of the Equity Purchase Price to be allocated on terms to be agreed among such Holders and the Holders of Claims in Class 4; *provided*, that each such Holder may elect to receive such share in the form of New Interests (without any discount to Plan value) up to the New Interests Cap; *provided*, *further*, that, to the extent Holders of Claims in Class 4 and Class 5 elect to receive their share of the Equity Purchase Price in the form of New Interests such that the amount of such New Interests would exceed the New Interests Cap, each such Holder's election shall be reduced *pro rata* such that, following such reduction, all such Holders receive, in the aggregate, an amount of New Interests equal to the New Interests Cap; *provided*, *further*, that the Equity Purchase Price shall be reduced dollar-for-dollar for the value of New Interests (without any discount to Plan value) received by Holders of Claims in Class 4 and Class 5; [*provided*, *further*, that any New Interests received by any SoftBank Party shall be subordinated in right of payment to all other New Interests until $[•] in | Impaired / Entitled to Vote |

| | **TREATMENT OF PREPETITION CLAIMS AND INTERESTS** | | |
|---|---|---|---|
| | | distributions have been made to all other Holders of such New Interests.] | |
| Class 6 | **Unsecured Notes Claims and General Unsecured Claims** | Each Holder of a 3L Notes Claim, Unsecured Notes Claim, and General Unsecured Claim shall receive its *pro rata* share of the Unsecured Claims Distribution. | [Impaired / Entitled to Vote] |
| Class 7 | **Parent Interests** | Each Holder of Interests in the Reorganized Company, shall have such Interest canceled, released, discharged, and extinguished and such Interests will be of no further force or effect, and Holders of such Interests shall not receive any distribution on account of such Interests (for the avoidance of doubt, other than any equity Interests held by any Flow Party with respect to which such Flow Party contributes its Claims and/or its share of the Equity Purchase Price in exchange for the retention of its equity Interests), pursuant to the Plan and as agreed by the Parties. | Impaired / Deemed to Reject |
| Class 8 | **Section 510(b) Claim** | All Allowed Section 510(b) Claims against any applicable Debtor shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims. | Impaired / Deemed to Reject |
| Class 9 | **Intercompany Claims / Intercompany Interests** | Each Intercompany Claim and Intercompany Interest shall be (a) canceled, released, discharged, (b) reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, at the option of the Debtors or the Reorganized Debtors in each case with the consent of the Flow Parties in accordance with the Restructuring Transactions Exhibit. | Unimpaired / Deemed to Accept, or Impaired / Deemed to Reject, as Applicable |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall settle and compromise the respective contractual, legal, and equitable subordination rights of the Holders of such Claims and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall authorize and ratify, among other things, all actions as may be necessary or appropriate, consistent with the RSA, to effect any Restructuring Transactions or settlement described in, approved by, contemplated by, or necessary to effectuate the Plan. On the applicable Plan Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, corporate governance documents, and other documents required to be issued to implement the Plan and the Restructuring Transactions. For the avoidance of doubt, the Flow Parties do not agree or consent to any rights offering. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Term Sheet, the RSA, the Plan, or other Definitive Documents, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, note purchase agreements, and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | The Plan will provide for reasonable and customary mutual releases; provided, that, the Flow Parties hereby acknowledge and agree that the releases set forth in **Annex B** are reasonable, customary, and acceptable with respect to the Flow Parties and may not be amended without the consent of the Flow Parties. |

\* \* \*

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the satisfaction of conditions precedent acceptable to the Flow Parties, including the following:<br><br>(a) The RSA shall have been executed, shall not have been terminated, and shall remain in full force and effect and no event or occurrence has occurred that, with the passage of time or the giving of notice, would give rise to the right of any of the Flow Parties to terminate the RSA.<br><br>(b) All financing necessary for the Plan shall have been obtained, including the New LC Facility, and any documents related thereto (including the New LC Facility Documents) shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred, having been satisfied or waived), and shall be in form and substance acceptable to the Flow Parties.<br><br>(c) The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by this Term Sheet and the RSA (subject to, and in accordance with, the consent rights set forth therein) and the Plan.<br><br>(d) All Flow Party Transaction Expenses shall have been paid in full in cash in accordance with the terms and conditions set forth in the RSA.<br><br>(e) All requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transactions, to the extent required.<br><br>(f) All documents contemplated by the RSA to be executed and delivered on or before the Plan Effective Date shall have been executed and delivered.<br><br>(g) The Confirmation Order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless waived by the Flow Parties. |
| **[MIP]** | [On or after the Plan Effective Date, the New Board shall determine the terms and conditions of and implement the MIP, including any and all awards granted thereunder and any determinations with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation.] |
| **Exemption from SEC Registration** | The issuance of all securities under the Definitive Documents will be (a) exempt from registration under the Securities Act and applicable Law to the fullest extent applicable and (b) permitted by Law in reliance on the Section 1145 Exemption or section 4(a)(2) of the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable local or state securities Laws.<br><br>For the avoidance of doubt, the New Interests are expected to be issued in reliance upon the Section 1145 Exemption, to the extent permissible and available. If the Section 1145 Exemption is not available, such New Interests are expected to be issued in reliance upon the exemptions provided by section 4(a)(2) of the Securities Act (or another applicable exemption under the Securities Act). |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable Law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, restructuring advisors, and other professionals and/or agents or representatives of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, than the indemnification provisions in place prior to the Plan Effective Date. <br><br> After the Plan Effective Date, the Reorganized Company will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased prior to the Plan Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than those that the Debtors release pursuant to the release and exculpation provisions outlined in this Term Sheet and as set forth in the Plan, with the consent of the Flow Parties. |
| **Restructuring Transactions Tax Structuring** | The parties will negotiate in good faith to structure and implement the Restructuring Transactions (a) in a tax-efficient manner (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) to the Debtors and the Reorganized Debtors, (b) in a manner that minimizes any current cash taxes payable by the Reorganized Debtors, and (c) to the extent not inconsistent with the preceding clauses (a) and (b), and to the extent reasonably practicable in a manner intended to be tax-efficient for Holders of Claims and Interests; *provided*, that no guarantee of tax efficiency will be made to any particular Holder, which may include reorganizing the ownership structure of WeWork, its subsidiaries and assets, and/or the exchange of interests of one or more existing or newly-formed subsidiaries of WeWork that own the assets currently owned by WeWork, rather than equity of WeWork, making one or more "elections" for U.S. federal income tax purposes, applying for one or more private letter rulings with the IRS, and/or transferring or assigning debt from an applicable Debtor or subsidiary to one or more Debtors or subsidiaries, and in each case, in a manner acceptable to the Debtors and the Flow Parties, with such structuring to be set forth in the Restructuring Transactions Exhibit. |
| **New Corporate Governance Documents** | The New Corporate Governance Documents will be agreed to by the Debtors and the Flow Parties and will become effective as of the Plan Effective Date, which will provide, among other things, the Flow Parties, as the majority owner of the New Interests, the right to appoint a majority of the members of the board of the |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | Reorganized Debtors. |
| **Executory Contracts and Unexpired Leases** | Executory Contracts and Unexpired Leases (other than Unexpired Leases of non-residential real property) that are not rejected as of the Plan Effective Date will be deemed assumed pursuant to section 365 of the Bankruptcy Code. Unexpired Leases of non-residential real property that are not expressly assumed as of the Plan Effective Date will be deemed rejected pursuant to section 365 of the Bankruptcy Code.   The Flow Parties shall have the sole and exclusive right to designate Executory Contracts and Unexpired Leases to be assumed or rejected in connection with the Plan.<br><br>Claims arising from the rejection of any of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims. |
| **[Milestones]** | The Debtors shall implement the Restructuring Transactions in accordance with the following Milestones, unless any such Milestone is extended or waived in writing, which may be by email between applicable counsel, by (a) the Debtors, and (b) the Flow Parties, subject to the Bankruptcy Court's availability (the "**Milestones**"):<br><br>(a)  no later than February 2, 2024, the Debtors and the Flow Parties shall have negotiated and entered into the RSA;<br><br>(b)  no later than fourteen (14) days after the date of entry into the RSA, the Debtors shall have filed (i) the Disclosure Statement and Plan and (ii) a motion seeking entry of the Disclosure Statement Order;<br><br>(c)  no later than thirty-five (35) days after the date of entry into the RSA, the Bankruptcy Court shall have entered the Disclosure Statement Order;<br><br>(d)  no later than seventy-five (75) days after the date of entry into the RSA, the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>(e)  no later than eighty-two (82) days after the date of entry into the RSA, the Plan Effective Date shall have occurred. |
| **Professional Fees and Expenses** | All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall be paid in full or amounts sufficient to pay such fees and expenses in full after the Plan Effective Date shall be placed in the professional fee escrow account as set forth in, and in accordance with, the Plan. |
| **Employment and Indemnification Obligations** | Treatment of the Debtors' employment obligations for officers, directors, and/or employees is to be determined with the consent of the Flow Parties. |
| **Modification to Treatment of Claims and Interests** | Any modifications to the proposed (or actual) treatment of Claims or Interests shall require the consent of the Flow Parties. For the avoidance of doubt, such consent shall be required in connection the treatment of any Class of Claims or Interests indicated herein to be determined at a future date or time. |

**Annex A**

| CERTAIN DEFINITIONS | |
|---|---|
| **1L Notes Claim** | All claims arising under the 1L Notes, including for postpetition interest, fees or other obligations arising postpetition in connection therewith. |
| **2L Notes Claim** | All claims arising under the 2L Notes, including for postpetition interest, fees or other obligations arising postpetition in connection therewith. |
| **3L Notes Claim** | All claims arising under the 3L Notes, including for postpetition interest, fees or other obligations arising postpetition in connection therewith. |
| **5.00% Unsecured Notes Indenture** | As it may be amended, supplemented, or otherwise modified from time to time, that certain Amended and Restated Senior Notes Indenture, dated as of December 16, 2021, by and among WeWork Companies LLC, as issuer, WW Co-Obligor Inc., as co-issuer, the guarantors from time to time party thereto, and U.S. Bank Trust Company, National Association (as successor to U.S. Bank National Association), as trustee. |
| **5.00% Unsecured Notes, Series I** | WeWork Companies LLC's 5.00% Senior Notes due 2025, Series I, issued pursuant to the 5.00% Unsecured Notes Indenture. |
| **5.00% Unsecured Notes, Series II** | WeWork Companies LLC's 5.00% Senior Notes due 2025, Series II, issued pursuant to the 5.00% Unsecured Notes Indenture. |
| **7.875% Unsecured Notes** | WeWork Companies Inc.'s 7.875% Senior Notes due 2025 issued pursuant to the 7.875% Unsecured Notes Indenture. |
| **7.875% Unsecured Notes Indenture** | As it may be amended, supplemented, or otherwise modified from time to time, that certain Senior Notes Indenture, dated of April 30, 2018, by and among WeWork Companies LLC, as successor to WeWork Companies Inc., as issuer, WW Co-Obligor Inc., as co-issuer, the guarantors from time to time party thereto, and U.S. Bank Trust Company, National Association (as successor to U.S. Bank National Association, as successor to Wells Fargo Bank, National Association), as trustee. |
| **Administrative Claim** | A Claim against any of the Debtors arising pursuant to section 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code. |
| **Affiliate** | As set forth in section 101(2) of the Bankruptcy Code. |
| **Agreement Effective Date** | Means the first date upon which the conditions precedent to the RSA are satisfied and the RSA becomes binding in accordance with its terms, which conditions precedent shall include, for the avoidance of doubt, the Flow Parties' completion of satisfactory due diligence. |

| | |
|---|---|
| **Allowed** | With reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Plan Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Plan Effective Date, or (ii) as to which any objection to allowance has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Company, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Company, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; *provided*, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Company shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan. |
| **Class** | A class of Claims or Interests as set forth in the Plan pursuant to section 1122(a) and 1123(a)(1) of the Bankruptcy Code. |
| **Confirmation Date** | The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021. |
| **Confirmation Order** | Means the confirmation order with respect to the Plan. |
| **Deemed to Accept** | An Unimpaired Claim, the Holder of which is conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. |
| **Deemed to Reject** | An Impaired Claim, the Holder of which is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. |
| **DIP TLC Credit Agreement** | Means the *Senior Secured Debtor-in-Possession Credit Agreement*, attached as Exhibit 1, to the *Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, filed at Docket No. 427 in the Chapter 11 Cases. |
| **DIP TLC Facility** | The senior secured, debtor-in-possession "Term Loan C" and cash collateralized letter of credit facility under the DIP TLC Credit Agreement. |
| **DIP TLC Fee Claims** | Means any Claims on account of the Structuring Fee and Fixed (Running) Cost (each as used or described in the DIP TLC Term Sheet) under the DIP TLC Facility. |

| | |
|---|---|
| **Drawn DIP TLC Claims** | Claims on account of the principal face amount of obligations due or payable as of the Plan Effective Date under the DIP TLC Documents attributable to letters of credit drawn under the DIP TLC Facility. |
| **Equity Purchase Price** | Means $650,000,000 in cash *less* the Unsecured Claims Distribution *less* any amounts allocable to the Election Reduction Proviso. |
| **Executory Contracts** | A contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof. |
| **Flow Party Transaction Expenses** | Means all reasonable and documented fees and out-of-pocket expenses of the Flow Parties (including such fees and expenses accrued since the inception of their respective engagements in accordance with the terms of the applicable engagement letters and/or fee letters, or as otherwise may be agreed, with the Debtors, and not previously paid by, or on behalf of, the Debtors) incurred in connection with this Term Sheet and the Restructuring Transactions. |
| **General Unsecured Claim** | Any unsecured Claim against any of the Debtors that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court, (b) an Administrative Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (e) an Other Secured Claim, (e) an Other Priority Claim, (f) an Intercompany Claim, or (g) any other Claim that is subordinated or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. |
| **Governmental Unit** | As set forth in section 101(27) of the Bankruptcy Code. |
| **Holder** | An Entity holding a Claim or Interest, as applicable |
| **Impaired** | Any Claim or Class of Claims, which is impaired under the terms of the Plan pursuant to section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | Any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor. |
| **Intercompany Interests** | Any interest in one Debtor held by another Debtor. |
| **Junior LC Facility** | The Junior L/C Tranche as defined in the Prepetition LC Credit Agreement. |
| **Liens** | As set forth in section 101(37) of the Bankruptcy Code. |
| **Milestone** | The deadlines by which the Debtors shall implement the Restructuring Transactions, as set forth in this Term Sheet. |
| **MIP** | Means the management incentive plan as determined by the New Board of the Reorganized Debtors. |
| **New Board** | The board of directors of the Reorganized Debtors following the Plan Effective Date. |

| | |
|---|---|
| **New Interests** | The class or classes of voting equity issued by the Reorganized Debtors on the Plan Effective Date. |
| **New Interests Cap** | An amount of New Interests, which may be distributed to Holders of Claims in Class 4 in accordance with the terms of this Term Sheet, not to exceed 49.0% of the aggregate New Interests in the Reorganized Debtors on a fully-diluted basis. |
| **New LC Facility** | The letter of credit facility to be entered into on the Plan Effective Date, which shall be on terms no less favorable to the Debtors than the DIP TLC Facility. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim other than: (a) the Prepetition LC Facility Claims; (b) the Secured Notes Claims; or (c) the Prepetition LC Subrogation Claims. |
| **Plan** | Means the joint plan of reorganization, including any exhibits and schedules thereto, filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of RSA). |
| **Plan Effective Date** | Means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are waived in accordance with the terms of this Agreement and the Plan, and on which the Restructuring Transactions become effective or are consummated. |
| **Prepetition LC Facility** | Means, collectively, the Junior LC Facility and the Senior LC Facility. |
| **Prepetition LC Facility Claims** | All claims arising under the Prepetition LC Facility Documents, including the Prepetition LC Subrogation Claim or the Prepetition LC Reimbursement Claim, and all unpaid accrued and deferred fees, including, without limitation, any upfront fees, running fees, administrative, and fronting fees (without double counting). For the avoidance of doubt, (a) any cash collateral posted but subsequently returned to the SoftBank Parties shall not give rise to a Prepetition LC Facility Claim and (b) any Holder of a Prepetition LC Facility Claim shall be entitled to recover on account of either its Prepetition LC Subrogation Claim or Prepetition Reimbursement Claim, but not both. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | Any Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |

| | |
|---|---|
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **Rejecting** | The status of a Class of Claims that is Deemed to Reject. |
| **Reorganized Debtor** | Means any of the Debtors being reorganized with the consent of the Flow Parties, on and after the Plan Effective Date |
| **Section 1145 Exemption** | The exemption from the requirement to register issued securities under the Securities Act established pursuant to section 1145 of the Bankruptcy Code, and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security. |
| **Section 510(b) Claim** | Any Claim against any of the Debtors subject to subordination under section 510(b) of the Bankruptcy Code. |
| **Secured Claim** | A Claim that is: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Definitive Documents, or separate order of the Bankruptcy Court, as a secured claim. |
| **Secured Notes Claims** | Means, collectively, the 1L Notes Claims, the 2L Notes Claims, and the 3L Notes Claims. |
| **Security** | Any security, as defined in section 2(a)(1) of the Securities Act. |
| **Senior LC Facility** | The Senior L/C Tranche as defined in the Prepetition LC Credit Agreement. |
| **Undrawn DIP TLC Claims** | Claims on account of undrawn letters of credit under the DIP TLC Facility. |
| **Unexpired Lease** | An unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof. |
| **Unimpaired** | Any Claim or Class of Claims, which is not Impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Unsecured Claims Distribution** | Means $[•] in cash. |
| **Unsecured Notes** | Collectively, the 5.00% Unsecured Notes, Series I, the 5.00% Unsecured Notes, Series II, and the 7.875% Unsecured Notes. |

| **Unsecured Notes Claims** | Any Claim against a Company Party arising under, derived from, based on, or related to the Unsecured Notes or the Unsecured Notes Indentures. |
|---|---|
| **Unsecured Notes Indentures** | Collectively, the 5.00% Unsecured Notes Indenture and the 7.875% Unsecured Notes Indenture. |

**Annex B**

**CUSTOMARY RELEASE**

*Definitions.*

The following definitions shall be applicable to the foregoing release and exculpation provisions:

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such, (a) each of the Debtors, (b) each independent director of any Debtor, and (c) any statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as well as each of its member.

"**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, investment committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, investment or fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees.

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Companies; (c) the Flow Parties; (d) each DIP TLC Issuing Bank; (e) each DIP TLC Agent; (f) current and former Affiliates of each Entity in clause (a) through clause (e); and (g) each Related Party of each Entity in clause (a) through clause (e); *provided, that* in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the releases contained in the Plan, either by means of (i) a formal objection filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor, (b) each Reorganized Company; (c) the Flow Parties;  (d) each DIP TLC Issuing Bank; (e) each DIP TLC Agent; (f) all holders of Claims that vote to accept the Plan; (g) all holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (h) all holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (i) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) each current and former Affiliate of each Entity in clause (a) through (i); and (k) each Related Party of each Entity in clause (a) through (i) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law.

A.      *Releases by the Debtors.*

Except as expressly set forth in the Plan or the Confirmation Order, effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, finally, and forever released, waived, and discharged, to the fullest extent permissible under applicable Law, by each and all of the Debtors, and each of their respective current and former Affiliates, the Reorganized Debtors, and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or any other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the Notes, the Indentures, the Prepetition LC Credit Agreement, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (b) any retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' estates asserting any Claim or Cause of Action of any

kind whatsoever released pursuant to the Debtor Release; essential to the Confirmation of the Plan; and (g) an exercise of the Debtors' business judgment

    B.   *Releases by the Releasing Parties.*

    Effective as of the Plan Effective Date, except as expressly set forth in the Plan or the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the fullest extent permissible under applicable Law, each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the Notes, the Indentures, the Prepetition LC Credit Agreement, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section B, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases set forth in this Section B is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to this Section B; (e) in the best interests of the Debtors and their estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the

Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to this Section B.

      *C.*      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Cause of Action or Claim whether direct or derivative, for any claim related to any act or omission from the Petition Date to the Plan Effective Date, in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Disclosure Statement, the Plan (including the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other or omission, transaction, agreements, event, or other occurrence taking place on or before the Plan Effective Date related to or relating to any of the foregoing (including, for the avoidance of doubt, providing any legal opinion effective as of the Plan Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Plan Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

      *D.*      *Injunction.*

Upon entry of the Confirmation Order, except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been extinguished, released, discharged, or are subject to exculpation, whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interests, along with their respective present or former employees, agents, officers, directors, principals, Affiliates, and Related Parties are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (a) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action,

or liabilities; (d) except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Plan Effective Date, and notwithstanding an indication of a Claim, Interest, Cause of Action, liability or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Action released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

With respect to Claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Plan Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases (including the filing and administration thereof), the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany transactions, the Restructuring, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or filing of the RSA and the Definitive Documents, the DIP TLC Facility, the DIP TLC Documents, the Disclosure Statement, the Plan, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the Notes and the Indentures, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action. To the extent the Bankruptcy Court may have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.

**<u>Annex C</u>**

**Flow DIP Facility Term Sheet**

HIGHLY CONFIDENTIAL
SUBJECT TO FRE 408 AND
STATE LAW EQUIVALENTS

**SENIOR SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION TERM LOAN FACILITY TERM SHEET**

Set forth below is a summary (the "<u>Flow DIP Term Sheet</u>") of the principal terms and conditions for a proposed debtor-in-possession financing facility (the "<u>Flow DIP Facility</u>").

This Flow DIP Term Sheet is intended for discussion purposes only and does not constitute a commitment to lend.  This Flow DIP Term Sheet is non-binding and the proposals contained herein are subject to, among other things, the Flow DIP Lenders' (as defined below) investment committee approval, satisfactory due diligence results, and the negotiation, documentation and execution of definitive documentation acceptable to the Flow DIP Lenders. Only execution (if at all) and delivery of the definitive documentation relating to the transactions referred to herein shall result in any binding or enforceable obligations of any party relating to the transactions.

The terms and conditions for the extensions of credit described herein are dependent upon, among other things, authorization and approval by the Bankruptcy Court (as defined below).

| | |
|---|---|
| **Parties** | **<u>Borrower</u>**: WeWork Companies U.S. LLC (the "<u>Borrower</u>").<br><br>**<u>Guarantors</u>**: Each of the subsidiaries and affiliates of the Borrower who are guarantors of the Initial DIP Facility (as defined below), and such other companies as may be required by the Flow DIP Lenders (together with the Borrower, the "<u>Loan Parties</u>").<br><br>The Borrower and each Guarantor shall continue to be a debtor and debtor-in-possession (collectively, the "<u>Debtors</u>") in the chapter 11 cases (the "<u>Chapter 11 Cases</u>") commenced on November 6, 2023 in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>") consolidated under Case No. 23-19865 (JKS).<br><br>**<u>Lenders</u>**: Flow Global Holdings LLC and certain of its affiliates or designees (together with their successors and assigns, the "<u>Flow DIP Lenders</u>").[1]<br><br>**<u>Agent</u>**:  A third party administrative and collateral agent to be appointed by the Flow DIP Lenders and reasonably acceptable to the Borrower (the "<u>Flow DIP Agent</u>," and together with the Flow DIP Lenders, the "<u>Flow DIP Secured Parties</u>"). |
| **Initial DIP Facility** | That certain Senior Secured Debtor-in-Possession Credit Agreement, dated on or around December 11, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Initial DIP Credit Agreement</u>"), by and among the Borrower, the lenders party thereto from time to time (the "<u>Initial DIP Lenders</u>"), Goldman Sachs International Bank, as Senior LC Facility Administrative Agent and |

---

[1]  [**<u>Note to Draft</u>**: (i) SoftBank Vision Fund II-2 L.P., its affiliates, and the lenders under the Initial DIP Facility and (ii) the holders (the "<u>1L Noteholders</u>") of the 1L Notes and 2L Notes (each as defined in the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed with the Bankruptcy Court at Docket No. 21) may participate in the Flow DIP Facility on a *pari passu* basis in a maximum amount to be agreed, [with, in the case of clause (ii), such 1L Noteholders "rolling up" a portion of their 1L Notes in a ratio to be agreed].]

|  | Shared Collateral Agent, and SoftBank Vision Fund II-2 L.P., as Junior TLC Facility Administrative Agent (together with GSIB, the "<u>Administrative Agents</u>"), among others.<br><br>The Initial DIP Lenders and the Administrative Agents are collectively referred herein as the "<u>Initial DIP Secured Parties</u>."<br><br>All instruments and documents executed at any time in connection with the Initial DIP Credit Agreement shall be referred to collectively as the "<u>Initial DIP Documents</u>."  The Obligations (as defined under the Initial DIP Documents) shall be referred to herein as the "<u>Initial DIP Obligations</u>". |
|---|---|
| **DIP Facility; Use of Proceeds** | <u>**Flow DIP Facility**</u>: The Flow DIP Facility shall be composed of superpriority term loans in an aggregate amount of up to $250 million (the "<u>Flow DIP Loans</u>"), which Flow DIP Loans shall be senior to the Initial DIP Obligations and payable as set forth herein.[2]<br><br>Amounts paid or prepaid under the Flow DIP Facility may not be reborrowed.  As used herein, "<u>Flow DIP Obligations</u>" shall mean the Flow DIP Loans, including all principal and accrued interest on the Flow DIP Loans, all fees (including all prepayment or similar fees), and all reimbursement, indemnity, and other obligations under the Flow DIP Facility.<br><br><u>**Use of Proceeds**</u>:  Subject to the terms and conditions herein, including the restrictions on Use of Proceeds set forth below, the proceeds of the Flow DIP Loans will be used in accordance with the terms of the 13-Week Cash Flow Forecast (as defined below), subject to Permitted Variances (as defined below) to: (a) pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of the unsecured creditors' committee appointed in the Chapter 11 Cases (the "<u>Committee</u>"), (b) pay professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the Flow DIP Agent and/or the Flow DIP Lenders as provided under the Flow DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the Flow DIP Facility, (c) provide for the working capital, and for other general corporate purposes of the Debtors, (d) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (e) fund the Stub Rent Reserve in accordance with the terms of the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 428] (the "<u>Final Cash Collateral Order</u>").<br><br>No portion of the proceeds of the Flow DIP Facility, the Collateral (as defined below), or the Carve-Out (to be defined in the Flow DIP Orders (as defined below)) may be used: |

---

[2]   [<u>**Note to Draft**</u>: The Flow DIP Lenders are willing to discuss a *pari* or junior priority structure based, in part, on (i) the results of due diligence, (ii) satisfactory intercreditor arrangements, and/or (iii) the pursuit of a 363 sale process with corresponding milestones.]

| | |
|---|---|
| | (a) for any purpose that is prohibited under title 11 of the United States Code (the "<u>Bankruptcy Code</u>") or the Flow DIP Orders; |
| | (b) directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the Flow DIP Secured Parties and/or the Initial DIP Secured Parties or (ii) any other action, which with the giving of notice or passing of time, would result in an event of default under the Flow DIP Facility; |
| | (c) directly or indirectly for the payment of fees, expenses, interest, or principal under any financing agreement or arrangement junior in priority to the Flow DIP Facility (other than adequate protection payments permitted under the Flow DIP Orders and the applicable 13-Week Cash Flow Forecast); and |
| | (d) except as otherwise agreed in writing by the Flow DIP Agent and Flow DIP Lenders, to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "<u>Plan of Reorganization</u>") that does not provide for the indefeasible payment in full in cash of the Flow DIP Obligations. |
| **Availability** | <u>Interim Facility</u>: During the period commencing on the date (the "<u>Interim Order Entry Date</u>") of the Bankruptcy Court's entry of an interim order approving the Flow DIP Facility (the "<u>Flow Interim Order</u>") but prior to the entry of a final order approving the Flow DIP Facility (the "<u>Flow Final Order</u>", and together with the Flow Interim Order, the "<u>Flow DIP Orders</u>", as applicable), or if earlier, the occurrence of a maturity event, the maximum amount available under the Flow DIP Facility shall be limited to one draw in the amount of $[•] million of Flow DIP Loans.

<u>Full Availability</u>:  Upon the Bankruptcy Court's entry of the Flow Final Order (the "<u>Final Order Entry Date</u>"), the full amount of the Flow DIP Loans shall be made available in a single draw. |
| **13-Week Cash Flow Forecast and Permitted Variances** | The Flow DIP Facility and the Flow DIP Orders shall contain provisions similar in form and scope with the Initial DIP Credit Agreement and the Bankruptcy Court order approving the Initial DIP Facility relating to delivery of, and updates to, a 13-week forecast of anticipated cash receipts and disbursements, to be set forth on a weekly basis, including the anticipated uses of the Flow DIP Facility for such period (each as approved by the Flow DIP Lenders in their sole discretion, a "<u>13-Week Cash Flow Forecast</u>").

<u>Forecast Variances</u>:  Commencing for the second week following the date of entry of the Flow Interim Order (and delivered during the third week following such date), and continuing weekly thereafter, the Loan Parties shall deliver to the Flow DIP Agent a report (each, a "<u>Variance Report</u>") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements during the preceding testing period (which testing period initially shall be the prior two weeks, then the prior three weeks, then the prior 4 weeks thereafter (the "<u>Testing Period</u>")) as compared to the projected, |

| | |
|---|---|
| | aggregate cash receipts and disbursements provided by the then-current 13-Week Cash Flow Forecast for each Testing Period (such difference, a "Variance"). <br><br> "Permitted Variance" means a Variance from the then-current 13-Week Cash Flow Forecast during any Testing Period that (x) does not exceed the total aggregate amount of cash disbursements in such 13-Week Cash Flow Forecast by more than 20% and (y) is not less than 80% of the aggregate cash receipts in such 13-Week Cash Flow Forecast.[3] <br><br> The Loan Parties hereby agree that during any Testing Period, the Variance from the then-current 13-Week Cash Flow Forecast shall not exceed the Permitted Variance. |
| **Collateral; Priority**[4] | **Collateral**: All property and assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), excluding all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "Avoidance Actions") and the proceeds of such Avoidance Actions as permitted under applicable law (together with the Avoidance Actions, the "Avoidance Action Assets").[5] <br><br> **Priority**: All obligations of the Loan Parties to the Flow DIP Lenders and the Flow DIP Agent under the Flow DIP Facility shall, subject in all respects to the Carve-Out, at all times: <br><br> (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the Flow DIP Facility shall be superior to all other claims; <br><br> (b) pursuant to section 364(c)(2) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof); <br><br> (c) pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), other than as set forth in clause (d) immediately below; and <br><br> (d) pursuant to section 364(d) of the Bankruptcy Code, have liens of a priority senior to those granted under the Initial DIP Facility. |

---

[3]    [**Note to Draft**: If pursuing a *pari* or junior priority structure, clauses (x) and (y) to be revised to 10% and 90%, respectively.]

[4]    [**Note to Draft**: The agreed intercreditor relationship between the Flow DIP Secured Parties and Initial DIP Secured Parties may require some adjustments to this language.]

[5]    [**Note to Draft**: If pursuing a *pari* or junior priority structure, Avoidance Actions and proceeds thereof shall constitute Collateral.]

|  | All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements.<br><br>The Flow DIP Orders shall contain provisions prohibiting each Loan Party from incurring any indebtedness which (x) ranks senior to the Flow DIP Obligations or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code. |
| --- | --- |
| **Carve-Out** | "Carve-Out" shall mean, collectively, the Carve Out and the JPM Carve Out (each as defined in the Final Cash Collateral Order). |
| **Adequate Protection** | "Adequate Protection" shall have the meaning set forth in the Flow DIP Orders, which, in the case of a senior priority structure, shall include a grant of a lien on the Avoidance Action Assets in favor of the beneficiaries of such Adequate Protection. |
| **Flow DIP Orders** | The Flow DIP Orders shall, among other things, (i) upon entry of the Flow Interim Order, provide that in no event shall the Flow DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, (ii) upon entry of the Flow Final Order, approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (iii) otherwise be in form and substance satisfactory to the Flow DIP Lenders. |
| **Closing Date** | The closing date of the Flow DIP Facility (the "Closing Date") shall occur within one (1) business day of the date of entry of the Flow Interim DIP Order and shall be the first business day on which the conditions precedent set forth in definitive documentation governing the Flow DIP Facility have been satisfied or waived by the Flow DIP Agent and the Flow DIP Lenders. |
| **Maturity** | All Flow DIP Obligations shall be due and payable in full and in cash, and the commitments (if any) shall terminate, on the earlier to occur (the "Maturity Date") of (i) nine months from the Closing Date, (ii) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (iii) 25 days after the Interim Order Entry Date unless on or before such day the Flow Final Order shall have been entered by the Bankruptcy Court, and (iv) a sale of all or substantially all of the assets of the Debtors.<br><br>Any confirmation order entered in the Chapter 11 Cases ("Confirmation Order") shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the Flow DIP Agent and the Flow DIP Lenders under the Flow DIP Facility, other than after the payment in full and in cash to the Flow DIP Agent and the Flow DIP Lenders of all obligations under the Flow DIP Facility on or before the effective date of such Plan of Reorganization. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate, and fees under the Flow DIP Facility are set forth in Annex I hereto. |

|  | Interest shall accrue on the principal balance of the Flow DIP Loans, from time to time, based on a 360 day year and charged for the actual number of days outstanding. Borrower shall pay interest monthly in kind in arrears on the last business day of each calendar month and on the Maturity Date. All fees and default interest shall be required to be paid in cash on the dates to be specified in the definitive documentation. |
|---|---|
| **Conditions Precedent** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Conditions Precedent to Extensions of Credit** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Covenants** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement), including, without limitation, (i) certain milestones (as set forth below)), (ii) access to the business and operations of the Loan Parties and to senior and downstream management, (iii) compliance with the 13-Week Cash Flow Forecast (subject to Permitted Variance) and with the provisions of this Flow DIP Term Sheet, (iv) a prohibition on transferring any cash or cash equivalents that constitute Collateral to a non-Loan Party except as otherwise agreed by the Flow Required Lenders (as defined below), (v) compliance with the Flow DIP Orders, (vi) a prohibition on filing, proposing, or supporting any plan of reorganization that does not indefeasibly satisfy the Flow DIP Obligations in full in cash, and (vii) maintaining its cash management system in a manner reasonably acceptable to the Flow DIP Agent.<br><br>Milestones. The Debtors shall comply with the following milestones, and the failure timely to comply shall constitute an immediate event of default under the Flow DIP Facility:<br><br>    (a) No later than [•], 2024, file a motion to approve the Flow DIP Facility (the "Motion Filing Date");<br><br>    (b) [If interim borrowing is requested, obtain entry by the Bankruptcy Court of the Flow Interim Order no later than [three (3)] business days after the Motion Filing Date;] and<br><br>    (c) Obtain entry by the Bankruptcy Court of the Flow Final Order as soon as reasonably practicable but in no event later than [twenty-five (25)] calendar days after the Motion Filing Date. |
| **Representations and Warranties** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement). |
| **Events of Default** | Usual and customary for the facilities of this type (and anticipated to be similar to the analogous provisions in the Initial DIP Credit Agreement), including (i) non-compliance with the Milestones and the covenants set forth in this Flow DIP Term Sheet, (ii) any request made by the Debtors for, or the reversal, modification, amendment, stay, |

| | reconsideration or vacatur of, a Flow DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the Flow Required Lenders, (iii) the occurrence and/or continuance of an "Event of Default" under the Initial DIP Credit Agreement, and (iv) the dismissal of the Cases or the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code. |
|---|---|
| **Credit Bidding** | The Flow DIP Agent, upon the instruction of a majority (by reference to dollar amount of outstanding Flow DIP Loans) of Flow DIP Lenders (the "Flow Required Lenders"), shall have the right to credit bid up to the full amount of the outstanding Flow DIP Obligations. |
| **Exit Facility** | At the option of the Loan Parties, all Flow DIP Loans will be (i) indefeasibly repaid in full in cash at maturity or (ii) converted into term loans at exit pursuant to a plan of reorganization or sale transaction, in each case, on terms and conditions acceptable to the Flow DIP Lenders (the "Exit Facility").  Any Exit Facility shall be on terms and conditions (including maturity, interest, fees and any make-whole) acceptable to the Flow DIP Lenders. |

### Annex I

**Interest, Fees, Etc.**

| | |
|---|---|
| **Interest Rate** | Flow DIP Loans will bear interest at the Term SOFR Rate (as defined in the Initial DIP Credit Agreement) plus 5%. |
| **Default Interest**: | During the continuance of an event of default, the Flow DIP Loans and all other outstanding obligations under the Flow DIP Facility will bear interest at an additional 2% *per annum* above the interest rate otherwise applicable. |
| **Agency Fees**: | As agreed with the Flow DIP Agent. |
| **Upfront Fee:** | 1% paid in kind on the Closing Date. |
| **Exit Fee:** | 1% paid in cash upon any repayment of the Flow DIP Loans. |