**FRIEDMAN KAPLAN SEILER**
**ADELMAN & ROBBINS LLP**
Eric Seiler *(pro hac vice pending)*
Robert J. Lack
Andrew M. Englander
Blair R. Albom
1 Gateway Center, 25th Floor
Newark, New Jersey 07102-5311
Telephone: (973) 877-6400
Facsimile:  (973) 877-6409
eseiler@fklaw.com
rlack@fklaw.com
aenglander@fklaw.com
balbom@fklaw.com

**ROPES & GRAY LLP**
Gregg M. Galardi (*pro hac vice pending*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9139
Gregg.Galardi@ropesgray.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Alex Spiro *(pro hac vice)*
Susheel Kirpalani *(pro hac vice)*
James Tecce *(pro hac vice pending)*
Benjamin Finestone *(pro hac vice)*
Kenneth Hershey *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
jamestecce@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
kenhershey@quinnemanuel.com

*Co-Counsel to Adam Neumann, Flow Global Holdings LLC, and Nazare Asset Management, LP*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>WEWORK INC., *et al.*,<br><br>Debtors.[1] | Case No. 23-19865 (JKS)<br><br>Chapter 11<br><br>Hon. John K. Sherwood |

**OBJECTION OF ADAM NEUMANN ET AL. TO**
**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN NEW POSTPETITION FINANCING,**
**(II) GRANTING LIENS AND PROVIDING CLAIMS SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these chapter 11 cases is WeWork Inc. c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.

Adam Neumann and Nazare Asset Management, LP, parties-in-interest[2] in the above-captioned chapter 11 cases of WeWork, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," the "**Company**," or "**WeWork**"), on behalf of themselves and Flow Global Holdings LLC ("**Flow**," and collectively with Flow and potential co-investors, the "**Flow Group**"), by and through their undersigned counsel, hereby file this objection to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain New Postpetition Financing, (II) Granting Liens and Providing Claims Superiority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [ECF No. 1804] (the "**DIP Motion**"),[3] and, in support thereof, respectfully state as follows.

## PRELIMINARY STATEMENT

1. The Bankruptcy Code authorizes a debtor in possession to obtain credit under section 364 to finance operations during bankruptcy. That is largely not the relief sought by the Debtors here. For reasons that remain hidden, the Debtors improperly attempt to use section 364 to sanction their entry into a novel "Exit DIP New Money Facility." The "new money" will ***not*** fund the bankruptcy estate, but rather will capitalize the Reorganized Debtors pursuant to the Plan. On or "immediately prior" to emergence, the Debtors seek authority for the Reorganized Debtors to "borrow" $400 million in exchange for ***substantially all of the Reorganized Debtors' equity to be issued pursuant to the Plan***. Such transformative change, however, cannot be accomplished through section 364 and its deferential "business judgment" standard because that statute only

---

[2] Mr. Neumann is a creditor of certain of the Debtors. *See* Proofs of Claim Nos. 87, 88. Nazare Asset Management, LP is a shareholder of the Debtors. Respondents accordingly have the right to be heard on any issue in these cases under section 1109(b) of the Bankruptcy Code.

[3] Unless otherwise specified, capitalized terms used and not defined herein shall bear the meanings ascribed to such terms in the DIP Motion.

2

4868-6262-1628.1

authorizes a **debtor in possession** to incur postpetition loans during the case. Including a request to sell equity capital for Reorganized WeWork under the guise of section 364 is the latest effort by the Debtors to disguise the true nature of the Plan—a sale of Reorganized WeWork at a discount to fair value without any market test. With the confirmation hearing scheduled just 23 days after this purported emergency "DIP" hearing, the Debtors are simply trying to use section 364 of the Bankruptcy Code to cement the terms of the Plan or sidestep the confirmation requirements of section 1129 altogether.

2. Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders "authorizing the Debtors . . . to obtain postpetition financing and to guarantee the obligations . . . with superpriority, senior secured, and priming debtor-in-possession term loan credit facilities in the aggregate principal amount not to exceed $450 million." DIP Motion ¶ 1. The purported "debtor-in-possession term loan credit facilities" that the Debtors seek permission to incur come in two shapes and sizes: $50 million in term loans "to be made immediately available" upon entry of the Court's order (the "**Interim DIP New Money Facility**") and $400 million "to be made available **on or immediately prior to emergence** . . . which **shall be equitized into the common stock of the reorganized Debtors pursuant to the Plan.**" *Id.* (emphasis added). As the Debtors' own description makes clear, the latter of these two supposed "credit facilities"[4]—which is 89% of the relief sought—will not be "available" to the Debtors until the Debtors exit bankruptcy and will immediately be "equitized into the common stock of the reorganized Debtors." *Id.*; *see also id.* ¶ 29 (describing the Exit DIP New Money Facility as a "commitment to provide an additional

---

[4] The Flow Group does not endorse any definition or term used by the Debtors to the extent that they purport to recast the true nature of the sale being conducted pursuant to the Plan as a "debt-for-equity" exchange and uses them solely for the sake of avoiding more confusion.

3

4868-6262-1628.1

$400 million of financing to support the Company's **go-forward business plan** that **will equitize at emergence**") (emphasis added).

3. In other words, the "Exit DIP New Money Facility" is **not** a loan to the debtors in possession; indeed, it is not even a loan at all. Rather, it is a $400 million investment of **equity capital** in the Reorganized Debtors—a fact that the Debtors acknowledged in their first amended plan of reorganization when they previously defined the same $400 million investment—no doubt in a way consistent with the true intent of the parties—as the "Exit Equity Commitment." *See* ECF No. 1690 at 14. But the Debtors—eager to rush through the sale of Reorganized WeWork at a massive discount to fair value—then tried to disguise this equity investment by packaging it as a purported form of debtor-in-possession financing on the eve of the disclosure statement hearing. Emboldened by conditional approval of the Disclosure Statement, the Debtors now seek approval of a sale that can only be accomplished through a chapter 11 plan under the guise of the DIP Motion.[5]

4. But the Debtors cannot evade reality—or the law—by a contrived manipulation of defined terms. The "Exit DIP New Money Facility" is in truth an **exit equity commitment**, not a DIP loan. As such, it cannot be approved pursuant to the statutory framework applicable to *bona fide* debtor-in-possession financing. While a reorganized debtor can issue equity to fund its go-forward business pursuant to a plan, section 364 by its plain terms only authorizes a "trustee" (or

---

[5] Notwithstanding the Court's conditional approval of the Debtors' Disclosure Statement, the Flow Group believes that the Debtors' Disclosure Statement lacked (and still lacks) adequate information about the Plan and that the Plan is patently unconfirmable. The Flow Group intends to object to approval of the Disclosure Statement on a final basis as well as to confirmation of the Debtors' Plan which, among other things, proposes to make distributions to unsecured creditors notwithstanding that such creditors will not be solicited, is infeasible, and violates the absolute priority rule. The Flow Group reserves the right, if necessary, to serve discovery in support of its anticipated objections.

4

4868-6262-1628.1

debtor in possession) to obtain "credit." The Debtors thus have no legal grounds to raise exit equity capital under section 364, and the DIP Motion should accordingly be denied as to the Exit DIP New Money Facility.[6]

5. The DIP Motion should be denied as to the Exit DIP New Money Facility for the separate reason that the proposed facility is an impermissible *sub rosa* plan of reorganization. As is now known (thanks in part to the Flow Group's efforts), the centerpiece of the Debtors' Plan is a sale of Reorganized WeWork to an "operating partner," Yardi Systems, Inc. ("*Yardi*") (which has agreed to cut in certain prepetition secured creditors, including its wholly owned subsidiary Cupar Grimmond, LLC ("*Cupar*")) at a substantial discount to fair value. Yet pursuant to the DIP Motion, the Debtors propose to lock in this core feature of the Plan **outside of the confirmation process** and subject only to the lax business judgment standard. But a debtor cannot use the limited authority provided by section 364 to lock in a plan of reorganization. Indeed, a well-established body of caselaw protects against precisely that outcome. Because the Exit DIP New Money Facility is indisputably such an arrangement, the Court should deny the DIP Motion as to that facility.

6. Finally, the Court should not enter an interim order approving the Debtors' entry into the DIP New Money Facilities because the DIP Motion was not properly noticed. The Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Local Rules for the U.S.

---

[6] The Flow Group objects to the Debtors' entry into the $50 million Interim DIP New Money Facility on other grounds, namely, the failure of the Debtors to comply with Federal Rule of Bankruptcy Procedure 4001(c)(1)(A)'s requirement that the proposed credit agreement must have been filed together with the DIP Motion and the failure to demonstrate that the Interim DIP New Money Facility is "necessary to avoid immediate and irreparable harm" pending a final hearing—an interim DIP order cannot approve anything more than that. *See* Fed. R. Bankr. P. 4001(c)(2). From an initial review of the budget filed at 7:00 p.m. ET the night before this objection was due, *see* ECF No. 1840, it appears the Debtors will be unable to meet their evidentiary burden.

5

Bankruptcy Court for the District of New Jersey (the "*Local Rules*") require the Debtors to file a copy of the proposed credit agreement *together with* any motion to obtain postpetition credit. The Debtors failed to do so and even if they do so on the eve of the hearing, that does not comply with the rules or due process.  At a minimum, this means that any "premiums, fees, or interest" contained in those documents cannot be approved even if the Court authorizes an interim borrowing up to some amount to "avoid immediate and irreparable harm" pending a final hearing. Moreover, because the Debtors will not obtain any funds under the Exit DIP New Money Facility until they emerge from bankruptcy, no exigencies could possibly justify approving the Debtors' entry into that facility—even on an interim basis—with inadequate notice.

7. For these reasons and those set forth below, the DIP Motion should be denied.

**OBJECTION**

**I.    Section 364 Does Not Authorize The Debtors To Obtain Exit Financing**

8. Pursuant to the DIP Motion, the Debtors seek approval under section 364 of the Bankruptcy Code to enter into the DIP New Money Facilities.  *See, e.g.*, DIP Motion ¶ 25 ("Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing."); *id.* ¶ 30 ("The Debtors propose to obtain financing under the DIP New Money Facilities by providing security interests . . . and superpriority claims . . . pursuant to sections 364(c) and 364(d) of the Bankruptcy Code."); *id.* ¶ 36 ("[T]he relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.").  But section 364 does not authorize a debtor to obtain exit financing, and thus provides no basis for this Court to approve the DIP New Money Exit Facility.

9. Section 364(c) provides that "[i]f *the trustee* is unable to obtain unsecured credit . . . the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt . . . with priority over any or all administrative expenses of the kind specified in section 503(b) . . . of this title; [ ] secured by a lien *on property of the estate* that is not otherwise subject to a lien;

6

or [ ] secured by a junior lien *on property of the estate* that is subject to a lien." 11 U.S.C. § 364(c) (emphasis added).  Section 364(d) further provides, in relevant part, that "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien *on property of the estate* that is subject to a lien only if—[ ] *the trustee* is unable to obtain such credit otherwise; and [ ] there is adequate protection of the interest of the holder of the lien *on the property of the estate* on which such senior or equal lien is proposed to be granted." *Id.* § 364(d) (emphasis added).  Section 364(c) and (d) thus authorize a bankruptcy trustee (or debtor in possession) to obtain "credit" or incur "debt," and allow the debtor to secure such debt with a lien "on the property of the estate."

10.     This grant of authority plainly does not authorize a debtor to issue shares to fund its go-forward business plan after it has exited bankruptcy.  As one court has aptly explained, "[s]ection 364 is designed to provide a mechanism for the trustee or debtor-in-possession to obtain credit to finance the operation of the business of the debtor or to fund the administering of the bankruptcy case, not to finance post-confirmation operations after the property of the estate has vested in the reorganized debtor." *In re Aspen Club & Spa, LLC*, 2020 WL 4251761, at *11 (B.A.P. 10th Cir. July 4, 2020).  Indeed, that section 364 only authorizes a trustee or debtor in possession to obtain credit is confirmed "[b]y its express terms," which "refer only to obtaining of credit by the bankruptcy trustee, or Debtors-in-Possession . . . and refer to incurring debt secured by a lien on 'property of the estate.'" *In re City of Detroit*, 524 B.R. 147, 276 (Bankr. E.D. Mich. 2014).  Upon their exit from bankruptcy, the Debtors will "no longer [be] Debtors-in-Possession," *id.*, and "no property [will] remain[ ] in the estate to which a lien can attach," *In re SAI Holdings Ltd.*, 2012 WL 3201893, at *7 (Bankr. N.D. Ohio Aug. 3, 2012); *see* 11 U.S.C. § 1141(b) ("[T]he confirmation of a plan vests all of the property of the estate in the debtor.").  Accordingly,

4868-6262-1628.1

because the Exit DIP New Money Facility is in reality a $400 million equity investment in the Reorganized Debtors—and not a loan to the Debtors to fund their chapter 11 cases—the Debtors cannot invoke section 364 in support of their entry into the facility. *See In re City of Detroit*, 524 B.R. at 276 ("The City argues that § 364 does not apply to post-confirmation exit financing. The Court agrees."); *In re Les Ruggles & Sons, Inc.*, 222 B.R. 344, 345 (Bankr. D. Neb. 1998) (concluding that section 364 "does not apply to post-confirmation borrowings"); *In re Hickey Props., Ltd.*, 181 B.R. 173, 174 (D. Vt. 1995) (same).

11. The Debtors cannot obtain approval of the Exit DIP New Money Facility under the auspices of section 364 and have identified no other provision of the Bankruptcy Code that authorizes the relief they seek. The DIP Motion should accordingly be denied as to the Exit DIP New Money Facility.

**II.    The Exit DIP New Money Facility Is An Impermissible *Sub Rosa* Plan**

12. The Court should deny the DIP Motion as to the Exit DIP New Money Facility for the separate reason that the facility is an improper *sub rosa* plan of reorganization. It is well established that "[a] bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 815-16 (Bankr. S.D.N.Y. 2020). Accordingly, "[w]hen a transaction . . . in bankruptcy has the effect of 'dictating some of the terms of any future reorganization plan," the transaction is "impermissible" because it "short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan *sub rosa*." *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 284-85 (3d Cir. 2016). To determine whether a proposed financing arrangement improperly dictates the terms of a plan, courts "look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all . . . by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other

8

parties in interest." *In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018).

13. Here, there can be no question that the Exit DIP New Money Facility grants the DIP New Money Lenders "excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest," *id.*, and "dictat[es] some of the terms of any future reorganization plan," *In re Energy Future Holdings*, 648 F. App'x at 284. As set forth above, the Exit DIP New Money Facility is not a *bona fide* loan to carry the Debtors through their chapter 11 cases; rather, it is a sale of ***substantially all of the equity of Reorganized WeWork to the DIP New Money Lenders.*** *Cf., e.g.*, *Laffite*, 2018 WL 272781, at *3 ("The size of the proposed transaction in relation to all estimates of value of the property is sufficiently large that the proposed priming lien amounts to a sub rosa plan.").[7]

14. The Debtors acknowledge as much, explaining in the DIP Motion that "the Exit DIP New Money Facility shall receive approximately eighty percent of the equity interests in the Reorganized Debtors at emergence." DIP Motion ¶ 21. Conspicuously omitted from this disclosure, however, is that the New Money DIP Lenders are also slated to receive a "DIP New Money Initial Commitment ***Premium***" equal to ***an additional 10%*** of the Reorganized Debtors' equity. *See* ECF No. 1818 at 20 n.14. Thus, the Exit DIP New Money Facility will, if approved, actually authorize the transfer of ***90% of the equity of Reorganized WeWork*** to the DIP New Money Lenders in exchange for $400 million—the centerpiece of the Debtors' Plan.[8]

---

[7] While perhaps just another example of a "boilerplate" provision, for this reason, paragraph 19 of the Proposed Interim Order must be stricken. That "Limitation of Liability" paragraph can only be reserved for true third-party lenders, and not for the very institutions who indisputably will be controlling shareholders under the terms of the Exit DIP New Money Facility.

[8] Although this initial equity allocation is subject to dilution, the extent of the dilution is opaque and has not been adequately explained by the Debtors. Regardless, it is clear that the DIP New Money Lenders (including Yardi/Cupar) will retain a controlling stake of the Company, even

9

4868-6262-1628.1

15. Far from merely providing financing to the Debtors to fund their chapter 11 cases, the DIP New Money Exit Facility will lock in the very outcome that the DIP New Money Lenders hope to achieve through confirmation of the Plan: the purchase of WeWork at a massive 42% discount to the equity value estimated by the Debtors' own investment banker. Pursuant to the DIP New Money Exit Facility, the DIP New Money Lenders will obtain a 90% stake in WeWork for $400 million, for a total implied equity value of $444.4 million. That valuation is $320.6 million less than the $765 million midpoint equity value estimated by PJT Partners, *see* ECF No. 1706 at 2, implying a discount of 41.9%.[9]

16. The DIP New Money Exit Facility, if approved, will thus irrevocably dictate the ownership and control of the Debtors following their emergence from bankruptcy and will insulate the defining feature of the Debtors' Plan from scrutiny. The rule against *sub rosa* plans of reorganization exists precisely to prevent such an outcome. *See, e.g.*, *In re SAS AB*, 644 B.R. 267, 271-72 (Bankr. S.D.N.Y. 2022) ("[I]t is very clear that decisions about the issuance of equity in the reorganized debtors should be reserved for the plan process."); *Latam Airlines*, 620 B.R. at 819 ("[T]he Tranche C DIP Facility necessarily determines plan terms giving the Debtors the right to distribute equity in the reorganized Debtors to the Tranche C Lenders – at a 20% discount to fair value – that will not be subject to court review. That 'short circuits' the chapter 11 review process under the Bankruptcy Code, by establishing plan terms sub rosa in the Tranche C DIP Facility.");

---

after taking dilution into account. *See, e.g.*, ECF No. 1818 at 36-37 (noting that the "Corporate Governance Term Sheet . . . shall be subject to the consent of the Required Consenting Stakeholders"). The "Required Consenting Stakeholders" are "the SoftBank Parties, Cupar, and the Required Consenting AHG Noteholders." ECF No. 1816 at 25.

[9] Before last week's hearing to conditionally approve the Debtors' Disclosure Statement, the amount of the DIP New Money Initial Commitment Premium had not been disclosed. *See* ECF No. 1757 at 12. Based on the information available at the time of the hearing, the Flow Group believed the discount to be a "mere" 34.6%.

10

*In re McClure*, 2015 WL 1607365, at *8 (Bankr. C.D. Cal. Apr. 2, 2015) ("[T]he sale of substantially all of the debtor's assets in and of itself may be considered a *sub rosa* plan."); *In re Belk Props., LLC*, 421 B.R. 221, 225-26 (Bankr. N.D. Miss. 2009) (concluding that financing proposal in which a putative lender would obtain between 51% and 90% of the Debtors' equity was an improper *sub rosa* plan).

17. The Debtors cannot escape the requirements of section 1129 of the Bankruptcy Code by selling substantially all of their post-reorganization equity under the false pretense of seeking "DIP" financing 23 days prior to the confirmation hearing. For this independent reason, because the DIP New Money Exit Facility would, if approved, substantially dictate the terms of the Debtors' Plan, the Court should deny the DIP Motion as to that facility.

### III. The Role Of Insiders/Potential Insiders Requires A Market-Check

18. Such a disguised sale is particularly concerning here as there can no longer be any dispute as to the close relationships among the Debtors and the parties purchasing or ultimately holding the controlling interests in the Reorganized Debtors. The vast majority of the so-called "DIP New Money Loans" is being provided by Cupar, a potential insider of the Debtors[10] as an

---

[10] While relevant facts are only now beginning to be revealed, others are likely to come to the surface and, thus, it bears emphasizing that the Third Circuit has set forth the criteria of when parties may be considered an "insider" for Bankruptcy Code purposes: "[I]t is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship between debtor and creditor and anything other than closeness to suggest that any transactions were not conducted at arm's length.'" *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396-97 (3d Cir. 2009) (quoting *In re U.S. Med.*, 531 F.3d 1272, 1277 (10th Cir. 2008)) (brackets and alterations omitted); *see* S. Rep. No. 95-989, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."); *see also In re Miller Homes, LLC*, 2009 WL 4430267, at *6 (Bankr. D.N.J. Nov. 25, 2009) ("The Bankruptcy Code's concern is whether a person is able to exert influence over a debtor so as to gain a more favorable position.") (quoting *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 428 (Bankr. S.D.N.Y. 2005)) (internal quotation marks omitted); *In re Foothills of Tex., Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) ("The Third Circuit's focus of inquiry is in accord with the plain meaning of insider–'a person who is within some society,

11

affiliate of the Debtors' existing operating partner Yardi and large holder of first lien claims, see Apr. 23, 2024 Hr'g Tr. at 6:2-3, which will initially receive 60% of the New Interests. And while the SoftBank Parties, the Debtors' prepetition equity sponsor, one of its largest lenders and an undeniable insider, will not only receive some equity on account of its outstanding first lien claims, they will also have the opportunity both to obtain additional New Interests by immediately equitizing the drawn letters of credit for which they posted collateral and obtain further New Interests as the remaining letters of credit for which they posted collateral are drawn in the future. And worse, it still appears under the RSA[11] and the Plan that the SoftBank Parties will be the only holders of existing equity interests to retain such interests in clear violation of the absolute priority rule. *See* ECF No. 1818 at 86 (stating that the RSA Transactions contemplate, among other things, "the cancelation of all other indebtedness and preexisting equity Interests in the Reorganized Company, as further set forth in the RSA (other than any equity Interests held by the SoftBank Parties with respect to which, pursuant to the Plan and as agreed by the Parties to the RSA, a SoftBank Party contributes its Claims in exchange for the retention of its equity interests)").[12]

19.  Therefore, under the circumstances, the DIP New Money Facilities and the Plan raise significant questions regarding the confirmability of the Plan because of the Debtors' decision to impermissibly offer certain parties, including insiders, the exclusive opportunity to purchase

---

organization, etc.; a person who is party to a secret, *esp. so as to gain an unfair advantage*.'") (quoting I Shorter Oxford English Dictionary 1394).

[11] While the DIP Motion references an "Amended RSA," no such Amended RSA has been filed.

[12] The Court cannot accept the Debtors' representation that SoftBank will retain its interests solely on account of its contributed claims at face value. The Plan violates the absolute priority rule to the extent that SoftBank's extant equity interests played any role in its ability to retain those interests under the Plan. *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 96 (2d Cir. 2011) ("[A] transfer partly on account of factors other than the prior interest is still partly 'on account of' that interest. . . . [R]eceipt of property partly on account of the existing interest [is] enough for the absolute priority rule to bar confirmation of the plan.").

New Interests in the Reorganized Debtors without first market-testing such interests. *See Bank of Am. Nat'l Tr. & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 458 (1990) (holding that a plan violated the absolute priority rule when it provided "junior interest holders with exclusive opportunities free from competition and without benefit of market valuation"). Further, given the appearance of a partnership or joint venture between Yardi and the SoftBank Parties to obtain control of Reorganized WeWork, the DIP Motion and the Plan raise not only issues under *LaSalle* but also questions as to the adequacy of the disclosures and whether the Plan can be confirmed under, among others, Bankruptcy Code sections 1129(a)(1)-(3) and (5).[13]

### IV. The Debtors Have Not Provided Sufficient Notice

20. Finally, the Court should deny the DIP Motion because the Debtors have not provided sufficient notice of the DIP New Money Facilities' terms as required by the Bankruptcy Rules and the Local Rules. Bankruptcy Rule 4001(c)(1)(A) **requires** the Debtor to file "a copy of the credit agreement" together with its motion and proposed form of order. Fed. R. Bankr. P. 4001(c)(1)(A). Similarly, Local Rule 4001-3 requires the Debtor to "summarize" the material provisions and "identify the location of each [such provision] in any relevant document." Local R. 4001-3(c). The Debtors did not timely file a copy of the DIP New Money Documents, *see* DIP Motion Exs. 3(i)-(ii), and as such have not complied with the Bankruptcy Rules or the Local Rules.

21. What makes this worse is that the devil will be in the details. ***The DIP Motion makes 17 references to the "DIP New Money Documents," yet the Debtors have failed to provide the Court or parties in interest with copies of those documents.*** At a minimum, this means that

---

[13] The Flow Group reserves all rights to investigate the nature of the relationships among the Debtors, Cupar, Yardi, and the SoftBank Parties, as well as the insider nature of the transactions contemplated by the DIP Motion and the Plan and to raise any objections based on *LaSalle* and any disclosed and undisclosed relationships in connection with proceedings on confirmation of the Plan.

any interim order approving DIP financing in whatever amount can be proven to be "necessary to avoid immediate and irreparable harm to the estate pending a final hearing," Fed. R. Bankr. P. 4001(c)(2), must not include the approval of any "premium, fees, and interest," DIP Motion ¶ 39, that are no doubt contained in documents that were not filed in accordance with the Bankruptcy Rules or Local Rules. Moreover, because the Debtors will not receive the proceeds of the DIP New Money Exit Facility until *after* they emerge from bankruptcy, no exigencies could possibly justify approval of the DIP New Money Exit Facility with inadequate notice—even on an interim basis.

## CONCLUSION

22. For the reasons set forth above, the Court should deny the DIP Motion.

| | |
|---|---|
| Dated: May 4, 2024 | **FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP** |
| | */s/ Robert J. Lack* |
| | Eric Seiler *(pro hac vice pending)* |
| | Robert J. Lack |
| | Andrew M. Englander |
| | Blair R. Albom |
| | 1 Gateway Center, 25th Floor |
| | Newark, New Jersey 07102-5311 |
| | Telephone: (973) 877-6400 |
| | Facsimile: (973) 877-6409 |
| | Email: eseiler@fklaw.com |
| |       rlack@fklaw.com |
| |       aenglander@fklaw.com |
| |       balbom@fklaw.com |
| | -and- |
| | **ROPES & GRAY LLP** |
| | Gregg M. Galardi (*pro hac vice pending*) |
| | 1211 Avenue of the Americas |
| | New York, New York 10036 |
| | Telephone: (212) 596-9139 |
| | Gregg.Galardi@ropesgray.com |
| | -and- |
| | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| | Alex Spiro *(pro hac vice)* |
| | Susheel Kirpalani *(pro hac vice)* |
| | James Tecce *(pro hac vice pending)* |
| | Benjamin Finestone *(pro hac vice)* |
| | Kenneth Hershey *(pro hac vice)* |
| | 51 Madison Avenue, 22nd Floor |
| | New York, New York 10010 |
| | Telephone: (212) 849-7000 |
| | Email: alexspiro@quinnemanuel.com |
| |       susheelkirpalani@quinnemanuel.com |
| |       jamestecce@quinnemanuel.com |
| |       benjaminfinestone@quinnemanuel.com |
| |       kenhershey@quinnemanuel.com |
| | *Co-Counsel to Adam Neumann, Flow Global Holdings LLC, and Nazare Asset Management, LP* |

15

4868-6262-1628.1