| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COLE SCHOTZ P.C.** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Michael D. Sirota, Esq. |
| Edward O. Sassower, P.C. | Warren A. Usatine, Esq. |
| Joshua A. Sussberg, P.C. (admitted *pro hac vice*) | Felice R. Yudkin, Esq. |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | Ryan T. Jareck, Esq. |
| Ciara Foster (admitted *pro hac vice*) | Court Plaza North, 25 Main Street |
| 601 Lexington Avenue | Hackensack, New Jersey 07601 |
| New York, New York 10022 | Telephone: (201) 489-3000 |
| Telephone: (212) 446-4800 | msirota@coleschotz.com |
| Facsimile: (212) 446-4900 | wusatine@coleschotz.com |
| edward.sassower@kirkland.com | fyudkin@coleschotz.com |
| joshua.sussberg@kirkland.com | rjareck@coleschotz.com |
| steven.serajeddini@kirkland.com | |
| ciara.foster@kirkland.com | |
| | |
| *Co-Counsel for Debtors and* | *Co-Counsel for Debtors and* |
| *Debtors in Possession* | *Debtors in Possession* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WEWORK INC., *et al.*, | Case No. 23-19865 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF JAMIE BAIRD
IN SUPPORT OF THE DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN NEW
POSTPETITION FINANCING, (II) GRANTING LIENS AND
PROVIDING CLAIMS SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims Agent at https://dm.epiq11.com/WeWork. The location of Debtor WeWork Inc.'s principal place of business is 12 East 49th Street, 3rd Floor, New York, NY 10017; the Debtors' service address in these Chapter 11 Cases is WeWork Companies U.S. LLC c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005.

I, James H. Baird, III, hereby declare under penalty of perjury as follows:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"). PJT is a global investment banking firm listed on the New York Stock Exchange and has its principal offices at 280 Park Avenue, New York, New York 10017. PJT has been engaged as the investment banker for the debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors") since September 2023.

2. For the past eight months, my team and I have worked closely with the Debtors on their current restructuring process. As such, I am familiar with the Debtors' operations, business affairs, financial performance, and restructuring efforts.

3. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain New Postpetition Financing, (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP New Money Motion"),[2] which seeks approval to obtain postpetition financing and to guarantee the obligations in connection with superpriority, senior secured, and priming debtor in possession ("DIP") credit facilities in the aggregate principal amount not to exceed $450 million, consisting of: (i) up to $50 million in term loans (the "DIP New Money Interim Facility") to be made immediately available upon entry of the DIP New Money Interim Order and the satisfaction of the other conditions precedent in the DIP New Money

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Plan, the DIP New Money Interim Order, the DIP New Money Term Sheet, the Interim DIP New Money Credit Agreement, the Exit DIP New Money Credit Agreement, the *Declaration of David Tolley, Chief Executive Officer of WeWork Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 21], or the *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Final Cash Collateral Order") [Docket No. 428], as applicable.

2

Documents; and (ii) up to $400 million to be made available on or immediately prior to emergence and upon satisfaction of the other conditions precedent in the DIP New Money Documents, which will repay the $50 million DIP New Money Interim Facility, pay exit costs, fund the post-emergence balance sheet, and equitize into the common stock of the reorganized Debtors pursuant to the Plan (the "DIP New Money Exit Facility" and, together with the DIP New Money Interim Facility, the "DIP New Money Facilities").

4. All statements set forth in this Declaration are based on my experience, my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, information I have learned from my review of relevant documents, information supplied to me by members of the Debtors' management and/or their other advisors, and/or information that I have received from employees of PJT working directly with me or under my supervision or direction. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional that has been retained by the Debtors.[3] I am authorized to submit this Declaration on behalf of the Debtors, and, if called to testify as a witness, I could and would testify competently to the statements set forth herein.

## Qualifications

5. PJT is a leading global financial advisory firm with more than 1,000 employees in eleven offices in the U.S., Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment

---

[3] Pursuant to PJT's engagement letter with the Debtors, which has been approved by the Court, PJT will be entitled to receive certain fees in connection with the financing facilities described herein.

banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

6. I joined PJT when it first spun off from The Blackstone Group L.P. ("Blackstone") in 2015. I started at Blackstone in 2002 and over the years held numerous positions there, including as a Managing Director in the Restructuring and Reorganization Group immediately prior to the spin-off. I hold a Master of Business Administration with a concentration in finance from Columbia Business School and a Bachelor of Arts from Bowdoin College.

7. I have over twenty years of experience advising financially distressed companies, municipalities, creditors, and sponsors in chapter 11 restructurings, out-of-court workouts, and other special situations, and my representations have collectively involved over $150 billion in liabilities. I have worked across numerous industries including municipals, gaming, media and telecom, retail, automotive, industrials, aerospace, financials, real estate, insurance, and oil and gas. Select publicly disclosed transactions on which I have worked include: 24 Hour Fitness, AIG, Bon-Ton Stores, Centric Brands, Covia, Cumulus Media, Deluxe Entertainment, Detroit, Ford Motor Company, FullBeauty Brands, General Motors, Gibson Brands, Houghton Mifflin, Hovnanian Enterprises, iHeartMedia, ILFC, J. Crew, Loyalty Ventures, Mohegan Tribal Gaming Authority, Monitronics, Noranda Aluminum, Preferred Sands, Puerto Rico, Sequa, SemGroup, Star Tribune, and Tailored Brands.

8. On or around September 1, 2023, PJT was engaged by the Debtors to provide advisory and investment banking services in connection with the Debtors' potential restructuring. Since that time, PJT has been involved in negotiations with the Debtors' capital structure

constituents on the terms of the RSA, the Debtors' efforts to obtain the consensual use of cash collateral, and the Debtors' efforts to obtain both the DIP LC Facility and other debtor-in-possession and exit financing. Prior to its September 2023 engagement, the Debtors had previously engaged PJT in October 2021 to provide financial advisory services in connection with its merger with BowX Acquisition Corp. In addition, subsequent to that transaction, PJT was engaged by the Debtors in December 2022 in connection with potential refinancing, restructuring, and/or recapitalization transactions which culminated with the consummation of a recapitalization transaction in May 2023.

9. As a result of the prepetition and postpetition work PJT has performed on behalf of the Debtors, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, capital structure, assets, key stakeholders, financing documents, and other related materials and information.

**The DIP New Money Facility**

10. In January 2024, the Debtors, in consultation with their advisors, including PJT, determined that it may be prudent for the Debtors to raise new money financing to carry the Debtors through the remainder of these Chapter 11 Cases and provide capital to fund the Debtors' exit costs. Following several months of good-faith, arm's-length negotiations, the Debtors and the DIP New Money Lenders reached an agreement in principle as to the terms of the DIP New Money Interim Facility and the DIP New Money Exit Facility, which together are anticipated by the Debtors to (i) carry the Debtors through the conclusion of these Chapter 11 Cases, (ii) provide sufficient liquidity for the Debtors to pay all administrative claims in full, in cash, and (iii) ensure that the Debtors are adequately capitalized upon emergence from these Chapter 11 Cases.

11. The proposed DIP New Money Facilities will serve as the foundation for a consensual deal among the Company and the RSA Parties and provide the Debtors with access to

up to $450 million of liquidity ($400 million net liquidity to the Company) in the form of superpriority, senior secured, and priming credit facilities, of which $50 million will be made immediately available to the Debtors upon entry of the DIP New Money Interim Order and the satisfaction of other conditions precedent in the DIP New Money Documents. In addition to providing the Debtors with the funding necessary to address their anticipated immediate liquidity needs, the DIP New Money Lenders have also committed to fund up to an additional $400 million in the form of the DIP New Money Exit Facility to be made available immediately prior to or upon emergence from these Chapter 11 Cases, which will support the Debtors' business plan and go-forward operations in addition to allowing the Debtors to satisfy their administrative claims, including payment of DIP New Money Interim Facility Claims, in cash in full on the effective date.

12. The proposed DIP New Money Facilities demonstrate the RSA Parties' continued support of, and commitment to, the Debtors, as well as their belief in the Debtors' future earning potential and viability as a go-forward business. The DIP New Money Lenders have agreed to equitize their DIP New Money Exit Facility Claims in full upon emergence pursuant to the Plan, which is a critical component of these agreements considering the Company will likely not be able to support debt in the near term after emergence.

### The Debtors' Efforts to Obtain Postpetition Financing

13. The Debtors, in consultation with PJT and their other advisors, concluded that there was not an immediate need for postpetition financing at the outset of these Chapter 11 Cases. The Debtors instead chose to rely on cash collateral and the DIP LC Facility to meet their operating needs during the initial weeks of bankruptcy. The Debtors, their advisors, and the RSA Parties, however, recognized that the Debtors would likely require incremental financing on or prior to emergence, depending on the direction and the duration of these Chapter 11 Cases. While the form of the new money financing (a DIP financing, exit financing, or both) was yet to be determined,

6

the likely need for new money financing was discussed among the Consenting Stakeholders early in these Chapter 11 Cases.

14. To that end, in early 2024, the Debtors' advisors began engaging with the RSA Parties on their willingness to provide the Debtors with incremental postpetition financing. In connection with these preliminary discussions, on February 1, 2024, the Debtors circulated an initial draft term sheet to the RSA Parties. Since that time, the Debtors and their advisors have engaged extensively with the RSA Parties to negotiate the framework and terms of a postpetition financing facility that would provide the Debtors with the necessary liquidity to operate their business in the ordinary course and pay all administrative claims in full, while also retaining the support of the RSA Parties who represent more than 95 percent of the Debtors' secured claims. During these conversations, certain of the RSA Parties indicated that they were willing to provide DIP and exit financing, subject to mutually agreeable terms, and that they may seek to terminate the consensual use of Cash Collateral, accelerate the DIP LC Facility, and terminate the RSA if the Debtors pursued a new DIP financing proposal without their consent.

15. In parallel, on January 30, 2024, the board of directors discussed PJT's commencement of a formal DIP marketing process designed to canvas the market and identify the optimal solution to the Debtors' financing needs. PJT began the marketing process by developing a list of, and then reaching out to, thirty potential counterparties, including seven banks and twenty-three non-bank alternative lenders capable of providing postpetition financing. PJT discussed with these parties their willingness to provide DIP financing, either on a junior basis or a non-consensual priming basis. Four of those parties (the "Potential DIP Financiers") demonstrated an initial interest in learning about the financing opportunity and the Debtors, therefore, began sharing diligence with these Potential DIP Financiers after signing appropriate

7

non-disclosure agreements. Ultimately, none of the parties that PJT reached out to, including the Potential DIP Financiers, were interested in moving forward with providing alternative DIP financing proposals. Among other reasons, they were unwilling to: (a) provide a DIP facility on a junior basis given the considerable amount of the Debtors' existing secured debt; (b) participate in a non-consensual priming financing process; or (c) lend against the Debtors' relatively limited pool of unencumbered assets that could be utilized for a non-priming DIP facility.

16. In addition, in December 2023, before PJT had commenced the DIP marketing process described above, a group of co-investors (the "Flow Parties") affiliated with Adam Neumann, WeWork's co-founder and former chief executive officer, approached the Debtors to express an interest in a potential acquisition of the Company. On December 14, 2023, PJT hosted the Flow Parties for an initial in-person meeting at their New York office. The meeting included Mr. Adam Neumann, and certain of his team members and advisors, as well as Mr. David Tolley, the Company's CEO, and certain PJT representatives. During this initial meeting, the Flow Parties asked the Debtors to enter into a non-disclosure agreement and share material non-public information to inform the formation of a bid for an acquisition of the Company. PJT informed the Flow Parties that, although the Debtors were not running a formal sale process for the Company at that time, they would evaluate any good-faith proposals, including any proposals to provide DIP financing, and asked the Flow Parties to utilize the information the Debtors had already disclosed in the public domain to inform a potential bid, should they desire. Subsequently, PJT and the Flow Parties (specifically members of 166 2nd Financial Services, the family office of Adam Neumann, and their advisors) participated in a series of business diligence calls on December 20, 2023, January 2, 2024, and January 4, 2024. Throughout these discussions, as well as over email, PJT answered various diligence requests by the Flow Parties regarding, among other things, (a) the

8

November 7, 2023 cleansing materials, including the business plan and projections contained therein, filed in connection with these Chapter 11 Cases, (b) the Debtors' capital structure, and (c) the Debtors' pro forma equity ownership.

17. On January 23, 2024, the Debtors and their advisors even shared examples of DIP financing that have been successful in Chapter 11 cases of similar size and complexity with the Flow Parties and their advisors, at their request. Thereafter, on January 26, 2024, the Flow Parties sent a term sheet to the Debtors that proposed a $200 million new money priming DIP facility (the "Initial Flow DIP Proposal"). While the Initial Flow DIP Proposal indicated in a footnote the Flow Parties' potential willingness to discuss a *pari passu* or junior DIP financing, their proposal focused on a structure that sought to prime the Debtors' existing secured lenders.

18. Following receipt of the proposal, in late January and early February, WeWork and its board of directors considered the Initial Flow DIP Proposal and determined that it did not constitute an actionable offer and would be value-destructive to the Debtors primarily because, as noted above, the Debtors had commenced discussions with the RSA Parties regarding a potential new money DIP financing and were informed that entering into a priming facility that lacked support from the Consenting Stakeholders would have resulted in termination of the RSA, termination of the consensual use of cash collateral, and immediate acceleration of the DIP LC Facility.

19. Although the Debtors determined in their business judgment that the Initial Flow DIP Proposal was not actionable, we continued to engage with the Flow Parties to enhance their proposal over the following weeks, in case anything changed, as we would with any interested third-party. In early February 2024, the Debtors engaged in telephonic discussions with the Flow Parties and informed them of the deficiencies in the Initial Flow DIP Proposal. The Debtors

9

informed the Flow Parties that a priming DIP was not actionable without the support of the Consenting Stakeholders and provided the Flow Parties with information on the requisite number and/or percentage of Consenting Stakeholders who would need to support a priming DIP to avoid a termination of the RSA.

20. Following these discussions, on March 11, 2024, the Flow Parties provided the Debtors with a subsequent proposal (the "Revised Flow Proposal," together with the Initial Flow DIP Proposal, the "Flow Proposals"), which included (a) a non-binding offer to acquire the reorganized company for $650 million, and (b) a non-binding proposal for up to $250 million in DIP financing. As with the Initial Flow DIP Proposal, although the Revised Flow Proposal stated in a footnote that the Flow Parties may consider a *pari passu* or junior DIP facility, their proposal focused on a structure that sought to prime the Company's secured creditors. The provision of junior capital was not central to discussions with the Flow Parties. In addition, given the feedback received from PJT's marketing process and the Flow Parties' own proposal to purchase the Company for $650 million, in my judgment, the Flow Parties would not, in fact, have provided junior DIP financing below approximately $4 billion of secured debt. Therefore, in my view, the Flow Parties' alleged interest in providing junior DIP financing was not credible. Further, the Flow Parties, who have publicly stated their intention to potentially compete with WeWork,[4] requested sensitive, material, and non-public information in connection with the proposal, which

---

[4] Fortune Magazine, *Adam Neumann Explains Why Marc Andreesen Invested $350 Million in "Flow,"* YouTube (July. 20, 2023), https://youtu.be/pvN_P2fLzNQ?t=416 ("I think Flow has only two choices: compete or partner"); *see also* Anne Sraders, *Fortune* (July 11, 2023), https://fortune.com/2023/07/11/adam-neumann-new-company-flow-compete-wework/.

the Debtors were not willing to provide to a potential competitor whose proposal was not actionable.

21. After evaluating the Revised Flow Proposal, the Debtors, with the assistance of PJT and their other advisors, concluded that it was not actionable because, among other things, the consideration offered to existing secured creditors in the Revised Flow Proposal was well below the amount required to pay off the Debtors' nearly $4 billion in secured debt obligations, and it lacked the support of the Required Consenting Stakeholders, who would need to vote in favor of such an alternative Plan.

22. As of the date hereof, I am not aware of other proposals from the Flow Parties other than the Flow Proposals discussed above. Nor am I aware of any other DIP proposals from any other sources. Based on the third-party DIP marketing process, the Debtors concluded that it was in the best interest of their estates to avoid a costly due diligence exercise for a proposal that was unlikely to yield better results than the proposed DIP New Money Facilities, and continued to focus their efforts on negotiating the terms thereof with the DIP New Money Lenders.

23. On April 28, 2024, the Debtors and the DIP New Money Lenders reached an agreement in principle as to the terms of the DIP New Money Interim Facility and the DIP New Money Exit Facility, which together are anticipated to: (a) carry the Debtors through the conclusion of these Chapter 11 Cases, (b) provide sufficient liquidity for the Debtors to pay all Administrative Claims, including Stub Rent claims and any deferred postpetition rent obligations, in full in cash, and (c) ensure that the Company is adequately capitalized upon emergence from these Chapter 11 Cases. For the reasons discussed above, I believe that the DIP New Money Facilities are the most viable and value maximizing path forward for the Debtors.

**The Economic Terms of the DIP New Money**

**Facilities Are, Taken as a Whole, Reasonable Under the Circumstances**

24. In connection with the proposed DIP New Money Facilities, the Debtors have agreed, subject to Court approval and the finalization of the DIP New Money Exit Credit Agreement, to pay interest and certain fees. Specifically, the Debtors have agreed to pay, among other things:

    (a) **Interest Rate**: The Borrower will pay interest at SOFR plus 10.0 percent paid-in-kind for amounts drawn under the DIP New Money Facilities (the "Interest Rate").

    (b) **Fees**:

        (i) Initial Commitment Premium: A premium equal to 12.5 percent paid-in-kind of the Cupar and AHG Exit DIP tranches. The Initial Commitment Premium shall equate to 10 percent of the reorganized equity, subject to dilution from the DIP TLC Fee Equity Distribution, Adyen LC Equity Distribution, Exit LC Assigned Cash Collateral Equity Distribution, Exit LC SoftBank Cash Collateral Equity Distribution, Exit LC Lender Fees, and the MIP;

        (ii) Extension Premium: A premium of up to 3 percent paid-in-kind in connection with extension of the maturity date, with 0.5 percent earned, due and payable on each extension date; and

    (c) **Ticking Premium**: SOFR plus 5.0 percent paid-in-kind on undrawn amounts.

    (d) **Make Whole**: Non-call through maximum nine-month maturity.

25. The DIP New Money Interim Facility will be paid in full in cash from proceeds of the DIP New Money Exit Facility at emergence. The DIP New Money Exit Facility (including interest and fees but excluding the Initial Commitment Premium) will convert into 80 percent of the reorganized equity at emergence, subject to dilution from the DIP TLC Fee Equity Distribution, Adyen LC Equity Distribution, Exit LC Assigned Cash Collateral Equity Distribution, Exit LC SoftBank Cash Collateral Equity Distribution, Exit LC Lender Fees, and the MIP.

26. In addition, the proposed DIP New Money Facilities contain milestones that will push these Chapter 11 Cases toward completion as quickly as possible. Therefore, based on my extensive experience facilitating similar restructuring transactions, I believe that the economic terms of the proposed DIP New Money Facilities, taken as a whole, are reasonable in light of the circumstances of these Chapter 11 Cases.

### The DIP New Money Facilities, Taken as a Whole, Are the Best Financing Arrangement Currently Available to the Debtors

27. Based on my experience with DIP financing transactions as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP New Money Facilities, taken as a whole, are the best financing option currently available to the Debtors under the facts and circumstances of these Chapter 11 Cases and that the Debtors are unlikely to secure alternative additional DIP financing on better terms absent a potentially value-destructive priming fight.

28. The proposed DIP New Money Facilities offer the Debtors and their estates several key benefits, including: (a) certainty that operations will continue in the ordinary course of business during the remainder of these Chapter 11 Cases, (b) an additional $400 million capital injection at emergence that is anticipated to allow the Debtors to satisfy administrative claims in full in cash, and (c) a clearer path to the successful emergence from these Chapter 11 Cases. Importantly, I understand that the DIP New Money Facilities are supported by at least 95 percent of the Debtors' secured claims.

29. Approval of the proposed DIP New Money Facilities is necessary to preserve the value of the Debtors' estates, and the economic terms of the proposed DIP New Money Facilities, taken as a whole, are reasonable under the circumstances of these Chapter 11 Cases.

**Conclusion**

30. Because the Debtors' access to the proposed DIP New Money Facilities is fundamental to the Debtors' continued business operations and the success of these Chapter 11 Cases, I believe that the relief requested in the DIP New Money Motion is necessary and appropriate and should be approved by this Court.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

PJT PARTNERS LP

Dated: May 6, 2024

*/s/ James H. Baird, III*
Name: James H. Baird, III
Title: Partner